# EXHIBIT 10
**Redacted Version of
Document Sought to be Sealed**

# Exhibit A

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Austin Schwing
Direct: +1 415.393.8210
Fax: +1 415.374.8458
ASchwing@gibsondunn.com

**HIGHLY CONFIDENTIAL–ATTORNEYS EYES ONLY**

July 15, 2022

<u>VIA JAMS ACCESS</u>

Special Master Daniel B. Garrie
DGarrie@jamsadr.com

Re:     *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, 3:18-md-02843

Dear Special Master Garrie:

Simon Cross testified in a Rule 30(b)(6) deposition on four broad topics with subtopics, including the development of friend sharing, the decision to whitelist third parties, types of user data shared with or made available to third parties, and tracking of data sent to and from third parties. Each of these extremely broad topics span a 15-year period. Here, Facebook has consistently expressed its concern about the overbreadth of the topics. *See* Ex. A (6/16/22 Corr.); Ex. B (5/28/22 Corr.). "While a corporation must make a good faith effort to prepare a Rule 30(b)(6) witness . . . that task becomes less realistic and increasingly impossible as the number and breadth of noticed subject areas expand." *Mailhoit v. Home Depot U.S.A., Inc.*, 2012 WL 12884049, at *2 (C.D. Cal. Aug. 27, 2012). "An overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task." *Id.* Nevertheless, Mr. Cross prepared extensively for his deposition. He met with attorneys over fifteen times, met with over a dozen employees at the company, and independently spent numerous hours studying documents. In total, Mr. Cross spent approximately 100 hours preparing for his deposition, which required him to spend significant time away from his job duties. He testified for nearly 28 hours on the record over the course of five days. Not surprisingly, he could not answer *every* question over the course of five days, but that is not required and such an expectation is unreasonable. The standard for a Rule 30(b)(6) deposition is not "perfection." *See QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 691 (S.D. Fla. 2012) ("Absolute perfection is not required of a Rule 30(b)(6) witness."). Nor are such depositions supposed to be a "memory contest." *Goldie v. the Harford Ins. Co.*, 2006 WL 8451352, *2 (C.D. Cal. Feb. 2, 2006). Facebook has met its obligations under Rule 30(b)(6), but Plaintiffs nevertheless seek additional information in this seemingly never-ending deposition. It needs to end, and Facebook requests the Special Master's assistance to end it.

In advance of the Special Master's June 24 hearing, Plaintiffs identified 11 issues on which they seek additional written or oral testimony. Plaintiffs further indicated that they desired to furnish an unidentified number of questions relating to those 11 topics by June 28,

HIGHLY CONFIDENTIAL–ATTORNEYS EYES ONLY

an proposed a mere 48-hour turnaround for Facebook to provide substantive responses. At the June 24 hearing, Facebook asked the Special Master for assistance in finding "a reasonable path forward for the 30(b)(6) depositions," noting its willingness to compromise on appropriately tailored additional testimony, but that Facebook should not be placed in an impossible position of answering whole new sets of questions. *See* June 24 Hr'g Tr. at 9:14-11:8. *See* Ex. D. Further, Facebook noted that Plaintiffs' requested 48-hour turnaround time was unreasonable.

The Special Master provided guidance at the June 24 hearing. First, the Special Master said that Plaintiffs' proposed schedule was unworkable, noting that Facebook should have "two weeks minimum" to respond to questions. *See id.* at 19:15-17; 29:13-16. *See* Ex. D. Second, the Special Master instructed that the number of questions should be limited and should be focused on questions that were asked of Mr. Cross that he did not answer. The Special Master similarly told the parties that "[t]his isn't a whole new round of [questions]," *id.* at 19:25-20:1, and "[i]f it turns out that it's a field-of-dreams thing[], it will be axed." *Id.* at 29:11-12. *See* Ex. D.

Plaintiffs did not heed the Special Master's instructions. Plaintiffs instead sent Facebook **143 questions** inclusive of sub-parts. Plaintiffs never indicated during any meet and confer or during the June 24 hearing that they intended to send such an exhaustive list of questions after taking five full days of deposition testimony. It is baffling to surmise how Plaintiffs would have expected Facebook to ever be able to substantively respond to each of these questions within 48 hours, Plaintiffs' initial request that the Special Master declined. Despite the excessive and improper questions, in the interest of compromise and cooperation, Facebook nevertheless agreed to respond in writing to 57 of Plaintiffs' questions, which Facebook provided to Plaintiffs on July 13 in the form of a chart. Ex. C. It took a full two weeks for Facebook to analyze and respond to these questions. The chart at Exhibit C sets forth Facebook's substantive response to many of Plaintiffs' follow-up questions. And, when Plaintiffs indicated on July 14 that they had five follow up questions in response to those detailed answers, Facebook agreed to provide additional information. *See* Ex. E (7/15/22 Corr.).

Facebook has more than met its discovery obligations, and it should not be required to respond to the rest of Plaintiffs' numerous proposed questions. Facebook's chart at Exhibit C sets forth the nature of its objections to Plaintiffs' improper questions. In particular, many of the questions were never asked of Mr. Cross during his deposition; many of the questions Mr. Cross has already sufficiently answered; several questions call for such volume of information and granularity of detail that they are in actuality interrogatories in disguise and would be

Special Master Daniel B. Garrie
July 15, 2022
Page 3

HIGHLY CONFIDENTIAL–ATTORNEYS EYES ONLY

impossible to respond to within two weeks (if at all); some of Plaintiffs' questions call for irrelevant information; and some of the questions fall outside the scope of Plaintiffs' topics entirely. Below is a small sample of problems in Plaintiffs' list of questions, which were more fully explained to Plaintiffs in Exhibit C.

*Many of the requests are questions Plaintiffs never asked.* The Special Master said that Plaintiffs should focus on questions that were asked in the deposition, and should provide citations to where they were asked, and Plaintiffs agreed. June 24 Hr'g Tr. at 26:25-27:3; 29:1-5. *See* Ex. D. But Plaintiffs have gone far beyond that, and for many of the questions they provide no deposition transcript citation at all. Plaintiffs instead are demanding responses to questions that they never raised, or forgot to ask, in direct contradiction of the Special Master's instructions. Plaintiffs ask, for example, for *oral testimony* on whether, as of 2018, Facebook knew the full access of partners to all existing Private APIs (*see* Ex. C at 39); whether, as of 2018, Facebook tracked the contracts and applicable contractual obligations relevant to access friend data (*see id.*); what Facebook did (apart from ADI) to investigate how apps with access to non-public friend data after 2014 exceeded the use case (*see id.* at 35); and whether Facebook did anything beyond its usual enforcement efforts to determine whether entities with access to non-public friend information after May 2015 exceeded the use case (*see id.* at 36). Plaintiffs do not include transcript citations for these questions, because none exist, and the point of this exercise was not for Plaintiffs to dream up new questions they never asked. Plaintiffs are using their follow-up questions to carry out exactly what the Special Master instructed against: asking a "whole new round of [questions]." June 24 Hr'g Tr. at 19:25-20:1. *See* Ex. D. Facebook objects to Plaintiffs stating new questions, effectively attempting to exceed the limitations on interrogatories.

*Mr. Cross has already sufficiently answered several of the questions during his depositions.* For example, Plaintiffs ask whether there are any documents that explain the final risk level taxonomy and if so what they are (Mr. Cross answered this at Cross Tr. at 1072:8-1073:12) (*see* Ex. C at 19); and why third parties that received extended or exempted access to friend information after 2017 received that access (Mr. Cross testified to this extensively, explaining that whitelisting decisions were made on a case-by-case basis, "based on whether or not the user experience would be broken if the deprecation timeline was followed or whether or not there would be other risks for the developer of the deprecation being enforced on the general time frame," and that revenue was not taken into account in making whitelisting decisions. *See* Cross Tr. at 562:15-24, 188:7-12, 192:3-9, 186:2-191:15, 1179:12-1181:22, 1207:5-11, 1208:5-1213:22, 1171:5-10 (*see* Ex. C at 20). In fact, an entire section of re-direct was dedicated to this line of questioning, and Plaintiffs recently served an interrogatory request seeking the same information. Plaintiffs cannot keep repeatedly asking the same questions

# GIBSON DUNN

HIGHLY CONFIDENTIAL–ATTORNEYS EYES ONLY

just because they do not like the responses they received. Mr. Cross has answered these questions. Plaintiffs should not be permitted to keep ask questions Mr. Cross has already answered.

*Several of the questions ask for an unduly burdensome amount of information and detail not appropriate for a deposition.* Plaintiffs ask, for example, for Facebook to list the ways, other than via Platform or email, that Facebook provided user data for third parties and for each such way—and for email—to identify the type of information made available, the recipients of the information, and the time period for which that type of information was made available for third parties (*see* Ex. C at 4) (emphasis added). Mr. Cross already testified that the Developer Platform was the primary way that third parties would have received user information. *See* Cross Tr. at 741:4-7 (*see* Ex. C at 4) He simply commented that he could not rule out the possibility that some information may have been shared with third parties through an email or some other way. *See id.* at 740:23-741:7. In other words, it isn't possible for him to know what information, *if any*, someone may have emailed, and it would be a wild goose chase of epic proportion for Facebook to try to review everyone's emails to see if anyone ever sent anything through that means. And Facebook has already produced numerous documents from many custodians in this case, so Plaintiffs can review them for themselves if they so desire. Setting aside the enormous and disproportionate burden of attempting to identify all recipients of all information and all emails where user data might possibly have been shared with third parties (an impossible undertaking), this case is about sharing *friend data* through the Developer Platform, *not any and all user data of any sort*. Plaintiffs also propose to ask several questions relating to specific apps' access to friend data and when such access ended, as well as why certain specific apps received access to particular Private APIs, essentially requesting Facebook—within two weeks—to conduct an enormously burdensome app-by-app analysis that was never contemplated during the deposition and is not an appropriate line of questioning for a Rule 30(b)(6) witness. *See id.* at 18-20, 22-28. In addition to these questions asking for an unduly burdensome amount of information and detail not appropriate for a deposition, these questions also were not asked during Mr. Cross's deposition.

*Plaintiffs are asking questions that call for irrelevant information that falls outside the scope of Plaintiffs' case.* During Mr. Cross's deposition, Plaintiffs asked Mr. Cross about "data logging structure[s] built more recently . . ." called the "CAN" and "DID" tables. *See* Cross Tr. at 758:2-7. Mr. Cross testified that these tables were built in around 2019 and become operational sometime in 2020. *Id.* at 759:3-4; 764:21-25. Mr. Cross's testimony makes clear that these tables contain data *after friend sharing was deprecated and accordingly do not contain data during the relevant time period in this case*. Plaintiffs nevertheless ask at

HIGHLY CONFIDENTIAL–ATTORNEYS EYES ONLY

least thirteen questions relating to the CAN and DID tables. Facebook has already responded to some of those questions in writing, including confirming that the CAN and DID tables do not contain information concerning the time period before they became operational (*see* Ex. C at 5, 6), that the oldest data available in those tables dates back to July 21, 2020 (*see id.*), and the specific provisions of which FTC consent decree(s) the Tables were developed in response to (*see id.* at 1). Accordingly, Facebook's written responses make clear that the CAN and DID tables fall outside the scope of Plaintiffs' case and are irrelevant. Facebook should not be required to respond to any further questions relating to the CAN and DID tables; and for the same reasons, production of those tables is unnecessary.

*Plaintiffs are asking questions beyond the scope of Mr. Cross's topics.* Plaintiffs continue to ask questions that go beyond the scope of their noticed topics for Mr. Cross. For example, Plaintiffs propose several questions relating to Facebook's enforcement efforts and specific questions about ADI, questions better suited for the witness Facebook is making available regarding ADI (*see* Ex. C at 32-33). Facebook has already designated a 30(b)(6) witness to testify as to ADI and offered dates to Plaintiffs. There is simply no reason why Mr. Cross should also be asked questions relating to ADI (an issue he is not designated on). Setting aside the fact that these questions clearly fall outside the scope of Mr. Cross's topics, Plaintiffs furthermore did not ask questions specifically about ADI during Mr. Cross's deposition. Plaintiffs also ask what Facebook's "position" is on whether there was a breach of trust relating to friend data or whether it made a mistake relating to providing access to friend data after May 2015, questions that call for legal contentions and that go beyond Topics 6 and 7 (which relate to the "development" of friend sharing and the "decision" to whitelist particular apps or partners) (*see id.* at 30). Plaintiffs cannot belatedly rewrite the topics to capture anything and everything relating to friend data.

Finally, with respect to Topics 6 and 7 in particular, Plaintiffs have submitted 20 proposed questions on which they want oral testimony, all of which are improper for the reasons set forth in Exhibit C (*see* Ex. C at 33-41). In the event Facebook is required to provide additional testimony beyond what it has agreed to do in Exhibit C, Facebook reserves the right to answer orally or in writing. Further, the current schedule will not be workable. Facebook would need more than a month to answer the questions. Facebook respectfully requests the Special Master to limit these follow-on questions as he indicated would be appropriate at the June 24 hearing. Mr. Cross has already testified for nearly 28 hours on the record over five days, and Plaintiffs will depose him again in his personal capacity on September 7. They can ask him follow up questions at that time. Additionally, Facebook has already designated 14 individual 30(b)(6) witnesses who have provided over 70 hours of testimony on the record to date, with an additional nine more 30(b)(6) depositions scheduled in the coming weeks.

# GIBSON DUNN

HIGHLY CONFIDENTIAL–ATTORNEYS EYES ONLY

Plaintiffs do not need to prolong this particular 30(b)(6) deposition any further. That is especially true given that Facebook has now answered an additional 57 questions in writing, a significant undertaking that took the better part of two weeks.

Ultimately, Plaintiffs should not be allowed to transform this deposition process into an abusive set of super interrogatories and questions that they never asked, that Mr. Cross has already sufficiently answered, that call for information not relevant to Plaintiffs' claims, or that are outside the scope of the deposition. What Plaintiffs submitted—essentially a laundry list of written questions that cannot possibly all be answered within two weeks, and that could not possibly be answered by *any* 30(b)(6) witness regardless of how prepared or educated—is improper tactic designed to force Facebook to miss a deadline in an attempt to engineer another sanctions motion. Facebook respectfully requests the Special Master to deny Plaintiffs' request for additional deposition testimony. Five days of testimony and 57 responses to written questions is enough.

Sincerely,

*/s/ Austin Schwing*
Austin Schwing

cc:    Matt Melamed, Derek W. Loeser

# Exhibit A

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Austin Schwing
Direct: +1 415.393.8210
Fax: +1 415.374.8458
ASchwing@gibsondunn.com

June 16, 2022

**VIA ELECTRONIC MAIL**

Lesley Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Re:     *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Dear Counsel:

We write in response to your June 13 correspondence, in which you described subject matter you plan to discuss with Mr. Cross during the fourth day of his 30(b)(6) deposition on June 20, as well as in response to your June 14 correspondence, in which you listed issues Mr. Cross purportedly "was not prepared to testify about."

With regard to the subject matter you plan to discuss with Mr. Cross during his fourth 30(b)(6) deposition session, we again reiterate the extensive preparation Mr. Cross has undergone in order to testify to the best of his ability at each of his depositions. As of the last time we wrote you, Mr. Cross had spent over 60 hours preparing for the topics he has been designated to testify on. And he has provided extensive testimony. As just one example, he has testified as to Topic 7—a topic Plaintiffs initially estimated would take one hour to cover—over the course of multiple days of testimony. We are continuing to work with Mr. Cross to prepare him. But of course, "[a]bsolute perfection is not required of a Rule 30(b)(6) witness." *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 691 (S.D. Fla. 2012). This is particularly true, as here, Plaintiffs' topics are incredibly broad and complex. *See Mailhoit v. Home Depot U.S.A. Inc.*, 2012 WL 12884049, at *2 (C.D. Cal. Aug. 27, 2012) (educating a witness becomes "increasingly impossible as the number and breadth of noticed subject areas expand.") (quoting *Apple, Inc. v. Samsung Elecs., Co.*, 2012 WL 1511901, at *2 (N.D. Cal. Jan. 27, 2012)). We remain concerned that Plaintiffs' topics are overbroad and do not, with "painstaking specificity," outline the particular subject areas that are intended to be questioned, as required by Rule 30(b)(6). *Id.*

# GIBSON DUNN

Regarding Topic 2, as described in our May 28 and June 2 correspondence, Mr. Cross will be prepared to identify, by category, the types of data or information Facebook made available to third parties (not including advertisers) through the Facebook Platform. Mr. Cross will also be prepared to discuss generally the steps the Platform Integrity team undertook to detect misuse. We believe that this description is consistent with what you appear to be seeking in your June 13 email correspondence; but for avoidance of doubt, Mr. Cross will only be prepared to testify on these matters insofar as the subject matter is at issue in this case. As you know, this case is not about every type of user-related data.

Regarding Topic 8, Mr. Cross will be prepared to provide, as you have requested, *an overview* on each of the Capabilities Tool and Method Table documents you identified, as well as discuss the additional subject matter outlined in our May 28 correspondence, including how data provided to third parties (not including advertisers) through the Facebook Platform is tracked; the extent to which, if at all, third parties (not including advertisers) are required to pay for access to data or information via the Facebook Platform; the mechanisms by which data or information was transferred from third parties (not including advertisers) back to Facebook; and whether Facebook charged for Facebook Platform API usage. Mr. Cross will not be prepared to meticulously testify as to specific information contained in every specific row or entry, or as to detailed minutiae in the aforementioned tables; nor do we believe that a 30(b)(6) designee could ever be expected to do so. Your correspondence indicates that you share that understanding

With regard to your June 14 correspondence, we have several concerns about the issues you claim Mr. Cross supposedly "was not prepared to testify about." I explained these concerns to you during our meet and confer on June 16.

### When, if ever, Facebook deprecated all APIs that emit friend data.

This is a very broad and complicated topic. The answer also changes depending on, for example, how "friend data" is defined—for example, there are still public pages that emit "friend data," but we do not believe that this is the type of sensitive data relevant to this case; and as you know, this case is not about every type of user-related data.

Mr. Cross has invested hours into becoming educated on this issue. Mr. Cross testified with examples, explaining—for instance—that "in April 2018 the . . . comments and likes edge . . . was removed from . . . several of those APIs, and the groups and events APIs have since been modified so that they only emit data of people who have authorized the application." Cross 30(b)(6) Tr. at 513:11-18. But there are many APIs, and Mr. Cross cannot be expected to know or memorize a full list of APIs, as Mr. Loeser asked of Mr. Cross during his last deposition. *See id.* at 512:2-11; 513:3-9 (asking whether Mr. Cross knew "offhand" whether

all or any of a "relatively large list of APIs" had been deprecated). Rule 30(b)(6) is not designed to be a memory contest. *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 539 (D. Nev. Mar. 24, 2008) (internal citation omitted). Those sorts of questions are better suited to written discovery. Mr. Cross will be prepared to provide additional information on this issue at his next deposition. If Plaintiffs believe gaps remain after his next deposition, we can discuss the possibility of other means of providing this information to Plaintiffs, for example in an interrogatory response or other written correspondence, if warranted.

> **Factors that led Facebook to deprecate APIs that emit friend data after the Cambridge Analytica scandal.**

Facebook disagrees that another witness is necessary to testify on this issue. Mr. Cross will be prepared to speak to this at his next deposition.

> **Whether Facebook believed it was a breach of trust and a mistake to allow apps to continue having access to friend data after publicly stating that apps no longer would have access to this data.**

This issue calls for a legal conclusion, is argumentative, and is an improper question for a 30(b)(6) witness. *See Snapp v. United Transportation Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) ("[A] Rule 30(b)(6) deponent's own interpretation of the facts or legal conclusions do not bind the entity") (internal citation omitted). You asked Mr. Cross about an email by an employee's, Jackie Rooney's, "Suggested Guidance" that had this language. Mr. Cross was not put forward to discuss this topic. Nor is this issue part of Plaintiffs' Topics 6 or 7, which seek information about the "***development*** of Friend Sharing," including its purpose, how it functioned, and the revenue impact and net profits for Facebook relating to friend sharing (Topic 6); and the "***decision to whitelist particular apps or partners***," including identifying whitelisted entities, payments Facebook received for permitting whitelisting, and identification of those with decision-making responsibility regarding whitelisting (Topic 7).

> **Whether Facebook calculated or tracked revenue associated with third parties that had access to friend data.**

As we discussed during our meet and confer today, this issue, as drafted, attempts to re-write Plaintiffs' Topic 6, which instead calls for testimony relating to "the revenue impact and net profits for Facebook ***relating to*** Friend Sharing throughout the Class Period" (emphasis added). In other words, Topic 6 asserts a causal link between friend sharing and revenues derived from such friend sharing, whereas the issue Plaintiffs raise now—revenue of third parties who had access to friend data—does not include that same causal link and essentially

asks for Facebook's financial books and records (which, again, would be impossible for Mr. Cross to know or memorize). In short, this topic is not covered by the deposition notice.

> **Whether Facebook evaluated or in any other manner took into account revenue received from partners when deciding whether to whitelist or otherwise allow partners to have access to APIs that emit friend data after 2014.**

Mr. Cross has already testified as to the factors Facebook took into account when deciding whether to whitelist (e.g. to avoid disturbing the user experience), and has further testified that, after speaking with several individuals at the company, including Ime Archibong, Francisco Varela, and Eddie O'Neil, "none of them represented . . . that revenue was . . . a driver in the decision-making." *Id.* at 540:11-541:4. Plaintiffs are welcome to ask Mr. Cross additional follow-up questions, but we believe the record is already clear.

> **The revenue received after 2013 from apps/developers/partners that were whitelisted or otherwise allowed to have access to APIs that were publicly deprecated after Graph API V.1.**

As discussed during our meet and confer, this request improperly attempts to rewrite the deposition notice. Specifically, Topic 7 seeks testimony relating to "[t]he most efficient way to establish payments, revenues, exchanged value, actual promised, Facebook received *for permitting Whitelisting capabilities*, and the revenues and net profits Facebook recognized *related to Whitelisting* . . ." (emphasis added). Thus, the topic presumes a causal link between whitelisting and revenues derived from such whitelisting, whereas the issue Plaintiffs raise here—any revenue received after 2013 from apps, developers, and partners that were whitelisted (regardless of the reason)—does not include that same causal link and essentially asks for Facebook's financial books and records (which, again, would be impossible for Mr. Cross to know or memorize). During our meet and confer you acknowledged that Mr. Cross cannot be expected to know this information.

We wish to reiterate Mr. Cross's extensive preparation on these broad deposition topics. Please let us know if you have any questions or wish to discuss further in advance of Mr. Cross's next deposition.

We look forward to seeing you on June 20th.

**GIBSON DUNN**

Lesley Weaver
Derek W. Loeser
June 16, 2022
Page 5

Sincerely,

*/s/ Austin V. Schwing*
Austin V. Schwing

AVS/tm

Exhibit B

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Austin Schwing
Direct: +1 415.393.8210
Fax: +1 415.374.8458
ASchwing@gibsondunn.com

May 28, 2022

**VIA ELECTRONIC MAIL**

Lesley Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Re:  *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Dear Counsel:

To ensure that Simon Cross's next 30(b)(6) deposition proceeds in a productive and efficient manner, we write again to explain our understanding of his designated topics and to ask that the parties try to resolve any confusion or disagreement in advance.  Specifically, if there is any remaining confusion or disagreement, we ask that you let us know sufficiently in advance of the next deposition so that we may meet and confer and, as necessary, seek assistance of our mediators and/or Special Master Garrie.  We want the remaining 30(b)(6) depositions to go smoothly and offer this summary in the spirit of achieving that mutual goal.

Mr. Cross is designated to testify on Topics 6, 7, 8, 2(a), 2(c) and 2(d), with certain exceptions explained below.  Mr. Cross testified on Topics 6 and 7 during his first two days of deposition, so we begin with those topics.

**Topic 6.**  Mr. Cross was designated to testify on Topic 6, except as it relates to communications to Users about friend sharing (including any communication via Facebook's Terms of Service, SRR, and/or Data and Privacy Policies related to friend sharing), which is being covered by Ms. Hendrix.  *See, e.g.*, Hendrix 30(b)(6) Tr. at 23:24-24:17.

Specifically, Mr. Cross was designated to testify about the technical aspects of friend sharing, including (1) the technical development of friend sharing, (2) the purpose of friend sharing, and (3) the revenue and net profits (if any) Facebook attributed directly to friend sharing.  Plaintiffs' notice does not define "friend sharing," but Facebook understands this

**GIBSON DUNN**

term to refer to permissions related to how third-party app developers and/or integration partners access the Information or Data of a User's friends.

Accordingly, Mr. Cross was prepared on and testified to the following issues, among others, during his first two days of deposition:

- Inception of friend sharing via friend permissions, including when it was developed and how it functioned over time (*see, e.g.*, Cross 30(b)(6) Tr. at 71:11-16);

- Inception of Graph API and how it evolved over time, including the reasons for such evolutions (*see, e.g.*, *id.* at 40:1-44:6);

- Definition of friend sharing (*see id.* at 68:17-70:7);

- Purpose of friend sharing (*see id.* at 70:13-71:4);

- Definition and function of integration partners (*see id. at 52:2-21*);

- Facebook Users' decision-making as to whether certain apps or integration partners obtained access to that User's friend data. *See, e.g.*, *id.* at 82:25-83:18;

- How Facebook made Data accessible to developers (including integration partners) to allow them to build applications (*see, e.g.*, *id.* at 52:22-55:23; 195:19-196:4);

- Permissions associated with friend sharing (*see, e.g.*, *id.* at 72:7-74:25);

- How friend-sharing technology functioned, including developers' access to Data through Graph API (versions 1, 2, and 3), as well as REST API and FQL (*see, e.g.*, *id.* at 38:20-39:25; 86:5-88:4);

- Reasons behind the transition to Graph API version 2 as that transition related to the deprecation of friend permissions (*see, e.g.*, *id.* at 41:24-46:18; 253:18); and

- Revenue impact, if any, that deprecating friend permissions had on Facebook (which is different and distinct from valuing User Data, a topic Mr. Cross was not designated for) (*see, e.g.*, *id.* at 66:20-67:14; 147:3-10).[1]

During his first two days of deposition, Mr. Cross provided detailed answers to your questions, often helping to frame questions more precisely in ways that you repeatedly

---

[1] On May 9, Plaintiffs' counsel asked Mr. Cross about "an analysis that [Mr. Cross had] seen of the impact of the Platform changes that were proposed," but Mr. Cross could not remember the document specifically. *See* Cross 30(b)(6) Tr. at 146:25-147:18. The document Mr. Cross was thinking of is FB-CA-MDL-01813453.

indicated was helpful. *See, e.g.*, Tr. 33:9-11 ("Q. Thank you. You've helped me understand any number of documents I have reviewed now. That's helpful information."); Tr. 54:14-15 ("Q. And, again, this clarification is really helpful."); Tr. 101:7-10 ("I've asked you some questions about the different permissions, and you've provided some helpful information about the terminology used to discuss different permissions.")

There were also instances where Mr. Cross could not answer your questions, or could not answer them with a simple "yes" or "no," which you suggested was because he was not adequately prepared or was being evasive. Mr. Cross's preparation was extensive, lasting many hours over several sessions, and it is not accurate to accuse him to being evasive because he does not believe that a question can be answer in a single word. In the interest of trying to avoid the same issues going forward, we wish to share, and discuss if you would like, a few examples of what we mean.

Plaintiffs introduced emails and documents, which Mr. Cross was not copied on and had not drafted, and asked him to explain what the authors meant. Even though these types of questions fall outside the scope of a 30(b)(6) deposition, Mr. Cross did his best to answer them in his personal capacity. That said, it is not reasonable or fair to expect Mr. Cross to get into the minds of other people to explain what they meant in emails and documents. *See, e.g.*, *id.* at 76:12-21 (asking what KP (a former employee) was referring to when he wrote the term "identity data" in a 2013 e-mail); 77:3-25 (asking Mr. Cross to make "reasonable interpretations" or "fair interpretations" of language in an e-mail); 78:1-4 (similar); 277:22-278:12 (asking Mr. Cross whether information in an email "suggest[s] to you" that Konstantinos Papamiltiadis believed that a "framework" for "sorting partners into buckets" was one that had been proposed by Jackie Chang); 279:4-280:1 (asking whether Mr. Cross could confirm, on behalf of Facebook, whether Konstantinos Papamiltiadis was making certain recommendations with respect to a "framework" articulated by Jackie Chang based on language in an email).

Plaintiffs also asked Mr. Cross questions on topics for which Facebook had designated other witnesses and advised Plaintiffs of that designation. For example, Plaintiffs asked questions about whether apps use User Data for advertising, *see id.* at 138:11-17, and whether Facebook did any financial analysis of the value of User Data it makes available to Third Parties, *see, e.g.*, *id.* at 144:18-145:1; 146:3-6. These questions fall squarely into topics for which Facebook designated other witnesses and informed Plaintiffs of those designations: Isabella Leone for targeted advertising (see below), and Amy Lee for "how Facebook quantified the value of sharing User Data" as part of Topic 10.

**Topic 7.** Mr. Cross was designated to testify on Topic 7, which covers Whitelisting as

Facebook used the term after the public deprecation of Graph API v1 (as opposed to the broader industry-wide use of the term), including (1) the purpose of Whitelisting, (2) the entities Facebook Whitelisted after announcing its decision to publicly deprecate friend permissions in Graph API v. 1, (3) the Data and Information that Users could permit Whitelisted entities to access, (4) the period of time entities were Whitelisted after the public deprecation of Graph API version 1, (5) the processes and practices undertaken to ensure that these Whitelisted entities complied with their relevant use cases, (6) the individuals or functions within Facebook who had decision-making authority related to adding or removing third-party entities to the Whitelist after the public deprecation of Graph API version 1, and (7) any payments, revenues, exchanged value, or benefit Facebook received or recognized related specifically to the decision to Whitelist entities after the public deprecation of Graph API version 1.

Before the depositions, we informed you that Mr. Cross would not be prepared to recount from memory the specific, granular detail contained in call logs, APIs, or permissions granted to any particular entity—indeed, memorizing such information on an entity-by-entity basis would be impossible given the number of developers and applications running on the platform every year between 2007 and 2018. Nevertheless, Mr. Cross provided extensive testimony on Whitelisting, including, among other things:

- What "Whitelisting" is or refers to. *Id.* at 157:13-12; 164:20-165:15. Mr. Cross testified both as to Whitelisting generally and specifically in the context of permissions granted to certain developers after friend sharing was deprecated. *See, e.g.*, *id.* at 167:21-168:5.

- What it means to Whitelist friend-sharing APIs for an app. *Id.* at 158:23-159:9.

- How developers would access publicly deprecated APIs or permissions. *Id.* at 231:20-3.

- Whether there are means other than via Whitelisting for a developer or an app that is not considered a partner of Facebook's to get access to publicly deprecated permissions. *Id.* at 163:4-19.

- How you would identify apps that had been Whitelisted and received deprecated permissions, including testimony regarding the Capabilities Tool. *Id.* at 169:4-8, 172:8-172:21.

- What "Gatekeepers" are, including their function. *Id.* at 170:22-171:10.

- The reasons why Facebook allowed certain partners to obtain friend data after the transition to Graph API version 2. *Id.* at 192:18-194:22; 232:4-233:22.

- The removal of access for Whitelisted apps and the reasons underlying such removal. *Id.* at 240:22-242:21.

As Plaintiffs' counsel acknowledged, he and Mr. Cross had an "obviously lengthy discussion about whitelisting . . . ." *Id.* at 227:13-16.

**Topic 2.** Mr. Cross is designated to testify on Topics 2(a) and 2(c), except as they relate to "targeted advertising" for which Facebook has designated Isabella Leone. "Targeted advertising" is addressed below. Mr. Cross is also designated to testify on Topic 2(d), to the extent it relates to Platform Integrity. As you know, Allison Hendrix was designated to testify as to Topic 2(d) except as it may relate to targeted advertising. *See* Hendrix 30(b)(6) Tr. at 17:15-24. For further avoidance of doubt, Mr. Cross will not testify on Topic 2(b), for which Facebook has designated Ms. Hendrix.

Specifically, Mr. Cross will be prepared to testify on the following issues:

- General categories of User Data shared or made accessible to Third Parties (not including advertisers) through the Facebook Platform ;

- How Third Parties (not including advertisers) are able to access User Data or Information on the Facebook Platform, e.g., via Graph API;

- How developers are able to query specific user data fields to build their apps;

- Process by which an app developer may access non-public User data associated with a specific permission through Graph API;

- The permissions and data points available through Facebook's public APIs;

- Data integration partners and the Data they were able to obtain through the Facebook Platform, and why; and

- Generally the steps the Platform Integrity team undertook to detect misuse.

**Topic 8.** Mr. Cross is designated to testify on Topic 8, except it relates to "targeted advertising," for which Facebook has designated Isabella Leone. "Targeted advertising" is addressed below. Specifically, Mr. Cross will be prepared to testify on the following issues:

- How Data provided to Third Parties (not including advertisers) through the Facebook Platform is tracked;

- The extent to which, if at all, Third Parties (not including advertisers) are required to pay for access to Data or Information via the Facebook Platform;

- Mechanisms by which Information or Data was transferred from Third Parties (not including advertisers) back to Facebook; and

- Whether Facebook charged for Facebook Platform API usage.

On May 6 and May 9, 2022, Plaintiffs identified 55 documents they said they anticipate asking Mr. Cross about during his 30(b)(6) deposition. Mr. Cross has reviewed those documents. Mr. Cross has also reviewed, for example, Facebook's responses to FTC Requests for Information (e.g. FB-CA-MDL-01747399; FB-CA-MDL-00346000; FB-CA-MDL-01747759; FB-CA-MDL-01747773; FB-CA-MDL-01747857); white papers submitted to the FTC (e.g. FB-MDL-01194066); letters to the FTC regarding integration partnerships (FB-CA-MDL-01747655); resources from the Facebook Developer website; prior deposition testimony (e.g. Steve Elia, Mike Vernal, Simon Cross); slides regarding the estimated impact of Facebook ecosystem changes (e.g. FB-CA-MDL-01813453-54); and draft slides discussing criteria for granting Whitelisting exemptions and extensions (e.g. FB-CA-MDL-02007346). Mr. Cross has reviewed and is prepared to testify about these documents, or aspects of those documents, that are within the scope of his designated topics.

**Targeted Advertising**. The parties have agreed to meet and confer on May 31, 2022, regarding the meaning of "targeted advertising" as it relates to the exceptions noted above for Topics 2 and 8. In advance of and subject to the parties' discussions in that meet and confer, Facebook provides this initial response in hopes of facilitating those discussions.

With respect to Topic 2, Facebook understands "targeted advertising" to mean the Data or Information, if any, that "Facebook sold, made accessible, made available, or allowed Third Parties to use to target Users" for the purpose of delivering advertisements to Users on Facebook. Facebook understands that "targeted advertising" is not relevant to Topic 2(d), which applies only to apps and app developers, not to advertising.

With respect to Topic 8, Facebook understands "targeted advertising" to mean the Data or Information, if any, that Facebook received from or provided to Third Parties and Data Brokers for the purpose of delivering advertisements to Users on Facebook [subtopics 8(a) and (b)], and payments, consideration, and evaluation of the benefits of any such exchanges [subtopics 8(c) and (d)].

Facebook reserves the right to revise the above descriptions based on the parties' continuing meet and confer efforts.

We hope that this information is helpful and provides a productive path forward. If you would like to meet and confer on any of these issues, we should do that in advance of Mr.

**GIBSON DUNN**

Cross' final deposition session.

Sincerely,


*/s/ Austin V. Schwing*
Austin V. Schwing

AVS/tm

# Exhibit C

Highly Confidential –
Attorneys' Eyes Only

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| Question | Response |
|---|---|
| *Actions related to tracking user data undertaken in response to the* ▮▮▮▮▮▮ *Questions:* | |
| Facebook's designee testified that the ▮▮▮▮▮ was developed in response to obligations imposed by the ▮▮ ▮▮▮▮▮▮▮ June 20, 2022 Dep. Tr. at 763:24-764:1.<br><br>Which provision of which ▮▮▮▮▮▮▮▮▮ was the ▮▮▮ ▮▮ developed in response to? | The ▮▮▮▮▮▮ were developed in response to ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Facebook's designee testified that it redesigned how apps got access to capabilities around 2018 or 2019 in response to concerns raised by the Cambridge Analytica situation and the ▮▮▮▮▮▮▮▮▮▮ *Id.* at 978:1-25.<br><br>Which provision of which ▮▮▮▮▮▮▮ was this redesign in response to? | There were changes made in 2018 and 2019 in response to numerous factors. Changes continued to be made following the ▮▮▮▮▮▮▮▮▮▮ of which includes specific requirements relating to access by third party apps. |
| Facebook's designee testified that Column AD ("in_scope_for_e1") refers to an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 1086:3-1087:16.<br><br>Which provision of which FTC order does the ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ reference? | ▮▮▮▮▮▮▮▮▮▮ within the ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ |
| ▮▮▮▮▮▮ *and other means to track API calls* | |
| Do the ▮▮▮▮▮ documents produced to Plaintiffs, Bates | Objection. Plaintiffs have not identified a deposition question |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*



| | |
|---|---|
| Nos. FB-MDL-MTHD- 00001-FB-MDL-MTHD-00080, include all available information contained in the ███ ███? | asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. This is a production question that should be directed to Facebook's counsel. |
| Does the ███████ indicate the number of ███ made by each third party for user data? | The ███████ tracks the aggregate number of ███ made by each app per day for each ███ called. |
| From 2007-present, what is the complete list of ways Facebook recorded information about ████████████ ███? | Objection in part. Plaintiffs did not ask this question in the deposition. Plaintiffs asked ████████████████████████ ████████████████████████ ███ 770:18-773:21. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. Subject to this objection, Facebook responds with the following additional information: Facebook has deployed several systematic logging systems for ████████ may include both ███ and third ███ ███ as well as requests involving ███ and those unrelated to ███. In addition to these systematic logging systems engineers have produced records about subsets of ███ in many temporary or single purpose systems for multiple use cases of which there is no complete list. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | In May 2007 Facebook used a logging system producing a table called ▮▮▮▮ for logging ▮▮▮▮▮▮▮▮▮▮▮ information. Facebook does not currently possess the ▮▮▮ ▮▮▮▮▮▮ from this system.  In April 2014 platform API logging migrated to the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ was no longer used for logging. |
| For each, please identify the other types of information, in addition to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, reflected in that way of recording the information. | Objection.  Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer.  Additionally, the question is unclear. |
| *Connecting API methods pertaining to user data to API calls.* | |
| Facebook's designee testified that, when an ▮▮▮▮ is made, there is a system which takes that ▮▮▮▮▮ and determines which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Is there a resource available internally at Facebook that indicates the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ | No, there is not a resource that indicates the API method that is run for each ▮▮▮▮▮▮▮▮▮ can make.  Software code determines what ▮▮▮▮ to run for each ▮▮▮▮. |
| If so, what is the name of that resource? | No such resource exists. |
| Does the resource exist in a form that can be produced as a standalone document? | No such resource exists. |
| If not, can the information in that resource that associates ▮▮ ▮▮▮▮▮▮ be extracted? | No such resource exists. |
| On an annual basis, how many ▮▮▮▮▮▮▮▮▮▮ did Facebook maintain, from 2007-present? | Objection.  Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| *All ways third parties could access user data.* | |
| Facebook's designee testified it's possible Facebook made user data available to third parties over other means than via Facebook Platform. June 20, 2022 Dep. Tr. at 740:18- 744:4.<br><br>Please list the ways, other than via Platform or email, that Facebook provided user data for third parties. *See id.* at 743:12-17 (testimony that Facebook was not aware of any "major ways" other than via Platform and email that Facebook would have shared data with third parties). | <u>Objection</u>. Mr. Cross answered this question. User data was made available through the Developer Platform and he was not aware of any other systematic or major way that user information was provided to third parties. It would not be reasonable or possible to try to talk to thousands of employees (or former employees) over a 15 year period to see if there was ever any minor exception. This case is about sharing friend data through the Developer Platform, not any and all user data of any sort. Any potential minimal relevance of such information is far outweighed by the burden on Facebook of providing such information. |
| For each such way — and for email — please identify by category:<br><br>the type of information made available to third parties;<br>the recipients of the information; and<br>the time period during which that type of information was made available to those recipients in that way. | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Mr. Cross testified user data was made available through the Developer Platform and he was not aware of any other systematic or major way that user information was provided to third parties. It would not be reasonable or possible to try to talk to thousands of employees (or former employees) over a 15 year period or review millions of emails to see if there was ever any minor exception. This case is about sharing friend data through the Developer Platform, not any and all user data of any sort. Any potential minimal relevance of the requested information is |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | far outweighed by the burden on Facebook of providing such information. |
| *For the ▉▉▉▉▉▉▉▉, the columns in those tables, a description of the information contained in those columns, and the time period reflected by the information in each column.* | |
| Do the ▉▉▉▉▉ contain information concerning the time period before they became operational? *Id.* at 759: 5-8 | No. |
| If so, what time period is covered by the data in the ▉▉▉ ▉▉? | The oldest data in the ▉▉▉▉▉ dates back to July 21, 2020. |
| Was there anything preventing the ▉▉▉▉▉ from being created before 2019? Id. at 759:12-761:25 | Yes. |
| If so, what prevented the ▉▉▉▉▉ from being created before 2019? | Facebook could not create these records earlier because it did not have the code and infrastructure in place to do so. Facebook developed the code and infrastructure to create the ▉▉▉▉▉ in response to the ▉▉▉▉▉ requirements. Significant engineering resources were needed to invent the framework to produce these records in light of the particular ▉▉▉ requirements. <br><br> In particular, the ▉▉▉▉▉▉▉ was developed by multiple software engineers and other technical professionals. Work began on developing the ▉▉▉▉▉▉▉ in August 2019, and subsequent improvements continue to the present day. <br><br> To create the ▉▉▉▉▉▉, Facebook had to invent a system to allow the ▉▉▉▉▉▉▉▉▉▉▉ |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | ███████████████████████████████ |
|---|---|
| For each thing identified as preventing the ████████ from being created before 2019, please identify the time period for which that thing would have prevented the ████████ from being created. | It would not be possible to have the ████████ operational at any time prior to the code and infrastructure being in place. The oldest data in the ████████ goes back to July 21, 2020. |
| Please identify each column in the ████████. *See id.* at 762:14-763:7 | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. Additionally, this question seeks irrelevant information. The ████████ does not contain data during the relevant time period in this case. |
| For each column, please describe the information it contains. | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. Additionally, this question seeks irrelevant, burdensome information. The ████████ does not contain data during the relevant time period in this case. |
| Do the ████████ contain information concerning the time period before they became operational? | No. |
| If so, what time period is covered by the data in the ████ ████? | The oldest data available in the ████████ dates back to February 16, 2020. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| Was there anything preventing the ███████ from being created before 2019? | Yes. |
| If so, what prevented the ███████ from being created before 2019? | The oldest data available in the ███████ dates back to February 16, 2020. |
| For each thing identified as preventing the ███████ from being created before 2019, please identify the time period for which that thing would have prevented the ███████ from being created. | Facebook could not create these records earlier because it did not have the code and infrastructure in place to do so. Facebook developed the code and infrastructure to create the ███████ in response to the ███████ requirements. Significant engineering resources were needed to invent the framework to create these records.<br><br>In particular, the ███████ was developed by multiple software engineers and other technical professionals. Work developing the ███████ began in August 2019 and continues to the present day.<br><br>The ███████ required the invention of an approach to ███████ |
| Please identify each column in the ███████ *See id.* at 766:6-767:11; 786:10-786:25. | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

|  |  |
|---|---|
|  | Additionally, the ███████ does not contain data during the relevant time period in this case. |
| For each column, please describe the information it contains. | <u>Objection</u>.  Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer.  *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question seeks irrelevant, burdensome information.  The ███████ does not contain data during the relevant time period in this case. |
| *Ways other than Facebook Login for Third Parties to access user tokens.* | |
| Facebook's designee testified that Facebook Login is the "primary" way by which apps get an access token for a user. June 20, 2022 Dep. Tr. at 874:3-5. It also testified that ███████ is another way for ███████ t███. Id. at 875:18-876:1. What other ways did ███████ for users, from 2007-present? | Facebook is aware of the following additional ways that third parties would be able to access user tokens from 2007 to present:<br><br>(1) Third Parties were also able to get access tokens for users vis-a-vis other login APIs that behave identically to ███████" For example, Third Parties were able to get access tokens via the Graph API variant of ███████ via ███████" and via the Graph API variant of "███████ Some iOS- and Android-specific variants also allowed native iOS and Android apps to obtain a ███████ from the Facebook app on the user's device via the first-party Facebook app calling those APIs and passing the ███████ obtained from the API back to those apps locally. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | (2) Tools on "developers.facebook.com" (e.g. Graph API Explorer and App Dashboard) provide developers with their own personal access ███████ . <br> (3) Test user APIs give ████████ for test users created by an app. |
| What was the time period during which ████ ████ could get ████████ in that way? | <u>Objection</u>.  Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer.  Plaintiffs did not ask this question of the methods Mr. Cross identified.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| What categories of ████████ could get ████████ in that way? | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer.  Plaintiffs did not ask this question of the methods Mr. Cross identified.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| Why did Facebook enable ████████ to get ████████ in that way? | <u>Objection</u>.  Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer.  Plaintiffs did not ask this question of the methods Mr. Cross identified.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| If Facebook stopped enabling ████████ to get ████████ | <u>Objection</u>. Plaintiffs have not identified a deposition question |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| in that way, why? | asked that Mr. Cross did not answer. Plaintiffs did not ask this question of the methods Mr. Cross identified. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| *Follow-up questions regarding the Capabilities Tool* | |
| Facebook's designee testified that, before the Capabilities Tool existed, Facebook used a tool called Pearly Gates to manage some API whitelists and ███████████████████ ████████████. June 20, 2022 Dep. Tr. at 944:14-23. <br><br> Does Facebook still have all of the information that was contained in Pearly Gates? Id. at 945:1-7. | It is Facebook's understanding that "Pearly Gates" refers to the same tool as the "Capability Tool." In other words, Pearly Gates was renamed the Capability Tool. The information associated with the Capability Tool has already been produced in this action. |
| If so: Where is that information now kept? | As stated above, Facebook's understanding is that Pearly Gates was renamed the Capability Tool, and that the information contained in Pearly Gates is therefore also in the Capability Tool (which has already been produced in this action). |
| If not: Does Facebook have any of the information that was contained in Pearly Gates? | See above. |
| If so (if Facebook has any information in Pearly Gates), what types of information does Facebook have, where is that information kept, and what time period does it reflect? | See above. |
| For any information that was contained within Pearly Gates | See above. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| that Facebook no longer has, when did Facebook delete, destroy, or otherwise lose access to that information? | |
| Facebook's designee testified that the Capabilities Tool changed to ███████████ ████████████████ Id. at 952:13-953:20. When did this change occur? | This change occurred in May 2018. |
| Facebook's designee testified that there's a list of ████████ ████████████████████████ How many action types exist? Id. at 958:2-19. | There are ██ distinct values for the ████████ column in the log table. |
| Facebook's designee testified that the ██████████ ██████████████ called the ██████████. How long has the Launch Manager been used at Facebook? Id. at 960:17-963:10. | ████████████ started being used for ██████ reviews in January, 2019. Accordingly, it has been used at Facebook for the last approximately three years. |
| Facebook's designee testified that it was not sure what the ██████████████ column tracks. What does that column track? Id. at 963:14-20. | This is the identifier of an app developer (Facebook user) who accepted or declined an invitation to use a capability via their app's dashboard on developers.facebook.com |
| What is the type of information is identified by column B, '████ Id. at 969:2-19. | A ████ is a unique identifier for every ████ of the ██████ ████ The ████ column is the primary identifier of the grant. |
| Facebook's designee testified repeatedly that numerous columns were added to this document in or around 2018 or 2019. For each, what was the reason it was added at or around those dates? | Objection. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| How are the entries in Column G, ███████████ populated and filled? June 21, 2022 Dep. Tr. at 1020:9-1021:1. | ██████████████ is supplied by the person or team creating the capability in human readable form via ███████ review submission. |
| Who is responsible for entering the text in Column H, "████████████"? Id. at 1021:7-20. | "██████████ is created by an internal user of the Capability Tool when creating a new capability. |
| Why is Column H blank for certain entries? Id. at 1021:21-1022:13. | This column may be blank for recently created capabilities as it has been superseded by the "████████████████ and ████████████████████ columns and is no longer required for 3rd party capabilities. |
| How does the ████████ team determine whether a given ████████ as documented in Column I, "████████████"? Id. at 1022:14-20, 1024:23- 1025:1. | This starts with the team proposing to create a new capability indicating if the capability will emit user data. The ████████ ████████████████████ |
| Is there any documentation of the process the ████████ team uses to determine whether a given ████████████████, as documented in Column I? Id. at 1022:14-20, 1024:23-1025:1. | <u>Objection</u>. This question is better suited to a document request, not a Rule 30(b)(6) deposition. |
| If so, what documents reflect the process? | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. This question is better suited to a document request, not a Rule 30(b)(6) deposition. |
| What does it mean if the entry "████ is reflected in Column M, ████████████████████? Id. at 1036:6-1037:19. | "████ means that approval was not required from a super-admin or an admin group to grant access to a capability. This column currently has no meaning. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| Please describe what the information in Column O, ▮▮▮▮▮▮▮▮ reflects? Id. at 1038:15-1039:11. | The information in Column O reflects whether access to a capability was restricted based on the status of the app as a non-first party app. This column currently has no meaning. |
| Are there any circumstances where information is not entered in Column O? Id. at 1039:6-11. | This is a deprecated field that has been replaced with ▮▮▮▮▮▮▮▮ to describe what apps can use a given capability. It is defined as non-null in the database schema and defaults to 0 but is not used. |
| If so, what are the circumstances? | See above. |
| In the context of Column P, "▮▮▮▮▮▮▮▮ what are ▮▮▮▮▮▮▮▮ Id. at 1039:22-1040:23. | ▮▮▮▮▮▮▮▮ are used for Facebook integrations with ▮▮▮▮ , where the app is owned by ▮▮ and managed by ▮▮▮▮ |
| Is that definition of ▮▮▮▮▮▮ consistent with the general definition of that term when used by Facebook in other contexts? | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. The question is unclear. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| What does a "▮▮▮ value in Column Q, ▮▮▮▮▮▮▮▮ indicate? Id. at 1042:17-1043:12. | A value of "▮▮▮ in the "a▮▮▮▮▮▮▮ column indicates that this capability has not been marked as approved by ▮▮ ▮▮ review. |
| Are the decisions that ▮▮▮▮ made to determine whether to ▮▮▮▮▮▮▮ captured in Exhibit 429? | ▮▮▮▮ review decisions are not stored in the Capability Tool. |
| If so, where? | ▮▮▮▮ review decisions are not stored in the Capability Tool. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| If not, are they captured elsewhere in the Capabilities Tool? Where? | ███████ review decisions are not stored in the Capability Tool. |
| What are the entries that can be reflected in Column S, '██████████████ Id. at 1045:7-17, 1046:19-1048:6. | This field refers to a privacy review process that is no longer in place. Accordingly, these values no longer have meaning.<br><br>The numerical values mapped to the states: ████████████<br>████████████████████████<br>████████████████████████ |
| What does each such entry mean? *Id.* | Objection. This was not asked during the deposition. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>The question also seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |
| Was anyone involved in the ████████████ prior to ████ ████ that resulted in the entries in Column S? Id. at 1045:23-1046:3. | Objection. Seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |
|---|---|
| If so, who? | Objection. Seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |
| For each person identified above, when were they involved in the ███████████ that resulted in the entries in Column S? | Objection. Seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |
| Who were the people responsible for entering the content in Column W, ███████████? Id. at 1050:10-1051:1. | Objection. Seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| What time period was each of these people responsible for entering content in Column W? | <u>Objection</u>. Seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |
| What is meant by the ███ in Row 2, Column W of Exhibit 429? Id. at 1051:2- 12. | This field refers to a privacy review process that is no longer in place. Accordingly, these values no longer have meaning.<br><br>The ███ are what is recorded in the database. |
| Regarding the six potential values in Column Z, "██<br>███████████<br><br>Does █ indicate a ███ *Id.* at 1073:13-15. | <u>Objection</u>. Mr. Cross answered this question. 1073:13-15. |
| What does "███ mean in the context of a ██████? | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. Plaintiffs did not ask Mr. Cross what "███ means in the context of a ████. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| Does █ indicate ██ ███? Id. at 1073:16-21. | Our internal documentation stated that this level meant that ██<br>███████████ |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| What does █████████" mean in the context of a ████████ | This reflects capabilities identified as ████████ ██████████████████████████ |
| Does █ indicate ██████████████? Id. at 1074:21-1075:5? | Our internal documentation stated that this level meant that "████████████████████████ ███████ This was a manually curated list. |
| What does "████████████████ mean in the context of a ██████ | This reflects that capabilities identified as ████████████ ██████████████████████ |
| How is "████████████ different from ████████ in the context of a ██████ Id. at 1075:10-13. | ████████████████████████████████ ████████████████████████████████ ████████████████████████ |
| Does █ indicate ██████? Id. at 1075:18-23. | Yes. |
| What does "██████ mean in the context of a ██████? Id. at 1076:2-22. | Facebook relied on an ██████████████████ ████████████ hich estimated if particular Graph API data elements were ████ We detected which ████████ ██████ and any capabilities detected as ████ this would also be considered high ████ |
| Does █ indicate ██ Id. at 1076:11-22. | No. 2 ████████████ The ██████████ meant that the ████████ y deals with ████████████. |
| What does "████ mean in the context of a ██████ | N/A. |
| How does "████ differ from "████████ in the context of a ██████ ████ Id. at 1076:14-15? | ████ was the default ████████ |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| Does ▉ indicate ▉ Id. at 1072:4-5. | <u>Objection</u>. Mr. Cross provided this information during the deposition. 1072:4-5. |
| What does " ▉ mean in the context of a ▉ | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. Plaintiffs did not ask Mr. Cross what "low" means in the context of a risk level. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| Who created this ▉ ? Id. at 1076:23-1077:22. | <u>Objection</u>. Seeks information beyond the scope of the notice. On June 3, 2022, Plaintiffs' clarified the limited scope of the intended questioning on the capabilities table: "Plaintiffs do not expect Facebook's designee to be fully familiar with the entirety of [the tables identified as exhibits]. Rather, Plaintiffs expect the designee to be able to describe the type and categories of information in the spreadsheets based on a representative sample." |
| Are there any documents reflecting the process of creating this ▉ ? | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>This is more appropriate as a document request. |
| If so, what are they? | <u>Objection</u>. Plaintiffs have not identified a deposition question asked that Mr. Cross did not answer. During the June 24 |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

|  |  |
|---|---|
|  | hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>This is more appropriate as a document request. |
| Are there any documents that explain the final ███ ███████ | Objection.  Mr. Cross answered this question (1072:8-1073:12) and no further testimony was sought. |
| If so, what are they? | Objection.  Mr. Cross answered this question (1072:8-1073:12) and no further testimony was sought. |
| Do the entries in Column AA, ███████████ comprehensively reflect which type of ███████ ████████████ listed in the full version of this document? *Id.* at 1078:4-12, 1081:5-13. | No. |
| If not, was information reflecting which type of ███████████████ logged somewhere else? *Id.* at 1081:24-1082:6. | Yes. |
| If so, where? | Since March 2020 ████████ reviews creating capabilities requiring contracts store the contract details in an object type called ████████████████████ |

Questions for Facebook's 30(b)(6) designee to testify on Topics 6 and 7. Plaintiffs are requesting written responses for each of the questions on these specific topics except where indicated. BUT SEE LANGUAGE TO INCORPORATE BELOW

*Specific reasons that apps had extended access to nonpublic friend data after 2014 (for each app and partner to which such access was granted).*

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| Why did the third parties that received extended or exempted access to friend information after 2017 receive that access? Tr. 687:17–690:23 | <u>Objection</u>: The cited testimony does not ask this question; it references an interrogatory response that the witness did not verify. This question has been asked and sufficiently answered. Plaintiffs have repeatedly asked Mr. Cross for the reasons that apps had extended access. Mr. Cross has provided substantial testimony on this question over his five days of deposition testimony. He explained that whitelisting decisions were made on a case by case basis. Tr. 562:15-24. He explained that some apps were given continued access to the data of a user's friends "based on whether or not the user experience would be broken if the deprecation timeline was followed or whether or not there would be other risks for the developer of the deprecation being enforced on the general time frame." Tr. 188:7-12. He further explained "that the extensions granted to applications to access API Version 1 and the friend permissions were limited to cases where the user experience would be significantly degraded if they weren't given extra time or there was some form of legal and regulatory risk to the partner if the extension was not granted for a period of time." Tr. 192:3-9; 186:2-191:15. Additionally, Mr. Cross testified that there were "Integration[] partners who had built experiences that were on unusual devices, operating systems, and set-top boxes and so on that required, in order to function . . . permissions which – APIs that were not generally available." Tr. 193:24-196:20. Finally, Mr. Cross testified that revenue was not taken into account in making whitelisting decisions and that payments were not received for whitelisting. Tr. 1179:12-1181:22; 1207:5-11; 1208:5-1213:22; 1171:5-10. |
| Why was the access revoked? | <u>Objection</u>: Plaintiffs did not ask for this information during the deposition. During the June 24 hearing, Special Master Garrie |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Answering this question would be unduly burdensome, as it would require Facebook to, within less than two weeks, engage in an app-by-app analysis that plaintiffs did not request in the deposition, and which would not be appropriate for a deposition. |
| When did ▮▮▮ access to friend information end? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never contemplated in the deposition. |
| Why did ▮▮▮▮▮▮▮▮▮ receive an extension for friend information until June 2018? | Objection:  Plaintiffs did not ask this question or ask for this level of granularity during the deposition; plaintiffs only asked "So that's access to these friend permissions that was more than six months after the deprecation of those permissions; is that right?"  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer.  *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | that was never sought in the deposition. |
|---|---|
| Why did ███████ receive access to friend information until June 2018? | <u>Objection</u>:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ███████ receive access to friend information until June 2018? | <u>Objection</u>:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ███████ receive access to friend information until June 2018? | <u>Objection</u>:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ██████████ receive access to friend information until June 2018? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ██████████ receive access to friend information until March 2018? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Did Facebook use the template described in Exhibit 407, or similar template, to determine whether to continue to allow access to certain APIs? Tr. 645:1–648:1 | No.  Facebook did not use the template described in Exhibit 407, or similar template, to determine whether to continue to allow individual developers access to certain APIs.<br><br>Exhibit 407 relates to a company-wide review of all APIs to |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | evaluate which APIs should be deprecated in 2019. |
|---|---|
| To the extent Facebook used such a template, or similar, explain the reason why Facebook requested the information identified on Slide 18 ███████████████ . | Objection: Plaintiffs did not ask for this information during the deposition |
| Did Facebook obtain revenue information from product managers or others for the purpose of evaluating whether to continue to provide access to certain APIs? Tr. 653:7–654:6. | Objection: Plaintiffs did not ask for this information during the deposition; plaintiffs cite to a discussion where Mr. Cross was unable to interpret what the phrase "revenue attribution" meant in the context of a specific slidedeck. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Furthermore, Mr. Cross has testified repeatedly that third parties were not whitelisted for access to friend data because of ad spend or revenue more generally. Tr. 1179:12-1181:22; 1207:5-11; 1208:5-1213:22. |
| What were the specific reasons apps had extended access to nonpublic friend data after 2014? Tr. 706:4–14 | Objection: This question has been asked and answered. Plaintiffs have repeatedly asked Mr. Cross for the reasons that apps had extended access. Mr. Cross has provided substantial testimony on this question over five days. He explained that whitelisting decisions were made on a case by case basis. Tr. 562:15-24. He explained that some apps were given continued access to the data of a user's friends "based on whether or not the user experience would be broken if the deprecation timeline was followed or whether or not there would be other risks for the developer of the deprecation being enforced on the general |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | time frame." Tr. 188:7-12. He further explained "that the extensions granted to applications to access API Version 1 and the friend permissions was limited to cases where the user experience would be significantly degraded if they weren't given extra time or there was some form of legal and regulatory risk to the partner if the extension was not granted for a period of time." Tr. 192:3-9; 186:2-191:15. Additionally, Mr. Cross testified that there were "Integration[] partners who had built experiences that were on unusual devices, operating systems, and set-top boxes and so on that required, in order to function . . . permissions which – APIs that were not generally available." Tr. 193:24-196:20. Finally, Mr. Cross testified that revenue was not taken into account in making whitelisting decisions and that payments were not received for whitelisting. Tr. 1179:12-1181:22; 1207:5-11; 1208:5-1213:22; 1171:5-10. |
| Why did ███ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ████ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ██ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ██████ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ████ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ▮▮▮▮ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ▮▮▮▮ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| Why did ███████ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ███████ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ███████ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | that was never sought in the deposition. |
|---|---|
| Why did ▮▮▮▮▮ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ▮▮▮▮▮ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ▮▮▮ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

|  |  |
|---|---|
|  | Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ███ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.

Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ██████ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.

Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ████████ receive access to private APIs? | Objection: Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Why did ▓▓▓▓ receive access to private APIs? | Objection:  Plaintiffs did not ask for this level of granularity during the deposition; plaintiffs did not mention this entity at all. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>Additionally, this question is unduly burdensome in requiring Facebook to, within two weeks, conduct an app-by-app analysis that was never sought in the deposition. |
| Which of the business integrations, media integrations, search integrations, and specialized consumer experiences that required Facebook to provide access to friend information were developed after April 2014? | Objection:  Plaintiffs did not ask for this information during the deposition, in fact plaintiffs provide no citation at all for this question.<br><br>The question is compound, confusing, and unduly burdensome. The question improperly calls for a narrative response and would require Facebook to investigate the development dates of many individual apps/experiences over the course of 8 years and then cross-reference Facebook's contractual agreements with said apps/experiences. |
| Which third parties had extended or exempted access to friend information after 2014 that was not governed by contract? Tr. 195:12. | Objection:  Plaintiffs did not ask for this information during the deposition; plaintiffs cite to Mr. Loeser's questions regarding all the reasons Facebook provided access to friend data after the |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | transition to Graph API v2. |
| | This question is also unduly burdensome, as it would require Facebook to, within less than two weeks, conduct individual contractual analysis for many third parties over an 8 year period. This was not sought in the deposition. |
| | Furthermore, it calls for a legal conclusion as to whether extended or exempted access to friend information after 2014 was governed by contract. |
| For each third party that was provided access to friend sharing via whitelisting after Facebook announced that friend sharing permissions would be deprecated (4/2014), identify all revenue received by Facebook from the third party. Include ad spend, or any other source of revenue or payment received, by year from 2007 to the present. Tr. 1216:8–20. | Objection:  Plaintiffs did not ask for this information during the deposition; they only asked whether Mr. Cross conducted an independent investigation as part of his deposition preparation to determine what revenue, if any, whitelisted partners had paid to Facebook after 2014.  Tr. 1216:8–20.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer.  *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| | Additionally, this question is beyond the scope of the deposition, as it asks for all revenue received by Facebook from a third party, irrespective of whether that revenue was received in exchange for whitelisting.  That is not covered by Topics 2, 6, 7 or 8. |
| | Furthermore, Mr. Cross has testified repeatedly that third parties were not whitelisted for access to friend data because of ad spend or revenue more generally.  Tr. 1179:12-1181:22; 1207:5-11; 1208:5-1213:22. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | This question is also unduly burdensome, as it would require Facebook to, within less than two weeks, conduct individual investigations of all potential sources of revenue for many third parties over an eight year span. |
|---|---|
| *Whether Facebook believed that continuing to share nonpublic friend data with third parties after 2014 was a mistake or breach of trust.* | |
| QUESTIONS BELOW: ORAL TESTIMONY SOUGHT | |
| What is Facebook's position on whether there was a breach of trust relating to friend data? Tr. 667:9–11 | Objection: This question calls for a legal conclusion, is argumentative, and is an improper question for a 30(b)(6) witness. On June 24, we also noted for Plaintiffs that this question is inappropriate for a deposition and suggested sending a contention interrogatory instead.<br><br>This question is also outside the scope of both Topics 6 and 7, which seek information about the "*development* of Friend Sharing," and the "*decision to whitelist particular apps or partners.*" Neither topic calls for an after-the fact "position" to be taken regarding a material legal issue in the case. |
| What is Facebook's position on whether it made a mistake relating to providing access to friend data after May 2015? | Objection: This question calls for a legal conclusion, is argumentative, and is an improper question for a 30(b)(6) witness. On June 24, we also noted for Plaintiffs that this question is inappropriate for a deposition and suggested sending a contention interrogatory instead.<br><br>This question is also outside the scope of both Topics 6 and 7, which seek information about the "*development* of Friend |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | Sharing," and the "*decision to whitelist particular apps or partners.*" Neither topic calls for an after-the-fact "position" to be taken regarding a material legal issue in the case. |
|---|---|
| Does Facebook believe that it adequately informed users that it would continue to share their information with third parties through their friends after May 2015? | Objection: Plaintiffs did not ask for this information during the deposition. During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer. *See* June 24 Hr'g Tr. at 26-27, 28-29. |
| | This question is also outside the scope of both Topics 6 and 7, which seek information about the "*development* of Friend Sharing," and the "*decision to whitelist particular apps or partners.*" Neither topic calls for an after-the-fact position to be taken regarding a material legal issue in the case; i.e., the adequacy of disclosures. |
| | As indicated in our May 28 scope letter, Mr. Cross was designated to testify to Topic 6 "except as that topic relates to communications to users about friend sharing (including any communication via Facebook's Terms of Service, SRR, and/or Data and Privacy Policies related to friend sharing." |
| *Whether apps with access to nonpublic friend data (including, but not limited to, through extensions, exemptions, user_posts, Events API, Pages API, and Group APIs, and newsfeed) after 2014 exceeded the use case, and what Facebook did, if anything, to investigate.* | |
| Was Facebook aware that friends permissions were often called by apps in ways that exceed the use case for the app? Tr. 22:11–15. | Objection: This question has been asked and answered. Mr. Cross explained that, around 2013, "there was a number of discussions about how apps were using the information they got via the API. One of those reasons would have been that there |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | were some questions about how that information was being used." Tr. 82:7-24<br><br>Furthermore, this question is better suited for the upcoming ADI deposition. |
| Were all third parties with access to nonpublic friend information after May 2015 investigated as part of Facebook's ADI investigation? Tr. 1167:16–1169:18. | Objection:  Plaintiffs did not ask Mr. Cross about the ADI during the deposition; plaintiffs only asked generally "what examination has Facebook done to determine whether apps whitelisted for access to APIs that emit friend data exceeded the use case for the apps after 2014," which Mr. Cross answered.<br><br>This issue is outside the scope of the issues Mr. Cross is designated to testify on.  As we indicated in our May 28 scope letter, Mr. Cross was designated to testify on Topic 2(d) only to the extent it relates to Platform Integrity.  Mr. Cross has already provided substantial testimony on Platform Integrity.  Tr. 810:23-812:6; 819:21-821:5; 828:11-830:18.<br><br>This question is solely about ADI.  Plaintiffs should ask it in the upcoming ADI deposition. |
| Apart from the ADI, what did Facebook do to investigate if and how apps with access to nonpublic friend data after 2014 exceeded the use case? | Objection:  Asked and answered.  Mr. Cross testified that "the partnerships team reviewed the applications and -- and either removed access to private APIs and whitelists or determined that the -- the application had the appropriate level of access."  Tr. 1167:22-1168:1.  Mr. Cross further explained that "It was a process in 2018 and early 2019 to assess apps that had been granted additional access to information and -- and determine whether or not that access should continue."  1168:3-6. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | This issue is outside the scope of the issues Mr. Cross is designated to testify on.  As we indicated in our May 28 scope letter, Mr. Cross was designated to testify on Topic 2(d) only to the extent it relates to Platform Integrity.  Mr. Cross has already provided substantial testimony on Platform Integrity.  Tr. 810:23-812:6; 819:21-821:5; 828:11-830:18. |
| Did Facebook do anything above and beyond its usual enforcement efforts to determine whether entities with access to nonpublic friend information after May 2015 exceeded the use case? | <u>Objection</u>:  Plaintiffs did not ask for this information during the deposition.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer.  *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>This issue is outside the scope of the issues Mr. Cross is designated to testify on.  As we indicated in our May 28 scope letter, Mr. Cross was designated to testify on Topic 2(d) only to the extent it relates to Platform Integrity.  Mr. Cross has already provided substantial testimony on Platform Integrity.  Tr. 810:23-812:6; 819:21-821:5; 828:11-830:18.<br><br>Furthermore, Plaintiffs are going to take a deposition on ADI. |
| Why, or why not? | <u>Objection</u>:  Plaintiffs did not ask for this information during the deposition.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer.  *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>This issue is outside the scope of the issues Mr. Cross is designated to testify on.  As we indicated in our May 28 scope letter, Mr. Cross was designated to testify on Topic 2(d) only to |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

|  |  |
|---|---|
|  | the extent it relates to Platform Integrity.  Mr. Cross has already provided substantial testimony on Platform Integrity.  Tr. 810:23-812:6; 819:21-821:5; 828:11-830:18.<br><br>Furthermore, Plaintiffs are going to take a deposition on ADI. |
| If so, what did Facebook do? | Objection:  Plaintiffs did not ask for this information during the deposition.  During the June 24 hearing, Special Master Garrie advised that for each question raised, Plaintiffs should reference the testimony where they believe Mr. Cross was unable to answer.  *See* June 24 Hr'g Tr. at 26-27, 28-29.<br><br>This issue is outside the scope of the issues Mr. Cross is designated to testify on.  As we indicated in our May 28 scope letter, Mr. Cross was designated to testify on Topic 2(d) only to the extent it relates to Platform Integrity.  Mr. Cross has already provided substantial testimony on Platform Integrity.  Tr. 810:23-812:6; 819:21-821:5; 828:11-830:18.<br><br>Furthermore, Plaintiffs are going to take a deposition on ADI. |
| Did ███ misuse friend information received after 2015? | Objection:  This issue is outside the scope of the issues Mr. Cross is designated to testify on.  It is not reasonable to require the deponent to know how each of thousands of potential third parties may have used user data.  As we indicated in our May 28 scope letter, Mr. Cross was designated to testify on Topic 2(d) only to the extent it relates to Platform Integrity.  It is unreasonable to expect Mr. Cross to be able to testify as to any specific investigation into a single entity.  Mr. Cross has already provided substantial testimony on Platform Integrity more generally.  Tr. 810:23-812:6; 819:21-821:5; 828:11-830:18. |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| *Facebook's reasons and processes for managing and reducing risk from private APIs that emitted friend data in and after 2018.* | |
| What are the risks from private APIs? Tr. 616:21–617:19 | Objection:  Asked and answered.  Mr. Cross testified that "there's a number of potential risks – from private APIs" and that he "can attempt to enumerate some examples."  Tr. 616:24-617:6.  Mr. Cross then stated that "there a number of -- as I said, a number of private APIs. One of the risks for an ███████ ██████████ is that it allowed developers to ██████ ████████ ████████████████████ in order to allow a user to log in to an experience on a device. And an app that had that capability, there were a number of risks around making sure that the ██████████████████████████████████████ and that the ████████████████████████████████████████████ So that would be one -- ██████████ from one type of -- of ████████████████ Tr. 617:7-19.  He continues," So we talked about this in a -- in a previous testimony around some of the reasons for the changes to the public API surface area. We'd had concerns from users that they were not always aware how their information was being used by -- by applications, and so in the case of private APIs, we would want to make sure that information was being used appropriately." Tr. 618:6-13.  No further testimony was sought. |
| Did Facebook identify ██████ private API application pairs that included ████████ Tr. 619:5–15. | Objection:  Asked and answered.  Mr. Cross testified that "I'm -- the author was KP. I -- I don't know how these data were compiled or collected.  But from rating the slide, somebody at Facebook, KP, seems to have identified ██████ API -- API application pairs that met some definition of -- of ████ which I'm not aware of the details of."  Tr. 619:9-15.  Mr. Cross then provides additional explanation "So private API is a -- is an ambiguous term, and so I think he may have used a -- he may be |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | referring to a different technical term. So I would actually be speculating if I -- if I confirmed that -- understanding -- if I confirmed. My understanding, speaking -- you know, trying to do my best here and trying to give you the best answer I can -- is that -- I understand him to be referring to capability app pairs. So that -- that -- that's my understanding of what he'd be referring to. But private APIs is a little bit ambiguous in this context." Tr. 619:18-620:8. No further testimony about identifying 2,300 private API application pairs was sought.<br><br>Plaintiffs are scheduled to depose Konstantinos Papamiltiadias ("KP") in August, so there is no need to depose another Facebook employee on this issue. |
| As of 2018, did Facebook know the full access of partners to all existing private APIs? | Objection: Plaintiffs did not ask for this information during the deposition and have not identified a deposition question asked that Mr. Cross did not answer. |
| As of 2018, did Facebook track the contracts and applicable contractual obligations relevant to access to friend data? | Objection: Plaintiffs did not ask for this information during the deposition and have not identified a deposition question asked that Mr. Cross did not answer. |
| What is a private API application pair? Tr. 6:19–16–620:8. | Objection: Asked and answered. When plaintiffs asked "And what is 'a private API application pair,'" Mr. Cross explained that "private API is a -- is an ambiguous term, and so I think he may have used a -- he may be referring to a different technical term. So I would actually be speculating if I -- if I confirmed that -- understanding -- if I confirmed. My understanding, speaking -- you know, trying to do my best here and trying to give you the best answer I can -- is that -- I understand him to be referring to capability app pairs. So that -- that -- that's my |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| | understanding of what he'd be referring to. But private APIs is a little bit ambiguous in this context." Tr. 619:18-620:8.  No further testimony about what constitutes a "private API application pair" was sought.<br><br>Plaintiffs are scheduled to depose Konstantinos Papamiltiadias ("KP") in August, so there is no need to depose another Facebook employee on this issue. |
| What events prompted Facebook to audit and understand the existing APIs and how they were being used as well as to develop new processes and practices for controlling changes to APIs going forward? Tr. 621:9–622:2. | Objection:  Asked and answered.  When plaintiffs asked "what events prompted that audit," Mr. Cross explained that "So probably a number of factors that went into the -- the decision-making that I, you know, have not fully -- I'm not fully aware of. So I can't answer fully as to what that was -- what drove that decision-making. But, again, what I can share from my personal perspective is this is after the Cambridge Analytica story broke, and -- and I would -- my understanding is that was one of the drivers for improving development practices around APIs."<br><br>Plaintiffs are scheduled to depose Konstantinos Papamiltiadias ("KP") in August, so there is no need to depose another Facebook employee on this issue. |
| Why didn't Facebook review private APIs in an audit of why that app has that capability and whether or not it should continue to have that capability? Tr. 623:17–11. | Objection.  Mr. Cross answered this question by explaining that "there was an effort in 2013 to reduce the number of capability app pairs which existed, and so I think this is -- it's not right to characterize this as 'not done' and 'done.' There were -- have been a number of efforts over a number of years to attempt  to manage the -- the set of private APIs." 624:5-11. |
| What are questionable private API app pairs? Tr. 624:20– | Objection.  This question was asked in the context of a slide |

*Facebook's Responses to Plaintiffs' Requests for*
*Additional Testimony on Topics 2, 6, 7, and 8*
*July 13, 2022*

| | |
|---|---|
| 625:14. | deck prepared by Konstantinos Papamiltiadias ("KP"), so if Plaintiffs want to know how he meant to use the term, they should ask him in his deposition. Plaintiffs are scheduled to depose Mr. Papamiltiadias in August, so there is no need to depose another Facebook employee on this issue. |
| What does hi/low value of API usage mean? Tr. 625:18–626:7. | Objection. This question was asked in the context of a slide deck prepared by Konstantinos Papamiltiadias ("KP"), so if Plaintiffs want to know how he meant to use the term, they should ask him in his deposition. Plaintiffs are scheduled to depose Mr. Papamiltiadias in August, so there is no need to depose another Facebook employee on this issue. |
| What does the term "strategic partners" mean in the context of determining which apps to continue to whitelist for private APIs? Tr. 631:7–632:3. | Objection. Plaintiffs have not identified a deposition question asked that Mr. Cross could not answer. In the context of the use of the phrase "strategic partners" in a slide deck prepared by an individual employee, Plaintiffs asked "[w]ho at Facebook could tell me whether there's a subset of partners called 'strategic partners' at Facebook? In response, Mr. Cross explained that "I don't think there's a standard definition for 'strategic partner[.]'" 632:4-6, 13-14. Plaintiffs did not separately seek testimony regarding the meaning of the term "strategic partners" in the context of determining which apps to whitelist for private APIs. |

Exhibit D

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

IN RE:  FACEBOOK, INC.,      MDL No. 2843

4  CONSUMER USER PROFILE        Case No.

   LITIGATION                   18-md-02843-VC-JSC

5  _____

6  This document relates to:

7  ALL ACTIONS

8

   _____

9

10

11               **CONFIDENTIAL**

12               ZOOM HEARING

13     BEFORE DANIEL B. GARRIE, SPECIAL MASTER

14          555 W. 5th Street, 32nd Floor

15          Los Angeles, California 90013

16     (Reported Remotely via Web Videoconference)

17               Friday, June 24, 2022

18

19

20

   STENOGRAPHICALLY REPORTED BY:

21  REBECCA L. ROMANO, RPR, CSR, CCR

   California CSR No. 12546

22  Nevada CCR No. 827

   Oregon CSR No. 20-0466

23  Washington CCR No. 3491

24  JOB NO. 5295645

25  PAGES 1 - 133

                                        Page 1

1    that I wanted to say --

2            SPECIAL MASTER GARRIE:  We are on the

3    record, right, Rebecca?

4            THE COURT REPORTER:  Yes.

5            SPECIAL MASTER GARRIE:  Go ahead.

6            MR. SCHWING:  Yeah, thanks.

7            I'm really happy we could get together to

8    talk today because we do need a path forward.

9    We've been working super hard on the 30(b)(6)

10   depositions.  There's, you know, hundreds of hours

11   of preparation, and I won't go on and on about

12   that.  You have been in these depos.  You know

13   there's been a lot going on.

14           There's one significant issue that I

15   wanted to flag at the outset and to explicitly ask

16   your help on, and that is that we need a reasonable

17   path forward for the 30(b)(6) depositions.

18           We've now finished all of the 30(b)(6)

19   depositions that we had scheduled to be completed

20   by June 30th.  The plaintiffs are saying that they

21   want some additional discovery with respect to some

22   of those issues.  And that's -- that's fine.  We

23   are working through that -- those issues.  We are

24   compromising with them.

25           I think you will see, as we get into

1　various issues today, that kind of across the board

2　for these 30(b)(6) depositions we are -- we are

3　compromising, oftentimes giving Plaintiffs

4　everything they want.  If it's not everything, at

5　least trying to compromise to come to a reasonable

6　position.  I would like to thank the plaintiffs'

7　lawyers for engaging in that.

8　　　　The -- the issue that I wanted to flag is

9　that I want to be sure that, as we are offering,

10　you know, compromises, finding our path forward

11　here, working with you, Special Master, that we are

12　not going to be in a position where, because we are

13　compromising -- we are giving additional deposition

14　testimony -- that we are going to be kind of

15　accused of having violated a court order by giving

16　that information, whether because of timing or some

17　other issue, so --

18　　　　SPECIAL MASTER GARRIE:  Yeah.

19　　　　MR. SCHWING:  -- I want -- yeah.

20　　　　SPECIAL MASTER GARRIE:  That was one

21　of -- so your point is, is that -- and I kind of

22　took that from the way it was being presented --

23　you believe you fulfilled all the 30(b)(6)s.  You

24　are willing to give additional to tie it off.  What

25　you don't want to happen is give the additional and

Veritext Legal Solutions
866 299-5127

1    then go before the Court and Plaintiffs say that,

2    hey, look, we didn't hit the deadlines, and we

3    didn't comply -- Facebook didn't comply with the

4    order.

5            MR. SCHWING:  Exactly.  We want to work

6    this out, get closure --

7            SPECIAL MASTER GARRIE:  I got it.  I'm

8    not going to let them sandbag -- let's be clear:

9    If this goes forward and -- like, you can either

10    stand your ground or you can play and concede and

11    get -- give -- everybody can work it out, and I can

12    make -- either -- there's two ways to do it.  You

13    can stand your ground, fight every issue, and I can

14    rule on everything, or you guys can work it out,

15    and you don't want to be accused of not meeting the

16    deadline the Court set out; because it's your

17    position, where you sit, that you have for the --

18    and I'm not ruling either way -- that you have met

19    your obligation, and you are happy to work with

20    Plaintiffs to -- to provide follow-on, additional

21    depositions for further clarifications that came

22    out of the deposition testimony or that didn't --

23    and Plaintiffs viewed didn't address the topics,

24    however you want to phrase it, additional

25    deposition testimony to complete the 30(b)(6)

1   this before, before the agenda was sent over to

2   you, was that their plan was to send us, on the

3   28th of June, a whole list of questions, and then

4   Facebook would have to -- and I don't know what

5   those questions will be, and that Facebook would

6   have to respond to them -- all of them in

7   writing -- I don't know what they have in mind --

8   by June 30th, and -- and that is problematic.  That

9   is not enough time --

10          SPECIAL MASTER GARRIE:  I got it.  So you

11  don't have enough information to answer the

12  questions.

13          MR. SCHWING:  And just the timing is,

14  like --

15          SPECIAL MASTER GARRIE:  If it's one

16  question, it would be easy.  If it's ten questions,

17  it would be hard, so --

18          MR. SCHWING:  Depends what they are, too.

19  Yeah, depends what they are.  I don't know what

20  it's going to be yet, so -- can I just make one

21  tiny point?

22          I think what they really are after is

23  kind of -- right?  The follow-on questions need to

24  be things that Mr. Cross was unable to answer in

25  his deposition.  This isn't a whole new round of,

Veritext Legal Solutions
866 299-5127

1   like, this is a bunch of other stuff we want to

2   know.  This is follow-on to Mr. Cross's deposition.

3           I think, when I actually am able to,

4   like, get with Matt Melamed later, that that's what

5   he's going to kind of be after.  We can obviously

6   hear from him now, but what we need to do is get a

7   list of those questions out and come to some kind

8   of understanding of what they are and then work out

9   an appropriate timing, whether it's, you know, two

10  weeks to respond to them or a week or whatever it

11  is, depending on how many questions there are, and

12  I think that's our path forward.  And that's what I

13  want to meet and confer with them about.

14          MS. WEAVER:  Let me just --

15          SPECIAL MASTER GARRIE:  Before anybody

16  responds, I have two questions, and then you can

17  respond.

18          MS. WEAVER:  Great.

19          SPECIAL MASTER GARRIE:  I want to ask my

20  questions, and you can respond.  I'll ask you

21  questions, and then we can talk.

22          So you -- as far as you understand, they

23  are not asking for more depo time for 2a and 2c and

24  8.

25          MR. SCHWING:  That is my understanding

1    that are mine.  But that's neither here nor there.

2         On my agenda was 2a, 2c, and 8, so I

3    threw that in so you could help feel like you were

4    guiding the process.

5         Now, Counsel Weaver, your position is --

6    because I don't want to keep going back and forth,

7    is that you want to start with written questions

8    because that's what you thought -- my question is:

9    Is it Plaintiffs' position that they want written

10   testimony or they prefer oral testimony?  That's

11   step one.

12        MS. WEAVER:  I'm going to defer to

13   Mr. Melamed.  I think we were trying to comprise

14   before, but my guess is our preference would be

15   some combination of both.

16        Go ahead, Mr. Melamed.

17        MR. MELAMED:  Yes.  Thank you.

18        So regarding 2a, 2c, and 8, in light of

19   Facebook's concerns and in effort to comprise in

20   context all of these 30(b)(6) -- ongoing 30(b)(6)

21   discussions, we offered, in our agenda -- and this

22   is our offer -- to take written testimony about

23   seven bulleted topics that we identified to

24   Facebook for which we will design questions.

25        Those topics each relate to testimony

1 that Mr. Cross was either not able to give or not

2 able to follow up -- and to follow-up questions

3 regarding -- and that the proposal, as Mr. Schwing

4 noted, was that we would provide the list of

5 questions by -- by June 28th, and they would --

6 Facebook would be required to submit the testimony

7 by June 30th and that we reserved our right, as

8 Mrs. Weaver indicated, to follow up with live

9 testimony, if needed, regarding some of the

10 answers.

11     SPECIAL MASTER GARRIE:  All right.

12     MR. MELAMED:  The reasons for the dates

13 is that it is our understanding that the Court

14 ordered that these --

15     SPECIAL MASTER GARRIE:  We can all

16 stipulate to change that, so --

17     MR. SCHWING:  And what Mr. Melamed says

18 is totally -- that's exactly what the agenda says.

19 I wasn't trying to argue with Mr. Melamed --

20     SPECIAL MASTER GARRIE:  No, no.  Time

21 out.  I don't care -- the agenda -- like, we got to

22 let the agenda go, people.  I wrote my own agenda.

23 It was literally so you guys could feel like you

24 were part of a process, and I am going to determine

25 how it really goes, because I have given you every

Veritext Legal Solutions
866 299-5127

1          SPECIAL MASTER GARRIE:  And in each of

2     those topics, will you reference the testimony

3     where you believe will indicate that Mr. Cross was

4     unable to answer -- like, it's not, like, some

5     far-afield field-of-dreams thing.  It's real deal.

6          MR. MELAMED:  Yes, and we have identified

7     those topics to Mr. Schwing and Facebook.

8          SPECIAL MASTER GARRIE:  Fine.

9          MR. MELAMED:  We are happy to --

10         SPECIAL MASTER GARRIE:  I'm giving you

11    general indication.  If it turns out that it's a

12    field-of-dreams things, it will be axed.

13         All right.  So -- all right.  So you are

14    going to give them a set of questions.  Two days is

15    definitely not going to go anywhere.  I'm thinking,

16    like, two weeks at a minimum, and we have the

17    July 4th holiday, so -- and then I'm thinking two

18    hours of testimony on the outside.  A week

19    thereafter receiving the written testimony may be

20    appropriate.  On the outside, two hours is being --

21    if there are many questions you have and it's

22    actually -- I agree with you, but -- so that's kind

23    of what I'm thinking 2a, 2c, and 8.

24         But, Counsel Weaver, just so I

25    understand -- and Counsel Melamed -- written

Veritext Legal Solutions
866 299-5127

# Exhibit E

**From:** Schwing, Austin <ASchwing@gibsondunn.com>
**Sent:** Friday, July 15, 2022 1:15 PM
**To:** Matthew Melamed <mmelamed@bfalaw.com>
**Cc:** Wangdra, Phuntso <PWangdra@gibsondunn.com>; Buongiorno, Matt <MBuongiorno@gibsondunn.com>; Derek Loeser <dloeser@kellerrohrback.com>; Adele Daniel <adaniel@kellerrohrback.com>; Angelica Ornelas <aornelas@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Benjamin Gould <bgould@kellerrohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; Chris Springer <cspringer@bfalaw.com>; David Ko <dko@kellerrohrback.com>; Emma Wright <ewright@kellerrohrback.com>; Eric Fierro <efierro@kellerrohrback.com>; Josh Samra <jsamra@bfalaw.com>; Julie Law <jlaw@bfalaw.com>; Lesley Weaver <lweaver@bfalaw.com>; Sarah R. Skaggs <sskaggs@kellerrohrback.com>; *** Service-FB-CA_MDL <Service-FB-CA_MDL@gibsondunn.com>
**Subject:** Re: Simon Cross deposition

Matt, we will respond to these in writing. Thanks

Austin Schwing

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1.415.393.8210 • Fax +1.415.374.8458
ASchwing@gibsondunn.com • www.gibsondunn.com

On Jul 15, 2022, at 10:54 AM, Matthew Melamed <mmelamed@bfalaw.com> wrote:

[WARNING: External Email]

Yes – sorry for the omission.

**From:** Schwing, Austin <ASchwing@gibsondunn.com>
**Sent:** Friday, July 15, 2022 10:51 AM
**To:** Matthew Melamed <mmelamed@bfalaw.com>; Wangdra, Phuntso <PWangdra@gibsondunn.com>; Buongiorno, Matt <MBuongiorno@gibsondunn.com>; Derek Loeser <dloeser@kellerrohrback.com>; Adele Daniel <adaniel@kellerrohrback.com>; Angelica Ornelas <aornelas@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Benjamin Gould <bgould@kellerRohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; Chris Springer <cspringer@bfalaw.com>; David Ko <dko@kellerrohrback.com>; Emma Wright <ewright@kellerrohrback.com>; Eric Fierro <efierro@kellerrohrback.com>; Julie Law <jlaw@bfalaw.com>; Lesley Weaver <lweaver@bfalaw.com>; Sarah R. Skaggs <sskaggs@KellerRohrback.com>
**Cc:** *** Service-FB-CA_MDL <Service-FB-CA_MDL@gibsondunn.com>
**Subject:** RE: Simon Cross deposition

Hi Matt. Is it your position that written responses would be sufficient for the last two questions as well? Thanks.

**From:** Matthew Melamed <mmelamed@bfalaw.com>
**Sent:** Thursday, July 14, 2022 9:05 PM
**To:** Wangdra, Phuntso <PWangdra@gibsondunn.com>; Buongiorno, Matt <MBuongiorno@gibsondunn.com>; Derek Loeser <dloeser@kellerrohrback.com>; Schwing, Austin <ASchwing@gibsondunn.com>; Adele Daniel <adaniel@kellerrohrback.com>; Angelica Ornelas <aornelas@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Benjamin Gould <bgould@kellerrohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; Chris Springer <cspringer@bfalaw.com>; David Ko <dko@kellerrohrback.com>; Emma Wright <ewright@kellerrohrback.com>; Eric Fierro <efierro@kellerrohrback.com>; Josh Samra <jsamra@bfalaw.com>; Julie Law <jlaw@bfalaw.com>; Lesley Weaver <lweaver@bfalaw.com>; Sarah R. Skaggs <sskaggs@KellerRohrback.com>
**Cc:** *** Service-FB-CA_MDL <Service-FB-CA_MDL@gibsondunn.com>
**Subject:** RE: Simon Cross deposition

[WARNING: External Email]

Counsel,

We have five follow-up questions, highlighted, below, to Facebook's written 30(b)(6) testimony that it provided last night. Unfortunately, we were not able to get these to you by the 6pm deadline and ask that you extend the courtesy of accepting them as timely filed. We will (and have) extended similar courtesies to you.

Thank you,
Matt

| Was there anything preventing the ▮▮▮▮ from being created before 2019? Id. at 759:12-761:25 | Yes. | |
|---|---|---|
| If so, what prevented the ▮▮▮▮ from being created before 2019? | Facebook could not create these records earlier because it did not have the code and infrastructure in place to do so. Facebook developed the code and infrastructure to create the ▮▮▮▮ in response to the ▮▮▮▮ Significant engineering resources were needed to invent the framework to produce these records in light of the particular ▮▮▮▮ requirements.<br><br>In particular, the ▮▮▮▮ was developed by multiple software engineers and other technical professionals. Work began on developing the ▮▮▮▮ in August 2019, and subsequent improvements continue to the present day.<br><br>To create the ▮▮▮▮, Facebook had to invent a ▮▮▮▮ | • ▮▮▮▮ |
| If so, what prevented the ▮▮▮▮ from being created before 2019? | The oldest data available in the ▮▮▮▮ dates back to February 16, 2020. | |
| For each thing identified as preventing the ▮▮▮▮ from being created before 2019, please identify the time period for which that thing would have prevented the ▮▮▮▮ from being created. | Facebook could not create these records earlier because it did not have the code and infrastructure in place to do so. Facebook developed the code and infrastructure to create the ▮▮▮▮ in response to the ▮▮▮▮ Significant engineering resources were needed to invent the framework to create these records.<br><br>In particular, the ▮▮▮▮ was developed by multiple software engineers and other technical professionals. Work developing the ▮▮▮▮ began in August | • ▮▮▮▮ |

| | 2019 and continues to the present day. The ███████████ required the invention of an approach to ███████████████████████ | |
| --- | --- | --- |
| Facebook's designee testified that there's a list of loggable events associated with an action type number. How many action types exist? Id. at 958:2-19. | There are ████████ for the ██████ column in the log table. | • ████████████████████████ |
| If not, are they captured elsewhere in the Capabilities Tool? Where? | ██████ review decisions are not stored in the Capability Tool. | • █████████████████ |
| Does █ indicate ███? Id. at 1076:11-22. | No. █ indicates ████. The ████████ meant that the ███████ deals with ████████. | • █████████████████ |