# EXHIBIT 31-B
## Redacted Version of
## Document Sought to be Sealed

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

 5   PRIVACY USER PROFILE LITIGATION) Case No.

 6   _____) 18-md-02843-VC

 7   This document relates to:      )

 8   ALL ACTIONS                    )

 9   _____)

10

11

12

13    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17              FACEBOOK INC. REPRESENTATIVE,

18              KONSTANTINOS PAPAMILTIADIS

19              TUESDAY, FEBRUARY 23, 2021

20

21

22   Reported by:

23   Ashala Tylor, CSR #2436, CLR, CRR, RPR

24   JOB NO. 4473154

25   PAGES 1 - 280
```

                                            Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4   IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5   PRIVACY USER PROFILE LITIGATION) Case No.

6   _____) 18-md-02843-VC

7   This document relates to:      )

8   ALL ACTIONS                    )

9   _____)

10

11

12

13

14

15

16       Videotaped deposition of FACEBOOK, INC.

17   REPRESENTATIVE, KONSTANTINOS PAPAMILTIADIS taken via

18   virtual Zoom, commencing at 9:10 a.m. and ending at

19   3:58 p.m., on Tuesday, February 23, 2021, before Ashala

20   Tylor, CSR No. 2436, RPR, CRR, CLR.

21

22

23

24

25

                                        Page  2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3        BLEICHMAR FONTI & AULD LLP

 4        BY:  LESLEY E. WEAVER, ESQ.

 5             ANNE DAVIS, ESQ.

 6             MATTHEW MONTGOMERY, ESQ.

 7             MATTHEW MELAMED, ESQ.

 8        555 12th Street, Suite 1600

 9        Oakland, California  94607

10        415.445.4003

11        lweaver@bfalaw.com

12        adavis@bfalaw.com

13        mmmontgomery@falaw.com

14        mmelamed@bfalaw.com

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1    A P P E A R A N C E S (continued)
 2    FOR PLAINTIFFS:
 3            KELLER ROHRBACK LLP
 4            BY:  DAVID KO, ESQ.
 5                 CARI C. LAUFENBERG, ESQ.
 6                 DAVID LOESER, ESQ.
 7            1201 Third Avenue, Suite 3200
 8            Seattle, Washington  98101-3052
 9            206.623.3384
10            dko@kellerrohrback.com
11            claufenberg@kellerrohrback.com
12            dloeser@kellerrohrback.com
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page  4
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    A P P E A R A N C E S (continued)

 2    FOR THE DEFENDANT FACEBOOK, INC.:

 3          GIBSON, DUNN & CRUTCHER LLP

 4          BY:  DEBORAH STEIN, ESQ.

 5               MARTIE KUTSCHER CLARK, ESQ.

 6          333 S. Grand Avenue, 47th Floor

 7          Los Angeles, California  90071

 8          213.229.7000

 9          dstein@gibsondunn.com

10          mkutscherClark@gibsondunn.com

11                   - and -

12          GIBSON DUNN & CRUTCHER LLP

13          BY:  LAURA MUMM, ESQ.

14          200 Park Avenue, 47th Floor

15          New York, New York  10166

16          212.351.4000

17          lmumm@gibsondunn.com

18

19    Also Present:

20          Ian Chen, In-House Facebook Counsel

21          Kimberly Decker, Videographer

22

23

24

25

                                        Page 5
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    I N D E X

 2   WITNESS        EXAMINATION BY              PAGE

 3   KONSTANTINOS PAPAMILTIADIS

 4                 Ms. Weaver                  9, 171

 5

 6                 E X H I B I T S

 7   NO.           DESCRIPTION                  PAGE

 8   Exhibit 1     Plaintiffs' Amended Notice of     10

 9                 Deposition of Defendant Facebook,

10                 Inc. Pursuant to Federal Rule of

11                 Civil Procedure 30(b)(6)

12   Exhibit 2     Discovery Order No. 9            10

13                 (Dkt. Nos. 515, 526, 537, 548)

14   Exhibit 3     Email from Simone LiTrenta to    49

15                 Matt Scutari and others, 5-8-14,

16                 FB CA MDL 00213423 - 443

17   Exhibit 4     Email exchange, top one from    240

18                 Simon Cross to Steven Elia,

19                 1-29-15, FB-CA-MDL-00227697 - 699

20   Exhibit 5     Excel spreadsheet,              265

21                 FB-CA-MDL-01434884.csv

22   Exhibit 6     Excel spreadsheet,              266

23                 FB-CA-MDL-01434885.csv

24                 Instruction Not to Answer

25                    Page 91, LIne 9
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                 Tuesday, February 23, 2021

 2                        9:10 a.m.

 3                        --o0o--

 4

 5             THE VIDEOGRAPHER:  Good morning.  We are      09:10

 6    going on the record at 9:10 a.m. on February 23rd of   09:10

 7    2021.  All participants are attending remotely.        09:10

 8             Audio and video recording will continue to    09:10

 9    take place unless all parties agree to go off the      09:10

10    record.                                                09:10

11             This is Media Unit 1 of the recorded          09:10

12    deposition of Facebook, Inc. representative,           09:10

13    Konstantinos Papamiltiadis, taken by counsel for the   09:10

14    plaintiffs in the matter of Facebook, Inc. Consumer    09:10

15    Privacy User Profile Litigation filed in the           09:10

16    United States District Court, Northern District of     09:10

17    California, Case Number 18-md-02843-VC.                09:10

18             My name is Kimberly Decker from Veritext      09:10

19    Legal Solutions and I'm the videographer.  The court   09:10

20    reporter is Ashala Tylor.  I'm not related to any      09:10

21    party in this action, nor am I financially             09:11

22    interested in the outcome.                             09:11

23             Counsel and all present will now state        09:11

24    their appearances and affiliations for the record.     09:11

25    If there are any objections to proceeding, please      09:11
```

Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | state them at the time of your appearance, beginning | 09:11 |
| 2 | with the noticing attorney. | 09:11 |
| 3 | MS. WEAVER:  Good morning, everybody.  I'm | 09:11 |
| 4 | Lesley Weaver, co-lead counsel for plaintiffs and | 09:11 |
| 5 | from Bleichmar Fonti & Auld. | 09:11 |
| 6 | MS. DAVIS:  Good morning.  Anne Davis also | 09:11 |
| 7 | for plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 8 | MR. MONTGOMERY:  Matthew Montgomery for | 09:11 |
| 9 | plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 10 | MR. MELAMED:  Matt Melamed for plaintiffs, | 09:11 |
| 11 | Bleichmar Fonti & Auld. | 09:11 |
| 12 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 13 | plaintiffs from Keller -- | 09:11 |
| 14 | THE REPORTER:  I'm sorry, one more time, | 09:11 |
| 15 | please. | 09:11 |
| 16 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 17 | plaintiffs from Keller Rohrback. | 09:11 |
| 18 | MR. KO:  David Ko of Keller Rohrback also | 09:11 |
| 19 | on behalf of the plaintiffs.  Good morning. | 09:12 |
| 20 | MR. LOESER:  Good morning.  Derek Loeser | 09:12 |
| 21 | from Keller Rohrback for plaintiffs. | 09:12 |
| 22 | MS. STEIN:  Are you ready for defendant? | 09:12 |
| 23 | Deborah Stein from Gibson, Dunn on behalf | 09:12 |
| 24 | of defendant Facebook. | 09:12 |
| 25 | MS. CLARK:  Martie Kutscher Clark from | 09:12 |

Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Gibson, Dunn also on behalf of Facebook. | 09:12 |
| 2 | MS. MUMM:  Laura Mumm from Gibson, Dunn on | 09:12 |
| 3 | behalf of Facebook. | 09:12 |
| 4 | MR. CHEN:  And this is Ian Chen.  I am | 09:12 |
| 5 | in-house counsel for Facebook. | 09:12 |
| 6 | THE VIDEOGRAPHER:  Would the court | 09:12 |
| 7 | reporter please swear in the witness. | 09:12 |
| 8 | | 09:13 |
| 9 | KONSTANTINOS PAPAMILTIADIS, | 09:13 |
| 10 | being first duly sworn or affirmed to testify | 09:13 |
| 11 | to the truth, the whole truth, and nothing but | 09:13 |
| 12 | the truth, was examined and testified as follows: | 09:13 |
| 13 | THE REPORTER:  Proceed, Counsel. | 09:13 |
| 14 | EXAMINATION | 09:13 |
| 15 | BY MS. WEAVER: | 09:13 |
| 16 | Q.   Good morning.  And thank you very much for | 09:13 |
| 17 | being here this morning and as we adjust to this new | 09:13 |
| 18 | process. | 09:13 |
| 19 | May I address you as K.P. throughout the | 09:13 |
| 20 | deposition or would you prefer Mr. Papamiltiadis? | 09:13 |
| 21 | A.   I don't need to ask counsel's permission | 09:13 |
| 22 | to answer that question.  I guess you can. | 09:13 |
| 23 | Q.   All right.  You come prepared. | 09:13 |
| 24 | I'm going to start by marking a couple of | 09:13 |
| 25 | exhibits, and I think that you've practiced with | 09:13 |

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | your counsel about how to pull those down.  These | 09:13 |
| 2 | will be the deposition notice and Discovery Order | 09:13 |
| 3 | Number 9. | 09:13 |
| 4 | So, first, we'll mark as Exhibit 1 the | 09:13 |
| 5 | notice for deposition in this action.  And Ms. Davis | 09:13 |
| 6 | is going to be marking that right now and uploading | 09:13 |
| 7 | it. | 09:13 |
| 8 | (Exhibit 1 was marked for | 09:13 |
| 9 | identification and attached | 09:13 |
| 10 | hereto.) | 09:13 |
| 11 | MS. WEAVER:  And then as Exhibit 2 she | 09:13 |
| 12 | will mark Discovery Order Number 9. | 09:13 |
| 13 | (Exhibit 2 was marked for | 09:13 |
| 14 | identification and attached | 09:13 |
| 15 | hereto.) | 09:13 |
| 16 | BY MS. WEAVER: | 09:13 |
| 17 | Q.   And I'll direct you to the portions of | 09:13 |
| 18 | those exhibits I'd like you to review.  Just let us | 09:13 |
| 19 | know when you have those. | 09:14 |
| 20 | MS. DAVIS:  They are distributed now. | 09:14 |
| 21 | BY MS. WEAVER: | 09:14 |
| 22 | Q.   Are you seeing those, K.P., in your -- | 09:14 |
| 23 | A.   Not -- yes, I can see Exhibit 2 now. | 09:14 |
| 24 | Q.   Okay.  Let's start with 1. | 09:14 |
| 25 | A.   I don't need to refresh -- I don't need to | 09:14 |

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | refresh the browser, right?  It's automatic, so... | 09:14 |
| 2 | MS. DAVIS:  On my end it shows that 1 and | 09:14 |
| 3 | 2 are distributing. | 09:14 |
| 4 | THE VIDEOGRAPHER:  And you do need to | 09:14 |
| 5 | refresh. | 09:14 |
| 6 | THE WITNESS:  Okay. | 09:15 |
| 7 | MS. WEAVER:  Yeah, I'm still just seeing | 09:15 |
| 8 | 2. | 09:15 |
| 9 | THE WITNESS:  Yeah, I can only see 2. | 09:15 |
| 10 | MS. WEAVER:  Do you see it now? | 09:15 |
| 11 | THE WITNESS:  Let me refresh as well. | 09:15 |
| 12 | Okay.  Great.  Do you want me to open | 09:15 |
| 13 | number 1? | 09:15 |
| 14 | BY MS. WEAVER: | 09:15 |
| 15 | Q.   Yes, please.  Thank you. | 09:15 |
| 16 | Do you recognize Exhibit 1? | 09:15 |
| 17 | A.   Can I take a look? | 09:15 |
| 18 | Q.   Yes, please. | 09:15 |
| 19 | MS. WEAVER:  And, for the record, | 09:15 |
| 20 | Exhibit 1 is Plaintiffs' Amended Notice of | 09:15 |
| 21 | Deposition of Defendant Facebook, Inc. Pursuant to | 09:15 |
| 22 | Federal Rule of Civil Procedure 30(b)(6). | 09:15 |
| 23 | Q.   K.P., I'll direct your attention just to | 09:16 |
| 24 | page 2 of the document where it says "Matters for | 09:16 |
| 25 | Testimony." | 09:16 |

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Page 2 you said? | 09:16 |
| 2 | Q.    Yes.  Have you seen Exhibit 1 before? | 09:16 |
| 3 | A.    I believe I have seen parts of that. | 09:16 |
| 4 | Q.    Okay.  So do you recognize it as the | 09:16 |
| 5 | notice for the deposition today? | 09:16 |
| 6 | A.    Yes. | 09:16 |
| 7 | Q.    And are you here today to testify on | 09:16 |
| 8 | behalf of Facebook? | 09:16 |
| 9 | A.    Yes, I am. | 09:16 |
| 10 | Q.    Okay.  And are you here to testify | 09:16 |
| 11 | regarding the format, nature, and location of | 09:16 |
| 12 | discoverable user data as defined by Discovery Order | 09:16 |
| 13 | Number 9 as set forth on Topic 1? | 09:17 |
| 14 | A.    I am not really sure I understand exactly | 09:17 |
| 15 | what that sentence means. | 09:17 |
| 16 | Q.    Okay.  Do you understand that you are | 09:17 |
| 17 | testifying in response to Topic 1? | 09:17 |
| 18 | MS. STEIN:  Objection to form. | 09:17 |
| 19 | THE WITNESS:  Topic 1 is -- sorry, | 09:17 |
| 20 | scrolling through the document. | 09:17 |
| 21 | MS. STEIN:  I'll just state for the record | 09:17 |
| 22 | that we lodged objections to the description of the | 09:17 |
| 23 | categories in this notice, but, you know, the | 09:17 |
| 24 | witness is free to describe his understanding as to | 09:17 |
| 25 | what he's going to be testifying about today. | 09:17 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                        09:17

 2        Q.   So I'll restate my question, K.P.  Have     09:17

 3    you reviewed Topic 1 before today?                   09:17

 4        A.   I'm sorry, I'm having a hard time locating   09:17

 5    where is the Topic 1.                                09:17

 6        Q.   Okay.  It's page 2 where it says "Matters   09:17

 7    for Testimony" under Roman Numeral III.              09:17

 8            MS. STEIN:  Lesley, I think it may be        09:17

 9    further down in the document.                        09:18

10            MR. KO:  Yeah, there's a couple page 2s.     09:18

11    K.P., it's page 6 of the PDF.                        09:18

12            THE WITNESS:  Okay.  Sorry.                  09:18

13    BY MS. WEAVER:                                       09:18

14        Q.   My apologies.                               09:18

15        A.   I was like -- I was like, what am I         09:18

16    missing here?                                        09:18

17        Q.   I apologize for that.                       09:18

18            I see.  Yes, it's page 2 of the exhibit.     09:18

19        A.   Wait.  Now, I'm getting confused.  It's     09:18

20    page 2 -- so I have page 2 under Schedule A.  I      09:18

21    have --                                              09:18

22        Q.   Right.  Go to Schedule A and page 2 of      09:18

23    Schedule A.                                          09:18

24        A.   Okay.  Matters of testimony.  That's what   09:18

25    you're looking at?                                   09:18
```

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Exactly. | 09:18 |
| 2 | A.   Okay. | 09:18 |
| 3 | Q.   So do you see where it says "Topic 1:  The | 09:18 |
| 4 | format, nature, and location of 'discoverable user | 09:18 |
| 5 | data' as defined by Discovery Order Number 9?"  Do | 09:18 |
| 6 | you see that? | 09:18 |
| 7 | A.   Yes, I do see that. | 09:18 |
| 8 | Q.   Are you here today to testify regarding | 09:18 |
| 9 | that topic? | 09:18 |
| 10 | MS. STEIN:  Objection to form. | 09:18 |
| 11 | THE WITNESS:  Like I said -- | 09:18 |
| 12 | BY MS. WEAVER: | 09:19 |
| 13 | Q.   You may answer. | 09:19 |
| 14 | A.   I don't know what "format" means in that | 09:19 |
| 15 | context, or "location," but I'm here to tell you | 09:19 |
| 16 | about how Facebook has access to user data and how | 09:19 |
| 17 | this is made available to third parties if that's | 09:19 |
| 18 | relevant. | 09:19 |
| 19 | Q.   Okay.  Great.  And are you here to discuss | 09:19 |
| 20 | data collected from a user's on-platform activity as | 09:19 |
| 21 | well as off-platform activity? | 09:19 |
| 22 | A.   Yes. | 09:19 |
| 23 | Q.   Okay.  Great.  As well as data inferred | 09:19 |
| 24 | from on- or off-platform activity? | 09:19 |
| 25 | A.   That's correct. | 09:19 |

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  Great. | 09:19 |
| 2 | What did you do to prepare for your | 09:19 |
| 3 | deposition today? | 09:19 |
| 4 | A.   Well, part of my job is to -- you know, | 09:19 |
| 5 | and so my day-to-day job is to work on integrations | 09:19 |
| 6 | that have access to data, including user data.  I | 09:19 |
| 7 | have been a Facebook employee for the last eight and | 09:19 |
| 8 | a half years, so this is my day-to-day job to some | 09:19 |
| 9 | extent.  At the same time I had a number of sessions | 09:19 |
| 10 | with my counsels in preparation of this deposition | 09:19 |
| 11 | to make sure that I familiarize myself with certain | 09:19 |
| 12 | aspects related to this deposition. | 09:20 |
| 13 | Q.   Great.  And looking back at Exhibit 1, if | 09:20 |
| 14 | you turn to the next page, it says "Schedule B" | 09:20 |
| 15 | after the matters? | 09:20 |
| 16 | A.   Yes. | 09:20 |
| 17 | Q.   Do you see where it says Plaintiffs' | 09:20 |
| 18 | request for production of certain documents?  There | 09:20 |
| 19 | are two categories of documents. | 09:20 |
| 20 | A.   Yeah. | 09:20 |
| 21 | Q.   Did you review any documents or consult | 09:20 |
| 22 | them to prepare for your deposition today? | 09:20 |
| 23 | A.   I'm not sure they all documents.  This is | 09:20 |
| 24 | something I can, you know, like suggest that I have | 09:20 |
| 25 | knowledge of. | 09:20 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I reviewed certain documents, yes, but I | 09:20 |
| 2 | don't know if that was all of them. | 09:20 |
| 3 | Q.   Okay.  And what did you review? | 09:20 |
| 4 | A.   I reviewed this document, for example.  I | 09:20 |
| 5 | reviewed some data policies from the past 10 or so | 09:20 |
| 6 | years.  I reviewed the contents of the download | 09:20 |
| 7 | information files.  I reviewed developer | 09:20 |
| 8 | documentation.  Different things. | 09:21 |
| 9 | Q.   Okay.  So when you say you reviewed data | 09:21 |
| 10 | policies, about how many did you review? | 09:21 |
| 11 | A.   I can't remember.  Five or six. | 09:21 |
| 12 | Q.   Okay.  And you said you also reviewed | 09:21 |
| 13 | developer documentation; is that right? | 09:21 |
| 14 | A.   Yes. | 09:21 |
| 15 | Q.   And what do you mean by that?  What were | 09:21 |
| 16 | those documents? | 09:21 |
| 17 | A.   And so any information with regards to our | 09:21 |
| 18 | APIs is fully documented on our website, | 09:21 |
| 19 | developers.facebook.com.  And so while I spent a | 09:21 |
| 20 | considerable amount of my time there, I wanted to | 09:21 |
| 21 | familiarize myself with certain aspects of the API | 09:21 |
| 22 | that's maybe, you know, the item of your questions | 09:21 |
| 23 | here. | 09:21 |
| 24 | Q.   Okay.  And how many developer documents | 09:21 |
| 25 | did you review? | 09:21 |

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I mean the developer website is 5,000 | 09:21 |
| 2 | pages.  I reviewed at least, you know, documentation | 09:21 |
| 3 | for the basic APIs. | 09:21 |
| 4 | Q.   And when you say "the basic APIs," which | 09:21 |
| 5 | APIs do you mean? | 09:22 |
| 6 | A.   The Graph API. | 09:22 |
| 7 | Q.   Which version? | 09:22 |
| 8 | A.   Well, there is only one version right now. | 09:22 |
| 9 | Q.   You reviewed the current version? | 09:22 |
| 10 | A.   The current version, yes. | 09:22 |
| 11 | Q.   Okay.  Did you understand that testimony | 09:22 |
| 12 | today was to be limited to the time period 2012 to | 09:22 |
| 13 | 2017? | 09:22 |
| 14 | A.   Yes, I do. | 09:22 |
| 15 | Q.   Okay.  So did you review the Graph API | 09:22 |
| 16 | documentation for that time period? | 09:22 |
| 17 | A.   I don't need to.  I understand. | 09:22 |
| 18 | Q.   Because -- | 09:22 |
| 19 | A.   Because I understand Version 1 of the API | 09:22 |
| 20 | as well as I do the current version. | 09:22 |
| 21 | Q.   And how many developer documents did you | 09:22 |
| 22 | say you reviewed? | 09:22 |
| 23 | A.   It's hard to quantify a number of pages. | 09:22 |
| 24 | They're web pages, right?  So I don't know how you | 09:22 |
| 25 | want me to -- I may have reviewed like three or four | 09:22 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | different, you know, like web pages. | 09:22 |
| 2 | Q.   So you would identify those by hyperlinks; | 09:22 |
| 3 | is that right? | 09:22 |
| 4 | A.   Yes. | 09:22 |
| 5 | Q.   Great.  And then did you say that you | 09:22 |
| 6 | reviewed a third category of documents as well? | 09:22 |
| 7 | A.   Yes, the contents of the downloaded | 09:23 |
| 8 | information file, the fields included, more | 09:23 |
| 9 | specifically. | 09:23 |
| 10 | Q.   And was that a web page as well? | 09:23 |
| 11 | A.   That was produced in the form of PDF. | 09:23 |
| 12 | Q.   And did you review anything else? | 09:23 |
| 13 | A.   I don't think so.  That's -- that's pretty | 09:23 |
| 14 | much it. | 09:23 |
| 15 | MS. WEAVER:  Okay.  So, Counsel, we | 09:23 |
| 16 | obviously already have requested production and | 09:23 |
| 17 | identification of those documents.  If they've | 09:23 |
| 18 | already been produced -- we repeat the request. | 09:23 |
| 19 | Q.   Do you have a current -- current CV? | 09:23 |
| 20 | A.   You mean a resume? | 09:23 |
| 21 | Q.   Yes. | 09:23 |
| 22 | A.   Yes, I do. | 09:23 |
| 23 | Q.   Okay.  Great. | 09:23 |
| 24 | MS. WEAVER:  We request that as well. | 09:23 |
| 25 | Q.   Okay.  You joined Facebook in 2012; that's | 09:23 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 09:23 |
| 2 | A.   Correct. | 09:23 |
| 3 | Q.   And you're a current employee; is that | 09:23 |
| 4 | right? | 09:24 |
| 5 | A.   Yes. | 09:24 |
| 6 | Q.   So I hope you'll bear with us.  We're | 09:24 |
| 7 | laying the foundation, and this is our first | 09:24 |
| 8 | deposition in this case, and so we need to establish | 09:24 |
| 9 | a few definitions that I'm sure will seem obvious to | 09:24 |
| 10 | you. | 09:24 |
| 11 | What is a Facebook user? | 09:24 |
| 12 | MS. STEIN:  I'm just going to -- I'm just | 09:24 |
| 13 | going to, you know, object to form, and, you know, | 09:24 |
| 14 | the witness can testify as to his -- the | 09:24 |
| 15 | understanding he'll use today. | 09:24 |
| 16 | BY MS. WEAVER: | 09:24 |
| 17 | Q.   So that means you may answer.  Go ahead. | 09:24 |
| 18 | So what is a Facebook user? | 09:24 |
| 19 | A.   So I'll give you the definition that I | 09:24 |
| 20 | have.  I don't think it's anywhere documented.  But | 09:24 |
| 21 | when we talk about the Facebook user, we are talking | 09:24 |
| 22 | about the -- the accounts that the human has created | 09:24 |
| 23 | that represents their presence on the Facebook | 09:24 |
| 24 | platform. | 09:24 |
| 25 | Q.   And what is a Facebook platform? | 09:24 |

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Historically that platform has evolved | 09:25 |
| 2 | from being just facebook.com to include Instagram, | 09:25 |
| 3 | Messenger, Oculus, and -- | 09:25 |
| 4 | Q.   And so is the platform the website upon | 09:25 |
| 5 | which users engage?  Is that fair to say? | 09:25 |
| 6 | A.   It's not just the website because you most | 09:25 |
| 7 | likely use -- I don't know if you have a Facebook | 09:25 |
| 8 | account, but I assume that you may have used | 09:25 |
| 9 | Facebook on your Apple device or your Android | 09:25 |
| 10 | device.  So it's not just the website.  It used to | 09:25 |
| 11 | be just the website. | 09:25 |
| 12 | Q.   So Facebook now offers products and | 09:25 |
| 13 | services like Facebook Messenger, Facebook Watch, | 09:25 |
| 14 | Facebook Portal, Facebook Business Tools and | 09:25 |
| 15 | Facebook Payments, correct?  Is that correct? | 09:25 |
| 16 | A.   That's -- | 09:25 |
| 17 | MS. STEIN:  Object to form. | 09:25 |
| 18 | THE WITNESS:  I think you just listed some | 09:25 |
| 19 | of our products, not every single product. | 09:25 |
| 20 | BY MS. WEAVER: | 09:25 |
| 21 | Q.   Okay.  For the products that I listed, do | 09:25 |
| 22 | they all collect data from users? | 09:25 |
| 23 | A.   I mean depends how you define "collect." | 09:26 |
| 24 | Q.   What does -- what does collect mean to | 09:26 |
| 25 | you? | 09:26 |

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   If we are talking about creating an | 09:26 |
| 2 | account which requires the user to enter a username, | 09:26 |
| 3 | passwords, first name, last name, I don't think | 09:26 |
| 4 | that's possible in every single one of those | 09:26 |
| 5 | products.  I don't know that you can create an | 09:26 |
| 6 | account on Portal, for example. | 09:26 |
| 7 | Q.   Okay.  But regardless of whether or not | 09:26 |
| 8 | you create an account, do all of those services | 09:26 |
| 9 | collect data about Facebook users? | 09:26 |
| 10 | MS. STEIN:  Objection to form and object | 09:26 |
| 11 | to the extent that some of those products may not be | 09:26 |
| 12 | from the relevant time period. | 09:26 |
| 13 | THE WITNESS:  Yeah. | 09:26 |
| 14 | BY MS. WEAVER: | 09:26 |
| 15 | Q.   You may answer. | 09:26 |
| 16 | A.   I mean that's -- that's probably a good | 09:26 |
| 17 | point.  The products that you're talking about have | 09:26 |
| 18 | not been available to users before 2017, but I'll | 09:26 |
| 19 | answer the question by -- | 09:26 |
| 20 | Q.   Thank you. | 09:26 |
| 21 | A.    -- saying it depends.  In most cases we | 09:26 |
| 22 | are talking about activity data and not -- | 09:27 |
| 23 | Q.   What is the primary objective of the | 09:27 |
| 24 | platform when it was originally created? | 09:27 |
| 25 | A.   By "platform" you mean Facebook or the | 09:27 |

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Facebook developer platform? | 09:27 |
| 2 | Q.   Facebook -- well, let's start with | 09:27 |
| 3 | Facebook and then talk about the Facebook developer | 09:27 |
| 4 | platform. | 09:27 |
| 5 | MS. STEIN:  Objection to form and beyond | 09:27 |
| 6 | the scope of what this witness is authorized to | 09:27 |
| 7 | testify about on behalf of the company. | 09:27 |
| 8 | But you can testify as to your | 09:27 |
| 9 | understanding just for foundation. | 09:27 |
| 10 | BY MS. WEAVER: | 09:27 |
| 11 | Q.   I'll ask the question again. | 09:27 |
| 12 | What was the primary purpose of the | 09:27 |
| 13 | Facebook platform when it was created, the website? | 09:27 |
| 14 | A.   So Facebook, the -- the Facebook product, | 09:27 |
| 15 | which also is referred as platform, is -- or was | 09:27 |
| 16 | always meant to allow people to connect with each | 09:27 |
| 17 | other and create a more open and connected world. | 09:27 |
| 18 | Q.   Thank you. | 09:27 |
| 19 | A.   Which would help the value of community | 09:27 |
| 20 | and we build a service to basically help people | 09:28 |
| 21 | connect. | 09:28 |
| 22 | Q.   So it was meant to allow people to connect | 09:28 |
| 23 | socially as well; is that fair? | 09:28 |
| 24 | A.   No, that's -- | 09:28 |
| 25 | MS. STEIN:  Object to form. | 09:28 |

Page  22

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I mean I don't know of any | 09:28 |
| 2 | other connection. | 09:28 |
| 3 | BY MS. WEAVER: | 09:28 |
| 4 | Q.   Okay.  And what was the purpose of the | 09:28 |
| 5 | Facebook developer platform, in your understanding? | 09:28 |
| 6 | A.   The Facebook develop -- | 09:28 |
| 7 | MS. STEIN:  I'm going to object here. | 09:28 |
| 8 | This, you know, is both outside the scope of the | 09:28 |
| 9 | deposition and what this witness is authorized to | 09:28 |
| 10 | testify about.  And dating -- dating back -- | 09:28 |
| 11 | MS. WEAVER:  I understand your objection. | 09:28 |
| 12 | You can either instruct him not to answer or allow | 09:28 |
| 13 | him to answer. | 09:28 |
| 14 | MS. STEIN:  I will allow him to answer to | 09:28 |
| 15 | his understanding. | 09:28 |
| 16 | BY MS. WEAVER: | 09:28 |
| 17 | Q.   So you referenced the Facebook developer | 09:28 |
| 18 | platform earlier.  What's your understanding of its | 09:28 |
| 19 | purpose when it was created? | 09:28 |
| 20 | A.   And so our mission to -- you know, to | 09:28 |
| 21 | connect the world and bring the whole world closer | 09:28 |
| 22 | together is not something that we could do on our | 09:28 |
| 23 | own resources, you know.  So we built the platform, | 09:29 |
| 24 | like a lot of technology companies have done, to | 09:29 |
| 25 | allow third parties to build on top of our platform | 09:29 |

Page  23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | and bring capabilities and experiences for people to | 09:29 |
| 2 | connect on their surfaces in many ways. | 09:29 |
| 3 | Q.   And is it fair to say that Facebook has | 09:29 |
| 4 | three constituents then:  Its business partners, | 09:29 |
| 5 | developer partners, and users? | 09:29 |
| 6 | MS. STEIN:  Objection to form. | 09:29 |
| 7 | THE WITNESS:  I'm not sure I understand | 09:29 |
| 8 | exactly the definition of developer -- sorry, | 09:29 |
| 9 | business partner.  Because, you know, like developer | 09:29 |
| 10 | partners are also businesses.  So I could probably | 09:29 |
| 11 | put them in the same bucket. | 09:29 |
| 12 | BY MS. WEAVER: | 09:29 |
| 13 | Q.   I just didn't quite understand your answer | 09:29 |
| 14 | there, and my -- | 09:29 |
| 15 | A.   So I -- so I cannot really, you know, like | 09:29 |
| 16 | give a distinction between business partners and | 09:29 |
| 17 | developer partners.  Developer partners are also | 09:29 |
| 18 | businesses. | 09:30 |
| 19 | Q.   Got it.  So who do you understand to be | 09:30 |
| 20 | encompassed in the business partners? | 09:30 |
| 21 | A.   Probably -- | 09:30 |
| 22 | MS. STEIN:  Objection to form. | 09:30 |
| 23 | THE WITNESS:  Sorry. | 09:30 |
| 24 | BY MS. WEAVER: | 09:30 |
| 25 | Q.   You may answer. | 09:30 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    A business partner is probably anybody      09:30
 2   that is not a developer partner, I would imagine, in   09:30
 3   that definition.                                       09:30
 4        Q.    Can you think of categories of business     09:30
 5   partners that would be included in that?  Would it     09:30
 6   include data brokers, for example?                     09:30
 7             MS. STEIN:  Objection to form.               09:30
 8             THE WITNESS:  I'm not sure what you're       09:30
 9   referring to, data brokers.  But I can -- I can give   09:30
10   you a list of different partners in case that helps    09:30
11   answer the question.                                   09:30
12   BY MS. WEAVER:                                         09:30
13        Q.    Yes, that would be helpful, please.         09:30
14        A.    So historically Facebook has engaged with   09:30
15   maybe four or five categories of so-called partners.   09:30
16   One category of them is device manufacturers and       09:30
17   mobile operators.  They help us build the -- within    09:30
18   that period of time that I think you're talking        09:31
19   about, they help us build Facebook-like experiences    09:31
20   in order to reach a wider audience.                    09:31
21             A second category is what we call            09:31
22   developer partners.  Those are third-party software    09:31
23   companies that have access to our APIs and they        09:31
24   build experience for both consumers and other          09:31
25   businesses.                                            09:31
```

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A third category is anybody that is a | 09:31 |
| 2 | business that is publishing on our platform, from | 09:31 |
| 3 | news companies to NZOs, the UNICEFs of this world. | 09:31 |
| 4 | The WHO is using our platform to make sure that | 09:31 |
| 5 | people have accurate information about COVID; we | 09:31 |
| 6 | would consider them to be a partner of some sort. | 09:31 |
| 7 | And a fourth category would be what, I | 09:31 |
| 8 | think, other comments may call suppliers.  We -- we | 09:31 |
| 9 | have partners in place with companies like | 09:31 |
| 10 | Salesforce because we need to maintain a record of | 09:31 |
| 11 | our, you know, partners.  We work very closely with | 09:32 |
| 12 | Workday because that's where our employee data is | 09:32 |
| 13 | stored.  My salary and everything related to me | 09:32 |
| 14 | somehow is stored to like this.  We would still call | 09:32 |
| 15 | them or refer to them as a business partner in that | 09:32 |
| 16 | sense. | 09:32 |
| 17 | So those broadly are the four categories | 09:32 |
| 18 | of partners that I can -- I'm not sure if that | 09:32 |
| 19 | answers your question. | 09:32 |
| 20 | Q.   That's very helpful.  No, thank you very | 09:32 |
| 21 | much. | 09:32 |
| 22 | And so, again, this is rudimentary, but | 09:32 |
| 23 | what do you understand "data" to mean? | 09:32 |
| 24 | And let me back up and say every time I | 09:32 |
| 25 | ask you in this deposition -- I refer to "you," | 09:32 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | because you're testifying on behalf of Facebook, I | 09:32 |
| 2 | mean Facebook.  Is that fair? | 09:32 |
| 3 | A.   (Unreportable response.) | 09:32 |
| 4 | Q.   Do you have -- what is your general | 09:32 |
| 5 | understanding of what data is? | 09:32 |
| 6 | A.   I'm waiting for my counsel.  She is not | 09:32 |
| 7 | talking so I can answer, I guess. | 09:32 |
| 8 | Q.   Yes, exactly. | 09:32 |
| 9 | A.   There is a little bit of lag -- there is a | 09:32 |
| 10 | little bit of lag.  Sorry.  I just want to make sure | 09:32 |
| 11 | I don't talk over about you -- everybody. | 09:33 |
| 12 | Data is information. | 09:33 |
| 13 | Q.   Okay.  And content and code and materials | 09:33 |
| 14 | as well are all information.  Is that all data, in | 09:33 |
| 15 | your understanding? | 09:33 |
| 16 | A.   Code is not really information. | 09:33 |
| 17 | Information in the code, if you are an engineer, | 09:33 |
| 18 | yes.  But not in a -- for everybody else. | 09:33 |
| 19 | Q.   Great.  Does Facebook collect information | 09:33 |
| 20 | about how users use Facebook's products? | 09:33 |
| 21 | A.   It's kind of broad statement, but we do | 09:33 |
| 22 | have an understanding of when people use our | 09:33 |
| 23 | services, yes. | 09:33 |
| 24 | Q.   Okay.  So Facebook collects -- and so | 09:33 |
| 25 | going forward, when we say "information," we may | 09:33 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | also mean data and we can ask for clarification. | 09:33 |
| 2 | But, in general, that's the same concept for | 09:33 |
| 3 | purposes of this deposition; is that fair? | 09:33 |
| 4 | A.   Yeah.   I just want to make sure that, you | 09:34 |
| 5 | know, like we don't use those terms very loosely, | 09:34 |
| 6 | because sometime the information that we are talking | 09:34 |
| 7 | about is activity information and not necessarily | 09:34 |
| 8 | user data. | 09:34 |
| 9 | Q.   I understand.   So we'll just clarify so | 09:34 |
| 10 | that we have our meanings correctly. | 09:34 |
| 11 | So does Facebook collect information about | 09:34 |
| 12 | when users are using and have last used products, | 09:34 |
| 13 | for example? | 09:34 |
| 14 | A.   Any product, no.   The Facebook products, | 09:34 |
| 15 | yes. | 09:34 |
| 16 | Q.   Okay.   And Facebook collects information | 09:34 |
| 17 | about posts and videos and contents that they | 09:34 |
| 18 | review; is that right? | 09:34 |
| 19 | MS. STEIN:   I'm just going -- sorry.   I | 09:34 |
| 20 | just want to -- so -- | 09:34 |
| 21 | MS. WEAVER:   Please don't coach the | 09:34 |
| 22 | witness.   Just state an objection. | 09:34 |
| 23 | MS. STEIN:   No, Lesley, this is to you | 09:34 |
| 24 | actually.   Just so you're framing your questions in | 09:34 |
| 25 | the present, but the time period is 2012 to 2017. | 09:34 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you want to have some sort of agreement so that | 09:34 |
| 2 | that's -- | 09:34 |
| 3 | MS. WEAVER:  Sure. | 09:34 |
| 4 | MS. STEIN:  You know what I'm saying?  I | 09:34 |
| 5 | just want to have something on the record.  I have a | 09:35 |
| 6 | feeling -- | 09:35 |
| 7 | MS. WEAVER:  That is fair. | 09:35 |
| 8 | MS. STEIN:  -- it might go in and out. | 09:35 |
| 9 | But I don't coach witnesses, so -- you know, for the | 09:35 |
| 10 | record. | 09:35 |
| 11 | MS. WEAVER:  Great. | 09:35 |
| 12 | Q.   So for purposes of this deposition, K.P., | 09:35 |
| 13 | we're going to be referring to the time period 2012 | 09:35 |
| 14 | to 2017.  You can assume that.  If you need to | 09:35 |
| 15 | clarify a question, let's just clarify it.  Is | 09:35 |
| 16 | that -- is that fair?  Okay. | 09:35 |
| 17 | A.   That's fine by me. | 09:35 |
| 18 | But can you repeat the question? | 09:35 |
| 19 | Q.   Yeah, no problem. | 09:35 |
| 20 | A.   Thanks. | 09:35 |
| 21 | Q.   So does Facebook also log when users are | 09:35 |
| 22 | using and have last used Facebook's products? | 09:35 |
| 23 | A.   Yes, we would know when you open them up | 09:35 |
| 24 | and when you close it. | 09:35 |
| 25 | Q.   And also what posts, videos, and other | 09:35 |

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | contents users view? | 09:35 |
| 2 | A.   Yes, we would. | 09:35 |
| 3 | Q.   Okay.  And do you collect information | 09:35 |
| 4 | about how users' use features like the camera, | 09:36 |
| 5 | Facebook camera? | 09:36 |
| 6 | A.   I don't know.  I don't think so.  Unless | 09:36 |
| 7 | it's within the app itself. | 09:36 |
| 8 | Q.   Okay.  Does Facebook analyze content | 09:36 |
| 9 | information about users? | 09:36 |
| 10 | A.   I'm not sure I understand the question. | 09:36 |
| 11 | What do you mean "content"? | 09:36 |
| 12 | Q.   Well, I'm just trying to introduce a | 09:36 |
| 13 | couple of topics here, and I'm actually working off | 09:36 |
| 14 | the congressional testimony that Facebook submitted | 09:36 |
| 15 | in 2018. | 09:36 |
| 16 | So it says "We also receive and analyze | 09:36 |
| 17 | content, communications and information that other | 09:36 |
| 18 | people provide when they use our products." | 09:36 |
| 19 | So I'm just asking you, is it true that | 09:36 |
| 20 | Facebook receives and analyzes content, | 09:36 |
| 21 | communications and information that other people | 09:36 |
| 22 | provide? | 09:36 |
| 23 | A.   By "other people," I guess we mean users? | 09:36 |
| 24 | Q.   Yes. | 09:36 |
| 25 | A.   Okay.  I think there's definitely some | 09:36 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    truth to that statement.  I mean just to give you an      09:37
 2    idea, if you come to Facebook and you post something      09:37
 3    that is against our policies, if -- if it's an            09:37
 4    explicit, you know, something that promotes violence      09:37
 5    or something like that, we have a responsibility to       09:37
 6    take it down.  So in that sense we do analyze that        09:37
 7    content for the purposes of keeping our community         09:37
 8    safe.                                                     09:37
 9         Q.   Okay.  Is it true that Facebook collects        09:37
10    information about the computers, phones, connected        09:37
11    TVs and other web-connected devices that users use?       09:37
12         A.   Throughout the -- the activity we would         09:37
13    collect the IP address.  If it's connected -- or if       09:37
14    the user is connected through a mobile phone, we          09:37
15    probably collect information about the carrier.  If       09:37
16    they are on a desktop, we collect information about       09:37
17    their Internet service provider, yes, the browser        09:37
18    version, things like this.                                09:37
19         Q.   Okay.  And does Facebook use the                09:37
20    information collected about users' use of their           09:37
21    products to better personalize the content,              09:38
22    including ads or features they see?                       09:38
23         A.   Yes.                                            09:38
24         Q.   Okay.  And -- and so also do -- does            09:38
25    Facebook track that information across devices that       09:38
```

                                                    Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | users use? | 09:38 |
| 2 | MS. STEIN:  Object to the form. | 09:38 |
| 3 | THE WITNESS:  I'm not sure I understand | 09:38 |
| 4 | what "tracking" means in that sense. | 09:38 |
| 5 | BY MS. WEAVER: | 09:38 |
| 6 | Q.   So I'm just again reading to you. | 09:38 |
| 7 | "We use information collected about users' | 09:38 |
| 8 | use of our products on their phone to better | 09:38 |
| 9 | personalize the content they see when they use our | 09:38 |
| 10 | products on another device such as their laptop or | 09:38 |
| 11 | tablet, or to measure whether they took an action in | 09:38 |
| 12 | response to an ad we showed them on their phone on a | 09:38 |
| 13 | different device." | 09:38 |
| 14 | Is that a true statement? | 09:38 |
| 15 | A.   Yes, that's a true statement. | 09:38 |
| 16 | Q.   Okay.  Does that include battery level? | 09:38 |
| 17 | A.   I don't think so. | 09:38 |
| 18 | Q.   Is it a true statement that Facebook | 09:38 |
| 19 | obtains information from these devices which | 09:38 |
| 20 | includes information about the operating system, | 09:38 |
| 21 | hardware and software versions, battery level, | 09:39 |
| 22 | signal strength, available storage space, browser | 09:39 |
| 23 | type, app and file names and types, and plug-ins? | 09:39 |
| 24 | Is that a true statement? | 09:39 |
| 25 | A.   There are certain things there that I | 09:39 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | don't think we have any access to.  But there are | 09:39 |
| 2 | certain others like the browser version like I | 09:39 |
| 3 | mentioned before that we do. | 09:39 |
| 4 | Q.   Again, this is from Congress's | 09:39 |
| 5 | congressional written testimony. | 09:39 |
| 6 | Does Facebook collect information about | 09:39 |
| 7 | operations and behaviors performed on devices such | 09:39 |
| 8 | as whether a window is foregrounded or backgrounded | 09:39 |
| 9 | or mouse movements? | 09:39 |
| 10 | MS. STEIN:  Objection to form. | 09:39 |
| 11 | THE WITNESS:  I don't know. | 09:39 |
| 12 | BY MS. WEAVER: | 09:39 |
| 13 | Q.   Does Facebook collect that information? | 09:39 |
| 14 | A.   I don't know. | 09:39 |
| 15 | Q.   You don't know? | 09:39 |
| 16 | A.   I don't know. | 09:39 |
| 17 | Q.   Okay.  Does Facebook collect identifiers | 09:39 |
| 18 | about users? | 09:39 |
| 19 | A.   Can you explain what you mean by | 09:39 |
| 20 | "identifiers"? | 09:39 |
| 21 | Q.   Yeah.  What is an identifier?  Do you | 09:39 |
| 22 | know? | 09:40 |
| 23 | A.   Well, I mean the users are locked in when | 09:40 |
| 24 | they are on Facebook, so we already have an | 09:40 |
| 25 | understanding of who the users are.  Is that an | 09:40 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | identifier? | 09:40 |
| 2 |     Q.   Okay.  Is there something called a | 09:40 |
| 3 | Facebook identifier? | 09:40 |
| 4 |     A.   There's a Facebook identity. | 09:40 |
| 5 |     Q.   Do you know what a Facebook identifier is, | 09:40 |
| 6 | a user identifier? | 09:40 |
| 7 |     A.   No. | 09:40 |
| 8 |     Q.   Okay.  So is this statement true: | 09:40 |
| 9 | Facebook collects information about unique | 09:40 |
| 10 | identifiers, device IDs and other identifiers, such | 09:40 |
| 11 | as from games, apps or accounts users use and family | 09:40 |
| 12 | device identifiers?  Does Facebook collect that | 09:40 |
| 13 | information? | 09:40 |
| 14 |     A.   I mean we have an understanding of people | 09:40 |
| 15 | that log in on third-party apps using the Facebook | 09:40 |
| 16 | identity, and we have an ID for that, yes. | 09:40 |
| 17 |     Q.   And, for example, Apple has its own | 09:40 |
| 18 | identifier; isn't that true? | 09:40 |
| 19 |     A.   Yes, we have an Apple ID, I guess. | 09:40 |
| 20 |     Q.   And there's an Android ID as well; is that | 09:41 |
| 21 | right? | 09:41 |
| 22 |     A.   Yes. | 09:41 |
| 23 |     Q.   And a Google ID? | 09:41 |
| 24 |     A.   It's probably the same as Android, yes. | 09:41 |
| 25 |     Q.   Okay.  And so does Facebook use those | 09:41 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | identifiers to collect information about people? | 09:41 |
| 2 | A.   Those specific ones, no. | 09:41 |
| 3 | Q.   Okay.  Do they use -- they don't use | 09:41 |
| 4 | those -- are you -- are you testifying today that | 09:41 |
| 5 | Facebook does not use the Apple identifier to | 09:41 |
| 6 | collect information about people? | 09:41 |
| 7 | A.   We don't. | 09:41 |
| 8 | Q.   Okay. | 09:41 |
| 9 | A.   How can we? | 09:41 |
| 10 | Q.   Okay. | 09:41 |
| 11 | A.   It's impossible. | 09:41 |
| 12 | Q.   Does Facebook collect information about | 09:41 |
| 13 | Bluetooth signals and information about nearby Wi-Fi | 09:41 |
| 14 | access points, beacons and cell towers? | 09:41 |
| 15 | A.   I believe we do, yes. | 09:41 |
| 16 | Q.   Does Facebook collect data from device | 09:41 |
| 17 | settings, information that users allow us -- let me | 09:41 |
| 18 | try that.  Do they collect data from device settings | 09:41 |
| 19 | when users turn them on, such as their GPS location, | 09:41 |
| 20 | camera or photos? | 09:41 |
| 21 | A.   Some of that would require consent, but I | 09:42 |
| 22 | think, broadly speaking, if there is consent, yes, | 09:42 |
| 23 | we do collect. | 09:42 |
| 24 | Q.   For these other categories that we have | 09:42 |
| 25 | been discussing, does Facebook collect that data | 09:42 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | without consent? | 09:42 |
| 2 | MS. STEIN:  Object to form. | 09:42 |
| 3 | THE WITNESS:  Sorry, I didn't hear the | 09:42 |
| 4 | objection. | 09:42 |
| 5 | BY MS. WEAVER: | 09:42 |
| 6 | Q.   You said that for these kinds of data you | 09:42 |
| 7 | sometimes had to obtain consent.  Are there -- is | 09:42 |
| 8 | there other kinds of data that Facebook collects | 09:42 |
| 9 | without consent? | 09:42 |
| 10 | A.   No, no, no. | 09:42 |
| 11 | Q.   All right. | 09:42 |
| 12 | A.   I should probably say that's from | 09:42 |
| 13 | everything.  But it seems that there was an omission | 09:42 |
| 14 | from my part.  There's no way we can collect any of | 09:42 |
| 15 | that data without users' consent. | 09:42 |
| 16 | Q.   Okay.  Does Facebook collect information | 09:42 |
| 17 | about users' connection speed and other devices that | 09:42 |
| 18 | are nearby? | 09:42 |
| 19 | A.   I don't know about the other devices, but | 09:42 |
| 20 | the connection speed is something that we would log, | 09:42 |
| 21 | yes. | 09:42 |
| 22 | Q.   Okay.  Well, is it a true statement that | 09:42 |
| 23 | "Facebook collects information about other devices | 09:42 |
| 24 | that are nearby or on their network so we can do | 09:42 |
| 25 | things like help users stream a video from their | 09:43 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | phone to their TV"?  Is that a true statement? | 09:43 |
| 2 | A.   Yes, that's a true statement. | 09:43 |
| 3 | Q.   Okay.  Does Facebook also collect cookie | 09:43 |
| 4 | data? | 09:43 |
| 5 | A.   We have access to certain cookies, yes. | 09:43 |
| 6 | Q.   Okay.  So it's a true statement that | 09:43 |
| 7 | Facebook collects data from cookies stored on a | 09:43 |
| 8 | users' device, including cookie IDs and settings; is | 09:43 |
| 9 | that right? | 09:43 |
| 10 | A.   Yes. | 09:43 |
| 11 | MS. STEIN:  Object to form. | 09:43 |
| 12 | BY MS. WEAVER: | 09:43 |
| 13 | Q.   Do you know what a Facebook pixel is? | 09:43 |
| 14 | A.   Yes, I do. | 09:43 |
| 15 | Q.   What is a Facebook pixel? | 09:43 |
| 16 | A.   How -- okay.  Let me try to make it plain | 09:43 |
| 17 | and simple. | 09:43 |
| 18 | On a third-party website there is one | 09:44 |
| 19 | pixel which goes back to the old days of how, you | 09:44 |
| 20 | know, like the computer screens used to work.  This | 09:44 |
| 21 | Facebook owns, and whenever someone visits that | 09:44 |
| 22 | website, that pixel will fire an event that will | 09:44 |
| 23 | effectively confirm to Facebook that a user has | 09:44 |
| 24 | visited that website. | 09:44 |
| 25 | Q.   So do pixels uniquely identify users of | 09:44 |

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the platform on and off the platform? | 09:44 |
| 2 | A.   No. | 09:44 |
| 3 | Q.   What do they identify? | 09:44 |
| 4 | A.   The pixels identify someone visiting the | 09:44 |
| 5 | website.  It doesn't identify the user. | 09:44 |
| 6 | Q.   So is it accurate to say that where a | 09:44 |
| 7 | website has embedded a Facebook pixel, Facebook | 09:44 |
| 8 | collects data about user actions on that website, | 09:44 |
| 9 | even if the user is not signed in to Facebook, | 09:44 |
| 10 | right? | 09:44 |
| 11 | A.   And so let's say you go to CNN.com -- I | 09:44 |
| 12 | don't know if that's your media provider of choice, | 09:44 |
| 13 | but for the sake of the argument -- and there is a | 09:44 |
| 14 | Facebook pixel embedded.  That will fire an event | 09:45 |
| 15 | that will basically say user X has visited CNN.com. | 09:45 |
| 16 | And that information will come to Facebook, and | 09:45 |
| 17 | Facebook will actually identify whether it was K.P. | 09:45 |
| 18 | or Lesley. | 09:45 |
| 19 | Q.   And does data collected from pixels | 09:45 |
| 20 | include items placed in shopping carts or purchases | 09:45 |
| 21 | or which pages are viewed? | 09:45 |
| 22 | MS. STEIN:  Objection to form. | 09:45 |
| 23 | THE WITNESS:  Can we break it down?  It's | 09:45 |
| 24 | huge.  Maybe.  Depends on whether the third party | 09:45 |
| 25 | has implemented the pixel on different pages. | 09:45 |

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Things added to the cart.  Not the things | 09:45 |
| 2 | that have been added to the cart but potentially the | 09:45 |
| 3 | action taken.  It's not relevant for -- for the | 09:45 |
| 4 | third party to share that information but share the | 09:45 |
| 5 | action. | 09:45 |
| 6 | What was the third one? | 09:45 |
| 7 | BY MS. WEAVER: | 09:45 |
| 8 | Q.   I believe it was which pages are viewed. | 09:45 |
| 9 | A.   Yes.  So, like I said, if there is a pixel | 09:46 |
| 10 | embedded on different pages, we would have an | 09:46 |
| 11 | understanding that it wasn't just the home page but | 09:46 |
| 12 | it was, say, the landing page, or it was a product | 09:46 |
| 13 | page, better say, or the cart page, or something | 09:46 |
| 14 | like that. | 09:46 |
| 15 | Q.   Okay.  What is the like button? | 09:46 |
| 16 | A.   It's a plug-in. | 09:46 |
| 17 | Q.   And what does that mean? | 09:46 |
| 18 | A.   It's something that allows the user to | 09:46 |
| 19 | take action that will be shared on Facebook on a | 09:46 |
| 20 | third-party website. | 09:46 |
| 21 | Q.   And so in a sense is a like providing | 09:46 |
| 22 | information about whether a user approves or likes | 09:46 |
| 23 | an object that it is engaging with? | 09:46 |
| 24 | A.   Yeah, if you like -- if you click on the | 09:46 |
| 25 | like button when you are -- again, on a third-party | 09:46 |

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | website, and that suggests that you're probably | 09:46 |
| 2 | liking that story that you just read. | 09:47 |
| 3 | Q.   Okay.  So there's some content provided by | 09:47 |
| 4 | the like button; is that right? | 09:47 |
| 5 | A.   Well, the content is provided by the third | 09:47 |
| 6 | party.  The like button captures your affinity with | 09:47 |
| 7 | that company. | 09:47 |
| 8 | Q.   Understood. | 09:47 |
| 9 | You mentioned APIs earlier.  Could you | 09:47 |
| 10 | just for the record define an API and explain how it | 09:47 |
| 11 | works. | 09:47 |
| 12 | A.   An API is basically an industry-wide | 09:47 |
| 13 | standard that allows two applications to communicate | 09:47 |
| 14 | with each other.  And what I mean by applications, | 09:47 |
| 15 | I'm talking about pieces of software. | 09:47 |
| 16 | Q.   Okay.  And what is an SDK? | 09:47 |
| 17 | A.   An SDK is a way to, you know, access the | 09:47 |
| 18 | APIs without necessarily writing code that would | 09:47 |
| 19 | make it a little bit harder. | 09:47 |
| 20 | So, in other words, I guess, what I'm | 09:47 |
| 21 | trying to say is that the -- the SDK is a piece of | 09:47 |
| 22 | software that would allow a third-party developer to | 09:48 |
| 23 | access the Facebook APIs through the SDK, whereas in | 09:48 |
| 24 | the old days if you want to really access the API | 09:48 |
| 25 | you have to double the amount of code or maybe even | 09:48 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | more to access the same AP. | 09:48 |
| 2 | Q.   Got it.  And what are Facebook business | 09:48 |
| 3 | tools? | 09:48 |
| 4 | A.   It's a very broad definition, but it | 09:48 |
| 5 | refers to the different tools that businesses use to | 09:48 |
| 6 | monitor their presence manage on the Facebook | 09:48 |
| 7 | platform. | 09:48 |
| 8 | Q.   Okay.  So is it a true statement that | 09:48 |
| 9 | advertisers, app developers, and publishers can send | 09:48 |
| 10 | Facebook information through Facebook business tools | 09:48 |
| 11 | they use, including social plug-ins, like the like | 09:48 |
| 12 | button, Facebook log-in, Facebook's APIs and SDKs or | 09:48 |
| 13 | the Facebook pixel?  Is that a true statement? | 09:48 |
| 14 | A.   That -- that's correct. | 09:48 |
| 15 | Q.   And you referred to partners earlier.  Do | 09:49 |
| 16 | you recall that discussion? | 09:49 |
| 17 | A.   Yes. | 09:49 |
| 18 | Q.   Okay.  So going forward in the deposition | 09:49 |
| 19 | we'll use your definition of partners.  Is that | 09:49 |
| 20 | fair? | 09:49 |
| 21 | A.   That's okay by me. | 09:49 |
| 22 | Q.   So do partners provide information about | 09:49 |
| 23 | users' activities off Facebook, including | 09:49 |
| 24 | information about their device, websites they visit, | 09:49 |
| 25 | purchases they make, the ads they see and how they | 09:49 |

Page  41

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | use their services whether or not they have a | 09:49 |
| 2 | Facebook account or are logged in to Facebook?  Is | 09:49 |
| 3 | that a true statement? | 09:49 |
| 4 | MS. STEIN:  Objection to form. | 09:49 |
| 5 | THE WITNESS:  This is a very broad | 09:49 |
| 6 | statement.  So if you want me to answer I think we | 09:49 |
| 7 | need to break it down a little bit. | 09:49 |
| 8 | BY MS. WEAVER: | 09:49 |
| 9 | Q.   Great, go ahead.  So is it true that | 09:49 |
| 10 | partners provide information about users' activities | 09:49 |
| 11 | off Facebook? | 09:49 |
| 12 | A.   Again -- | 09:49 |
| 13 | MS. STEIN:  Objection to form. | 09:49 |
| 14 | THE WITNESS:  Okay.  Based on my | 09:49 |
| 15 | definition of what a partner is, we're only talking | 09:50 |
| 16 | about a subset for those partners that use any of | 09:50 |
| 17 | the products that you just listed before.  They | 09:50 |
| 18 | either use the pixel or the SDK or the -- to the API | 09:50 |
| 19 | or they advertise on Facebook. | 09:50 |
| 20 | Okay.  So for those four scenarios, | 09:50 |
| 21 | anybody, any business out there that uses any of | 09:50 |
| 22 | those products, they do send some information back | 09:50 |
| 23 | to Facebook. | 09:50 |
| 24 | BY MS. WEAVER: | 09:50 |
| 25 | Q.   Okay.  And that can include information | 09:50 |

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about users' devices; is that right? | 09:50 |
| 2 |     A.   I'm not sure about the pixel or the API | 09:50 |
| 3 | or -- the SDK, most likely, yes, in certain | 09:50 |
| 4 | scenarios. | 09:50 |
| 5 |     Q.   Okay.  Do partners -- those partners in | 09:50 |
| 6 | general provide information about websites users' | 09:50 |
| 7 | visits and purchases they make? | 09:50 |
| 8 |         MS. STEIN:  Objection to form. | 09:50 |
| 9 |         THE WITNESS:  Okay.  So that would mean | 09:50 |
| 10 | that they use the pixel and they would have to fire | 09:50 |
| 11 | an event when the user visits their website, and | 09:51 |
| 12 | that means that they will do that after the user has | 09:51 |
| 13 | probably seen an ad and they will probably -- and | 09:51 |
| 14 | it's up to them about how they're going to implement | 09:51 |
| 15 | it if the user decides to buy something. | 09:51 |
| 16 |         But that's not necessarily how the whole | 09:51 |
| 17 | thing works.  This is just one specific | 09:51 |
| 18 | implementation. | 09:51 |
| 19 | BY MS. WEAVER: | 09:51 |
| 20 |     Q.   Yeah, I'm just asking at a very high | 09:51 |
| 21 | level.  It's a pretty simple question. | 09:51 |
| 22 |     A.   Okay.  At a very high level, if you want | 09:51 |
| 23 | to, you know, like talk about how the systems work, | 09:51 |
| 24 | if you are an advertiser on Facebook, you want to | 09:51 |
| 25 | make sure that your dollars are well spent.  And | 09:51 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | what you would do is implement the pixels because | 09:51 |
| 2 | you want to track the performance of your ad | 09:51 |
| 3 | campaigns.  And how do you track the performance of | 09:51 |
| 4 | your ad campaigns?  It's a function of what business | 09:51 |
| 5 | you're running. | 09:51 |
| 6 | If you're in the service provider, you | 09:51 |
| 7 | would probably fire a pixel when somebody makes an | 09:51 |
| 8 | appointment, or, you know, books a test drive.  If | 09:51 |
| 9 | you are a product company or a commerce side and you | 09:51 |
| 10 | are selling products, you'll fire a pixel when | 09:52 |
| 11 | someone completes a purchase.  And like that you can | 09:52 |
| 12 | track the investment that you made on your ad | 09:52 |
| 13 | campaign. | 09:52 |
| 14 | Q.  Let's talk, for example, about a game | 09:52 |
| 15 | developer.  If a game developer has a Facebook user | 09:52 |
| 16 | on it, do they use Facebook's API to tell Facebook | 09:52 |
| 17 | what games a user plays, for example? | 09:52 |
| 18 | MS. STEIN:  Objection to form. | 09:52 |
| 19 | THE WITNESS:  Okay.  This is again a very | 09:52 |
| 20 | broad scenario.  But let me spell it out, right? | 09:52 |
| 21 | So let's say I want to play Word With | 09:52 |
| 22 | Friends.  I have options.  I can log in with | 09:52 |
| 23 | Facebook or I can create an account directly. | 09:52 |
| 24 | If I log in with Facebook, then, you know, | 09:52 |
| 25 | the developer will request my consent to access | 09:52 |

Page  44

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | certain pieces of my identity that will come from | 09:52 |
| 2 | Facebook, like my first name, like my last name, | 09:52 |
| 3 | like my profile picture.  To the extent that I | 09:52 |
| 4 | provide consent to that developer, the developer | 09:53 |
| 5 | will have access to that information. | 09:53 |
| 6 | From then on every time I log in to play | 09:53 |
| 7 | Words with Friends, Facebook will have to reconfirm | 09:53 |
| 8 | the identity of that user and make sure that the | 09:53 |
| 9 | user remains logged in with Words with Friends. | 09:53 |
| 10 | BY MS. WEAVER: | 09:53 |
| 11 | Q.   Okay.  So, again, this is from the | 09:53 |
| 12 | congressional testimony, and I just want to | 09:53 |
| 13 | understand it.  It says "Facebook also receives | 09:53 |
| 14 | information about users' online and offline actions | 09:53 |
| 15 | and purchaser -- purchases from third-party data | 09:53 |
| 16 | providers who have the rights to provide us with | 09:53 |
| 17 | users' information." | 09:53 |
| 18 | Do you agree with that sentence? | 09:53 |
| 19 | MS. STEIN:  Object to form. | 09:53 |
| 20 | BY MS. WEAVER: | 09:53 |
| 21 | Q.   Is that correct? | 09:53 |
| 22 | A.   Well, if it's on the congressional and | 09:53 |
| 23 | it's validated by Facebook, I would say, yes, I | 09:53 |
| 24 | agree. | 09:53 |
| 25 | Q.   Okay.  So do the third-party data | 09:53 |

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | providers provide Facebook information about the | 09:53 |
| 2 | activities on the third-parties' apps or sites at a | 09:53 |
| 3 | high level? | 09:54 |
| 4 | A.   I think -- at a high level, it would be | 09:54 |
| 5 | the same business that would provide information, | 09:54 |
| 6 | not anything Facebook. | 09:54 |
| 7 | Q.   Got it. | 09:54 |
| 8 | MS. WEAVER:  Okay.  I'll mark now as | 09:54 |
| 9 | Exhibit 2 -- or I say I will, but I am asking my | 09:54 |
| 10 | colleague, Anne Davis, to do that.  This is a | 09:54 |
| 11 | document bearing Bates numbers FB-CA-MDL-00213423 | 09:54 |
| 12 | through 443. | 09:54 |
| 13 | Q.   And while we're waiting, have you been | 09:54 |
| 14 | deposed before? | 09:54 |
| 15 | A.   Yes. | 09:54 |
| 16 | Q.   Okay.  So I'm asking partly just if you | 09:54 |
| 17 | know what a Bates number is. | 09:54 |
| 18 | There are documents -- and there actually | 09:54 |
| 19 | was a man named Bates in 1899 who created a stamp | 09:54 |
| 20 | that he put on these documents in the lower | 09:54 |
| 21 | right-hand corner.  So it's just a way of | 09:54 |
| 22 | consecutively numbering hard copy documents that | 09:54 |
| 23 | would probably be obsolete in your world, but that | 09:55 |
| 24 | is what I just read into the record. | 09:55 |
| 25 | A.   Okay. | 09:55 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Have you testified on behalf of Facebook | 09:55 |
| 2 | before? | 09:55 |
| 3 | A.   No. | 09:55 |
| 4 | Q.   Okay.  How many times have you been | 09:55 |
| 5 | deposed? | 09:55 |
| 6 | A.   This my fourth one. | 09:55 |
| 7 | Q.   And were you deposed on topics similar to | 09:55 |
| 8 | the topics we're discussing today? | 09:55 |
| 9 | MS. STEIN:  Objection to form. | 09:55 |
| 10 | THE WITNESS:  I've been deposed and | 09:55 |
| 11 | discussing about various topics.  I don't know where | 09:55 |
| 12 | this is going to head to -- | 09:55 |
| 13 | BY MS. WEAVER: | 09:55 |
| 14 | Q.   Okay. | 09:55 |
| 15 | A.   -- so I can answer that question at the | 09:55 |
| 16 | end of the day. | 09:55 |
| 17 | Q.   Fair enough.  Were those depositions in | 09:55 |
| 18 | relation to your employment at Facebook? | 09:55 |
| 19 | A.   Yes. | 09:55 |
| 20 | Q.   Okay.  And did they occur in the last four | 09:55 |
| 21 | years? | 09:55 |
| 22 | A.   I can't remember the first one, but I | 09:55 |
| 23 | assume it would be in the last four years, but they | 09:55 |
| 24 | are the last two years. | 09:55 |
| 25 | Q.   Okay.  Do you know if any of those | 09:55 |

Page  47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    depositions were conducted by regulators?          09:55

2         A.   Yes.                                      09:55

3         Q.   Which regulators?                         09:56

4
```

```
12        Q.   Okay.  And what were the other two        09:56

13   depositions or three depositions that you have sat  09:56

14   for?                                                09:56

15        A.   So there are another two.  One was a      09:56

16   private litigation in Canada.  The other was a      09:56

17   private litigation in the U.S.                      09:56

18        Q.   Okay.  Do you recall what each of those   09:56

19   litigations were about?                             09:56

20        A.   Let me think.  The first one, which was -- 09:56

21   I don't remember exactly when it was, three or four 09:56

22   years ago -- was around the Facebook platform and  09:56

23   access to the APIs.  And the deposition in Canada   09:56

24   was around, I think, access to user data.  But very 09:56

25   broadly.                                            09:57
```

Page 48

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ███ ████ ██████████ | ███ |
| ██ | █████████████ | ███ |
| ██ | ███ ███████████ | ███ |
| ██ | ██████ | ███ |
| ██ | ███ ████ ██████████ | ███ |
| ██ | █████████ | ███ |
| ██ | ███ ███████████ | ███ |
| ██ | ████████████████ | ███ |
| ██ | ██████ ██████████ | ███ |
| ██ | █████████████████ | ███ |

11        A.    I believe so, yes.                      09:57

12        Q.    Okay.  And do you recall how many there  09:57

13   were, roughly?                                     09:57

14        A.    I have no idea.  I'm sorry.              09:57

15        Q.    That's okay.  It's not a memory test, but 09:57

16   I'm just asking in general.                        09:57

| 17 | █████████████████ | ███ |
|---|---|---|
| ██ | ████████████ | ███ |
| ██ | ██ ██ | 09:57 |

20        Q.    Okay.  Why don't we pull up -- is it     09:57

21   there?  I need to refresh my Marked Exhibit set.  I 09:57

22   have an Exhibit 3.                                  09:57

23                    (Exhibit 3 was marked for          09:57

24                     identification and attached       09:57

25                     hereto.)                          09:57

Page  49

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                      09:57

 2         Q.   Do you have an Exhibit 3?                 09:57

 3         A.   So we're going to 3?                      09:57

 4         Q.   We are going to 3.                        09:58

 5         A.   Okay.  I don't see it yet.                09:58

 6         Q.   I think you might need to refresh.        09:58

 7              Do you have Exhibit 3 yet?                09:58

 8         A.   Yes.                                       09:58

 9         Q.   Okay.                                      09:58

10              MS. WEAVER:  For the record, Exhibit 3 is 09:58

11    an email dated May 8, 2014, with some attachments.  09:58

12         Q.   Have you seen Exhibit 3 before?           09:58

13         A.   No, I haven't.                            09:58

14         Q.   Okay.  Did --                             09:58

15              MS. STEIN:  Why don't you give the witness 09:58

16    an opportunity to review the document.              09:58

17              MS. WEAVER:  Okay.  Thanks, Deb.  You were 09:58

18    about to get in trouble.                            09:58

19         Q.   So there's the cover email, K.P., but if  09:58

20    you look at the attachment, and I direct your       09:58

21    attention to the Bates number that ends with 424.   09:58

22    Remember the -- if you look at the bottom there.    09:58

23              THE WITNESS:  Yes, I've seen those pages,  09:58

24    yes.                                                09:59

25
```

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                         09:59

 2        Q.   Okay.  And when did you last see them?       09:59

 3        A.   Either yesterday or Friday.                  09:59

 4        Q.   When did you first see them?                 09:59

 5        A.   Maybe Friday.                                09:59

 6        Q.   Okay.  You hadn't seen them before Friday?   09:59

 7        A.   No.                                          09:59

 8        Q.   Is that right?  Okay.                        09:59

 9             Do you have an understanding as to what      09:59

10   Exhibit 3 is?                                          09:59

11        A.   I don't know the contents of the email,      09:59

12   but I think I can understand the page that you asked   09:59

13   me to look at, what it meant to be.                    09:59

14        Q.   Okay.  And what is your understanding?       09:59

15        A.   It's definition of different data that       09:59

16   Facebook may have accessed.                            09:59

17        Q.   Okay.  And let me back up again.  This is    09:59

18   foundational.  Do people communicate by email at       09:59

19   Facebook?                                              09:59

20        A.   It's one of the ways to communicate, yes.    09:59

21        Q.   How else do people communicate in the        09:59

22   course of doing business at Facebook?                  09:59

23        A.   We use a version of the product that is      09:59

24   designed for the business world called Workplace.      09:59

25   We use a version of our Messenger product, which is    10:00
```

                                                    Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | also an example, a device called Workset.  We use | 10:00 |
| 2 | emails.  We use Zoom.  We use other | 10:00 |
| 3 | videoconferencing facilities.  We use our telephones | 10:00 |
| 4 | to call each other.  Different ways. | 10:00 |
| 5 | Q.   And people text as well; is that right? | 10:00 |
| 6 | A.   We don't like text messaging.  We have our | 10:00 |
| 7 | own messaging apps. | 10:00 |
| 8 | Q.   Just out of curiosity, is the Facebook | 10:00 |
| 9 | Messenger that people that work at Facebook use, is | 10:00 |
| 10 | that different than the Facebook Messenger that | 10:00 |
| 11 | users on the platform use, or is it the same? | 10:00 |
| 12 | A.   I mean I use Messenger the same way you | 10:00 |
| 13 | would use it.  But internally I don't use that | 10:00 |
| 14 | version of the product.  I use an Enterprise | 10:00 |
| 15 | personal product -- | 10:00 |
| 16 | Q.   Okay. | 10:00 |
| 17 | A.   -- which is called Workset. | 10:00 |
| 18 | Q.   And what's the difference functionally | 10:00 |
| 19 | between those two? | 10:00 |
| 20 | MS. STEIN:  Objection.  This is like way | 10:00 |
| 21 | beyond the scope about what employees at Facebook | 10:00 |
| 22 | use. | 10:01 |
| 23 | MS. WEAVER:  Okay.  Fine.  It's fine.  I | 10:01 |
| 24 | was trying to establish a foundation, but I guess we | 10:01 |
| 25 | can come back to that in another deposition. | 10:01 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So, K.P., back to Exhibit 3.  Do you who | 10:01 |
| 2 | Simone LiTrenta is? | 10:01 |
| 3 | A.   No. | 10:01 |
| 4 | Q.   Okay.  Looking at just the cover email, do | 10:01 |
| 5 | you recognize the names of anybody on this email as | 10:01 |
| 6 | individuals who work at Facebook? | 10:01 |
| 7 | A.   I recognize Matt Scutari, Rob Sherman, and | 10:01 |
| 8 | Erin Egan. | 10:01 |
| 9 | Q.   And you understand that those are | 10:01 |
| 10 | employees of Facebook during the time this email was | 10:01 |
| 11 | written; is that right? | 10:01 |
| 12 | A.   That is 2014?  Yes, I believe so. | 10:01 |
| 13 | Q.   Okay.  And do you believe Exhibit 3 to be | 10:01 |
| 14 | an email sent by employees at Facebook in the | 10:01 |
| 15 | regular course of business? | 10:01 |
| 16 | A.   Yes, that looks like. | 10:01 |
| 17 | Q.   Okay.  Do you have an understanding as to | 10:01 |
| 18 | what the materials that are attached to this email | 10:02 |
| 19 | are? | 10:02 |
| 20 | A.   I think it's a set of definitions that -- | 10:02 |
| 21 | or slides that were meant to be presented at an | 10:02 |
| 22 | off-site. | 10:02 |
| 23 | Q.   Okay.  And what is -- do you know what the | 10:02 |
| 24 | global policy team is? | 10:02 |
| 25 | A.   Yes. | 10:02 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What is it? | 10:02 |
| 2 | A.   It's a team that is responsible for our | 10:02 |
| 3 | relationships with governments and regulators. | 10:02 |
| 4 | Q.   Okay.  And just again by way of | 10:02 |
| 5 | understanding how Facebook functions, you see | 10:02 |
| 6 | there's a Dropbox hyperlink here in the email? | 10:02 |
| 7 | A.   Yes. | 10:02 |
| 8 | Q.   Does Facebook also use Dropbox? | 10:02 |
| 9 | MS. STEIN:  Objection to form.  This | 10:02 |
| 10 | isn't -- not an ESI depo and he is not testifying | 10:02 |
| 11 | about what Facebook uses internally.  Let's focus on | 10:02 |
| 12 | the subjects that he's here for. | 10:02 |
| 13 | MS. WEAVER:  I'm trying to understand if | 10:02 |
| 14 | this document is complete, and that's a little bit | 10:02 |
| 15 | difficult to do.  So are you going to instruct him | 10:03 |
| 16 | not to answer? | 10:03 |
| 17 | MS. STEIN:  Is there a reason why you | 10:03 |
| 18 | think the document is not complete? | 10:03 |
| 19 | MS. WEAVER:  Okay.  Let me question. | 10:03 |
| 20 | Q.   So is it true that Facebook -- people use | 10:03 |
| 21 | Dropbox at Facebook to share document files? | 10:03 |
| 22 | A.   Can I answer? | 10:03 |
| 23 | Q.   Yes. | 10:03 |
| 24 | A.   Sorry, I was looking at the document. | 10:03 |
| 25 | Q.   No problem. | 10:03 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It's -- it's true that for files that are | 10:03 |
| 2 | concise that are too big to send by email we would | 10:03 |
| 3 | use Dropbox. | 10:03 |
| 4 | Q.   Okay.  Is there any way to know whether or | 10:03 |
| 5 | not a hard copy version of a document like this was | 10:03 |
| 6 | everything that was contained in the hyperlink or | 10:03 |
| 7 | would you have to see it in native form? | 10:03 |
| 8 | MS. STEIN:  Objection to form. | 10:03 |
| 9 | Lesley, next. | 10:03 |
| 10 | BY MS. WEAVER: | 10:03 |
| 11 | Q.   Please answer the question. | 10:03 |
| 12 | A.   I'm not sure I understand exactly what you | 10:03 |
| 13 | saying.  I don't even know what you have printed | 10:03 |
| 14 | out, so I cannot really establish whether it's a | 10:03 |
| 15 | complete document or not. | 10:03 |
| 16 | Q.   Okay.  Is there -- normally -- let me ask | 10:03 |
| 17 | this.  Does Facebook maintain document like -- | 10:04 |
| 18 | documents like this in PDF form or are they native? | 10:04 |
| 19 | MS. STEIN:  Objection to form. | 10:04 |
| 20 | Lesley, move on. | 10:04 |
| 21 | BY MS. WEAVER: | 10:04 |
| 22 | Q.   Please answer the question. | 10:04 |
| 23 | MS. STEIN:  It's not an ESI deposition. | 10:04 |
| 24 | Move on. | 10:04 |
| 25 | MS. WEAVER:  I'm trying to understand this | 10:04 |

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | document, which we gave to you ahead of time, and | 10:04 |
| 2 | whether or not it's complete.  So please allow him | 10:04 |
| 3 | to answer. | 10:04 |
| 4 | MS. STEIN:  Ask him if he knows whether | 10:04 |
| 5 | it's complete.  Don't ask him about things that have | 10:04 |
| 6 | nothing to do with what he's here to testify about | 10:04 |
| 7 | here today.  He's not authorized on behalf of | 10:04 |
| 8 | Facebook to talk about Dropbox, email, messaging | 10:04 |
| 9 | that gets used internally. | 10:04 |
| 10 | BY MS. WEAVER: | 10:04 |
| 11 | Q.  So, K.P., can I ask you, is there any kind | 10:04 |
| 12 | of -- for Dropbox is there any -- well, just -- I'll | 10:04 |
| 13 | move on.  I'll come back to it. | 10:04 |
| 14 | So looking back at Exhibit 3, and turning | 10:04 |
| 15 | to the first page ending at Bates number 424 -- | 10:04 |
| 16 | A.  424, yes. | 10:05 |
| 17 | Q.  -- it says "Ads and Measurement" on top. | 10:05 |
| 18 | Do you see that? | 10:05 |
| 19 | A.  Yes. | 10:05 |
| 20 | Q.  And you said earlier that you know who Rob | 10:05 |
| 21 | Sherman is; is that right? | 10:05 |
| 22 | A.  Yes, I do. | 10:05 |
| 23 | Q.  And who is he? | 10:05 |
| 24 | A.  He's the VP of privacy. | 10:05 |
| 25 | Q.  And he's still at Facebook; is that right? | 10:05 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes, he is. | 10:05 |
| 2 | Q.    Okay.  And do you have an understanding as | 10:05 |
| 3 | to what this page represents? | 10:05 |
| 4 | A.    I think that's a list of things that | 10:05 |
| 5 | supposing Facebook receives about people. | 10:05 |
| 6 | Q.    Okay.  And, in fact, it says at the top of | 10:05 |
| 7 | the document "What kinds of information does | 10:05 |
| 8 | Facebook receive about people?"  Is that correct? | 10:05 |
| 9 | A.    Uh-huh, that's what it says, yes. | 10:05 |
| 10 | Q.    Fair enough. | 10:05 |
| 11 | So did you talk to Mr. Sherman to prepare | 10:05 |
| 12 | for your deposition today? | 10:05 |
| 13 | A.    No, I haven't spoken to him. | 10:05 |
| 14 | Q.    Did you speak to anybody other than your | 10:06 |
| 15 | counsel to prepare for your deposition today? | 10:06 |
| 16 | A.    No, I haven't. | 10:06 |
| 17 | Q.    And how long did you take to prepare for | 10:06 |
| 18 | your deposition? | 10:06 |
| 19 | A.    I think I already answered that question. | 10:06 |
| 20 | I been preparing for this deposition for as long as | 10:06 |
| 21 | I have been at Facebook. | 10:06 |
| 22 | Q.    Fair enough. | 10:06 |
| 23 | A.    It's a collective -- collective knowledge | 10:06 |
| 24 | of my last 8 and a half years of being employed at | 10:06 |
| 25 | this company. | 10:06 |

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And specifically to prepare for | 10:06 |
| 2 | this deposition in response to this notice, how much | 10:06 |
| 3 | time did you spend preparing? | 10:06 |
| 4 | A.   I don't know.  Between, you know, calls | 10:06 |
| 5 | with my counsels and homework that I have done for | 10:06 |
| 6 | myself, I would say 15-20 hours. | 10:06 |
| 7 | Q.   Okay.  Thank you. | 10:06 |
| 8 | And looking back now at the page that we | 10:06 |
| 9 | were looking at ending in Bates number 424, do you | 10:06 |
| 10 | see that it describes three categories of data on | 10:06 |
| 11 | the left? | 10:06 |
| 12 | A.   Yes. | 10:06 |
| 13 | Q.   And it says "Native Data, Appended Data | 10:07 |
| 14 | and Behavioral Data."  Do you see that? | 10:07 |
| 15 | A.   Yes. | 10:07 |
| 16 | Q.   Do you have an understanding as to what | 10:07 |
| 17 | native data is? | 10:07 |
| 18 | A.   I can see that the definition of that is | 10:07 |
| 19 | data collected through our website apps and branded | 10:07 |
| 20 | products. | 10:07 |
| 21 | Q.   Okay.  And is that consistent with your | 10:07 |
| 22 | understanding? | 10:07 |
| 23 | A.   Yes, it makes sense. | 10:07 |
| 24 | Q.   Okay.  And then what is appended data? | 10:07 |
| 25 | MS. STEIN:  Object to form. | 10:07 |

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Data that is -- what? | 10:07 |
| 2 | MS. STEIN:  Objection to form. | 10:07 |
| 3 | BY MS. WEAVER: | 10:07 |
| 4 | Q.   I'll repeat the question.  What is | 10:07 |
| 5 | appended data? | 10:07 |
| 6 | MS. STEIN:  Same objection. | 10:07 |
| 7 | THE WITNESS:  It's -- sorry.  I have to | 10:07 |
| 8 | look at the document while you're talking.  I don't | 10:07 |
| 9 | mean to talk over you. | 10:07 |
| 10 | It's okay I answer the question now? | 10:07 |
| 11 | BY MS. WEAVER: | 10:07 |
| 12 | Q.   Yes. | 10:07 |
| 13 | A.   Okay.  It's data provided by third | 10:07 |
| 14 | parties. | 10:07 |
| 15 | Q.   I'm sorry, data provided by -- I just | 10:07 |
| 16 | didn't hear you. | 10:07 |
| 17 | A.   Third parties. | 10:08 |
| 18 | Q.   Okay.  So for the record, appended data is | 10:08 |
| 19 | data provided by third parties; is that correct? | 10:08 |
| 20 | A.   Yes, as it is defined here, yes. | 10:08 |
| 21 | Q.   Okay.  And what is behavioral data? | 10:08 |
| 22 | MS. STEIN:  Objection to form. | 10:08 |
| 23 | THE WITNESS:  Sorry, I need to switch back | 10:08 |
| 24 | to see -- you don't want to talk.  Okay. | 10:08 |
| 25 | So it's data collected for activity on | 10:08 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | third parties using the Facebook product. | 10:08 |
| 2 | BY MS. WEAVER: | 10:08 |
| 3 | Q.   Okay.  And as you sit here today, are | 10:08 |
| 4 | there any other kinds of information Facebook | 10:08 |
| 5 | receives about people other than these three | 10:08 |
| 6 | categories? | 10:08 |
| 7 | A.   I don't think so. | 10:08 |
| 8 | Q.   Okay.  Let's return to our discussion of | 10:08 |
| 9 | native data.  Do you have an understanding as to why | 10:08 |
| 10 | the word "native" is being used?  What does that | 10:08 |
| 11 | mean?  Is it the same as raw data? | 10:09 |
| 12 | MS. STEIN:  Objection to form. | 10:09 |
| 13 | THE WITNESS:  Every piece of data has a | 10:09 |
| 14 | degree of rawness associated with it.  Depends how | 10:09 |
| 15 | you define raw. | 10:09 |
| 16 | BY MS. WEAVER: | 10:09 |
| 17 | Q.   Okay.  I just didn't quite hear.  Every | 10:09 |
| 18 | piece of data has a particular -- | 10:09 |
| 19 | A.   (Indecipherable).  I'm joking. | 10:09 |
| 20 | They -- if you are talking about raw data, | 10:09 |
| 21 | what do you mean? | 10:09 |
| 22 | Q.   Okay.  Well, I'm trying to learn from you, | 10:09 |
| 23 | so let me ask you. | 10:09 |
| 24 | A.   The IP address -- the IP address is raw | 10:09 |
| 25 | data. | 10:09 |

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.    Uh-huh, okay.  Good.                    10:09

 2        A.    But it comes through activity that happens   10:09

 3   on a native Facebook app.  The "native" means, in my    10:09

 4   mind, the way I see the definition there, as            10:09

 5   activity that's happening on Facebook platform.         10:09

 6        Q.    Okay.  So for the record, native data is     10:09

 7   data relating to activity on the Facebook platform;     10:09

 8   is that right?                                          10:09

 9        A.    Correct.                                     10:09

10        Q.    Okay.  And so when we --  ████████        ████

██   ████████████████████████████████████████████         ████

██   ████████████████████████████████████████████         ████

██      ████████████████████                               10:10

14        A.    ████████████████████████████              10:10

15        Q.    ████                                       10:10

16        A.    ██████████████████████████████           ████

██   ████████████████████████████████████████████         ████

██   ████████████████████████████████  ████████          ████

██   ██████████████████████████████████████████          ████

██   ████████████████████████████████████                ████

██   ████████████████████████████████████                 10:10

22        Q.    Okay.  Can you think of any other branded   10:10

23   apps in the United States that were used during 2012   10:10

24   to 2017?                                                10:10

25        A.    Facebook branded apps?  Messenger,          10:10
```

                                              Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Instagram. | 10:10 |
| 2 |     Q.   Great.  Thank you. | 10:10 |
| 3 |        And then on the right it seems -- this | 10:10 |
| 4 | chart seems to further break down categories of | 10:10 |
| 5 | native data.  Do you see that? | 10:10 |
| 6 |     A.   Yes. | 10:10 |
| 7 |     Q.   Okay.  And there's a column or really a | 10:10 |
| 8 | box that says "Explicitly collect."  Do you see | 10:10 |
| 9 | that? | 10:11 |
| 10 |     A.   Yes. | 10:11 |
| 11 |     Q.   And then it lists profile info, email | 10:11 |
| 12 | address, phone number, et cetera.  And then below | 10:11 |
| 13 | that it says "Implicitly collect."  And it lists a | 10:11 |
| 14 | number of data.  And then under that it says "Infer | 10:11 |
| 15 | from engagement on the site."  Do you see all of | 10:11 |
| 16 | those boxes? | 10:11 |
| 17 |     A.   Yes. | 10:11 |
| 18 |     Q.   Okay.  Do you have an understanding as to | 10:11 |
| 19 | what "Explicitly collect" means? | 10:11 |
| 20 |     A.   Explicitly collect -- I'm sorry, I'm | 10:11 |
| 21 | looking back.  Explicitly collect is something the | 10:11 |
| 22 | user has submitted on their own. | 10:11 |
| 23 |     Q.   Okay.  And so that means that a user has | 10:11 |
| 24 | taken an action to share the data; is that fair? | 10:11 |
| 25 |     A.   Correct. | 10:11 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And so what does "Implicitly | 10:11 |
| 2 | collect" mean? | 10:11 |
| 3 | MS. STEIN:  Object to form. | 10:11 |
| 4 | THE WITNESS:  So that would mean | 10:11 |
| 5 | activities related to data. | 10:11 |
| 6 | BY MS. WEAVER: | 10:11 |
| 7 | Q.   I'm sorry, did you -- | 10:11 |
| 8 | A.   So -- so -- just to draw the distinction, | 10:12 |
| 9 | right, this is data that we collect during someone's | 10:12 |
| 10 | use of the Facebook app.  So the IP address or the | 10:12 |
| 11 | device information is not something that the user | 10:12 |
| 12 | would have to type in and say, hey, this is my IP | 10:12 |
| 13 | address.  It's something that we would collect when | 10:12 |
| 14 | a user uses Facebook because we would know which IP | 10:12 |
| 15 | address they are accessing Facebook from. | 10:12 |
| 16 | Q.   Is it fair to say that the kinds of data | 10:12 |
| 17 | that Facebook implicitly -- implicitly collects is | 10:12 |
| 18 | data that Facebook observes? | 10:12 |
| 19 | A.   Observes?  It's confusing me.  So what do | 10:12 |
| 20 | you mean by that? | 10:12 |
| 21 | Q.   Okay.  No, I'm just trying to understand | 10:12 |
| 22 | and put it in English for a layperson by -- so you | 10:12 |
| 23 | understand what I'm trying to do here.  So let me | 10:12 |
| 24 | try to ask a better question. | 10:12 |
| 25 | Is it fair to say that the data that is | 10:12 |

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | implicitly collected by Facebook is not expressly | 10:12 |
| 2 | shared by users? | 10:12 |
| 3 |    MS. STEIN:  Objection to form. | 10:12 |
| 4 |    THE WITNESS:  So they may not be explicit | 10:13 |
| 5 | shared because they submit the data to us, but they | 10:13 |
| 6 | have agreed to share that data because they have | 10:13 |
| 7 | agreed to the privacy policies -- | 10:13 |
| 8 | BY MS. WEAVER: | 10:13 |
| 9 |   Q.   Okay. | 10:13 |
| 10 |   A.   -- that make it clear that we will have | 10:13 |
| 11 | access to this kind of data. | 10:13 |
| 12 |   Q.   Okay.  And do you see where it says | 10:13 |
| 13 | "Device identifiers" here? | 10:13 |
| 14 |   A.   Yes. | 10:13 |
| 15 |   Q.   And it lists a number of identifiers.  Do | 10:13 |
| 16 | you see that? | 10:13 |
| 17 |   A.   Yes. | 10:13 |
| 18 |   Q.   Okay.  And what is UDID? | 10:13 |
| 19 |   A.   I think it's another way of calling the | 10:13 |
| 20 | Android ID. | 10:13 |
| 21 |   Q.   And then what is IDFA? | 10:13 |
| 22 |   A.   It's an Apple identifier. | 10:13 |
| 23 |   Q.   And Google Ad ID, do you see that? | 10:13 |
| 24 |   A.   Yes. | 10:13 |
| 25 |   Q.   And what is that? | 10:13 |

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        A.   I think that's an ID used specifically        10:13

2   around Google ads.                                      10:13

3        Q.   Okay.  So does Facebook implicitly collect    10:13

4   device identifiers?                                      10:13

5        A.   We have access to those identifiers.          10:14

6        Q.   Okay.  And it also collects location          10:14

7   device, GPS, Wi-Fi, IP address, phone number,           10:14

8   carrier and device type; is that right?                 10:14

9        A.   Yes.                                           10:14

10        MS. STEIN:  Object.  Objection to form.            10:14

11  BY MS. WEAVER:                                           10:14

12        Q.   ███████   ███████████████████████       ████

    █    ████████████████████████████████   █████████████   ████

    █    ███████                                             10:14

15        A.   Yes, I do.                                    10:14

16        Q.   What does that refer to?                      10:14

17        █   ████████████████████████████        ████

    █    ████████████████████████████████████             ████

    █    ██   █████████                                    ████

    █    ██   ███████████████████████████████████        ████

    █    ████████████████████████████████                ████

    █    ██   ████████████████████████████              ████

    █    █████████   ███████████████████████████        ████

    █    ██████████                                      ████

    █    ██   ████████████████████████████████          10:14
```

                                          Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   ████████████████████████████████   ████

2   ██████████████████████████████████   ████

3   ███████████████████████████████████   ████

4   ████████████████████████████████████   ████

5   ██████   ████████████████████████   ████

6        Q.   How did you know?                    10:15

7             So how does Facebook retain that     10:15

8   information once it draws that inference?       10:15

9        A.   You know, there would be --          10:15

10            MS. STEIN:  Objection.               10:15

11            THE WITNESS:  There would be a list of   10:15

12   potential interest that would be derived by your   10:15

13   affinity to certain entities on the platform,   10:15

14   certain businesses on the platform.            10:15

15   BY MS. WEAVER:                                 10:15

16        Q.   And how does Facebook record those   10:15

17   interests, if you will?                        10:15

18            MS. STEIN:  Objection to form.        10:15

19        ████████   █████████████████   ████

20   ████████   ██████████████████████   ████

21   ███████████   ████████████████████   ████

22   ██████████████████████████████████   ████

23   ████████████████████   ████

24   BY MS. WEAVER:                                 10:16

25        ██   ██████   ████████████████   ████

                                        Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1  ████████████████████████████████████      ████
    ████████████                              ████
    ████    ████████████████████████████      ████
    ████████    ████████████████████████      ████
    ██████████                                ████
    ████    ████████                          ████
    ████    ████████████████████████          ████
    ████████████████                          ████
    ████    ████    ████████████████████      ████
    ████████████████████    ████████████      ████
    ████████████████████████████████████      ████
```

12          MS. STEIN:  Objection.  Form.                    10:16

13          THE WITNESS:  What do you mean?                  10:16

14  BY MS. WEAVER:                                           10:16

15      Q.   Well, I'm trying to understand.  Facebook       10:16

16  receives explicitly collected data; is that right?      10:16

17      A.   Yes.                                            10:16

18      Q.   And where does it receive it and where          10:16

19  does it go?  Where does the data go?                     10:16

20      A.   It's a -- it's a very complicated               10:16

21  question, so let me try to answer it may be with,        10:16

22  you know, like a high-level perspective.                 10:17

23          So when you come to Facebook for the first       10:17

24  time in your life you will create an account, right?     10:17

25  To create an account you need to provide the             10:17

                                            Page  67

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | username and a password.  And then it will ask you a | 10:17 |
| 2 | couple of questions.  What is your first name?  What | 10:17 |
| 3 | is your last name?  What is your date of birth, and | 10:17 |
| 4 | so on and so on. | 10:17 |
| 5 | All that information lives in some, you | 10:17 |
| 6 | know, database somewhere, right?  The next time you | 10:17 |
| 7 | come to Facebook you decide to post a photo of | 10:17 |
| 8 | yourself, you know, celebrating your birthday.  That | 10:17 |
| 9 | information lives somewhere in a distributed | 10:17 |
| 10 | database, right? | 10:17 |
| 11 | Then some people will start liking your | 10:17 |
| 12 | page, saying -- will most likely be your friends. | 10:17 |
| 13 | That information is captured somewhere about who has | 10:17 |
| 14 | liked your photo. | 10:17 |
| 15 | Then the next day you come in and you -- | 10:17 |
| 16 | you like Beyonce's page because you just saw her two | 10:17 |
| 17 | months and you want to keep up with her work.  That | 10:18 |
| 18 | information is captured somewhere. | 10:18 |
| 19 | But all that information is available | 10:18 |
| 20 | to -- to you, right?  You can go into your Facebook | 10:18 |
| 21 | settings and you can find all that information. | 10:18 |
| 22 | Q.   Okay.  When you say it is captured | 10:18 |
| 23 | somewhere, where is the somewhere? | 10:18 |
| 24 | A.   It depends on, you know, what is that you | 10:18 |
| 25 | are looking for, right?  It's not a single place. | 10:18 |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   Use your example.  I go on Facebook's        10:18
 2   website and I take an action.  Where is that          10:18
 3   captured?  You said it's captured somewhere.  Where   10:18
 4   is the somewhere?                                      10:18
 5        A.   ███████████████████████████████    ████     10:18
 ▮   █████████████████████                                 10:18
 7        Q.   Okay.                                        10:18
 8        A.   That's a database.                           10:18
 9        Q.   And what if it's a like?                     10:18
10        A.   Again, it's an activity.                     10:18
11        Q.   Okay.  ████████████████████████     ████    10:18
 ▮   ████████████████    ████████████████████              10:18
13        ██   ████████████████                            10:18
14        Q.   Yes.                                         10:19
15        A.   Probably nowhere.                            10:19
16        Q.   Okay.  ████████████████████████     ████    10:19
 ▮   ███████████████████████████████████████ █    ████
 ▮   ████████████                                  ████
 ▮   ██   ██████████████████                       ████
 ▮   ██   ██████████████████                               10:19
21        A.   Yes.                                         10:19
22        Q.   Okay.  ████████████████████████     ████
 ▮   ████████████████████████████████             ████
 ▮   ██   ████████████████████████████████████    ████
 ▮   ████████████████████                                  10:19
```

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1                                                    
                                                      
                                                      
                                                      
                                                      
                                                      
                                                      
                                                      
                                                      
                                                      
                                                      
                                          10:19
13        A.   I'm really sorry, but I'm having a hard    10:20
14   time hearing.  Is it me or is it your mic?           10:20
15             MS. WEAVER:  I'm not having a hard time    10:20
16   hearing.                                             10:20
17             MS. STEIN:  It's the mic.                  10:20
18             MS. WEAVER:  Oh, okay.  Can you hear me    10:20
19   now or is it --                                      10:20
20                                                    
                                                      
                                                      
                                                      
                                                      
                                                      
```

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   And by "entities" I mean in most cases -- | 10:20 |
| 2 | THE REPORTER:  I'm sorry, "I mean in most | 10:20 |
| 3 | cases"... | 10:20 |
| 4 | BY MS. WEAVER: | 10:20 |
| 5 | Q.   And -- | 10:20 |
| 6 | THE REPORTER:  I'm sorry, "I mean in most | 10:20 |
| 7 | cases"... | 10:20 |
| 8 | THE WITNESS:  Pages, Facebook pages. | 10:20 |
| 9 | THE REPORTER:  Thank you. | 10:20 |
| 10 | BY MS. WEAVER: | 10:20 |
| 11 | Q.   Let me move on.  I'm going to return to | 10:20 |
| 12 | that because I think we need to drill down a little | 10:20 |
| 13 | bit.  But I'll just go to "Appended Data."  Do you | 10:21 |
| 14 | see that category? | 10:21 |
| 15 | A.   Yes. | 10:21 |
| 16 | Q.   And so appended data is data that Facebook | 10:21 |
| 17 | receives from third parties; is that right? | 10:21 |
| 18 | A.   Yes. | 10:21 |
| 19 | Q.   Okay.  And you see it refers to data | 10:21 |
| 20 | brokers there? | 10:21 |
| 21 | A.   Yes. | 10:21 |
| 22 | Q.   What is a data broker? | 10:21 |
| 23 | A.   It's -- sorry. | 10:21 |
| 24 | MS. STEIN:  Are you asking him to read | 10:21 |
| 25 | from the document or are you asking him his | 10:21 |

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | understanding? | 10:21 |
| 2 | MS. WEAVER:  I'm asking Facebook what a | 10:21 |
| 3 | data broker is. | 10:21 |
| 4 | THE WITNESS:  According to this document | 10:21 |
| 5 | it's a -- a list of third parties, including, you | 10:21 |
| 6 | know, like public records, DMVs or auto | 10:21 |
| 7 | registration, you know, authorities, supermarkets, | 10:21 |
| 8 | retailers and so on that provide access to certain | 10:21 |
| 9 | information. | 10:21 |
| 10 | BY MS. WEAVER: | 10:21 |
| 11 | Q.  Do you know what a data broker is? | 10:21 |
| 12 | A.  My definition of data broker? | 10:21 |
| 13 | Q.  Yes. | 10:22 |
| 14 | A.  Anybody that has access to a broad set of | 10:22 |
| 15 | data. | 10:22 |
| 16 | Q.  Okay.  Is Facebook a data broker? | 10:22 |
| 17 | A.  No. | 10:22 |
| 18 | Q.  Okay.  Did you talk to anybody -- well, | 10:22 |
| 19 | strike that. | 10:22 |
| 20 | Do you see where it says "Partner | 10:22 |
| 21 | categories" on this document? | 10:22 |
| 22 | A.  Yes. | 10:22 |
| 23 | Q.  What does that refer to? | 10:22 |
| 24 | A.  I guess a list of different categories I | 10:22 |
| 25 | listed myself.  It's also documented here. | 10:22 |

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And so do you see to the right there it | 10:22 |
| 2 | says "Public records, auto registration data, | 10:22 |
| 3 | supermarket loyalty cards, retail purchases, credit | 10:22 |
| 4 | card purchases," et cetera, on the right? | 10:22 |
| 5 | A.   Yes. | 10:22 |
| 6 | Q.   And is it your understanding that those | 10:22 |
| 7 | are examples of the kind -- kinds of data that | 10:22 |
| 8 | Facebook collects from data brokers? | 10:22 |
| 9 | A.   Yes.  I don't know if it's exhaustive or | 10:23 |
| 10 | not, but I would imagine that it is exhaustive. | 10:23 |
| 11 | Q.   Thank you.  And then underneath that do | 10:23 |
| 12 | you see where it says "Advertisers"? | 10:23 |
| 13 | A.   Yes. | 10:23 |
| 14 | Q.   What is an advertiser? | 10:23 |
| 15 | A.   Someone that is running marketing | 10:23 |
| 16 | companies on Facebook. | 10:23 |
| 17 | Q.   Okay.  And then there's a parenthetical | 10:23 |
| 18 | that refers to "Custom audiences, offline conversion | 10:23 |
| 19 | measurement."  Do you see that? | 10:23 |
| 20 | A.   Yes. | 10:23 |
| 21 | Q.   What is custom audiences? | 10:23 |
| 22 | A.   A custom audience is a reference to a | 10:23 |
| 23 | products whereby a business can upload and encrypt | 10:23 |
| 24 | its -- a version of their database of customers for | 10:23 |
| 25 | the purpose of running a campaign that targets those | 10:23 |

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | customers. | 10:23 |
| 2 |     Q.  Okay.  I want to break that down a little | 10:23 |
| 3 | bit. | 10:23 |
| 4 |       MS. WEAVER:  I'm not seeing that on my | 10:23 |
| 5 | live feed. | 10:23 |
| 6 |       Could you read his response back, please. | 10:24 |
| 7 |           (The record was read by the | 10:24 |
| 8 |           court reporter, as requested) | 10:24 |
| 9 | BY MS. WEAVER: | 10:24 |
| 10 |     Q.  Okay.  And when you say "encrypt," what do | 10:24 |
| 11 | you mean? | 10:24 |
| 12 |     A.  They wouldn't upload the raw data.  They | 10:24 |
| 13 | would upload a version of that data. | 10:24 |
| 14 |       THE REPORTER:  I'm sorry, could you repeat | 10:24 |
| 15 | that last part, please? | 10:24 |
| 16 |       THE WITNESS:  They wouldn't upload raw | 10:24 |
| 17 | customer data.  They would upload encrypted personal | 10:24 |
| 18 | or hashed personal data. | 10:24 |
| 19 | BY MS. WEAVER: | 10:24 |
| 20 |     Q.  Thank you.  And when you say "raw customer | 10:24 |
| 21 | data," what do you mean? | 10:24 |
| 22 |     A.  Email addresses. | 10:24 |
| 23 |     Q.  Anything else? | 10:24 |
| 24 |     A.  No. | 10:24 |
| 25 |     Q.  And what does "offline conversion | 10:24 |

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | measurement" mean? | 10:24 |
| 2 | A.   So imagine that you see an ad campaign | 10:24 |
| 3 | from Walmart, but you don't necessarily click on | 10:25 |
| 4 | that to buy the specific thing that they advertise. | 10:25 |
| 5 | But eventually you visit the Walmart and you end up | 10:25 |
| 6 | purchasing something, not necessarily the same item | 10:25 |
| 7 | from Walmart. | 10:25 |
| 8 | If Walmart wanted to track the offline | 10:25 |
| 9 | conversion, the fact that you purchased something | 10:25 |
| 10 | from them in their retail location, they could | 10:25 |
| 11 | actually made available some encrypted data again | 10:25 |
| 12 | back to us, and we would confirm to them that a | 10:25 |
| 13 | certain percentage of people that have interacted | 10:25 |
| 14 | with Walmart offline have actually seen the ads that | 10:25 |
| 15 | Walmart has run. | 10:25 |
| 16 | Q.   So what does "conversion" mean in that | 10:25 |
| 17 | sentence?  Purchase? | 10:25 |
| 18 | A.   It's defined by the advertiser.  Because | 10:25 |
| 19 | the -- the advertiser may optimize for store visits | 10:25 |
| 20 | versus others that may optimize for purchases, | 10:26 |
| 21 | right?  So -- | 10:26 |
| 22 | Q.   So conversion is taking some action as | 10:26 |
| 23 | defined by the advertiser; is that correct? | 10:26 |
| 24 | A.   Correct. | 10:26 |
| 25 | Q.   And that could also include engaging in -- | 10:26 |

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | well, strike that. | 10:26 |
| 2 | Could conversion also include a like or | 10:26 |
| 3 | agreeing to become a member of a group? | 10:26 |
| 4 | A.   "No" in that context because we are | 10:26 |
| 5 | talking about offline conversion. | 10:26 |
| 6 | Q.   Got it.  Does advertisers here also | 10:26 |
| 7 | include political campaigns? | 10:26 |
| 8 | A.   I'm looking at the -- sorry.  Sorry.  I | 10:26 |
| 9 | need to answer that, I guess.  What do you mean?  In | 10:26 |
| 10 | what context? | 10:26 |
| 11 | Q.   Do political campaigns advertise? | 10:26 |
| 12 | A.   Yes, they do. | 10:26 |
| 13 | Q.   Okay.  And when they are seeking | 10:26 |
| 14 | conversion, are they seeking to encourage certain | 10:26 |
| 15 | actions by Facebook users? | 10:26 |
| 16 | MS. STEIN:  Objection to form. | 10:27 |
| 17 | THE WITNESS:  Yeah, but that wouldn't | 10:27 |
| 18 | include, you know, like what people voted.  It would | 10:27 |
| 19 | probably include if they read, or if they donated, | 10:27 |
| 20 | or if they took an action on their website, | 10:27 |
| 21 | depending on what the campaign is actually optimized | 10:27 |
| 22 | for. | 10:27 |
| 23 | BY MS. WEAVER: | 10:27 |
| 24 | Q.   Got it. | 10:27 |
| 25 | A.   But, no, the conversion wouldn't be that I | 10:27 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | voted for Biden or I voted for Trump.  That's not -- | 10:27 |
| 2 | THE REPORTER:  I'm sorry, could you please | 10:27 |
| 3 | slow down.  The last part? | 10:27 |
| 4 | THE WITNESS:  Oh, sorry. | 10:27 |
| 5 | THE REPORTER:  "The conversion"... | 10:27 |
| 6 | THE WITNESS:  The conversion that | 10:27 |
| 7 | political campaigns are tracking have to do with | 10:27 |
| 8 | fundraising, donations, registration, this kind of | 10:27 |
| 9 | things. | 10:27 |
| 10 | BY MS. WEAVER: | 10:27 |
| 11 | Q.   Okay.  And so Facebook provides conversion | 10:27 |
| 12 | measurement information back to the advertisers | 10:27 |
| 13 | which could include political campaigns; is that | 10:27 |
| 14 | right? | 10:27 |
| 15 | MS. STEIN:  Objection to form. | 10:27 |
| 16 | THE WITNESS:  Yes. | 10:27 |
| 17 | BY MS. WEAVER: | 10:27 |
| 18 | Q.   And then do you see on the right of | 10:27 |
| 19 | Advertisers it says "Existing customer | 10:27 |
| 20 | relationships"?  Do you see that?  It's to the right | 10:27 |
| 21 | of Advertisers. | 10:28 |
| 22 | A.   Yes. | 10:28 |
| 23 | Q.   What does "Existing customer | 10:28 |
| 24 | relationships," that subcategories of advertisers, | 10:28 |
| 25 | refer to? | 10:28 |

Page  77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   And so going back to our example earlier, | 10:28 |
| 2 | if -- if you are Walmart again, and you know that -- | 10:28 |
| 3 | let's say there are thousands of people that | 10:28 |
| 4 | attempted to purchase a TV from Walmart's website | 10:28 |
| 5 | and you have an understanding of the email addresses | 10:28 |
| 6 | of those people.  Then you can encrypt those email | 10:28 |
| 7 | addresses, make them available to Facebook to create | 10:28 |
| 8 | what we call a custom audience. | 10:28 |
| 9 | And then Facebook will, you know, like -- | 10:28 |
| 10 | can target those specific users to the extent that | 10:28 |
| 11 | they are also Facebook users, of course, with an ad | 10:28 |
| 12 | that offers them, let's say, a discount for that | 10:28 |
| 13 | specific TV. | 10:28 |
| 14 | Q.   What do you mean by "encrypt"? | 10:28 |
| 15 | A.   Again we -- we want to have access to | 10:29 |
| 16 | their raw email addresses.  We will have access to | 10:29 |
| 17 | hashed personal email addresses and then we will | 10:29 |
| 18 | match them with the hashed personal email address we | 10:29 |
| 19 | have on record and find those users that have both a | 10:29 |
| 20 | Walmart account and a Facebook account. | 10:29 |
| 21 | Q.   So what is the difference between | 10:29 |
| 22 | encryption and hashing? | 10:29 |
| 23 | A.   It's same thing in that sense. | 10:29 |
| 24 | Q.   It is the same thing? | 10:29 |
| 25 | A.   Yeah. | 10:29 |

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.   Is it true that hashing has two inputs --          10:29

2    well, let me go back.  Is it fair to say that           10:29

3    encryption has two inputs so that if you have a key,    10:29

4    you can associate data point together; is that fair?    10:29

5          MS. STEIN:  Object to form.  He's not here        10:29

6    as a technical expert, so...                            10:29

7          You can give your high-level                      10:29

8    understanding, if you have one.                         10:29

9          THE WITNESS:  Yes, I don't -- I don't             10:29

10   want -- I don't want to talk about, you know, like     10:29

11   encryption.  But it's important here, I think, to      10:29

12   take away is that we don't have access to those        10:29

13   email addresses and they don't have access to the     10:30

14   people who we ended up identifying as users who have  10:30

15   both a Facebook account and a Walmart account.        10:30

16   BY MS. WEAVER:                                         10:30

17   ████  ████  ███████████████████            ████

████  ██████████████████████████████            ████

████  █████  ████████████████████████            ████

████  ██████                                     ████

████      ███  █████                             ████

████      ███  ██████████████████████            ████

████  ████████████                               ████

████      ███  █████                             ████

████      ███  █████████████████████             ████

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      ██      ███████████████████████████      ████

██      ████████████████████████                         10:30

3          Q.    So could you, please, explain what hashed      10:30

4      data matching is?                                        10:30

5          A.    If an advertiser has information about a       10:30

6      user, a customer of theirs, like their email            10:30

7      address -- I didn't realize that we can actually be     10:30

8      based on phone number or home address, but if it        10:30

9      seems to be the case, then that's basic data that we    10:30

10     can use to match those users on the Facebook site.      10:30

11         Q.    And do you see that there's an arrow here      10:30

12     that goes from "Email address, phone number and         10:30

13     address," it's a dotted line but goes to "Hashed        10:31

14     data matching," and then it goes down to "Appended      10:31

15     Data"?  Do you see that?                                10:31

16         A.    Yes, I do.  I do see that.                    10:31

17         Q.    Okay.  And so what's your understanding of    10:31

18     what those arrows mean?                                 10:31

19         A.    No idea.                                      10:31

20     ██    ████    ████████████████████      ████

██     ██████████████████████████████████      ████

██     ███████████████████████████             ████

██     ██    ████████████████████████████      ████

██     ███████████    ████████████████████     ████

██     ██████████████████████████████          ████

                                          Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



20    Q.   Okay.  So Facebook is getting data about,     10:32

21  for example, that I had something in my cart that I   10:32

22  didn't purchase; is that right?                       10:32

23         MS. STEIN:  Object to form.                    10:32

24         THE WITNESS:  No, not that, no.                10:32

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                      10:32
 2        Q.   Okay.  Who has it?  You just gave that as  10:32
 3    an example.                                         10:32
 4        A.   Yeah, but that is a logic that takes place 10:32
 5    on the advertiser's side.                           10:32
 6        Q.   Okay.                                       10:32
 7        A.   The advertiser selects the marketing team  10:32
 8    on the advertiser side to decide what kind of       10:32
 9    campaign they want to run.  And they create a       10:33
10    segment of their customers that they want to target 10:33
11    with their ad campaign, and then they will decide   10:33
12    what creative they want to use, like how the ad is  10:33
13    going to look like.                                 10:33
14        Q.   Right.  But this is a list of information  10:33
15    that Facebook receives, right?                      10:33
16        MS. STEIN:  Objection to form.                  10:33
17    ███████████   ██████████████████   ████             10:33
██    ███████████████   ██████████████████   ████
██    ██████████████████████████                         10:33
20    BY MS. WEAVER:                                      10:33
21        Q.   Okay.  Looking at this chart here, it's    10:33
22    labeled, "What kinds of information does Facebook   10:33
23    receive?" correct?                                  10:33
24        MS. STEIN:  Objection to form.                  10:33
25        (Background audio interference.)                10:33
```

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  Somebody needs to put their | 10:33 |
| 2 | phones on mute or their computers on mute. | 10:34 |
| 3 | Q.    Returning to the document, sir, isn't this | 10:34 |
| 4 | page a list of information that Facebook receives | 10:34 |
| 5 | about people? | 10:34 |
| 6 | MS. STEIN:  Objection to form. | 10:34 |
| 7 | THE WITNESS:  We received information that | 10:34 |
| 8 | an associate hashed email address with a Walmart | 10:34 |
| 9 | customer. | 10:34 |
| 10 | MS. WEAVER:  Okay.  Tat's -- I'll just | 10:34 |
| 11 | move to strike as nonresponsive.  We will move on. | 10:34 |
| 12 | Q.    Going back to this category that says | 10:34 |
| 13 | "Both."  Do you see that, near Appended Data? | 10:34 |
| 14 | A.    Yes. | 10:34 |
| 15 | Q.    What does "both" mean? | 10:34 |
| 16 | MS. STEIN:  Objection to form. | 10:34 |
| 17 | THE WITNESS:  A combination of advertisers | 10:34 |
| 18 | and data brokers, I assume. | 10:34 |
| 19 | THE REPORTER:  I'm sorry, could you repeat | 10:34 |
| 20 | that, please.  Information? | 10:34 |
| 21 | THE WITNESS:  A combination of advertisers | 10:34 |
| 22 | and data brokers. | 10:34 |
| 23 | BY MS. WEAVER: | 10:34 |
| 24 | ██   ██   ████████████      ████ | |
| ██  ████████████████████      ████ | | |

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                                                  10:34
 2          MS. STEIN:  Objection to form.  The     10:35
 3   document speaks for itself.                     10:35
 4          MS. WEAVER:  I'm here to depose him about 10:35
 5   the document, Deb.  It was identified ahead of time. 10:35
 6          Please answer the question.              10:35
 7          MS. STEIN:  Yeah, Lesley, this document is 10:35
 8   all about targeted advertising, and you've been 10:35
 9   going on for about an hour about targeted       10:35
10   advertising which isn't even in this case.  It's 10:35
11   outside the scope of this case.                 10:35
12          MS. WEAVER:  You can instruct him not to 10:35
13   answer if you want, but I'm actually --         10:35
14          MS. STEIN:  Lesley, I've let this witness 10:35
15   testify for an hour about targeted advertising.  So 10:35
16   if you want to ask him about the scope of this  10:35
17   deposition, you're free to, but suggesting that just 10:35
18   because you sent us a document about targeted   10:35
19   advertising --                                  10:35
20          MS. WEAVER:  Deb, stop lecturing and     10:35
21   wasting my minutes with the witness, please.    10:35
22          MS. STEIN:  Lesley, I am stating my      10:35
23   position for the record.  This is a 30(b)(6)    10:35
24   deposition on a specific set of topics.  You've gone 10:35
25   beyond the scope.  I've been very liberal in that. 10:35
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I will let the witness continue answering | 10:35 |
| 2 | some more questions, but if it continues focusing on | 10:35 |
| 3 | targeted advertising, then we're going to have to | 10:36 |
| 4 | move on. | 10:36 |
| 5 | BY MS. WEAVER: | 10:36 |
| 6 | Q.   So the question -- I'm sorry, K.P. -- the | 10:36 |
| 7 | question is this: ████████████████████████ | █████ |
| █ | ████████████████████████████████ | █████ |
| █ | █████████████████████████████████ | █████ |
| █ | ██████████ | 10:36 |
| 11 | MS. STEIN:  Objection to form. | 10:36 |
| 12 | THE WITNESS:  I don't know the definition | 10:36 |
| 13 | of an ██████████████████ | 10:36 |
| 14 | BY MS. WEAVER: | 10:36 |
| 15 | Q.   Okay. | 10:36 |
| 16 | A.   █████████████████████████ | █████ |
| █ | ███████████████████████ | █████ |
| █ | ████████████████████████ | █████ |
| █ | ████████ | 10:36 |
| 20 | Q.   Thank you. | 10:36 |
| 21 | And does Facebook also receive behavioral | 10:36 |
| 22 | data? | 10:36 |
| 23 | A.   In what context? | 10:36 |
| 24 | Q.   Well, I'm just reading from the chart.  Do | 10:36 |
| 25 | you see where it says "Behavioral Data"? | 10:36 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Okay.  In the context of this document -- | 10:36 |
| 2 | Q.    Yes. | 10:36 |
| 3 | A.    -- not in the context of appended data? | 10:36 |
| 4 | Yes, we do collect. | 10:36 |
| 5 | Q.    Yes.  I'm so sorry.  So I'll ask the | 10:36 |
| 6 | question again.  Does Facebook also receive | 10:36 |
| 7 | behavioral data about people? | 10:36 |
| 8 | A.    Yes. | 10:36 |
| 9 | Q.    Okay.  ██████████████████████████ | ████ |
| ██ | ████████████ | 10:36 |
| 11 | A.    Yes. | 10:37 |
| 12 | Q.    What does that refer to? | 10:37 |
| 13 | A.    ██████████████████████████████ | ████ |
| ██ | █████████████████████████████████████ | ████ |
| ██ | ███████████████████████████████████ | 10:37 |
| 16 | Q.    Okay.  █████████████████████ | 10:37 |
| 17 | A.    █████████████████████████ | ████ |
| ██ | ████████████████████████████████████ | ████ |
| ██ | ██████████████████████████████████ | ████ |
| ██ | ████████████████████████████████ | ████ |
| ██ | ████████████████████████████████ | ████ |
| ██ | ██████████ | 10:37 |
| 23 | Q.    Okay.  And then "Web SDK," do you see | 10:37 |
| 24 | that? | 10:37 |
| 25 | A.    Yes. | 10:37 |

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What does that refer to? | 10:37 |
| 2 | A.   So this is the version of the SDK that is | 10:37 |
| 3 | used by websites. | 10:37 |
| 4 | Q.   Okay.  And did that change over time? | 10:37 |
| 5 | A.   Yes, we update the SDKs quite regularly. | 10:38 |
| 6 | Q.   Okay.  And "Mobile SDK," what is that? | 10:38 |
| 7 | A.   This is the SDK that is used by native | 10:38 |
| 8 | apps, meaning iOS and Android. | 10:38 |
| 9 | Q.   Okay.  I just want to go back to | 10:38 |
| 10 | behavioral data for a minute.  What is behavioral | 10:38 |
| 11 | data as opposed to appended data? | 10:38 |
| 12 | A.   I think we discussed about that before. | 10:38 |
| 13 | So I'll try to repeat my previous response. | 10:38 |
| 14 | So behavioral data is activities happening | 10:38 |
| 15 | on third-party sites that are being captured through | 10:38 |
| 16 | a Facebook product, a pixel or an SDK. | 10:38 |
| 17 | Q.   Okay.  I see that I guess the videographer | 10:38 |
| 18 | would like to take a quick break.  So do you want to | 10:38 |
| 19 | just -- is that comfortable for you, K.P., to take a | 10:38 |
| 20 | break for a little bit here? | 10:38 |
| 21 | A.   Yes, I need a coffee. | 10:38 |
| 22 | MS. WEAVER:  Okay.  So why don't we come | 10:38 |
| 23 | back at, do you want to say, 10:50? | 10:38 |
| 24 | THE WITNESS:  10 minutes from now? | 10:38 |
| 25 | MS. WEAVER:  Yeah, does that work?  Well, | 10:39 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      1    11 minutes?  Okay.  Great.                      10:39

        2               THE VIDEOGRAPHER:  We are off the record   10:39

 2                      10:39   3    at       a.m.

        10:39

 3      4               (Recess.)                             10:39

                        10:39   5              (Off record:       a.m.)

 4      10:39

 5      6               (On record:  10:53 a.m.)              10:39

 6      7               THE VIDEOGRAPHER:  We are on the record at  10:53

 7                      10:53   8         a.m.

 8      10:53

 9      9    BY MS. WEAVER:                                   10:53

10     10         Q.   Hello, K.P.  You understand you are still   10:53

11     11    under oath, correct?                             10:53

12     12         A.   Yes, I do.                             10:53
```

13 ▓▓          ▓▓   ▓▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                     ▓▓▓

▓▓  ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                     ▓▓▓

▓▓  ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓                                 ▓▓▓

▓▓  ▓▓   ▓▓▓  ▓▓▓▓▓                                   ▓▓▓

▓▓  ▓▓   ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                        ▓▓▓

▓▓  ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                      ▓▓▓

▓▓  ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                      ▓▓▓

▓▓  ▓▓   ▓▓▓▓▓▓▓▓▓▓▓                                  ▓▓▓

▓▓  ▓▓   ▓▓   ▓▓▓▓▓                                   10:53

```
22     22               MS. STEIN:  Object to form.          10:53

23     23    BY MS. WEAVER:                                   10:53

24     24         ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                        ▓▓▓
```

▓▓  ▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                         ▓▓▓

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      ███████████████████████   ████████████        ██████

2  ██    ██████                                              10:54

3         A.    Yes, I do.                                   10:54

4         Q.    Okay.  ████████████████████████      ██████

   ██    ████████████████████████████████                   ██████

5  ██    ██████████████████████                             10:54

7               MS. STEIN:  Objection to form.              10:54

8               THE WITNESS:  Yeah.  █████████████    ██████

   ██    █████████████████████████████████████████   ██████

   ██    ████████████████████████████████████        ██████

   ██    ███████████████████████████████████████     ██████

   ██    ██████████████████████████████████████      ██████

   ██    ███████████████████                              10:54

14     BY MS. WEAVER:                                       10:54

15        Q.    Okay.  And do you see here where it says     10:54

16     "Explicit actions (likes, logins) off Facebook"?     10:54

17        A.    Yes.                                         10:54

18        Q.    Do you see that?  What does that refer to?   10:54

19              MS. STEIN:  Objection.  Asked and            10:54

20     answered.                                             10:54

21              You can answer.                              10:54

22              THE WITNESS:  This is in relation to the     10:54

23     web SDK and refers to activities captured in -- this  10:54

24     is for the purpose of those examples via the          10:55

25     Facebook log-in button and a like button.            10:55

                                              Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                      10:55

 2         Q.   Okay. ███████████████████████████    ██████

 ██   ██████████████████████████                        10:55

 4         A.   Yes.                                      10:55

 5         Q.   ████████████████                          10:55

 6         A.   ██████████████████████████          ██████

 ██   ████████████████████████████████████         ██████

 ██   █████████████████████████████████████        ██████

 ██   ███████████████████████████████████████      ██████

 ██   ████████████████████                           10:55

11         Q.   So it was called ███████████ is that    10:55

12    correct?                                           10:55

13         A.   I don't remember the exact name of the   10:55

14    app.                                                10:55

15         Q.   Do you recall that it was a VPN, a virtual  10:55

16    private network?                                    10:55

17              MS. STEIN:  Objection to form.            10:55

18              THE WITNESS:  Yes.                         10:55

19    BY MS. WEAVER:                                      10:55

20         Q.   ███████████████████████████████     ██████

 ██   ████████████████████████████████               10:55

22              MS. STEIN:  Object to form.              10:55

23              THE WITNESS:  ████████████████████       10:55

24    BY MS. WEAVER:                                      10:55

25         Q.   Uh-huh.                                   10:56
```

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   I don't think so. ████████████████   ██████
                                                     10:56
          ██████████                                 10:56
 3        Q.   Right. ████████████████████████████   ██████
                                                     10:56
          ████████████████████████████              10:56
 5             MS. STEIN:  Objection to form.  Beyond the   10:56
 6   scope.                                          10:56
 7             MS. WEAVER:  It relates directly to the   10:56
 8   ████████████████████████████████████████       10:56
 9        Q.   ████████████████████████████████   ██████
                                                     10:56
     ██   ██████                                     10:56
11             MS. STEIN:  Objection to form.  Beyond the   10:56
12   scope.  This witness is not testifying about --   10:56
13             MS. WEAVER:  Are you instructing him not   10:56
14   to answer my question about ████████           10:56
15             MS. STEIN:  That it's not subject to this   10:56
16   testimony.  He's not here -- he knows it -- he's not   10:56
17   designated --                                  10:56
18             MS. WEAVER:  State an objection to form or   10:56
19   instruct him not to answer.  Please don't fill my   10:56
20   record with your speeches.                     10:56
21             MS. STEIN:  Okay.  It's not a speech.  I'm   10:56
22   explaining that this witness came prepared to   10:56
23   testify about certain things.  He's not a company   10:56
24   witness on ████████████  so he's not answering the   10:56
25   question.                                      10:56
```

                                                Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                      10:56

 2        Q.   ███████████████████████████████          ████

 ▓   ██████████████████████████████████████████         ████

 ▓   ████████████████████████████  Do you see that?     10:57

 5        A.   Yes, I see that.                          10:57

 6        Q.   What does that refer to?                  10:57

 7        A.   Again, only guess.                        10:57

 8        Q.   What -- what do you believe it means?     10:57

 9             MS. STEIN:  The witness should not guess. 10:57

10   If he knows, he can answer.  If he does not know, he 10:57

11   should not answer.                                  10:57

12             THE WITNESS:  I don't know.               10:57

13   BY MS. WEAVER:                                      10:57

14        Q.   Okay.  ████████████████████████████       ████

 ▓   ████████████████████████████████████████           ████

 ▓   ███████████████████                                 10:57

17             MS. STEIN:  Objection.  The witness just  10:57

18   said he doesn't know.                               10:57

19   BY MS. WEAVER:                                      10:57

20        Q.   You can answer the question.              10:57

21        A.   I don't know.                             10:57

22        Q.   Okay.  █████████████████████████          ████

 ▓   ██████████████████████████                          10:57

24        A.   No, I didn't.                             10:57

25        Q.   Okay.  Do you know who did?               10:57
```

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It's a very broad question.  So in what | 10:57 |
| 2 | capacity? | 10:57 |
| 3 | Q.   Who oversaw the Onavo project from within | 10:57 |
| 4 | Facebook?  It was a partnership, correct? | 10:57 |
| 5 | A.   No, it's not a partnership.  It's an | 10:57 |
| 6 | acquisition. | 10:57 |
| 7 | Q.   Okay.  So who oversaw that acquisition? | 10:57 |
| 8 | A.   On the Facebook side or -- | 10:57 |
| 9 | Q.   Yes. | 10:58 |
| 10 | A.   -- after the acquisition? | 10:58 |
| 11 | Q.   On the Facebook side. | 10:58 |
| 12 | A.   I don't know. | 10:58 |
| 13 | Q.   Okay.  What about after the acquisition? | 10:58 |
| 14 | A.   The -- I guess the CEO of Onavo. | 10:58 |
| 15 | Q.   Okay.  Move on. | 10:58 |
| 16 | Do you know what an opt-in panel is? | 10:58 |
| 17 | A.   I don't know. | 10:58 |
| 18 | Q.   So I'll turn to the next page on this | 10:58 |
| 19 | document.  And that's the one beginning at 425.  Do | 10:58 |
| 20 | you see that?  It says "Hard Questions" at the top? | 10:58 |
| 21 | A.   Yes. | 10:58 |
| 22 | Q.   Okay.  And then do you see where it says | 10:58 |
| 23 | "Does Facebook share my data with advertisers?"  Do | 10:58 |
| 24 | you see that? | 10:58 |
| 25 | A.   I see that. | 10:58 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And in quotes it says "We don't share the | 10:58 |
| 2 | private information that you put on Facebook with | 10:58 |
| 3 | advertisers without your consent."  Do you see that? | 10:58 |
| 4 | A.   I see that. | 10:58 |
| 5 | Q.   And do you see that it's in quotations? | 10:58 |
| 6 | A.   Yes. | 10:59 |
| 7 | Q.   And is that in quotations because that was | 10:59 |
| 8 | Facebook's policy at the time? | 10:59 |
| 9 | MS. STEIN:  Objection to form.  If the | 10:59 |
| 10 | witness knows what the people who wrote this -- | 10:59 |
| 11 | MS. WEAVER:  Please stop coaching him and | 10:59 |
| 12 | telling him to say that he doesn't know. | 10:59 |
| 13 | MS. STEIN:  Lesley -- Lesley, do not | 10:59 |
| 14 | accuse me of coaching.  You've gotten -- | 10:59 |
| 15 | MS. WEAVER:  That's strike one. | 10:59 |
| 16 | Q.   Okay.  Go ahead, K.P. | 10:59 |
| 17 | MS. STEIN:  Excuse me? | 10:59 |
| 18 | BY MS. WEAVER: | 10:59 |
| 19 | Q.   I'll ask the question again.  Do you know | 10:59 |
| 20 | at this point in time whether Facebook's policy was, | 10:59 |
| 21 | "We don't share the private information that you put | 10:59 |
| 22 | on Facebook with advertisers without your consent"? | 10:59 |
| 23 | A.   I can only speak at a high level.  This | 10:59 |
| 24 | has always been not just the policy but the way we | 10:59 |
| 25 | operated as a business. | 10:59 |

Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  Thank you. | 10:59 |
| 2 | And then do you see it says "Why do we use | 10:59 |
| 3 | that framing?" right below it? | 10:59 |
| 4 | A.   Yes, yes. | 10:59 |
| 5 | Q.   Okay.  And then there's a bullet point | 10:59 |
| 6 | that says "Though Facebook's policies prohibit | 11:00 |
| 7 | sharing of data with data brokers or similar | 11:00 |
| 8 | entities, we only make commitments about what | 11:00 |
| 9 | Facebook will do."  Do you see that? | 11:00 |
| 10 | A.   Yes, I do. | 11:00 |
| 11 | Q.   Okay.  So is it a true statement that at | 11:00 |
| 12 | this time Facebook's policy prohibited sharing of | 11:00 |
| 13 | data with data brokers or similar entities? | 11:00 |
| 14 | A.   Yes. | 11:00 |
| 15 | Q.   Okay.  And do you have an understanding as | 11:00 |
| 16 | to what the "We only make commitments about what | 11:00 |
| 17 | Facebook will do," what does that mean? | 11:00 |
| 18 | A.   It means that Facebook as a business only | 11:00 |
| 19 | makes public commitments about things that are | 11:00 |
| 20 | within our control. | 11:00 |
| 21 | Q.   Okay.  And so I just want to direct your | 11:00 |
| 22 | attention to the bottom bullet point there in the | 11:00 |
| 23 | second sentence.  Do you see where it says "Also, we | 11:00 |
| 24 | may in the future operate a 'data cooperative,' or | 11:01 |
| 25 | other product allowing exchange of information that | 11:01 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | people haven't given to us directly"?  Do you see | 11:01 |
| 2 | that? | 11:01 |
| 3 | A.   I see that. | 11:01 |
| 4 | Q.   Okay.  Do you know what a data cooperative | 11:01 |
| 5 | is as it's expressed here? | 11:01 |
| 6 | A.   It would probably mean some sort of a | 11:01 |
| 7 | partnership with data brokers. | 11:01 |
| 8 | Q.   Okay.  And do you know if Facebook did | 11:01 |
| 9 | engage in a data cooperative with data brokers? | 11:01 |
| 10 | A.   No. | 11:01 |
| 11 | Q.   No, you don't know, or, no, they did not? | 11:01 |
| 12 | A.   No, we haven't. | 11:01 |
| 13 | Q.   Okay.  What is -- a little bit lower | 11:01 |
| 14 | there, do you see "Facebook Exchange" referenced? | 11:01 |
| 15 | A.   Yes. | 11:01 |
| 16 | Q.   What does that refer to? | 11:01 |
| 17 | A.   I don't know. | 11:01 |
| 18 | Q.   Okay.  There's a question here "How can | 11:02 |
| 19 | people see what you know about them and control | 11:02 |
| 20 | their ad experiences?"  Do you see that? | 11:02 |
| 21 | A.   Yes, I see that. | 11:02 |
| 22 | Q.   And there's something there that says | 11:02 |
| 23 | "Context menu."  Do you see it? | 11:02 |
| 24 | A.   Yes. | 11:02 |
| 25 | Q.   What is that? | 11:02 |

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   Sorry, I'm searching back so I can see      11:02

 2   you.                                                  11:02

 3   ████████████████████████████████████████     ██████

     █ ████████████████████████████████████████    ██████

     █ ██████████████████████████████████████      11:02

 6        Q.   Okay.  And can you -- that was during the   11:02

 7   time period in 2012 to 2017?                          11:02

 8        A.   My -- I don't know exactly when that        11:02

 9   option was added, but I believe it was always there.  11:02

10        Q.   Okay.  And "Activity Log and Download Your  11:02

11   Information (DYI)."  Do you see that?                  11:02

12        A.   Yes.

13        Q.   And it says "See the information you've     11:03

14   put on Facebook that may be used for ads."  Do you    11:03

15   see that?                                             11:03

16        A.   Yes.                                        11:03

17        Q.   So is it true that -- well, let me back     11:03

18   up.  What is the activity log?                        11:03

19        A.   It's a list of every single action you     11:03

20   have taken on Facebook.                               11:03

21        Q.   Okay.  And what is "Download Your           11:03

22   Information"?                                          11:03

23        A.   It's a user-friendly way of downloading --  11:03

24   it's a file basically, but it's a user-friendly file  11:03

25   of everything that Facebook held -- all the           11:03
```

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    information that Facebook has for you.              11:03
 2         Q.   Okay.  And going back to the activity log, 11:03
 3    it's a list of every single action you have taken on 11:03
 4    Facebook.  Do you mean on the platform?             11:03
 5         A.   I believe it's on the platform, yes.      11:03
 6         Q.   Okay.  So is it limited to only the       11:03
 7    activity on the platform?                           11:03
 8         A.   The Facebook activity log, yes.           11:04
 9         Q.   Okay.  And back to the DYI.  You say it's 11:04
10    all the information that Facebook has for you; is   11:04
11    that correct?                                       11:04
12         A.   Yes.                                      11:04
13         Q.   What do you mean by that?                 11:04
14         A.   It includes from things from like the    11:04
15    information you submitted when you created your     11:04
16    account, to the photos that you may have uploaded,  11:04
17    to the pixels of your friends you may have liked, to 11:04
18    the ads you may have seen, the videos you may have  11:04
19    watched.  It's a -- it's a very lengthy, you know,  11:04
20    like document with different things.                11:04
21         Q.   Okay.  So going back to the previous page 11:04
22    where we were talking about appended data, does the 11:04
23    DIY tool include appended data?                     11:04
24         A.   No.                                       11:04
25         Q.   Okay.  Does it include behavioral data?   11:04
```

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection to form. | 11:04 |
| 2 | THE WITNESS:  Yes, it does. | 11:05 |
| 3 | BY MS. WEAVER: | 11:05 |
| 4 | Q.   Okay.  So it includes the conversions and | 11:05 |
| 5 | purchases off Facebook? | 11:05 |
| 6 | A.   I don't know about that, but it includes | 11:05 |
| 7 | the apps that you have logged in.  It includes, I | 11:05 |
| 8 | think, the websites that you may have liked, and so | 11:05 |
| 9 | on. | 11:05 |
| 10 | Q.   Okay.  Does the Do It Yourself network | 11:05 |
| 11 | include the native data that was inferred from | 11:05 |
| 12 | engagement on the site? | 11:05 |
| 13 | MS. STEIN:  Objection to form. | 11:05 |
| 14 | THE WITNESS:  I think you're referring to | 11:05 |
| 15 | the DYI file? | 11:05 |
| 16 | BY MS. WEAVER: | 11:05 |
| 17 | Q.   Yes.  I'll ask the question again.  Sorry. | 11:05 |
| 18 | Does the DIY file include native data that | 11:05 |
| 19 | is inferred from engagement on the site? | 11:05 |
| 20 | MS. STEIN:  Objection to form. | 11:05 |
| 21 | THE WITNESS:  It should include interests, | 11:05 |
| 22 | which are inferred data, so yes. | 11:05 |
| 23 | BY MS. WEAVER: | 11:05 |
| 24 | Q.   Does it also include behaviors? | 11:05 |
| 25 | MS. STEIN:  Objection to form. | 11:05 |

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  What's the objection? | 11:06 |
| 2 | MS. STEIN:  "Behaviors" is a very vague | 11:06 |
| 3 | term, Lesley. | 11:06 |
| 4 | MS. WEAVER:  No.  It's listed right here | 11:06 |
| 5 | on the document.  So I'm going to restate the | 11:06 |
| 6 | question. | 11:06 |
| 7 | Q.   Does the DIY tool also include the native | 11:06 |
| 8 | data that's inferred from the engagement on the site | 11:06 |
| 9 | like behaviors as listed in this document? | 11:06 |
| 10 | MS. STEIN:  Objection to form. | 11:06 |
| 11 | THE WITNESS:  So I will answer with, you | 11:06 |
| 12 | know, like a high-level understanding that the DYI | 11:06 |
| 13 | file includes the pages that you liked.  And by | 11:06 |
| 14 | default, that's a behavior. | 11:06 |
| 15 | BY MS. WEAVER: | 11:06 |
| 16 | Q.   Does Facebook engage in -- okay.  But | 11:06 |
| 17 | just -- sorry.  Just go back to that question. | 11:06 |
| 18 | Do you know, as you sit here today, | 11:06 |
| 19 | whether the DIY tool includes native data inferred | 11:06 |
| 20 | from engagement on the site, including interests and | 11:06 |
| 21 | behaviors as identified on this chart? | 11:06 |
| 22 | MS. STEIN:  Objection to form. | 11:06 |
| 23 | THE WITNESS:  DYI file includes activities | 11:06 |
| 24 | such as you liking a page that may suggest an | 11:07 |
| 25 | interest and, by default, explain a behavior or | 11:07 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    describe a behavior.                              11:07

 2    BY MS. WEAVER:                                    11:07

 3        Q.   Okay.  But is that to be inferred from the   11:07

 4    engagement on the site?                           11:07

 5        A.   It's driven by your activities happening   11:07

 6    on the Facebook website or the Facebook apps.     11:07

 7        Q.   Okay.  Going back to the page ending in   11:07

 8    425.  We were near the bottom of the page there.   11:07

 9        A.   Yes.                                      11:07

10        Q.   Do you see where it says "Centralized     11:07

11    opt-out"?                                         11:07

12        A.   Yes.                                      11:07

13        Q.   What does that refer to?                  11:07

14        A.   So this refers to the ability of the user   11:07

15    to turn off any kind of activity around behavioral   11:07

16    data captured through our SDKs --                 11:07

17            THE REPORTER:  I'm sorry, "Behavioral     11:08

18    data" --                                          11:08

19            THE WITNESS:  -- and pixel.                11:08

20            THE REPORTER:  I'm sorry, "Behavioral     11:08

21    data"...                                          11:08

22            THE WITNESS:  -- captured through the SDKs   11:08

23    and pixel.                                         11:08

24            THE REPORTER:  Thank you.                  11:08

25
```

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 11:08 |
| 2 | Q.   And what is third-party behavioral data | 11:08 |
| 3 | again? | 11:08 |
| 4 | A.   I think we exhausted that, but I will go | 11:08 |
| 5 | back to the definition as it's being offered in a | 11:08 |
| 6 | previous page:  Website, browser behaviors, | 11:08 |
| 7 | conversations, explicit actions, mobile apps | 11:08 |
| 8 | installed, and so on. | 11:08 |
| 9 | Q.   And is that contained in the DYI tool or | 11:08 |
| 10 | the DYI file? | 11:08 |
| 11 | MS. STEIN:  Object to form.  Objection to | 11:08 |
| 12 | form. | 11:08 |
| 13 | THE WITNESS:  I'm sorry, how can a file | 11:08 |
| 14 | include activities as you have already opted out? | 11:08 |
| 15 | BY MS. WEAVER: | 11:08 |
| 16 | Q.   Okay.  What I'm asking is whether the DIY | 11:08 |
| 17 | tool collects third-party behavioral data as it's | 11:08 |
| 18 | referred to there? | 11:08 |
| 19 | A.   I'm sorry, I feel like I'm repeating | 11:08 |
| 20 | myself.  But the DYI file identified the apps that | 11:09 |
| 21 | you used, the websites that you may have liked and | 11:09 |
| 22 | so on.  So it captures behavioral data as per -- | 11:09 |
| 23 | Q.   Okay. | 11:09 |
| 24 | A.   -- the definition of the previous page. | 11:09 |
| 25 | Q.   Does it collect all third-party behavioral | 11:09 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | data? | 11:09 |
| 2 | MS. STEIN:  Objection to form. | 11:09 |
| 3 | THE WITNESS:  All?  I don't know. | 11:09 |
| 4 | BY MS. WEAVER: | 11:09 |
| 5 | Q.   Yeah.  Okay. | 11:09 |
| 6 | How would you find out? | 11:09 |
| 7 | A.   I would have to look at the DYI file. | 11:09 |
| 8 | Q.   Okay.  And have you looked at any DYI | 11:09 |
| 9 | files to prepare for your deposition today? | 11:09 |
| 10 | A.   No, I have not, because that would be a | 11:09 |
| 11 | violation of my commitment to users' privacy. | 11:09 |
| 12 | Q.   Did you look at DYI files for any of the | 11:09 |
| 13 | named plaintiffs in this action to prepare for the | 11:09 |
| 14 | deposition? | 11:09 |
| 15 | A.   No, because that would be in violation of | 11:09 |
| 16 | my commitment to users' privacy. | 11:09 |
| 17 | Q.   To prepare -- | 11:10 |
| 18 | A.   I would be fired -- | 11:10 |
| 19 | Q.   If your -- | 11:10 |
| 20 | A.   -- if I look -- | 11:10 |
| 21 | Q.   If your lawyers had you look at the | 11:10 |
| 22 | plaintiffs' DYI files to prepare for deposition in | 11:10 |
| 23 | this action? | 11:10 |
| 24 | A.   I would be fired. | 11:10 |
| 25 | Q.   Okay.  Well, we'll table that. | 11:10 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Can you look at your -- | 11:10 |
| 2 | A.   No one here -- | 11:10 |
| 3 | Q.   Can you look at your own -- | 11:10 |
| 4 | A.   I can only look at mine. | 11:10 |
| 5 | Q.   -- DYI -- oh, okay.  So can you look at | 11:10 |
| 6 | your own DYI file to determine whether or not all | 11:10 |
| 7 | third-party behavioral data is included in it? | 11:10 |
| 8 | A.   I can, but not right now. | 11:10 |
| 9 | Q.   Okay.  Right. | 11:10 |
| 10 | Okay.  Give me a moment here. | 11:10 |
| 11 | Okay.  So let's turn for a moment to the | 11:11 |
| 12 | page ending in 3428.  It says "Location" at top. | 11:11 |
| 13 | Do you know who Maritza Johnson is? | 11:11 |
| 14 | A.   No, I don't. | 11:11 |
| 15 | Q.   Okay.  And do you see, it says, "Knowing | 11:11 |
| 16 | where people are when they interact with our | 11:11 |
| 17 | services is useful for designing innovative | 11:11 |
| 18 | products"?  Do you see that? | 11:11 |
| 19 | A.   Yes, I do see that. | 11:11 |
| 20 | Q.   So did Facebook track people's -- users' | 11:11 |
| 21 | location? | 11:11 |
| 22 | A.   Facebook will have an understanding of the | 11:11 |
| 23 | user's location based on different signals. | 11:11 |
| 24 | Q.   Okay.  And you see here it says -- when | 11:11 |
| 25 | you say "different signals," what do you mean? | 11:11 |

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Like if someone is using the app from | 11:11 |
| 2 | their mobile phone and they have allowed us access | 11:11 |
| 3 | to their GPS, we would have a precise, you know, | 11:11 |
| 4 | understanding of that location.  If someone is | 11:12 |
| 5 | accessing Facebook through their computer, we will | 11:12 |
| 6 | try to determine their location from an IP address | 11:12 |
| 7 | and so on. | 11:12 |
| 8 | Q.   Okay.  And do you see where it says, "Is | 11:12 |
| 9 | derivative data produced (example, ad clusters)?" | 11:12 |
| 10 | It's the last bullet point -- | 11:12 |
| 11 | A.   Ah. | 11:12 |
| 12 | Q.   -- on the top. | 11:12 |
| 13 | A.   Yes. | 11:12 |
| 14 | Q.   Okay.  So the question is, what is | 11:12 |
| 15 | derivative data? | 11:12 |
| 16 | A.   Could I read the whole thing quickly just | 11:12 |
| 17 | to make sure I'm -- | 11:12 |
| 18 | Q.   Absolutely, of course. | 11:12 |
| 19 | (Pause while witness peruses document.) | 11:12 |
| 20 | A.   Okay. | 11:12 |
| 21 | Q.   What is derivative data? | 11:12 |
| 22 | MS. STEIN:  I will just instruct the | 11:13 |
| 23 | witness to make sure that you only testify about | 11:13 |
| 24 | things that you know, and that if there are things | 11:13 |
| 25 | in this document that you don't know or are not a | 11:13 |

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | company term, to please, you know, tell the | 11:13 |
| 2 | examiner, because you should not be testifying | 11:13 |
| 3 | beyond the scope of what your -- what's at issue in | 11:13 |
| 4 | this deposition and -- | 11:13 |
| 5 | MS. WEAVER:  This is completely within the | 11:13 |
| 6 | scope, Deb, and that's improper coaching. | 11:13 |
| 7 | Q.   So, sir, do you know what derivative data | 11:13 |
| 8 | is? | 11:13 |
| 9 | A.   I think there is an example for derivative | 11:13 |
| 10 | data there. | 11:13 |
| 11 | Q.   I'm sorry? | 11:13 |
| 12 | A.   Ad clusters.  Ad cluster is derivative | 11:13 |
| 13 | data. | 11:13 |
| 14 | Q.   Okay.  That's an example of derivative | 11:13 |
| 15 | data? | 11:13 |
| 16 | A.   Yes. | 11:13 |
| 17 | Q.   Okay.  How is it derived, if you will? | 11:13 |
| 18 | How are ad clusters derived? | 11:13 |
| 19 | MS. STEIN:  Objection to form. | 11:13 |
| 20 | THE WITNESS: ███████████████ | ███████ |
| ███ | ████████████████████████████ | ███████ |
| ███ | ██████████████████████████████████ | ███████ |
| ███ | ██████████████████   ██████████████████ | ███████ |
| ███ | ████████████████████████████████ | ███████ |
| ███ | █████████████ | 11:14 |

Veritext Legal Solutions
866 299-5127



```
 1
                                                        11:14
12        A.    Those are things that are --           11:14
13              MS. STEIN:  Objection to form.          11:14
14              You may answer.                         11:14
15              THE WITNESS:                            11:14
                                                        11:14
17    BY MS. WEAVER:                                    11:15
18        Q.    Okay.  So --                            11:15
19        A.                                            11:15

                                                        11:15
22        Q.    Okay.  So for the record,               11:15

                                                        11:15
25              MS. STEIN:  Objection to form.          11:15
```

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1

11:15

13      Q.   Okay.  And is it contained in the DYI      11:15

14   file?                                              11:15

15      A.   That -- how is that relevant for you?      11:15

16      Q.   I get to ask the questions.                11:16

17      A.   No, I mean -- I'm -- I'm thinking loudly.  11:16

18   That a user's information, when it is -- so the -- 11:16

19   okay.  So let me take a step back.                 11:16

20           That data that we are talking about are    11:16

21   anonymized.  They are not associated with a given  11:16

22   user.  And so it wouldn't show up in a -- in user's 11:16

23   DYI file.                                          11:16

24      Q.   Okay.  And when --                          11:16

25           MS. STEIN:  I'm just waiting for my feed

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    here.

 2          Oh, could you read his answer back,

 3    please.                                      11:16

 4                   (The record was read by the   11:17

 5                   court reporter, as requested)  11:17

 6    BY MS. WEAVER:                                11:17

 7          Q.   And what do you mean by "associated"?  11:17

 8          A.   Like we have a broad understanding of who  11:17

 9    lives in San Francisco but we don't know exactly who  11:17

10    lives in San Francisco.                      11:17

11          Q.   Okay.  But the data's collected from  11:17

12    individual users, right?                      11:17

13          A.   It depends.                        11:17

14          Q.   On what?                           11:17

15          A.   It depends on whether the data has been  11:17

16    collected because some are explicitly said "I live  11:17

17    in San Francisco."  Some people have their hometown  11:17

18    identified on Facebook, some people don't.   11:17

19          Q.   Right, but it's still one individual.  The  11:17

20    source of the -- the -- originally is one user,  11:17

21    right?                                        11:17

22                MS. STEIN:  Objection to form.   11:17

23    BY MS. WEAVER:                                11:17

24          Q.   Because either I live in San Francisco or  11:17

25    I indicated -- I mean, all of this data comes from  11:17
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | individuals, right? | 11:17 |
| 2 | A.   Some of the data -- sorry.  Again, if -- | 11:17 |
| 3 | if it's -- according to the previous definition, if | 11:17 |
| 4 | it's native data, that means that you have provided | 11:17 |
| 5 | that information. | 11:18 |
| 6 | Q.   Okay.  So let's -- okay.  Let's talk -- | 11:18 |
| 7 | A.   Like you have defined San Francisco -- | 11:18 |
| 8 | Q.   Right. | 11:18 |
| 9 | A.   -- to be your hometown. | 11:18 |
| 10 | Q.   Perfect. | 11:18 |
| 11 | A.   Okay. | 11:18 |
| 12 | Q.   So it's associated with me initially, | 11:18 |
| 13 | right? | 11:18 |
| 14 | A.   You have specifically suggested to your | 11:18 |
| 15 | Facebook friends by basically filling in that | 11:18 |
| 16 | specific field that Facebook asked you to do that | 11:18 |
| 17 | your hometown is San Francisco.  You may live in | 11:18 |
| 18 | Denver, but your hometown appears to be | 11:18 |
| 19 | San Francisco. | 11:18 |
| 20 | Q.   Okay.  So an algorithm runs on this data | 11:18 |
| 21 | and it creates an ad cluster and puts me -- when | 11:18 |
| 22 | does it become disassociated with me?  Because it | 11:18 |
| 23 | was initially associated, correct? | 11:18 |
| 24 | A.   That association will never cease to exist | 11:18 |
| 25 | unless you basically go there and suggest that you | 11:18 |

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | move to Denver. | 11:18 |
| 2 | Q.   Okay.  I'm just -- honestly, K.P., I'm | 11:18 |
| 3 | trying to understand your answer. | 11:18 |
| 4 | You said the data that we are talking | 11:18 |
| 5 | about is not associated with specific users.  We | 11:18 |
| 6 | just talked about -- | 11:19 |
| 7 | A.   Yes, please. | 11:19 |
| 8 | Q.   -- it was associated with an individual | 11:19 |
| 9 | user because they're from San Francisco. | 11:19 |
| 10 | A.   Yes. | 11:19 |
| 11 | Q.   So when does it become disassociated? | 11:19 |
| 12 | A.   But I'm trying to explain to you the | 11:19 |
| 13 | distinction between data that comes from native | 11:19 |
| 14 | data, to use your -- | 11:19 |
| 15 | Q.   Okay. | 11:19 |
| 16 | A.   -- the definition in this document, versus | 11:19 |
| 17 | behavioral data. | 11:19 |
| 18 | Q.   Okay.  And -- | 11:19 |
| 19 | A.   So -- no, no, no, no.  Sorry.  I have to | 11:19 |
| 20 | be super precise here. | 11:19 |
| 21 | There are two kinds of native data.  There | 11:19 |
| 22 | are native data that come because you have, as a | 11:19 |
| 23 | user, indicated that your hometown is San Francisco. | 11:19 |
| 24 | Q.   Right. | 11:19 |
| 25 | A.   And there is native data that comes from | 11:19 |

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | your activity.  So if -- hypothetically speaking, I | 11:19 |
| 2 | don't -- I don't know exactly what period of time we | 11:19 |
| 3 | are going to be looking at, but let's say for the | 11:19 |
| 4 | last three -- the last 30 days you have accessed | 11:19 |
| 5 | Facebook from an IP address in -- in San Francisco, | 11:19 |
| 6 | that is still, according to our definition, native | 11:19 |
| 7 | data.  But it's -- it's not data that's -- it's | 11:19 |
| 8 | directly explicitly, you know, like, documented by | 11:19 |
| 9 | the user, but it's in data inferred by their | 11:20 |
| 10 | activity. | 11:20 |
| 11 | Q.   Okay.  And so the -- | 11:20 |
| 12 | A.   Still native. | 11:20 |
| 13 | Q.   I understand. | 11:20 |
| 14 | By the way, would you use a different word | 11:20 |
| 15 | than native data?  Is there another way to reference | 11:20 |
| 16 | that? | 11:20 |
| 17 | A.   I would probably use on-site activity. | 11:20 |
| 18 | Q.   On-site activity? | 11:20 |
| 19 | A.   Versus off-site activity. | 11:20 |
| 20 | Q.   Okay.  Perfect. | 11:20 |
| 21 | Do you -- would you use the -- the words | 11:20 |
| 22 | "appended data" or is there another term for that? | 11:20 |
| 23 | A.   I haven't heard that term until recently. | 11:20 |
| 24 | Until this -- | 11:20 |
| 25 | Q.   Okay.  Do you have another understanding | 11:20 |

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    of how people at Facebook refer to it?                    11:20

2         A.   Customer data provided by third parties or      11:20

3    something --                                              11:20

4         Q.   Okay.                                           11:20

5         A.   -- like that.                                   11:20

6         Q.   All right.  And then what about behavioral      11:20

7    data; is there another term of art at Facebook used       11:20

8    to reference that?                                         11:20

9         A.   That's my definition of offline activity.       11:20

10        Q.   Offline activity.  Okay.                         11:20

11        A.   Oh, sorry, off-site activity.                    11:20

12        Q.   Off-site.  I see.  Okay.                         11:20

13   ████████████████████████████████████████████    ███████

     ████████████████████████████████████████████████    ███████

     ███████████████████████████████████████████    ███████

     ██████████████████    ███████

     ███    ███    ███████

     ███    ██████████████████    ███████████    ███████

     ██████████████████    ███████

     ███    ██████████████████    ████████████    ███████

     ███    ███    ███████    ██████████    ██████████  █    ███████

     ███████████████████████████    ███████

     ███████    ███████████████    11:21

24        A.   Okay.  At the very high level, if we are         11:21

25   talking about the specific scenario that a business        11:21
```

                                                    Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    that is operating in San Francisco wants to target            11:21

2    users in San Francisco, they will run the campaign            11:21

3    for, let's say, two days; they will target specific           11:21

4    users that live in that area.  They may target only           11:21

5    females or only men, people of a certain age, people          11:21

6    of a certain profession, depending on, you know,              11:21

7    like, what sort of campaign they want to run, right?          11:21

8            So that will all be effectively identified            11:21

9    as a potential audience of, let's say for the sake            11:21

10   of the argument, 20,000 users.  They still have no            11:22

11   access to the information.  They only understand              11:22

12   what is the potential audience their ad campaign can          11:22

13   reach.                                                        11:22

14           And then when they start, you know, like,             11:22

15   placing the advertisement, then their advertisement          11:22

16   is going to go into an auction.  That auction may            11:22

17   actually, you know, allow others to beat against             11:22

18   that same audience.  So if there is a competitor of         11:22

19   this service, or another service that wants to              11:22

20   target people with similar characteristics that live       11:22

21   in San Francisco, they may or may not see the first        11:22

22   ad.  So it's the highest bidder that will have the         11:22

23   ad show up.                                                 11:22

24   ███████████████████████████              ██████            11:22

█  ████████████████████████████████████                         11:22

                                                      Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1  ███████████████████████████████████            11:22
 2      Q.   Okay.  So let me ask this:  So I'm -- say  11:22
 3  I'm being targeted in that ad campaign.  Is there a  11:22
 4  way for me to find out that I was targeted by those  11:22
 5  categories that the advertiser chose?              11:22
 6      A.   You can see it only if that ad campaign  11:23
 7  shows up to you.                                    11:23
 8      Q.   Okay.  And only in realtime?  And there's  11:23
 9  no record of it after that?                         11:23
10      A.   I think you can actually see the -- the  11:23
11  information in realtime.  But if you go to the DYI  11:23
12  file, you can see probably ad campaigns that you    11:23
13  have been displayed -- or you have seen yourself, or 11:23
14  you have clicked.                                   11:23
15      Q.   Okay.  But if they were --               11:23
16      A.   You know --                               11:23
17      Q.   -- targeted to me and I didn't take an   11:23
18  action, it's not in the DYI file; is that right?   11:23
19      A.   You -- you will see the ad campaigns that 11:23
20  ended up showing up on your feed, but you wouldn't 11:23
21  see any ad campaigns that, for whatever reason, you 11:23
22  haven't seen, because there was another advertiser 11:23
23  that won the bid.                                   11:23
24      Q.   Got it.                                    11:23
25          And so let's talk about the information   11:23
```

Page 115

| | | |
|---|---|---|
| 1 | that is used to create the derived data.  How do you | 11:23 |
| 2 | determine what information can be used to apply | 11:24 |
| 3 | those algorithms? | 11:24 |
| 4 | A.   I need to clarify that question. | 11:24 |
| 5 | Q.   Yeah, it's -- so is only public | 11:24 |
| 6 | information used to create derived data? | 11:24 |
| 7 | MS. STEIN:  Objection to form. | 11:24 |
| 8 | THE WITNESS:  Okay.  So are you talking | 11:24 |
| 9 | about derived data in the context of location, or | 11:24 |
| 10 | you're talking about derived data broadly? | 11:24 |
| 11 | BY MS. WEAVER: | 11:24 |
| 12 | Q.   Well, what is derived data broadly? | 11:24 |
| 13 | A.   I mean, I don't know of any use of derived | 11:24 |
| 14 | data broadly, but I'm trying to understand exactly | 11:24 |
| 15 | how you want me to answer the question in a | 11:24 |
| 16 | thoughtful way. | 11:24 |

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But at large, is it fair to say that | 11:25 |
| 2 | derived data is created through algorithms running | 11:25 |
| 3 | on realtime data? | 11:25 |
| 4 | MS. STEIN:  Objection to form. | 11:25 |
| 5 | THE WITNESS:  I cannot talk about that. | 11:25 |
| 6 | But derived data is a -- a broad, you know, like, | 11:25 |
| 7 | industry term that you can use, and it's a legal | 11:25 |
| 8 | term as well, as far as I understand.  It can be | 11:25 |
| 9 | used in different context and it doesn't always | 11:25 |
| 10 | require realtime processing. | 11:25 |
| 11 | BY MS. WEAVER: | 11:25 |
| 12 | Q.   Okay.  So let's -- we can stick with your | 11:25 |
| 13 | example then if you like for now. | 11:25 |
| 14 | What if I sent a -- a private -- a message | 11:25 |
| 15 | in Facebook Messenger to one friend saying "I used | 11:25 |
| 16 | to live in San Francisco" and I've never posted | 11:25 |
| 17 | anything publicly about it.  Is that information | 11:25 |
| 18 | used to create the derived data for ad clusters? | 11:26 |
| 19 | A.   No. | 11:26 |
| 20 | Q.   Why not? | 11:26 |
| 21 | A.   That's a private conversation between you | 11:26 |
| 22 | and your friend -- | 11:26 |
| 23 | Q.   Okay. | 11:26 |
| 24 | A.   -- that -- | 11:26 |
| 25 | Q.   So how does the algorithm distinguish -- | 11:26 |

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | let me ask this:  When the data is being run on | 11:26 |
| 2 | algorithms, is it segregated by public or private | 11:26 |
| 3 | data? | 11:26 |
| 4 | A.   So your definition of public or private is | 11:26 |
| 5 | what, if I may say? | 11:26 |
| 6 | Q.   If a user designated something private or | 11:26 |
| 7 | restricted audience. | 11:26 |
| 8 | A.   Okay.  Let's take a little bit of a step | 11:26 |
| 9 | back.  Because what we define as public data is | 11:26 |
| 10 | basically your first name, your last name, your | 11:26 |
| 11 | profile picture. | 11:26 |
| 12 | Q.   Okay. | 11:26 |
| 13 | A.   Anything else that comes with a -- an | 11:26 |
| 14 | audience selection doesn't necessarily belong -- | 11:26 |
| 15 | it's not necessarily by default public.  It may have | 11:26 |
| 16 | a limited audience.  It may be just you, if it's | 11:26 |
| 17 | things like your birthday, or it may be friends -- | 11:27 |
| 18 | or accessible to your friends. | 11:27 |
| 19 | What we always, you know, like, like to | 11:27 |
| 20 | suggest that communications that happen over | 11:27 |
| 21 | messenger is also by default private, meaning that | 11:27 |
| 22 | it's -- the content of your exchanges with your | 11:27 |
| 23 | friends belong to you and your friends.  So that | 11:27 |
| 24 | wouldn't be considered public information.  But it | 11:27 |
| 25 | wouldn't be considered necessarily private | 11:27 |

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | information because it's not accessible by anybody | 11:27 |
| 2 | in that -- it's a private conversation but it's not | 11:27 |
| 3 | private data in that sense. | 11:27 |
| 4 | Q.   And when Facebook is, let's say -- we can | 11:27 |
| 5 | just stick with your ad clusters example.  When it | 11:27 |
| 6 | is using the algorithm to create derived data, such | 11:27 |
| 7 | as ad clusters, is it using that world of | 11:27 |
| 8 | information that you just described that is not | 11:27 |
| 9 | public? | 11:27 |
| 10 | A.   We would be using native data such as your | 11:27 |
| 11 | registered home location and things like your IP | 11:28 |
| 12 | address to determine where you live. | 11:28 |
| 13 | Q.   Okay.  But what I'm trying to say is -- | 11:28 |
| 14 | and I gave you a different example.  So if you | 11:28 |
| 15 | could, just follow my example.  Okay. | 11:28 |
| 16 | A.   We wouldn't.  I think I made -- | 11:28 |
| 17 | Q.   Okay. | 11:28 |
| 18 | A.   -- that point that -- | 11:28 |
| 19 | Q.   When I -- when I look -- | 11:28 |
| 20 | A.   -- you telling your friends you live in | 11:28 |
| 21 | San Francisco is your business and it's not for us | 11:28 |
| 22 | to use in any kind of ads. | 11:28 |
| 23 | Q.   Okay.  And that's because reading messages | 11:28 |
| 24 | and using that content and making it available to | 11:28 |
| 25 | advertisers would violate Facebook's policies, | 11:28 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 11:28 |
| 2 | A.    Reading private communications between you | 11:28 |
| 3 | and your friends would be a violation of our | 11:28 |
| 4 | commitment to your privacy. | 11:28 |
| 5 | Q.    Okay.  Switching topics just for a second. | 11:28 |
| 6 | You know what capabilities are; is that | 11:28 |
| 7 | right? | 11:29 |
| 8 | A.    In what -- | 11:29 |
| 9 | Q.    In connection with -- in connection with | 11:29 |
| 10 | APIs? | 11:29 |
| 11 | A.    Yes, I do. | 11:29 |
| 12 | Q.    Okay.  Sorry. | 11:29 |
| 13 | So are you familiar with the read stream | 11:29 |
| 14 | capability? | 11:29 |
| 15 | A.    Read stream is an API but there is an | 11:29 |
| 16 | associated capabilities. | 11:29 |
| 17 | Q.    Yeah.  And what is that? | 11:29 |
| 18 | A.    It's an API that allows a third party to | 11:29 |
| 19 | access someone's News Feed. | 11:29 |
| 20 | Q.    Okay.  And what does "read stream" mean in | 11:29 |
| 21 | particular? | 11:29 |
| 22 | A.    It's a very poorly, you know, like, | 11:29 |
| 23 | defined -- | 11:29 |
| 24 | Q.    It should probably be for the period 2012 | 11:29 |
| 25 | to 2017. | 11:29 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   Yes.  So the News Feed is also referred as    11:29
 2   stream.                                                 11:29
 3        Q.   Uh-huh.                                       11:29
 4        A.   And that API and the corresponding            11:29
 5   capability effectively describes the ability to read    11:29
 6   the stream.                                             11:29
 7        Q.   Okay.                                         11:29
 8        A.   In other words, read the News Feed.           11:29
 9        Q.   Okay.  And are you aware at any point in      11:30
10   time if third parties were allowed to read Facebook     11:30
11   Messenger messages?                                     11:30
12           MS. STEIN:  Objection.                          11:30
13   BY MS. WEAVER:                                          11:30
14        Q.   Through -- through API capabilities?          11:30
15           MS. STEIN:  Objection to form.  And we're       11:30
16   talking about 2012 to 2017.                             11:30
17           You may answer.                                 11:30
18           THE WITNESS:  Between 2012 and 2017, I          11:30
19   don't think we made the -- the Messenger API -- the     11:30
20   current version of the Messenger API available.         11:30
21           THE REPORTER:  I'm sorry.  That -- that...      11:30
22           THE WITNESS:  So I'm -- between 2012 and        11:30
23   2017, the current version of the Messenger API was      11:30
24   not available.  I think the only way for third          11:30
25   parties to access Messenger was through the Inbox       11:30
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | API. | 11:30 |
| 2 | MS. WEAVER:  I'm sorry, I just need to | 11:30 |
| 3 | look really quickly. | 11:31 |
| 4 | Q.   What is the Inbox API? | 11:31 |
| 5 | A.   It's an API that allows a third party to | 11:31 |
| 6 | access a user's Messenger conversation. | 11:31 |
| 7 | Q.   Okay.  And what do those third parties -- | 11:31 |
| 8 | strike that. | 11:31 |
| 9 | What access were they given to -- | 11:31 |
| 10 | A.   So the third -- | 11:31 |
| 11 | Q.   -- use Messenger conversation? | 11:31 |
| 12 | A.   Yeah.  The third parties that had access | 11:31 |
| 13 | to the Inbox API were app third parties that | 11:31 |
| 14 | replicated core Facebook functionality, including | 11:31 |
| 15 | messaging.  So we call those integrations device | 11:31 |
| 16 | integrations because they were replicating | 11:31 |
| 17 | Facebook -- the Facebook app. | 11:31 |
| 18 | Q.   Are you aware -- are you familiar with the | 11:31 |
| 19 | company Royal Bank of Canada, RBC? | 11:31 |
| 20 | A.   Yes.  Yes. | 11:31 |
| 21 | Q.   Did -- did they have access to Messenger | 11:31 |
| 22 | inboxes during this time period? | 11:32 |
| 23 | A.   They had the access to an API that allowed | 11:32 |
| 24 | them to write into someone's inbox. | 11:32 |
| 25 | Q.   And why? | 11:32 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    But -- but not to read. | 11:32 |
| 2 | Q.    Okay.  And why -- | 11:32 |
| 3 | A.    Why? | 11:32 |
| 4 | Q.    -- did they have that access? | 11:32 |
| 5 | A.    Because we were testing the ability for a | 11:32 |
| 6 | Royal Bank of Canada customer that wants to wire | 11:32 |
| 7 | money to friends to tell them through Messenger that | 11:32 |
| 8 | they have successfully wired the money. | 11:32 |
| 9 | Q.    So I'm going to turn to the page ending | 11:32 |
| 10 | with 429 now.  It's just the next page of the same | 11:32 |
| 11 | document. | 11:32 |
| 12 | Oh, strike it.  I will move on. | 11:32 |
| 13 | Going, actually, to the page ending in | 11:33 |
| 14 | 430.  What is "facial recognition" as used in this | 11:33 |
| 15 | document? | 11:33 |
| 16 | A.    Can I take a quick moment to read the | 11:33 |
| 17 | document? | 11:33 |
| 18 | Q.    Of course.  Sorry. | 11:33 |
| 19 | A.    Thank you. | 11:33 |
| 20 | (Pause while witness peruses document.) | 11:33 |
| 21 | A.    I'm sorry, there's a little bit of | 11:33 |
| 22 | background noise.  I don't know where it's coming. | 11:33 |
| 23 | MS. WEAVER:  I think that's Ms. Stein. | 11:33 |
| 24 | But maybe not. | 11:33 |
| 25 | MS. STEIN:  Sorry.  Sorry. | 11:33 |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Oh.  Okay. | 11:33 |
| 2 | MS. STEIN:  I will -- I will mute.  The | 11:33 |
| 3 | gardeners are here.  Hazards of -- | 11:33 |
| 4 | MS. WEAVER:  Yes. | 11:33 |
| 5 | MS. STEIN:  -- of COVID. | 11:33 |
| 6 | BY MS. WEAVER: | 11:33 |
| 7 | Q.   I'm going to direct your attention just to | 11:33 |
| 8 | a few pages here. | 11:33 |
| 9 | A.   Okay. | 11:33 |
| 10 | Q.   Great. | 11:33 |
| 11 | So what is facial recognition, the facial | 11:33 |
| 12 | recognition feature that's referred to in this | 11:34 |
| 13 | document? | 11:34 |
| 14 | A.   And do you want me to read what is defined | 11:34 |
| 15 | in this document or shall I tell you -- | 11:34 |
| 16 | Q.   Just tell me -- | 11:34 |
| 17 | A.   -- what my understanding? | 11:34 |
| 18 | Q.   -- your understanding. | 11:34 |
| 19 | Yes, sorry. | 11:34 |
| 20 | A.   So it's a -- it's a code that allows us to | 11:34 |
| 21 | understand who may be shown or seen in a picture, in | 11:34 |
| 22 | a photo. | 11:34 |
| 23 | Q.   Okay.  And how does it work? | 11:34 |
| 24 | A.   Technically? | 11:34 |
| 25 | Q.   Yes. | 11:34 |

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Through a combination of pattern matching | 11:34 |
| 2 | and other characteristics. | 11:34 |
| 3 | Q.    Combination of?  I just didn't understand | 11:34 |
| 4 | you.  Could you repeat it again. | 11:34 |
| 5 | A.    Pattern matching. | 11:34 |
| 6 | Q.    Pattern -- | 11:34 |
| 7 | A.    So we try to see patterns. | 11:34 |
| 8 | Q.    Pattern -- pattern matching? | 11:34 |
| 9 | A.    Yes. | 11:34 |
| 10 | Q.    Okay.  And what patterns?  It's looking at | 11:34 |
| 11 | people's faces for those patterns; is that correct? | 11:34 |
| 12 | A.    Yeah.  Would analyze certain | 11:34 |
| 13 | characteristics of your face and try to, you know, | 11:34 |
| 14 | create a matching with a pattern.  And then when we | 11:35 |
| 15 | see a similar pattern, we can associate this back to | 11:35 |
| 16 | you. | 11:35 |
| 17 | Q.    Okay.  And so if you turn to the second | 11:35 |
| 18 | page here ending in 3431, do you see where it says | 11:35 |
| 19 | "Graph Search"?  It's in bold. | 11:35 |
| 20 | A.    Yeah. | 11:35 |
| 21 | Q.    Okay.  And then it says, "We're looking to | 11:35 |
| 22 | incorporate facial recognition results in Graph | 11:35 |
| 23 | Search." | 11:35 |
| 24 | Do you see that? | 11:35 |
| 25 | A.    Yes. | 11:35 |

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         Q.    Do you -- what is Graph Search?          11:35

 2         A.    Graph Search is our own version of        11:35

 3   searching within the graph.                           11:35

 4         Q.    And what do you mean by graph?            11:35

 5         A.    Everything at Facebook is the graph.  Any 11:35

 6   entity, any connection that's affecting the part of   11:35

 7   the graph.                                            11:35

 8         Q.    Okay.  Is it a relational database?       11:35

 9         A.    It's not a -- a database per se.  The     11:35

10   graph is -- I don't know.  It's a -- it's an          11:35

11   abstract thing that describes basically every single 11:36

12   connection and entity on -- on the platform.          11:36

13         Q.    Okay.  So if somebody is using Graph      11:36

14   Search, they are searching all over Facebook's        11:36

15   entire network; is that right?                        11:36

16         A.    Sort of, because there may be exceptions  11:36

17   to that.  Like people that opt out from --            11:36

18         Q.    Okay.                                     11:36

19         A.    -- from that they wouldn't have their     11:36

20   results in that.                                      11:36

21         Q.    If people opt out, are they still in the 11:36

22   graph?                                                11:36

23         A.    They can opt out from being discovered    11:36

24   through Graph Search.                                 11:36

25         Q.    But they're still in the graph?           11:36
```

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   But they are still in the graph, yes. | 11:36 |
| 2 | Q.   Is there any way to be removed from the | 11:36 |
| 3 | graph? | 11:36 |
| 4 | A.   You have to delete your Facebook account. | 11:36 |
| 5 | Q.   Okay.  And if I go to delete my Facebook | 11:36 |
| 6 | account, what is deleted?  Is all the data relating | 11:36 |
| 7 | to me deleted? | 11:36 |
| 8 | A.   Your interactions with public entities | 11:36 |
| 9 | will not be deleted. | 11:36 |
| 10 | Q.   So how do you identify all of the data to | 11:37 |
| 11 | delete? | 11:37 |
| 12 | A.   My -- my response would be anything that | 11:37 |
| 13 | lives in the "Download Your Information" file is | 11:37 |
| 14 | going to disappear. | 11:37 |
| 15 | Q.   What about all the rest of the data in the | 11:37 |
| 16 | graph? | 11:37 |
| 17 | A.   Again, the only exception here would be, | 11:37 |
| 18 | you know, like, your interactions with public | 11:37 |
| 19 | entities.  If you end -- ended up commenting on | 11:37 |
| 20 | United's page you didn't like their service, that | 11:37 |
| 21 | is, by default, public and is not personal | 11:37 |
| 22 | information.  And, to some extent, it belongs also | 11:37 |
| 23 | to United because you did that on their entity. | 11:37 |
| 24 | Q.   So -- | 11:37 |
| 25 | A.   But pretty much every -- everything else | 11:37 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    that is associated to you will be deleted.          11:37

 2         Q.   Okay.  And when you say "is associated to  11:37

 3    me," what do you mean?                               11:37

 4         A.   Any kind of on-site or off-site activity.  11:37

 5         Q.   What about derived data?                   11:37

 6         A.   The derived data, again, if we are talking 11:38

 7    about location?  Are we?                             11:38

 8         Q.   No.  Just in general.  Derived data in     11:38

 9    general.                                             11:38

10         A.   Oh.  In general?                           11:38

11         Q.   Yeah.                                       11:38

12         A.   Derived data may be your interest like we  11:38

13    discussed before that may be inferred from you       11:38

14    liking Beyonce's page, that will show up in the DYI  11:38

15    file.  So, yes, they will be deleted.                11:38

16         Q.   Okay.  You -- you referred earlier to data 11:38

17    that is not associated with individuals.  Do you     11:38

18    recall that?                                         11:38

19         A.   I need to play back my -- you know, like,  11:38

20    my sentence.  Okay.  What about it?                  11:38

21         Q.   You -- okay.  So there is data that is not 11:38

22    associated with individual users; is that right?     11:38

23         A.   Overall?                                   11:38

24         Q.   Yes.                                        11:38

25         A.   Yes, we -- we do have some information     11:38
```

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    that is not associated with specific users.          11:38

2         Q.   Right.                                      11:38

3         A.   Like United's page on Facebook is not       11:38

4    associated with specific users.                       11:38

5         Q.   Okay.  We'll put a pin in this and we'll     11:38

6    come back to it.  Because I think really drilling in  11:39

7    on what Facebook can identify about me specifically    11:39

8    is at the heart of this deposition.                   11:39

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.    Okay.  And do you know whether or not      11:39
 2    ████████████████████████████████████████   ███████
      ████████████████████████████████████████    11:40
 4        A.    I don't know.                              11:40
 5        Q.    Who would know?                            11:40
 6        A.    I don't know.                              11:40
 7        Q.    Who at Facebook was in charge for facial   11:40
 8    tech -- recognition technology at this time?        11:40
 9        A.    I don't know.                              11:40
10        Q.    Who is Emily Sharpe?                        11:40
11        A.    I -- I don't know.  I've heard that name   11:40
12    just recently.                                       11:40
13        Q.    Okay.  So I'd like for you to turn to the  11:40
14    next page.  It says "Apps, Acquisition, and Creative 11:40
15    Labs" and it has the name of Travis Bright           11:40
16    underneath it.  Do you see that?                     11:40
17        A.    Yes.                                        11:40
18        Q.    And this is page 3433.                      11:40
19              Who is Travis Bright?                        11:40
20        A.    I don't know.                               11:40
21        Q.    ██████   ████████████████████████   ██████
      ████████████████████████████████████████   ██████
      ████████████████████████████████████████   ██████
      ████████████████████████████████            11:41
25              Do you see that?                            11:41
```

                                              Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    And you said next page? | 11:41 |
| 2 | Q.    I'm on the -- sorry.  I'm on the bottom | 11:41 |
| 3 | paragraph on the page ending with 3433. | 11:41 |
| 4 | A.    Oh, okay. | 11:41 |
| 5 | Sorry, which sentence? | 11:41 |
| 6 | Q.    Well, let's do this.  Do you see where it | 11:41 |
| 7 | says "Data Integration"? | 11:41 |
| 8 | A.    Yes. | 11:41 |
| 9 | Q.    Okay.  So there it says, "Facebook's data | 11:41 |
| 10 | is hugely valuable but comes with a lot of | 11:41 |
| 11 | restrictions we've either placed on ourselves or by | 11:41 |
| 12 | external parties (regulators)." | 11:41 |
| 13 | Do you see that? | 11:41 |
| 14 | A.    Yes. | 11:41 |
| 15 | Q.    And it says a little bit lower there, | 11:41 |
| 16 | "Some apps want to take advantage of the data we | 11:41 |
| 17 | have while some are trying to simplify their app by | 11:41 |
| 18 | running it independently." | 11:41 |
| 19 | Do you see that? | 11:41 |
| 20 | A.    Yes. | 11:41 |
| 21 | Q.    ███████████████████████   ████ | |
| ██ | █████████████████████████████████   ████ | |
| ██ | ███████████████████████ | 11:41 |
| 24 | Do you see that? | 11:42 |
| 25 | A.    Yes. | 11:42 |

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      Q.   ██████████                              ██████
 █           █    ██████████████████████            ██████
 █      ████████████████████████████████████████    ██████
 █      ███████████████████████████             11:42
 5      Q.   Got it.                                 11:42
 6           And then looking forward, it says, █████ ██████
 █      ████████████████████████████████████████     ██████
 █      ████████████████████████████████████████    11:42
 9           Do you see that?                         11:42
10      A.   Let me see.  Where are you now?          11:42
11      Q.   I'm sorry.  It's two sentences -- here,  11:42
12      I'll go at the sentence ahead.  "You only need a  11:42
13      phone to create an account, aliases used in the app  11:42
14      aren't linked to Facebook profiles, and they are  11:42
15      showing ads so don't even need demographic or  11:42
16      aggregated data."                             11:42
17           Do you see that?                         11:42
18      A.   Yes.                                     11:42
19      Q.   And then it says, ██████████████         ██████
 █      ███████████████████████████████████████      ██████
 █      ████████████████████████████████            11:42
22           Do you see that?                         11:42
23      A.   Yes.                                     11:42
24      Q.   ████████████████████████████████████    ██████
 █      ██████████████████████                      11:42
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   No.                                      11:42

 2        Q.   Okay.  Now, it -- it's referring to      11:42

 3   Facebook extracting data for reporting and search  11:43

 4   warrants.  Do you see that?                         11:43

 5        A.   Yes, I do see that.                       11:43

 6        Q.   Does Facebook do that?                    11:43

 7        A.   Export data for search warrants?          11:43

 8        Q.   Yeah.                                     11:43

 9        A.   I██████████████████████████████    ██████ 11:43

██   ██████████████████████████                         11:43

11        Q.   Okay.                                     11:43

12        ██ ████████████████████████                   11:43

13             THE REPORTER:  I'm sorry.  By the --      11:43

14   BY MS. WEAVER:                                      11:43

15        Q.   And when Facebook extracts data --        11:43

16             THE REPORTER:  I'm sorry.  I'm sorry. ██  ██████ 11:43

██   ████████████████                                   11:43

18             THE WITNESS:  I'm sorry?                  11:43

19             THE REPORTER:  You said something         11:43

20   ██████████ ████████████                            11:43

21             THE WITNESS: ██████████████████████  ██████ 11:43

██   █████████████████████████                          11:43

23   BY MS. WEAVER:                                      11:43

24        Q.   ███████████████████                      11:43

25        A.   Yeah.                                     11:43
```

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              THE REPORTER:  Thank you.                  11:43

 2     BY MS. WEAVER:                                      11:43

 3         Q.   ███████████████████████████████           ████

       ██████████████████████████████████████             ████

       ██████████████████████████                         11:43

 6         A.   I haven't been involved in the process, so  11:43

 7     I don't know.                                       11:43

 8         Q.   Okay.  ███████████████████████████         ████

       ██████████████████████████████████████             ████

       ██████████████████████████████                     11:44

11         A.   My understanding is that, yes, we do.      11:44

12         Q.   ███████████████████████████████████       ████

       ██████████████████████████████████████             11:44

14         A.   I don't know.                              11:44

15         Q.   Who would know?                            11:44

16         A.   I don't know.                              11:44

17         Q.   Okay.  So here, going back to the          11:44

18     paragraph where we started, it says "The next step  11:44

19     up from this is sharing of anonymized, aggregated,  11:44

20     or hashed data."                                    11:44

21              Do you see that?                           11:44

22         A.   Yes.                                       11:44

23         Q.   And what is anonymized data?              11:44

24         A.   Anonymized is any data that cannot be     11:44

25     associated with a specific user.                    11:44
```

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And how does Facebook anonymize | 11:44 |
| 2 | data? | 11:44 |
| 3 | A.   That's a very broad question, but if you | 11:44 |
| 4 | want my high-level understanding, I'm happy to | 11:44 |
| 5 | answer. | 11:45 |
| 6 | Q.   Yes, please. | 11:45 |
| 7 | A.   So normally, we disassociate the data with | 11:45 |
| 8 | anybody's specific identity.  I'll -- I'll use maybe | 11:45 |
| 9 | the San Francisco example.  Without necessarily, you | 11:45 |
| 10 | know, like, suggesting who are the people that live | 11:45 |
| 11 | in San Francisco who have created a cluster of some | 11:45 |
| 12 | sort of the people that live in San Francisco. | 11:45 |
| 13 | MS. WEAVER:  I'm sorry, my realtime feed | 11:45 |
| 14 | is not working.  Could you read that answer back, | 11:45 |
| 15 | please. | 11:45 |
| 16 | (The record was read by the | 11:46 |
| 17 | court reporter, as requested) | 11:46 |
| 18 | BY MS. WEAVER: | 11:46 |
| 19 | Q.   Okay.  Does every user get a user ID? | 11:46 |
| 20 | Facebook user ID? | 11:46 |
| 21 | A.   Everybody that has an account on the | 11:46 |
| 22 | Facebook platform will have a user ID. | 11:46 |
| 23 | Q.   Okay.  And are there -- does Facebook use | 11:46 |
| 24 | any other identifiers for individuals? | 11:46 |
| 25 | A.   I think if we look at the beginning of the | 11:46 |

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | document, it's being suggested that we use things | 11:46 |
| 2 | like IDFA, the Google ad ID -- | 11:46 |
| 3 | THE REPORTER:  I'm sorry.  We use | 11:46 |
| 4 | things -- | 11:46 |
| 5 | MS. WEAVER:  Okay. | 11:46 |
| 6 | THE REPORTER:  I'm sorry.  We use | 11:46 |
| 7 | things -- | 11:46 |
| 8 | BY MS. WEAVER: | 11:46 |
| 9 | Q.   What's the longest -- | 11:46 |
| 10 | THE REPORTER:  I'm sorry.  We use things | 11:46 |
| 11 | like? | 11:46 |
| 12 | THE WITNESS:  IDFA and the Google ad ID. | 11:46 |
| 13 | MS. WEAVER:  We should probably slow down | 11:46 |
| 14 | because we're making our court reporter's life | 11:46 |
| 15 | miserable. | 11:46 |
| 16 | THE WITNESS:  Sorry.  I will -- I will. | 11:46 |
| 17 | MS. WEAVER:  No.  It's my fault, too. | 11:46 |
| 18 | Q.   Okay.  What is the purpose of a user ID? | 11:46 |
| 19 | MS. STEIN:  Objection to form. | 11:46 |
| 20 | THE WITNESS:  Are you talking specifically | 11:47 |
| 21 | about the Facebook user ID? | 11:47 |
| 22 | BY MS. WEAVER: | 11:47 |
| 23 | Q.   Yes. | 11:47 |
| 24 | A.   It's to uniquely identify a user within | 11:47 |
| 25 | our own systems. | 11:47 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And among the data Facebook collects from | 11:47 |
| 2 | apps developed with its API is -- is also app users' | 11:47 |
| 3 | IP addresses, right? | 11:47 |
| 4 | A.   The SDK will pass (inaudible) -- | 11:47 |
| 5 | THE REPORTER:  I'm sorry.  One more time. | 11:47 |
| 6 | THE WITNESS:  Sorry.  I'm talking | 11:47 |
| 7 | technical terms here.  That's probably why. | 11:47 |
| 8 | The SDK will pass that information. | 11:47 |
| 9 | BY MS. WEAVER: | 11:47 |
| 10 | Q.   Okay.  So the platform that an app | 11:47 |
| 11 | developer uses to send data will also send a user's | 11:47 |
| 12 | IP address; is that correct? | 11:47 |
| 13 | MS. STEIN:  Objection to form. | 11:47 |
| 14 | THE WITNESS:  It depends. | 11:47 |
| 15 | BY MS. WEAVER: | 11:47 |
| 16 | Q.   Well, I was just trying to say -- instead | 11:47 |
| 17 | of saying SDK, I was trying to put what you said | 11:47 |
| 18 | into English, so... | 11:48 |
| 19 | A.   Yes, but there is nuance here.  Because it | 11:48 |
| 20 | may be the IP address of the app's back-end servers | 11:48 |
| 21 | or the IP address of the phone, depending on when | 11:48 |
| 22 | the call, the API call is initiated from. | 11:48 |
| 23 | Q.   Okay.  And the data Facebook collects from | 11:48 |
| 24 | apps also includes this unique user-specific | 11:48 |
| 25 | advertiser ID; is that right? | 11:48 |

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   No. | 11:48 |
| 2 | Q.   It does not? | 11:48 |
| 3 | A.   That's not correct. | 11:48 |
| 4 | Q.   What is incorrect? | 11:48 |
| 5 | A.   It's a time you log in with an app using | 11:48 |
| 6 | Facebook, there is a unique identifier that is | 11:48 |
| 7 | mapped against your Facebook ID but is not the same. | 11:48 |
| 8 | And it's unique to the app. | 11:48 |
| 9 | Q.   Okay.  Fair enough. | 11:48 |
| 10 | And what would you call that? | 11:48 |
| 11 | A.   It's called app-scoped ID. | 11:48 |
| 12 | Q.   Okay.  That's an app-scoped ID. | 11:48 |
| 13 | And then are apps themselves also assigned | 11:48 |
| 14 | separate identifiers? | 11:49 |
| 15 | A.   Depends on their architecture. | 11:49 |
| 16 | Q.   Okay.  So some do and some don't; is that | 11:49 |
| 17 | right? | 11:49 |
| 18 | A.   Yeah.  For example, if an app only uses | 11:49 |
| 19 | Facebook as the only way to authenticate people, | 11:49 |
| 20 | they may as well use the app-scope ID as their only | 11:49 |
| 21 | identifier.  But if an app uses different | 11:49 |
| 22 | authentication systems from, like, Google or Apple, | 11:49 |
| 23 | or even email passwords, they would probably have an | 11:49 |
| 24 | additional identifier in order to capture all | 11:49 |
| 25 | different ways of authentication. | 11:49 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And when you say authenticate, what | 11:49 |
| 2 | do you mean? | 11:49 |
| 3 | A.   Apps that require you to create an | 11:49 |
| 4 | account, which allow you to create an account | 11:49 |
| 5 | upfront, and then every time you try to log in back | 11:49 |
| 6 | to that app will authenticate you based on that | 11:49 |
| 7 | account you have created. | 11:50 |
| 8 | Q.   Okay.  So is all data that's associated | 11:50 |
| 9 | with a user linked through that user's user ID? | 11:50 |
| 10 | MS. STEIN:  Objection to form. | 11:50 |
| 11 | THE WITNESS:  I'm sorry.  Is it in the | 11:50 |
| 12 | context of Facebook or third-party apps? | 11:50 |
| 13 | BY MS. WEAVER: | 11:50 |
| 14 | Q.   Let's do Facebook for now. | 11:50 |
| 15 | A.   And so all the data that we have been | 11:50 |
| 16 | talking about this morning, native data, behavioral | 11:50 |
| 17 | data, will be associated back to that Facebook user | 11:50 |
| 18 | ID. | 11:50 |
| 19 | Q.   I'm sorry, I just didn't hear what... | 11:50 |
| 20 | A.   The behavioral data -- | 11:50 |
| 21 | Q.   Would be associated -- yes.  Okay. | 11:50 |
| 22 | Perfect. | 11:50 |
| 23 | And how is that mapping accomplished?  Is | 11:50 |
| 24 | every data point that's pulled in assigned to the | 11:50 |
| 25 | user ID? | 11:50 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection to form. | 11:50 |
| 2 | THE WITNESS:  So in my -- so you use Word | 11:50 |
| 3 | With Friends and you have created an account using | 11:51 |
| 4 | Facebook.  The app developer will make an API call | 11:51 |
| 5 | the next time you try to open the app and | 11:51 |
| 6 | authenticate yourself.  The information that they | 11:51 |
| 7 | are going to be passing back to us is your app-scope | 11:51 |
| 8 | ID. | 11:51 |
| 9 | BY MS. WEAVER: | 11:51 |
| 10 | Q.    Uh-huh. | 11:51 |
| 11 | A.    And we are going to basically confirm to | 11:51 |
| 12 | them, that, that, yes, this is a user; that you have | 11:51 |
| 13 | previously authenticated successfully and they | 11:51 |
| 14 | should be logged in. | 11:51 |
| 15 | Q.    Okay. | 11:51 |
| 16 | A.    Now, what -- what we are getting from the | 11:51 |
| 17 | app developer is your app-scoped ID.  And what we | 11:51 |
| 18 | basically do is map it on our end with the Facebook | 11:51 |
| 19 | User ID. | 11:51 |
| 20 | Q.    Okay.  And what about appended data?  Is | 11:51 |
| 21 | that mapped -- information received about users from | 11:51 |
| 22 | third parties, what do you call that again? | 11:51 |
| 23 | Off-site?  No, that's behavioral. | 11:52 |
| 24 | A.    Yeah, so this is -- | 11:52 |
| 25 | Q.    Off-platform? | 11:52 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Off-platform, yes. | 11:52 |
| 2 | Q.   So is off-platform data received about | 11:52 |
| 3 | users attached to a Facebook user ID as well? | 11:52 |
| 4 | A.   I'm trying to think.  No.  My | 11:52 |
| 5 | understanding is that that's not the kind of data | 11:52 |
| 6 | that would be associated with a specific user | 11:52 |
| 7 | profile because they are for the purposes of | 11:52 |
| 8 | creating ad campaigns. | 11:52 |
| 9 | Q.   Okay.  So what we were about to get into | 11:52 |
| 10 | here, and we can read the document, but I'll just | 11:52 |
| 11 | ask you.  At some point Facebook aggregates data, | 11:52 |
| 12 | right?  It receives data from advertisers or data | 11:52 |
| 13 | brokers or apps about their activities off-site, | 11:52 |
| 14 | correct? | 11:52 |
| 15 | A.   Yes. | 11:52 |
| 16 | Q.   And then it also possesses information | 11:52 |
| 17 | about users, correct? | 11:53 |
| 18 | A.   The possession is not really the right | 11:53 |
| 19 | term, but I understand, I think, what you are | 11:53 |
| 20 | saying. | 11:53 |
| 21 | Q.   Okay.  And so how does -- and Facebook | 11:53 |
| 22 | also aggregates this data?  It brings the data | 11:53 |
| 23 | together; is that correct? | 11:53 |
| 24 | A.   Yes. | 11:53 |
| 25 | MS. STEIN:  Objection to form. | 11:53 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  I'm sorry, was there an | 11:53 |
| 2 | objection? | 11:53 |
| 3 | MS. STEIN:  I said "Objection to form." | 11:53 |
| 4 | THE REPORTER:  Thank you. | 11:53 |
| 5 | BY MS. WEAVER: | 11:53 |
| 6 | Q.   How does Facebook authenticate or match | 11:53 |
| 7 | the data that it's receiving off-site to the data | 11:53 |
| 8 | that it possesses on-site -- itself? | 11:53 |
| 9 | A.   Back to the previous example.  The ID of | 11:53 |
| 10 | that user will be mapped to a user ID.  If a third | 11:53 |
| 11 | party is sending information via SDK or a pixel and | 11:53 |
| 12 | that association will be, I guess -- let me see. | 11:53 |
| 13 | That's probably poor framing. | 11:54 |
| 14 | The association will happen at the user ID | 11:54 |
| 15 | level. | 11:54 |
| 16 | Q.   Okay. | 11:54 |
| 17 | So with a user ID you could -- you should | 11:54 |
| 18 | be able to identify off-site data and data that | 11:54 |
| 19 | Facebook already possessed because of Facebook | 11:54 |
| 20 | activity, correct? | 11:54 |
| 21 | MS. STEIN:  Object to form. | 11:54 |
| 22 | THE WITNESS:  Yes, but that's not | 11:54 |
| 23 | different from what's available in your DYI file. | 11:54 |
| 24 | MS. WEAVER:  I'll move to strike.  That's | 11:54 |
| 25 | not what I'm asking. | 11:54 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   I'm just trying to understand how Facebook | 11:54 |
| 2 | aggregates data. | 11:54 |
| 3 | So what is a cross-app identifier? | 11:54 |
| 4 | A.   Is it in the -- sorry.  I'm just looking. | 11:54 |
| 5 | Q.   No, no.  It is in the documents, but do | 11:54 |
| 6 | you know what a cross-app identifier is? | 11:54 |
| 7 | A.   I think it refers to an identity that | 11:55 |
| 8 | people have across their family of apps between | 11:55 |
| 9 | Instagram, Facebook, Messenger, and WhatsApp. | 11:55 |
| 10 | Q.   Okay.  So do you know what a hashed UID | 11:55 |
| 11 | is? | 11:55 |
| 12 | A.   In the context of audience network? | 11:55 |
| 13 | Sorry.  In audiences, as we discussed, advertisers | 11:55 |
| 14 | can upload hashed email addresses or hashed phone | 11:55 |
| 15 | numbers.  They will then be associated with specific | 11:55 |
| 16 | users on our platform to the extent that they have | 11:55 |
| 17 | that information provided to us. | 11:55 |
| 18 | Q.   Okay.  So I'll ask you to just look at the | 11:55 |
| 19 | bottom of page 433. | 11:55 |
| 20 | A.   Yes. | 11:55 |
| 21 | Q.   Do you see where it begins -- it's in the | 11:55 |
| 22 | middle of the paragraph.  I apologize for this.  It | 11:55 |
| 23 | says "So if Bob sees an ad within a Firefox window." | 11:56 |
| 24 | Do you see that? | 11:56 |
| 25 | A.   Yes. | 11:56 |

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.    "So if Bob sees an ad within a Firefox          11:56
 2   window and then later makes a purchase within a            11:56
 3   Chrome window or via his phone, the ad server and          11:56
 4   measurement would not be able to link those actions        11:56
 5   together, leading to poor knowledge about what's           11:56
 6   driving people their purchases."  Do you see that?         11:56
 7        A.    Yes, I see that.                                 11:56
 8        Q.    And then it says "Facebook can solve this        11:56
 9   by writing a hashed UID to the Atlas cookie."  Do          11:56
10   you see that?                                              11:56
11        A.    Yes.                                             11:56
12        Q.    And it says ███████████████████████    ██████
██   ████████████████████████████████████████████████    ██████
██   ████████████████████████████████████████████████    ██████
██   ███████████████████████████████████████    Do you         11:56
16   see that?                                                  11:56
17        A.    Yes.                                             11:56
18        Q.    So is this a practice that Facebook             11:56
19   engaged in during -- from 2012 to 2017?                    11:56
20        A.    ███████████████████████████████████            11:56
21        Q.    No, in general.                                 11:57
22        A.    In general, ██████████████████████████    ██████
██   ██████████████████████████████████████████████████    ██████
██   ███████████████████████████████████████████           ██████
██   ██████████████████████████████████████████████            11:57
```

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   ██████████████████████████████████   ███

2   ██████████████████████████████                11:57

3        Q.    Okay.  Is it true that the Facebook UID is   11:57

4   the same across all of the browsers and devices you   11:57

5   are logged into?                               11:57

6        A.    For what is -- for what is related to   11:57

7   Facebook, yes, that's true.                    11:57

8        Q.    Okay.  And then how does -- just to return   11:57

9   to our discussion of app-scoped IDs, how does   11:57

10  mapping between user ID and app-scoped ID      11:57

11  accomplished?  Is there a table?              11:57

12       A.    So under your user settings you can see --   11:57

13  your Facebook user settings you can see which apps   11:57

14  you have logged in, right?  So there is an app-scope   11:57

15  ID for each one of those apps.  And it should also   11:57

16  appear on your user profile.                   11:58

17            THE REPORTER:  I'm sorry, "also appear"...   11:58

18            THE WITNESS:  On the user profile.   11:58

19  BY MS. WEAVER:                                 11:58

20       Q.    I'm sorry, I've lost --              11:58

21       A.    The user settings, whatever you want it.   11:58

22       Q.    Okay.  But it's not -- the DIY profile is   11:58

23  not doing the mapping.  Facebook is doing the   11:58

24  mapping.  Where is that done?                 11:58

25       A.    Facebook is doing the mapping ads and it's   11:58

                                          Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | |
|---|---|
| 1 | captured in the DYI files. | 11:58 |
| 2 | Q.   Okay.  Forget the DIY file.  Where -- how | 11:58 |
| 3 | does the mapping between the user ID and app-scoped | 11:58 |
| 4 | ID happen? | 11:58 |
| 5 | MS. STEIN:  Objection to form. | 11:58 |
| 6 | THE WITNESS:  Which server? | 11:58 |
| 7 | BY MS. WEAVER: | 11:58 |
| 8 | Q.   Sorry? | 11:58 |
| 9 | A.   Which server?  I can't answer that | 11:58 |
| 10 | question. | 11:58 |
| 11 | Q.   I don't -- what do you mean "which | 11:58 |
| 12 | server"? | 11:58 |
| 13 | A.   I mean I don't understand what -- there's | 11:58 |
| 14 | no locations, yeah. | 11:58 |
| 15 | Q.   Okay.  So how -- how is the mapping | 11:58 |
| 16 | accomplished?  Is it an algorithm? | 11:58 |
| 17 | MS. STEIN:  Objection to form and -- | 11:58 |
| 18 | BY MS. WEAVER: | 11:58 |
| 19 | Q.   Is there -- | 11:58 |
| 20 | MS. STEIN:  -- it's really beyond the | 11:58 |
| 21 | scope of this deposition at this point. | 11:58 |
| 22 | MS. WEAVER:  Fully disagree.  We are | 11:59 |
| 23 | trying to figure out what data can be produced for | 11:59 |
| 24 | nine plaintiffs. | 11:59 |
| 25 | MS. STEIN:  You're asking about mapping of | 11:59 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | IDs. | 11:59 |
| 2 | MS. WEAVER:  Exactly.  I know that you | 11:59 |
| 3 | don't -- well, anyway. | 11:59 |
| 4 | Q.   So let's continue. | 11:59 |
| 5 | A.   It's -- don't worry. | 11:59 |
| 6 | Q.   Thank you. | 11:59 |
| 7 | A.   This is -- this is actually not very | 11:59 |
| 8 | complicated thing.  Because we are issuing the | 11:59 |
| 9 | app-scope ID, so we don't need to do that mapping. | 11:59 |
| 10 | Q.   I see.  Okay.  So it -- | 11:59 |
| 11 | A.   We do the mapping when -- the developer | 11:59 |
| 12 | uses that app-scope ID when they make an API call. | 11:59 |
| 13 | But we are the ones giving them the app-scope ID. | 11:59 |
| 14 | Q.   Okay.  All right.  Good.  Thank you. | 11:59 |
| 15 | Let me turn to one other -- I apologize, | 11:59 |
| 16 | but I want to just stick with this. | 12:00 |
| 17 | Okay.  So let's talk about hashing then | 12:00 |
| 18 | for a second.  Is it true that Facebook -- well, is | 12:00 |
| 19 | hashing a one-way function? | 12:00 |
| 20 | A.   I don't understand what you mean by that. | 12:00 |
| 21 | Q.   Hashing is a process of assigning a | 12:00 |
| 22 | particular piece of data to -- I think Facebook | 12:00 |
| 23 | uses -- what's it called? -- shaw 256, which is an | 12:00 |
| 24 | algorithm -- | 12:00 |
| 25 | A.   Yes. | 12:00 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    -- to assign, right?  Okay. | 12:00 |
| 2 | So when Facebook hashes that data, is it | 12:00 |
| 3 | possible to reverse engineer and reidentify where | 12:00 |
| 4 | the data came from? | 12:00 |
| 5 | A.   I don't know.  I -- my technical knowledge | 12:00 |
| 6 | is not sufficient to answer that question. | 12:00 |
| 7 | Q.   Okay.  Can hash data be reidentified using | 12:00 |
| 8 | data stored on Facebook systems? | 12:00 |
| 9 | A.   It's not meant to be, so I don't know. | 12:00 |
| 10 | ████   ████  ████ | ████ |
| | ██         ████████████████████ | ████ |
| | ██  ████████████████ | ████ |
| | ██    ██  ██████████████████████████ | ████ |
| | ██  █████████████████████████████ | ████ |
| | ██  ████████████████████████████████ | ████ |
| | ██  ███████████████ | 12:01 |
| 17 | Q.   Okay.  Are you aware of a rule that data | 12:01 |
| 18 | is hashed after 90 days? | 12:01 |
| 19 | A.   In what context? | 12:01 |
| 20 | Q.   I -- never mind.  If you're not familiar | 12:01 |
| 21 | with it, it's fine. | 12:01 |
| 22 | Is a reidentifier assigned to hashed data? | 12:01 |
| 23 | A.   I think you may be referring -- I'm | 12:01 |
| 24 | double-guessing.  So give me an honest -- if I'm | 12:01 |
| 25 | going through an account -- I think you are | 12:02 |

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | referring to the deletion of an account and our | 12:02 |
| 2 | ability to preserve the data for 90 days in this | 12:02 |
| 3 | kind of semi state in case they change their minds. | 12:02 |
| 4 | ██  ███  ███  ████████████ | ███ |
| | █ ████████████ | ███ |
| | █  ██ █████████████████ | 12:02 |
| 7 | to people to change their minds within a certain | 12:02 |
| 8 | time frame in case they want to restore in their | 12:02 |
| 9 | Facebook account. | 12:02 |
| 10 | ██  ███  ███████████████ | ███ |
| | █ ████████████████████ | ███ |
| | █  █████ | 12:02 |
| 13 | MS. STEIN:  Objection to form. | 12:02 |
| 14 | THE WITNESS:  I don't know. | 12:02 |
| 15 | MS. WEAVER:  What was the objection? | 12:02 |
| 16 | MS. STEIN:  Objection to form. | 12:02 |
| 17 | MS. WEAVER:  What was the basis? | 12:02 |
| 18 | MS. STEIN:  I find your question confusing | 12:02 |
| 19 | and overbroad. | 12:02 |
| 20 | MS. WEAVER:  Okay.  Just wanted to make | 12:02 |
| 21 | sure you weren't coaching the witness. | 12:02 |
| 22 | MS. STEIN:  I'm saying "Objection to | 12:02 |
| 23 | form." | 12:02 |
| 24 | Lesley, please stop with your coaching | 12:02 |
| 25 | objections.  I've not made a lot of objections and | 12:03 |

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | |
|---|---|
| 1 they're almost always just objection to form. | 12:03 |
| 2 BY MS. WEAVER: | 12:03 |
| 3    Q.    Are any outputs or products like interests | 12:03 |
| 4 generated from hashed data? | 12:03 |
| 5    A.    No. | 12:03 |
| 6    Q.    Is information collected from hashed data? | 12:03 |
| 7    A.    The hashed data, at least in the context | 12:03 |
| 8 of custom audiences we have been talking about, it's | 12:03 |
| 9 not collected.  It's meant to allow us for analysis. | 12:03 |
| 10    Q.    For analysis on it; is that right? | 12:03 |
| 11    A.    To create a custom audience. | 12:03 |
| 12    Q.    Okay.  And that would include, for | 12:03 |
| 13 example, interests -- is that right? -- an interest | 12:03 |
| 14 category? | 12:03 |
| 15    A.    That depends on the advertiser.  The | 12:03 |
| 16 advertiser may have the ability for themselves to | 12:03 |
| 17 create the custom audience based on interests that | 12:03 |
| 18 they have collected on their ends but not on our -- | 12:03 |
| 19 on our end. | 12:03 |
| 20        Just to make sure that we understand what | 12:04 |
| 21 we're talking about here.  If you're actively | 12:04 |
| 22 listening on Beyonce on Spotify, and you're probably | 12:04 |
| 23 not the only one, Spotify can create a custom | 12:04 |
| 24 audience based on whoever listens to Beyonce's | 12:04 |
| 25 tracks.  That would be the custom audience based on | 12:04 |

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | any interest, but an interest that is specific to | 12:04 |
| 2 | Spotify. | 12:04 |
| 3 | Q.   Okay. | 12:04 |
| 4 | A.   But we have no access to that. | 12:04 |
| 5 | Q.   In your example, is the -- Beyonce, is | 12:04 |
| 6 | that hashed data? | 12:04 |
| 7 | A.   If Spotify decides to run a custom | 12:04 |
| 8 | audience campaign on Facebook for everybody that has | 12:04 |
| 9 | been listening to Beyonce on Spotify, it would come | 12:04 |
| 10 | in the form of hashed email addresses that we | 12:04 |
| 11 | wouldn't necessarily have the ability to identify | 12:04 |
| 12 | with specific users. | 12:04 |
| 13 | Q.   Okay.  So for creating custom audiences | 12:04 |
| 14 | are hash -- is hashed data combined with nonhashed | 12:04 |
| 15 | or identified data such as the user profile? | 12:04 |
| 16 | A.   No.  Why would we do that?  It doesn't | 12:05 |
| 17 | make sense.  I mean from -- not even from a | 12:05 |
| 18 | technical perspective.  But not even for the purpose | 12:05 |
| 19 | of running a successful campaign. | 12:05 |
| 20 | Spotify wants to target specific users | 12:05 |
| 21 | that are already on their platform for the purpose | 12:05 |
| 22 | of retargeting.  So there is no point in us, you | 12:05 |
| 23 | know, like using any other data unless they | 12:05 |
| 24 | specified into their app -- ad campaign.  But that | 12:05 |
| 25 | would be broader than just the custom audience. | 12:05 |

Veritext Legal Solutions
866 299-5127

```
1        Q.   Okay.  All right.  So back to -- we're       12:05

2   almost done with this, I hope.  And thank you for      12:05

3   your patience.  I know we're getting into lunchtime.   12:05

4        Okay.  Turn, if you wouldn't mind, to the         12:05

5   next page.  It's ending on 434.                        12:05

6        A.   Yes.                                          12:05

7        Q.   Just looking at the top paragraph there,     12:05

8   do you see where it says ███████████████████          ███

█   ███████████  ████████████████████████              ███

█   ███████████████      ███████████████████           ███

█   █████████████████████████████████                  ███

█   █████████████████████████████████████              ███

█   ████████████████                                    12:06

14       A.   Yes.                                         12:06

15       Q.   Okay.  ████████████████████                ███

█   ████████████████████████████████████               ███

█   ██████████                                          12:06

18       A.   I'm sorry, ██████████████████████          ███

█   ████████████████████████  right?                    12:06

20       Q.   Okay.  It could be.  We can start with      12:06

21   that.                                                 12:06

22       A.   No, this is the section that talks about    12:06

23   apps, positions and creative apps with Facebook's     12:06

24   own properties.                                        12:06

25       Q.   ███████████████████████████████            12:06
```

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   ████████████████████████████████████████    ████████
 █   ████████████████████████████                           12:06
 3       A.   It depends.                                    12:06
 4           MS. STEIN:  Object to form.  You can talk       12:06
 5   about the 2012 to 2017 time period.  Don't speculate    12:06
 6   as to all times.                                        12:07
 7           THE WITNESS:  Yeah, this is a very              12:07
 8   difficult question because it depends on the nature     12:07
 9   of the integration and the app in question.             12:07
10   BY MS. WEAVER:                                          12:07
11       Q.   What about Instagram?                          12:07
12       A.   Instagram is almost fully integrated.          12:07
13       Q.   Okay.  And when you say "almost," what is      12:07
14   not integrated?                                         12:07
15       A.   There are certain aspects of the Instagram     12:07
16   platform that are unique to Instagram.  For example,    12:07
17   you can create an account on Instagram not using        12:07
18   Facebook.                                               12:07
19       Q.   In that case is your data still                12:07
20   integrated?                                             12:07
21           MS. STEIN:  Objection to form.                  12:07
22           THE WITNESS:  In what sense integrated?         12:07
23   BY MS. WEAVER:                                          12:07
24       Q.   In the sense that Facebook has access to       12:07
25   all of it.                                              12:07
```

Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   If you go to your DYI file you wouldn't    12:07

 2   find any activity related to what you're doing on    12:07

 3   Instagram.                                           12:07

 4        Q.   That's -- I just -- you keep running to    12:07

 5   the DIY file and I'm not asking --                   12:07

 6        A.   I'm just using -- look, I understand.  But 12:07

 7   I'm trying -- I'm just trying to, you know, have you 12:08

 8   understand that everything about you is in that      12:08

 9   file.                                                12:08

10        Q.   Except for categories you've identified    12:08

11   previously?                                          12:08

12        A.   I'm sorry, I don't understand your --      12:08

13        Q.   So derived data is not contained in the    12:08

14   DIY file, right?                                     12:08

15             MS. STEIN:  Objection.  Misstates your     12:08

16   testimony.                                           12:08

17             THE WITNESS:  I -- I disagree with that    12:08

18   statement.                                           12:08

19   BY MS. WEAVER:                                       12:08

20   ██   █████████████████████████████████████   ████

     █   ██   ████████████████████████████         ████

     █   ██████████████                             12:08

23        Q.   Okay.                                      12:08

24        A.   ██████████████████████████████████   ████

     █   ████████████████████████████████████████   12:08
```

Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      ██████████████████                                    ████████

▪                 ███████████████████████████████      ████████

▪      ██████████████████████████████████████                      ████████

4          Q.   Okay.  I think we are done with this         12:09

5      document.  I want to make sure.                        12:09

6               You can set aside Exhibit 3.  I don't         12:09

7      think we'll be returning to it, but I can't promise.   12:09

8               So we've discussed a vast amount of --        12:09

9      well, strike that.                                     12:09

10                    ████████████████████████     ████████

▪      ██████████████████████████████████                          12:09

12               MS. STEIN:  Objection.  Outside the scope.   12:09

13               THE WITNESS:  I don't know.                   12:09

14     BY MS. WEAVER:                                          12:09

15         Q.   ██████  ███████████████████████████     ████████

▪      ███████████████████████████                              ████████

▪          ██████  ██████████████████████  ████████      ████████

▪      ██████████████████████████████████                          12:10

19         Q.   And do you recall how many current            12:10

20     Facebook users there are in the United States?         12:10

21         A.   Roughly, I think 200 million or something.    12:10

22         Q.   Okay.  And do you know how many users,        12:10

23     U.S. users, there have been from 2007 to the           12:10

24     present?                                               12:10

25         A.   No, I don't know.                             12:10

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              MS. STEIN:  Objection.  Outside the scope.    12:10
 2     BY MS. WEAVER:                                          12:10
 3         Q.   Do you know where in general user data is      12:10
 4     stored?  What's a UDB?  Are you familiar with the        12:10
 5     term?                                                    12:10
 6         A.   No, but I suspect it means user database.       12:10
 7         Q.   And what is it?                                 12:10
 8         A.   I don't know.                                   12:10
 9         Q.   Does Facebook have user databases?              12:10
10         A.   We have different databases where we store      12:10
11     information.                                             12:10
12         Q.   Okay.  Are you familiar with a database         12:10
13     called MySQL database?                                   12:11
14         A.   Yes.                                            12:11
15         Q.   What is it?                                     12:11
16         A.   It's a database that stores different           12:11
17     kinds of information.                                    12:11
18         Q.   What kind of information?                       12:11
19         A.   Different entities from users to                12:11
20     businesses and so on.                                    12:11
21         Q.   Okay.  So what specific information about        12:11
22     users does MySQL database store?                         12:11
23         A.   Anything related to your activity on the        12:11
24     platform is stored in MySQL.                             12:11
25         Q.   And how many databases support MySQL            12:11
```

Page 156

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | database?  Is it one database or is it many? | 12:11 |
| 2 | A.   So this is where I think where we are in | 12:11 |
| 3 | technical territory that I'm not well-placed to | 12:11 |
| 4 | respond.  We are talking about database | 12:11 |
| 5 | architecture, which is not my area of expertise. | 12:11 |
| 6 | Q.   Okay.  Do you recall assisting -- well, | 12:11 |
| 7 | strike that. | 12:12 |
| 8 | Do you know what an interrogatory is? | 12:12 |
| 9 | A.   Someone that has been interrogated. | 12:12 |
| 10 | Q.   Fair enough.  We received some written | 12:12 |
| 11 | responses about the location of user data, which is | 12:12 |
| 12 | at the square of this deposition.  And Facebook | 12:12 |
| 13 | identified a few databases where it says user data | 12:12 |
| 14 | is stored.  And I'm just asking if you are familiar | 12:12 |
| 15 | with them. | 12:12 |
| 16 | A.   I'm aware of MySQL.  I'm aware of Tao. | 12:12 |
| 17 | I'm aware of Hive databases where different kinds of | 12:12 |
| 18 | information is stored. | 12:12 |
| 19 | Q.   Okay.  I'm just trying to understand what | 12:12 |
| 20 | is stored in each of them. | 12:12 |
| 21 | A.   Well, I can't tell you at a high level. | 12:12 |
| 22 | MS. STEIN:  Lesley, he already testified | 12:12 |
| 23 | to this.  He told you that this is beyond the scope. | 12:12 |
| 24 | MS. WEAVER:  Please do not state for him. | 12:12 |
| 25 | Please provide me the information. | 12:12 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  No, Lesley, Lesley, I'm | 12:12 |
| 2 | allowed to make my objection.  I'm not coaching the | 12:12 |
| 3 | witness. | 12:12 |
| 4 | MS. WEAVER:  And that's a fact? | 12:12 |
| 5 | MS. STEIN:  I'm about to tell you that the | 12:12 |
| 6 | interrogatories, the technical interrogatories, were | 12:12 |
| 7 | not verified by this witness. | 12:12 |
| 8 | MS. WEAVER:  Who were they verified by? | 12:13 |
| 9 | MS. STEIN:  The other individual who | 12:13 |
| 10 | verified the other portion of interrogatories. | 12:13 |
| 11 | BY MS. WEAVER: | 12:13 |
| 12 | Q.   So you're not prepared to testify about | 12:13 |
| 13 | the location of user data today; is that correct? | 12:13 |
| 14 | MS. STEIN:  That's an unfair | 12:13 |
| 15 | characterization.  He is not testifying about the | 12:13 |
| 16 | architecture of his book systems. | 12:13 |
| 17 | MS. WEAVER:  Well, we're going to have to | 12:13 |
| 18 | get somebody back for that. | 12:13 |
| 19 | Q.   So do you know what's contained in MySQL | 12:13 |
| 20 | database at all other than to say users' activities? | 12:13 |
| 21 | A.   Anything else related to the users | 12:13 |
| 22 | activities on Facebook should be in MySQL database. | 12:13 |
| 23 | Certain -- certain aspects of those activities, for | 12:13 |
| 24 | example, their connection with other people or with | 12:13 |
| 25 | other entities would probably be captured in Tao | 12:13 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    database.                                              12:13

 2         Q.   Okay.  And what is --                        12:13

 3         A.   Their activities on Facebook or              12:13

 4    off-platform or API calls will be captured on Hive.    12:14

 5    That's at a very high level how our database are       12:14

 6    architected.                                           12:14

 7         Q.   And what is Hive?                            12:14

 8         A.   It's a database that captures logs.          12:14

 9         Q.   And what are logs?                           12:14

10         A.   It's an activity that you have taken on-     12:14

11    or off-platform made by a call that was made from an   12:14

12    app on your behalf.  The fact that you may have        12:14

13    liked someone's photo is something that lives in       12:14

14    Hive.                                                  12:14

15         Q.   Okay.  ███████████████████████████           ███

      ██   ████████████████████████████                      ███

      ██     ██   ███████████████████████                    ███

      ██   ████████████████████████████████████              12:14

19         Q.   Okay.  ████████████████████████              ███

      ██   ████████████████████████████████████              ███

      ██     ██   ███████████████████████████                ███

      ██   ███████████████████████████████                   ███

      ██   ████████████████████████████  ████                ███

      ██   ████████████████████████████████                  ███

      ██   ██████████████████████████████                    12:15
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 ██████████████████████                                    12:15

2       Q.   Going back to Tao, is it Tao or Dow?          12:15

3       A.   T-A-O.                                         12:15

4       Q.   Okay.  That stands for the associations        12:15

5 and optics server; is that right?                         12:15

6       A.   I don't remember what it stands for, but      12:15

7 it's definitely connections, database.                    12:15

8       Q.   Okay.  When you say it's the connections,      12:15

9 is it a relational database?                              12:15

10       A.   Yes.                                           12:15

11       Q.   Okay.                                          12:15

12       A.   It identifies people's connections with       12:15

13 friends and other entities on the platform.              12:16

14    ██  ████████████████████████████        ████          

██    ████████████████████                    ████          

██    ██  ███████████████████████             ████          

██    ████████████                            ████          

██    ██  ████    █████████████████           ████          

██    ████████████████                        ████          

██    ██    ████                               12:16

21       Q.   What is ZippyDB?  Do you know?                 12:16

22       A.   No, I don't really recall what -- ZippyDB.    12:16

23    ██  ███████████████████████████         ████          

██    ████████    ██████████                   ████          

██    ██    ███████████                        ████          

                                      Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1      ███    ████                                 ███

 █      ███    ██████████████████████████          ███

 █      ████████                                    ███

 █      ███    ████                                 ███

 █      ███      ███████████████                    ███

 █      ███    █████████████████████████            ███

 █      ████████████████████████████████████        ███

 █      ████████████████████████████████            ███

 █      ██████████████████████████                  12:17

10              MS. STEIN:   Object to form.         12:17

11              THE WITNESS:  Yes.                   12:17

12      BY MS. WEAVER:                               12:17

13      ███    ██████████████████████████           ███

 █      ██████████████                              ███

 █      ███████████████████████████████            ███

 █      ███████                                     ███

 █      ███    ████████████████████████████████     ███

 █      ███    ███████████████████████████████      ███

 █      ████████████████████████████████            ███

 █      ████████████████████████████████            ███

 █      ███████████████████    ███████████████      ███

 █      ███    ███████████████████████████████      ███

 █      ████████████████████████████████            ███

 █      ██████████████████████████████              ███

 █      █████████████████████████                   ███
```

Veritext Legal Solutions
866 299-5127



```
1    1         Q.   Okay.  I'm not asking a good question.    12:17

     2    Let me try again.  Sorry.                           12:17

2    3              For on-site activity that is contained in 12:18

3



































23   23   BY MS. WEAVER:                                      12:19

24   24         Q.   Okay.  And so all of that is associated  12:19

25   25   with the Facebook user ID, correct?                 12:19
```

Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1       A.    Because of activity that happens on the        12:19
2   platform, yes.                                            12:19
3   ███    ███    █████████████████                ████       
    █  ██████████████    ███████████████           ████
    █  ████████████████                            ████
    █  ██    ███   █████████████    █████████████   ████
    █  ██████████████████████                       12:19
8       Q.    Like privacy controls should be in the DIY     12:19
9   file?                                                     12:19
10      A.    If you change the privacy controls you          12:19
11  mean?                                                     12:19
12      Q.    I -- in general what the settings are,          12:19
13  sure, yeah.  Is that in the DIY file?                     12:19
14      A.    It's a very broad question because depends      12:19
15  whether -- are you talking about specifically a post      12:19
16  that you made and the privacy controls for that or       12:19
17  privacy controls for a specific attribute on your        12:19
18  user profile?                                             12:20
19      Q.    Either.  You can answer both questions.         12:20
20          MS. STEIN:  Objection to form.                    12:20
21          THE WITNESS:  We -- we will know and the          12:20
22  DIY file should indicate whether your date of birth      12:20
23  is private information, i.e., only available to you       12:20
24  or available to your friends or available to the         12:20
25  public.  Because we need to be able to control the       12:20
```

Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | access to that piece of information whenever someone | 12:20 |
| 2 | requests that information. | 12:20 |
| 3 | And similarly -- | 12:20 |
| 4 | BY MS. WEAVER: | 12:20 |
| 5 | Q.   I don't mean to cut you off, but let me | 12:20 |
| 6 | just ask because I don't think we -- we want to have | 12:20 |
| 7 | as little time together as possible in some sense, | 12:20 |
| 8 | so let me just ask you what I'm trying to get at. | 12:20 |
| 9 | ███████████████████████████████████ | ████ |
| █ | ████████████████████████████████████ | ████ |
| █ | █████ | ████ |
| █ | ███ ██████████████████████████████ | ████ |
| █ | ████████████████████████████████ | ████ |
| █ | ████████████████████████████████ | ████ |
| █ | ██████████████████████████ | 12:21 |
| 16 | THE REPORTER:  I'm sorry, ███████ | ████ |
| █ | ██████████████ | 12:21 |
| 18 | THE WITNESS: ████████████████████ | ████ |
| █ | █████████████████████████████████ | ████ |
| █ | ████ | 12:21 |
| 21 | BY MS. WEAVER: | 12:21 |
| 22 | Q. ████████████████████████ | ████ |
| █ | ██████████████████████████ | ████ |
| █ | ███ ███████████████████████████ | ████ |
| █ | ███████████████████████ | 12:21 |

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1
                                                                              12:22
18          MS. STEIN:  Objection to form.                                    12:22
19   BY MS. WEAVER:                                                           12:22
20      Q.   Let me ask it again.  Let me ask it again.                       12:22
21   It was just unclean.                                                     12:22
22
```

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1
                                                 12:23
15          MS. WEAVER:  The realtime is really not    12:23
16  working.  Could you please read his response back.  12:23
17                  (The record was read by the        12:24
18                  court reporter, as requested)       12:24
19  BY MS. WEAVER:                                       12:24
20      Q.   So how in the DIY file does it appear?     12:24
21  What does that look like, last attempted effort to  12:24
22  reidentify with an app?                              12:25
23          MS. STEIN:  Object to form.                  12:25
24          THE WITNESS:  You have the list of apps     12:25
25  that you have authenticated using Facebook log-in at 12:25
```

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    the time, the last --                          12:25

 2    BY MS. WEAVER:                                  12:25
```



```
16            MS. STEIN:  Objection to form.  Beyond the   12:26

17    scope.                                          12:26

18            THE WITNESS:  I don't know.             12:26

19    BY MS. WEAVER:                                  12:26

20       Q.   Who would know?                         12:26

21       A.   Someone with technical knowledge of     12:26

22    databases.                                      12:26
```

```
                                                      12:26
```

```
                                        Page 167
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      ██       ████████████████████████          12:26
 2          Q.   Do you have a name of somebody in data   12:26
 3      science?                                    12:26
 4          A.   No, I don't.                       12:26
 5          Q.   Could you find that out?           12:26
 6          A.   Are you asking me or the counsel?  12:26
 7          Q.   I'm asking Facebook, you.          12:26
 8          A.   I could.                           12:26
 9          Q.   Yeah.                              12:26
10          A.   But I need -- I need to understand exactly  12:26
11      the technical, you know, aspects of your question   12:26
12      and make sure --                            12:26
13      ██      █████████████████████████ █     ████
        █      ██████████████████████████ █     ████
        █      ████████████████                 ████
        █      ██      ███████████████████       ████
        █      ████████████████████████          ████
        █      █████████████ ████████████████     ████
        █      ██████████ ████████████████    12:27
20          Q.   Do you know if that's occurred in this   12:27
21      case?                                       12:27
22              MS. STEIN:  I'm just going to object   12:27
23      because the witness just told you that he didn't   12:27
24      know one way or the other and is guessing, so...   12:27
25      BY MS. WEAVER:                              12:27
```

Page 168

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   Do you know if that's occurred in this        12:27
 2   case?                                                    12:27
 3        A.   I don't know what information is available     12:27
 4   for your plaintiffs.                                     12:27
 5        Q.   Yeah.  Do you know what's been collected       12:27
 6   by Facebook relating to our plaintiffs out of the        12:27
 7   Hive database?                                           12:27
 8        A.   I'm aware that they -- the DYI files of        12:27
 9   those plaintiffs were made available to -- to the        12:27
10   plaintiffs.  Based on what you've told me, I assume      12:27
11   that's sufficient.                                       12:27
12                                                            12:27
                                                              12:28
24        MS. STEIN:  I think now is a good time for          12:28
25   lunch.                                                   12:28
```

Page 169

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    MS. WEAVER:  That's fine.  We can go to                    12:28

2    lunch and why don't we -- do you want a half an            12:28

3    hour?                                                       12:28

4           THE REPORTER:  Do you want to go off the            12:28

5    record first?                                               12:28

6           MS. WEAVER:  Yes, let's go off the record.          12:28

7           THE VIDEOGRAPHER:  We are off the record            12:28

8    at        p.m.                                              12:28

9           (Whereupon a luncheon recess was had.)              12:28

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Tuesday, February 23, 2021 | 01:15 |
| 2 | 1:19 P.M. | 01:15 |
| 3 | | 01:15 |
| 4 | THE VIDEOGRAPHER:  We are on the record at | 01:19 |
| 5 | 1:19 p.m. | 01:19 |
| 6 | EXAMINATION (resumed) | 01:19 |
| 7 | BY MS. WEAVER: | 01:19 |
| 8 | Q.   Good afternoon, K.P.  Do you understand | 01:19 |
| 9 | that you are still under oath? | 01:19 |
| 10 | A.   Yes, I do.  Thank you. | 01:19 |
| 11 | Q.   Okay.  Let's change focus a little bit. | 01:19 |
| 12 | What is News Feed? | 01:20 |
| 13 | A.   The easiest way to describe the News Feed | 01:20 |
| 14 | is a collection of stories published by pages you | 01:20 |
| 15 | follow or your friends that you would see when you | 01:20 |
| 16 | go to Facebook or when you open the Android or iOS, | 01:20 |
| 17 | yeah. | 01:20 |
| 18 | Q.   And does an algorithm determine the | 01:20 |
| 19 | content that a user receives on News Feed? | 01:20 |
| 20 | A.   Yes, it does. | 01:20 |
| 21 | Q.   It's an intelligent algorithm, right; so | 01:20 |
| 22 | it's constantly learning? | 01:20 |
| 23 | A.   It's an intelligent algorithm because the | 01:20 |
| 24 | purpose of the feed is to be relevant to the user. | 01:20 |
| 25 | Q.   Right.  But -- so it's constantly | 01:20 |

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | learning, right? | 01:20 |
| 2 | A.   Yes, it will -- | 01:20 |
| 3 | Q.   Changes -- | 01:20 |
| 4 | A.   It updates itself periodically based on | 01:20 |
| 5 | information around your response to some of the | 01:20 |
| 6 | stories that you see. | 01:20 |
| 7 | Q.   Okay.  And what are the inputs for the | 01:20 |
| 8 | algorithm so that it can be intelligent and learn? | 01:20 |
| 9 | MS. STEIN:  Objection to form. | 01:21 |
| 10 | THE WITNESS:  Your interactions with | 01:21 |
| 11 | content that shows up on the News Feed informs how | 01:21 |
| 12 | the algorithm trains itselves -- itself. | 01:21 |
| 13 | BY MS. WEAVER: | 01:21 |
| 14 | Q.   And so when a user clicks on a story or | 01:21 |
| 15 | engages with it, does Facebook record that activity? | 01:21 |
| 16 | A.   There is a record of that activity, yes. | 01:21 |
| 17 | Q.   Fair enough.  Thank you. | 01:21 |
| 18 | So is one objective of News Feed to | 01:21 |
| 19 | increase users interaction with varying courses of | 01:21 |
| 20 | content to learn what they are interested in? | 01:21 |
| 21 | A.   The main objective of the News Feed is to | 01:21 |
| 22 | keep you informed about the things that matter to | 01:21 |
| 23 | you. | 01:21 |
| 24 | Q.   Right.  And so how does News Feed | 01:21 |
| 25 | determine what matters to you? | 01:21 |

Page 172

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Based on your interactions with the | 01:21 |
| 2 | comments that show up there, it trains itself. | 01:21 |
| 3 | Q.   And is it true that the more the user | 01:22 |
| 4 | engages on the platform, the more accurate News Feed | 01:22 |
| 5 | will be? | 01:22 |
| 6 | A.   The level -- | 01:22 |
| 7 | MS. STEIN:  Object to form. | 01:22 |
| 8 | THE WITNESS:  It's very subjective. | 01:22 |
| 9 | BY MS. WEAVER: | 01:22 |
| 10 | Q.   Okay.  But isn't it true that the more | 01:22 |
| 11 | data points the algorithm has about users, the more | 01:22 |
| 12 | it can correctly gauge whether or not it is giving | 01:22 |
| 13 | users the content they want to see? | 01:22 |
| 14 | MS. STEIN:  Objection to form. | 01:22 |
| 15 | THE WITNESS:  Like I think I said, the | 01:22 |
| 16 | purpose of the News Feed is to connect you with | 01:22 |
| 17 | information that's relevant to you.  And so there is | 01:22 |
| 18 | no element of accuracy in that sense.  It all goes | 01:22 |
| 19 | back to relevance.  And relevance -- | 01:22 |
| 20 | BY MS. WEAVER: | 01:22 |
| 21 | Q.   Okay. | 01:22 |
| 22 | A.    -- is very subjective. | 01:22 |
| 23 | Q.   And what does relevance mean to you? | 01:22 |
| 24 | A.   Relevance is a way of being captured by | 01:22 |
| 25 | the kind of interactions you have with that piece of | 01:23 |

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | content. | 01:23 |
| 2 | Q.   Okay.  So when you say -- so Facebook is | 01:23 |
| 3 | trying to give me a News Feed that I will find | 01:23 |
| 4 | relevant; is that right? | 01:23 |
| 5 | A.   Correct. | 01:23 |
| 6 | Q.   And how does it find what is relevant to | 01:23 |
| 7 | me? | 01:23 |
| 8 | A.   It's calculated in realtime, and based on | 01:23 |
| 9 | the interactions you're going to have with the | 01:23 |
| 10 | content that is displayed to you, we will determine | 01:23 |
| 11 | whether content from the same entity or of the same | 01:23 |
| 12 | kind would be relevant to you in a future instance. | 01:23 |
| 13 | Q.   So is it Facebook's view that these data | 01:23 |
| 14 | sets are necessary to determine the relevancy of | 01:23 |
| 15 | these updates to users? | 01:23 |
| 16 | MS. STEIN:  Objection to form.  Beyond the | 01:23 |
| 17 | scope. | 01:23 |
| 18 | THE WITNESS:  Are you talking about | 01:23 |
| 19 | specific data sets? | 01:23 |
| 20 | BY MS. WEAVER: | 01:23 |
| 21 | Q.   In general, just in general at a high | 01:23 |
| 22 | level. | 01:23 |
| 23 | MS. STEIN:  Objection to form and beyond | 01:23 |
| 24 | the scope. | 01:23 |
| 25 | THE WITNESS:  There are certain signals | 01:24 |

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   that we are going to be using to determine how the        01:24

 2   future versions of the New Feeds would be relevant        01:24

 3   to you.                                                   01:24

 4   BY MS. WEAVER:                                            01:24

 5       Q.   Okay.  And what signals are those?              01:24

 6       A.   Your affinity with the people that posting      01:24

 7   those stories, so the business entity that is            01:24

 8   posting those stories to your previous response to       01:24

 9   content of the same type.                                01:24

10       Q.   And all of this is data that Facebook           01:24

11   collects about users while they're on and off the        01:24

12   platform, correct?                                       01:24

13       A.   We record --                                    01:24

14            MS. STEIN:  Objection to form.                   01:24

15            THE WITNESS:  We record the interactions         01:24

16   you have with that platform to inform the future         01:24

17   (indecipherable) --                                      01:24

18            THE REPORTER:  I'm sorry, I did not -- I'm       01:24

19   sorry, I did not understand.                             01:24

20   BY MS. WEAVER:                                            01:24

21       Q.   In order to inform?  I did not hear the         01:24

22   last part.                                                01:24

23       A.   A future -- a future instance of the News       01:24

24   Feed that will remain relevant to you.                   01:24

25       Q.   Is there a standard set of documents or         01:24
```

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    manuals that describes how News Feed operates?           01:24
2         A.   There is nothing like that.                    01:25
3         Q.   Okay.  Does Facebook use internal training     01:25
4    manuals when a new hire comes on or do they point        01:25
5    just everybody to the public website?                    01:25
6         A.   For what purposes?                              01:25
7         Q.   For -- let's say you hire an engineer who      01:25
8    is going to work on the algorithm for News Feed.         01:25
9         A.   I haven't been through that training so I      01:25
10   don't have firsthand experience.                         01:25
11        Q.   Okay.  When you started at Facebook did        01:25
12   they give you a training manual?                         01:25
13        A.   What do you mean, like a book printed?         01:25
14        Q.   Yeah, or online, some kind of way to           01:25
15   acclimate you to how Facebook operates.                  01:25
16        A.   Well, they're -- my obligations to             01:25
17   Facebook are documented in different formats.  In        01:25
18   2012 I did not get a paper copy of that, but I was       01:25
19   given links to trainings that I had to undertake to      01:25
20   verify my understanding of the company's policies.       01:25
21        Q.   Okay.  So we discussed this earlier in the     01:26
22   morning.  But apps on Facebook's platform send           01:26
23   information about users of those apps to Facebook,       01:26
24   right?                                                    01:26
25        A.   Apps on Facebook platform send information     01:26
```

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about those users back to Facebook, is that the | 01:26 |
| 2 | question? | 01:26 |
| 3 | Q.   Yes. | 01:26 |
| 4 | MS. STEIN:  Objection to form. | 01:26 |
| 5 | THE WITNESS:  They send certain pieces of | 01:26 |
| 6 | information about those users, the users' activities | 01:26 |
| 7 | to those -- | 01:26 |
| 8 | BY MS. WEAVER: | 01:26 |
| 9 | Q.   Right.  Is it a true statement that app | 01:26 |
| 10 | developers share data with Facebook through the | 01:26 |
| 11 | Facebook software development kit? | 01:26 |
| 12 | A.   Different kinds of data, but yes. | 01:27 |
| 13 | Q.   Yes?  The answer is "yes," isn't it? | 01:27 |
| 14 | A.   Yes. | 01:27 |
| 15 | Q.   Okay.  So I'm just going to say, apps on | 01:27 |
| 16 | Facebook's platform send information about users of | 01:27 |
| 17 | those apps to Facebook, correct? | 01:27 |
| 18 | MS. STEIN:  Objection.  The witness | 01:27 |
| 19 | clarified the statement for you. | 01:27 |
| 20 | THE WITNESS:  Yeah, an app developer that | 01:27 |
| 21 | uses the SDK will send different pieces of | 01:27 |
| 22 | information related to that user or the activity of | 01:27 |
| 23 | that user to that third-party app. | 01:27 |
| 24 | BY MS. WEAVER: | 01:27 |
| 25 | Q.   Okay.  Are you familiar with action | 01:27 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   importers?                                          01:27
 2        A.   Action importers?  Vaguely.               01:27
 3        Q.   Okay.  What's your recollection?           01:27
 4             MS. STEIN:  Objection to form.            01:27
 5             THE WITNESS:  I -- I don't want to answer 01:27
 6   because I don't know in what context.              01:27
 7             MS. WEAVER:  Are you instructing him not  01:27
 8   to answer?                                          01:27
 9             MS. STEIN:  Did you hear me instruct him  01:28
10   not to answer, Lesley?                              01:28
11             MS. WEAVER:  Okay.                        01:28
12             MS. STEIN:  The witness is testifying in  01:28
13   response to your question.  Why don't you listen to 01:28
14   him.                                                01:28
15             MS. WEAVER:  I'd rather listen to him for 01:28
16   sure.                                               01:28
17        Q.   What are -- what is action importers,     01:28
18   K.P., please?                                       01:28
19        A.   I need you to provide me a little bit more 01:28
20   context.                                            01:28
21        Q.   What is your understanding of what action 01:28
22   importers is?                                       01:28
23        A.   It was a feature, by my recollection, of  01:28
24   the platform that allowed the third party to do an  01:28
25   import of all the actions taken by a user on a      01:28
```

Page 178

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | third-party app. | 01:28 |
| 2 | Q.   When you say -- | 01:28 |
| 3 | MS. WEAVER:  Could you repeat the last | 01:28 |
| 4 | part?  Could you read back his response?  Realtime | 01:28 |
| 5 | is still not working. | 01:28 |
| 6 | (The record was read by the | 01:28 |
| 7 | court reporter, as requested) | 01:28 |
| 8 | BY MS. WEAVER: | 01:28 |
| 9 | Q.   Okay.  And when did action importers | 01:29 |
| 10 | function?  Was it during the 2012 to 2017 time | 01:29 |
| 11 | frame? | 01:29 |
| 12 | A.   I don't know. | 01:29 |
| 13 | Q.   Who would know? | 01:29 |
| 14 | A.   I don't know who would know. | 01:29 |
| 15 | Q.   Can you, as testifying on behalf of | 01:29 |
| 16 | Facebook today, say that you do not know who was | 01:29 |
| 17 | involved with action importers? | 01:29 |
| 18 | A.   No, because my understanding of that | 01:29 |
| 19 | feature -- my recollection, again, being before | 01:29 |
| 20 | my -- you know, my date of arrival at Facebook. | 01:29 |
| 21 | ████  ████  ███████████████  ████ | |
| | ███████████████████████  ████ | |
| | ██████████████████████ | 01:29 |
| 24 | MS. STEIN:  Objection to form. | 01:29 |
| 25 | █████████  ███████████ | 01:29 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    ████████████████████    ████████████████    ██████
 █    ██████████████████   ██████████████████████   ██████
 █    ████████████████████████████████████████████████   ██████
 █    ████████████████████████████████                   01:30
 5    BY MS. WEAVER:                                      01:30
 6        Q.   What is data reciprocity, to your          01:30
 7    understanding?                                      01:30
 8        A.   Data in that context is very broad.  I'm   01:30
 9    talking about specific obligations stemming out of  01:30
10    the platform policies that require a third-party    01:30
11    developer to allow people to post activity from that 01:30
12    app back to Facebook.                               01:30
13        Q.   No, I'm talking about Facebook and apps    01:30
14    sharing data with each other.  Facebook provided    01:30
15    data to apps and apps provided data back to         01:30
16    Facebook.  Are you aware --                         01:30
17        MS. STEIN:  Objection.                          01:30
18    BY MS. WEAVER:                                       01:30
19        Q.   -- of that occurring during the time       01:30
20    frame 2012 to 2017?                                 01:30
21        MS. STEIN:  Objection to form.                  01:30
22            ████████████   ████████████████████   ██████
 █    ████████████████████████████████████████   ██████
 █    ████████████████████████████████   ██████████   ██████
 █    ████████████████████████████                  01:30
```

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 01:30 |
| 2 | Q.   I'm not talking about users -- | 01:30 |
| 3 | MS. STEIN:  Lesley -- Lesley, let the | 01:31 |
| 4 | witness finish his answer. | 01:31 |
| 5 | MS. WEAVER:  He's not answering the right | 01:31 |
| 6 | question. | 01:31 |
| 7 | MS. STEIN:  He's answering -- just don't | 01:31 |
| 8 | cut off the witness when he's speaking. | 01:31 |
| 9 | BY MS. WEAVER: | 01:31 |
| 10 | Q.   K.P., this is what I'm asking.  Let me | 01:31 |
| 11 | rephrase the question. | 01:31 |
| 12 | I'm not talking about users sharing data. | 01:31 |
| 13 | I'm talking about the apps providing data to | 01:31 |
| 14 | Facebook and Facebook providing data to the apps. | 01:31 |
| 15 | Are you aware of that kind of data | 01:31 |
| 16 | reciprocity occurring during 2012 through 2017? | 01:31 |
| 17 | MS. STEIN:  Objection to form. | 01:31 |
| 18 | THE WITNESS:  I think I'm trying to | 01:31 |
| 19 | respond to the question, but I don't know that's -- | 01:31 |
| 20 | maybe it's my fault; I'm not making myself clear. | 01:31 |
| 21 | People that -- people that log in with a | 01:31 |
| 22 | third-party app are making their Facebook data | 01:31 |
| 23 | available to a third-party app.  And in response, a | 01:31 |
| 24 | third-party app can allow a user to publish back to | 01:31 |
| 25 | Facebook.  That involves some sort of data setting | 01:31 |

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    as well.  If that's what you're referring to, then        01:31
 2    the answer is yes.                                         01:31
 3    BY MS. WEAVER:                                             01:31
 4         Q.   Did Facebook provide user data to the           01:31
 5    apps?                                                      01:31
 6         A.   To the extent that user log in with             01:32
 7    Facebook, yes.                                             01:32
 8         Q.   Okay.  And at some point did you hear of        01:32
 9    anyone saying they wanted to let apps crawl               01:32
10    Facebook's APIs and access Facebook's data as long        01:32
11    as Facebook could call their APIs and crawl their         01:32
12    website and access their data?  Were you aware of         01:32
13    that occurring?                                           01:32
14              MS. STEIN:  Objection to form.                  01:32
15              THE WITNESS:  I think the way it was            01:32
16    stated is fundamentally wrong because there's no way      01:32
17    you can crawl an API.                                     01:32
18    BY MS. WEAVER:                                             01:32
19    ██   ████   ███████████████████████                 ████
██   ██████████████████████████████████████              ████
██   ██████████████████                                    01:32
22              MS. STEIN:  Objection to form.                  01:32
23       ███████████   ███████████████                       ████
██   ███████████   █████████████████████████            ████
██   ███████████████████████████████████████           ████
```

Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1
                                                01:33
18     BY MS. WEAVER:                           01:33
19          Q.   And what was the Apps Events tool?    01:33
20          A.   I'm sorry, which one?          01:33
21          Q.   App Events.                    01:33
22          A.   So App Event is an equivalent of a    01:33
23     Facebook pixel.  Facebook pixel --       01:33
24          Q.   Okay.                          01:34
25          A.   -- works on the web and App Event works in    01:34
```

                                    Page 183

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | native iOS or Android app. | 01:34 |
| 2 | Q.   And are you aware, then, of a custom | 01:34 |
| 3 | analytics -- well, are you aware of something called | 01:34 |
| 4 | Custom Events? | 01:34 |
| 5 | A.   Yes, I'm aware. | 01:34 |
| 6 | Q.   What is that? | 01:34 |
| 7 | A.   And so Facebook provided a predetermined | 01:34 |
| 8 | list of events that any developer could use as an | 01:34 |
| 9 | off-the-shelf solution, events like an app in store, | 01:34 |
| 10 | events like app registration, things like that, | 01:34 |
| 11 | where -- predetermined list.  I think there were 18 | 01:34 |
| 12 | of them. | 01:34 |
| 13 | A custom app event is an event that an app | 01:34 |
| 14 | developer can create to track specific activity to | 01:34 |
| 15 | that app that is for that app and that app only.  So | 01:34 |
| 16 | a custom event for a Nike app would be a run, which | 01:34 |
| 17 | is an event specific to this app.  Or for Spotify it | 01:34 |
| 18 | would be a track to listen to which is specific to | 01:34 |
| 19 | Spotify. | 01:34 |
| 20 | Q.   And then does Facebook use the information | 01:35 |
| 21 | it collects to provide analytics like aggregate its | 01:35 |
| 22 | statistics and insights for its advertisers and | 01:35 |
| 23 | third-party partners? | 01:35 |
| 24 | A.   To the extent that -- sorry. | 01:35 |
| 25 | THE REPORTER:  Was there an objection? | 01:35 |

Page 184

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  I said "Objection to form." | 01:35 |
| 2 | THE REPORTER:  Thank you. | 01:35 |
| 3 | THE WITNESS:  The purposes of us providing | 01:35 |
| 4 | this capability was to provide aggregated data back | 01:35 |
| 5 | to the third-party developers about usage patterns | 01:35 |
| 6 | on their apps. | 01:35 |
| 7 | BY MS. WEAVER: | 01:35 |
| 8 | Q.   And -- strike that. | 01:35 |
| 9 | And did Facebook often obtain sensitive | 01:35 |
| 10 | data from app developers? | 01:35 |
| 11 | MS. STEIN:  Objection to form. | 01:35 |
| 12 | THE WITNESS:  It depends.  What do you | 01:35 |
| 13 | mean by "sensitive data"? | 01:35 |
| 14 | BY MS. WEAVER: | 01:35 |
| 15 | Q.   Did Facebook receive information about | 01:35 |
| 16 | diseases, medical conditions and injuries, or sexual | 01:35 |
| 17 | and reproductive health from apps? | 01:36 |
| 18 | A.   By design, the app events, they do not | 01:36 |
| 19 | allow, you know, a third-party developer to be | 01:36 |
| 20 | passing that information. | 01:36 |
| 21 | Q.   Okay.  Well, I don't know what you mean by | 01:36 |
| 22 | "by design," but the question is pretty simple. | 01:36 |
| 23 | Is it your testimony today that Facebook | 01:36 |
| 24 | did not obtain data relating to diseases, medical | 01:36 |
| 25 | conditions and injuries, or sexual and reproductive | 01:36 |

Page 185

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   health from apps?                                    01:36
 2        A.   Well, it's a very broad question, so I'm   01:36
 3   trying to respond to the best of my ability.         01:36
 4             So by design, access to that information   01:36
 5   was not available.  However, if the app developer    01:36
 6   decided to tell us about an event that was a custom  01:36
 7   event that may have disclosed some of that           01:36
 8   information, we would have discussed it.             01:36
 9        Q.   As you sit here today, do you know whether 01:36
10   or not Facebook received data that related to        01:36
11   diseases, medical conditions and injuries, or sexual 01:37
12   and reproductive health?                             01:37
13        A.   There was an incident we had a year or two 01:37
14   ago with period tracker apps that were sending app   01:37
15   events, custom app events, around the cycle of a     01:37
16   certain user.  If that's what you mean by this       01:37
17   category, then the answer is yes.                    01:37
18        Q.   Okay.  And did those categories also       01:37
19   include mental health and psychological states,      01:37
20   types of medical devices and health trackers,        01:37
21   medical treatments, body specifications, bodily      01:37
22   activities and biological cycles, among other        01:37
23   things?                                              01:37
24        A.   I don't know, but I don't think it's       01:37
25   possible to do that.                                 01:37
```

Page 186

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Were you part of the team that | 01:37 |
| 2 | investigated this? | 01:37 |
| 3 | A.   No. | 01:37 |
| 4 | Q.   Who was? | 01:37 |
| 5 | A.   I don't know. | 01:37 |
| 6 | Q.   Okay.  When Facebook did receive the | 01:37 |
| 7 | sensitive information such as diseases, medical | 01:37 |
| 8 | conditions, injuries, sexual and reproductive | 01:37 |
| 9 | health, did that -- where did that data go? | 01:37 |
| 10 | MS. STEIN:  Objection to form. | 01:37 |
| 11 | THE WITNESS:  You're making an assumption | 01:38 |
| 12 | that we did receive.  I only referred to a specific | 01:38 |
| 13 | incident around period trackers. | 01:38 |
| 14 | BY MS. WEAVER: | 01:38 |
| 15 | Q.   Okay.  So in that instance, where did -- | 01:38 |
| 16 | A.   I can only respond to that. | 01:38 |
| 17 | Q.   Okay.  In that instance, where did the | 01:38 |
| 18 | data go? | 01:38 |
| 19 | A.   The data were aggregated and anonymized. | 01:38 |
| 20 | Q.   Okay.  But Facebook still retains it then; | 01:38 |
| 21 | is that right? | 01:38 |
| 22 | A.   No, since we have deleted the data.  They | 01:38 |
| 23 | shouldn't have arrived -- | 01:38 |
| 24 | Q.   How could you delete it if it was | 01:38 |
| 25 | anonymized? | 01:38 |

Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   What do you mean?                       01:38

 2        Q.   You just said "We deleted the data," but   01:38

 3   you described that data as anonymized.  So how did   01:38

 4   you delete it if it was anonymized?  How did you     01:38

 5   identify which data to delete?                       01:38

 6        A.    This is a technical question.  But you can 01:38

 7   imagine an app event that basically suggests period  01:38

 8   start.  It's somewhere locked, so I can -- not me     01:38

 9   personally, but we can identify probably app events   01:38

10   that are associated with a specific action that       01:38

11   shouldn't have been recorded that we will then have   01:38

12   to delete.  And we would work with the developer to   01:39

13   remove this kind of custom events from being sent.    01:39

14

21        Q.   When was that data deleted?              01:39

22        A.   I don't have an exact recollection of    01:39

23   that.                                                01:39

24        Q.   Was it in 2018?                           01:39

25        A.   It may be 2018, 2019, around that time    01:39
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | frame. | 01:39 |
| 2 | Q.   Who made the decision to delete it? | 01:39 |
| 3 | A.   I don't know.  I wasn't involved in this | 01:39 |
| 4 | investigation. | 01:39 |
| 5 | Q.   Once that data is deleted can it be | 01:39 |
| 6 | recovered? | 01:39 |
| 7 | MS. STEIN:  Objection.  Outside the scope | 01:39 |
| 8 | of this witness's knowledge. | 01:39 |
| 9 | THE WITNESS:  I don't know. | 01:39 |
| 10 | BY MS. WEAVER: | 01:39 |
| 11 | Q.   But you knew that it was deleted; is that | 01:40 |
| 12 | right? | 01:40 |
| 13 | A.   I know that's -- the data has been | 01:40 |
| 14 | deleted, yes. | 01:40 |
| 15 | Q.   How did you come to know that? | 01:40 |
| 16 | A.   Because I was part of the communications | 01:40 |
| 17 | to the developer audience about the specific | 01:40 |
| 18 | instance. | 01:40 |
| 19 | Q.   And which developer are you thinking of? | 01:40 |
| 20 | A.   There were a number of period tracker apps | 01:40 |
| 21 | that have to comply. | 01:40 |
| 22 | Q.   Can you identify some of them? | 01:40 |
| 23 | A.   Not at the top of my mind. | 01:40 |
| 24 | Q.   Flow Health? | 01:40 |
| 25 | A.   I don't recall that. | 01:40 |

Page 189

| | | |
|---|---|---|
| 1 | Q.   How would you refresh your recollection? | 01:40 |
| 2 | A.   I would have to look at the entire | 01:40 |
| 3 | universe of apps that have been in scope that have | 01:40 |
| 4 | been sending this kind of events. | 01:40 |
| 5 | Q.   Why did Facebook delete the data? | 01:40 |
| 6 | A.   Because that's not the kind of data | 01:40 |
| 7 | that's -- we want to have access to. | 01:40 |
| 8 | Q.   Were any regulators involved? | 01:40 |
| 9 | A.   For that, I don't know. | 01:41 |
| 10 | Q.   Okay.  When Facebook receives information | 01:41 |
| 11 | about an individual from an app, does Facebook | 01:41 |
| 12 | associate that information with other information | 01:41 |
| 13 | Facebook has collected about that individual through | 01:41 |
| 14 | the Facebook user ID? | 01:41 |
| 15 | MS. STEIN:  Objection to form. | 01:41 |
| 16 | THE WITNESS:  Again, depends what kind of | 01:41 |
| 17 | data we're talking about here. | 01:41 |
| 18 | BY MS. WEAVER: | 01:41 |
| 19 | Q.   Let's say sensitive health data like | 01:41 |
| 20 | diseases, medical, injuries, sexual or reproductive | 01:41 |
| 21 | health. | 01:41 |
| 22 | A.   If the data has been communicated to us | 01:41 |
| 23 | through app events, no. | 01:41 |
| 24 | Q.   Okay.  When is the answer yes?  When does | 01:41 |
| 25 | it connect it to other users? | 01:41 |

Page 190

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   If the user basically establishes that      01:41

 2   they are suffering from a certain disease and they     01:41

 3   decide to post on Facebook and tell their friends      01:41

 4   about it, then yes.                                    01:41

 5        Q.   So even if the post is to three of my        01:41

 6   friends, Facebook will collect that data; is that      01:41

 7   right?                                                 01:41

 8             MS. STEIN:  Objection to form.               01:42

 9             THE WITNESS:  Well, you're posting it to     01:42

10   Facebook, so, yes, Facebook will have an               01:42

11   understanding of that.                                 01:42

12   BY MS. WEAVER:                                         01:42

13        Q.   Even if it's to a restricted audience?       01:42

14        A.   That audience will have access to that       01:42

15   data, but someone has to host the data in order to     01:42

16   be able to sell it to that audience, and we provide    01:42

17   the service.                                           01:42

18        Q.   And then does Facebook -- I'm sorry.         01:42

19        A.   Sorry.  We provide the service, so yes.      01:42

20        Q.   So then does Facebook then use that          01:42

21   information to create custom target audiences for      01:42

22   advertisers?                                           01:42

23        A.   Are you talking broadly or about the         01:42

24   specific things?                                       01:42

25        Q.   Both.                                        01:42
```

Page 191

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              MS. STEIN:  Objection to form.              01:42
 2              THE WITNESS:  Like -- it's a very broad     01:42
 3    question.  So I would say that if we know that you    01:42
 4    use -- if you play Candy Crush Saga 10 times a day,   01:42
 5    that may inform our targeting for U.S. potential      01:42
 6    audience for games of this same genre.                01:42
 7              If we have expressed -- or if we establish  01:43
 8    your affinity to Beyonce, again like I described      01:43
 9    before, we would use that information to target you   01:43
10    with like R&B music.                                  01:43
11    BY MS. WEAVER:                                        01:43
12        Q.   So let's talk about custom audiences for a   01:43
13    moment, though, please.                               01:43
14              So if I posted to three friends that I had  01:43
15    a medical condition and Facebook collects that        01:43
16    information, does Facebook use that information to    01:43
17    create a custom audience for advertisers if they are  01:43
18    seeking something about a medical condition?          01:43
19        A.   No, that's not how it works.                 01:43
20        Q.   Why doesn't it work that way?  Why does it   01:43
21    only work for Beyonce but not a medical condition?    01:43
22              MS. STEIN:  Objection to form.              01:43
23              THE WITNESS:  Because a custom audience is  01:43
24    an advertisement product that reengages with         01:43
25    customers of an existing business.                    01:43
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                          01:43
 2         Q.   Right.  I understand what it is.              01:43
 3              So I'm a business and I come to Facebook      01:43
 4    and I say "I want -- I want to target people with      01:43
 5    this medical condition."  Does Facebook provide        01:44
 6    that -- that custom audience?                          01:44
 7         A.   No, that's not how it works.  If you         01:44
 8    really want to use custom audience, you need to        01:44
 9    provide with hashed email addresses or information     01:44
10    about the users that you have diagnosed to have        01:44
11    suffered from that disease.                            01:44
12         Q.   Could you repeat the last part of the        01:44
13    sentence?  I just didn't understand.                   01:44
14         A.   So let's say you use a medical app for the   01:44
15    sake of the argument.                                  01:44
16         Q.   Okay.                                        01:44
17         A.   And you have a thousand users that went      01:44
18    through a questionnaire and they have been diagnosed   01:44
19    with, say, alcoholism.  That's probably a bad          01:44
20    example because I don't think -- but, anyhow, let's    01:44
21    use that.                                              01:44
22              Then to the extent that you can identify     01:44
23    those users because they have created an account       01:44
24    with that medical app using their email address or     01:44
25    the phone number, you can upload the email addresses   01:44
```

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | of those thousand users hashed to us and then we are | 01:44 |
| 2 | going to create the custom audience ad campaign | 01:45 |
| 3 | trying to find those 1,000 users on Facebook. | 01:45 |
| 4 | To the extent that they exist, they will | 01:45 |
| 5 | see an ad.  But, again, the ad will compete with | 01:45 |
| 6 | other ads, like we discussed before.  But it will be | 01:45 |
| 7 | a database provided by the third party hashed, so | 01:45 |
| 8 | anonymized with specific people that have been | 01:45 |
| 9 | diagnosed to suffer from a certain disease. | 01:45 |
| 10 | Q.    Okay.  Let's talk for a moment about APIs. | 01:45 |
| 11 | We touched upon them this morning.  Do you recall | 01:45 |
| 12 | that? | 01:45 |
| 13 | A.    Yes. | 01:45 |
| 14 | Q.    You're aware at some point that -- well, | 01:45 |
| 15 | there was more than one version of Graph API over | 01:45 |
| 16 | time; is that right? | 01:45 |
| 17 | A.    Yes, Version 1 of the API, it's being -- | 01:45 |
| 18 | running from 2008 or 2009 until 2000 -- May 1st, | 01:45 |
| 19 | 2015. | 01:46 |
| 20 | Q.    It was accessible until April 2015 or | 01:46 |
| 21 | May 2015? | 01:46 |
| 22 | A.    I think it's May 1st, but it may be... | 01:46 |
| 23 | MS. WEAVER:  You should amend your rog | 01:46 |
| 24 | responses, Deb. | 01:46 |
| 25 | Q.    And by "accessible," that means third | 01:46 |

Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | parties could access data through it; is that | 01:46 |
| 2 | correct? | 01:46 |
| 3 |     A.   Yes. | 01:46 |
| 4 |     Q.   Okay.  And then Graph API Version 2 came | 01:46 |
| 5 | into being at some point; is that right? | 01:46 |
| 6 |     A.   Graph API V2 was launched on April 30, | 01:46 |
| 7 | 2014. | 01:46 |
| 8 |     Q.   Okay.  And it was accessible until | 01:46 |
| 9 | May 2020; is that right? | 01:46 |
| 10 |     A.   The Version 2?  I'm sorry. | 01:46 |
| 11 |     Q.   Version 2, yeah. | 01:46 |
| 12 |     A.   Are you talking about Version 2? | 01:46 |
| 13 |     Q.   Yes, Version 2 was accessible until | 01:46 |
| 14 | May 2020; is that correct? | 01:46 |
| 15 |     A.   I need to check because I don't know when | 01:46 |
| 16 | the last version -- the last Version 2 of the API | 01:47 |
| 17 | was final, approved.  Because we have Version 3 | 01:47 |
| 18 | right now. | 01:47 |
| 19 |     Q.   Okay.  Right.  And Version 3 came into | 01:47 |
| 20 | effect May 2018; is that right? | 01:47 |
| 21 |     A.   That seems about right. | 01:47 |
| 22 |     Q.   Okay.  And that was accessible -- it will | 01:47 |
| 23 | be accessible through August 2021; is that correct? | 01:47 |
| 24 |     A.   So let me take a step back to explain a | 01:47 |
| 25 | little bit how the replacement process works because | 01:47 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I think that may be helpful. | 01:47 |
| 2 | An API is rolled out at a specific point | 01:47 |
| 3 | in time and the version of this API is successful | 01:47 |
| 4 | for the next 2-plus years.  Each time we release a | 01:47 |
| 5 | new version of the API, that means that the previous | 01:47 |
| 6 | would be accessible for the period of time between | 01:47 |
| 7 | that plus-2 years.  So the lifetime of the version | 01:47 |
| 8 | of the API would be 2-plus years, more or less two | 01:47 |
| 9 | to three months on top of the 2-year mark. | 01:47 |
| 10 | But we have versions that start from 2.0 | 01:47 |
| 11 | to 2.1 all the way to 2.10 or 11, if I'm not | 01:48 |
| 12 | mistaken.  And then we switch to Version 3.  And | 01:48 |
| 13 | Version 3.0 will be available for 2-plus years, | 01:48 |
| 14 | Version 3.1 would be available for 2-plus years, so | 01:48 |
| 15 | on and so on. | 01:48 |
| 16 | Q.   Understood.  You're familiar with the | 01:48 |
| 17 | phrase "Public APIs"? | 01:48 |
| 18 | A.   Yes. | 01:48 |
| 19 | Q.   What is the difference between a public | 01:48 |
| 20 | API and a private API? | 01:48 |
| 21 | A.   A public API is an API that is available | 01:48 |
| 22 | in general availability, meaning that the | 01:48 |
| 23 | third-party developer that wants to access this API | 01:48 |
| 24 | has to go through the process, we call it app | 01:48 |
| 25 | review, where the developer will specifically ask | 01:48 |

Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    for permission to access that API, and once        01:48

 2    approved, will be able to access that API.          01:48

 3         Q.   When was the process of app review first  01:48

 4    implemented?                                         01:48

 5         A.   The introduction of Version 2 of the API  01:48

 6    coincided with the introduction of the app review   01:48

 7    process.                                             01:49

 8         Q.   So April of 2015?                          01:49

 9         A.   April 30, 2014.                            01:49

10         Q.   2014?                                      01:49

11         A.   Yes.                                       01:49

12    ███    ██████████████████████                 ███

██  ██████                                          ███

██  ██  ████████████████████     █████             ███

██  ████████████████████████████████               ███

██  ████████████████████████                        01:49

17         Q.   Okay.  And we discussed this before.  But 01:49

18    what is a capability?                                01:49

19         A.   A capability is a way to provide access   01:49

20    control to a private API.                            01:49

21         Q.   And what is a permission?                  01:49

22         A.   A permission is a way to gain user's      01:49

23    consent for access to specific data points.          01:49

24         Q.   Okay.  And what was -- at a very high      01:49

25    level, what was the difference between Graph API     01:49
```

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    Versions 1.0 and 2.0?                              01:50

 2         A.   At the very high level?                  01:50

 3         Q.   Yes.                                     01:50

 4         A.   Access to friends' information was       01:50

 5    deprecated with introduction of Version 2 of the   01:50

 6    API.                                               01:50

 7         Q.   And what do you mean by "friends'        01:50

 8    information was deprecated"?                        01:50

 9         A.   And so in Version 1 of the API a user    01:50

10    could log in with a third-party app and allow access 01:50

11    to this app to their friends' photos or their      01:50

12    friends' birthdays, things like that.              01:50

13              With Version 2 of the API, this feature  01:50

14    was completely deprecated.  So a user could only   01:50

15    allow a third-party app to have access to their own 01:50

16    birthday information and their own photos.          01:50

17    █      ██████████                                  █████

█      ██████████████████                                █████

█    ██████████████████████                              █████

█    ██████████████████████                              █████

█    ████████████████                                    █████

█       ██  ████████████████████████                     █████

█       ██  ████████████████████████                     █████

█    █████████████████████████                           █████

█    ████████████████                                    █████
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    ██        █████████████████████        ████
     █    ██████████████                    ████
     █      ██    ██                         ████
     █        ██████████    ███████████    ██████
     █    ███████                           ████
     █    █████████████                     ████
     █      ██  █████████████  █████████████  ████
     █      ██  ███████████████                01:51
```

9         Q.    What was Post-Search API?                    01:51

10        A.    An API that allowed a third party to         01:51

11   search for public posts on Facebook.                    01:51

12        Q.    Did Post-Search API enable analytics via     01:51

13   listening tracking mentions of keywords and hashtags    01:51

14   over time?                                              01:51

15        MS. STEIN:  Objection to form.                     01:51

16        THE WITNESS:  I want to understand a               01:52

17   little bit better.  Do you have a specific example      01:52

18   in mind?                                                01:52

19   BY MS. WEAVER:                                          01:52

20        Q.    I don't.  I was just asking the question.    01:52

21        MS. STEIN:  Objection to form.                     01:52

22        THE WITNESS:  I'm having hard time                 01:52

23   understanding what sort of analytics you are looking    01:52

24   for.                                                    01:52

25   BY MS. WEAVER:                                          01:52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you know what sentiment analysis is? | 01:52 |
| 2 | A.   Yes. | 01:52 |
| 3 | Q.   What is it? | 01:52 |
| 4 | A.   Normally brands do certain analysis to | 01:52 |
| 5 | understand how their brands are perceived in social | 01:52 |
| 6 | media. | 01:52 |
| 7 | Q.   And so did Post-Search API enable | 01:52 |
| 8 | sentiment analysis? | 01:52 |
| 9 | A.   I don't think that would be valuable, so | 01:52 |
| 10 | my answer is no. | 01:52 |
| 11 | Q.   You're answering it didn't do that because | 01:52 |
| 12 | you don't think it would be valuable? | 01:52 |
| 13 | MS. STEIN:  Objection.  Argumentative. | 01:52 |
| 14 | BY MS. WEAVER: | 01:52 |
| 15 | Q.   I don't understand the answer. | 01:52 |
| 16 | A.   Post-Search on account of public posts. | 01:52 |
| 17 | And those are not necessarily posts that a brand | 01:52 |
| 18 | would use to inform or to understand the sentiment | 01:52 |
| 19 | of people against that brand. | 01:53 |
| 20 | Q.   Okay.  So your testimony is that | 01:53 |
| 21 | Post-Search API did not allow sentiment analysis or | 01:53 |
| 22 | enable sentiment analysis? | 01:53 |
| 23 | A.   I'm saying that the public posts may not | 01:53 |
| 24 | be relevant for a brand to establish sentiment | 01:53 |
| 25 | analysis. | 01:53 |

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        Q.    Did Facebook deprecate Post-Search API?        01:53

2        A.    Yes.                                            01:53

3              MS. STEIN:  Objection.  Outside the scope.      01:53

4              THE WITNESS:  Yes, we did.                      01:53

5   BY MS. WEAVER:                                             01:53

6

15       Q.    So during the transition period from Graph      01:53

16  API Version 1.0 to 2.0, did Facebook inform certain        01:53

17  third parties that they would no longer access             01:54

18  friends' data?                                             01:54

19             MS. STEIN:  Objection to form.  And             01:54

20  objection to scope.                                        01:54

21             This witness is not our corporate designee      01:54

22  on communications with third parties.  He's the            01:54

23  designee on the topic ordered by Judge Corley.  So         01:54

24  he's not authorized to testify about communications        01:54

25  that you are asking him about.                             01:54
```

Page 201

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  I don't think you understand. | 01:54 |
| 2 | This is what data was shared with third parties. | 01:54 |
| 3 | Are you declining to allow the witness to testify | 01:54 |
| 4 | what was shared with third parties? | 01:54 |
| 5 | MS. STEIN:  You're asking him about | 01:54 |
| 6 | communications with developers.  Do you want -- | 01:54 |
| 7 | MS. WEAVER:  No, I'm not.  I'm asking | 01:54 |
| 8 | about what was -- I'm leading into what data was | 01:54 |
| 9 | shared with whitelisted third parties and others. | 01:54 |
| 10 | Are you going to impede -- continue to | 01:54 |
| 11 | impede this deposition? | 01:54 |
| 12 | MS. STEIN:  Okay.  First of all, I'm not | 01:54 |
| 13 | impeding.  Second of all, that's not what you asked. | 01:54 |
| 14 | So if you'd like to ask what got shared with | 01:54 |
| 15 | whitelisted apps -- | 01:54 |
| 16 | MS. WEAVER:  Would you please read back my | 01:54 |
| 17 | question. | 01:54 |
| 18 | (The record was read by the | 01:55 |
| 19 | court reporter, as requested) | 01:55 |
| 20 | BY MS. WEAVER: | 01:55 |
| 21 | Q.   Please answer. | 01:55 |
| 22 | A.   So on April 30, 2014, we hold our annual | 01:55 |
| 23 | conference called F8, and that's when we announced | 01:55 |
| 24 | introduction of Version 2 of the API.  So the | 01:55 |
| 25 | communications were broad about the deprecation of | 01:55 |

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the Version 1 of the API and the deprecation of | 01:55 |
| 2 | access to any of the friends' data. | 01:55 |
| 3 | Q.   And so some third parties were allowed to | 01:55 |
| 4 | continue to access friends' data while others were | 01:55 |
| 5 | not; is that correct? | 01:55 |
| 6 | A.   After the deprecation of the Version 1 of | 01:55 |
| 7 | the API, the only integrations that maintain their | 01:55 |
| 8 | access to friends' data were device integrations. | 01:55 |
| 9 | Q.   And what is the phrase "whitelisting"? | 01:55 |
| 10 | A.   I would decline the opportunity to lecture | 01:56 |
| 11 | as on the use of white or blacklists right now, but | 01:56 |
| 12 | I would use the term "allow lists" for the purposes | 01:56 |
| 13 | of being politically correct from now on. | 01:56 |
| 14 | You can use whatever term you would use, | 01:56 |
| 15 | but I will use the term "allow lists" to refer to | 01:56 |
| 16 | anything that you may use the term "whitelist." | 01:56 |
| 17 | Q.   Okay.  During the time period 2012 to | 01:56 |
| 18 | 2017, did Facebook use the term "whitelist"? | 01:56 |
| 19 | A.   Yes. | 01:56 |
| 20 | Q.   Did you? | 01:56 |
| 21 | A.   Yes. | 01:56 |
| 22 | Q.   Okay.  And you said that Facebook only | 01:56 |
| 23 | whitelisted integration partners a moment ago, | 01:56 |
| 24 | didn't you? | 01:56 |
| 25 | A.   I didn't use that term in relation to | 01:56 |

Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    device integrations.                                    01:56

 2         Q.   Okay.                                          01:56

 3         A.   We can read back my statement, but I'm        01:56

 4    pretty certain that I said the only integrations        01:56

 5    that could access to friends' information were          01:56

 6    device integrations.                                    01:56

 7         Q.   Okay.  Was Oracle a device integrator?        01:56

 8         A.   I don't think so.                             01:57

 9         Q.   Was Salesforce?                               01:57

10         A.   I don't think so.                             01:57

11         Q.   Did Facebook whitelist Oracle and            01:57

12    Salesforce?                                             01:57

13         A.   If they have ever whitelisted Salesforce     01:57

14    and Oracle, is that the question?                       01:57

15         Q.   Did they at the time period that we're        01:57

16    talking about whitelist Oracle and Salesforce?         01:57

17              MS. STEIN:  Lesley, this is out of scope.     01:57

18    This deposition --                                      01:57

19              MS. WEAVER:  It's not.  I'm trying to         01:57

20    understand what companies had access to user data.     01:57

21              MS. STEIN:  No, friends of friends' data.    01:57

22              MS. WEAVER:  No.                              01:57

23              MS. STEIN:  It's Salesforce -- stop.  This    01:57

24    deposition --                                           01:57

25              MS. WEAVER:  You can instruct him -- you      01:57
```

                                                    Page 204

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | can instruct him not to answer or object to form, or | 01:57 |
| 2 | we can call Judge Corley. | 01:57 |
| 3 | MS. STEIN:  We can call Judge Corley if | 01:57 |
| 4 | you want because you're asking merits questions. | 01:57 |
| 5 | This deposition is supposed to be about what data | 01:57 |
| 6 | Facebook collected and which of that data was | 01:57 |
| 7 | accessible or shareable, and so far -- | 01:57 |
| 8 | MS. WEAVER:  Exactly.  Maybe you don't | 01:58 |
| 9 | understand, Deb, but this goes to the heart of | 01:58 |
| 10 | whether Salesforce and Oracle were receiving | 01:58 |
| 11 | friends' data and when.  That is what I am trying to | 01:58 |
| 12 | figure out. | 01:58 |
| 13 | MS. STEIN:  No, that's not what -- that is | 01:58 |
| 14 | not what this deposition is about.  This witness is | 01:58 |
| 15 | not testifying about specific apps. | 01:58 |
| 16 | He's talking about what types and | 01:58 |
| 17 | categories of data got collected and what could have | 01:58 |
| 18 | been -- could have been accessed or shared, right? | 01:58 |
| 19 | This is supposed to be high level, not about, you | 01:58 |
| 20 | know, who did what when. | 01:58 |
| 21 | MS. WEAVER:  Are you done? | 01:58 |
| 22 | MS. STEIN:  Yes. | 01:58 |
| 23 | BY MS. WEAVER: | 01:58 |
| 24 | Q.   Is Salesforce a device integrator? | 01:58 |
| 25 | A.   It's not. | 01:58 |

Page 205

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Thank you. | 01:58 |
| 2 | So your testimony that only device | 01:58 |
| 3 | integrators were whitelisted would not include | 01:58 |
| 4 | Salesforce or Oracle, would it? | 01:58 |
| 5 | MS. STEIN:  Objection to form. | 01:58 |
| 6 | THE WITNESS:  I think your use of the term | 01:58 |
| 7 | "whitelist" in relation to user data is problematic | 01:58 |
| 8 | here.  I'm not trying to criticize you.  I'm trying | 01:58 |
| 9 | to understand exactly what you mean.  Because | 01:59 |
| 10 | whitelist is an access control or an allow list to | 01:59 |
| 11 | an API.  That API doesn't necessarily need to allow | 01:59 |
| 12 | access to user data.  It may be pages data.  Your | 01:59 |
| 13 | assumption is that -- | 01:59 |
| 14 | THE REPORTER:  It may be what data? | 01:59 |
| 15 | THE WITNESS:  Pages data. | 01:59 |
| 16 | MS. WEAVER:  Okay.  So let's move on.  The | 01:59 |
| 17 | documents will speak for themselves.  We can move | 01:59 |
| 18 | on. | 01:59 |
| 19 | THE WITNESS:  No, I want to continue my | 01:59 |
| 20 | response if that's okay, because I want to make sure | 01:59 |
| 21 | that it's covered.  I have the -- | 01:59 |
| 22 | BY MS. WEAVER: | 01:59 |
| 23 | Q.   I don't think what you're saying is | 01:59 |
| 24 | accurate, and I'd like to just move on, if you don't | 01:59 |
| 25 | mind. | 01:59 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I have reasons to believe that my response | 01:59 |
| 2 | is 100 percent accurate. | 01:59 |
| 3 | Q.   Okay.  I understand. | 01:59 |
| 4 | Were there third parties who were using | 01:59 |
| 5 | friends' data for research also whitelisted? | 01:59 |
| 6 | MS. STEIN:  If the witness has something | 01:59 |
| 7 | that he needs to clarify now, we should do that now. | 01:59 |
| 8 | I'm sure Judge Corley would want his testimony to be | 01:59 |
| 9 | clarified in something that he's comfortable with. | 01:59 |
| 10 | BY MS. WEAVER: | 01:59 |
| 11 | Q.   What would you like to add? | 01:59 |
| 12 | MS. STEIN:  If there's a clarification you | 02:00 |
| 13 | need to make, let's make sure we have a clear | 02:00 |
| 14 | record. | 02:00 |
| 15 | THE WITNESS:  Yes.  So I would like to | 02:00 |
| 16 | suggest that there are three -- three things that | 02:00 |
| 17 | are -- is worth clarifying here. | 02:00 |
| 18 | We have the data.  We have APIs that allow | 02:00 |
| 19 | access to the data.  And then we have access | 02:00 |
| 20 | controls to that data.  Right?  What you're talking | 02:00 |
| 21 | about here is the allow list also known as | 02:00 |
| 22 | whitelist. | 02:00 |
| 23 | That is very broad because it -- | 02:00 |
| 24 | BY MS. WEAVER: | 02:00 |
| 25 | Q.   I was talking about friends' permissions, | 02:00 |

Page 207

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 02:00 |
| 2 | A.   Yes, but to the extent that the allow list | 02:00 |
| 3 | you're talking about are for APIs that are not | 02:00 |
| 4 | exposing this kind of data, then I would argue that | 02:00 |
| 5 | the question about Salesforce or Oracle is | 02:00 |
| 6 | irrelevant. | 02:00 |
| 7 | Q.   Okay.  You can argue that. | 02:00 |
| 8 | Back to my question.  Were there -- other | 02:00 |
| 9 | third parties who were using friends' data for | 02:00 |
| 10 | research, were they also whitelisted? | 02:00 |
| 11 | MS. STEIN:  Objection to form. | 02:00 |
| 12 | THE WITNESS:  I have no recollection of | 02:01 |
| 13 | any other device integrations being access -- or | 02:01 |
| 14 | having access to friends' information beyond May 1, | 02:01 |
| 15 | 2015. | 02:01 |
| 16 | BY MS. WEAVER: | 02:01 |
| 17 | Q.   Right.  But between the time when they | 02:01 |
| 18 | announced the transition and before 2015, were there | 02:01 |
| 19 | researchers who were whitelisted and given access to | 02:01 |
| 20 | friends' data? | 02:01 |
| 21 | A.   They didn't need to be whitelisted because | 02:01 |
| 22 | that was also publically available through Version 1 | 02:01 |
| 23 | of the API. | 02:01 |
| 24 | Q.   Did that include Cambridge Analytica? | 02:01 |
| 25 | A.   Cambridge Analytica was never a developer | 02:01 |

Page 208

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | on the platform. | 02:01 |
| 2 | Q.   Okay.  But I was just asking about | 02:01 |
| 3 | researchers.  Do you recall that? | 02:01 |
| 4 | A.   If -- | 02:01 |
| 5 | Q.   Let me ask the question again.  So were | 02:01 |
| 6 | there certain third parties who were given friends' | 02:01 |
| 7 | data for research who were also whitelisted? | 02:01 |
| 8 | MS. STEIN:  Objection to form. | 02:01 |
| 9 | THE WITNESS:  Access to public APIs | 02:01 |
| 10 | doesn't come through a whitelist.  The access | 02:01 |
| 11 | control that we use for access to public APIs is a | 02:01 |
| 12 | process called app review. | 02:02 |
| 13 | Now, back in 2014, before even the app | 02:02 |
| 14 | review was introduced, any third party could access | 02:02 |
| 15 | anything from the -- that was made available through | 02:02 |
| 16 | Version 1 of the API with the appropriate user's | 02:02 |
| 17 | consent. | 02:02 |
| 18 | There were a number of researchers, and I | 02:02 |
| 19 | think I can double-guess if -- the name of the | 02:02 |
| 20 | specific researcher that you have in mind that's | 02:02 |
| 21 | built an application on our platform on the Version | 02:02 |
| 22 | 1 of the API, they requested and gained permission | 02:02 |
| 23 | from users to access their data and their friends' | 02:02 |
| 24 | data, and that's the end of it. | 02:02 |
| 25 | | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    BY MS. WEAVER:                                        02:02

2         Q.   Okay.  Are you familiar with Crimson        02:02

3    Hexagon?                                              02:02

4         A.   I have an understanding of the company but  02:02

5    nothing more than that.                               02:02

6         Q.   Do you know who does have information        02:02

7    about what Crimson Hexagon accessed?                  02:02

8         A.   No.                                          02:02

9              MS. STEIN:  Objection to form.               02:02

10   BY MS. WEAVER:                                         02:02

11
```

Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 211

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    ██████  ████████████████████  ██████      ██████
     ██  ██████████████████              ██████
     ██  ██  ████████████████████████          ██████
     ██  ████████████  ██████████████          ██████
     ██  ██████  ████████████████              ██████
     ██  ██████  ████████████████████          02:04
```

7        Q.    Okay.  What is Groups API?                    02:04

8        A.    It's an API that allows third parties to      02:04

9    help group administrators manage the groups from        02:04

10   posting contents to moderating or allowing members      02:04

11   to join the group and so on.                            02:05

12       Q.    When was it launched?                          02:05

13       A.    I don't remember the date it was launched.     02:05

14       Q.    Was it between 2012 to 2017?                    02:05

15       A.    Most likely, yes.                              02:05

16       Q.    And then it was -- does Groups API still       02:05

17   exist?                                                   02:05

18       A.    I think that the Groups API was fully          02:05

19   deprecated in May 2018.                                  02:05

20       Q.    And you were part of that decision, right?     02:05

21       A.    Yes.                                           02:05

22       Q.    And why was it deprecated?                     02:05

23       A.    So I can answer from my perspective why        02:05

24   it's since been deprecated.                              02:05

25             MS. STEIN:  If you don't know from the         02:05

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | company's perspective, then I'm going to direct the | 02:05 |
| 2 | witness not to answer. | 02:05 |
| 3 |       MS. WEAVER:  I'm sorry, you're going to | 02:05 |
| 4 | have to be deposed again. | 02:05 |
| 5 |     Q.   Do you have an understanding on behalf | 02:05 |
| 6 | company as to why Groups API was deprecated? | 02:05 |
| 7 |     A.   There are certain groups that are not | 02:06 |
| 8 | public that want to make sure that third parties | 02:06 |
| 9 | couldn't access its members. | 02:06 |
| 10 |       THE REPORTER:  I'm sorry, "Make sure | 02:06 |
| 11 | that"... | 02:06 |
| 12 |       THE WITNESS:  -- third parties couldn't | 02:06 |
| 13 | access its members. | 02:06 |
| 14 | BY MS. WEAVER: | 02:06 |
| 15 |     Q.   Okay.  What is Live Video API? | 02:06 |
| 16 |     A.   It's an API that allows a third party to | 02:06 |
| 17 | broadcast live video on Facebook. | 02:06 |
| 18 |     Q.   I'm sorry, I didn't hear that either. | 02:06 |
| 19 |     A.   Sorry.  It's an API -- I have changed my | 02:06 |
| 20 | headset. | 02:06 |
| 21 |     Q.   I know, I know.  It's me.  I'm kind of | 02:06 |
| 22 | deaf. | 02:06 |
| 23 |     A.   So it's an API that allows a third party | 02:06 |
| 24 | to broadcast live video on Facebook. | 02:06 |
| 25 |     Q.   Okay.  And when did it first come into | 02:06 |

Page 213

```
1    being?                                                02:06

2         A.   2015, 2016, maybe.                          02:06

3         Q.   And what is an endpoint?                    02:06

4         A.   An endpoint in reference to an API?         02:06

5         Q.   Uh-huh.                                     02:07

6         A.   It's -- how should I explain it?            02:07

7         Q.   I can try, but don't make fun of me.        02:07

8         A.   Please.                                     02:07

9         Q.   Is an endpoint an object that is accessed   02:07

10   through an API?                                       02:07

11        A.   I -- I don't know that the endpoint refers  02:07

12   to the -- the object.  It refers to, I think, the     02:07

13   structure of the API.  But it may be used in both     02:07

14   ways.                                                 02:07

15        Q.   Okay.  And then what is a data field with   02:07

16   regard to API?                                        02:07

17        A.   Okay.  So let me try to explain maybe in a  02:07

18   different way.                                         02:07

19             So there are objects and fields.            02:07

20        Q.   Uh-huh.                                     02:07

21        A.   So an object can be, let's say, the Crate   02:07

22   & Barrel Facebook page.  A field can be the picture   02:07

23   that is being used on that page.                      02:07

24             So when you make an API call against that   02:07

25   object where you specify the object ID, you can add   02:07
```

Page 214

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | perimeters in the API request about what is it the | 02:08 |
| 2 | API needs to respond to.  And you can respond that | 02:08 |
| 3 | in the field section.  You can specify that you want | 02:08 |
| 4 | the name of the page potentially, the profile | 02:08 |
| 5 | picture of the page, or you can specify if you want | 02:08 |
| 6 | posts made against that page. | 02:08 |
| 7 | Q.   Thank you.  That's very helpful. | 02:08 |
| 8 | So is an object an endpoint in that | 02:08 |
| 9 | description?  Are those the same? | 02:08 |
| 10 | A.   An endpoint from the API perspective, you | 02:08 |
| 11 | know, the API that requests access to the page, | 02:08 |
| 12 | there's just an API that requests access to, I don't | 02:08 |
| 13 | know, a friends connection.  That would be a | 02:08 |
| 14 | different endpoint. | 02:08 |
| 15 | Q.   I see.  Okay.  So are you aware of an | 02:08 |
| 16 | endpoint Get Event ID Live Videos? | 02:08 |
| 17 | A.   No. | 02:08 |
| 18 | Q.   Okay.  You prepared Facebook's | 02:08 |
| 19 | interrogatory responses relating to capabilities and | 02:09 |
| 20 | permissions, right? | 02:09 |
| 21 | MS. STEIN:  Objection.  Form. | 02:09 |
| 22 | BY MS. WEAVER: | 02:09 |
| 23 | Q.   Was that you or was that someone else? | 02:09 |
| 24 | A.   I'm supported the counsels in, you know, | 02:09 |
| 25 | like this response, but I don't recall exactly | 02:09 |

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | what's that. | 02:09 |
| 2 |     Q.   I know.  I know.  And it's cute and you | 02:09 |
| 3 | worked very hard and we're grateful. | 02:09 |
| 4 |        MS. STEIN:  I'll add I believe that was | 02:09 |
| 5 | the other individual who verified part of it. | 02:09 |
| 6 |        MS. WEAVER:  Okay.  So we're going to have | 02:09 |
| 7 | talk to him.  So I'll try -- | 02:09 |
| 8 |     Q.   So do you know -- let me just try this | 02:09 |
| 9 | then.  For the call Get Event ID Live Video, do you | 02:09 |
| 10 | know what it was seeking and what it obtained? | 02:09 |
| 11 |     A.   I think it's associated with the live | 02:09 |
| 12 | event, most likely, the live video that is being | 02:09 |
| 13 | broadcast.  But I don't understand exactly the event | 02:09 |
| 14 | in connection with the live video. | 02:09 |
| 15 |     Q.   Okay.  Do you know the difference between | 02:10 |
| 16 | "get" and "post"? | 02:10 |
| 17 |     A.   Yes. | 02:10 |
| 18 |     Q.   What's the difference? | 02:10 |
| 19 |     A.   The one is a read and the other is a | 02:10 |
| 20 | write. | 02:10 |
| 21 |     Q.   Okay.  And so do you know what Get User ID | 02:10 |
| 22 | Live Videos is? | 02:10 |
| 23 |     A.   No, I don't -- I don't know the exact | 02:10 |
| 24 | endpoints. | 02:10 |
| 25 |     Q.   Okay.  Do you know what Post User ID Live | 02:10 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   Videos is?                                              02:10

 2        A.   I don't, no.                                  02:10

 3        Q.   Okay.  Does Facebook know which third         02:10

 4   parties had access to Live Video API?                   02:10

 5        A.   Historically, yes.                            02:10

 6        Q.   Okay.  What's Pages API?                      02:10

 7        A.    I think I used that example earlier, so it   02:10

 8   may be repetitive.  It's an API that allows and pays    02:11

 9   administrator to manage the page with -- which may      02:11

10   includes -- manage the pages, which may include         02:11

11   posting content on the page, updating the profile       02:11

12   picture on the page, responding to comments made by     02:11

13   users on the page, and so on.                           02:11

14        ██     ████    ██████████████             ████

██        ██     ██████████████████████             ████

██        ████████████████████████████████          ████

██        ██████████████████████                    ████

██        ██    ████████████████████████            ████

██        ████████                                        02:11

20             MS. STEIN:  Objection to form.              02:11

21             ████████████  ██████████████████      ████

██        ████████████████████████████████          ████

██        ████████████████████████████████          ████

██        ██████████████████                              02:12

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                    02:12
```



```
 6         Q.    Do you know who would?                 02:12

 7         A.    No.                                     02:12
```

```
13         Q.    Do you know what DataSift is?           02:12

14         A.    I have heard that name, but I don't know  02:12

15    about it.                                          02:12
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 219

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          ██     ████████████████████        ████

██    ████████████████████████        ████

██    ███████        ████

██     ██    █████████████████████        ████

██    ████████████████████        ████

██     ██    █████████████████████        ████

██    ████████████████   ██████████        ████

██    ████████████        ████

██        ██████████████████████        ████

██    ███████████████████████████        ████

██    ██████████████████████████        ████

██    ██████████████████        ████

██    ██████████████████        02:15

14          Q.   Okay.  Is there -- so you said this        02:15

15    already, but just for foundation, what were private        02:15

16    APIs?        02:15

17          A.   Private APIs are APIs that are not in        02:15

18    general availability and whose access control is        02:15

19    maintained by partnerships.        02:15

20          Q.   By -- I'm sorry -- maintained by what?        02:15

21          A.   Partnerships.  So someone in partnerships        02:15

22    in the --        02:15

23          Q.   Somebody in partnerships, okay.        02:15

24          A.   -- would have to approve the access to        02:15

25    that given API.        02:15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        Q.    Okay.  And when was the first private API      02:15

2   launched?                                                 02:15

3        A.    I -- I honestly don't know.                    02:15

4        Q.    Was it like 2012 or 2014 or --                 02:16

5        A.    I -- I believe that private APIs have          02:16

6   always been there since the invention of Facebook.        02:16
```

Page 221

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1  ███████████                              ████
    █    █   ██████████
    █        ██████    ████████             ████
    █                  ████████             ████
    █        ███████    ████                ████
    █        ██████                         ████
    █████████                               ████
    █        ████    ████████████████       ████
    █        ████████                       ████
    █        ██    ████████████████████     ████
    █        ██████████                     ████
```

10        Q.    Okay.  Do you know if there's a private      02:17

11   API associated with it?                                  02:17

12        A.    I don't.                                      02:17

13        Q.    So when an API is providing, in response      02:17

14   to a call, an object like a photo, does that photo       02:17

15   also come with metadata?                                 02:17

16        A.    Yes, it does.                                 02:17

17        Q.    Okay.  And what's an example of the kinds     02:17

18   of metadata that's attached?                             02:17

19        A.    The time-stamp of the photo, when it was,     02:17

20   you know, taken, when it was uploaded.                   02:17

21        Q.    And --                                        02:17

22        A.    The location of the photo, if it was          02:17

23   started in the first place by the user, things like      02:17

24   that.                                                    02:17

25        Q.    Is there a metadata field for whether or      02:17

                                              Page 222

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    not a photo is -- was for a restricted audience          02:17

2    only, like public or private?                            02:17



18                    (The record was read by the             02:18

19                    court reporter, as requested)            02:18

20   BY MS. WEAVER:                                            02:18

21

Page 223

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1

2

3

4                                                           02:19

5        Q.   Okay.

6                                                           02:19

7

8

9                                                           02:19

10       A.   Okay.

11                                  right?                  02:19

12

13

14                                                          02:19

15       A.   Okay.

16                              , right?                    02:19

17       Q.   Yes.                                          02:19

18       A.

19

20                                                          02:19

21       Q.   Right.                                        02:19

22       A.   Right?   That's the scenario?                 02:19

23       Q.   Right.                                        02:20

24       A.

25                                                          02:20

Page 224



1        Q.    Yes.                                              02:20

Page 225

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     ████████████████████████████████    ████

■     █████████████████           02:21

3       A.    No.            02:21

4       Q.    █████████████████████    ████

■     ████████████████████████████████    ████

■     ██████████████████           ████

■       ██   █████████████████████    ████

■     █████████████████████████████████    02:21

9       Q.    Okay.   ███████████████    ████

■     █████████████████████████████████    ████

■     █████████████            02:22

12      A.    ██████████████████████    ████

■     ████████████████████████      ████

■     █████████████████████████     ████

■     ███████              02:22

16       Q.    And when you say "signature," what do you    02:22

17   mean?              02:22

18       A.    I mean that loosely, like it comes with    02:22

19   some information that identifies the app --    02:22

20       Q.    Okay.           02:22

21       A.    -- that makes that API request.    02:22

22       Q.    What were extended APIs?    02:22

23       A.    "Extended APIs" is a term we use to    02:22

24   describe private APIs.        02:22

25       Q.    Okay.  Makes sense.  And then you're    02:22

Page 226

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | familiar with the phrase "PMD"? | 02:23 |
| 2 | A.   Yes. | 02:23 |
| 3 | Q.   And what is that? | 02:23 |
| 4 | A.   I think it stands for preferred marketing | 02:23 |
| 5 | development. | 02:23 |
| 6 | Q.   And give me an example of a preferred | 02:23 |
| 7 | marketing developer. | 02:23 |
| 8 | A.   I think Salesforce may be one of them. | 02:23 |
| 9 | Q.   So is that a kind of partner? | 02:23 |
| 10 | A.   Yes, it would be partners mostly having | 02:23 |
| 11 | access to marketing APIs.  That's why it's called | 02:23 |
| 12 | preferred marketing developers, because of their | 02:23 |
| 13 | access to the marketing APIs. | 02:23 |
| 14 | Q.   What's a marketing API? | 02:23 |
| 15 | A.   APIs that allow a third party to run at | 02:23 |
| 16 | (indecipherable). | 02:23 |
| 17 | Q.   And how is that different than custom | 02:23 |
| 18 | audience? | 02:23 |
| 19 | A.   Custom audience is a feature that is | 02:23 |
| 20 | accessible through the market behavior. | 02:23 |
| 21 | Q.   Okay.  What other features are available | 02:23 |
| 22 | on marketing APIs other than custom audience? | 02:23 |
| 23 | A.   So this is not necessarily my expertise, | 02:23 |
| 24 | so I may be missing certain things.  But the | 02:23 |
| 25 | marketing API allows you to schedule a marketing | 02:24 |

Page 227

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | campaign on Facebook the way you would otherwise do | 02:24 |
| 2 | it if you were going to facebook.com and doing it on | 02:24 |
| 3 | the platform. | 02:24 |
| 4 | MS. STEIN:  Hey, Lesley, when you get to a | 02:24 |
| 5 | good break point, can we take a short break? | 02:24 |
| 6 | MS. WEAVER:  I think it's time to take a | 02:24 |
| 7 | break now, if that's what's popular and democratic. | 02:24 |
| 8 | We can reconvene in ten minutes or so. | 02:24 |
| 9 | THE VIDEOGRAPHER:  We are off the record | 02:24 |
| 10 | at 2:24 p.m. | 02:24 |
| 11 | (Recess.) | 02:24 |
| 12 | (Off record:  2:24 p.m.) | 02:24 |
| 13 | (On record:  2:37 p.m.) | 02:24 |
| 14 | THE VIDEOGRAPHER:  We are on the record at | 02:37 |
| 15 | 2:37 p.m. | 02:37 |
| 16 | BY MS. WEAVER: | 02:37 |
| 17 | Q.   You understand you're still under oath? | 02:37 |
| 18 | A.   Yes, I do. | 02:38 |
| 19 | Q.   Okay.  Thank you. | 02:38 |
| 20 | Who -- how were decisions made about what | 02:38 |
| 21 | third parties had access to data through private | 02:38 |
| 22 | APIs? | 02:38 |
| 23 | MS. STEIN:  That's outside the scope of | 02:38 |
| 24 | about how decisions were made, but if you want to | 02:38 |
| 25 | ask, you know, who had access, that's fine. | 02:38 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                  02:38

 2       Q.   Please answer.                          02:38

 3       A.   ████████████████████████               ██████

 ▮   █████████████████████████████████               ██████

 ▮   █████████████████████████████████               ██████

 ▮   ███████████████████                             ██████

 ▮       ███     ████████████████████                ██████

 ▮       ███     ████████████████  █████████████     ██████

 ▮   ██████████████████████████████████              ██████

 ▮   ████████████████████████████████████████        ██████

 ▮   ████████████   ████████████████████            ██████

 ▮   █████████████████████████████████████           ██████

 ▮   █████████████████████████████                   ██████

 ▮   ██████████████████████████████                  ██████

 ▮   ████████████                                     02:39

16       Q.   What do you mean by "use case"?         02:39

17       A.   For example, if the API is meant to give   02:39

18   access to a user's photos and it's a photo editing   02:39

19   app, that seems to be an obvious use case, right?   02:39

20           But if, let's say, the app is -- I don't   02:39

21   know -- let's say a fitness app requesting access to   02:39

22   Facebook user photos, it doesn't seem to, you know,   02:39

23   make a lot of sense, so we would have to make sure   02:39

24   that we understand exactly the use case that the   02:39

25   fitness app wants to power that would make use of   02:40
```

Page 229

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | their access to users' photos. | 02:40 |
| 2 | Q.   And who was involved in making those | 02:40 |
| 3 | decisions? | 02:40 |
| 4 | MS. STEIN:  Objection.  Outside the scope. | 02:40 |
| 5 | MS. WEAVER:  You will not let me explore | 02:40 |
| 6 | who made those decisions so that we can figure out | 02:40 |
| 7 | who to talk to about those issues? | 02:40 |
| 8 | MS. STEIN:  Lesley, you weren't even | 02:40 |
| 9 | supposed to be asking about decision-making.  But I | 02:40 |
| 10 | mean if you -- if you want to ask the witness if he | 02:40 |
| 11 | knows who the right people are to talk about things, | 02:40 |
| 12 | you can ask him for this particular question, but, | 02:40 |
| 13 | please, why don't you focus on the topics that Judge | 02:40 |
| 14 | Corley directed this deposition to be about. | 02:40 |
| 15 | BY MS. WEAVER: | 02:40 |
| 16 | Q.   During the time period 2012 to 2017, who | 02:40 |
| 17 | decided which third parties would have extended | 02:40 |
| 18 | permissions and therefore access to more third-party | 02:40 |
| 19 | data? | 02:40 |
| 20 | A.   Again, depending on the API, it would be | 02:40 |
| 21 | the product manager, the partnerships person.  Maybe | 02:40 |
| 22 | engineering and design may have been involved. | 02:41 |
| 23 | Legal may have been involved. | 02:41 |
| 24 | Q.   I'm hoping for names.  Who were the | 02:41 |
| 25 | project managers who had that authority? | 02:41 |

Page 230

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    ██████████████████████████████      ████████
 █    ███████████████████████████████████████       ████████
 █    ██████████████████████████████████████             02:41
 4        Q.    How about ████████  or ████████           02:41
 5        A.    ███████████████████████████████████      ████████
 █      ██████████████                                     02:41
 7        Q.    I'm asking, who were the product managers  02:41
 8    who were in charge of them?  Who decided whether or  02:41
 9    not they would be whitelisted?                        02:41
10        A.    The product managers are in charge of an   02:41
11    API.  So it's product manager that owns every one of 02:41
12    those APIs, and the question, would he have been     02:41
13    part of the decision-making.  But it's not the       02:41
14    single product manager that would be responsible for 02:41
15    allowing access to Salesforce.                        02:41
16        Q.    Can you identify a single person by name   02:41
17    who was involved in decision-making around which     02:41
18    third parties would get extended permissions during  02:42
19    2012 to 2017?                                         02:42
20        A.    So what do you mean by extended            02:42
21    permissions?                                          02:42
22        Q.    Private APIs.                               02:42
23        A.    Again, the number of private APIs is       02:42
24    significant for a single person to have been         02:42
25    involved.                                             02:42
```

Page 231

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      ████                ██████████████████████              ████

 █      ██████████████████████                                 ████

 █      ████    ██████████████████████████████████████        ████

 █      ████████████████                                    02:42

 5      Q.   Any name.                                      02:42

 6      A.   I have been involved in some of that --        02:42

 7      Q.   Right.                                         02:42

 8      A.   ████████████████████████████                   ████

 █      ██████████████████████████████████████████         ████

 █      ████████████████████████                           02:42

11      Q.   Was it so hard for you to come up with         02:42

12   your own name?                                         02:42

13      A.   See, it's confusing when you're dropping a     02:42

14   lot of different things in one sentence.               02:42

15      Q.   Okay.  ████████████████████████                ████

 █      ████████████████████████████████████████████       ████

 █      ████████████████████                               02:42

18      A.   Again --                                       02:42

19           MS. STEIN:  Objection.  Lesley, can we         02:43

20   please focus on the topics that Judge Corley ordered   02:43

21   this deposition to be about?  It is not about who      02:43

22   did what when.  He's not the person most              02:43

23   knowledgeable on these issues.  He's here to testify   02:43

24   about what data gets collected by Facebook during     02:43

25   2012 and 2017, what they had, and what could be       02:43
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   shared or accessed by third parties.                02:43

 2   BY MS. WEAVER:                                       02:43

 3       Q.   Are you declining to identify even one      02:43

 4   name other than your own?                            02:43

 5           MS. STEIN:  Asked and answered.  He gave     02:43

 6   you a name.  You asked for one name.                 02:43

 7           MS. WEAVER:  Deb, I'm not asking --          02:43

 8           MS. STEIN:  He gave it to you.               02:43

 9           MS. WEAVER:  I can -- we can all read the    02:43

10   transcript.  I'm asking the witness.                 02:43

11       Q.   Can you identify one name other than your   02:43

12   own who was involved in deciding what third parties  02:43

13   had access to users' data during the time period     02:43

14   2012 - 2017 through private APIs?                     02:43

15       A.   User data and private APIs.  Not            02:43

16   salesperson.                                          02:43

17       Q.   Okay.                                        02:43

18       A.   I'm trying -- I'm just trying to             02:43

19   understand what you're looking for.                   02:43

20           MS. WEAVER:  Will you read the question      02:44

21   back, please?                                         02:44

22                   (The record was read by the          02:44

23                   court reporter, as requested)         02:44

24           THE WITNESS:  I cannot remember anybody      02:44

25   but myself at this point to give you answer to those 02:44
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    question.                                          02:44

2    ███████████                                        ██

███   ██    ███                                         ██

███   ██    █████████████████████                      ██

███   ██████████████                                    ██

███   ██    █████████████████████████                   ██

███   ██    █████████████████████████                   ██

███   ████                                              ██

███   ██    ████████████████████                        ██

███   ██    ██████████████                              ██

███   ██    ████████████████████                        ██

███   █████████████████████                             ██

███   ██    ████████████████████████                    ██

███   █████████████                                    02:45

15       Q.   Okay.  And we discussed briefly before    02:45

16   that friends permissions were deprecated.  Do you   02:45

17   recall that?                                        02:45

18       A.   Yes.                                       02:45

19       Q.   Roughly how many capabilities were related 02:45

20   to friends permissions that were deprecated?        02:45

21       A.   Okay.  This is the question that I need     02:45

22   clarification.  What was deprecated was the access   02:45

23   to friends permission -- sorry -- friends data      02:45

24   through the API.  As a consequence of the API being  02:45

25   deprecated, friends-related permissions were        02:45

Page  234

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | deprecated as well, meaning that there was no point | 02:45 |
| 2 | in us allowing a user to go through a consent flow | 02:45 |
| 3 | for pieces of information that were no longer | 02:45 |
| 4 | available, right? | 02:46 |
| 5 | Capabilities that gave access to the same | 02:46 |
| 6 | data through private APIs were not deprecated until | 02:46 |
| 7 | later on in 2018 because it was the same | 02:46 |
| 8 | capabilities that enabled device integrations to | 02:46 |
| 9 | have access to that data for the purposes of | 02:46 |
| 10 | replicating core Facebook functionality. | 02:46 |
| 11 | THE REPORTER:  I'm sorry.  Core Facebook? | 02:46 |
| 12 | THE WITNESS:  Functionality. | 02:46 |
| 13 | THE REPORTER:  Thank you. | 02:46 |
| 14 | BY MS. WEAVER: | 02:46 |
| 15 | Q.   So is it true that certain friends | 02:46 |
| 16 | capabilities like friends about me, friends actions, | 02:46 |
| 17 | friends check-ins, friends online presence, friends | 02:46 |
| 18 | photo video tags were deprecated when friends | 02:46 |
| 19 | permissions were deprecated? | 02:46 |
| 20 | A.   So I think what you're referring to is | 02:46 |
| 21 | capabilities.  And I think I answered that question, | 02:46 |
| 22 | that those capabilities had to be there because they | 02:46 |
| 23 | gated access to the corresponding APIs that powered | 02:47 |
| 24 | device integrations.  And that doesn't happen until | 02:47 |
| 25 | late -- later on in 2018. | 02:47 |

Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.    Okay.  So those capabilities were not          02:47
 2    deprecated, the ones I just listed?                      02:47
 3        A.    I'm not aware of the specifics, but they       02:47
 4    seem to be capabilities related to device                02:47
 5    integrations.  And, as such, they -- they -- they        02:47
 6    wouldn't be deprecated before 2018.                      02:47
 7        Q.    Who would know about what was deprecated        02:47
 8    with regard to friends permissions?                      02:47
 9        A.    With regards to friends permissions, I          02:47
10    think I --                                               02:47
11        Q.    The issue that we're discussing right now,      02:47
12    you're saying --                                         02:47
13        A.    I'm --                                          02:47
14        Q.    I'm sorry, just allow me to -- allow me to      02:47
15    ask the question.                                        02:47
16              The very issue we're discussing right now,      02:47
17    you just said you don't know specifically.  Who          02:47
18    would?                                                   02:47
19        A.    I think you're using different terms in         02:47
20    places that are very confusing.  Like I said,            02:47
21    friends permissions were deprecated by May 1, 2015.      02:47
22    APIs that were attached to those permissions have        02:48
23    deprecated down at the same time.  Capabilities          02:48
24    which are -- are access controls to private APIs         02:48
25    that expose similar information were not deprecated      02:48
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | until 2018. | 02:48 |
| 2 | Q.   Okay.  Thank you.  I understand. | 02:48 |
| 3 | ███████████████████████████████████ | ████ |
| █ | ████████████████████████████████ | ████ |
| █ | ████████████████████ | 02:48 |
| 6 | MS. STEIN:  Objection to form. | 02:48 |
| 7 | THE WITNESS: ████████████████████ | ████ |
| █ | ████████████████████████████████ | ████ |
| █ | ███████████████████████████████████ | ████ |
| █ | ████████████████ | 02:48 |
| 11 | BY MS. WEAVER: | 02:48 |
| 12 | ██ ██████████████████████ | ████ |
| █ | ███████████████████████████████████ | ████ |
| █ | ███████████████████ | 02:48 |
| 15 | Who is knowledgeable on that topic? | 02:48 |
| 16 | MS. STEIN:  Okay.  Lesley, this deposition | 02:48 |
| 17 | is not about that subject. | 02:48 |
| 18 | BY MS. WEAVER: | 02:49 |
| 19 | Q.   Are you refusing to provide a name? | 02:49 |
| 20 | A.   Look, I think that you -- what you're | 02:49 |
| 21 | asking is not really what you intend to ask.  That's | 02:49 |
| 22 | why I'm really confused.  Because the question you | 02:49 |
| 23 | ask me is very different from the specification you | 02:49 |
| 24 | provide to my counsel. | 02:49 |
| 25 | So can we actually be a little bit more | 02:49 |

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | precise?  What you're asking is who can tell me? | 02:49 |
| 2 | The developer docs can tell you.  That's the answer. | 02:49 |
| 3 | You don't need to reference a single human to | 02:49 |
| 4 | actually give you the -- the truth.  Because the | 02:49 |
| 5 | developer docs and the change log there is the | 02:49 |
| 6 | source of truth. | 02:49 |
| 7 | Q.   Who created the developer docs and the | 02:49 |
| 8 | change logs? | 02:49 |
| 9 | A.   They are automatically generated by the | 02:49 |
| 10 | code. | 02:49 |
| 11 | Q.   Who created the code? | 02:49 |
| 12 | A.   An engineer. | 02:49 |
| 13 | Q.   Do you know who the engineers are who | 02:49 |
| 14 | created the code? | 02:49 |
| 15 | A.   It's probably not a single engineer that | 02:49 |
| 16 | created that code. | 02:49 |
| 17 | Q.   Can you name one name? | 02:49 |
| 18 | A.   I don't remember a specific name of an | 02:49 |
| 19 | engineer. | 02:49 |
| 20 | Q.   Do you know whether or not auto granted | 02:50 |
| 21 | friends videos was deprecated? | 02:50 |
| 22 | A.   No, I don't remember the exact date. | 02:50 |
| 23 | Q.   Who would know? | 02:50 |
| 24 | A.   I really cannot tell you who would know. | 02:50 |
| 25 | Q.   Is that in the developer pages? | 02:50 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        A.    Private APIs are not documented in the        02:50

2    developer pages.                                        02:50



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

```
 1        Q.   Yes.                                     02:52
 2    ███   ████████████████████████████████        ████
   ██  ███████████████████████████████████████       ████
   ██  ███████████████████████████████████████       ████
   ██  ███████████████████████████████████████       ████
   ██  █████████████████████                          ████
   ██  ███   ██████   ██████████████████████████      ████
   ██  ████████████                                   02:53
 9        A.   I can see it, yes.                       02:53
10        Q.   Okay.  Can you pull it up?              02:53
11        A.   Yes.                                    02:53
12        Q.   And I'm just going to ask you about a   02:53
13    question there on the front page, but take your  02:53
14    time.                                            02:53
15             (Pause while witness peruses document.) 02:54
16        A.   Okay.                                   02:54
17        Q.   Do you recognize Exhibit 4?             02:54
18        A.   Yes.                                    02:54
19        Q.   What is it?                             02:54
20        A.   It's an email exchange between myself and  02:54
21    four or five other people.                       02:54
22        Q.   That includes Simon Cross; is that      02:54
23    correct?                                         02:54
24        A.   That's correct.                         02:54
25        Q.   And the underlying email looks like he  02:54
```

Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | sent an email around January 29, 2015, to Steven | 02:54 |
| 2 | Elia; is that right? | 02:54 |
| 3 | A.   Let me see.  I have to go back. | 02:54 |
| 4 | Q.   Just look at the top of the page there. | 02:54 |
| 5 | A.   I think it's under chronological, the way | 02:54 |
| 6 | you look at it.  So the first thing, I'm looking | 02:54 |
| 7 | there at the bottom of the exhibit. | 02:54 |
| 8 | (Pause while witness peruses document.) | 02:54 |
| 9 | A.   Sorry, what -- how can I -- | 02:54 |
| 10 | Q.   Okay.  What does this document reflect? | 02:54 |
| 11 | Let me ask you a different question. | 02:55 |
| 12 | MS. STEIN:  Form. | 02:55 |
| 13 | BY MS. WEAVER: | 02:55 |
| 14 | Q.   Do you see where it says "Recent Activity" | 02:55 |
| 15 | and then it has a number there at the top of the | 02:55 |
| 16 | email? | 02:55 |
| 17 | A.   Yes. | 02:55 |
| 18 | Q.   What does that refer to, in general? | 02:55 |
| 19 | A.   I think that's a task number. | 02:55 |
| 20 | Q.   Okay.  What is a task number? | 02:55 |
| 21 | A.   So we used a tool that is called the task | 02:55 |
| 22 | monitor to track progress against specific things | 02:55 |
| 23 | that need to happen. | 02:55 |
| 24 | Q.   Okay. | 02:55 |
| 25 | A.   It's a program management tool of some | 02:55 |

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    sort.                                            02:55

 2         Q.    Thank you.                            02:55

 3              And just looking right at the very first   02:55

 4    message under "Task Description," do you see it says   02:55

 5    "Title," and then underneath that "Assigned to Eddie   02:55

 6    O'Neil"?                                         02:55

 7         A.    Yes.                                  02:55

 8         Q.    And then do you see there it says     02:55

 9    "Creator" and then your name?                    02:56

10         A.    Yes.                                  02:56

11         Q.    What does that mean?                  02:56

12         A.    Who has initiated the -- the task, that   02:56

13    would be the creator, and who the task is assigned   02:56

14    to is the person that has the obligation to complete   02:56

15    the task.                                        02:56

16         Q.    Okay.  And then when it says          02:56

17    "Description," there's a description.  Do you see   02:56

18    that?                                            02:56

19         A.    Yes.                                  02:56

20         Q.    And is that a description that you wrote?   02:56

21         A.    Yes.                                  02:56

22         Q.    Okay.  And so you wrote ███████       ████

      ██ █████████████████████████████████            ████

      ██ ██████████████                               02:56

25              Do you see that?                       02:56
```

Page 243



```
 1        A.   Yes.                                    02:56

 2        Q.   And you wrote ████████████████         ████

 ██   ████████████████████████████████████████       ████

 ██   ████████████                                    02:56

 5             Do you see that?                        02:56

 6        A.   Yes.                                    02:56

 7        Q.   ████████████████                        ████

 ██      ██   ████████████████████████████            ████

 ██   ████████████████████████████                    02:56

10        Q.   Okay.  And then do you see the next     02:56

11   sentence, ████████████████████████████           ████

 ██   ████████████████████████████████████            ████

 ██   ████████████████████████████████████            ████

 ██   ████████████████                                02:57

15             Do you see that?                        02:57

16        A.   Yes.                                    02:57

17        Q.   ████████████████████████████████       ████

 ██   ████████████                                    02:57

19        A.   I don't remember exactly what we did for 02:57

20   ████████████████████████████████                 ████

 ██   ████████████                                    02:57

22        Q.   Okay.  ████████████████████████        ████

 ██   ████████                                        02:57

24        A.   Yes.  I believe I already answer that  02:57

25   question.                                         02:57
```

Page 244



```
 1        Q.    Okay. ████████████████████████  █████

██   ████████████████████████████████████   █████

██       ██    ████████████████            █████

██       ██    ██████████████████████       █████

██       ██    ██████████████████████       02:57

 6        Q.    Okay. ████████████████████   █████

██   ████████████████████                    █████

██       ██    ████████████████████████       02:58

 9        Q.    Okay. ██████████████████████████   █████

██   ████████████████████████████████████████   █████

██   ████████████████████████████████████████   █████

██   ██████████                               █████

██       ██    ████████████████████████       █████

██   ██████████████                           02:58

15        Q.    Okay. ██████████████████████   █████

██   ████████████  ██████████████████         █████

██       ██    ████████████████████████████   █████

██   ████████████████████████████████         █████

██   ██████████  ████████████████████████████   █████

██   ██████████████                           █████

██       ██    ████████████████████████████   █████

██   ████████████████                         █████

██       ██    ████████████████   No, I haven't heard   02:58

24   of that statement.                        02:58

25        Q.    Okay.  Okay. ████████████████████████   02:58
```

Page 245



```
 1    �conc                                       ▬▬
 ▬    ▬     ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                      ▬▬
 ▬    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                          ▬▬
 ▬    ▬▬▬▬▬▬▬▬                                     ▬▬
 ▬    ▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬                             ▬▬
 ▬    ▬▬▬▬▬▬▬                                   02:59
 7    A.   Yes.                                 02:59
 8    Q.   ▬▬▬▬▬▬▬▬                             02:59
 9    A.   No.                                  02:59
10    Q.   ▬▬▬▬▬▬▬                                ▬▬
 ▬    ▬   ▬▬▬▬▬▬  ▬▬▬▬▬▬▬▬                         ▬▬
 ▬    ▬   ▬▬▬▬▬▬▬▬▬▬                               ▬▬
 ▬    ▬   ▬▬▬▬▬▬▬  ▬▬▬▬▬                           ▬▬
 ▬    ▬   ▬▬▬▬▬▬▬▬▬▬                               ▬▬
 ▬    ▬▬▬▬▬                                     02:59
16    A.   Possibly, but I don't know.          02:59
17    Q.   Okay.  ▬▬▬▬▬▬▬▬▬                        ▬▬
 ▬    ▬▬▬▬▬▬▬▬▬▬▬                               02:59
19    A.   No.                                  02:59
20    Q.   ▬▬▬▬▬▬▬▬▬                            02:59
21    A.   No.                                  02:59
22    Q.   ▬▬▬▬▬▬▬▬▬ ▬                            ▬▬
 ▬    ▬▬▬▬▬▬▬▬                                     ▬▬
 ▬    ▬  ▬▬▬▬▬▬  ▬▬▬▬▬▬▬                           ▬▬
 ▬    ▬▬                                        03:00
```

Page 246

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        Q.    Do you have an understanding as to whether     03:00

2    it ███████████████████████████████████████████████████   ████

█    ██████████████████                                        ████

█    █████  ███████████████████████████████                    ████

█    █████████████  ██████████████████                         ████

█    █████  ███████████████████████████████████████            ████

█    █████████████████████████████████████████                 ████

█    ████████████████████████████████████████                  ████

█    ██████████████████████████████████████                    03:00

10       A.    Could you repeat that description?             03:00

11       Q.    Sure, sure.                                    03:00

12                     █████████████████████████████████████  ████

█    ██████████████████████████████████████████████████████   ████

█    ██████████████████████████████████████████████████████   03:00

15       A.    Okay.  I don't know that's --                 03:00

16       Q.    I'll try it this way.                         03:01

17       A.    I don't know that.                            03:01

18       Q.    A ██████████████████████████████████████████  ████

█    █████████████████████  ██████████████████████████████    ████

█    ██████████████████████████████████████████████████████   ████

█    ███████████████████████████                              03:01

22       A.    I mean, I understand --                       03:01

23             MS. STEIN:  Objection to form.                03:01

24             THE WITNESS:  Sorry.                          03:01

25             MS. STEIN:  Objection to form.                03:01
```

                                              Page  247

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1            THE WITNESS:  I ████████████████        ████
 █    █████████████████████████████████████████        ████
 █    ███████████████████████████████████████         ████
 █    ██████████████████████████████████               03:01
 5    BY MS. WEAVER:                                    03:01
 6        Q.   ██████████████████████████████          ████
 █       █   ███████████████████       ████████        ████
 █    ███████                                           ████
 █       █   ███████████████████████                   03:01
10        A.   I don't know either.                     03:01
11        Q.   ███████████████████████████████         ████
 █    ████████████████████████████████████████         ████
 █    █████████████████████████                         03:02
14            MS. STEIN:  Objection to form.            03:02
15            THE WITNESS:  I don't know.               03:02
16    BY MS. WEAVER:                                    03:02
17        Q.   ███████████████████████                 ████
 █       █   ████████████████████████████████████      ████
 █    ███████████████                                   03:02
20        Q.   Of the what?                             03:02
21            THE REPORTER:  I'm sorry.  ████████████   ████
 █    ████████████████   ████████████████████          ████
 █    █████████████████████████                         03:02
24    BY MS. WEAVER:                                    03:02
25        Q.   And what specifically, ███████████████   03:02
```

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1    ███████████████████                    03:02

 2    A.   Okay.  ███████████████████        ████

 █    ███████████████████████████████        ████

 █    ███████████████████████████  ████       ████

 █    ████████████████                        03:02

 6    Q.   Uh-huh.                             03:02

 7    A.   ██████████████████████             ████

 █    ██████████████████████  ██              ████

 █    ███████████████████████████████        ████

 █    █████████████████████████████           ████

 █    ███████████                             ████

 █    █████████████████████████████           ████

 █    ███████████████████████████████        ████

 █    ███████████████  ██████████            ████

 █    ███████████████████████████████        ████

 █    ███████████████  ██████████████        ████

 █    ████████████████████████████           ████

 █    ███████████████████████████████        ████

 █    ██████████                              ████

 █    █    ██████████████████████            03:03

21    A.   I don't remember.                   03:03

22    Q.   █████████                           03:03

23    A.   I don't remember.                   03:03

24    Q.   So ██████████████████████          ████

 █    ████████  Do you remember that?         03:03
```

                                    Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 03:03 |
| 2 | Q.    So does Facebook use the data that it | 03:03 |
| 3 | collects about users to identify the interests that | 03:03 |
| 4 | they have? | 03:04 |
| 5 | A.    Facebook identifies -- | 03:04 |
| 6 | MS. STEIN:  Object to form.  Objection to | 03:04 |
| 7 | form. | 03:04 |
| 8 | THE WITNESS:  So Facebook identifies the | 03:04 |
| 9 | interest based on the user's action on the platform. | 03:04 |
| 10 | I like (indecipherable).  It's a way for us to | 03:04 |
| 11 | identify a user's interests. | 03:04 |
| 12 | BY MS. WEAVER: | 03:04 |
| 13 | Q.    What -- Facebook also receives information | 03:04 |
| 14 | from other third parties like app developers and | 03:04 |
| 15 | data brokers and other partners, correct? | 03:04 |
| 16 | MS. STEIN:  Objection to form. | 03:04 |
| 17 | THE WITNESS:  I guess.  But as we | 03:04 |
| 18 | discussed, the data that's -- is being given by | 03:04 |
| 19 | third parties may be anonymized, may not be user | 03:04 |
| 20 | data.  So I cannot answer that question without -- | 03:04 |
| 21 | BY MS. WEAVER: | 03:04 |
| 22 | Q.    What -- what -- | 03:04 |
| 23 | A.    -- a little bit more specificity. | 03:04 |
| 24 | Q.    Why does Facebook collect data from other | 03:04 |
| 25 | third parties? | 03:04 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Why? | 03:04 |
| 2 | Q.   Yes. | 03:04 |
| 3 | A.   For many reasons.  For example, if you log | 03:05 |
| 4 | in with Facebook on a third-party app, there's no | 03:05 |
| 5 | way for us not to be able to provide that data. | 03:05 |
| 6 | It's part of the service. | 03:05 |
| 7 | Q.   Okay.  What's another reason? | 03:05 |
| 8 | A.   For the purposes of allowing people to | 03:05 |
| 9 | express themselves using a third-party app.  Again, | 03:05 |
| 10 | within 2020 -- sorry, 2012 and 2017, people could | 03:05 |
| 11 | post back to Facebook using a third-party app.  That | 03:05 |
| 12 | is -- | 03:05 |
| 13 | Q.   Does Facebook use any of the information | 03:05 |
| 14 | it obtains from third parties to develop the | 03:05 |
| 15 | interest categories through which users are | 03:05 |
| 16 | targeted? | 03:05 |
| 17 | MS. STEIN:  Objection to form. | 03:05 |
| 18 | THE WITNESS:  I don't know. | 03:05 |
| 19 | BY MS. WEAVER: | 03:05 |
| 20 | Q.   You don't know? | 03:05 |
| 21 | A.   I don't think so. | 03:05 |
| 22 | Q.   What's the basis of your saying "I don't | 03:05 |
| 23 | think so"? | 03:05 |
| 24 | A.   Because, again, the question is very | 03:06 |
| 25 | broad.  If you are talking about pixel data that are | 03:06 |

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    provided by third parties, yes, that informs the ads      03:06
 2    targeting, but it doesn't form the interests.             03:06
 3        Q.   Can you identify for a user what interest         03:06
 4    categories they have been placed in?                      03:06
 5        A.   Those categories that have been placed in,        03:06
 6    which I am not -- I'm not sure that I agree with           03:06
 7    that term -- would be identified for the user under        03:06
 8    their app -- sorry, under their Facebook settings in       03:06
 9    the DYI file.                                              03:06
10        Q.   And that DIY file, is it completely               03:06
11    historical?  So it will show me yesterday I was in         03:06
12    this interest category and five days ago I was in          03:06
13    this category?  Or does it just list the categories        03:06
14    in general?                                                03:06
15        A.   Just lists the categories in general.            03:06
16        Q.   And if I'm no longer in a category, does          03:06
17    it list that category?                                     03:07
18        A.   No.                                               03:07
19        Q.   And the lists of interest change over             03:07
20    time, then, right?                                         03:07
21        A.   It depends on how you use the platform.           03:07
22    If you haven't used the platform for the last five         03:07
23    years, probably not.                                       03:07
24        Q.   Okay.  But let's just say it's you.  When         03:07
25    were you last on the platform?                             03:07
```

Page 252

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1         A.   I don't know.  Maybe during the lunch      03:07

2    break.                                               03:07

3         Q.   Okay.  So do your interest categories      03:07

4    change over time?                                    03:07

5              MS. STEIN:  We're talking about 2012 to    03:07

6    2017.                                                03:07

7    BY MS. WEAVER:                                       03:07

8         Q.   Did your interest categories change        03:07

9    between 2012 and 2017?                               03:07

10        A.   I'm pretty certain that they had.          03:07

11        Q.   Okay.  And what causes them to change?     03:07

12        A.   The thought that they may have taken        03:07

13   action against certain entities that I have          03:07

14   expressed an affinity about.                         03:07

15        Q.   Do they change at all based on information 03:07

16   Facebook learns about whether those interests are -- 03:07

17   provide for effective ad placement?                  03:08

18        A.   I'm almost certain that I'm confused right 03:08

19   now.  Can you repeat the question?                   03:08

20             MS. WEAVER:  Please read it back.          03:08

21                  (The record was read by the           03:08

22                   court reporter, as requested)        03:08

23             THE WITNESS:  I'm still having a hard       03:08

24   time, but let me try to answer the question the way  03:08

25   I understand, all right?                             03:08
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              Are those interests used to inform ad        03:08

 2   targeting criteria?  The answer is yes.               03:08

 3   BY MS. WEAVER:                                        03:08

 4        Q.   And Facebook provides analytic data to      03:08

 5   advertisers about how effective its advertisements    03:08

 6   are, correct?                                         03:08

 7        A.   Facebook provides performance data to the   03:08

 8   advertisers, yes.                                     03:08

 9        Q.   What is performance data?                   03:08

10        A.   It's an aggregated list of data that        03:08

11   suggests whether an ad has been viewed by certain     03:09

12   number of people that have seen -- visited the        03:09

13   third-party website or took an action on the          03:09

14   third-party website.                                  03:09

15        Q.   And when you say "an ad," what do you        03:09

16   mean?                                                 03:09

17        A.   An ad is being defined as a story that      03:09

18   shows up on your Facebook News Feed that is not       03:09

19   necessarily generated by a friend or a page you       03:09

20   follow but is sponsored by a third party.             03:09

21        Q.   So an ad could include something that       03:09

22   wasn't -- well, strike that.                          03:09

23              So there's one category of ads that         03:09

24   literally looks like an ad to the user, "Go buy       03:09

25   these shoes"; is that correct?                        03:09
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Sure, yes. | 03:09 |
| 2 | Q.   Right.  And then there's -- there are | 03:09 |
| 3 | other categories of ads that don't look like | 03:09 |
| 4 | advertisements necessarily but it's something that | 03:09 |
| 5 | shows up in the News Feed; is that right? | 03:09 |
| 6 | A.   Every single ad unit that shows up on your | 03:09 |
| 7 | News Feed is clearly identified as an ad. | 03:09 |
| 8 | Q.   Okay.  And how is it identified? | 03:09 |
| 9 | A.   Kind of different, but I think in most | 03:10 |
| 10 | cases you can see that this is a sponsored, you | 03:10 |
| 11 | know, like story or something like that. | 03:10 |
| 12 | Q.   Sponsored story?  Is that the language | 03:10 |
| 13 | from 2012 to 2017? | 03:10 |
| 14 | A.   I cannot remember the exact language.  I | 03:10 |
| 15 | think I need to look up some historical, you know, | 03:10 |
| 16 | like, UI treatment. | 03:10 |
| 17 | Q.   Are there documents at Facebook that | 03:10 |
| 18 | describe how interests are created? | 03:10 |
| 19 | A.   How interests are created?  I think I've | 03:10 |
| 20 | already responded to that question multiple times | 03:10 |
| 21 | today. | 03:10 |
| 22 | I think interests are associations for | 03:10 |
| 23 | certain people with certain entities -- entities | 03:10 |
| 24 | that exist on the Facebook platform -- and those | 03:10 |
| 25 | entities are public figures, businesses, anything | 03:10 |

Page 255

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   that is not a friend.                                03:10

 2        Q.   The question that I asked is, are there    03:10

 3   documents that describe how they're created?         03:10

 4        A.   I can only say one.                         03:11

 5        Q.   Are there web links or websites within     03:11

 6   Facebook that discuss how interests are being        03:11

 7   generated?                                            03:11

 8        A.   I haven't seen a public document about     03:11

 9   that, no.                                             03:11

10        Q.   Is there a team that focuses -- let me     03:11

11   just back up.                                         03:11

12             You've testified that interests change     03:11

13   over time, right?                                     03:11

14        A.   Yes.                                        03:11

15        Q.   And how -- who decides what the new        03:11

16   interests are and what the old interests are?        03:11

17        A.   Okay.  So let's assume that between 2012   03:11

18   and 2017 I started liking more pages.  That's        03:11

19   something that will further expand the list of       03:11

20   interests that I have.                                03:11

21             So if in 2012 I didn't like the Starbucks  03:11

22   page, but in 2015 I like the Starbucks page, that    03:11

23   means my interests can be updated.  It is an action  03:11

24   that is driven and dialed by me.  It's not --        03:11

25        Q.   What is -- got it.  I understand.          03:11
```

Page 256

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.   It's not something that the PM, or product          03:12

2  manager, at Facebook or someone else will dictate.          03:12

3  It's given by the user.          03:12

4    Q.   And there are algorithms that are running          03:12

5  on the page to identify these interests; is that          03:12

6  correct?          03:12

7        MS. STEIN:  Objection to form.          03:12

8        THE WITNESS:  A page will have a certain,          03:12

9  you know, like category associated with it.          03:12

10  BY MS. WEAVER:          03:12

11    Q.   What do you mean by "second category"?          03:12

12    A.   A certain category.  So a page would be --          03:12

13  a page of a singer or a page of an actor or a page          03:12

14  of a hairdresser or a page of a retailer.  That's          03:12

15  what derives the interest.          03:12

16    Q.   And so there's a historical record over          03:12

17  time of what I have been interested in the past and          03:12

18  I'm interested in today; is that fair?          03:12

19        MS. STEIN:  Objection to form.  Misstates          03:12

20  his testimony.          03:12

21        THE WITNESS:  The -- the interests are          03:12

22  derived from your association with Facebook pages.          03:12

23  If that list gets -- remain unchanged throughout the          03:13

24  years, that would mean that the interests' graph is          03:13

25  the same, exactly the same as it was back in the          03:13

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | day. | 03:13 |
| 2 | If in that time period you have expanded | 03:13 |
| 3 | your affiliation by liking or interacting with more | 03:13 |
| 4 | pages or other entities that have, you know, | 03:13 |
| 5 | associated with certain interests, that will | 03:13 |
| 6 | obviously update your interests as well. | 03:13 |
| 7 | BY MS. WEAVER: | 03:13 |
| 8 | Q.   Where is the interest graph maintained? | 03:13 |
| 9 | A.   For a given user? | 03:13 |
| 10 | Q.   Yes. | 03:13 |
| 11 | A.   It lives in the DYI file. | 03:13 |
| 12 | Q.   Facebook doesn't access the DIY file, | 03:13 |
| 13 | right?  That's for users to access data? | 03:13 |
| 14 | A.   Well, we provide the hosting of that file. | 03:13 |
| 15 | Q.   Right.  So where is the actual data that | 03:13 |
| 16 | is extracted through the DIY tool?  Where is the | 03:13 |
| 17 | actual data in the interest graph maintained? | 03:13 |
| 18 | A.   I'm not sure I understand the question. | 03:13 |
| 19 | Q.   Okay.  The DIY file is created through a | 03:14 |
| 20 | tool to face the users, right? | 03:14 |
| 21 | A.   Yes. | 03:14 |
| 22 | Q.   Okay.  If I'm an advertiser and I'm -- | 03:14 |
| 23 | come to you and I say "I want to target people with | 03:14 |
| 24 | these interests," does Facebook go to the DIY tool? | 03:14 |
| 25 | A.   To do a lookup, no, that's not how. | 03:14 |

Page 258

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1      Q.    Exactly.                                              ███
                                                                  03:14
3            MS. STEIN:  Objection to form.                       03:14
4            Would you know let the witness explain,              03:14
5      Lesley?  He's clearly trying to tell you how this          03:14
6      works.                                                     03:14
7            THE WITNESS:  Okay.                                  ███

                                                                  03:15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1    ██████████████████████████████████████        ████████
 █    ████████████████████████████████████████      ████████
 █    ████████████████████████████████████████████  ████████
 █    ████████████                                   03:15
 5    BY MS. WEAVER:                                  03:15
 6        Q.   Okay.  I understand that.  But I'm asking    03:15
 7    you where --  ████████████████████████████████  ████████
 █    ████████████████████████████████████████████    ████████
 █    ████████                                         03:16
10        A.   Yes.                                    03:16
11        Q.   ████████████████                        03:16
12        A.   The way you ask it, I would say ████████  ████████
 █    ████████████                                     03:16
14        Q.   ██████████████████████████              ████████
 █    ██    ██████████████████████                      ████████
 █    ██    ████████████████  ████████████████          ████████
 █    ██    ██████████████████                          ████████
 █    ██    ████████████████████  ████████████████      ████████
 █    ██████████████                                    ████████
 █    ██    ██████████████████████████                  ████████
 █    ████████████████████████████████████████████      ████████
 █    ██████████████████████████                        ████████
 █    ██    ████████████████████████████████████        ████████
 █    ████████████████████████████                      03:16
25        A.   No.                                      03:16
```

Page 260

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Why does Facebook allow advertisers to | 03:16 |
| 2 | custom target advertising through the selection of | 03:16 |
| 3 | interests? | 03:17 |
| 4 | MS. STEIN:  Objection to form.  Beyond the | 03:17 |
| 5 | scope. | 03:17 |
| 6 | Are you really asking questions about | 03:17 |
| 7 | targeting advertising?  Like that directly, Lesley? | 03:17 |
| 8 | I know you've done half the depo on it, but now you | 03:17 |
| 9 | want to know why Facebook does targeted advertising? | 03:17 |
| 10 | BY MS. WEAVER: | 03:17 |
| 11 | Q.   Please answer the question. | 03:17 |
| 12 | A.   Okay.  So there are a couple of | 03:17 |
| 13 | differentials here. | 03:17 |
| 14 | The first one is, how does advertisement | 03:17 |
| 15 | work in the first place?  So a business wants to | 03:17 |
| 16 | advertise on platforms where they can get better | 03:17 |
| 17 | ROI, better return on the investment for this | 03:17 |
| 18 | advertisement.  A lot of businesses still advertise | 03:17 |
| 19 | on TV. | 03:17 |
| 20 | And let's use Super Bowl as an example | 03:17 |
| 21 | because the audience that will attend Super Bowl is | 03:17 |
| 22 | falling into the demographics of users that business | 03:17 |
| 23 | is trying to attract.  That's -- that's why, I | 03:18 |
| 24 | guess, you see a lot of car manufacturers or junk | 03:18 |
| 25 | foods being advertised during Super Bowl.  Now, | 03:18 |

Page 261

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that's one way of doing advertisement.  It's mostly | 03:18 |
| 2 | brand. | 03:18 |
| 3 | THE REPORTER:  It's mostly what?  I'm | 03:18 |
| 4 | sorry. | 03:18 |
| 5 | THE WITNESS:  Brand.  Brand.  Brand. | 03:18 |
| 6 | A modern way of doing advertisement is by | 03:18 |
| 7 | effective advertising in platforms that can provide | 03:18 |
| 8 | a little bit more clarity and on the intent. | 03:18 |
| 9 | Because in that scenario you have higher chances of | 03:18 |
| 10 | having a better ROI for your marketing spend. | 03:18 |
| 11 | Facebook provides granular way for | 03:18 |
| 12 | advertisers to hit the right audiences because that | 03:18 |
| 13 | is very effective way for businesses and, therefore, | 03:18 |
| 14 | actually contributes to our business model very | 03:18 |
| 15 | effectively.  But at the same time we truly believe | 03:18 |
| 16 | that relevant ads have the opportunity to build a | 03:18 |
| 17 | better product experience for the users as well. | 03:18 |
| 18 | I can give you from my personal point of | 03:19 |
| 19 | view my perspective of using Facebook and Instagram | 03:19 |
| 20 | and all our products have become definitely better | 03:19 |
| 21 | when the ads that I could see on those products are | 03:19 |
| 22 | more relevant to me. | 03:19 |
| 23 | BY MS. WEAVER: | 03:19 |
| 24 | Q.   Do you believe that most users join | 03:19 |
| 25 | Facebook because they want to receive ads? | 03:19 |

Page 262

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          MS. STEIN:  Objection to form.  Lacks        03:19

2     foundation.  Beyond the scope.                    03:19

3          THE WITNESS:  It's really hard for me to     03:19

4     understand or be able to identify the intention of 03:19

5     2.8 billion people.                               03:19

6     BY MS. WEAVER:                                    03:19

7          ██   ████████████████████████████           ████

 ██   ██████████████████████████████████████           ████

 ██   ████████████████████████████                     03:19

10         MS. STEIN:  Objection to form.               03:19

11    Argumentative.                                    03:19

12         THE WITNESS:  █████████████████████          ████

 ██   ███████████████████████████████████              ████

 ██   ████████████████████████████                     03:19

15    BY MS. WEAVER:                                    03:19

16         ██   ██████████████████████████             ████

 ██   ██████████████████████████████████████           ████

 ██   ██████████████████████████████████████           ████

 ██   ██████████████████                                ████

 ██        ██   ████████████████████████                ████

 ██   ████████████████                                  ████

 ██        ██   ██████████████████████████              ████

 ██   ███████████████                                   ████

 ██        ██   █████████████████████████               ████

 ██        ██   ███████████████████████████████         ████
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



22          MS. WEAVER:  Okay.  Why don't we take a    03:21

23   little break and I'll mark a few things.  I don't    03:21

24   think we'll be going that much longer.  Hold on just    03:21

25   a little longer.    03:21

Page 264

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | We can go off the record. | 03:21 |
| 2 | THE VIDEOGRAPHER:  We are off the record | 03:21 |
| 3 | at 3:21 p.m. | 03:21 |
| 4 | (Recess.) | 03:34 |
| 5 | (Off record:  3:21 p.m.) | 03:34 |
| 6 | (On record:  3:34 p.m.) | 03:34 |
| 7 | THE VIDEOGRAPHER:  We are on the record at | 03:34 |
| 8 | 3:34 p.m. | 03:34 |
| 9 | BY MS. WEAVER: | 03:34 |
| 10 | Q.   You understand you're still under oath? | 03:34 |
| 11 | A.   Yes, I do. | 03:34 |
| 12 | Q.   Okay.  So were you involved in collecting | 03:34 |
| 13 | or looking for documents that Facebook possesses | 03:34 |
| 14 | relating to the plaintiffs in this action? | 03:34 |
| 15 | A.   No. | 03:34 |
| 16 | Q.   Okay.  Do you know what Facebook did to | 03:34 |
| 17 | collect documents relating to the plaintiffs in this | 03:34 |
| 18 | action? | 03:34 |
| 19 | A.   My understanding is that we made available | 03:34 |
| 20 | the DYI file for each of the plaintiffs. | 03:34 |
| 21 | MS. WEAVER:  Okay.  We'll mark Plaintiffs' | 03:34 |
| 22 | 5 and 6, two Excel spreadsheets that were provided | 03:34 |
| 23 | us by Facebook's counsel.  This may take a second. | 03:34 |
| 24 | (Exhibit 5 was marked for | 03:34 |
| 25 | identification and attached.) | 03:34 |

Page 265

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | (Exhibit 6 was marked for | 03:34 |
| 2 | identification and attached | 03:34 |
| 3 | hereto.) | 03:34 |
| 4 | THE WITNESS:  Do you want me to do | 03:34 |
| 5 | anything? | 03:35 |
| 6 | BY MS. WEAVER: | 03:35 |
| 7 | Q.   Yes, will you pull them up? | 03:35 |
| 8 | A.   Shall we start with 5? | 03:35 |
| 9 | Q.   Sure.  Take a look at both Exhibits 5 and | 03:35 |
| 10 | 6 and tell me if you've seen them before. | 03:35 |
| 11 | A.   I'm just trying to understand what is the | 03:35 |
| 12 | file I'm looking at. | 03:35 |
| 13 | (Pause while witness peruses document.) | 03:35 |
| 14 | A.   Okay.  Can I look at 6? | 03:35 |
| 15 | Q.   Please do. | 03:36 |
| 16 | (Pause while witness peruses document.) | 03:36 |
| 17 | A.   Okay. | 03:36 |
| 18 | Q.   Have you seen these documents before? | 03:36 |
| 19 | A.   No, I haven't. | 03:36 |
| 20 | Q.   Okay.  Do you -- are you aware of Facebook | 03:36 |
| 21 | searching Hive databases to obtain documents | 03:36 |
| 22 | relating to the plaintiffs in this case? | 03:36 |
| 23 | MS. STEIN:  Objection to form. | 03:36 |
| 24 | THE WITNESS:  I don't know how to respond | 03:36 |
| 25 | to that question.  Are you talking about Hive | 03:36 |

Page 266

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    specifically?                                    03:36

2    BY MS. WEAVER:                                    03:36

3    ████   ████████████████████          ████

     ████████████████████████████████████ ████

     ███████████████████████████████████  ████

     ████████████████████████████████     ████

     ███████████████████████              ████

          ██████████████████████████████  ████

     ████████████████████████             ████

     ████    ████████████                 ████

     ████    ████  ████████████████████   ████

     ████████████████████████             ████

     ████    ████████████████████         03:37

14       Q.   Okay.  Do you know why -- I guess if you  03:37

15   don't know anything about that, I guess we'll just  03:37

16   have to come back.                               03:37

17            MS. WEAVER:  I think we need to go off the  03:37

18   record again.  We'll be back.  We're off the record.  03:37

19            THE VIDEOGRAPHER:  We are off the record  03:37

20   at 3:37 p.m.                                      03:37

21            (Recess.)                                03:38

22            (Off record:  3:37 p.m.)                 03:38

23            (On record:  3:47 p.m.)                  03:38

24            THE VIDEOGRAPHER:  We're on the record at  03:47

25   3:47 p.m.                                         03:47
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 03:47 |
| 2 | Q.   Returning just for a moment to Exhibits 5 | 03:47 |
| 3 | and 6, K.P., if you wouldn't mind, let's just look | 03:47 |
| 4 | at the columns on the left in those files.  And it | 03:47 |
| 5 | says "ds."  Do you know what that refers to? | 03:47 |
| 6 | A.   Sorry, just for the record, I'm under | 03:47 |
| 7 | oath. | 03:47 |
| 8 | Q.   Yes.  Good job.  Thank you. | 03:47 |
| 9 | A.   And if you're talking about column A, by | 03:47 |
| 10 | the format of the information there, I assume it's a | 03:48 |
| 11 | date. | 03:48 |
| 12 | Q.   And then it says "userid."  Would you | 03:48 |
| 13 | understand that to be Facebook user ID? | 03:48 |
| 14 | A.   I assume that's to be the case, yes. | 03:48 |
| 15 | Q.   And what is "event tim"? | 03:48 |
| 16 | A.   I'm sorry, I'm opening all the fields so I | 03:48 |
| 17 | can understand from the comments. | 03:48 |
| 18 | Q.   That's fine.  It's column C. | 03:48 |
| 19 | A.   Column C is probably when the specific | 03:48 |
| 20 | activity took place. | 03:48 |
| 21 | Q.   You think it's -- I mean, for example, | 03:48 |
| 22 | there's an entry for 46:37.1.  That's not a time. | 03:48 |
| 23 | Do you think -- what does that refer to? | 03:48 |
| 24 | MS. STEIN:  I'm just going to object for | 03:48 |
| 25 | lack of foundation. | 03:48 |

Page 268

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1            THE WITNESS:  I don't know what it may be.    03:48

2    I can only look at the description, but I agree with   03:48

3    you, the format doesn't suggest -- it's like --        03:48

4    BY MS. WEAVER:                                          03:48

5        Q.   ████████████████████████████           ████

         ████████████████████████████████             ████

         ███████████                                   03:49

8        A.   I don't know.                             03:49

9            MS. STEIN:  Objection to form.             03:49

10   BY MS. WEAVER:                                     03:49

11       Q.   Okay.  Are you aware of whether or not   03:49

12   ████████████████████████████████             ████

     ██████████████████████████████████           ████

     ██  ████████████████████████████████         ████

     ████████████████████████████████             ████

     ████████  ████████████████████████           ████

     ██████████████████████████████████           ████

     ████████  ████████████████████████           ████

     ████████████████                              ████

     ████  ████████████████████████████           ████

     ████████  ██████████████████████████████     ████

     ██████████████████████████████████████       ████

     ████████████████████████████████             ████

     ████████████                                  03:49

25       A.   My understanding of your question -- well,   03:49
```

                                                Page 269

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    ████████████████████    ███████████████    ████
     ████████████████████████████████████████    ████
     ████████████████████                        03:50

4         Q.   And do you believe that's contained in the      03:50
5    DIY file?                                                   03:50
6         A.   So the DYI file would include information         03:50
7    about the -- sorry.  Let me take a step back just to        03:50
8    make sure that I answer the question appropriately.         03:50
9              So the DYI file would have information             03:50
10   about a photo and when you uploaded that photo.  But        03:50
11   if you really want to check the privacy setting of          03:50
12   that photo there is probably a link that will link          03:50
13   you to the original post to check the privacy               03:50
14   setting of that photo.                                      03:50
15        Q.   You say "probably."  Do you know?                 03:50
16        A.   I -- I think that's my understanding of           03:50
17   what I would be looking at, the DYI file, if I had          03:50
18   it in front of me.                                          03:50
19        ██  ██████████████████████████    ████
     ███████████████████████████████████████    ████
     ██████████████████████████                  03:50
22             MS. STEIN:  Objection.  Lacks foundation.         03:51
23             THE WITNESS:  I don't know what am I               03:51
24   looking at here.                                            03:51
25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 03:51 |
| 2 | Q.   Okay.  Let me -- let me -- | 03:51 |
| 3 | A.   I see the user ID -- | 03:51 |
| 4 | Q.   Let me tell you that your counsel has | 03:51 |
| 5 | represented that this -- the first table logs events | 03:51 |
| 6 | related to the changes in user privacy settings, | 03:51 |
| 7 | including the old value and the new value.  Is it | 03:51 |
| 8 | your understanding that that is contained in the DIY | 03:51 |
| 9 | file? | 03:51 |
| 10 | A.   The change of the privacy settings doesn't | 03:51 |
| 11 | necessarily mean that the users has posted | 03:51 |
| 12 | something. | 03:51 |
| 13 | Q.   I don't understand your response.  I'm | 03:51 |
| 14 | just asking a simple question. | 03:51 |
| 15 | A.   Okay.  Your question is not that simple. | 03:51 |
| 16 | Q.   Let me ask my question, okay? | 03:51 |
| 17 |      Is the information contained in this -- | 03:51 |
| 18 | these logs in the DIY files for these people? | 03:51 |
| 19 |      MS. STEIN:  Objection to form.  And the | 03:51 |
| 20 | witness should feel free to explain his answer as he | 03:51 |
| 21 | was just trying to do. | 03:51 |
| 22 |      THE WITNESS:  Okay.  So let's say you go | 03:51 |
| 23 | to Facebook and you go to the composer and you look | 03:51 |
| 24 | at the privacy setting of your composer to be | 03:52 |
| 25 | public.  And you decide that whatever you are | 03:52 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    planning to post next is not relevant for the        03:52
 2    general public, but you only want to post it to your  03:52
 3    friends or you want to be accessible by your          03:52
 4    friends.                                              03:52
 5            Then you click on the option and you          03:52
 6    change the privacy setting.  That is locked.  But     03:52
 7    you haven't made the post yet.  If you made the       03:52
 8    post, that's when the information can actually be      03:52
 9    available in the DYI file.                            03:52
10            So every time you change your app settings    03:52
11    or your settings in the composer doesn't mean that    03:52
12    you create an entry that will be available in the     03:52
13    DYI file.                                             03:52
14    BY MS. WEAVER:                                        03:52
15        Q.   I'm just asking a very specific question.    03:52
16        A.   And I'm answering with the best of my        03:52
17    ability because what you are saying here is           03:52
18    different.                                            03:52
19        Q.   Yeah.  Is the answer that you don't know     03:52
20    whether or not this information is in the DIY file?   03:52
21            MS. STEIN:  Objection.  Form.                 03:52
22            THE WITNESS:  My -- my answer is that this    03:52
23    information there is not always associated with the   03:52
24    user posting a piece of content on Facebook, and as   03:53
25    a consequence of that, that is not going to be        03:53
```

Page 272

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    broadly available in the DYI file.                      03:53

2    BY MS. WEAVER:                                          03:53

3        Q.   Thank you.                                     03:53

4    ███████████████████████████████████    ██████

     ███████████████████████████████████    ██████

     ██████████████████████████████████████████    ██████

     ██████████████████████                                 03:53

8        A.   Didn't you ask me that question before?       03:53

9    And my answer was I don't know.                         03:53

10       Q.   Okay.  Has the data made available through    03:53

11   the DYI tool changed over time?                         03:53

12       A.   It's a very broad question.  Are you           03:53

13   talking about specific individual?                      03:53

14       Q.   I'm talking from 2012 to 2017, what -- how     03:53

15   has data made available in the DIY tool changed over    03:53

16   time?                                                   03:53

17       A.   I think the DYI file presents activity         03:53

18   that you have on the platform, and that's problem.      03:53

19   Because people are doing different things on the        03:54

20   platform than they did in 2012.                         03:54

21       Q.   Right.  I'm not talking about the content;     03:54

22   I'm talking about the capabilities.  So how has it      03:54

23   over time changed what users could obtain about         03:54

24   their activity through the DYI tool?                    03:54

25       A.   Again, the content is available if the         03:54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | features are available.  In that sense, yes, the | 03:54 |
| 2 | data would have changed. | 03:54 |
| 3 | Q.    Did the fields change? | 03:54 |
| 4 | A.    The fields described pieces of data, so | 03:54 |
| 5 | yes, they would have changed. | 03:54 |
| 6 | Q.    Okay.  Well, did the -- what I'm asking | 03:54 |
| 7 | is, in 2012 could I search for privacy settings, but | 03:54 |
| 8 | in 2017 I could not? | 03:54 |
| 9 | A.    No, that's -- that wouldn't have changed. | 03:54 |
| 10 | Q.    Are the same categories of information | 03:54 |
| 11 | available in the DYI tool in 2012 as it was in 2017? | 03:54 |
| 12 | A.    Again, for the sake of the argument, if | 03:54 |
| 13 | you were able to see photos posted in 2017, that | 03:55 |
| 14 | meant that the composer allowed you to post photos | 03:55 |
| 15 | on Facebook.  If in 2012 you could only post text, | 03:55 |
| 16 | that means that you wouldn't be able to see any | 03:55 |
| 17 | photos because you wouldn't be able to post any | 03:55 |
| 18 | photos. | 03:55 |
| 19 | Q.    We are not understanding each other. | 03:55 |
| 20 | I understand that my content changes over | 03:55 |
| 21 | time.  The question is whether the categories of | 03:55 |
| 22 | objects collected and made available in the DYI tool | 03:55 |
| 23 | changed over time. | 03:55 |
| 24 | MS. STEIN:  And, Lesley, I actually -- and | 03:55 |
| 25 | I'm not trying to be combative.  I actually think he | 03:55 |

Page 274

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    was answering your question.  So I don't want -- I      03:55
2    don't want to repeat what the witness said.             03:55
3            But, K.P., why don't you try again.             03:55
4            THE WITNESS:  I'll try one more time.           03:55
5            The way the question is framed suggests         03:55
6    that nothing would change.  And I'm answering the       03:55
7    question by saying, yes, it would change because the    03:55
8    features are available and the comment that can be      03:55
9    posted in the app will change.  As a consequence of     03:55
10   that, the data that shows up in the DYI will be         03:55
11   different.  2017 --                                     03:55
12   BY MS. WEAVER:                                          03:55
13      Q.   Do you --                                       03:56
14      A.   Between 2012 and 2017, Facebook -- the          03:56
15   Facebook app provided different capabilities to the     03:56
16   users.  Some of them may have been deprecated since.    03:56
17   Some of them may be still available.  But the way       03:56
18   your DYI file looked in 2012 cannot be the same as      03:56
19   the way it looks in 2017.                               03:56
20           And I'm not just talking about the same         03:56
21   things that you did in 2012 and repeated in 2017.       03:56
22   I'm talking about the enhancement with additional       03:56
23   pieces of information that may not have been            03:56
24   possible in 2012.                                       03:56
25      Q.   So who decided what data is collected in        03:56
```

Page 275

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the DYI tool? | 03:56 |
| 2 | A.   I -- I don't know. | 03:56 |
| 3 | MS. WEAVER:   Okay.   I think we have no | 03:56 |
| 4 | more questions at this time.   This deposition | 03:56 |
| 5 | remains open.   There are a number of questions that | 03:56 |
| 6 | were not answered. | 03:56 |
| 7 | Q.   Oh, I have one more question.   How long | 03:56 |
| 8 | has the DYI tool existed? | 03:57 |
| 9 | A.   I believe since 2012-2013 or something | 03:57 |
| 10 | around that time frame. | 03:57 |
| 11 | BY MS. WEAVER: | 03:57 |
| 12 | Q.   So for data prior to that time, is there | 03:57 |
| 13 | any record for users of what data Facebook | 03:57 |
| 14 | maintained on them? | 03:57 |
| 15 | A.   The DYI files shouldn't show data for | 03:57 |
| 16 | those users even prior to the date the tool was | 03:57 |
| 17 | available to users.   I'm talking about the data that | 03:57 |
| 18 | the tool was exposed to users. | 03:57 |
| 19 | Q.   When did the DYI tool begin collecting | 03:57 |
| 20 | data about users? | 03:57 |
| 21 | MS. STEIN:   Objection to form. | 03:57 |
| 22 | THE WITNESS:   I think everybody that has a | 03:57 |
| 23 | Facebook account since forever, they would be able | 03:57 |
| 24 | to download the DYI file and find that information | 03:57 |
| 25 | to be available in the DYI file. | 03:57 |

Page 276

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | The question is when can they -- when have | 03:57 |
| 2 | they started downloading that file?  And it's my | 03:57 |
| 3 | understanding is that they -- the ability for people | 03:57 |
| 4 | to download information that Facebook had on their | 03:57 |
| 5 | behalf started in 2012-2013 time frame. | 03:58 |
| 6 | MS. WEAVER:  Okay.  I think we have no | 03:58 |
| 7 | further questions.  And, again, the deposition | 03:58 |
| 8 | remains open. | 03:58 |
| 9 | We can go off the record. | 03:58 |
| 10 | MS. STEIN:  Well, I don't want to go off | 03:58 |
| 11 | the record yet because I would like to say that we | 03:58 |
| 12 | disagree and object to the idea that this deposition | 03:58 |
| 13 | is being held open. | 03:58 |
| 14 | And, you know, we'll just express our | 03:58 |
| 15 | disappointment that, you know, the witness spent a | 03:58 |
| 16 | lot of time preparing for this deposition on the | 03:58 |
| 17 | topics that Judge Corley ordered this deposition to | 03:58 |
| 18 | be on, and, you know, we're disappointed that, you | 03:58 |
| 19 | know, there wasn't time spent on those topics. | 03:58 |
| 20 | MS. WEAVER:  We disagree.  This deponent | 03:58 |
| 21 | does not know where user data is maintained and did | 03:58 |
| 22 | not -- could not even address the spreadsheets that | 03:58 |
| 23 | obtained user data that we sent to you ahead of | 03:58 |
| 24 | time, and I think it was an unfortunate waste of all | 03:58 |
| 25 | of our time.  We can go off the record. | 03:58 |

Page 277

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      THE VIDEOGRAPHER:  We are off the record      03:58

2    at 3:58 p.m., and this concludes data testimony    03:58

3    given by Konstantinos Papamiltiadis.  The total    03:58

4    number of media units used was six and will be     03:59

5    retained by Veritext Legal Solutions.              03:59

6          MS. WEAVER:  Thank you very much, Mr.        03:59

7    Papamiltiadis.                                     03:59

8          THE WITNESS:  Thank you for having me.       03:59

9        (At the time of 3:58 p.m., the deposition      04:00

10          was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              PENALTY OF PERJURY CERTIFICATE

2

3          I hereby declare I am the witness in the within

4     matter, that I have read the foregoing transcript and

5     know the contents thereof; that I declare that the same

6     is true to my knowledge, except as to the matters which

7     are therein stated upon my information or belief, and

8     as to those matters, I believe them to be true.

9          I declare being aware of the penalties of

10    perjury, that the foregoing answers are true and

11    correct.

12

13

14

15    Executed on the _____ day of _____, 20__, at

16    _____, _____.

17       (CITY)                    (STATE)

18

19            _____

20              KONSTANTINOS PAPAMILTIADIS

21            FACEBOOK INC. REPRESENTATIVE

22

23

24

25
                                          Page  279
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              CERTIFICATE OF REPORTER

 2       I, ASHALA TYLOR, CSR No. 2436, in and for the State

 3   of California, do hereby certify:

 4       That the foregoing proceedings were taken before me

 5   at the time and place herein set forth; that any

 6   witnesses in the foregoing proceedings, prior to

 7   testifying, were placed under oath; that a verbatim

 8   record of the proceedings were made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; further that the foregoing is an accurate

11   transcription thereof.

12       That before the completion of the deposition,

13   review of the transcript was not requested.

14       I further certify that I am neither financially

15   interested in this action nor a relative or employee of

16   any attorney or any of the parties hereto.

17       In compliance with Section 8016 of the Business and

18   Professions Code, I certify under penalty of perjury

19   that I am a Certified Shorthand Reporter with

20   California License No. 2436 in full force and effect.

21   WITNESS my hand this 26th day of February, 2021.

22

23

24

25       Ashala Tylor, CSR #2436, RPR, CRR, CLR

                                          Page 280
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[ ▮▮▮▮▮▮ ]



Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 12



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127



**disappear** 127:14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**import**   178:25



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 24



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 26



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127



Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

187:8 190:20

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 38



Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Veritext Legal Solutions
866 299-5127



strong   66:1



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



108:17

189:19

Veritext Legal Solutions
866 299-5127

[　　　　]



Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.