Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br>Hearing Date: May 5, 2022<br>Hearing Time: 10:00 a.m. |

**UNREDACTED VERSION**

# TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................1

II.    BACKGROUND ................................................................................................4

       A.     An overview of discovery in this case ........................................................4

       B.     The discovery misconduct here goes beyond what this motion can
              discuss. ......................................................................................................9

III.   LEGAL STANDARDS .....................................................................................10

IV.    SANCTIONS FOR MISCONDUCT CONNECTED WITH ADI
       DOCUMENTS..................................................................................................12

       A.     Background: the ADI and its relevance ...................................................12

       B.     Foot-dragging and stonewalling ..............................................................13

       C.     Factual misrepresentations and frivolous legal arguments .......................20

       D.     Sanctions should be imposed. ..................................................................25

V.     SANCTIONS FOR MISCONDUCT CONNECTED WITH THE NAMED
       PLAINTIFFS' DATA ........................................................................................26

       A.     November 2019 – July 2020: Plaintiffs seek production of their data. .....27

       B.     Summer 2020: Facebook's documents identify three categories of
              data it collects about users and shares with third parties—and had
              not turned over to Plaintiffs. ...................................................................28

       C.     August 2020 – October 2020: After briefing, Judge Corley issues an
              order agreeing with Plaintiffs on the scope of relevant user data. ............29

       D.     November 2020 – December 2020: Despite Judge Corley's order,
              Facebook produces no further data related to the Named Plaintiffs. .........30

       E.     December 2020 – February 2021: Judge Corley authorizes a
              30(b)(6) deposition...................................................................................30

       F.     March 2021 – September 2021: The dispute continues unresolved,
              even after months of discovery mediation. ...............................................31

       G.     October 2021 – January 2022: Special Master Garrie's order and
              Judge Corley's affirmance demonstrate that Facebook had
              disobeyed Judge Corley's order for more than a year and that
              sanctions under Rule 37(b) are warranted. ...............................................32

H.      January 2022 – March 2022: Special Master Garrie's efforts to get basic information about the Named Plaintiffs' data confirm that Facebook willfully delayed the resolution and production of the data, warranting sanctions under 28 U.S.C. § 1927 or the Court's inherent power. ........................................................................................35

I.      Sanctions should be imposed. ...................................................................37

VI.     SANCTIONS FOR MISCONDUCT CONNECTED WITH DEPOSITIONS .....38

A.      September 2020 – December 2020: After a suggestion from Judge Corley about how discovery could be streamlined, some of the Named Plaintiffs are voluntarily dismissed. ...............................................38

B.      October 2021 – November 2021: The parties work to schedule depositions of the current Named Plaintiffs, while Facebook seeks to take depositions of the former Named Plaintiffs. .....................................39

C.      December 2021 – January 2022: Facebook takes depositions of two current Named Plaintiffs and unsuccessfully moves to compel the depositions of former Named Plaintiffs. ..................................................40

D.      January 2022: Facebook abruptly cancels all depositions of the Named Plaintiffs on flimsy grounds. .........................................................41

E.      Facebook's cancellation of the Named Plaintiffs' depositions reveals that it felt no need to take those depositions soon and provides compelling evidence of bad faith that warrants sanctions. ........................41

VII.    SANCTIONS FOR MISREPRESENTING THE RECORD TO GAIN UNFAIR ADVANTAGE.......................................................................................42

A.      Facebook's attorneys create a false narrative about discovery delays.......43

B.      The false narrative culminates in an argument that it was now too late for Plaintiffs to be seeking rulings on discovery disputes..................45

C.      Sanctions should be imposed ...................................................................47

VIII.   CONCLUSION...................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BKB v. Maui Police Dep't,*
   276 F.3d 1091 (9th Cir. 2002) ........................................................................10, 25

*In re Boucher,*
   837 F.2d 869 (9th Cir. 1988) ....................................................................................3

*California Department of Social Services v. Leavitt,*
   523 F.3d 1025 (9th Cir. 2008) ................................................................................22

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) ...........................................................................................10, 13

*Dahl v. City of Huntington Beach,*
   84 F.3d 363 (9th Cir. 1996) ....................................................................................47

*Fink v. Gomez,*
   239 F.3d 989 (9th Cir. 2001) ...........................................................................10, 42

*Hyde & Drath v. Baker,*
   24 F.3d 1162 (9th Cir. 1994), *as amended* (July 25, 1994) ..............................11, 34

*In re Itel Sec. Litig.,*
   791 F.2d 672 (9th Cir. 1986) ...........................................................................10, 42

*In re Keegan Mgmt. Co. Sec. Litig.,*
   78 F.3d 431 (9th Cir. 1996) ....................................................................................10

*Lahiri v. Universal Music & Video Distrib. Corp.,*
   606 F.3d 1216 (9th Cir. 2010) .....................................................................11, 12, 13

*Lone Ranger Television, Inc. v. Program Radio Corp.,*
   740 F.2d 718 (9th Cir. 1984) ..................................................................................10

*Malhiot v. S. Cal. Retail Clerks Union,*
   735 F.2d 1133 (9th Cir. 1984) ................................................................................11

*Pierce v. Underwood,*
   487 U.S. 552 (1988)................................................................................................11

*Roadway Express, Inc. v. Piper,*
   447 U.S. 752 (1980)................................................................................................36

*Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang*,
    105 F.3d 521 (9th Cir. 1997) ................................................................................11

*Varney v. Cal. Highway Patrol*,
    2013 WL 2299544 (N.D. Cal. May 24, 2013) .......................................................34

*Wages v. I.R.S.*,
    915 F.2d 1230 (9th Cir. 1990) ..............................................................................11

**Statutes**

28 U.S.C. § 1927 ............................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 26 ...............................................................................................4, 41

Fed. R. Civ. P. 37 ............................................................................................. *passim*

Fed. R. Civ. P. 53 ....................................................................................................3

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on such date as the Court may set, in Courtroom 4 of the U.S. District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs will and hereby do move for an order imposing sanctions upon Defendant and its counsel, as explained below. This motion is supported by a Memorandum of Points and Authorities as well as by the Joint Declaration of Derek W. Loeser and Lesley E. Weaver.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

*The Court:* . . . *[W]ithout making any suggestions about anybody, . . . I am concerned that Facebook has, you know, often made statements reflecting an unduly narrow view of what should be turned over to the Plaintiffs. . . .*

*Mr. Snyder:* . . . *If I was there, I would look you in the eyes.  I'm telling you, Judge, we are not only acting in good faith; we are eager to produce documents, whatever the expense, that are relevant to the issues in this case. . . .*

*. . . I am confident, Your Honor, that when you see our performance on the issues in this case in terms of our production of documents, you will have no basis for concern because we want to get on with it because we think those documents actually are the key to us winning this case.*

Hr'g Tr. at 28:23–29:2, 29:22–25,
30:22–31:2 (Mar. 5, 2020).

Plaintiffs bring this motion because the assurances above were not true at the time and are not true today.  In fact, the history of discovery in this case reveals a pattern of misconduct that has significantly impeded progress. The record supports sanctioning Facebook and its counsel for their substantial disruption and delay of this litigation—by years, not months. As of February 2, 2022, this was the state of document production in a case that entered discovery in 2019:



**Documents Produced by Facebook**
*(624,420 Total Documents Produced )*

Two and a half years since Plaintiffs first propounded requests for data relating to Named Plaintiffs, Facebook has produced little more than what was already accessible to the Named Plaintiffs. Similarly, by February 2, 2022, Facebook had produced only 50 internal ADI documents. In each instance, Plaintiffs spent years meeting and conferring with Facebook, drafted multiple briefs, and secured orders compelling production. But Facebook and its lawyers stonewalled. Rather than take positions and join issue, Facebook and its counsel often provided no position at all. When they did, the positions were meritless and, as the record shows, occasionally false.

Facebook's and Gibson Dunn's intransigence was paired with a false narrative that portrayed *Plaintiffs* as deliberately delaying the case. For years, Facebook's lawyers claimed that Plaintiffs were seeking obviously irrelevant discovery to slow the case down. This false narrative culminated in a hearing before the Special Master ten days before the January 31 substantial-completion deadline. At that hearing—which occurred while Facebook had still produced only a small fraction of the discovery it had been ordered to produce—attorney Snyder told the Special Master that Plaintiffs "have no interest in a substantial completion discovery date," that "[t]his case is out of control" because "[t]he plaintiffs will not stop," and that Plaintiffs were trying to raise too many discovery issues and should be told "no mas, no mas." Ex. 3 at 10:1–11, 12:19–20, 13:9–15.[1] Having delayed discovery for so long, Facebook's counsel was now arguing that it was too late, a two-step litigation strategy through which Facebook sought to capture the benefit of its own intransigence.

There was never any factual basis for Facebook's repeated statements in hearings and motions that Plaintiffs sought irrelevant information to delay these proceedings. To the contrary, the record demonstrates that Plaintiffs have sought relevant information. Since the Special Master's appointment, alone, Plaintiffs have brought 10 discovery motions. The Special Master has granted eight and denied one, while one remains pending. As the Ninth Circuit explained,

---

[1] Unless otherwise noted, all citations of exhibits are citations of the exhibits attached to the accompanying Declaration of Derek W. Loeser and Lesley E. Weaver in Support of Plaintiffs' Motion for Sanctions. Citations of the Declaration itself are given as "Decl. ¶ __."

"The vice of misrepresentation is not that it is likely to succeed but that it imposes an extra burden on the court. The burden of ascertaining the true state of the record would be intolerable if misrepresentation was common." *In re Boucher*, 837 F.2d 869, 871 (9th Cir. 1988). Here, Facebook's and its counsel's misrepresentations imposed a burden so extreme that the appointments of Magistrate Judge Corley, discovery mediators Judge Gail Andler and Daniel Garrie, and finally the Rule 53 appointment of Special Master Garrie, have been necessary.

While the misconduct here has been pervasive, this motion focuses on a few discrete topics that are exemplars of the obstruction, misdirection, and failure of candor that have led to this moment: Facebook's refusal to produce non-privileged documents relating to its App Developer Investigation ("ADI"); its refusal to produce information relating to the Named Plaintiffs; misconduct related to the depositions of current and former Named Plaintiffs; and a January 2022 attempt to benefit from past intransigence by imploring the Special Master to block Plaintiffs from raising long-unresolved discovery issues. Plaintiffs focus on these courses of misconduct because they consumed much time and energy, involved critical discovery, and exemplified the behavior of Facebook and its counsel. By no means do these examples capture the full scope of the delay and waste. For purposes of this motion, Plaintiffs are seeking $196,288.72 in costs related to the retention of Special Master Garrie and discovery mediator Judge Gail Andler, and $657,907 in fees incurred due to misconduct.

The Court has directed Plaintiffs to consider monetary sanctions not only against Facebook, but also against individual attorneys. After considerable reflection, Plaintiffs ask that the Court impose monetary sanctions on Facebook; the firm representing it in this action, Gibson Dunn & Crutcher LLP; and Facebook's lead lawyer from Gibson Dunn, Orin Snyder. While a number of Gibson Dunn attorneys played roles in the misconduct, Plaintiffs believe that it is enough to hold the decision-makers accountable, and trust that others will learn from the example.

Plaintiffs are not seeking to recover all of the fees and costs that they incurred as a result of the discovery abuse. Plaintiffs are also not seeking to recover all of the fees incurred through

each discrete course of misconduct. Rather, Plaintiffs focus on particular periods when the misconduct prejudiced Plaintiffs the most. As a result, the amount of reimbursement sought is modest relative to the total fees incurred.

The sanctions sought here will not compensate the Court, Judge Corley, the discovery mediators, Special Master Garrie, or the proposed Class for their wasted time. Nor, because Plaintiffs ask for only a narrow slice of their fees and costs, will the requested sanctions fully compensate Plaintiffs' counsel for needless time and expense. Rather, this motion is necessary to bring the worst misconduct to the Court's attention and prevent it from happening again.

## II.   BACKGROUND

### A.   An overview of discovery in this case



Timeline of Major Events in Discovery

### 1.   *The referral to Judge Corley*

Discovery in this case has never proceeded smoothly. Within a month of the ruling on Facebook's motion to dismiss, the parties raised their first discovery dispute, which arose from the scheduling of a Rule 26(f) conference. J. Disc. Letter, Oct. 3, 2019, ECF No. 314. The Court ordered the parties to hold the conference within seven days of the initial case management conference in November 2019. Later that same month, Plaintiffs issued their discovery requests. More discovery disputes, including over the production of documents that Facebook had produced to the FTC, emerged shortly thereafter.

At a March 2020 case management conference, the Court opined that it was not best positioned to adjudicate the parties' growing number of disputes, *see* Ex. 58 at 11:17–23, 12:14–13:7, and then referred discovery to Magistrate Judge Corley, Pretrial Order 37: Referral to Magistrate Judge for Disc., Mar. 10, 2020, ECF No. 390. Before doing so, however, it raised its

"concern[] that Facebook has . . . often made statements reflecting an unduly narrow view of what should be turned over to the Plaintiffs." Ex. 58 at 28:25–29:2. This was "a big case," the Court commented, and it continued: "[T]his is not the type of case where we are going to be saying: Well, that might end up—that effort might end up uncovering some relevant information; but, you know, it is just too expensive or difficult, and so we are not going to make Facebook do it." *Id.* at 29:3–10. Facebook's counsel assured the Court that it had nothing to worry about. *See id.* at 29:22–25, 30:22–31:2 ("I'm telling you, Judge, we are not only acting in good faith; we are eager to produce documents, whatever the expense, that are relevant to the issues in this case.").

### 2. *Discovery under Judge Corley's supervision*

Judge Corley held her first discovery conference on April 17, 2020. At that conference, Facebook's counsel again insisted that they had "been trying to expedite discovery" and had no "interest . . . [in] dragging our feet." Ex. 4 at 7:16–19. One of Judge Corley's initial orders was to require the parties to meet and confer in person over Zoom as often as three times a week. *See* Disc. Order No. 1, Apr. 17, 2020, ECF No. 404 ("The parties shall meet and confer by video regarding the above issues, and shall plan on doing so at least on Monday, Wednesday, and Friday unless they agree fewer meetings are necessary."). Under Judge Corley's supervision, the parties negotiated the scope of custodial discovery and a number of other issues.[2]

In the fall of 2020, Judge Corley ruled on the parties' dispute over data related to the Named Plaintiffs. She clarified that relevant data included not only information about the Named Plaintiffs' on-platform activity, but also information collected about the Named Plaintiffs' off-platform activity and information Facebook inferred from Plaintiffs' on- or off-platform activity. Disc. Order No. 9, Oct. 29, 2020, ECF No. 557.

During this period, Judge Corley also gave the parties much informal guidance on Facebook's categorical assertion of privilege over documents from its App Developer Investigation (ADI), questioning the merits of Facebook's claim of privilege. *See, e.g.*, Ex. 5 at

---

[2] By "custodial discovery," Plaintiffs refer to the discovery of electronic documents associated with a particular "custodian"—e.g., e-mail in a Facebook employee's inbox.

16. This guidance did not cause Facebook to change course, so in September 2021, after several rounds of briefing, she ruled that the work-product privilege did not shield documents generated by the ADI. *See* Order Granting Mot. to Compel ADI Materials, Sept. 8, 2021, ECF No. 736; *see also* Further Order Re: ADI Privilege Dispute, July 26, 2021, ECF No. 711.

### 3. *Discovery mediation*

Meanwhile, many other discovery disputes continued. Concerned about how much time she could devote to resolving the parties' disputes, Judge Corley in March 2021 suggested that the parties engage a discovery mediator. Ex. 6 at 14:5–12; *see also* Minute Entry, Mar. 4, 2021, ECF No. 632. The parties selected the Hon. Gail Andler (ret.) of JAMS. *See* Stip. & Order Regarding Disc. Mediator, Mar. 22, 2021, ECF No. 646. With the parties' consent, Judge Andler then brought in her colleague Daniel Garrie, a seasoned e-discovery and technical neutral, to assist in mediation. *See* Ex. 7 at 3:18–22. To the Court, Attorney Snyder expressed how "delighted" he was to have Judge Andler's and Mr. Garrie's assistance. Ex. 5 at 8:11. Facebook's counsel wanted to work with the mediators "to develop the most flexible, efficient, fluid, fair, reasonable, pragmatic approach" to the resolution of discovery disputes," and "to roll up our sleeves and get discovery done." *Id.* at 8:24–9:3.

Intensive discovery mediation continued through summer 2021, but progress was extremely slow. Plaintiffs became concerned that many significant discovery issues remained unresolved (for example, Facebook's assertion of privilege over the ADI, the collection and production of documents from non-custodial electronic sources, and the scheduling of depositions). Pls.' Status Update at 1–2, June 22, 2021, ECF No. 688. Nor did the mediations accelerate Facebook's document production. *Id.* at 1. When Plaintiffs attempted to raise issues with the Court for resolution outside of discovery mediation, Facebook said that Plaintiffs were trying to "bypass mediation" by seeking rulings on discovery disputes, and even declared that Plaintiffs were violating mediation confidentiality, which the Court did not credit. Facebook's Status Update at 2–3, June 22, 2021, ECF No. 689; Ex. 8 at 20:18-21:2. In fact, conscious of the passage of time and accumulation of disputes, Plaintiffs were simply seeking a way to encourage

progress.

### 4. *Appointment of the Special Master*

At the June 2021 case management conference, Plaintiffs expressed their concerns that, in the absence of the authority to issue orders, discovery mediation was leaving too many discovery issues unresolved. They asked the Court to appoint Mr. Garrie as special discovery master with the power to issue orders. *See* Ex. 8 at 6:13–7:18. For the first time, at the hearing, Facebook agreed. Attorney Snyder declared that it was "not in the dispute manufacturing business" and wanted to "get this case on the road." *Id.* at 11:9–11. He even suggested that the Court impose a loser-pays requirement and eliminate the ability to appeal the Special Master's rulings. *Id.* at 10:24–11:7.

After discussions with Judge Corley and the discovery mediators, *see* Minute Entry, June 24, 2021, ECF No. 695, the Court appointed Mr. Garrie as Special Master, Order Appointing Special Disc. Master, July 20, 2021, ECF No. 708.

Since Mr. Garrie's appointment last July, he has issued rulings on over a dozen discovery disputes, and he is continuing to hold hearings and issue orders. In Plaintiffs' view, his work as Special Master has greatly accelerated the adjudication of discovery disputes.  Nonetheless, this chart reflects the status of production relating to many key disputes, including those discussed here:

| | Relief Sought | Moving Party | Special Master's Disposition | Result on Appeal | Further Proceedings or Orders? | Number of Docs Produced In Response as of 2/10/22 | Number of Docs Produced In Response as of 3/10/22 |
|---|---|---|---|---|---|---|---|
| 1 | Production of Mark Zuckerberg's notebooks | Plaintiffs | Granted 9/29/21 | Not appealed | No | 0 | 0 |
| 2 | Use of technology-assisted review ("TAR") by Facebook | Plaintiffs | Denied 10/9/21 | Not appealed | Yes 9/22/21 | N/A | N/A |

| | Relief Sought | Moving Party | Special Master's Disposition | Result on Appeal | Further Proceedings or Orders? | Number of Docs Produced In Response as of 2/10/22 | Number of Docs Produced In Response as of 3/10/22 |
|---|---|---|---|---|---|---|---|
| 3 | Addition of Mark Zuckerberg and Sheryl Sandberg as document custodians | Plaintiffs | Granted 10/22/21 | Not appealed | Yes 1/19/22 3/10/22 3/11/22 | 0 | 235 |
| 4 | Identification of companies ("Business Partners") with which Facebook agreed to exchange user information | Plaintiffs | Granted 11/2/21 | Not appealed | Yes | 0 | 0 |
| 6 | Production of Named Plaintiffs' Data (content and information) | Plaintiffs | Granted 11/29/21 | Affirmed 1/12/22 | Yes 12/17/21 1/14/22 2/8/22 2/10/22 2/14/22 2/17/22 2/28/22 3/3/22 3/9/22 | 0 | 0 |
| 7 | Implementation of M.J. Corley's order regarding Plaintiffs' Motion to Compel ADI document production | Neither | Granted relief sought by Plaintiffs 12/8/21 | Denied Stay 12/22/21 Affirmed 1/12/22 | Yes 10/26/21 11/15/21 1/10/22 1/20/22 1/31/22 2/10/22 | 444 | 27,617 |
| 9 | Depositions of two Facebook employees (Mike Vernal and Anne Lewis) | Plaintiffs | Granted 12/17/21 | Not appealed | No | N/A | N/A |
| 11 | Production of "Facebook Secret | Plaintiffs | Granted 1/31/22 | Affirmed 2/10/22 | No | 1 | 16 |

| | Relief Sought | Moving Party | Special Master's Disposition | Result on Appeal | Further Proceedings or Orders? | Number of Docs Produced In Response as of 2/10/22 | Number of Docs Produced In Response as of 3/10/22 |
|---|---|---|---|---|---|---|---|
| | Sauce" memo | | | | | | |
| 12 | Certain documents related to Cambridge Analytica | Plaintiffs | Granted 2/4/22 | Affirmed 2/9/22 | No | 0 | 0 |
| 15 | Production of Documents Facebook Designated as Privileged | Plaintiffs | Granted in Part 3/3/22 | Not appealed | No | N/A | |
| 16 | Production of Protiviti Documents | Plaintiffs | Pending | N/A | Pending | | |

As reflected in this chart, Facebook had produced only 445 documents responsive to the Special Master's orders by February 10, 2022, the date of the last case management conference.

**B. The discovery misconduct here goes beyond what this motion can discuss.**

This motion seeks compensation for past sanctionable conduct that has wasted the most time and effort. It is not an exhaustive history.

Thus, the motion does not discuss many ongoing discovery disputes. Of these, the most important may be a dispute related to certain financial information. Plaintiffs propounded a request in November 2019 that asked for documents showing the value of users' information to Facebook—including the value of selling access to that information. Ex. 10 at RFP No. 17. That request is relevant to calculating damages for claims, such as breach of contract, under which Plaintiffs seek the remedy of disgorgement (e.g. disgorgement of profits earned from the sharing of information that exceeded user consent). For some time, Facebook denied that such documents were relevant. Exs. 56, 57. More consistently, it has denied that such documents

exist, based on "hav[ing] investigated this extensively." Ex. 30 at 9:6-9. Recently, however, it has agreed to search for documents "supporting Facebook's public reporting of revenues, including" revenue from user information made available to third parties. Ex. 62. This suggests that when Facebook denied that responsive documents existed, that denial was *not* based on the extensive investigation of which it boasted.

Plaintiffs reserve their right to move for sanctions arising from ongoing disputes should it become clear that Facebook or its counsel merit them.

## III.   LEGAL STANDARDS

*1.  28 U.S.C. § 1927.*  28 U.S.C. § 1927 authorizes an award of "excess costs, expenses, and attorneys' fees" against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." Sanctions under § 1927 do not necessarily require a finding of bad faith. Rather, "recklessness suffices," *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001), if an attorney files a frivolous filing, *see In re Keegan Mgmt. Co. Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996), or violates a law or rule of which counsel is consciously aware, *see BKB v. Maui Police Dep't*, 276 F.3d 1091, 1106–07 (9th Cir. 2002). Nonfrivolous actions may also be sanctioned under § 1927 when they are motivated by an improper purpose, such as delay. *See Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 727 (9th Cir. 1984).

*2.  The inherent power.*  Unlike § 1927, sanctions under the Court's inherent power require a finding that a litigant acted in bad faith. *Fink*, 239 F.3d at 993. Bad faith is not synonymous with frivolousness. A finding of bad faith does not require that an action or decision be frivolous, so long as the "litigant is substantially motivated by" an improper purpose. *In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986); *see also Fink*, 239 F.3d at 992 ("*Itel* teaches that sanctions are justified when a party acts for an improper purpose—even if the act consists of making a truthful statement or a non-frivolous argument or objection."). That is why a party may "show[] bad faith by delaying or disrupting the litigation"—i.e., by acting for the improper purpose of delay. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (citation and quotation omitted).

The Court may rely on a wide range of evidence to determine whether bad faith is present. It may, for example, rely on the repetition of arguments that have already been rejected, *Wages v. I.R.S.*, 915 F.2d 1230, 1235 (9th Cir. 1990), a pattern of misrepresentations, *Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133, 1138 (9th Cir. 1984), and "[d]isobedient conduct not shown to be outside the control of the litigant," *Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang*, 105 F.3d 521, 525 (9th Cir. 1997). More generally, a court may rely on the cumulative record of litigation conduct, rather than any one action, to find bad faith. *See Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010) (affirming a bad-faith finding based on the "cumulative effect" of litigation conduct).[3]

**2. Rule 37(a).** When a party prevails on a motion to compel discovery, a court "must . . . require" the opposing party or attorney "to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," unless the motion was filed without a good-faith conferral, the other side's position was "substantially justified" or "other circumstances" would make an award "unjust." Fed. R. Civ. P. 37(a)(5)(A). Similarly, when a motion to compel is denied, the court must require the movant or the movant's attorney to pay the nonmoving party's reasonable expenses incurred in opposing the motion, unless the motion was "substantially justified" or "other circumstances" would make an award "unjust." *Id.* R. 37(a)(5)(B). For a motion or opposition to be "substantially justified," it must have a "reasonable basis both in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quotation and citation omitted).

**3. Rule 37(b).** If a party "fails to obey an order to provide or permit discovery," the court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses" caused by the disobedience, unless it "was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Bad faith is not required for imposition of sanctions under Rule 37(b). *Hyde & Drath v. Baker*, 24 F.3d 1162,

---

[3] The Ninth Circuit has yet to decide whether sanctionable conduct under § 1927 and the inherent power must be supported by clear and convincing evidence, as certain other courts require. *Lahiri*, 606 F.3d at 1219. That legal question is immaterial to the present motion, however, because the evidence here satisfies the clear-and-convincing standard.

1171 (9th Cir. 1994), *as amended* (July 25, 1994).

## IV.   SANCTIONS FOR MISCONDUCT CONNECTED WITH ADI DOCUMENTS

Under 28 U.S.C. § 1927 or the Court's inherent power, as well as under Rule 37(a) and (b), sanctions should be imposed on Facebook and its counsel for misconduct connected with the ADI documents. That misconduct has principally taken three overlapping forms: (1) willful and unreasonable foot-dragging and stonewalling; (2) disobedience of Court orders; and (3) misrepresentations and frivolous arguments. The cumulative evidence that Facebook and its counsel have acted in bad faith is overwhelming. *See Lahiri*, 606 F.3d at 1222.

### A.  Background: the ADI and its relevance

The ADI is Facebook's investigation, initially led by Gibson Dunn, into whether third-party apps may have improperly accessed or misused the information of Facebook users. This investigation began in March 2018 as part of Facebook's public response to the Cambridge Analytica scandal. Meta, *An Update on Our App Developer Investigation* (Sept. 20, 2019), https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation. Because of the clear relevance to Plaintiffs' claims, a request for ADI-related documents was included in their November 2019 set of requests for production. Plaintiffs expected ADI-related documents to shed light on whether Facebook failed to properly monitor third parties who had access to information about Facebook users. *See* Pretrial Order No. 20: Granting in Part & Denying in Part Mot. to Dismiss First Am. Compl. at 9–10, Sept. 9, 2019, ECF No. 298 (fourth category of misconduct alleged by Plaintiffs). It may also reveal whether "whitelisted" apps continued to access information about the friends of users with whom the apps directly interacted. *See id.* at 7–8 (second category of misconduct alleged by Plaintiffs). Facebook, however, claimed work-product privilege over all documents generated by the ADI.

The parties litigated Facebook's assertion of work-product privilege for years. When faced with the prospect of producing ADI investigative materials, attorney Snyder told the Special Master that Plaintiffs were seeking documents from a "dry well." Ex. 19 at 105:8, 108:11. Recent productions, made under compulsion by Facebook, explain Facebook's

recalcitrance. The documents are illuminating and highly probative:

- An ADI memo concerning the app developer Microstrategy, Inc. confirms that Microstrategy's apps "had collected vast quantities of highly sensitive user and friends permissions." Ex. 67 at FB-CA-MDL-02630235. It also noted that "the data collected by the entities described in this report was known to be highly valuable—with many parallels drawn between the data collected by these entities and that of Cambridge Analytica." *Id.*

- An ADI memo concerning the app developer Social Video Downloader revealed that its app likely "committed serious violations of privacy" and "had access to a concerning amount of sensitive user data" including "friends likes, photos, videos, and profile information." Ex. 66. "With a total user base of 9,230,213 (before May 1, 2015), the potential affected population and the amount of sensitive data at risk are both very high." *Id.*

- An ADI memo concerning Yahoo, impacting up to 123 million users and specifically noting its whitelisted status, revealed that Yahoo was acquiring information "deem[ed] sensitive due to the potential for providing insights into preferences and behavior." Ex. 68 at FB-CA-MDL-02552091. It was also "possible that the [Yahoo] App accessed more sensitive user or friends' data than can be detected." *Id.*

The probative value of the ADI documents Plaintiffs shows that counsel's delay impeded the progress of the litigation. It also casts doubt on the good faith of Facebook's past arguments that producing ADI documents would be disproportionate. *See, e.g.*, Mot. for Recons. of Special Master's Order Regarding Produc. of ADI Related Docs at 1–2 (Dec. 15, 2021).

## B. Foot-dragging and stonewalling

Throughout the parties' ADI dispute, Facebook has slow-walked the issue, refusing to engage and giving flimsy if not frivolous reasons for postponing resolution. Taken together, this pattern of behavior is clear and convincing evidence of bad faith, i.e., a deliberate litigation strategy of delay. *See Lahiri*, 606 F.3d at 1222 (affirming a district court's finding of bad faith based on cumulative litigation conduct); *see also Chambers*, 501 U.S. at 46 (a party may exhibit bad faith through delay).

### 1. *May 2020 – April 2021: Plaintiffs attempt to tee up the ADI dispute for resolution, while Facebook refuses to state a position and delays adjudication.*

Foot-dragging: Plaintiffs first brought the ADI privilege dispute to Judge Corley's

attention in an April 2020 filing. J. Status Update at 4–5, Apr. 30, 2020, ECF No. 413. The next month, Plaintiffs asked to brief the dispute over Facebook's blanket assertion of work-product protection, given the ADI's "importance." J. Status Update at 3, May 28, 2020, ECF No. 449. Facebook said that there was "no urgent need for the parties to brief this issue." *Id.*

In mid-June 2020, Judge Corley directed Facebook to state its position on whether certain ADI documents were privileged. *See* Ex. 12 at 11–12, 16. Facebook refused to state a position. Instead, it said that it did not object to producing ADI documents to the extent they were "not privileged"—a response that dodged the question of *which* documents were not privileged. J. Status Update at 2–3, 7, July 10, 2020, ECF No. 471. At the same time, Facebook's counsel urged Judge Corley to defer consideration of the privilege dispute until after Plaintiffs had reviewed all communications between Facebook and third-party app developers. Ex. 13 at 25. Counsel did not say why review of those communications was a necessary pre-condition to the privilege dispute's being ripe.

Rightly, Judge Corley saw no reason for postponement. *Id.* at 37. Judge Corley proposed ruling on a subset of the ADI documents to provide the parties legal guidance for the rest, *see id.* at 36, and directed the parties to agree on a procedure for selecting a subset of ADI documents for *in camera* review.

Facebook's counsel used this directive as another opportunity to drag their feet. After Plaintiffs sent Facebook a written proposal about how to select and present a subset of ADI documents, Facebook took more than a month to provide a written counterproposal. Stip. & [Proposed] Order Regarding Process to Log Exemplar Materials From Facebook's App Developer Investigation ¶ 4, Sept. 11, 2020, ECF No. 513. Finally, in an attempt to at least begin the process, Plaintiffs agreed to a procedure under which documents for a small number of exemplar apps, collected from ADI-specific custodians, would be reviewed and logged, and for which briefing would begin in January 2021. *See id.*; Further Stip. & [Proposed] Order Regarding Process to Log Exemplar Materials From Facebook's App Developer Investigation, Sept. 25, 2020, ECF No. 525.

The Court had ordered briefing to commence in January 2021. *See* Disc. Order No. 7 ("The Court anticipates that briefing on the privilege dispute will commence no later than some time in January 2021"). When January 2021 came, however, Facebook again urged that briefing be postponed. Counsel asserted that, rather than presenting the dispute to the Court, the parties should be required to meet and confer about *each* of the 400 privilege log entries identified by Plaintiffs as the subset to be presented to the Court. J. Status Update at 4, 8, Jan. 14, 2021, ECF No. 599. Facebook wholly failed to explain why meeting and conferring about 400 individual privilege-log entries was a prerequisite to briefing whether the work-product privilege shielded the ADI investigation as a whole. Its position was another pretext for delay.

Judge Corley again rejected Facebook's bid for delay. Ex. 59 at 4; *see also id.* at 4:25–5:18, 6:3–13 (arguments by Facebook's counsel). In connection with the briefing, Judge Corley ordered Plaintiffs to select 20 documents out of the 6,000 identified in Facebook's ADI privilege log. These 20 documents would then be reviewed *in camera*. Disc. Order No. 12 at 1, Jan. 15, 2021, ECF No. 602.

> **2. *April 2021 – June 2021: Although Judge Corley "can't conceive" of how the ADI is work-product privileged, the Judge gives the parties an opportunity to meet and confer about how to proceed—an opportunity that Facebook uses for more delay.***

Foot-dragging: Once briefing was complete and the 20 ADI documents had been reviewed *in camera*, Judge Corley provided the parties with legal guidance as to Facebook's work-product privilege claim. Under the "dual-purpose" doctrine, the work-product privilege does not shield documents generated by an investigation that would have been done even without anticipated litigation. As Judge Corley saw it, "certainly the investigation was done in anticipation of litigation, but also I can't conceive of how it wouldn't have been done otherwise as well."[4] Ex. 5 at 16:9–12. This was clear from Facebook's own statements about the ADI, in

---

[4] In arguing that the ADI was privileged work product, attorney Snyder claimed that the ADI is "an internal legal investigation," "separate and apart from Facebook's regular enforcement activities," and "is not done . . . in the ordinary course" of business. Ex. 13 at 31:22–32:9; *see also, e.g.*, ECF No. 471 at 6, 7 (stating that ADI was "designed and directed by Gibson Dunn" and was "retrospective"). These statements were misleading. Recently produced documents

which it had told its users that the ADI was intended to protect the public and its users. *Id.* at 16:13–15.

Judge Corley also noted that some of the documents reviewed *in camera* did not appear to be relevant and wondered what information Plaintiffs believed they needed. *Id.* at 17:8–23; *see also id.* at 26:2–6. Plaintiffs reiterated to the Court the requests set forth in their briefing and proposed order. A Gibson Dunn associate falsely claimed that Facebook had never before been presented with those requests, and proposed that Plaintiffs issue entirely new discovery requests about which negotiation would begin anew. *Id.* at 19:4-20:7.

While Judge Corley said that she was prepared to rule on the privilege motion, she wanted to provide Facebook with the opportunity to present more evidence on the privilege question. *See id.* at 22:6–23, 23:18–19. Facebook maintained that it did have more evidence. *Id.* at 23:20–24:14. Ultimately, Judge Corley told the parties to meet and confer about how to proceed in light of the guidance she had given. Order Following Apr. 6, 2021 Disc. Conf. at 1, Apr. 6, 2021, ECF No. 655 ("[T]he parties shall meet and confer regarding how to proceed, including whether they wish to submit affidavits in support of their positions or whether they can agree to production of a narrow set of documents."). By this point, the parties had retained discovery mediators, so the parties met and conferred about their ADI dispute in mediation. After several more months of delay, *see* Exs. 14, 15, an agreement had not been reached.

### 3. June 2021 – August 2021: After the parties' discussions go nowhere, Judge Corley gives Facebook one last chance to prove privilege—only for Facebook to submit useless evidence.

More delay: With no agreement between the parties, Judge Corley in late July 2021 allowed Facebook to submit one more declaration before she ruled on privilege. Further Order

---

show that Facebook planned to integrate the ADI into its day-to-day business and that the transition appears to have been underway since 2019. FB-CA-MDL-02681567; FB-CA-MDL02681687 at slide 6; *see also* FB-CA-MDL02673832. These documents show that Facebook provided an incomplete and inaccurate description of the ADI. Not once during the numerous privilege arguments did Facebook reveal that the ADI had been transitioned to a standing, prospective, internally run operation—facts that undermine Facebook's asserted basis for withholding the documents.

Re: ADI Privilege Dispute at 7, July 26, 2021, ECF No. 711. Facebook did so, submitting the Declaration of Gibson Dunn partner Alexander H. Southwell, who "led the Gibson Dunn team engaged to develop and conduct the investigation." Decl. of Alexander H. Southwell in Supp. of Facebook's Position in the Parties' July 2, 2021 Letter Br. Regarding ADI Privilege Dispute ¶ 4, Aug. 2, 2021, ECF No. 720.

Mr. Southwell's declaration had negligible value at best because it ignored the Court's focus. When Judge Corley had told Facebook that it could submit more evidence, she had cautioned its counsel to focus on the "dual-purpose" doctrine, under which an investigation is not clothed in work-product privilege if it would have occurred in substantially similar form even in the absence of anticipated litigation. *See* Ex. 5 at 24:15–20.

The Southwell Declaration did not heed Judge Corley's guidance. It focused on the degree to which the ADI was supervised by Gibson Dunn attorneys. It did not even try to address the critical question under the dual-purpose doctrine: whether the ADI would not have occurred in substantially similar form if not for anticipated litigation. There was, as Judge Corley later commented, simply "no evidence" in the declaration that "addresse[d]" that question. Order Granting Mot. to Compel at 6, ECF No. 736. Rather, after Facebook had sought an "opportunity to submit additional evidence" about privilege, "it provided a declaration from outside counsel which does not even acknowledge" the public statements showing that the ADI had an independently sufficient non-litigation purpose." *Id.* This Court would be entirely justified in finding that the declaration's uselessness is evidence of purposeful delay.

### 4. *September 2021: Judge Corley grants Plaintiffs' motion to compel and directs the parties to work with Special Master Garrie.*

Disobedience: In Judge Corley's September 2021 order on privilege, she ruled that the ADI was not privileged work-product because Facebook would have launched it even in the absence of anticipated litigation. Order Granting Mot. to Compel at 3–5. "[I]n the light of Facebook's public pronouncements," the order reasoned, it was "inconceivable that Facebook would *not* have initiated a speedy, large-scale-subject matter specialist investigation into app data misuse in the absence of potential litigation." *Id.* at 5–6 (emphasis added). A contrary

assertion "could only be true if the Court found that Facebook was lying to the public" in its public statements. *Id.* at 6.

Judge Corley ordered Facebook to produce "background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties" as part of the procedure for adjudicating privilege.[5] *Id.* at 7. The parties were "to work with the Special Master regarding production of additional materials *consistent with the guidance offered by this Order*." *Id.* (emphasis added).

Facebook did not obey this directive. It did not "work with the Special Master" or with Plaintiffs. Nor did it agree to produce "additional materials consistent with the guidance offered by" Judge Corley's order. Instead, Facebook and its counsel resisted that guidance at every turn, refusing the produce any more than eleven reports relating to the six exemplar apps.

### 5. September 2021 – November 2021: Facebook disobeys Judge Corley's Order, ignores the Special Master, and uses every opportunity for delay.

Delay: Following Judge Corley's September 2021 Order, Plaintiffs asked Facebook to produce "all memoranda prepared by" Facebook's outside ADI consultants, "background and technical reports, audits, and developer interviews, and internal Facebook communications regarding these materials." Ex. 16. Plaintiffs offered to meet and confer the following week, if necessary. *Id.* After Plaintiffs' repeated requests to confer, Facebook's counsel eventually made themselves available to confer on October 12, but declined to offer a proposal for what additional ADI documents should be produced. Pls.' Statement Concerning ADI Issues in Advance of Hr'g at 1, Oct. 22, 2021. The parties failed to make further progress.

With no progress made, Special Master Garrie scheduled a Zoom hearing on ADI for

---

[5] The parties had stipulated to a procedure under which Plaintiffs would identify a small number of "exemplar apps" that had been investigated in the ADI, for which Facebook would then collect and log associated ADI documents. *See generally* Stip., ECF No. 513. Later, Facebook submitted to Judge Corley the privilege log associated with those documents. *See* Stip. & [Proposed] Order Regarding Privilege Briefing, Feb. 5, 2021, ECF No. 609. Then, after Judge Corley rejected Facebook's claim of privilege over the ADI, Facebook produced reports, audits, and interviews related to the six exemplar apps, as well as correspondence with the exemplar apps that it had failed to previously produce. This production totaled 11 documents. Special Master Order ¶ 3 (Oct. 26, 2021).

November 11 and ordered the parties to identify issues that needed resolution. In response to this order, Plaintiffs again sought production of the categories of documents previously identified to Facebook, arguing that Judge Corley's order dictated the production of these documents. *See* Facebook's Appellate Record for Appeal of Special Master's Am. Order Re: Produc. of ADI Related Docs. at 398–401, Dec. 23, 2021, ECF No. 778.

In its submission to the Special Master, Facebook's counsel again largely declined to state a position on what should be produced. Counsel said that the documents Plaintiffs sought "appear to go far beyond Judge Corley's order" and included "requests Judge Corley has already rejected." *Id.* at 406. Facebook also said it would provide a "preliminary position" on what non-privileged materials it might produce, *id.*—which it never did, *see id.* at 800–05; Ex. 19 at 7:19–22.

Then, in early November, attorney Snyder asked to delay the ADI hearing by a month, emailing the Special Master to tell him that a trial would make it impossible for him to prepare for the hearing. He therefore "respectfully request[ed] that the ADI hearing be scheduled for the first week of December." Email from Orin Snyder to Special Master Daniel Garrie (Nov. 2, 2021, 3:54 pm). He made this request despite having known for months about the trial. *See* Ex. 20; *see also* Ex. 21 (setting trial). The Special Master reluctantly granted the request. *See* Ex. 22 ("one final extension"). Despite granting the continuance, the Special Master "strongly encourage[d]" Facebook to move the process forward by stating a position and producing documents:

> I strongly encourage Facebook to provide Plaintiffs with a written description of the materials they believe are required by the ADI Order by the end of tomorrow. I also strongly encourage you to either produce the memoranda identified by Plaintiffs in their October 22nd memorandum or inform Plaintiffs in writing the reason for not providing these materials by Friday afternoon at the latest.

*Id.* Facebook's counsel did not comply with this directive. Counsel never described the materials it believed were required by the ADI Order. They did not produce more ADI memoranda. And they never informed Plaintiffs in writing why they would not produce those materials. Instead,

they simply pointed Plaintiffs to an earlier submission from November 4—the very submission that had prompted Special Master Garrie to strongly encourage Facebook's counsel to provide a position and explain it. *See* Ex. 23.

## C. Factual misrepresentations and frivolous legal arguments

When finally forced to take a position and present arguments to Special Master Garrie, Facebook's counsel advanced arguments that were factually baseless and legally frivolous. This behavior disobeyed Judge Corley's ADI order and is thus sanctionable under Rule 37(b). It also constituted further evidence of bad faith, independently warranting sanctions under 28 U.S.C. § 1927 or the inherent power.

### 1. *December 2021: At an ADI hearing before the Special Master, Facebook advances frivolous arguments that conflicted with Judge Corley's ADI order.*

Frivolous arguments: The long-delayed ADI hearing finally went ahead on Saturday, December 4. At that hearing, Facebook acknowledged that "background technical reports," "audits," and "interviews" from non-attorneys were "within the ambit of what is producible" under Judge Corley's order. Ex. 19 at 17:23–18:1. Even so, Facebook argued, some of those documents might be protected by the attorney-client or work-product privileges. *See id.* at 30:4–11, 106:12–14.

As made, this argument was frivolous. Facebook failed to explain how the attorney-client privilege shielded background technical reports, audits, and interviews from non-attorneys. Nor did Facebook explain how the work-product privilege could attach when Judge Corley had already rejected the notion that the work-product privilege shielded the ADI investigation. Since it was Facebook's burden to prove privilege, the conclusory statement it offered utterly failed to carry that burden.[6]

Facebook also argued that Judge Corley had already ruled that internal or external ADI

---

[6] At an April 2021 hearing, Judge Corley had commented that ADI communications *from attorneys* might be shielded by the attorney-client or work-product privileges, Ex. 5 at 16:22–17:3, but Facebook's conclusory statement about privilege was discussing technical reports, audits, and interviews, not communications—let alone communications from attorneys, which Plaintiffs were not seeking at all.

communications from non-attorneys were not discoverable. "Their demand for ADI correspondence was already litigated, and Judge Corley rejected it after an extensive sampling and logging exercise and in-camera review." *Id.* at 12:1–4. The 20 ADI documents Judge Corley had reviewed *in camera* had included communications, Facebook asserted, and because Judge Corley had stated that quite a few of the 20 documents were not relevant, she had thus "realized" that communications were categorically not discoverable. *Id.* at 14:9–21. Facebook added that because Judge Corley had not mentioned ADI communications explicitly in her order, the Judge had effectively ruled that they were not discoverable. Attorney Snyder claimed that there is "a lot of case law," "from the Supreme Court cases on down," holding that when a motion to compel requests certain materials and an order disposes of that motion without mentioning those materials, there is a presumption "that [the materials are] not subject to production." *Id.* at 25:25–26:7, 27:3–8.

These arguments are objectively frivolous for several independent reasons. First, it is fanciful to suggest that Judge Corley would come to conclusions about all ADI communications after having reviewed only 20 documents out of what Facebook has represented are millions. *See* Ex. 24 at 21:19. Nowhere did she imply that her comments about the 20 documents somehow extended to all ADI communications Facebook had withheld. *See* Ex. 5 at 17:8–14. To the contrary, Judge Corley merely noted that many of the 20 documents were insignificant, scheduling-type emails and not helpful for resolving the issues in dispute. *See id.* at 26:4–6 (e.g., "Are you available for this meeting?").

Second, even by its own terms, Facebook had no factual basis for its "presumption" that Judge Corley's order denied Plaintiffs' requests for ADI-related communications because it did not mention them. Facebook's argument for its presumption from silence depended on the factual premise that Judge Corley's order had intended to finally rule on *all* of Plaintiffs' requests for ADI documents. If the order did not have that intention, its silence about one of Plaintiffs' requests would just mean that the order did not rule on it, leaving it for Special Master Garrie to determine. Here, Facebook's factual premise that Judge Corley's order addressed all of

Plaintiffs' requests was obviously false. The order was explicit that it did *not* provide a comprehensive and final decision on which materials sought by Plaintiffs' pending motion should be produced. Instead, it directed the parties to "work with the Special Master regarding production of additional materials." In claiming otherwise, Facebook's counsel distorted Judge Corley's order.

Nor have Plaintiffs found authority—and certainly not "a lot of case law," including "Supreme Court cases"—presuming that a court has denied production of certain materials when it disposes of a motion to compel without mentioning the materials. As far as Plaintiffs can tell, the only case Facebook has cited to support such a presumption is *California Department of Social Services v. Leavitt*, 523 F.3d 1025, 1031 (9th Cir. 2008) (cited by ECF No. 778-1 at 15:1–2). That case speaks of no such general presumption. Rather, a party had moved to enforce a judgment and included in that motion a request for limited discovery in service of full enforcement. *Id.* at 1030. The district court denied that motion in relevant part but "did not expressly discuss the request to authorize discovery." *Id.* at 1031. The Ninth Circuit concluded in passing that the district court had "implicitly den[ied] the request." *Id.* The Ninth Circuit was saying that because the district court had denied the motion to enforce the judgment, it had necessarily denied the motion for discovery in service of such enforcement. That is entirely different from an order that *declines* to rule comprehensively on a pending motion to compel. Order on Mot. to Compel at 7, ECF No. 736. Attorney Snyder's representation that there was a "lot of law" supporting counsel's position was not supportable.

### 2. December 2021 – January 2022: The Special Master sides with Plaintiffs, and in response Facebook repeats its frivolous arguments.

Frivolous arguments: Four days after the ADI hearing, on December 8, Special Master Garrie issued an order requiring the rolling production of all ADI reports, audits, interviews, and consultant memoranda. ECF No. 778-1 at 384, ¶ 13. It also rejected Facebook's argument that Judge Corley had excluded ADI communications from discovery. The order ruled that Plaintiffs could request a statistically significant sample of ADI communications and, after reviewing them, request additional communications "upon a showing that the communications are

relevant." *Id.* at 384, ¶ 16.

Facebook moved for reconsideration, repeating all the frivolous arguments it had made at the ADI hearing. *See* Mot. for Recons. at 4–8 (Dec. 15, 2021). Counsel also asked Special Master Garrie to review all ADI communications *in camera* before they were produced. *Id.* at 12–14. In response, Special Master Garrie amended the order to require Facebook to submit, for *in camera* review, all 6,000 documents it had previously logged as privileged related to just six out of the millions of investigated apps. ECF No. 778-1 at 384, ¶ 16.

Unsatisfied with this amendment, Facebook appealed to Judge Corley. At the hearing, a Gibson Dunn associate repeated the frivolous assertion that Judge Corley had already ruled out discovery of ADI communications. *See* Ex. 24 at 9:25-10:2 ("[C]ommunications are categorically out of play at this point."). Counsel also argued that because Judge Corley had disposed of Plaintiffs' motion to compel ADI materials "without ordering those [communications] produced," there was "a general presumption" that Plaintiffs' request for communications had "been denied." *Id.* at 11:16–19. Judge Corley responded that Facebook should not litigate based on such a presumption: "That is not how it works. I wouldn't do that. That's a mistake." *Id.* at 11:21–22.

The day after the appellate hearing, Judge Corley affirmed the Special Master's ADI order, stating that it was "exactly what this Court's ADI Order contemplated." Order Re: Facebook's Appeal of Special Master's Order Regarding ADI Materials at 1, Jan. 12, 2022, ECF No. 806. Meanwhile, Special Master Garrie had completed his *in camera* review of 6,000 ADI communications concerning six apps, finding that a "substantial number" of them were relevant. Suppl. Order Regarding Produc. of ADI Related Docs. ¶ 17, Jan. 10, 2022. He therefore ordered Facebook to produce all ADI communications, later amending the order to make clear that Facebook need not produce communications from non-custodians or produce or log certain emails involving attorneys. Am. Suppl. Order ¶ 20.

At the February 10, 2022 case management conference, the Court ordered Facebook to complete its ADI production within 21 days. By March 3, 2022, Facebook had produced

approximately 27,000 ADI-related documents since Judge Corley affirmed the Special Master's ADI order. This production—which Plaintiffs had requested some two and a half years earlier—included only 8,445 communications, of which 2,451 are duplicates. Facebook has informed Plaintiffs the production is complete.

### 3. February 10, 2022: Facebook's statements at the case management conference cast doubts on past representations about burden.

Misrepresentations: As of February 3, Facebook had produced a total of 50 ADI documents, J. Case Mgmt. Statement at 5, out of an investigation that by Facebook's own count involved "millions of apps," Ex. 24 at 9:2. At the February 10 conference, though, attorney Snyder stated that Facebook would be able to produce all ADI materials "within one month, if not sooner." Ex. 28 at 13:4–5. The Court responded that they needed be produced "21 days from today." *Id.* at 13:10. "That's fine, your Honor," replied attorney Snyder. *Id.* at 13:11.

These statements cast grave doubts on past representations. When Facebook moved for reconsideration of the Special Master's initial ADI order, counsel claimed that producing all ADI communications would be wildly burdensome. One of Facebook's attorneys claimed, for example, that producing the communications would "delay the case for at least another year while we collect, review, and analyze millions of additional documents." Ex. 24 at 21:17-20. Facebook's counsel also stated that it had taken 300 attorney hours to collect and review communications associated with just six of the apps investigated in the ADI, out of some 32,000 relevant apps. Mot. for Recons. at 4, 8 (Dec. 15, 2021); Ex. 24 at 8:25–9:1; *see also* Mot. for Recons. at 8–9 (Jan. 19, 2022). Assuming that the attorneys are working 50 hours a week, 300 attorney hours represent six weeks of full-time work by one attorney or one week of full-time work by six attorneys. Extrapolating 300 hours of work out to 32,000 apps yields an estimate of 1.6 million attorney hours required to collect and review ADI communications. This would require 100 attorneys working 50 hours a week for about six years, with no breaks. This description cannot have been accurate given the assurance at the February 10 conference that the ADI documents could be produced in 21 days.

**D. Sanctions should be imposed.**

 *1. Delay and prejudice.*  Since Plaintiffs first served the request for production seeking ADI documents in November 2019, they have met and conferred with Facebook concerning the issue at least 11 times; filed a motion to compel in February 2021 and additional briefs related to the motion in July and August 2021; engaged in several extended mediation sessions led by the discovery mediators in the attempt to resolve the dispute; and argued the issue before Judge Corley, Special Master Garrie, and Judge Corley again. Decl. ¶ 6. Between them, Judge Corley and Special Master Garrie have issued six orders on the production of ADI documents. *Id.* From September 2021, when Judge Corley issued her ADI order, through February 2, 2022, when the parties filed their latest joint statement, Facebook produced only 50 ADI documents. *See* J. Case Mgmt. Statement, Feb. 3, 2022, ECF No. 829.

 *2. Monetary sanctions: April 7, 2021 to September 8, 2021.* Ample evidence suggests that Facebook's bad-faith delay of the ADI dispute began well before April 2021. *See supra* § II.B.1. To be conservative, however, Plaintiffs are asking for sanctions beginning April 7, 2021, the day after Judge Corley stated her view that the ADI was not protected by work-product privilege. At that point, Facebook and its counsel were indisputably on notice that their claim of privilege was dubious and that further delay would be in bad faith. After that point, the refusal to compromise on ADI documents, submission of a legally useless declaration in support of its claim of privilege, purposeful delay, factual misrepresentations, and frivolous legal arguments all wasted the time and energy of Plaintiffs, the discovery mediators, Special Master Garrie, and Judge Corley.

 From April 7 to September 8, 2021, when Judge Corley issued her ADI order, sanctions should be imposed on Facebook's counsel under 28 U.S.C. § 1927 (or on Facebook and its counsel under the inherent power). The misconduct of Facebook's counsel during this period exhibited, at the very least, reckless disregard of known law. *See BKB*, 276 F.3d at 1106–07.

 *3. Monetary sanctions: September 9, 2021 to January 31, 2021.* The record shows that after Judge Corley issued her ADI order on September 8, 2021, Facebook chose to deliberately

ignore it and delay compliance for as long as possible. Sanctions for disobedience under Rule 37(b), therefore, should begin immediately after the issuance of the ADI order. Disobedience continued, moreover, until at least the end of January 2022, when Facebook had produced only 50 ADI documents. Plaintiffs propose, therefore, that the period for Rule 37(b) sanctions end on January 31, 2022. Alternatively, because the disobedience rises to the level of bad faith, sanctions could be imposed on Facebook's counsel under 28 U.S.C. § 1927, or on Facebook and its counsel under the inherent power.

*4. Total monetary sanctions*. For ADI-related misconduct, Plaintiffs seek $240,067 in fees.[7] *See* Decl. ¶ 17.

## V.   SANCTIONS FOR MISCONDUCT CONNECTED WITH THE NAMED PLAINTIFFS' DATA

The data that Facebook collects and shares is at the core of Plaintiffs' contract, negligence, statutory, and privacy claims. Facebook has proclaimed for four years that the Named Plaintiffs have no standing to pursue their claims because they have no evidence that *their* information has been shared. But for more than two years, Facebook has refused to produce much of what it possesses and shares about them, while providing shifting statements about what Facebook collects and whether it can be produced. This includes the most troubling kinds of information, such as the behavioral inferences Facebook draws about users based on their activity and the data it collects by tracking users on and off the Facebook platform.

Plaintiffs' focus on obtaining the Named Plaintiffs' data was intended as an efficient, proportional approach—using the handful of class representatives as examples of how Facebook collects and uses millions of class members' information. This is how class actions normally work. Indeed, documents relating to the lead plaintiffs are regularly produced in class actions. They relate to adequacy, typicality and commonality, and to the merits.

But Facebook has resisted basic disclosures concerning the Named Plaintiffs' data. Facebook's resistance to Plaintiffs' legitimate requests for the Named Plaintiffs' data has

---

[7] With this motion, Plaintiffs also seek total costs of $196,288.72. *See* Decl. ¶¶ 67–78.

involved two overlapping categories of sanctionable misconduct. The first is disobedience of discovery orders, and the second is deliberate foot-dragging.

### A. November 2019 – July 2020: Plaintiffs seek production of their data.

In November 2019, just two months after the Court's order on Facebook's motion to dismiss, Plaintiffs served discovery seeking data relating to each of the Named Plaintiffs.[8]

Plaintiffs have been diligent and persistent in pursuing this information. In April 2020, in the parties' first submission to Judge Corley, Plaintiffs noted that they had not been informed about "where data about Named Plaintiffs . . . resides." J. Status Update at 3, Apr. 16, 2020, ECF No. 400. Facebook, by contrast, maintained that it had already given "Plaintiffs tremendous insight into the categories of ESI Facebook maintains and where it is maintained[.]" *Id.* at 18. Judge Corley encouraged Facebook to start discussing, "informally," where data related to the Named Plaintiffs resides. Ex. 4 at 28:6–11; *see also id.* at 32:20-25.

In late spring of 2020, when the parties by Court order were meeting and conferring two to three times a week, Plaintiffs tried to seek discovery relating to Facebook's data architecture, in a search for ways to identify Plaintiffs' data on an individual or classwide basis. In March 2020, Plaintiffs asked whether Facebook could produce developer manuals or other documents describing Facebook's data architecture, to allow Plaintiffs to understand the content and organization of locations that contained information about the Named Plaintiffs and other class members. *See* Decl. ¶ 8.  On more than one occasion, Facebook's response, through Gibson Dunn associates, was to tell Plaintiffs to "Google" such information. *See id.* Plaintiffs explained that the existence of a handful of publicly available documents did not relieve Facebook of its obligation to produce documents in its own possession, particularly when counsel was pointing to 2020 documents that did not sufficiently describe Facebook's architecture during the full

---

[8] RFP No. 9 sought data relating to the Named Plaintiffs. *See* Ex. 10. RFP No. 10 sought documents sufficient to show the categories of information Facebook collects, tracks, and maintains about each Named Plaintiff. *Id.* RFP No. 11 sought documents sufficient to identify third parties to which Facebook granted access to Named Plaintiffs' information. *Id.*; *see also id.* at RFP Nos. 12-15 (seeking information related to third-party access).

Class Period. *Id.* Counsel disregarded these arguments. *Id.*

In July 2020, Plaintiffs again raised the issue of data related to the Named Plaintiffs, noting that Facebook had yet to confirm that it would produce that data. J. Status Update at 3, July 30, 2020, ECF No. 484.

Judge Corley then issued an Order giving guidance on the issue. "To the extent they have not done so already," the Order stated, "Plaintiffs shall complete their review of the documents Facebook has produced regarding the named Plaintiffs." Disc. Order No. 5 at 1, July 31, 2020, ECF No. 487. The parties were then to meet and confer about "Plaintiffs' concerns over the scope of the produced data." *Id.* Thereafter, the parties were to update the Court on what had been produced and what had not been. *Id.* at 1–2.

## B. Summer 2020: Facebook's documents identify three categories of data it collects about users and shares with third parties—and had not turned over to Plaintiffs.

As Plaintiffs' counsel examined the information Facebook had produced about the Named Plaintiffs, they found it to be of limited assistance. Facebook had produced information almost exclusively from its "Download Your Information" Tool—a tool that Facebook had already made available to all Facebook users. *See* J. Status Update at 2–3, Aug. 13, 2020, ECF No. 495; Ex. 34 at 1–2. The tool reflects a subset of users' activity on the Facebook platform: users' likes, posts, messages, and the like. But the tool, created by Facebook, did not appear to reveal all of the information Facebook collects about users' off-Facebook activity or inferences that Facebook draws from users' activity. *See* ECF No. 495 at 2–3. More significantly, counsel refused to engage in a transparent discussion about what Facebook collects about users and what it does with it.

The discovery that Facebook had produced to the FTC, however, indicated that it maintained additional types of data. Among that discovery was a document identifying three general categories of data that Facebook possesses about users: (1) "Native Data," (2) "Appended Data," and (3) "Behavioral Data." Ex. 65. Native Data includes information Facebook collects from a user's activity on Facebook, as well as information it can infer from user activity on and off Facebook. Appended and Behavioral Data include information from user

activity both on and off Facebook. Appended Data is information obtained from third parties, including advertisers and data brokers, about a user's activities (e.g., existing consumer relationships). Behavioral Data includes information largely related to users' off-platform activity (e.g., web-browsing behavior). Facebook also appeared to connect and integrate information generated from users' on-platform activity with user information it obtained from third parties and users' off-platform activity. Exs. 63, 64, 65.

## C. August 2020 – October 2020: After briefing, Judge Corley issues an order agreeing with Plaintiffs on the scope of relevant user data.

In an August 2020 submission to Judge Corley, Plaintiffs noted that Facebook had only produced information generated by the "Download Your Information" Tool, which did not include a significant amount of information that Facebook collects about the Named Plaintiffs. J. ECF No. 495 at 2–3. Facebook responded that Plaintiffs had overlooked information it had produced, and that to the extent Plaintiffs were asking for other information, it was irrelevant and that "[e]ven a large team of engineers working full time for several years likely could not identify all the information Plaintiffs seek." *Id.* at 4–7. But that did not mean that counsel could not identify at least *some* sources other than the DYI tool. By taking such an extreme position, counsel impeded any progress on the issue. Judge Corley concluded that the dispute was ripe for resolution. *See* Ex. 29 at 17:6–17.

In the ensuing briefing, the parties disagreed about the scope of the case. Facebook argued that the only relevant information related to the Named Plaintiffs was information about on-Facebook activity that Plaintiffs shared with their Facebook friends. Facebook Reply Br. at 1, Oct. 8, 2020, ECF No. 537. Allowing discovery about other data "would expand the case far beyond what Judge Chhabria considered." *Id.* at 3. Plaintiffs pointed out that, in fact, the case focuses on the information Plaintiffs restricted but that Facebook nevertheless collected and made accessible to third parties. This includes data about users' off-platform activities that Facebook collects and data that Facebook derives from the data it collects about users' activities. *See* Pls.' Resp. in Reply to Def. Facebook, Inc.'s Req. to Enforce the Partial Stay of Disc. in Pretrial Order No. 20 and in Supp. of Cross-Mot. to Compel at 1, 7–11, Oct. 19, 2020, ECF No.

548.

Judge Corley rejected "Facebook's restrictive view of relevant discovery." Disc. Order No. 9 at 1, Oct. 29, 2020, ECF No. 557. She concluded that "discoverable user data at issue includes" three categories of information: (1) information "collected from a user's on-platform activity"; (2) information "obtained from third parties regarding a user's off-platform activities"; and (3) information "inferred from a user's on or off-platform activity." *Id.* at 2.

### D. November 2020 – December 2020: Despite Judge Corley's order, Facebook produces no further data related to the Named Plaintiffs.

Stonewalling:  After the order, Plaintiffs expected that Facebook would soon produce additional information related to the Named Plaintiffs. That expectation was not met.

On November 12, 2020, Plaintiffs sent Facebook a letter asking it to identify materials responsive to the order, including their format, to allow the parties to discuss ways production could be narrowed or made more efficient. J. Status Update at 1–2, Dec. 8, 2020, ECF No. 583. Facebook made no substantive response. *Id.* at 2. Instead, in a December 2020 joint status report and hearing, Facebook's counsel informed Plaintiffs and Judge Corley that while they were still investigating, they believed they had already produced all information related to the Named Plaintiffs that could have been shared with third parties. *Id.* at 9; Ex. 30 at 17:17–18:9. Plaintiffs' counsel expressed disbelief that such a statement could be correct. Ex. 30 at 18:10–19:1, 19:8–20:6.

### E. December 2020 – February 2021: Judge Corley authorizes a 30(b)(6) deposition.

Stonewalling and disobedience:  Faced with this dispute, Judge Corley allowed Plaintiffs to take a 30(b)(6) deposition on the categories of "discoverable user data" listed in her order defining the scope of relevant data. Disc. Order No. 11 at 1, Dec. 11, 2020, ECF No. 588. She noted Facebook's contention that "the inferred user data" it maintains "is not relevant" because "Facebook does not share" it. *Id.* She responded, "[I]f the Court were to accept Facebook's arguments about the scope of production, it would eliminate [the] third category of [discoverable data related to the Named Plaintiffs]: data inferred from a user's on or off-platform activity." *Id.* So she ordered Plaintiffs to provide Facebook with a 30(b)(6) notice and told Facebook to

respond to it. *Id.* at 1–2.

A month later, after wrangling over the topics to be covered at the 30(b)(6) deposition, Judge Corley ordered the parties to conduct the deposition in February 2021, with the scope limited to "discoverable user data" as she had defined it.[9] ECF No. 602 at 1. She cautioned that "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question." *Id.* at 1–2.

A 30(b)(6) deposition on discoverable user data was held on February 23, 2021. In the aftermath, Facebook blamed Plaintiffs' counsel for spending much of the deposition on what Facebook deemed to be irrelevant subjects on which the deponent offered few substantive responses. J. Status Update at 2, 8–9, Mar. 3, 2021, ECF No. 631. Among the purportedly irrelevant subjects Facebook identified were questions about the document identified above that identified Facebook's collection of "Native," "Appended," and "Behavioral" information about users. During the deposition, Facebook's counsel stated that the document was "outside the scope of the case" and beyond the scope of the 30(b)(6) deposition. Ex. 31 at 84:7-25; *see id.* at 82–84. For Plaintiffs, however, the deposition "confirmed that Facebook is withholding significant amounts of data relating to the Named Plaintiffs." ECF No. 631 at 2.

### F.  **March 2021 – September 2021: The dispute continues unresolved, even after months of discovery mediation.**

<u>Foot-dragging and stonewalling</u>: Not long after the 30(b)(6) deposition, Plaintiffs asked Facebook "to produce all data and information in Facebook's possession relating to the Named Plaintiffs in this action." Ex. 60 at 1. Facebook refused, accusing Plaintiffs of "spinning in circles on this issue for more than a year" and "relaps[ing] to their original position that Facebook must locate and produce all data relating in any way, shape, or form, to the Named Plaintiffs." Ex. 32 at 6. According to Facebook, Judge Corley had "rejected this position." *Id.*

---

[9] The 30(b)(6) deposition was also supposed to cover "how Facebook monetizes—directly or indirectly—and thus values user data." ECF No. 602 at 1. Deposition testimony on that topic was offered on a separate day, and was given by a different designee, from testimony on user data itself.

It was around this time that Judge Corley proposed that the parties retain a discovery mediator. In discovery mediation, Plaintiffs sought information that could help the parties fashion a solution to limit the burden of producing the data. Ex. 33 at internal exhibit 15. After months of futility, in September 2021, Plaintiffs again asked for the complete production of information collected about the Named Plaintiffs or an explanation of the specific information that Facebook was withholding. *Id.* at internal exhibit 16. Facebook did not respond. Pls. Mot. to Compel at 8 (Oct. 18, 2021).

**G. October 2021 – January 2022: Special Master Garrie's order and Judge Corley's affirmance demonstrate that Facebook had disobeyed Judge Corley's order for more than a year and that sanctions under Rule 37(b) are warranted.**

Disobedience and misrepresentation: Meanwhile, the Court had appointed Daniel Garrie as Special Discovery Master in July 2021. ECF No. 708. In early October 2021, after the discovery mediators determined that the parties were at impasse over the production of further data related to the Named Plaintiffs, the Special Master ordered briefing.

In its briefing, Facebook again asserted that the only relevant information was data it admitted had been shared with or made accessible to third parties. Ex. 61 at 7. Facebook's counsel had repeatedly represented that third parties had no access to data collected about users' off-platform activity or inferences about users' activity, and asserted that Facebook should be the arbiter of what was "shared." Based on those assertions, Facebook concluded that it had produced all that was required. Plaintiffs might not believe its representations about what was shared, but that disbelief did not entitle them to "discovery on discovery." *See id.* at 9–12.

Facebook's position not only distorted what Judge Corley had held a year before, but also ignored her rulings since then. Under her October 2020 ruling on the scope of discoverable data, relevant data included data "collected from a user's on-platform activity," "obtained from third parties regarding a user's off-platform activities," and "inferred from a user's on or off-platform activity." ECF No. 557 at 2. Her order did not say that data was relevant only if Facebook admitted it had shared it with third parties.

Then, in a December 2020 order, Judge Corley dismissed Facebook's contention that

"because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant." ECF No. 588 at 1. She clarified, "How it specifically uses this data"—including inferred user data and data derived from third parties—"is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity." *Id.* This order makes clear that data was not excluded from "the scope of production" simply because Facebook denied that the data was shared. *Id.* Sharing was an "open question"—i.e., a question of fact that Plaintiffs were entitled to probe, not a question on which the representations of Facebook's counsel would be accepted as the final word. *Id.*

Next, in a January 2021 order on the 30(b)(6) deposition, Judge Corley stated that "whether particular user data is not shared . . . is not a valid reason to object to a particular deposition question." ECF No. 602 at 1–2. This statement further confirmed that relevance did not turn on Facebook's admission that data had been shared.

Taken together, these orders hold unambiguously that Facebook's discovery obligations regarding the Named Plaintiffs' data did not end once it denied that the data had been shared with third parties. Facebook, in short, had disobeyed a discovery order for over a year. This was confirmed by Special Master Garrie and Judge Corley herself.

In a November 2021 order on the Named Plaintiffs' data, Special Master Garrie ruled that Judge Corley had not limited discoverable user data the way Facebook claimed. Order Re: Pls.' Mot. to Compel Produc. of Pl. Data ¶ 15 (Nov. 29, 2021). To the contrary, one of her orders about the 30(b)(6) deposition had made it clear that discovery was not so limited. *See id.* ¶ 16. The Special Master also ruled that Facebook's past statements to the Court and its own documents showed that it maintained Named Plaintiffs' data that it had not produced. *See id.* ¶¶ 4, 17.

This was the second order defining the scope of discovery of Named Plaintiffs' data. Rather than comply, Facebook appealed.

In affirming the Special Master, Judge Corley made clear that Facebook had *failed to*

*comply* with her discovery order. Order Re: Facebook's Appeal of Special Master's Order Regarding Produc. of Pl. Data, Jan. 12, 2022, ECF No. 807. "This Court did not rule that Facebook only had to produce data about the Named Plaintiffs that Facebook admits it shared with third parties," Judge Corley stated. *Id.* at 1. "To the contrary, . . . the Court held that Facebook must produce data about the Named Plaintiffs that were collected from off-platform activity, even though Facebook insisted that such data were not shared with third parties." *Id.* at 1-2. She further held that "Facebook's insistence that the Court somehow ruled that only data that Facebook admits were shared with third parties is discoverable is belied by the Court's discovery ruling two months later." *Id.* at 2.

Judge Corley continued: "If the Court had previously ruled that only that data which Facebook concedes it shared with third parties were discoverable, then the Order would have said that Facebook does not have to disclose inferred user data because Facebook insists it [] never shared such data with third parties." *Id.* But "[t]hat is not what the Order stated." *Id.* "Facebook's contention that the Court previously ruled that the only discoverable Named Plaintiff data are the data that Facebook concedes it shared with third parties," Judge Corley concluded, "is wrong." *Id.*

In the words of Judge Corley and the Special Master, Facebook's interpretation was "not what Judge Corley intended" in her order, was "not what the Order stated," was "belied" by a later clarification, and was "wrong." Hence, "neither counsel nor [Facebook] was substantially justified in failing to comply" with the Named-Plaintiff-data orders. *Varney v. Cal. Highway Patrol*, 2013 WL 2299544, at *4 (N.D. Cal. May 24, 2013). Nor are there any circumstances that make an award of expenses and fees to Plaintiffs unjust. While Plaintiffs submit that the full pattern of behavior here provides compelling evidence of bad faith, "a finding of bad faith is not a requirement for imposing sanctions" under Rule 37. *Hyde*, 24 F.3d at 1171 (9th Cir. 1994); *see also Varney*, 2013 WL 2299544, at *2 ("[A]n imposition of sanctions under Rule 37 does not require willfulness, fault, or bad faith if the sanction is less than dismissal."). The imposition of monetary sanctions under 37(b) is appropriate.

**H. January 2022 – March 2022: Special Master Garrie's efforts to get basic information about the Named Plaintiffs' data confirm that Facebook willfully delayed the resolution and production of the data, warranting sanctions under 28 U.S.C. § 1927 or the Court's inherent power.**

<u>Delay and obstruction:</u>  The identification and production of Named Plaintiffs' data was referred to Special Master Garrie.  In the Special Master's initial order on Named Plaintiffs' data, he told Facebook to produce certain information about a discrete list of data sources that could contain the Named Plaintiffs' data. *See* Am. Order Re: Pls.' Mot. to Compel Produc. of Pl. Data ¶ 21 (Dec. 17, 2021); *see also* Am. Order Re: Pls.' Mot. to Compel Produc. of Pl. Data ¶ 21 (Dec. 29, 2021) (further clarification). In response, counsel submitted a declaration from Facebook employee David Pope, who identified 149 different data sources, presumably to support counsel's position that identifying Named Plaintiffs' data was too onerous a task to be pursued.

Beginning in early January 2022, the Special Master issued further orders and held a series of hearings to get more information about where and how Facebook stored data about the Named Plaintiffs. First, he ordered Mr. Pope to appear at a hearing to answer questions. Order Re: Pls.' Mot. to Compel Produc. of Pl. Data ¶ 23, Jan. 6, 2022, ECF No. 793. In the hearing, Mr. Pope admitted that he did not have personal knowledge of most of the assertions in his declaration. Decl. ¶ 9. The Special Master ordered Facebook to give him "a date certain" by which it could (1) tell him "which systems identified by Mr. Pope" have "discoverable data related to the Named Plaintiffs"; and (2) either produce the relevant data from those systems or "articulate, with sufficient detail," why it "should not have to produce" the data. Garrie Order (Jan. 18, 2022). A week went by without Facebook providing such a date. Noting that the substantial-completion deadline was rapidly approaching, the Special Master instructed Facebook to give him a date certain by January 27. Garrie email Order (Jan. 25, 2022).

When Facebook did submit a letter on January 27, the Special Master found Facebook's letter "nonsensical" and ordered it to provide more information. Suppl. Order Re: Pls.' Mot. to Compel Produc. of Pl. Data ¶¶ 1-2, Jan. 31, 2022, ECF No. 826. Facebook then provided a fuller response. *See* Suppl. Order Re: Pls.' Mot. to Compel Produc. of Pl. Data, Feb. 8, 2022, ECF No.

833.

These earlier responses differ markedly from Facebook's responses since the February

10, 2022 case management conference in which the Court invited this sanctions motion. Since

that hearing, the Special Master has held two evidentiary hearings relating to Facebook's data

architecture. The first hearing revealed that the Pope Declaration, which Facebook had submitted

in connection with a motion to reconsider the Special Master's Named Plaintiffs' data order and

which identified 149 systems and data sources, had neither been prepared for this case nor vetted

for the information Plaintiffs seek. Decl. ¶ 10.

The necessity of all these proceedings before the Special Master therefore shows that

until the recent case management conference, counsel had not taken meaningful steps to

determine what information is collected about Named Plaintiffs, where it is stored or maintained,

and how that data may be retrieved.

Facebook, moreover, has recently been trying to take unfair advantage of its delay when

deposing the Named Plaintiffs. In these depositions, counsel—attempting to show that the

Named Plaintiffs lack standing—demands that the Named Plaintiffs identify what specific

information Facebook shared with third parties about them and how the Named Plaintiffs have

been harmed by those disclosures. Ex. 36 at 134:22-135:17; Ex. 39 at 17:20-18:7. The Named

Plaintiffs have identified some apps and third parties, such as Cambridge Analytica, who they

believe have accessed their data in violation of their privacy settings. But the Named Plaintiffs

have also testified that they cannot answer these questions fully because of Facebook's failure to

produce precisely the information they are now asking for. By delaying production of

information about what data was shared, and then seeking to take testimony from the Named

Plaintiffs about precisely that question, Facebook is using its own intransigence to distort the

record.

Given the orders of Judge Corley and the Special Master, and Plaintiffs' repeated

requests, the years-long delay that Facebook and its counsel have caused is "tantamount to bad

faith." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) (articulating standard for

inherent-power sanctions). Altogether, it is difficult to imagine a more perfect illustration of the unreasonable and vexatious multiplication of proceedings under 28 U.S.C. § 1927.

**I.  Sanctions should be imposed.**

*1.  Delay and prejudice.*  Since Plaintiffs served the requests for production seeking the Named Plaintiffs' data in November 2019, they have met and conferred with Facebook concerning the issue at least ten times, filed a motion to compel in September 2020, engaged in several extended mediation sessions led by the discovery mediators in the attempt resolve the dispute, filed another motion to compel in October 2021, and argued the issue before Judge Corley in October 2020 and January 2022. Decl. ¶ 7. Between them, Judge Corley and Special Master Garrie have issued more than a dozen orders related to the Named Plaintiffs' data, starting with Judge Corley's October 2020 order defining the scope of discoverable data, and the Special Master has recently conducted three half- or full-day hearings with Facebook employees to determine where Facebook stores the Named Plaintiffs' data. *Id.* The Special Master's inquiry remains ongoing. *Id.* As of the date of this filing, Facebook has not produced any documents reflecting the Named Plaintiffs' data that were not already accessible to them. *Id.*

*2.  Calculation of monetary sanctions.*  For disobedience of Judge Corley's order on the scope of discoverable data, sanctions should be imposed under Rule 37(b). Plaintiffs suggest that the period of monetary sanctions begin 30 days after Judge Corley's order—on November 28, 2020—to represent a "grace period" for Facebook to comply.[10] They suggest that the sanctions period end on January 31, 2022. As discussed above, several of Facebook's responses to the Special Master's relevant orders have fallen so far short of the Special Master's instructions as to merit sanctions for disobedience. Plaintiffs suggest that January 31 is a sensible end point for sanctions. Using these guideposts, Plaintiffs seek $385,085 in attorneys' fees as monetary sanctions for misconduct related to the Named Plaintiffs' data. Decl. ¶ 39; *see also id.* ¶¶ 67–78 (costs information).

---

[10] The events since January 12, 2022, *see supra* § V.H, indicate that Facebook no steps at *any* time to comply with that order—i.e., made no meaningful efforts to investigate the whereabouts, format or retrievability of the Named Plaintiffs' discoverable data.

Finally, while bad faith is not required for the imposition of sanctions under Rule 37(b), Plaintiffs submit that the cumulative record of Facebook's litigation conduct, both with respect to the Named Plaintiffs' data and other discovery matters, prove that Facebook's disobedience of Judge Corley's October 2020 order was in bad faith. This independently warrants sanctions under 28 U.S.C. § 1927 (which does not require bad faith) or the inherent power.

## VI.   SANCTIONS FOR MISCONDUCT CONNECTED WITH DEPOSITIONS

In December 2021, Facebook filed an unsuccessful motion to compel depositions of former Named Plaintiffs who had been voluntarily dismissed from the case. Then, the next month, Facebook abruptly canceled all scheduled depositions of the current Named Plaintiffs after the parties had negotiated over their depositions for months.

These actions indicate that Facebook did not intend to take the Named Plaintiffs' depositions—at least not any time soon. They also indicate that when Facebook moved to compel depositions of the former Named Plaintiffs, it filed the motion not because its counsel thought those depositions would advance the case, but simply to harass class members who were no longer named parties.

Plaintiffs ask that, under 28 U.S.C. § 1927 or the Court's inherent power, they be compensated for the time spent negotiating the dates of the depositions and preparing for them. Also, under Rule 37(a) or 28 U.S.C. § 1927, they ask that they be compensated for the time spent responding to Facebook's motion to compel the former Named Plaintiffs' depositions.

### A. September 2020 – December 2020: After a suggestion from Judge Corley about how discovery could be streamlined, some of the Named Plaintiffs are voluntarily dismissed.

Facebook's misconduct regarding Plaintiffs' depositions took place in late 2021 and early 2022. The larger context for that misconduct, however, begins at a September 2020 status conference before Judge Corley. During the conference, Plaintiffs' counsel commented on the large volume of Facebook's interrogatories. Judge Corley responded, "If you don't want to answer all of them, then have fewer named plaintiffs then. . . . You're never going to move for class cert with 23 anyway. Right? I mean, that's going to be unreasonable for Judge Chhabria."

Ex. 40 at 13:19–25.

Plaintiffs heeded Judge Corley's recommendation, voluntarily dismissing more than half of the then-Named Plaintiffs, thus narrowing the scope of discovery. J. Status Update at 4–5, Oct. 29, 2020, ECF No. 558. The parties stipulated to voluntary dismissal in December 2020. Stip. & Order Re: Voluntary Dismissal, Dec. 21, 2020, ECF No. 593.

### B. October 2021 – November 2021: The parties work to schedule depositions of the current Named Plaintiffs, while Facebook seeks to take depositions of the former Named Plaintiffs.

Thereafter, the issue of depositions did not arise until October 2021, when the discovery mediators told the parties to exchange lists of the first ten deponents each side was requesting. Facebook listed five current Named Plaintiffs and five former Named Plaintiffs. Ex. 41; Ex. 42 at 2.

Plaintiffs' counsel proposed dates for the current Named Plaintiffs' depositions and sought confirmation that Facebook had not identified the five former Named Plaintiffs as deponents by mistake. *See* Letter from Matthew Melamed at 2. Facebook made clear in response that there was no mistake. *See* Ex. 43 at 1 ("We are concerned by Plaintiffs' approach to deposition scheduling, which appears intended to cause unnecessary delay and inefficiency . . . . Plaintiffs incorrectly suggest it was a 'mistake' for Facebook to include [former Named Plaintiffs] on its proposed list of deponents . . . .").

In mid-November, Judge Andler and Daniel Garrie mediated the parties' deposition-scheduling issues. During the mediation, Facebook agreed to take one Named Plaintiff's deposition on January 20, as Plaintiffs' counsel had offered. Ex. 44. Shortly thereafter, Plaintiffs' counsel offered deposition dates for two other Named Plaintiffs. Ex. 45. Facebook accepted the offered date for one of these two Named Plaintiffs and rejected the offer for the other. Ex. 46. Plaintiffs immediately offered a new date, Ex. 47, an offer that was later accepted, Ex. 48. Thus, by the end of November 2021, three depositions of Named Plaintiffs were on the calendar. Plaintiffs expended time and effort arranging and preparing for these depositions.

Meanwhile, Facebook reiterated that it wished to take the former Named Plaintiffs'

depositions, "including but not limited to" the five it had identified earlier. *See* Ex. 49.
According to Facebook, Plaintiffs' counsel, by opposing depositions of the former Named
Plaintiffs, were "add[ing] another layer of difficulty" to the scheduling of depositions, were
trying to "strategically insulate" the former Named Plaintiffs, and were taking a position "as
disingenuous as it is unsupported." *Id.*

### C. December 2021 – January 2022: Facebook takes depositions of two current Named Plaintiffs and unsuccessfully moves to compel the depositions of former Named Plaintiffs.

In December 2021, Facebook deposed two of the Named Plaintiffs. It also filed a motion
asking the Special Master to order the depositions of the former Named Plaintiffs.

Facebook's motion asserted that the objections to depositions of the former Named
Plaintiffs came "from Plaintiffs' counsel, who do not want Facebook to depose anyone who may
provide testimony helpful to Facebook." Ex. 50 at 1. And it argued the depositions were
consistent with "Judge Corley's prior instructions," which had made clear that Facebook had
retained its right to take the former Named Plaintiffs' depositions. *Id.* at 1, 3. Plaintiffs responded
that the former Named Plaintiffs had been voluntarily dismissed, following Judge Corley's
guidance, to streamline discovery—so permitting their depositions would be contrary to that
guidance. Ex. 51 at 2–3. The law is clear in this District that absent class members are not targets
for deposition absent good cause. Plaintiffs also argued that it was not appropriate to take the
former Named Plaintiffs' depositions before taking depositions from all current Named
Plaintiffs. *Id.* at 5.

Special Master Garrie denied Facebook's motion for substantially the reasons advanced
by Plaintiffs. *See* Ex. 52 ¶ 11. Facebook appealed to Judge Corley, who could not understand
why Facebook needed the former Named Plaintiffs' depositions before taking depositions of the
current Named Plaintiffs, Ex. 24 at 43:6–8, 44:3–6, rejected Facebook's account of the guidance
she had previously given, *id.* at 45:13–46:3, and denied the motion without prejudice to renewal
after all current Named Plaintiffs' depositions had been taken, *id.* at 48:7–18, 49:7–50:1, 51:2–
52:7; Order Re: Facebook's Appeal of Special Master's Order Regarding Deps. of Five Former

Named Pls., Jan. 12, 2022, ECF No. 805.

**D. January 2022: Facebook abruptly cancels all depositions of the Named Plaintiffs on flimsy grounds.**

On January 18, just thirty-six hours before the next scheduled Plaintiff deposition, Facebook's counsel wrote to inform Plaintiffs and the Special Master that it was cancelling the three then-calendared depositions of Named Plaintiffs "because we continue to lack basic discovery from Plaintiffs—including discovery regarding the bases of Plaintiffs' claims, alleged injuries, and alleged damages." Ex. 53. Counsel added that they expected "to file a motion to regarding Plaintiffs' Rule 26 disclosures in short order." *Id.* Two weeks later, they sent another email noting that they would also not move forward with three other depositions scheduled for late February and early March. Ex. 54.

The grounds Facebook's counsel gave for deposition postponement were transparently pretextual. Facebook had already taken depositions of two Named Plaintiffs in December. Since then, Plaintiffs had served Facebook with *expanded* Rule 26(a) disclosures. Ex. 55. Because Facebook had taken the December depositions before Plaintiffs had provided the disclosures that Facebook claimed were insufficient, it made no sense to argue that further depositions were precluded by Plaintiffs' insufficient disclosures. And if Facebook really thought useful depositions required fuller Rule 26(a) disclosures, why had it tried so hard to take depositions of the *former* Named Plaintiffs?

**E. Facebook's cancellation of the Named Plaintiffs' depositions reveals that it felt no need to take those depositions soon and provides compelling evidence of bad faith that warrants sanctions.**

Whatever the real reason for Facebook's about-face on the Named Plaintiffs' depositions, their cancellation makes one fact clear: Facebook saw no urgency in taking those depositions. This fact, in turn, throws a harsh light on actions that Facebook and its counsel had taken over the previous few months.

*1. Bad faith in seeking to compel depositions of former Named Plaintiffs.* Because Facebook had no immediate need to take the current Named Plaintiffs' depositions, it cannot have had a legitimate and pressing need to take the former Named Plaintiffs' depositions *first*—

precisely the relief it had asked for in its motion. And if Facebook lacked such a need, it raises the question why it filed the motion at all (a motion that, as the reactions of the Special Master and Judge Corley indicate, lacked merit to begin with). It is hardly plausible that Facebook's counsel filed the motion because they had no grasp of the relevant law and facts. It is far more plausible that counsel filed the motion simply to harass the former Named Plaintiffs and thereby try to gain some illegitimate leverage.

Litigation actions taken with an improper motive, such as an intent to harass, are by definition taken in bad faith. They merit sanctions under 28 U.S.C. § 1927 or the Court's inherent power. *See Fink*, 239 F.3d at 992; *In re Itel*, 791 F.2d at 675. At the very least, Facebook's motion to compel depositions, and its appeal to Judge Corley, were not substantially justified, thereby triggering an award of the expenses Plaintiffs incurred in opposing Facebook's motion and appeal. Fed. R. Civ. P. 37(a)(5)(B).

*2. Bad faith in forcing Plaintiffs' counsel to schedule and prepare for depositions that were not needed any time soon.* Plaintiffs' counsel spent a great deal of time in October, November, and December of last year, and January of this year, negotiating deposition dates for the Named Plaintiffs and arranging and preparing for them. This process became so contentious that the discovery mediators were required to step in. By pushing so urgently for depositions it did not need—at least not any time soon—Facebook and its counsel acted in bad faith. Under 28 U.S.C. § 1927 or the inherent power, Plaintiffs should be awarded the fees and costs they expended in negotiating, arranging, and preparing for the cancelled depositions.

*3. Monetary sanctions.* To ensure that the amount of sanctions sought does not become a distraction, Plaintiffs have been conservative in determining the excess fees caused by misconduct related to depositions. Plaintiffs ask only for a total of $26,240 in fees.

## VII.   SANCTIONS FOR MISREPRESENTING THE RECORD TO GAIN UNFAIR ADVANTAGE

For several years, Facebook's counsel have tried to create a false narrative about this case: Plaintiffs are to blame for the discovery morass, because they do not have a case and are desperately raising frivolous discovery issues in an effort to delay this litigation and find another

case. This narrative culminated in a chaotic January 19, 2022 hearing before the Special Master—a hearing in which Facebook's counsel, after many months of willful delay, contended that it was too late for Plaintiffs to raise long-unresolved discovery issues. That episode provides compelling evidence of a bad-faith litigation strategy and is independently sanctionable.

### A. Facebook's attorneys create a false narrative about discovery delays.

Two years ago, attorney Snyder told the Court that Plaintiffs were "holding up things at every turn" because they were "not content with" their claims and "want[ed] to search around for something else." Ex. 58 at 11:2–5. This statement lacked any basis in fact and sought to take advantage of the limited visibility that courts have into discovery. *See id.* at 11:17–23, 13:16–18 (statements by the Court noting that it was not in a position to decide who was in the wrong).

Facebook continued to press the false narrative in the months that followed. Plaintiffs, Facebook asserted, were delaying the case through their excessive and irrelevant discovery requests. Thus, Facebook told Judge Corley that "Plaintiffs' vexatious approach has impeded an orderly and sensible discovery process," ECF No. 400 at 10, and that they were "undermin[ing]" her "well-considered orders . . . by insisting on an unfocused whack-a-mole process that would unwind past agreements and work." J. Status Update at 5, Nov. 4, 2020, ECF No. 563. Plaintiffs had a "pattern of misusing civil discovery in pursuit of a roving investigation into all aspects of Facebook's business." ECF No. 599, Ex. A (pdf page 43 of 52). And they took a "scattershot approach to litigation" that "cause[d] significant inefficiencies, unnecessary friction, wasteful motion practice, and a race to litigate (rather than resolve) disputes." J. Status Update at 6, Mar. 3, 2021, ECF No. 631.

The accusation that Plaintiffs have tried to delay this case by seeking irrelevant information or advancing baseless arguments was first answered by Judge Corley's two major orders on discovery: her order on the scope of discoverable data and her order on whether the ADI is privileged. In both orders, Judge Corley ruled in Plaintiffs' favor.[11] Yet Facebook's claim

---

[11] The major discovery dispute that the Court itself resolved before referring discovery to Judge Corley was also substantially resolved in Plaintiffs' favor. *See* Pretrial Order No. 36: Order

that Plaintiffs sought to stall the case with baseless discovery disputes only grew louder.

After the Special Master was appointed, Facebook informed him that Plaintiffs' (successful) motion regarding the Named Plaintiffs' data was "an opportunistic, wasteful, and abusive attempt to erase the proceedings before Judge Corley, gain access to information Plaintiffs have conceded is irrelevant, and hunt for *anything* to stall this case before it finally reaches the merits." Ex. 61 at 2. And he was told that another successful motion was "the latest unfortunate example of [Plaintiffs'] ongoing strategy of declaring impasse on issues with no prior good faith engagement . . . in an effort to drum up as many frivolous discovery disputes as possible." Facebook's Resp. to Pls.' Mot. to Compel Produc. of Certain Docs. Related to Cambridge Analytica at 1, Jan. 24, 2022.

This false narrative, however, is belied by the results of the 10 discovery motions Plaintiffs have been required to file with Special Master Garrie. Of these motions, the Special Master has granted eight and denied one, while one remains pending. The series of orders granting Plaintiffs' motions to compel should have led Facebook to abandon its story that Plaintiffs were fabricating meritless discovery disputes.

Instead, at a hearing before Judge Corley, the narrative expanded to include criticisms of the Special Master:

> MR. SNYDER: . . . Now we have hearings before the Special Master, and the process that was intended to streamline, make more efficient, and focus on proportionality is kind of out of control, with all due respect. That's our concern.
>
> . . .
>
> [W]e just would respectfully request some general guidance on how Mr. Garrie, who has not been a judge, where Judge Andler has, that he view—he was originally our technical expert, he became a Special Master. You recall we asked Judge Andler to co-serve for this precise reason. No disrespect intended, but he is not someone who seems to be focused on the judicial interests, the institutional

---

Granting in Part & Denying in Part Mot. to Compel Disc., Mar. 3, 2020, ECF No. 381 (granting motion to compel discovery dating back to 2007, while declining to order privilege logs to be served within 30 days after production).

> interest, and, frankly, our interest in getting some repose here as opposed to an
> open-ended discovery process.

Ex. 24 at 42:8–11, 56:5–13. Judge Corley "decline[d]" this "oral argument plea." ECF No. 806 at

4.

### B. The false narrative culminates in an argument that it was now too late for Plaintiffs to be seeking rulings on discovery disputes.

Part of Facebook's false narrative has been that Plaintiffs, scrounging around for a case,

have raised too many discovery issues at once and have subverted the meet-and-confer process.

Counsel made these arguments repeatedly to Judge Corley before the discovery mediators were

appointed. *See, e.g.*, J. Status Update at 7, Jan. 14, 2021, ECF No. 598 ("Plaintiffs' portion of the

joint update continues a concerning trend of asking the Court for rulings on [unripe] issues . . . .

By using their status updates to seek rulings on unripe issues, Plaintiffs are undermining the

meet-and-confer process, forcing Facebook to brief significant issues in fewer than 24 hours and

in an artificially confined space, and imposing on the Court to issue premature and potentially

unnecessary rulings."); Ex. 13 at 61:20–62:4 (July 13, 2020) (complaining that the "meet-and-

confers" had become a "game of whack-a-mole" because of "the sheer number of issues that are

on meet-and-confer agendas," and asking for "a little bit of guidance limiting the number of

issues, or at least focusing the number of issues," that could be raised). And during discovery

mediation, counsel argued strenuously that Plaintiffs should be required to mediate all discovery

disputes, ECF No. 689 at 2–3, and that they were trying to solicit the Court to resolve issues

prematurely, *id.* at 2. All the while, counsel delayed progress on discovery disputes by routinely

refusing to provide positions or agreeing to brief an unresolved issue. *See, e.g.*, J. Status Update

at 4, 8 (Jan. 2021); Ex. 13 at 25 (July 13, 2020); J. Status Update at 2–3, 7, ECF No. 471, July

10, 2020; J. Status Rep. at 3, May 28, 2020, ECF No. 449.

As the substantial-completion deadline neared, however, Facebook and its counsel began

to argue that it was now too *late* for Plaintiffs to be seeking rulings on discovery disputes. *See*

Corr. J. Status Update at 4, Jan. 10, 2022, ECF No. 797. These arguments reached a crescendo

on January 19, 2022, in a hearing before the Special Master that Facebook had requested. *See* Ex.

3 at 6:11–21.

At that hearing, attorney Snyder argued that Plaintiffs were deliberately attempting to delay the case:

> MR. SNYDER: . . . [T]he plaintiffs are doing what plaintiffs rarely do, which is they have no interest in a substantial completion discovery date.
>
> They're going to say it is because we are hiding documents, blah, blah, blah, blah, blah. It is nonsense. . . .
>
> . . .
>
> [R]ight now they cannot defend their case on the merits. So they do not want—usually plaintiffs want to end discovery and get to trial. They don't want the clock to end. . . .
>
> . . .
>
> . . . If you don't stop it, and you are the boss, we have two remedies. We can appeal it or we can do what we're going to say when we are before the Judge. Judge, if you want this case to go on another two years in fact discovery, there are no facts that they can get where they will win the case. We may then just be delayed by two more years.
>
> But Judge, this discovery process ain't going to end by June of 2020 [*sic*] because we think the special master process has been—I am not going to use a bad word—has been converted into—by the plaintiffs into this roving, ongoing, every month they get to send us another 30 or 40 or 60 requests. In my experience judges or master special judges say no mas, no mas. You are done.

*Id.* at 10:4–9, 11:13–16, 13:2–15. Attorney Snyder also claimed that Plaintiffs were raising "dozens and dozens of documents issues," with "no end even in sight." *Id.* at 15:21–22. He falsely claimed that these new issues had "never been" raised previously, and were "coming from left field, right field, the dugout, the saloon down the street into the ballpark," and only days before the substantial completion deadline. *Id.* at 23:22–24:1. He also claimed that Plaintiffs had just served a new set of RFPs. *Id.* at 12:20–23, 14:20–21. (In fact, Plaintiffs' last set of RFPs had been served five months earlier. *Id.* at 20:6, 21:14–16.)

One of Plaintiffs' counsel noted that attorney Snyder had referred to a list of 27 unresolved discovery issues, some of which were "issues that Facebook raised." *Id.* at 27:5–6.

Using one of the Plaintiffs' issues—non-custodial ESI—as an example, Plaintiffs' counsel observed that it had been "raised in meet and confers years ago," that Plaintiffs had not received a definite answer on it from Facebook, and that the issue implicated "documents related to monetization of user information." *Id.* at 27:7–25. More generally, Plaintiffs' counsel noted that these and other issues "have been raised and raised continuously by Plaintiffs and not yet resolved." *Id.* at 28:4–5. Attorney Snyder immediately interjected, "That is my point." *Id.* at 28:6; *see also id.* at 30:3–15 (arguing that Plaintiffs had forfeited their chance to raise the issue). Attorney Snyder persistently mischaracterized the record in an effort to deprive Plaintiffs of discovery.

### C. Sanctions should be imposed

Facebook had delayed discovery by slow-walking discovery disputes, obstructing Plaintiffs' requests for relevant evidence, disobeying or distorting Court orders, and making insubstantial and sometimes frivolous legal arguments. *See supra* §§ IV–VI. Counsel's false narrative about discovery itself likely contributed to the delay. After that delay, it was unjust for Facebook's counsel to turn around and argue not only that Plaintiffs were deliberately delaying the case, but also that it was too late for them to bring unresolved discovery disputes to the Special Master. Under 28 U.S.C. § 1927 or the Court's inherent power, the Court should exercise its discretion to fashion an appropriate sanction. *See Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996) ("The district court has great latitude in imposing sanctions for discovery abuse . . . .")

Most fundamentally, the statements of Facebook's counsel at the January 19, 2022 hearing indicate that the delays here were not accidental, but a two-step litigation strategy of bad faith: first, delay discovery on the ground that it is too early; second, evade it on the ground that it is too late. This strategy merits sanctions.

### VIII.    CONCLUSION

Despite the diligence of Judge Corley, the discovery mediators, Special Master Garrie, and Plaintiffs, the discovery process here has largely malfunctioned, and as a result, this case has

made much less progress than it should have by now. As this motion shows, Facebook and its attorneys have actively delayed resolution of this case's most important discovery disputes. In service of delay, they have deliberately dragged their feet in bringing disputes to adjudication; have made plainly false statements, and then repeated them; have advanced legal arguments that were often devoid of merit, sometimes outright frivolous, and at times, persisted after their arguments had been rejected; and have disobeyed orders of the Court. And they have done all of this while proclaiming their utmost good faith. *See supra* § II.A.

For these reasons, Plaintiffs respectfully ask the Court to impose monetary sanctions on Facebook; Gibson Dunn, the law firm that represents it; and Orin Snyder, the Gibson Dunn partner who is leading the firm's efforts.

Dated: March 14, 2022                                           Respectfully submitted,

KELLER ROHRBACK L.L.P.                            BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                             By:    */s/ Lesley E. Weaver*
         Derek W. Loeser                                                 Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)        Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)   Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                    Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)           Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                         Joshua D. Samra (SBN 313050)
1201 Third Avenue, Suite 3200                        555 12th Street, Suite 1600
Seattle, WA 98101                                          Oakland, CA 94607
Tel.: (206) 623-1900                                       Tel.: (415) 445-4003
Fax: (206) 623-3384                                        Fax: (415) 445-4020
dloeser@kellerrohrback.com                           lweaver@bfalaw.com
claufenberg@kellerrohrback.com                      adavis@bfalaw.com
dko@kellerrohrback.com                                 mmelamed@bfalaw.com
adaniel@kellerrohrback.com                           aornelas@bfalaw.com
bgould@kellerrohrback.com                            jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497

cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*