Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SANCTIONS**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br>Hearing Date: May 19, 2022<br>Hearing Time: 10:00 a.m. |

**UNREDACTED VERSION**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     SANCTIONS FOR MISCONDUCT CONNECTED WITH THE ADI ............................2

        A.      After Judge Corley issued the ADI order, Facebook purposely delayed
                further progress for months. ....................................................................3

        B.      Facebook's continued assertion of work-product and attorney-client
                privilege in the fall of 2021 was frivolous. ............................................4

        C.      It was frivolous to argue that Judge Corley had categorically excluded ADI
                communications from discovery. ..............................................................5

        D.      Facebook had no reason to submit the Southwell Declaration other than
                delay or recklessness. ..............................................................................7

        E.      Facebook's other arguments related to ADI either raise irrelevant points or
                get the record wrong. ...............................................................................9

        F.      ADI-related developments since Plaintiffs filed their motion for sanctions
                only further support the motion. .............................................................12

III.    SANCTIONS FOR MISCONDUCT CONNECTED WITH THE NAMED
        PLAINTIFFS' DATA .............................................................................................14

        A.      Facebook disobeyed Judge Corley's orders. .........................................14

        B.      The remaining points that Facebook raises are irrelevant. ....................17

IV.     SANCTIONS FOR MISCONDUCT CONNECTED WITH DEPOSITIONS ................18

        A.      Facebook used obviously insubstantial excuses to justify cancelling
                depositions at the last minute. ...............................................................18

        B.      The obviously insubstantial reasons Facebook gave for cancelling the
                depositions provide compelling evidence of bad faith in scheduling
                depositions of the current, and seeking depositions from the former, Named
                Plaintiffs. ...............................................................................................21

V.      SANCTIONS FOR A BAD-FAITH LITIGATION STRATEGY SUPPORTED
        BY MISREPRESENTATIONS ..................................................................................23

        A.      Facebook's litigation strategy was in bad faith. ....................................23

B.    Facebook's counsel used misrepresentations to aid its bad-faith litigation strategy..................................................................................................24

VI.   THE TIMELINESS OF PLAINTIFFS' MOTION ..........................................................25

VII.  SUBSTANTIATION OF FEES AND COSTS ................................................................25

VIII. CONCLUSION...........................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BKB v. Maui Police Dep't,*
 276 F.3d 1091 (9th Cir. 2002) (recklessly ignoring known law justifies
 sanctions under 28 U.S.C. § 1927) ...................................................................................8, 16

*Brandt v. Vulcan, Inc.,*
 30 F.3d 752 (7th Cir. 1994) (cited by Opp'n ) ........................................................................25

*Cal. Dep't of Soc. Servs. v. Leavitt,*
 523 F.3d 1025 (9th Cir. 2008) ..................................................................................................7

*Chambers v. NASCO, Inc.,*
 501 U.S. 32 (1991)....................................................................................................................8

*Fjelstad v. Am. Honda Motor Co.,*
 762 F.2d 1334 (9th Cir. 1985) ................................................................................................16

*Hill v. SmithKline Beecham Corp.,*
 393 F.3d 1111 (10th Cir. 2004) ................................................................................................7

*Kirby Forest Indus., Inc. v. United States,*
 467 U.S. 1 (1984)......................................................................................................................7

*Kraszewski v. State Farm Gen. Ins. Co.,*
 No. C 79-1261 TEH, 1984 WL 1027 (N.D. Cal. June 11, 1984) ...........................................26

*Lahiri v. Universal Music & Video Distribution Corp.,*
 606 F.3d 1216 (9th Cir. 2010) .............................................................................................4, 10

*Martinez v. City of Chicago,*
 823 F.3d 1050 (7th Cir. 2016) ..................................................................................................6

*Mercy v. Suffolk Cty.,*
 748 F.2d 52 (2d Cir. 1984) (cited by Opp'n ) ........................................................................25

*N. Am. Watch Corp. v. Princess Ermine Jewels,*
 786 F.2d 1447 (9th Cir. 1986) ..................................................................................................6

*Optrics Inc. v. Barracuda Networks Inc.,*
 No. 17-cv-04977-RS (TSH), 2021 WL 411349 (N.D. Cal. Feb. 4, 2021)..............................26

*Simpson v. Lear Astronics Corp.,*
 77 F.3d 1170 (9th Cir. 1996) ....................................................................................................8

*True Health Chiropractic Inc v. McKesson Corp.*,
No. 13CV02219HSGDMR, 2015 WL 3453459 (N.D. Cal. May 29, 2015) ...........................26

*United States v. Richey*,
632 F.3d 559 (9th Cir. 2011) ...................................................................................................5

*United States v. W. Titanium, Inc.*,
348 F. App'x 224 (9th Cir. 2009) ...........................................................................................5

*Weil v. Inv./Indicators, Research & Mgmt., Inc.*,
647 F.2d 18 (9th Cir. 1981) .....................................................................................................5

*In re Yagman*,
796 F.2d 1165 (9th Cir. 1986) ................................................................................................25

**Statutes**

28 U.S.C. § 1927 ...........................................................................................................................16

**Other Authorities**

Fed. R. Civ. P. 23(b)(3) ...............................................................................................................22

Fed. R. Civ. P. 26 ....................................................................................................................*passim*

Fed. R. Civ. P. 37(b) ....................................................................................................................16

## TABLE OF SHORT CITATION FORMS

| Short Citation Form | Full Title of Document Cited |
| --- | --- |
| Mot. | Plaintiffs' Corrected Notice of Motion, Motion, and Memorandum in Support of Motion for Sanctions, ECF No. 879 |
| Opp'n | Opposition of Facebook, Inc., Gibson, Dunn & Crutcher LLP, and Orin Snyder to Plaintiffs' Motion for Sanctions, ECF No. 911 |
| Ex. __ | Exhibit to the Declaration of Derek W. Loeser and Lesley E. Weaver in Support of Motion for Sanctions, ECF No. 873-6, or to the Declaration of Lesley E. Weaver and Derek Loeser in Support of Plaintiffs' Reply in Support of Motion for Sanctions[*] |

---

[*] The exhibits to these two Declarations are continuously numbered. Thus, the last exhibit to the Declaration accompanying Plaintiffs' Motion for Sanctions is exhibit 68, and the first exhibit to the Declaration accompanying this Reply is exhibit 69.

## I.    INTRODUCTION

Facebook's opposition shows why sanctions are necessary in this case. Rather than accepting responsibility for their intransigence, Facebook and its attorneys refuse to admit they did anything wrong. They do not even point to anything that in hindsight they would now do differently. Instead, Facebook takes significant liberties with the record, while simultaneously accusing Plaintiffs of dishonesty. This kind of projection is not new. For years now, Facebook's attorneys have delayed discovery while blaming the delay on Plaintiffs. Facebook's opposition doubles down on these tactics.

Facebook's account of discovery, however, is not just materially inaccurate—it also buries the most important issues under a heap of extraneous details. Plaintiffs will therefore focus on their central arguments for sanctions, which remain untouched by an opposition brief that either misconstrues them, turns them into strawmen, or just ignores them. They will then address Facebook's extraneous details and factual inaccuracies.

Where appropriate, Plaintiffs will also acquaint the Court with facts they have learned only since filing their motion—facts that strengthen the case for sanctions. The reality is that Facebook and its counsel have violated discovery orders, including those regarding the ADI and the Named Plaintiffs' data, and have not been candid with the Court. In its February 3 case management statement, Facebook told the Court it had met the substantial completion deadline. It was not true then that Facebook had substantially completed production, and it is not true now.

Just one example is the ADI documents. On February 10, the Court ordered Facebook to complete the ADI production by March 3, which Facebook assured the Court it could do. Facebook then reported to Plaintiffs that it had, in fact, completed the production. Facebook then informed Plaintiffs that it had only produced documents through March 2019, and only for certain custodians, problems they told Plaintiffs they would fix. At the March 30 case management conference, the Court ordered Facebook to produce the ADI documents through the present by April 27.

Following the hearing, Facebook's counsel revealed the production was not only cut off

in 2019 and limited to certain custodians, but also that it was generated using just two types of search terms: the name of the investigated third-party app and the app ID. Remarkably, "ADI" and "App Developer Investigation" were not used as search terms. Facebook now claims it will solve these problems—but not by April 27.

This sequence of events demonstrates how far Facebook and its counsel have strayed from their discovery obligations. Facebook stonewalled for years, then made a woefully inadequate production it claimed was complete, then revealed some but not all the problems to the Court, and then revealed the rest of the problems after a hearing in which it was given what must have been considered a final extension for production of ADI-related documents—a deadline which it now seems Facebook is not likely to meet. This conduct and the other examples set forth in Plaintiffs' motion merit sanctions.

Finally, the Court raised the concept of issues sanctions during the latest hearing. Plaintiffs have been prejudiced by Facebook's discovery misconduct, and will, as necessary and appropriate, seek issues sanctions with regard to class certification and the merits. For present purposes, the question is merely whether Facebook's and its counsel's discovery abuses to date merit monetary sanctions. For the reasons set forth in Plaintiffs' motion and in this reply, the answer is yes.

## II.    SANCTIONS FOR MISCONDUCT CONNECTED WITH THE ADI

There are four reasons related to the ADI dispute alone to impose sanctions on Facebook and its attorneys for discovery misconduct.

First, after Judge Corley's September 2021 order, Facebook purposely delayed progress on ADI.

Second, after Judge Corley's September 2021 ADI order, the arguments that Facebook advanced to support its claims of attorney-client and work-product privilege were frivolous.

Third, by arguing that ADI-related communications were "categorically out of play" after Judge Corley's ADI order, ex. 24 at 10:1, Facebook advanced another frivolous argument.

Fourth, even before Judge Corley's ADI Order, when allowed to submit more evidence to

support its claim of privilege, Facebook submitted a declaration that was undisputedly irrelevant to the legal issue that Judge Corley had identified as dispositive. It had no legitimate reason to submit this declaration—other than the desire to delay, or reckless disregard for the law.

In what follows, Plaintiffs will show why each of these four points stands unrebutted. *See infra* §§ II.A–D. They will then address the extraneous matters that Facebook raises most insistently as defenses to its ADI-related misconduct. *See infra* § II.E.

Finally, they will briefly summarize some of the ADI-related developments that have occurred since Plaintiffs filed their motion for sanctions in mid-March. These developments strengthen the case for sanctions. *See infra* § II.F.

## A.  After Judge Corley issued the ADI order, Facebook purposely delayed further progress for months.

1.  In September 2021, Judge Corley decided that work-product privilege did not protect the ADI and ordered the parties "work with the Special Master regarding production of additional materials consistent with the guidance offered by this Order." ECF No. 736 at 7. Facebook could have appealed that ruling to the Court within 14 days. *See* Fed. R. Civ. P. 72(a). Exhausting remedies in this way would have been a legitimate tactic, but Facebook *neither appealed nor obeyed* Judge Corley's ruling. Rather than "work[ing] with" Plaintiffs or the Special Master, ECF No. 736 at 7, Facebook went to great lengths to delay resolution:

- When the parties met and conferred about further production of ADI materials, Facebook declined to offer a proposal for what additional ADI documents should be produced. Ex. 17 at 1. Facebook does not dispute this.

- When the Special Master asked the parties to "submit a statement concerning the ADI issues," ex. 75, Facebook refused to state its position on the production of further documents, promising that it would "provide a preliminary position the week of October 25," ECF No. 778 at 0406. Facebook does not dispute this.

- Facebook broke that promise and never provided a preliminary position. *See id.* at 800–05; Ex. 19 at 7:19–22. Facebook does not dispute this.

- Indeed, despite Special Master Garrie's "strong[] encourage[ment]," ex. 22, Facebook never provided any position at all in advance of the December 2021 ADI hearing. Mot. at 19–20. Facebook does not dispute this.

- Despite knowing for months about a scheduled trial, attorney Snyder cited that trial in a request to postpone the ADI hearing by nearly a month. Exs. 20, 21. Neither Facebook nor attorney Snyder himself disputes this. ECF No. 912, ¶ 7.

Together, these facts show a calculated pattern of delay, not an isolated incident. They demonstrate that for months—from September 2021 through December 2021—Facebook and its attorneys purposely delayed resolution of the ADI issue.

**2.** For the most part, Facebook is silent about this pattern of behavior. The two limited responses it does provide are wholly inadequate.

First, it says that Plaintiffs' argument that it "engaged in delay tactics" is "inconsistent" with "statements" in an October 21, 2021 hearing, Opp'n at 20, citing only one passing statement from one of Plaintiffs' co-lead counsel: "Your Honor, the process is working I think as you intended." Ex. 76 at 4:5–6. This anodyne statement hardly concedes that Facebook's behavior was unexceptionable. It also preceded some of Facebook's worst delaying tactics. *See supra* pp. 3–4; Mot. at 18–20. And it cannot negate facts that Facebook itself does not dispute.

Second, attorney Snyder's declaration defends his request for a 23-day continuation of the ADI hearing. *See* ECF No. 912, ¶ 7. His defense, however, does not explain why he was the only Gibson Dunn lawyer who could conduct the ADI hearing, which was a virtual hearing in any event. Nor does it explain why he was able to participate in a mediation session during his New York trial, ECF No. 912, ¶ 7, but not the ADI hearing. While these unanswered questions might not raise suspicions in a different context, attorney Snyder's request for postponement does not stand alone. It is part of a larger pattern of foot-dragging in discovery since 2019. *See Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010) (finding of bad faith was supported by the "cumulative effect" of litigation conduct); *see also* Mot. at 14–15, 45.

**B.   Facebook's continued assertion of work-product and attorney-client privilege in the fall of 2021 was frivolous.**

After Judge Corley issued the ADI ruling in September 2021, Facebook argued frivolously that some ADI documents might be work-product or attorney-client privileged. This

argument not only merits sanctions, but also provides further evidence of bad faith.

**1.** Facebook's arguments were frivolous for a simple reason. It is the proponent of work-product or attorney-client privilege that bears the burden of showing that materials are privileged. *See, e.g.*, *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (burden of proving any privilege rests on its proponent); *see also United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011); *United States v. W. Titanium, Inc.*, 348 F. App'x 224, 225 (9th Cir. 2009); Ex. 59 at 6:18 (Facebook's counsel acknowledging the burden of proof).

And yet, Facebook pointed to nothing at all when it argued that "background technical reports," "audits," and "interviews" from non-attorneys were "within the ambit of what is producible" under Judge Corley's order but still could be protected by the attorney-client or work-product privileges. Ex. 19 at 17:23–18:1, 30:7–10, 106:12–14. It made no argument beyond a mere assertion. It pointed to no evidence. To state the obvious: It is frivolous to assert that materials are privileged but rely on nothing to support that assertion. What is more, accomplished attorneys at a major law firm must know that it is frivolous—which is why the argument provides further evidence of bad faith.

**2.** Facebook and its attorneys have little of value to say in their defense. Their only direct response is to note that even if the ADI as a whole is not privileged, individual ADI documents, even from non-attorneys, may be. Opp'n at 16. This is theoretically true but practically irrelevant. If Facebook wished to argue that individual ADI documents might be privileged, it had an obligation to come forward with *some reason* or *some evidence* to support that privilege. It did not even try to meet that obligation.

Facebook also tries to shield itself with a comment from Judge Corley. Opp'n at 18:10–13. This comment from months earlier was not applicable to the documents that Facebook was claiming could be privileged. *See* Mot. at 20 n.6.

## C. It was frivolous to argue that Judge Corley had categorically excluded ADI communications from discovery.

**1.** Before Special Master Garrie, and then once more before Judge Corley, Facebook argued that Judge Corley's September 2021 order had categorically excluded ADI

communications from discovery. Ex. 19 at 12, 14, 25–27; ECF No. 778 at 0012–17; Ex. 24 at 9–11. This argument, as Plaintiffs have explained, was frivolous. Mot. at 21–22. Facebook did not back down even when Plaintiffs immediately challenged this position. *See* Ex. 88 at 48–54, 57–59.

**2.** Facebook buries its only response in a footnote. As the footnote admits, Facebook argued that because the September 2021 ADI order had mentioned certain types of ADI materials but did not mention ADI-related communications, the order "had implicitly rejected" Plaintiffs' request for communications. Opp'n at 20 n.11. The footnote then goes on to address only one of the reasons that Facebook's argument was frivolous: attorney Snyder's statement "that 'a lot of law' supported Facebook's position." *Id.* This statement "was true but ultimately immaterial," says Facebook, because Judge Corley ultimately rejected Facebook's argument and "Facebook timely produced the documents the Special Master ordered it to produce." *Id.* (citation omitted).

Facebook appears to be saying that the merits of its argument are "immaterial" to the question of sanctions because Judge Corley ultimately rejected the argument and Facebook eventually produced the ADI-related communications. That position cannot be accepted. Discovery misconduct—which includes frivolous arguments advanced to delay discovery—warrant sanctions even if the discovery is ultimately produced. *See N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (affirming sanctions and noting, "[b]elated compliance with discovery orders does not preclude the imposition of sanctions" as the "[l]ast-minute tender of documents does not cure the prejudice to opponents" (citation omitted)); *accord, e.g.*, *Martinez v. City of Chicago*, 823 F.3d 1050, 1057 (7th Cir. 2016).

On the merits, Facebook's defense of its frivolous argument fails. Facebook says attorney Snyder was justified in saying that "a lot of law" supported Facebook's position, Opp'n at 20 n.11, but it is missing the larger point. Judge Corley's ADI order made clear that it was not ruling on all aspects of the motion to compel, but instead delegating that task to the Special Master. *See* ECF No. 736 at 7 ("The parties shall work with the Special Master regarding

production of additional materials consistent with the guidance offered by this Order."). It was therefore facially illogical to argue, as Facebook did, that the order had somehow ruled on an aspect of the motion to compel by *failing* to rule explicitly on it. The order had just stated that it was *not* ruling on all aspects of a motion to compel. It contradicted that statement to argue that by failing to rule on one aspect of that motion, it had somehow ruled on it. Yet this nonsensical argument is precisely what Facebook asserted before the Special Master and Judge Corley.

Unsurprisingly given its illogic, Facebook's argument is not supported by the cases that attorney Snyder now cites. ECF No. 912, ¶ 6. One of those cases stands for the proposition that when a court issues a final ruling on a motion to compel, it is permissible for *an appellate court* to infer that the ruling implicitly denies certain aspects of that motion when it explicitly grants others. *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1116 (10th Cir. 2004) (cited by ECF No. 912, ¶ 6). But a final ruling on a motion to compel was precisely what Judge Corley's September 2021 ADI order was not—as the order itself explicitly stated. In the two other cases cited, appellate courts inferred that a district court implicitly ruled on a particular matter because such a ruling was necessarily implied by the court's explicit ruling.[1] No such necessary implication was present here.

### D. Facebook had no reason to submit the Southwell Declaration other than delay or recklessness.

In submitting the Southwell Declaration in August 2021 and further delaying adjudication of the ADI privilege issue, Facebook not only committed misconduct sanctionable in itself, but also provided strong evidence of its bad faith. There was no legitimate reason to submit that Declaration. In light of what preceded the Declaration, Facebook knew that it could not be relevant to Judge Corley. And, in light of what followed the Declaration, Facebook could not have had any other legitimate reason to submit it. For this behavior, sanctions are warranted.

---

[1] Thus, a district court that denies a request to enforce a judgment necessarily denies a request for discovery in support of that enforcement. *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1031 (9th Cir. 2008) (cited by ECF No. 912, ¶ 6). Similarly, when a party argues that a taking occurred on a particular day, a court necessarily rejects that argument when it awards interest on that taking beginning on a different day. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 8 n.10 (1984) (cited by ECF No. 912, ¶ 6).

1.  Before submitting the Declaration, Facebook knew Judge Corley's views on the privilege question. She had noted that in its public statements about the ADI, Facebook said that the investigation was meant to protect the public and its users—i.e., it had a non-litigation purpose. Ex. 5 at 16. Thus, the dispositive question, she told Facebook, was whether that non-litigation purpose would have been enough on its own to create the ADI in substantially similar form. *See* Ex. 5 at 24:15–20; *see also* Mot. at 15–16, 17. Facebook should have focused on this question, since its request to submit a declaration further delayed resolution of the issue by more than six weeks. *See* ECF Nos. 736, 711.

On that dispositive question, however, the Declaration contained "no evidence," as Judge Corley later noted. ECF No. 736 at 6. It did not "acknowledge," let alone discuss, the public statements showing that the ADI had an independently sufficient non-litigation purpose. *Id.* The Declaration contained *no* evidence on the question that Judge Corley had deemed dispositive of privilege. Facebook does not dispute this. Thus, to the extent Judge Corley was the intended audience for the Declaration, Facebook knew it had no legitimate reason to submit it.

Facebook could have had a different legitimate reason to submit the Declaration—so long as it intended to *appeal* the adverse privilege ruling that Judge Corley would inevitably issue. In that case, the Declaration would have been intended to make a fuller record for review. But Facebook did *not* appeal Judge Corley's ruling to this Court. *See* Fed. R. Civ. P. 72(a). And since Facebook did not appeal that ruling to the Court, it has forfeited any right it might have to challenge that ruling before the Ninth Circuit. *See Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996). It is unlikely, therefore, that Facebook submitted the Southwell Declaration to make a fuller record.

Facebook had no reason for submitting the Declaration specifically to Judge Corley. Nor did it have any other legitimate reason to submit it. The only plausible purposes for the Declaration are deliberate delay or a reckless heedlessness of Judge Corley's clear admonitions. Either purpose merits sanctions. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (sanctionable bad faith includes purposeful delay); *BKB v. Maui Police Dep't*, 276 F.3d 1091,

1106–07 (9th Cir. 2002) (recklessly ignoring known law justifies sanctions under 28 U.S.C. § 1927).

**2.** Facebook's defenses of the Southwell Declaration do not respond to Plaintiffs' argument. Instead, Facebook argues at length that its assertion of work-product privilege over the ADI was substantially justified, as shown by the Massachusetts Supreme Judicial Court's acceptance of some of its privilege arguments. Opp'n at 14–15, 16–17, 19; *cf.* Ex. 5 at 22:15–16 (Judge Corley stating that she was "not sure" the Massachusetts court was "applying the same rule as the Ninth Circuit"). Facebook misses the point. Plaintiffs are not arguing that the assertion of work-product privilege over the ADI was itself sanctionable.[2] They are arguing that, given the context, Facebook's submission of the Southwell Declaration served no legitimate purpose. Indeed, Plaintiffs' argument is that Facebook knew that the Southwell Declaration *could not have furthered* its assertion of privilege over the ADI, because (1) it was irrelevant to Judge Corley and (2) was not intended to bolster the record for appeal.

Facebook also defends itself by saying that its *request* to submit a further declaration was not in itself sanctionable. *See* Opp'n at 19:12 & n.9. Again, that misses the point. Facebook deserves sanctions not because it asked to submit more evidence, but because it did so and then submitted a Declaration that it knew was utterly useless for resolving the privilege question. And this frivolous briefing further delayed the production of ADI documents.

**E. Facebook's other arguments related to ADI either raise irrelevant points or get the record wrong.**

*1. Irrelevant points.* Facebook's main forensic strategy is to discuss so many details that the dispositive facts get lost. Many of these details are self-evidently irrelevant, but two merit

---

[2] That is not to say, however, that Facebook was candid in making that assertion. Despite several years of claiming privilege on the ground that the ADI was a Gibson-Dunn-run operation, Plaintiff discovered in documents produced after the February 10 hearing that the ADI transitioned in-house to Facebook in 2020. Plaintiffs also have been informed by counsel that Facebook later replaced the ADI with a new Facebook-run internal program that investigated third-party misuse of user data. Decl. ¶ 8. And Plaintiffs have learned, too, that Facebook itself—separate and apart from Gibson Dunn—investigated nearly 1,700 apps as part of ADI. *Id.* ¶ 9.

some discussion.

**a.** At a January 2022 appeals hearing, Facebook claims, Judge Corley said that its appeals from the Special Master's orders were not taken in bad faith. This claim both misreads what Judge Corley said and is irrelevant.

At the January 2022 hearing, when one of the co-lead counsel observed that Facebook had earlier said "they would not appeal anything and they wanted cost shifting for people who did appeal,"[3] and yet "here we are on motions for reconsideration and appeals," Judge Corley responded, "They do have a right to appeal." Ex. 77 at 54:2–9. She then turned to the motions for reconsideration: "Special Master Garrie responded and narrowed his orders in response to their motions for reconsideration. So I don't think you can make an argument that there was anything bad faith about that at all because he responded to it." *Id.* at 54:10–13.

Judge Corley's comment about a lack of bad faith, then, was not about Facebook's appeals but about their motions for reconsideration. And Facebook's motion for reconsideration of the Special Master's ADI ruling, Plaintiffs agree, was not sanctionable insofar as it argued that the Special Master's procedure for collecting and producing ADI communications was unduly burdensome.[4] *See* Opp'n at 21. But Facebook and its attorneys should not escape sanctions for ADI-related misconduct merely because they may have done one thing that wasn't sanctionable.

More generally, Judge Corley's comment did not purport to evaluate the whole pattern of misconduct that Plaintiffs have discussed here. *See Lahiri*, 606 F.3d at 1222 (relying on the "cumulative effect" of misconduct to affirm a finding of bad faith). The comment focused on one filing in isolation. And it was certainly not intended as a formal finding of fact—it was an informal comment made in passing during a hearing.

**b.** Facebook touts its production in 2020 of Facebook's communications with app developers. Opp'n at 6:24–7:1, 14:4–8. Contrary to Facebook's suggestions, however, most of

---

[3] *See* Ex. 8 at 10:24–11:7, 11:19–22.

[4] To be more precise, the motion for reconsideration was not sanctionable given what Judge Corley knew in January 2022. At the time, Facebook was still claiming that the burden of producing ADI communications was massive. *See* Ex. 24 at 9:4–5; ECF No. 778 at 0019. This claim, of course, was thrown into doubt by later statements. *See* Mot. at 24; *see infra* at p. 11.

these documents revealed very little relevant information. *See* Decl. ¶ 15. Facebook's voluntary disclosure of largely unhelpful documents does not excuse the bad faith that led to delayed disclosure of the most probative ADI documents. *See* Mot. at 12–13.

     ***2. Taking liberties with the record***. Plaintiffs also wish to correct three of the factual inaccuracies in Facebook's opposition.

     *First*, Facebook says that a Gibson Dunn associate who claimed that production of ADI materials would take more than a year was merely referring to production of "literally all documents related to ADI." Opp'n at 22 n.12. No: the claim was that collecting and producing "*every single communication from ADI* . . . would take, charitably, at least a year." Ex. 24 at 9:4–5 (emphasis added). But producing all ADI communications—*among other documents*—was what Facebook later promised it could do within a month. Ex. 28 at 13. Either Gibson Dunn badly misrepresented the burden of producing the ADI materials at issue or it later improperly withheld responsive materials from its initial production. *See also infra* § II.F.

     *Second*, Plaintiffs stated that on February 2, 2022, only 50 ADI documents had been produced in response to the Special Master's and Judge Corley's orders. *See* Mot. at 2, 25; *see also* ECF No. 829 at 5. Facebook calls February 2 "an arbitrary cut-off date" and "artificial." Opp'n at 8, 23 n.13. As an initial matter, even if the date were in some way arbitrary, it would not matter to the larger point, which is that Facebook had purposefully delayed the production of ADI documents by at least half a year—with no clear end date, as Plaintiffs have recently learned. *See infra* § II.F.

     In any event, February 2 is neither arbitrary nor artificial. Rather, it was the day before the parties filed the joint case management statement for the hearing in which the Court raised the possibility of sanctions. Put differently, it was the last day for which the case management statement could report the status of document production. (Facebook made a small additional production of ADI documents the same day that the parties filed their joint case management statement, but that production came too late to be included in the statement.)

     Facebook only started producing ADI documents in earnest after the Court raised the

possibility of sanctions and ordered Facebook to complete ADI production in 21 days. The chart below shows the volume and timing of Facebook's ADI production relative to the numerous Court orders and hearings that addressed Facebook's lack of production.



*Third* and last, Facebook gives a misleading account of its 2020 delays. It implies that Judge Corley agreed with its summer 2020 attempt to delay resolution of the ADI dispute. *See* Opp'n at 17 ("[S]he adopted Facebook's suggestion . . . ."); *cf.* Mot. at 14. This implication is untrue. *See* Decl. ¶ 3. Facebook also implies that it did not delay in agreeing to a procedure for resolving the ADI dispute. Opp'n at 17 n.8; *cf.* Mot. at 14. This implication is likewise untrue. *See* Decl. ¶ 4.

## F.   ADI-related developments since Plaintiffs filed their motion for sanctions only further support the motion.

Plaintiffs have learned more about how Facebook searched for and produced ADI documents in response to the Special Master's December 2021 and January 2022 orders.

*1. Search terms.* Facebook has revealed that, in collecting ADI documents, it used as search terms only the names of investigated apps and their app numbers, i.e., the identification

numbers that Facebook assigns apps. Decl. ¶ 7.  Thus, Facebook did not use the terms "ADI" or "app developer investigation" to search for ADI documents (or any other terms likely to identify discoverable documents). *Id.* It is inexcusable not to use these terms at all, not even in conjunction with another delimiting term. It was also inexcusable—and, Plaintiffs suggest, in bad faith—not to inform Plaintiffs that it was using search terms at all so that the parties could confer about them. Also deeply troubling was Facebook's decision not to reveal the shortcomings of the search terms before the latest case management conference so that Plaintiffs could address the issue when discussing the status of the overdue ADI production.

   *2. Search period.*  Facebook did not search for documents from the full period of the ADI, instead ending the search in 2019. *Id.* ¶ 8. But this investigation did not end in 2019—it continued into 2020. *See id.* Facebook did not disclose its time limitation until after the Court invited this sanctions motion. Nor did it disclose this limitation before reporting to Plaintiffs on March 10 that the ADI production was complete. *Id.* ¶ 6 & Ex. 71.

   *3. Custodians.*  Facebook did not search "all custodians that the parties have identified and collected," which is what the Special Master's final January 2022 ADI Order required. ECF No. 828 at 5, ¶ 20. Instead, for purposes of producing ADI documents by the March 3 deadline this Court ordered, Facebook selected a subset of custodians. *Id.* ¶ 10. Plaintiffs were not informed of this fact until recently. *Id.* ¶ 6. In addition to violating the Special Master's order, Facebook's limited search for ADI documents was inadequate given the ADI's probative value. *See* Mot. at 13. Even after the orders from Special Master Garrie, Judge Corley and the admonitions of this Court, Facebook did not take seriously its discovery obligations with respect to the ADI.

   *4. Further production.*  On March 10, Facebook told Plaintiffs that it had completed the ADI production ordered by this Court. *See* Ex. 71. But after several meet-and-confer sessions following that date, Facebook confirmed that it is conducting a corrected ADI search that does not have the search-term, temporal, or custodial limitations employed to meet the March 3 production deadline. Decl. ¶ 11. Although the Court has ordered Facebook to complete its ADI

production by April 27, Facebook's ADI production will not be complete by that date. *Id.* ¶ 12. Facebook will thus have compounded its violation of the ADI-related production deadlines ordered by this Court. Facebook has told Plaintiffs that the first production of documents retrieved by the corrected ADI search will likely be in the range of 50,000 to 100,000 documents. *Id.* ¶ 13. This further confirms the falsity of Facebook's February statement that it had substantially completed its document production. ECF No. 829 at 11. All of this bolsters the case for sanctions.

### III.   SANCTIONS FOR MISCONDUCT CONNECTED WITH THE NAMED PLAINTIFFS' DATA

Regarding the discovery dispute arising from the Named Plaintiffs' data, the case for sanctions rests on three simple propositions. *First*, after Judge Corley's October 2020 ruling on the Named Plaintiffs' data, Facebook refused to produce further data because Facebook unilaterally decided that it had not been "shared with" or "made accessible to" third parties. *Second*, nothing in the text of Judge Corley's October 2020 ruling makes discoverability of data depend on whether Facebook concedes that the data has been shared or made accessible to third parties. *Third*, if there was any reasonable doubt about what Judge Corley had said in her October 2020 ruling, her rulings in December 2020 and January 2021 dispelled it. These rulings unambiguously held that the discoverability of data did not turn on Facebook's admission that it had been shared or made accessible to third parties.

Plaintiffs will explain why the truth of these three propositions is unaffected by anything Facebook says in its opposition. *See infra* § III.A. They will then address some of the irrelevant arguments that Facebook makes against sanctions. *See infra* § III.B.

### A.   Facebook disobeyed Judge Corley's orders.

**1.**  In late 2020 and throughout 2021, Facebook refused to produce further data related to the Named Plaintiffs expressly because it claimed that the data had not been shared or made accessible. *See, e.g.*, Ex. 32 at 2–5; Ex. 61 at 8–11 & *passim*. According to Facebook, if it did not admit that data had been shared or made accessible, that data was categorically excluded from discovery. Facebook does not appear to deny that it took this position.

Facebook took this position in spite of Discovery Order No. 9, issued in October 2020. Under the terms of that order, relevant data included data "collected from a user's on-platform activity," "obtained from third parties regarding a user's off-platform activities," and "inferred from a user's on or off-platform activity." ECF No. 557 at 2. Nowhere does the order say that data was relevant only if Facebook admitted it had been shared with or made accessible to third parties. Facebook's 2020–2021 position on what data was or was not discoverable thus conflicted with the plain language of Discovery Order No. 9.

If there was any genuine doubt about what Discovery Order No. 9 had held, that doubt should have been dispelled by subsequent orders. *See* Mot. at 32–33. First, Discovery Order No. 11, issued less than two months after Discovery Order No. 9, rejected the contention that "because Facebook does not share inferred user data," that data is not relevant. ECF No. 588 at 1. Rather, the use of that data—including whether it was shared—was an "open question." *Id.* In other words, whether data was shared was itself a contested issue of fact on which Plaintiffs were entitled to discovery. *Id.* Facebook's denial that certain data was shared did not render that data irrelevant.

Second, Discovery Order No. 12, issued about a month later, addressed an upcoming 30(b)(6) deposition. In doing so, it stated that "whether particular user data is not shared . . . is not a valid reason to object to a particular deposition question." ECF No. 602 at 1–2. Once again, Judge Corley clarified that discoverability of data did not depend on whether Facebook conceded the data was shared or made accessible. It flouted Judge Corley's orders to refuse to search for data on the express ground that it had supposedly not been shared. *See* ECF No. 807 (Judge Corley's January 2022 ruling regarding the Named Plaintiffs' data); Mot. at 33–34. Plaintiffs stress this point because Facebook, as evidenced by the latest case management statement, still seems to believe that it has no obligation to produce user data that it contends was not shared. *See* ECF No. 882 at 6.

**2.** Facebook's main defense of its disobedience is that Discovery Orders Nos. 9, 11 and 12 did not require Facebook to produce any specific documents or information. *E.g.*, Opp'n at

27, 29, 32, 34. Facebook is avoiding the point yet again. Plaintiffs do not claim that Facebook violated the orders merely because it failed to produce certain materials (although Facebook's failure to produce responsive materials over a year ago *has* caused delay). Facebook violated the orders because (1) the orders ruled that the relevance of user data under Rule 26(b)(1) did not depend on whether Facebook admitted that data had been shared or made accessible; and (2) after the orders, Facebook consistently refused to search for, much less produce, user data *on the explicit ground* that it claimed it had not been shared or made accessible. This is enough to justify sanctions under Rule 37(b). *See Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1339 (9th Cir. 1985) (an order directing a party to answer interrogatories fully and completely, without mentioning any specific interrogatories or pointing to specific answers that were inadequate, could be disobeyed, thus warranting sanctions under Rule 37(b)). And even if Facebook's disobedience were not sanctionable under Rule 37(b), sanctions would still be appropriate under 28 U.S.C. § 1927. Judge Corley's orders were clear. Facebook's counsel was undeniably aware of those orders and recklessly violated their clear holdings on what was and was not relevant. *See BKB*, 276 F.3d at 1106–07.

Remarkably, however, Facebook still refuses to concede that Judge Corley's orders, including Discovery Order No. 9, determined what user data was relevant. That order, Facebook insists, "identified the scope of 'discoverable user data,' *not whether it was relevant* and proportional to the case so as to require production of that data." Opp'n at 26 (emphasis added). Wrong: Discovery Order No. 9 expressly uses the word "relevant." *See* ECF No. 557 at 1 (rejecting "Facebook's restrictive view of relevant discovery"). But even if it hadn't used that word, Discovery Order No. 9 did deem certain user data "discoverable." *Id.* at 2. Facebook does not explain how materials can be "discoverable" without being relevant. Facebook's refusal, even now, to acknowledge the plain language of Discovery Order No. 9 is frivolous and shows that sanctions are needed as a deterrent.[5]

---

[5] Facebook also cites Discovery Order No. 9 to maintain that Judge Corley rebuffed Plaintiffs' request for discovery on stayed claims. Opp'n at 12:5. The truth is that while Facebook *argued* that Plaintiffs were seeking discovery on stayed claims, ECF No. 515, at 7–8, 10–15, Plaintiffs

Facebook's next line of defense appears to concede, if only for the sake of argument, that Judge Corley's discovery orders ruled that user data was relevant regardless of whether Facebook admitted it had been shared. Even so, Facebook maintains, it did not disobey those orders by not producing further data, because relevant data need not be produced if it is not proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1); *see* Opp'n at 32–33. But proportionality or undue burden was not the ground on which Facebook resisted further discovery about the Named Plaintiffs' data. Rather, Facebook's argument was that data that had not been shared was categorically irrelevant. *See* Ex. 61. Facebook raised an argument about undue burden only when it moved to reconsider the Special Master's initial ruling on the Named Plaintiffs' data—and even then it led with the argument that data it claimed had not been shared was categorically irrelevant. *See* ECF No. 780 at 0010–15. And before Judge Corley, Facebook made it clear that it was appealing only "the holding that data that is not shared is relevant and discoverable in the case." *See* Ex. 77 at 34. Thus, to resist searching for or producing any more data, Facebook relied on a ground that violated Judge Corley's discovery orders. That is how Facebook disobeyed those orders. Facebook's repeated resurrection of overruled arguments, which has extensively delayed discovery in this case, is sanctionable.

## B.   The remaining points that Facebook raises are irrelevant.

Facebook's discussion of the dispute over the Named Plaintiffs' data interjects a great many extraneous details. Plaintiffs will address two of them and ignore the "gorilla dust."

*First*, Facebook makes much of the fact that the parties, with Special Master Garrie's supervision, are still in the process of determining what further data related to the Named Plaintiffs should be produced. Opp'n at 24, 25, 33. This process is indeed continuing, but this does not help Facebook. The misconduct that justifies sanctions largely *preceded* that process, which began in earnest only in January 2022. *See* Mot. 35; *see also id.* at 37. And the fact that

---

denied it, pointing out that Facebook did not actually identify the stayed claims on which Plaintiffs were supposedly seeking discovery, ECF No. 548 at 3. Judge Corley simply "rule[d] that discovery is stayed as to the stayed claims." ECF No. 557 at 2. She did *not* say that Plaintiffs were seeking such discovery. Facebook's incessant distortions of Plaintiffs' positions in this case compounded the delays and fed Facebook's false narrative.

the process is still ongoing, rather than completed, just demonstrates the delay that Facebook has caused. The process, moreover, is the highly unusual result of Facebook's stonewalling. Special Master Garrie, through extraordinary efforts and diligence, has forced Facebook to identify information that Facebook should have produced long ago, had it engaged in the normal operations of discovery. It is no defense that Facebook's intransigence has required the imposition of a Special-Master-run discovery program.

*Second*, Facebook highlights a compliment that the Special Master bestowed on it last month. *Id.* at 33:22–25. But again, the sanctionable conduct here preceded that date, and Plaintiffs have acknowledged that the Court's comments at the February case management conference have improved the discovery dynamic, with new Facebook counsel engaging in far more constructive communications with Plaintiffs' counsel.[6] Ex. 79 at 4:8–15.

## IV.   SANCTIONS FOR MISCONDUCT CONNECTED WITH DEPOSITIONS

Two core propositions support sanctioning Facebook and its attorneys for their deposition-related discovery misconduct. *First*, the justifications they gave for their last-minute cancellation of all scheduled depositions of the Named Plaintiffs were obviously insubstantial. *Second*, the fact that Facebook and its attorneys gave such justifications provides compelling evidence of bad faith both in scheduling the depositions of current Named Plaintiffs and in seeking to depose the former Named Plaintiffs. These reasons are not rebutted by Facebook's opposition.

### A.   Facebook used obviously insubstantial excuses to justify cancelling depositions at the last minute.

**1.** On January 18 of this year, one of Facebook's attorneys sent Plaintiffs an email

---

[6] Facebook leans heavily on another comment from Special Master Garrie: his statement in an order that "there do not appear to be deficiencies in Facebook's production to date." ECF No. 746, ¶ 10 (cited by Opp'n at 3, 9). He made this comment while ruling that Facebook did not need to use technology-assisted review to review and produce documents. In making the comment, the Special Master was saying that Facebook's review of the documents for which it had agreed to search was not deficient. *See* ECF No. 742, ¶ 4 (the Special Master's investigation of Facebook's review process). He was not suggesting that Facebook had already agreed to produce all relevant documents—nor could he have, in light of his later orders on ADI and the Named Plaintiffs' Data.

informing them that the depositions of three Named Plaintiffs would have to be rescheduled. Postponement was necessary, the email said, because "basic discovery from Plaintiffs" was still lacking. Ex. 53. This included "discovery regarding the bases of Plaintiffs' claims, alleged injuries, and alleged damages." *Id.* The email continued: "[W]e will be filing two motions to compel this information later this week, and we expect to file a motion to compel regarding Rule 26 disclosures in short order, given that Plaintiffs did not disclose their alleged damages theories and model as required in their amended disclosures last week." *Id.*

So, to justify cancelling the depositions, Facebook relied on allegedly insufficient "discovery regarding the bases of Plaintiffs' claims, alleged injuries, and alleged damages"—i.e., insufficient 26(a) disclosures. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii). It repeated this justification in a filing that again claimed a lack of "basic information regarding [Plaintiffs'] claims," including "what information they believe Facebook shared without consent," "how they believe they were harmed," or "a damages model, which they were required to provide years ago in their Rule 26 disclosures." ECF No. 840 at 4.

This justification was so obviously insubstantial as to raise the inference that it was a mere pretext. This is shown by three considerations.

*First*, Facebook had already taken two depositions in December 2021, before Plaintiffs had provided the expanded Rule 26(a) disclosures that Facebook claimed were insufficient. Given this fact, it made no sense for Facebook to suddenly claim that further depositions required fuller Rule 26(a) disclosures. Nor is it convincing or exculpating to claim, as Facebook now does, that these two December depositions—one on December 10 and another on December 20—convinced Facebook that further depositions required fuller Rule 26(a) disclosures from Plaintiffs. Opp'n at 37:2–23, 38:21–23. If that were really the case, there would be no excuse for waiting nearly a month, until January 18, to cancel the remaining depositions—a delay that by itself would warrant sanctions.

*Second*, and perhaps more importantly, it has now been more than three months since Facebook cancelled the depositions on January 18. Since then, Facebook has not moved to

compel fuller 26(a) disclosures, or asked the mediators to declare an impasse on the issue. *See* Exs. 84, 85. Given this inaction, it is hard to believe that Facebook really thinks that fuller Rule 26(a) disclosures are crucial to depositions of the Named Plaintiffs.

*Third*, it is difficult to believe that Facebook's highly competent attorneys truly think the claimed insufficiencies of Plaintiffs' Rule 26(a) disclosures supplied a good reason to cancel depositions at the last minute. As the Court has pointed out, it is "preposterous" to claim that depositions could not be taken until Plaintiffs identified, among other things, the information they claimed was shared without their consent. Ex. 78 at 7:8–15. What information was shared is precisely what Plaintiffs are still trying to find out through discovery. It is similarly outlandish to claim that a "damages model," ECF No. 840 at 4, was needed to take the depositions of the Named Plaintiffs, who are laypeople and not experts. More generally, it verges on the frivolous to argue that Plaintiffs had provided insufficient Rule 26(a) disclosures, particularly about their injuries and damages. Ex. 53. Facebook has thus far failed to provide the financial information upon which damages calculations would be based,[7] so Plaintiffs need not supply such calculations, *see* Fed. R. Civ. P. 26(a)(1)(E).

**2.**  In arguing that its reasons for cancelling the depositions were not pretextual, Facebook does not mention Plaintiffs' Rule 26(a) disclosures. *Compare* Opp'n at 37–38, *with* Ex. 53, *and* ECF No. 840 at 4. Instead, it focuses on two motions to compel, arguing that those motions provided a reasonable basis to cancel the depositions. Before its opposition to the sanctions motion, however, Facebook's principal justification for cancellation had been Plaintiffs' Rule 26(a) disclosures, not the two motions to compel. *See* Ex. 53; ECF No. 840 at 4.

In any event, it is deeply implausible that Facebook's attorneys really believed that the

---

[7] After more than two years of conferring over financial discovery, Facebook stated in January 2022 that the financial documents Plaintiffs had been seeking did not exist. Ex. 86. This claim was consistent with earlier representations. *See* Ex. 30 at 9:6–9; *see also* Mot. at 9–10. Recently, however, Facebook confirmed for the first time that the financial documents Plaintiffs are seeking do exist, and that Facebook is producing them on a rolling basis. Ex. 87. Facebook's prior representations were therefore objectively false. Facebook has also continued to give contradictory answers to the Special Maser's inquiries about the Named Plaintiffs' data. *See* Decl. ¶¶ 16–24.

materials sought by those motions to compel were necessary for the depositions of the Named Plaintiffs. This is clear once we consider what materials those motions to compel asked for—a subject that Facebook keeps rather vague in its response.

One of the motions to compel sought information about certain kinds of photographs and posts that the Named Plaintiffs had made on *other*, non-Facebook social media platforms, even though the Named Plaintiffs had already disclosed their profile names or user handles on other social media. *See* Ex. 80. The other motion to compel asked the Named Plaintiffs to state if they knew whether their Facebook friends used certain devices, apps, or services of certain of Facebook's whitelisted partners or business partners. *See* Ex. 81. Note that in this second motion to compel, Facebook was not asking whether the Named Plaintiffs' friends used certain devices, apps, or services, but whether the Named Plaintiffs *knew* whether their friends used them. *See* Ex. 82 at 1–3. Even if—as Special Master Garrie later ruled—the information sought by these motions was discoverable, it was hardly so valuable and probative as plausibly to justify the wholesale cancellation of depositions.

Thus, Plaintiffs' conclusion remains on solid ground: the reasons that Facebook gave for cancelling the Named Plaintiffs' depositions were obviously insubstantial—so insubstantial, in fact, that it is reasonable to infer that those reasons were a mere pretext.

**B.   The obviously insubstantial reasons Facebook gave for cancelling the depositions provide compelling evidence of bad faith in scheduling depositions of the current, and seeking depositions from the former, Named Plaintiffs.**

Although the reasons Facebook gave for cancelling depositions seem pretextual, they were, in any event, obviously insubstantial. And this fact, in turn, leads to unpleasant conclusions about Facebook's prior actions.

*1. Scheduling the current Named Plaintiffs' depositions.* If Facebook was willing to cancel the Named Plaintiffs' depositions on such flimsy grounds, they must not have been an urgent priority. Yet in the months before the cancellation, Facebook had pushed urgently and contentiously to schedule the Named Plaintiffs' depositions—a process that occupied a great deal of time. *See* Mot. at 39. By pushing in this way for depositions for which it felt no great need,

Facebook acted in sanctionable bad faith.

   ***2. Seeking the former Named Plaintiffs' depositions.*** The grounds that Facebook gave for cancelling the current Named Plaintiffs' depositions also reflects harshly on Facebook's push to take the depositions of the former Named Plaintiffs—and to take those depositions *first*.

   Whether or not the grounds for cancellation were pretextual, they were certainly insubstantial, thus showing that Facebook saw no urgent need to take the current Named Plaintiffs' depositions. Given that fact, there could have been no urgent need to take the *former* Named Plaintiffs' depositions either; realistically, the former Named Plaintiffs offered nothing that the current named Plaintiffs lacked. Facebook's attempt to take depositions from the former Named Plaintiffs first thus looks like an attempt to harass former Named Plaintiffs, not a good-faith discovery motion.

   Facebook argues, however, that the former Named Plaintiffs *did* offer something special. In trying to depose the former Named Plaintiffs, Facebook asserts, it was trying to elicit information relevant to predominance under Rule 23(b)(3) or to standing. This argument cannot be taken seriously. As the Special Master pointed out, the former Named Plaintiffs whose depositions Facebook wanted to take represented about "0.0000017% of the total class, assuming a class size of approximately 300,000,000." ECF No. 782 at 006. So small a proportion of the class could not show anything helpful about predominance or standing that depositions of the current Named Plaintiffs could not. And none of this can justify Facebook's attempt to take depositions from the former Named Plaintiffs *first*.

   Worse, if Facebook really wanted to take depositions from the former Named Plaintiffs to show lack of standing, the reasons it gave for cancelling the current Named Plaintiffs' depositions would apply with only more force to the former Named Plaintiffs. Suppose for the moment that Facebook genuinely believed that depositions of the current Named Plaintiffs would not be useful without fuller 26(a) disclosures about their injuries. If so, that line of thought would apply equally, if not more, to the former Named Plaintiffs, whom Facebook says it wanted to probe about their injuries-in-fact. *See* Opp'n at 39. In short, if Facebook really believed the

grounds it gave for cancelling the current Named Plaintiffs' depositions, then it also would have avoided deposing the former Named Plaintiffs—who, of course, were under no obligation to supplement their initial disclosures.

In sum, Facebook's cancellation of the current Named Plaintiffs' depositions strongly suggests that its attempt to depose the former Named Plaintiffs was in bad faith.

## V.   SANCTIONS FOR A BAD-FAITH LITIGATION STRATEGY SUPPORTED BY MISREPRESENTATIONS

### A.   Facebook's litigation strategy was in bad faith.

For nearly two years, Facebook had a practice of delaying the resolution of discovery disputes. Once the deadline for substantial completion of document discovery began to approach, however, they began to argue that it was too late for Plaintiffs to be raising the disputes that Facebook itself had delayed. This bad-faith litigation strategy is sanctionable.

*1. Delaying resolution of disputes.* There is ample evidence that Facebook deliberately delayed, or tried to deliberately delay, the resolution of discovery disputes. Plaintiffs have already discussed its attorneys' sanctionable attempts to delay resolution of the ADI dispute in late 2021, *see supra* pp. 3–4, but those attempts were just one part of a larger pattern. Facebook's counsel repeatedly delayed the resolution of discovery disputes by flatly refusing to state their position, *see* ECF No. 471 at 2–3, or by maintaining that a dispute was not ripe for resolution, ECF No. 558 at 9–10; ECF No. 583 at 10; ECF No. 598 at 4, 8; Ex. 59 at 4–6. And again and again, Facebook's counsel insisted that Plaintiffs were bringing up too many discovery issues at once or were seeking rulings on unripe issues. *See, e.g.*, Ex. 13 at 61–62 (too many issues at once); ECF No. 598 at 7 (unripe issues).

Facebook denies that it tried to delay resolution of disputes, but it says little about the evidence to which Plaintiffs have pointed. *Compare* Mot. at 45, *with* Opp'n at 43. Instead, it speaks to only part of the picture. Specifically, it maintains that when it insisted in June 2020 that all discovery disputes had to be mediated before they could be resolved, ECF No. 689 at 2–3, its position was accepted by the Special Master, Opp'n at 43:4–6. This claim is deeply misleading because it conflates two different periods in this litigation: before and after appointment of the

Special Master. In June 2020, there was no Special Master. At that time, when Plaintiffs opposed Facebook's position that all discovery disputes should be mediated, they did so *precisely because there was no Special Master* that could issue a binding order and actually resolve a dispute. *See* Ex. 8 at 6:13–7:9; ECF No. 688. That is why, before the Special Master was appointed, it halted progress when Facebook insisted that all discovery disputes had to be mediated.

  *2. Arguing it was too late for disputes to be resolved.* During the January 19, 2022 hearing, Attorney Snyder argued at length that it was too late for existing discovery disputes to be adjudicated. *See* Ex. 3 at 13:2–15, 30:16–21. Facebook cannot deny this, so instead it discusses other things that attorney Snyder said at the January 19 hearing. *See* Opp'n at 43:14–20. Attorney Snyder did say a great many things at the hearing. One of those things, however, was an argument that existing discovery disputes should not be resolved. Ex. 3 at 30:3–13, 30:16–21. The statements to which Facebook points did not negate that argument.

## B.  Facebook's counsel used misrepresentations to aid its bad-faith litigation strategy.

  For nearly two years, Facebook's counsel maintained that Plaintiffs—not Facebook—were delaying discovery by seeking irrelevant information or raising meritless issues. Mot. at 43–44. Facebook now characterizes these statements as zealous advocacy or mere statements of opinion. Opp'n at 41–42.

  To some degree, the false accusations that Facebook made against Plaintiffs are a side issue. Sanctions are warranted because Facebook first delayed resolution of discovery disputes, and then argued it was too late to resolve them. The false accusations played a role in that strategy by shifting the blame for discovery delays, but the strategy would be sanctionable whether or not Facebook leveled its false accusations.

  Facebook is also wrong to dismiss its accusations as mere advocacy or statements of opinion. Facebook did not use vague epithets. It said that Plaintiffs were delaying the litigation by raising scores of meritless issues. *See* Mot. at 43–44. Whether a party is raising scores of meritless issues is a matter of fact that can be objectively true or false. Here, the accusation was objectively false. *See id.* at 44; *see also supra* at p. 20 n.7. And these false accusations also

placed a burden on the Court—first Judge Corley, then the discovery mediators, and finally the Special Master—to disentangle the frivolous arguments from the serious ones.

## VI.   THE TIMELINESS OF PLAINTIFFS' MOTION

Facebook suggests that Plaintiffs' motion is untimely. Opp'n at 13. The Ninth Circuit case it cites, however, does not establish any bright-line rule for timeliness. *See In re Yagman*, 796 F.2d 1165, 1184 (9th Cir. 1986) (timeliness of a sanctions motion depends on the circumstances and "may vary widely"). Instead, the court reversed a post-trial imposition of sanctions, reasoning that waiting to impose sanctions "until the end of the case" does not further "the policy of deterrence." *Id.*[8]

Here, by contrast, discovery is ongoing. Sanctions would thus further the policy of deterring further discovery misconduct. The misconduct that Plaintiffs' motion targets is either ongoing (ADI, Named Plaintiffs' data) or only improved recently (misconduct related to depositions, bad-faith litigation strategy). Plaintiffs' motion is not untimely.

In arguing that it is too late to impose sanctions, Facebook also contradicts its argument that the Court should hold Plaintiffs' motion in abeyance. The Court should hold the motion in abeyance, Facebook maintains, so that the Court can evaluate the entirety of its discovery conduct. *See* Opp'n at 47 (asking for "the opportunity to demonstrate . . . that any concerns the Court might have had are being addressed"). It does not explain how this would promote "the policy of deterrence." *Yagman*, 796 F.2d at 1184. But this contradiction does not prevent Facebook from arguing, yet again, that it is both too early and too late.

## VII.   SUBSTANTIATION OF FEES AND COSTS

According to Facebook, Plaintiffs have failed to adequately substantiate their request for attorneys' fees and costs. Opp'n at 45. Facebook appears to take the position that individual billing records, or their equivalent, are required. *Id.* That is not a blanket rule in this District.

---

[8] *See also Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756–57 (7th Cir. 1994) (cited by Opp'n at 13) (motion seeking sanctions for discovery abuse was untimely when not filed until the jury instruction conference); *Mercy v. Suffolk Cty.*, 748 F.2d 52, 55–56 (2d Cir. 1984) (cited by Opp'n at 13) (right to seek sanctions is normally deemed forfeited if not made before trial).

Courts have accepted declarations considerably less detailed than Plaintiffs'. *See Optrics Inc. v. Barracuda Networks Inc.*, No. 17-cv-04977-RS (TSH), 2021 WL 411349, at *8–9 (N.D. Cal. Feb. 4, 2021). In any event, Plaintiffs are willing to submit their billing records to the Court if so requested. It is common practice to grant a motion for sanctions and then invite the moving party to submit substantiation.[9]

## VIII. CONCLUSION

The history of this case reveals a pattern of discovery misconduct that flowed not from isolated lapses of judgment but from a strategy of delay, disobedience, and even, at times, prevarication. For the reasons given here and in their initial motion, Plaintiffs respectfully ask the Court to impose monetary sanctions as requested in their motion.

Dated: April 25, 2022                                 Respectfully submitted,


KELLER ROHRBACK L.L.P.                    BLEICHMAR FONTI & AULD LLP

By:   */s/ Derek W. Loeser*                     By:   */s/ Lesley E. Weaver*
      Derek W. Loeser                                   Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)        Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*) Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)               Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)        Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                      Joshua D. Samra (SBN 313050)
Emma M. Wright (admitted *pro hac vice*)         555 12th Street, Suite 1600
1201 Third Avenue, Suite 3200                    Oakland, CA 94607
Seattle, WA 98101                                Tel.: (415) 445-4003
Tel.: (206) 623-1900                             Fax: (415) 445-4020
Fax: (206) 623-3384                              lweaver@bfalaw.com
dloeser@kellerrohrback.com                       adavis@bfalaw.com
claufenberg@kellerrohrback.com                   mmelamed@bfalaw.com
dko@kellerrohrback.com                           aornelas@bfalaw.com
adaniel@kellerrohrback.com                       jsamra@bfalaw.com
bgould@kellerrohrback.com

---

[9] *See True Health Chiropractic Inc v. McKesson Corp.*, No. 13CV02219HSGDMR, 2015 WL 3453459, at *1–2 (N.D. Cal. May 29, 2015) (granting sanctions motion and then reviewing attorney fee application); *Kraszewski v. State Farm Gen. Ins. Co.*, No. C 79-1261 TEH, 1984 WL 1027, at *2, *3, *12 (N.D. Cal. June 11, 1984) (analyzing the attorney's fees provided in a submission filed after the Court made a finding of sanctionable conduct).

ewright@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of April, 2022, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on April 25, 2022, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ *Sarah Skaggs*
Sarah Skaggs