GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Rosemarie T. Ring (SBN 220769)
    rring@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **OPPOSITION OF FACEBOOK, INC., GIBSON, DUNN & CRUTCHER LLP, AND ORIN SNYDER TO PLAINTIFFS' MOTION FOR SANCTIONS** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 5

    I.     Facebook has produced an enormous volume of documents........................................ 5

    II.    Plaintiffs now seek to recast Facebook's actions as bad faith and delay. ..................... 8

ARGUMENT ...................................................................................................................... 11

    III.   There Has Been No Sanctionable Conduct Relating to the ADI Documents. ............ 13

         A.     Facebook's claims of attorney-client privilege and work-product
               protection were not only substantially justified but also *upheld* in
               important respects. ......................................................................................... 14

         B.     As Plaintiffs and Judge Corley have acknowledged, Facebook has
               participated in good faith in dispute-resolution processes relating to the
               ADI documents. ............................................................................................ 16

         C.     Facebook has complied with all ADI orders................................................. 20

    IV.   There Has Been No Sanctionable Conduct Relating to Named Plaintiff Data. .......... 23

         A.     *March–October 2020*:  Facebook produced named plaintiff data that
               could have been shared with third parties, including in all three
               categories of "discoverable user data" identified in Discovery Order
               No. 9. ............................................................................................................ 25

         B.     *June–October 2020*:  Judge Corley issues Discovery Order No. 9,
               which identifies three categories of "discoverable user data." ..................... 26

         C.     *November 2020–January 2021*: Judge Corley issues *Discovery Order
               Nos. 11 and 12*, allowing Plaintiffs to conduct discovery into what, if
               any, additional named plaintiff data covered by *Discovery Order No. 9*
               is relevant and proportional to their claims and therefore should be
               produced under Rule 26. ............................................................................... 28

         D.     *April–September 2021*:  The parties go to mediation about various
               discovery disputes, and Plaintiffs continue to seek production of *all*
               named plaintiff data in the three categories of discoverable user data
               identified in Discovery Order No. 9................................................................ 30

         E.     October *2021–Present*:  Plaintiffs move to compel, resulting in orders
               requiring the parties to participate in a process before the Special
               Master to determine what, if any, additional named plaintiff data should
               be produced. .................................................................................................. 30

    V.    Sanctions Are Not Appropriate for Conduct Relating to Deposition
         Scheduling................................................................................................................. 35

          A.     Postponing depositions until relevant documents have been produced is
               good practice, not bad faith............................................................................ 35

Gibson, Dunn &
Crutcher LLP

   B.  Facebook had legitimate reasons for seeking to depose former named plaintiffs. ................................................................................... 39

   C.  Deposition discovery is proceeding apace. ...................................... 40

VI. Counsel's True Statements and Statements of Opinion, Made in the Course of Normal Advocacy, Are Not Sanctionable. ................................................... 41

VII. Plaintiffs' Fee Request Is Unreasonable. ................................................... 44

VIII. If the Court Has Any Doubts, Gibson Dunn Respectfully Asks the Court to Hold Plaintiffs' Motion in Abeyance. ........................................................ 46

CONCLUSION .................................................................................................................. 47

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS   CASE NO. 3:18-MD-02843-VC

# TABLE OF AUTHORITIES

## CASES

*A.B. v. Pac. Fertility Ctr.*,
2019 WL 6605883 (N.D. Cal. Dec. 3, 2019) ..................................................................43

*Adobe Sys.A & S Elecs., Inc.*,
2016 WL 8222618 (N.D. Cal. June 30, 2016) ................................................................39

*Apple Inc. v. Samsung Elecs. Co.*,
2012 WL 1511901 (N.D. Cal. Jan. 27, 2012) .................................................................39

*Apple Inc. v. Samsung Elecs. Co.*,
2012 WL 762240 (N.D. Cal. Mar. 8, 2012) ...................................................................39

*Aristocrat Techs. v. Int'l Game Tech.*,
2009 WL 3573327 (N.D. Cal. Oct. 30, 2009) ...........................................................18, 21

*AT&T Corp. v. Microsoft Corp.*,
2003 WL 21212614 (N.D. Cal. Apr. 18, 2003) ..............................................................17

*Att'y Gen. v. Facebook, Inc.*,
164 N.E.3d 873 (Mass. 2021) .........................................................................................16

*Bird v. Wells Fargo Bank*,
2017 WL 4123715 (E.D. Cal. Sept. 18, 2017) ...............................................................48

*Brandt v. Vulcan, Inc.*,
30 F.3d 752 (7th Cir. 1994) .............................................................................................15

*Choudhuri v. Wells Fargo Bank, N.A.*,
2017 WL 5598685 (N.D. Cal. Nov. 21, 2017) ...............................................................49

*Clark v. United States*,
2011 WL 66181 (D. Haw. Jan. 7, 2011) .........................................................................15

*Claypole v. Cnty. of Monterey*,
2016 WL 145557 (N.D. Cal. Jan. 12, 2016) ..................................................................39

*Colaco v. ASIC Advantage Simplified Pension Plan*,
301 F.R.D. 431 (N.D. Cal. 2014) ...................................................................................17

*Commissioner of Rev. v. Comcast*,
901 N.E.2d 1185 (Mass. 2009) .......................................................................................16

*CRS Recovery, Inc. v. Laxton*,
2008 WL 2951379 (N.D. Cal. July 25, 2008) ................................................................25

*Dahl v. City of Huntington Beach*,
84 F.3d 363 (9th Cir. 1996) .............................................................................................47

*Digital Empire Ltd. v. Compal Elecs. Inc.*,
2015 WL 11570938 (S.D. Cal. Sept. 4, 2015) ...............................................................50

*Dolby Labs. Licensing Corp. v. Adobe Inc.*,
402 F. Supp. 3d 855 (N.D. Cal. 2019) ....................................................................18

*Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*,
2009 WL 3617786 (N.D. Cal. Oct. 29, 2009) ........................................................49

*Eberle v. City of Anaheim*,
901 F.2d 814 (9th Cir. 1990) ..................................................................................13

*FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*,
2020 WL 907058 (S.D. Cal. Feb. 25, 2020) ..........................................................14

*Glasser v. Blixseth*,
649 F. App'x 506 (9th Cir. 2016) ...........................................................................47

*Goodyear Tire & Rubber Co. v. Haeger*,
137 S. Ct. 1178 (2017) ............................................................................................48

*In re Grand Jury*,
23 F.4th 1088 (9th Cir. 2022), *petition for cert. filed*
(U.S. Apr. 6, 2022) (No. 21M105) ..........................................................................24

*In re Grand Jury Subpoena*,
357 F.3d 900 (9th Cir. 2004) ..................................................................................16

*Hensley v. Eckhart*,
461 U.S. 424 (1983) ................................................................................................49

*I.E.I. Co. v. Advance Cultural Educ.*,
2011 WL 1335407 (N.D. Cal. Apr. 7, 2011) .........................................................49

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005) ................................................................................13

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) ..................................................................................48

*Luxul Tech. Inc. v. NectarLux, LLC*,
2016 WL 3345464 (N.D. Cal. June 16, 2016) .......................................................44

*Mas v. Cumulus Media Inc.*,
2010 WL 4916402 (N.D. Cal. Nov. 22, 2010) .......................................................39

*McConnell v. PacifiCorp Inc.*,
2008 WL 4279682 (N.D. Cal. Sept. 12, 2008) ......................................................39

*Mercy v. Suffolk Cnty.*,
748 F.2d 52 (2d Cir. 1984) .....................................................................................15

*Moore v. Stepp*,
2014 WL 116271 (N.D. Cal. Jan. 13, 2014) ..........................................................27

*Mount Hope Church v. Bash Back!*,
705 F.3d 418 (9th Cir. 2012) .............................................................................44, 45

Gibson, Dunn &
Crutcher LLP

iv

OPPOSITION OF FACEBOOK, INC., GIBSON, DUNN & CRUTCHER LLP, AND ORIN SNYDER TO
PLAINTIFFS' MOTION FOR SANCTIONS – CASE NO. 3:18-MD-02843-VC

*Operating Eng'rs Pension Tr. v. A-C Co.*,
  859 F.2d 1336 (9th Cir. 1988)..................................................................................13, 44

*Orgler Homes, Inc. v. Chi. Reg'l Council of Carpenters*,
  2008 WL 5082979 (N.D. Ill. Nov. 24, 2008),..............................................................49

*Otis v. Demarasse*,
  399 F. Supp. 3d 759 (E.D. Wis. 2019)..........................................................................47

*Phillips v. C.R. Bard, Inc.*,
  290 F.R.D. 615 (D. Nev. 2013).....................................................................................18

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  2019 WL 1589974 (N.D. Cal. Apr. 11, 2019) ..............................................................39

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
  115 F.3d 644 (9th Cir. 1997)..........................................................................3, 17, 47

*Procongps, Inc. v. Skypatrol, LLC*,
  2013 WL 11261327 (N.D. Cal. May 22, 2013) .............................................................40

*Quiroz v. Horel*,
  2014 WL 572381 (N.D. Cal. Feb. 11, 2014) .................................................................18

*Reygo Pac. Corp. v. Johnston Pump Co.*,
  680 F.2d 647 (9th Cir. 1982)..................................................................................13, 17

*Rooney v. Sierra Pac. Windows*,
  2011 WL 2149097 (N.D. Cal. June 1, 2011) ................................................................48

*Sneller v. City of Bainbridge Island*,
  606 F.3d 636 (9th Cir. 2010)........................................................................................49

*Sorensen v. Nat'l R.R. Passenger Corp.*,
  2017 WL 6520629 (C.D. Cal. Nov. 30, 2017)..............................................................46

*In re Subpoena Issued to Cisco Sys., Inc.*,
  2010 WL 3155895 (N.D. Cal. Aug. 9, 2010)................................................................39

*Sweet People Apparel, Inc. v. Saza Jeans, Inc.*,
  2016 WL 6053958 (C.D. Cal. May 25, 2016)...............................................................49

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 13093328 (N.D. Cal. Oct. 19, 2012)..............................................................39

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021).................................................................................................43

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989)......................................................................................................43

*United States v. Corinthian Colls.*,
  652 F. App'x 503 (9th Cir. 2016) .................................................................................47

*United States v. Figueroa-Arenas*,
  292 F.3d 276 (1st Cir. 2002).........................................................................................47

Gibson, Dunn &
Crutcher LLP

*United States v. Richey*,
   632 F.3d 559 (9th Cir. 2011).............................................................................................24

*Van Gerwen v. Guarantee Mut. Life Co.*,
   214 F.3d 1041 (9th Cir. 2000)...........................................................................................48

*Vogel v. Harbor Plaza Ctr., LLC*,
   893 F.3d 1152 (9th Cir. 2018)...........................................................................................48

*Matter of Yagman*,
   796 F.2d 1165 (9th Cir. 1986)....................................................................................14, 15

## OTHER AUTHORITIES

LexisNexis Discovery Services, Fact Sheet: How Many Pages in a Gigabyte? at 1,
   https://tinyurl.com/2p9bms6w (last visited April 10, 2022)...............................................9

Regan Hunt Crotty, *Pre-Certification Discovery of Absent Class Members*, Law Journal Newsletters
   (Jan. 2006), available at https://tinyurl.com/yncpbje3 ....................................................42

What Is a Petabyte?, Teradata, https://www.teradata.com/ Glossary/What-is-a-Petabyte (last visited
   April 1, 2022)....................................................................................................................10

## RULES

Fed. R. Civ. P. 11 ....................................................................................................................13

## TREATISES

Model Rules of Prof'l Conduct R. 3.3 (2020)..........................................................................44

Model Rules of Prof'l Conduct R. 3.3 cmt. 2 (2020)...............................................................44

Gibson, Dunn &
Crutcher LLP

OPPOSITION OF FACEBOOK, INC., GIBSON, DUNN & CRUTCHER LLP, AND ORIN SNYDER TO
PLAINTIFFS' MOTION FOR SANCTIONS – CASE NO. 3:18-MD-02843-VC

## **INTRODUCTION**

When the Court invited Plaintiffs to file a motion for sanctions, it had before it a false and misleading account of the discovery record in this case, which Plaintiffs repeat in their motion. Plaintiffs' motion is based on accusations of disobeying orders and making frivolous legal arguments, and a mechanical repetition of buzzwords like "foot-dragging" and "stonewalling," none of which is supported by the record. In fact, the record shows that Facebook has complied with all orders and participated in good faith in dispute-resolution processes that were agreed upon by the parties and ordered by this Court. While these processes have taken longer than anyone expected, Plaintiffs ignore the unreasonable and incessant demands they made throughout leading to numerous disputes and now attempt to create the false impression that they prevailed on all of these disputes through motion practice by obtaining orders requiring Facebook to produce documents that never came. As explained below, Plaintiffs' narrative is incomplete and untrue. Plaintiffs' request for sanctions on this record is an invitation to error, and this Court should reject it in its entirety.

Plaintiffs seek sanctions on four grounds, none of which has any merit. *First*, Plaintiffs seek sanctions for conduct relating to the App Developer Investigation, or ADI. While the parties spent a significant amount of time litigating and engaging in other discovery processes regarding ADI-related documents, the story Plaintiffs tell on ADI is simply false. As an initial matter, Plaintiffs say (at 24) that "[a]s of February 3, Facebook had produced a total of 50 ADI documents." Not true. By that date, Facebook had produced 13,908 documents (30,617 pages), and produced an additional 405 documents (8,735 pages) the very next day. Stein Decl. ¶ 11(b), (k). Plaintiffs also claim (at 18) that Facebook "did not obey [the] directive" in Judge Corley's September 2021 order to "work with the Special Master regarding production of additional" ADI materials. Again, not true. Facebook has not only completed its production of documents pursuant to the Special Master's ADI-related orders, it has affirmatively reached out to Plaintiffs about additional steps not required by those orders and a request to seek amendment of them, which the Court addressed during our last case management conference. And there is no basis to sanction Facebook for arguing that ADI-related documents are protected by the work-product doctrine and attorney-client privilege, positions that have *prevailed* in another jurisdiction and *succeeded* in narrowing the scope of production here.

*Second*, Plaintiffs seek sanctions for conduct relating to named plaintiff data, and again base their arguments on false characterizations of the record. As an initial matter, Plaintiffs misrepresent Facebook's productions to date, as they have throughout the discovery process to minimize the volume and type of named plaintiff data that has already been produced. Facebook has produced nearly one million pages of named plaintiff data, including all three types of data that Judge Corley ruled are discoverable. Stein Decl. ¶ 4(h). Plaintiffs also falsely assert (at 32) that Facebook "disobeyed Judge Corley's order for more than a year." But the "order" Plaintiffs are referring to did not direct Facebook to produce additional named plaintiff data. It defined the scope of discoverable data and was followed by two more orders issued by Judge Corley identifying issues relevant to determining whether additional named plaintiff data should be produced. Judge Corley's latest order on this subject, dated January 12, 2022, confirms this in explaining that the ongoing proceedings before the Special Master are meant "to determine what, *if any*, data from [Facebook] systems should be produced consistent with [Rule 26]." Dkt. 807 at 4 (emphasis added). In that process, which began in late November 2021, Facebook has timely and fully complied with 11 orders and produced four witnesses who testified for more than ten hours during three hearings. Stein Decl. ¶ 11(g).

*Third*, Plaintiffs seek sanctions based on Facebook postponing named plaintiff depositions and seeking to depose former named plaintiffs. There is nothing sanctionable about postponing depositions where, as here, discovery relevant to those depositions had not been provided, or requesting to depose former named plaintiffs. Both are customary and reasonable practices. In any event, Facebook has now deposed six of the eight named plaintiffs, and the last two are scheduled for April 15 and 28, even though Plaintiffs still have not fully complied with two orders issued by the Special Master in February compelling production of documents.

*Finally*, Plaintiffs' request for sanctions against Mr. Snyder is a dangerous attempt to make advocacy a basis for imposing sanctions. According to Plaintiffs, Mr. Snyder presented a "false narrative" about Facebook's intention to comply with its discovery obligations and about who was to blame for discovery delays. Plaintiffs apparently target Mr. Snyder because, while they say (at 3) "a number of Gibson Dunn attorneys played roles in the misconduct," Mr. Snyder is "Facebook's lead lawyer." But there is no imputed liability for sanctions. Sanctions, which "may have a severe effect

on the individual attorney sanctioned," must be "based *solely on [the attorney's] own improper conduct* without considering the conduct of the parties or any other attorney." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 650 (9th Cir. 1997) (reversing award of sanctions) (emphasis added) (cleaned up); *see also id.* (recognizing that a court must "assess an attorney's individual conduct"). The so-called "false narrative" reflects Mr. Snyder's truly held beliefs, then and now, and his zealous advocacy based on them. Mr. Snyder stands behind his statement in March 2020 that Facebook intended to comply with its discovery obligations. Snyder Decl. ¶ 5. Despite a global pandemic that upended personal and professional lives in the two years since, Facebook delivered on that commitment. And Mr. Snyder's view that Plaintiffs share the blame for discovery disputes and delays is supported by the record. His advocacy on these points is not "false" simply because Plaintiffs believe their own conduct was justified. Mr. Snyder has never once been sanctioned in more than 35 years of practicing law, and it would be unprecedented and unfair to do so here.

Plaintiffs' charge of a false narrative is also deeply hypocritical, given that they support their request for sanctions with false and misleading accounts of the record in this case. Indeed, the false narrative conjured up by Plaintiffs permeates every aspect of their motion. The record shows that Facebook has complied with all orders, made meritorious legal arguments, and participated in good faith in dispute-resolution processes, which explains why neither Plaintiffs nor any of the discovery neutrals have suggested, let alone accused anyone of, sanctionable conduct.

Five months ago, in the heart of the period for which Plaintiffs seek sanctions, Special Master Garrie reviewed a sample of documents from Facebook's review set and approvingly noted that "there do not appear to be deficiencies in Facebook's production to date," and found that Facebook was "on pace to meet the substantial completion deadline." Dkt. 746 at 3 (emphasis added). Three months ago, during a hearing on appeals by Facebook involving three of the four issues on which Plaintiffs seek sanctions, Judge Corley rejected Plaintiffs' assertion that Facebook's motion practice and appeals were somehow improper, observing that they have resulted in Special Master Garrie narrowing his orders and that "[Facebook hasn't] appealed every order [or] every aspect of every order," "[s]o I don't think you can make an argument that there was anything bad faith about that at all. . . . I couldn't let that stand uncorrected. I don't think that's fair." Ex. 32 at 54:11–23 (emphasis

added).  And just last month, in a hearing on named plaintiff data, Special Master Garrie said he wanted "to officially on the record recognize and thank Facebook for accommodating an accelerated timeline for a very complex set of problems" and providing "very helpful" materials.  Ex. 42 at 6:21–7:11; *see also, e.g.*, Dkt. 717 at 4:20–5:7 (Judge Andler, at a July 2021 status conference, describing counsel as a "dedicated" and "tremendously hardworking group of attorneys").  These are not the descriptions of a litigant or counsel who has acted in bad faith.

Discovery in this case has not been easy, and has involved numerous disputes between the parties on important and often technically complex issues that have taken time to work through.  But there is no support in the record for Plaintiffs' contention that it is due to sanctionable conduct by Facebook, Gibson Dunn, or Mr. Snyder, and Plaintiffs have never raised sanctions with Judge Corley or the discovery neutrals, none of whom has ever suggested that Facebook or Gibson Dunn engaged in sanctionable conduct.  Plaintiffs' change in position likely reflects their view that, given the time it took to work through the parties' discovery disputes, they needed more time for discovery.  This led Plaintiffs to present a narrative to the Court before the February 10, 2022 CMC in anticipation of requesting more time, which the Court has now granted.  But Plaintiffs went too far, and rather than admit it, they are asking this Court to grant a sanctions motion that the record does not support.  The Gibson Dunn lawyers who have appeared on behalf of Facebook in this case have a collective 150 years of experience practicing law and none has ever been sanctioned.  Stein Decl. ¶ 6.

With the parties now close to completing discovery and working through agreed-upon and court-ordered processes to resolve issues addressed in Plaintiffs' motion, Facebook, Gibson Dunn, and Mr. Snyder ask that the Court deny Plaintiffs' motion in full, or, in the alternative, hold the motion in abeyance pending the completion of discovery, so the Court can see that this is not a case calling for the rare and exceptional remedy of sanctions.[1]

---

[1]  During the February 10, 2022 case management conference, the Court advised Plaintiffs that their motion was not subject to the usual 15-page limit, but did not expressly address the page limit for Facebook's response.  Facebook has kept its response to the same length as Plaintiffs' motion.

## **BACKGROUND**

Plaintiffs initially filed a 424-page consolidated complaint asserting 21 "prioritized" and 28 "non-prioritized" claims. Dkt. 257. Plaintiffs then filed a 366-page amended consolidated complaint. Dkt. 491. As this Court observed in its ruling on Facebook's motion to dismiss the amended consolidated complaint, Plaintiffs' allegations seemingly spanned "anything Facebook has ever been reported to have done wrong," and made it "nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Dkt. 298 at 5–6. The Court allowed the case to proceed on four theories, all having to do with data that is shared with or made accessible to third parties, and stayed all others. Dkt. 515 at 1, 6–10.

Since then, the parties, Judge Corley, and the discovery neutrals appointed by this Court have been engaged in processes to move discovery forward consistent with the Court's ruling. In MDL involving complex technical issues and parties with very different views on discovery, it is not surprising that the parties have disagreed on a number of important issues. But Facebook has produced an enormous volume of documents and always raised arguments and engaged in these discovery processes in good faith—and in many cases, those arguments have been successful. The picture of recalcitrance painted by Plaintiffs is simply not true.

## I. Facebook has produced an enormous volume of documents.

To date, Facebook has reviewed approximately 24 million pages of documents and produced nearly 3 million pages of documents, as well as 80 gigabytes (GB) of structured data. Stein Decl. ¶ 2(a)–(b). This was no easy task. It was the result of dedicated work by nearly 80 Gibson Dunn attorneys (collectively devoting more than 17,000 hours) and 170 contract attorneys (collectively devoting more than 100,000 hours). *Id.* ¶ 2(e). This investment of resources by Facebook and Gibson Dunn underscores their commitment to meeting their discovery obligations.

In April and July 2020, Facebook produced approximately 302,562 pages of documents that it had produced to regulators that investigated Cambridge Analytica. Stein Decl. ¶ 10(b). Plaintiffs said these documents would "very significantly, if not entirely, overlap[] with this case," Dkt. 391 at 8:23–9:4, and the Court agreed, predicting that documents provided to the FTC "would cover the vast majority of the documents Plaintiffs would want in this litigation." *Id.* at 4:14–15.

Between March and October 2020, Facebook also produced nearly *one million pages* of named plaintiff data. Stein Decl. ¶ 10(b). These productions include data in all three categories of "discoverable user data" identified by Judge Corley in her order dated October 29, 2020:[2]

(1)     *On-platform activity*: Facebook has produced on-platform activity including, among other things, profile data, user-generated content (*e.g.*, posts, videos, photos, comments, stories), message content, friends, location check-ins, language choices, clicks, Groups, Events, usage data, device data, networks and connections, users' activity levels, advertiser interactions, page interactions (user pages, pages a user liked or recommended, pages a user follows, pages a user has unfollowed), IP addresses, user choices to "see less" or "see first" other users in News Feed, last location, people a user blocked on Messenger, notifications, time zone, email address verification, and various other notifications and interactions. Ex. 41 at 3.

(2)     *Off-platform activity*: Facebook has produced off-platform activity including, among other things, users' interactions with third-party apps and websites that integrate Facebook business tools and provide information about users viewing content, searching for an item, adding an item to a shopping cart, or making a purchase. *Id*. Business tools include Facebook Pixel, Facebook SDK, Conversions API, Offline Conversions, and the App Events API. Facebook also receives impression data through Facebook Social Plugins (*e.g.*, Like and Share buttons). *Id.* at 4.

(3)     *Inferred data*: Facebook has produced data that is derived from on or off-platform activity including, among other things, ads interests; music recommendations based on genres of music a user has interacted with on Facebook; "your topics," which is a collection of topics determined by a user's activity on Facebook that is used to create recommendations for users in different areas of Facebook such as News Feed, News, and Watch; primary location; primary public location; friend peer group; time zone; and language preferences. *Id.*

Between April and October 2020, Facebook produced 30,617 pages of non-privileged

---

[2]  *See, e.g.*, Stein Decl. ¶ 12(b) (FB-CA-MDL-00379097–FB-CA-MDL-00386689 (Jason Ariciu, produced Apr. 7, 2020); FB-CA-MDL-00378871–FB-CA-MDL-00379096 (Steven Akins, produced Apr. 7, 2020); FB-CA-MDL-00405251–FB-CA-MDL-00417392 (Terry Fischer, produced May 4, 2020). And Facebook later made a supplemental production of additional data associated with two of the Named Plaintiffs. *See id.* (FB-CA-MDL-02097000–FB-CA-MDL-02112805 (Bridgett Burk, produced Oct. 22, 2021), FB-CA-MDL-02090574–FB-CA-MDL-02096999 (Steven Akins, produced Oct. 22, 2021)).

documents (roughly 13,900 documents) related to ADI.  Stein Decl. ¶ 11(b), (k).  ADI was an investigation, conducted by Gibson Dunn, to review apps and app developers that were active on Facebook before Facebook transitioned away from a form of data sharing with third parties called "friend sharing."  ADI's goal was to identify and assess any legal risks.  Gibson Dunn, with Facebook's in-house counsel and two forensic consulting firms, addressed millions of apps and app developers.  As a result, Facebook and Gibson Dunn believed (and continue to believe) that many of ADI-related documents are protected by the work-product doctrine and attorney-client privilege, as the Massachusetts Supreme Judicial Court has held.  *See infra* at 15–17.

With respect to ESI from the files of Facebook employees, the parties met and conferred at least 30 times, for more than 50 hours, to identify custodians and search terms.  Dkt. 469 at 6–7.  With the assistance of Judge Corley, the parties agreed on 81 custodians by May 2020.  Dkt. 436 at 1.  Plaintiffs initially sought strings that would have required Facebook to review nearly *100 million pages* of documents.  *See* Dkt. 495 at 8; Dkt. 599 at 6.  After six months of negotiations, with assistance from the discovery neutrals, the parties agreed on strings resulting in roughly 24 million pages of documents for review.  Dkt. 517 at 4; Dkt. 599 at 6; Dkt. 650 at 7; Dkt. 654 at 2–3; Stein Decl. ¶ 10(c).  The review yielded a low responsiveness rate—on average, less than 5% were responsive and non-privileged.  Stein Decl. ¶ 10(e).  In October 2021, after Plaintiffs challenged the responsiveness rate, Special Master Garrie conducted an *in camera* review of a random sample of documents remaining to be reviewed and found that "*there do not appear to be deficiencies in Facebook's production to date*."  Dkt. 746 at 3 (emphasis added).

In December 2021, after Plaintiffs demanded production of nearly 200 petabytes of data from tables associated with "API calls" made by third-party apps even though API call logs do not reflect what, if any, data was actually returned in response to the call, Facebook offered to produce an 80 GB table ("Method Table") summarizing the API calls.  Plaintiffs refused, Facebook successfully moved for a protective order (*infra* at 10), and then produced the Method Table.  Stein Decl. ¶ 10.

## II.    Plaintiffs now seek to recast Facebook's actions as bad faith and delay.

Plaintiffs open their brief with a chart (at 1) designed to minimize the extensive discovery that has occurred in this case to date.  The volume of Facebook's productions vastly exceeds what is depicted in that chart, which is misleading in several respects:

- It ignores the difference between a 1-page "junk" file and a 212-page technical report by listing the number of *documents* produced rather than the number of *pages* produced.

- It ignores that presentations and spreadsheets were produced as native files, which would be counted as a single document and page, even though Facebook would have had to review every single page before production.  Stein Decl. ¶ 10(f).

- It discounts the significance of the production of named plaintiff data by saying it was "already available to Plaintiffs."

- It ignores 80 GB of API call-log data, equivalent to 8 million pages of printed email.[3]

- It excludes more than 360,000 pages of ADI-related documents that were produced on March 3, 2022, by applying an arbitrary cut-off date of February 2, 2022.  Stein Decl. ¶ 11(k).

A fair and accurate depiction of Facebook's productions (Stein Decl. ¶ 10(c)) tells a very different story:



Plaintiffs also attempt to create the false impression that Facebook and Gibson Dunn have

---

[3]    LexisNexis Discovery Services, *Fact Sheet: How Many Pages in a Gigabyte?*, at 1, https://tinyurl.com/2p9bms6w (last visited April 10, 2022).

disobeyed orders and made frivolous legal arguments by misrepresenting the parties' motion practice in the table (at 7–9) purporting to "reflect[] the status of production relating to many key disputes." The table, which is a lightly modified version of what Plaintiffs submitted to the Court before the February 3, 2022 case management conference (Dkt. 829 at 3–4), selectively omits motions that Facebook won and misrepresents others as victories for Plaintiffs or as directing Facebook to produce documents.

Plaintiffs omit the following motions on which Facebook prevailed, for example:

- In October 2021, the Special Master denied Plaintiffs' motion to compel Facebook to use Technology Assisted Review to review documents because he found that "*there do not appear to be deficiencies in Facebook's production to date*." Dkt. 746 at 3 (emphasis added).

- In November 2021, the Special Master granted Facebook's motion for a protective order denying Plaintiffs' demand for production of two tables with 200 petabytes of data. Ex. 23 at 2.

- In early February 2022, the Special Master granted two motions to compel Plaintiffs' discovery responses. Dkts. 834, 845.

- In March 2022, the Special Master denied in full Plaintiffs' motion to compel Facebook to produce documents related to an independent assessment conducted under Facebook's 2020 consent decree with the FTC. Dkt. 886.

- Between December 17, 2021 and January 31, 2022, the Special Master granted four motions brought by Facebook asking him to reconsider portions of his orders. These motions significantly narrowed the information Facebook was required to produce and, in one case, yielded a "good cause" standard for Plaintiffs to depose certain Facebook witnesses.

- Throughout the process, the Special Master has also granted four motions for reconsideration brought by Facebook, resulting in orders that were meaningfully narrowed.

For motions Plaintiffs chose to include in the chart, they claim many as "victories" (at 7–9) that are mixed at best and often significantly *narrow* the relief requested by Plaintiffs. And by including a column called "Number of Docs Produced In Response as of" 2/10/22 and 3/10/22, Plaintiffs falsely imply that certain orders required Facebook to produce documents and that Facebook violated those orders. The chart below explains the actual motion practice and result.[4]

---

[4] Two motions in Plaintiffs' chart they claim as "granted" are not included. No. 9 found that Plaintiffs had good cause to depose two Facebook witnesses deposed in related matters; and No. 11 ordered Facebook to produce documents related to a discrete topic (interactions, if any, between Facebook and Cambridge Analytica in 2016 relating to the Trump campaign).

| No. | Motion | Actual Motion Practice and Result |
|-----|--------|-----------------------------------|
| 1 | Production of Mark Zuckerberg's notebooks | • Order did not require production of documents, so chart's notation of "0" documents produced is misleading. <br><br> • Also, the Special Master did not grant the relief Plaintiffs sought. Order was for Facebook to *search for* (not produce) the notebooks, and submit any that were found for relevance review. Dkt. 745 at 5. Upon a reasonable search, no notebooks were located. Ex. 37. |
| 3 | Addition of Mark Zuckerberg and Sheryl Sandberg as document custodians | • Order did not require production of any documents by 2/10/22, and Facebook has produced all documents required by 3/10/22. <br><br> • Also, Special Master did not grant relief Plaintiffs sought, and instead accepted Facebook's proposal for more targeted searches to avoid delaying substantial completion. Currently, the parties are working with the Special Master to negotiate search terms. Stein Decl. ¶ 14(b). Plaintiffs' initial proposal hit on 770,000 documents, so the Special Master ordered Plaintiffs to identify their top ten search strings. *Id.* Plaintiffs' amended search terms hit on 410,000 documents. *Id.* |
| 4 | Identification of companies ("Business Partners") with which Facebook agreed to exchange user information | • Order did not require production of documents, so chart's notation of "0" documents produced is misleading. |
| 6 | Production of Named Plaintiffs' Data | • Order did not require production of documents, so chart's notation of "0" documents produced is misleading. As Judge Corley's most recent order makes clear, the parties are working with the Special Master to determine "what, *if any*" additional named plaintiff data should be produced. Dkt. 807 at 4 (emphasis added). |
| 7 | Implementation of Judge Corley's Order on Production of ADI-Related Documents | • Chart acknowledges that Facebook had produced 27,617 ADI-related documents as of March 10, but statement below that "Facebook had produced only 445 documents responsive to the Special Master's orders by February 10, 2022," reflects an arbitrary cutoff. |
| 11 | Production of "Facebook Secret Sauce" Memo | • Facebook *agreed* to produce the memo and any prior versions and denied Plaintiffs' demand that Facebook use search terms to locate documents related to the memo. Stein Decl. ¶ 14(c). Special Master instead ordered Facebook to make a "good faith effort" to identify custodians involved with the memo and conduct a targeted search. <br><br> • Facebook has complied with that order and has made productions pursuant to that order in February and April 2022. |

| No. | Motion | Actual Motion Practice and Result |
|-----|--------|-----------------------------------|
| 15 | Production of Documents Facebook Designated as Privileged | • Facebook entirely prevailed on the one part of this motion, and substantially prevailed on the other.<br><br>• *Part 1*. Plaintiffs moved to compel Facebook to remove trade secret redactions (primarily from source code), and Facebook proposed inspection. Special Master agreed with Facebook. Dkt. 872. Plaintiffs nevertheless characterize this motion as "uph[olding]" Plaintiffs' challenge in a recent CMC statement. Dkt. 882 at 8.<br><br>• *Part 2*. Plaintiffs challenged Facebook's assertion of privilege over 159 emails. Special Master upheld all but one privilege assertion (which applied to four versions of the same email). |
| 16 | Production of Protiviti Documents | • After Plaintiffs filed their sanctions motion, Special Master denied this motion in full. |

In short, Plaintiffs' motion distorts the discovery record. An accurate accounting shows there is no basis for Plaintiffs' accusations of frivolous legal arguments, order violations, and so-called "foot-dragging and stonewalling." As explained below, Facebook has made meritorious legal arguments that have prevailed in many cases and narrowed the scope of discovery in many others; complied with all discovery orders; and at all times worked in good faith to resolve the parties' many discovery disputes through processes that were agreed upon by the parties and ordered by the Court.

## ARGUMENT

Plaintiffs invite this Court to commit error by seeking sanctions on the record in this case.[5] It is well-settled that discovery sanctions are inappropriate where "reasonable people could differ" about the merits of a party's legal position. *Reygo Pac. Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982); *see also Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1344–45 (9th Cir. 1988) (sanctions are reserved for "the rare and exceptional case"—a high bar that has required the Ninth Circuit "with some regularity to reverse district court awards of sanctions") (discussing sanctions under Fed. R. Civ. P. 11). Facebook, like Plaintiffs and this Court, wants to complete

---

[5] The Court should reject any argument by Plaintiffs on reply based on their conclusory allegation (at 9) that Facebook's "discovery misconduct goes beyond what this motion can discuss." *See also* Pls.' Decl. ¶ 12. That claim is both untrue and undeveloped. Allowing Plaintiffs to pursue it on reply would be particularly inappropriate in the context of a sanctions motion. *See, e.g., Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (litigants may not raise new issues on reply); *see also Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109–10 (9th Cir. 2005).

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS      CASE NO. 3:18-MD-02843-VC

discovery so the case can proceed to the merits. But Facebook had a right to dispute Plaintiffs' views on the scope of permissible discovery, which has at times, as the Court observed about their amended complaint, seemed to cover "anything Facebook has ever been reported to have done wrong." *See* Dkt. 298 at 5. Indeed, for nearly a year, Plaintiffs took the position that they were entitled to discovery on claims this Court stayed, until Judge Corley rejected that position. Dkt. 557 at 2. It has taken time to bridge the gap, especially on important issues like ADI and named plaintiff data, which are also technically complex. So it is no surprise that these issues have taken the longest to resolve. Facebook and Gibson Dunn cannot fairly be punished for participating in processes agreed upon by the parties and ordered by the Court to do just that.

Indeed, Plaintiffs have repeatedly and recently praised these processes, and just a few months ago Judge Corley rejected the suggestion by Plaintiffs that Facebook's motion practice and appeal of orders from the Special Master relating to two of the three issues for which Plaintiffs seek sanctions were somehow improper. By way of example:

- In April 2021, Plaintiffs reported to Judge Corley that parties, with the help of mediators Judge Andler and Mr. Garrie, had made "significant progress toward a negotiated resolution of Plaintiffs' request for ADI materials." Dkt. 662 at 1.

- In May 2021, Plaintiffs' counsel reported they were "pleased with the progress" the parties had made in mediation. Ex. 13 at 5:13–14; *see also* Dkt. 671 ("the parties made progress toward resolving or narrowing disputes regarding . . . Plaintiffs' request for materials from . . . ADI").

- In October 2021, Plaintiffs reported to Judge Corley that the "process" proceeding under Special Master Garrie was "working" as Judge Corley "intended." Dkt. 750 at 3:21–4:6.

- In January 2022, Judge Corley confirmed Facebook's "right to appeal" and recognized that Facebook had not "appealed every order," and it had not "appealed every aspect of every order." Ex. 32 at 54:9, 15–18. Moreover, she acknowledged that Special Master Garrie had "responded and narrowed his orders in response to [Facebook's] motions for reconsideration. So I don't think you can make an argument that there was anything bad faith about that at all because he responded to it." *Id.* at 54:10–13; *see also id.* at 9:18–19.

This is consistent with the fact that neither Plaintiffs nor any of the discovery neutrals had ever accused Facebook or Gibson Dunn of engaging in sanctionable conduct.[6] Stein Decl. ¶ 8.

---

[6] There are only two criticisms of Facebook in the record: (1) failing to respond promptly to Plaintiffs' requests to meet-and-confer regarding a motion to compel, and (2) as a result, rejecting arguments that the motion to compel should be denied for failing to meet and confer in advance of filing, as required. Dkt. 827 at 1; Dkt. 846 at 1. These criticisms, which have been misreported in the press, had nothing to do with the merits of the motions to compel, let alone anything to do with Facebook's or Gibson Dunn's approach to discovery generally. These

Plaintiffs' motion, which begins (at 1) with a quote from a *March 2020* hearing and then chronicles a list of complaints since then, is "essentially an accumulation of all perceived misconduct . . . with a reevaluated determination that it was far more serious than appeared at the time." *See Matter of Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986) (reversing an award of sanctions). That is not how sanctions are supposed to work. "District courts are expected to sanction wrongful conduct *as it occurs*"—not months or years afterward, as discovery winds down. *FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.,* 2020 WL 907058, at *6 n.10 (S.D. Cal. Feb. 25, 2020). The "primary purpose of sanctions" is "to deter subsequent abuses," and "[t]his policy is not well served by tolerating abuses during the course of an action and then punishing the offender" only later. *Yagman*, 796 F.2d at 1183. Sanctionable conduct "should be brought to the *immediate* attention of the offending attorney," and any sanctions "should be levied contemporaneously with the offending misconduct." *Id.* (emphasis added); *see also, e.g.*, *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) ("unreasonable delay may render [a sanctions] motion untimely"); *Mercy v. Suffolk Cnty.*, 748 F.2d 52, 55 (2d Cir. 1984) (Rule 37 sanctions motion "should be promptly made"); *Clark v. United States*, 2011 WL 66181, at *5 (D. Haw. Jan. 7, 2011) ("unexplained delay" of 10 months was "unreasonable"). Had Plaintiffs moved for sanctions (or even raised the possibility of sanctions) contemporaneously, Facebook would have had an opportunity to timely address such concerns. Now, as the parties near the end of discovery, imposing sanctions retroactively based on recharacterizations (and mischaracterizations) of years of discovery would fail to serve sanctions' "therapeutic purpose." *Yagman*, 796 F.2d at 1183.

## III. There Has Been No Sanctionable Conduct Relating to the ADI Documents.

There is no basis for Plaintiffs' request (at 12–26) for sanctions based on alleged "misconduct connected with ADI documents." Facebook's arguments based on the work-product doctrine and attorney-client privilege were justified and succeeded in meaningful ways, during mediation, in motions practice, and on appeal. And Facebook has not only complied with all orders requiring the production of the ADI documents, it affirmatively reached out to Plaintiffs to discuss additional steps

---

findings are so inconsequential that Plaintiffs do not even cite them in their motion.

Gibson, Dunn & Crutcher LLP

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS                    CASE NO. 3:18-MD-02843-VC

not required by those orders and to jointly request clarification of them, which this Court addressed during the last case management conference. That is not a record that justifies sanctions.

### A. Facebook's claims of attorney-client privilege and work-product protection were not only substantially justified but also *upheld* in important respects.

Early in discovery, in an effort to prioritize the documents Plaintiffs said they wanted most, Facebook voluntarily produced non-privileged ADI documents—roughly 13,900 communications with third-party app developers. *Supra* at 7–8. These communications contained significant details about the apps addressed in ADI: They included Facebook's requests to developers for information, the developers' responses, and Facebook's suspension notices detailing the grounds for suspension. Dkt. 699 at 1. Facebook also provided lists identifying which apps were suspended as a result of ADI. *Id.* Later in discovery, Plaintiffs expressed interest in approximately 3,700 apps that as of December 2020 had been suspended during ADI for reasons other than non-responsiveness to the investigation. For each of these apps, Facebook agreed to produce underlying data, including the type of data the apps were able to access, how many users used each app, and how many users gave each app access to each type of data, along with other technical information. *Id.* at 1–2. With respect to certain other ADI-related materials—confidential documents and internal communications— Facebook asserted good-faith claims of attorney-client privilege and attorney work-product.

These privilege and work-product claims were important not just in this case, but in several other of the proceedings related to Cambridge Analytica. In one of those proceedings, the Supreme Judicial Court of Massachusetts resolved these same issues in March 2021 (albeit with respect to a more "targeted set" of materials, Ex. 10 at 17:12–13) largely in Facebook's favor, holding that certain lists of ADI apps and internal ADI communications were protected by the work-product doctrine and attorney-client privilege. *Att'y Gen. v. Facebook, Inc.*, 164 N.E.3d 873, 878, 881 (Mass. 2021). Specifically, the Court held that the attorney-client privilege covered "confidential communications relating to the ADI among Facebook, Gibson Dunn, and other members of the ADI team[,] including Facebook's outside consultants." *Id.* at 888. With respect to lists of apps addressed by ADI in certain circumstances (*id.* at 881), the Court held that they were compiled "because of the prospect of litigation" and therefore protectable work product because "the ADI is meaningfully distinct from Facebook's ongoing enforcement program. It is staffed by outside counsel and outside forensic

consultants, . . . has its own distinct methodology[,]" and serves a "very different purpose" than its ongoing enforcement efforts. *Id.* at 891.[7] The Court expressly addressed whether ADI served a "dual purpose," *id.* at 892, and applied the same "because of" standard employed by the Ninth Circuit. *Compare id.* (citing *Commissioner of Rev. v. Comcast*, 901 N.E.2d 1185, 1204 (Mass. 2009)), *with In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004).

In September 2021, Judge Corley reached a different conclusion on the work-product doctrine. Dkt. 736 at 6. At issue was Plaintiffs' demand for "documents (not created by lawyers) from" two phases of ADI, "including Facebook conducted audits and interviews." Dkt. 711 at 2–3. Judge Corley held that certain categories of ADI-related documents (*see id.*) were not *categorically* protected because ADI had a dual business and legal purpose. Dkt. 736 at 6–7. But she refrained from issuing a more sweeping work-product ruling, leaving other documents subject to an individualized assessment. Her order also did "not address[] the application of the attorney-client privilege." *Id.* at 6.

These rulings confirm that Facebook's privilege and work-product arguments were never so "dubious" as to be "in bad faith." *Contra* Mot. at 25. For one thing, "dubious" is not the standard for sanctions; sanctionable conduct is conduct that is "clearly frivolous, legally unreasonable or without legal foundation." *Primus Auto.*, 115 F.3d at 649 (cleaned up). In any event, even on issues where Judge Corley disagreed with the Supreme Judicial Court, it is well-settled that discovery sanctions are inappropriate where "reasonable people could differ" on the merits of a party's discovery position. *Reygo Pac.*, 680 F.2d at 649 (reversing district court's award of sanctions). That principle is dispositive here in light of the Massachusetts court's decision upholding Facebook's work-product claim under essentially the same "created because of litigation" standard that applies in the Ninth Circuit. *See Colaco v. ASIC Advantage Simplified Pension Plan*, 301 F.R.D. 431, 436 (N.D. Cal. 2014) (denying motion for sanctions in part because "the case law on this issue [was] not fully delineated or settled" and there was "persuasive authority from other districts").

---

[7] The Massachusetts court also concluded that the attorney general had shown a "substantial need for the fact work product" such that any fact work product (as opposed to opinion work product) should be disclosed, but that was in light of "[t]he Attorney General's [investigative] mandate" and the "strong public interest in disclosure in cases in which the Attorney General is investigating . . . that is absent in a typical civil dispute." *Facebook*, 164 N.E.3d at 896.

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS          CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

For similar reasons, Plaintiffs are also wrong to contend (at 20) that after Judge Corley entered her September 2021 order, it was "frivolous" for Facebook to say that some documents not prepared by lawyers might still be privileged or work product. As to privilege, in rejecting Plaintiffs' challenge to Facebook's assertion of privilege over non-attorney communications just last month, the Special Master held that privilege attaches to "documents assembling factual information to inform legal advice" even where the documents are not created by lawyers. Ex. 40 at 3, ¶ 10 (citing *AT&T Corp. v. Microsoft Corp.*, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003)). Similarly, because Judge Corley "rejected the notion that the work-product privilege shielded" ADI *as a whole* (Mot. at 20), it does not follow that *particular documents* created during ADI could never be work product. Rather, other courts in the Ninth Circuit typically conduct a document-by-document analysis of dual-purpose materials before holding that any particular document is non-privileged or not work product. *E.g.*, *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 868–76 (N.D. Cal. 2019); *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 641–42 (D. Nev. 2013).

Simply put, the fact that Judge Corley found that some documents were not work product does not "demonstrate that the objections were made in bad faith or for other inappropriate reasons." *Quiroz v. Horel*, 2014 WL 572381, at *7 (N.D. Cal. Feb. 11, 2014) (denying motion for sanctions). To the contrary, a "good faith assertion of a valid privilege (even if such assertion later proves unsuccessful) is hardly the kind of shocking behavior warranting discovery sanctions." *Aristocrat Techs. v. Int'l Game Tech.*, 2009 WL 3573327, at *4 (N.D. Cal. Oct. 30, 2009).

### B. As Plaintiffs and Judge Corley have acknowledged, Facebook has participated in good faith in dispute-resolution processes relating to the ADI documents.

Plaintiffs rewrite history with their argument that Facebook unreasonably delayed the process of negotiating, litigating, and appealing the parties' ADI disputes. At each step of the way, Facebook engaged in good faith in the dispute-resolution processes that the parties agreed to and this Court ordered. Those processes took time to play out, but that time was commensurate with the complexity, importance, and scope of the parties' disputes. At no point in the process did Judge Corley or Special Master Garrie ever accuse Facebook of misconduct. Stein Decl. ¶ 8. Just the opposite—in January, Judge Corley expressly (and correctly) *rejected* Plaintiffs' accusation that Facebook's advocacy was pursued in bad faith. *Supra*, p. 13.

Gibson, Dunn & Crutcher LLP

When Plaintiffs first raised the ADI issue with Judge Corley in the summer of 2020, they painted it as an easy decision. Judge Corley disagreed, observing that "[p]rivilege is not clear, and there's arguments both ways." Ex. 1 at 36:8–12. In response to Judge Corley's indication that the privilege issue would have to be resolved "in chunks" and "in context," *id.* at 40:20, Facebook suggested Plaintiffs review the roughly 13,900 *external* ADI communications Facebook had already produced, explaining that that review could help Plaintiffs identify additional materials to request about particular apps, *id.* at 24:20–25. Plaintiffs claim (at 14) "Judge Corley saw no reason for postponement," but she adopted Facebook's suggestion, telling Plaintiffs to "start reviewing those documents" so the parties could "focus on [a] subset" of apps. *Id.* at 36:15–22.

This exchange highlights an important aspect of the ADI dispute that is conspicuously absent from Plaintiffs' motion—proportionality. Given ADI's breadth and length—involving millions of apps and nearly 300 internal and external personnel for more than two years, Dkt. 720 at 3—it generated an enormous volume of materials. Ex. 1 at 33:4–12, 46:24–25. Thus, any determination that ADI materials were relevant and *potentially* non-privileged would necessitate a proportionality analysis to account for the time and resources required to review, produce, and log the materials. And in *every instance* in which the parties have litigated ADI-related proportionality issues, Facebook's positions have been adopted in whole or in part. It is no exaggeration to say that it is only because of this successful advocacy on proportionality—which began with Facebook's suggestion in 2020 that the parties focus their dispute on a subset of apps—that Facebook has been, and will be, able to complete its productions of ADI materials on schedule.

In the fall of 2020, after Plaintiffs completed the initial review, the parties heeded Judge Corley's guidance and focused on a subset of six apps, chosen by Plaintiffs. Dkts. 513, 533.[8] Facebook fully complied with these stipulations and timely produced privilege logs containing roughly 6,000 entries related to the six exemplar apps on December 10, Ex. 26, Southwell Decl. ¶ 17; Stein Decl. ¶ 11(a). Completing these logs required more than 300 Gibson Dunn attorney hours. Ex. 26, Southwell Decl. ¶ 16. Plaintiffs responded by challenging 400 of the 6,000 entries on the logs—

---

[8] Plaintiffs say (at 14) that Facebook delayed the first of these stipulations by taking "more than a month" to provide a written counterproposal. But at the time, Plaintiffs reported to Judge Corley that Facebook had responded to their proposal within 10 days. Dkt. 495 at 3.

every entry where no attorney appeared on the communication—even though the privilege protocol required them to explain any challenges with reasonable specificity as to each entry. Dkt. 599 at 9 (citing Dkt. 462 ¶ D(1)–(4)). Judge Corley ordered Plaintiffs in January 2021 to choose 20 of those communications for *in camera* review and ordered simultaneous briefing. Dkt. 602 at 1.

When this issue was next addressed with Judge Corley at an April 2021 hearing, she offered her "tentative view" that ADI served a "dual purpose" and that, as a result, not all of the ADI-related materials were *categorically* protected as work product. Ex. 10 at 22:6–11, 24:15–17. Plaintiffs now claim (at 25) that Judge Corley's comments at the hearing should have put Facebook "on notice" that any "further delay would be in bad faith." But as explained *supra* at p. 15, Judge Corley did not suggest (much less rule) that *all* ADI documents were non-privileged or non-work product. Just the opposite: she expressly acknowledged that "there certainly are going to be documents in there that are, A, attorney-client privilege; or, B, attorney work product" that are "not going to be discoverable." *Id.* at 16:22–17:3; *see also id.* at 17:8–21 (noting that "a lot of it I don't think is relevant at all"). After suggesting that "a discovery mediator would be useful" in helping the parties resolve their dispute, *id.* at 20:6–7, Judge Corley ordered the parties "to meet and confer regarding how to proceed." Dkt. 655.

The parties spent the next several months working with the discovery mediators on ADI. While Plaintiffs now denigrate (at 16) this period as "several more months of delay," at the time, they told Judge Corley that mediation had helped the parties make "significant progress toward a negotiated resolution of Plaintiffs' request for ADI materials . . . in lieu of a court order." Dkt. 662 at 1; *see also* Dkt. 671 at 1 ("the parties made progress toward resolving or narrowing disputes regarding . . . Plaintiffs' request for materials from . . . ADI"). That was and remains true, no matter what Plaintiffs say now: during mediation, the parties agreed to narrow the scope of their dispute from the millions of apps that were addressed during ADI, to the approximately 3,700 apps that as of December 2020 had been suspended for reasons other than non-responsiveness to the investigation. Ex. 11. Plaintiffs also initially agreed to narrow their request to specific data points about each of those apps. Ex. 12 at 1. This narrowing was consistent with Plaintiffs' representation that "what we

need and what we've asked for . . . are the facts underlying the investigation . . . . [T]he facts underlying these communications are what we're really seeking." Ex. 10 at 18:1–14.

In June 2021, once no more progress was being made in mediation, Judge Corley ordered the parties to submit a joint letter brief explaining what documents Facebook had agreed to produce and what else Plaintiffs wanted. Dkt. 693 ¶ 2. In that submission, Plaintiffs reneged on the agreements they had made in mediation (*see* Dkt. 699 at 2, 6), and argued that Facebook should produce certain ADI-related *communications*, in addition to other ADI-related *documents and data,* from two phases of ADI. *See* Dkt. 699 at 2, 6. Because Plaintiffs had not addressed ADI-related communications in mediation, and because (as Judge Corley recognized) "none of the[] documents [from the two phases] were part of the *in camera* review the Court earlier conducted," Dkt. 711 at 3, Facebook sought leave to file a declaration to substantiate its privilege and work-product claims. Dkt. 699 at 4.

Plaintiffs say this request was made in bad faith, but Judge Corley *granted* the request, Dkt. 711 at 3, and Facebook submitted a declaration in August 2021 that laid out four types of "ADI-specific investigation [materials]" associated with the two phases, explained they were designed by counsel, varied in content depending on the particulars of the investigation, and contained varying degrees of attorney-client communications and work product. Dkt. 720 at 5–7.[9] Unlike the Massachusetts court, which held that even the lists showing which apps fell into which buckets reflected attorney judgment and therefore were work product, Judge Corley compelled Facebook to produce all four types of investigative materials (*infra*, p. 21) relating to the six exemplar apps. Dkt. 736 at 7. But Facebook can hardly be said to have acted in bad faith or without substantial justification in asserting work-product protection over the four categories of materials when its work-product claim had been found to cover even less substantive materials in another jurisdiction. And while this Court (like the parties) is understandably frustrated with how long the process took, there is no basis to sanction Facebook for raising legitimate arguments through proper channels.

---

[9]  Plaintiffs argue in their motion (at 17) that Facebook's request to submit a declaration in support of its work-product and privilege claims was not in good faith because Judge Corley concluded it had "negligible value." But again, the fact that a party's advocacy does not ultimately prevail is not a basis to infer bad faith. *Aristocrat Techs.*, 2009 WL 3573327, at *4. A similar declaration had persuaded the Massachusetts Supreme Judicial Court on the merits of Facebook's position, and while Judge Corley disagreed with that court, Facebook's invocation of privilege in this case was substantially justified. *Supra*, p. 16–17.

### C. Facebook has complied with all ADI orders.

The first and only order by Judge Corley compelling the production of ADI-related documents was issued in early September 2021, and was limited to any "background and technical reports, audits, and developer interviews" for the "six exemplar apps chosen by the parties." Dkt. 736 at 7.[10] This order was consistent with Judge Corley's stated approach: "take some exemplars, and rule, and then the parties then can use that and apply it," Ex. 1 at 36:16–18, understanding "that's not going to resolve the privilege for everything." *Id.* at 36:22–23. Facebook complied with that order two weeks later, on September 21, 2021. Stein Decl. ¶ 11(c). Plaintiffs suggest this production was incomplete (at 18 n.11) because it comprised "11 documents," but the obvious reason is that the production order was limited to six exemplar apps (and expressly did not reach communications).[11]

Judge Corley's September 2021 order directed the parties to "work with the Special Master Garrie regarding production of additional materials consistent with the guidance offered by [the] Order." Dkt. 736 at 7. And that is what Facebook has done. Plaintiffs now argue (at 18–20) Facebook engaged in delay tactics from September to November 2021. But these characterizations are again inconsistent with Plaintiffs' statements during that time, when they told Judge Corley in October 2021 that the Special Master process was "working . . . as intended." Dkt. 750 at 3:21–4:6.

While the parties disagreed about which materials should be produced under Judge Corley's "guidance," their work with Special Master Garrie was productive. Following Facebook's production in response to Judge Corley's September 2021 order, Plaintiffs requested for the first time "all memoranda prepared by [Facebook's outside consultants]," reiterated their demand for "internal Facebook communications" regarding ADI reports, and specifically asked for all communications

---

[10] The order was expressly limited to Facebook's claims of work-product protection—it did not address attorney-client privilege because Plaintiffs were, at that point, not seeking communications by counsel. Dkt. 736 at 7.

[11] In later proceedings before the Special Master, Facebook took the position that because Judge Corley's September 2021 order granted Plaintiffs' request for production of certain types of ADI materials but did not grant Plaintiffs' request for production of ADI-related communications, her order had implicitly rejected that latter request. Plaintiffs now claim (at 21–22) that it "was not supportable" for Mr. Snyder to state at a December 4, 2021 hearing that "a lot of law" supported Facebook's position. That statement was true (*see* Snyder Decl. ¶ 6) but ultimately immaterial. Judge Corley later clarified that it had not been her intention to deny Plaintiffs' request for production of non-privileged ADI-related communications (Ex. 32 at 7:8–15, 11:9–13, 18:19–19:14), and Facebook timely produced the documents the Special Master ordered it to produce.

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS      CASE NO. 3:18-MD-02843-VC

Gibson, Dunn & Crutcher LLP

with the outside consultants relating to ADI reports.  Ex. 22, ¶¶ 3–4.  The Special Master issued a two-part tentative order on December 8, 2021.  Dkt. 766.  The first part proposed to order Facebook to produce the same four types of materials Judge Corley ordered Facebook to produce for the six exemplar apps for any other apps for which these materials were created.  Facebook did not seek reconsideration of, or appeal, this portion of the order, which became final on December 20, 2021.  On March 3, 2022, Facebook complied with that order, producing 296,152 pages of reports (with appropriate redactions for privilege and work product)..  Stein Decl. ¶ 11(f), (h).

The second part proposed to order Facebook to produce "all non-attorney internal Facebook communications," as well as communications between Facebook and its forensic consultants, "in connection with a statistically significant sample of the reports provided" in connection with the first part of the ruling.  Dkt. 766 at 4.  It also proposed to order Facebook to begin its production of those communications within two weeks.  *Id.*  Facebook moved for reconsideration of these portions of the tentative order on several grounds—chief among them that it would have been impossible for Facebook to review, log, and begin producing communications associated with *thousands more apps*—many of the reports addressed developers with multiple apps—within two weeks.  Ex. 26 at 6–8; *id.* at Southwell Decl. ¶¶ 11–14.  A similar review for just six apps had required more than 300 attorney hours to complete.  *Id.* ¶ 17.  In addition, Facebook argued that the tentative ruling conflicted directly with the Massachusetts court's ruling that ADI communications are privileged.  Ex. 26 at 2.

The Special Master *granted* Facebook's motion for reconsideration on December 20, and issued a substantially narrowed order requiring Facebook to submit for *in camera* review "all ADI related communications pertaining to the six exemplar app[s]."  Dkt. 776 at 4.  This narrowing made it possible for Facebook to timely comply with the order, and Facebook did so four days later on Christmas Eve, submitting over 6,000 communications for *in camera* review.  Stein Decl. ¶ 11(g).

As it complied with the December 20 order, Facebook appealed to Judge Corley and argued, *inter alia*, that even the narrowed order improperly expanded the scope of her September 2021 order.  Dkt. 778 at 2.  Judge Corley held a hearing on Facebook's appeal in January, and while she affirmed the Special Master's order, Dkt. 806, she expressly rejected Plaintiffs' suggestion that Facebook had moved for reconsideration or appealed in bad faith.  *Supra* p. 13.

Gibson, Dunn &
Crutcher LLP

Meanwhile, the night before the hearing on Facebook's appeal, Special Master Garrie issued an even broader ruling than the one Facebook had appealed. The new "supplemental tentative" order, issued January 10, proposed to order production of "*all ADI related documents*, including communications where attorneys were listed as direct recipients or were listed as copied (i.e. cc'd) . . . except for ADI related documents created for the sole and specific purpose of obtaining legal advice from attorneys." Ex. 29 ¶ 16 (emphasis added). Facebook sought reconsideration, explaining again that the supplemental tentative order would be impossible to comply with on a reasonable timetable because the language requiring production of "all ADI related documents" would require collection, review, and production of millions of ADI-related documents and communications (including from Gibson Dunn, Facebook's consultants, and Facebook's employees) in a matter of days. Ex. 35 at 8. Facebook also pointed out that the standard articulated in the tentative order—"sole and specific purpose"—was inconsistent with the standards the Ninth Circuit has applied in dual-purpose cases. *See In re Grand Jury*, 23 F.4th 1088, 1094–95 (9th Cir. 2022) ("primary purpose" test for privilege), *cert. filed* (U.S. Apr. 6, 2022) (No. 21M105); *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011) ("because of" test for work product).

Upon receiving the motion for reconsideration, the Special Master clarified that he had not intended his order to sweep as broadly as it was written. Stein Decl. ¶ 11(h). He granted the motion and narrowed his order to require production only from the "custodians the parties have identified and collected." Ex. 36 at 5. He also changed the "sole and specific purpose" language to "primary purpose." *Id.* at 4. As a result of the Special Master reconsidering and clarifying the scope of his order, Facebook was able to (and did) timely comply with the order.[12] Stein Decl. ¶ 11(h).

As this chronology lays out, Facebook had legitimate legal arguments—many of which prevailed, in this case and elsewhere—in response to Plaintiffs' requests for ADI materials, and

---

[12] The Special Master's clarification in response to Facebook's reconsideration motion also explains why Plaintiffs are wrong to accuse Facebook (at 24) of misrepresenting the burden associated with its production of ADI materials. Had Facebook been required to produce literally all documents related to ADI—as the Special Master's January 10 tentative ruling proposed—it would have taken an enormous amount of time and resources, as Facebook explained. In granting reconsideration, the Special Master narrowed the universe of materials Facebook had to produce by orders of magnitude, allowing Facebook to comply much more quickly.

raised them in good faith and through agreed-upon and court-ordered processes, as Judge Corley has expressly recognized on the record. *Supra* at 13. And Facebook fully and timely complied with every order that Judge Corley and Special Master Garrie have entered on ADI, ultimately producing nearly 42,000 documents totaling more than 395,000 pages. *See* Stein Decl. ¶ 11(l).[13]

Indeed, after complying with the Special Master's January 31, 2022 amended supplemental order, requiring production of documents from the "custodians the parties have identified and collected," (Dkt. No. 828), because documents had only been collected through a certain date, Facebook reached out to Plaintiffs to discuss additional collections for a later time period and to jointly seek amendment of the order, which this Court thankfully addressed during the March 30, 2022 case management conference. Dkt. 903 at 5:19–6:2. Facebook has also agreed, among other things, to collect documents for this time period for MDL custodians, as well as ADI custodians, and to use search terms for the collection that the parties are negotiating. *See* Stein Decl. ¶ 11(j).

## IV. There Has Been No Sanctionable Conduct Relating to Named Plaintiff Data.

Plaintiffs seek sanctions relating to named plaintiff data based on two accusations that are patently false. *First*, Plaintiffs say (at 32) that Facebook has "disobeyed Judge Corley's order for more than a year." But the "order" referred to by Plaintiffs, Discovery Order No. 9 (Dkt. 557), did not require Facebook to produce additional named plaintiff data beyond the nearly one million pages that had already been produced.[14] Discovery Order No. 9 simply identified the scope of permissible discovery on named plaintiff data, which Facebook believed then (and still believes) is covered by its prior productions consistent with Rule 26. Plaintiffs' reliance on subsequent orders by Judge Corley and Special Master Garrie as "confirming" that Facebook has disobeyed Discovery Order No. 9 is

---

[13] Plaintiffs' claim (at 24) that Facebook had produced only "50 ADI documents" as of February 3, 2022 is both inaccurate and misleading—inaccurate because Facebook had actually produced documents totaling appx. 31,000 pages by that date, and misleading because just one day after this artificial date, Facebook produced an additional 405 documents (and another 1,096 the week after that). Stein Decl. ¶ 11(k). In any event, Plaintiffs' selective retelling does not change the fact that Facebook fully and timely complied with every ADI-related order that was issued.

[14] Plaintiffs say only (at 30) that they "expected" Facebook to produce additional named plaintiff data in response to Discovery Order No. 9. That expectation is not a basis for sanctions, particularly given Plaintiffs' failure to appreciate that Facebook had, in fact, already produced data in each of the three categories of "discoverable user data" Judge Corley identified. *See, e.g.*, *CRS Recovery, Inc. v. Laxton*, 2008 WL 2951379, at *1 (N.D. Cal. July 25, 2008) (denying sanctions motion where defendant had not violated any discovery order).

puzzling.  As explained below, Discovery Order No. 9 identified three categories of "discoverable user data" and was followed by a process, starting with Judge Corley and continuing with Special Master Garrie, to determine what, if any, additional named plaintiff data should be produced based on evidence of sharing or potential sharing so as to make production of that data relevant and proportional to the needs of the case.  Judge Corley's most recent order on named plaintiff data could not be clearer in describing the current Special Master proceedings:

> [T]o work with the parties to determine *what, if any,* data from [systems other than the DYI system] should be produced consistent with Federal Rule of Civil Procedure 26(b).  The Special Master, with his technical expertise, is well-positioned to review the evidence and determine whether systems may contain *shared* Named Plaintiffs' data, or may not.  And, similarly, whether the production of *potentially shared* Named Plaintiff data is feasible and proportional to the needs of the case.

Dkt. 807 at 4 (emphases added).

*Second*, Plaintiffs say (at 26–27) that Facebook's participation in the process of determining what, if any, additional named plaintiff data should be produced constitutes "deliberate foot-dragging."  This accusation is also false.  As explained below, in a case this Court described as being "about Facebook's practice of sharing its users' personal information with third parties," Dkt. 298 at 1, Plaintiffs have been trying (unsuccessfully) to compel production of named plaintiff data that was not "shared" with a third party under any conceivable definition of that term.  Most notably, Plaintiffs seek production of all user data that Facebook uses for targeted advertising on its platform, even though that data is never disseminated to, obtained by, or accessed by any third party.  Plaintiffs' theory seems to be that, as long as data was used by Facebook in a way that benefits a third party, the data is "shared or made accessible to" a third party.  As explained below, after Discovery Order No. 9 issued and Plaintiffs argued for this type of discovery, Judge Corley noted that Plaintiffs' theory did not seem consistent with the type of "sharing" at issue in this case, which she observed, consistent with this Court's ruling on Facebook's motion to dismiss, concerned Cambridge Analytica and situations where data is actually disseminated to and obtained by a third party.  Ex. 5; *see also* Dkt. 298 ("This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practices of sharing its users' personal information with third parties.").  Judge Corley also found that Plaintiffs did not have to take Facebook's word on whether user data was "shared or [made]

Gibson, Dunn & Crutcher LLP

accessible to" third parties, Dkt. 807, and, through Discovery Order Nos. 11 and 12, allowed Plaintiffs to conduct discovery on this issue to determine whether additional named plaintiff data should be produced. *E.g.*, Dkt. 588, 602; Ex. 5; Ex. 6. Plaintiffs took a 30(b)(6) deposition on this topic, but made no showing then (or since) that there is any reason to believe that Facebook has not produced data that is shared, or even potentially shared, with third parties so as to justify production consistent with Rule 26.

As Judge Corley confirmed in her January 12, 2022 order, Dkt. 807 at 4, the current process before Special Master Garrie is meant to address the issue that Plaintiffs left unanswered: what, if any, additional data should be produced consistent with Rule 26. Just over two weeks later, Plaintiffs filed a CMC statement in which they falsely accused Facebook of "delay" by following that process and violating Discovery Order No. 9. Dkt. 829 at 6. Plaintiffs' accusations are not supported by the record, and do not support any award of sanctions. The fact that this process remains ongoing also weighs against sanctions. *Cf. Moore v. Stepp*, 2014 WL 116271, at *1 (N.D. Cal. Jan. 13, 2014) (denying sanctions motion when defendant could still comply with a discovery order).

A. ***March–October 2020*: Facebook produced named plaintiff data that could have been shared with third parties, including in all three categories of "discoverable user data" identified in Discovery Order No. 9.**

Facebook has produced *nearly one million pages* of named plaintiff data. Stein Decl. ¶ 10(b). The data came from a Facebook system called "Download Your Information," or "DYI," which represents the most complete and best compilation of data Facebook maintains associated with that user in a human-readable and producible format. Ex. 25 at Ex. C [Mitchell Decl.], ¶ 4, ¶ 5. DYI contains data in all three categories of "discoverable user data" identified in Discovery Order No. 9:[15] (1) on-platform activity, (2) off-platform activity, and (3) data inferred from on and off-platform activity. The contents of DYI files are described in more detail above. *Infra* at 5–6.

Plaintiffs claim in their motion (at 28), as they have throughout these proceedings to create the false impression that Facebook's production of named plaintiff data is deficient, that the DYI system contains only data in category (1): on-platform activity. That is not true, and it is difficult to

---

[15] Whether data constitutes "on-platform," "off-platform" or "inferred" is a legal question on which Facebook does not take a position for the purposes of trying to identify data in these categories.

Gibson, Dunn &
Crutcher LLP

see how Plaintiffs could make such an assertion. DYI files—which Plaintiffs have had since 2020 and which they claim to have reviewed, Ex. 3 at 4:19–20—contain all three types of "discoverable user data," and as Facebook has repeatedly told Plaintiffs, include data that could have been shared or made accessible to third parties and therefore are relevant and proportional to their claims. Ex. 25 at Ex. C [Mitchell Decl.] ¶ 5.

**B.** *June–October 2020*: **Judge Corley issues Discovery Order No. 9, which identifies three categories of "discoverable user data."**

Plaintiffs say that in "Summer 2020" (at 28) they found documents that identified "three categories of data [Facebook] collects about users and shares with third parties—and had not turned over to Plaintiffs" (citing Pls.' Ex. 65). As Facebook explained to Judge Corley in October 2020, Dkt. 537 at 7 n.6, and again to the Special Master recently, Ex. 41 at Ex. B, that claim is false. Data identified in those documents are either in the DYI system or relate to products that were deprecated before this case was filed. *Id.* Plaintiffs also claim (at 29) that, during the period between August 2020 and October 2020, "Judge Corley issue[d] an order agreeing with Plaintiffs on the scope of *relevant* user data." (emphasis added). This claim is also false. Judge Corley's order identified the scope of "discoverable user data," not whether it was relevant and proportional to the case so as to require production of that data.

Following a hearing before Judge Corley, on July 31, 2020, in which Plaintiffs complained about deficiencies in Facebook's production of named plaintiff data without having reviewed it, Judge Corley issued Discovery Order No. 5, directing Plaintiffs to complete their review and the parties to meet and confer regarding Plaintiffs' concerns. She also ordered the parties to "include [in their next joint statement to the court] information regarding the meet and confer efforts and discuss in detail each sides' understanding of what precisely has been produced and precisely what is the data that is being withheld as not relevant or not reasonably available." Dkt. No. 487.

In the next joint statement to Judge Corley, filed in advance of a hearing on August 14, 2020, Facebook reported that, during the parties' meet and confer, "Plaintiffs incorrectly stated that they had not yet received several types of data that were included in Facebook's production," including data about the named plaintiffs' off-Facebook activity; GPS data; ad interests and interactions; logins,

logouts, and periods of time users were active on Facebook; devices used to access Facebook; cookie information; and IP addresses. Dkt. 495 at 4-5. Plaintiffs (wrongly) reported that the DYI system was an "archive" that does not contain "GPS information, cell tower information, and data analytics possessed by Facebook," accused Facebook of refusing to tell them what data was being withheld, and sought a Rule 30(b)(6) deposition on that topic.[16] *Id.* at 2–3.

During the August 14, 2020 hearing, Judge Corley rightly described the issue of "what [data is being] withheld" as "a chicken-and-egg problem," in light of the parties' disagreement regarding the permissible scope of discovery, and directed the parties to "adjudicate that dispute as [to] discoverability," which the parties did over the next two months. Ex. 3 at 14:20-17:7. Facebook argued that the scope of discoverable user data should be limited to sensitive information shared by users on Facebook and given to third parties. Dkt. 537 at 1; *see also* Dkt. 515 at 8-9. Plaintiffs argued that "sensitive information about users that Facebook shared with third parties" derives from "(1) what a user posts and the user's activity on Facebook; (2) information about users originally generated off the Facebook platform but obtained by Facebook; and (3) information derived by Facebook from a user's activity on and off Facebook," Dkt. 547-3 at 1, and therefore argued that no source of this shared data should be excluded from discovery. Plaintiffs emphasized that they "seek only a holding that the sensitive data Facebook collected about [the named plaintiffs] and *shared* with third parties is relevant." *Id.* at 9 (emphasis in original).

On October 29, 2020, Judge Corley issued Discovery Order No. 9, identifying the following three categories of "discoverable user data": (1) data collected from a user's on-platform activity; (2) data obtained from third parties regarding a user's off-platform activities; and (3) data inferred from a user's on or off-platform activity. Dkt. 557. The order did not direct or require Facebook to produce any additional named plaintiff data.

---

[16] At the August 14, 2020 hearing, Plaintiffs elaborated further, arguing that Facebook received more data in the form of "content" of what "users did" on a third-party site than was available in DYI. Ex. 3 at 5:10-13 ("So there's an event that says one of the users went to a website, but the content of what they did on the site is stripped away."). Facebook's 30(b)(6) witness later testified that Facebook did not receive that information. Ex. 7 at 75:2-24, 77:23-78:13, 81:10-82:19.

Gibson, Dunn & Crutcher LLP

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS          CASE NO. 3:18-MD-02843-VC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.** *November 2020–January 2021***: Judge Corley issues** *Discovery Order Nos. 11 and 12***, allowing Plaintiffs to conduct discovery into what, if any, additional named plaintiff data covered by** *Discovery Order No. 9* **is relevant and proportional to their claims and therefore should be produced under Rule 26.**

Following Discovery Order No. 9, the parties submitted a joint statement in advance of a hearing on December 9, 2020, in which Plaintiffs reported that they had asked Facebook to identify all data in the three categories of "discoverable user data" identified in Discovery Order No. 9. Dkt. 583 at 1. Facebook reported that, given Plaintiffs' position in briefing on Discovery Order No. 9 that they were seeking *only sensitive data shared with third parties*, Facebook believed it had already produced such data but was continuing to investigate for the 13-year time period. *Id.* at 9.

During the December 9, 2020 hearing, Facebook reiterated its belief that it had already produced named plaintiff data that could have been shared or made accessible to third parties, subject to confirming the 13-year time period. Ex. 5 at 17:9-18:9, 22:17-23:15; 28:6-7. Plaintiffs (falsely) claimed they had received "no production of data Facebook receives from third parties" and "no inferred data," *id.* at 21:2-4,[17] and said they wanted data that had been "made accessible" to third parties, not just data that had been shared with third parties. *Id.* at 18:15-16. In response to Judge Corley pointing out that Facebook's counsel had covered both points, shared and made accessible, *id.* at 19:6, Plaintiffs said: "Then, perhaps, we need some clarification on what [Facebook] interpret[s] 'made accessible' to mean because it doesn't mean the same thing as actually shared." *Id.* at 19:8-10. Plaintiffs then explained their view that user data used for targeted advertising is "shared or made accessible" to advertisers, *id.* at 21:7-23, 24:3-11, to which Facebook responded by pointing out that targeted advertising was not among the four theories of liability this Court had allowed to proceed in Pretrial Order No. 20, *id.* at 22:12-16. When Plaintiffs disagreed, *id.* at 23:16-22, Judge Corley responded: "No, no, no, no. I don't think so. . . . This is—this [case] came from Cambridge Analytica and that [Cambridge Analytica] had access to [sensitive user] information." *Id.* at 23:23-25. Judge Corley and Plaintiffs then had an exchange trying to clarify what Plaintiffs meant by "shared or made accessible" during which Judge Corley indicated she understood Cambridge

---

[17] Plaintiffs have been saying since December 2020 that they have documents that "talk about sharing inferences," Ex. 5 at 28:18-20, but their motion does not point this Court to a single one that expressly addresses sharing inferences, calling that representation into question.

Analytica, and therefore Plaintiffs' claims, to involve a third party actually obtaining or accessing user data, not data used by Facebook to place targeted advertisements that is not disseminated to, obtained by, or even learned by third parties.  *Id.* at 24-27.  This exchange ended with Judge Corley ordering a Rule 30(b)(6) deposition on this "disconnect" between the parties, *id.* at 26:6, namely: "How [does Facebook] use this data?  How is it shared?  What do they mean by 'made accessible?'" *Id.* at 30:4-8.

So the Rule 30(b)(6) deposition was intended to help Plaintiffs identify what data exists in the three categories of "discoverable user data" and whether there is any basis to say it is actually "shared or made accessible" to third parties so that a further determination could be made as to what, if any, additional named plaintiff data should be produced consistent with Rule 26.  This is clear from Judge Corley's Discovery Order No. 11, issued after the December 9, 2022 hearing: "What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well [as] the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests." Dkt. 588 at 1.  Judge Corley further made clear that the "30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with *identifying* relevant discovery . . . ."  *Id.* at 2 (emphasis added).  Discovery Order No. 11 therefore made clear that Discovery Order No. 9 was not an order compelling the production of any additional named plaintiff data.  Instead, in response to Facebook's position that it had already produced all data in the three categories of discoverable user data that was shared with or made accessible to third parties, Plaintiffs were directed to conduct a Rule 30(b)(6) deposition to determine whether there was any additional named plaintiff data in these categories for which there was a basis to say the data has been "shared or made accessible" to third parties, such that it was relevant and proportional to their claims and should be produced under Rule 26.  After a dispute with Plaintiffs over the scope of their Rule 30(b)(6) notice—a dispute that Facebook won, Ex. 6 at 17:12–13, 19:19–23:13—the deposition took place in February 2021.[18]

---

[18]  Plaintiffs allege (at 31) that Facebook refused to let the 30(b)(6) witness testify on the contents of Plaintiffs' Exhibit 65.  Not so.  The testimony on that document spanned forty pages of the transcript, including nine pages after the objection Plaintiffs complain about.  Ex. 7 at 51-93.

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS                    CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

In March 2021, Plaintiffs sent Facebook a letter "renew[ing]" their demand that Facebook produce "*all* data and information relating to the Named Plaintiffs," backtracking on their repeated representations to Judge Corley that they sought only data that was *shared* with third parties. Ex. 8 (emphasis added). In April 2021, Facebook sent a letter to Plaintiffs again stating its position that "Facebook's productions under Discovery Order No. 9 are complete." Ex. 9 at 6.

**D.** *April–September 2021*: **The parties go to mediation about various discovery disputes, and Plaintiffs continue to seek production of *all* named plaintiff data in the three categories of discoverable user data identified in Discovery Order No. 9**.

Between April and September 2021, the parties worked with the discovery mediators on various discovery disputes. On September 10, 2021, Plaintiffs again (falsely) asserted that "Facebook has not produced data from categories 2 or 3" of Discovery Order No. 9 and demanded production of "*all* data" relating to the named plaintiffs, regardless of whether it had been shared or made accessible to third parties. Ex. 20 at 2, 4. Facebook responded, again explaining that it produced data in all three categories that was shared or made accessible to third parties, and that, Plaintiff still had not made any showing that more shared data existed and should be produced consistent with Rule 26. Ex. 21. In October 2021, the discovery mediators declared an impasse "on the issue of whether Facebook should be compelled to produce additional documents related to the Named Plaintiffs," and the parties briefed the issue before Special Master Garrie. Ex. 24 at 3.[19]

**E.** **October** *2021–Present*: **Plaintiffs move to compel, resulting in orders requiring the parties to participate in a process before the Special Master to determine what, if any, additional named plaintiff data should be produced.**

Since October 2021, Special Master Garrie has been working with the parties to determine what, if any, additional named plaintiff data should be produced consistent with Rule 26, and Facebook has fully and timely complied with each of his 11 orders, none of which has required Facebook to produce additional named plaintiff data.

On November 29, 2021, Special Master Garrie issued his first tentative ruling, directing Facebook to submit a list of systems that may contain named plaintiff data in the three categories of discoverable user data identified in Discovery Order No. 9, after which the parties would meet and

---

[19] Plaintiffs concede (at 32) that the impasse declared by the mediators in October 2021 related to "the production of further data related to the named plaintiffs," further undercutting their argument that the order issued a year before ordered the production of further data.

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS            CASE NO. 3:18-MD-02843-VC

confer and submit a proposed protocol for production of data from those systems. Ex. 24 at 6. In support of his order, Special Master Garrie relied on Plaintiffs' Exhibit 65 to find that "Facebook appears to maintain data related to the Named Plaintiffs that was not produced in response to" Plaintiffs' RFPs because "it is not available via the DYI Tool." *Id.* at 5. Plaintiffs rely on this finding (at 33) as evidence that Facebook "disobeyed" Discovery Order No. 9, but the document establishes nothing of the sort. *Supra* at 27. Moreover, Plaintiffs' implication that the Special Master only uncovered this allegedly unproduced data in November 2021 is also wrong. Facebook told Plaintiffs and the Court in August 2020 that there was "machine readable data that might reflect the off-Facebook activity that [Plaintiffs' counsel] is describing in a kind of raw, disaggregated way[,]" but explained that this information is "not associated with the plaintiffs' account" and instead is associated with the advertiser. Ex. 3 at 7:16-11:19. And Judge Corley acknowledged that Facebook might have to search the "book" of data associated with certain advertisers, and noted that Plaintiffs now "have a template of where to start" to look for that data. *Id.* at 11:5-19.

Facebook sought reconsideration of the Special Master's November 29, 2021 tentative order on December 10, 2021, arguing that the order should be limited to data that was shared or made accessible to third parties. Ex. 25. Facebook also argued that compliance with the tentative order as written would have been impossible in the four days permitted. *Id.* Facebook submitted a declaration identifying a list of 149 systems that may store or interact with user data that Facebook had compiled previously, explaining that the "purpose and function" of the 149 systems identified "may vary depending on the team that is using it." Ex. 25; *id.* at Ex. B [Pope Decl.], ¶¶ 7-8. Special Master Garrie granted Facebook's reconsideration motion on December 17, 2021, narrowing the tentative order to require Facebook to submit "a high level description of the most common functions and purposes of the system," and instructing Plaintiffs to submit "a list of systems from which Plaintiffs believe Facebook should produce data relating to the named Plaintiffs, explaining for each system why they believe the data should be produced." Ex. 27 at 7. Facebook timely complied with the amended order, Ex. 25; Ex. A,[20] but appealed certain aspects of it to Judge Corley, Dkt. 780.

---

[20] Plaintiffs allege (at 36) that they only discovered that the list of 149 systems identified in the Pope declaration had been prepared in the ordinary course, and not "for this case," during the "first

On January 12, 2022, Judge Corley affirmed the amended order, but Plaintiffs misrepresent (at 32) her ruling as (1) confirming that Facebook had "disobeyed" Discovery Order No. 9, and (2) holding that whether data was shared or made accessible to third parties is irrelevant to determining what, if any, additional named plaintiff data should be produced. The text of the order contradicts both points:

> [Special Master Garrie is working] with the parties to determine what, *if any*, data from [Facebook systems] should be produced consistent with Federal Rule of Civil Procedure 26(b). The Special Master, with his technical expertise, is well-positioned to review the evidence and determine whether systems may contain *shared* Named Plaintiffs' data, or may not. And, similarly, whether the production of *potentially shared* Named Plaintiff data is feasible and proportional to the needs of the case." Dkt. 557 (emphasis added).

On point (1), the order confirms that Discovery Order No. 9 identified three categories of "discoverable user data" and that it is a separate issue whether additional data in those categories must be produced under Rule 26. After Discovery Order No. 9 was issued at the end of 2020, Judge Corley allowed Plaintiffs to pursue discovery for data in all three categories to determine whether there was a basis for compelling production of that data under Rule 26—*i.e.*, whether Plaintiffs could identify any basis for their contention that data "shared or made accessible" to third parties existed and had not been produced to Plaintiffs. Plaintiffs did not make, and still have not made, any such showing, and the parties are in the process of determining "what, if any," additional named plaintiff data should be produced consistent with Rule 26 before the Special Master. Dkt. 807 at 4:9-10.

On point (2), the order also confirms that Plaintiffs' characterization of Judge Corley's order is false. Plaintiffs characterize Judge Corley's order as holding that whether data was "shared or made accessible to third parties" is not relevant to the determination being made by Special Master Garrie. Judge Corley rejected "Facebook's contention that [] the only discoverable named plaintiff data are the data *that Facebook concedes it shared* with third parties." Dkt. 807 at 2:24-25 (emphasis added). But that does not mean that whether data was shared with third parties is irrelevant to determining whether additional named plaintiff data should be produced consistent with Rule 26. Judge Corley went on to make that clear.

---

hearing" with Mr. Pope on January 14, 2022. Not so. Facebook's January 6, 2022 letter expressly stated that the list was comprised of "existing materials prepared by Mr. Pope's team in the course of its work, which was unrelated to this or any litigation." Ex. 30 at 1.

Gibson, Dunn &
Crutcher LLP

Just as she did nearly a year before in directing Plaintiffs to conduct discovery into whether there was additional user data in the three categories of "discoverable user data" that was shared or made accessible to third parties (*see* Dkt. 588), Judge Corley explained again that "how Facebook uses the data it collects about its users is an 'open question,'" and "[t]he first step in answering that question is to identify the data it collects about its users and, specifically, what it has collected about the Named Plaintiffs." Dkt. 807 at 4:1-2. While Judge Corley rejected Facebook's position that the discovery conducted last year by Plaintiffs resolved that issue, it is hard to understand how Plaintiffs can take the position that she also held that whether data was shared with third parties is irrelevant to determining what, if any, additional named plaintiff data must be produced under Rule 26. Judge Corley referred to "shared" data not once, but twice in describing the ongoing process before the Special Master to determine what, if any, additional named plaintiff data should be produced.

Since November 29, 2021, the Special Master has issued 11 orders. Facebook has timely complied with all of those orders through submissions compiling substantial volumes of dense technical information on very short turnarounds,[21] and the Special Master and parties have together participated in three hearings in which four Facebook witnesses provided nearly 10 hours of testimony. Stein Decl. ¶ 12(g). Through this process, the Special Master and Plaintiffs have been able to test—and confirm—that Facebook has produced named plaintiff data in all three categories of "discoverable user data" identified in Discovery Order No. 9. They have also been able to gather information about Facebook's systems to determine, as Judge Corley explained in her January 12, 2022 order, "whether systems may contain shared Named Plaintiffs' data, [] and whether the production of potentially shared Named Plaintiff data is feasible and proportional to the needs of the case." Special Master Garrie has lauded the quality of Facebook's work in that process. At the beginning of a recent hearing, he opened by saying he wanted to "officially on the record recognize and thank Facebook for accommodating an accelerated timeline for a very complex set of problems" and stating that "the answers and data that has been provided is very helpful." Ex. 42 at 6:21–7:11.

---

[21] Plaintiffs highlight (at 35) the Special Master's use of "nonsensical" to describe Facebook's January 27, 2022 submission. Facebook understands that its submission was not as clear as it could have been, however it was prepared in good faith and in short order. Once Facebook conferred with the Special Master, he recognized that Facebook had provided the information requested. Ex. 48.

Gibson, Dunn & Crutcher LLP

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS          CASE NO. 3:18-MD-02843-VC

The parties' disputes relating to named plaintiff data have been hard-fought, time-consuming, and frustrating—for everyone involved. But that is not because Facebook disobeyed orders or engaged in foot-dragging or stonewalling. It is because of the parties' conflicting views on what it means for user data to be "shared or made accessible to" third parties. Plaintiffs' view seems to be that all user data that Facebook uses in its business to benefit a third party is "shared or made accessible to" that third party—even if the data is never disseminated to, obtained by, or even learned by the third party, such as data used by Facebook for targeted advertising on its platform. Facebook's view is that Plaintiffs' definition of "sharing and accessibility" cannot possibly be what this Court meant in allowing certain claims (and related discovery) to proceed in a case it described as follows: "Broadly speaking, this case is about whether Facebook acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained." Dkt. 298 at 3. Under Plaintiffs' view, there is no limiting principle. Indeed, Plaintiffs have now dropped all pretense of seeking discovery of only user data that is shared or made accessible to third parties. On March 1, 2022, Plaintiffs served a Rule 30(b)(6) deposition notice seeking testimony on "the types of User Data or Information Facebook shared, made accessible *or permitted* Third Parties *to target,*" Ex. 39 at 11 (emphases added), which admits what they have been doing all along—seeking discovery on stayed targeted advertising claims. Dkt. 298 at 6 (observing that Plaintiffs "appear to concede [targeted advertising] is perfectly legitimate").

These conflicting views resulted in disputes over (1) whether discovery of data that is not shared or made accessible to third parties is permissible, and (2) if so, the extent of that discovery. Discovery Order No. 9 resolved (1), holding that user data in three categories that Plaintiffs argued was "shared" with third parties was discoverable, and Discovery Order Nos. 11 and 12 resolved (2) by allowing Plaintiffs to conduct discovery on what named plaintiff data exists in the three categories and how it was used to test whether it was shared or made accessible to third parties. In other words, these orders allowed discovery into three categories of "discoverable user data," but none required Facebook to produce named plaintiff data that was not shared or made accessible to third parties.

Gibson, Dunn &
Crutcher LLP

In any event, Facebook remains optimistic that, with the help of Special Master Garrie, the parties will resolve the issue of "what, if any" additional named plaintiff data should be produced.[22]

## V. Sanctions Are Not Appropriate for Conduct Relating to Deposition Scheduling.

Plaintiffs' request for sanctions based on Facebook's approach to deposition scheduling (at 38–42) seeks to punish Facebook for engaging in uncontroversial civil discovery practices. Facebook postponed three named plaintiff depositions (after taking two) because Plaintiffs had not yet produced discovery materials relevant to the depositions. And Facebook sought to depose some of the former named plaintiffs so that it could gain unique, otherwise-unavailable information about standing and predominance. This is routine and uncontroversial civil litigation, not sanctionable conduct.

### A. Postponing depositions until relevant documents have been produced is good practice, not bad faith.

It would be unprecedented to impose sanctions on Facebook for rescheduling depositions based on Plaintiffs' incomplete discovery responses. And it would be especially unfair to do so in this case, where the Special Master's Deposition Scheduling Protocol specifically states that parties may not reopen a deposition based on the other side's failure to substantially complete document production before the deadline. Dkt. 789 at 9. Far from warranting sanctions, it was standard practice for Facebook to request to postpone depositions until it had all of the documents it needed. Plaintiffs themselves seem to recognize this, as they recently postponed three depositions, purportedly on grounds that they would prefer to wait for the production of documents they believe are relevant to those depositions. Stein Decl. ¶ 13(b).

It is a widely recognized principle of civil discovery that, whenever possible, relevant documents should be produced *before* a witness's deposition. *E.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2019 WL 1589974, at *8 n.6 (N.D. Cal. Apr. 11, 2019) ("documents should be produced in advance of those depositions to avoid further delays in the discovery process"); *accord Adobe Sys. Inc. v. A & S Elecs., Inc.*, 2016 WL 8222618, at *3 (N.D. Cal. June 30, 2016); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 13093328, at *2 (N.D.

---

[22] Facebook has added new categories of data to the DYI systems, since producing named plaintiffs data in 2020. Facebook is happy to produce updated versions of DYI files for the named plaintiffs but has understood that Plaintiffs are not interested in additional DYI data, since it is "already available to Plaintiffs" through their Facebook accounts.

Gibson, Dunn & Crutcher LLP

Cal. Oct. 19, 2012). Indeed, this Court's Guidelines for Professional Conduct instruct that attorneys "should not delay producing documents to prevent opposing counsel from inspecting documents prior to scheduled depositions." N.D. Cal. Guidelines for Professional Conduct § 9.

Decisions from this Court regularly give effect to that principle. If documents relevant to a witness have not been produced before a scheduled deposition, the parties are advised to "work [together] to select another date for the deposition." *In re Subpoena Issued to Cisco Sys., Inc.*, 2010 WL 3155895, at *2 n.1 (N.D. Cal. Aug. 9, 2010). If they do not, and a later document production necessitates a supplemental deposition, this Court often requires the party that failed to produce documents before the first deposition to bear the fees and costs of the second one. *Claypole v. Cnty. of Monterey*, 2016 WL 145557, at *2 (N.D. Cal. Jan. 12, 2016); *Mas v. Cumulus Media Inc.*, 2010 WL 4916402, at *31 (N.D. Cal. Nov. 22, 2010); *McConnell v. PacifiCorp Inc.*, 2008 WL 4279682, at *1–7 (N.D. Cal. Sept. 12, 2008). The reason is simple: Contemporary complex litigation is heavily document-driven. One of the core purposes of a deposition is to examine the witness on relevant documents about which the witness may have unique or important knowledge. Receiving documents before a deposition increases the likelihood that the deposition will be illuminating and productive.

In this case, waiting until after documents had been produced to take depositions was especially important. In many complex cases, if relevant documents are produced after—or even shortly before—a witness's deposition, courts simply order the witness to sit for a second day of testimony. *E.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1511901, at *12 (N.D. Cal. Jan. 27, 2012); *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 762240, at *3 (N.D. Cal. Mar. 8, 2012). But here, for any deposition taken before the January 31, 2022 substantial-completion deadline, the Special Master's Deposition Scheduling Protocol provides that "the fact that document production was not substantially complete before the deposition will not constitute good cause to reopen the deposition of that Witness, or seek additional deposition time with that Witness." Dkt. 789 at 9. Given that rule, had Facebook gone forward with the named plaintiff depositions notwithstanding Plaintiffs' incomplete productions, it could have lost its opportunity to question those witnesses on any later-produced documents. And as a practical matter, even if Facebook could have obtained additional deposition time, the more efficient and courteous course was to wait until after receiving the

discovery; doing so minimized the chance that the named plaintiffs would have to be called back for a second day of testimony. *See Procongps, Inc. v. Skypatrol, LLC*, 2013 WL 11261327, at *1 (N.D. Cal. May 22, 2013) (it is "more efficient and economical to have a single round of depositions").

These basic civil litigation principles drove Facebook's decision in mid-January to postpone the three named plaintiff depositions that had been scheduled to occur in January. Facebook served document requests and interrogatories on the named plaintiffs in August 2021 that sought, among other things, documents concerning their sharing of allegedly private information on other social media platforms and information about the third-party apps and devices used by their friends. Ex. 18 at Nos. 31–34; Ex. 19 at Nos. 15–16. These discovery requests sought information relevant to central issues in the case, including the named plaintiffs' privacy expectations, the existence of any privacy injury, and individualized issues of injury and causation—precisely the issues this Court identified in its order on Facebook's motion to dismiss when it noted it was "possible that a few of the named plaintiffs have not adequately alleged a privacy injury" and promised that "Facebook will be given an opportunity to attempt to knock out individual named plaintiffs on standing grounds at a later stage." Dkt. 298 at 17 n.6. After Plaintiffs objected to these requests in late October, Facebook pursued them diligently over the next two months through meet-and-confers, written correspondence, and mediation proposals. Exs. 28, 45–47. While that process was playing out, the parties agreed to deposition dates for the eight named plaintiffs, with two to occur in mid-to-late December and the other six in early 2022. Ex. 31 at 7. In mid-December, with the dates of the first two named plaintiff depositions drawing near, Plaintiffs still had not produced documents in response to Facebook's requests. Nonetheless, in an effort to make progress, Facebook went forward with both depositions. After taking these two depositions and reviewing the transcripts, Facebook determined they were not as fruitful and efficient as they could have been if the missing documents and interrogatory responses had been available.

In early January, Plaintiffs confirmed that they were standing on their objections and would not produce documents responsive to Facebook's requests. Ex. 28. Facebook promptly sought leave from the discovery mediators to file motions to compel, and the mediators granted leave on January 13. Ex. 33. Two business days later, on January 18, Facebook notified Plaintiffs that it would postpone the three January depositions (set for January 20, 27, and 31) because Facebook

"continue[d] to lack basic discovery from Plaintiffs . . . regarding the bases of Plaintiffs' claims, alleged injuries, and alleged damages" and would "be filing two motions to compel this information later this week." Ex. 34. In light of "the Amended Deposition Protocol's presumption against reopening depositions," Facebook explained, Facebook had to postpone the depositions or else risk losing the opportunity to obtain testimony on key issues. *Id.* After filing its two motions to compel—one on Requests for Production 31–34, and the other on Interrogatories 15–16—Facebook notified Plaintiffs that it would postpone the three February and March depositions as well.

In mid-February, the Special Master granted both of Facebook's motions in full, ordering Plaintiffs "to produce full and complete responses." Dkts. 834, 846. Two months have now gone by since those orders issued, and while all eight named plaintiffs have provided some response to the interrogatories, Plaintiffs have produced documents responsive to the Requests for Production 31–34 for only one named plaintiff (40 pages total). Even so, in light of this Court's instructions at the February CMC, Facebook has now taken six of the eight named plaintiffs' depositions, and the last two will occur on April 15 and 28—the first available dates that Plaintiffs provided.

This record makes clear that Facebook's decision to postpone three of the named plaintiffs' depositions was routine, responsible civil discovery practice, not sanctionable misconduct. Plaintiffs attack (at 41) the "grounds Facebook's counsel gave for deposition postponement" as "transparently pretextual," but Facebook told Plaintiffs about its intent to file two motions to compel—both of which were *successful*. The record also refutes Plaintiffs' claim (at 38) that Facebook's "actions indicate that Facebook did not intend to take the Named Plaintiffs' depositions—at least not any time soon." In fact, Facebook went forward with two named plaintiff depositions—despite not having received strategically significant discovery responses from Plaintiffs—before deciding to postpone the others. A one-time postponement of depositions pending the production of important discovery materials relevant to those depositions does not meet the high bar for demonstrating sanctionable bad faith—especially not where, as here, there were legally and pragmatically proper reasons to postpone. There is a reason Plaintiffs could not cite even one case awarding sanctions based on nothing more than a defendant's decision to postpone a deposition pending completion of document discovery.

Gibson, Dunn & Crutcher LLP

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS    CASE NO. 3:18-MD-02843-VC

**B.    Facebook had legitimate reasons for seeking to depose former named plaintiffs.**

The record belies—and Judge Corley's order on the issue forecloses—Plaintiffs' contention that Facebook's motion to depose former named plaintiffs was bad-faith harassment.  Facebook had a legitimate, well-considered strategic rationale for seeking to depose the former named plaintiffs.  As Plaintiffs acknowledge, Judge Corley encouraged Plaintiffs in late 2020 to substantially reduce the number of named plaintiffs.  Pls.' Ex. 33.  Plaintiffs did so, dropping 14 of the 23 then–named plaintiffs.  Dkt. 593.  It is certainly within the realm of reasonable strategic consideration to presume that part of Plaintiffs' calculus in deciding who to keep and who to drop would be to keep the individuals they felt were the strongest class representatives.  From there, it requires no great leap of logic to infer that Plaintiffs believed at least some of the 14 former named plaintiffs had flaws—on standing, the merits, class issues, or all three—that, if discovered, would make it more difficult for Plaintiffs to prevail.  Tellingly, Plaintiffs chose to drop all 12 named plaintiffs with the largest DYI files—that is, those with the most extensive record of their activities on Facebook.  Given that backdrop, it was well within Facebook's strategic prerogative to decide it was worthwhile to depose those individuals and probe whatever flaws may have prompted Plaintiffs to drop them.

In fact, it would have been irresponsible for Facebook *not* to pursue discovery from the former named plaintiffs.  The predominance inquiry under Rule 23(b)(3) is a perennial strategic focal point in class litigation—and an issue on which "discovery of absent class members" is particularly appropriate.  Regan Hunt Crotty, *Pre-Certification Discovery of Absent Class Members*, Law Journal Newsletters (Jan. 2006), available at https://tinyurl.com/yncpbje3.  And recent caselaw developments have elevated to a new position of prominence the question of absent-class-member standing.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).  Facebook had good reason to believe depositions of the former named plaintiffs—whose DYI files indicated they were among the most prolific in willingly sharing their information online—would bear directly on both of those issues.  *See U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("[T]he extent of the protection accorded a privacy right at common law rested in part on the *degree* of dissemination of the allegedly private fact.") (emphasis added).

Although Judge Corley denied Facebook's motion to depose the former named plaintiffs, she did so "*without prejudice* to Facebook renewing its request after it has taken the depositions of the Named Plaintiffs." Dkt. 805 at 1 (emphasis added). It strains credulity to suggest that Judge Corley would have granted Facebook leave to renew a request that was inappropriate or unlawful. Rather, she left open the possibility of taking these depositions in the future if "Facebook shows that such discovery is necessary." *Id.* at 2. Judge Corley also noted that "the least burdensome" approach to deposing absent class members "would be to depose an absent class member who previously agreed to serve as a named plaintiff." *Id.* Plaintiffs cannot deny that it is sometimes appropriate for defendants in a putative class action to depose absent members of the putative class—especially where those absent class members have "inserted [themselves] into the litigation" by, for example, being listed on initial disclosures as persons likely to have knowledge. *See, e.g.*, *A.B. v. Pac. Fertility Ctr.*, 2019 WL 6605883, at *1 (N.D. Cal. Dec. 3, 2019) (Corley, M.J.). All five of the former named plaintiffs Facebook sought to depose were listed in Plaintiffs' initial disclosures as persons with knowledge. Ex. 44. Regardless whether Facebook is ultimately permitted to depose any former named plaintiffs, there is no serious argument that it had no legitimate strategic basis to do so.

### C. Deposition discovery is proceeding apace.

Over the last two months, the parties have made significant progress in taking and scheduling depositions. Facebook has now taken six named plaintiff depositions and will take the last two in short order. Plaintiffs have taken fourteen depositions of current or former Facebook employees, and eleven more depositions are on the calendar. Stein Decl. ¶ 13(a).

Facebook is also conferring with Plaintiffs to schedule additional depositions. *Id.* ¶ 13(a) Plaintiffs identified the next tranche of twelve witnesses they wish to depose, including three apex witnesses, in late March. Facebook offered deposition dates for three of the witnesses three business days later and has advised Plaintiffs where they have requested depositions of former employees who Facebook does not control. *Id.*

Facebook has also met-and-conferred extensively with Plaintiffs about a Rule 30(b)(6) deposition. As part of those efforts (which remain ongoing), Facebook has agreed to sixteen hours of Rule 30(b)(6) deposition testimony on at least nine topics and offered deposition dates that

accommodate Plaintiffs' requested timetable for the deposition. Stein Decl. ¶ 13(c). Facebook's efforts in the two months since the February CMC further underscore that it is acting reasonably and in good faith in connection with deposition scheduling.

## VI. Counsel's True Statements and Statements of Opinion, Made in the Course of Normal Advocacy, Are Not Sanctionable.

Plaintiffs' request for sanctions against Mr. Snyder individually (at 42–47) is particularly unjustified. "Given the importance of advocacy, our adversarial system encourages lawyers to act with zeal for a client's cause." *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 426 (9th Cir. 2012). Lawyers, unlike judges, are not neutral expositors of the law. Model Rules of Prof'l Conduct R. 3.3 cmt. 2 (2020). Rather, "the primary duty of an attorney [is] to represent his or her client zealously." *Luxul Tech. Inc. v. NectarLux, LLC*, 2016 WL 3345464, at \*4 (N.D. Cal. June 16, 2016) (quoting *Operating Eng'rs Pension Trust*, 859 F.2d at 1344). An "attorney's enthusiasm and creativity" also "plays a key part . . . in assisting . . . a tribunal's decision-making process." *Bash Back!*, 705 F.3d at 426. For both of those reasons, "sanctions should not result from normal advocacy." *Id.* But that is exactly what Plaintiffs' motion requests.

Plaintiffs' request for sanctions against Mr. Snyder is more notable for what it fails to say than for what it says. Plaintiffs do not (and cannot) claim that Mr. Snyder made any false statement of fact or law, failed to disclose any controlling adverse authority, or offered any false evidence. *See* Model Rules of Prof'l Conduct R. 3.3 (2020) (detailing a lawyer's duty of candor to the tribunal). Instead, their motion rests on an accusation (at 42) that through various statements over the past two years, Mr. Snyder tried to "create a false narrative about this case"—specifically, that Plaintiffs are responsible for the discovery delays in this case (rather than Facebook, as Plaintiffs contend). But crafting a narrative—an interpretation designed to organize and give meaning to an otherwise disjointed collection of facts—is the bread-and-butter work of trial lawyers. And while Plaintiffs may disagree with Mr. Snyder's "narrative" about discovery, that does not make it *false*. Indeed, in a case as complex and protracted as this one, it would be surprising if there were not two sides to any story about which party bears the blame for discovery delays.

None of the statements Plaintiffs pluck from hearings over the past two years is even remotely sanctionable, and to impose sanctions for them years later would be unprecedented and unfair.

Plaintiffs' brief opens (at 1), for example, with a quote from Mr. Snyder from early March 2020 explaining that Facebook was "eager to produce documents" because "those documents actually are the key to us winning the case." It was true when Mr. Snyder said it, and remains true today, that he (like Facebook) believes the case is without merit and that the evidence adduced during discovery will prove it. Snyder Decl. ¶ 5. And despite the difficulties the parties have had throughout discovery (to say nothing of the difficulties occasioned by being forced to conduct discovery during a global pandemic), there is no basis to deem that advocacy "false." Indeed, considering the untruths, half-truths, and outright misrepresentations sprinkled throughout Plaintiffs' motion, it takes more than a little chutzpah to seek sanctions based on a "false narrative" theory.

Plaintiffs also allege (at 42) that Mr. Snyder "lacked any basis in fact" to argue in March 2020 that Plaintiffs were delaying discovery, unhappy with their claims, and trying to expand the case. Mr. Snyder believed those statements when he made them, and he continues to believe them today. Snyder Decl. ¶ 5. These statements were not inconsistent with this Court's observation in its motion-to-dismiss ruling that Plaintiffs' allegations had "expanded in scope" and that "at times it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong." *See* Dkt. 298 at 5. In any event, Mr. Snyder's statements are most naturally read not as statements of fact, but as statements of opinion about the merits of Plaintiffs' case. Statements of opinion are not sanctionable. They simply reflect "normal advocacy," *Bash Back!*, 705 F.3d at 426, and "sanctions are not to … be used to 'chill' creative advocacy or attorneys' enthusiasm," *Sorensen v. Nat'l R.R. Passenger Corp.*, 2017 WL 6520629, *3–4 (C.D. Cal. Nov. 30, 2017).[23]

Plaintiffs fare no better with their claim (at 43, 47) that statements made during a January 19, 2022 hearing are "independently sanctionable" because they reflect a "two-step litigation strategy" of "delay[ing] discovery on the ground that it is too early" and then "evad[ing] it on the ground that it is too late." Facebook took neither "step" of this supposed two-step strategy.

---

[23] The other statements Plaintiffs criticize are cut from the same cloth. Mot. at 43 (characterizing Plaintiffs' approach to discovery as "unfocused" and "scattershot"); *id.* at 44 (arguing in motion papers that two of Plaintiffs' discovery motions lacked merit); *id.* at 44–45 (advocating for court-imposed limits on the discovery process); *id.* at 45 (opining that Plaintiffs were raising too many discovery issues at once); *id.* at 46 (interpreting requests for production that had been served five months earlier—in a case that by then was 43 months old—as having "just" been served).

Facebook did not seek to "delay" any of the discovery at issue because it was too early. Rather, when the parties first began working with the discovery mediators, Facebook argued that Plaintiffs should be required to meet-and-confer with Facebook and attempt to resolve any disputes through mediation before bringing a discovery motion. Ex. 16. *The Special Master agreed:* He ordered that neither party could file a discovery motion without first obtaining a declaration of impasse from the discovery mediators. Dkt. 733 ¶ 2. Similarly, after Facebook raised a concern that Plaintiffs were seeking to raise an unwieldy number of issues in discovery mediation, the mediators advised the parties to raise no more than three issues per mediation session. Exs. 14-15, 17. That limitation worked: It allowed the parties to focus their efforts on a manageable number of disputes, resolve many disputes without motions practice, and narrow the scope of most of the disputes that were litigated.

Nor did Facebook seek to "evade" discovery because it was too late. To support their claim that Facebook did so, Plaintiffs cite *their own statement* in a joint status update (at 45, citing Dkt. 797 at 4)—not anything Mr. Snyder said. And at the January 19 hearing, Mr. Snyder's comments focused on the overbreadth of the Special Master's order requiring production of "all documents" related to ADI. Pls.' Ex. 3 at 14:9–15. Here again, the Special Master agreed: as detailed above, he later issued an amended order narrowing the scope of the production to "existing custodians." *Id.* at 15:4; *supra* at p. 28. As for Mr. Snyder's plea that the Special Master should impose proportionality-based limits on Plaintiffs' discovery demands, he was "guilty of nothing more sinister than the zealous discharge of [his] duty to represent [his] clients with vigor." *United States v. Figueroa-Arenas*, 292 F.3d 276, 281–82 (1st Cir. 2002) (vacating an order imposing sanctions); *United States v. Corinthian Colls.*, 652 F. App'x 503, 505–06 (9th Cir. 2016) (reversing sanctions where the record did not support a finding of vexatious conduct, frivolous arguments, or acting in bad faith); *Glasser v. Blixseth*, 649 F. App'x 506, 507 (9th Cir. 2016) (similar). It speaks volumes that Plaintiffs could not identify even one case where a court has awarded sanctions on the "false narrative" theory Plaintiffs press here.[24]

---

[24] The lone case Plaintiffs cite is inapposite: it affirmed sanctions against an attorney who propounded discovery requests that were either facially frivolous or duplicative of earlier requests that had been denied. *Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996).

At bottom, while Plaintiffs contend (at 3) that "a number of Gibson Dunn attorneys played roles in the misconduct," they apparently zero in on Mr. Snyder simply because he is "Facebook's lead lawyer." But that arbitrary targeting-the-top approach is baseless and unfair; there is no imputed liability or *respondeat superior* theory for sanctions. Rather, sanctions must be "based solely on [an attorney's] own improper conduct without considering the conduct of the parties or any other attorney." *Primus*, 115 F.3d at 650. And here, it would be "a great injustice for a court to publicly punish an attorney who has done nothing wrong and is merely representing his client's interests," as "sanctions act as a symbolic statement about the quality and integrity of an attorney's work—a statement which may have a tangible effect upon the attorney's career." *See Otis v. Demarasse*, 399 F. Supp. 3d 759, 766–67 (E.D. Wis. 2019) (citation omitted). Plaintiffs' request for sanctions against Mr. Snyder individually runs roughshod over these principles, and there is no basis for such a punitive action.

## VII. Plaintiffs' Fee Request Is Unreasonable.

This record cannot support an award of sanctions. But even if it could, Plaintiffs have failed to meet their burden to show that the sanction they request is warranted. The only sanction Plaintiffs seek is a monetary sanction—specifically, an award of attorneys' fees and costs. Plaintiffs' motion does not seek any form of non-monetary sanction.[25]

When evaluating requests for attorneys' fees, "district courts have a *duty* to ensure that claims for attorneys' fees are reasonable, and a district court does not discharge that duty simply by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018) (cleaned up). Rather, the party seeking fees bears the burden of proving the reasonableness of both its hours and its rates. *Bird v. Wells Fargo Bank*, 2017 WL 4123715, at *1 (E.D. Cal. Sept. 18, 2017) (citing *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000)).

---

[25] Nor could there be any argument that a non-monetary sanction, such as evidentiary sanctions or terminating sanctions, would be warranted here. Evidentiary sanctions are unwarranted where a "less severe" remedy—such as extending the case schedule—is adequate to avoid any potential prejudice. *Rooney v. Sierra Pac. Windows*, 2011 WL 2149097, at *4 (N.D. Cal. June 1, 2011). Terminating sanctions are unwarranted in all but the rarest and most egregious cases in which bad-faith, willful misconduct has occurred that "threaten[s] to interfere with the rightful decision of the case" on the merits and cannot be addressed with a "less severe alternative[] than outright dismissal." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958, 959 (9th Cir. 2006) (quotations omitted).

Plaintiffs' fee request here is untethered from any record that could possibly support a fee award. It covers periods of time in which the Plaintiffs said the process was *working well*. *Supra* at 12. Plaintiffs also seek to recover for motions for reconsideration of the ADI and named plaintiff data rulings that Judge Corley said were made in good faith, *supra* p. 4, and incredibly, Plaintiffs seek fees for work on *motions that Facebook won* (as well as motions that Facebook won in substantial part), *supra* at p. 14. *Contra Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1189 (2017) (a "sanctioning court must determine which fees were incurred because of, and solely because of, the misconduct at issue"). Facebook *prevailed* on numerous issues relating to both ADI and named plaintiff data. *Supra*, Pts. IV.A, V.E. Plaintiffs offer no explanation whatsoever for their broad-brush requests and make no discernible attempt to segregate hours spent on winning versus losing issues.

The evidence Plaintiffs submitted is also woefully insufficient to establish the reasonableness of their hours or allow disaggregation of tasks spent on motions and issues where Facebook prevailed: They submitted no time records or billing statements, and simply recite that each attorney performed a list of tasks associated with each of the three issues on which Plaintiffs seek fees. *See* Pls.' Decl. ¶¶ 18–37, 40–51, 54–63. The generic descriptions of the tasks each lawyer performed are identical or nearly identical in their wording, and the hours attributed to each attorney are listed as a block rather than broken down by task. *See id.* That is a far cry from the detailed information this Court would need to ensure that a fee award "exclude[s] hours that are 'excessive, redundant, or otherwise unnecessary,'" including hours spent on motions where Facebook prevailed. *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, 2009 WL 3617786, at *1, 3 (N.D. Cal. Oct. 29, 2009) (quoting *Hensley v. Eckhart*, 461 U.S. 424, 433–34 (1983)); *see also, e.g.*, *I.E.I. Co. v. Advance Cultural Educ.*, 2011 WL 1335407, at *3–4 (N.D. Cal. Apr. 7, 2011) (the "party requesting fees must provide detailed time records documenting the task completed and the time spent"). Without detailed time records—or a declaration from counsel detailing the nature of the tasks performed, the need for them, and the amount of time incurred on each task—"the Court has no basis to judge whether the amount sought constitutes 'reasonable expenses.'" *Choudhuri v. Wells Fargo Bank, N.A.*, 2017 WL 5598685, at *10 (N.D. Cal. Nov. 21, 2017) (denying motion for sanctions).

**VIII.** **If the Court Has Any Doubts, Gibson Dunn Respectfully Asks the Court to Hold Plaintiffs' Motion in Abeyance.**

Gibson Dunn is the true target of Plaintiffs' motion. The issues Plaintiffs have raised all relate to decisions Gibson Dunn has made, and actions Gibson Dunn has taken, in discovery. The motion does not accuse Facebook of any independent misconduct, and in fact, Facebook has gone to extraordinary lengths in discovery. And sanctions against Mr. Snyder individually are unwarranted for the reasons explained above. *Supra* Part VI. Gibson Dunn is counsel of record in this case and stands behind the conduct of its lawyers.

Gibson Dunn takes full responsibility for the conduct of discovery in this case. Where, as here, responsibility "rests with the attorneys," "the appropriate remedy is" to issue any sanction against "the party's counsel," not the party itself. *Orgler Homes, Inc. v. Chi. Reg'l Council of Carpenters*, 2008 WL 5082979, at *3 (N.D. Ill. Nov. 24, 2008).[26] Likewise, "in the absence of any indication that" any individual attorney was "personally responsible for" the conduct at issue, any sanctions would be appropriately "levied against Defendants' law firm." *Sweet People Apparel, Inc. v. Saza Jeans, Inc.*, 2016 WL 6053958, at *2 (C.D. Cal. May 25, 2016). If this Court were to conclude that sanctions were warranted, any sanction should be issued only against Gibson Dunn.

That said, Gibson Dunn has sought to bring before the Court the full and fair record of what has actually happened in discovery over the past two years, not the incomplete and misleading record Plaintiffs submitted to the Court. Gibson Dunn is hopeful and confident that this record will demonstrate to the Court's satisfaction that Gibson Dunn has advanced good-faith positions in motions practice that were often successful, utilized the processes the parties agreed to and this Court ordered, and complied with every order Judge Corley and Special Master Garrie have issued. In short, while the record certainly confirms that discovery in this case has been long, complex, and hard-fought, it also confirms that Gibson Dunn has met its discovery obligations while serving as an effective and zealous advocate for Facebook.

That is not to say that the record cannot be improved. The Court's comments at the CMC in February, and again in March, made it clear that, thus far, Gibson Dunn's conduct in discovery had not

---

[26] As the Court knows, 28 U.S.C. § 1927 "authorizes sanctions only upon counsel." *Sneller v. City of Bainbridge Island*, 606 F.3d 636, 640 (9th Cir. 2010).

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS        CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

met the Court's expectations. The firm was mortified to learn that. As lawyers and advocates, Gibson Dunn's highest priority in our work is satisfying our obligations as officers of the Court. Mr. Snyder has been practicing law for more than 35 years and has never been sanctioned. Snyder Decl. ¶ 2. Collectively, the Gibson Dunn lawyers who have appeared in this matter have been practicing law for more than 150 years. Stein Decl. ¶ 9. None of them has ever been sanctioned. In this case, as in every case, Gibson Dunn strives not just to meet its obligations, but to exceed them. And the firm has heard the Court loud and clear that the Court expects nothing less.

Gibson Dunn submits that this is not the kind of rare and exceptional case in which discovery sanctions are warranted. If for any reason the Court is not yet fully convinced on that front, Gibson Dunn would ask the Court to limit any contemplated award to Gibson Dunn alone, and not to Facebook or Mr. Snyder individually, and to hold its ruling on Plaintiffs' motion in abeyance pending completion of discovery. *Cf. Digital Empire Ltd. v. Compal Elecs. Inc.*, 2015 WL 11570938, at *7 (S.D. Cal. Sept. 4, 2015) (denying Rule 37 sanctions where, "[t]hough the plaintiff may have delayed in the production of discovery in the past, it now appears to be making efforts to produce all relevant documents in accord with this Court's Orders"). Although Gibson Dunn may not have acted perfectly, and cannot promise perfection, if given the chance, Gibson Dunn would welcome the opportunity to demonstrate to the Court's satisfaction that any concerns the Court might have had are being addressed, discovery is proceeding as it should, and Gibson Dunn (and Facebook) will continue to satisfy every obligation, comply with every order, and move discovery toward completion.

## <u>CONCLUSION</u>

Plaintiffs' motion for sanctions should be denied. In the alternative, the Court should hold the motion in abeyance pending the completion of discovery.

Gibson, Dunn & Crutcher LLP

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS        CASE NO. 3:18-MD-02843-VC

Dated: April 11, 2022

**GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Rosemarie T. Ring*
Rosemarie T. Ring (SBN 220769)
rring@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8247
Facsimile: 415.801.7358

*Attorneys for Defendant Facebook, Inc.*

Gibson, Dunn &
Crutcher LLP

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS          CASE NO. 3:18-MD-02843-VC