Pages 1 - 112

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION )  **NO. 18-MD-02843 VC**
_____ )

San Francisco, California
Thursday, September 15, 2022

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC
SOUND RECORDING - 10:02 a.m. to 12:36 p.m.**

**APPEARANCES:**

For Plaintiffs:

        KELLER ROHRBACK LLP
        1201 Third Avenue - Suite 3200
        Seattle, Washington  98101
    BY: **DEREK LOESER, ATTORNEY AT LAW**
        **DAVID J. KO, ATTORNEY AT LAW**

        KELLER ROHRBACK LLP
        300 Lakeside Drive - Suite 1000
        Oakland, California  94612
    BY: **BENJAMIN B. GOULD, ATTORNEY AT LAW**

        BLEICHMAR, FONTI & AULD LLP
        555 12th Street - Suite 1600
        Oakland, California  94607
    BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
        **ANNE K. DAVIS, ATTORNEY AT LAW**
        **MATTHEW P. MELAMED, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Transcribed By:    Marla F. Knox, RPR, CRR, RMR
           United States Official Court Reporter

```
 1   APPEARANCES:   (CONT'D)

 2   For Defendant:
                             GIBSON, DUNN & CRUTCHER LLP
 3                           1881 Page Mill Road
                             Palo Alto, California  94304
 4               BY:   MARTIE KUTSCHER CLARK, ATTORNEY AT LAW

 5                           GIBSON, DUNN & CRUTCHER LLP
                             555 Mission Street - Suite 3000
 6                           San Francisco, California  94105
                 BY:   ROSEMARIE T. RING, ATTORNEY AT LAW
 7
                             GIBSON, DUNN & CRUTCHER LLP
 8                           200 Park Avenue
                             New York, New York 10166
 9               BY:   ORIN SNYDER, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>Thursday - September 15, 2022</u>                    <u>10:02 a.m.</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | **THE CLERK:**  All rise.  This Court is now in session. |
| 5 | The Honorable Vince Chhabria presiding. |
| 6 | (Pause in proceedings.) |
| 7 | **THE CLERK:**  Please be seated.  Counsel can step |
| 8 | forward to make their appearances. |
| 9 | Calling case number 18-MD-2843, In Re: Facebook, Inc. |
| 10 | Consumer Privacy User Profile Litigation. |
| 11 | Counsel, please state your appearances for the record. |
| 12 | And just so you know, I have the microphones at counsel table |
| 13 | turned off. |
| 14 | **MS. WEAVER:**  Good morning, Your Honor, Lesley Weaver |
| 15 | for Plaintiffs, Bleichmar Fonti & Auld. |
| 16 | **THE COURT:**  Good morning. |
| 17 | **MR. LOESER:**  Good morning, Your Honor, nice to see |
| 18 | you, Derek Loeser from Keller Rohrback. |
| 19 | **THE COURT:**  Good morning. |
| 20 | **MS. RING:**  Good morning, Your Honor, Rose Ring from |
| 21 | Gibson Dunn on behalf of Facebook, and I have with me today |
| 22 | Orin Snyder and Martie Kutscher-Clark. |
| 23 | **THE COURT:**  Good morning, everyone.  It is nice to see |
| 24 | everybody in person after, what, like three years or something |
| 25 | like that. |

1          Let me start with my favorite topic which is sealing.

2     There are some things in the briefs that are redacted, I guess,

3     in -- as part of a motion to seal.

4          I didn't see anything in the briefs that should be

5     redacted.  Does anybody disagree with that?

6          **MR. LOESER:**  The Plaintiffs certainly don't,

7     Your Honor.

8          **MS. RING:**  Your Honor, not in the first round of

9     briefing, but I do believe there was something in our

10    supplemental brief.

11         **THE COURT:**  Yeah, I didn't see -- I mean, reading

12    through it, I didn't see anything that seemed like it ought to

13    be sealed.

14         **MS. RING:**  Okay.  I will ask --

15         **THE COURT:**  I mean, there is a reference to the Hive,

16    for example, but that doesn't seem to me that that should be

17    sealed, I mean, general discussion of that.

18         **MS. RING:**  I will ask right now and clear this up for

19    you, but --

20         **THE COURT:**  There is reference to specific apps.

21         **MS. RING:**  Yes.

22         **THE COURT:**  That, you know, according to the documents

23    described in the briefs, you know, acquired a bunch of user

24    information; but the fact that specific apps required a bunch

25    of user information doesn't seem like something that should be

```
 1   sealed.

 2        MS. RING:  There was some references, Your Honor, to

 3   the Special Master's order on named Plaintiff data that

 4   attached a number of submissions that did have sealed

 5   information in them, just detailed informations about system

 6   and so on.

 7        THE COURT:  Well, we can have a conversation about

 8   whether, you know, the attachment -- some of the attachments

 9   still need to be sealed or partially redacted or whatever, but

10   I'm just talking about the briefs.

11     Do you want to take a quick second and flip through and

12   see if you think that anything in the briefs needs to be

13   redacted?

14        MS. RING:  I will but I think you just cleared it up.

15   I was referring to attachments and that sort of thing, which

16   some of that is sealed.  So if we want to talk about that,

17   that's a different question.  I don't think in the brief itself

18   anything is sealed, no.

19        THE COURT:  Okay.  Well, that will be helpful for us

20   at least to get started on, you know, making sure that nothing

21   is redacted that shouldn't be redacted.

22        Sounds like we all agree that nothing in the briefs should

23   be redacted, and then we can use that as a guide.

24        Obviously, if the equivalent information is in the

25   document, that should not be redacted too; but there may be
```

1  stuff in some of the attachments that need to be redacted.

2          **MS. RING:**  That's right.

3          **THE COURT:**  Okay.  So that's -- that will get us

4  started on making sure that nothing is sealed that shouldn't

5  be, and we will -- I will issue a further order on that after

6  the hearing.

7      Okay.  Second question -- I think this is for the

8  Plaintiffs mostly.  It might be for both of you -- but we are

9  in this weird posture where you filed a motion for sanctions

10  and then you announced that you had reached a settlement.

11      You -- you filed something on the docket asking for

12  everything in the litigation to be stayed for a period.  I

13  don't remember what it was, like, 60 days or something like

14  that?

15          **MR. LOESER:**  Right.

16          **THE COURT:**  And I said yes, except for the sanctions

17  hearing will take place and Facebook has to file its final

18  brief on the sanctions motion.

19      So I guess I need to get a -- an understanding of what the

20  Plaintiffs' position is on sanctions in light of the

21  settlement.

22      I -- obviously I may have my own independent discretion

23  and, perhaps, obligation to press ahead on the question of

24  whether Facebook engaged in serious litigation misconduct; but

25  I need to know if I'm sort of acting alone at this point or if

1   the Plaintiffs wish to press ahead on their request for

2   sanctions in the form of attorneys' fees.

3       I know you are not asking -- assuming that the settlement

4   goes through, you won't be asking for issue sanctions any more.

5   But what about the money?

6           MR. LOESER:  Yeah.  And, of course, we anticipated

7   that question, Your Honor.  And we were very careful through

8   the process of reaching agreement to carve out and exclude

9   anything related to the sanctions motion, so it is not part

10  of --

11          THE COURT:  What does that mean, to carve out and

12  exclude anything related to the sanctions motion?

13          MR. LOESER:  We did not settle any of the requests for

14  relief relating to our sanctions motion, and so we -- we,

15  frankly, anticipated that Your Honor would not stay the

16  sanctions proceeding, so we weren't the least bit surprised

17  when you didn't; but in the -- the agreement in principle that

18  we have reached there is an express carve out for the relief

19  sought in our sanctions motion.

20          THE COURT:  But, I mean, I guess this sort of begs the

21  question, right, because you are going to have a motion for

22  preliminary approval of the settlement agreement and then you

23  will have a motion for final approval.

24      And in the -- with the motion for final approval, there

25  will be a motion for attorneys' fees.  And let's just make up a

1   number.  Let's just say you are going to ask for a hundred

2   million dollars in attorneys' fees; right.

3       How much are you seeking in fees in the sanction motion?

4       **MR. LOESER:**  The motion has -- in the preliminary

5   motion I think we identified something like $845,000.  I think

6   that included costs and --

7       **THE COURT:**  Let's call it a million.

8       **MR. LOESER:**  -- we think we will be seeking more based

9   upon the other --

10      **THE COURT:**  Right.  So let's call it a million

11  dollars.  So if -- and does the settlement agreement, I guess

12  it is just an agreement in principle at this point, but does

13  that include a provision that we often see in these class

14  action settlements saying, you know, the Plaintiffs can seek up

15  to X amount in attorneys' fees and Facebook won't oppose that?

16      **MR. LOESER:**  It does not, Your Honor.

17      **THE COURT:**  Okay.

18      **MR. LOESER:**  It has been our practice from, based on

19  some Ninth Circuit guidance, to not provide provisions like

20  that in our agreements and instead leave it completely up to

21  the Court.  And, you know, we will submit a fee petition; and

22  the Court will evaluate whether it is appropriate or not.

23      **THE COURT:**  Will it come from the -- the overall

24  settlement fund that will be created, would your fees come from

25  that fund?

1          **MR. LOESER:**  Certainly that would be the -- the idea.

2     However, because we have not settled or compromised our

3     sanctions motion, we would continue and do continue to seek

4     fees from Facebook and Gibson directly.

5          Any fees that we receive would then be credited against

6     the fees we would be seeking from the class, and I think that's

7     really important because, you know, this conduct had a huge

8     impact on what it cost to litigate this case.

9          I don't think the class should have to pay that increased

10    burden, so we would just credit against the fees that we are

11    seeking, anything we recover in our sanctions motion.

12          **THE COURT:**  Right, but so -- but I think what the --

13    okay, so -- so in other words, let me make sure I understand.

14          So what you are saying is, let's just say -- and, again,

15    I'm totally making up the number.  Nobody should attach any

16    significance to the hundred-million-dollar number that I just

17    made up and nobody should attach any significance to the number

18    I'm about to state -- but let's say I decided to sanction

19    Facebook a million dollars -- Facebook and Gibson Dunn a

20    million dollars.

21          You are saying that that would mean, given the way you

22    have structured the settlement agreement, that Facebook and

23    Gibson Dunn would have to pay an extra million dollars; they

24    would be on the hook for an extra million dollars compared to

25    what they would be on the hook for at the final approval stage?

1              **MR. LOESER:**  Um, well, when you put it that way, I

2      think -- you know, we really haven't made a decision about

3      that, so I'm just thinking out loud right now.

4          So certainly the way that we had contemplated this, to the

5      degree we have thought about it, is we are going to seek a

6      percentage of the -- of the fund, and we are also seeking fees

7      directly from Gibson.

8          And just -- I mean, I think our -- it made sense to me to

9      say, look, let's say we seek -- again, I'm making up numbers.

10     Let's say we seek 25 percent of the fund.  Let's say we seek

11     20 percent, whatever -- say we seek 30 percent -- whatever it

12     is, if we recovered -- if the Court were to grant our fee

13     petition, we would credit and reduce the burden on the class,

14     the amount that was paid directly by Gibson and/or Facebook

15     so...

16              **MR. GOULD:**  Mr. Loeser?

17              **MR. LOESER:**  Yes.

18              **MR. GOULD:**  I'm sorry.  I think the answer to the

19     question is just yes because --

20              **THE CLERK:**  This is not being recorded.  You need to

21     be --

22              **MR. LOESER:**  This is Ben Gould.  By the way, just to

23     correct the record here or complete the record, we didn't

24     introduce the other people at the table and I apologize for

25     that.  Ben Gould, who has been working on this case from the

1   start, and David Ko, as well; Anne Davis and Matt Melamed.

2        MR. GOULD:  Sorry to interrupt you.  I was just going

3   to say the quick answer to your question is yes because if the

4   common fund is non-revisionary, then anything credited from

5   the -- the fees will just go back into that pile that Facebook

6   would be paying anyway if that makes sense.

7        THE COURT:  Okay.  So -- I think so, but I want to

8   make sure, right, because, you know, if -- if I were to

9   sanction Facebook and Gibson Dunn a million dollars and the

10  sanction would be that they would have to pay your fees, right;

11  pay a million dollars in attorneys' fees to you, if you were

12  going to get that money anyway as part of the settlement, then

13  we have to ask ourselves whether it's a useless exercise;

14  right.

15      And it may still not be a useless exercise.  It may be

16  very important for general deterrence to -- to continue to

17  press ahead on sanctions.

18      It may be that I need to think about a different form of

19  sanctions, right, like a fine, perhaps, as opposed to requiring

20  Facebook and Gibson Dunn to pay your fees.

21      So that's why I want to try to get clarity on this

22  question.

23        MR. GOULD:  And maybe I'm not communicating.  If there

24  is a fund that Facebook is going to pay anyway --

25        THE COURT:  Okay.

1    **MR. GOULD:**  Then -- and if any -- if the attorney fee

2    portion of that common fund will be reduced by whatever amount

3    is ordered to pay as sanctions, that reduced amount will go

4    back into the fund that Facebook is going to pay anyway.  So

5    necessarily any sanctions ordered here would be in addition to

6    the settlement amount.  Does that make sense?

7          **THE COURT:**  I think so.

8          **MR. GOULD:**  Okay.

9          **THE COURT:**  Yeah.

10         **MR. GOULD:**  Thank you.  Sorry.

11         **THE COURT:**  So what it -- as a practical matter, what

12   it means -- what it would mean is that the lawyers wouldn't get

13   any money -- the Plaintiffs' lawyers would not get any money

14   over and above what they are already going to get; right.

15       But the Plaintiff class will get a million dollars more,

16   if that were the sanction, than they would otherwise get.

17         **MR. LOESER:**  That's how I conceived of it, Your Honor.

18   Again, just admittedly thinking out loud.  Of course, there are

19   other ways to do it.  If the Court were inclined to just simply

20   require payment on top of the fees that we recovered and we

21   ended up with more, we obviously wouldn't complain about that.

22       But the way we had contemplated, again, was that this was

23   a -- additional burden on the class.  The class would have to

24   pay -- would be -- you know, we have a lodestar in this case,

25   and we justify our fees based on our lodestar.  So the class

1  has been burdened, and the class should be compensated; but

2  that's just --

3          THE COURT:  Would there be -- would an alternative be

4  to -- assuming I decide to sanction Facebook and Gibson Dunn,

5  would an alternative be to simply fine them?

6          MR. LOESER:  Yes.  I mean, I think that -- with --

7  within this context, these are -- we are seeking compensatory

8  sanctions here.  We are not seeking what the Court sometimes

9  described as punitive sanctions.

10          THE COURT:  Right.  But if you are going to be

11  compensated anyway --

12          MR. LOESER:  Yeah.  If we are going to get compensated

13  anyway, then one wonders how are they compensatory?

14      And so, I think provided the fine was -- satisfies the

15  standards for compensatory sanctions, which is -- you know,

16  there is a -- it is a civil procedure and there is a but-for

17  requirement; there is a relationship between the conduct and

18  the fine.  Those are the requirements between the law -- I

19  don't think there is anything problematic about labeling it a

20  fine.

21          THE COURT:  I think -- I mean, I don't know.  I think

22  that to the extent they are not considered punitive sanctions,

23  it would have to be to compensate someone; right.

24      And so it would either be to compensate the Plaintiffs'

25  lawyers, maybe the Plaintiffs' class, although I don't -- I

1    don't know about that.  That's something we need to think about

2    more -- or I think compensate the -- you know, the Court.

3         And if we are talking about compensating the Court, that's

4    a very -- I mean, it's a -- it's difficult to figure out -- I

5    think it would be difficult to measure, you know, how much of

6    the Court's time and resources were wasted by the misconduct as

7    opposed to just handling regular litigation.

8              MR. LOESER:  Right.

9              THE COURT:  Right.  And presumably it would be a

10   pretty small amount.

11             MR. LOESER:  Well, there are some other features of

12   this whole experience that make it a little easier.

13        We had two discovery mediators and a Special Master, and

14   there is hard costs that, frankly, we as the Plaintiffs'

15   Counsel paid that were increased because of the conduct.  So

16   there are dollar figures and not insignificant dollar figures.

17             THE COURT:  Well, are you going to be seeking

18   reimbursement of those costs as part of the -- in connection

19   with the settlement?

20             MR. LOESER:  Certainly, yes.  And again, it is the

21   same conundrum that you have identified before, which is that

22   if they are going to pay it anyway.  I mean, I guess it is the

23   same answer which is, well, unless Gibson and Facebook pay them

24   directly, in which case the class pays less as a result.

25        But I certainly understand the dilemma presented by this,

```
 1   and I think we need to think through what it means.

 2        I certainly -- our goal is to have this have an impact; be

 3   meaningful; discourage this type of behavior; compensate the

 4   class.

 5        And we haven't said much about it, but obviously there was

 6   a huge burden on the lawyers; and this is -- this has been a

 7   challenging experience over a long period of time, so I don't

 8   want to cut out of this picture the impact it has had on us and

 9   what we think would be appropriate to compensate us for that

10   so...

11        THE COURT:  Ms. Ring, do you have any thoughts about

12   these issues?

13        MS. RING:  Well, Your Honor, I hope we are going to

14   talk about the conduct.

15        THE COURT:  We will.

16        MS. RING:  But I -- I am not aware of -- and it sounds

17   like we will need to do more thinking about this and more

18   briefing, I would assume, but I'm not aware of authority to

19   issue a fine.  And it is --

20        THE COURT:  Well --

21        MS. RING:  -- compensatory and not punitive.

22        THE COURT:  Right.  But, I mean, that begs the

23   question about whether there should be punitive sanctions;

24   right.

25        I mean, a fine would be I think a punitive sanction.  And,
```

1    you know, to impose a fine or to impose a punitive sanction,

2    you would have the right to a trial.

3              **MS. RING:**  That's right.

4              **THE COURT:**  Right, a jury trial.

5              **MS. RING:**  Yeah.

6              **THE COURT:**  But -- but it can't be that -- I know you

7    dispute that there was litigation misconduct, and I will get

8    to that but -- but assuming for the sake of argument that there

9    was serious mislit -- serious litigation misconduct, it can't

10   be that a company can engage in serious dilatory litigation

11   misconduct and then receive a motion for sanctions and then

12   settle the case and avoid the consequences of its serious and

13   dilatory litigation misconduct.

14             **MS. RING:**  Your Honor, we are not --

15             **THE COURT:**  A judge has to be able to do something

16   about that; both I think to remedy the misconduct that occurred

17   in the case and also to -- to make clear that this can't --

18   this type of behavior can't happen in the future; right.

19        So -- so if the -- if the attorneys already, as a result

20   of the settlement, would get the same amount of fees regardless

21   of whether I ordered payment of a million dollars in fees in

22   connection with this sanctions motion, then the question is

23   what should I do?

24        And I -- it can't be that I'm unable to do anything.  I

25   have to be able to do something to, you know, to address, you

1    know, misconduct of this sort by a company and its law firm.

2              **MS. RING:**  I -- Your Honor, I understand that and I

3    would say two things.

4         We didn't ever assume that settling the case would resolve

5    the sanctions motion.  This agreement in principle is -- is an

6    agreement in principle together.  We both carved this out.

7         And on the second point, I -- and which follows from the

8    first is, of course, you know, you will still need to rule on

9    the sanctions motion.  And if you award monetary sanctions -- I

10   think in hearing the discussion that just went back and

11   forth -- I don't know that they wouldn't necessarily get the

12   same amount.

13        In other words, if there is a fund and they apply for, you

14   know, the rules, you know, a certain percentage of the fund and

15   then if there are monetary sanctions on top of that, I -- to be

16   honest with you, I haven't -- and I think it sounds like none

17   of us have thought exactly what the mechanics of that would be,

18   but I am not suggesting nor did we ever assume that the

19   settlement would mean that no sanctions would be issued.

20             **THE COURT:**  I saw Mr. Snyder nodding his head

21   vigorously when I mentioned a trial.  I mean, maybe that's --

22   maybe that -- maybe that's a possible solution; that we, you

23   know, we have a trial on whether there should be punitive

24   sanctions issued against Facebook and Gibson Dunn.

25             **MS. RING:**  Your Honor --

 1          **THE COURT:**  The decision would be out of my hands.  I

 2    assume that that would be a good thing -- you would perceive

 3    that as a good thing.

 4          **MS. RING:**  I didn't see Mr. Snyder nodding to that,

 5    and I would say let's cross that bridge when we come to it.  I

 6    don't think -- this case -- as you know, I'm relatively new to

 7    this case, and discovery was extremely difficult in this case.

 8    There were way too many disputes.

 9          **THE COURT:**  Hold on.

10          **MS. RING:**  Yep.

11          **THE COURT:**  Let's get back --

12          **MS. RING:**  I am.  I am getting --

13          **THE COURT:**  You will have your chance.

14          **MS. RING:**  No, no.  I'm sorry.  I'm not going to get

15    into the specifics of the conduct.

16          **THE COURT:**  I'm just asking sort of a legal and

17    procedural question here about how, you know, if a judge

18    believes a company has engaged in serious litigation misconduct

19    and then there is a settlement that might render it sort of

20    meaningless to award attorneys' fees to the Plaintiffs' side --

21    might.  I don't know if it is.  I think we still have a lot of

22    thinking to do to work that out -- but if it would render -- if

23    a settlement would render it meaningless to award fees to the

24    Plaintiffs' side, then what's the judge supposed to do?

25          And maybe the answer is a trial on punitive sanctions

1  where you -- you know, I suppose Facebook could waive the right

2  to a trial if it wanted, and Gibson Dunn could waive the right

3  to a trial if it wanted, if it wanted, you know, me to decide

4  it.

5      But, you know, you would have the protections of an

6  independent prosecutor appointed by me and the protections of a

7  jury, who would have to find beyond a reasonable doubt that

8  Facebook and Gibson Dunn engaged in this misconduct.  Maybe

9  that's -- maybe that's what should happen.

10      **MS. RING:**  Maybe.  I don't -- I don't -- we are not

11  there yet, Your Honor.  I don't -- this all presumes that

12  anything you could do now would be meaningless, and I don't

13  think we are there yet; but certainly, if we were to reach the

14  point where it would not be -- whatever you are considering

15  doing would not be compensatory and would instead be punitive,

16  yes, those procedural safeguards would be needed.

17      **THE COURT:**  Right.  Okay.

18      **MR. LOESER:**  Your Honor, I would just add one further

19  thought.  And I appreciate --

20      **THE COURT:**  Sure.

21      **MR. LOESER:**  -- this conversation.  I think any time

22  we are in your courtroom you asked questions we should have

23  thought about beforehand and so here we are sort of thinking as

24  we go.

25      I do think that what you are saying makes sense to me;

 1   that if you are just getting the same amount anyway, what

 2   impact does it have?  So, it does make sense to be added to.

 3        I would say the one place it would be is fees that would

 4   be paid by Gibson Dunn.

 5        So, you know, at present there is a common fund funded by

 6   Facebook, non-reversionary fund; but, you know, a sanction that

 7   requires Gibson Dunn to pay fees would be by definition on top

 8   of what has been agreed.

 9        **THE COURT:**  Yes, although I don't know if that gets at

10   the root of the problem.

11        **MR. LOESER:**  No.

12        **THE COURT:**  And I'm guessing that you would agree with

13   that; that this is a -- this is far from a Gibson Dunn problem.

14   This is a Facebook and Gibson Dunn problem.

15        **MR. LOESER:**  I absolutely agree with that, Your Honor.

16        **THE COURT:**  I mean, the idea of the Defense side --

17   when you are thinking about the combination of the settlement

18   agreement and the sanctions, the idea of the Defense side

19   needing to pay more and that resulting in the class members

20   getting more is, you know, attractive on a common sense level,

21   you know, sort of as a matter of justice; but I just don't know

22   if that fits within the rubric of compensatory sanctions.

23   Maybe it does.  I don't know.  I just don't know.  I think

24   that's something we need to think about more.

25        **MR. LOESER:**  And we are happy to brief that issue,

1    Your Honor, if that would be helpful too.

2             **THE COURT:**  Okay.

3             **MR. LOESER:**  If you received enough briefs in this

4    case already, we understand that as well.

5             **THE COURT:**  Yeah, but it is a different issue.

6             **MR. LOESER:**  Okay.

7             **THE COURT:**  And it -- you know, it is, perhaps, one

8    that we should think about carefully.

9        Okay.  Well, let's get to the conduct.  And, you know, I

10   think the -- I think that the categories of conduct that I want

11   to describe -- I want to discuss today are, you know, the

12   fights about the named -- the named Plaintiff data, the fights

13   about the app developer investigation and documents associated

14   with the app developer -- the ADI investigation.  Is it App

15   Developer Investigation, is that what it stands for?

16            **MS. RING:**  Yes, Your Honor.

17            **THE COURT:**  The privilege issue, the sort of massive

18   privilege designation, and then the deposition misconduct, the

19   mostly 30(b)(6) depositions.

20       Those -- I think those are the four categories of conduct

21   I want to focus on today.

22       I'm happy, Mr. Loeser, if you want to sort of at some

23   point, you know, insist that there is some other category of

24   conduct that I should be, you know, focusing as closely on, you

25   know, please let me know; but let's start with the -- why don't

 1   we start with the named Plaintiff data.  Probably doesn't

 2   matter what we start with.

 3        **MR. LOESER:**  And, Your Honor, Ms. Weaver and I have

 4   divided up these issues.  The Plaintiff data issue is one that

 5   she is prepared to address.

 6        **THE COURT:**  Okay, great.

 7        **MS. WEAVER:**  Good morning.

 8        **THE COURT:**  Good morning.  So it seems like -- I mean,

 9   maybe I will start with you, Ms. Weaver, just to make sure I'm

10   getting to the heart of it.

11        And if you don't think I'm getting to the heart of the

12   issue, you think there is something else that needs to be

13   focused on relating to the named Plaintiff data, you can -- you

14   can -- you can tell me or if you want to add something to what

15   I have said, you can do so and then we can hear from -- give

16   the Defendants a chance to respond.

17        It seems to me that the -- the main problem with the named

18   Plaintiff data is that pretty much at every -- everybody

19   including Judge Corley was saying, look, just because you,

20   Facebook, say that this data that you may have about the named

21   Plaintiffs was not shared with third parties does not mean you

22   don't have to turn it over.  You are not the arbiter of that.

23        You know, you may still have to turn stuff over, and we

24   are going to -- we are going to have a process for figuring

25   that out even if you contend that you never shared this with

1    third parties.

2        And in response to that, it seems like Facebook just kept

3    saying over and over, we don't -- the Plaintiffs don't have a

4    right to this because it wasn't shared with third parties.

5        And that seems to have gone on for, like, well over -- for

6    years; right.  That in late 2020 everyone is telling Facebook

7    you can't take that position.  You cannot take the position

8    that because you didn't share it, it's not -- it's not

9    potentially discoverable.

10       And as late as the end of '21, a year later, you know,

11   late October -- late October 2021, and probably even after

12   that, Facebook is still pounding the podium and saying:  We

13   didn't -- you know, the Plaintiffs haven't shown that this data

14   was shared with anybody and so the Plaintiffs aren't entitled

15   to it.

16       And it's -- and then, of course, Facebook continued to

17   take that position in case management statements that were

18   filed with me later on, and it just seems -- that position was

19   frivolous from the start, but it -- after having been told over

20   and over again by Judge Corley that that's not right to

21   continue to take that position, it just seems like an example

22   when you consider that conduct in -- alongside all the other

23   conduct that we will talk about and that you have written

24   about, it seems like that is an example -- a good illustration

25   of bad faith dilatory conduct by Facebook in sort of an effort

1    to avoid turning stuff over or doing the work necessary to

2    figure out whether stuff needs to be turned over.

3         I mean, did I -- is that it in a nutshell?  Do you want to

4    add anything to that?  I mean, I know you talk about additional

5    stuff in your supplemental brief.  Maybe you want to discuss

6    that a little bit.

7              MS. WEAVER:  Yeah, thank you, Your Honor.

8         I think that does cut to the heart of it.  I would like to

9    give you one example that happened in Facebook's supplemental

10   brief that we haven't had a chance to respond to that I think

11   is exactly -- it just exemplifies everything you just

12   described, and it happened -- the misrepresentation happened

13   again to you in those supplemental brief.

14        So this involves these DYI files or these other files

15   called Switchboard.

16             THE COURT:  Right.

17             MS. WEAVER:  And they repeatedly told us that the DYI

18   files were complete, and we were saying that's what everybody

19   can publically download, but --

20             THE COURT:  Right.

21             MS. WEAVER:  -- we don't think they are complete.

22        At page 25 of their brief they tell you the exact same

23   device cookies appear in DYI files.  They tell you that on line

24   15, and then they cite the Richardson declaration, paragraph 8.

25        And if you go to the Richardson declaration, paragraph 8,

there is a photo from the DYI slides and from the Switchboard,
and what you see in the photo is that the cookie identifier is
hashed in the DYI.

It's not hashed in the Switchboard.  And the reason that's
important is because it's actually an identifier you can use to
search for other Plaintiff data and on -- so that's the first
point.

If we had that, we could have gone to third parties and
said:  Hey, here is this cookie value.  Can you search for
this?  And then the very thing they have been attacking us
about -- you have no standing; this person is not harmed
because you are not showing information about them in the hands
of the third parties -- we could have at least begin to unwind,
well, what did the third parties have.

The second reason it's important is that even if you
accepted the argument of "they didn't have to produce what was
shared," these cookie identifiers are for the purpose of
sharing.

And there was -- we only learned about this when I took
this deposition on June 22nd of this year.  And all of the
sudden we learn about these snapshots that were preserved.
They are easier to produce than what was produced to us even
though we were repeatedly told the DYI files were more
accessible, and we were told this is what's given to law
enforcement and they are PDF files.

1          And what we had received were very, very difficult to

2     parse.  They were these unwieldly -- one of the reasons we were

3     complaining about inflated production numbers was Facebook

4     giving us these DYI files in these massive formats that were

5     very difficult to decode.

6          The Switchboard files are PDFs.  Law enforcement likes

7     getting them that way.  We had asked for them in 2020.  Do you

8     have --

9          **THE COURT:**  Well, that's the thing -- on the issue of

10    the Switchboard files, I mean, I -- I almost find it

11    unbelievable.

12         So did you -- you knew there was something called the

13    Switchboard files in 2020?  Is that what you are saying?

14         **MS. WEAVER:**  No.  We just suspected that there was a

15    mechanism for law -- I mean, I have friends who are

16    prosecutors.  There are lots of stories about people who are

17    criminals and the prosecutors coming to Facebook and saying

18    where are these people located, etc.

19         So we had had in meet-and-confer sessions discussions.

20    What is it that you give to law enforcement?  And all we were

21    ever getting were the DYI files.

22         **THE COURT:**  Right.

23         **MS. WEAVER:**  And it didn't seem plausible --

24         **THE COURT:**  And a repeated insistence that these DYI

25    files have all that you need to figure out what data was shared

 1    with third parties.

 2              **MS. WEAVER:**  Exactly.

 3              **THE COURT:**  But -- so --

 4              **MS. WEAVER:**  We didn't learn about them until this

 5    deposition on June 22nd.  This deponent who was supposed to

 6    testify about named Plaintiff data actually came in with a fact

 7    sheet, and on the fact sheet it referred to Switchboard files.

 8    So I was learning about it in the deposition.  And I said:

 9    What is this?  And so then we learned on June 22nd of this

10    year.

11              **THE COURT:**  I mean, the idea that they -- I just don't

12    understand the idea that they wouldn't turn over the

13    Switchboard files.  I just don't understand why -- I mean,

14    that's why I said it is almost unbelievable because I'm --

15    I guess I'm feeling a little skeptical that you ever asked for

16    them because if you asked for them, it seems so obvious that

17    they should have turned them over.

18              **MS. WEAVER:**  Uh-huh, well, and let me put it this way:

19    These were Switchboard files that were preserved specifically

20    for this litigation.  They are just snapshots in time.  So they

21    are plainly responsive.

22         We are saying give us everything you have on the named

23    Plaintiffs.  We didn't know to ask for the word "Switchboard

24    files," but we were saying give us everything you have on the

25    named Plaintiffs.  Give us -- we were asking for identifiers --

 1    all of the identifiers.  Cookies is an identifier and these

 2    were withheld.

 3              THE COURT:  You are saying the Switchboard files -- I

 4    know that the Hive -- there were those files in the Hive; is

 5    that what you call it?

 6              MS. WEAVER:  Yes.

 7              THE COURT:  -- that were -- that were preserved in

 8    part apparently for this litigation.

 9              MS. WEAVER:  Yes.

10              THE COURT:  Right.  And you also didn't learn about

11    those apparently until the -- you know, this summer.

12              MS. WEAVER:  The same --

13              THE COURT:  But that's a different issue; right.

14              MS. WEAVER:  Yes.

15              THE COURT:  So the Switchboard -- you said the

16    Switchboard files on the named Plaintiffs were preserved for

17    the litigation?

18              MS. WEAVER:  Yes, according to the deponent.

19         So what we learned in the deposition is that there were 52

20    files for these named Plaintiffs.  Presumably others were made.

21    You know, our list of named Plaintiffs narrowed.

22         And we immediately asked for this, and they have now

23    produced, I think, 106 Switchboard files so -- but it is, to

24    us, unbelievable that we didn't have them earlier.  It is, to

25    us -- it was a massive waste of resources that we could not get

1   these so that we could then use these identifiers to say "go

2   search Hive."

3       One of their defenses is:  Oh, the Hive tables we

4   preserved don't have anything relevant to the named Plaintiffs.

5       Well, we could have said:  Search using these cookie

6   identifiers, and then we would know that they did.  So that's

7   one -- yes, but to us it is unbelievable.  To us, we clearly

8   and plainly and repeatedly have been asking for this

9   information; and it was shocking in the deposition to learn

10  both about the Hive tables and about these Switchboard files.

11  And, you know, so little --

12      THE COURT:  But did you also -- is it also the case

13  that you learned of the Hive tables or -- only at that

14  deposition?

15      MS. WEAVER:  Yes.

16      THE COURT:  I thought it was that you knew of -- you

17  knew about the Hive, but you just didn't know that -- and

18  Facebook had been insisting that there is nothing -- you know,

19  there is nothing recoverable as to the named Plaintiffs from

20  the Hive; but then you later learned that there were these Hive

21  tables that were preserved at the outset of the litigation in

22  part because they had information about the named Plaintiffs.

23      MS. WEAVER:  So the Hive tables are a little bit

24  different.  The Switchboard snapshots were created, as we

25  understand it, for this litigation.

1          **THE COURT:**  Got it.

2          **MS. WEAVER:**  And still not produced to us.  The Hive

3    tables were preserved, according to this deponent -- we learned

4    it in the same deposition -- they were preserved relating to

5    Cambridge Analytica.  So I don't know if it is for this

6    litigation specifically.

7          I was unable in the deposition to really ferret out what

8    that meant, and we did not have a satisfactory response ever on

9    why they were identified, how they were identified, why -- how

10   were they related to Cambridge Analytica, but it is very -- and

11   I understand Facebook to be saying not all of those tables have

12   named Plaintiff data in them, but it is simple enough to search

13   those with identifiers like these that we got in the

14   Switchboard files.

15         And I guess the point is this:  We spent two years

16   briefing this, you know; having magistrate Judge Corley

17   engaged; working with a Special Master.  We paid an excessive

18   amount of fees to a very dedicated Special Master who is

19   digging in, and we all worked together.  It was a sideshow when

20   we could have just started with the Switchboard files and those

21   Hive tables.

22         And actually Facebook I think would have been in a better

23   position because then we would have had to show, oh, what more

24   do you need, Plaintiffs?  But we didn't get it and that didn't

25   happen and it is two years later.

1          **THE COURT:**  Okay.  Anything else that you want to fill

2     in on the named Plaintiff data issue?

3          **MS. WEAVER:**  I think that's fine, Your Honor.

4       One thing I would say -- you want to hand this up -- we

5     did prepare -- and it is just factual -- a list of timeline

6     events for named Plaintiff -- and do we have a copy for -- we

7     can hand this up and e-mail -- all it is, is just this happened

8     on this date, this happened on that date.  There is a section

9     for named Plaintiff data and the other things as well, but I

10    think that's it, Your Honor, for named Plaintiff data.

11         **THE COURT:**  Okay.  Ms. Ring.

12         **MS. RING:**  Your Honor, obviously we would like -- we

13    don't have a copy of that yet.  So, we would like to get one

14    and respond to it if we need to, which I suspect we will.

15       I will start, I guess, where Ms. Weaver left off, which is

16    that deposition was a deposition about preservation.

17    Preservation, it's just common sense, you preserve a lot of

18    data, not all of which you produce.  You are not required to.

19       This -- you know, the Cambridge Analytica was a large

20    matter.  There were a lot of people interested in it.  The

21    company preserved a lot of data, and we went into this just --

22    this is another example of how -- I have never seen a situation

23    where two sides have such different perspectives on things.

24       We went into this ESI deposition; prepared the witness.

25    We thought this was nothing, no big deal.  It's just

1  preservation.  And so -- and we had told the Plaintiffs, you

2  know, we are preserving named Plaintiff data by taking

3  snapshots.  What Facebook does to preserve user data is take a

4  snapshot of DYI.

5       In this situation they also took a snapshot in

6  Switchboard, but that doesn't always happen.  I represented the

7  company for 13 years.  When we produce user data, we produce it

8  from DYI.

9       So Switchboard -- the fact that there was a snatch -- a

10  snapshot taken was not even noted when we were preparing for

11  this deposition because it -- it was not, to us, anything that

12  was additional or different.

13       And this cookie reference, it is true that in the -- in

14  the Switchboard snapshot and in DYI they are the same cookies.

15  They just have a different format in the way that they

16  presented.

17       And Ms. Weaver is saying that if they had had the

18  Switchboard records, so as to have the full or different, I

19  should say, format of the cookie, that then they would have

20  asked us to use those to search as identifiers.

21       I think Ms. Weaver is forgetting that she recently took

22  another deposition of another 30(b)(6) witness who explained

23  that cookies are not identifiers at Facebook.  They are not

24  used in that way.

25       So that is just a false premise.  This is not something --

1   I have yet to hear or understand what it is in the Switchboard

2   files that were so different than what they already had.  I

3   just -- I have not seen any basis for that statement at all,

4   and it is another example of form over substance.

5        Just because it's more data, it doesn't mean that it was

6   relevant or responsive.  And that is absolutely the case with

7   these records.  So that's the first point, Your Honor.

8        I think the second go to your description of how you are

9   viewing this issue; that basically Facebook had taken the

10  position that we don't have to turn over this data.  We only

11  have to turn over data that was shared or made accessible.

12       And that --

13            **THE COURT:**  You just -- you just totally misstated

14  my --

15            **MS. RING:**  I'm sorry.  I thought I took -- you said --

16  what I wrote down is that you -- you thought Facebook had taken

17  the position that unless Facebook agreed that it was shared and

18  made accessible, they did not have to turn it over.

19            **THE COURT:**  Right, yes.

20            **MS. RING:**  I apologize.  I left out the first part.

21            **THE COURT:**  That's right.

22            **MS. RING:**  I apologize.  And that there would be a

23  process for figuring that out.

24       We agree with that a hundred percent.  There was a process

25  for figuring that out.  The DYI file, again, I think

1    Plaintiffs -- and I learned this when I joined the case and

2    started to discuss this issue with them -- I think -- and

3    again, this is also symptomatic of just the complete lack of

4    trust that exists here.

5         The -- because the DYI file is accessible to the public,

6    they assumed it was nothing.  They assumed it couldn't include

7    the important information that they were after.

8         But that's just not true.  That's just not true.  And

9    maybe it is an unfortunate name for it -- you know, Do It

10   Yourself -- and maybe we should have named it something a

11   little more -- you know, made it sound a little more secretive;

12   but it -- it's nearly a million pages of data for the named

13   Plaintiffs.

14        I have looked at my own DYI file.  It's -- it's everything

15   you have done on platform, the off-platform activity also, and

16   inferred data.

17        And I read through transcript after transcript, filing

18   after filing, where the Plaintiffs told Judge Corley that

19   Facebook has produced no named Plaintiff data, and then they

20   would say or if they then would concede there was at least

21   on-platform activity, they would say but no off-Facebook

22   activity.  That's just false.  That's just not true.  And no

23   inferred data.  Again, that's just false.  It's nearly a

24   million pages of data that was produced in 2020.

25             THE COURT:  Well, you are responding, I think, to

```
 1   something different than what I'm talking about; right.

 2        You know, you -- I think that's one of the problems that

 3   we see over and over again in the record is this sort of

 4   misdirection, right, that, you know, somebody says, look,

 5   Facebook, you can't be the arbiter of what was shared.

 6        And then you respond, well, we have produced -- you know,

 7   we have produced inferred -- inferred data.

 8        Well, that's not responsive to the assertion, Facebook,

 9   you can't be the arbiter of determining what was shared and

10   what wasn't.

11        And you can't simply say, look, this wasn't shared and,

12   therefore, the Plaintiffs don't have a right to it.  And at the

13   same time say, well, the Plaintiffs are unable to prove what

14   data about them was shared and so they don't have standing in

15   the -- to sue us.

16        I mean, it's --

17        MS. RING:  These are two separate -- I'm -- first, let

18   me say I'm not trying to misdirect you.  These are really

19   difficult issues.  They are hard to understand.

20        THE COURT:  But what --

21        MS. RING:  Let me address --

22        THE COURT:  Can I just quote --

23        MS. RING:  Yes, please.

24        THE COURT:  -- quote from Judge Corley in January of

25   '22 --
```

1          **MS. RING:**  Yes.

2          **THE COURT:**  -- when this issue -- I mean, she is

3   saying the same stuff in 2020, right, but she has to say again

4   in 2022 (as read:) "Facebook's position is that the only

5   data" -- talking about named Plaintiff data, "Facebook's

6   position is that the only data that is discoverable is that

7   which Facebook contends was shared or made accessible; and if

8   Facebook says it was not shared or made accessible, that's the

9   end of the matter."

10      And so that's in January of 2022 after years of Judge

11  Corley saying, you can't do -- that cannot be your position;

12  you cannot take that position; you are not the arbiter of what

13  data is discoverable and what data might have been shared and

14  might not have been shared.

15      Because after all, one big problem is that Facebook -- and

16  one of the reasons we are here is that Facebook doesn't have a

17  good sense of its own of what data was shared and what data

18  wasn't shared; right.

19          **MS. RING:**  Your Honor, this was one of -- if you read

20  back through all the transcripts before Judge Corley on this

21  issue, this was one -- this was something she called a

22  disconnect, I think, correctly, which is what does sharing or

23  making data accessible mean?

24      So after she issued Discovery Order Number 9 and she said

25  "there is three buckets of discoverable user data:

1    On-platform, off-platform and inferred."

2         And I mention the first point, Your Honor, just to say

3    that this case has been one of absolutes and extremes.  And so

4    when the Plaintiffs would say they haven't produced any

5    off-Facebook data and any inferred data, that just wasn't true.

6         **THE COURT:**  I'm not talking about that.

7         **MS. RING:**  Yeah, I understand.

8         **THE COURT:**  I'm talking about how can Facebook be

9    taking this position over the course of several years; that,

10   look, the Plaintiffs haven't shown that this data was shared --

11        **MS. RING:**  But that's not the position --

12        **THE COURT:**  -- by us with third-party apps, and we

13   proclaim that it wasn't.  And, therefore, we don't have to turn

14   it over; and that's the end of the matter.

15        **MS. RING:**  That wasn't the position we took,

16   Your Honor, in fairness.  And that's what Judge Corley

17   recognized when she ordered a 30(b)(6) deposition.

18        She said, rightly, they don't have to take your word for

19   that.  And we said okay.  And so she -- in an exchange with --

20   I think it was actually Ms. Weaver, similar to one that you had

21   in 2018, there was a whole exchange about targeted advertising

22   and how targeted advertising is shared or made accessible.

23        And so that's what we have spent the last six months on

24   actually, which we still believe has nothing to do with this

25   case; but we, nevertheless, did it.  And Judge Corley said,

```
 1   wait a minute, that's -- that's not really at issue here.

 2         And then there was the further exchange about, well, what

 3   do you mean by shared or made accessible?  I don't know.  What

 4   do you mean by shared or made accessible?

 5         And so then Judge Corley -- I think, rightly -- said,

 6   look, we need some discovery.  Enough of the lawyers talking.

 7   The Plaintiffs are going to get to depose someone and they can

 8   talk about what is all the, you know, the data that we have,

 9   the different types of data and to try to get to the bottom of

10   what is shared or made accessible because that is what is

11   relevant here and that's what needs to be produced, not what we

12   say but what -- whether there is some evidence to say that it

13   was shared and made accessible.

14         And Judge Corley in January of this year, she -- in the

15   order at the end of it -- and this is exactly the process that

16   you were talking about in your resuscitation of how this played

17   out -- that there was going to be a process.  And she said when

18   the Special Master here took the position of "just give me

19   information about every system that might contain user data and

20   then we will figure out what, if any, additional named

21   Plaintiff data needed to be produced," and that's what Judge

22   Corley said here.

23         She said (as read:) "The Special Master right now is

24   working through with the parties to determine what, if any,

25   additional data from these systems should be produced
```

1   consistent with Rule 26."

2        That's all we have ever wanted.  It's not -- it is not

3   relevant or proportional to this case to produce all named

4   Plaintiff data.  And, Your Honor, that is what Plaintiffs

5   wanted.  That is what they wanted.

6        **THE COURT:**  But your response was:  This wasn't

7   shared; therefore, Plaintiffs are not entitled to it.

8        **MS. RING:**  No.  Our response was take a 30(b)(6)

9   deposition, as Judge Corley instructed you to do.  And if there

10  is something in -- we prepared a witness.  I think most of that

11  time was spent questioning about targeted advertising, which is

12  fine.  We disagree that that's covered but that's fine.

13       And there was nothing -- nothing else happened after that.

14  No further -- well, here is what we learned in the 30(b)(6), so

15  this is the additional data that we believe should be produced.

16       The only thing they pointed to was a document which talked

17  about appended native, that sort of data -- and I'm sure you

18  have seen it if you have looked in the briefing.  During the

19  Special Master proceedings, we submitted something to him

20  showing that that data was in DYI or it didn't exist.

21       I'm telling you the moment I joined the case, it is

22  just -- if it was in DYI, Plaintiffs wanted nothing to do with

23  it because I think -- and, again, I went back to the 2008 [sic]

24  transcript.  The Plaintiffs were and are still convinced that

25  we have something like an avatar; and until they get that

1  avatar, they will never be happy; but it doesn't exist.   It

2  doesn't exist.

3      So, this -- when you said a process, we agree with you

4  completely.  All we ever wanted was a process to determine what

5  is reasonable here?  What is proportional to the needs of the

6  case because it is not proportional to require Facebook to go

7  and search every system and produce every bit of data to

8  Plaintiffs.

9      This case is about data sharing.  And by the way, Judge

10 Corley confirms that in January 2022 order.  She says (as

11 read:) "The Special Master with his technical expertise is well

12 positioned to review the evidence and determine whether systems

13 may contain shared named Plaintiff data."

14     That's it.  That's all we ever wanted was to be able to go

15 through that process instead of saying here, just give them

16 everything without any showing or any even indication that it

17 is something that could have been shared or made accessible to

18 third parties.  That's all we ever wanted.

19     And you know what, in looking back -- and especially after

20 I read the 2018 transcript and your exchange with Plaintiffs'

21 Counsel -- and I think as everyone should do in these

22 situations, think about what would we have done differently.

23     Inasmuch as we didn't want to bring any issues to you, I

24 think I would have brought that one to you because we needed

25 closure on that and we never got it.  We still don't have it,

1   but we gave it up after February.

2       We just -- we have spent a tremendous amount of time since

3   February on targeted advertising, and I think, Your Honor, that

4   explains a lot of what has been -- again, what I think Judge

5   Corley correctly identified -- as the disconnect.

6       What is sharing or made accessible mean?  We could have

7   asked -- we could have and we should have gotten a ruling on

8   what that means because in the absence of that ruling, we were

9   left with, again, absolutes and extremes.

10      We want everything and there was no process for getting to

11  anything reasonable until we went before the Special Master,

12  and now that's where we are; and I think if anything makes that

13  point, it's that his order basically requires just a sampling.

14  It is just a sampling.  He didn't order that we had to produce

15  all of the data that Plaintiffs have always been asking for.

16  He did not order that.

17      I wish that had happened sooner, Your Honor.  I really do,

18  but it's -- it's not fair and it's not right to say that we --

19  that Facebook's position was "you are going to get what we say

20  you get."  That's not what we said.  And that's not what we

21  did.

22          **THE COURT:**  Okay.  Let's talk about the app developer

23  investigation.  And maybe same process.  I will sort of try to

24  get to the heart of the matter.  And if you think I failed to

25  get to the heart of the matter, you can -- you can kind of fill

```
 1   in the blanks.

 2          MS. WEAVER:  Your Honor, may I just address two issues

 3   or would you rather --

 4          THE COURT:  That's okay.  There is a lot to talk

 5   about, and I want to make sure Facebook has the last word on

 6   all of these issues.

 7        On the app developer investigation, I think it's fair of

 8   you to have spent some time talking about the lead-up to the

 9   fall of 2021.  Was it September of '21 when Judge Corley issued

10   her ruling?

11          MR. LOESER:  Yes.

12          THE COURT:  But I'm primarily focusing on the

13   aftermath of Judge Corley's ruling in September of '21.  That

14   is when it was established that as a categorical matter, you

15   know, the documents from the app developer investigation were

16   not privileged, which seems like an easy answer to me; but, you

17   know, maybe unreasonable people can disagree about that.  I

18   don't know.

19        But in September of '21 Judge Corley makes clear that the

20   documents from the app developer investigation are not

21   privileged as a categorical matter, which means we are going to

22   have to go through this process of figuring out, you know, what

23   should be turned over and what should be withheld as privileged

24   on an individual basis right, not a categorical basis.

25        And it seems like from that time Facebook consistently
```

1  took the position that documents reflecting communications

2  between non-lawyers in connection with the app developer

3  investigation were not discoverable.

4      And it seems like everybody kept saying "What are you

5  talking about?  How could you say" -- including Judge Corley;

6  right, "How could you say that documents from the app developer

7  investigation reflecting communications between non-lawyers are

8  not discoverable?"

9      But Facebook just continued taking that position and

10 Gibson Dunn continued taking that position throughout the

11 dispute and that is so frivolous that it has to be evidence

12 considered -- along with all of the other conduct that we are

13 talking about, that has to be considered a prime example of bad

14 faith, frivolous litigation conduct that's just designed to

15 obstruct, delay, stonewall, whatever word you want to use.

16     To me, that's the heart of it with the documents from the

17 ADI investigation -- from the app developer investigation.  Did

18 I -- am I missing anything or do you need -- do you need me to

19 fill anything in?

20         **MR. LOESER:**  No.  I mean, there are other things that

21 were also upsetting and obviously in our view frivolous and

22 caused ridiculous delay.

23     But, you know, each of us -- we have a team of people, and

24 we all handled different issues in the case; and ADI was

25 something that I spent a lot of time on.

1          **THE COURT:**  Congratulations.

2          **MR. LOESER:**  Yeah.  And it was deeply frustrating.

3    And the point at which I just became so stunned I actually

4    stopped being able to speak for a few minutes, which was

5    recognized by opposing counsel, was when the argument was made

6    to Special Master Garrie on December 3rd that Judge Corley had

7    ruled that communications about the ADI were not discoverable.

8          And to me -- I had the order in front of me.  The order

9    doesn't say that.  The whole background of how that order came

10   to be doesn't allow for any fair inference of that, and yet the

11   argument was made so stridently to a new judge in the case, to

12   a Special Master who didn't hear the argument before, who

13   didn't issue that order, oh, this was -- the Plaintiffs are

14   trying to redo everything.  They are trying to undo all the

15   work Judge Corley has done.  They are trying now to go back to

16   what she said you can't have and get it back.

17         And it was stunning to me.  I actually had to take a

18   minute to actually think about how untrue that was and

19   misleading it was.

20         And, you know, we are all -- we have all been doing this a

21   long time.  They are big cases, so obviously it is an

22   outstanding firm that does great work most of the time, a lot

23   of the time, some of the time.  However they do it, they are

24   aggressive litigators, and I'm accustomed to aggressive

25   litigators.  And some people want to litigate aggressively.

1  Have at it.  Sometimes it works.  Sometimes it doesn't.

2      You cannot misrepresent a court order to the Special

3  Master.  You cannot lie about what the Court has done to try

4  and block discovery.  That crosses the line.

5      And so what you have identified is for me what I also

6  thought was the most egregious part of the whole ADI fight.

7      Now, there are -- and it didn't take Judge Corley long on

8  the appeal to point out that that concept was also quite wrong.

9      But what is lost in that is, you know, there is an

10 argument, there is an appeal, there is a decision.  What is

11 lost in that is just the months that we had to spend fighting

12 against that argument repeated over and over and over again

13 that had no basis whatsoever, and we wasted time getting back

14 to where we were on September of 2021 on ADI.

15     And I think it's really important to think about with ADI,

16 despite years of litigating, despite an order that rejected

17 Facebook's position, up and until when we filed our case

18 management statement on February 3rd of 2021 --

19          **THE COURT:**  '22 you mean.

20          **MR. LOESER:**  2022, that's correct.  We had received, I

21 think, something like 50 documents relating to the ADI.  So

22 that order was issued in September of '21, and through all of

23 that just wasted time dealing with frivolous arguments, we

24 weren't getting more documents; and that was a critical

25 juncture in the case.

1        The discovery period was coming to a close.  And so we get

2   to the end.  Facebook tells you -- you know, in what I think is

3   one of the most remarkable statements in this case -- that they

4   have met the substantial completion deadline.  And yet we have

5   something like 50 documents from the ADI.  And since then, we

6   have received, you know -- I lost count -- a couple hundred

7   thousand documents.  And there is just all of that delay

8   dealing with frivolous arguments.

9        And it brings me back to the Ninth Circuit case which we

10  started our motion with -- this *In Re: Boucher* case -- which

11  talks about the impact of misrepresentation and just what a

12  burden it imposes on the Court because it is so hard to figure

13  out what happened.

14       And I think the ADI and that is a good example of how in

15  the ADI -- how that impact occurred and the damage that it

16  caused to the progress of this case.

17       **THE COURT:**  And then the delay and the frivolous

18  arguments, and then you get towards the end of discovery and

19  you have Facebook and Gibson Dunn arguing that you should not

20  be entitled to do any more discovery because you were

21  responsible for the delays in getting us up to this point.

22       **MR. LOESER:**  Yeah, and that's another sort of issue

23  that we identified in the sanction brief; that whole concept of

24  delaying, delaying, delaying; making frivolous arguments;

25  re-arguing everything; blocking discovery and then you get to

1    the end of the period, not only do you say "time is up," but

2    you also say "you have met the substantial completion

3    deadline?"

4        That is just not -- that is not good faith, and that's

5    what occurred to us and became clear, that was the strategy.

6    The strategy was to delay as long as possible; run out the

7    clock; and then somehow claim that you have actually produced

8    the documents that you were supposed to.

9        Just a couple more facts that kind of reinforce the point

10   that you are making.

11       I was stunned by the representation in, I believe, it's

12   the -- Ms. Ring's declaration supporting the supplemental

13   sanctions opposition in which Facebook identifies -- Gibson

14   Dunn identifies the work that they did after March 30th on the

15   ADI.

16       And you will remember that you ordered the completion of

17   the ADI by March 3rd, and they did not meet that deadline.  The

18   explanation you have received for how they did is just

19   tortured.  They did not.

20       And how you know they did not is when you look at what

21   they did after -- on March -- in a six-week period, from

22   March 30th through what looks like about June 15th, they had --

23   from the March 30th to April 27th, 900 lawyers who worked

24   70,000 hours.  And then from April 27th to --

25           **THE COURT:**  Hold on.  900 lawyers.

1          **MR. LOESER:**  900 lawyers; 70,000 hours.

2          **THE COURT:**  70,000 hours.

3          **MR. LOESER:**  And that was just for six weeks.

4          **THE COURT:**  What was the average hourly rate, you

5     think, probably like 500 bucks an hour or something, 800?

6          **MR. LOESER:**  I'm sure they can tell you precisely what

7     that number is.  Then there was another period from April 27th

8     to June 15th or so where they had 600 lawyers and they

9     billed -- I guess they worked harder -- they also billed 70,000

10    hours.  So 140,000 hours that started on March 30th, which is

11    weeks after you said this had to be completed.

12         And lo and behold, they produced a lot of documents in

13    that time period.  I don't know a better way to describe what

14    should have happened over the two years that preceded this, the

15    work that should've been done, that could have been done that

16    would have avoided this tremendous delay and burdens on us to

17    deal with these issues.

18         I won't -- I'm sure Ms. Ring is going to talk about how

19    they complied with the March 30th deadline, and I guess I will

20    not say anything about the explanation until I hear it; but I

21    think it is pretty obvious that when a Court says, you know,

22    produce the documents, all custodians, that are collected for

23    the ADI and then you say, do it by March 3rd; and then they

24    tell us that they did that.  And then a week later they tell

25    us:  Let us tell you about the restrictions we made on our

1  production and tried to describe that somehow as, like, we

2  wanted something new and we are the reason why they had to do

3  more work, it is so misleading.

4      And again, if Facebook had just said on March 10th, you

5  know what, I went back, I looked.  I realized that instead of

6  searching for all the custodians for which information is

7  collected for all of the time period of ADI using reasonable

8  search terms, we did something different.  We are sorry.  We

9  made a mistake.  We are going to fix it.

10     **THE COURT:**  I'm glad you brought that up because I am

11 confused about the issue of the search terms.  I mean, I -- it

12 seems to me that usually what happens in complex litigation is

13 that the parties get together to agree on search terms that are

14 going to be used to search a particular universe of documents,

15 right, for potentially responsive material.

16     And it seems to me that if the Plaintiffs are not involved

17 in the discussion of what the search terms should be, they are

18 going to come squawking to the Court.

19     And I guess I'm -- I'm confused -- I think you have argued

20 in your papers or stated in -- asserted in your papers that you

21 were never involved in the negotiation of the search terms that

22 would be used for the ADI documents, and I just can't

23 understand why that is and if it's really true, that you

24 weren't involved in negotiating the search terms, why didn't

25 you come to the Court and say, "they are not involving us in

1   the -- in the definition of the search terms?"

2            MR. LOESER:  Yeah, I will tell you -- again, this is

3   an issue that I lived with, so I can tell you what happened.

4   The -- there was a sampling exercise that Judge Corley set up

5   when she was --

6            THE COURT:  Right.

7            MR. LOESER:  -- trying to figure out how to deal --

8   when they were withholding hundreds of thousands of documents,

9   like, how are we going to deal with this issue and we came to

10  this concept of a sampling exercise.  And we chose, frankly,

11  without a lot of information, six exemplar apps.

12       And then Facebook said that they would search those apps.

13  And at the time the discussion was for the sampling exercise.

14  They would use the name of the app and the app ID number for

15  the sampling exercise.

16       And, I mean, that wasn't our decision; but we knew that's

17  what they were doing for the sampling exercise.

18            THE COURT:  And I understand what you are -- what you

19  are going to say is it makes no sense to use that limited set

20  of search terms once you are searching the entire universe of

21  ADI documents.  I get that.  I understand that; right.

22            MR. LOESER:  Right.

23            THE COURT:  It seems like you should have been

24  involved in figuring out what the search terms were for the

25  search of the broader universe of ADI documents, and that one

1   aspect of your presentation about the ADI documents here leaves

2   me a little concerned; right.

3       You seem to be blaming Facebook for, you know, not using

4   the right search terms where I think about it -- and if you

5   think I'm wrong, you can tell me; but the way I think about it

6   is, it is the responsibility of both sides to figure out what

7   the right search terms are for this universe of ADI documents

8   or whatever universe of documents we are talking about.

9       MR. LOESER:  So here is what happened:  There are --

10  these were the terms used for the sampling exercise.  We had no

11  idea they were using those terms.  We had no idea they were

12  using search terms for the larger production.

13      We had said -- the Judge issued an order, these are the

14  things you have to produce, the audits and background reports

15  and so on.

16      And so, you know, companies don't always use search terms

17  when they produce documents.  They sometimes just identify all

18  the responsive documents and then produce them.  We had no idea

19  they were even using search terms.  But when on March --

20      THE COURT:  Shouldn't you -- shouldn't that have been

21  a conversation that you had with them?  Hey, what are you --

22  you know, what are you -- how are you searching for responsive

23  ADI documents, right, or how are you sifting through for -- I

24  don't know.  Maybe you would ask:  How are you sifting through

25  for privilege or -- but I mean, I assume --

1        **MR. LOESER:**  What --

2        **THE COURT:**  The assumption built into my question that

3   I'm asking you is that there were ADI documents that were not

4   responsive in this litigation; right.

5        I'm assuming that there was never a requirement to turn

6   over all ADI documents.  It was just a -- I'm assuming it was a

7   requirement to turn over responsive ADI documents but maybe I'm

8   wrong about that.

9        **MR. LOESER:**  It's a little different than that.  The

10  ADI was a -- had a specific description for specific levels of

11  review, and there were apps for which they had elevated review

12  because they suspected them of misuse.

13       We asked for all of the materials Judge Corley ordered

14  produce -- ordered produced for that level of the ADI.  We

15  asked for all of that information.  And so -- and there was no

16  concept --

17       **THE COURT:**  So you are just assuming that they are

18  producing all non-privileged documents?

19       **MR. LOESER:**  Right.

20       **THE COURT:**  From that level?

21       **MR. LOESER:**  Right.  And wouldn't it have been nice if

22  there was an opportunity to talk to them about how they were

23  going to search the materials, but instead --

24       **THE COURT:**  Don't you still have to search for ADI

25  documents?  I mean, I'm assuming they didn't have a cache of

documents in the -- that was labeled ADI documents.  They had

to search through various custodians and whatnot to find the

ADI documents; right.

    **MR. LOESER:**  I think, again, there was -- the

conversations we had with them were almost entirely "we refuse

to produce any of this" and "we are going to prevent you from

getting any of that."  So we briefed it and briefed it and

briefed it until we got an order to produce it.  You are not

talking about a lot of time after they were ordered to produce

the information and then when they were actually required to

produce the information.

    And it was in that time period that we learned on

March 10th that these were the two terms they used.  At that

point we said to them -- and this is a whole other long story,

but the search term negotiations were the most ridiculous,

elongated, frustrating negotiations probably in the case for

the search terms for the custodial files.

    What we said to them on March 10th was:  We are not going

to tell you what search terms to use because we have no

interest in getting back into that with you, but here are some

ideas for what we think you should do; here are some examples

of some responsive documents that we think you should look for;

here are some general terms you might want to use, but what

terms you use -- as you've been saying to us throughout this

case -- you get to come up with your search terms and if they

1    are the right terms, great.

2         So I think that -- I understand your question; but if you

3    think about what is the time period you are talking about when

4    this search term conversation was supposed to be going on, it's

5    a very, very, short time period and right in the smack dab

6    middle of those few weeks or whatever it was, is when they

7    revealed that they were just using these two terms.

8         So that's how that unfolded.  And then they produced the

9    documents based on, you know, whatever terms they ended up

10   using; but I think because of -- I'm sure you are right; that

11   there was a search -- you know, when they went out into the

12   larger pool of custodians and searching for ADI-related

13   materials, they must have utilized search terms for that.

14        That was the point at which we were involved -- and again,

15   we didn't want to get into -- it took a year to negotiate

16   search terms in this case before, and we were tired of that and

17   didn't want to do it anymore.  We did give them some ideas for

18   what we thought they should search.

19              **THE COURT:**  Ms. Ring?

20                   (Pause in proceedings.)

21        **MS. RING:**  Your Honor, I -- I am resisting the

22   temptation to -- I just -- I have written down

23   "misrepresentation, lies, lies, lies."

24        That's pretty hard to take.  That's not true.  And I

25   wasn't there for -- you know, again, I'm relatively new to the

1    case.  I have read everything.  I have read the briefs that the

2    parties filed.  I have read the transcripts.

3         That is just wrong and --

4              **THE COURT:**  What is --

5              **MS. RING:**  Let me start with the point you started

6    with which is the communications -- and actually, before I

7    start there, I do want to -- it took me some time to understand

8    this distinction.

9         There are the ADI, what I call, reports.  They are the

10   investigation documents.  And then there are the

11   communications.  So I think of those in the two separate

12   categories.  And Plaintiffs wanted all of those, and they got

13   all of those by March 3rd.  Done.

14        The communications, to say that taking the position

15   that -- that Judge Corley's order that the parties had

16   addressed communications and that none were ordered to be

17   produced, that is true.

18        The communication -- the sampling exercise in this case

19   was about communications.  And Judge Corley ordered that

20   exercise.  That was not something that Facebook asked for, and

21   yet Plaintiffs now have that included in part of their delay

22   arguments.

23        Judge Corley asked for that because she said:  Listen, I

24   can't make this privilege ruling in a vacuum.  I need context,

25   and this is going to be iterative process.  So let's do this

1  sampling exercise, and we agreed to do it.

2      And then after she -- we had gone through the sampling

3  exercise, she looked at some of the documents from the sample.

4  And there was a CMC, Your Honor, in April of 2021.  And she

5  said, you know, I have looked through these and a lot of it I

6  don't think it's relevant at all.

7      And she said, you know, I also -- you know, some of it is

8  privileged.  So she said, I don't think -- and I'm quoting

9  now -- (as read:) "I don't think Plaintiffs need every single

10  document.  There is certain information, like you say, that you

11  may need and maybe it's not even going to be privileged.  There

12  is going to be other information that may be privileged, and I

13  actually think you don't need.  So what is it precisely that

14  Plaintiffs need from that investigation?"

15      And the Plaintiffs responded and said (as read:)

16  "Your Honor, what we need is the facts underlying the

17  investigation that relate to our claims.  And in particular

18  which apps were in violation of or in -- a violation or in

19  potential violation of Facebook's policies and over what period

20  of time."

21      And then went on and said:  "Again, the facts underlying

22  these communications are what we really need."

23      And that's correct.  What they needed are just the facts.

24  They have to try to --

25          THE COURT:  I just don't understand -- so, are you

1    trying to argue that the Plaintiffs -- before Judge Corley's

2    ruling in September of '21, that the Plaintiffs were not

3    seeking -- that they were -- they were not seeking internal

4    Facebook communications between non-lawyers about the app

5    developer investigation?

6          MS. RING:  No -- no, Your Honor.  I'm saying that

7    Judge Corley was questioning whether that was a reasonable

8    request.  And --

9          THE COURT:  What you just read me did not suggest that

10   she was questioning whether that was a reasonable request.

11         MS. RING:  It didn't?  She said "I don't think you

12   need every single document."

13         THE COURT:  Right, every single document.

14         MS. RING:  "A lot of this is not relevant."

15         THE COURT:  Right.

16         MS. RING:  A lot.  So as a result of this in this

17   hearing then, she ordered the parties to meet and confer and

18   she issued an order on this.

19         THE COURT:  Can I ask you a question?

20         MS. RING:  Sure.

21         THE COURT:  Again, I mean, you are talking a lot about

22   the lead-up to Judge Corley's ruling in September '21.

23         MS. RING:  Yes.

24         THE COURT:  And what I have tried to describe as the

25   heart of the matter is Facebook's response and Gibson Dunn's

1   response to her order and sort of obvious frivolous

2   interpretation of her order as precluding the -- the production

3   of documents that are so obviously relevant, and you are

4   spending a bunch of time talking about the lead-up to Judge

5   Corley's September 21st order.  And I'm just trying to figure

6   out why you are doing that.

7          **MS. RING:**  Okay, I'll tell you.  Because I think to

8   reach a conclusion that this is frivolous -- I'm trying to give

9   you the context here, the context that Judge Corley had.

10      And I think the reason that in January of this year when

11  we went back before her on these issues, she didn't say "you

12  are violating my order."

13      She didn't say that.  They are her orders.  If she thought

14  that Facebook was violating them, she would have said that.

15  And to the contrary, when Plaintiffs --

16         **THE COURT:**  She would have -- she made a number of

17  comments --

18         **MS. RING:**  She did.

19         **THE COURT:**  -- along the lines of "you have got to be

20  kidding me."  I mean, that was the gist the --

21         **MS. RING:**  Well, I read the transcript also.

22         **THE COURT:**  "You have got to be kidding me.  You are

23  saying that I precluded the production of these obviously

24  relevant documents?"

25         **MS. RING:**  Do you know what she said actually,

1   Your Honor -- and I thought this was interesting also -- I was

2   trying to give you the context of it because I think -- I think

3   it's unfair to reach a conclusion that anyone made a frivolous

4   argument without understanding what -- all what the dialogue

5   was with the parties and with Judge Corley and in the briefs.

6        And the fact is that Plaintiffs' motion to compel the ADI

7   documents that were filed -- that was filed in February did not

8   ask for communications.

9        When they filed a joint supplemental brief in July, then

10  they added something about communications.  But, Your Honor,

11  what I found most remarkable was when Judge Corley then issued

12  an order after the joint supplemental brief, she said -- she

13  characterized Plaintiffs as just asking for the reports.  She

14  made no mention of communications.  And that makes sense in

15  larger context.

16       **THE COURT:**  I think this is -- that your comment there

17  is illustrative of the problem and I think we sort of saw it

18  with the named Plaintiff data.

19       Any little ambiguity that -- in something that a Judge

20  says or Special Master says or the Plaintiff says, Facebook and

21  Gibson Dunn would pounce on that and use it as part of their

22  effort to obstruct and delay and resist the production of

23  obviously responsive materials because if -- could I just ask

24  you to take a step back for a moment and without focusing on

25  the ambiguity of anything anybody said about these documents,

1    just take a step back from a 10,000-foot level.

2        What possible argument could there be that communications

3    between non-lawyers, about the app developer investigation are

4    not fair game in this litigation?

5        What non-frivolous argument can you make to me right now

6    that those documents, communications between non-lawyers about

7    the app developer investigation, are not fair game in this

8    case?

9            MS. RING:  Your Honor, because what goes to the

10   relevant issues in this case are what do the investigation

11   show?

12       We initially and maintain the position that the reports

13   that had those facts were part of an attorney-directed

14   investigation, therefore were --

15           THE COURT:  I'm asking you --

16           MS. RING:  I'm getting to your question.  It is not

17   proportional.

18           THE COURT:  I'm asking you --

19           MS. RING:  It's not proportional.

20           THE COURT:  Okay.

21           MS. RING:  I mean, we have a right -- and that -- and

22   Judge Corley agreed with that.  That's why -- I'm not -- and

23   again, I have to say, you seem to have made your mind up; but I

24   have to say this is not -- having come on here on this case and

25   read all these documents, I was not looking for ambiguities to

1    take advantage of.  I was trying to understand what -- what the

2    team thought and -- as we talked through it.

3        And again, as I look back, I think we all could have done

4    more to seek clarity.  And I'm not -- this isn't a gotcha.

5    This isn't trying to take advantage of an ambiguity.  I'm

6    trying to explain to you the context where -- you know, I know

7    it's hard.

8        THE COURT:  I wasn't saying that you were trying to

9    take advantage of me.

10        MS. RING:  I know but no one was.

11        THE COURT:  Although you may be.  But I'm talking

12    about the pattern in this case of Facebook and Gibson Dunn

13    pouncing on any little ambiguity in any ruling by the Special

14    Master or any statement by Judge Corley to -- and to use that

15    as an effort to oppose and delay the production of obviously

16    responsive material.

17        MS. RING:  I don't --

18        THE COURT:  Material that is obviously fair game.

19    This was an investigation about what app developers were doing

20    with user data.  And communications between non-lawyers at

21    Facebook about the investigation are so obviously potentially

22    relevant.  I mean, there may have been some documents that

23    weren't relevant; but the universe of documents is so obviously

24    relevant.

25        And, you know, you are -- you are pouncing on, you know,

 1   some statement by Judge Corley about reports to resist turning

 2   over what is so obviously relevant.  I think that is --

 3           MS. RING:  These weren't reports.

 4           THE COURT:  I think that is -- I think that is

 5   emblematic of the problem with Facebook and Gibson Dunn's

 6   approach to this litigation.

 7           MS. RING:  Your Honor, those weren't reports that she

 8   was referring to.  She was referring to communications, first

 9   of all.

10       And I'm -- I -- this -- it is not pouncing.  It is when --

11   these are complicated highly technical points to work through.

12       They are not -- they are not ambiguities when you look at

13   the larger context, and that's why I'm trying to give you the

14   larger context.

15       And I'm not saying when we went before the Special Master

16   and we were litigating this issue of communications, because

17   the sampling exercise had -- had concerned communications --

18   not the reports.  The sampling exercise did not involve the

19   reports -- but because the sampling exercise had involved the

20   communications, and when Judge Corley issued her order, she

21   didn't say anything about communications, I think the team

22   thought that that issue was put to rest.

23       When -- we understand -- we understand it wasn't and in

24   January of --

25           THE COURT:  That is -- that thought is ridiculous on

 1   its face, but it becomes more and more ridiculous as time goes

 2   on when everybody including Judge Corley is saying "What are

 3   you talking about?"

 4        **MS. RING:**  A month later.  And once she said that, we

 5   gave them everything.  And what I found remarkable in that

 6   January 22nd hearing is when we -- none of this is -- you know,

 7   typically in situations like this, this is under the cloak; you

 8   know, parties are not open about what you say now are frivolous

 9   arguments.  We made them publically.  We didn't hide them from

10   anyone.  We weren't trying to play gotcha at all.

11        **THE COURT:**  I don't understand what that means.

12        **MS. RING:**  It means that -- it means that that was

13   the -- that was what we thought she had -- in going through the

14   sampling exercise and then ordering no communications to be

15   produced, I think the team thought that she had looked at it

16   and said, you know what, let's focus on the reports because

17   those are the underlying facts and that's what Plaintiffs had

18   talked about.

19        And when -- in January when she said no, no, and she was

20   very -- the discussion at this point -- and the transcript I

21   found helpful -- because she said when the lawyers explained

22   that this was how they understood her order, she said:  No,

23   that's a mistake.

24        She didn't say:  You know, you are taking advantage of an

25   ambiguity in my order.  She said:  No, that's a mistake.

1    And once she said that, then all attention turned to just

2    producing all the communications.

3         **THE COURT:**  You are going to -- you are relying on the

4    politeness of Judge Corley to argue that she didn't think that

5    the position was frivolous?  I mean, I -- I know Judge Corley

6    very well.

7         **MS. RING:**  I know.

8         **THE COURT:**  And if she looks at me and says "that's a

9    mistake," she is telling me "what the heck are you talking

10   about."

11        **MS. RING:**  I understand, Your Honor, and I'm not --

12   what I'm saying is my understanding -- I wasn't at that

13   hearing -- but in all of the transcripts that I read, in all of

14   the discussions with the team and with Meta there was no

15   thought to trying to make something up that wasn't there; and

16   it was a proportionality argument, which is a fair argument to

17   make in these circumstances.

18        And the other context is -- but once she said that, we got

19   it.  We get it.  And we -- in the Special Master we had -- we

20   had to unfortunately file a number of motions for

21   reconsideration because the orders were unclear, you know, and

22   I think, again, the lesson is clarify if there is not clarity.

23        And the other thing that jumped out to me in context --

24   this is just context -- is in seeking reconsideration of this

25   second to last order on the coms, we made the argument that

1    listen, if this is really all the communications, we are not

2    going to make the substantial completion date.  That's going to

3    be impossible.

4        And as a result we said:  Look, we have these -- and I'm

5    getting to your point about the search terms too because I had

6    the same question.  We said in our motion for reconsideration,

7    Your Honor -- you know, Special Master Garrie, we are not going

8    to make the substantial completion date if the order stands in

9    this way.  There cannot be any new searches, new corrections or

10   new search terms.

11       And in response after we filed that motion for

12   reconsideration, he issued another order, an amended order, and

13   in -- and this is -- in the order it said "for all custodians

14   who the parties have identified and collected."

15       So it's you have already got it, so you can make the

16   substantial -- that's what we understood that to mean.

17       And the other thing I learned when I joined the case --

18           **THE COURT:**  I don't even know what that means

19   "custodians you have identified and collected."  I mean, what

20   does it mean to collect a custodian?

21           **MS. RING:**  I also had that question, Your Honor, but

22   as --

23           **THE COURT:**  It sounds like you -- Facebook and Gibson

24   Dunn were quick to interpret that even though we are sitting

25   here right now saying what does that mean.  I don't even

1   understand what that means.

2        **MS. RING:**  The brief.

3        **THE COURT:**  And you are quick to interpret it as I

4   don't have to -- I don't have to do anything else.

5        **MS. RING:**  I wasn't -- I don't think it's fair to say

6   we were quick to interpret it that way.

7        Looking at the briefing -- I looked at the briefing and we

8   say, look, if we have to do any more collections or search

9   terms, we are not going to make the substantial completion

10  deadline.  Then the Special Master issues an amended order

11  which changes and says just do the collected.

12       And so that's how they interpreted it.  That's how they

13  interpreted the order.  And I also have to say -- because then

14  now this was when I came on the case -- and I think the way

15  this is characterized -- and again, this has been a case of

16  extremes and absolutes all the way along and a total inability

17  to communicate.

18       I called Plaintiffs myself and said:  Okay, so the order

19  says collected.  What was collected for the ADI custodians was

20  through August 2019.  I think ADI went a little longer than

21  that, so I think we should -- I assume you will want --

22       **THE COURT:**  I didn't complain about, you know,

23  that's -- I didn't complain about Facebook's and Gibson Dunn's

24  conduct when you called them to seek clarity.  I mean, I think

25  that's a good thing; right.  The problem is that that was not

 1   happening -- you know, the opposite of that was happening for

 2   several years leading up to that.

 3        **MS. RING:**  Your Honor, I want to finish the ADI

 4   discussion, but my observation is -- and it seems like, you

 5   know, you have reached the conclusion that the fact that that

 6   was not happening is Facebook and Gibson Dunn's fault.

 7        And my own experience on the case is that it was both and

 8   it caused delay.  There is no question about it, and we are

 9   sorry for the role that we played in that.

10        And looking back, should we have just given in on a lot of

11   these points?  Sure.  But they were positions that were taken

12   in good faith.  They were positions that I still think are

13   correct, but they did not serve us well because here we are.

14        But it's not fair.  I really and truly believe that.  It

15   is not fair to say they were taken in bad faith, Your Honor,

16   and ADI is something again when we go through -- and then

17   again, this is something that I handled myself.  I said, "We

18   are not going to have one more dispute over ADI."

19        But we did.  We did.  Despite my best efforts, and

20   ultimately we just gave in on everything.

21        To do these additional collections and searches and

22   productions for all of the MDL custodians, quadrupling the

23   number is -- if we had not been in the situation we were in, we

24   would have argued proportionality and won.  There is no

25   question about that; but we just gave in because as you can

imagine after February, there was really not a lot of room to

compromise.

So, you know, now -- but the point is, Your Honor, all of

the reports -- and again, this was always helpful to me to

think about -- all of the reports that had the facts,

Plaintiffs had those as of March 3rd.

The communications -- we produced what we reasonably

believed in light of what the briefing had been was covered by

Judge -- by the Special Master's order of January 31st, by the

way, which was, like, a week before that February CMC.  So we

hadn't even had a final order yet.

And since that time, we talked to Plaintiffs.  They wanted

more and more and more.  And we said yes, yes, yes.  And now

they have it all.

THE COURT:  Okay.  Mr. Loeser, you seem anxious to say

something about all this, if you can keep it brief, please

because we have other --

MR. LOESER:  I will keep it brief, Your Honor.

THE COURT:  -- things we need to talk about.

MR. LOESER:  I think the briefs are very clear.  I

think the sequence of events is very clear.

The order that says all custodians identified and

collected, you know, they interpreted that to mean some

custodians for some part of the time period and didn't tell us

that that's what they did until after the deadline.  That's

1    when they started telling us about, oh, look we searched some

2    of the custodians, not all; and we searched for some of the

3    time period, not all; and then we used these search terms that

4    we used for the sampling exercise, which mind you, was for

5    6,000 documents.  Special Master Garrie reviewed every single

6    one of them and found that there were discoverable materials in

7    that.

8         I don't know that you want to hear much more about what

9    Judge Corley said or didn't say.  I will just say that when she

10   said that a lot was not relevant, she was talking about 20

11   documents that had been basically blindly selected off of a

12   privilege log; and we didn't even know there were reports at

13   the time.  I mean, we didn't have anything.  And so she went

14   through 20 documents -- and if you read the transcript, when

15   she says some of this isn't relevant, she uses, as an example,

16   scheduling e-mails.

17        So to take from that and somehow conclude she ruled out

18   all internal communications is silly.  And I will say we had

19   many, many conversations and meet-and-confers and -- with the

20   discovery mediators and in hearings where I couldn't have been

21   more clear that the reason why I thought these internal

22   communications were obviously relevant and obviously

23   discoverable, these are people inside Facebook talking about

24   the results of an effort to identify other apps that misused

25   user data.  So there was never any good-faith basis for trying

1    to withhold those communications.

2         On something else that I think is overlooked, which is the

3    fight was not only about communications.  Judge Corley ordered

4    the production of these reports, and she told Facebook to work

5    with Special Master Garrie on producing materials consistent

6    with this order.

7         We tried for four months in meet-and-confers and

8    discussions to get those reports.  We didn't get those reports

9    until February of 2022.  So there is just a great example, a

10   four-month time period in which there is no basis.  Judge

11   ordered -- like --

12        THE COURT:  Can I ask you a question?

13        MR. LOESER:  Yeah.

14        THE COURT:  I don't remember reading about that in

15   your sanctions paper.  Is it included?

16        MR. LOESER:  It is.  There is a discussion of the

17   instruction from the order to work with the Special Master.

18   There is a discussion of the meet-and-confers in which we

19   sought to get their position on what they would produce.  There

20   is a discussion of Special Master Garrie ordering them to --

21   strongly encouraging them to produce the reports.

22        That was all before the December 3rd hearing.  Then there

23   was the December 3rd hearing.  There is a discussion of that,

24   and the reports didn't start to flow into until, I think it

25   was, February 2022; but so there was not -- there was not some

immediate reaction by Facebook, oh, well, the order doesn't --
and I'm getting a page -- opening brief page 12 is where we
talk about this.  They didn't read her order and say, "Let's
hurry up and get them the reports."

It's clear.  There is no doubt about that, they didn't do
that at all and they dragged it out and it took months to get
them.

**THE COURT:**  Okay.

**MR. LOESER:**  That's all I have, Your Honor.

**THE COURT:**  You want to have the final word on this
issue before we move on?

**MS. RING:**  Thank you, Your Honor.

As you know, Judge Corley issued her order in September,
and the Special Master issued his order -- his first order on
December 8th, which became final December 20th covering the
reports.

It's not true to say there were no reports produced until
February.  We started producing them in January.

And to say that Judge Corley did order the parties to --
for the six exemplar apps to produce the reports, and we did
that within two weeks.

And then she ordered the parties to work with the Special
Master for further productions, which we also did.

And the thing that I think gets lost here a lot,
Your Honor -- and I know this because I confronted it in one

1    of -- in a related production with ADI.

2         As you know, the Massachusetts courts reached a different

3    conclusion on the privilege issue.  And so if we produce these

4    materials not under compulsion; meaning, not subject to an

5    order, we waive that privilege.

6         And so -- and I'm sure you are also familiar, you can't

7    say, can we -- it's difficult -- it puts us in a difficult

8    position because we understand how Judge Corley has ruled.  She

9    has directed us to work with the Special Master.

10        Once he issued an order, then we are okay.  Then we can

11   produce those materials and not worry about waiver, but this is

12   the part -- again, and I discussed this Plaintiffs and I

13   understand it is not their problem -- but we have to be

14   cognizant of that, and we have to be aware of it.

15        Again, respecting Judge Corley's different ruling but also

16   having to protect waiver in the other jurisdiction that found

17   the other way.  So I do -- I hope the Court understands that

18   because that -- we needed an order.

19        And then finally I would say it's -- for the -- for the

20   all custodians that were identified and collected and that we

21   had only produced for some custodians, that's also not true.

22   We produced for all custodians, ADI and MDL, by March 3rd just

23   as the order required.

24             **THE COURT:**  Okay.  On the privilege --

25             **MR. LOESER:**  Your Honor, can I correct two

1    misstatements that I made?  I want to make sure the record is
2    clear.
3              THE COURT:  Yeah.
4              MR. LOESER:  The brief cite for where we raise this is
5    pages 18 and 19.  And I do stand corrected.  Facebook did
6    produce 11 documents in response to Judge Corley's order in
7    January.
8              THE COURT:  Okay.
9              MS. RING:  From six apps.
10             THE COURT:  So, on the privileged issue -- privilege
11   designations, I guess I'm a little confused as to why it
12   happened; and I'm less certain how to think about this issue.
13        I mean, there was a -- in -- it was, what, around like
14   February or March or April or something of 2022 when all of the
15   sudden Facebook submits a new privilege log with a massively
16   increased number of privileged documents; is that correct?
17             MR. LOESER:  Yes.
18             THE COURT:  And your -- I want to ask you to explain
19   because I couldn't quite get it from the papers, explain your
20   theory for why that happened and why it's reflective of
21   misconduct.
22             MR. LOESER:  Sure, Your Honor.  So in the materials
23   that we provided to you are a series of timelines, and one of
24   the timelines is for the privilege log issue.  And the reason
25   why we were suspicious, to say the least, if you look at the

1    tab that says "privilege" --

2          **THE COURT:**  Got it.

3          **MR. LOESER:**  -- is prior to January of 2022, there

4    were 10,000 -- fewer than 10,000 documents logged as privilege

5    from the duration of the case at that point, and January 28th

6    there were 14,000 documents identified on the third categorical

7    privilege log.  And then on March 17th, 2022, 182,112 documents

8    were added to the privilege log.

9          **THE COURT:**  Okay.  Are those -- do we have an

10   understanding of whether those are ADI documents or named

11   Plaintiff documents or some other category of documents?

12         **MR. LOESER:**  I believe it's a mix of documents and

13   the -- and something that goes along with this is that Facebook

14   had been saying for creation of its privilege log it was

15   necessary to individually review every document, so every

16   document that they reviewed was reviewed and then put on the

17   log based upon a determination -- a good-faith determination

18   that there was privilege.

19       It just seemed kind of unbelievable to us that you could

20   have so few documents, and then all of the sudden somehow

21   through some individual review add 182,000 documents to the

22   log.

23       And the logs, I have just been told -- the ADI materials

24   were under a separate log.  So none of these were ADI materials

25   on this log.

1           **THE COURT:**  Okay.

2           **MR. LOESER:**  And so it seemed like -- and there was a

3    requirement through the way the privilege exercise was supposed

4    to work is a rolling requirement.  They were supposed to be

5    identifying privilege documents on a rolling basis.

6           So it just kind of seemed fairly obvious that this had

7    been -- whether -- they must have identified a lot of these

8    documents sooner or they were doing a whole lot of work at the

9    last minute, and yet at the very -- all of the sudden all these

10   documents just showed up.

11          And so -- and then, you know, we challenged a lot of these

12   documents; and that's when the wheels kind of came off the bus.

13                     (Pause in proceedings.)

14          **THE COURT:**  Okay.  But -- so are you -- are you saying

15   that -- so, are you saying that the -- the eleventh hour -- the

16   fact that they designated so many of these documents at the

17   eleventh hour is misconduct or are you just saying that the

18   fact that they designated -- when they designated all of these

19   documents, so many of them were obviously not privileged and

20   that's the misconduct?

21          **MR. LOESER:**  Your Honor, it is the latter although we

22   don't like -- we can speculate as to why all of the sudden

23   180,000 documents show up on the log at one time.  We believe

24   that they identified these documents earlier but just didn't

25   produce the logs until later.

1      The misconduct is withhold -- these are discoverable

2   materials that were withheld for a long period of time, and

3   Facebook tries to tell you that they should get credit, this

4   affirmative act they took to redo the log.

5      Well, what they are not saying is that we challenged the

6   log.  We challenged thousands of documents on log, and it was

7   based upon that and a sampling exercise that the parties set up

8   to try and deal with this massive log that they said, you know

9   what, we are going to do redo this whole log.

10      And then after they re-reviewed the whole log, they ended

11   up producing 55,000 documents that had been withheld.  Again,

12   they said that they did this individual review and there was a

13   good-faith basis to withhold these documents; and there clearly

14   wasn't.  55,000 were then produced, not out of some altruistic

15   act of goodwill but because we challenged the log.

16      **THE COURT:**  Is your contention -- do you make a

17   contention about whether this was a mistake or whether this was

18   kind of part of an intentional effort to -- to prevent

19   disclosure of damaging documents?

20      I mean, I -- you describe some documents in your brief,

21   right, like you described this document that was initially

22   withheld as privileged and, I guess, was a -- was an e-mail

23   from somebody named Yul Kwon to somebody named Debra Liu and

24   both were not attorneys, and Kwon is sharing materials that he

25   presented to Zuckerberg in 2015 on the need to build stronger

```
1    and more centralized privacy and data use org.

2        And Kwon says (as read:) "I wonder how much of a better

3    place we would be in today if the proposal had been implemented

4    three years ago."

5        Did -- you know, and then there are also the documents

6    where, you know, Facebook employees are just improperly trying

7    to cloak their communications in the privilege; right.

8        But are you -- are you saying -- do you put those

9    documents in for the purpose of asserting that this was like a

10   nefarious effort to conceal damaging or embarrassing documents

11   through the -- through misuse of the privilege or are you just

12   saying this was a mistake?  I mean, I don't quite understand

13   what your contention is about that.

14       MR. LOESER:  What we are saying is there was not a

15   good-faith basis for a lot of these privilege designations.

16   And if you lack a good-faith basis for doing something, that's

17   a problem; and we think that conduct is sanctionable because it

18   results in relevant discoverable materials not being produced.

19       Do I know if they had some nefarious purpose in doing

20   this?  I don't.  I don't.  I do know that when we looked at the

21   documents that they eventually produced, you can't find a

22   good-faith basis for withholding those documents.  That's the

23   basis of our motion in that regard.

24       I would also note that we were in the midst of taking a

25   lot of depositions, and there were many deponents who -- for
```

whom depositions occurred and these documents were produced after those depositions.

So it's not like there is no impact from those withholding.  These are materials that we did not have.  The ones that we identify in the brief, for example, those are things that we would have liked to have questioned witnesses about, and we couldn't because we didn't have documents.

So it's a -- you know, I want to be careful not to claim that there was some conspiracy inside those walls to conceal those documents because I don't know one way or the other.

I do know when they were forced -- not volunteered.  When we challenged and they then produced these materials, we couldn't identify any good-faith basis.

And if you consider the number of documents, I think that's -- that's why we included it as a sanctionable event.  It is just a huge number of documents that did have an impact on the litigation.

**THE COURT:**  Okay.  Ms. Ring?

**MS. RING:**  Your Honor, we have never said that we, out of the goodness of our heart, just went back to our privilege log and took a second look.

We were very clear that -- when it was raised.  That's how it works.  You produce a privilege log.  The Plaintiffs challenge it.  We -- the thing we were calling out is we not only looked at what they asked about, we said we would look at

1    the whole thing again.

2         **THE COURT:**  But -- and I understand that that's what

3    happens, but the number of documents that ended up not being

4    privileged is quite extraordinary.

5         **MS. RING:**  As you pointed out, though -- I don't know,

6    at the CMC before the last one -- there are many duplicates in

7    there which, you know, Plaintiffs --

8         **THE COURT:**  Yeah, but even --

9         **MS. RING:**  -- never call out when it serves.

10        **THE COURT:**  Isn't it quite --

11        **MS. RING:**  It's a lot.

12        **THE COURT:**  -- an extraordinary number?

13        **MS. RING:**  It's a lot -- I don't -- it's a lot,

14   Your Honor.  But I would say in complex litigation where there

15   are a lot of lawyers involved in various aspects and different

16   issues, these are people who are reviewing these documents.

17        I -- that's another thing I just think is lost here.  I

18   know it is hard to see Facebook or Gibson Dunn as anything but

19   big tech or big law, but these are people; and they are very --

20   and these people are maybe first, second year associates.  They

21   are terrified that they are going to waive a privilege.  And so

22   over-designation is not uncommon.  It's not.

23        And that's why there is a process that we had, and we came

24   up with the sampling process; and we suggested ways to go

25   around this.  And Plaintiffs -- we worked together on that --

 1   on that -- on that to come up with something to address this

 2   issue quickly.

 3        **THE COURT:**  But why -- why wasn't it -- I mean, I

 4   understand your comment that these are people, and I understand

 5   your comment about first and second year associates being

 6   terrified about waiving the privilege; but you -- you are not

 7   supposed to just send the Plaintiffs a privilege log, that it

 8   reflects the decision of terrified first and second year

 9   associates to designate something privileged; right?  I mean,

10   there needs to be a process --

11        **MS. RING:**  And there was.

12        **THE COURT:**  -- to make sure that they haven't been

13   over-designated.

14        **MS. RING:**  Your Honor, all I can say is it is not

15   uncommon to have over-designations.  I'm not going to say that

16   there weren't a lot here.  There were.  But to say that that is

17   sanctionable, I just think in any complex civil litigation --

18        **THE COURT:**  Well, how did this happen?  I mean, the --

19   that's, I guess -- I mean, I'm speculating; right?  I'm left to

20   speculate.  I don't recall seeing an explanation in your papers

21   about how this ended up happening.

22        I'm speculating that you got involved in the case in

23   February, and you are like "we need to get our act together on

24   the privilege log;" and you put your -- you know, you put

25   everybody's foot on the gas and, you know, maybe it happened

 1    too fast and, you know, there wasn't enough time to review the

 2    documents for privilege; but that's pure speculation on my part

 3    because I -- I wasn't there.  So tell me what happened.

 4         **MS. RING:**  Well, that's not what happened.

 5         **THE COURT:**  Okay.

 6         **MS. RING:**  Look, part of this, Your Honor, is -- it's

 7    we have talked about this in our briefing or when we were doing

 8    our briefing, some of this is work product, which I'm sure you

 9    can appreciate.

10         But the things that -- when we looked -- when I saw this

11    privilege log and I said:  Oh, how did we arrive here?  There

12    were a lot of attorneys on these documents, and I think that

13    the -- the best explanation, the right explanation, is that I

14    think the people reviewing these documents were very nervous

15    about -- when they see an attorney on these documents, they are

16    nervous about waiving privilege.

17         **THE COURT:**  But weren't there a lot of documents that

18    didn't have attorneys on them?

19         **MS. RING:**  There were, yes.

20         **THE COURT:**  And there were documents --

21         **MS. RING:**  But they talk about --

22         **THE COURT:**  -- where Facebook employees are improperly

23    cloaking their communications in the privilege.

24         **MS. RING:**  Well, I was --

25         **THE COURT:**  I guess, you can understand when you are

1   doing a document search why that might get into the privilege

2   bucket because they use the word "privilege" in the e-mail;

3   right.

4           **MS. RING:**  Yeah, but actually I wanted to -- I thought

5   you were maybe using Plaintiff's characterization of that, but

6   it sounds like that's actually what you think.

7           **THE COURT:**  Yes.

8           **MS. RING:**  I don't think that's a fair

9   characterization of those documents at all.

10          **THE COURT:**  Wait a minute.  Hold on a second.

11                          (Pause in proceedings.)

12          **THE COURT:**  So there is an e-mail where they are

13  talking about incorrectly giving a third party access to user

14  posts and the Facebook employee says (as read:) "Simon, can we

15  discuss in person, else we need to make this AC priv and add a

16  lawyer to the thread."

17      I mean, what --

18          **MS. RING:**  Your Honor, those kind of --

19          **THE COURT:**  What is appropriate about that?

20          **MS. RING:**  Those kind of discussions happen all the --

21          **THE COURT:**  Oh, I am sure you are right.

22          **MS. RING:**  But not for the reason that you think.

23          **THE COURT:**  Hold on a second.  Just like people speed

24  all the time and only, you know, one percent of them get a

25  speeding ticket.  I believe you that those kind of discussions

1   happen all the time, but you are saying that that exchange is

2   appropriate?

3          MS. RING:  What I'm saying is that when issues -- that

4   situation, I don't know all of the facts around it; but if --

5   what's happened is an app has allegedly gotten unauthorized

6   access.  There are obviously legal issues potentially there.

7   And so oftentimes -- that's why in-house counsel exists, to

8   seek their advice, to include them, to loop them into things.

9          THE COURT:  But you can't make something privileged by

10  adding a lawyer to the thread.

11         MS. RING:  No, you can't.  But what you are talking

12  about and what you want to talk about is what should we do next

13  and let's understand what our legal risk is, that has to

14  happen.  That's the whole reason to have counsel.

15      If something happens that makes you think, "Oh, this could

16  be a problem.  Let's get the lawyers involved so that we can

17  understand what are our options here and what are the risks."

18      That's what that discussion -- when I read that, ten years

19  of experience doing this with Meta, that's what that kind of

20  discussion is.  And that's a good thing.

21         THE COURT:  I don't know if ten years of experience

22  doing this with Meta suggests that what you have seen over ten

23  years is proper at least based on this.

24         MS. RING:  Well, that's certainly how I made this

25  statement.  I have never seen anything improper in this regard.

1      I mean, really and truly, Your Honor, I thought you were

2   maybe using Plaintiffs' characterization; but I am sorry if you

3   think that -- you know, that's how you read these e-mails, and

4   all I can do is try to explain to you the context; but I don't

5   see anything inappropriate with that.  Something has happened,

6   and they are saying "What are we going to do here."

7           THE COURT:  Anything else --

8           MS. RING:  And it may depend --

9           THE COURT:  Anything else on privilege?

10                     (Pause in proceedings.)

11          MS. RING:  Only to say, Your Honor, I thought that

12   this was actually a rare but good example of the parties

13   working together and working through this issue in a way that

14   worked.

15      And I -- again, I'm not going to stand here and tell you

16   that that was not a large privilege log.  It was.  But we

17   worked through it and tried to work with Plaintiffs to say who

18   are the upcoming depositions, let us prioritize those.  And

19   that's what we did.

20      So, no, I don't think there is --

21          THE COURT:  Okay.

22          MS. RING:  There was certainly no bad faith in it

23   happening.  And once the issue was raised and the parties

24   discussed it, we addressed it promptly.

25          THE COURT:  Okay.  Now deposition misconduct.

1              (Pause in proceedings.)

2         **THE COURT:**  I have now watched excerpts of the Hendrix

3    deposition.  I'm guessing that you are not going to -- I'm

4    guessing that Ms. Ring is not going to dispute that the conduct

5    of the Gibson Dunn lawyer and the conduct of the witness was

6    abominable.

7         I think it's probably a broader problem, though, you know

8    it's -- you know, refusal of witnesses to ask basic questions,

9    failure to properly prepare 30(b)(6) witnesses.

10        I do have a question, though.  I mean, I'm happy for you

11   to sort of summarize what you think the problem is, but I have

12   a question and it's a question that I developed after -- while

13   watching the excerpts of the Hendrix deposition.

14        Why was the Special Master adjudicating disputes about

15   whether a question was within the scope of the -- of the

16   30(b)(6) deposition?

17        How did that happen?  Did you-all ask him to adjudicate

18   disputes as the deposition went along about whether a question

19   was outside the scope of the 30(b)(6) topic?

20        **MS. WEAVER:**  Well, Your Honor, no, we did not.  These

21   were objections that Facebook raised.  In ordinary course and

22   our experience -- I think our collective experience on the

23   Plaintiffs' side, when we take a 30(b)(6), there may be an

24   objection that something is out of scope; but you don't

25   instruct a witness not to answer.  We can litigate later

1   whether or not that testimony is on behalf of the company or

2   not.

3        So in our strong preference, it would have been just to

4   proceed to take the testimony and we can litigate later what

5   would happen.

6          **THE COURT:**  Right, but that's why I was asking.

7          **MS. WEAVER:**  Right.

8          **THE COURT:**  That was my understanding of how it was

9   supposed to happen.

10         **MS. WEAVER:**  Right.

11         **THE COURT:**  But we, you know, so much -- like, you

12  know, at one point you talk about a 17-minute speaking

13  objection by the Gibson Dunn lawyer; right.  And I watched the

14  17-minute clip that you are referring to.

15       I think it is not fair to characterize it as a 17-minute

16  speaking objection, right, because it's -- there is a ton of

17  back-and-forth between the Gibson Dunn lawyer and the -- and

18  the Plaintiffs' lawyer and the Special Master which includes

19  trying to figure out whether a question which is in -- is

20  within the scope of the topic; right.

21       And I was just trying to figure out, like, did you-all

22  agree in advance that that's what the Special Master should be

23  doing during the deposition or is it -- is it -- is -- is it

24  something that kind of just went off the rails?

25         **MS. WEAVER:**  Good question, Your Honor.  I think it is

1    something that went off the rails.  And I think it would help

2    to frame this a little bit because there were two really

3    important framing facts for these 30(b)(6) deps.

4         A, the asymmetry of information in this case.  It's not a

5    securities case where everybody knows -- okay, so -- and B,

6    when we tried to take in-person depositions -- not the

7    30(b)(6); like the Chang deposition is one or the Misary

8    (phonetic) deposition, which we took recently, we were getting

9    a lot of just unbelievable I don't knows in our view.

10        That happens in cases.  We can string together a section

11   for the jury, but in this case when we got the "I don't knows"

12   coupled with the asymmetry, you have a problem like we don't

13   know that there are Switchboard snapshots and so we don't know

14   what to ask for.

15        And then when you parse that with counsel saying "Facebook

16   doesn't say cookies are identifiers," when you Google -- as we

17   were invited to do repeatedly by opposing counsel in

18   meet-and-confers to Google terms -- if you Google "cookie,"

19   Kaspersky will pop up and call it an identifier.

20        So we had to take depositions to try to learn the exact

21   language, which is a point I think Your Honor was making; like

22   there is -- if we didn't ask for the exact specific thing, we

23   did not get even a general descriptor.

24        We couldn't have meet-and-confers in good faith the way

25   reasonable lawyers do.  I know what you are asking for.  I

1    think this is it.  That did not happen for two years.

2          And so that was the beginning of the 30(b)(6) frame.  When

3    we issued our notice in December and said "let's talk about

4    this," and we didn't hear for three months, the concept behind

5    having a meet-and-confer about scope is that you have a meeting

6    of the minds about what is going to be discussed.

7          We didn't have that discussion through, we would say, not

8    our fault.  And because of that Facebook's entire tactic in

9    defending these depositions meant that in the depositions they

10   were complaining about scope because they had failed to

11   properly meet and confer before that time.

12         Again, we did not want to be having these debates on the

13   record in front of malleable witnesses.  We did not want to

14   recall witnesses.  When witnesses are recalled, they become

15   more proficient.

16         What we want to do is depose somebody who is hopefully

17   going to give us an honest answer, who may not be prepped like

18   yes, there are Switchboard files.

19         So it became a long, attenuated process precisely because

20   Facebook then said "you can proceed with these 30(b)(6)

21   depositions" but they made a request that is also

22   unprecedented, which is -- we sent lengthy e-mails; this is

23   what we are going to ask about.  I wrote a bunch of these

24   e-mails.  Here are documents we are going to show them, and

25   then we would get into the deposition -- and I think a really

good example is the Mike Clark deposition -- the topics were
like de-identification, re-identification, association,
pseudonymizing and deleting data.  We got in there and he was
only prepped on deleting data and sort of the de-identification
process; and there was no explanation.  We had not been told
before that association was somehow not going to be covered.

     And what that meant is that every deposition had baby
depositions.  We had one deposition and then that would turn
into the follow-up -- the four follow-up depositions where we
had to go pick up this trail of all the things they had
decided, apparently ahead of the deposition, this witness
wouldn't be prepared to discuss but they had never shared with
us.

     So in a healthy and robust functioning litigation process,
we have a meet-and-confer.  They may say "We don't think this
is relevant."

     We go to the Special Master ahead of time and say:  Hey,
they say association of data is not relevant.  We brief it.  We
get the witness or we don't.  That did not happen here.

     So it was happening in the deposition, and that meant that
we spent tens and hundreds of hours of our time -- and I think
it was, frankly, not a pleasurable process for either side.
And if anything, it is a lesson.

          **THE COURT:**  When did the 30(b)(6) depositions begin?

          **MS. WEAVER:**  Well, we took two actually in 2019, but

1   the timeline -- and again, we provided one to you which --

2                   (Pause in proceedings.)

3        **MS. WEAVER:**  Sorry, December 2021 was the first one --

4   well, no, no, that's not true -- yeah, February 2020 there were

5   two.  And they were largely unsuccessful on Plaintiffs' data,

6   so we issued this follow-up notice in December of 2021 and

7   sought to meet and confer.

8        So they then began in earnest.  Our first one --

9   Your Honor had proposed that we begin in them in April.  That

10  did not happen.  Our first one was May 5th, 2022.

11       **THE COURT:**  Okay.

12       **MS. WEAVER:**  And I think Mr. Ko --

13       **MR. KO:**  David Ko, Keller Rohrback for the Plaintiffs.

14  I just want to try and answer your question as simply as

15  possible as to why Special Master Garrie got involved.

16       At the very beginning of the deposition -- as you may have

17  seen, I was the lawyer that took Ms. Hendrix's deposition, for

18  better or for worse.

19       But when it became clear that Mr. Bloom or Facebook's

20  attorney was giving improper instructions, as you will see from

21  the deposition transcript, I -- I gave my specific

22  representation on the record that that was improper and that we

23  should proceed and that the questions must be answered absent,

24  for example, instructions not to answer based on privilege,

25  which were the instructions given.

1    So it was our position that she needed to answer and that
2    there were no issues for the Special Master to resolve.

3    But as you -- as Ms. Weaver correctly characterized, it
4    just kind of went off the rails and everyone just started
5    talking; and that infected, as you saw, the entire proceeding
6    including just wholly improper instructions to the witness not
7    to answer.

8    So to answer your question, Your Honor, it's -- we did not
9    feel that Special Master Garrie needed to adjudicate anything
10   we wanted the questions to be answered.

11        **THE COURT:**  What you are describing right now, do you
12   have a citation for where that is in the deposition transcript
13   so I can read that?

14        **MR. KO:**  Good question.  I don't immediately, but I'm
15   sure I can find it and provide it for Your Honor.

16        **THE COURT:**  Great.  Anything else on the depositions?

17        **MS. WEAVER:**  I don't think so, Your Honor.

18        **THE COURT:**  Okay.

19                     (Pause in proceedings.)

20        **THE COURT:**  Go ahead.

21        **MS. RING:**  Well, I have to say one of the first things
22   I learned after joining the case is when we would be able to
23   have a conversation and I would want to share something, the
24   response would be it was just revealed to us.

25        So I'm sort of feeling that way now because I don't

1   understand.  Why else would we have and pay a Special Master to

2   attend these depositions if not to rule on issues?

3       That if you read more of the transcripts and watch more of

4   the videos, he says pretty much every single time "Oh, I

5   haven't ruled on that.  Let me rule on that."

6       That's the whole reason to have a Special Master there.

7   And, in fact, he ruled on this one.  And so I want to pause,

8   though.  We have addressed this in a prior CMC.

9       That attorney made a mistake.

10      **THE COURT:**  Well --

11      **MS. RING:**  Let me -- I know you want to use different

12  words.  We will get there, but I want to say that -- and

13  obviously you have read the transcript, as have I; and I was

14  there for much of it actually.  I came later when there started

15  to be this back-and-forth.

16      And the objection started off as "Don't answer that as a

17  corporate representative.  You can answer that in your personal

18  capacity."

19      That's not right either.  He should have just objected as

20  out of scope.

21      Then they became, as this exchange between the lawyers

22  went on -- and Special Master Garrie was there the whole

23  time -- it started to escalate a little bit and then it was

24  shorthand.  It was just:  "Yes, I'm instructing you not to

25  answer;" but I think what he meant was "Don't answer in your

1    corporate capacity."

2         Again, not right; that you should just object out of scope

3    and you are done.  But let me get to the point here on --

4    Special Master Garrie did rule on this, and this is not -- it

5    is difficult.  It is real-time and -- but he -- he sustained

6    that objection and the direction not to answer.

7              THE COURT:  Which one?  There were so many of them.

8              MS. RING:  I will direct you.  It's in the transcript.

9              THE COURT:  You are talking about the one during the

10   17-minute --

11             MS. RING:  No, no.  This was -- yeah, actually it may

12   have been part of that one.  It is on page 241 and it starts at

13   4:26:03.  And Mr. Ko who just spoke makes the point -- again,

14   he is correct.  "You shouldn't instruct this witness not to

15   answer."

16        And the attorney said:  "Well, I can actually."

17        And Special Master Garrie said yeah.  And then they had

18   more back-and-forth.  And Special Master Garrie said (as read:)

19   "With a 30(b)(6) you can because the witness is here to testify

20   on certain subjects and under the case law in the Ninth

21   Circuit, they have to preserve their rights because the witness

22   testimony can be called at trial accordingly, so he is

23   obligated to make sure that the witness testifies only on

24   subjects that are, therefore, have been designated."

25        That's a mistake; okay.  It shouldn't have happened.  And

1  that's why the minute this deposition was over, we contacted

2  Plaintiffs.  We offered them everything they ultimately -- they

3  then asked for in the sanctions motion that they filed.  That

4  motion never needed to be filed.  I understand why they filed

5  it, but we gave them everything they wanted.  And this hasn't

6  recurred, I should say.

7           THE COURT:  Well, I was going to ask --

8           MS. RING:  No.

9           THE COURT:  -- were there -- in any other 30(b)(6)

10  depositions, were there any other instructions not to answer?

11           MS. RING:  So I want to be pristine in what I say to

12  this Court.  I have not looked at every deposition transcript,

13  Your Honor, but what I can say is everyone knew; and I had not

14  heard of any other instance like this where we -- I am not

15  aware of any other situation where any lawyer directed a

16  witness not to answer a question that was out of scope.  And

17  there were many, many out-of-scope questions.

18           THE COURT:  Do you want to -- do you want to address

19  Jackie Chang's deposition?  I mean, this person seemed to be,

20  you know, heavily involved in the whole white-listing

21  discussion and deciding which apps should be white-listed apps

22  and all of that.  And then she just gets up there and says that

23  she can't remember anything about it.

24      And she -- you know, Mr. Loeser asks her -- I watched a

25  number of clips from that deposition as well.  And Mr. Loeser

1  asks her:  "Well, is this e-mail a good representation of what

2  you were thinking at the time?"

3       And she refuses -- she says, "I don't know what you mean

4  by good."

5       I mean, what -- what -- do you have any explanation for

6  that witness' conduct in that deposition other than sort of

7  obstructionist?

8          **MS. RING:**  I do, Your Honor.  I want to -- I guess

9  there are a couple of -- again, context.  Plaintiffs' brief

10 make it sound like they deposed Simon Cross and then asked him

11 about an e-mail that Jackie Chang.

12         **THE COURT:**  I know they deposed Cross after Chang.  I

13 understand that.

14         **MS. RING:**  Correct.  And Chang was a fact witness, not

15 a 30(b)(6) witness.

16         **THE COURT:**  I understand.

17         **MS. RING:**  And that was ten years ago.

18         **THE COURT:**  Not that she was deposed.  It may feel

19 like ten years ago.

20         **MS. RING:**  Well, it does.

21         **THE COURT:**  She was talking about --

22         **MS. RING:**  She was talking about --

23         **THE COURT:**  -- 2013; right?

24         **MS. RING:**  Correct, she was talking about something

25 that happened nearly ten years ago; and my understanding is she

1    wasn't heavily involved.

2         So at Meta -- at Facebook, people move around.  They do

3    different things at the company.

4         And I don't think she was heavily involved in

5    white-listing.  She was involved in white-listing.  There was

6    this e-mail.  They asked Simon Cross about it.  He wasn't

7    familiar with what it meant, what she was talking about.

8         And then when she was asked about it again, all I can say

9    is it was nearly ten years ago.  People have a lot of different

10   roles at the company over time, and I'm not -- I'm not shocked

11   that she wouldn't remember that.  That's a long time ago.

12            THE COURT:  But she -- she -- I mean, she almost came

13   off as maybe worried that she was going to be -- she, herself,

14   would be in trouble if she answered questions about that.  I

15   mean, it was -- it was remarkable how uncooperative she was;

16   don't you think?

17            MS. RING:  I don't think -- I would not use --

18            THE COURT:  Even if it's true that she didn't remember

19   anything about this thing that she was doing -- that seems like

20   kind of a significant thing that she would remember something

21   about -- even if it's true that she didn't remember anything

22   about it, don't you think she might have been a little more

23   cooperative in -- you know, the way she was answering

24   Mr. Loeser's questions?

25            MS. RING:  Your Honor, you characterize it as

1    cooperative or uncooperative, rather.

2         I think -- all I can say is -- these are people.  They get

3    nervous.  This is not a normal setting for them.  They are not

4    used to being deposed.

5         And if -- you know, and when you look at those clips and

6    you are asking yourself, what are the options --

7                   **THE COURT:**  Can I interrupt you for just a second?

8                   **MS. RING:**  Please, yes.

9                   **THE COURT:**  The person in the front row who is just

10   constantly making facial expressions and shaking their head and

11   nodding their head, it is very distracting.  I'm having a hard

12   time paying attention to what Ms. Ring is saying.  Thank you.

13                        (Pause in proceedings.)

14                   **MS. RING:**  I guess, what -- the point I was

15   addressing -- and I want to go back to this point also -- but I

16   think to say, you know, she is become uncooperative, again,

17   it's just -- I think for lack of a better term, sometimes

18   witnesses are scared in this situation.  They are not used to

19   it.  They are not used to being -- and I will note -- and I'm

20   sure you noticed it; right.  I hope you noticed it because I

21   thought it was quite strange -- sometimes there is a practice

22   of asking these witnesses to say "Explain to the Court XYZ."

23   It's scary.  It's scary to someone who is not a lawyer, and

24   they are not quite sure how to handle that.

25         I have never seen that actually in deposition practice.  I

```
1   don't do that, but I think that with Jackie Chang, she didn't

2   remember; and I don't think she was trying to be uncooperative.

3   I think she just didn't remember.  It wasn't something

4   significant to her, and I think it scared her to not be able to

5   answer when she was being questioned so aggressively about it.

6        THE COURT:  It didn't seem that aggressive that she

7   was being --

8        MS. RING:  Well, you are not in the hot seat.

9        THE COURT:  But I watched.  I did watch.  It didn't

10  seem that aggressive to me.

11       MS. RING:  Yeah.

12       THE COURT:  Okay.  Anything else you want to say about

13  the depositions?

14       MS. RING:  Um, well, I guess, I would -- did you --

15  you ordered a lot of transcripts and a lot of videos.  Did you

16  watch more than just the Hendrix deposition?

17       THE COURT:  What I have reviewed so far is portions --

18  in terms of watching?

19       MS. RING:  Yeah, or reading.

20       THE COURT:  Portions of the Hendrix and Chang

21  deposition, that's what I focused on so far.

22       MS. RING:  I guess, Your Honor --

23       THE COURT:  Those two -- those seem to be the primary

24  things that the Plaintiffs complain about as far as I can tell.

25       MS. RING:  The Chang deposition and the -- look, I
```

 1   would say, look, as you know, Plaintiffs didn't move for

 2   sanctions on the 30(b)(6) depositions.  So, you know, if we get

 3   there, there will be more --

 4        **THE COURT:**  But they are relevant to -- I mean, as I

 5   try to keep saying, we are looking at the totality of Facebook

 6   and Gibson Dunn's conduct throughout this litigation to try to

 7   determine whether it was in bad faith; right.

 8        **MS. RING:**  Well, to make that determination, then you

 9   have to have context; and what they have given you is kind of

10   the vignette, an overview, of some issues with the 30(b)(6)

11   depositions and I think an unfair one.

12      You know, this was -- we couldn't disagree more about why

13   the parties were not able to meet and confer about these

14   30(b)(6) topics.

15      I was personally involved in that, and we were given the

16   choice of take it or leave it or bring it to you.  And after

17   February, we were not going to do that, so we did the best we

18   could, which was pretty good; excellent, I would say.

19      I mean, I have done a lot of 30(b)(6) depositions, a lot

20   of prep.  There were ten topics and 27 subtopics, every data

21   practice in this company for 15 years.  We didn't even know

22   where to start.  We had to put a big team together.  We

23   identified 14 witnesses.

24      Normally, Your Honor, as I'm sure you know, you try to

25   identify the fewest possible witnesses.  We identified 14.  I

1   have never done that in my career.

2        And the amount of time that went into preparing them --

3   and Ms. Weaver refers to the detailed letters they sent to us

4   in advance of the depositions, that was on our initiation

5   because we couldn't have a productive meet-and-confer in

6   advance.

7        And so at the suggestion of the Special Master to try to

8   help us, he suggested that we send letters to Plaintiffs in

9   advance of the depositions to say, look, this is how we

10  understand the topic.  And that is what we did.

11       We started that practice right after the Hendrix

12  deposition because it was so difficult, and we had to have some

13  basis.  In a 30(b)(6) we have an obligation to prepare those

14  witnesses.  That is true.  But they have an obligation in

15  writing that notice to be particularized and they weren't.

16       And so we did the best we could.  And in that situation

17  when in a 30(b)(6) deposition you don't get all the answers you

18  think you are entitled to, what you do -- what you should do is

19  try to work it out between the parties or move to compel

20  further testimony.

21       They never did that because when they felt that our

22  witnesses couldn't answer all of their questions, even where we

23  felt the questions were unreasonable, which they were, many of

24  them, we still agreed to more time, to more witnesses.

25       We just -- written answers, which again, I have never done

quadrupled the number of rogs.  I mean, they are basically

rogs.

     So I just think if this is not sufficient to prepare a

30(b)(6) witnesses, I don't know what is.  And it makes me very

nervous in terms of -- I know you are concerned about sending

messages and, you know, deterrence; but if this is not

sufficient to prepare a 30(b)(6) witness in dealing with the

notice that we got, I honestly don't know what is.  If you can

be sanctioned for that, I don't know what to do.

          THE COURT:  Okay.  Any -- do you want to briefly

respond or --

          MS. WEAVER:  Yes, I would.

          THE COURT:  -- are we good?

          MS. WEAVER:  Very briefly, Your Honor.  Part of what

was happening here with the scope of the topics is consistent

with the theme of Facebook reframing our case and reinforcing a

false narrative about what they decided our case is about and

what discovery they decided they would give us.

     So, in the Amy Lee financial deposition, we identified --

we wanted that deponent to talk about the programs where

Facebook pays users for their data because that's a market

price that our damages experts can rely on.

     We came into the deposition.  It was clearly in the

e-mails.  We had exchanges.  We came in.  She just was like

"I'm not prepared to testify on that."

1        Second deposition, same thing.  She is not prepared to

2   testify.  Same example, Mr. Clark's deposition, he -- it's not

3   all in the record, but it's in the transcript.  I was asking

4   him about a specific document.  There was a hyperlinked

5   document.  He said, "I would need to see that to be able to

6   answer this question."

7        So in the deposition we pick up that document and give it

8   to him and that document refers to personal information.  A

9   later deponent says "Mike Clark is the guy who enforces whether

10  or not third parties access users' personal information."

11  Squarely within the case.  And this was May 18th.  The Hendrix

12  deposition was on May 5th.

13       So you were asked if there were directions not to answer

14  because out of scope, there was a direction not to answer or

15  define what personal information is because it was calling for

16  a legal conclusion.

17       Although the witness was repeatedly told "we just need to

18  know what your understanding of personal information is so that

19  we can understand how Facebook is policing whether or not third

20  parties are accessing their third-party information," he did

21  not provide a definition for that.

22       And a similar conversation happened with Ms. Leone -- this

23  is all page 20 of our supplemental brief.  So you are right,

24  Your Honor, we didn't move for sanctions because these

25  depositions were ongoing; but we do think the artful

1   preparation of witnesses on topics that suit Facebook's

2   litigation posture but the artful omission of preparing them on

3   the topics, which we have been seeking to discover which

4   included Mr. Cross' re-examination on topics Ms. Chang was not

5   knowledgeable about, was also a tactic that then caused us to

6   have to then depose Mr. Cross for 21 hours.

7       So that -- in our view it is consistent.

8           **THE COURT:**  Is it right that there were no other

9   30(b)(6) depositions where lawyers instructed witnesses to --

10  not to answer questions except on privilege?

11          **MS. WEAVER:**  Except on privilege.  That is true.  That

12  is true.

13          **THE COURT:**  Okay.  Okay.

14              (Pause in proceedings.)

15      **MR. KO:**  Your Honor, I just want to make sure to

16  answer your question about the citation.

17          **THE COURT:**  Yeah.

18      **MR. KO:**  I want to give you two citations because

19  there are, you know, in my practice the standard beginning

20  instructions and guidelines of the deposition.

21      And so at the beginning I give those instructions about --

22  I give what I view are the rules as to on what basis the

23  witness should not answer, but I think to answer your question

24  most specifically about when the Special Master Garrie got

25  involved and what Plaintiffs' position was, that citation would

1  be at 202, 3 through 11.  And that exchange is actually in

2  response to Special Master Garrie's invitation to me to

3  represent what our position was.  So that's the citation.

4          **THE COURT:**  Okay.  All right.

5          **MS. RING:**  If I may, the Mike Clark deposition,

6  Your Honor, the personal information -- Mike Clark is part of

7  the privacy program, and Counsel Weaver took that deposition

8  and asked him -- that document was referring to the meaning of

9  PII, Personal Identifiable Information, under the CCPA.  That

10  is a legal conclusion, and he was trying to explain -- and if

11  you haven't watched that one, you should.

12          **THE COURT:**  Okay.

13          **MS. RING:**  He was very nervous.  He kept saying "what

14  I know is from the lawyers," which makes sense because that's a

15  term that is used in the CCPA.  That's part of his job.

16      And after asking him nine times under the CCPA, then said

17  "Well, what do you think it is?"  And he said, I think very

18  reasonably, "Well, what I know is based on what the lawyers

19  have told me."  And that is attorney-client communication.

20      And after asking several more times -- and he was visibly

21  flustered at the end of it -- Counsel said "sanctionable" and

22  moved on.

23      And I think that is a very accurate view of what it's been

24  like since February and that -- that is not fair to the

25  witnesses either.  So, the Mike Clark deposition is an example.

1    He answered every topic on that list, and he tried his very

2    hardest.  He was very well prepared for that deposition.  There

3    was a miscommunication -- a miscommunication -- but those

4    topics all went to deletion, and that's his area and that's

5    what he was prepared to discuss.

6        When that miscommunication was identified -- again,

7    because we were unable to have the kind of conversations that

8    we ought to have been able to have -- we then put up a

9    different witness, a new person, to address the additional

10   questions that Plaintiffs had.  I don't know what else we could

11   do.

12       **THE COURT:**  Okay.  What I would like to do is get

13   letter briefs from you maybe in seven days -- they don't need

14   to be long -- but discussing the questions that we discussed at

15   the outset of the hearing.

16       You know, number one is, you know, what is the point of

17   awarding attorneys' fees as compensation to Plaintiffs' Counsel

18   if they would already be getting their fees as part of a class

19   action settlement?  And, you know, the issue -- all of those --

20   all of the issues surrounding that question that we discussed

21   at the outset.

22       And then I guess the second question is:  If I wish to

23   consider imposing punitive sanctions on Facebook and Gibson

24   Dunn, should -- what should the -- what should the process be?

25                   (Pause in proceedings.)

 1          **THE COURT:**  And for Facebook, part of that question --

 2   Facebook and Gibson Dunn, part of that question is, you know,

 3   do you -- you would obviously have certain rights to certain

 4   procedures and do you want to invoke those rights or do you

 5   prefer to have some different procedure?

 6                         (Pause in proceedings.)

 7          **THE COURT:**  So if you can both file letter briefs

 8   seven days from today addressing those two questions, that

 9   would be helpful.

10      Any final comment -- anybody feel the need to make a final

11   comment or have you said your piece?

12          **MR. LOESER:**  Your Honor, I have -- very quickly.  If

13   you are searching for other transcripts and you -- that are

14   characteristic of some of the problems, the Cross transcript

15   which was a long, long deposition, I think does illustrate a

16   lot of the problems that we faced.

17      There are some citations.  The last part of the

18   transcript, there is a redirect and a cross that I think is

19   indicative of kind of how -- the difficulty with having

20   witnesses testify about documents and whether they actually

21   made any effort to understand the documents.

22      I guess the last thing I would say is none of this is

23   easy.  This is not how most cases end.  We are in the midst of

24   these settlement efforts and negotiations and agreement, but

25   this has been a deeply troubling case; and so we are trying to

1  both complete the process of resolving this case, which I think

2  Your Honor would be pleased to see how that unfolds, but also

3  deal with this -- with misconduct which had a real impact.

4      Ms. Ring talks about people.  Well, you know, there is a

5  lot of people involved; and this was a deeply challenging

6  experience.

7      I did come across one case that I thought had a -- kind of

8  a pithy saying that made a lot of sense, and that is *US v. York*

9  from the Seventh Circuit, 933 F.2d 1343.  It is a criminal case

10  but basically the court says:  If you win the lottery once, you

11  are envied.  If you win it twice, you are investigated.

12      And the idea -- the point is if something improbable keeps

13  happening, it is by design.  And I think Your Honor has seen

14  enough of the record to see that what happened here had to have

15  been by design.

16      I mean, it couldn't have been this hard and taken this

17  long to deal with these issues if someone didn't want it to be

18  that way.

19      So with that, I thank the Court for this.  I know this is

20  not fun for the Court either.  And, you know, I think we are

21  where we are, and hopefully next time we see you we will

22  have --

23          **THE COURT:**  Better news?

24          **MR. LOESER:**  Better news, yes.

25          **THE COURT:**  Okay.  Ms. Ring, any final comment?

1          **MS. RING:**  By design.  I have been practicing for 20

2     years.  I have never once been accused of anything like this,

3     and it is a daily occurrence on this case.

4          And the Plaintiffs, I think -- you know, I'm going to

5     continue -- I have to resist the urge of finger pointing, but

6     it is at a level now that I really have never seen and it is a

7     miserable experience.

8          And I know that it is very easy to attribute and to use

9     these words like "false narrative" and "by design" and

10    "tactics" and "strategy" about a big company and about a big

11    law firm.

12         And I have tried to make this, you know, about the people

13    who are engaged in this process, and I do recognize that there

14    are people on the Plaintiffs' side; but I don't think we get

15    the same courtesy.

16         But there are people on our side, and I think those people

17    were trying to deal with a very, very complex set of facts,

18    very difficult legal issues.  And there is no question that

19    discovery -- it took longer than it should.

20         And again, as I have said, in retrospect, would we take a

21    different approach?  Would we just give in on many of these

22    points?  Maybe.  But it doesn't make any of them wrong or in

23    bad faith at the time we took them.

24         And I look at these decisions now, and I wouldn't say this

25    to you -- I wouldn't say this to you for any client or any

firm.  I do not believe that these positions were taken in bad
faith, and they were not taken by design.

    And when you see heads shaking, it is hard to listen to
that.  It has been hard for me to listen to these accusations
when I'm just trying to have a conversation about something
that I legitimately don't understand or am trying to work
through and immediately I'm accused of bad faith and being a
liar.  It is very hard to put up with that.

    And, Your Honor -- but we have, and I do look forward to
the next time we are in front of you being -- it being
something positive.  But I have to say, I do not see anything
sanctionable about the conduct of this case.

    It has been very difficult for everyone, but I do think
that everyone working on this -- Facebook and Gibson Dunn
worked very hard to -- to move this case forward, and this
false narrative works both ways.  And I again encountered this
myself.  Plaintiffs had a very -- certain ideas about how
Facebook operates and what Facebook is.

    And they are wrong in a lot of them.  Maybe they are right
in some, but they are wrong on a lot of them.  And that led to
a lot of difficulty in wanting to information about X because,
of course, you have X; but we don't have X because that's not
what we do.

    And so the false narrative works both ways, and it's
really caused a problem in this case.  It has really made it

1   impossible to have the kind of conversations that I have all
2   the time -- and I have a lot of tech clients -- but you have to
3   be open to having those conversations.  You can't just come
4   into it and insist and demand that it is the way you think it
5   is.  You have to be open to hearing how it actually is even if
6   you don't like it.
7          So anyway, Your Honor, I hope -- I really hope that you
8   will -- and I think you have but I'm sure you will continue to
9   think about this, but this was a situation involving a very
10  difficult set of issues, very complex.
11         It has taken seven months before the Special Master to
12  work through the named Plaintiff data; very complicated facts.
13  And I think all playing out in the early part especially during
14  the pandemic, which everyone recognized at the time and
15  commented about on the record, but is very easy to forget now
16  very easy; but that's the reality of the situation.
17         And I think that there was -- there were good intentions,
18  and I'm even willing to say again, I'm tired of these absolutes
19  and extremes.  I just can't engage in it anymore and pointing
20  fingers.  I think everyone made mistakes here.  Everyone did.
21         And so but in any event, you know, we got through it.  And
22  again, I hope the next time we see you it will be with good
23  news.
24              **THE COURT:**  Okay.  Thank you very much.  I will look
25  forward to receiving your briefs in a week.

```
 1            MR. LOESER:  Thank you, Your Honor.  I'm sorry.  I
 2    just wanted to ask a question about the briefing, the first
 3    question.  As I understand it, what's -- the sort of subsidiary
 4    things you are trying to get at, at that question is:  Number
 5    one, would such attorneys' fees really be compensatory?
 6         And second, if they are not, would they, therefore, be
 7    punitive?  Is that really sort of the concerns you are getting
 8    at there?
 9            THE COURT:  I think that's -- I think that's a good
10    way to put it.
11            MR. LOESER:  Okay.
12            THE COURT:  And within that is the question we
13    discussed earlier about well, would it be okay if it ended up
14    being the case that it would be a wash for the attorneys but
15    the Plaintiff -- the class members would end up getting more
16    money as a result?
17            MR. LOESER:  Got it.
18            THE COURT:  In other words, a larger share --
19            MR. LOESER:  Right.
20            THE COURT:  -- of the total settlement amount.
21            MR. LOESER:  How does that dynamic work into the
22    question, basically affect the question.
23            THE COURT:  Yeah, or would that be a permissible.
24            MR. LOESER:  I see.
25            THE COURT:  -- result of the sanctions order.
```

1          **MR. LOESER:**  Thank you, Your Honor.

2       **THE COURT:**  Thank you.

3       **MS. RING:**  Thank you, Your Honor.

4       **THE CLERK:**  Court is adjourned.

5              (Proceedings adjourned at 12:36 p.m.)

6                      ---oOo---

1

2                          **CERTIFICATE OF REPORTER**

3           I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the official

5    electronic sound recording provided to me by the U.S. District

6    Court, Northern District of California, of the proceedings

7    taken on the date and time previously stated in the

8    above-entitled matter.

9           I further certify that I am neither counsel for, related

10   to, nor employed by any of the parties to the action in which

11   this proceeding was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15   DATE:   Friday, September 16, 2022

16

17

18

19   _____

20           Marla F. Knox, RPR, CRR, RMR
             United States Court Reporter

21

22

23

24

25