Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

Additional counsel listed on signature page

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **JOINT DECLARATION OF DEREK W. LOESER AND LESLEY E. WEAVER REGARDING FEES AND COSTS INCURRED DUE TO SANCTIONABLE MISCONDUCT**<br><br>Judge: Hon. Vince Chhabra<br>Courtroom: 4, 17th Floor |

I, Derek W. Loeser, and I, Lesley E. Weaver, declare and state as follows:

1. Derek W. Loeser is a partner at the law firm of Keller Rohrback L.L.P. and Lesley E. Weaver is a partner at the law firm of Bleichmar Fonti & Auld LLP. We are Co-Lead Counsel for Plaintiffs in the above-captioned matter.

2. We have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

3. This declaration submits testimony and evidence to support the costs and attorney fees sought as sanctions in response to the Court's request. ECF No. 1073. Where testimony or evidence is submitted by only one of the above declarants, this declaration so states.

## I. COLLECTING, REVIEWING, AND SELECTING THE BILLING RECORDS

4. The billing records that support the fees sought are maintained in the ordinary course of each firm's business and were maintained contemporaneously by each attorney and staff member working on the case. The Exhibits attached to this declaration that contain relevant billing records are being submitted for *in camera* review and will be served on Facebook's counsel subject to counsel's agreement that such service will not waive work-product or any other privileges.

5. The records submitted represent only a portion of the time Plaintiffs spent on discovery related to ADI and the Named Plaintiffs' data, and a small fraction of Plaintiffs' total time on this case. Conscious of the but-for standard of *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017), Plaintiffs have been careful to submit only that time that they are confident was caused specifically by the misconduct associated with the ADI and the Named Plaintiffs' data, rather than from discovery more generally or from delays that were not associated solely with the relevant discovery misconduct.

6. Keller Rohrback and Bleichmar Fonti & Auld previously collected time records that were the basis for the total amount of attorneys' fees they sought for misconduct related to ADI and Named Plaintiffs' Data in Plaintiffs' initial motion for sanctions, filed March 14, 2022. ECF No. 1050-1. However, there are slight discrepancies between the relevant fees sought in

Plaintiffs' initial motion and some of the fees sought here for the period covered by the initial motion. Those discrepancies are because Plaintiffs are seeking fees for a more limited set of timekeepers and because those timekeepers re-reviewed their time records in support of this submission.

7. Plaintiffs decided to exclude from consideration all billing records from non-attorney timekeepers. Most of the time that non-attorney timekeepers spent on discovery related to the ADI or the Named Plaintiffs' data was not spent on tasks related to the discovery dispute itself. Non-attorney professionals, instead, were largely tasked with reviewing documents or other assignments that Plaintiffs would have had to do even if Facebook had not engaged in misconduct.[1] While the blanket exclusion of non-attorney time likely excluded some compensable time at the margins, it also greatly simplified the process of gathering and reviewing time. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.").

8. If, at any point during the review of the billing records, it was determined that an entry was duplicative, that entry was eliminated or reduced through the exercise of billing discretion. In reviewing Plaintiffs' billing records, at first glance, there may appear to be duplicative entries submitted for ADI and Named Plaintiffs' data; however, the compensation sought is not duplicative. Rather, because in many instances attorneys performed tasks in furtherance of more than one subject matter (e.g., preparing for or attending a mediation session at which both ADI and Named Plaintiff data were negotiated), time was carefully apportioned by the relevant timekeeper to each subject matter so as not to seek duplicative compensation for any given task.

9. Plaintiffs used the following processes to collect and review billing records from the attorneys whose time was considered.

---

[1] Plaintiffs have not sought compensation for reviewing ADI and Named Plaintiff documents produced by Facebook.

J. DECL. RE. FEES AND COSTS
INCURRED DUE TO MISCONDUCT

2

MDL NO. 2843
CASE NO. 18-MD-02843-VC

A.  **Fees due to misconduct associated with the ADI or the Named Plaintiffs' data**

10. First, attorneys working at our direction collected all billing records from the periods of time during which additional work was necessitated by sanctionable misconduct arising from the two relevant discovery disputes. (In what follows, this declaration will generally refer to that work as "compensable work.")

11. Next, the attorneys reviewed the collected billing records and provisionally put each billing record into four categories: (1) fully compensable work; (2) non-compensable work; (3) partially compensable work; and (4) unsure.

12. Billing records falling into the second category were excluded from further review.

13. Billing records falling into categories three and four were further reviewed by the attorney or professional that had created them.

14. For a billing record in category three (partially compensable work), the attorney was asked to make a good-faith assessment of what portion of the billed time—if any—was devoted to compensable work. They were encouraged to consult past emails or other documents if doing so would be helpful to making such an assessment.

15. For a billing record in category four ("unsure"), the attorney was asked to determine whether the billing record captured any compensable work. If so, the attorney was to assess what portion of the billed time was devoted to compensable work.

16. Plaintiffs have also ensured that the descriptions of work in the billing records being submitted are sufficiently descriptive for purposes of the Court's review.

17. Once the billing records had been collected and reviewed, the records that remained were reviewed once again as a whole.

B.  **Fees incurred in the process of seeking sanctions**

18. A similar process of review was used to select billing records showing the fees that Plaintiffs incurred in the process of seeking sanctions.

19. A billing record was excluded if it clearly indicated that it recorded time spent seeking sanctions for misconduct *other than* the misconduct associated with the ADI and the Named Plaintiffs' data.

20. Plaintiffs then gathered the other billing records that recorded fees incurred in the process of seeking sanctions. After totaling these records, they applied an across-the-board reduction of 40% to the associated fees. This is explained in more detail below. *See infra* Part V.

## II. RELEVANT ATTORNEYS AND RATES

21. The ADI and the Named Plaintiffs' data discovery sought by Plaintiffs was crucial to the case. The ADI concerned third-party misuse of Facebook user content nd information, and was an investigation launched because of the Cambridge Analytica scandal. Named Plaintiff data is likewise central to the claims at issue in this case. In order to understand the nature and extent of the improper sharing of Facebook content and information, it was necessary to understand the nature and extent of Facebook user content and information that was selected by Facebook. Both of these categories of discovery were fact-intensive, and often highly technical. Moreover, Facebook vigorously resisted the discovery concerning both of these topics through means and methods that caused considerable delay and a needless increase of work and expense. Consequently, litigating the disputes has required the work of a large team of attorneys, professionals and staff from both Keller Rohrback and Bleichmar Fonti & Auld.

22. Profiles of the relevant Keller Rohrback and Bleichmar Fonti & Auld attorneys are attached hereto as, respectively, Exhibits 1 and 2. These profiles are taken from Keller Rohrback's and Bleichmar Fonti & Auld's resumes.

### A. Keller Rohrback

23. This section of the declaration is submitted by Derek W. Loeser.

24. Keller Rohrback L.L.P. has over 60 attorneys in six cities and its Complex Litigation practice group has spent nearly 30 years fighting corporate abuse and pursuing litigation on behalf of consumers, whistleblowers, government entities, small businesses, institutional investors, and employees in many of the major class action cases litigated in the

United States. The firm prides itself on serving the public interest by taking on cases that make a tangible difference in our communities. To date, Keller Rohrback has recovered over $23.5 billion for the individual, institutional and governmental plaintiffs the firm represents.

25. Keller Rohrback attorneys have, in recent years, been appointed to leadership roles in numerous high-profile cases, including *In re National Opiate Litigation*, MDL 2804, an important MDL seeking to hold opioid manufacturers and distributors accountable for devastating communities across the country; *In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, MDL 2913 (N.D. Cal.), another case with important public health implications relating to the marketing of Juul e-cigarette products; *Jabbari v. Wells Fargo*, No. 15-02159 (N.D. Cal.), the Wells Fargo unauthorized account consumer class action; *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litigation*, MDL No. 2785 (D. Kan.), the MDL concerning EpiPen price-gouging allegations; *In Re: Blackbaud, Inc., Customer Data Breach Litigation*, MDL 2972 (D.S.C.), the MDL regarding Blackbaud's massive data breach; and *In re: T-Mobile Customer Data Security Breach Litigation*, MDL 3019 (W.D. Mo.), the MDL regarding T-Mobile's massive data breach.

26. The Keller Rohrback attorneys and legal professionals for whose work compensation is sought are:

    A.    Derek W. Loeser, a partner with over 28 years of professional experience whose current hourly rate is $1,100;

    B.    Cari Campen Laufenberg, a partner with over 19 years of professional experience whose current hourly rate is $1,010;

    C.    David Ko, a partner with over 15 years of professional experience whose currently hourly rate is $815;

    D.    Benjamin Gould, a partner with over 15 years of professional experience whose current hourly rate is $815;

    E.    Christopher Springer, an associate attorney with over 7 years of professional experience whose current hourly rate is $650;

F.  Adele A. Daniel, an associate attorney with approximately five years of professional experience whose current hourly rate is $585;

G.  Emma Wright, an associate attorney with approximately two years of professional experience whose current hourly rate is $550.

27.  Keller Rohrback's hourly rates are reviewed and adjusted annually. Based on our regular monitoring of prevailing market rates charged by attorneys of comparable skill, experience, and qualifications in the San Francisco Bay Area and other major metropolitan areas, we adjust our rates so that they are in line with those charged by counsel preforming similar national class action work. Our rates are substantially lower than a number of firms, but consistent with many others.

28.  Fee awards supported by Keller Rohrback's hourly rates and corresponding lodestar have regularly been approved in class action settlements. Recent examples include *Ryder et al. v. Wells Fargo Bank, N.A.*, Case No. 1:19-cv-638, Docket No. 57 (S.D. Ohio Jan. 25, 2022); *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, MDL No. 2785, Docket. No. 2506 (D. Kan. Nov. 17, 2021); *Fox et al. v. Iowa Health System*, Case No. 3:18-cv-00327, Docket No. 115 (W.D. Wis. Mar. 4, 2021); *In re Chrysler-Dodge-Jeep "EcoDiesel" Marketing, Sales, Practices, & Products Liability Litig.*, MDL No. 2777, Docket No. 561 (N.D. Cal. May 3, 2019); and four separate settlements in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litig.*, MDL No. 2672 (N.D. Cal.): Audi C02 Cases, MDL 2672, Docket No. 7244 (Mar. 2, 2020); 3.0-liter TDI Settlement, 2017 WL 3175924 (July 21, 2017); Bosch Settlement, 2017 WL 2178787 (May 17, 2017); and 2.0-liter TDI Settlement, 2017 WL 1047834 (Mar. 17, 2017).

**B.  Bleichmar Fonti & Auld**

29.  This section of the declaration is submitted by Lesley E. Weaver.

30.  Bleichmar Fonti & Auld LLP has over 25 attorneys based out of offices in four cities. It has recovered more than $17 billion for investors and consumers since the firm was

formed in 2014. Its achievements have been profiled in publications including the Wall Street Journal and the New York Times.

31. Bleichmar Fonti & Auld attorneys have, in recent years, been selected for leadership roles in numerous high-profile cases, including groundbreaking data privacy cases in addition to this one, including *Calhoun v. Google LLC*, No. 20-cv-05146 (N.D. Cal.), a nationwide class action alleging that Google collects users' data when using the Chrome browser outside of synched mode, and *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-02155 (N.D. Cal.), a nationwide class action alleging that's Google's digital ad auction system violates the company's contractual promise not to share or sell its account holders' personal information; consumer class actions including *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability*, No. 17-md-02777 (N.D. Cal.), multidistrict litigation concerning Fiat Chrysler Automobiles' alleged cheating on emissions testing of Dodge and Jeep trucks marketed as environmentally friendly; and numerous securities fraud cases, including *The Police Retirement System of St. Louis v. Granite Construction Inc.*, No. 19-cv-04744 (N.D. Cal.), *In re Teva Securities Litigation*, No. 17-cv-00558 (D. Conn.), and *Owen v. Elastos Foundation*, No. 19-cv-5462 (S.D.N.Y.).

32. The BFA attorneys and legal professionals for whose work compensation is sought are:

  A. Lesley E. Weaver, a partner at BFA with more than 25 years of professional experience whose currently hourly rate is $1,050;

  B. Anne Davis, a partner at BFA with more than 14 years of professional experience whose current hourly rate is $800;

  C. Matthew Melamed, a partner at BFA with more than 14 years of professional experience whose current hourly rate is $800;

  D. Matthew Montgomery, formerly of counsel at BFA with more than 27 years of professional experience whose hourly rate is $740;

E. Angelica Ornelas, an associate at BFA with more than 10 years of professional experience whose current hourly rate is $690;

F. Joshua Samra, an associate at BFA with more than 6 years of professional experience whose current hourly rate is $605; and

G. Sara Pildis Simnowitz, special counsel at BFA with more than 16 years of professional experience whose current hourly rate is $780.

33. Bleichmar Fonti & Auld's hourly rates are reviewed and adjusted annually. Based on our regular monitoring of prevailing market rates charged by attorneys of comparable skill, experience, and qualifications in the San Francisco Bay Area and other major metropolitan areas, we adjust our rates so that they are in line with those charged by counsel preforming similar national class action work. Our rates are substantially lower than a number of firms and consistent with many others.

34. Fee awards supported by Bleichmar Fonti & Auld's hourly rates and corresponding lodestar have been approved in numerous class action settlements: *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices & Products Liability*, No. 17-md-02777 (N.D. Cal.), ECF No. 561 (May 3, 2019); five separate settlements in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litig.*, MDL No. 2672 (N.D. Cal.)—Audi C02 Cases, MDL 2672, Docket No. 7244 (Mar. 2, 2020); 3.0-liter TDI Settlement, 2017 WL 3175924 (July 21, 2017); Bosch Settlement, 2017 WL 2178787 (May 17, 2017); 2.0-liter TDI Settlement, 2017 WL 1047834 (Mar. 17, 2017), and Porsche Gasoline Settlement, Docket No. 8088 (Nov. 9, 2022); *The Police Retirement System of St. Louis v. Granite Construction Inc.*, No. 19-cv-04744 (N.D. Cal.), ECF No.303 (Mar. 17, 2022); and *In re Teva Securities Litigation*, No. 17-cv-00558 (D. Conn.), ECF No. 963 (June 2, 2022).

### III. FEES CAUSED BY ADI-RELATED MISCONDUCT

35. Since Plaintiffs first served the request for production seeking ADI documents in November 2019, they have met and conferred with Facebook concerning the issue numerous times; filed a motion to compel in February 2021 and additional briefs related to the motion in

July and August 2021; engaged in several extended mediation sessions led by the discovery mediators in the attempt to resolve the dispute; and argued the issue before Judge Corley, Special Master Garrie, and Judge Corley again. Between them, Judge Corley and Special Master Garrie have issued six orders on the production of ADI documents. From September 2021, when Judge Corley issued her ADI order, through February 2, 2022, when the parties filed their last joint statement before the hearing during which the Court invited a sanctions motion, Facebook produced only 50 ADI documents.

36. On February 10, 2022, the court directed Facebook to produce all ADI-related documents within 21 days. Hr'g Tr. at 13 (Feb. 10, 2022). On March 10, Facebook told Plaintiffs it had completed the ADI production. During meet and confers in late March and early April, however, Facebook reversed course, informing Plaintiffs of previously undisclosed limitations on its ADI production.

37. Meanwhile, the Court again directed Facebook to produce all ADI-related documents, this time by April 27, 2022. See Hr'g Tr. at 7 (Mar. 30, 2020). By April 27, however, Facebook had completed production only of ADI documents from a limited subset of 26 custodians. *See* ECF No. 939 at 8 (Facebook conceding on June 3 that it had collected from only 26 "ADI custodians" and stating it would not complete production from "MDL custodians"— i.e., all 83 custodians—by June 15).

38. On June 9, 2022, based on Facebook's representation that ADI production would be completed by June 15, the Court set the June 15 as the new date by which Facebook was to complete ADI production. On July 17, Facebook informed Plaintiffs that it was going to produce more than 1,200 ADI documents previously withheld as privileged.

39. Plaintiffs litigated issues related to the ADI from the first discovery request in November 2019 through the summer of 2022. Substantial time and costs have been expended on that effort.

40. Plaintiffs seek reimbursement for certain work performed between April 7, 2021 to August 26, 2022, the date the Court granted in part the Parties' request to stay proceedings

while they finalize the settlement. ECF No. 1015. The misconduct that caused this work and the basis for this time period is set out in detail in Plaintiffs' prior papers and in the supplemental brief that this declaration accompanies.

41. True and correct copies of billing records showing fees incurred due to misconduct related to the ADI have been submitted for *in camera* review as Exhibit 3 (Bleichmar Fonti & Auld) and Exhibit 4 (Keller Rohrback). The total hours and fees shown by those exhibits are as follows:

| Total Hours | Total Fees |
|---|---|
| 518.2 | $435,803.00 |

### IV. FEES CAUSED BY MISCONDUCT RELATED TO THE NAMED PLAINTIFFS' DATA

42. Since Plaintiffs served the requests for production seeking the Named Plaintiffs' data in November 2019, they have met and conferred with Facebook concerning the issue dozens of times, filed a motion to compel in September 2020, conducted preliminary depositions pursuant to Rule 30(b)(6), engaged in numerous extended sessions led by the discovery mediators in the attempt resolve the dispute, filed another motion to compel in October 2021, argued the issue before Judge Corley in October 2020 and January 2022, submitted briefs to the Special Master, and participated in on-the-record hearings with the Special Master and Facebook employees. Between them, Judge Corley and Special Master Garrie issued more than a dozen orders related to the Named Plaintiffs' data, starting with Judge Corley's October 2020 order defining the scope of discoverable Named Plaintiffs' data, and the Special Master has conducted half- or full-day hearings with Facebook employees to determine where Facebook stores the Named Plaintiffs' data.

43. On October 29, 2020, Judge Corley issued an order holding that the "discoverable user data at issue" includes (1) Named Plaintiff data "collected from a user's on-platform activity"; (2) Named Plaintiff data "obtained from third parties regarding a user's off-platform activities"; and (3) Named Plaintiff data "inferred from a user's on or off-platform activity." ECF No. 557 at 2. Despite this order, and despite subsequent orders from Judge Corley and the

Special Master, Facebook continued to dispute the scope of Named Plaintiff data that was discoverable. ECF No. 1050-1 at 31-34; ECF No. 1050-2 at 14-18; ECF No. 1050-3 at 12-16.

44. Plaintiffs litigated issues related to the Named Plaintiff data from the first discovery request in November 2019 through August 26, 2022, the date the Court stayed proceedings so that the parties could finalize the settlement. ECF No. 1015 Substantial time and costs have been expended on that effort. Plaintiffs seek reimbursement for certain work performed between November 29, 2020 and August 26, 2022. The misconduct that caused this work and the basis for the selected time period is set out in detail in Plaintiffs' prior papers and in the supplemental brief that this declaration accompanies.

45. True and correct copies of billing records showing fees incurred due to misconduct related to the Named Plaintiffs' data have been submitted for *in camera* review as Exhibit 5 (Bleichmar Fonti & Auld) and Exhibit 6 (Keller Rohrback). The total hours and fees shown by those exhibits are as follows:

| Total Hours | Total Fees |
|---|---|
| 794.3 | $655,160.00 |

## V. FEES INCURRED IN SEEKING SANCTIONS

46. Seeking sanctions in this action was a massive undertaking. Plaintiffs had to review several years of complex litigation records that had produced a huge collection of filings, correspondence, discovery, and other documents. Plaintiffs conducted a painstaking review to ensure that the decisions that Plaintiffs made on the scope of a sanctions motion were as principled, thoughtful, serious, and well-informed as possible. For the same reasons, internal deliberations on the sanctions motion were, at every step of the process, extensive and in-depth and informed by thorough legal research. No decisions were made lightly.

47. Due to the sheer size of the litigation, some litigating attorneys had grown to know more about certain aspects of the litigation than others. Thus, the full team of attorneys were required to be part of the process of seeking sanctions.

48. The careful review of time entries and expenses was itself a time-consuming enterprise, especially given the duration and complexity of the litigation. Because that review was intimately tied to legal decisions about the scope of our sanctions motion, review of time and expenses was not something that could be fully delegated to non-attorneys.

49. Replying to Facebook's response to the sanctions motion was also time-consuming, requiring a further search of the record, further legal research, and further internal discussion.

50. After the filing of the initial sanctions motion in March, Plaintiffs learned additional facts that informed their reply in support of their motion (filed in late April) and their supplemental brief in support of their motion (filed in early August). These additional facts included facts related to Facebook's misconduct concerning the ADI and Named Plaintiffs' data. Properly incorporating these facts into the reply and supplemental brief required still more work.

51. Because the supplemental brief raised numerous issues that had arisen since March, it required considerable work and was not merely a re-run of the initial briefing.

52. Preparation for the September hearing on the sanctions motion required much time as well, especially given the months that had passed since the filing of the initial motion in March.

53. In Plaintiffs' view, sanctions for misconduct associated with the ADI and the Named Plaintiffs' data were the most important portions of their sanctions motion. These were two of the three issues that the Court specifically identified when it first raised the possibility that Plaintiffs should seek sanctions against Facebook and its counsel. Hr'g Tr. at 4-8 (Feb. 10, 2022). They were also, by far, the portions that required the most time and effort.

54. Of course, not all time expended in seeking sanctions was expending in seeking sanctions specifically for misconduct related to the ADI or the Named Plaintiffs' data. But billing records related to seeking sanctions almost uniformly did not distinguish between time seeking sanctions for different kinds of misconduct.

55. Plaintiffs therefore needed to determine what time was attributable to seeking sanctions for the relevant kinds of misconduct. After discussion of the costs and benefits of different approaches, Plaintiffs decided to make an across-the-board cut of 40% to all non-excluded billing entries associated with seeking sanctions. To reach that number, they looked at the portion of the argument in Plaintiffs' sanction briefs that was composed of argument related to the ADI and the Named Plaintiffs' data: out of 99 pages of argument, argument on the ADI and the Named Plaintiffs' data took up 55 pages, or slightly more than 60%. Plaintiffs believe that figure likely understates the amount of time that they devoted seeking sanctions for misconduct associated with the ADI and the Named Plaintiffs' data, since it does not take into account the vast record that had to be reviewed to produce the arguments related to the ADI and the Named Plaintiffs' data. It is a conservative approximation.

56. Plaintiffs also incurred fees in preparing this brief and the accompanying declaration. They have been careful not to seek fees for any work that duplicated what was already done in connection with the earlier sanctions briefing.

57. True and correct copies of the billing records gathered pursuant to the process outlined above in Section I.B are submitted for *in camera* review as Exhibit 7 (Bleichmar Fonti & Auld) and Exhibit 8 (Keller Rohrback).

58. The total fees in Exhibits 7 and 8 are $1,156,127.50; total hours are **1371.4**. Sixty percent of $**1,156,127.50**, the figure for total fees, is $**693,676.50**.

## VI. COSTS PAID TO JAMS

59. Keller Rohrback and Bleichmar Fonti & Auld have also incurred substantial costs in connection with payments made to JAMS for services provided by Judge Gail Andler as discovery mediator, and Daniel Garrie, both as a discovery mediator and a Special Master.

60. The parties agreed to retain the services of Judge Andler and Daniel Garrie in March 2021. The parties agreed to split the costs for Judge Andler and Mr. Garrie's services evenly. Plaintiffs' total share of JAMS expenses for their services as discovery mediators is $197,307.28.

61. The Court appointed Mr. Garrie as Special Master on July 20, 2021, and ordered that the parties split his costs evenly. ECF No. 709. Plaintiffs' total share of JAMS expenses for his service as Special Master is $1,172,704.96.

62. In view of the complexity and importance of the disputes over ADI and the Named Plaintiffs' data, Plaintiffs believe that without those disputes, Judge Corley would not have suggested, and the parties would not have obtained, the services of discovery mediators. Plaintiffs therefore believe that the misconduct associated with ADI and Named Plaintiffs data here is likely the primary cause of *all* the discovery-mediation expenses that Plaintiffs incurred. As an alternative, however, we have employed a more conservative methodology to select a subset of discovery-mediation expenses for reimbursement. That methodology is explained below.

63. It seems even less likely that Plaintiffs would have pushed for the appointment of a Special Master, and the Court appointed one, without the misconduct related to ADI and the Named Plaintiffs' data. For that reason, Plaintiffs submit that they are entitled under *Goodyear* to reimbursement of all of their Special Master expenses. Again, however, we have used an alternative, more conservative methodology (explained below) to select a subset of Special Master expenses for reimbursement.

**A. Process of reviewing and selecting JAMS expenses**

64. Since March 2021, JAMS has provided Keller Rohrback and Bleichmar Fonti & Auld with two sets of bills—one for services rendered by Judge Andler and Mr. Garrie as discovery mediators, and another for services rendered by Mr. Garrie as Special Master. In connection with his role as Special Master, and at the approval of both parties, Special Master Garrie also retained the services of a law clerk, Michael Mann.

65. While some of the invoice entries provided by JAMS specifically identify whether the task by Judge Andler, Mr. Garrie, and Mr. Mann involved a particular topic, many entries do not. Many of the entries also involved time incurred on more than one issue.

66. Where a JAMS entry indicated on its face, or where there was context showing, that it did not involve a compensable topic, such an entry was not included in the expenses for which reimbursement is sought through this supplemental submission.

67. Where a JAMS entry indicated on its face, or where there was context showing, that it solely involved a compensable topic, that entry was included in the expenses for which reimbursement is sought.

68. For the rest of the entries, Plaintiffs undertook a careful process of determining how much of the entry was a compensable expense.

69. As the first analytical step in that determination, Plaintiffs separated mediation-related expenses and special-master expenses.

### 1. Expenses for discovery mediation

70. For mediation-related expenses, certain chronological guideposts were used to exclude expenses from further review. In 2021, mediation of the ADI dispute could not have continued past June 2, *see* ECF No. 699, although it started up again in 2022. With respect to the Named Plaintiffs' data, the mediators declared an impasse on that issue (i.e., declared that further mediation would be fruitless) on October 6, 2021. There could not have been any mediation of that subject after that date, although our records indicate that mediation of the subject started up again after January 12, 2022, when Judge Corley affirmed Special Master Garrie on the proper scope of discovery into the Named Plaintiffs' data.

71. The remaining mediation expenses—i.e., those mediation expenses that were not chronologically excluded—were winnowed down in the following manner.

    A. During discovery mediation, the parties would suggest certain topics be covered at given mediation sessions. From these suggestions, the mediators would select an agenda for a mediation session. For mediation expenses from 2021, Plaintiffs consulted mediation agendas for mediation sessions, and other mediation submissions, to estimate how much of a given invoice entry involved a compensable topic.

J. DECL. RE. FEES AND COSTS
INCURRED DUE TO MISCONDUCT
15
MDL NO. 2843
CASE NO. 18-MD-02843-VC

B. Next, the parties had begun using a "mediation tracker" in January 2022 to keep track of progress (or lack thereof) on the discovery issues that were being mediated. Thus, when there was a mediation tracker available, Plaintiffs calculated the time spent on topics related to the sanctions motion by first looking to the parties' jointly submitted mediation tracker, which was submitted to the mediators weekly. A given mediation expense was divided by the total number of topics in the mediation tracker covering the date of that expense. That amount was then multiplied by the number of topics in the mediation tracker that were associated with the Named Plaintiffs' Data or the ADI. Although not every topic on the mediation tracker was addressed in every mediation, this method of calculation provided a conservative approximation of mediation expenses associated with Named Plaintiffs' Data or the ADI.

### 2. Expenses related to the Special Master

72. Some Special Master invoice entries stated on their face that they related to a compensable topic. Such entries were included in this submission in their entirety.

73. When an entry did not state on its face that it related only to a compensable topic, Plaintiffs typically assumed that the entry at most could be partially compensable. To categorically exclude some of these entries from further consideration, Plaintiffs used certain chronological guideposts. For the remaining entries, Plaintiffs carefully reviewed historical communications to and from, and the parties' submissions to, the Special Master. If the communications and submissions indicated that the entry likely related (at least in part) to a compensable topic, Plaintiffs included only a portion of the expense here. When an invoice entry referred expressly to several topics, one or more of which was compensable, the general approach was to prorate the expense accordingly.

### B. Reimbursement sought

74. For invoices Keller Rohrback and Bleichmar Fonti & Auld received and paid in connection with Judge Andler and Mr. Garrie's role as discovery mediators, Plaintiffs seek reimbursement of $30,678.52. These amounts represent a conservative estimate of fees for the

time Judge Andler and Mr. Garrie spent as discovery mediators on issues that were required to be mediated due to misconduct associated with the ADI or Named Plaintiffs' Data. This time includes reviewing the parties' mediation submissions and agendas, preparing for mediation sessions, attending mediation sessions, reviewing the parties' correspondence, and communicating directly with the parties.

75. For invoices Keller Rohrback and Bleichmar Fonti & Auld received and paid in connection with Mr. Garrie's role as Special Master, Plaintiffs seek reimbursement of $233,819.26. These amounts represent a conservative estimate of fees for the time Mr. Garrie and his law clerk Michael Mann spent resolving disputes created by misconduct associated with the ADI or Named Plaintiffs' data, as well as the Special Master's review of the briefing on sanctions. This time includes reviewing the parties' briefs and exhibits, preparing for hearings, conducting hearings, conducting research, drafting and issuing orders, and reviewing *in camera* documents.

76. To substantiate costs sought, Plaintiffs attach several exhibits. Attached hereto as Exhibit 9 are all the billing statements that Plaintiffs have received from JAMS. Attached hereto as Exhibit 10 is a spreadsheet showing the subset of Special Master expenses for which Plaintiffs seek reimbursement. Attached hereto as Exhibit 11 is a spreadsheet showing the subset of discovery mediation expenses for which Plaintiffs seek reimbursement.

77. The total amount JAMS expenses sought here is $264,497.78.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

Executed on November 18, 2022.

By: _____
      Derek W. Loeser

At: Seattle, Washington

By: _____
      Lesley E. Weaver

At: Oakland, California