# Defendant's Supplemental Exhibit 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
             UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA


IN RE:  FACEBOOK, INC.,       MDL No. 2843
CONSUMER USER PROFILE         Case No.
LITIGATION                    18-md-02843-VC-JSC
_____

This document relates to:
ALL ACTIONS


_____


    **HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**
       ZOOM DEPOSITION OF FACEBOOK'S 30(b)(6)
       CORPORATE REPRESENTATIVE - HARRISON FISK
 (Reported Remotely via Video & Web Videoconference)
      Menlo Park, California (Deponent's location)
                Tuesday, August 16, 2022
                       Volume 1


STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491
JOB NO. 5345585
PAGES 1 - 206
```

Page 1

```
 1        A.   Yes, I worked on TAO very extensively.         09:18:12

 2        Q.   It says that you prepared for about

 3   48 hours; is that right?

 4        A.   Yes.

 5        Q.   And 40 of those hours were with counsel,       09:18:26

 6   correct?

 7        A.   Yes.

 8        Q.   About how many times did you meet with

 9   counsel?

10        A.   I don't know the specific number.  Some        09:18:43

11   of them were in, like, larger blocks of time.  So

12   we would meet for four hours at a time.  I would --

13   if I had to make an estimate, I'd say probably

14   somewhere between a dozen or two dozen times.

15        Q.   Were those in person?                          09:19:02

16        A.   No.

17        Q.   Were those by video?

18        A.   Yes.

19        Q.   Do -- who did you meet with -- was it

20   counsel at Facebook?                                     09:19:17

21        A.   So there was typically a number of

22   different counsels.  So we had Heather, Martie, and

23   then our internal counsel, Ian, as well.

24        Q.   Okay.  And it says you spent eight hours

25   studying on your own; is that right?                     09:19:35
```

Page 17

| | | |
|---|---|---|
| 1 | A.  Correct. | 09:19:37 |
| 2 | Q.  What did you do to study on your own? | |
| 3 | A.  So this was primarily reviewing some of | |
| 4 | the documents, such as the white papers, since they | |
| 5 | were pretty extensive, understanding -- reading | 09:19:47 |
| 6 | through those, as well as reviewing some of the | |
| 7 | prior case submissions to understand what's been | |
| 8 | stated already. | |
| 9 | Q.  For those white papers identified by your | |
| 10 | counsel ahead of this deposition? | 09:20:10 |
| 11 | A.  They -- I believe these are the ones that | |
| 12 | were negotiated and discussed beforehand.  They did | |
| 13 | identify them to me, but I believe they came via | |
| 14 | negotiations with your couple as well. | |
| 15 | Q.  And then it says you met with -- and it | 09:20:29 |
| 16 | lists a couple people, and I'm going to ask you | |
| 17 | some questions. | |
| 18 | So first, it says you met with | |
| 19 | Dez Udezue; is that right? | |
| 20 | A.  Yes. | 09:20:43 |
| 21 | Q.  How long did you meet with him? | |
| 22 | A.  For 30 minutes. | |
| 23 | Q.  And what was that regarding? | |
| 24 | A.  So this was regarding the SRT system. | |
| 25 | Q.  And what specifically did you discuss | 09:20:54 |

Page 18

```
 1   about the SRT system?                                09:20:57

 2       A.   Primarily about how it pulls data.  How

 3   it's built to -- to confirm some of my beliefs.

 4       Q.   And what were your beliefs?

 5       A.   So the -- the -- places and the ways that   09:21:19

 6   it actually pulled data matched the -- the ways

 7   that I believed it would.

 8       Q.   Okay.  We -- we can discuss SRT in a

 9   little bit more detail later, and we'll revisit the

10   ways that it does pull data.                         09:21:37

11            So it says you met as well with

12   Maxwell Dickey.

13            What was that about?

14       A.   This is similar, but around Centra and

15   Switchboard.                                         09:21:50

16       Q.   And was that for 30 minutes?

17       A.   Yes.

18       Q.   And it says you met with Adam Kramer; is

19   that right?

20       A.   Yes.                                        09:22:03

21       Q.   Was that regarding HQL?

22       A.   Yes.

23       Q.   And for 30 minutes?

24       A.   Yes.

25       Q.   And it says you met with Sara Galvin?      09:22:11
```

Page 19

Case 3:18-md-02843-VC   Document 1085-24   Filed 12/12/22   Page 6 of 7
HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         A.   Yes.                                       09:22:16

 2         Q.   Regarding Switchboard for 30 minutes,

 3   correct?

 4         A.   Correct.

 5         Q.   Is it fair to assume that all -- where it  09:22:23

 6   says Hive or TAO for Mayur Patel, that's what you

 7   discussed?

 8         A.   Yes.

 9         Q.   And that was for five hours?

10         A.   Yes.                                       09:22:36

11         Q.   For Zachary Prinzbach, you discussed

12   Centra, correct?

13         A.   Yes.

14         Q.   For 30 minutes?

15         A.   Yes.                                       09:22:51

16         Q.   I'm just going to assume that where it

17   says the subject after the name, that's -- that's

18   what you discussed for these people; is that fair?

19         A.   Yes.  Correct.

20         Q.   And in parentheses, the number is          09:23:09

21   reflecting how much time you discussed for?

22         A.   Yeah, the amount of hours.

23         Q.   Okay.  For Chaya Nayak, it says you

24   discussed research.

25              What -- what did you discuss about         09:23:25
```

Page 20

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | research? | 09:23:27 |
| 2 | A. This was about understanding how the | |
| 3 | research program works with regards to data. | |
| 4 | Q. Did you discuss how data can be pulled | |
| 5 | from Hive? | 09:23:54 |
| 6 | A. Yes. We discussed essentially the -- the | |
| 7 | flow of data and the requirements in order to be | |
| 8 | able to disclose it to research. | |
| 9 | Q. What are some of the requirements? | |
| 10 | A. One of the -- the primary ones is we do | 09:24:11 |
| 11 | not disclose any sort of user specific identifying | |
| 12 | data. We only disclose aggregated data that's also | |
| 13 | gone through various privacy enhancing techniques. | |
| 14 | Q. How do you make sure that those | |
| 15 | requirements are met? | 09:24:35 |
| 16 | A. So there's various audits as well as | |
| 17 | analysis done in order to ensure prior to any sort | |
| 18 | of disclosure. | |
| 19 | Q. Okay. This is another one we may return | |
| 20 | to later. | 09:24:51 |
| 21 | By Kyle Minshall, it says you discussed | |
| 22 | APIs; is that right? | |
| 23 | A. Correct. | |
| 24 | Q. What did you discuss about APIs? | |
| 25 | A. There was a question put forward | 09:25:06 |

Page 21