# Exhibit G to
# Special Master's Second Amended Order on Plaintiffs' Motion to Compel Additional Production of Quips, Tasks, and Groups

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*[Additional counsel listed on signature page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF SANCTIONS**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor<br>Hearing Date: September 2, 2022<br>Hearing Time: 10:00 a.m. |

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# <u>TABLE OF CONTENTS</u>

PAGE(S)

I.     INTRODUCTION ....................................................................................................1

II.    LEGAL STANDARDS ............................................................................................2

    A.    Non-monetary sanctions are available under Rule 37 and the inherent power........2

    B.    Several principles governing the imposition of sanctions are especially pertinent here..........................................................................................................................3

III.   SANCTIONS SHOULD BE IMPOSED FOR MISCONDUCT CONNECTED WITH ADI DOCUMENTS.................................................................................................5

    A.    January 2022–present: An inadequate search, tardy disclosure of that search, and continued delays in production. ...................................................................................5

    B.    Sanctions should be imposed. ..................................................................................7

        1.    Monetary sanctions .....................................................................................7

        2.    Nonmonetary sanctions................................................................................8

IV.   SANCTIONS SHOULD BE IMPOSED FOR MISCONDUCT CONNECTED WITH THE NAMED PLAINTIFFS' DATA ....................................................................12

    A.    June 2, 2022: Facebook discloses that it preserved data from 137 Hive tables due to their relevance to this litigation. ........................................................................12

    B.    June 2, 2022: Facebook discloses that it has 52 Switchboard snapshots for the Named Plaintiffs. .................................................................................................14

    C.    Sanctions should be imposed. ................................................................................16

        1.    Additional monetary sanctions. .................................................................16

        2.    Nonmonetary sanctions...............................................................................17

V.    AT AN APPROPRIATE TIME, SANCTIONS MAY NEED TO BE IMPOSED FOR UNPREPARED RULE 30(B)(6) DEPONENTS....................................................18

VI.   SANCTIONS SHOULD BE IMPOSED FOR FACEBOOK'S RECKLESS OVERDESIGNATION OF DOCUMENTS AS PRIVILEGED.....................................22

    A.    Facebook designates tens of thousands of documents as privileged, only to retreat from those designations when challenged. ..........................................................22

    B.    Many of Facebook's designations were frivolous. ...............................................23

C.      There is some evidence that Facebook employees tried to claim attorney-client
        privilege over nonprivileged communications......................................................24

D.      Facebook's defense of its conduct is meritless. ...................................................25

E.      Sanctions should be imposed. ..............................................................................26

VII.    SANCTIONS SHOULD BE IMPOSED FOR MISSTATEMENTS ABOUT, AND
        DELAY IN PRODUCING, FINANCIAL DOCUMENTS. ..........................................27

A.      2019 to April 2022: Facebook continually denies that responsive financial
        information exists, only to change its tune abruptly in spring 2022.....................27

B.      Sanctions should be imposed. ..............................................................................29

VIII.   SANCTIONS SHOULD BE IMPOSED FOR MISCONDUCT CONNECTED WITH
        COLLECTING AND PRODUCING QUIPS. .................................................................30

A.      The importance of Quips to this case....................................................................31

B.      A brief history of Plaintiffs' efforts to understand how Facebook is collecting and
        reviewing Quips for production. ...........................................................................32

C.      Sanctions should be imposed. ..............................................................................35

        1.      Bad faith in continued failure to search for or produce responsive Quips.35

        2.      Issue sanctions. ..........................................................................................36

        3.      Monetary sanctions. ....................................................................................36

IX.     CONCLUSION................................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. Farber & Partners, Inc. v. Garber*,
    234 F.R.D. 186 (C.D. Cal. 2006) ............................................................29

*Adriana Int'l Corp. v. Thoeren*,
    913 F.2d 1406 (9th Cir. 1990) ...............................................................3

*Anheuser-Busch, Inc. v. Nat'l Beverage Distributors*,
    69 F.3d 337 (9th Cir. 1995) ...................................................................4

*BKB v. Maui Police Dep't*,
    276 F.3d 1091 (9th Cir. 2002) ...............................................................7

*Bowoto v. ChevronTexaco Corp.*,
    2006 WL 294799 (N.D. Cal. Feb. 7, 2006) .........................................20

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) ...............................................................26

*G-K Properties v. Redevelopment Agency of City of San Jose*,
    577 F.2d 645 (9th Cir. 1978) ...............................................................11

*Halaco Eng'g Co. v. Costle*,
    843 F.2d 376 (9th Cir. 1988) .................................................................3

*Henry v. Gill Indus., Inc.*,
    983 F.2d 943 (9th Cir. 1993) .................................................................4

*Lahiri v. Universal Music & Video Distrib. Corp.*,
    606 F.3d 1216 (9th Cir. 2010) ...............................................................7

*N. Am. Watch Corp. v. Princess Ermine Jewels*,
    786 F.2d 1447 (9th Cir. 1986) .......................................................11, 17

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001) ............................................................8, 27

*Payne v. Exxon Corp.*,
    121 F.3d 503 (9th Cir. 1997) ............................................................4, 18

*Primus Automotive Fin. Servs. v. Batarse*,
    115 F.3d 644 (9th Cir. 1997) ...............................................................29

PLAINTIFFS' SUPPLEMENTAL BRIEF IN
SUPPORT OF SANCTIONS
              iii
                                                  MDL NO. 2843
CASE NO. 18-MD-02843-VC

*United States v. Martin,*
278 F.3d 988 (9th Cir. 2002) ..........................................................................................25

*United States v. Procter & Gamble Co.,*
356 U.S. 677 (1958).........................................................................................................2

*United States v. Sumitomo Marine & Fire Ins. Co.,*
617 F.2d 1365 (9th Cir. 1980) ....................................................................................4, 11

*United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.,*
857 F.2d 600 (9th Cir. 1988) ...........................................................................................3

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
259 F.3d 1101 (9th Cir. 2001) ....................................................................................4, 17

**Statutes**

28 U.S.C. § 1927 ........................................................................................................7, 26

**Other Authorities**

Fed. R. Civ. P. 26 (e) ...................................................................................................3, 17

Fed. R. Civ. P. 26(g) ........................................................................................................29

Fed. R. Civ. P. 26(g)(1).....................................................................................................30

Fed. R. Civ. P. 30(b)(6).......................................................................................1, 12, 18, 22

Fed. R. Civ. P. 30(c)(2).....................................................................................................19

 Fed. R. Civ. P. 37................................................................................................... *passim*

8B *Federal Practice and Procedure* § 2284 (3d ed. 2022 update).................................3

# I.    INTRODUCTION

Before the February 10 hearing in which the Court raised the possibility of sanctions, Facebook and its counsel had failed to produce much of the most relevant evidence in its possession. *See* ECF No. 878 at 1 (number of documents produced as of early February 2022); ECF No. at 922 at 10–12 (timeline of ADI production). The discovery misconduct had a general pattern. Facebook would go silent for weeks at a time, or refuse to articulate a position, or claim that the dispute was not ripe. *See* ECF No. 878 at 13–15, 45; ECF No. 922 at 12, 23-24; ECF No. 923, ¶¶ 3–4. If Judge Corley issued an order on the dispute, Facebook and its counsel would defy it for as long as they could. *See* ECF No. 878 at 18–22 (ADI order); ECF No. 922 at 3–9 (same); ECF No. 878 at 31–32 (orders regarding Named Plaintiffs' data); ECF No. 922 at 14–17 (same). In fact, Facebook took advantage of the fact that its conduct had forced the appointment of a Special Master to try to convince him to reconsider and undercut Judge Corley's orders.. ECF No. 878 at 20–22, 32; ECF No. 922 at 4–7, 17-18. Finally, Facebook appealed to Judge Corley herself, who rejected Facebook's tortured reading of her orders. ECF Nos. 806, 807. Meanwhile, after years of delay that Facebook had caused, its counsel argued that it was now too late for Plaintiffs to seek further discovery and blamed Plaintiffs' counsel for its own actions. ECF No. 878 at 45–47; ECF No. 922 at 24-25.

Since February, the need for sanctions has only become more urgent. Numerous additional misrepresentations have been revealed. It is now clear, for example, that Facebook's counsel made reckless or knowing misstatements, or knowingly concealed facts, about the status of the ADI production, as well as the Named Plaintiffs' data and the financial information the company possessed. Deponents designated under Rule 30(b)(6) have often been unprepared to testify about matters well within the designated topics. And at one deposition, the misconduct was egregious enough that Facebook voluntarily paid monetary sanctions and agreed to other relief Plaintiffs' sought.

Facebook's delays have prejudiced Plaintiffs' ability to conduct discovery. The fact-discovery deadline—already moved from January 31 to September 16—is imminent. Plaintiffs

no longer have time to pursue the myriad significant leads opened up by late-produced and wrongly withheld documents—ADI documents, Named Plaintiff data that Facebook has been sitting on for years, more than 60,000 documents wrongfully withheld as privileged for years and only recently produced, and documents indicating the existence of probative but unproduced documents generated by "Quip," a collaborative productivity software.

Also favoring sanctions is the public import of this case. It affects hundreds of millions of Facebook users. The factual allegations underlying the claims are a source of international scandal that has been covered by innumerable media organizations, and proceedings in this case have been widely reported. For more than four years, Named Plaintiffs have been asking for Facebook to identify the information Facebook has collected about them and to whom it provided access. Facebook has blocked transparency at every turn, even while claiming it already disclosed and received consent for its practices.

The pervasive nature of Facebook's misconduct justifies not only the monetary sanctions that Plaintiffs request, but also the nonmonetary sanctions they now seek. Each sanction is tied closely to the category of misconduct it seeks to remedy. As Plaintiffs will discuss in more detail below, these sanctions are intended to true the balance that Facebook's misconduct has skewed.

## II.     LEGAL STANDARDS

### A.     Non-monetary sanctions are available under Rule 37 and the inherent power.

"Modern instruments of discovery" are designed to make litigation "a fair contest with the basic issues and facts disclosed to the fullest possible extent." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958). Full disclosure is especially crucial where, as here, there is an extreme asymmetry of information between the parties. It is hard to think of another matter where more information is in the exclusive possession of one party. Plaintiffs do not have personal knowledge of the scope of the data Facebook collected, how Facebook used it, or with whom Facebook shared or made it accessible. Nor do Plaintiffs have personal knowledge of just how many third parties received their data against their wishes, or what they did with it.

When parties do not live up to their discovery obligations, the district court "may, within

reason, use as many and as varied sanctions as are necessary to hold the scales of justice even." 8B *Federal Practice and Procedure* § 2284 (3d ed. 2022 update). The discovery process here has malfunctioned seriously enough to justify sanctions beyond the purely monetary ones that Plaintiffs requested in earlier briefing.[1] *See generally* ECF No. 878. Three sources of sanctioning power are most relevant to this Brief.

*First*, when a party violates a discovery order, Rule 37(b)(2)(A) authorizes a variety of sanctions. For the most serious cases of disobedience, district courts may dismiss claims or an action, or render a default judgment. Fed. R. Civ. P. 37(b)(2)(A)(v)–(vi). In other cases, they may strike pleadings, direct that certain matters or facts be deemed "established for purposes of the action," or preclude a disobedient party from making certain arguments or introducing certain evidence. *Id.* R. 37(b)(2)(A)(i)–(iii).

*Second*, these sanctions are also available when a party fails to timely supplement a discovery response as required by Rule 26 (e). *Id.* R. 37(c)(1)(C). A court may also "inform the jury of the party's failure." *Id.* R. 37(c)(1)(B).

*Third*, for "discovery abuses that may not be a technical violation of the discovery rules," sanctions under the Court's inherent power are available. *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988). That power embraces all the sanctions available under Rule 37. As the case law notes, sanctions under the inherent power are "subject to much the same considerations" as those under Rule 37. *Id.*; *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 n.4 (9th Cir. 1990) (making use of cases involving Rule 37 and the inherent power "interchangeably"); *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 603 n.5 (9th Cir. 1988) (same).

**B.    Several principles governing the imposition of sanctions are especially pertinent here.**

Because certain considerations are relevant to each nonmonetary sanction Plaintiffs request, they discuss those considerations upfront.

---

[1] Plaintiffs also request additional monetary sanctions in this Brief.

**1.** Plaintiffs neither ask that judgment be entered on any claim nor seek any other sanction that is tantamount to a judgment in their favor. For that reason, the legal standards applicable to a terminating sanction do not apply here. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[T]his case is distinguishable from cases in which we have required a district court to identify 'willfulness, fault, or bad faith' before dismissing a cause of action outright as a discovery sanction. These cases do not apply because this sanction, although onerous, was less than a dismissal." (citation omitted)).

Nevertheless, two factors that *do* favor a terminating sanction are present here. First, Facebook is guilty of "willfulness, fault, or bad faith" in its discovery misconduct simply because its "disobedient conduct" was not "outside [its] control." *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993) (quotation marks and citation omitted); *see* ECF No. 878 at 18–20, 32–37; ECF No. 922 at 3–4, 11–12, 14–17; *infra* §§ III.A, IV.A–B, V, VI.A–B , VIII.A–B. Second, discovery has revealed a pervasive pattern of deception, including reckless or knowing misrepresentations. *See* ECF No. 878 at 24, 43–47; ECF No. 922 at 24–25; *infra* §§ IV.A–B, VII.A. "[C]ontinued deceptive misconduct" can justify case-dispositive sanctions. *Anheuser-Busch, Inc. v. Nat'l Beverage Distributors*, 69 F.3d 337, 352 (9th Cir. 1995). The presence of these factors indicate that the more lenient sanctions Plaintiffs seek are fully justified.

**2.** The Court may take general deterrence into account in imposing sanctions. That is because one of the objectives of discovery sanctions is "generally deterring flagrant disobedience and callous disregard of court discovery orders." *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1370 (9th Cir. 1980) (citing *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam)). This objective includes deterring any notion that resources or prestige exempt litigants or their attorneys from generally applicable rules.

**3.** In imposing sanctions, this Court "may properly consider all of a party's discovery misconduct" in weighing what sanction to impose. *Payne v. Exxon Corp.*, 121 F.3d 503, 508 (9th Cir. 1997) (affirming dismissal). This includes "conduct which has been the subject of earlier sanctions." *Id.* Under this principle, the more pervasive the discovery misconduct, the more

onerous a sanction may be. Here, the misconduct has been pervasive indeed.

## III.   SANCTIONS SHOULD BE IMPOSED FOR MISCONDUCT CONNECTED WITH ADI DOCUMENTS

### A.   January 2022–present: An inadequate search, tardy disclosure of that search, and continued delays in production.

On February 10, the court directed Facebook to produce all ADI-related documents within 21 days. Hr'g Tr. at 13 (Feb. 10, 2022). On March 10, Facebook told Plaintiffs it had completed the ADI production. Ex. 71.[2]

During meet and confers in late March and early April, Facebook reversed course, informing Plaintiffs of previously undisclosed limitations on its ADI production. Facebook had not searched all custodians. It had used obviously deficient search terms not previously disclosed—for example, it had not used "ADI" and "App Developer Investigation" as search terms, even in conjunction with limiters. And it had searched for documents from a truncated time period. *See* ECF No. 923, ¶¶ 5–10.

Plaintiffs were surprised to learn of these failings. Most surprising was Facebook's failure to search "all" custodians, since the Special Master's January 2022 order required production of "*all* documents relating to ADI from *all* custodians that the parties have identified and collected." ECF No. 828 at 5, ¶ 20 (emphasis added). Instead, without informing Plaintiffs or the Court, Facebook limited its search to 26 custodians. Those 26 custodians had been identified in 2020 for the limited purpose of creating "a sample set of materials" from the ADI, which formed the basis for the parties' initial presentation of ADI privilege issues to Judge Corley.[3]

---

[2] Where not otherwise specified, citations to numbered exhibits of the form "Ex. __" are citations to the continuously numbered exhibits to the Declaration of Derek W. Loeser and Lesley E. Weaver in Support of Motion for Sanctions, ECF No. 873-6, the Declaration of Lesley E. Weaver and Derek W. Loeser in Support of Plaintiffs' Reply in Support of Motion for Sanctions, ECF No. 923, or to the Declaration of Lesley E. Weaver in Support of Plaintiffs' Supplemental Brief in Support of Sanctions (submitted herewith).

[3] In that context, Plaintiffs identified a small number of "exemplar apps" that had been investigated in the ADI, for which Facebook would then collect and log associated documents. *See generally* ECF No. 513 & Ex. A. Later, the log was submitted to Judge Corley in the hope that she could rule on whether this subset of ADI documents was privileged, thereby providing the parties legal guidance for the remaining documents. Ex. 13 at 36; *see also* ECF No. 878 at

ECF No. 513, ¶ 1; *see id.*, Ex. A. However, by order of Judge Corley, 81 custodians' files were to be searched and produced for the case. ECF No. 436. Later, the Special Master ordered Facebook to add Mark Zuckerberg and Sheryl Sandberg as custodians, bringing the total to 83. ECF No. 753.

Facebook's choice to search files of only the 26 custodians used in the limited sampling exercise from a year and a half earlier, and to do so without informing Plaintiffs or the Court, was at least reckless, particularly in light of the Special Master's directive to search "all" custodians. And it was deceptive for Facebook to limit its search this way and then affirm that it had completed production. Indeed, Facebook continued to refuse to search "all" custodians for ADI documents until April. *See* ECF No. 923, ¶¶ 6, 11. Thus Facebook's deception further delayed the case.

Meanwhile, the Court again directed Facebook to produce all ADI-related documents, this time by April 27. *See* Hr'g Tr. at 7 (Mar. 30, 2020). Facebook did not meet that deadline either. Rather, by April 27, Facebook only completed production of ADI documents from the limited subset of 26 custodians. *See* ECF No. 939 at 8 (Facebook conceding on June 3rd that it had collected from only 26 "ADI custodians" and stating it would not complete production from "MDL custodians"—i.e., all 83 custodians—by June 15). Despite admitting that it had not completed production of ADI-related documents from all custodians, Facebook falsely told the Court that it had "completed production of documents under the Special Master's ADI orders *as modified by the Court*." *Id.* (emphasis added).

On June 9, based on Facebook's representation that ADI production would be completed by June 15, the Court set the 15th as the new date by which Facebook was to complete ADI production. Hr'g Tr. at 13:11–19, 14:15–16. And in its most recent case management statement, Facebook still asserted that it had met its obligations: "On March 3, 2022, Facebook completed its production of ADI documents under the ADI Orders." ECF No. 964 at 7. But saying does not

---

14–16. Ultimately, this process was unsuccessful. *See* ECF No. 806 at 2 (mentioning an unsuccessful "attempt[] to narrow the issues to determine if the parties could agree on what ADI materials to produce"); *see also* ECF No. 878 at 21.

make it so. Facebook informed Plaintiffs on July 17 that Facebook would be producing more than 1,200 ADI documents previously withheld as privileged. Decl. ¶ 12.

On at least three occasions, then, Facebook has informed the Court that it had complied with its orders to complete ADI productions by dates certain. ECF No. 882 at 5; ECF No. 939 at 8; ECF No. 964 at 7. These statements have consistently proven false, and it remains unclear whether Facebook has yet complied with the orders.

**B.      Sanctions should be imposed.**

Without first telling Plaintiffs or the Special Master, Facebook limited its production of ADI documents. These limitations not only violated the Special Master's January 2022 order, but are unreasonable enough to raise the inference that Facebook's counsel recklessly disregarded an order of which they were aware, thereby justifying sanctions under 28 U.S.C. § 1927. *See BKB v. Maui Police Dep't*, 276 F.3d 1091, 1106–07 (9th Cir. 2002) (sanctions under § 1927 are warranted by the reckless violation of a law or rule of which counsel is consciously aware).

Facebook also failed to comply with multiple Court deadlines for production of ADI documents. This by itself would warrant sanctions under Rule 37(b). Facebook's noncompliance has substantially delayed the case management schedule, including Plaintiffs' ability to conduct discovery. Depositions have had to be rescheduled due to Facebook's failure to produce documents from witnesses involved in the ADI, and because Plaintiffs have been forced to expend considerable time and resources, at the expense of their ability to conduct other activities, pursuing documents Facebook was obligated to produce. Decl. ¶ 3. Finally, Facebook repeatedly and falsely told Plaintiffs and the Court that it had complied with the Court's orders.

**1.   Monetary sanctions**

These actions, in combination with the rest of Facebook's misconduct, amply justify a finding of bad-faith litigation conduct. *See Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010) (affirming a bad-faith finding based on the "cumulative effect" of litigation conduct). Plaintiffs respectfully ask, therefore, that the Court impose the monetary sanctions that Plaintiffs have sought for Facebook's ADI-related misconduct. ECF No.

878 at 26. If the Court grants Plaintiffs' request for monetary sanctions, Plaintiffs will submit additional records reflecting the time and expenses incurred related to ADI discovery since submission of their opening brief on the motion for sanctions submitted in March.

### 2. Nonmonetary sanctions

In addition, Plaintiffs respectfully ask the Court to impose sanctions under Rule 37(b)(2)(A)(i), the provision of Rule 37 that allows district courts to "direct[] that matters embraced in the order or other designated facts be taken as established for purposes of the action." Under this provision, sanctions for failure to obey a discovery order are warranted "as long as the established issue bears a reasonable relationship to the subject of discovery that was frustrated by sanctionable conduct." *Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001). Here, the issues that Plaintiff ask the Court to deem established are narrowly related to the ADI documents. Indeed, as Plaintiffs will show, the ADI documents themselves suggest that the issues that Plaintiffs ask the Court to deem established are in fact true.

*a. Contractual breach.* Plaintiffs ask the Court to find that Facebook breached the following contractual clause, which was in the Data Use Policy from at least September 7, 2011 through January 29, 2015: "If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else." Ex. 89. In the alternative, Plaintiffs ask the Court to order that Plaintiffs have established a presumption that Facebook breached that contractual provision as to all Facebook users.

This sanction is justified by what ADI-related documents demonstrate: Facebook did not limit applications' use of friend data accessed through the users of the apps. Instead, Facebook permitted apps to access friend information *without* any "use case"—i.e., without a realistic use of "that information only in connection with" the app user. In some cases, the app developers were suspected of selling user information collected via friend permissions, which obviously is not a use of data "only in connection with the person that gave the permission and no one else." Moreover, the documents demonstrate that the violations of the contractual term were so

pervasive that it is near certain they affected every single Facebook user. Here are four examples:

- One ADI memo addresses 20 apps created by AppBank, a developer that created a number of quiz apps, virtual-gifting apps, and social gaming apps. One such app was "FriendHug," which operated on Facebook from 2007 to 2013 and "had access to a large number of permissions that likely fall outside the use case of the app, such as friends permissions"—each of which "was granted by approximately 13 million users." Ex. 90 at FB-CA-MDL-02014221-4222. Another was "Send Flowers," which operated from 2008 to 2015 and to which about 2 million users gave permission to access friends' "education history, notes, tagged photos and videos, relationship details, status, photo and video posts, managed groups, . . . and religious politics" with "no apparent use case for these permissions." *Id.* at FB-CA-MDL-02014238-4239. Still another app was "Send Kisses," which operated from 2008 to 2015, and had the ability to view data from approximately 2 million users' friends, including their "education history, notes, tagged photos and videos, relationship details, status, photo and video posts, work history, managed groups, . . . and religious politics," but had "no apparent purpose" to have such access. *Id.* at FB-CA-MDL-02014240–4241.

- An ADI investigation into "Sync.Me," an app that operated from before 2010 through at least 2018, notes that the app had access to more than 9 million users' friends' locations, photos, websites, and work histories, as well as more than 8 million users' read_stream information, which "allow[s] the App to access the user's entire newsfeed" (including friends' posts) regardless of the privacy setting applicable to different newsfeed entries. Ex. 91 at FB-CA-MDL-02221188–1189. The Investigation states: "These permissions grant the App access to sensitive information about users and their friends and appear to be out of scope for the use case of the App." *Id.* at FB-CA-MDL-002221189. In 2013, Facebook's enforcement team had removed the app's access to certain permissions, but that access was quickly restored because, at the time, Facebook "'no longer disable[d] apps like these for violating'" its policy. *Id.* at FB-CA-MDL-02221196.

- An ADI investigation into "Social Video Downloader," an app that operated from around 2011 through at least 2018, revealed that the app could access more than 8 million users' "friends' likes, photos, videos, and profile information." Ex. 92 at FB-CA-MDL-02709851. The investigation suggested the collection of this data "may speak to an ulterior motive by the developer." *Id.*

- One ADI document reveals that the top 500 apps developed by Zynga—which had developed at least 44,000 apps on Facebook—could have accessed the "photos, videos, about me, activities, education history, events, groups, interests, likes, notes, relationship details, religion/politics, status, work history, and all content from user-administered groups" for the friends of 200 million users. Ex. 93 at FB-CA-MDL-02851185 and n.2. A separate ADI memorandum discloses that "Zynga shares social network ID and other personal information with third parties, including advertisers." Ex. 94 at FB-CA-MDL-02560057.

Recall that the Cambridge Analytica scandal was based on information it acquired from one app, This Is Your Digital Life, with 270,000 users. Through so-called "friends permissions," the app collected information from 87 million users. *See* Issie Lapowsky, "Facebook Exposed 87 Million Users to Cambidge Analytic," *Wired* (Apr. 4, 2018), https://www.wired.com/story/facebook-exposed-87-million-users-to-cambridge-analytica/ (citing Facebook communications). On average, therefore, each user of This Is Your Digital Life provided access to information of 322 friends. The apps and developers in the examples above had far more users than This Is Your Digital Life through which they could access friends data. Using 322 friends per user as a measure, these four developers/apps gained access to the user data of *74 billion people*.

| App/Developer | Users through which it could access friends data | Number of friends data made accessible (based on 322 friends/user) |
|---|---|---|
| This Is Your Digital Life | 270,000 | 87 million |
| AppBank (only FriendHug, Send Flowers, Send Kisses) | 17,000,000 | 5.47 billion |
| Sync.Me | 9,000,000 | 2.89 billion |
| Social Video Downloader | 8,000,000 | 2.57 billion |
| Zynga | 200,000,000 | 64.4 billion |

Needless to say, this table cannot be the actual number of friends whose data was misused by Facebook. There are only about 8 billion people living on earth, and only 2.3 billion monthly active users on Facebook. If an app's user base is large enough, the number of unique friends per user necessarily decreases, since the users will have many friends in common. The point of this exercise is not to pinpoint the exact number of friends whose data was made accessible through these apps, but simply to show that that number is huge. And because it is huge, it is highly likely that most everyone who used Facebook at the same time as just these few apps had their information exposed without a use case. Moreover, the ADI came to similar conclusions about hundreds of other apps and developers. The record therefore amply supports the conclusion that, where "an application ask[ed] permission from someone else to access your

information, the application" was not limited to "us[ing] that information only in connection with the person that gave the permission and no one else."

*b. Violation of duty.* Plaintiffs also ask the Court to establish that, if the Court later concludes that Facebook had a duty to ensure that Third Parties were not improperly collecting, storing, obtaining, or selling users' content and information, Facebook violated that duty as to all Facebook users through April 30, 2015 (the date on which friend permissions were deprecated). In the alternative, if the Court concludes that Facebook had a duty to ensure that Third Parties were not improperly collecting, storing, obtaining, or selling users' content and information, then Plaintiffs ask for a presumption that Facebook violated that duty as to all Facebook users through April 30, 2015.

This sanction is justified by what ADI-related documents demonstrate. As the examples above show, Facebook routinely permitted apps that had no use case, and with suspected ulterior motives, to access the data of users' friends.

\*     \*     \*

The issue sanctions that Plaintiffs request for Facebook's ADI-related misconduct are appropriate under Rule 37(b). They are not claim-dispositive, much less case-dispositive. And they are amply supported by the ADI documents and Facebook's record of willful disobedience of discovery orders. While Facebook will likely assert that it has now complied with all ADI orders, "[b]elated compliance with discovery orders does not preclude the imposition of sanctions." *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (affirming dismissal of counterclaim as discovery sanction); *see also Sumitomo Marine*, 617 F.2d at 1370 ("The government's belated compliance with the orders requiring the government to answer interrogatories, and its efforts to provide some, though not all of the requested damage figures, are entitled to little weight in analyzing whether the sanctions imposed were proper."); *G-K Properties v. Redevelopment Agency of City of San Jose*, 577 F.2d 645, 647 (9th Cir. 1978) ("Litigants who are willful in halting the discovery process act in opposition to the authority of

the court and cause impermissible prejudice to their opponents. It is even more important to note, in this era of crowded dockets, that they also deprive other litigants of an opportunity to use the courts as a serious dispute-settlement mechanism.").

### IV.    SANCTIONS SHOULD BE IMPOSED FOR MISCONDUCT CONNECTED WITH THE NAMED PLAINTIFFS' DATA

Plaintiffs' Sanctions Motion and Reply explain Facebook's misconduct related to its obligation to search for and produce Named Plaintiffs' data. ECF No. 879 at 26-38; ECF No. 922 at 14–17. On June 2, 2022, more than a month after briefing on Plaintiffs' sanctions motion was fully submitted, Plaintiffs conducted a Rule 30(b)(6) deposition on preservation of ESI that revealed additional aspects of Facebook's misconduct.

### A.    June 2, 2022: Facebook discloses that it preserved data from 137 Hive tables due to their relevance to this litigation.

Hive is Facebook's data warehousing framework, where it maintains and facilitates the querying of data about users, apps, advertisers, and near-countless other types of information, in tables and partitions. *See* Ex. 135. During the June 2 deposition, Facebook's designee disclosed, for the first time, that data from 137 Hive tables were preserved under a litigation hold for this case. June 2 30(b)(6) Tr. at 69:8-21; *see also* Ex. 96 at ADVANCE-META-00003259 (a document produced for the first time in conjunction with the June 2 deposition). Further, in response to the Special Master's order requiring supplemental briefing regarding these Hive tables, Facebook implicitly conceded that at least some of the 137 tables contain Named Plaintiffs data. "Tables in Hive were preserved in this litigation and related litigation for a number of reasons," Facebook wrote, "many of which have nothing to do with Named Plaintiff data." Facebook's June 16, 2022 Submission to JAMS at 3. If "many" have "nothing to do with Named Plaintiff data," it follows that some do. On July 25, Facebook sent an email to Plaintiffs and the Special Master attaching a spreadsheet indicating that 66 of the 137 tables that it had preserved contained what it called "user identifiers," and are therefore likely sources of Named

Plaintiff data. [4] Ex. 129.

Facebook did not disclose to Plaintiffs, the Special Master, or the Court that it had preserved data from 137 Hive tables for this litigation, let alone that 66 of the tables contained user identifiers and were therefore obvious sources for data related to Named Plaintiffs, until the June 2 deposition. For two years before that deposition, Facebook stonewalled all efforts to discuss the existence of Named Plaintiffs' data beyond the information disclosed in the Download Your Information tool, insisting that to even search for Named Plaintiffs' data would be impossibly burdensome. For example:

- On August 13, 2020, Facebook told the Court that "[e]ven a large team of engineers working full time for several years likely could not identify all of the information Plaintiffs seek." ECF No. 495 at 6-7.

- On October 8, 2020, Facebook told the Court that Plaintiffs' requests for Named Plaintiffs' data would require it to search "millions of disaggregated data sets" and that there was no way "to run a centralized search for" data that could be associated with Named Plaintiffs "across millions of data sets." ECF No. 537 at 6, 9.

- In its December 2021 motion for reconsideration of one of the Special Master's Named Plaintiffs' data orders, Facebook stated that "compiling the remaining information would take more than one year of work and would require coordination across dozens of Facebook teams and hundreds of Facebook employees." ECF No. 779-3 at 5.

Each of these filings were opportunities for Facebook to disclose what it had preserved so that the parties could conduct discovery in a way that balanced the burdens of production with the importance of the information to the case. And Facebook had plenty of other opportunities to

---

[4] Facebook did not identify what it meant by "user identifiers," nor has it indicated whether any of the other 137 preserved tables contain data that can be associated with the Named Plaintiffs.

disclose what it had preserved. The parties met and conferred about Named Plaintiff data and discussed the issue with the Discovery Mediators scores of times, and numerous other filings have addressed the issue. It was not until Plaintiffs were able to take the long-delayed sworn testimony of a corporate designee that the truth came out. In the meantime, the parties and the Special Master spent months inquiring how Hive could be searched, including conducting three half-day hearings, when Facebook knew it had at least some Hive data tables that contained Plaintiffs' data. June 2 30(b)(6) Tr. at 69:8-21; June 16, 2022 Submission to JAMS at 3. Even now, Facebook has not explained how it identified these tables in particular and its designee was unable to testify on the issue.[5]

Whether Facebook will be required to produce the data it preserved from 137 Hive tables is presently being discussed. Over the last two days, the parties each identified 250 Hive tables to be searched for data that can be associated with the Named Plaintiffs. The issue of what specific data from those (or other) tables will be produced remains unresolved.

**B.     June 2, 2022: Facebook discloses that it has 52 Switchboard snapshots for the Named Plaintiffs.**

For years, Facebook has insisted that the DYI files it produced contain the "most complete compilation of data associated with the Named Plaintiffs' accounts." *See, e.g.*, Ex. 136 at 2 (Facebook statement: "Facebook subsequently repeatedly informed Plaintiffs and the Court that it had produced the most complete compilation of data associated with the Named Plaintiffs' accounts, including on July 30, 2020 (Dkt. 484), August 13, 2020 (Dkt. 495), and September 18, 2020 (Dkt. 515)."); *id.* at 2–3 (Facebook statement: "Facebook's DYI tool reflects, in human-readable and producible form, the most complete compilation of data Facebook maintains

---

[5] In fact, Facebook consistently took the position that Hive did not contain any relevant material because third parties are not given access to it. As recently as last Friday, Facebook's corporate deponent repeatedly testified that Hive contain logs that show ***every ad a user has seen.*** Leone 30(b)(6) Rough Tr. 128:9-18. Facebook has still not produced that data.

relating to any user."); ECF No. 779-3 at 45-46 (Facebook declaration: "The DYI file for each individual user represents the most complete and best compilation of data Facebook maintains associated with that user, and the best available compilation of the data about that user in the Social Graph, in a human-readable and producible form."); *id*. at 386 (Facebook statement: "[A] user's DYI file contains a human-readable download of the most complete set of data about that user in the Social Graph (and more).").

Facebook failed to disclose, until the designee's July 2 testimony, that it had taken 52 "snapshots" using a tool called Switchboard that contained Named Plaintiffs' data not captured by the DYI tool: according to the designee, "Switchboard has some additional information that DYI doesn't." June 2 30(b)(6) Tr. at 40:4–5. The designee described several types of information included in the Switchboard snapshots, but not in DYI, including:

- Information about the Named Plaintiffs' involvement in Pages, Groups, and advertising accounts. June 2 30(b)(6) Tr. at 55:2–5.

- Information about privacy settings. *Id.* at 56:12.

- Information about the relationships between users. *Id.* at 64:22–63:4.

Further, the designee testified that Facebook regularly produces Switchboard snapshots, not DYI files, in response to law enforcement subpoenas for information about specific Facebook users. *Id.* at 41:6–42:2. It does so because the Switchboard snapshots are produced "in a more useable way than DYI has available to it as a download." *Id.* at 41:20–22. The Switchboard files are a PDF record, *id*. at 42:2, rather than the thousands of atomized DYI files Facebook produced for each of the Named Plaintiffs, including documents consisting wholly of the Facebook like graphic (a thumbs-up). Not only do the Named Plaintiff Switchboard snapshots contain information not available in their DYI files, but they're also easier to use.

During and after the deposition, Plaintiffs requested that Facebook produce Switchboard snapshots for the Named Plaintiffs. On August 1, 2022, following an Order by the Special Master, Facebook finally produced 106 Switchboard snapshots for the Named Plaintiffs, consisting of over 170,000 pages of information about the Named Plaintiffs. This production

confirms the testimony of Facebook's designee about, and prove that Facebook's representations about the DYI files were at best misleading. These records include new information about the Named Plaintiffs' interactions with Pages, Groups, and advertising accounts. They also include information about the accounts the user has blocked and been blocked by. In addition, the records include more granular detail about the Named Plaintiffs. For instance, the Switchboard snapshots contain the full alphanumeric identifier for each cookie associated with the Named Plaintiffs' devices, as well as the accounts associated with that cookie, the number of times that cookie was seen, and the date and time it was seen. *See, e.g.*, FB-CA-MDL-04137713 at FB-CA-MDL-04137724. In contrast, the DYI files includes a list of datr cookies associated with the Named Plaintiffs, which consists only of a list of hashed alphanumeric identifiers and dates and times. *Id.* at FB-CA-MDL-00031925.

In addition, the August 1 production of Switchboard records include updated privacy settings of the Named Plaintiffs' accounts that are not included in DYI. Facebook now admits that when it produced Named Plaintiffs' privacy settings in 2020, it took these settings from Switchboard. Ex. 97 at 3. Thus, Facebook decided in 2020 to produce a portion of the Switchboard snapshots but neither informed Plaintiffs of their provenance nor that it was withholding the rest.

Plaintiffs have long asked Facebook for more useable versions of the information it was producing about Named Plaintiffs. For example, in September 2020, Plaintiffs submitted a brief stating not only that the Named Plaintiffs' DYI files did not include all the information Facebook maintained about each, but also that the format of production "obscures" information about their privacy settings. ECF No. 526 at 7. All the while, Facebook was sitting on data about each of the Named Plaintiffs that it kept "in a more useable way than DYI." June 2 30(b)(6) Tr. at 41:20–42:2.

## C.     Sanctions should be imposed.

### 1.   Additional monetary sanctions.

Plaintiffs opening brief sought monetary sanctions under Rule 37(b) for the time period

November 28, 2020—30 days after Judge Corley's Discovery Order No. 9—through January 31, 2022. ECF No. 879 at 37. With this supplemental motion, Plaintiffs suggest extending the period of sanctions to encompass all costs associated with the Special Master's involvement since January 31, 2022 to identify the scope of Facebook's obligation to produce Named Plaintiffs' data. Plaintiffs are prepared to submit a declaration substantiating the additional fees and costs they incurred as a result of Facebook's misconduct related to Named Plaintiffs' data in addition to the $385,085 sought in their opening brief.

### 2.  Nonmonetary sanctions.

Plaintiffs seek nonmonetary sanctions under Rule 37(b)(2)(A), Rule 37(c)(1), or the Court's inherent power. Facebook disobeyed Judge Corley's Discovery Order No. 9, as well the Special Master's orders reaffirming Discovery Order No. 9. *See* ECF No. 879 at 32–34. And now, Facebook's corporate designee has disclosed the existence of preserved Named Plaintiffs' data from Hive tables and in Switchboard snapshots, neither of which was disclosed to Plaintiffs, the Special Master, or the Court during two years of litigating this issue. Facebook violated its duty to timely supplement its discovery responses. Fed. R. Civ. P. 26(e).

Thus, Plaintiffs ask the Court to instruct the jury that Facebook deliberately failed to disclose Named Plaintiffs' user data, including evidence about what Facebook collected about them and what Facebook did with it. Another court in this district recently chose this sanction under Rule 37(b)(2) where the defendant, Google, had been grossly negligent in failing to turn over relevant sources of data. Ex. 99. Such a sanction is also expressly authorized under Rule 37(c)(1), a provision under which this Court has "particularly wide" discretion. *Yeti by Molly*, 259 F.3d at 1106. Here, the testimony of Facebook's demonstrates that Facebook acted in bad faith—or at least was grossly negligent in failing to disclose information regarding the longstanding existence of preserved Named Plaintiff data from Hive tables and Switchboard snapshots. Once again, to the extent Facebook claims that it has now complied with discovery orders, such "[b]elated compliance . . . does not preclude the imposition of sanctions," *N. Am. Watch*, 786 F.2d at 1451, especially given the cumulative record of discovery misconduct in this

action, *see Payne*, 121 F.3d at 508 (court "may properly consider all of a party's discovery misconduct").

## V.    AT AN APPROPRIATE TIME, SANCTIONS MAY NEED TO BE IMPOSED FOR UNPREPARED RULE 30(B)(6) DEPONENTS.

In December of last year, Plaintiffs served a draft 30(b)(6) notice on Facebook and sought to meet and confer about it. Decl. ¶ 6. Despite Plaintiffs' repeated attempts to confer, *e.g.*, Ex. 100, Facebook did not respond until after Plaintiffs had served the operative (and substantively identical) 30(b)(6) notice on March 1 of this year. Decl. ¶ 6.

Facebook served its objections on March 29, the day before a case management conference. Upon receiving the objections, Plaintiffs immediately met with Facebook's counsel, who stated that the objections were "boilerplate," "really nothing," and would not limit the scope of the topics. Ko Decl. ¶ 7; *see also* Ex. 101. The next day, based on these reassurances, Plaintiffs told the Court that they expected the 30(b)(6) depositions to go ahead in April and that witnesses would be prepared to testify about the topics enumerated in the notice. Hr'g Tr. at 11:15–21, 11:25–12:1 (Mar. 30, 2022). On April 25, however, Facebook told Plaintiffs that the objections were *not* boilerplate. Ex. 138.

The 30(b)(6) depositions began on May 5. From the very first deposition, Plaintiffs' attempt to procure testimony was impeded by counsel and unprepared witnesses.

During the May 5 deposition, Facebook's counsel and its designee, Allison Hendrix, substantially impeded Plaintiffs' ability to procure testimony. *See generally* ECF No. 935. Counsel improperly instructed the witness not to answer at least 22 times based not on an assertion of privilege, but rather on his unilateral view that the questions were beyond the scope of the noticed topics. *Id.* at 4. The instruction and Ms. Hendrix's decision to follow it would have violated the Rules even if counsel had been correct that questions were outside the scope. *See id.* at 5–6 (citing cases). Nevertheless, counsel was not correct. Among the questions he instructed Ms. Hendrix not to answer were questions about how Facebook enforced its policies against third parties—questions that fell well within the noticed topics, which concerned how Facebook ensured third parties' use of user data was limited to their use case and how Facebook monitored

and enforced contractual terms with third parties about their use of user data. *Id.* at 7. Counsel also improperly instructed Ms. Hendrix not to answer questions that called for Facebook's opinion. *Id.* at 6. But 30(b)(6) designees "'can be examined as to the corporation's opinions and beliefs.'" Joyce C. Wang et al., "Speak for Yourself: The 30(b)(6) Deposition," *The Brief* (Sept. 19, 2019), https://www.americanbar.org/groups/tort_trial_insurance_practice/publications/ the_brief/2018-19/summer/speak-yourself-30b6-deposition (citing cases). Ms. Hendrix herself, even without counsel's objection, refused to answer questions that she believed beyond the scope. ECF No. 935 at 6–7. Just as there is no basis for counsel to assert such objections, there is no basis for the designee to refuse to answer questions on this ground.

At this same deposition, counsel also made extensive speaking objections, even in the face of the Special Master's repeated admonitions.[6] *Id.* at 7. That behavior violates Rule 30(c)(2). One of the speaking objections was more than 17 minutes long. ECF No. 935 at 4.

The day after this deposition, Plaintiffs filed a motion for sanctions and expedited relief. Facebook did not oppose Plaintiffs' motion. Instead, it eventually stipulated to the relief Plaintiffs sought. ECF No. 936. Separately, Facebook also agreed to provide more time for 30(b)(6) testimony. While the parties had previously agreed to 21 hours for nine topics, it now agreed to permit Plaintiffs to depose Facebook's designees on those nine topics for 100 hours, and also agreed not to include Ms. Hendrix's time towards that total.

Despite the stipulation, some of the same problems recurred. During a May 18, 2022 deposition of Mike Clark, Facebook's designee on Topic 4—pseudonymization, de-identification, re-identification, association, and deletion of user data—Facebook's lack of preparation and counsel's improper interruptions continued the pattern of misconduct established during the earlier 30(b)(6) deposition of Ms. Hendrix. Mr. Clark was not prepared to testify about the datr cookie, which Plaintiffs had identified to Facebook in advance of the deposition as a topic on which they would seek testimony. *See* Ex. 102 (May 8 email to Facebook stating

---

[6] The Special Master has attended each of the 30(b)(6) depositions and nearly all 30(b)(1) depositions in this case.

Plaintiffs' intent to understand cookies including datr, fbp, xs/c, user xs/c, fbc, and fr); Ex. 104 at 129:14–136:3 (designee unprepared to testify on Facebook's behalf, or at all, about the datr, fpb, xs/c, user xs/c, fbc, or fr cookies).

Thereafter, counsel for Facebook instigated on an 11-minute on-the-record argument about the extent to which Mr. Clark was prepared to address the previously identified cookies. May 18, 2022 Clark 30(b)(6) Dep. Tr. at 145:2–157:8. The deposition closed with Facebook's counsel repeatedly objecting to questions about, and Mr. Clark being unable to answer, how Facebook defined "personal information," a concept that underpins this case and is fundamental to how data is pseudonymized, de-identified, re-identified, associated, and deleted. *Id.* at 217:19–226:8. Counsel then commenced an on-the-record argument about whether it was improper for Plaintiffs to seek the definition of "personal information." *Id.* at 239:23–246:4. During the exchange, Counsel repeatedly interrupted the Special Master. *Id.* at 241:13–7, 242:11–15, 244:11–13.

Plaintiffs were left without testimony about topics they had identified in advance and with the Special Master recommending that Facebook find a witness that can state how it defines personal information. *Id.* at 244:13–245:24. The deposition wasted Plaintiffs' and the Special Master's time, required Plaintiffs to seek and take another full-day deposition on Topic 4, and reflected Facebook's continued failure to fulfill its obligation to adequately educate its designees so they were prepared to fully answer questions within the topics for which they were designated. *Bowoto v. ChevronTexaco Corp.*, 2006 WL 294799, at *1 (N.D. Cal. Feb. 7, 2006); *see also* Ex. 104 (detailing more examples).

As recently as last Friday, August 5, Facebook continued this obstructionist tactic. When Ms. Leone was asked "[w]hat is Facebook's understanding of what it means when they promise that they will not provide personal identifiable information to advertisers," Facebook objected that the question was "out of scope," even though a document that Facebook had identified prior to the deposition used that express language. Ex. 98 at 287:25-288 (the questions); *id.* at 290:23-25 ("And she was asked to define a term personally identifiable information and I objected to it

as being out of scope"). This compounded Facebook's refusal to allow Mr. Clark to provide a definition of "personal information." Plaintiffs will now be forced to seek this definition through another deposition.

Moreover, although Plaintiffs are required to disclose the documents they will use in 30(b)(6) depositions three days before each deposition, ECF No. 789, ¶ 24, some of the designees have been unprepared to discuss even these documents. Indeed, in the first three days of Simon Cross's testimony on Topics 6 and 7 (friend sharing and whitelisting), Amy Lee's testimony on Topic 10 (monetization), and Mr. Clark's testimony on Topic 4, the designees stated 109 times that they were unfamiliar with information contained in an exhibit or had not made an effort to learn more about it (for example, by asking other Facebook employees). *See* Ex. 109.

Unprepared 30(b)(6) designees also compounded the obstructive behavior of other Facebook witnesses. Simon Cross, who was designated to testify about whitelisting, was asked about a framework that Facebook employee Jackie Chang had developed to determine which partners should continue to receive sensitive user information after Facebook supposedly deprecated access to friends data. His testimony, ultimately, was that Plaintiffs would have to ask Chang about that framework. Ex. 105 at 261–273, 278–283, 285–286. But when Plaintiffs took Chang's deposition, *she* claimed to have no memory of these matters,[7] even though documents showed her extensive involvement in whitelisting. Ex. 106 at 101:20–23, 104:24–105:5 & dep. ex. 7; *see also id.* at 168:18–20, 169:23–170:1 & dep. ex. 13.

Because Plaintiffs have recently filed a motion with the Special Master seeking additional

---

[7] *See* Ex. 106 at 69:13–22; 92:15–18, 94:12–16, 118:7–119:3, 161:15–21, 163–165, 182:13–16, 216:9–18, 219:2–13, 223:24–226:10, 240:2–7. Chang impeded her deposition in other ways as well. She claim she didn't understand the phrase "general understanding," *see id.* at 76:11–15, and at one point claimed she didn't understand what "indirectly" meant, even though she had just used its antonym, "directly," *id.* at 92:19–25. She obstructed or evaded the simplest of questions, such as whether her past emails contained information that she believed was correct when she sent them, *id.* at 130:9–132:2, 250:10–15, and she refused to agree that an email "would be a good guide of what you were thinking about the topics discussed in the email"— while also managing to profess ignorance about the definition of "good," *id.* at 134:13–135:15.

time for 30(b)(6) depositions, the imposition of sanctions in connection with the 30(b)(6) depositions should await the conclusion of the depositions. Only then can the amount of prejudice created by Facebook be gauged. However, the sanctions should include all costs and fees Plaintiffs incurred in preparing for and taking the depositions, including but not limited to all costs for the Special Master's attendance at the 30(b)(6) depositions and adjudicating related motions, and all fees for Plaintiffs' preparation for and taking of each 30(b)(6) deposition and preparation of briefs and other filings related to Facebook's Rule 30(b)(6) misconduct. They may also include the imposition of non-monetary sanctions.

## VI.     SANCTIONS SHOULD BE IMPOSED FOR FACEBOOK'S RECKLESS OVERDESIGNATION OF DOCUMENTS AS PRIVILEGED.

### A.     Facebook designates tens of thousands of documents as privileged, only to retreat from those designations when challenged.

Before January 2022, Facebook had logged fewer than 10,000 documents as privileged (excluding the documents Facebook logged as part of the initial presentation of ADI privilege issues to Judge Corley, *see supra* n.1). Decl. ¶ 10. On January 28, 2022, Facebook produced an amended "categorical" log that included documents over which it claimed attorney-client privilege.[8] *Id*. There were now a total of 14,132 documents on Facebook's categorical privilege log. Ex. 107 at 2.

Facebook's next iteration of its categorical privilege log, produced on March 17, 2022, added 233,544 documents, or 182,112 documents not counting "lesser included" ones, in 19 categories.[9] *Id*. This was a substantial escalation. Plaintiffs reached out to Facebook in April to discuss how to resolve disputes arising from this new privilege log in light of its volume, and after discussions, provided a written proposal on April 12. Ex. 108. The parties agreed that Plaintiffs would identify up to nine categories of documents at a time to challenge. Facebook

---

[8] The parties agreed to the use of "categorical designations" on privilege logs where "appropriate." ECF No. 462, ¶ C.3. When such designations are "appropriate," Facebook may claim privilege over documents "by categorizing [them] by type and/or topic and placing them into various categories that fit the nature of the documents." *Id.*

[9] A common example of a "lesser included" document would be an incomplete email string that is produced in addition to the complete email string.

would review a statistically significant sample of documents in each category, and report back to Plaintiffs. *See* Stipulation ¶¶ 3–5.

In late April, Plaintiffs identified the first nine categories of documents from the categorical privilege log for challenge. Ex. 109 at 2–5. In early May, after reviewing a sample of 3,062 unique documents, *see* Ex. 110, Facebook withdrew any privilege claim over 1,938, or 63%, of the documents; produced 331 previously withheld documents with redactions; and withdrew work-product designation for 17 documents. Ex. 111. Facebook thus altered the designations of *nearly 75%* of the sampled documents.

In light of this result, Facebook agreed to re-review all 182,112 withheld documents from the categorical privilege log. (That number excludes the lesser included documents.) This process appears to have resulted in the withdrawal of all privilege claims over tens of thousands of documents and the alteration of privilege designations for thousands more.[10] These documents were produced on a rolling basis beginning on June 9, 2022 Hr'g Tr. at 19:17-20:15. The Court ordered that Facebook produce an amended privilege log and complete its production of de-designated documents by June 24, 2022. It did not do so. On July 1, July 18, and August 1, Facebook informed Plaintiffs that it had identified several hundred additional documents that it had not yet produced due to "due to error."

## B.   Many of Facebook's designations were frivolous.

As implied by Facebook's decision to reverse previous assertions of privilege for more than 64,000 documents, Facebook's privilege logs contained assertions of privilege that lacked any arguable merit. For example, the logs included documents over which Facebook asserted

---

[10] For a number of reasons, including technical issues with Facebook's privilege logs, Plaintiffs cannot pinpoint the exact number of documents that have been de-designated in whole or in part. What Plaintiffs *can* say, however, is that on Facebook's April 2022 privilege log, there were 191,308 entries designated as some form of "Withheld/Withhold." The amended privilege log produced on July 21 has 130,658 entries designated as some form of "Withheld/Withhold." That is **60,650 fewer entries.** The 60,650 entries consist of 53,168 entries that were dropped completely and presumably produced in full, plus 7,482 entries that were changed from some form of "Withheld/Withhold" to some form of "Redacted." Decl. ¶ 11. Note that these numbers do not account for the entries previously designated as "Redacted" that were dropped from the log and presumably produced in full.

attorney-client privilege that had been disclosed to third parties, as well as over documents that were distributed to over 100 recipients. Ex. 109 at 2–3. Plaintiffs do not have the space in this brief to catalog the full range, or even a statistically significant sample, of Facebook's baseless assertions of privilege. But the three examples below are illustrative both of the lack of any merit of many of the designations and the probative value of many of the documents previously withheld:

- FB-CA-MDL-03306752: Facebook claimed attorney-client privilege over a message thread between non-attorneys discussing a number of business-related topics, including "what to do about friend data" and "do apps get to store the user data?" One suggestion on the latter topic is "apps can store any data they get."

- FB-CA-MDL-03334826: Facebook claimed attorney-client privilege over an email, which is from non-attorney Richard Allan to other non-attorneys, discussing data portability and a framework for vetting third parties from a competition standpoint. The document uses Cambridge Analytica as an example of data portability issues.

- FB-CA-MDL-03384808: Facebook claimed attorney-client privilege over a 2018 email from non-attorney Yul Kwon to non-attorney Deborah Liu sharing materials that Kwon had originally presented to Mark Zuckerberg in mid-2015 on "the need to build stronger and more centralized privacy & data use org." Kwon states, "I wonder how much of a better place we'd be in today if the proposal had been implemented three years ago."

**C.    There is some evidence that Facebook employees tried to claim attorney-client privilege over nonprivileged communications.**

Separately, there is some evidence that Facebook employees improperly tried to shield nonprivileged communications with the attorney-client privilege. One email among nonlawyers reads:

> **From:** Konstantinos Papamiltiadis
> **Date:** Thursday, May 7, 2015 at 6:18 PM
> **To:** Ashley Moore, Simon Cross
> **Cc:** Gareth Morris
> **Subject:** Re: Thanks & follow-up
>
> + Gareth as fyi
>
> Simon, can we discuss in person? Else we need to make this a/c priv and add a lawyer in the thread.
>
> kp

Ex. 112 at FB-CA-MDL-01537997. There is no indication that these employees were discussing a legal matter.

Similarly, a string of messages among Facebook employees ties attorney-client privilege not to the content of the communication but merely to how "sensitive" a topic was:[11]

> William Moca Fusz (3/20/2018 16:43:39 PDT):
>
> >Just ensure that if it's *very sensitive* you ask a lawyer for guidance in the Quip and privilege it
>
> Emma Jacquemart-Simonen (3/20/2018 16:44:53 PDT):
>
> >How does one 'privilege it'?
>
> David Doyle (3/20/2018 16:45:22 PDT):
>
> >With the presence and approval of an attorney

Ex. 113 at FB-CA-MDL-00303171 (emphasis added). Mr. Doyle then went on to link to two internal Facebook documents about attorney-client privilege.

These documents raise suspicions. While they are not conclusive, they can be read to suggest that Facebook employees were trying to shield nonprivileged communications about sensitive topics by invoking the attorney-client privilege in bad faith. This raises serious concerns about the credibility of Facebook's privilege assertions. Such a practice would also help to explain the overdesignation problem.

## D.  Facebook's defense of its conduct is meritless.

Facebook has defended its conduct in two ways. First, it has insisted that its March 2022 privilege log claimed privilege over not 233,544 documents, but only 89,637 once "duplicates and 'near-dupes'" are eliminated. ECF No. 939 at 10. To the extent this is any defense at all, it ignores the work that Plaintiffs were required to do to challenge Facebook's privilege designations. For while the parties' protocol for privilege logs allows categorical logging, it did

---

[11] "The fact that a person is a lawyer does not make all communications with that person privileged." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (citing *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996)).

not obviate the requirement to provide particularized challenges to privilege. Thus, even the categorical privilege logs must provide (and have provided) document-specific metadata, with each document listed separately for that purpose. Plaintiffs then had to use that information, along with the categorical claim of privilege, to determine whether to challenge the assertion of privilege on a document-by-document basis. And because Facebook withheld so many documents in full, Plaintiffs could not be sure which documents were lesser-included documents, or near dupes, merely by looking at the document metadata. Plaintiffs still had to treat each document individually, a massive undertaking. Decl. ¶ 7.

Second, Facebook has defended itself by emphasizing that after a "significant percentage" of the sampled documents were de-designated, it "immediately began a full re-review of the log." ECF No. 939 at 10. This misses the point. Facebook should never have designated the documents as privileged in the first place. Moreover, Facebook did not decide on its own to re-review the logged documents. It re-reviewed them only after it had served Plaintiffs with a privilege log with tens of thousands of new privilege designations and Plaintiffs had negotiated a new protocol for resolving privilege disputes over so vast a number of documents, carefully reviewed the log, and identified nine categories of documents to prioritize for challenge. It was Plaintiffs, not Facebook, whose hard work forced the re-review to happen.

**E.    Sanctions should be imposed.**

Even without more, the withdrawal of privilege claims over so high a proportion of logged documents indicates that Facebook's claims of privilege were recklessly made. This recklessness, in combination with the delay in logging documents and the frivolousness of so many of the claims of privilege, justifies sanctions under 28 U.S.C. § 1927 or the inherent power. *See Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001). As a monetary sanction, Plaintiffs seek the additional fees and costs they incurred in dealing with the privilege log that Facebook issued in March of this year. Plaintiffs are prepared to submit a declaration substantiating those additional fees and costs.

As nonmonetary sanction under the Court's inherent power, Plaintiffs ask that Facebook

be precluded from making affirmative use of any de-designated document from the privilege log issued in March of this year, whether to defeat class certification, to obtain a dispositive order, or at trial. In addition, Plaintiffs ask that they be permitted, at their discretion, to conduct depositions, after the fact-discovery cutoff but no later than 30 days before trial, of individuals who are active contributors in the de-designated documents. This includes the ability to take additional testimony from a previously deposed witness if the de-designated documents, in which the witness was an active contributor, were not produced at least 7 days before their depositions. Such sanctions are closely linked to the discovery misconduct at issue. *Cf. Navellier*, 262 F.3d at 947 (where issue is deemed established as a sanction, the issue must "bear[] a reasonable relationship to the subject of discovery that was frustrated by sanctionable conduct"). The sanctions are also justified by the degree of fault shown in Facebook's overdesignation, by its overall record of discovery misconduct, and by the need to generally deter reckless claims of privilege, which strike at the heart of litigation's truth-seeking function. *See supra* § II.B.

## VII.   SANCTIONS SHOULD BE IMPOSED FOR MISSTATEMENTS ABOUT, AND DELAY IN PRODUCING, FINANCIAL DOCUMENTS.

### A.   2019 to April 2022: Facebook continually denies that responsive financial information exists, only to change its tune abruptly in spring 2022.

Since the inception of discovery in 2019, Plaintiffs have sought information about the revenue that Facebook receives as a result of allowing third parties to access users' data. Ex. 10 at RFP No. 17; *see also id.* RFP Nos. 14–16. The information is relevant to the calculation of damages for claims, such as breach of contract, under which Plaintiffs seek disgorgement of profits earned from the sharing of information beyond users' consent.

Facebook has repeatedly asserted that no documents responsive to these requests exist. Ex. 10 at Responses Nos. 14–17 ("Facebook states it does not have any documents in its possession, custody, or control responsive to this Request."). Well into 2020, Facebook also asserted that the information that Plaintiffs sought was not relevant. Exs. 56, 57. It took the position that Plaintiffs were asking for "highly sensitive financial information bearing no conceivable relevance to the issues remaining in dispute, as identified in Judge Chhabria's

Motion to Dismiss Order." Ex. 114 at n.3.

Plaintiffs consistently pressed the point, informing Facebook time and again why the information was relevant and expressing disbelief that it did not maintain responsive information. Decl. ¶ 8. Finally, in December 2020, Facebook told Judge Corley that it had "investigated this extensively" and "to the best of our knowledge there wouldn't be responsive materials." Hr'g Tr. at 9:6–9 (Dec. 9, 2020). In light of this assertion, Judge Corley in early 2021 ordered a limited 30(b)(6) deposition, directing Facebook to "provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus values user data." ECF No. 588 at 1–2. The purpose of the deposition was "investigatory" and "to assist Plaintiffs with identifying relevant discovery." *Id.* at 2.

The 30(b)(6) deposition occurred in February 2021. On the eve of the deposition, Facebook produced a high-level, three-page summary of various channels through which Facebook generated revenue during the 2012–2017 time period. Ex. 137. This was the very first document Facebook produced in response to Plaintiffs' request for financial information, more than 14 months after Plaintiffs first asked for these materials. Nevertheless, it was not sufficiently detailed or meaningful to provide the information Plaintiffs sought.

For the 30(b)(6) deposition itself, Facebook chose as its designee an advertising project manager who did not work for or with Facebook's finance or growth teams. Despite her lack of direct involvement in Facebook's finances, the designee confirmed that "average revenue per user" (ARPU), daily average users, and month average users were key financial metrics for Facebook. Ex. 116 at 64. She confirmed that Facebook's growth team tracked user activity in order to calculate these metrics, and testified that ARPU figures were tracked and analyzed by the finance team. *Id.* at 71, 73. She also acknowledged that the finance team tracked more granular components of how Facebook generated revenue, including through advertising, *see id.* at 79, and that Facebook takes "user value" into account in connection with advertising. *Id.* at 56.

After the deposition, Plaintiffs reiterated their request for financial information. Ex. 117. Unfortunately, Facebook continued to stonewall. By this time, the parties had engaged the

services of Judge Andler and Special Master Garrie to assist with discovery disputes. Each time Plaintiffs tried to raise the issue, Facebook and its counsel claimed that the issue was not yet ripe. *See, e.g.*, Ex. 118. Facebook also repeatedly told Plaintiffs that it would be prioritizing other discovery issues before addressing the requests for financial information. Ex. 119.

Ultimately, the issue of financial information was mediated before Judge Andler and Special Master Garrie on February 14, 2022. At that mediation, Plaintiffs identified seven categories of financial information that they had been seeking. Ex. 62. In early March, Facebook agreed to search for these categories of information. Ex. 120.

Production of responsive documents finally began on April 15, 2022. Decl. ¶ 9. In early June, the Court ordered Facebook to complete the production by July 1. ECF No. 941. Facebook later sought, and was granted, an extension of that deadline until July 22. ECF No. 959. To date, Facebook has thousands of financial documents that it previously told Plaintiffs and the Court did not exist.

## B.    Sanctions should be imposed.

Facebook denied for years that responsive financial information existed. In March 2022—only after the Court had raised the possibility of sanctions—Facebook agreed to search for responsive financial information. *The next month*, it began to produce responsive documents.

Given this turnaround time, it strains credulity to believe that Facebook's earlier denials were based on a reasonable search for responsive documents. The only reasonable inference—and the inference that is consistent with the rest of Facebook's discovery misconduct—is that the denials were made in bad faith, i.e., with the knowledge that they did not rest on a reasonable search for responsive information. *See Primus Automotive Fin. Servs. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) ("A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument . . . ."); *see also, e.g.*, *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006) ("[A] party has an obligation to conduct a reasonable inquiry into the factual basis of his responses to discovery . . . .").

Facebook's misconduct violated Rule 26(g), which requires that a written discovery

response be made "to the best of the [signer's] knowledge, information, and belief formed after reasonable inquiry." Fed. R. Civ. P. 26(g)(1). Indeed, it went further. Facebook repeatedly issued written and oral denials—directed both to Plaintiffs and to neutrals—that responsive financial information existed. Because these denials were in bad faith, greatly delayed the discovery of highly relevant financial information, and have affected Plaintiffs' ability to timely conduct discovery, sanctions under Rule 37(c)(1), 26(g)(3), or the inherent power are appropriate.

Monetary sanctions should be imposed. Plaintiffs are prepared to submit a declaration substantiating the additional fees and costs they incurred as a result of Facebook's misconduct connected with financial documents.

Nonmonetary sanctions are also appropriate. Facebook should be precluded from affirmatively arguing at any stage of the case that the information in the financial documents is incomplete, untrue, or inaccurate, or cannot provide a basis for the calculation of restitution, should the Court determine that restitution is an available remedy for any claim. Such a sanction is tied closely to the discovery misconduct at issue, and is justified by Facebook's bad faith and its pervasive discovery misconduct more generally. *See supra* § II.B.

## VIII. SANCTIONS SHOULD BE IMPOSED FOR MISCONDUCT CONNECTED WITH COLLECTING AND PRODUCING QUIPS.

Facebook made extensive internal use of a collaborative document editing program called Quip, which enables multiple people to collaborate on documents and spreadsheets. Since 2019, Plaintiffs have identified Quip as a source of responsive documents that Facebook was obligated to search in a manner proportionate to their importance to the case. However, Facebook's production is replete with probative documents containing internal links to Quips that are not accessible to Plaintiffs.

In March, Plaintiffs learned that Facebook's collection of Quips was inconsistent and incomplete. Plaintiffs have separately moved to compel Facebook to conduct a proportionate collection and review of Quips (and other relevant documents not adequately collected: Tasks and internal Facebook Group messages). That motion was presented to the Special Master. Here, Plaintiffs seek sanctions for Facebook's delayed and deficient production of these documents.

### A.    The importance of Quips to this case.

Facebook uses Quip as a collaborative software tool, similar to Google Docs. By using Quip, Facebook employees collaboratively create and edit documents and spreadsheets. Facebook has produced more than 38,000 documents that mention or link to at least one Quip but has only produced approximately 3,500 Quips. Even that limited production, however, demonstrates their relevance. For example:

- Exhibit 121 is a November 2018 Quip titled "Interfaces One-Pager Roadmap: Platform Foundations (CA Remediation/Legacy Login Issues)." Among other things, the document provides examples of "API related issues we have seen this year," including "[w]e don't understand our system and lack sufficient oversight into creation and access to APIs" and that the "FTC is frustrated FB cannot easily answer questions about which APIs share PII with 3rd parties." *Id.* at CA-MDL-META-0000139629. The first three-and-a-half pages reflect the most recent, clean version of the document, and the remaining two-and-a-half pages identify the document users and edits.

- Exhibit 122 is a June 2018 Quip that appears to be a performance review of a Facebook employee involved in the ADI. The document lauds her for "Enforc[ing] on over 30 apps developed under the MyPersonality project at CPC," the Cambridge University Psychometric Centre, where Alexander Kogan also developed This Is Your Digital Life. "Total installs for" MyPersonality project apps "totaled more than 6 million users (20x the # of installs that the main CA"— Cambridge Analytica—"app had, of which, nearly 3 million had authorized permission to a friend's data, with the total number of friends' affected totaling over 500 million." *Id.* at FB-CA-MDL-02539176.

Facebook employees frequently link to Quips in produced documents. Despite their obvious relevance to this case, however, the overwhelming majority of Quips identified in the documents do not appear to have been produced. Three examples are illustrative.

*First*, Exhibit 139 is a June 2018 email thread about certain third parties that maintained access to "Friends Data (ie friends birthday, religion, education[,] history, etc.)" because they still "had access to v1 of the API" or because they had "been added in relevant capabilities." *Id.* at FB-CA-MDL-03657078-03657079. It links to two Quips—one that identifies "3rd party integrations that have been whitelisted for V1 that have also been active in the last 90 days" and a "Masterlist" that identifies, among other information" "App IDs that are still on V1."*Id.* at FB-CA-MDL-03657079.

*Second*, Exhibit 123 is an April 2018 Quip titled "Policy H1 2018 Quip of Quips." The document is itself a Quip that provides links to 23 other Quips. While Plaintiffs have been able to locate several, others do not appear to have been produced, including "CA [Cambridge Analytica] Updates," "Cambridge Analytica General," "Cambridge Analytica Numbers [April 4]," "CubeYou, YouAreWhatYouLike, Cambridge University [April 7]," and "Privacy Improvements Over Time." *Id.* at CA-MDL-META-0000163270.

*Third*, Exhibit 124 is a December 2016 email thread about Facebook's Data Protection Handbook that references "case studies in this quip." *Id*. at FB-CA-MDL-03760654. The relevance of this Quip is highlighted by the discussion elsewhere in the email chain. Facebook's Deputy Chief Privacy Officer Rob Sherman expresses concern about "adding language that disclosing even anonymized data can still expose people to harm," which is relevant to Plaintiffs' allegations about how third parties can interpret user data that Facebook makes available to them. He also expresses concern about the focus "on the idea that the data itself is valuable (i.e., that it is monetizable or that we collect metadata about people's interactions that we can leverage," which he admits is "obviously true" and which is relevant to an assessment of damages under an unjust enrichment theory. And he expresses concern about "places where the draft says that it is basically impossible for people to understand complex data flows and therefore consent is ultimately impossible" since "Facebook's data processing is complex and we rely on consent to justify it," which is relevant to Plaintiffs' breach of the implied covenant of good faith and fair dealing claim. *Id.* at FB-CA-MDL-03760652–0653.

**B.      A brief history of Plaintiffs' efforts to understand how Facebook is collecting and reviewing Quips for production.**

On November 16, 2019, shortly after the Court issued its order resolving Facebook's motion to dismiss the complaint, Plaintiffs asked Facebook to describe custodial and non-custodial sources and confirm that Quips are being preserved. Ex. 125. On November 4, 2020, Plaintiffs proposed a production protocol that incorporated a provision applicable to Quips. *See* ECF No. 563-1 at 3 (asking Facebook to propose a method for collecting and producing responsive information from Quip and other ESI sources).

However, Facebook delayed discussions about producing Quips and other non-custodial ESI, insisting that the parties prioritize custodial search terms over additional targeted collections. ECF No. 563 at 6. The process of negotiating custodians and search strings took more than a year, and Facebook did not first purport to complete that production until January 31, 2022, the former deadline for substantial completion of document production. ECF No. 706.

Plaintiffs tried, without success, to engage with Facebook about the production of Quips throughout that time period. Once discovery mediation commenced, Plaintiffs continued to press the issue. *E.g.*, Ex. 126. (listing issues Plaintiffs sought to mediate, including #2: production of Quips and other sources of responsive ESI). Yet Facebook limited the focus of mediation and discovery briefing to Named Plaintiffs' data, ADI, deposition scheduling, and one-off issues such as the production of the "Secret Sauce" report and Mark Zuckerberg's notebooks. Those issues took approximately nine months to resolve.

When the Discovery Mediators asked the parties to submit a tracker of discovery disputes in February 2022, Plaintiffs identified that they sought additional production of Quips. Ex. 130. That issues has remained on the mediation tracker, now submitted on a weekly basis, ever since.

On March 15, 2022, at the Discovery Mediators' suggestion, Plaintiffs sent Facebook exemplars of produced documents containing references to relevant Quip files that had not themselves been produced. Ex. 127. Plaintiffs were clear that these were only exemplars: "Plaintiffs have identified approximately 50 exemplars of references to relevant Quip files that have not been produced by Facebook. It is not a comprehensive list of Quip production gaps." To date, however, Facebook has produced more than 38,000 documents referencing Quips and still only produced about 3,500 Quips.

As the parties continued to meet and confer about Quips, Facebook's explanation of how it had collected them shifted. During an April 8 meet and confer, Facebook proposed writing a letter documenting its process for collecting and reviewing Quips. Laufenberg and Melamed Decl. ¶ 4. Though Plaintiffs agreed, and asked about the letter during many of the parties' twice-

weekly standing meet-and-confers, Facebook kept pushing the deadline out.

During the parties' May 3, 2022 meet and confer, Facebook disclosed that, while all Quips associated with certain custodians had been collected and searched for responsive documents, that was not the process for other custodians. For the second group of custodians, Facebook informed Plaintiffs that technical limitations at the time of collection prevented it from collecting all Quips associated with those custodians. Those custodians' Quips were identified and collected based on custodial interviews. Ex. 131. Thus, Facebook's collection for the second group of custodians was twice constrained: first by the custodians' memories of Quips, and second counsel's determination during the custodial interview of what information was relevant to the case.

Plaintiffs continued to ask, during the parties' twice weekly standing meet-and-confers, when Facebook would provide the written explanation of how it had collected and searched Quips that it promised in May. When Plaintiffs raised the issue on July 14, 2022, counsel for Facebook expressed frustration that Plaintiffs continued to press the point. Even though the attorney had been present during the meet and confer when Facebook agreed to provide the letter on April 8, she now stated her belief that Plaintiffs were not entitled to the information they sought. Since Facebook had promised the letter, she said Facebook would provide it. But she stated that it was her lowest priority. Laufenberg and Melamed Decl. ¶¶ 4–6.

On July 22, 2022, Facebook sent its letter describing its process for collection of Quips and other document sets. It was far less than Facebook had promised. The full statement about Facebook's collection of Quips was: "Quips were collected from the Quip system based on a reasonable and diligent investigation conducted by counsel which included the collection of Quip accounts for document custodians who identified Quips as a potentially relevant data source, as well as targeted searches of the Quip system based on interviews with knowledgeable persons." Ex. 128.

The single sentence explanation fails to provide the information Plaintiffs sought. It does not identify the custodians whose Quips were not fully collected. It does not state whether

Facebook has gone back to collect those custodians' Quip files in full, like it had for other custodians. It does not explain what Facebook is doing to ensure it had produced Quips referenced in the documents it had produced—documents it had already determined were responsive, or which it had been ordered to produce. Facebook has still not provided this information.

On August 5, Plaintiffs filed a motion with the Special Master asking for the following additional production. First, Facebook should be required to produce all non-privileged Quips referenced in any other document Facebook has produced. Second, Facebook should collect all Quips associated with custodians whose Quips were previously identified by custodial interview, run the parties' previously identified search strings for each custodian against their collected Quips, and produce all non-privileged Quips responsive to that search. But in this motion, Plaintiffs ask the Court to issue sanctions based on the excessive delay and continued resistance to full production of Quips.

**C.     Sanctions should be imposed.**

### 1.  Bad faith in continued failure to search for or produce responsive Quips.

For nearly two years, Plaintiffs have sought production of responsive Quips. Facebook's custodial email collection confirms that Quips were tools regularly used by Facebook employees to collaborate on the creation of documents concerning issues core to this action. While Facebook has produced some Quips, it has failed to conduct a reasonable search for those that are responsive to Plaintiffs' document requests. Indeed, it has not come close to producing even those Quips referenced in documents it has produced. This is similar to producing responsive emails while omitting attachments. Facebook's bad faith is most evident in its promise to provide a written explanation of the collection; repeatedly missing the date it provided for providing the letter; and ultimately providing a letter two weeks ago with a single, boilerplate sentence regarding its collection. Facebook has stonewalled, refused to provide necessary information, and avoided its obligation to undertake an effort to collect, review, and produce Quips proportionate to their relevance to the case.

### 2.  Issue sanctions.

Plaintiffs seek permission to conduct additional depositions at their discretion, after the close of fact discovery but no later than thirty days before trial, of any active contributors in Quips that have not been produced as of July 22, 2022, the date Facebook sent its insufficient letter regarding how it had collected Quips. This includes the ability to take additional testimony from previously deposed witnesses regarding Quips that were not produced at least seven days before their deposition.

### 3.  Monetary sanctions.

Plaintiffs are prepared to submit a declaration substantiating the additional fees and costs they incurred as a result of Facebook's misconduct connected with Quips.

## IX.    CONCLUSION

Facebook's discovery misconduct has been long-running and pervasive. It has threatened the fair resolution of this litigation. The Court should impose the nonmonetary sanctions proposed above in addition to the monetary sanctions that Plaintiffs have requested here and in previous briefing.


Dated: August 8, 2022                                        Respectfully submitted,


KELLER ROHRBACK L.L.P.                         BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                          By:    */s/ Lesley E. Weaver*
         Derek W. Loeser                                              Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)          Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)   Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                 Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)          Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                        Joshua D. Samra (SBN 313050)
Emma M. Wright (admitted *pro hac vice*)           555 12th Street, Suite 1600
Daniel Mensher (admitted *pro hac vice*)           Oakland, CA 94607
Michael Woerner (admitted *pro hac vice*)          Tel.: (415) 445-4003
Matthew Gerend (admitted *pro hac vice*)           Fax: (415) 445-4020
1201 Third Avenue, Suite 3200                      lweaver@bfalaw.com
Seattle, WA 98101                                  adavis@bfalaw.com
Tel.: (206) 623-1900                               mmelamed@bfalaw.com

Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com
ewright@kellerrohrback.com
dmensher@kellerrohrback.com
mwoerner@kellerrohrback.com
mgerend@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

aornelas@bfalaw.com
jsamra@bfalaw.com

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of August, 2022, at Oakland, California.

*/s/ Lesley E. Weaver*
Lesley E. Weaver