# Defendant's Exhibit 32

Pages 1 - 57

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE

IN RE: FACEBOOK, INC. CONSUMER   )   **NO. 18-MD-02843 VC (JSC)**
PRIVACY USER PROFILE LITIGATION, )
_____  )
                                     San Francisco, California
                                     Tuesday, January 11, 2022


### TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR


**APPEARANCES**:

For Plaintiffs:          KELLER ROHRBACK LLP
                         1201 Third Avenue, Suite 3200
                         Seattle, Washington 98101
                  BY:    **DEREK W. LOESER, ESQ.**
                         **CARI C. LAUFENBERG, ESQ.**
                         **DAVID J. KO, ESQ.**


                         BLEICHMAR, FONTI & AULD LLP
                         555 12th Street, Suite 1600
                         Oakland, California 94607
                  BY:    **LESLEY E. WEAVER, ESQ.**
                         **ANNE K. DAVIS, ESQ.**
                         **MATTHEW P. MELAMED, ESQ.**


For Defendant:           GIBSON, DUNN & CRUTCHER LLP
                         200 Park Avenue
                         New York, New York 10166-0193
                  BY:    **ORIN SNYDER, ESQ.**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




Reported by:  Katherine Powell Sullivan, CSR #5812, CRR, RMR
              Official Reporter - U.S. District Court

```
 1   APPEARANCES:  (via Zoom Webinar; continued)

 2   For Defendant:        GIBSON, DUNN & CRUTCHER LLP
                           1881 Page Mill Road
 3                         Palo Alto, California 94304
                      BY:  MARTIE KUTSCHER CLARK, ESQ.
 4
                           GIBSON, DUNN & CRUTCHER LLP
 5                         333 South Grand Avenue
                           Los Angeles, California 90071-3197
 6                    BY:  DEBORAH L. STEIN, ESQ.

 7   Also Present:         Honorable Gail A. Andler

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Tuesday - January 11, 2022                        10:01 a.m.

 2                          P R O C E E D I N G S

 3                               ---oOo---

 4        THE CLERK:  Court is now in session, the Honorable

 5   Jacqueline Scott Corley presiding.

 6        Calling Civil action 18-md-02843, In Re Facebook.  We

 7   don't need the appearances, but please state your name each and

 8   every time before you speak, for the reporter.  Thank you.

 9        THE COURT:  Good morning.

10        And thank you, Judge Andler, for being here today.

11   Mr. Garrie advised me he's unable to be here, but he can get a

12   transcript.

13        Okay.  So the main thing we need to discuss today is we

14   have Facebook's three appeals of three of the Special Master's

15   order.  So now is the time for Facebook to be heard.

16        I will simply note that my review is de novo.  So whoever

17   is going to speak for Facebook, whichever appeal you would like

18   to start with, please, go ahead.

19        MR. SNYDER:  Thank you, Judge.  Good morning.  It's

20   Orin Snyder.  I'm going to have my colleagues Martie Kutscher

21   Clark and Deb Stein address the three issues.  They've been in

22   the weeds and on the ground day-to-day.

23        I just wanted to say that these are three issues, Your

24   Honor, before the Court, all of which we've worked through with

25   you previously and we believed were settled.  Two of the issues
```

1   we first began discussing, unfortunately, with the Court in

2   early 2020.

3       And the bottom line is that, frustratingly, we appear to

4   be back at square one or even square negative one despite Your

5   Honor working hard and issuing what we thought was settled

6   guidance long ago and despite the special master process.

7       And what we are going to respectfully request today is

8   that Your Honor assist us in reimposing an orderly, fair, and

9   proportionate discovery process because we're now three weeks

10  away from the substantial completion deadline that

11  Judge Chhabria ordered, and the goalposts still continue to

12  move and threaten to upend that scheduling deadline in a way

13  that is very concerning to us.

14      As Your Honor knows, we're eager to get to depositions,

15  summary judgment, class cert, move the case forward.  It's

16  already too old, too delayed.  And Your Honor knows how much

17  we've produced, the millions and millions of pages.

18      Judge -- Special Master Garrie has ruled on a number of

19  motions.  He's rejected all of the allegations that Facebook

20  has been hiding the ball after reviewing random samples of

21  documents.

22      But the entire reason Your Honor and Judge Chhabria

23  appointed the Special Master was to streamline, expedite, and

24  avoid burdening this Court.

25      And, unfortunately, just to be clear or blunt about it,

1   the orders that we received, including one at 10:00 o'clock

2   last night, that ordered us to produce every single ADI

3   communication, period, full stop, really blows open issues that

4   this Court spent a tremendous amount of time working through.

5   And we just need finality repose.  And the problem is, for

6   example, an order we received last night.

7            THE COURT:  I don't want to talk about that because

8   there's a process for that.  There's three that are pending

9   before me.

10           MR. SNYDER:  Okay.

11           THE COURT:  So why don't we go forward with that.

12           MR. SNYDER:  Sure.

13           THE COURT:  So which one do you want to start with?

14           MR. SNYDER:  So ADI, Your Honor.

15           THE COURT:  Okay.  And who's going to take that one?

16           MR. SNYDER:  I'm going to have Ms. Clark do that.

17           THE COURT:  All right.  Ms. Kutscher Clark, please, go

18   ahead.

19           MS. KUTSCHER CLARK:  Your Honor, when we left off with

20   you on ADI, you had done an in-camera review and disposed of

21   plaintiffs' motion to compel ADI communications without

22   ordering any of those communications produced.

23       You had also identified three specific buckets of

24   documents that you found to potentially contain discoverable

25   underlying facts uncovered by the investigation.  Those were

1  background and technical reports prepared by non-attorneys,

2  audits conducted by non-attorneys, and interviews conducted by

3  non-attorneys.

4       You ordered Facebook to produce those documents for six

5  specific apps, and we did that.  And the only issue that your

6  order left open for us to work through with the Special Master

7  was whether materials in those same buckets were discoverable

8  for other apps.

9       Unfortunately, now we're three weeks before the

10 substantial completion deadline and the Special Master's order

11 has brought back into play virtually all documents from ADI,

12 which is very concerning to us for a number of reasons.

13      As you know, this case is not about ADI.  ADI began after

14 the lawsuit was filed.  This lawsuit is, instead, about long

15 defunct forums of data sharing that ended long before ADI even

16 began.

17      Your prior orders and guidance recognized all of this and

18 how that any ADI production should be proportionate and

19 tailored to specific materials containing underlying facts that

20 the investigation uncovered.

21      The Special Master's order --

22           **THE COURT:**  What order said that?  What order did I

23 issue that said that?

24           **MS. KUTSCHER CLARK:**  At multiple hearings, the

25 Court --

1          **THE COURT:**  But what order?  There is no written order

2     that says that; right?

3          **MS. KUTSCHER CLARK:**  I believe both the order that the

4     Court issued in September and there was also an order, that I'm

5     digging for right now, from August that referred to underlying

6     facts being discoverable while legal advice and legal work

7     product not being discoverable.

8          **THE COURT:**  Correct.  Correct.  That's right.  I never

9     ruled that attorney work product or attorney-client privilege

10    communications had to be produced.  I don't know what would be

11    the basis for doing so.

12         I did rule, though, that despite Facebook's contention

13    that the entire ADI was protected by the privilege or attorney

14    work product, that it was not; right?  That's what we had

15    months of briefing on, and I did rule that.

16         **MS. KUTSCHER CLARK:**  Correct.  We understand that

17    order.  Obviously, we disagree with that order, but we do

18    understand it.  We have --

19         **THE COURT:**  No, no, no.  I mean, you didn't appeal it

20    to Judge Chhabria.  At the time Special Master Garrie hadn't

21    been appointed.

22         **MS. KUTSCHER CLARK:**  Right.  And at that time the

23    Court ordered Facebook to produce documents relating to six

24    apps that were materials created by non-attorneys and three

25    specific buckets and to work with the Special Master on

1    additional productions consistent with the Court's guidance.

2        Our concern at this point is the Special Master's order

3    brings the parties all the way back to square one.  It's

4    bringing back into the case every single ADI document, the

5    requests that we worked with the Court for two years to narrow.

6        I think the Court will remember that we did a very

7    complicated, long, burdensome sampling process specifically so

8    that the Court could provide guidance on what, if any, ADI

9    communications were discoverable.

10       And plaintiffs were permitted to select communications

11   that they wished for the Court to review in camera.  We

12   submitted those communications for the Court to review in

13   camera.  And after reviewing those documents, the Court did not

14   order any of them produced.

15       Instead, at a hearing last April, you advised the parties

16   that you found many of the communications, in your words, to be

17   not at all relevant and that many of them were likely

18   privileged.

19       Where we are now is the Special Master has held all of

20   those communications are potentially back in play.  And this is

21   problematic not only for legal reasons, not only because it

22   unwinds the work and this Court's guidance, but it also really

23   throws a bomb in the discovery process right before the

24   substantial completion deadline.

25       When we collected and reviewed the documents for six apps,

only six apps, it took 300 attorney hours to do that work.

ADI looked at millions of apps.  If we were now ordered
and an order was upheld that we had to collect and review, log,
produce every single communication from ADI, that would take,
charitably, at least a year, if not longer.  It's a tremendous
amount.

**THE COURT:**  Isn't what the Special Master said is that
he requires more information to determine relevance and whether
such communication should be produced?

That's what he said in the order that you've appealed.

**MS. KUTSCHER CLARK:**  Correct.  And we provided the
Special Master all of the communications from the six exemplar
apps.  And last night we received another order that said --

**THE COURT:**  Not in front of me.  Not in front of me.

So what I have in front of me is his order in response to
your motion for reconsideration --

**MS. KUTSCHER CLARK:**  Correct.

**THE COURT:**  -- which apparently was well taken,
because he did narrow his order considerably, and he said that
he required more information to determine relevance and whether
such communications should be produced.

But, as I understand, it's Facebook's position that no
communications should be produced, that it's those six --
nothing; right?  Because you're appealing that order.

**MS. KUTSCHER CLARK:**  Yes, Your Honor.  And it's our

1   position that communications are categorically out of play at

2   this point.

3       We did a very long exercise to work through this so that

4   the Court could provide guidance on communications.  The Court

5   issued an order in September that stated it disposed of

6   plaintiffs' motion to compel ADI communications, and it did not

7   order any produced.

8       Again, the Court had also stated that many were not

9   relevant and many were privileged.  And we are now -- we're

10  really back --

11          THE COURT:  I don't know that I recall saying that

12  they were privileged.  I mean, basically, the 20 or so odd that

13  the parties presented to me weren't at the heart of the matter

14  at all.  They were nothing.  A lot of them were like between,

15  you know, saying, oh, let's meet or do something and that there

16  were other underlying data.

17      And what I had thought from reviewing it was, A, why is

18  Facebook even fighting some of this?  It's fighting over

19  nothing.  Perhaps there's a way for the parties to agree that

20  the underlying data could be produced.

21          MS. KUTSCHER CLARK:  Right.

22          THE COURT:  And not attorney -- and the parties met

23  and conferred and were unable to come to agreement.  So then I

24  had to issue the opinion as to whether the ADI was attorney

25  work product and, therefore, privileged.

1       And I held it was not because Facebook told the entire

2  world, told all their members, that they were conducting this

3  investigation to root out any problem apps and make sure it was

4  safe for their customers.  That's what they told them.

5       And, as I recall, I said in my order to find in favor of

6  Facebook I would have to find that Facebook was lying when they

7  said that to their users.  I don't find that they were lying,

8  and you didn't argue that you were lying.

9       So that's my understanding of how it went, which is why I

10 asked if you could point me to a written order in which I said

11 that communications are forever out of play, that you can't

12 have them, that the discovery is limited forever to those six

13 apps.

14      It's not an iterative process at all as to those six apps.

15 I don't recall that being in a written order.

16      **MS. KUTSCHER CLARK:**  Your Honor, there's a general

17 presumption that when a party makes a request for specific

18 materials and the Court resolves the request without ordering

19 those materials produced, the request has been denied.

20      **THE COURT:**  Okay.  I just want to say you should not

21 litigate based on that presumption.  That is not how it works.

22 I wouldn't do that.  That's a mistake.

23      **MS. KUTSCHER CLARK:**  We understand.

24      And, again, Your Honor, one of our biggest concerns is

25 that when we were before the Court last April, after we had

1    done this full sampling exercise, after the Court had looked at

2    the materials in camera, recognizing the volume, recognizing

3    how messy all this was, recognizing that many of these

4    materials were not relevant, the Court asked plaintiffs, What

5    is it that you really need?  I don't think you need all of

6    these communications.

7         And plaintiffs agreed with that, and they said, We don't;

8    what we need are the underlying facts.  And that led to, I

9    think, six months of back and forth about underlying facts.

10        And the parties worked in mediation, the parties worked

11   with the Special Master, the parties submitted extensive

12   supplemental briefing to the Court in order to get plaintiffs

13   what we were all describing as underlying facts.  And those

14   were the materials the Court ultimately ordered produced.

15        The Court ordered these background and technical reports

16   that involved investigations of the apps and factual

17   information about the apps.  The Court ordered interviews,

18   audits, the types of materials that would have factual

19   information in them.  And that was all consistent with the

20   conversation we had to focus plaintiffs' request on facts

21   instead of communications about how this investigation was

22   conducted years after this case was even filed.

23        And our -- our biggest concern right now is we've unwound

24   all that.  The Special Master has erased all of that work.

25        **THE COURT:**  See, I don't understand --

1          **MS. KUTSCHER CLARK:**  We are talking about the

2     communications.

3          **THE COURT:**  Ms. Kutscher Clark, I don't understand

4     because the order you appealed, the Special Master, in response

5     to your motion for reconsideration, specifically stated he

6     requires more information to determine relevance and whether

7     such communication should be produced.

8        So, as I understand it then, Facebook's position is that

9     no communication should be produced because you specifically

10    called out and put in your notice of appeal that you were

11    appealing that determination.  Correct?

12         **MS. KUTSCHER CLARK:**  Correct.

13         **THE COURT:**  Okay.

14         **MS. KUTSCHER CLARK:**  Okay.

15         **THE COURT:**  So your position is that no communication

16    should be produced.

17         **MS. KUTSCHER CLARK:**  That is correct.

18         **THE COURT:**  Okay.  All right.

19      So I guess I don't understand why you're saying the

20    Special Master has unwound everything.  What he did is he said,

21    no, I'm going to figure out if some of those communications

22    should be produced.

23         **MS. KUTSCHER CLARK:**  What we're saying is the Special

24    Master is redoing a process that was already completed before

25    this Court.

1          **THE COURT:**  Okay.

2          **MS. KUTSCHER CLARK:**  Many months went into doing a

3     sampling exercise, litigating, providing the Court in-camera

4     communications to determine whether or not communications

5     should be produced, and none were ordered produced.

6          And then nearly a year after that we received an order

7     basically starting that process again saying, Facebook, give me

8     documents to review in camera so we can look at whether

9     communications should be produced.

10         All of this work had already been done, which is, again,

11    as Mr. Snyder was saying, a very concerning aspect of this

12    because we're litigating issues over and over again, and this

13    was one that we thought had already been settled.

14         **THE COURT:**  Okay.  All right.  Do the plaintiffs wish

15    to say anything?

16         **MR. LOESER:**  Yes, thank you, Your Honor.  Good

17    morning.

18         I think the place to start is to go back and look at what

19    was ordered by Special Master Garrie.  Ms. Kutscher Clark has

20    focused exclusively on the communication aspects of it.  And I

21    do want to talk about it, but it's also important to keep in

22    mind that there are all of the other reports.

23         So after Your Honor entered its order, you required

24    certain materials for the six exemplar apps.  And then Your

25    Honor indicated that other materials would be produced, we

1    should work with the Special Master about producing other

2    materials consistent with that guidance.

3         We now know there are approximately 7,500 other reports

4    that are also by third-party companies hired by Facebook, █████

5    ████████████████████        And notwithstanding the instruction to --

6    to produce other materials --

7              **MS. KUTSCHER CLARK:**  Your Honor, respectfully, I need

8    to interrupt Mr. Loeser because he is revealing publicly, in

9    court, information that the Court has consistently sealed about

10   the outside experts that Facebook retained.  And I would

11   request, if Mr. Loeser wishes to reveal that type of

12   confidential information, that we go into closed court.

13             **THE COURT:**  It's unnecessary to reveal it.  You don't

14   need to mention any names, Mr. Loeser.

15             **MR. LOESER:**  Sure.

16             **MS. KUTSCHER CLARK:**  Thank you.

17             **MR. LOESER:**  My apologies.

18        The point is that there are a whole lot of other reports

19   just like the ones that they produced.  And notwithstanding

20   your guidance to work with the Special Master to produce other

21   materials consistent with your guidance, in the many, many

22   months since the September 8th order Facebook has produced not

23   one other report.

24        So when considering what Special Master Garrie ordered,

25   the first thing to consider is that there's this population of

1   materials, these other reports for which Facebook has not one

2   argument, and you haven't heard one today, as to why those

3   materials have not been produced and why they should not be

4   produced.

5        As to the issue of communications, Facebook's argument

6   basically is Your Honor settled this when it didn't order those

7   communications after the logging exercise the parties went

8   through.

9        But, as Your Honor noted, that logging exercise wasn't

10  particularly helpful because the materials were not

11  particularly relevant.  Those materials were blindly selected

12  by plaintiffs from a log of 6,000 documents.  Your Honor then

13  issued an order that provided guidance.

14       So the question for the Court is, is the requirement to

15  produce and then, in the amended order, for Special Master

16  Garrie to receive in camera to evaluate these other

17  communications, are those other communications consistent with

18  your guidance?  And the answer is yes, they are.

19       They are entirely consistent because those other

20  communications can't be work product because, as Your Honor

21  explained in great detail, there's a dual purpose here, and

22  these communications about the ADI the same dual purpose as the

23  other materials Your Honor ordered produced.

24       And these materials can't be protected by the

25  attorney-client privilege because, just like the materials Your

1   Honor ordered produced, these are not communications by, to, or

2   from lawyers.  These are internal communications at Facebook

3   regarding the ADI.  So that is very much consistent with your

4   guidance.

5        And just to pause for a minute as to why we are so

6   concerned about these communications and why they are so

7   important to produce, as we all know, in modern litigation the

8   internal email is the unvarnished truth.  Companies talk

9   directly about -- and contemporaneously about the events at

10  issues in litigation.

11       The ADI is very much at the heart of this litigation.

12  They were going back and looking at other apps that misused and

13  abused user data just like Cambridge Analytica.  And what

14  internal people, who are not lawyers and are not seeking legal

15  advice, say to each other about the ADI, the results, the

16  findings is critical information in this case.

17       If one engineer says to another, Did you see the latest

18  █████ memo?  I can't believe that we didn't shut those people

19  down.  We've known for years that they were abusing user

20  information --

21            **THE COURT:**  Mr. Loeser, I just want to stop you for a

22  moment.  I think I said not to mention names.

23            **MR. LOESER:**  I'm sorry.

24            **THE COURT:**  Ms. Clark brought it up, and to do it

25  again --

 1          MR. LOESER:  I'm sorry.

 2          THE COURT:  -- gives great pause.  You're a good

 3   lawyer, and I don't know how you could unintentionally make

 4   that mistake.

 5          MR. LOESER:  Well, I --

 6          THE COURT:  I think I've heard enough from the

 7   plaintiff now.

 8       Ms. Clark, did you wish to respond further?

 9          MS. KUTSCHER CLARK:  I wanted to make clear that the

10   Court never categorically held that there are no privileged

11   documents and that there's no work product among the ADI

12   materials.

13       The Court held that the work product protection did not

14   attach to specific types of materials created by nonlawyers,

15   and the Court's September order states explicitly that it's not

16   addressing attorney-client privilege and that plaintiffs were

17   not even seeking materials created by lawyers or communications

18   with lawyers.

19       The Special Master's order goes far beyond that and

20   actually does address --

21          THE COURT:  It does not.  It does not.  His order was

22   limited to non-attorney.  That's what I didn't get.  His was

23   non-attorney.  He has not ordered production of attorney

24   communications.

25          MS. KUTSCHER CLARK:  What he asked us to provide him

1   in camera were all communications relating to the six apps,

2   including --

3           **THE COURT:**  Well, in camera, in camera, because he has

4   to address privilege; right?  Because the question is, there

5   are some communications that may in fact -- there are some

6   things part of the ADI that may, in fact, be privileged.

7           There may be edits from lawyers to, you know, reports or

8   things like that.  There may actually be communications seeking

9   legal advice.  You're correct, I did not hold that those

10  communications, that work product would not be privileged or is

11  privileged.  I didn't have any of those things in front of me.

12  What I had was Facebook's, you know, swinging-for-the-fences

13  argument that every single thing part of the ADI was

14  privileged, and that argument I rejected.

15          **MS. KUTSCHER CLARK:**  Your Honor, I think what would be

16  most helpful at this point would be guidance from the Court

17  that any further ADI productions need to be proportionate and

18  tailored at this point.

19          As Mr. Loeser said, Facebook will be producing all of

20  these background and technical reports that have a tremendous

21  amount of underlying factual information.

22          Those are the reports the Court was very focused on and

23  that we submitted declarations about several months ago.

24  You've ordered production of interviews, audits.  Those are all

25  of the underlying factual information.

1        **THE COURT:**  Can I stop you for one second?  My

2    understanding is, with the six exemplar apps, you've taken the

3    position that none of those things exist, that there aren't

4    any -- anything other than the reports by the consultants.

5    There aren't any interviews.

6        **MS. KUTSCHER CLARK:**  Interviews and audits were --

7        **THE COURT:**  There aren't any audits.

8        **MS. KUTSCHER CLARK:**  For the six exemplar apps, that's

9    correct.

10        **THE COURT:**  So Facebook's position is they don't have

11    to produce any interviews or audits because your position is

12    that it's limited to those six exemplar apps.

13        **MS. KUTSCHER CLARK:**  No, that's not correct.  The

14    Special Master, in his order, orders production of those

15    materials for other apps as well.

16        **THE COURT:**  And you're not objecting to that.

17        **MS. KUTSCHER CLARK:**  We have not appealed that.

18        **THE COURT:**  Okay.  All right.  But why doesn't the

19    Special Master's order that says he requires more information

20    to determine relevance whether such communications be

21    produced -- that's the guardrails that you just asked for.

22        **MS. KUTSCHER CLARK:**  Your Honor, we're in a little bit

23    of a tricky position because the Special Master has now

24    supplemented his order to be very different.  And I know that

25    that order is not before the Court, so we're in a -- you know,

1    it's a little tricky today because he has now ordered every

2    single document to be produced.  But, from our perspective,

3    this further review never should have happened.  We did all

4    this work with the Court previously.  There was no reason to

5    unwind all of that.

6         And, again, we had understood the focus on underlying

7    facts, the focus on the specific types of documents prepared by

8    non-attorneys, that involved factual information, to be what

9    plaintiffs were requesting and what the Court had asked -- the

10   Court -- the Court had asked plaintiffs to focus on.  And if

11   we -- you know, at this point, if we were to dive back into

12   communications, we see no way that it would not significantly

13   delay the case.

14        And, again, I'm just going to briefly mention that the

15   Special Master has now ordered Facebook to produce every single

16   document from ADI, including attorney communications, which we

17   will separately appeal.  But if we were required to do that, I

18   don't see how it would not delay the case for at least another

19   year while we collect, review, and analyze millions of

20   additional documents.

21             **THE COURT:**  Okay.

22             **MR. LOESER:**  Your Honor, if I may, very briefly?

23             **THE COURT:**  No, Mr. Loeser.  I'm sorry.  You struck

24   out for today.  Someone else is going to have to argue.  I'm

25   sorry.  I'm sorry.

1         **MR. LOESER:**  Your Honor --

2         **THE COURT:**  She brought it up and I brought it up, and

3    that's it.  That's it.  Not today.  Someone else is going to

4    have to argue.

5         I don't need to hear from the plaintiffs anymore on that

6    one.  I want to move to the appeal regarding the plaintiffs --

7    named plaintiffs' data.

8         So, Ms. Stein.

9         **MS. STEIN:**  Thank you, Your Honor.  Appreciate that.

10        So the named plaintiff data appeal largely centers around

11   our asking Your Honor to hold plaintiffs to their word and

12   confirm that the only user data that's relevant to this

13   data-sharing case is that data that Facebook -- data that was

14   shared or made accessible to third parties.

15        When we were before Your Honor, before we had the Special

16   Master engaged, and we were litigating this before Your Honor,

17   this was a very significant moment in time when plaintiffs said

18   in their last brief, in response to Facebook's concern about

19   the scope of all this user data being sought, that plaintiffs

20   seek only upholding that sensitive data Facebook collected

21   about ten named plaintiffs and shared with third parties is

22   relevant.

23        Plaintiffs do not contend that information that was not

24   shared is relevant, which substantially narrows the information

25   Facebook would be required to produce in this case.

1    And, as Your Honor may recall and as we noted in our

2    briefing and in our motion for reconsideration before Special

3    Master Garrie, this concession about information not being

4    shared, which Mr. Loeser expanded to "shared" or "accessible,"

5    and which we would like to honor that, is a very, very

6    significant concession here in terms of the fact that this case

7    is about data sharing, which I think there's no dispute about

8    that, but about what -- what user data could possibly be

9    relevant here.

10    And this impacts not only the issue before Special Master

11    Garrie but, obviously, the scope of the case and what else

12    might become relevant as we go through depositions.  Because if

13    this case is expanded to be something other than data sharing,

14    that's going to be a very significant sort of what I know

15    Mr. Snyder always refers to as a "Whack-a-Mole" problem in this

16    case.

17    Plaintiffs cabined their own description of what's

18    relevant in this case to data that's shared or made accessible.

19    The special Master's holding does not hold plaintiff to their

20    word and does not cabin this data-sharing case to data that was

21    actually shared or made accessible.

22    Facebook has produced approximately 1 million pages of

23    data relating to the named plaintiffs.  We have multiple

24    declarations in the record about what this data includes.  This

25    data was from a tool that was specifically designed to allow

1    users to access the most complete set of data that Facebook

2    maintains about them.

3         THE COURT:  We already litigated that, and I held that

4    you weren't limited to that.

5         Isn't it Facebook's position that data that was inferred

6    from off-platform activity is not shared?

7         MS. STEIN:  So, Your Honor, the inferred data is not

8    shared with advertisers.  They're in the DYI file that was

9    produced.  There is inferred data that is included in that.

10        THE COURT:  From off-platform activity?

11        MS. STEIN:  Yes, Your Honor.

12        THE COURT:  Because when I went back and I re-read the

13   briefs, Facebook repeatedly said in its briefs that none of

14   that data was shared with third parties --

15        MS. STEIN:  That's correct.

16        THE COURT:  -- and, therefore, should not be produced.

17        MS. STEIN:  So, Your Honor, that is a true statement.

18   Facebook does not share inferred data.  Nonetheless, there was

19   inferred data that was produced because it's part of the DYI

20   file.

21        THE COURT:  So why, then, did we litigate and have all

22   this argument as to whether data inferred from off-platform

23   activity had to be produced or was within the scope of the case

24   if you knew and it was your position that it wasn't shared and

25   it was Facebook's position that data not shared didn't have to

1   be produced?  Which now explains why, then, you didn't produce

2   any after I issued the order.

3        It seemed it was a pointless exercise if it was Facebook's

4   understanding all along that whatever we say was not shared we

5   don't have to produce.

6        **MS. STEIN:**  So, Your Honor, I have two responses to

7   that.  First of all, when we were litigating this issue, we

8   litigated it before Your Honor and did not have plaintiffs'

9   position with respect to shared or made accessible data until

10  their last brief on this point.

11       So when we were litigating it, we did not know that they

12  were limiting their position to that, so we were having to

13  argue, you know, both the fact that it was not shared and also

14  the fact that that did not fall within the scope of the case.

15       I would like to respectfully remind Your Honor, when --

16  you never ordered that Facebook had to produce more than DYI.

17  Your Honor ordered a 30(b)(6) deposition to see if there was

18  material beyond what's in the DYI materials that was shared or

19  made accessible.

20       That was a very significant moment in the proceedings when

21  we reminded -- when we flagged for Your Honor that, based upon

22  plaintiffs' concession that the case was limited to data and

23  that they were only entitled to data that was shared or made

24  accessible, we raised the point that we thought we were

25  complete based upon that concession.

1          And plaintiffs said, We don't want to take Facebook's word

2   for it, and Your Honor said, You can have a 30(b)(6)

3   deposition.  And plaintiffs took a 30(b)(6) deposition to what

4   Your Honor said should explore whether there are materials

5   beyond the DYI file that would fall into the bucket of data

6   that was shared or made accessible.

7          Plaintiffs took that deposition.  I defended that

8   deposition, Your Honor.  And after that deposition, if

9   plaintiffs had something, they should have put that in their

10  motion to compel to Special Master Garrie and say, We learned

11  in this 30(b)(6) deposition that the DYI file is not the only

12  material that should be produced in this case; there's another

13  database that third parties can access and Facebook failed to

14  produce from that database.

15         Well, Your Honor, despite taking that 30(b)(6) deposition

16  and being able to ask whatever they wanted, essentially, about

17  what data was shared or made accessible, plaintiffs didn't come

18  forward with an iota of evidence that there was another

19  database that was accessible by third parties that contained

20  plaintiffs' user data.

21         And this is very significant, Your Honor, because breaking

22  open this issue beyond data that was shared or made accessible

23  means that there's no limit to what plaintiffs could be asking

24  about in this case, in terms of the scope of the case, where

25  data resides, even data that, you know, is anonymized,

1    aggregated.

2         There's a tremendous burden that we put in declarations

3    into the record that shows that in order to scour the Facebook

4    systems would literally take thousands of years in order --

5         **THE COURT:**  You know, I didn't understand that

6    argument because, again, in response to your motion for

7    reconsideration, the Special Master listened and heard you, and

8    he changed his order to require what he called high-level

9    information about the data sources which Facebook -- I think

10   maybe it was Mr. Ross -- identified.  High-level information.

11   And yet your appeal said that he ordered detailed information.

12        Normally, I haven't seen high-level information to

13   coincide with detailed.  I mean, they came up with that list

14   somehow.  The high-level information he sought, seemed like

15   they had to have that information, Mr. Ross, to even come up

16   with that list.

17        **MS. STEIN:**  So the list that was provided -- I believe

18   you may be referring to Mr. Pope.

19        **THE COURT:**  Pope.  Ross, Pope.  Four letters.

20        **MS. STEIN:**  The list that was provided was the result

21   of, I believe, a year's worth of work, inventorying and

22   figuring out across multiple groups and many, many, many

23   employees to try and put that high-level list together.

24        But it's a slippery slope, Your Honor, because now -- now

25   Special Master Garrie wants to have hours of evidentiary

```
 1   hearings about those data sources.

 2            THE COURT:  It's the slippery slope that can be

 3   stopped with a sticky staircase.  I just heard that one the

 4   other day.

 5            MS. STEIN:  I like that expression, but, respectfully,

 6   this is why there is a 30(b)(6) witness.

 7        The issue that we are asking Your Honor to honor is that

 8   this case and the relevant data in this case is about data

 9   that's shared or made accessible.  And Special Master Garrie

10   said that -- refused to honor that.  And he has broken the

11   gates wide open.

12        And, you know, maybe it's the case Your Honor feels like

13   you're okay with Special Master Garrie doing a little bit more

14   exploring as to whether there was other data that was shared or

15   made accessible.  We would disagree with that.  We believe that

16   ship has sailed, and we don't believe there's anything else to

17   produce.  But to not at least cabin that exploration to be

18   limited and to tell Special Master Garrie that the rule in this

19   case is that the only producible data here is data that was

20   shared or made accessible, it's very significant.

21        And Special Master Garrie needs to hear that from you

22   because he's, you know, trying to, you know -- you know, read

23   all the history in this case, which I'm sure is quite

24   challenging.  And he, I'm sure, wants to honor and respect what

25   you have said in this case.  And he, respectfully, needs to
```

1   have direction that the only relevant data in this case, as far

2   as plaintiffs' data goes, is data that was shared or made

3   accessible.  And that is what plaintiffs have said.

4        **THE COURT:**  Well, yes.  But Facebook's position is the

5   only named plaintiff -- we're only talking about the named nine

6   now, nine named plaintiffs, which is fair -- that the only data

7   that is discoverable is that which Facebook contends was shared

8   or made accessible, and if Facebook says it was not shared or

9   made accessible, that's the end of the matter.

10       **MS. STEIN:**  I would actually -- I would -- I'd like to

11  clarify that, Your Honor, because when we talk about shared or

12  made accessible, we're talking about that from a technological

13  standpoint.  So it's not a substantive -- you know, this was --

14  it's our position that this was shared or made accessible.

15  This is about how the technology works.

16       And we have a technological -- you know, a technology

17  declaration in the record that explains that the theories that

18  are in play in this case, the technology that gets hooked up,

19  you know, to these databases, there aren't other databases that

20  are accessible to third parties.

21       And plaintiffs were given a 30(b)(6) deposition so that

22  they didn't have to take our word for it.  Your Honor said they

23  could take a 30(b)(6) deposition so that they could find out

24  whether there were other data sources that were hooked up, you

25  know, to the outside world that would allow them to have

 1   access, and they took that deposition.

 2       You know, respectfully, I don't think they asked the right

 3   questions.  They asked very few questions about shared -- I

 4   don't even think they used the words "shared" or "made

 5   accessible" in the deposition.  That was their opportunity.

 6       They took that deposition, I think, a year ago, Your

 7   Honor.  And to blow this open now and to give plaintiffs

 8   exploratory discovery on the eve of the substantial completion

 9   deadline not only about -- you know, about what was shared or

10   made accessible, but beyond that, to basically say anything is

11   fair game because, according to Special Master Garrie's order,

12   this case is not so limited.

13       **THE COURT:**  Well, that's not -- I don't think that's

14   the case.  The plaintiffs agreed that the case is about data

15   that was shared.  There's no question about that.

16       The question is, in discovery, how you get to that answer.

17   That's -- that's the question is, how do you get to that answer

18   as to what was shared and what was made accessible.

19       I wonder, a little bit, why Facebook doesn't want to just

20   tell the named plaintiffs what data it collects about them,

21   whether it's shared or not.

22       **MS. STEIN:**  Well, we have produced that to them, Your

23   Honor.  We have produced the best representation we have in

24   human readable form.

25       The DYI file, it's hundreds of thousands of pages for some

1    of the named plaintiffs.  It goes well beyond what the

2    plaintiffs just post themselves.  It has a very -- you know, we

3    can point Your Honor to a very robust description of the DYI

4    file.  That tool is basically designed so that there's

5    transparency for any user to be able to go and download, using

6    the Facebook tool, to say what has Facebook collected about me?

7    What do they --

8         **THE COURT:**  Well, then there's no dispute.  If you've

9    already produced everything, what are we arguing about?

10        **MS. STEIN:**  Because Special Master Garrie is not

11   holding plaintiffs to this --

12        **THE COURT:**  No, you said that you -- that plaintiffs

13   already have everything that Facebook collects about them

14   regardless of whether Facebook contends it is shared or not.

15   Then there's nothing to fight about.

16        **MS. STEIN:**  So, your Honor --

17        **THE COURT:**  It must be that Facebook collects

18   additional information which it does not now want to produce to

19   the named plaintiffs.

20        **MS. STEIN:**  So I think I'd like to clarify what Your

21   Honor just said.  We have produced everything that is in the

22   social graph, that we have in human readable form, that is

23   potentially accessible by third parties depending on what the

24   permission settings are.

25        **THE COURT:**  The additional information -- I mean,

1   Mr. Pope, those 150 databases, right, he identified them as

2   potentially having information about the named plaintiffs.

3           **MS. STEIN:**  Well --

4           **THE COURT:**  And that information has not been

5   disclosed.

6           **MS. STEIN:**  So there are many different databases.

7   One of the most significant ones is a storage database where

8   information is anonymized, aggregated information, not

9   accessible.  It's information that would be likely duplicative.

10  It's backed up, basically.  It's a storage facility and where

11  analytics might be run -- there are declarations about this in

12  the record -- but it's not accessible.

13      But that information -- you know, if it's based upon

14  something that the users posted or shared or activity on

15  their -- using their Facebook account, that's something that

16  would have been produced through the DYI tool.

17          **THE COURT:**  Okay.  But does it include something that

18  would not have been reproduced through that tool?

19          **MS. KUTSCHER CLARK:**  Can I add some detail?

20          **MS. STEIN:**  Sure.  Of course.  Thank you, Martie.

21          **MS. KUTSCHER CLARK:**  I think what's helpful to

22  understand here is the issue is not that Facebook is trying to

23  hide any data.  Facebook makes very clear in its data

24  disclosures, its data policies, exactly what information it

25  collects about users.

1      The difficulty here is that it's stored in very

2  complicated ways.  Facebook is an enormous company with a very,

3  very complicated data infrastructure.  And, as we've discussed

4  a lot of times, it has data storage facilities that have

5  millions and millions of data tables, that have trillions of

6  data points within them.  Much of this data is anonymized.

7  Much of it's aggregated with data about millions of other

8  users.

9      In order to go through all those data sources and try to

10  identify any data point that might relate back to a particular

11  user is a gargantuan undertaking.  It's not that we're trying

12  to hide data, it's that it's extraordinarily difficult to find

13  all of it and to figure out which data might relate back in

14  some way to one of these people.  And the issue is --

15      **THE COURT:**  But, Ms. Clark, isn't that what

16  Mr. Garrie -- why he asked for -- isn't what you just gave what

17  he asked for?  A high-level description of the most common

18  functions and purposes of the system.

19      So for any particular system, you would say it's just

20  storage of this and it's used by this.  And he'll say, okay,

21  then I guess there isn't anything to do there.

22      I mean, I don't understand.  What's the objection to the

23  high-level description of the most common functions and

24  purposes of the system?

25      **MS. KUTSCHER CLARK:**  I want to make clear that we've

1   already complied with Mr. Garrie's order.  And we have

2   submitted information earlier this week about all of those data

3   sources.  So I want to make sure the Court is aware of that.

4          **THE COURT:**  So is it moot then, your appeal of that

5   portion of the order?

6          **MS. KUTSCHER CLARK:**  Uhm, potentially, yes.  But what

7   we're appealing is the holding that data that is not shared is

8   relevant and discoverable in the case, because Mr. Garrie did

9   not say, I'd like to further explore whether other data was

10  shared.  What he said is the discoverable data is not limited

11  to data that was shared or made accessible, which --

12         **THE COURT:**  As I read the briefs, though, the briefs

13  that were presented to Mr. Garrie, what plaintiffs' argument

14  was, was we don't disagree that the data shared, but as this

15  Court, as I ruled, that's sort of an open question as to what

16  was shared or made accessible.

17         So it really comes back, I think, to Ms. Stein's point

18  that the 30(b)(6) was the beginning and the end --

19         **MS. KUTSCHER CLARK:**  Correct.

20         **THE COURT:**  -- and plaintiffs get no more.

21         So let me hear from plaintiffs on that with respect to the

22  30(b)(6).

23         **MS. WEAVER:**  Thank you, Your Honor.  Good morning and

24  Happy New Year.

25         So I think that Your Honor has made many of the points

 1  that we've made.  I think the record needs to be corrected on a

 2  few salient points.

 3      The first is that the 30(b)(6) deponent on data, which I

 4  took, was unable to answer questions about how Facebook shared

 5  data.  In fact, there were two individuals who verified

 6  interrogatories on the question of capabilities in APIs.

 7      And when I asked the witness about how data was shared,

 8  Ms. Stein said to me in the transcript:  "He did not sign the

 9  interrogatories on those points."

10      We can seek another 30(b)(6), but in the interim Your

11  Honor appointed Special Master Garrie, who, as we all

12  acknowledge, is very sophisticated --

13          THE COURT:  Oh, I just want to correct something for

14  the record.

15          MS. WEAVER:  Yes.

16          THE COURT:  I have no power to appoint a Special

17  Master.  It was Judge Chhabria.

18          MS. WEAVER:  Fair enough.  Judge Chhabria appointed

19  Special Master Garrie, and I think all parties agreed that he

20  was highly qualified to investigate these issues.

21      The order that is being challenged right now is very

22  basic.  It's Discovery 101.  Tell us all data sources that

23  might have data relating to these eight people.  And we're in

24  the very nascent stages of that.

25      And, as you said, it's unclear to plaintiffs whether

that's mooted or not.  So it seems like what we're focused on

right here is the question of what is shared or made

accessible.  And plaintiffs contend that that is a question for

the jury.  And to get to the jury, we need discovery.

     And let me point out a few --

          **THE COURT:**  Well, I'm going to stop you one second.

          **MS. WEAVER:**  Yes.

          **THE COURT:**  Not if it's undisputed.

          **MS. WEAVER:**  Yes.

          **THE COURT:**  Not if you don't have a good-faith

argument based on evidence that something is not -- you know,

is not shared.  It is not -- we're not there yet.  It may or

may not be; right?

          **MS. WEAVER:**  Excellent.  Good point.  I agree.

     Let me point out some comments that Ms. Stein made that

underlines why we, plaintiffs, feel like Facebook should not be

the arbiter of what is discoverable based on their definition

of what is shared.

     She said today, "in the social graph," "data in the social

graph," "data in human readable form," "data is not accessible,

"data is likely duplicative."  All of those are conclusions and

assertions made by counsel.  They are not rooted in evidence.

     And Special Master Garrie is uniquely qualified to make

those decisions as between -- and also to consider proportion.

He hasn't ordered Facebook to produce all the data in the hive

1   relating to these nine people.  He's just said, Tell me what's

2   there and describe it so we can get our arms around it.

3       Another point to make is that data reciprocity is also in

4   this case.  Facebook possesses data that it received from data

5   brokers about our nine named plaintiffs.  Under this narrow

6   ruling right now, they're saying, oh, you don't get to know

7   that.

8       And you have to look at this in the context that Facebook,

9   in almost every hearing, has come in and said these plaintiffs

10  have no standing, they weren't hurt, they don't know what's

11  going on.

12      They've now deposed two of our plaintiffs, both of whom

13  very clearly asserted standing.  Plaintiff Tyler King said,

14  hey, I had NetFlix and I had Spotify.  And we know that NetFlix

15  and Spotify were reading users' private Facebook Messenger

16  messages.  And we only know that because it's public not

17  because of what Facebook has produced here.

18      So we would think that would be enough.  But if Facebook

19  is going to say, no, we need to see -- you have to prove that

20  Ms. Tyler King's messages actually went to NetFlix and Spotify,

21  we are entitled to that discovery.  They can't make an argument

22  and then deny us the discovery of what happened here.

23      One final, you know, bigger-picture point is that if what

24  Facebook is saying here is that it would take them a year to

25  identify data sources for nine people, that isn't merits.  The

1    jury deserves to hear that.

2        We want a response admitting that, as well, and an order

3    so that we can tell the jury they took so much data from these

4    nine people they can't even identify it.  They don't know where

5    it is, they don't know how it was used.  All of this is fair

6    game for discovery in our view.

7        We're not saying today, and there is no order today

8    saying, Facebook, produce all the data in these 149 sources.

9    It's merely, disclose what you have on these nine people.

10       And I'll pull back to the Discovery 101.  Plaintiffs are a

11   little bit befuddled because this is a 26(f) disclosure

12   conversation that should have happened in 2019.  Anytime we're

13   in a case, we're like, okay, identify the data sources.

14       We understand that Facebook is complex.  We have a lot of

15   experts who understand precisely what Ms. Stein is talking

16   about when she talks about anonymization.  We know how to

17   preserve.  We can get into that with Special Master Garrie.

18   He's uniquely situated here.

19       But there is neither a procedural problem with his ruling

20   and certainly not a substantive one.  And I think it would be

21   erroneous for the Court today to make a ruling on the

22   definition of what is shared or made accessible in a vacuum.

23       Yes, on December 10th, Facebook put in a number of

24   declarations for the first time, that plaintiffs had never

25   seen, making factual assertions about data types and sources

 1   that Facebook had never before identified or produced.

 2        We're ill-equipped to respond to that right now.  I mean,

 3   at worst, at least, Facebook should be able to explore and

 4   depose Mr. Pope and talk about all of these data sources and

 5   figure out the basis.

 6        We know that there's a hearing in front of Special Master

 7   Garrie this Friday, at noon, on this topic, but for plaintiffs'

 8   perspective, we're finally at the beginning.  We're finally

 9   going to have identify these data sources.  We would like to

10   get in there and not be foreclosed, as I was in the 30(b)(6)

11   deposition, to talk about the data sources.

12        We only had, frankly, Your Honor, one document at that

13   time, at that deposition, that talked about dependent and

14   behavioral data.  If you look at Exhibit 18 to our filing,

15   there were other exhibits we have.  That one's between board

16   members talking about the kinds of data that's collected.

17        What is very clear is that Facebook develops -- this has

18   been our allegation from the beginning.  They create profiles.

19   Our plaintiffs all testified, I would really like to know what

20   inferences Facebook is drawing about me and then how it is

21   selling that information to advertisers and other -- other

22   entities.

23        I mean, it depends how you defined advertiser.  It's not

24   necessarily somebody who's selling a product.  It's somebody

25   who's trying to instigate behavior, whether it's a political

1  party.  That's what we want.  We want the profiles that

2  Facebook has on the individuals.

3       And they will say they're not really profiles, what they

4  are is aggregated datasets.  And that's what we want

5  identified, and Special Master Garrie can help get us there.

6              **THE COURT:**  All right.  Anything further, Ms. Stein?

7              **MS. KUTSCHER CLARK:**  Your Honor --

8       **MS. STEIN:**  Ms. Clark is actually going to address the

9  proportionality issue in particular.

10             **MS. KUTSCHER CLARK:**  Yes.  Your Honor, just like the

11  ADI issue, this brings us back to a relevance burden,

12  proportionality, the fact that we have a discovery cutoff in

13  three weeks.

14       We have long --

15       **THE COURT:**  I'm just going to cut you off, Ms. Clark,

16  because, in response to your motion for reconsideration,

17  Special Master Garrie changed his order to say just give us

18  this high-level detail, this very basic information, just so he

19  can address those very concerns.

20       Of course those are issues.  Those are live issues.  And

21  that's why he asked for that high-level information.  So he

22  hasn't ordered you to do -- to produce anything --

23             **MR. SNYDER:**  Your Honor, if I can --

24             **THE COURT:**  -- any particular data.

25             **MR. SNYDER:**  If I can just be heard for two minutes or

 1   60 seconds.  Counsel just said "we're finally at the

 2   beginning."  And that really is our concern.

 3       We're going to comply with the orders, obviously, as we

 4   have been.  There just needs to be some discipline here because

 5   the case is almost four years old.  We know how many millions

 6   and millions of documents we've produced, how many hundreds of

 7   thousands of hours we've spent in attorney time producing

 8   documents.

 9       And what we're concerned about is this constant moving of

10   the goalpost into data that we confirmed is not shared,

11   whatever the next issue is going to be.  We're not just at the

12   beginning, with all due respect.  We are at the end of

13   substantial completion.

14       And this -- if this continues without some guidance from

15   Your Honor on broad-level, not specific, proportionality and

16   adherence to overall case schedule, my concern -- and I think

17   it's very well placed and based on empirical experience -- is

18   that we will be well into 2022, if not at the end of '22, and

19   still having this "Whack-a-Mole" detour into data and issues

20   that we've been litigating for two years, and we won't even get

21   to the merits of this case until the case is five years old.

22   And that's not -- that's not appropriate or fair.

23       And so we have -- yes, we have the resources.  We're

24   devoting those resources, ever increasing resources, to comply

25   with this Special Master process that, frankly, needs more

1  guardrails from this Court unless we're going to, you know,

2  wake up in June and, I can assure you, Your Honor, we're going

3  to be in the quicksand and the goalposts are going to be back

4  and forth.

5       And sometimes enough is enough.  And we're in a position

6  now, we're in no man's land, honestly.  We just don't know

7  where this is going to end, where it's going to go.

8       Now we have hearings before the Special Master, and the

9  process that was intended to streamline, make more efficient,

10 and focus on proportionality is kind of out of control, with

11 all due respect.  That's our concern.

12      And so we're not asking Your Honor necessarily to

13 replicate or intrude on the special master process, but I do

14 think it would be very helpful from you or Judge Chhabria to

15 give the special master process a structure with which to apply

16 a framework on proportionality and the like.  Because right now

17 it's just -- it's really a little bit a free-ranging process

18 with no guardrails whatsoever.

19           **THE COURT:**  Ms. Stein, did you want to add anything?

20           **MS. STEIN:**  Only just to close, Your Honor.

21      In keeping with what Mr. Snyder said, one of the important

22 guardrails that I think Special Master Garrie needs to be

23 comfortable with is that the only discoverable data in this

24 case regarding the named plaintiffs is data that was shared or

25 made accessible.  And that is from plaintiffs' mouth.  And we

1   relied on that for the past year, and for this to change now

2   would be completely prejudicial.

3       **THE COURT:**  Okay.  All right.  Let's move on to the

4   last motion with respect to the deposition of the five formerly

5   named plaintiffs.

6       I guess I want to know why Facebook needs their

7   depositions now before having taken the depositions of the

8   named plaintiffs.

9       And I guess what's interesting about this case is there's,

10  what, like potentially 300 million, maybe more, I don't know,

11  users in the class that Facebook has access to.  Right?

12      You could go -- if you want to make -- I understand the

13  standing argument.  And since June, it is now crystal clear

14  that all members of the class have to have standing.

15      Why do you need these five formerly named plaintiffs when,

16  presumably, you have access to lots and lots and lots and lots

17  of these consumers?

18      **MS. KUTSCHER CLARK:**  Your Honor, we wanted to start

19  with these five former named plaintiffs because we think

20  they're the most appropriate absent class members to start with

21  because they actually inserted themselves into the case.

22      **THE COURT:**  So I'm going to stop you there.  I'm going

23  to stop you there because nobody cited it, but I actually ruled

24  on this.  And I said named plaintiffs who withdraw, they're the

25  opposite of having inserted themselves, right.  They've

1   actually taken themselves out.  It's not like they've submitted

2   a declaration.  They weren't identified on initials.

3      So I'm really focusing on need.  Why do you need it?  Now,

4   there might be a reason why, based on the depositions that you

5   take of the named plaintiffs.  You haven't done that.  And the

6   two that you have, I don't have anything in front of me.

7      But -- and there could be a need if a defendant, for

8   example, didn't have access to other members of the class.  I

9   could certainly see that.  But, in general, right, we don't

10  order discovery of absent class members.  That's the rule.

11     And there are exceptions, for example, if you've inserted

12  yourself.  You're identified as a person on initial

13  disclosures.  If you're a named plaintiff, obviously, you have

14  to be -- or you submit a declaration, become a witness in the

15  case.  But we don't have that.

16        **MS. KUTSCHER CLARK:**  Your Honor, respectfully, these

17  absent -- these former named plaintiffs are uniquely situated

18  because all of them have reserved their right to rejoin the

19  case.  And this was an issue we had discussed with the Court

20  about a year ago, before they withdrew.

21     Plaintiffs had originally asked for an order allowing them

22  to simply de-prioritize certain named plaintiffs who would not

23  have to participate in discovery but could then serve as class

24  members later.

25     We objected to that saying these plaintiffs really need to

1  swim or cut bait -- fish or cut bait, because if they want the

2  ability to later serve as a class rep, we need the ability to

3  take whatever discovery we might need about them.

4      Ultimately, at a hearing, I think it was probably last

5  February, March, the Court encouraged Facebook to enter a

6  stipulation allowing the voluntary withdrawal of these

7  plaintiffs, reserving their right to rejoin, stating that

8  Facebook wouldn't be waiving any rights.

9      And we entered a stipulation with the understanding that

10 we were not waiving our rights to take discovery from these

11 individuals so long as they were reserving their right to

12 rejoin.

13      THE COURT:  So reserving their right, I know lawyers

14 always do that.  Blah, blah, blah, reserve the right.  It's

15 meaningless, right, because Judge Chhabria is going to decide

16 whether at some point they could be added.

17      And if discovery has closed, that would be a really good

18 argument that Facebook could make:  No, you can't substitute in

19 these people because discovery has closed and it will delay it.

20      Right?  Isn't Judge Chhabria going to decide?  And,

21 certainly, if he were to decide, yes, I'll let them come in,

22 we'd have to reopen discovery, and you'd get to take their

23 depositions of that.

24      So what I'm looking for is why you need it now.  You don't

25 need it for that because if they came back in -- if he allowed

1  them to come back in, which is a big if, right, given how

2  old -- as Mr. Snyder pointed out -- how old the case is, you

3  would get it then.

4      So why do you need it now?

5          **MS. KUTSCHER CLARK:**  Your Honor, we need it now

6  because we're building our arguments about the differences

7  between the current named plaintiffs --

8          **THE COURT:**  Okay.  I'm going to stop you there.

9          **MS. KUTSCHER CLARK:**  -- and some of the absent class

10  members.

11          **THE COURT:**  I'm going to stop you there.  You have

12  access to 299 million users.  Why do you need these five?  I

13  mean, you can get them from anyone.

14      And, frankly, these other people would be better for you.

15  They're all members of the class.  They're all members of the

16  putative class; right?  So why these?

17          **MS. KUTSCHER CLARK:**  If plaintiffs would not object to

18  Facebook deposing other absent class members, I think we'd be

19  in a different situation.  But plaintiffs have taken the

20  position that the only class members Facebook may depose are

21  the nine, soon to be eight, I believe, current named

22  plaintiffs.

23          **THE COURT:**  No, that's a different matter.  What I'm

24  saying is, are you saying that Facebook couldn't voluntarily

25  get declarations?  I mean, defendants do this -- you've done

1    this, I'm sure, many times in cases.

2         In opposition to class certification, you get declarations

3    from putative class members.  Right?  You're saying that

4    Facebook can't?

5              MS. KUTSCHER CLARK:  No, no.  Of course I'm not saying

6    that, no.

7              THE COURT:  So then why do you need the depositions of

8    these five; right?  Why is this any different from any other

9    case?

10             MS. STEIN:  Your Honor, I can jump in for a moment and

11   respond to that.

12        I think, given the number of Facebook users, anyone that

13   Facebook hand selects is going to be subject to challenge by

14   plaintiffs, that, you know, we had -- we could pick anyone we

15   wanted.

16        So we think it's much more probative for us to go to the

17   source, to the plaintiffs that -- that were named plaintiffs in

18   this case, that reserved their rights to continue as named

19   plaintiffs.  Those are the ones who seem to believe that they

20   have the strongest case here.

21        And we want to be in a position to be able to show that

22   even the people who came forward and wanted to serve as class

23   reps, who were not hand-selected by Facebook, don't have

24   standing.

25             THE COURT:  And you have nine.  You have nine.  Maybe

1    it's eight, I don't know.  Maybe they're dropping.  Ms. Weaver

2    said eight.  It went from ten to nine to now eight.  You have

3    them; right?

4          **MS. STEIN:**  We want to show that absent class

5    members -- that members of the class who are not named

6    plaintiffs do not have standing as well.

7          **THE COURT:**  This is what I'm going to do.  I mean,

8    your argument would apply in every single class action, and I

9    don't think the courts are ready to go there; right.  That's

10   not the rule.

11       I'm going to deny it without prejudice.  You take the

12   depositions of the named plaintiffs and see if you can develop

13   something.  I don't see it.  I don't see it here, but maybe

14   there's something I'm missing that I don't know.

15       But there isn't anything that's been articulated as to why

16   you would need it and why the rule -- the rule that we don't

17   generally do absent-class-member discovery absent a special

18   showing, which hasn't been made.

19         **MS. STEIN:**  Your Honor, I don't think that these

20   former named plaintiffs fall into the bucket of absent class

21   members because they have inserted themselves.

22       Part of the rule is, have they inserted themselves.

23   They've inserted themselves.  They reserved the right to come

24   back in.  Those are people who have been engaged in the case,

25   who wanted to seek relief in the case, who are unwilling to say

 1  to this Court that they don't want to remove themselves.  They

 2  haven't said they want to remove themselves.

 3      They haven't said we want to remove themselves because.

 4  They said we -- we aren't willing to cut bait and say we will

 5  not serve as a named plaintiff.  And I think that's a very,

 6  very significant distinction, Your Honor.

 7          **THE COURT:**  Okay.  I disagree.  We all know why they

 8  did that, because their lawyers told them.  Because in case

 9  some of the named plaintiffs get knocked out, then they have a

10  well that they could go to, to see if Judge Chhabria would

11  allow them to amend and come in.

12      It happens all the time; right?  And sometimes judges give

13  leave to amend to do that and sometimes they don't.

14      The question is whether you've shown -- you haven't made

15  any showing.  And, again, I disagree as to "inserted

16  themselves."  They've actually withdrawn from the case.

17  They've withdrawn.  They're not a witness.  They're nothing.

18      Now, if they reinsert themselves, if Judge Chhabria allows

19  them at some point to do it, that's a different matter.  Right?

20  I mean -- and he certainly would never do that and not allow

21  you to depose them.  That just wouldn't happen, and you know

22  that.  So I just don't see it.

23      But I do think it's possible, after you take those

24  depositions, that maybe there is some reason, I don't know,

25  that I'm not thinking of.  So I'll deny it without prejudice,

1    but the showing, I don't think, has been made yet.

2        So let me --

3             MS. KUTSCHER CLARK:  Your Honor, if I could -- oh, I'm

4    sorry.

5             THE COURT:  No, go ahead, because I was going to turn

6    to a different subject.

7             MS. KUTSCHER CLARK:  I just wanted to add one point,

8    that there really is --

9             MS. STEIN:  Sorry, Mr. Snyder just needs to be

10   readmitted.

11       I apologize for interrupting you, Martie.

12            THE COURT:  I swear it was not me who removed him.

13            MS. KUTSCHER CLARK:  Judge Corley, I understand that

14   there are cases where a named plaintiff has participated in a

15   case briefly, withdraws their claims, and then the defendant is

16   not permitted to take discovery of that individual.

17       But generally, on a higher level, there really is a firm

18   distinction in the case law between general absent class

19   members and former named plaintiffs.

20       And, generally, when you look at the case law, the

21   standard is much different for former named plaintiffs.  And

22   the 2former named plaintiffs standard typically looks at

23   whether you're seeking to harass the individual, whether the

24   individual inserted themselves into the case, and whether

25   there's relevant information to obtain from that person.

1        And all of those factors are met here, and the case --

2        **THE COURT:**  No, I disagree.  I don't know why you need

3   it.  I don't.  Your argument is, if you're a former named

4   plaintiff, we get the deposition, period, full stop, because

5   you've given me no reason why what you have at your disposal,

6   which is the depositions of the eight or nine named plaintiffs,

7   and all those other users out there who you can get

8   declarations from, are not sufficient.

9        So that's it.  That's -- that's -- I'm not persuaded.  I'm

10  denying it without prejudice.  But you have to give me -- the

11  only reason you're giving me is they're a former named

12  plaintiff.

13       I agree with you that if you take those depositions of the

14  eight then you can articulate some reason why depositions of

15  absent class members could be useful, that those are the people

16  you should first turn to, right, because they already have

17  inserted themselves into the litigation, having initially

18  agreed to be a named plaintiff.

19       And, to boot, this case is different because they withdrew

20  not because they got cold feet, because the plaintiffs,

21  frankly, were complaining about the burden of answering

22  interrogatories.  So I agree.

23       And, by the way, so I'm not saying that, because they

24  withdrew, they never can.  The circumstances here were because

25  plaintiffs were complaining about the burden.  I said, well,

1   then don't put up 24.  Whoever puts up 24 named plaintiffs

2   anyway?  Right?  That's not workable and it's not going to

3   happen.

4        So I agree with you, Ms. Clark, those are the people we

5   would turn to first, but we're not there yet to turn to because

6   you haven't shown me anything other than that they are formerly

7   named plaintiffs, and I don't think that's sufficient.

8        All right.  Okay.  So the last thing I want to address, I

9   want to issue an order about giving you some structure for

10  scheduling depositions to help -- help you with the deponents

11  and help each side.

12       So what I'm proposing -- I don't know what your protocol

13  says, but when a party requests a deposition, that the other

14  side have seven days to provide dates.  That's regardless of

15  whether you're going to object to the deposition at all.

16       You provide the dates, and then that will give you some

17  time to work out the objections with the Special Master.  Okay?

18  If it's a nonparty, then you have two weeks to provide dates.

19       If the nonparty can't -- isn't cooperating or you can't

20  get in contact with them, as sometimes happens with former

21  employees, then the requesting party then can start assuming

22  that they're not being represented by the other side and do

23  what they need to do to schedule that.

24       I think this will help you with your deponents because you

25  say, The Judge has issued an order, we have to give dates in

1    seven days or the other side is just going to be able to

2    unilaterally set depositions.

3          I think that helps with both sides and gives you some

4    ammunition with the deponents.  Sorry, not my fault, it's the

5    Judge, the bad Judge; she put that order out there and we have

6    to do that.

7          So I think that might head off some disputes, which I'm

8    seeing on both sides, about scheduling, and will get things on

9    calendar sooner.

10          So I'm open to hearing a reaction to that since I --

11          MR. SNYDER:  We're fine.  Facebook loves that and is

12    fine with that.

13          MS. WEAVER:  Your Honor, Leslie Weaver on behalf of

14    the plaintiffs.  That's fine with us.

15          I do think this digs at a deeper problem.  And Mr. Snyder

16    made some comments earlier about the case schedule.  I think

17    the parties are in agreement that we are all concerned about

18    the January 31st substantial completion.

19          We are in stark disagreement about how we got here.

20    Plaintiffs have been working very actively.  But we do think

21    that we need the Court's guidance on this issue about where we

22    are.

23          And we do think that when discovery orders are issued they

24    should be complied with quickly, once they are disposed of.

25    And one of the problems that the plaintiffs see in this case,

 1    notwithstanding Facebook's earlier admonition at a hearing many
 2    months ago that they would not appeal anything and they wanted
 3    cost shifting for people who did appeal, here we are on motions
 4    for reconsideration and appeals, and plaintiffs are still even
 5    just waiting to get plaintiffs' dataset identified.
 6         **THE COURT:**  Okay.  I'm just going to stop you there,
 7    though.
 8         **MS. WEAVER:**  Yep.
 9         **THE COURT:**  They do have a right to appeal.  And
10    Special Master Garrie responded and narrowed his orders in
11    response to their motions for reconsideration.  So I don't
12    think you can make an argument that there was anything bad
13    faith about that at all because he responded to it.
14         The protocol or the order has a very limited time for
15    appeal.  And they haven't appealed every order because I've
16    seen, there's lots of orders on the dockets and they haven't
17    appealed.  And they haven't appealed every aspect of every
18    order.
19         And I think it would be unfair to say that you could --
20    you can never appeal.  And should you do that, no one would
21    ever agree to a Special Master.  So I just want to -- I
22    couldn't let that stand uncorrected.  I don't think that's
23    fair.
24         Do you have a case management conference scheduled with
25    Judge Chhabria?

1          **MS. WEAVER:**  We do not.  And that might be helpful.

2          **THE COURT:**  Yeah.  Okay.  I will let him know.

3     He's also going to issue an order today modifying his

4 order as to the appeal process to give you some -- some

5 argument opportunity, which I think is required, frankly, by

6 the rule.  And we did have this robust argument today, which

7 was helpful, but you'll also have the ability to do that.

8          And the order will also, unless he changes his mind,

9 clarify that when I'm unable to serve as the discovery judge in

10 this case, he will play that role so you won't get another

11 magistrate judge.

12          **MR. SNYDER:**  Thank you, Your Honor.

13          Your Honor, one more request, which is an amplification of

14 my earlier comments, which is that we are going to now be

15 before the Special Master and resolving, hopefully

16 successfully, all these issues.

17          But if Your Honor could, at the highest level, just share

18 your observations or your guidance on proportionality because,

19 of course, in an imperfect world, the discovery process,

20 particularly in a case involving data and the claims here,

21 could be endless, honestly.  We could keep on going on

22 iteration for months and months and months.

23          And when, for example, the Special Master ordered us to

24 produce something and we said this could blow open the schedule

25 and delay it by a year, he did modify his order.  But there

just doesn't seem to be any urgency in terms of getting to repose.

And proportionality, you know, obviously, is the word of the day in the federal judiciary, as it must be on discovery issues.  And we just would respectfully request some general guidance on how Mr. Garrie, who has not been a judge, where Judge Andler has, that he view -- he was originally our technical expert, he became a Special Master.  You recall we asked Judge Andler to co-serve for this precise reason.  No disrespect intended, but he is not someone who seems to be focused on the judicial interests, the institutional interest, and, frankly, our interest in getting some repose here as opposed to an open-ended discovery process.

THE COURT:  You know, I heard you before, Mr. Snyder, but I have to say, as I said to Ms. Clark, his order asking for the high-level description is exactly how you get to proportionality, yet Facebook appealed that portion of his order.

All right.  But I've heard you.  I'll take that into consideration.

Rather than set a next date, what I suggest you do is, when you believe a next date would be useful -- and I may set a hearing date if there are additional appeals, but if there's something else before then, just contact Ms. Means.  And in the era of Zoom, which we don't appear to be leaving anytime soon,

1    it's very easy to get you on -- on calendar.

2            MR. SNYDER:  Although, I do think it's 50/50 that you

3    disconnected me just to not hear from me again.

4            THE COURT:  No, no, no.  I would never.  I did not.

5            MR. LOESER:  He did that to me.

6            THE COURT:  It may have been Ms. Means, but I'm not in

7    control.

8         All right.  Thank you, everybody.

9         (Counsel thank the Court.)

10        (At 11:16 a.m. the proceedings were adjourned.)

11                           - - - - -

12                    <u>CERTIFICATE OF REPORTER</u>

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15   DATE: Wednesday, January 12, 2022

16

17

18

19   _____

20        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                 U.S. Court Reporter

21

22

23

24

25