# Exhibit 33-B

# Redacted Version of Document Sought to be Sealed

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley Weaver (Cal. Bar No.191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **DECLARATION OF DEREK W. LOESER PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabra<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674<br><br>ORAL ARGUMENT REQUESTED |

I, Derek W. Loeser, declare as follows:

1.      I am a partner at the law firm of Keller Rohrback L.L.P. and am Co-Lead Counsel for Plaintiffs in the above-captioned matter. I submit this declaration in support of Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. I have personal knowledge of the information contained herein, and, if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of Plaintiffs' Second Set of RFPs to Facebook.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiffs' Fourth Set of Interrogatories to Facebook.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a filing in this action docketed at ECF No. 537.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a filing in this action docketed at ECF No. 526.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a filing in this action docketed at ECF No. 557.

7.      Attached hereto as Exhibit 6 is a true and correct copy of a filing in this action docketed at ECF No. 588.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a filing in this action docketed at ECF No. 602.

9.      Attached hereto as Exhibit 8 is a true and correct copy of correspondence dated April 1, 2021 received from counsel representing Defendant.

10.     Attached hereto as Exhibit 9 is a true and correct copy of Facebook's Second Amended Responses and Objections to Plaintiffs' Fourth Set of Interrogatories.

11.     Attached hereto as Exhibit 10 is a true and correct copy of a transcript of a hearing held on August 14, 2020 in this action.

12.     Attached hereto as Exhibit 11 is a true and correct copy of a document produced in discovery in this action with initial Bates number FB-CA-MDL-00213424.

13.     Attached hereto as Exhibit 12 is a true and correct copy of a document produced in discovery in this action with initial Bates number FB-CA-MDL-00149613.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a document produced in discovery in this action with initial Bates number FB-CA-MDL-00203262.

15.     Attached hereto as Exhibit 14 is a true and correct copy of United States Patent Application Publication No. US 2017/0195435 A1, dated July 6, 2017.

16.     Attached hereto as Exhibit 15 is a true and correct copy of an email dated July 9, 2021 from Matthew Melamed, one of the attorneys representing Plaintiffs, to attorneys representing Defendant Facebook.

17.     Attached hereto as Exhibit 16 is a true and correct copy of correspondence dated September 10, 2021 from counsel representing Plaintiffs to counsel representing Defendant Facebook.

18.     Attached hereto as Exhibit 17 is a true and correct copy of excerpts from the transcript of a hearing in this action on December 9, 2020.

19.     Attached hereto as Exhibit 18 is a true and correct copy of Exhibit C to the filing in this action docketed at ECF No. 526.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a document produced in discovery with Bates number FB-CA-MDL-01952478.

21.     Attached hereto as Exhibit 20 is a true and correct copy of excerpts from the transcript of a hearing in this action on November 4, 2019.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a document produced in discovery with initial Bates number FB-CA-MDL-01938268.

23.     Attached hereto as Exhibit 22 is a true and correct copy of the transcript of a hearing in this action on March 5, 2020.

24.     Attached hereto as Exhibit 23 is a true and correct copy of a document produced in discovery with initial Bates number FB-CA-MDL-00377690.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of October, 2021 at Seattle, Washington.


*/s/ Derek W. Loeser*
Derek W. Loeser

# Exhibit 1

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.**<br><br>Judge:  Hon. Vince Chhabria<br>Courtroom:  4, 17th Floor |

PROPOUNDING PARTY:     Plaintiffs

RESPONDING PARTY:      Facebook

SET NUMBER:            Two (2)

Plaintiffs hereby propound the following requests for production of documents to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 34, and request that Facebook produce the documents and electronically-stored information set forth herein within thirty (30) days of service of these requests, at Bleichmar Fonti & Auld LLP, 555 12th Street, Suite 1600, Oakland, CA 94607.

## <u>INSTRUCTIONS</u>

1.      You shall respond to these requests for the production of documents in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

2.      In responding to each document request, furnish all responsive documents available at the time of production, including documents in your possession, custody or control, and in the possession, custody or control of your agents, employees, partners, representatives, subsidiaries, affiliates, investigators, or by your attorneys or their agents, employees or investigators.

3.      If any otherwise responsive document was, but is no longer, in existence or in your possession, custody or control, identify the type of information contained in the document, its current or last known custodian, the location/address of such document, the identity of all persons having knowledge or who had knowledge of the document and describe in full the circumstances surrounding its disposition from your possession or control.

4.      This is a continuing request for the production of documents and requires supplemental responses as provided for in the Federal Rules of Civil Procedure. If, after making your initial production, you (or any other persons acting on your behalf) obtain or become aware

of any further documents responsive to any document request, you are required to produce such additional documents to plaintiffs. Each supplemental response shall be served on plaintiffs no later than thirty days after the discovery of the further information.

5.    You shall produce the original of each document described below or, if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

6.    Documents shall be produced as kept in the regular course of business together with the original folders, binders, boxes or other containers in which they were maintained.

7.    All documents or things that respond in whole or in part to any portion of these requests are to be produced in their entirety, including attachments and their enclosures.

8.    Documents attached to each other should not be separated.

9.    Documents not otherwise responsive to any particular document request shall be produced if such documents mention, discuss, refer to, or explain the documents called for by any document request, or if such documents are attached to documents called for by any document request.

10.    Documents shall be produced in such fashion as to identify the custodian of each document.

11.    Identify the source of each document produced, by identifying: (a) all of the person(s) who possessed the document; (b) the positions or titles of any such individuals; and (c) all of the divisions and departments where each document was located. If you are unable to determine the individual(s) who possessed the document, identify the department and division where the document was located when produced.

12.     If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing any document, state the following:

      a.   The date of the document;

      b.   The name, the present or last known home and business address, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, reproduced or who were recipients of said document;

      c.   A description of the document sufficient to identify it without revealing the information for which the privilege is claimed;

      d.   The nature of the privilege asserted;

      e.   The factual basis upon which you claim any such privilege;

      f.   The location of the document; and

      g.   The custodian of the document.

13.     To the extent you object to any document request, you must provide specific responses as to what portion of the request you object to and state expressly why you will not respond to such request in sufficient detail to permit the Court to determine the validity of the objection. Responsive documents to which your objection does not apply should be produced.

14.     If you claim that all or any part of any document request, the Definitions, or Instructions is vague or ambiguous, please identify the specific language you consider vague or ambiguous and state the interpretation of the language in question you used to frame your response.

15.     Each document requested herein is to be produced in its entirety and without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive to any document request. If you have removed, excised or deleted any portion of a

document, stamp the word "REDACTED" on each page of the document that you have redacted. Redactions should be included on the privilege log described in Instruction No. 13, above.

16.     One copy of each document should be produced. A document that varies in any way from the original or from any other copy, including drafts or a document with handwritten notations or deletions constitutes a separate document and must be produced, whether or not the original is in your possession, custody or control. Color (*i.e.*, not black and white) originals should be produced in color. If any identical copy cannot be produced for any reason (*e.g.*, faint writing, erasures, etc.), produce the original.

17.     Indicate the origin of each document and number each document with consecutive Bates numbers.

## DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these requests for the production of documents.

1.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.     The present tense of a verb includes its past tense, and vice versa.

3.     "And" and "or" are to be construed conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

4.     "Any" and "all" mean each and every.

5.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

6.     "App Developer Investigation" or "ADI" means (as described in paragraph seven of the Chen Declaration) Facebook's investigation to determine "whether there has been misuse

of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the [Facebook] Platform."

7.      "Apps Others Use" means the setting used to prevent the disclosure of personal information to third party App Developers through Facebook's API, as described in paragraphs 366 to 368 of the FAC.

8.      "App Settings" means settings that a User can alter or accept to limit Third Parties from accessing or obtaining Users' Content and Information, including Apps Others Use, Granular Data Permissions, Platform Opt Out, and the like.

9.      "Chen Declaration" means the Declaration of Stacy Chen in Support of Respondent's Opposition to the Attorney General's Petition, *Attorney General Maura Healy v. Facebook, Inc.*, No. 1984CV02597-BFS-1 (Mass. Super Ct., Suffolk Cty.).

10.     "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries or otherwise) and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, messages sent on Facebook Messenger, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, electronic mail or email, and postings of any type.

11.     "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

12.     "Content and Information" refers to the definition in footnote 2 of the FAC, referring to "content" and "information" as Facebook's Statements of Rights and

Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, including:

    a.   Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

    b.   Characteristics of protected classifications under California or federal law.

    c.   Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

    d.   Biometric information.

    e.   Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

    f.   Geolocation data.

    g.   Audio, electronic, visual, thermal, olfactory, or similar information.

    h.   Professional or employment-related information.

     i.   Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

     j.   Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13.    "Document" or "Documents" is defined to include any Document, ESI, or Electronic Media stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, but not limited to, electronic or computerized data compilations, Communications, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email Communications, other electronically stored information from Personal computers, sound recordings, photographs, and hard copy Documents maintained in your Personal files.

14.    "Electronic Media" means any magnetic, optical, or other storage media device used to record ESI including but not limited to computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (*e.g.*, DropBox, Box, OneDrive, or SharePoint), tablet computers (*e.g.*, iPad, Kindle, Nook, or Samsung Galaxy), cellular or smart phones (*e.g.*, BlackBerry, iPhone, or Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage and/or transmittal.

15.    "Electronically Stored Information" or "ESI" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, but is not limited to, metadata,

system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code.

16.     "FAC" refers to the First Amended Consolidated Complaint filed February 22, 2019, ECF No. 257.

17.     "Facebook," "Defendant," "You," or "Your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

18.     "FTC Consent Order" shall refer to the July 27, 2012 Federal Trade Commission Consent Order in *In the Matter of Facebook, Inc.*, No. C-4365.

19.     "Granular Data Permissions" means the setting through which the User accessing an App may limit the categories of Content and Information an App Developer may collect.

20.     "Identify," with respect to Documents, means to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; (d) author(s); (e) addressee(s); and (f) recipient(s).

21.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction but not to limit the request.

22.     "Internal Policy" or "Internal Policies" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

23.     "Misuse of Data," when used as a capitalized phrase, means the use by an App of a User's Content or Information that was broader or different than the use of that content or information only in connection with the person that gave the permission to the App to access such User's Content or Information.

24.     "Named Plaintiffs" means Steven Akins, Jason Ariciu, Samuel Armstrong, Anthony Bell, Bridgett Burk, Brendan Carr, John Doe, Terry Fischer, Shelly Forman, Paige Grays, Mary Beth Grisi, Tabielle Holsinger, Taunna Lee Johnson, Olivia Johnston, Tyler King, Ashley Kmieciak, William Lloyd, Gretchen Maxwell, Scott McDonnell, Ian Miller, Jordan O'Hara, Bridget Peters, Kimberly Robertson, Scott Schinder, Cheryl Senko, Dustin Short, Tonya Smith, Mitchell Staggs, Charnae Tutt, Barbara Vance-Guerbe, and Juliana Watson.

25.     "Person" or "Persons" means any natural Person or any business, legal or governmental entity or association.

26.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

27.     "Platform Opt Out" means the setting a User may access to choose that his or her Content and information is not accessed or obtained by any Apps or websites on Facebook's Platform.

28.     "Privacy Controls" means the audience selectors that control what information in a User's profile can be viewed by other Users, and includes Profile Privacy Settings, Profile Privacy Controls, Publisher Privacy Controls, and the like.

29.     "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means all Documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, but not limited to, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

30.     "Third Parties" include the following:

a.     Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

b.     Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

c.     Any person with which Facebook has or had an integration partnership.

31.     "User(s)" means individuals who maintain a Facebook account and can generally access the typical Facebook experience through website or mobile applications.

32.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the FAC.

## RELEVANT TIME PERIOD

The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated. Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise specified period, even if such documents or information were prepared or published outside of the Relevant Time Period or otherwise specified period. If a document prepared before or after this period is necessary for a correct or complete understanding of any

document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 6**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

**REQUEST FOR PRODUCTION NO. 7**

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access,

use, transmission, receipt, collection or analysis of Users' Content and Information by Third

Parties; and

(d)    the names, titles, job descriptions, and employment periods of Your present or

former directors, officers, or senior managers, as well as any secretaries or administrative

assistants assigned to these directors, officers, or senior managers.

**REQUEST FOR PRODUCTION NO. 8**

All versions (including each updated or amended version thereof) of Facebook's

"Platform Policies," which have been called the "Developer Principles and Policies," the

"Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform

Policies").

**REQUEST FOR PRODUCTION NO. 9**

All Documents relating to each of the Named Plaintiffs, including but not limited to all

Content and Information collected about each of them or gained from business relationships or

any other source.

**REQUEST FOR PRODUCTION NO. 10**

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content

and Information Facebook collects, tracks, and maintains about them.

**REQUEST FOR PRODUCTION NO. 11**

Documents sufficient to identify all Third Parties to which Facebook granted access to

Named Plaintiffs' Content and Information, what categories of Content and Information

Facebook granted access to, how Facebook allowed these Third Parties to access the Named

Plaintiffs' Content and Information, and the business purpose of all such access.

**REQUEST FOR PRODUCTION NO. 12**

Documents relating to any partnerships or agreements Facebook entered into with Third

Parties for access to Named Plaintiffs' Content and Information.

**REQUEST FOR PRODUCTION NO. 13**

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and

Information, Documents sufficient to show any use by Third Parties of such Content and

Information not in connection with the User that granted the permission to the Third Party or

inconsistent with Facebook's agreement with that Third Party.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show the monetary or retail value of each named Plaintiff's

Content and Information to Facebook, updated to reflect whenever Facebook's terms of service

changed, including the calculation of revenue earned by Facebook for each Named Plaintiff

based upon bartering or selling access to such Named Plaintiff's Content and Information.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show the money or any other thing of value, including but not

limited to money or any other thing of value paid in exchange for targeted advertising, that

Facebook received in exchange for each Named Plaintiff's Content and Information, which

entities paid Facebook, and when such payments were made.

**REQUEST FOR PRODUCTION NO. 16**

Documents sufficient to show the monetary or retail value of Users' Content and

Information to Facebook, including all monthly, quarterly, and annual financial reporting

relating to same, and including but not limited to the calculation of average revenue per user,

any changes to such monetary or retail value relating to changes to Facebook's terms of service,

and any financial reporting of Content and Information as an asset.

**REQUEST FOR PRODUCTION NO. 17**

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

**REQUEST FOR PRODUCTION NO. 18**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

**REQUEST FOR PRODUCTION NO. 19**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

> (d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 35.

**REQUEST FOR PRODUCTION NO. 20**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or

communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**REQUEST FOR PRODUCTION NO. 21**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**REQUEST FOR PRODUCTION NO. 22**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 23**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 24**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**REQUEST FOR PRODUCTION NO. 25**

All Documents relating to agreements or partnerships described in Request No. 24.

**REQUEST FOR PRODUCTION NO. 26**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

**REQUEST FOR PRODUCTION NO. 27**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**REQUEST FOR PRODUCTION NO. 28**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 29**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**REQUEST FOR PRODUCTION NO. 30**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 31**

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

**REQUEST FOR PRODUCTION NO. 32**

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits—or Communications regarding such investigations, examinations, inquiries, or audits—regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**REQUEST FOR PRODUCTION NO. 33**

Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**REQUEST FOR PRODUCTION NO. 34**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**REQUEST FOR PRODUCTION NO. 35**

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

**REQUEST FOR PRODUCTION NO. 36**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports.

Dated: November 25, 2019

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:     */s/ Derek W. Loeser*
      Derek W. Loeser

By:     */s/ Lesley E. Weaver*
      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

Plaintiffs' Second Set of RFPs to
Facebook, Inc.                      0                      MDL No. 2843
Case No. 18-md-02843-VC

# Exhibit 2

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

</div>

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO DEFENDANT FACEBOOK, INC.** |

PROPOUNDING PARTY:     Plaintiffs

RESPONDING PARTY:     Defendant Facebook, Inc.

SET NUMBER:     Four (4)

Plaintiffs hereby propound the following interrogatories to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 33, and request that Facebook respond to the interrogatories below within thirty (30) days of service of these requests at Keller Rohrback L.L.P., 1201 Third Avenue, Suite 3200, Seattle, WA 98101.

<div align="center">

**INSTRUCTIONS**

</div>

1.     You shall respond to these interrogatories in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

2.     In responding to these Interrogatories, you must answer the Interrogatories in writing and under oath pursuant to Rule 33(b)(5).

3.      If you object to an Interrogatory on the grounds that it calls for disclosure of information which you claim is privileged, then answer such Interrogatory as follows: (a) furnish all information and facts called for by such Interrogatory for which you do not assert a claim of privilege; and (b) for each communication, recommendation, fact, or advice which you claim is privileged, state the basis for your claim of privilege and all the facts that substantiate that basis, including each of the participants in the allegedly privileged communication.

4.      If you object to any portion of an Interrogatory, provide all information responsive to any portion of the Interrogatory to which you do not object.

5.      Unless otherwise stated, there are no time limits applicable to any interrogatory. When a time limit is specified in a discovery request, this time limit does not alter your obligations under the Federal Rules of Civil Procedure to supplement your responses.

6.      Seasonable and timely supplementation is required. Accordingly, if any additional information relating in any way to these discovery requests are acquired or discovered subsequent to the date of your response, this information shall be furnished to Plaintiffs' counsel promptly after such information is discovered.

7.      In answering these Interrogatories, furnish all knowledge and information available to you or subject to your reasonable inquiry, access or control, however obtained including hearsay. This includes, but is not limited to, information in the actual or constructive possession of your attorneys and anyone else acting on your behalf.

8.      Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the interrogatories and requests herein: (i) the singular shall include the plural and the plural shall include the singular; (ii) a masculine, feminine, or neuter pronoun shall not exclude the other genders; (iii) the terms "any" and "all" shall be understood to mean "any and all"; and (iv) the words "and" and "or" shall be read in the conjunctive or disjunctive or

both, as the case may be, all to the end that the interpretation applied results in the more expansive interpretation.

## DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these interrogatories.

1.      The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.      The present tense of a verb includes its past tense and vice versa.

3.      "2012 Consent Decree" means the Decision and Order entered by the Federal Trade Commission (FTC) in 2012 in *In the Matter of Facebook, Inc.*, No. C-4365, pursuant to an agreement between the FTC and Facebook.

4.       "And" and "or" are to be construed both conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

5.      The words "all" and "any" means each and every.

6.      The phrase "describe in detail" or "detailed description" includes a request for a complete description and explanation of the facts, circumstances, analysis, opinion, and other information relating to the subject matter of a specific interrogatory.

7.      "Facebook," "Defendant," "you," and "your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

8.      "Action" means this case captioned *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 18-md-02843-VC and each of the constituent Actions transferred to and/or consolidated therein.

9.      "API" refers to an application programming interface.

10.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

11.      "Business Partners" refers to the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems, including, but not limited to, the third parties listed in paragraph 484 of Plaintiffs' First Amended Consolidated Complaint.

12.     "Content and Information" refers to the definition in footnote 2 of the First Amended Consolidated Complaint, referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Facebook Users, including the actions they take, and "content" to mean anything Facebook Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* First Am. Consol. Compl. ("FAC") ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular Facebook User, including:

A.      Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

B.      Characteristics of protected classifications under California or federal law.

C.     Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

D.     Biometric information.

E.     Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

F.     Geolocation data.

G.     Audio, electronic, visual, thermal, olfactory, or similar information.

H.     Professional or employment-related information.

I.     Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g, 34 C.F.R. pt. 99).

J.     Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13.     "Data Analytics Infrastructure" refers to the services, applications, utilities and systems that are used for either preparing data for modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines.

14.     "Database" refers to any organized collection of information that is stored electronically.

15.     "Facebook Archive" means the archived activity of the Named Plaintiffs You produced in this action.

16.     "Facebook User" means a person who maintains or has maintained a Facebook account.

17.     "Friends of Installing Users" refers to Facebook Users:

A.      who did not install a particular App, but whose Content and Information became accessible to that App because they were Facebook friends with an Installing User; or

B.      whose Content and Information became accessible to a Business Partner because they were Facebook friends with an Installing User.

18.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify a request, definition, or instruction but not to limit it.

19.      "Installing User" refers to a Facebook User who installed a particular App via his or her Facebook account or who used the services or products of a Business Partner in connection with his or her Facebook account.

20.     "Not Generally Available," when used as an adjective to modify Content and Information, refers to a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience.

21.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

22.     "Third Parties" include the following:

A.      Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

B.      Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

C.      Any person with which Facebook has or had an integration partnership.

23.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the First Amended Consolidated Complaint.

## INTERROGATORIES

**INTERROGATORY NO. 8:**

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

**INTERROGATORY NO. 9:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such Database to respond to either internal or external queries.

**INTERROGATORY NO.  10:**

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

**INTERROGATORY NO. 11:**

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces. For each of the fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

**INTERROGATORY NO.  12:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by, such system.

**INTERROGATORY NO. 13:**

For every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users, list the name of the API, a description of its function, the data fields of Not Generally Available Content and Information of Friends of Installing Users to which it allowed access, the number of calls it received each month, the volume of data it returned each month, the number of Friends of Installing Users whose Content and Information was accessed, the name of every Third Party that Facebook allowed to use that API, and the period during which each Third Party was allowed to use the API.

**INTERROGATORY NO. 14:**

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

**INTERROGATORY NO. 15:**

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to

each Business Partner each month;

f) the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

g) any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

**INTERROGATORY NO. 16:**

For each Named Plaintiff, identify all Third Parties who had the ability to access such Named Plaintiff's Not Generally Available Content and Information by virtue of the fact that the Named Plaintiff was a Friend of an Installing User, the date and time of each request for such access, and the specific Content and Information that was accessed.

**INTERROGATORY NO. 17:**

For each Named Plaintiff, identify each Facebook Business Partner that had the ability to access the Named Plaintiff's Not Generally Available Content and Information, even if the Named Plaintiff had not downloaded an App from that Business Partner, the date and time of each request for such access, and the specific Content and Information that was accessed.

**INTERROGATORY NO. 18:**

Identify by Bates number every document You provided or made available to PwC related to any investigation, audit or assessment related to the subject matter of the Complaint.

**INTERROGATORY NO. 19:**

Identify all members of Facebook's senior management team involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

**INTERROGATORY NO. 20:**

Identify all members of the Board of Directors involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

**INTERROGATORY NO. 21:**

For each such individual identified above in Interrogatories 19 and 20, describe in detail their duties and responsibilities relating thereto.

**INTERROGATORY NO.  22:**

Describe in detail the facts and circumstances relied upon by Facebook in assessing and agreeing to pay a $5 billion fine to the Federal Trade Commission.

**INTERROGATORY NO.  23:**

Identify every person involved in the decision to pay the $5 billion fine to the Federal Trade Commission.

**INTERROGATORY NO.  24:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether Third Parties accessed the Not Generally Available Content and Information of Facebook Users by virtue of their being Friends of Installing Users; (2) which Third Parties accessed such Content and Information; and (3) which Facebook Users, by virtue of their being Friends of Installing Users, had their Not Generally Available Content and Information accessed by Third Parties.

**INTERROGATORY NO.  25:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether any Business Partners accessed the Not Generally Available

Content and Information of Facebook Users even if such Users did had not downloaded an App from those Business Partners; (2) which Business Partners accessed such Content and Information; and/or (3) which Facebook Users had their Not Generally Available Content and Information accessed in that manner.

## INTERROGATORY NO. 26:

Identify by name and time period all Third Parties that obtained Facebook Users' Content and Information through friend permissions prior to 2009.

## INTERROGATORY NO. 27:

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

## INTERROGATORY NO. 28:

Describe the criteria Facebook used to determine which Third Parties would be granted whitelisted access.

## INTERROGATORY NO. 29:

Identify by name and time period all Third Parties that were Business Partners of Facebook and were granted access to Facebook Users' Content and Information.

## INTERROGATORY NO. 30:

Identify all categories of Content and Information available to a Facebook User through the "Access Your Information" or "Download Your Information" tools, such as users' public and private posts, Facebook messenger messages, and any attached content.

**INTERROGATORY NO. 31:**

Identify all categories of Content and Information Facebook collects, tracks, and maintains about Facebook Users that are excluded from the Access Your Information or Download Your Information tools, such as advertisements served to a Facebook User, likes, audience selector information, reports of offensive content, or support communications.

**INTERROGATORY NO. 32:**

For each Named Plaintiff, identify each category of Content and Information Facebook collects, tracks, and maintains about them and for each category, indicate (1) whether each category has been produced in this action and the Bates Range associated with each category of produced Content and Information; (2) whether each category of Content and Information is available to Facebook Users through the "Access Your Information" or "Download Your Information" tools; and (3) for each category of Content and Information that has not been produced in this action, its location, and the reason it has not been produced.

**INTERROGATORY NO. 33:**

For all documents produced in this action relating to the Named Plaintiffs' Content and Information, describe any associated data that reflects whether the Content and Information was publicly or privately shared.

**INTERROGATORY NO. 34:**

Identify by name, time period and type of data accessed all Third Parties Facebook has removed or banned from the Platform for violating Facebook Users' privacy or for failure to comply with Facebook's privacy policies.

Dated: July 16, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*
      Derek W. Loeser

By:    */s/ Lesley E. Weaver*
      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice)*
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **CERTIFICATE OF SERVICE** |

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO DEFENDANT FACEBOOK, INC.**

via Email on this 16th day of July, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley, Esq.
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on July 16, 2020.

*/s/ Sarah Skaggs*
Sarah Skaggs

# Exhibit 3

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20** <br><br> Judge:  Hons. Vince Chhabria and Jacqueline Scott Corley <br> Courtroom 4, 17th Floor |

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.    The stay imposed by Pretrial Order 20 includes a discovery stay. .............................. 2

    II.    This case is about information users share with their friends on Facebook. ................ 3

        A.    The four live theories all concern data users shared with their Facebook friends. .................................................................................................................... 3

        B.    The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook. .......... 4

    III.    Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant. ....................................................................................................................... 6

    IV.    The Court should deny Plaintiffs' "Cross-Motion to Compel." ................................. 10

CONCLUSION ............................................................................................................. 10

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Meyers v. Cty. of Sacramento*,
   2020 WL 207213 (E.D. Cal. Jan. 14, 2020).....................................................................................2

*Mujica v. AirScan, Inc.*,
   771 F.3d 580 (9th Cir. 2014).............................................................................................................3

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011).........................................................................................................2

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn &
Crutcher LLP

## INTRODUCTION

The lawsuit Plaintiffs describe is not this case. This case is about ***information sharing***. Specifically, it concerns sensitive information ***that users shared with their Facebook friends*** and that third parties allegedly accessed as a result of friend sharing, whitelisting, and integration partner agreements. Pretrial Order 20 is clear on this point, and Plaintiffs do not identify a single line in Judge Chhabria's comprehensive order, much less in their own allegations, that supports their description of the case that survived dismissal.

The Order explains on its first page: "This lawsuit . . . is about Facebook's practice of ***sharing*** its users' personal information with third parties." Dkt. 298 ("Order") at 1 (emphasis added). It then says that each of the four live theories concerns "***substantive and revealing content that users intended only for a limited audience*** [*i.e.*, their Facebook friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." *Id.*; *see also id.* at 7, 13, 17. The user data relevant to those theories consists of "***information [users] make available to their friends on [Facebook]***. *Id.* at 1.

Plaintiffs do not dispute that Facebook produced all of the information the Named Plaintiffs ever shared on Facebook. These productions consist of ***more than one million pages of data*** and necessarily include any data Facebook shared under the live theories. But, Plaintiffs insist they are entitled to any other data that has ever crossed Facebook's servers that relates in any way to any Named Plaintiff and all derivative materials drawing on this data. Plaintiffs seek these materials even if the underlying data is not associated with any user and even if they were never shared with any third party. Plaintiffs do not even attempt to explain why they would need such data in a case concerning information ***they shared on the Facebook platform*** and that Facebook allegedly shared beyond the audience Plaintiffs intended. Instead, Plaintiffs openly admit that they seek these extraneous materials not to pursue live claims, but to resuscitate stayed and dismissed theories or to search for new ones.

Plaintiffs largely avoid the Court's instruction to brief "what the scope of discovery is based on the claims in Judge Chhabria's ruling [Pretrial Order 20]." 9/4/2020 Hr'g Tr. at 5:8-10. Instead, Plaintiffs devote the majority of their brief to side issues and seek to compel Facebook to produce all documents responsive to five RFPs that are not before the Court. The Court should disregard these diversions, conform discovery to the four operative theories, and deny Plaintiffs' motion to compel.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

## ARGUMENT

**I.     The stay imposed by Pretrial Order 20 includes a discovery stay.**

Plaintiffs take the surprising position that Pretrial Order 20 sets virtually no bounds on the scope of discovery in this case and allows them to explore theories Judge Chhabria stayed or dismissed.[1]

Plaintiffs' position makes no sense. When a stay is in place, it "include[s] a stay of discovery." *Meyers v. Cty. of Sacramento*, 2020 WL 207213, at *1 (E.D. Cal. Jan. 14, 2020). Judge Chhabria stayed all but Plaintiffs' core theories because Plaintiffs filed a 1,440-paragraph pleading. As he explained, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . [and] the presence of so many disparate and vague allegations ma[de] it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Order at 5-6. In order to avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria therefore issued an opinion regarding Plaintiffs' core allegations, without addressing most of their improperly pleaded theories, which he stayed, *id.* Judge Chhabria surely did not intend to allow discovery on hundreds of "disparate and vague allegations" that did not satisfy Rule 8. The very point of the stay was to focus this case—not to allow Plaintiffs to explore "anything Facebook has ever been reported to have done wrong" without stating cognizable claims.

Plaintiffs even suggest Pretrial Order 20 allows discovery to "reviv[e]" claims dismissed with prejudice. Opp'n at 6 n.3. To support this curious position, Plaintiffs cite a footnote in Judge Chhabria's analysis of Plaintiffs' deceit by concealment claim. *Id.* (citing Order at 37 n.21). Judge Chhabria held that Plaintiffs stated a plausible claim arising from Facebook's alleged practices concerning whitelisting and integration partners. But he held the claim did not satisfy Rule 9(b)'s heightened pleading standard with respect to friend sharing and Facebook's enforcement measures. He then said in a footnote that dismissal of a subset of the claim would not "preclude . . . plaintiff[s] from seeking revival if discovery reveals a factual basis that justified reconsideration." Order at 37 n.21. Judge Chhabria cited *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), which holds a plaintiff who fails to satisfy the PLRA's heightened pleading standard may potentially seek revival if other case-related discovery later allows the plaintiff to satisfy the

---

[1]   In addition to the discovery Plaintiffs seek from Facebook, Plaintiffs have served overbroad sub-poenas on 27 third parties. These parties also require clear guidance as to the scope of discovery.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

PLRA's heightened pleading standard.  Judge Chhabria certainly did not intend this footnote to create a gaping hole allowing discovery on hundreds of allegations that did not survive dismissal.  *See Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014) ("To the extent [earlier cases] suggest[] that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard, it is simply incompatible with *Iqbal* and *Twombly*.").

Pretrial Order 20 plainly defines the scope of discovery in defining the scope of the case.

## II.     This case is about information users share with their friends on Facebook.

A plain reading of Pretrial Order 20 explains the scope of the case Judge Chhabria allowed to move forward.[2]  Plaintiffs say the Order describes this case as concerning any data Facebook receives or infers about users and how that data may be used to target them.  To support this position Plaintiffs quote vague passages from the Order stating the case concerns "sensitive information."  Plaintiffs then say Judge Chhabria did not define "sensitive" and ask the Court to interpret the term to include any data Plaintiffs believe to be personal—including information they provide to third parties, information third parties collect through cookies, public records, and even inferences Facebook draws.  Opp'n at 4.

Plaintiffs disregard what Pretrial Order 20 actually says.  It describes "sensitive information" to be "substantive and revealing content that users intended only for a limited audience," and clarifies that this data is "**information [users] make available to their friends on [Facebook]**."  Order at 1.  To read the ruling otherwise would expand the case far beyond what Judge Chhabria considered and would also raise a host of thorny legal questions his Order does not address.

### A.     The four live theories all concern data users shared with their Facebook friends.

As discussed, Pretrial Order 20 allows four theories of relief to move forward.  Each theory concerns information users shared with their Facebook friends.

*Friend sharing*.  Friend sharing was a capability through which users could share with apps information their friends posted and made available to their Facebook friends.  Plaintiffs do not dispute

---

[2]   Plaintiffs disingenuously argue that Facebook takes an "unduly narrow" view of discovery, citing a comment Judge Chhabria made before discovery began advising Facebook to produce materials regarding "friends' information and friends' of friends information."  Opp'n at 13.  Facebook has now produced nearly 1.5 million pages of documents, before the parties have even reached a search term agreement, including all information the Named Plaintiffs shared with their friends and friends of their friends.  Those productions also include all of the Facebook documents produced to the FTC in response to its document requests in two related investigations.  They also include documents produced to a host of other government actors in related actions responsive to Plaintiffs' RFPs.  In addition to these materials, Facebook proposed search terms hitting on millions of additional documents.

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

this. Friend sharing underlies the Cambridge Analytica events, it has been hotly litigated, and there is no dispute as to what it is about. The Order explains: "[W]hen users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to," "such as photographs, videos they watched, religious preferences, posts, and even sometimes private one-on-one messages sent through Facebook." *Id*. at 6-7.

**Whitelisting**. Whitelisting is an extension of friend sharing and is about the same data. *Id*. at 8.

**Integration Partner Agreements.** Facebook allegedly "[s]har[ed] sensitive user information with business partners," through a list of "integration partnerships," to integrate Facebook with devices, websites, and social-media platforms. *Id*. at 8-9. As with the other theories, the "sensitive user information" at issue is "substantive and revealing content that users intended only for a limited audience [i.e. their Facebook friends]." *Id*. at 1. The purpose of these agreements was to allow users to integrate their Facebook activities *that they shared* on Facebook with other platforms and sites.

Plaintiffs say the Order allows claims relating to integration partners to proceed as to some broader set of "sensitive information" that they find personal in nature. Opp'n at 7. Plaintiffs provide no support for this assertion; the Order describes this theory as involving the same "sensitive user data" underlying the other theories of relief. And it must. As discussed below, the Order holds that Plaintiffs demonstrated standing, a reasonable expectation of privacy, and a lack of consent only with respect to Facebook's alleged practice of sharing information users shared with their Facebook friends.

**Enforcement**. This theory relates to how Facebook enforced its data-use policies with respect to data third parties obtained through friend sharing, whitelisting, and integration partner agreements, and it concerns the same data that users shared with their Facebook friends. Order at 9.

**B.      The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook.**

Pretrial Order 20 addressed various "global issues" and holds Plaintiffs demonstrated a reasonable expectation of privacy, standing, and lack of consent only with respect to Facebook's alleged practice of sharing with third parties information users shared with their friends on Facebook.

**Expectation of privacy**. Pretrial Order 20 addresses Facebook's argument that Plaintiffs were not injured, and therefore lack standing, because they did not have a reasonable expectation of privacy

Gibson, Dunn &
Crutcher LLP

4

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

over information they share with their Facebook friends. *Id*. at 1 ("Facebook argues that people have no legitimate privacy interest in information they make available to their friends on social media."). With respect to users' privacy expectations, Pretrial Order 20 holds: "the issue of whether users have a reasonable expectation of privacy *in information they share with their social media friends* is best understood as relating to the merits, not standing." *Id*. at 10-11 n.2 (emphasis added). On the merits, the Order holds that "[w]hen you share sensitive information with a limited audience . . . you retain privacy rights and can sue someone for violating them." *Id.* at 2. It then analyzes whether users retain a reasonable expectation of privacy over information *they share with their friends*, *see id*. at 10-12, and concludes: "social media users can have their privacy invaded if sensitive information *meant only for a few dozen friends* is shared more widely," *id*. at 11.

Pretrial Order 20 is so clear that this case concerns information that users shared with their Facebook friends that it goes out of its way to say *sua sponte*: "It seems quite possible that a user whose settings allow information to be shared not only with their friends, but friends of friends, loses any expectation of privacy." *Id*. at 11 n.3. Nowhere does Pretrial Order 20 consider whether users maintain a reasonable expectation of privacy over information beyond what users share on Facebook (as Plaintiffs wrongly suggest) such as information users provide third parties, public records, information third parties obtain through cookies, or information Facebook "infers" about users.

**Standing.** With respect to standing, Pretrial Order 20 holds: "The alleged injury is 'concrete' largely for the reasons already discussed – if you use a company's social media platform *to share sensitive information with only your friends*, then you suffer a concrete injury when the company disseminates that information widely." *Id*. at 17. The Order goes on to say that Plaintiffs' injuries are sufficiently particularized with respect to which third parties allegedly received their data because, "[i]f, as alleged in the complaint, *Facebook made users' 'friends only' information readily available* to such a broad swath of companies . . . it is virtually inevitable that some of these companies obtained information on the named plaintiffs." *Id*. at 18. The Order did not hold—or even consider—whether Plaintiffs have standing to sue Facebook with respect to information users did not share on Facebook.

**Consent**. On the issue of consent, the Court addressed whether Plaintiffs consented to the conduct underlying their claims because they "agreed, when they signed up for their accounts, that

Facebook could disseminate their 'friends only' information in the way it has done." *Id.* at 18. Pretrial Order 20 holds that judicially noticeable materials demonstrate that a subset of users consented to sharing their "friends only" information through friend sharing, but do not establish at the pleading stage that all users consented to sharing friends-only information through friend sharing, whitelisting, and integration agreements. *Id.* at 18-29. The Order did not consider whether Plaintiffs consented to sharing information they did not share on Facebook.

The Order is clear that this case is about sensitive information users made available to their friends on Facebook and third parties allegedly accessed. Discovery must conform to these theories.

## III. Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant.

Facebook produced **more than one million pages of content and information** related to the Named Plaintiffs.[3] ***Those materials include every each Named Plaintiff ever shared on Facebook*** (unless they deleted it). This includes, but is not limited to, the "Download Your Information" ("DYI") file that Facebook makes available to users,[4] plus *additional* information.

Plaintiffs do not dispute that the produced materials include any data users shared with their Facebook friends (sensitive or otherwise). Yet, Plaintiffs demand that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data—such as data sets tracking hours of peak user activity to monitor strains on Facebook's system. They demand such materials without regard for whether they were **_shared_** with any third party, much less under a live theory. To support this position, Plaintiffs misinterpret a handful of Facebook documents,[5] but their argument boils down to the following: Facebook has documents drawing on data relating to users; therefore, Facebook must search

---

[3] Since filing its opening brief, Facebook produced approximately 250,000 additional pages of information related to Named Plaintiffs who were added to the case in August.

[4] Plaintiffs assert that the DYI data is not useful because it does not display on an item-by-item basis the audience that Plaintiffs set for each of their posts. Facebook agreed to investigate whether it could produce this data for relevant posts—bearing in mind that the request involves granular data for *more than a million pages* of activity. Facebook also reminded Plaintiffs that their accounts display this information. If Plaintiffs believe the audience set to a particular post is critical evidence for their case, they could screen-shot that information from their accounts and produce it. They could also identify particular posts to Facebook so that Facebook can produce the relevant information.

[5] Because the Court ordered the parties not to submit declarations or evidence, 9/4/2020 Hr'g Tr. at 5:8-10, 18-22, Facebook does not here submit declarations or documents to dispute Plaintiffs' characterization of the materials they cite. If the Court is inclined to issue a ruling relying on the exhibits Plaintiffs submitted, Facebook respectfully requests permission to do so.

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

for and produce any materials drawing upon any data it has ever collected or created that relates in any way to a Named Plaintiff.  The Court should reject this position, which largely asks Facebook to search for materials that are out of scope and consist largely of data already produced in other formats.

**Data the Named Plaintiffs did not share on Facebook is out of scope,** including public records, data Plaintiffs shared with third parties, and information created by Facebook.  Facebook produced all of the information the Named Plaintiffs shared on Facebook (sensitive or otherwise).  These productions necessarily include any information shared under the live theories.[6]

Plaintiffs say the case is about data Facebook creates and that third parties share with Facebook that is used to draw "inferences" about users.  For instance, Plaintiffs may allow websites to collect data about their shopping habits through cookies.  Those sites then might share this data with other parties (including Facebook) to better place the site's advertisements.  As discussed above, nothing in Pretrial Order 20 supports Plaintiffs' argument that this type of data is part of this lawsuit.  This would be a very different case if—as Plaintiffs say—it were about Facebook sharing information that third parties passed on to Facebook.  To establish this sort of "third party data" claim, Plaintiffs would have had to allege (and prove) the nature of each of their relationships with the specific third parties at issue, the circumstances under which those third parties obtained their data, whether each individual user consented to that third party sharing data with Facebook, the circumstances under which the data was provided to Facebook, and so on.  None of that is at issue here and nothing in Pretrial Order 20 suggests it is.  Nor could Plaintiffs conceivably establish facts of this nature on a class-wide basis.

Plaintiffs seem to concede they demand these materials because "the very purpose of collecting all of this data . . . is to use it to target users."  Opp'n at 12.  As Plaintiffs admit, Pretrial Order 20 dismisses their targeted advertising theory.[7]  To the extent any advertisers received sensitive user data through friend sharing, whitelisting, or integration agreements, that user data was already produced.

---

[6]  To describe the data Plaintiffs believe Facebook maintains, Plaintiffs cite their Exhibit B at page 9, which was prepared by an employee in 2014 and regards Facebook's ads platform.  The document does not reflect Facebook's standard terminology, nor does Facebook agree with Plaintiffs' character-ization of the document.  In any case, Facebook does not dispute that it receives data from third par-ties in connection with its ads platform and maintains internal analyses which rely on user data.

[7]  Plaintiffs walk back their position that they need discovery to pursue their dismissed "targeted advertising" and "psychographic marketing" theories.  Opp'n at 11.  But Plaintiffs have been arguing for a year that these theories justify their demands for every piece of information Facebook collects and infers about users and took this position in the recent joint status updates that prompted this brief-ing. *See* 8/13/2020 Status Update at 2-3, 9, Dkt. 495; 7/30/2020 Status Update at 3, Dkt. 484.

7

Gibson, Dunn & Crutcher LLP

In any case, as discussed in its opening brief and below, Facebook actually produced the majority of data it receives from third parties in the off-Facebook Activity portion of the DYI materials.

**Data not shared through one of the four theories is out of scope.** Plaintiffs say they provide evidence that Facebook shares data beyond what users share on Facebook. Opp'n at 9-10. Even if that were true, it is not relevant to this lawsuit. The live theories concern data users shared with their Facebook friends that third parties accessed via friend sharing, whitelisting, or integration agreements.

In any case, the documents Plaintiffs cite describe Facebook's data *sources*; they say nothing about whether or how Facebook *shares* information. Of note, Plaintiffs claim their Exhibit C "confirms that Facebook shares [the data they seek] with third parties." Opp'n at 9. Exhibit C is an email outlining *hypothetical* platform capabilities—it does not discuss what data Facebook actually shared.

**The integration partner theory does not entitle Plaintiffs to all data from third parties.** Plaintiffs suggest Facebook must locate and produce all data points it has ever received from any third party regarding a Named Plaintiff because Facebook's integration partner agreements were built in part on "data reciprocity." Opp'n at 11. This argument is a red herring and misrepresents what "data reciprocity" means. Facebook did not, as Plaintiffs suggest, have agreements with integration partners to trade user data. Data reciprocity arrangements allowed users to post their Facebook activities to third-party platforms if the third-party platform also allowed its users to post their activities to Facebook. Plaintiffs acknowledge this. *See* SACC ¶ 657(g) ("'Reciprocity' agreements . . . requir[ed] Apps that used data from Facebook to <u>allow their users</u> to share their data back to Facebook"); *see also id.* ¶¶ 239, 745. Any user data relating to that type of sharing was produced. Again, Facebook produced everything the Plaintiffs shared on Facebook. This includes any Facebook activities Plaintiffs *elected* to share on other platforms and any off-Facebook activities Plaintiffs *elected* to share on Facebook. In any event, even if some other data from integration partners existed, only data received from *those partners* could even possibly be relevant—not data from thousands of other third parties.[8]

**Plaintiffs' SCA and VPPA claims do not require additional data.** Plaintiffs contend this case concerns data beyond what they shared on Facebook because Pretrial Order 20 did not dismiss

---

[8] Plaintiffs concede they seek any such data to prove damages. If the Court is inclined to require broad discovery to support damages, Facebook respectfully requests the opportunity to submit briefing regarding why any such discovery should be bifurcated from liability-related discovery.

Gibson, Dunn &
Crutcher LLP

8

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

their claims under the Stored Communications Act ("SCA") and Video Privacy Protection Act ("VPPA"). Opp'n at 4-5. Plaintiffs highlight that their SCA claim turns, in part, on "whether the shared information includes the contents of an electronic communication." *Id*. at 5. But the sensitive data at issue includes "private one-on-one messages" sent on Facebook. Order at 17; *see id*. at 1, 32. Similarly, Plaintiffs' VPPA claim survived dismissal on the basis that Facebook shared "information about the videos that users received in their private [Facebook] messages and about videos they 'liked.'" *Id*. at 34. Plaintiffs' messages and any videos they shared or liked were produced.

**The additional data Plaintiffs seek cannot even be reasonably collected**.[9] Facebook understands Plaintiffs seek two forms of data: (i) any additional data regarding users' off-Facebook Activity provided by third parties, and (ii) any derivative materials that draw from user data. Again, these materials are not relevant to any live theory. Facebook also cannot reasonably identify them.

With respect to off-Facebook Activity, as Facebook explained in its opening brief, the produced DYI materials include the vast majority of data Facebook receives from third parties. It is not clear what else Plaintiffs seek or how it could be relevant. Any off-Facebook Activity provided by third parties that is *not* included in the DYI materials is data Facebook has not linked to a particular user or data that is so granular that it is preserved only temporarily. There is no centralized way to search for either type of data. To the extent it exists, it is organized by the third parties who provided it. Facebook would therefore need to review every data set it has received from thousands of third parties and then attempt to link to the Named Plaintiffs data points it previously did not associate with any user. Such an exercise is unlikely to be fruitful or at all useful, particularly on a class-wide basis.

Facebook also explained that, within 90 days, any user data not included in the DYI materials is disassociated from the user's ID, anonymized entirely, or deleted (depending on the nature of the data and any business reasons for retaining it). Plaintiffs argue that Facebook should *still* be able to find any derivative materials drawing from data relating to any Named Plaintiff because data disassociated from a user's ID can sometimes be linked back to the user's account. Plaintiffs' explanation of this process is oversimplified, incorrect, and ignores that much of the data they demand

---

[9] Plaintiffs say Facebook did not prove undue burden because it did not submit declarations or evidence. The Court instructed the parties not to submit such materials. 9/4/2020 Tr. at 5:8-10, 18-22.

is fully anonymized or not retained at all.[10] The argument also misses the point. There is no way for Facebook to run a centralized search for a user's ID, random ID, or any "hashed data" identifiers across millions of data sets, which are largely used for business analytics (like scoping infrastructure needs). The only way to search these tables is to open all of them and search each to find any data relating to a particular user, whether by user ID or otherwise. The issue is opening and searching each table.[11]

To be clear, Facebook is not—as Plaintiffs suggest—urging the Court to issue a ruling regarding the scope of discovery based on undue burden. Facebook is highlighting that this is not a situation in which there are marginally relevant materials that are easy to sweep into an ongoing collection. The user data Plaintiffs seek has nothing to do with the four operative theories, most of it was actually produced, and any additional data would be virtually impossible to locate. If Plaintiffs are able to identify some specific type of data about user activity that is relevant to the case, Facebook will search for that data. But Plaintiffs' position that Facebook must search the entire company for every document including any data relating to a Named Plaintiff is simply not reasonable.

## IV. The Court should deny Plaintiffs' "Cross-Motion to Compel."

Plaintiffs style their brief as a "cross-motion to compel" compliance with five RFPs and criticize Facebook for not submitting declarations and evidence about these requests. The Court should disregard this diversion, which puts the cart before the horse. The Court directed the parties to submit "no declarations," as this briefing is "just a legal question as to what the scope of discovery is based on the claims in Judge Chhabria's ruling." 9/4/2020 Tr. at 5:8-10, 18-22. Facebook told Plaintiffs it will produce materials responsive to the RFPs they identify that are in Facebook's possession and relate to the operative theories. The Court must resolve this threshold legal issue before it can consider (on a full evidentiary record) whether Facebook produced the relevant evidence responsive to specific RFPs.

## CONCLUSION

The Court should enforce the stay Judge Chhabria imposed, allow discovery only on the four operative theories of relief detailed in Pretrial Order 20, and deny Plaintiffs' cross-motion to compel.

---

[10] Plaintiffs' Exhibit B, which they cite on page 12 of their brief, describes the ability to reidentify data points that remain live on a user's Facebook page. This live data has already been produced.

[11] Plaintiffs did not ease the burden of searching millions of data sets by identifying 10 Named Plaintiffs they *intend* to identify as class representatives. In any case, the other 14 Named Plaintiffs have not withdrawn their claims and have reserved their rights to proceed as class representatives.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

DATE:  October 8, 2020

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  _Orin Snyder_____
Orin Snyder (_pro hac vice_)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

_Attorneys for Defendant Facebook, Inc._

Gibson, Dunn &
Crutcher LLP

11
DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

# Exhibit 4

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' OPPOSITION TO DEFENDANT FACEBOOK, INC.'S REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20 AND CROSS-MOTION TO COMPEL DISCOVERY RELATED TO REQUESTS FOR PRODUCTION NOS. 9 THROUGH 13**<br><br>Judges: Hon. Vince Chhabria<br>Hon. Jacqueline S. Corley<br>Courtroom: 4, 17th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     ARGUMENT ..........................................................................................................2

        A.      The Order does not limit discovery to users' platform activity. ...........................2

        B.      The discovery requests at issue and Facebook's response .....................................6

        C.      Relevant sensitive information is not limited to platform activity, but also
                includes sensitive information Facebook derives and collects from business
                partners, app developers, apps, and other sources. ................................................7

                1.      User data includes, in Facebook's words, "native, appended and
                        behavioral data" that Facebook collects from business partners, apps
                        and other activity. ...................................................................................8

                2.      Internal documents confirm that Facebook's description of data
                        "associated" with users is misleading ......................................................11

        D.      Facebook has not established that the burden of producing the data relating
                to ten Plaintiffs is disproportional to the needs of this case. ...............................12

III.    CONCLUSION ......................................................................................................14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Doe v. Gangland Prods., Inc.*,
    730 F.3d 946 (9th Cir. 2013) ............................................................................10

*Harris v. Best Buy Stores, L.P.*,
    No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556 (N.D. Cal. Oct. 14, 2016)................13

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
    No. CV1600300CJCRAOX, 2017 WL 3275615 (C.D. Cal. Feb. 14, 2017).........................14

*Shulman v. Grp. W. Prods., Inc.*,
    18 Cal.4th 200 (1998)........................................................................................10

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
    No. CV 18-9536 MWF, 2020 WL 4341717 (C.D. Cal. June 25, 2020) ...............................14

*Sullivan v. Personalized Media Commc'ns, LLC*,
    No. 16-MC-80183-MEJ, 2016 WL 5109994 (N.D. Cal. Sept. 21, 2016) ............................14

**Statutes**

18 U.S.C. § 2702(a) ............................................................................... 3, 4, 5, 10

18 U.S.C. § 2710(b)(2).............................................................................. 3, 4, 5, 10

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)................................................................................13

Local Rule 5-1(i)(3) ....................................................................................16

## I.    INTRODUCTION

Facebook does not want Plaintiffs to obtain discovery showing the full breadth of its wrongful disclosure of its users' sensitive information. Accordingly, Facebook seeks to limit discovery in this case to a single category of improperly shared information: users' activity on the Facebook platform. The sensitive information that Facebook collects and shares with third parties is much more extensive than this. It collects users' sensitive information from a variety of sources—including from third parties—then pools the information with user-posted activity and generates additional information from the full data set it accumulates. It then shares this information about users and their friends with third parties. All of this information, including who has access to it and how it is used, is relevant to Plaintiffs' claims.

As a result, there are at least three compelling reasons that Facebook's motion should be denied and Plaintiffs' cross-motion to compel production of documents responsive to Requests for Production ("RFPs") Nos. 9 through 13[1] should be granted.

*First*, contrary to Facebook's tortured reading of Pretrial Order No. 20 ("Order" or "PTO 20"), Dkt. No. 298, the Court did not limit discovery in this case only to information regarding user activity on Facebook. While that information—and Facebook's subsequent disclosure of it—is of course relevant, that is not the only type of sensitive information relevant to Plaintiffs' claims or the four categories of wrongdoing recognized by the Order.

*Second*, the universe of data Facebook collects and shares about users is also not limited to user activity on Facebook, but instead consists of a sea of information obtained from a wide variety of sources, including from business partners, app developers, apps, and other third parties. Indeed, as Facebook's own documents show, it collects information about users far beyond what Facebook has produced in this case. And discovery produced to date further confirms that Facebook not only collects this information, but links it to users and shares it with third parties—putting to rest Facebook's nonsensical suggestions that Plaintiffs have failed to articulate what additional evidence exists or that Facebook cannot "associate" certain data with a

---

[1] For details on these RFPs, see *infra* § II.B.

user.

*Third*, there is no justification for Facebook's claims of undue burden. Such an argument should be accorded minimal weight in a case of this size and complexity involving a company whose business model is premised upon the collection and production of electronic information about billions of users. Facebook has come nowhere near meeting its burden of demonstrating why data regarding solely Named Plaintiffs—relative to the hundreds of millions of potential class members whose information is ultimately at issue in this case—is not proportional to the needs of the case. In fact, pursuant to the Court's recent guidance regarding streamlining Plaintiffs' discovery, Plaintiffs have reduced the number of individuals who will be class representatives to ten, down from the twenty-three. Plaintiffs only seek the discovery at issue here related to these ten Plaintiffs (for purposes of this motion, the "Named Plaintiffs.")

## II. ARGUMENT

### A. The Order does not limit discovery to users' platform activity.

PTO 20 does not directly address the question raised by Facebook in its motion—whether this case is limited to user activity on the Facebook platform or includes all the sensitive information about users that Facebook improperly shared with third parties. But the Order nowhere expressly limits the case to user activity. *Cf.* Mot.[2] at 1. Nor does it make sense to read the Order that way. That sort of limitation would conflict not only with claims and theories that the Order upheld, but also with the grounds on which they were allowed to proceed to discovery.

Facebook, under the guise of enforcing a discovery stay that was never issued in the first place, spends many pages straining to read the Order to limit discovery to data relating only to users' on-platform activity. This provides a misleading picture of what the Order says and inaccurately ascribes to the Court a set of internally inconsistent views.

*1. The Order.* The Order summarizes its understanding of Plaintiffs' claims in a two-sentence précis near the beginning: "Broadly speaking, this case is about whether Facebook

---

[2] Def. Facebook, Inc,'s Opening Brief in Supp. of Its Req. to Enforce the Partial Stay of Discovery in Pretrial Order No. 20 ("Mot."), Dkt. No. 515.

acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained." Order at 3. This description focuses on *Facebook's* unlawful disclosure of information about users and their friends to third parties—not on whether that information was originally posted, shared, or generated by users on the Facebook platform.

The Order then discusses the four categories of Facebook's wrongdoing. These categories are: (1) "[g]iving app developers access to sensitive user information"; (2) "[c]ontinued disclosure to whitelisted apps"; (3) "[s]haring sensitive user information with business partners"; and (4) "[f]ailure to restrict the use of sensitive information." Order at 6-9. These categories line up neatly with the earlier description of the action as alleging that "Facebook acted unlawfully in making user information widely available to third parties" (the first three categories) and that Facebook "fail[ed] to do anything meaningful to prevent third parties from misusing the information they obtained" (the fourth category). *Id.* at 3.

Using these four categories of wrongdoing as a framework, the Order analyzed whether Plaintiffs had standing to bring their claims and whether they stated valid claims. It ruled that Plaintiffs had standing because they alleged that their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14. It upheld nearly all of Plaintiffs' claims (e.g., three privacy-based tort claims under California law, a claim under the Stored Communications Act ("SCA"), a claim for breach of contract, and a claim for unjust enrichment) except to the extent they were based on the first category of wrongdoing, the disclosure of user information to app developers. *Id.* at 30-34, 38-41. It upheld in its entirety Plaintiffs' claim under the Video Privacy Protection Act ("VPPA"). *Id.* at 34-35. And it upheld Plaintiffs' claim for negligence, which was based on the fourth category of wrongdoing. *Id* at 35-36.

**2. *The Order's rationale.*** Why did the Order conclude that Plaintiffs had standing and had stated valid claims? On these points, the Order is clear. Plaintiffs had standing because "their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14.

This reasoning focuses not on *where* the user information was originally generated—whether on the Facebook platform or off it—but on its nature ("sensitive") and on what Facebook did with it ("disseminated" it "to third parties").

Similarly, when discussing the claims, the Order focused not on the original provenance of the information about users, but on its nature and on what Facebook did with it. So, for example, the Order ruled that:

- Plaintiffs had stated valid privacy torts because Facebook had disseminated information that was "sensitive" and as to which Plaintiffs had a reasonable expectation of privacy. *Id.* at 30-33.

- Plaintiffs had stated a claim under the Stored Communications Act because Facebook had disseminated the content of their electronic communications and had not gained their consent to do so. *Id.* at 33-34.

- Plaintiffs had stated a claim under the Video Privacy Protection Act because Facebook had disseminated "information which identifies a person as having requested or obtained specific video materials or services," *id.* at 34 (citation omitted), and Facebook qualified as a "video tape services provider" under the statute, *id.* at 35.

### 3. *"Sensitive information" is not defined by where Facebook collects that information.*

The Order repeatedly notes that Facebook shares "sensitive" user information without consent. Facebook pins its argument to this one word, maintaining that the Order "defined" sensitive user information to mean only information about what users post on Facebook, Mot. at 1, or users' platform activity, Mot. at 8. But the common-sense meaning of "sensitive information" encompasses more than just what users did on the platform. Consider, for example, a Facebook user's Amazon.com order for an over-the-counter contraceptive or another user's entry of "alcoholic support group in Tower District, Fresno" into a search engine. "Sensitive information" also includes information that Facebook can *infer* from on-platform information—a category of information it has not produced. (Think of the inferences that Facebook can draw from weekly photographs of a user taken at M.D. Anderson Cancer Center.) Facebook's objection that such information is categorically not "sensitive" is false.

It is true that when the Order gave examples of sensitive user information, the examples it

used concerned information generated on the Facebook platform. *E.g.*, Order at 1, 17. Nowhere, however, did the Order *define* or *limit* sensitive information to users' platform activity only. And the Order's reasoning certainly is not limited to such information. Rather, as noted above, Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on the nature rather than the provenance of the information, and on whether Facebook shared that information with third parties. And, as Plaintiffs have learned through discovery, the sensitive information about users that Facebook collects and shares with business partners and app developers includes both information originally generated outside the Facebook platform and information derived from on- and off-platform activity.

It also is farfetched for Facebook to argue that the Order rules that *all* of Plaintiffs' claims—including their federal statutory claims—rise or fall depending on whether the information that Facebook shared is "sensitive" in the sense of being embarrassing or deeply intimate. The validity of Plaintiffs' claim under the SCA, for example, does not turn on how embarrassing or intimate the information is that Facebook shared, but on whether the shared information includes the contents of an electronic communication. 18 U.S.C. § 2702(a)(1). Similarly, Plaintiffs VPPA claim turns on whether the information that Facebook shared includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). If, for example, Facebook collected and shared a user's video-watching queue from a different platform, that would constitute a VPPA violation.

In sum, while the Order does not explicitly address the issue posed by Facebook's motion, it certainly does not limit discovery in this case to on-platform user activity and reading it that way is inconsistent with the Court's reasoning. It is also inconsistent with statements by the Court during the motion to dismiss hearing about the breadth of user data that is relevant to Plaintiffs' claims:

> For example, if – I'm a Facebook user. And, you know, I'm trying to assess the
> likelihood that my sensitive information got into the hands of third parties and, if
> so, how many third parties and, if so, what kinds of third parties. If I have a full

understanding of the third parties that had access to the information, and a full understanding of what type of information they had access to, and a full understanding of who they were, and what they – and what restrictions were placed on them, we then have a better understanding of what was likely to have happened to me.

Nov. 4, 2019 Tr. at 15:20-16:4. It is the "full understanding" referred to by the Court that Plaintiffs seek, and that Facebook refuses to allow.

Finally, this reading prevents Named Plaintiffs from discovering even the general policies and practices of Facebook governing the sharing of their sensitive information, policies and practices that are critical for this case. *See* Pretrial Order No. 30 at 2, Dkt. No. 347 ("[T]he best way to assess the merits and to determine whether class certification is appropriate is almost certainly to conduct discovery on Facebook's general practices."). Plaintiffs submit that Facebook's exclusion of this information from discovery is not what the Order intended.

*4. The Order stayed claims, not discovery.* Plaintiffs organized their claims into three categories: prioritized claims, prioritized consumer protection act claims alleged in the alternative, and non-prioritized claims. First Am. Consolidated Compl. ("FACC") at 317-411, Dkt. No. 257. The Order made the simple observation that "[a]ll other prioritized claims not addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and adjudicated, if necessary, at a later state in the proceedings with the other non-prioritized claims." Order at 6. Facebook's claim that this holding somehow imposed a stay of *discovery* is baffling. The Order does not, and does not purport to, stay discovery in any fashion.[3]

B. **The discovery requests at issue and Facebook's response**

The present dispute arises from five discovery requests, each of which asks for data that Facebook possesses about Named Plaintiffs, the third parties that Facebook disclosed this data to, and the types of information that was disclosed to them. *See* Ex. A, Def. Facebook, Inc.'s Resps. & Objs. to Pls.' Second Set of Reqs. for Produc. In particular, RFP No. 9 requests "[a]ll

---

[3] Even if it were, the Order observed that "[o]f course, dismissal of a subset of claims with prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis that justifies reconsideration[.]" Order at 37 n.21 (citations omitted).

Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source."[4] *Id.* RFP No. 10 asks Facebook to produce, "[f]or each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them." *Id.* RFP Nos. 11-13 then request documents requesting Facebook to identify the third parties that were able to access this information, including the categories of data that were disclosed to them and how they accessed it. *Id.* Plaintiffs propounded these requests nearly one year ago in November 2019.

In response to these requests, Facebook produced information collected by the DYI ("Download Your Information") tool. This limited tool allows downloads of some, but not all, information relating to users' activity on the platform. And Facebook freely acknowledges that Plaintiffs can access this information themselves. *Id.* ("[A]ll Facebook users are free to download their DYI file if they wish."). In addition to the DYI production, Facebook has produced an undefined category of "additional information associated with [users'] accounts" for each Plaintiff. Mot. at 6. But Facebook does not describe what the "additional information" is, likely because it is extremely limited—it consists solely of information users can access through their account in the form of their privacy settings and information reflecting user activity on Facebook. Critically, the form of production also obscures whether some of the activity was public or private. Thus, virtually all of Facebook's 850,000-page production relating to the original Named Plaintiffs in this case was already accessible to Plaintiffs and tells only part of the story.

C.     **Relevant sensitive information is not limited to platform activity, but also includes sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources.**

Facebook acknowledges that it collects and shares substantial amounts of additional sensitive information about users beyond their platform activity. *See, e.g.*, Aug. 14, 2020 Hr'g

---

[4] The requests use the definition of "Content and Information" from Facebook's Statement of Rights of Responsibilities—a definition that is not limited to on-platform data.

Tr. 8:10-13 ("[T]here's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."); *see also* Mot. at 10-15 (describing off-platform activity and internal analytics it has not produced). However, Facebook contends that this other information is not relevant to this case. This is false.

1. **User data includes, in Facebook's words, "native, appended and behavioral data" that Facebook collects from business partners, apps and other activity.**

Facebook identifies three general categories of information it possesses about Facebook users: ████████████████████████████. *See* Ex. B, FB-CA-MDL-00213424-439. ████████████████████████
████████████████████████████████████
█████████ *Id.* ████████████████████████████
████████████████████████. *Id.* ████████████
████████████████████████████████████.
Specifically, ████████████████████████████████
████████████████████████████████████
████████████████████████████. *Id.* ████████
████████████████████████████████████
████████████████████████████████████
███████████ *Id.* These three categories of information, and how Facebook obtains this information, are illustrated as follows:



While ███████—the only type of data Facebook has partially produced about users so far—is important for this case, so too is ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████ *See* Ex. B, FB-CA-MDL-00213424-439 ████████████████ ████████████████████████████████████████ ██████ "███████████████" ); *id.* at FB-CA-MDL-00213424 (describing Facebook's ███ ██████████ process as instances where ██████████████████████████ █████████████████████████ ).

Critically—and contrary to Facebook's suggestion that this data is irrelevant and duplicative of information it has already produced (Mot. at 14)—discovery confirms that Facebook shares this data with third parties. For example, a 2012 internal email between senior team members explains that "Facebook has information about users which can be helpful to applications, and *which we provide to applications when we deem appropriate*[.]" Ex. C, Email from Sam Lessin to Douglas Purdy (Aug. 30, 2012), at 3 (emphasis added), NBCNews (Nov. 6, 2019), https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets/facebook-sealed-exhibits.pdf at 716. The email also identifies the kind of data

that Facebook shares, including (1) "[a]ggregate data about the tastes, properties, etc. of a user's friends," (2) "[d]erived data about a user/facebook's data/opinion of a user (probably location, account trust score, account age, etc.)," and (3) "[d]ata provided by third parties – information which third parties have contributed to the graph on behalf of a user." *Id.*.

Another internal document,  These documents make clear that Facebook collects sensitive user information in a variety of different ways and discloses it to third parties.

Facebook's insistence that it need only produce on-platform Native Data makes even less sense when considering Plaintiffs' claims. Plaintiffs' statutory and common law claims are not limited to information generated from users' activities on Facebook. For example, under the VPPA, Plaintiffs must prove that Facebook disclosed "personally identifiable information concerning any consumer" to "any person" absent written or informed consent. 18 U.S.C. § 2710(b)(2). Under the SCA, Plaintiffs must prove that Facebook "knowingly divulge[d] to any person or entity the contents of any communication" users did not intend for Facebook to divulge. 18 U.S.C. § 2702(a). The source of the information—that is, whether it was the result of on- or off- platform activity, gleaned directly from users' posts, or inferred from them—is irrelevant. Disclosure of any of this information without consent is actionable.

Similarly, Plaintiffs' Public Disclosure of Private Acts claim requires Plaintiffs to prove that Facebook disclosed a private fact about the plaintiff that is objectionable and offensive to a reasonable person. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). Likewise, Plaintiffs' Intrusion into Private Affairs claim requires Plaintiffs to prove an intrusion by Facebook into a private matter that is highly offensive to a reasonable person. *Shulman v. Grp. W. Prods., Inc.*, 18 Cal.4th 200, 231 (1998). In order to prove these claims, Plaintiffs must

ascertain the private facts about them that Facebook is collecting and disclosing, whether they originate from platform activity or not.

Across many claims, the Order sustained Plaintiffs' allegations about Facebook's undisclosed data reciprocity programs with business partners. Plaintiffs are thus entitled to know what sensitive user data, of any type or source, Facebook shared with its business partners. Plaintiffs are further entitled to any data that Facebook received from its business partners in return, since the value of that data constitutes the benefit Facebook received in the transaction, a benefit that Plaintiffs are entitled to recover under, *inter alia*, the unjust enrichment claim that the Court sustained. Order at 41;[5] *see also* Order at 8 (noting the allegation that "Facebook and its [business] partners agreed to exchange information about users' activities with each other").

Facebook notes repeatedly that targeted advertising and psychographic marketing are not part of this case. *See, e.g.*, Mot. at 9. This argument misses the point. The question is not whether Facebook should or should not have engaged in targeted advertising and psychographic marketing. The question is whether, when doing so, Facebook shared sensitive user and friend information without consent. Plaintiffs are entitled to obtain the discovery necessary to substantiate the allegation that improper sharing has occurred in the context of these activities.

## 2. Internal documents confirm that Facebook's description of data "associated" with users is misleading.

Facebook claims it has produced all data it possesses that is "associated" with Named Plaintiffs. That is, while it generated and collected reams of data about Named Plaintiffs, Facebook claims that most of that data, including Appended and Behavioral Data, is anonymized and cannot be connected to Named Plaintiffs. This is false.

Facebook explains that Appended and Behavioral Data cannot be associated with Plaintiffs' Facebook accounts because such data is "disassociated from the user's ID within 90

---

[5] Facebook's position blocking discovery of what it possesses and shares is in tension with Facebook's own discovery requests to Named Plaintiffs. Facebook's Interrogatory No. 8 asks Plaintiffs to "Identify all entities other than Cambridge Analytica that You believe have "misused sensitive information from Your Facebook Account." But Facebook itself will not identify with whom it shared that sensitive information, let alone what information it possesses.

days” (Mot. at 15). But, as confirmed by internal documents, what actually happens is that [redacted] Indeed, the very purpose of collecting all of this data in the first place is to use it to target users and their friends. [redacted] *Cf.* Mot. at 15.

Similarly, [redacted] *See* Ex. B. “Hashed data matching” is the process of matching different data sets through the hash values of unique identifiers. For instance, when an advertiser uploads a spreadsheet of Custom Audience data including hashed email addresses, Facebook can match this data to its users through the hashed email address field.

Thus, it simply is untrue that it would be “nearly impossible” to produce the “disassociated” data in this case for Named Plaintiffs. Mot. at 15. Facebook clearly has the ability to connect Named Plaintiffs’ user information through RIDs and hashed data matching, and should be ordered to do so in response to RFP Nos. 9-13.

D. **Facebook has not established that the burden of producing the data relating to ten Plaintiffs is disproportional to the needs of this case.**

Facebook also suggests that “the burdens of locating the additional information Plaintiffs seek would far exceed the needs of the case.” Mot. at 12. But the burden associated with producing the requested information is not undue; it is proportional to the needs of this complex

[6] Ex. E, PwC_CPUP_FB00030737-738.

[7] *Id.* at PwC_CPUP_FB00030738 [redacted].

case. In assessing proportionality, Federal Rule of Civil Procedure 26 directs consideration of

"the importance of the issues at stake in the action, the amount in controversy, the parties'

relative access to relevant information, the parties' resources, the importance of the discovery in

resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

likely benefit." Fed. R. Civ. P. 26(b)(1). Helpfully, Judge Chhabria provided further guidance at

the March 5, 2020 Case Management Conference, stating:

> I am concerned that Facebook has, you know, often made statements reflecting an
> unduly narrow view of what should be turned over to the Plaintiffs. And, you
> know, this is a big case. I mean, there is often a lot of talk about proportionality
> and whatnot. This is a big case. It is a significant issue. You know, and there is --
> this is not the type of case where we are going to be saying: Well, that might end
> up -- that effort might end up uncovering some relevant information; but, you
> know, it is just too expensive or difficult, and so we are not going to make
> Facebook do it. This is really not one of those cases where that is very -- that type
> of argument is likely to carry the day. You know, and, as I have said a number of
> times, you know, the best way to figure out what happened as it relates to the
> claims that are going forward now is to -- for Facebook to produce all
> information, all documents about the practices associated with giving third parties
> access to friends' information and friends' of friends information.

Tr. at 28:25-29:18. Judge Chhabria's observations regarding the size of this case remain on

point. The proposed class period extends from 2007 to the present, the potential class members

number in the hundreds of millions, and the third parties with whom Facebook shared user data

appear to number in the tens of thousands. In that context, Plaintiffs' request for the data

concerning ten individual users seems not only proportional to the needs of the case but modest.

Furthermore, Facebook's claims of burden are unsupported. "[T]he party opposing

discovery has the burden of showing that discovery should not be allowed, and also has the

burden of clarifying, explaining and supporting its objections with competent evidence." *Harris*

*v. Best Buy Stores, L.P.*, No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556, at *1 (N.D. Cal.

Oct. 14, 2016) (quoting *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D.

481, 485 (N.D. Cal. 2012)). A party claiming undue burden or expense "ordinarily has far better

information—perhaps the only information—with respect to that part of the determination." Fed.

R. Civ. P. 26(b)(1) advisory committee's note (2015). Therefore, the "party claiming that

discovery imposes an undue burden must 'allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence.'" *Sullivan v. Personalized Media Commc'ns, LLC*, No. 16-MC-80183-MEJ, 2016 WL 5109994, at *3 (N.D. Cal. Sept. 21, 2016) (quoting *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, No. 2:15-cv-01268-RFB-NJK, 2016 WL 4071988, at *4 (D. Nev. July 28, 2016)).[8] Facebook has furnished no evidentiary support for its objections of undue burden and its objections should be overruled.

Plaintiffs emphasize that they are seeking discovery about *ten Named Plaintiffs*—not millions, not thousands, and not hundreds of users. Based on the information Plaintiffs obtain about themselves, and about Facebook's general practices and procedures, they will seek to prove their class claims. Facebook's contention that Plaintiffs are not even entitled to obtain in discovery the evidence necessary to show what Facebook collects about them, and with whom it shares the information is impossible to square with Facebook's basic discovery obligations under the Federal Rules.

## III.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Facebook's motion to impose a discovery stay and grant Plaintiffs' motion to compel discovery responsive to Requests for Production Nos. 9 through 13.

---

[8] *See also SPS Techs., LLC v. Briles Aerospace, Inc.*, No. CV 18-9536 MWF (ASx), 2020 WL 4341717, at *2-3 (C.D. Cal. June 25, 2020) (overruling objection to requests for production of documents and noting that the party resisting discovery must describe "in specific detail, how each Request is overly broad and unduly burdensome by submitting affidavits or other evidence describing the nature of the burden"); *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. CV1600300CJCRAOX, 2017 WL 3275615, at *6 (C.D. Cal. Feb. 14, 2017) (court grants motion to compel production of documents by defendant Kingston in part because "[r]egarding its assertion that the requests are overly burdensome, Kingston has not submitted any evidentiary declaration to support this objection.").

Dated: September 28, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By: */s/ Derek W. Loeser*
     Derek W. Loeser

By: */s/ Lesley E. Weaver*
     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, 2020, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on September 28, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**


Paven Malhotra
Matan Shacham
Bryn Anderson Williams
pmalhotra@keker.com
bwilliams@kvn.com
bwilliams@kvn.com

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# Plaintiffs' Exhibit A

Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION** |

Defendant Facebook, Inc. ("Defendant" or "Facebook"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court orders in this action, and the parties' agreements and conferences among counsel, provides the following responses and objections to Plaintiffs' Second Set of Requests for Production (the "Requests").

## PRELIMINARY STATEMENT

1.     Facebook's responses to the Requests are made to the best of Facebook's current knowledge, information, belief, and understanding of Plaintiffs' requests. Facebook's factual and legal investigation of this matter is ongoing. Facebook reserves the right to supplement or amend any responses should future investigation indicate that such supplementation or amendment is necessary.

2.     Facebook's responses to the Requests are made solely for the purpose of and in relation to this action. Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility). All objections are reserved and may be interposed at any time.

3.     Facebook's responses are premised on its understanding that Plaintiffs seek only that information that is within Facebook's possession, custody, and control.

4.     Facebook incorporates by reference each and every general objection set forth below into each and every specific response. From time to time, a specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response shall not be interpreted as a waiver of any general objection to that response.

5.     Nothing contained in these Responses and Objections or provided in response to the Requests consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Request.

## GENERAL OBJECTIONS

1.       Facebook objects to each Request, including the Definitions and Instructions, to the extent that it purports to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Civil Rules of the U.S. District Court for the Northern District of California, and any agreements between the parties.

2.       Facebook objects to each Request to the extent it seeks information unrelated or irrelevant to the claims or defenses in this litigation.  In particular, the Court has held that individuals who joined Facebook in or after 2009 consented to data sharing policies described in Facebook's "Statement of Rights and Responsibilities" and "Data Use Policy," and dismissed Plaintiffs' claims to the extent they are based on data-sharing practices disclosed in these documents.  Facebook will not produce documents relevant only to dismissed claims or theories of relief.  Nor will Facebook produce documents related only to individuals who are not parties to this case.

3.       Facebook objects to each and every Request to the extent that the Request seeks information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

4.       Facebook objects to each Request as overly broad and unduly burdensome, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  For example, many of the Requests seek "all documents" regarding particular subject matters, which would require Facebook to conduct searches broader than a reasonable and diligent search of reasonably accessible files (including electronic files) where responsive documents reasonably would be expected to be found.  Such Requests are not proportional to the needs of the case.

5.       Facebook objects to each Request to the extent it purports to request the identification and disclosure of information or documents that were prepared in anticipation of litigation, constitute attorney work product, reveal privileged attorney-client communications, or are otherwise protected from disclosure under any applicable privileges, laws, or rules.

2

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

Facebook hereby asserts all such applicable privileges and protections, and excludes privileged and protected information from its responses to each Request. *See generally* Fed. R. Evid. 502; Cal. Code Evid. § 954. Inadvertent production of any information or documents that are privileged or otherwise immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to the discovery with respect to such information or documents or the subject matter thereof, or the right of Facebook to object to the use of any such information or documents or the subject matter thereof during these or any other proceedings. In the event of inadvertent disclosure of any information or inadvertent production or identification of documents or communications that are privileged or otherwise immune from discovery, Plaintiffs will return the information and documents to Facebook and will be precluded from disclosing or relying upon such information or documents in any way.

6. Facebook objects to each and every Request to the extent it is argumentative, lacks foundation, or incorporates allegations and assertions that are disputed or erroneous. In furnishing the responses herein, Facebook does not concede the truth of any factual assertion or implication contained in any Request, Definition, or Instruction. The production of documents in response to any Request shall not be construed as adopting a legal position.

7. Facebook objects to each and every Request to the extent that the information sought is more appropriately pursued through another means of discovery, such as responses to interrogatories.

8. Facebook objects to each and every Request, Definition, and Instruction to the extent that it seeks information outside of Facebook's possession, custody, and control.

9. Facebook objects to each Request to the extent that it requests information protected by the right of privacy of Facebook and/or third parties, or information that is confidential, proprietary, or competitively sensitive.

10. Facebook objects to each Request to the extent that it seeks documents or information already in Plaintiffs' possession or available in the public domain. Such information is equally available to Plaintiffs.

3

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

11.     Facebook objects to each Request to the extent that it calls for the production of "each," "every," "any," or "all" documents in cases where such a demand is overly broad and/or causes undue burden and expense.

## OBJECTIONS TO DEFINITIONS

1.     Facebook incorporates by references the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents.

2.     Facebook generally objects to any definitions or terms defined by reference to capitalized terms and acronyms relied upon in Plaintiffs' First Amended Complaint, which themselves may be vague, ambiguous, unduly broad, or unduly burdensome.

3.     Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of the Facebook are or were at any given time.  Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

4.     Facebook objects to Plaintiffs' definitions of "App Developer Investigation" and "ADI" as overly broad and unduly burdensome on the ground that these definitions include investigations into persons, entities, applications, and/or developers that are not relevant to Plaintiffs' remaining claims.  Facebook further objects to these definitions to the extent they seek documents or information protected by the attorney-client privilege and/or the work product doctrine.

5.     Facebook objects to Plaintiffs' definition of "Apps Others Use" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "App Developers," and "API."  Facebook further objects to

4

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

6.      Facebook objects to Plaintiffs' definition of "App Settings" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," "Content and Information," "Apps Others Use," "Granular Data Permissions," and "Platform Opt Out."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

7.      Facebook generally objects to Plaintiffs' definitions of "Communication," "Computer System," "Content and Information," "Document(s)," "Electronic Media," "ESI," "Electronically Stored Information," and "Identify" to the extent that Plaintiffs purport to use these defined terms to request the identification and disclosure of documents or information that: (a) were prepared in anticipation of litigation; (b) constitute attorney work product; (c) reveal privileged attorney-client communications; or (d) are otherwise protected from disclosure under any applicable privileges, laws, and/or rules.  Facebook further objects to the extent that these definitions purport to impose obligations that go beyond the requirements of the Federal and Local Rules.

8.      Facebook objects to Plaintiffs' definition and use of the terms "You," "Your," or "Facebook" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include "directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf. . . . parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf" over which Facebook

5

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

exercises no control, and to the extent that Plaintiffs purport to use these terms to impose obligations that go beyond the requirements of the Federal and Local Rules.

9.      Facebook objects to Plaintiffs' definition of "Granular Data Permissions" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," "Content and Information," and "App Developer." Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

10.     Facebook objects to Plaintiffs' definitions of "Internal Policy" or "Internal Policies" as overly broad and unduly burdensome to the extent that Plaintiffs purport to seek the identification and disclosure of documents or information that: (a) was prepared in anticipation of litigation; (b) constitute attorney work product; (c) reveal privileged attorney-client communications; or (d) are otherwise protected from disclosure under any applicable privileges, laws, and/or rules. Facebook further objects to these definitions as unduly broad and unduly burdensome to the extent they seek statements or directives which are implicit, informal, unwritten, or unofficial. For the purposes of these Responses and Objections, Facebook will interpret and use "Internal Policy" or "Internal Policies" as referring to the final, written, non-privileged version of any relevant policy, procedure, or directive provided to Facebook employees that is relevant to this litigation.

11.     Facebook objects to Plaintiffs' definition of "Misuse of Data" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content [or] Information," and "App Developer." Facebook further objects to this definition to the extent it assumes disputed facts or legal conclusions, particularly that Facebook members' data was "misused."

12.     Facebook objects to Plaintiffs' definitions of "Person" as vague, ambiguous, overly broad, and unduly burdensome to the extent that Plaintiffs intend to use the terms to

6

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

include "any natural person or any business, legal or governmental entity or association" over which Facebook exercises no control.

13.    Facebook objects to Plaintiffs' definitions of "[i]dentify," "[i]ncluding," "[r]elating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "[c]oncerning," and "concern" on the ground that the definitions make the Requests overly broad and unduly burdensome and impose obligations that go beyond the requirements of the Federal and Local Rules. Facebook shall construe these terms as commonly and ordinarily understood.

14.    Facebook objects to Plaintiffs' definition of "Platform Opt Out" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content and [I]nformation." Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings

15.    Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

16.    Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include applications, application developers, and/or "[a]ny person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software," and to the extent it encompasses individuals or entities outside of Facebook's knowledge and/or who may not be relevant to this litigation.

17.    Facebook objects to Plaintiffs' "Relevant Time Period," which dates back to January 1, 2007, as overly broad, unduly burdensome, and disproportionate to the needs of the litigation. In response to Plaintiffs' requests, Facebook will produce the following categories of documents dating back to January 1, 2007: (i) documents reflecting Facebook's platform

7

policies and user terms, (ii) Facebook's 2009 revisions to its user terms, and (iii) Documents reflecting privacy-related disclosures, communications, and other materials provided to users relating to Facebook's pre-2009 user terms and 2009 revisions to those terms. For all other categories of materials, Facebook will produce documents dating back to March 20, 2012 in response to Plaintiffs' requests.

## <u>OBJECTIONS TO INSTRUCTIONS</u>

1.      Facebook objects to Plaintiffs' Instructions to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

2.      Facebook objects to Plaintiffs' Instruction No. 2 as ambiguous as to the meaning of "available." Facebook further objects to the Instruction to the extent it exceeds the requirements of the Federal Local Rules.

3.      Facebook objects to Plaintiffs' Instruction No. 3 as unduly burdensome to the extent it requires Facebook to describe detailed information about documents which are no longer in existence or in Facebook's possession, custody, or control, which likely amounts to an extremely large volume of documents given the scope of Plaintiffs' claims and document requests. Facebook will comply with Instruction No. 3 only to the extent it can ascertain the requested information about the subject documents through reasonable, good-faith investigation and inquiry.

4.      Facebook objects to Plaintiffs' Instruction No. 7 to the extent that it imposes obligations that go beyond the requirements of the Federal and Local Rules.

5.      Facebook objects to Plaintiffs' Instruction No. 12 as ambiguous and unduly burdensome. Facebook further objects to the Instruction to the extent it exceeds the requirements of the Federal and Local Rules.

## SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 6:**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all documents provided to or received from any governmental entities or regulators in broad categories of "inquir[ies]" and investigation[s]" without regard for whether such information relates to Plaintiffs' claims.

(D) Facebook objects to this Request as overbroad as to time to the extent it seeks document predating March 20, 2012.

9

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

Subject to and without waiving the foregoing objections, Facebook will produce documents in response to this Request to the extent that those documents are responsive to Plaintiffs' other Requests, identified by a reasonable, good-faith search, and by December 26, 2019, Facebook will produce all document demand letters from the FTC associated with its 2018-2019 investigation into Facebook along with correspondence regarding the scope of those demands.

**REQUEST FOR PRODUCTION NO. 7:**

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)      the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)      the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)      the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(d)      the names, titles, job descriptions, and employment periods of Your present or former directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" organizational charts, personnel directories, or other documents sufficient to show Facebook's organizational structure, including the categories of entities, divisions, or individuals described in the Request, which are merely "related" or "relating" to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties, including those which may have no bearing on any issues in this Action and the names, titles, job descriptions, and employment periods of all present or former Facebook directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers, including those which may have no involvement with or knowledge of issues in this Action.

(D) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request. Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 8:**

All versions (including each updated or amended version thereof) of Facebook's "Platform Policies," which have been called the "Developer Principles and Policies," the "Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform Policies").

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" versions of certain documents without any limitation as to the relevant time period or whether the versions sought are in final form.

(D) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

(E) Facebook further objects to this Request to the extent that the Request seeks materials that are cumulative or duplicate of materials produced to Plaintiffs previously.

Subject to and without waiving the foregoing objections, Facebook will produce the final, written versions of Facebook's Platform Policies issued to users dating back to January 1, 2007, to the extent that those policies have not been produced to Plaintiffs previously.

12

**REQUEST FOR PRODUCTION NO. 9:**

All Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents merely "relating" to each of the Named Plaintiffs, including all Content and Information collected about each of them from any business relationship or any other source, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

(D) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" Content and Information "collected about each" Named Plaintiffs, which could include automated logs of actions taken, transaction-level date, and high-level summary documents used only for technical purposes, including those which may have no bearing on any issues in this Action.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts or specifically relate to the sharing of the Named Plaintiffs' Content and Information with third-parties, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

## REQUEST FOR PRODUCTION NO. 10:

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to show all categories of Content and Information Facebook collects, tracks, and maintains about each of the Named

14

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

Plaintiffs, including, for example, Content and Information that Facebook did not share with any third parties and that does not relate to any issue in this Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 9.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information and other information relating to such information sharing, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request. Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 12:**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks all Documents "relating" to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request. Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

## REQUEST FOR PRODUCTION NO. 13:

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks Documents regarding "all Third Parties" who obtained access to certain content and information, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the ground, and to the extent, that it seeks information that is outside of Facebook's possession, custody, or control because it seeks information regarding Third Parties' use of Named Plaintiffs' Content and Information.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers identified as having access to Facebook users' Content and Information during the Relevant Time Period relating to policy violations involving potential misuse of user data.

## REQUEST FOR PRODUCTION NO. 14:

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request on the grounds that "monetary or retail value of each named Plaintiff's Content and Information to Facebook" and "calculation of revenue earned by Facebook for each Named Plaintiff" are ambiguous and vague.

(D) Facebook further objects to this Request on the grounds that it assumes disputed facts or legal conclusions, particularly that Facebook "barter[s]" or "sell[s]" access to the "Named Plaintiff[s'] Content and Information" to any Third Parties.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents regarding all entities who provided money or any other thing of value to Facebook other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the grounds that "money or any other thing of value . . . that Facebook received in exchange for each Named Plaintiff's Content and Information" is ambiguous and vague.

(E) Facebook further objects to this Request on the grounds that it assumes disputed facts or legal conclusions, particularly that Facebook received "money or any other thing of value" from Third Parties in exchange for the "Named Plaintiff[s'] Content and Information."

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 16:**

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action and financial information unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Facebook" is ambiguous and vague.

(E) Facebook further objects to this Request as misleading to the extent that it suggests that Facebook's per-user revenues reflect the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

21

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, to the extent, that the Request seeks all Documents "relating to" Facebook's assessment of the monetary or retail value of Users' Content and Information to Users and information relating to compensation for data and/or information not related to Plaintiffs' claims

(E) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Users" is ambiguous and vague.

(F) Facebook further objects to this Request as misleading to the extent that it suggests any compensation offered for information in connection with the Onavo or Research app reflects the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks Documents transmitted to Users who are not parties to the Action.

(C) Facebook further objects to the Request on the ground that the Request seeks documents that are already in Plaintiffs' possession, custody, or control.

Subject to and without waiving the foregoing objections, Facebook will produce Facebook's communications to users regarding the Cambridge Analytica events.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

> (d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 35.

23

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Documents supporting the escalation of certain Apps, including escalations not relevant to the claims or defenses in this Action.

Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 20:**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

24

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, Facebook will produce relevant lists of Apps that Facebook provided to the Massachusetts Attorney General's Office.

**REQUEST FOR PRODUCTION NO. 21:**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Communications between Facebook and Third Parties "relating" to the ADI, including communications unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce Communications between Facebook's ADI team and third-party app developers relating to ADI.

**REQUEST FOR PRODUCTION NO. 22:**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks

all notes and agenda regarding various topics, including notes and agenda unrelated to Plaintiffs' claims.

Facebook stands on its objections.

**REQUEST FOR PRODUCTION NO. 23:**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request as seeking information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects that the term "assessment reports" is ambiguous and vague. Facebook will construe this term to mean the "Privacy Risk Assessments" referenced in Request No. 22.

(D) Facebook further objects to the Request to the extent that the Request seeks documents that are not in Facebook's possession, custody, or control because the Request seeks documents that support assessment reports prepared by another entity.

(E) Facebook further objects to the Request as Facebook lacks sufficient knowledge to identify with certainty documents relied upon by another entity.

Facebook stands on its objections.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, Facebook will produce final agreements with integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents relating to agreements or partnerships described in Request No. 24.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject agreements or partnerships, including those which are not relevant to the subject matter of the Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 24.

Subject to and without waiving the foregoing objections, Facebook will produce agreements with its integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 26:**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to the Request to the extent that the Request seeks Documents that are not in Facebook's possession, custody, or control because the Request relates to the conduct of Third Parties.

(E) Facebook further objects to this Request as seeking information outside of Facebook's knowledge regarding the actions and knowledge of third parties.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to Request No. 26.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users not a party to the Action.

(C) Facebook further objects to this Request on the grounds that the term "transmitted" is ambiguous and vague in that it could refer to any and all forms of conveying information, including passively making information available to a third party by hosting and displaying the information a User chooses to include on his or her Facebook profile page.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

31

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 28.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject measures and controls, including measures and controls unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that the phrases "measures and controls" and "proposed measures and controls" are ambiguous and vague and undefined.

(F) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 28 and 29.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

## REQUEST FOR PRODUCTION NO. 31:

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 31:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject audits, inquiries, and investigations, including audits, inquires, and investigations unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data. Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

## REQUEST FOR PRODUCTION NO. 32:

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits-or Communications regarding such investigations, examinations, inquiries, or audits-regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 32:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

35

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Concerning" Misuse of Data.

(D) Facebook further objects that the phrase "prior to the deprecation of Graph API v.1.0" is ambiguous and vague and undefined. Facebook will construe this phrase to mean prior to April 30, 2015.

(E) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 31.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data. Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 33:**

Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds that it seeks all Communications "related" to the subject notice.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

Subject to and without waiving the foregoing objections, Facebook will produce final, exemplar versions of notifications that Facebook made to users regarding material changes to its Data Use Policy and Statement of Rights and Responsibilities dating back to January 1, 2007.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to certain subjects, including Documents unrelated to Plaintiffs' claims and documents that are not within Facebook's possession, custody, or control.

(D) Facebook further objects to this Request to the extent it is based on the false and incorrect premise that Facebook "condition[ed]" or "condition[s]" access to information on certain purchases and/or payments.

Subject to and without waiving the foregoing objections, Facebook will produce final, formal, written Policies and agreements that governed access to Facebook consumer data by third-party Applications, integration partners, and mobile phone manufacturers during the Relevant Time Period.

## REQUEST FOR PRODUCTION NO. 35:

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to the subject manner of control, including Documents that are not within Facebook's possession, custody, or control.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, to the extent non-privileged documents are identified by a reasonable, good-faith search, Facebook will produce its user terms dating back to January 1, 2007, to the extent they have not been produced to Plaintiffs' previously, and screen shots sufficient to show how a user could control how data was shared with third-party applications.

## REQUEST FOR PRODUCTION NO. 36:

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 36:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as ambiguous and confusing on the grounds that the phrase "User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings" is ambiguous and vague and not defined.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "concerning" the subject User testing, evaluation and analysis, including Documents which are not within Facebook's possession, custody, or control.

(E) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

(F) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

DATE:  December 26, 2019                    Respectfully submitted,

                                          **GIBSON, DUNN & CRUTCHER, LLP**

                                          By:  /s/ *Joshua S. Lipshutz*
                                          Joshua S. Lipshutz (SBN 242557)
                                          jlipshutz@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, DC 20036-5306
                                          Telephone:  202.955.8500
                                          Facsimile:  202.467.0539

                                          Orin Snyder (*pro hac vice*)
                                          osnyder@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          200 Park Avenue
                                          New York, NY 10166-0193
                                          Telephone:  212.351.4000
                                          Facsimile:  212.351.4035

                                          Kristin A. Linsley (SBN 154148)
                                          klinsley@gibsondunn.com
                                          Brian M. Lutz (SBN 255976)
                                          blutz@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          555 Mission Street, Suite 3000
                                          San Francisco, CA 94105-0921
                                          Telephone:  415.393.8200
                                          Facsimile:  415.393.8306

                                          *Attorneys for Defendant Facebook, Inc.*

# Plaintiffs' Exhibit C

EXHIBIT 36

UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEAL

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets

| | |
|---|---|
| **From:** | Douglas Purdy </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DOUGLAS PURDY> |
| **Sent:** | Thursday, August 30, 2012 10:17 AM |
| **To:** | Sam Lessin |
| **Cc:** | Mike Vernal |
| **Subject:** | Re: Platform Business Model Framing |

I am on vacation this week (still), but happy to help.

That said, in wonder if you should just take the pen on the deck moving forward so I can have a day off and not be the bottle neck?

I can send you want I have so far in an hour when I get back to a computer.

On Aug 30, 2012, at 10:11 AM, "Sam Lessin" <sl@fb.com> wrote:

1. Sorry I wasn't clearer about my plans / being out. That is my bad guys / didn't mean to leave this hanging (obviously super important)
2. Doug, really glad you are framing this up / working on this …
3. Here are my notes on where things are from Friday, I think a lot of it is covered below but I just want to make sure we are in sync here, are presenting all the hard questions for this offsite



1

HIGHLY CONFIDENTIAL

FB-01370841



HIGHLY CONFIDENTIAL

FB-01370842

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets



HIGHLY CONFIDENTIAL

FB-01370843

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets

**From:** Douglas Purdy <<u>dmp@fb.com</u>>
**Date:** Wednesday, August 29, 2012 12:47 AM
**To:** Mike Vernal <<u>vernal@fb.com</u>>
**Cc:** Sam Lessin <<u>sl@fb.com</u>>
**Subject:** Re: Platform Business Model Framing

working on this.

going to see the attached to frame things up.

On Aug 28, 2012, at 6:15 PM, Mike Vernal <<u>vernal@fb.com</u>> wrote:

Doug - as context, we're having an mteam offsite on Tue + Wed of next week to talk about three-year-plan stuff, and one of the discussions we're going to have is around the Open Graph business model.

Sam is at burning man (not sure when he gets back), and we left it a little ambiguous about who was pulling together what, so I'd like to at least get started pulling together a deck that we can use to frame the conversation. Can you ask the PMs to pull together a few slides?

Ideally, I think we want to cover:



4

HIGHLY CONFIDENTIAL

FB-01370844

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets



I think Sam is probably the right person to write-up the CRM stuff, but the rest I think the PMs have the context on.

-mike

HIGHLY CONFIDENTIAL

FB-01370845

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets

# Plaintiffs' Exhibit D

# Redacted in its Entirety

# Plaintiffs' Exhibit E

# Redacted in its Entirety

# Exhibit 5

1

2 UNITED STATES DISTRICT COURT

3 NORTHERN DISTRICT OF CALIFORNIA

4

5 | IN RE: FACEBOOK, INC. CONSUMER | MDL No. 2843

PRIVACY USER PROFILE LITIGATION | Case No.  18-md-02843-VC (JSC)
6

7 | **DISCOVERY ORDER NO. 9**

8 | (Dkt. Nos. 515, 526, 537, 548)

9

10

11 This MDL matter has been assigned to the undersigned for management of discovery.

12 Now pending before the Court are the Parties' briefs concerning the proper scope of discovery

13 related to the data Facebook accumulates about the named Plaintiffs.  (Dkt. Nos. 515, 526, 537,

14 548.)  In brief, Facebook contends that the district court's order specifically defined the data at

15 issue as "substantive and revealing content that users intended only for a limited audience."  (Dkt.

16 No. 298.)  Based on this definition, Facebook argues that for any named Plaintiff data to be

17 relevant and discoverable, it must meet two criteria.  First, the discoverable data must have arisen

18 from user activity occurring on the Facebook platform, such as Facebook posts and sent messages.

19 Second, the named Plaintiff must have then overtly shared such data with a limited audience, such

20 as their friends.  Facebook submits that this is the only plausible reading of the district court's

21 order limiting Plaintiffs to four actionable categories of potential liability.  Plaintiffs respond that

22 the universe of discoverable data Facebook collects for each user is much larger and necessarily

23 includes: (1) user activity occurring off the Facebook platform; and (2) user data that can be

24 inferred from user activity occurring on or off the Facebook platform.  A second question

25 presented by the briefs is whether discovery may proceed on the claims the district court stayed.

26 After carefully considering the papers submitted by the Parties, and consulting with the

27 district court, the Court rules that discovery is not as limited as Facebook contends.  Plaintiffs

28 correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous

United States District Court
Northern District of California

amount of information that Facebook collects and shares with third parties about Facebook's users. The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information.

Accordingly, the Court rules the discoverable user data at issue includes:

- Data collected from a user's on-platform activity;
- Data obtained from third parties regarding a user's off-platform activities; and
- Data inferred from a user's on or off-platform activity.

As for the stayed claims, and again after consulting with the district court, the Court rules that discovery is stayed as to the stayed claims. Of course, if a particular discovery request is relevant to both a stayed and non-stayed claim, then discovery is not stayed merely because the discovery request is also relevant to a stayed claim.

**IT IS SO ORDERED.**

Dated: October 29, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

2

# Exhibit 6

<div style="text-align:center">

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

</div>

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843

Case No. 18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 11**

This MDL matter has been assigned to this Court for management of discovery.  The Court held a discovery status conference on December 9, 2020 and this Order memorializes the decisions made at the hearing.

**A. 30(b)(6) Witness**.  At the hearing, Facebook insisted it does not have any documents reflecting its valuation of the user data it collects.  It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt. No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant.  Facebook both collects and uses data about its users as part of its business model, including data derived from third parties.  How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity.  What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests.

The Court accordingly orders Facebook to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9.  (Dkt. No. 557.)  Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus

values user data. Plaintiffs shall provide Facebook with their 30(b)(6) Notice on or before December 18, 2020 and Facebook will have until January 13, 2021 to submit an initial response. The 30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with identifying relevant discovery in the above two areas. The deposition will be limited to the time period of 2012 through 2017 to reduce burden and given its investigatory purpose.

**B.** **Search Terms**. The Parties shall continue to meet and confer the week of December 14-18 regarding their competing proposals. Given the deadline for submission of final proposals—Christmas Eve—the Parties shall submit a stipulation by December 18, 2020, agreeing to a new deadline for final proposals.

**C.** **Five-Day Détente**. The Parties shall meet and confer to choose five consecutive business days during the upcoming holidays where no communications will take place between the Parties regarding the case. Communications on other topics are encouraged.

**D.** **Plaintiffs' Interrogatory Responses and Privacy Settings Data**. Plaintiffs shall supplement their interrogatory responses regarding what they characterize as their sensitive information with specific examples rather than general categories.

**E.** **Additional Proposed Custodians**. The addition of further custodians for discovery purposes is premature at this time.

**F.** **Dismissal of Named Plaintiffs**. The parties shall file a stipulation regarding the dismissal of certain named plaintiffs in accordance with what was discussed at the hearing no later than December 18, 2020.

**G.** **Next Status Conference**. The next video status conference shall be January 15, 2021 at 8:30 a.m. The Parties shall submit a joint status update by January 14, 2021 at 12:00 p.m.

**IT IS SO ORDERED.**

Dated: December 11, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

# Exhibit 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843

Case No.  18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 12**

This MDL matter has been assigned to this Court for management of discovery.  The Court held a discovery status conference on January 15, 2021 and this Order memorializes the decisions made at the hearing.

A. **ADI**.  Plaintiffs shall select 20 entries, from the previously identified 400 entries, for in camera review by the Court and notify Facebook by January 22, 2021—or earlier if possible—of the specific entries selected.  The Parties shall then simultaneously brief the Court, limiting the respective briefs to 20 pages total, by February 5, 2021.  By that same date, Facebook shall submit the documents for in camera review to jscsettlement@cand.uscourts.gov.

B. **30(b)(6) Depositions**.  The Parties have thus far been unsuccessful in negotiations regarding the 30(b)(6) deposition required by Discovery Order No. 11.  (Dkt. No. 588.)  The Court orders the Parties to conduct the deposition in the month of February, preferably prior to the next status conference.  Further, the deposition shall be no longer than 10 hours in total (over at least two days).  The scope of the depositions shall be limited to the discoverable user data as defined by Discovery Order No. 9, (Dkt. No. 557), and how Facebook monetizes—directly or indirectly—and thus values user data.  The purpose of the depositions is to gain a better understanding of Facebook's internal operations, related to the scope of the depositions as described above; whether particular user data is not

shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question.  If the deponent is unable or unprepared to answer particular questions, that can be addressed with further, more targeted, 30(b)(6) depositions if needed.

**C. Next Status Conference**.  The next video status conference shall be February 24, 2021 at 8:30 a.m.  The Parties shall submit a joint status update by February 23, 2021 at 12:00 p.m.

**IT IS SO ORDERED.**

Dated: January 15, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

2

# Exhibit 8

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Deborah L. Stein
Direct: +1 213.229.7164
Fax: +1 213.229.6164
DStein@gibsondunn.com

April 1, 2021

VIA E-MAIL

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Re:   *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Counsel:

     We write in response to Plaintiffs' recent flurry of letters purporting to invoke the parties' expedited dispute protocol and threatening to file a series of accelerated motions to compel.  Plaintiffs' letters are an abuse of the parties' dispute protocol, which is intended to address a party's refusal to produce previously-requested information—not to demand information never previously requested or discussed.  Plaintiffs' letters also reflect an abusive litigation tactic that is making it nearly impossible to move this case forward. Plaintiffs' letters seek to unravel many months, if not more, of negotiations; ignore rulings Judge Chhabria and Judge Corley have issued; and informally demand information on an expedited schedule that has never been discussed and has no bearing on this case.[1]

     Facebook would like this case to move forward quickly and efficiently so that the parties can finally litigate Plaintiffs' live claims on the merits.  It is impossible to make progress when Plaintiffs insist on an unfocused, whack-a-mole discovery process that unwinds past agreements and work.  The parties dedicate an enormous amount of time and resources to meeting and conferring regarding discovery requests.  The meet and confer process that Judge Corley ordered is designed to allow the parties to reach a compromise and move on.  Facebook cannot have faith in this process or rely upon agreements the parties

---

[1] In this letter, we respond specifically to Plaintiffs' letters dated March 4, March 1, February 19, and February 11, each of which invoke the parties expedited dispute protocol.  Facebook responded separately on March 23 to Plaintiffs' March 18 demand that the parties enter a Rule 53 stipulation. Facebook responded by email on March 22 to Plaintiffs' March 15 demand for certain deposition transcripts and interrogatory responses from government matters.  Facebook responded by email on March 21 to Plaintiffs' March 16 letter taking the position that inadvertent, privileged testimony may not be clawed back.  Facebook is responding separately to Plaintiffs' additional demand, also in their March 1 letter, for a list of the materials counsel selected for Facebook's deponents to review in advance of their depositions.  Facebook will also respond separately to Plaintiffs' letter dated March 9, which raises various complaints with respect to Facebook's 516 pages of responses to Plaintiffs' Fourth Set of Interrogatories.

have reached when Plaintiffs constantly seek to reopen and expand those agreements. Facebook urges Plaintiffs to reevaluate their approach and to focus on forward progress.

## I.    Plaintiffs' March 1 letter demanding "all data" relating to the Named Plaintiffs.

Plaintiffs' March 1, 2021 letter demands Facebook produce "all data and information relating to the Named Plaintiffs"—even if the data was not shared with third parties.  There is no basis for this overbroad request.  After the parties engaged in nearly a year of negotiations, informal discovery, and briefing on Plaintiffs' blanket demand for data "relating" to the Named Plaintiffs, Plaintiffs finally informed the Court on the last page of their sur-reply on Facebook's motion to enforce the partial stay of discovery that they "seek only a holding that the sensitive data Facebook collected about ten Named Plaintiffs and *shared* with third parties is relevant."  Plaintiffs conceded: "**Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case**."  Dkt. 548 at 9.

Plaintiffs' "renew[ed]" request for "all data" related to the Named Plaintiffs— including data that was never shared—seeks to unwind more than a year of forward progress. It also directly contradicts the representations Plaintiffs made to the Court in their prior briefing, which the Court accepted and relied on in issuing Discovery Order 9.

### A.    Facebook produced more than 1,000,000 pages of user data.

For nearly a year, Plaintiffs insisted that Facebook locate and produce any data Facebook presently has access to that might, in any way, relate to any Named Plaintiff, plus any derivative materials drawing on that data.  Plaintiffs demanded all of this information even if it was never shared outside of the Company and even if it is not associated with any particular user.

In response to this request, Facebook discussed with Plaintiffs in **January 2020** that the best way to produce the individual user data that could be within the scope of this case was to produce for each Named Plaintiff the content and information that Facebook associates with each Named Plaintiffs' account.  This information is contained in the "Download Your Information" ("DYI") file that Facebook also makes available to users. Facebook's current DYI tool reflects, in human-readable form, the most complete compilation of data Facebook maintains relating to any user, including any individual user data that third parties might have been able to access.

Beginning in February 2020, Facebook produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings). **In total, Facebook produced more than <u>one million pages</u> of individual user data it maintains relating to the Named Plaintiffs**.[2]

Facebook made these productions despite repeatedly expressing concerns that much the data it produced is not probative of any issue in this privacy litigation—which is about data sharing (not the data Facebook maintains).  As Judge Chhabria explained in the first line of his Motion to Dismiss Order:  "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. . . . [Plaintiffs'] principal allegations are that Facebook: (i) made sensitive user

---

[2] These productions were extremely burdensome and took many months to complete because they required reformatting data that is typically available only on a live website into individual documents for use in litigation.  Plaintiffs initially objected to the format in which Facebook produced the materials.  Facebook then reproduced documents to address Plaintiffs' formatting concerns.  Plaintiffs amended their complaint in August 2020 to substitute new Named Plaintiffs.  Facebook subsequently produced the same materials for the new Named Plaintiffs.

information available to countless companies and individuals without the consent of the users, and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information." *Id.* at 1.  The more than one-million pages of individual user data Facebook produced far exceed that scope.  Facebook's productions of individual user data are overinclusive in that Facebook produced the data it associates with each Named Plaintiffs' account and did not limit its production to data that actually was accessed by or shared with third parties.  Facebook also did not limit its productions "sensitive data," as defined in the Court's motion to dismiss order as the only type of data at issue in this case.  *See, e.g.*, *id*. at 1, 7, 9, 13.

### B. Plaintiffs demanded vast amounts of additional data—even if never shared.

After Facebook produced the individual user data that Facebook associates with the Named Plaintiffs' accounts—including data outside the scope of this case—Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, as well as any materials derived from that data.  In making this demand, Plaintiffs focused largely on a database called Hive and demanded that Facebook produce any data relating to any Named Plaintiff that is currently in that database.  Plaintiffs articulated no basis on which the data they demanded could be relevant to their live claims.

The parties met and conferred about Plaintiffs' demand over the course of several months.[3]  During those discussions Facebook explained repeatedly that Hive stores more than 12 million database tables that are largely used only for internal analytics—many of which contain several terabytes or even petabytes of data.  Facebook further explained that third parties do not have access to these tables and that any underlying individual user data that *could have* been shared is already reflected in the DYI files Facebook produced.

As Facebook explained, Plaintiffs' blanket demand not only sought large volumes of data having nothing to do with their claims—it was also nearly impossible to satisfy.  As Facebook has explained ██████████████████████████████████████████  Each table must be searched individually.  To provide a visual, if Hive were a library, to satisfy Plaintiffs' demand, Facebook would have to individually open at least 12 million different books and analyze each for any information that could have originated from one of the Named Plaintiffs.  For instance, Facebook would have to analyze massive tables used only internally to log when users log on to Facebook, and produce any information from those tables that accounts for one or more Named Plaintiffs' logins—even though Facebook already produced underlying data showing the Named Plaintiffs' logins.  Plaintiffs' demand asked Facebook to repeat this exercise more than 12 million times **even though the tables at issue were never shared with third parties**.[5]  Facebook explained that such a remarkable undertaking would take literally years and would result in the production of massive amounts of internal data tables that are

---

[3] At one point during the parties' extensive discussions on this issue, Facebook asked Plaintiffs if they would, at minimum, agree that if Facebook hypothetically possessed a database that had the ability to receive data, but no ability to output (*i.e.*, share) data, that database would be out of scope.  Plaintiffs refused to agree, arguing that the hypothetical database could theoretically create "inferences" from user data that Facebook could use to place advertisements on its platform.

[4] Plaintiffs state that "counsel has demonstrated that Hive tables can be searched by userID [*sic*]."  To be clear, as Facebook has repeatedly informed Plaintiffs, ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[5] This does not include any data produced in response to subpoenas or as part of Facebook's discovery obligations.  Certain Hive data has been produced in those contexts.

irrelevant and immaterial to Plaintiffs' claims, which concern only sensitive individual user data that was **shared** with third parties.

### C.    The Parties litigated the scope of discoverable user data and Plaintiffs conceded that only shared data is relevant.

The parties then litigated the scope of discoverable user data in connection with Facebook's motion to enforce the partial stay of discovery.  Throughout their briefs, Plaintiffs repeatedly acknowledged that the only data that is relevant to this case is data that was shared with third parties:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." (Dkt. 547-3 at 1).

- "Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on . . . whether Facebook shared that information with third parties." (Dkt. 526 at 5); *see also id.* at 10–11 (acknowledging that Plaintiffs' claims require proof that Facebook shared Plaintiffs' information with third parties).

- "[S]ensitive user information is relevant if Facebook shared it without users' consent." (Dkt. 547-3 at 2).

- "[T]he legal theories upheld at the pleading stage . . . turn . . . on whether Facebook shared [sensitive information] with third parties." (*Id.* at 4).

After four rounds of briefing, on the last page of their sur-reply, Plaintiffs finally conceded what they should have said a year earlier:  "***Plaintiffs do not contend that information that was not shared is relevant***." (Dkt. 547-3 at 9 (emphasis added)).  This concession—while welcome—raised frustrating and still unanswered questions about why Plaintiffs had forced the parties to spend many hundreds of attorney hours over the previous year negotiating and litigating over the relevance of data that was never shared or made accessible outside of Facebook.

### D.    Judge Corley held that the discoverable user data in this case is sensitive data shared with third parties.

In Discovery Order 9, Judge Corley addressed the user data relevant to this case and largely adopted the position Plaintiffs took in their sur-reply brief.  The Court held the user data relevant to this case is "information that Facebook collects and shares with third parties about Facebook's users."  The Court explained that Plaintiffs' claims "challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information." (Discovery Order 9, Dkt. 557 at 2 (emphasis added).)

Discovery Order 9 further explained that the information "Facebook collects and shares with third parties" is not necessarily limited to the information users post on Facebook (as Facebook had argued) and would also include any *shared* data: (1) collected from a user's on-platform activity; (2) obtained from third parties regarding a user's off-platform activities; and (3) inferred from a user's on or off-platform activity.  *Id.*

### E.    Facebook confirmed it completed its production of discoverable user data.

To comply with Discovery Order 9, Facebook investigated whether any discoverable user data had not already been produced.  We did not identify any such data.  Indeed, as stated earlier, the DYI file is *overinclusive* of the universe of discoverable data under Pretrial Order 20 and Discovery Order 9.

Again, this data-privacy litigation relates to Facebook's alleged practice of sharing certain "sensitive" user data with third parties.  Third parties who are permitted access to

individualized data about Facebook users access that data through application programming interfaces ("APIs").  APIs are a standard industry programming tool, and they allow applications to access data and features of other applications, services, or operating systems.  All of the APIs Facebook has made available to third parties query Facebook's Social Graph only and allow access to a subset of the information contained in the Social Graph.[6]  Facebook's current "Download Your Information" or "DYI" tool retrieves data from, and allows users to download the information Facebook maintains about them in, the Social Graph.  It is the most complete compilation of data Facebook maintains for any user and reflects a human-readable version of the data relating to any user in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties.

**F.      The Court allowed a 30(b)(6) deposition to allow Plaintiffs to confirm Facebook had satisfied is production obligations.**

After Facebook reported its preliminary finding that it completed its productions of discoverable user data, as described in Pretrial Order 20 and Discovery Order 9, Plaintiffs told the Court: "[I]t is, frankly, just impossible for us to believe that."  (12/9/2020 Hr'g Tr. at 19:22-23.)

To address Plaintiffs' "disbelief . . . as to how Facebook operates," the Court suggested a 30(b)(6) deposition to narrowly address "the discoverable user data as articulated by Discovery Order 9."  *See* 12/9/2020 Hr'g Tr. at 26:6-9; Discovery Order 11, Dkt. 588.  Ignoring the Court's instructions, Plaintiffs issued a deposition notice on 12 extraneous topics.  Judge Corley quashed this notice—explaining it was "way beyond what she had in mind."  *See* 1/15/2021 Hr'g Tr. at 17:12-13.  The Court explained, "[w]e just need somebody under oath" (*id.*) to "verify [Facebook's] representation" (*id*. at 35:3-5) that it has produced all discoverable data within the scope of Discovery Order 9.

The 30(b)(6) deposition on discoverable user data was held on February 23, 2021.  Facebook designated Konstantinos Papamiltiadis as its witness on this issue.  Mr. Papamiltiadis is Facebook's Vice President of Platform Partnerships, has over eight years of experience at Facebook, and has 127 reports.  Consistent with Judge Corley's instructions, Mr. Papamiltiadis spent nearly 20 hours preparing to testify about the discoverable user data under Discovery Order 9—including the user data Facebook collects, how Facebook uses different categories of user data, which categories of user data Facebook shares, and how shared categories of user data are reflected in produced materials.

**G.      Plaintiffs declined to use the 30(b)(6) deposition as ordered and reverted to their position that all data relating to the Named Plaintiffs must be produced—even if not shared.**

Rather than use the 30(b)(6) deposition to address the topic the Court ordered, Plaintiffs pursued their own agenda and used the deposition to explore all of the topics in the

---

[6] Facebook uses the term the "Social Graph" to describe the complex web of peoples, places, things, actions, and connections on the Facebook Platform.  The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience.  As Facebook users navigate through Facebook and interact with it—including, for example, by liking posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see.  This web of peoples, places, things, actions, and connections are referred to as the "Social Graph."  Facebook's Social Graph is not powered by a single database.  Rather, Facebook is powered by an extraordinarily complex information architecture that stores user content and information in various databases. ■

notice the Court had rejected.  At the deposition, Plaintiffs did not even ask the most basic questions about what user data Facebook shares with third parties.  Plaintiffs never asked "what categories of user data does Facebook make accessible to third parties?"  Nor did they ask whether the materials Facebook has produced reflect the scope of user data accessible to third parties.  Plaintiffs instead questioned Mr. Papamiltiadas for hours regarding different types of data Facebook has used only internally (which Plaintiffs were already aware existed)—including "data from third parties about users' off-platform activity," data derived from the Facebook Pixel, and "information . . . associated with users via app-scoped IDs."

Plaintiffs now demand all of that data after they tactically avoided asking Mr. Papamiltiadas whether any of it has been shared or otherwise made accessible to third parties.  It has not.  Plaintiffs did not even seek to learn whether any of the data they asked about was collected on an individual or aggregate level, whether it is stored (and, if so, for how long), or whether it is anonymized.  It is Plaintiffs' burden to demonstrate how information they seek is relevant to live claims.  The Court ordered a narrow 30(b)(6) deposition specifically to allow Plaintiffs to understand whether any user data relevant to their claims was yet to be produced, and Plaintiffs deliberately declined to use the deposition to address that issue.

Rather, it seems that after spinning in circles on this issue for more than a year, Plaintiffs have relapsed to their original position that Facebook must locate and produce all data relating in any way, shape, or form, to the Named Plaintiffs—even if it was not shared and exists only as part of aggregated or anonymized data sets.  The Court has already rejected this position.  And with Plaintiffs having obtained a ruling from the Court accepting Plaintiffs' earlier position that discoverable user data is limited to data that was shared with third parties, Plaintiffs are judicially estopped from now arguing that user data is discoverable irrespective of whether it was shared.  *See, e.g.*, *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779 (9th Cir. 2009) (citing *New Hampshire v Maine*, 532 U.S. 742, 750 (2001)).

Facebook confirms again:  Third parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflects a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties.  Facebook's productions under Discovery Order 9 are complete.

## II.    Plaintiffs' March 4 letter demanding supplemental interrogatory responses relating to "Business Partners."

Plaintiffs' letter demanding that Facebook supplement its responses to Interrogatories 14 and 15, which concern "Business Partners," raises the same concerns about unnecessary re-litigation of previously decided issues.  The parties litigated—and Judge Corley decided— this issue **last month**.  *See* Dkt. 608.  Facebook confirmed, consistent with Judge Corley's Order, that its responses to these Interrogatories are complete.  Facebook's responses to Interrogatories 14 and 15 are extraordinarily comprehensive and alone span **195 pages**— most of which are single-spaced tables, using a Size 7 font.

After speaking with Plaintiffs about this issue, we understand Plaintiffs to demand additional information in response to these Interrogatories on two grounds.  First, Plaintiffs explained that they believe Judge Corley intended her Discovery Order on Business Partners (Dkt. 608) to "expand the case" beyond Judge Chhabria's Motion to Dismiss Order (and Plaintiffs' Complaint) to reach *all of Facebook's business relationships*.  Second, Plaintiffs highlight that Facebook has had business relationships over the past decade with entities that do not appear in Facebook's Interrogatory responses.

Plaintiffs position seeks to unwind more than three years of litigation, multiple court orders, and Plaintiffs' own allegations and discovery requests. Neither this case nor the specific Interrogatories at issue concern every business relationship Facebook has ever had.

A. **Judge Chhabria's Motion to Dismiss ruling allowed Plaintiffs' "Business-Partner" allegations to move forward with respect to a finite set of third parties.**

In his decision on Facebook's Motion to Dismiss, Dkt. 298, Judge Chhabria made clear that Plaintiffs would *not* be permitted to litigate a sweeping attack on Facebook's entire business and all of its business relationships. Plaintiffs' First Amended Consolidated Complaint was 1,442 paragraphs and 412 pages. Dkt. 257. Judge Chhabria observed, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . . [T]he presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Dkt. 298 at 5-6.

To avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria did not address each of Plaintiffs' improperly pleaded theories and claims. Instead, he concluded that Plaintiffs adequately pleaded "four categories" of potential wrongdoing related to "Facebook's practice of sharing its users' personal information with third parties." *Id.* at 6, 1. He then dismissed certain claims, *id.* at 30, and *stayed all other claims and theories not falling into the four categories of alleged misconduct*. *Id*. at 6 ("All other prioritized claims not addressed by this ruling will be stayed.").

The first two theories Judge Chhabria allowed to move forward concern data-sharing with app developers. Judge Chhabria described the third theory as "sharing sensitive user information with business partners." Dkt. 298 at 8. The fourth theory concerns Facebook's enforcement of its data-use policies with respect to third parties.

The third "Business Partner" theory Judge Chhabria allowed to move forward is about Facebook's alleged practice of entering "data reciprocity" agreements with third parties in connection with arrangements to make certain Facebook functionalities available on third-party devices and platforms. *See* Dkt. 298 at 8. Plaintiffs' Complaint uses the term "Business Partners" to describe "roughly 150" entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems." *See* SACC ¶¶ 430-440.[7] The Complaint alleges that Facebook "gave Business Partners access to users' content and information" to facilitate these partnerships. *Id*. In support of its allegations with respect to "Business Partners," Plaintiffs cite a list of entities Facebook describes as its "integration partners" that Facebook shared with Congress (SACC ¶ 431), and a New York Times article about Facebook's integration partners (SACC ¶¶ 433, 435).

Judge Chhabria similarly explained that the list of "Business Partners" Plaintiffs had identified "came from Facebook itself, which asserted that it had 'integration partnerships' with these companies." Dkt. 298, at 8. Judge Chhabria held that the misconduct Facebook allegedly engaged in with respect to these entities was "relatively straightforward": "Facebook shared information about its users with this non-exclusive list of business

---

[7] These partnerships served two primary purposes: (i) to enable users to access their Facebook accounts or specific Facebook features on devices and platforms built by other companies, such as Blackberry and Apple, before the existence of the "app store"; and (ii) to enable users to connect their Facebook social experiences with other popular apps and websites, like Yahoo and Twitter—if they chose to do so. Some transfer of data was needed to allow users to access their Facebook accounts on devices and platforms built by other companies (like Blackberry) and, if they explicitly chose, to connect their Facebook accounts with other platforms.

partners, and that those companies in turn shared data with Facebook." *Id.* at 8.  "These partnerships, the complaint alleges, were built in part on 'data reciprocity.'  Facebook and its partners agreed to exchange information about users' activities with each other." *Id.* (internal quotations omitted).

**B.    Facebook provided nearly 200 pages of responses to Plaintiffs' Interrogatories regarding "Business Partners."**

Plaintiffs' Fourth Set of Interrogatories seeks information about the "Business Partners" alleged in their Complaint.  Specifically, Interrogatory 14 seeks a list of "Business Partners" that had access to "Not Generally Available" information about users even if users did not download an app made by the entity.[8]  Interrogatory 15 seeks details about the "Not Generally Available" information the so-called "Business Partners" were able to access.

Plaintiffs' own Interrogatories recognize that the "Business Partner" theory does not concern all of Facebook's business relationships.  Consistent with Plaintiffs' Complaint and Judge Chhabria's Order, Plaintiffs' Interrogatories defined "Business Partners" as "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."

Facebook served nearly 200 pages of responses to these Interrogatories.  As parties typically do in their responses to interrogatories, Facebook also provided definitions that it would use in its response.  Facebook offered a definition of "Business Partners" that was intended to add clarity and capture all entities falling into the business partner conduct Judge Chhabria described in Pretrial Order 20.  The parties discussed their definitions of "Business Partners" at length over the course of several months.

**C.    Plaintiffs litigated the scope of Facebook's Interrogatory responses.**

After months of back-and-forth—during which Facebook confirmed it did not withhold any relevant or responsive information based on its definition of "Business Partners"—Plaintiffs insisted on litigating the definition of "Business Partners" that would be used to respond to their Interrogatories.

Judge Corley found the term "Business Partners" to refer to the third category of potential liability identified by Judge Chhabria and deciphered "no meaningful difference between the parties' definitions."  Dkt. 608.  Judge Corley confirmed that "Business Partners" would include companies with which Facebook had agreements "to exchange information about users' activities with each other," consistent with Judge Chhabria's explanation, even if Facebook did not label them "integration partners," *id.*, and she ordered Facebook to confirm it had fully responded to Plaintiffs' requests.  *Id.*  Facebook confirmed it had.

**D.    Plaintiffs now argue Judge Corley's order with respect to "Business Partners" expands the scope of the case to reach all of Facebook's business relationships.**

Plaintiffs now seek to relitigate this issue.  During a meet and confer, Plaintiffs' counsel represented that they believe Judge Corley intended her Order to greatly "expand" the "Business Partner" theory articulated in Plaintiffs' Complaint and by Judge Chhabria.

---

[8] The Interrogatories define "Not Generally Available" information to be information "to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience."  This definition explicitly asks about activities conducted on Facebook (which users can limit the audience for).

In Plaintiffs' words, nearly three years into this litigation, Judge Corley "expanded the case" to concern Facebook's relationship with any entity that has ever received a single piece of information relating in any way to people who use Facebook, so long as, at any point in time, that entity told Facebook anything that could be interpreted to concern Facebook users.  Plaintiffs take this position even though Plaintiffs' Business Partner allegations refer to a finite number of entities with whom Facebook allegedly entered "data reciprocity" agreements in connection making Facebook functionalities available on third-party devices and platforms.  *See* SACC ¶¶ 430-440.

For instance, Plaintiffs' letter claims the "Business Partner" theory now extends to Facebook vendors that performed statistical analyses for Facebook using anonymized data, on the basis that these vendors accessed anonymized information to perform analyses for Facebook and then reported their conclusions back to Facebook.  Plaintiffs also claim "Business Partners" include so-called "data brokers"[9] because several years ago Facebook purchased licensed data from certain entities and, under separate agreements, Facebook later engaged different divisions of some of the same companies to measure the success of its advertisements—which required those entities to access certain anonymized advertising data to perform this service.  No allegations about relationships of this nature appear in the Complaint, nor is it clear how they could possibly be actionable.[10]

Plaintiffs' extreme and unfounded position would bring nearly every entity with which Facebook has ever interacted within the scope of this case—even where the relationship is clearly disclosed within Facebook's terms and has no relationship to the conduct actually alleged.  Indeed, Plaintiffs' letter recites every type of business relationship Facebook's 30(b)(6) deponent said Facebook has had over the years and demands that Facebook update its interrogatory responses to address every entity falling into each category he listed.  Plaintiffs seek this information even with respect to relationships that did not include any sort of data sharing, much less the type of arrangements described in Plaintiffs' Complaint and Judge Chhabria's motion to dismiss order.[11]

---

[9] Plaintiffs' selective quoting of Ms. Lee's testimony is tremendously misleading.  For instance, when Ms. Lee said, "there was an exchange with partners with Facebook receiving data from these partners," (Tr. 200:14-16) she was referring to a "revenue exchange in return for this data" (Tr. 200:21-201:5).  In other words, she was referring to licensed data that Facebook purchased.  Moreover, Ms. Lee specifically testified several times that these entities were not provided user data in exchange for the data they sold Facebook.  (*See* Tr. 184:22-24 ("[W]e were earlier specifically discussing user data, and we did not provide user data back to these partners."); Tr. 203:25-204:4 ("[A]lthough we were getting user data from data partners like Acxiom, Epsilon, et cetera, to create better targeting options in our platform, we weren't giving back sort of equivalent data to these partners for their use.").)

[10] Facebook's use of vendors and work with measurement partners is clearly disclosed in its Data Policy and thus cannot constitute the type of illicit data-sharing partnership the Court has found actionable.  *See* MTD Order, Dkt. 298, at 21-22 (dismissing claims where information sharing at issue was disclosed in Facebook's Data Use Policy); *see also* FB's 6/8/12 Data Use Policy, FB-CA-MDL-00233442 at 00233455 ("We give your information to the people and companies that help us provide, understand and improve the services we offer.  For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results." (emphasis added)); *see also* SACC ¶ 561 (quoting same).

[11] The first two categories of entities Mr. Papamiltiadis listed, "device manufacturers and mobile operators that . . . help us build Facebook-like experiences in order to reach a wider audience," Tr. at 25:16-20, and "developer partners . . . [which] are third-party software companies that have access to our APIs and they build experience[s] for both consumers and other businesses," *id.* at 25:21-25, are already accounted for in Facebook's Interrogatory responses.  The second two categories described

*(Cont'd on next page)*

9

It is clear that neither Judge Chhabria nor Judge Corley intended to open the door to such wide-ranging and irrelevant inquiries.  For starters, it is clear that Judge Chhabria's Motion to Dismiss ruling did not bucket all of Facebook's business relationships into the "Business Partner" theory, which would have expanded the case to include theories of liability going far beyond what Plaintiffs even alleged.  To the contrary, Judge Chhabria made clear that his motion to dismiss order allowed four alleged theories of potential liability to move forward and that Plaintiffs' remaining allegations would be stayed.  Dkt. 298 at 6.

Judge Chhabria identified specific theories of relief that would move forward to focus this case and make it manageable to litigate—not to allow Plaintiffs to conduct a roving investigation of all of Facebook's business relationships over the past 13 years without stating cognizable claims.  Judge Corley's February 1, 2021 order with respect to "Business Partners" certainly did not expand this case to allow such an investigation.  The order makes clear that it tracks the third category of potential misconduct described in Judge Chhabria's Motion to Dismiss ruling and that Facebook should identify the entities Judge Chhabria described, even if Facebook does not call some of those entities "integration partners."

We confirm again that our 195 pages of responses to Interrogatories 14 and 15 are complete to the best of our knowledge and consistent with Judge Corley's Discovery Order with Respect to Business Partners.  Discovery in this case is ongoing, and should we become aware of any additional responsive information during the course of our ongoing factual investigation, we will update our responses accordingly.

**III.    Plaintiffs' February 19 letter demanding additional materials provided to government entities.**

Plaintiffs' letter regarding RFP 6 follows the same pattern and raises the same concerns as the letters addressed above.  This letter backtracks on more than a year of productive discussions and litigation regarding Plaintiffs' RFPs 6 and 43; inappropriately invokes the parties' expedited dispute resolution protocol to demand materials never previously requested; and seeks materials relating only to events that occurred years after this case was filed.

**A.    Facebook agreed to make cloned productions from certain government matters under RFP 6 to kick-start discovery while the parties negotiated threshold ESI issues.**

Plaintiffs served RFP 6 in November 2019.  The request demands document productions Facebook provided government entities in matters touching on related issues. The parties extensively negotiated this request and completed negotiating it a year ago, in early 2020.

Facebook largely agreed to produce the materials RFP 6 requests.  Even though courts usually frown upon the type of "cloned discovery" requested by RFP 6,[12] Facebook agreed to make certain cloned productions from numerous matters under RFP 6 in a good faith effort to move discovery forward.

As Plaintiffs know, the parties had tremendous difficulty negotiating an ESI Protocol, custodians, and search terms, and have been negotiating these threshold ESI issues for 18 months.  To kick-start document discovery during these negotiations, Facebook agreed to

---

by Mr. Papamiltiadis—"business[es] that . . . publish[] on our platform, from news companies to [NGOs]" and "suppliers"—have no apparent relationship to user data and Mr. Papamiltiadis identified none.

[12] *King County v. Merrill Lynch & Co., Inc.*, No. C10-1156-RSM, 2011 WL 3438491, at *3 (W.D. Wash., Aug. 5, 2011) (quotation omitted)

produce—and did produce—all of the Facebook documents produced in response to the FTC's document requests during its 2011 and 2019 investigations into Facebook.  On top of that, Facebook also agreed to review the Facebook documents it had produced to various other state and federal entities in 9 additional government matters and to produce those documents, so long as they were responsive to Plaintiffs' document requests.

The parties agreed that Facebook would complete its productions under RFP 6 by July 3, 2020.  Even though RFP 6 sought documents produced to government entities through "the present" (*i.e.*, through November 2019, when RFP 6 was served), Facebook ultimately agreed to produce responsive documents it had produced to government entities through April 15, 2020.

### B.    After the parties reached an agreement on cloned discovery, Plaintiffs sought more.

Facebook understood the parties' negotiations regarding materials from government matters were complete.  However, after the parties completed negotiating RFP 6, Plaintiffs issued RFP 43, which sought additional materials exchanged in 10 government matters, including:  "All privilege logs, interrogatory responses, written reports, correspondence and deposition transcripts."  During the parties' meet and confer discussions, Plaintiffs told us that they issued this RFP because the parties had agreed RFP 6 would apply only to document productions but Plaintiffs in fact wanted any other piece of paper to have exchanged hands with any government entity in any matter touching on related issues. Facebook objected to this request in June 2020.

Six months after Facebook served its responses and objections to RFP 43, on December 10, 2020, Plaintiffs sent Facebook a letter stating they would agree to limit the scope of RFP 43 to deposition transcripts from government matters and any written discovery responses Facebook provided government entities.  Then, in a subsequent meet and confer, Plaintiffs informed Facebook that their revised request for written discovery responses also included a demand for all of Facebook's counsel's formal and informal correspondence with the government.  On February 12, 2021, Plaintiffs filed a motion to compel all materials demanded under RFP 43.  Facebook responded on February 18.

### C.    After filing a motion to compel certain materials from government matters, Plaintiffs return to RFP 6 to seek additional materials they did not include in their motion.

On February 19, *one day after Facebook responded to Plaintiffs' motion to compel*, Plaintiffs sent Facebook another letter demanding *additional* materials from government matters—this time supposedly under the ambit of RFP 6, which the parties had finished negotiating a year earlier.  Plaintiffs' letter invokes RFP 6 to demand that Facebook now review and produce any document productions made in the 10 government matters since April 2020.  It further demands that Facebook produce materials created and provided to the FTC pursuant to a consent decree that was entered in July 2020.

#### 1.    There is no basis for additional cloned productions—Facebook produced the cloned materials it agreed to provide, and the parties now have their own search terms.

As an initial matter, the parties completed negotiating RFP 6 in April 2020 and reached an agreement on the scope of Facebook's productions in response to that RFP. Plaintiffs' efforts to revisit that agreement a year later undermines the time and effort the parties put into negotiating and compromising discovery requests and makes it difficult for the meet and confer process to work effectively.

In any case, RFP 6 does not request the documents Plaintiffs seek. Plaintiffs defined the "Relevant Time Period" for this request as materials provided to government entities "through the present" (*i.e.*, through November 2019). Despite Plaintiffs' November 2019 cut-off, Facebook agreed to produce materials in response to RFP 6 that had been produced to government entities through April 2020. The parties agreed Facebook would complete its production of these materials by July 3, 2020. Facebook did.

There is no good-faith basis for Plaintiffs' demand that Facebook now review and produce additional cloned productions from government matters. As explained above, courts typically reject blanket demands for document productions from other actions for two reasons. First, "compelling a responding party to do duplicate searches—one for responsive documents in their custody and control and one for all documents in their custody and control that were previously produced in other litigation—is definitionally unduly burdensome." *Goro v. Flowers Foods, Inc.*, No. 17-CV-02580-JLS-JLB, 2019 WL 6252499 *18 (S.D. Cal., Nov. 22, 2019); *accord In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods Liability Lit.*, MDL No. 2672, 2017 WL 4680242 (N.D. Cal., Oct., 18, 2017) (Corley, M.J.) (rejecting cloned discovery requests). Second, cloned discovery "is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the subject case." *King County*, 2011 WL 3438491, at *3 (quotation omitted).

Facebook agreed to jump-start document discovery, while the parties negotiated threshold ESI issues, by reviewing and producing certain materials produced to government entities. The parties have now negotiated search strings *for a year* and finally appear to have reached agreement to use search strings that hit on approximately 6 million documents. On the eve of finalizing that agreement, Plaintiffs seek to substantially expand that universe by requiring Facebook to also engage in an ongoing review of all documents produced in numerous government matters for any additional responsive documents.

It is neither practical nor reasonable to expect Facebook to continue to track every document produced in numerous other actions (handled by multiple law firms) and to review every one of those documents for responsiveness—in addition to approximately 6 million documents identified through search strings. This is precisely why courts generally reject requests for cloned discovery. To the extent documents have been produced to government entities since April 15, 2020 that are responsive to Plaintiffs' RFPs, the parties have agreed to search for those materials by running the agreed-upon and court-ordered search terms against the agreed-upon and court-ordered custodians. Plaintiffs' request that Facebook separately review its ongoing productions to government entities is unreasonable, unduly burdensome, and not proportional to the needs of the case.

## 2. Materials created for the FTC after July 2020 are neither responsive to RFP 6 nor relevant to this case.

Finally, Plaintiffs' letter demands materials Facebook agreed to create and produce to the FTC, as part of the FTC's ongoing monitoring of Facebook under a consent decree that was entered in July 2020.[13] These materials fall outside of the timeframe of RFP 6. They also appear to be among the materials Plaintiffs requested originally through RFP 43 (which seeks "written reports" to the government) but later told Facebook and the Court they had dropped from their request.

---

[13] Plaintiffs also seem to request categories of materials Facebook put on legal hold for periods of 6 months to 5 years under the FTC's 2011 consent decree. To the extent these materials remained on hold when this action was filed and are captured by the negotiated custodians and search terms, they will be produced.

More fundamentally, materials created for the FTC after July 2020 and as part of the FTC's forward-looking monitoring of Facebook have no conceivable relevance to this case, which was filed in March 2018 and concerns conduct before that date.

## IV.   Plaintiffs February 11 letter regarding "Developer Manuals."

Finally, Plaintiffs invoke the parties' dispute resolution protocol to compel the immediate production of materials over which there is no dispute and no apparent urgency.  Plaintiffs' February 11, 2021 letter demands—under threat of an immediate motion to compel—that Facebook produce within 8 days, what they describe as "manuals" relating to Facebook's systems that were created over the course of a decade.  While not entirely clear, Facebook understands this request to seek every iteration of its developer website to have been published since 2007, because this site provides technical instructions to application developers regarding how to use Facebook's systems.

Plaintiffs are correct that the parties discussed this request previously.  However, these discussions took place **a year ago** in March 2020 and related to a demand that Facebook produce "developer manuals" in connection with an ESI deposition Plaintiffs had noticed.  Judge Corley ultimately ruled that the noticed deposition would not move forward.  Plaintiffs did not follow up with this document demand again until a meet and confer held in November 2020.  During that meet and confer, Plaintiffs' counsel informed Facebook that it should *not* prioritize collection and production of the developer documents and should instead focus on other targeted collections.

Three months later, during a meet and confer held on February 11, 2021, Plaintiffs (out of nowhere) demanded that Facebook locate and produce all "developer manuals" within one week, in anticipation of an upcoming 30(b)(6) deposition.  Facebook urged Plaintiffs to clarify their request and to identify any specific, targeted documents they believed they needed for the deposition—explaining it would be difficult to locate, collect, and produce a large volume of materials within a matter of days.

Plaintiffs did not clarify their request or limit it to specific documents.  Instead, hours after the meet and confer, Plaintiffs sent Facebook a letter purporting to invoke the parties' dispute protocol with respect to "developer manuals."

There is no outstanding dispute with respect to these documents.  As Facebook understands, Plaintiffs seek different versions of its developer website that have been published over time.  Facebook does not object to producing the current version of Facebook's developer website (which Plaintiffs can access at developers.facebook.com) or any prior versions of the website Facebook maintains to the extent they have been archived internally at Facebook. But the Wayback Machine appears to maintain more than 30,000 saved instances of past versions of the developer website.  If there are specific versions of the site that Plaintiffs seek, they should identify them.  The parties should meet and confer to clarify what specific information Plaintiffs are seeking and define an appropriate set of responsive materials.

Finally, as Facebook has told Plaintiffs numerous times, the parties must agree upon a schedule for Facebook to produce documents in response to targeted requests.  Plaintiffs' ongoing demands that Facebook immediately locate and produce one-off materials significantly interfere with Facebook's ability to produce responsive documents found among the millions of documents hitting on the parties' agreed-upon search strings.  Facebook encourages Plaintiffs to limit, narrow, and clarify their requests and to work with Facebook to develop a production schedule.

Sincerely,

Deborah L. Stein

Exhibit 9

CERTAIN PAGES MARKED CONFIDENTIAL OR
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

Defendant Facebook, Inc. ("Defendant" or "Facebook"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court's orders in this action, and the parties' agreements and conferences among counsel, provides the following amended responses and objections to Plaintiffs' Fourth Set of Interrogatories (the "Interrogatories").

## PRELIMINARY STATEMENT

1.     Facebook's responses to the Interrogatories are made to the best of Facebook's current knowledge, information, and belief.  Facebook reserves the right to supplement or amend any responses should future investigation indicate that such supplementation or amendment is necessary or appropriate.

2.     Facebook's responses to the Interrogatories are made solely for the purpose of and in relation to this action.  Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility).  All objections are reserved and may be interposed at any time.

3.     Facebook's responses are premised on its understanding that Plaintiffs seek only that information that is within Facebook's possession, custody, and control.

4.     Nothing contained in these Responses and Objections or provided in response to the Interrogatories consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Interrogatory.

## GENERAL OBJECTIONS

1.     Facebook objects to the Interrogatories to the extent they contain discrete subparts requiring Facebook to engage in separate and distinct inquiries to respond to each subpart so that

the subparts should be construed as independent interrogatories, and that, in total, would cause Plaintiffs to exceed the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories. ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1).

2.       Facebook objects to the Interrogatories to the extent they exceed the maximum number of permissible Interrogatories under Discovery Order No. 6 and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Notwithstanding and without waiving this Objection, Facebook has made a good faith effort to respond to the Interrogatories, in whole or in part, to the extent it is able.

## OBJECTIONS TO DEFINITIONS

1.       Facebook incorporates by reference the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First, Second, and Third Sets of Interrogatories.

2.       Facebook objects to Plaintiffs' definitions of "and" and "or" as unreasonable, inconsistent with the Federal Rules of Civil Procedure, vague, and grammatically incoherent. Facebook will interpret "and" and "or" in accordance with their ordinary, everyday meaning, which includes interpreting disjunctive terms disjunctively and conjunctive terms conjunctively.

3.       Facebook objects to Plaintiffs' definition of "describe in detail" or "detailed description" on the ground that the definition makes the Interrogatories overly broad and unduly burdensome and imposes obligations that go beyond the requirements of the Federal and Local Rules. Facebook shall construe these terms as commonly and ordinarily understood. Facebook further objects to this definition to the extent it seeks information beyond relevant facts,

including Facebook's analyses or opinions, which are appropriately sought through contention interrogatories, which are not appropriate or justified at this early stage.

4.      Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of Facebook's platform are or were at any given time.  Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

5.      Facebook objects to Plaintiffs' definition of "Business Partners" as vague, ambiguous, and overly broad to the extent it refers to entities with which Facebook "partnered" to "develop and integrate" Facebook "on a variety of devices and operating systems" without defining any of those terms.  Facebook will construe "Business Partners" as referring to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to Request for Production No. 24. During the parties' meet and confer discussions, beginning on or about August 27, 2020, Plaintiffs took the position that "Business Partners" refers to a broader set of entities than the integration partners and/or device manufacturers described in Facebook's August 14 Objection because Plaintiffs understood the Court to describe a broader set of "Business Partners" than the set of entities Facebook describes (hereinafter referred to as Facebook's "Integration Partners") in Pretrial Order 20.  Via email on September 11, 2020, Plaintiffs clarified that they understood the Court had adopted a "conduct-based definition" for "Business Partners" under which the term "Business Partners" described entities with whom "Facebook shared information about its

users . . . and those companies in turn shared data with Facebook."  Plaintiffs thus contend that "Business Partners" include any and all entities with whom Facebook exchanged user data in any form.  Having considered Plaintiffs' arguments, Facebook maintains its Objection to Plaintiffs' definition of "Business Partners" and will continue to construe this term as pertaining to Facebook's Integration Partners.  *First*, Plaintiffs have not re-issued their Fourth Set of Interrogatories with a revised definition of "Business Partners" that follows the definition adopted in their September 11 email.  The definition of "Business Partners" in Plaintiffs' Fourth Set of Interrogatories refers to entities with whom "Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems" and does not mention sharing user data. Plaintiffs' proposed post-hoc revision of the term "Business Partners" is inconsistent with the discovery requests Facebook is responding to.  *Second*, Plaintiffs' proposed revision to "Business Partners" is inconsistent with the allegations in Plaintiffs' Second Amended Consolidated Complaint ("SACC").  Apart from conclusory allegations regarding data sharing without user consent, Plaintiffs allege Facebook's "Business Partners" were entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems," SACC, ECF No. 491, ¶ 430, and that these partnerships "allowed Facebook to expand its reach by outsourcing . . . the time, labor, and money required to build Facebook's Platform on different devices," *id.* ¶ 433, which required Facebook and the Business Partners to "exchange information about users' activities with each other," *id.* ¶ 434.  The SACC includes a partial list of "Business Partners," which Facebook had provided to Congress in June 2018.  *Id.* ¶ 431.  As the letter to Congress that Plaintiffs cite to makes clear, this list is of Facebook's Integration Partners.  Plaintiffs also concede that certain of the other entities they reference as being "Business Partners"—including Airbnb, Lyft, and Netflix—are actually "whitelisted apps," and

<div align="center">4</div>

therefore relate to a separate category of allegations in the SACC.  *Id.* ¶ 457.  As a result, the only set of "Business Partners" about which Plaintiffs' SACC asserts non-conclusory allegations are Facebook's Integration Partners.  *Third*, the Court's Order on Facebook's Motion to Dismiss does not—and cannot—broaden the set of relevant entities.  Rather, the Court describes Plaintiffs' allegations as being "difficult to pin down" but describes the relevant entities as being a set of Facebook's "integration partner[s]," as identified in Facebook's letter to Congress, with whom Facebook had "data reciprocity" agreements.  MTD Order, ECF No. 298, at 8.  Moreover, while the Court can narrow a plaintiff's claim on a motion to dismiss, it cannot rewrite the complaint to broaden them.  *E.g.*, *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 895 (N.D. Cal. 2011) ("A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. . . .  Review is limited to the contents of the complaint." (internal citations omitted)).  *Fourth*, the Court recently affirmed that discovery is stayed as to all of Plaintiffs' stayed claims.  ECF No. 557 at 9.  Accordingly, Plaintiffs are not entitled to discovery as to entities about which they have articulated no particularized claims, much less stayed ones.  Facebook thus stands on its original objection to Plaintiffs' definition of "Business Partners" and declines to adopt Plaintiffs' later-adopted definition.

6.     Facebook objects to Plaintiffs' definition of "Content and Information" as vague, ambiguous, overly broad, and unduly burdensome.  While purporting to cite Facebook's Statements of Rights and Responsibilities, Plaintiffs have expanded the scope of "Content and Information" to include 10 subcategories of information—including "thermal [and] olfactory" information—that are not derived from that definition.  Facebook objects to this definition to the extent it purports to seek documents or information that is not relevant to Plaintiffs' non-stayed claims and bears no relation to third-party application developers being granted access to

5

"sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties"). Facebook will construe this term as referring to "[i]nformation and content [users] provide" as described in Facebook's Data Policy. If Facebook identifies any additional categories of user content and information that are relevant to Plaintiffs' non-stayed claims, Facebook will update its responses accordingly.

7.     Facebook objects to Plaintiffs' definition of "Database" as vague, ambiguous, overly broad, and unduly burdensome to the extent the term is meant to include "any" organized collection of information that is stored electronically, which, for example, could include any files on an individual Facebook employee's computer. Facebook will construe this term as referring to enterprise-wide electronic collection of related data organized for ready access.

8.     Facebook objects to Plaintiffs' definition of "Data Analytics Infrastructure" as vague, ambiguous, overly broad, and unduly burdensome to the extent the term is meant to include all "services, applications, utilities and systems" used by Facebook, terms that are, themselves, broad and undefined. "Systems," for instance, could refer to any methodologies or operational procedures put in place for Facebook personnel to analyze data but are not themselves mechanical or electronic means for processing, analyzing, or storing user data.

Moreover, all "services, applications, utilities and systems" used by Facebook includes processes and mechanisms that do not support any of the functions at issue, to wit, the sharing of user content and information with third parties.  Facebook further objects to this definition to the extent it seeks information relating to "modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines," which bear no relevance to Plaintiffs' live claims.  *See* MTD Order, ECF No. 298, at 6-10.  Facebook will construe this term as relating to any internal electronic databases that may contain content or information relevant to Plaintiffs' claims.

9.      Facebook objects to Plaintiffs' definition of "Facebook Archive" as vague, ambiguous, and inaccurate.  Facebook has produced several categories of information relating to each of the Named Plaintiffs in this action, none of which is appropriately characterized as having been drawn from an "archive" as commonly understood.  Facebook further objects to this definition on the basis that this term does not appear in the Interrogatories.

10.      Facebook objects to Plaintiffs' definition of "Not Generally Available" on the ground that the term "access" is vague and ambiguous.  Facebook will construe this term as referring to content posted on the Facebook Platform by a user for which that user has limited the audience of other Facebook users who may view, interact with, or share a particular item of content.

11.      Facebook objects to Plaintiffs' definition of "Third Parties" to the extent it relies on other undefined terms, including "Whitelisted Apps," or other vague and ambiguous terms including "Business Partners."  Facebook will construe this term as referring to individuals or entities other than Facebook or individual Facebook users.

7

12.     Facebook objects to the portion of Plaintiffs' definition of the term "Facebook," "Defendant," "you," and "your" that defines Facebook to include its "executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf . . . includ[ing] parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf."  This portion of the definition is vague, ambiguous, overly broad, unduly burdensome, and inconsistent with basic principles of corporate separateness.  Facebook's response to the Interrogatory (if any) will use a definition of "Facebook" that encompasses only Facebook, Inc.

## OBJECTIONS TO INSTRUCTIONS

1.     Facebook objects to Plaintiffs' "Instructions" to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

2.     With respect to Plaintiffs' Instruction 5, which requests that Facebook answer discovery requests for a continuing time period, for consistency, the time period reflected in Facebook's responses to these Interrogatories is consistent with Facebook's responses to Plaintiffs' other discovery requests, unless a specific time period is identified in a particular request and/or Facebook's response to a particular request.

## SPECIFIC OBJECTIONS

## INTERROGATORY NO. 8:

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

## RESPONSE TO INTERROGATORY NO. 8 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the definitions of "Content and Information," "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe these terms as described in its objections to their Definitions.

(B)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(C)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(D)     Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(E)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 8

that it seeks information relating to "each" Facebook Database and Data Analytics Infrastructure, without regard for whether the "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of "Databases or Data Analytics Infrastructures" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 8**:

Users make their Content and Information available on the Facebook Platform by uploading it directly to the Platform.  The Facebook Platform is powered by a series of databases that Facebook relies upon for production purposes and which work in tandem to provide Facebook users a seamless experience as they access different categories and types of content posted on the Platform, by themselves or other users.  As Facebook users navigate through the Facebook Platform and interact with objects on the Platform by, among other things, liking posts

made by other users, watching videos, posting photos, and sending messages, they actively change the content and information available on the Facebook Platform.  The array of relationships between users, objects, and actions is referred to as the Social Graph, which is a model of the relationships between users, objects, and actions.  These databases described below constitute the primary infrastructure that maintains the Facebook Platform, and, thus, contain the content and information that makes up the Social Graph.  As relevant here, Plaintiffs have been provided with the content and information from the Social Graph—and therefore from the below databases—that was uniquely associated with their Facebook profiles as of the date(s) each set was pulled.  Additionally, through their Facebook profiles, Plaintiffs have access to the content or information they have posted to the Platform and not deleted since those productions were made.

The key databases Facebook uses to support the Facebook Platform, all of which were in use during the Relevant Time Period asserted by Plaintiffs and which store all of the content and information users post to Facebook and therefore contain all of the historical user content and information presently accessible via the Social Graph, are:

- █████████████████████████████████████
  ██████████████████████████
- ███████████████████████████████████████
  ████████████████████████████████████████
  ██████████████████████████████████████
  █████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 8**

- ███████████████████████████████████████████

  ███████████████████████████████████████████

  ██████████████████████████████████

▌ ███████████████████████████████████████████

  █████████████████████████████████

## INTERROGATORY NO. 9:

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such Database to respond to either internal or external queries.

## RESPONSE TO INTERROGATORY NO. 9 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" Database and Data Analytics Infrastructure that Facebook identified in its answer to Interrogatory No. 8.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, 2009 WL 102816, at *5 (N.D. Cal. Jan. 14, 2009) ).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**

separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual databases that contain different information and operate differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" Database and Data Infrastructure as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definitions of "Content and Information," "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe these terms as described in its objections to their Definitions.

(C)     Facebook objects to this Interrogatory on the ground that the term "corresponding query interfaces" is vague, ambiguous, and undefined.  Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information relating to "internal . . . queries" within Facebook.  Plaintiffs' claims relate to allegedly improper access to user content and information by third parties, not Facebook or its personnel.  Facebook will construe this Interrogatory as relating only to external queries.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**

(E)      Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's "Databases and Data Analytics Infrastructure" have no possible relation to or bearing on to Plaintiffs' live claims or Facebook's defenses.

(F)      Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(G)      Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(H)      Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "query interfaces" for "each" Facebook Database and Data Analytics Infrastructure, without regard for whether the "query interface" or "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to "query interfaces" or "Databases" or "Data Analytics Infrastructures" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of

"sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 9**:

Application Programming Interfaces ("APIs") are standard computing protocols used throughout the digital world.  Each time a user visits or uses an app, the user necessarily interacts through an API.  And every company that allows third parties to communicate with their servers uses APIs.  As just one example, e-mail programs like Outlook or Mail on iOS communicate with the user's e-mail provider (Yahoo, Gmail, etc.) through APIs to obtain the user's messages. Facebook has a series of public APIs that are published on its developer website (https://developers.facebook.com/), and any app developer can use them or request to use them to send or receive information from the Facebook Platform.

To the extent third parties are able to access user content and information, it is primarily through Graph API, which is the API Facebook has made broadly available to all app developers on its Platform and queries the Facebook Platform.  There have been several iterations of the Graph API including, among others, Graph API v.1 (most recent version from 2010 to April 2014 and accessible to April 2015), Graph API v.2 (most recent version from April 2014 to May

15

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**

2018 and accessible to May 2020), and Graph API v.3 (most recent version from May 2018 to July 2020 and accessible to August 2021).  A changelog detailing changes made to the Graph API when a new version is introduced is available on Facebook's developer website (https://developers.facebook.com/docs/graph-api/changelog/).

Individuals or business entities, including third party developers of apps connected to the Facebook Platform, may request access to endpoints that are not publicly available through the Graph API when they are necessary to enhance user experience on their app or product.  To receive approval to access these endpoints associated with non-public data, a third party is required to go through the App Review process, which may include having its identity verified by Facebook.  In that process, Third Parties are required to specify the types of data their apps will be requesting from users and describe how that data will be used.  A Facebook team within the Developer Operations (DevOps) group is responsible for evaluating developers' explanations for each extended permission sought.  If an app seeks data beyond what is necessary to enhance the user's experience, Facebook will reject the app's submission.  Facebook rejected more than half of the apps submitted for App Review between April 2014 and April 2018.

As relevant here, the APIs a third party may be granted access to after being approved through the App Review process and which may allow that third party to request access to some forms of user data include:

- Groups API, which allows a developer to read and create Facebook Group data on behalf of group members;

- Live Video API, which enables video encoders, cameras, web, and desktop applications to stream live video directly to Facebook user profiles, pages, and groups; and,

- Pages API, which, among other things, allows apps to update a Facebook Page's settings and content, create and get Posts, get Comments on Page owned content, get Page insights, and update actions that users are able to perform on a Page.

Facebook, like virtually all online companies, also uses other APIs that are not generally available to all app developers.  Among other things, these other APIs can be used to provide third parties access to certain capabilities that are not accessible through any of the public APIs and for which the third party has demonstrated a need.  These are commonly referred to a "private" APIs.  The vast majority of private APIs do not enable third-party apps to access user content and information.

As used here, the term "capability" describes a group of functionalities that are provided to a particular app or third party and give that app or third party the ability to access certain data through one or more APIs.  An app cannot access a capability associated with a private API unless a Facebook employee has approved it to do so.

After an extensive investigation, Facebook has identified the following capabilities which were associated with private APIs that may have allowed third party application developers and/or device manufacturers to ██████████████████████ that may have been associated with a user's friends during the Relevant Time Period asserted by Plaintiffs (as specifically set forth in response to Interrogatory Nos. 15 and 27), not all of which are necessarily relevant to Plaintiffs' non-stayed claims.  For the avoidance of doubt, the capabilities listed below are those Facebook presently understands may have allowed for ████████ ██████████████████ but Facebook is not representing that the data that may have been queried is "sensitive" pursuant to Pretrial Order 20, that any data was accessed outside the

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**

scope of any user's consent, or that any of the following capabilities are otherwise relevant in this action.



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**



19

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**



This list is the result of extensive investigation by Facebook's engineers, who, among other things, manually reviewed the code of each capability to determine which capabilities granted access to user's friends' data and, if so, to identify the specific data fields accessible through the capability.  Capabilities associated with Facebook's first-party apps (*i.e.*, internal Facebook programs developed to enable Facebook's own products that do not involve sharing user information with third parties) are excluded from this list.

**INTERROGATORY NO. 10:**

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10

## RESPONSE TO INTERROGATORY NO. 10 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" query interface that Facebook identified in its answer to Interrogatory No. 9.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual query interfaces that operate differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" query interface as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Facebook considers this

Interrogatory to include at least five subparts and therefore the below Response to constitute Facebook's Responses Nos. 10 to 14.

(B)     Facebook objects to this Interrogatory on the ground that the term "query interface" is vague, ambiguous, and undefined.  Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(C)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on to Plaintiffs' live claims or Facebook's defenses.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information relating to "internal queries" within Facebook.  Plaintiffs' claims relate to allegedly improper access to user content and information by third parties, not Facebook or its personnel.  Facebook will construe this Interrogatory as relating only to external queries.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "query interfaces," without regard for whether the "query interface" has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to "query interfaces" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 10**:  Graph API is available to third parties external to Facebook.  Third parties seeking to access more than basic public data (public profile and email address) must undergo the App Review process to receive additional access to permissions.

**Response No. 11**:  Groups API is available to third parties external to Facebook upon approval through the App Review process.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10**

**Response No. 12**:  Live Video API is available to third parties external to Facebook upon approval through the App Review process.

**Response No. 13**:  Pages API is available to third parties external to Facebook upon approval through the App Review process.

**Response No. 14**:  During the relevant time period, the following capabilities associated with private APIs may have been available to third parties external to Facebook only upon approval by Facebook:

Facebook, Inc.'s Second Amended Responses & Objections to Plaintiffs' Fourth Set of Interrogatories
CASE NO. 3:18-MD-02843-VC

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10**



**INTERROGATORY NO. 11:**

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces.  For each of the

fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

## RESPONSE TO INTERROGATORY NO. 11 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. Civ. P. 33 by asking for separate information about "each" query interface that Facebook identified in its answer to Interrogatory No. 10.  Not only does the Interrogatory embed subparts by asking for information about "each" query interface, the Interrogatory demands separate information about "each" field or query parameter identified.  Each of those inquiries is itself a subpart to be counted against the interrogatory limit.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate

27

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

and distinct subjects, to wit, several individual query interfaces that operate differently and are associated with different data end points, among other things.  Facebook will therefore treat Plaintiffs' inquiry into "each" query interface as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2]).  Facebook considers this Interrogatory to include at least 60 subparts and therefore the below Response to constitute Facebook's Responses Nos. 15 to 75.

(B)     Facebook objects to this Interrogatory as vague, ambiguous, and confusing.  As drafted, Facebook does not sufficiently understand the Interrogatory to provide a meaningful response.

(C)     Facebook objects to this Interrogatory on the ground that the term "query interface" is vague, ambiguous, and undefined.  Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(D)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "each" query interface, without respect for whether the query interface has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the "query interfaces" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 15**:  The list of permissions an app developer may be granted approval to access through Graph API, and therefore which data endpoints that app developer may potentially access through the Graph API, are publicly available on Facebook's Developer site.[1] In order to access non-public user data[2] associated with a specific permission through Graph API, an app developer needs approval from Facebook and the user.  First, in order to gain access to a particular permission, an app developer needs to have that permission approved through App Review.  Second, when users log onto the developer's app, they receive a request to grant the developer's app permission to access that category of their data (*i.e.*, the specific data associated with the approved permission).  Users can grant or deny the requested permissions or any subset of them.  The below list[3] includes permissions and/or data points available through Facebook's public APIs, including Graph API, that could provide—subject to relevant privacy controls and user settings, and the user's choices in the Granular Data Permissions dialog—user information

---

[1]  The Facebook Developers site is located here: https://developers.facebook.com/docs/permissions/reference.

[2]  The Facebook Data Policy defines "public information" as information that "can be seen by anyone, on or off our Products, including if they don't have an account.  This includes your Instagram username; any information you share with a public audience; information in your public profile on Facebook; and content you share on a Facebook Page, public Instagram account or any other public forum, such as Facebook Marketplace."

[3]  This list is based on readily available records and represents this information to the best of Facebook's present knowledge.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

to third-party consumer apps during the period between 2010-2018 (though few were available during the entire period).[4]  The permissions and/or data points included on the list below were published on Facebook's publicly available website for developers, which also explained the functionalities of and various restrictions on these permissions over time.

- age_range

- basic_info

- context

- cover

- currency

- default

- devices

- email

- first_name

- friends_about_me

- friends_activities

- friends_birthday

- friends_education_history

- friends_events

- friends_groups

- friends_hometown

- friends_interests

---

[4]  In particular, any permission beginning with "friends_" was deprecated with the transition to Graph API v.2.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

- friends_likes

- friends_location

- friends_photos

- friends_questions

- friends_relationship_details

- friends_relationships

- friends_religion_politics

- friends_status

- friends_subscriptions

- friends_website

- friends_work_history

- gender

- id

- last_name

- link

- locale

- middle_name

- name

- name_format

- picture

- public_profile

- read_custom_friendlists

- read_friendlists

- read_mailbox

- read_page_mailboxes

- read_requests

- read_stream

- short_name

- timezone

- updated_time

- user_about_me

- user_actions.books

- user_actions.fitness

- user_actions.music

- user_actions.news

- user_actions.video

- user_actions:APP_NAMESPACE

- user_activities

- user_age_range

- user_birthday

- user_education_history

- user_events

- user_friends

- user_games_activity

- user_gender

- user_groups

33

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

- user_hometown

- user_interests

- user_likes

- user_link

- user_location

- user_managed_groups

- user_online_presence

- user_photos

- user_posts

- user_questions

- user_relationship_details

- user_relationships

- user_religion_politics

- user_status

- user_subscriptions

- user_tagged_places

- user_videos

- user_website

- user_work_history

- username

- verified

**Response No. 16**:  As noted, there are a handful of additional APIs that a developer may request access to if necessary for the operation of their app.  Each of these APIs has its own unique set of permissions and/or endpoints associated with that API.  Information regarding these APIs and their associated permissions and/or endpoints are available on the Facebook Developers page.

As relevant here, the endpoints a developer presently may access through the Groups API after having been approved by Facebook include:

- /{application-id}/app_installed_groups

- /{group-id}/albums

- /{group-id}/docs

- /{group-id}/events

- /{group-id}/feed

- /{group-id}/files

- /{group-id}/live_videos

- /{group-id}/opted_in_members

- /{group-id}/photos

- /{group-id}/videos

- /{user-id}/groups

**Response No. 17**:  The endpoints a developer presently may access through the Live Video API after having been approved by Facebook include:

- DELETE /{live_video_id}

- GET /{event-id}/live_videos

- GET /{group-id}/live_videos

- GET /{live-video-id}

- GET /{live-video-id}/comments

- GET /{live-video-id}/crosspost_shared_pages

- GET /{live-video-id}/likes

- GET /{live-video-id}/polls

- GET /{live-video-id}/reactions

- GET /{page-id}/live_videos

- GET /{user-id}/live_videos

- POST /{event-id}/live_videos

- POST /{group-id}/live_videos

- POST /{live_video_id}

- POST /{live_video_id}/input_streams

- POST /{live_video_id}/polls

- POST /{page-id}/live_videos

- POST /{user-id}/live_videos

- GET /{live-video-input-stream-id}

- POST /{live_video_id}/input_streams

- GET /{live-video-id}/polls

- GET /{video-poll-id}

- POST /{live_video_id}/polls

- POST /{video_poll_id}

**Response No. 18**:  The data fields that may be accessed through the Pages API after having been approved by Facebook include:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

- id
- about
- access_token
- ad_campaign
- affiliation
- app_id
- artists_we_like
- attire
- awards
- band_interests
- band_members
- best_page
- bio
- birthday
- booking_agent
- built
- business
- can_checkin
- can_post
- category
- category_list
- checkins
- company_overview

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

- connected_instagram_account

- contact_address

- copyright_attribution_insights

- copyright_whitelisted_ig_partners

**Response No. 19**:  For the private API associated with the capability

███████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ████████████████████

**Response No. 20**:  For the private API associated with the capability

████████████████████, the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ███████████████  ranked

**Response No. 21**:  For the private API associated with the capability

██████████████████  the associated data fields a third party may have been able to access upon

approval by Facebook are:

- ████████████████

- ██████████████████████

**Response No. 22**:  For the private API associated with the capability

████████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ██████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 23**:  For the private API associated with the capability

███████████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ███████████████

**Response No. 24**:  For the private API associated with the capability

███████████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ███████████████

**Response No. 25**:  For the private API associated with the capability

███████████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ███████████████

**Response No. 26**:  For the private API associated with the capability

███████████████████████████████████  the associated data fields a third party may have been

able to access upon approval by Facebook are:

- ███████████████████

**Response No. 27**:  For the private API associated with the capability

███████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ███████████

**Response No. 28**:  For the private API associated with the capability

███████████████████████  the associated data fields a third party may have been able to

access upon approval by Facebook are:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

- ██████████

**<u>Response No. 29</u>**:  For the private API associated with the capability

██████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ██████████

**<u>Response No. 30</u>**:  For the private API associated with the capability

██████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ██████████

**<u>Response No. 31</u>**:  For the private API associated with the capability

██████████ the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ██████████

**<u>Response No. 32</u>**:  For the private API associated with the capability

██████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ██████████

**<u>Response No. 33</u>**:  For the private API associated with the capability

██████████, the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ██████████

**<u>Response No. 34</u>**:  For the private API associated with the capability

███████████████████████████ the associated data fields a third party may have been

able to access upon approval by Facebook are:

- ███████████

**<u>Response No. 35</u>**:  For the private API associated with the capability

███████████████████████████ the associated data fields a third party may have been

able to access upon approval by Facebook are:

- ███████████
- ███████████

**<u>Response No. 36</u>**:  For the private API associated with the capability

████████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- █████████████
- ███████████

**<u>Response No. 37</u>**:  For the private API associated with the capability

███████████████████████ the associated data fields a third party may have been

able to access upon approval by Facebook are:

- ██████████████

**<u>Response No. 38</u>**:  For the private API associated with the capability

████████████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ████████████

**Response No. 39**:  For the private API associated with the capability

████████████████████████ the associated data fields a third party may have been

able to access upon approval by Facebook are:

- ███████████
- █ ████████████

**Response No. 40**:  For the private API associated with the capability

███████████████ the associated data fields a third party may have been able to access

upon approval by Facebook are:

- █████████████

**Response No. 41**:  For the private API associated with the capability

███████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ██████████

**Response No. 42**:  For the private API associated with the capability

███████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ████████████████

**Response No. 43**:  For the private API associated with the capability

████████████████████ the associated data fields a third party may have been able

to access upon approval by Facebook are:

- ████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 44**:  For the private API associated with the capability

███████████████████████   the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ███████████████████

**Response No. 45**:  For the private API associated with the capability

███████████████████   the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ███████████████████

**Response No. 46**:  For the private API associated with the capability

███████████████████   the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ███████████████████████

**Response No. 47**:  For the private API associated with the capability

███████████████████   the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ███████████████████

**Response No. 48**:  For the private API associated with the capability

██████████████████████   the associated data fields a third party may have been able to

access upon approval by Facebook are:

- █   ███████████████

---

[5]  In contrast to other permissions that grant access to a user's friend list, th ████████████████
████████████████████████████████████████

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 49**:  For the private API associated with the capability

██████ the associated data fields a third party may have been able to access upon approval by

Facebook are:

- ████████████████

**Response No. 50**:  For the private API associated with the capability

█████████████████████████ the associated data fields a third party may have been able to

access upon approval by Facebook are:

- ███████████████

**Response No. 51**:  For the private API associated with the capability

██████████ the associated data fields a third party may have been able to access upon approval

by Facebook are:

- ████████████████████████████████████████████████████████

    ███████████████████████████████

**Response No. 52**:  For the private API associated with the capability

██████████ the associated data fields a third party may have been able to access upon

approval by Facebook are:

- ██████████████████████████████████

**Response No. 53**:  For the private API associated with the capability

██████████████████████████████████ the associated data fields a third party may

have been able to access upon approval by Facebook are:

- ██████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 54**:  For the private API associated with the capability █████████

the associated data fields a third party may have been able to access upon approval by Facebook

are:



45

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 55**:  For the private API associated with the capability ███████████

the associated data fields a third party may have been able to access upon approval by Facebook

are:

- ████████████████████████

**Response No. 56**:  For the private API associated with the capability ████████

████████  the associated data fields a third party may have been able to access upon approval by

Facebook are:

46

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

■ ███████

■ ██████████████

■ ████████

**Response No. 57**:  For the private API associated with the capability

████████████████ the associated data fields a third party may have been able to access

upon approval by Facebook are:

■ ███████

■ █████████

■ █████████

■ ████████

■ ████████

■ ██████████

■ █████████

**Response No. 58**:  For the private API associated with the capability

██████████████████ the associated data fields a third party may have been able

to access upon approval by Facebook are:

■ ████████

■ █████████

■ ███████

■ ██████████

■ ████████

■ █████████

■ ████████

47

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

■         ███████████████

**Response No. 59**:  For the private API associated with the capability

███████████ the associated data fields a third party may have been able to access upon

approval by Facebook are:

- ███████████████

**Response No. 60**:  For the private API associated with the capability

███████████ the associated data fields a third party may have been able to access upon

approval by Facebook are:

- ███████████████

**Response No. 61**:  For the private API associated with the capability

███████ the associated data fields a third party may have been able to access upon approval by

Facebook are:

- ███████████████

**Response No. 62**:  For the private API associated with the capability

██████████████████████████ the associated data fields a third party may

have been able to access upon approval by Facebook are:

- ■         ███████████

- ■         ███████████

- ■         █████████████████

**Response No. 63**:  For the private API associated with the capability

███████████ the associated data fields a third party may have been able to access upon

approval by Facebook are:

- ██████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

▪ ███████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████

**Response No. 64**:  For the private API associated with the ████████████ the

associated data fields a third party may have been able to access upon approval by Facebook are:

▪ ██████████████

▪ ████████████████

**Response No. 65**:  For the private API associated with the capability

████████████ the associated data fields a third party may have been able to access upon

approval by Facebook are:

- ██████████████

**Response No. 66**:  For the private API associated with the capability

████████████ the associated data fields a third party may have been able to access

upon approval by Facebook are:

- ██████████████

**Response No. 67**:  For the private API associated with the capability

███████████████ the associated data fields a third party may have been

able to access upon approval by Facebook are:

- █████████████████████

---

▪ The types of possible ██████████ are whether an app user's █████████████████████
█████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**<u>Response No. 68</u>**:  For the private API associated with the capability

████  the associated data fields a third party may have been able to access upon approval by

Facebook are:

- ████████████████

**<u>Response No. 69</u>**:  For the private API associated with the capability

████  the associated data fields a third party may have been able to access upon approval by

Facebook are:

█ ██████████████████████

**<u>Response No. 70</u>**:  For the private API associated with the capability

████████████████  the associated data fields a third party may have been

able to access upon approval by Facebook are:

█ ██████████████

**<u>Response No. 71</u>**:  For the private API associated with the capability

██████████████  the associated data fields a third party may have been able to access

upon approval by Facebook are:

█ ███████████

█ ███████████

█ █████████████

█ █████████████

█ ██████████

█ ███████████

█ ████████████

█ ████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 72**: For the private API associated with the capability ███████ the associated data fields a third party may have been able to access upon approval by Facebook are:

- ███████████████
- ████████
- █████████████████

**Response No. 73**: For the private API associated with the capability ████████ the associated data fields a third party may have been able to access upon approval by Facebook are:

- █████████████████████

**Response No. 74**: For the private API associated with the capability ████████ the associated data fields a third party may have been able to access upon approval by Facebook are:

- ██████████████████████████████
- ███████████████████████████
- █████████████

**Response No. 75**: For the private API associated with the capability ████████ the associated data fields a third party may have been able to access upon approval by Facebook are:

- ███████████████

**INTERROGATORY NO. 12:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by, such system.

**RESPONSE TO INTERROGATORY NO. 12:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" Database and Data Analytics Infrastructure that Facebook identified in its answer to Interrogatory No. 8. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual databases that contain different information and operate differently. Facebook will therefore treat Plaintiffs' inquiry into "each" Database and Data Infrastructure as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each

had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definitions of "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe these terms as described in its objections to their Definitions.

(C)     Facebook objects to this Interrogatory on the ground that the term "system architectures" is vague, ambiguous, and undefined.  Facebook further objects to this Interrogatory on the ground that Facebook's "system architectures," however defined, are unrelated to Plaintiffs' claims.

(D)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus,

the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "each" "Facebook Database and Data Analytics Infrastructure," without regard for whether the "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of Databases unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what information Facebook could reasonably provide proportionate to the needs of this case.  Facebook does not understand what information Plaintiffs are seeking via this Interrogatory, as written.

## INTERROGATORY NO. 13:

For every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users, list the name of the API, a description of its function, the data fields of Not Generally Available Content and Information of Friends of Installing Users to which it allowed access, the number of calls it received each month, the volume of data it returned each month, the number of Friends of Installing Users whose Content and Information was accessed, the name of every Third Party that Facebook allowed to use that API, and the period during which each Third Party was allowed to use the API.

## RESPONSE TO INTERROGATORY NO. 13:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "every" API.  *See, e.g.*, *New Amsterdam Project Mgmt.*

*Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual APIs that contain different information and operate differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" API as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Not only does the Interrogatory embed subparts by asking for information about "every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users," the Interrogatory demands a list of 6 different types of information about each responsive API.  Each of those inquiries is itself a subpart to be counted against the Interrogatory limit.

(B)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of Interrogatories Nos. 9, 10, 11, 14, 15, and 27, among others.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding the volume of API calls and data returned each month.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-

Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)     Facebook further objects to this Interrogatory to the extent the Interrogatory seeks information not in Facebook's possession, custody, or control.

(G)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 76**:

For a list of APIs by which third parties could access the not generally available content and information of friends of installing users and the data fields associated with each API, Facebook directs Plaintiffs to Facebook's responses to Interrogatory Nos. 9, 10, and 11.

For information relating to business partners who could access the not generally available content and information of friends of installing users, Facebook directs Plaintiffs to Facebook's responses to Interrogatory Nos. 14 and 15.

For information relating to so-called "whitelisted" applications who could access the not generally available content and information of friends of installing users, Facebook directs Plaintiffs to Facebook's response to Interrogatory No. 27.

With regard to the last relevant category of third parties who could access the not generally available content and information of friends of installing users—third party application developers that had access to "sensitive user information" via friend-sharing between 2009 and 2015—Facebook continues to investigate what information it can produce in response to this request.  Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of calls certain APIs received, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request.  Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14

## INTERROGATORY NO. 14:

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

## RESPONSE TO INTERROGATORY NO. 14 – CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as an improper compound interrogatory that also embeds multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each such Business Partner."  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook.  Facebook therefore considers Plaintiffs' inquiries into "each" Business Partner as separate Interrogatories.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to Business Partners unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14

Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-

Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user

information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that it is cumulative and

duplicative of prior requests, including RFPs 12 and 24.

(F)     Facebook objects to this Interrogatory on the basis that the information sought is

more appropriately pursued through another means of discovery, such as a request for the

production of documents.

(G)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of

information that is not reasonably available at this stage in the case and that would be unduly

burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary

to investigate as weighed against Plaintiffs' need for the information.  Responding fully to

Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including

conducting witness interviews and analyzing a large number of documents that have not yet been

identified and produced—to identify all Business Partners who were permitted to access to

information through a large number of APIs (many of which are unrelated to any live claim or

defense) over the course of at least thirteen years.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 77**:

"Business Partners" is not a term of art used within Facebook used to describe third parties to whom "Facebook outsourced . . . 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems,'" pursuant to "integration partnerships."  MTD Order, ECF No. 298, at 8 (quoting FACC ¶ 486).  To avoid confusion, Facebook will refer to these entities as "Integration Partners."  Facebook's Integration Partners are companies Facebook engaged to build integrations for a variety of devices, operating systems, and other products where Facebook and its partners wanted to offer people a way to receive Facebook or Facebook experiences.  These integrations were built by Facebook partners, for Facebook users, but approved by Facebook.  They included, for example:

- *Facebook-branded apps*: Some partners built versions of Facebook for their device or operating system that had all or substantially all of the features that Facebook built directly on the Facebook website and in Facebook's mobile apps.

- *Social Networking Service Hubs*: Some partners built "hubs" into their products, where people could see notifications from their friends or the people they followed on Facebook, MySpace, Twitter, Google and other services.  People could often also use these integrations to post on these social networking services.

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14

- *Syncing Integrations*: Some partners enabled people to sync their Facebook data (*e.g.*, photos, contacts, events, and videos) with their device in order to integrate Facebook features on their device.  This allowed people to, for example, easily upload pictures to Facebook and to download their Facebook pictures to their phones, or to integrate their Facebook contacts into their device address book.

- *USSD Services*: Some partners developed USSD services, which are services that provided Facebook notifications and content via text message.  This was useful for feature phones that did not have the ability to connect to the Internet; it particularly helped Facebook bring its service to people in the developing world.

To provide these experiences, Facebook permitted partners to use certain Facebook APIs. In general, partners were licensed to use the APIs solely for providing specific integrations approved by Facebook to Facebook users who requested these services on the partners' products. These integrations were reviewed by Facebook, which had to approve implementations of these APIs.  Typically, these apps were reviewed and "certified" by members of Facebook's partnerships and engineering teams.  In these and other ways, these partnerships differed significantly from third-party app developers' use of published APIs to build apps for consumers on Facebook's developer platform. Among other things, third-party app developers use the information they receive in order to build their own experiences, not to build Facebook-approved applications for purposes designated by Facebook.  Integration Partners were not permitted to use data received through Facebook APIs for independent purposes unrelated to the approved integration without user consent.

Below is a list of Facebook's Integration Partners during the Relevant Time Period asserted by Plaintiffs .  For information relating to the period during which each integration was

active, Facebook directs Plaintiffs to Facebook's responses to Interrogatory No. 15.  The lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

- Accedo

- Acer

- Aircel

- Airtel

- Alcatel/TCL

- Alibaba[7]

- Amazon

- AOL/ICQ/Mail.ru

- Apple

- AT&T

- Blackberry

- Comcast

- Dell

- DNP

- Docomo

- Garmin

- Gemalto

- GMX-Mail.com

---

[7] Alibaba only had APIs that allows it to query endpoints <u>not</u> associated with user's friends' data fields during the relevant time period, but is included on this list for completeness.

- HipLogic

- HP/Palm

- HTC

- Huawei

- INQ

- IQ Zone

- Kodak

- LG

- MediaTek/Mstar

- Mercedes-Benz

- Microsoft

- Miyowa/Hape Esia

- Mobinnova

- Motorola/Lenovo

- Mozilla

- mSonar

- Myriad

- Nexian

- Nintendo

- Nuance

- Nokia

- O2

- Opentech ENG

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

- Opera

- OPPO

- Orange

- Pantech

- Peugeot-Citroen

- Qualcomm

- Roamware

- Rockmelt

- Samsung

- Sony

- Spreadtrum

- Sprint

- Telstra

- ThreeUK

- TIM

- T-Mobile

- Tobii

- U2topia

- Verisign

- Verizon

- Virgin Mobile

- Vodafone

- Warner Bros.

- Western Digital

- Yahoo

- Yandex

- Zing Mobile

This list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

## INTERROGATORY NO. 15:

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to each Business Partner each month;

f) the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

g) any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15

## RESPONSE TO INTERROGATORY NO. 15 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)　　Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33.  Not only does the Interrogatory ask for separate information about "each" Business Partner identified in Facebook's answer to Interrogatory No. 14, *see, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009), the Interrogatory demands a list of 7 different types of information about each. Each of those inquiries is itself a subpart to be counted against the Interrogatory limit.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook.  Facebook will therefore treat Plaintiffs' inquiry into "each" Business Partner as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct*

*subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Although Facebook has provided a single table of data points relevant to each Integration Partner for ease of review, Facebook considers this Interrogatory to pose a separate Interrogatory about 67 different entities, and therefore the below Response to constitute at least 67 discrete Responses.

(B)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  The burdens of compiling such information outweigh the utility of the information.

(E)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business

70

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

Partners who were permitted to access information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years and then provide detailed historical information about each of those APIs and how they were utilized.

(F)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(G)     Facebook further objects to this Interrogatory on the ground that the Interrogatory seeks information not in Facebook's possession, custody, or control.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15**

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 78**:

With regard to the APIs Facebook's Integration Partners had access to, Facebook has provided a table below identifying, by Integration Partner, the APIs that may have allowed each Integration Partner to query (but would not have necessarily returned) endpoints associated with user's friends' data fields during the relevant time period, their associated apps, the date ranges during which they were active, and the data fields associated with the APIs they had access to. Note that the lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

However, it is important to note that the Integration Partner's—or any third party's—ability to query an API does not automatically translate into the ability to access or receive user data, as ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15

With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of API calls made, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request.  Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

## INTERROGATORY NO. 16:

For each Named Plaintiff, identify all Third Parties who had the ability to access such Named Plaintiff's Not Generally Available Content and Information by virtue of the fact that the Named Plaintiff was a Friend of an Installing User, the date and time of each request for such access, and the specific Content and Information that was accessed.

## RESPONSE TO INTERROGATORY NO. 16:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" of the 21 Named Plaintiffs. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory. During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but

instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently.  Not only does the Interrogatory embed subparts by asking for information about each of the 21 Named Plaintiffs, the Interrogatory contains multiple subparts describing the type of information demanded about each Named Plaintiff.  Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)      Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding third parties' access to data not at issue in this case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating third party access to data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook objects to this Interrogatory to the extent it seeks information regarding information provided to third parties through friend sharing related to users who joined Facebook in 2009 or later.  The Court held that users who joined Facebook in 2009 or later consented to friend sharing and therefore dismissed all claims related to friend sharing for such users.

(D)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(E)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome.  The Interrogatory seeks information about every third party that may have had access to any of Plaintiffs' data through friend sharing, which would require investigating the data received by potentially millions of apps over the course of eight years or more.  Further, friends of Plaintiffs are likely to have changed throughout that period, as are the applications that those friends installed, and the sharing permissions used by Plaintiffs.

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook first to conduct a broad investigation and analyze a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control to obtain information about every third party that may have had access to any of Plaintiffs' data through friend sharing.  This would require investigating the data received by potentially millions of apps over the course of

eight years or more, Plaintiffs' and their friends' settings during that time period, the applications

Plaintiffs' friends installed, and the sharing permissions used by Plaintiffs.

(G)     Facebook objects to the Interrogatory on the ground that it is overly broad and

unduly burdensome, as Plaintiffs have repeatedly indicated that they intend to voluntarily

dismiss 11 of the 21 Named Plaintiffs in order to, among other things, reduce the burden on

Facebook in producing discovery related to the Named Plaintiffs.  But Plaintiffs have not yet

stipulated to the dismissal of any Named Plaintiffs, so it is not clear which Named Plaintiffs

Plaintiffs are seeking discovery on.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless

made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing

nature of discovery in this action, Facebook responds as follows:

**Response No. 79**:

Facebook continues to investigate what, if any, information it can produce in response to

this request.

**INTERROGATORY NO. 17:**

For each Named Plaintiff, identify each Facebook Business Partner that had the ability to

access the Named Plaintiff's Not Generally Available Content and Information, even if the

259

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

Named Plaintiff had not downloaded an App from that Business Partner, the date and time of each request for such access, and the specific Content and Information that was accessed.

**RESPONSE TO INTERROGATORY NO. 17:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" of the 21 Named Plaintiffs.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently.  Not only does the Interrogatory embed subparts by asking for information about each of the 21 Named Plaintiffs, the Interrogatory

contains multiple subparts describing the type of information demanded about each Named

Plaintiff.  Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an

individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475

(N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different

products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits

[on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as

subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject

matter of this Action, and not proportional to the needs of the case, in that it seeks information

regarding third parties' access to data not at issue in this case.  Specifically, Facebook objects to

this Interrogatory to the extent it seeks information relating third party access to data unrelated to

application developers being granted access to "sensitive user information" via friend-sharing

between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the

sharing of "sensitive user information" with integration partners pursuant to "data reciprocity

agreements," and/or the misuse of "sensitive user information" disclosed in one of these three

manners as a result of Facebook's alleged failure to adopt effective policies or enforcement

procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF

No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s

Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that

"Facebook shared with or made accessible to third parties").

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Not

Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome.

Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(E)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome.  Specifically, the Interrogatory seeks information about every Business Partner that may have had access to any of Plaintiffs' data over a thirteen-year period.

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business Partners who were permitted to access information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years and then attempt to identify and provide detailed historical information about each piece of data those partners may have received.

(G)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome, as Plaintiffs have repeatedly indicated that they intend to voluntarily dismiss 11 of the 21 Named Plaintiffs in order to, among other things, reduce the burden on Facebook in producing discovery related to the Named Plaintiffs.  But Plaintiffs have not yet stipulated to the dismissal of any Named Plaintiffs, so it is not clear which Named Plaintiffs Plaintiffs are seeking discovery on.

(H)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of prior requests, including Interrogatory 14 and RFPs 12 and 24.

(I)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 80**:

Facebook continues to investigate what, if any, information it can produce in response to this request.

**INTERROGATORY NO. 18:**

Identify by Bates number every document You provided or made available to PwC related to any investigation, audit or assessment related to the subject matter of the Complaint.

**RESPONSE TO INTERROGATORY NO. 18:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory to the extent it seeks information equally available to Plaintiffs.  Plaintiffs are able to identify which produced documents reflect

communications with PwC relating to any investigation, audit, or assessment related to the subject matter of the Complaint.

(B)     Facebook objects to this Interrogatory on the ground that it seeks information having no relevance to the claims or defenses at issue.  There is no claim or defense at issue in the case that concerns which materials Facebook made available to PwC.

(C)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding materials made available to PwC having no bearing on the claims and defenses in the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to documents unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  In order to answer this Interrogatory, Facebook would need to collect all materials made available to PwC over a seven year period, then compare those materials to the 1.2 million pages produced in this action to date, identify on a

per-document basis which documents made available to PwC overlap with produced materials, and then create a list of the matching Bates numbers.  The burden of such an investigation far outweighs any potential utility it could serve.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 81**:

The parties have met and conferred extensively regarding Plaintiffs' repeated requests that Facebook produce or otherwise identify all documents that were provided to PwC in connection with its any investigations, audits, or assessments related to the subject matter of the Complaint.  As Facebook has explained, it does not have a central file or repository of documents that were provided to auditors or examiners from PwC, who were often on site at Facebook and meeting directly with Facebook personnel over the course of several years.  As a result, Facebook does not have an identifiable and complete set of materials that were provided to PwC or that PwC may have considered over the course of a decade.  Facebook already identified for Plaintiffs previously-produced documents that were referenced in PwC's Initial and Biennial Assessment Reports (on May 29, 2020) and previously-produced communications

265

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

between Facebook and PwC (on May 9, 2020), both of which Plaintiffs could have identified on their own.  It is unclear what additional information Plaintiffs seek through their request, which appears to be a make-work interrogatory, demanding that Facebook try to ascertain which documents in Facebook's productions were provided to PwC over the course of a decade (a fact that has absolutely no probative value here).

Facebook also notes that Plaintiffs have subpoenaed PwC directly, and (as Facebook understands) PwC has produced over 22,000 pages of documents to Plaintiffs, Bates numbered PwC_CPUP_FB00000001 - PwC_CPUP_FB00022281.  Facebook further directs Plaintiffs to that production.

Facebook sets forth below the previously-identified documents in Facebook's productions that include: (1) communications between Facebook and PwC and (ii) documents referenced by PwC in its Initial and Biennial Assessment Reports.

- FB-CA-MDL-00000001 - FB-CA-MDL-00000005
- FB-CA-MDL-00000006 - FB-CA-MDL-00000010
- FB-CA-MDL-00000011 - FB-CA-MDL-00000025
- FB-CA-MDL-00000094 - FB-CA-MDL-00000104
- FB-CA-MDL-00000105 - FB-CA-MDL-00000116
- FB-CA-MDL-00000117 - FB-CA-MDL-00000132
- FB-CA-MDL-00000133 - FB-CA-MDL-00000149
- FB-CA-MDL-00000179 - FB-CA-MDL-00000194
- FB-CA-MDL-00000195 - FB-CA-MDL-00000210
- FB-CA-MDL-00000211 - FB-CA-MDL-00000226
- FB-CA-MDL-00000292 - FB-CA-MDL-00000299

- FB-CA-MDL-00000300 - FB-CA-MDL-00000305

- FB-CA-MDL-00193055 - FB-CA-MDL-00193056

- FB-CA-MDL-00193058 -FB-CA-MDL-00193064

- FB-CA-MDL-00193071 - FB-CA-MDL-00193071

- FB-CA-MDL-00193087 - FB-CA-MDL-00193094

- FB-CA-MDL-00193096 - FB-CA-MDL-00193102

- FB-CA-MDL-00277488 - FB-CA-MDL-00277499

- FB-CA-MDL-00331537 - FB-CA-MDL-00331547

- FB-CA-MDL-1115879 - FB-CA-MDL-1115881

- FB-CA-MDL-00178297

- FB-CA-MDL-00178298

- FB-CA-MDL-00178386

- FB-CA-MDL-00178388

- FB-CA-MDL-00178431

- FB-CA-MDL-00178433

- FB-CA-MDL-00178434

- FB-CA-MDL-00178441

- FB-CA-MDL-00178443

- FB-CA-MDL-00178451

- FB-CA-MDL-00178452

- FB-CA-MDL-00178454

- FB-CA-MDL-00178455

- FB-CA-MDL-00178456

- FB-CA-MDL-00178457

- FB-CA-MDL-00178458

- FB-CA-MDL-00178459

- FB-CA-MDL-00178465

- FB-CA-MDL-00178468

- FB-CA-MDL-00178501

- FB-CA-MDL-00178506

- FB-CA-MDL-00178553

- FB-CA-MDL-00178556

- FB-CA-MDL-00178571

- FB-CA-MDL-00178572

- FB-CA-MDL-00179910

- FB-CA-MDL-00179912

- FB-CA-MDL-00180999

- FB-CA-MDL-00181000

- FB-CA-MDL-00185486

- FB-CA-MDL-00185487

- FB-CA-MDL-00185751

- FB-CA-MDL-00185753

- FB-CA-MDL-00185754

- FB-CA-MDL-00185784

- FB-CA-MDL-00185785

- FB-CA-MDL-00185801

- FB-CA-MDL-00185803

- FB-CA-MDL-00185811

- FB-CA-MDL-00185812

- FB-CA-MDL-00185900

- FB-CA-MDL-00185901

- FB-CA-MDL-00185934

- FB-CA-MDL-00185935

- FB-CA-MDL-00186056

- FB-CA-MDL-00186057

- FB-CA-MDL-00186091

- FB-CA-MDL-00186092

- FB-CA-MDL-00186115

- FB-CA-MDL-00186117

- FB-CA-MDL-00186119

- FB-CA-MDL-00186120

- FB-CA-MDL-00186121

- FB-CA-MDL-00186122

- FB-CA-MDL-00186145

- FB-CA-MDL-00186163

- FB-CA-MDL-00186165

- FB-CA-MDL-00186166

- FB-CA-MDL-00186172

- FB-CA-MDL-00186173

- FB-CA-MDL-00186665

- FB-CA-MDL-00186666

- FB-CA-MDL-00186667

- FB-CA-MDL-00186670

- FB-CA-MDL-00186671

- FB-CA-MDL-00186672

- FB-CA-MDL-00186962

- FB-CA-MDL-00186963

- FB-CA-MDL-00186964

- FB-CA-MDL-00186965

- FB-CA-MDL-00186966

- FB-CA-MDL-00186967

- FB-CA-MDL-00186968

- FB-CA-MDL-00187023

- FB-CA-MDL-00187024

- FB-CA-MDL-00187191

- FB-CA-MDL-00187192

- FB-CA-MDL-00187193

- FB-CA-MDL-00187194

- FB-CA-MDL-00187195

- FB-CA-MDL-00187196

- FB-CA-MDL-00187197

- FB-CA-MDL-00187202

- FB-CA-MDL-00187203
- FB-CA-MDL-00187362
- FB-CA-MDL-00187363
- FB-CA-MDL-00187727
- FB-CA-MDL-00187733
- FB-CA-MDL-00187734
- FB-CA-MDL-00187736
- FB-CA-MDL-00187737
- FB-CA-MDL-00187739
- FB-CA-MDL-00187742
- FB-CA-MDL-00187781
- FB-CA-MDL-00187782
- FB-CA-MDL-00187783
- FB-CA-MDL-00187784
- FB-CA-MDL-00187785
- FB-CA-MDL-00187786
- FB-CA-MDL-00187838
- FB-CA-MDL-00187840
- FB-CA-MDL-00187864
- FB-CA-MDL-00187865
- FB-CA-MDL-00187866
- FB-CA-MDL-00187867
- FB-CA-MDL-00187868

- FB-CA-MDL-00187869
- FB-CA-MDL-00187870
- FB-CA-MDL-00187871
- FB-CA-MDL-00187872
- FB-CA-MDL-00187873
- FB-CA-MDL-00187874
- FB-CA-MDL-00187875
- FB-CA-MDL-00187921
- FB-CA-MDL-00187922
- FB-CA-MDL-00188005
- FB-CA-MDL-00188006
- FB-CA-MDL-00188007
- FB-CA-MDL-00188008
- FB-CA-MDL-00188009
- FB-CA-MDL-00188010
- FB-CA-MDL-00188011
- FB-CA-MDL-00188012
- FB-CA-MDL-00188014
- FB-CA-MDL-00188133
- FB-CA-MDL-00188135
- FB-CA-MDL-00188217
- FB-CA-MDL-00188218
- FB-CA-MDL-00188219

- FB-CA-MDL-00188220

- FB-CA-MDL-00188221

- FB-CA-MDL-00188222

- FB-CA-MDL-00188223

- FB-CA-MDL-00188224

- FB-CA-MDL-00188606

- FB-CA-MDL-00188721

- FB-CA-MDL-00188723

- FB-CA-MDL-00188790

- FB-CA-MDL-00188791

- FB-CA-MDL-00188792

- FB-CA-MDL-00188793

- FB-CA-MDL-00188794

- FB-CA-MDL-00188795

- FB-CA-MDL-00188796

- FB-CA-MDL-00188797

- FB-CA-MDL-00188798

- FB-CA-MDL-00188799

- FB-CA-MDL-00188800

- FB-CA-MDL-00188803

- FB-CA-MDL-00188872

- FB-CA-MDL-00188873

- FB-CA-MDL-00188874

- FB-CA-MDL-00188875

- FB-CA-MDL-00188876

- FB-CA-MDL-00188877

- FB-CA-MDL-00188878

- FB-CA-MDL-00188879

- FB-CA-MDL-00188880

- FB-CA-MDL-00188881

- FB-CA-MDL-00188882

- FB-CA-MDL-00188886

- FB-CA-MDL-00188956

- FB-CA-MDL-00188957

- FB-CA-MDL-00188958

- FB-CA-MDL-00188959

- FB-CA-MDL-00188960

- FB-CA-MDL-00188961

- FB-CA-MDL-00188962

- FB-CA-MDL-00188963

- FB-CA-MDL-00188964

- FB-CA-MDL-00188965

- FB-CA-MDL-00188976

- FB-CA-MDL-00188979

- FB-CA-MDL-00189051

- FB-CA-MDL-00189052

- FB-CA-MDL-00189053

- FB-CA-MDL-00189054

- FB-CA-MDL-00189055

- FB-CA-MDL-00189056

- FB-CA-MDL-00189057

- FB-CA-MDL-00189058

- FB-CA-MDL-00189059

- FB-CA-MDL-00189060

- FB-CA-MDL-00189351

- FB-CA-MDL-00189352

- FB-CA-MDL-00189430

- FB-CA-MDL-00189431

- FB-CA-MDL-00189432

- FB-CA-MDL-00189433

- FB-CA-MDL-00189434

- FB-CA-MDL-00189435

- FB-CA-MDL-00189436

- FB-CA-MDL-00189437

- FB-CA-MDL-00189438

- FB-CA-MDL-00189439

- FB-CA-MDL-00189452

- FB-CA-MDL-00189453

- FB-CA-MDL-00189516

- FB-CA-MDL-00189517

- FB-CA-MDL-00189518

- FB-CA-MDL-00189519

- FB-CA-MDL-00189574

- FB-CA-MDL-00189581

- FB-CA-MDL-00189598

- FB-CA-MDL-00189599

- FB-CA-MDL-00189678

- FB-CA-MDL-00189679

- FB-CA-MDL-00189680

- FB-CA-MDL-00189681

- FB-CA-MDL-00189682

- FB-CA-MDL-00189683

- FB-CA-MDL-00189684

- FB-CA-MDL-00189685

- FB-CA-MDL-00189686

- FB-CA-MDL-00189687

- FB-CA-MDL-00189688

- FB-CA-MDL-00189689

- FB-CA-MDL-00189690

- FB-CA-MDL-00189782

- FB-CA-MDL-00189784

- FB-CA-MDL-00191099

- FB-CA-MDL-00191101
- FB-CA-MDL-00191103
- FB-CA-MDL-00191104
- FB-CA-MDL-00191105
- FB-CA-MDL-00191106
- FB-CA-MDL-00191120
- FB-CA-MDL-00191121
- FB-CA-MDL-00191122
- FB-CA-MDL-00191123
- FB-CA-MDL-00191125
- FB-CA-MDL-00191127
- FB-CA-MDL-00191128
- FB-CA-MDL-00191129
- FB-CA-MDL-00191130
- FB-CA-MDL-00191144
- FB-CA-MDL-00191145
- FB-CA-MDL-00191146
- FB-CA-MDL-00191283
- FB-CA-MDL-00191285
- FB-CA-MDL-00191287
- FB-CA-MDL-00191288
- FB-CA-MDL-00191289
- FB-CA-MDL-00191290

- FB-CA-MDL-00191304

- FB-CA-MDL-00191305

- FB-CA-MDL-00191306

- FB-CA-MDL-00191428

- FB-CA-MDL-00191429

- FB-CA-MDL-00191798

- FB-CA-MDL-00191800

- FB-CA-MDL-00191801

- FB-CA-MDL-00191802

- FB-CA-MDL-00192001

- FB-CA-MDL-00192002

- FB-CA-MDL-00192004

- FB-CA-MDL-00192005

- FB-CA-MDL-00192006

- FB-CA-MDL-00192015

- FB-CA-MDL-00192029

- FB-CA-MDL-00192030

- FB-CA-MDL-00192031

- FB-CA-MDL-00192032

- FB-CA-MDL-00192034

- FB-CA-MDL-00192035

- FB-CA-MDL-00192036

- FB-CA-MDL-00192038

- FB-CA-MDL-00192039
- FB-CA-MDL-00192040
- FB-CA-MDL-00192043
- FB-CA-MDL-00192044
- FB-CA-MDL-00192045
- FB-CA-MDL-00192049
- FB-CA-MDL-00192050
- FB-CA-MDL-00192052
- FB-CA-MDL-00192053
- FB-CA-MDL-00192054
- FB-CA-MDL-00192063
- FB-CA-MDL-00192077
- FB-CA-MDL-00192078
- FB-CA-MDL-00192079
- FB-CA-MDL-00192080
- FB-CA-MDL-00192082
- FB-CA-MDL-00192083
- FB-CA-MDL-00192084
- FB-CA-MDL-00192086
- FB-CA-MDL-00192087
- FB-CA-MDL-00192088
- FB-CA-MDL-00192091
- FB-CA-MDL-00192092

- FB-CA-MDL-00192093

- FB-CA-MDL-00192097

- FB-CA-MDL-00192098

- FB-CA-MDL-00192100

- FB-CA-MDL-00192101

- FB-CA-MDL-00192102

- FB-CA-MDL-00192111

- FB-CA-MDL-00192125

- FB-CA-MDL-00192126

- FB-CA-MDL-00192127

- FB-CA-MDL-00192128

- FB-CA-MDL-00192130

- FB-CA-MDL-00192131

- FB-CA-MDL-00192132

- FB-CA-MDL-00192134

- FB-CA-MDL-00192135

- FB-CA-MDL-00192136

- FB-CA-MDL-00192139

- FB-CA-MDL-00192140

- FB-CA-MDL-00192141

- FB-CA-MDL-00192948

- FB-CA-MDL-00192949

- FB-CA-MDL-00192955

- FB-CA-MDL-00192956

- FB-CA-MDL-00197086

- FB-CA-MDL-00197087

- FB-CA-MDL-00197177

- FB-CA-MDL-00197178

- FB-CA-MDL-00197986

- FB-CA-MDL-00197987

- FB-CA-MDL-00198205

- FB-CA-MDL-00198206

- FB-CA-MDL-00198514

- FB-CA-MDL-00198515

- FB-CA-MDL-00200227

- FB-CA-MDL-00200228

- FB-CA-MDL-00200894

- FB-CA-MDL-00200895

- FB-CA-MDL-00201542

- FB-CA-MDL-00201543

- FB-CA-MDL-00201551

- FB-CA-MDL-00201649

- FB-CA-MDL-00201651

- FB-CA-MDL-00201652

- FB-CA-MDL-00201654

- FB-CA-MDL-00201655

281

- FB-CA-MDL-00201656

- FB-CA-MDL-00201657

- FB-CA-MDL-00201660

- FB-CA-MDL-00201661

- FB-CA-MDL-00201662

- FB-CA-MDL-00201663

- FB-CA-MDL-00201664

- FB-CA-MDL-00201665

- FB-CA-MDL-00201666

- FB-CA-MDL-00201667

- FB-CA-MDL-00201668

- FB-CA-MDL-00201669

- FB-CA-MDL-00201670

- FB-CA-MDL-00201673

- FB-CA-MDL-00201674

- FB-CA-MDL-00201675

- FB-CA-MDL-00201676

- FB-CA-MDL-00201677

- FB-CA-MDL-00201678

- FB-CA-MDL-00201679

- FB-CA-MDL-00201680

- FB-CA-MDL-00201681

- FB-CA-MDL-00201682

- FB-CA-MDL-00201683

- FB-CA-MDL-00201684

- FB-CA-MDL-00201685

- FB-CA-MDL-00201686

- FB-CA-MDL-00201687

- FB-CA-MDL-00201688

- FB-CA-MDL-00201689

- FB-CA-MDL-00201690

- FB-CA-MDL-00201691

- FB-CA-MDL-00201692

- FB-CA-MDL-00201693

- FB-CA-MDL-00201694

- FB-CA-MDL-00201695

- FB-CA-MDL-00201696

- FB-CA-MDL-00201697

- FB-CA-MDL-00201698

- FB-CA-MDL-00201699

- FB-CA-MDL-00201700

- FB-CA-MDL-00201703

- FB-CA-MDL-00201704

- FB-CA-MDL-00201705

- FB-CA-MDL-00201706

- FB-CA-MDL-00201707

- FB-CA-MDL-00201708

- FB-CA-MDL-00201709

- FB-CA-MDL-00201710

- FB-CA-MDL-00201711

- FB-CA-MDL-00201712

- FB-CA-MDL-00201713

- FB-CA-MDL-00201714

- FB-CA-MDL-00201715

- FB-CA-MDL-00201716

- FB-CA-MDL-00201728

- FB-CA-MDL-00201731

- FB-CA-MDL-00201733

- FB-CA-MDL-00201734

- FB-CA-MDL-00201735

- FB-CA-MDL-00201736

- FB-CA-MDL-00201739

- FB-CA-MDL-00201740

- FB-CA-MDL-00201741

- FB-CA-MDL-00201742

- FB-CA-MDL-00201745

- FB-CA-MDL-00201746

- FB-CA-MDL-00201747

- FB-CA-MDL-00201748

- FB-CA-MDL-00201751

- FB-CA-MDL-00201752

- FB-CA-MDL-00201753

- FB-CA-MDL-00201754

- FB-CA-MDL-00201755

- FB-CA-MDL-00201756

- FB-CA-MDL-00201757

- FB-CA-MDL-00201758

- FB-CA-MDL-00201759

- FB-CA-MDL-00201760

- FB-CA-MDL-00201761

- FB-CA-MDL-00201762

- FB-CA-MDL-00201763

- FB-CA-MDL-00201764

- FB-CA-MDL-00201765

- FB-CA-MDL-00201766

- FB-CA-MDL-00201767

- FB-CA-MDL-00201768

- FB-CA-MDL-00201769

- FB-CA-MDL-00201772

- FB-CA-MDL-00201773

- FB-CA-MDL-00201774

- FB-CA-MDL-00201775

- FB-CA-MDL-00201776

- FB-CA-MDL-00201777

- FB-CA-MDL-00201778

- FB-CA-MDL-00201779

- FB-CA-MDL-00201780

- FB-CA-MDL-00201781

- FB-CA-MDL-00201782

- FB-CA-MDL-00201783

- FB-CA-MDL-00201784

- FB-CA-MDL-00201785

- FB-CA-MDL-00201786

- FB-CA-MDL-00201787

- FB-CA-MDL-00201788

- FB-CA-MDL-00201789

- FB-CA-MDL-00201790

- FB-CA-MDL-00201791

- FB-CA-MDL-00201792

- FB-CA-MDL-00201793

- FB-CA-MDL-00201794

- FB-CA-MDL-00201795

- FB-CA-MDL-00201796

- FB-CA-MDL-00201797

- FB-CA-MDL-00201798

- FB-CA-MDL-00201799

- FB-CA-MDL-00201800

- FB-CA-MDL-00201801

- FB-CA-MDL-00201802

- FB-CA-MDL-00201803

- FB-CA-MDL-00201804

- FB-CA-MDL-00201805

- FB-CA-MDL-00201806

- FB-CA-MDL-00201809

- FB-CA-MDL-00201810

- FB-CA-MDL-00201811

- FB-CA-MDL-00201812

- FB-CA-MDL-00201813

- FB-CA-MDL-00201814

- FB-CA-MDL-00201815

- FB-CA-MDL-00201816

- FB-CA-MDL-00201817

- FB-CA-MDL-00201818

- FB-CA-MDL-00201819

- FB-CA-MDL-00201820

- FB-CA-MDL-00201821

- FB-CA-MDL-00201822

- FB-CA-MDL-00201823

- FB-CA-MDL-00201824

- FB-CA-MDL-00201825

- FB-CA-MDL-00201826

- FB-CA-MDL-00201827

- FB-CA-MDL-00202077

- FB-CA-MDL-00202079

- FB-CA-MDL-00202329

- FB-CA-MDL-00202332

- FB-CA-MDL-00203260

- FB-CA-MDL-00203261

- FB-CA-MDL-00203911

- FB-CA-MDL-00203912

- FB-CA-MDL-00203913

- FB-CA-MDL-00203914

- FB-CA-MDL-00203959

- FB-CA-MDL-00203960

- FB-CA-MDL-00204978

- FB-CA-MDL-00204979

- FB-CA-MDL-00217161

- FB-CA-MDL-00217163

- FB-CA-MDL-00217594

- FB-CA-MDL-00217598

- FB-CA-MDL-00217599

- FB-CA-MDL-00217603

- FB-CA-MDL-00217748

- FB-CA-MDL-00217749

- FB-CA-MDL-00218605

- FB-CA-MDL-00218607

- FB-CA-MDL-00218608

- FB-CA-MDL-00218610

- FB-CA-MDL-00219178

- FB-CA-MDL-00219187

- FB-CA-MDL-00219196

- FB-CA-MDL-00220111

- FB-CA-MDL-00220112

- FB-CA-MDL-00220114

- FB-CA-MDL-00220117

- FB-CA-MDL-00220139

- FB-CA-MDL-00220142

- FB-CA-MDL-00220157

- FB-CA-MDL-00220158

- FB-CA-MDL-00220203

- FB-CA-MDL-00220205

- FB-CA-MDL-00220233

- FB-CA-MDL-00220234

- FB-CA-MDL-00220423

- FB-CA-MDL-00220424
- FB-CA-MDL-00220425
- FB-CA-MDL-00220426
- FB-CA-MDL-00220427
- FB-CA-MDL-00220428
- FB-CA-MDL-00220429
- FB-CA-MDL-00220582
- FB-CA-MDL-00220583
- FB-CA-MDL-00220644
- FB-CA-MDL-00220645
- FB-CA-MDL-00220646
- FB-CA-MDL-00220648
- FB-CA-MDL-00220812
- FB-CA-MDL-00220813
- FB-CA-MDL-00220814
- FB-CA-MDL-00220882
- FB-CA-MDL-00220883
- FB-CA-MDL-00220962
- FB-CA-MDL-00220963
- FB-CA-MDL-00220964
- FB-CA-MDL-00220965
- FB-CA-MDL-00220966
- FB-CA-MDL-00220967

- FB-CA-MDL-00220968

- FB-CA-MDL-00220969

- FB-CA-MDL-00220970

- FB-CA-MDL-00220971

- FB-CA-MDL-00220972

- FB-CA-MDL-00220973

- FB-CA-MDL-00220974

- FB-CA-MDL-00220975

- FB-CA-MDL-00220980

- FB-CA-MDL-00220981

- FB-CA-MDL-00220982

- FB-CA-MDL-00220984

- FB-CA-MDL-00220985

- FB-CA-MDL-00220986

- FB-CA-MDL-00220987

- FB-CA-MDL-00221066

- FB-CA-MDL-00221067

- FB-CA-MDL-00221068

- FB-CA-MDL-00221069

- FB-CA-MDL-00221070

- FB-CA-MDL-00221071

- FB-CA-MDL-00221072

- FB-CA-MDL-00221073

- FB-CA-MDL-00221074

- FB-CA-MDL-00221075

- FB-CA-MDL-00221076

- FB-CA-MDL-00221077

- FB-CA-MDL-00221078

- FB-CA-MDL-00221079

- FB-CA-MDL-00221084

- FB-CA-MDL-00221085

- FB-CA-MDL-00221086

- FB-CA-MDL-00221087

- FB-CA-MDL-00221166

- FB-CA-MDL-00221167

- FB-CA-MDL-00221168

- FB-CA-MDL-00221169

- FB-CA-MDL-00221170

- FB-CA-MDL-00221171

- FB-CA-MDL-00221172

- FB-CA-MDL-00221173

- FB-CA-MDL-00221174

- FB-CA-MDL-00221175

- FB-CA-MDL-00221176

- FB-CA-MDL-00221177

- FB-CA-MDL-00221178

- FB-CA-MDL-00221179

- FB-CA-MDL-00221180

- FB-CA-MDL-00221259

- FB-CA-MDL-00221260

- FB-CA-MDL-00221261

- FB-CA-MDL-00221262

- FB-CA-MDL-00221263

- FB-CA-MDL-00221264

- FB-CA-MDL-00221265

- FB-CA-MDL-00221266

- FB-CA-MDL-00221267

- FB-CA-MDL-00221268

- FB-CA-MDL-00221269

- FB-CA-MDL-00221270

- FB-CA-MDL-00221271

- FB-CA-MDL-00221272

- FB-CA-MDL-00221277

- FB-CA-MDL-00221278

- FB-CA-MDL-00221279

- FB-CA-MDL-00221280

- FB-CA-MDL-00221359

- FB-CA-MDL-00221360

- FB-CA-MDL-00221361

- FB-CA-MDL-00221362
- FB-CA-MDL-00221363
- FB-CA-MDL-00221364
- FB-CA-MDL-00221365
- FB-CA-MDL-00221366
- FB-CA-MDL-00221367
- FB-CA-MDL-00221368
- FB-CA-MDL-00221369
- FB-CA-MDL-00221370
- FB-CA-MDL-00221371
- FB-CA-MDL-00221378
- FB-CA-MDL-00221379
- FB-CA-MDL-00221381
- FB-CA-MDL-00221386
- FB-CA-MDL-00221387
- FB-CA-MDL-00221388
- FB-CA-MDL-00221389
- FB-CA-MDL-00222208
- FB-CA-MDL-00222209
- FB-CA-MDL-00222220
- FB-CA-MDL-00222221
- FB-CA-MDL-00222222
- FB-CA-MDL-00222233

- FB-CA-MDL-00222234

- FB-CA-MDL-00222235

- FB-CA-MDL-00222246

- FB-CA-MDL-00225931

- FB-CA-MDL-00225932

- FB-CA-MDL-00225935

- FB-CA-MDL-00225936

- FB-CA-MDL-00225939

- FB-CA-MDL-00225940

- FB-CA-MDL-00225943

- FB-CA-MDL-00225944

- FB-CA-MDL-00226198

- FB-CA-MDL-00226201

- FB-CA-MDL-00226217

- FB-CA-MDL-00226227

- FB-CA-MDL-00226231

- FB-CA-MDL-00226236

- FB-CA-MDL-00226310

- FB-CA-MDL-00226313

- FB-CA-MDL-00226314

- FB-CA-MDL-00226315

- FB-CA-MDL-00226318

- FB-CA-MDL-00226321

- FB-CA-MDL-00226323

- FB-CA-MDL-00226326

- FB-CA-MDL-00226329

- FB-CA-MDL-00226401

- FB-CA-MDL-00226414

- FB-CA-MDL-00226415

- FB-CA-MDL-00226483

- FB-CA-MDL-00226489

- FB-CA-MDL-00226501

- FB-CA-MDL-00226507

- FB-CA-MDL-00226515

- FB-CA-MDL-00226523

- FB-CA-MDL-00226531

- FB-CA-MDL-00226532

- FB-CA-MDL-00226540

- FB-CA-MDL-00226541

- FB-CA-MDL-00226549

- FB-CA-MDL-00226557

- FB-CA-MDL-00226564

- FB-CA-MDL-00226571

- FB-CA-MDL-00226578

- FB-CA-MDL-00226586

- FB-CA-MDL-00227414

- FB-CA-MDL-00227418

- FB-CA-MDL-00227460

- FB-CA-MDL-00227464

- FB-CA-MDL-00227469

- FB-CA-MDL-00227473

- FB-CA-MDL-00227824

- FB-CA-MDL-00227993

- FB-CA-MDL-00227994

- FB-CA-MDL-00228008

- FB-CA-MDL-00228270

- FB-CA-MDL-00228271

- FB-CA-MDL-00228272

- FB-CA-MDL-00228273

- FB-CA-MDL-00228274

- FB-CA-MDL-00228287

- FB-CA-MDL-00228289

- FB-CA-MDL-00228301

- FB-CA-MDL-00228302

- FB-CA-MDL-00228310

- FB-CA-MDL-00228311

- FB-CA-MDL-00228312

- FB-CA-MDL-00228313

- FB-CA-MDL-00228351

- FB-CA-MDL-00228352

- FB-CA-MDL-00228355

- FB-CA-MDL-00228357

- FB-CA-MDL-00228360

- FB-CA-MDL-00228364

- FB-CA-MDL-00228368

- FB-CA-MDL-00228373

- FB-CA-MDL-00228385

- FB-CA-MDL-00228397

- FB-CA-MDL-00228411

- FB-CA-MDL-00228423

- FB-CA-MDL-00228435

- FB-CA-MDL-00228447

- FB-CA-MDL-00228461

- FB-CA-MDL-00228486

- FB-CA-MDL-00228500

- FB-CA-MDL-00229204

- FB-CA-MDL-00229206

- FB-CA-MDL-00229207

- FB-CA-MDL-00229208

- FB-CA-MDL-00229209

- FB-CA-MDL-00229216

- FB-CA-MDL-00229217

- FB-CA-MDL-00229218
- FB-CA-MDL-00229219
- FB-CA-MDL-00229220
- FB-CA-MDL-00229249
- FB-CA-MDL-00229251
- FB-CA-MDL-00229252
- FB-CA-MDL-00229253
- FB-CA-MDL-00229254
- FB-CA-MDL-00229261
- FB-CA-MDL-00229264
- FB-CA-MDL-00229265
- FB-CA-MDL-00229266
- FB-CA-MDL-00229368
- FB-CA-MDL-00229371
- FB-CA-MDL-00229372
- FB-CA-MDL-00229373
- FB-CA-MDL-00229387
- FB-CA-MDL-00229389
- FB-CA-MDL-00229390
- FB-CA-MDL-00229391
- FB-CA-MDL-00229392
- FB-CA-MDL-00229393
- FB-CA-MDL-00229394

- FB-CA-MDL-00229395

- FB-CA-MDL-00229398

- FB-CA-MDL-00229399

- FB-CA-MDL-00229400

- FB-CA-MDL-00229401

- FB-CA-MDL-00229402

- FB-CA-MDL-00229403

- FB-CA-MDL-00229404

- FB-CA-MDL-00229407

- FB-CA-MDL-00229408

- FB-CA-MDL-00229409

- FB-CA-MDL-00229410

- FB-CA-MDL-00229411

- FB-CA-MDL-00229412

- FB-CA-MDL-00229413

- FB-CA-MDL-00229416

- FB-CA-MDL-00229417

- FB-CA-MDL-00229418

- FB-CA-MDL-00229419

- FB-CA-MDL-00229420

- FB-CA-MDL-00229421

- FB-CA-MDL-00229422

- FB-CA-MDL-00229423

- FB-CA-MDL-00229424

- FB-CA-MDL-00229425

- FB-CA-MDL-00229426

- FB-CA-MDL-00229427

- FB-CA-MDL-00229428

- FB-CA-MDL-00229429

- FB-CA-MDL-00229430

- FB-CA-MDL-00229431

- FB-CA-MDL-00229432

- FB-CA-MDL-00229433

- FB-CA-MDL-00229434

- FB-CA-MDL-00229435

- FB-CA-MDL-00229553

- FB-CA-MDL-00229557

- FB-CA-MDL-00229558

- FB-CA-MDL-00229559

- FB-CA-MDL-00229560

- FB-CA-MDL-00229561

- FB-CA-MDL-00229562

- FB-CA-MDL-00229563

- FB-CA-MDL-00229564

- FB-CA-MDL-00229565

- FB-CA-MDL-00229566

- FB-CA-MDL-00229567

- FB-CA-MDL-00229568

- FB-CA-MDL-00229572

- FB-CA-MDL-00229586

- FB-CA-MDL-00229587

- FB-CA-MDL-00229588

- FB-CA-MDL-00229589

- FB-CA-MDL-00229590

- FB-CA-MDL-00229667

- FB-CA-MDL-00229668

- FB-CA-MDL-00229729

- FB-CA-MDL-00229730

- FB-CA-MDL-00229731

- FB-CA-MDL-00229733

- FB-CA-MDL-00229734

- FB-CA-MDL-00229736

- FB-CA-MDL-00229737

- FB-CA-MDL-00229739

- FB-CA-MDL-00229934

- FB-CA-MDL-00229935

- FB-CA-MDL-00229936

- FB-CA-MDL-00229938

- FB-CA-MDL-00229982

- FB-CA-MDL-00229983

- FB-CA-MDL-00229990

- FB-CA-MDL-00229992

- FB-CA-MDL-00229993

- FB-CA-MDL-00230037

- FB-CA-MDL-00230039

- FB-CA-MDL-00230140

- FB-CA-MDL-00230143

- FB-CA-MDL-00230144

- FB-CA-MDL-00230147

- FB-CA-MDL-00230148

- FB-CA-MDL-00230153

- FB-CA-MDL-00230637

- FB-CA-MDL-00230638

- FB-CA-MDL-00230640

- FB-CA-MDL-00230754

- FB-CA-MDL-00230755

- FB-CA-MDL-00230815

- FB-CA-MDL-00230816

- FB-CA-MDL-00230817

- FB-CA-MDL-00230818

- FB-CA-MDL-00230819

- FB-CA-MDL-00230820

- FB-CA-MDL-00230821

- FB-CA-MDL-00230822

- FB-CA-MDL-00230823

- FB-CA-MDL-00230824

- FB-CA-MDL-00232464

- FB-CA-MDL-00232465

- FB-CA-MDL-00232530

- FB-CA-MDL-00232531

- FB-CA-MDL-00232532

- FB-CA-MDL-00232533

- FB-CA-MDL-00232534

- FB-CA-MDL-00232535

- FB-CA-MDL-00232536

- FB-CA-MDL-00232537

- FB-CA-MDL-00232538

- FB-CA-MDL-00232539

- FB-CA-MDL-00232540

- FB-CA-MDL-00232543

- FB-CA-MDL-00232544

- FB-CA-MDL-00232547

- FB-CA-MDL-00232548

- FB-CA-MDL-00232550

- FB-CA-MDL-00232615

- FB-CA-MDL-00232616

- FB-CA-MDL-00232617

- FB-CA-MDL-00232618

- FB-CA-MDL-00232619

- FB-CA-MDL-00232620

- FB-CA-MDL-00232621

- FB-CA-MDL-00232622

- FB-CA-MDL-00232623

- FB-CA-MDL-00232624

- FB-CA-MDL-00232625

- FB-CA-MDL-00232760

- FB-CA-MDL-00232762

- FB-CA-MDL-00232823

- FB-CA-MDL-00232824

- FB-CA-MDL-00232825

- FB-CA-MDL-00232826

- FB-CA-MDL-00232827

- FB-CA-MDL-00232828

- FB-CA-MDL-00232829

- FB-CA-MDL-00232830

- FB-CA-MDL-00232831

- FB-CA-MDL-00232832

- FB-CA-MDL-00232833

- FB-CA-MDL-00232834

- FB-CA-MDL-00232896

- FB-CA-MDL-00232897

- FB-CA-MDL-00232898

- FB-CA-MDL-00232899

- FB-CA-MDL-00232900

- FB-CA-MDL-00232901

- FB-CA-MDL-00232902

- FB-CA-MDL-00232903

- FB-CA-MDL-00232904

- FB-CA-MDL-00232905

- FB-CA-MDL-00232906

- FB-CA-MDL-00232909

- FB-CA-MDL-00232913

- FB-CA-MDL-00232974

- FB-CA-MDL-00232975

- FB-CA-MDL-00232976

- FB-CA-MDL-00232977

- FB-CA-MDL-00232978

- FB-CA-MDL-00232979

- FB-CA-MDL-00232980

- FB-CA-MDL-00232981

- FB-CA-MDL-00232982

- FB-CA-MDL-00232983

- FB-CA-MDL-00232984

- FB-CA-MDL-00232985

- FB-CA-MDL-00232989

- FB-CA-MDL-00232992

- FB-CA-MDL-00232993

- FB-CA-MDL-00232994

- FB-CA-MDL-00232996

- FB-CA-MDL-00232997

- FB-CA-MDL-00233058

- FB-CA-MDL-00233059

- FB-CA-MDL-00233060

- FB-CA-MDL-00233061

- FB-CA-MDL-00233062

- FB-CA-MDL-00233063

- FB-CA-MDL-00233064

- FB-CA-MDL-00233065

- FB-CA-MDL-00233066

- FB-CA-MDL-00233067

- FB-CA-MDL-00233068

- FB-CA-MDL-00233090

- FB-CA-MDL-00233091

- FB-CA-MDL-00233152

- FB-CA-MDL-00233153

- FB-CA-MDL-00233214

- FB-CA-MDL-00233215

- FB-CA-MDL-00233351

- FB-CA-MDL-00233353

- FB-CA-MDL-00233414

- FB-CA-MDL-00233415

- FB-CA-MDL-00233416

- FB-CA-MDL-00233417

- FB-CA-MDL-00233418

- FB-CA-MDL-00233419

- FB-CA-MDL-00233420

- FB-CA-MDL-00233421

- FB-CA-MDL-00233422

- FB-CA-MDL-00233423

- FB-CA-MDL-00233424

- FB-CA-MDL-00233425

- FB-CA-MDL-00242983

- FB-CA-MDL-00242984

- FB-CA-MDL-00242986

- FB-CA-MDL-00242987

- FB-CA-MDL-00242988

- FB-CA-MDL-00242991

- FB-CA-MDL-00243050
- FB-CA-MDL-00243068
- FB-CA-MDL-00243300
- FB-CA-MDL-00243302
- FB-CA-MDL-00243304
- FB-CA-MDL-00243673
- FB-CA-MDL-00243674
- FB-CA-MDL-00243930
- FB-CA-MDL-00243932
- FB-CA-MDL-00243933
- FB-CA-MDL-00243954
- FB-CA-MDL-00243980
- FB-CA-MDL-00243983
- FB-CA-MDL-00244103
- FB-CA-MDL-00244106
- FB-CA-MDL-00244109
- FB-CA-MDL-00244132
- FB-CA-MDL-00244135
- FB-CA-MDL-00244139
- FB-CA-MDL-00244143
- FB-CA-MDL-00244147
- FB-CA-MDL-00244151
- FB-CA-MDL-00244155

- FB-CA-MDL-00245666

- FB-CA-MDL-00245667

- FB-CA-MDL-00250414

- FB-CA-MDL-00250418

- FB-CA-MDL-00250419

- FB-CA-MDL-00250420

- FB-CA-MDL-00250421

- FB-CA-MDL-00250422

- FB-CA-MDL-00250427

- FB-CA-MDL-00250428

- FB-CA-MDL-00250429

- FB-CA-MDL-00250434

- FB-CA-MDL-00250435

- FB-CA-MDL-00250436

- FB-CA-MDL-00250441

- FB-CA-MDL-00250442

- FB-CA-MDL-00250443

- FB-CA-MDL-00250448

- FB-CA-MDL-00250449

- FB-CA-MDL-00250450

- FB-CA-MDL-00250455

- FB-CA-MDL-00250456

- FB-CA-MDL-00250791

- FB-CA-MDL-00250792

- FB-CA-MDL-00251302

- FB-CA-MDL-00251305

- FB-CA-MDL-00251462

- FB-CA-MDL-00252149

- FB-CA-MDL-00252153

- FB-CA-MDL-00252157

- FB-CA-MDL-00252162

- FB-CA-MDL-00252170

- FB-CA-MDL-00252175

- FB-CA-MDL-00252181

- FB-CA-MDL-00252187

- FB-CA-MDL-00252224

- FB-CA-MDL-00252231

- FB-CA-MDL-00252236

- FB-CA-MDL-00252241

- FB-CA-MDL-00252246

- FB-CA-MDL-00252386

- FB-CA-MDL-00252387

- FB-CA-MDL-00252399

- FB-CA-MDL-00252440

- FB-CA-MDL-00252454

- FB-CA-MDL-00252460

- FB-CA-MDL-00252467

- FB-CA-MDL-00252474

- FB-CA-MDL-00252494

- FB-CA-MDL-00252495

- FB-CA-MDL-00252550

- FB-CA-MDL-00252635

- FB-CA-MDL-00252636

- FB-CA-MDL-00252637

- FB-CA-MDL-00252638

- FB-CA-MDL-00252639

- FB-CA-MDL-00252641

- FB-CA-MDL-00252643

- FB-CA-MDL-00252656

- FB-CA-MDL-00252658

- FB-CA-MDL-00252672

- FB-CA-MDL-00252899

- FB-CA-MDL-00252901

- FB-CA-MDL-00252902

- FB-CA-MDL-00252904

- FB-CA-MDL-00252906

- FB-CA-MDL-00252933

- FB-CA-MDL-00252935

- FB-CA-MDL-00252936

- FB-CA-MDL-00252937
- FB-CA-MDL-00252938
- FB-CA-MDL-00252939
- FB-CA-MDL-00252940
- FB-CA-MDL-00252941
- FB-CA-MDL-00252942
- FB-CA-MDL-00252944
- FB-CA-MDL-00252946
- FB-CA-MDL-00252947
- FB-CA-MDL-00252985
- FB-CA-MDL-00252987
- FB-CA-MDL-00252991
- FB-CA-MDL-00253027
- FB-CA-MDL-00253029
- FB-CA-MDL-00253042
- FB-CA-MDL-00253045
- FB-CA-MDL-00253048
- FB-CA-MDL-00253051
- FB-CA-MDL-00253055
- FB-CA-MDL-00253059
- FB-CA-MDL-00253064
- FB-CA-MDL-00253069
- FB-CA-MDL-00253076

- FB-CA-MDL-00253078

- FB-CA-MDL-00253089

- FB-CA-MDL-00253091

- FB-CA-MDL-00253171

- FB-CA-MDL-00253173

- FB-CA-MDL-00253176

- FB-CA-MDL-00253177

- FB-CA-MDL-00253178

- FB-CA-MDL-00253179

- FB-CA-MDL-00253180

- FB-CA-MDL-00253181

- FB-CA-MDL-00253182

- FB-CA-MDL-00253183

- FB-CA-MDL-00253184

- FB-CA-MDL-00253185

- FB-CA-MDL-00253186

- FB-CA-MDL-00253187

- FB-CA-MDL-00253188

- FB-CA-MDL-00253189

- FB-CA-MDL-00253190

- FB-CA-MDL-00253191

- FB-CA-MDL-00253193

- FB-CA-MDL-00253194

- FB-CA-MDL-00253212

- FB-CA-MDL-00253214

- FB-CA-MDL-00253217

- FB-CA-MDL-00253221

- FB-CA-MDL-00253222

- FB-CA-MDL-00253226

- FB-CA-MDL-00253227

- FB-CA-MDL-00253229

- FB-CA-MDL-00253230

- FB-CA-MDL-00253231

- FB-CA-MDL-00253233

- FB-CA-MDL-00253236

- FB-CA-MDL-00253237

- FB-CA-MDL-00253238

- FB-CA-MDL-00253239

- FB-CA-MDL-00253240

- FB-CA-MDL-00253241

- FB-CA-MDL-00253242

- FB-CA-MDL-00253243

- FB-CA-MDL-00253244

- FB-CA-MDL-00253245

- FB-CA-MDL-00253246

- FB-CA-MDL-00253247

- FB-CA-MDL-00253248
- FB-CA-MDL-00253249
- FB-CA-MDL-00253250
- FB-CA-MDL-00253289
- FB-CA-MDL-00253291
- FB-CA-MDL-00253292
- FB-CA-MDL-00253293
- FB-CA-MDL-00253296
- FB-CA-MDL-00253297
- FB-CA-MDL-00253298
- FB-CA-MDL-00253299
- FB-CA-MDL-00253300
- FB-CA-MDL-00253301
- FB-CA-MDL-00253302
- FB-CA-MDL-00253303
- FB-CA-MDL-00253304
- FB-CA-MDL-00253305
- FB-CA-MDL-00253306
- FB-CA-MDL-00253307
- FB-CA-MDL-00253308
- FB-CA-MDL-00253309
- FB-CA-MDL-00253314
- FB-CA-MDL-00253315

- FB-CA-MDL-00253424
- FB-CA-MDL-00253427
- FB-CA-MDL-00253429
- FB-CA-MDL-00253430
- FB-CA-MDL-00253433
- FB-CA-MDL-00253435
- FB-CA-MDL-00253559
- FB-CA-MDL-00253562
- FB-CA-MDL-00253565
- FB-CA-MDL-00253568
- FB-CA-MDL-00253571
- FB-CA-MDL-00253593
- FB-CA-MDL-00253594
- FB-CA-MDL-00253595
- FB-CA-MDL-00253607
- FB-CA-MDL-00253623
- FB-CA-MDL-00253624
- FB-CA-MDL-00253761
- FB-CA-MDL-00253884
- FB-CA-MDL-00253886
- FB-CA-MDL-00253950
- FB-CA-MDL-00253951
- FB-CA-MDL-00253953

- FB-CA-MDL-00253954
- FB-CA-MDL-00253956
- FB-CA-MDL-00253959
- FB-CA-MDL-00253961
- FB-CA-MDL-00254018
- FB-CA-MDL-00254047
- FB-CA-MDL-00254078
- FB-CA-MDL-00254085
- FB-CA-MDL-00254086
- FB-CA-MDL-00254087
- FB-CA-MDL-00254089
- FB-CA-MDL-00254090
- FB-CA-MDL-00254503
- FB-CA-MDL-00254504
- FB-CA-MDL-00254639
- FB-CA-MDL-00254642
- FB-CA-MDL-00254677
- FB-CA-MDL-00254680
- FB-CA-MDL-00260135
- FB-CA-MDL-00260137
- FB-CA-MDL-00260301
- FB-CA-MDL-00260302
- FB-CA-MDL-00262387

- FB-CA-MDL-00262393

- FB-CA-MDL-00262454

- FB-CA-MDL-00262460

- FB-CA-MDL-00262521

- FB-CA-MDL-00262522

- FB-CA-MDL-00262523

- FB-CA-MDL-00262524

- FB-CA-MDL-00262941

- FB-CA-MDL-00262942

- FB-CA-MDL-00262980

- FB-CA-MDL-00262985

- FB-CA-MDL-00262986

- FB-CA-MDL-00262991

- FB-CA-MDL-00262993

- FB-CA-MDL-00262996

- FB-CA-MDL-00262997

- FB-CA-MDL-00263000

- FB-CA-MDL-00263025

- FB-CA-MDL-00263029

- FB-CA-MDL-00263036

- FB-CA-MDL-00263041

- FB-CA-MDL-00263068

- FB-CA-MDL-00263074

- FB-CA-MDL-00263080

- FB-CA-MDL-00263086

- FB-CA-MDL-00263092

- FB-CA-MDL-00263100

- FB-CA-MDL-00263211

- FB-CA-MDL-00263220

- FB-CA-MDL-00263221

- FB-CA-MDL-00263230

- FB-CA-MDL-00263557

- FB-CA-MDL-00263560

- FB-CA-MDL-00263561

- FB-CA-MDL-00263564

- FB-CA-MDL-00263565

- FB-CA-MDL-00263568

- FB-CA-MDL-00263570

- FB-CA-MDL-00263573

- FB-CA-MDL-00263578

- FB-CA-MDL-00263583

- FB-CA-MDL-00263592

- FB-CA-MDL-00263598

- FB-CA-MDL-00263604

- FB-CA-MDL-00263610

- FB-CA-MDL-00263615

- FB-CA-MDL-00263640

- FB-CA-MDL-00263667

- FB-CA-MDL-00263668

- FB-CA-MDL-00263679

- FB-CA-MDL-00263718

- FB-CA-MDL-00263719

- FB-CA-MDL-00263720

- FB-CA-MDL-00263722

- FB-CA-MDL-00263845

- FB-CA-MDL-00263847

- FB-CA-MDL-00263849

- FB-CA-MDL-00263851

- FB-CA-MDL-00263871

- FB-CA-MDL-00263873

- FB-CA-MDL-00263874

- FB-CA-MDL-00263876

- FB-CA-MDL-00263877

- FB-CA-MDL-00263879

- FB-CA-MDL-00263880

- FB-CA-MDL-00263882

- FB-CA-MDL-00263883

- FB-CA-MDL-00263885

- FB-CA-MDL-00263887

- FB-CA-MDL-00263889

- FB-CA-MDL-00263891

- FB-CA-MDL-00263895

- FB-CA-MDL-00263899

- FB-CA-MDL-00263903

- FB-CA-MDL-00263923

- FB-CA-MDL-00263927

- FB-CA-MDL-00263928

- FB-CA-MDL-00263940

- FB-CA-MDL-00263942

- FB-CA-MDL-00263944

- FB-CA-MDL-00263953

- FB-CA-MDL-00263957

- FB-CA-MDL-00264028

- FB-CA-MDL-00264033

- FB-CA-MDL-00264038

- FB-CA-MDL-00264043

- FB-CA-MDL-00264048

- FB-CA-MDL-00264054

- FB-CA-MDL-00264060

- FB-CA-MDL-00264066

- FB-CA-MDL-00264072

- FB-CA-MDL-00264078

- FB-CA-MDL-00264084

- FB-CA-MDL-00264091

- FB-CA-MDL-00264207

- FB-CA-MDL-00264209

- FB-CA-MDL-00264210

- FB-CA-MDL-00264213

- FB-CA-MDL-00264808

- FB-CA-MDL-00264813

- FB-CA-MDL-00264867

- FB-CA-MDL-00264868

- FB-CA-MDL-00264869

- FB-CA-MDL-00264870

- FB-CA-MDL-00264871

- FB-CA-MDL-00264872

- FB-CA-MDL-00264873

- FB-CA-MDL-00264874

- FB-CA-MDL-00264875

- FB-CA-MDL-00264876

- FB-CA-MDL-00264877

- FB-CA-MDL-00265010

- FB-CA-MDL-00265011

- FB-CA-MDL-00265069

- FB-CA-MDL-00265070

- FB-CA-MDL-00265071

- FB-CA-MDL-00265072

- FB-CA-MDL-00265073

- FB-CA-MDL-00265074

- FB-CA-MDL-00265075

- FB-CA-MDL-00265076

- FB-CA-MDL-00265077

- FB-CA-MDL-00265078

- FB-CA-MDL-00265079

- FB-CA-MDL-00265080

- FB-CA-MDL-00265081

- FB-CA-MDL-00265139

- FB-CA-MDL-00265140

- FB-CA-MDL-00265141

- FB-CA-MDL-00265142

- FB-CA-MDL-00265143

- FB-CA-MDL-00265144

- FB-CA-MDL-00265145

- FB-CA-MDL-00265146

- FB-CA-MDL-00265147

- FB-CA-MDL-00265148

- FB-CA-MDL-00265149

- FB-CA-MDL-00265150

- FB-CA-MDL-00265152

- FB-CA-MDL-00265210

- FB-CA-MDL-00265211

- FB-CA-MDL-00265212

- FB-CA-MDL-00265213

- FB-CA-MDL-00265214

- FB-CA-MDL-00265215

- FB-CA-MDL-00265216

- FB-CA-MDL-00265217

- FB-CA-MDL-00265218

- FB-CA-MDL-00265219

- FB-CA-MDL-00265220

- FB-CA-MDL-00265238

- FB-CA-MDL-00265241

- FB-CA-MDL-00265300

- FB-CA-MDL-00265301

- FB-CA-MDL-00265302

- FB-CA-MDL-00265303

- FB-CA-MDL-00265304

- FB-CA-MDL-00265305

- FB-CA-MDL-00265306

- FB-CA-MDL-00265307

- FB-CA-MDL-00265308

- FB-CA-MDL-00265309

- FB-CA-MDL-00265310

- FB-CA-MDL-00265311

- FB-CA-MDL-00265314

- FB-CA-MDL-00265373

- FB-CA-MDL-00265374

- FB-CA-MDL-00265375

- FB-CA-MDL-00265376

- FB-CA-MDL-00265377

- FB-CA-MDL-00265378

- FB-CA-MDL-00265379

- FB-CA-MDL-00265380

- FB-CA-MDL-00265381

- FB-CA-MDL-00265382

- FB-CA-MDL-00265383

- FB-CA-MDL-00265465

- FB-CA-MDL-00265495

- FB-CA-MDL-00265497

- FB-CA-MDL-00265527

- FB-CA-MDL-00265552

- FB-CA-MDL-00265553

- FB-CA-MDL-00265566

- FB-CA-MDL-00265567

- FB-CA-MDL-00265624
- FB-CA-MDL-00265625
- FB-CA-MDL-00265684
- FB-CA-MDL-00265685
- FB-CA-MDL-00265686
- FB-CA-MDL-00265687
- FB-CA-MDL-00265688
- FB-CA-MDL-00265689
- FB-CA-MDL-00265690
- FB-CA-MDL-00265691
- FB-CA-MDL-00265692
- FB-CA-MDL-00265693
- FB-CA-MDL-00265694
- FB-CA-MDL-00265700
- FB-CA-MDL-00265701
- FB-CA-MDL-00265756
- FB-CA-MDL-00265757
- FB-CA-MDL-00265758
- FB-CA-MDL-00265759
- FB-CA-MDL-00265760
- FB-CA-MDL-00265761
- FB-CA-MDL-00265762
- FB-CA-MDL-00265763

- FB-CA-MDL-00265764

- FB-CA-MDL-00265765

- FB-CA-MDL-00265766

- FB-CA-MDL-00265767

- FB-CA-MDL-00265768

- FB-CA-MDL-00265823

- FB-CA-MDL-00265824

- FB-CA-MDL-00265825

- FB-CA-MDL-00265826

- FB-CA-MDL-00265827

- FB-CA-MDL-00265828

- FB-CA-MDL-00265829

- FB-CA-MDL-00265830

- FB-CA-MDL-00265831

- FB-CA-MDL-00265832

- FB-CA-MDL-00265833

- FB-CA-MDL-00265834

- FB-CA-MDL-00265835

- FB-CA-MDL-00265890

- FB-CA-MDL-00265891

- FB-CA-MDL-00265892

- FB-CA-MDL-00265893

- FB-CA-MDL-00265894

- FB-CA-MDL-00265895
- FB-CA-MDL-00265896
- FB-CA-MDL-00265897
- FB-CA-MDL-00265898
- FB-CA-MDL-00265899
- FB-CA-MDL-00265900
- FB-CA-MDL-00265936
- FB-CA-MDL-00265937
- FB-CA-MDL-00265994
- FB-CA-MDL-00265995
- FB-CA-MDL-00265996
- FB-CA-MDL-00265997
- FB-CA-MDL-00265998
- FB-CA-MDL-00265999
- FB-CA-MDL-00266000
- FB-CA-MDL-00266001
- FB-CA-MDL-00266002
- FB-CA-MDL-00266003
- FB-CA-MDL-00266004
- FB-CA-MDL-00266005
- FB-CA-MDL-00266006
- FB-CA-MDL-00266063
- FB-CA-MDL-00266064

- FB-CA-MDL-00266065

- FB-CA-MDL-00266066

- FB-CA-MDL-00266067

- FB-CA-MDL-00266068

- FB-CA-MDL-00266069

- FB-CA-MDL-00266070

- FB-CA-MDL-00266071

- FB-CA-MDL-00266072

- FB-CA-MDL-00266073

- FB-CA-MDL-00266347

- FB-CA-MDL-00266351

- FB-CA-MDL-00266405

- FB-CA-MDL-00266406

- FB-CA-MDL-00266407

- FB-CA-MDL-00266408

- FB-CA-MDL-00266409

- FB-CA-MDL-00266410

- FB-CA-MDL-00266411

- FB-CA-MDL-00266412

- FB-CA-MDL-00266413

- FB-CA-MDL-00266414

- FB-CA-MDL-00266415

- FB-CA-MDL-00266416

- FB-CA-MDL-00266417

- FB-CA-MDL-00268604

- FB-CA-MDL-00268606

- FB-CA-MDL-00268609

- FB-CA-MDL-00268688

- FB-CA-MDL-00268689

- FB-CA-MDL-00268719

- FB-CA-MDL-00268720

- FB-CA-MDL-00268721

- FB-CA-MDL-00268722

- FB-CA-MDL-00268723

- FB-CA-MDL-00268724

- FB-CA-MDL-00268725

- FB-CA-MDL-00268726

- FB-CA-MDL-00268727

- FB-CA-MDL-00268728

- FB-CA-MDL-00268729

- FB-CA-MDL-00268730

- FB-CA-MDL-00268731

- FB-CA-MDL-00268732

- FB-CA-MDL-00268733

- FB-CA-MDL-00268734

- FB-CA-MDL-00268736

- FB-CA-MDL-00268739
- FB-CA-MDL-00268745
- FB-CA-MDL-00268746
- FB-CA-MDL-00268749
- FB-CA-MDL-00268755
- FB-CA-MDL-00268757
- FB-CA-MDL-00268758
- FB-CA-MDL-00268784
- FB-CA-MDL-00268785
- FB-CA-MDL-00268786
- FB-CA-MDL-00268787
- FB-CA-MDL-00268788
- FB-CA-MDL-00268789
- FB-CA-MDL-00268790
- FB-CA-MDL-00268791
- FB-CA-MDL-00268792
- FB-CA-MDL-00268793
- FB-CA-MDL-00268794
- FB-CA-MDL-00268795
- FB-CA-MDL-00268796
- FB-CA-MDL-00268797
- FB-CA-MDL-00268798
- FB-CA-MDL-00268799

- FB-CA-MDL-00268800
- FB-CA-MDL-00268801
- FB-CA-MDL-00268802
- FB-CA-MDL-00268828
- FB-CA-MDL-00268829
- FB-CA-MDL-00268830
- FB-CA-MDL-00268831
- FB-CA-MDL-00268832
- FB-CA-MDL-00268833
- FB-CA-MDL-00268834
- FB-CA-MDL-00268835
- FB-CA-MDL-00268836
- FB-CA-MDL-00268837
- FB-CA-MDL-00268838
- FB-CA-MDL-00268839
- FB-CA-MDL-00268840
- FB-CA-MDL-00268841
- FB-CA-MDL-00268842
- FB-CA-MDL-00268843
- FB-CA-MDL-00268844
- FB-CA-MDL-00268881
- FB-CA-MDL-00269041
- FB-CA-MDL-00269042

- FB-CA-MDL-00269043

- FB-CA-MDL-00269045

- FB-CA-MDL-00274491

- FB-CA-MDL-00274493

- FB-CA-MDL-00274498

- FB-CA-MDL-00274546

- FB-CA-MDL-00274926

- FB-CA-MDL-00275060

- FB-CA-MDL-00275083

- FB-CA-MDL-00275132

- FB-CA-MDL-00275133

- FB-CA-MDL-00275134

- FB-CA-MDL-00275135

- FB-CA-MDL-00275136

- FB-CA-MDL-00275137

- FB-CA-MDL-00275313

- FB-CA-MDL-00275314

- FB-CA-MDL-00275420

- FB-CA-MDL-00275909

- FB-CA-MDL-00186936

- FB-CA-MDL-00186937

- FB-CA-MDL-00186938

- FB-CA-MDL-00186941

- FB-CA-MDL-00186942

- FB-CA-MDL-00186943

## INTERROGATORY NO. 19:

Identify all members of Facebook's senior management team involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

## RESPONSE TO INTERROGATORY NO. 19 - CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B)     Facebook objects to this Interrogatory on the ground that the terms "involved," "senior management team," and "Facebook's Privacy Program" are vague, ambiguous, and undefined. Without definition, each term is susceptible to a number of meanings, including several levels of Facebook employees and a variety of privacy related work streams or settings.

(C)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding individuals involved with Facebook's Privacy Program without regard for whether their involvement related to issues in this case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to individuals involved with Facebook's Privacy Program to the extent their role did not implicate application developers being granted

access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure

of information to so-called "whitelisted" applications, the sharing of "sensitive user information"

with integration partners pursuant to "data reciprocity agreements," and/or the misuse of

"sensitive user information" disclosed in one of these three manners as a result of Facebook's

alleged failure to adopt effective policies or enforcement procedures governing the transmission

and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery

Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2

(describing the relevant scope of user information as being that "Facebook shared with or made

accessible to third parties").

(D)     Facebook objects to this Interrogatory as overly broad and unduly burdensome, to

the extent that it seeks the identies of individuals who were only incidentally "involved in" the

"oversight of Facebook's Privacy Program."

(E)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of

information that is not reasonably available at this stage in the case and that would be unduly

burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary

to investigate as weighed against Plaintiffs' need for the information.  Responding fully to

Plaintiffs' Interrogatory would require Facebook to conduct an investigation regarding what, if

any, involvement any member of Facebook's Senior Management team had in Facebook's

Privacy Program over the last eight years.  The burden of such an investigation outweighs any

potential utility it could serve.

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 19

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 82**:

Between 2012 and 2020, Facebook designated a team of employees who were directly responsible for the Facebook Privacy Program (the "Privacy Governance Team").  The Privacy Governance Team was responsible for reviewing company-wide privacy decisions, including product decisions and establishing, communicating, and monitoring relevant control policies and procedures.  The members of the Privacy Governance Team included:

- Michael Richter

- Erin Egan

- Joe Sullivan

- Alex Stamos

- Ed Palmieri

- Joshua Smith

- Susan Cooper

- Katherine Tassi

- Ashlie Beringer

- Yvonne Cunnane

- Joel Kaplan

- Elliot Schrage

- Gary Briggs

- Yul Kwon

## INTERROGATORY NO. 20:

Identify all members of the Board of Directors involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

## RESPONSE TO INTERROGATORY NO. 20:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B)    Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding individuals involved with Facebook's Privacy Program without regard for whether their involvement related to issues in this case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to individuals involved with Facebook's Privacy Program to the extent their role did not implicate application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of

"sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct an investigation regarding what, if any, involvement any member of Facebook's Board of Directors had in Facebook's Privacy Program over the last eight years.  The burden of such an investigation outweighs any potential utility it could serve.

(D)     Facebook objects to this Interrogatory on the ground that the terms "involved" and "Facebook's Privacy Program" are vague, ambiguous, and undefined.  For example, without definition, the terms could include a variety of privacy related work streams or settings.

(E)     Facebook objects to this Interrogatory as overly broad and unduly burdensome, to the extent that it seeks the identifies of individuals who were only incidentally "involved in" the "oversight of Facebook's Privacy Program."

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 83**:

As indicated *supra*, the Privacy Governance Team was directly responsible for the Facebook Privacy Program.  However, Facebook's business and affairs, including the Privacy Program, are ultimately managed by or under the direction of the Board of Directors, in its entirety.  *See* FB-CA-MDL-00009727.

**INTERROGATORY NO. 21:**

For each such individual identified above in Interrogatories 19 and 20, describe in detail their duties and responsibilities relating thereto.

**RESPONSE TO INTERROGATORY NO. 21:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" individual identified in response to Interrogatories 19 and 20. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers

and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several different individuals and their roles and/or duties in relation to Facebook.  Facebook will therefore treat Plaintiffs' inquiry into "each" individual as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(C)     Facebook objects to this Interrogatory on the ground that the term "Facebook's Privacy Program" is vague, ambiguous, and undefined.  For example, without definition, the term could include a variety of privacy related work streams or settings.

(D)      Facebook objects to this Interrogatory as overly broad and unduly burdensome, to the extent that it seeks the identifies of individuals who were only incidentally "involved in" the "oversight of Facebook's Privacy Program."

(E)      Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding individuals involved with Facebook's Privacy Program without regard for whether their involvement related to issues in this case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to individuals involved with Facebook's Privacy Program to the extent their role did not implicate application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)      Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct an investigation regarding what, if

any, involvement any member of Facebook's Board of Directors or Senior Management Team had in Facebook's Privacy Program over the last eight years.  The burden of such an investigation outweighs any potential utility it could serve.

(G)      Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Facebook stands on its objections.

## INTERROGATORY NO. 22:

Describe in detail the facts and circumstances relied upon by Facebook in assessing and agreeing to pay a $5 billion fine to the Federal Trade Commission.

## RESPONSE TO INTERROGATORY NO. 22:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)      Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B)     Facebook objects to this Interrogatory to the extent it seeks information related to confidential settlement negotiations that are protected from disclosure by Federal Rule of Evidence 408.

(C)     Facebook objects to this Interrogatory on the basis that it seeks an overbroad set of information that would be unduly burdensome for Facebook to provide.  The FTC's 2018 investigation of Facebook's practices involved a large number of issues—many of which do not relate to any live claims or defenses in this case—and, as with any settlement, a very large number of considerations factored into the Company's settlement decision.  Requiring Facebook to create a comprehensive list of such "facts and circumstances" is an unduly burdensome mechanism for Facebook to provide the information Plaintiffs appear to be seeking.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information unrelated and irrelevant to the claims or defenses in this litigation because Facebook's decision to settle claims with a government agency has no bearing on Plaintiffs claims against the Company.  Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, to the extent it seeks information relating to issues investigated by the FTC unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2

(describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)      Facebook objects to this Interrogatory on the basis that the non-privileged information Plaintiffs seek is publicly available or otherwise within Plaintiffs' custody or control.  Facebook has issued public statements and filed various court documents regarding its settlement with the FTC and the reasons for the settlement.

(F)      Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

(G)      Facebook objects to this Interrogatory on the basis that Plaintiffs' request that Facebook "[d]escribe in detail the facts and circumstances relied upon by Facebook" is so vague and overbroad that the Interrogatory is impossible to answer.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 84**:

To the extent Plaintiffs seek non-privileged information pertaining Facebook's decision to settle with the Federal Trade Commission, Facebook directs Plaintiffs to its public statements regarding that decision, including, among others:

- https://about.fb.com/news/2019/07/ftc-agreement/

- https://about.fb.com/news/2020/04/final-ftc-agreement/

345

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 23

## INTERROGATORY NO. 23:

Identify every person involved in the decision to pay the $5 billion fine to the Federal

Trade Commission.

## RESPONSE TO INTERROGATORY NO. 23 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections,

Objections to Definitions, and Objections to Instructions as though fully set forth in this

Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information

protected from disclosure by the attorney-client privilege, the attorney work-product doctrine,

and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this

Interrogatory as though it excludes information protected by these privileges and protections.

(B)     Facebook objects to this Interrogatory as overly broad, unduly burdensome,

and/or disproportionate to the needs of the case.  In order to answer this Interrogatory, Facebook

would need to conduct an investigation regarding who among Facebook's management,

employees, attorneys, and others, had any "involvement" in Facebook's decision to settle with

the FTC.  The burden of such an investigation outweighs any potential utility it could serve.

(C)     Facebook objects to this Interrogatory on the ground that it seeks information

unrelated and irrelevant to the claims or defenses in this litigation because Facebook's decision

to settle claims with a government agency has no bearing on Plaintiffs claims against the

Company.  Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter

of this Action, and not proportional to the needs of the case, to the extent it seeks information

relating to issues investigated by the FTC unrelated to application developers being granted

access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure

346

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 23**

of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(D)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs' request that Facebook "every person involved in the decision" to settle with the Federal Trade Commission is so vague and overbroad that the Interrogatory is impossible to answer.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 85**:

Facebook's response to the Federal Trade Commission's 2018 investigation, including the assessment of the terms of a potential settlement, was guided by a Special Committee of Facebook's Board of Directors, who were represented by Independent Legal Counsel.  After

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 23**

extensive deliberations and analysis, the Special Committee recommended approval of the proposed settlement.  The Special Committee was composed of Kenneth Chenault, Marc Andreesen, and Jeffrey Zients.  Facebook's Board of Directors voted to approve the proposed settlement.

## INTERROGATORY NO. 24:

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether Third Parties accessed the Not Generally Available Content and Information of Facebook Users by virtue of their being Friends of Installing Users; (2) which Third Parties accessed such Content and Information; and (3) which Facebook Users, by virtue of their being Friends of Installing Users, had their Not Generally Available Content and Information accessed by Third Parties.

## RESPONSE TO INTERROGATORY NO. 24:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(B)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and otherwise outside the scope of additional ESI

information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(C)      Facebook objects to this Interrogatory to the extent it is seeks to impose an unduly burdensome obligation on Facebook—beyond that required by the Federal Rules—to investigate sources of ESI containing information that is not otherwise responsive to Plaintiffs' requests for production, thereby improperly shifting the burden onto Facebook to identify broad sets of information Plaintiffs might deem relevant to their claims separate from the parties' agreed upon process for identifying relevant sources of ESI.  The parties negotiated a detailed process for identifying and producing relevant and responsive ESI, *see* ECF No. 416, which requires the parties to meet and confer regarding non-custodial ESI to be preserved.  The parties have also negotiated at length regarding a process by which Facebook will conduct custodial interviews and disclose relevant sources of ESI.  ECF No. 461.  Facebook has separately undertaken extensive efforts to respond to those RFPs the parties agree do not require custodial data searches and has disclosed the non-custodial data sources responsive to such requests.  This Interrogatory subverts the orderly process the parties have agreed to.

(D)      Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of ESI that do not store or reflect data related to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three

349

manners as a result of Facebook's alleged failure to adopt effective policies or enforcement

procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF

No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s

Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that

"Facebook shared with or made accessible to third parties").

      (E)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

      Facebook stands on its objections.

## INTERROGATORY NO. 25:

      Identify every noncustodial source of ESI on which is stored information (in any form)

sufficient to determine (1) whether any Business Partners accessed the Not Generally Available

Content and Information of Facebook Users even if such Users did had not downloaded an App

from those Business Partners; (2) which Business Partners accessed such Content and

Information; and/or (3) which Facebook Users had their Not Generally Available Content and

Information accessed in that manner.

## RESPONSE TO INTERROGATORY NO. 25:

      Facebook restates and incorporates its Preliminary Statement, General Objections,

Objections to Definitions, and Objections to Instructions as though fully set forth in this

Response.  Facebook objects to this Interrogatory on the following grounds:

350

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

(A)     Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(B)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(C)     Facebook objects to this Interrogatory to the extent it is seeks to impose an unduly burdensome obligation on Facebook—beyond that required by the Federal Rules—to investigate sources of ESI containing information that is not otherwise responsive to Plaintiffs' requests for production, thereby improperly shifting the burden onto Facebook to identify broad sets of information Plaintiffs might deem relevant to their claims separate from the parties' agreed upon process for identifying relevant sources of ESI.  The parties negotiated a detailed process for identifying and producing relevant and responsive ESI, *see* ECF No. 416, which requires the parties to meet and confer regarding non-custodial ESI to be preserved.  The parties have also negotiated at length regarding a process by which Facebook will conduct custodial interviews and disclose relevant sources of ESI.  ECF No. 461.  Facebook has separately undertaken extensive efforts to respond to those RFPs the parties agree do not require custodial data searches and has disclosed the non-custodial data sources responsive to such requests.  This Interrogatory subverts the orderly process the parties have agreed to.

(D)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(E)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of ESI that do not store or reflect data related to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557 at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548 at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Facebook stands on its objections.

352

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

**INTERROGATORY NO. 26:**

Identify by name and time period all Third Parties that obtained Facebook Users' Content and Information through friend permissions prior to 2009.

**RESPONSE TO INTERROGATORY NO. 26:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the term "friend permissions" is vague, ambiguous, and undefined.

(B)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data that would require Facebook to conduct an investigation of each of the millions of apps connected to the Facebook Platform during the relevant time period, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(C)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify potentially

millions of apps connected to the Facebook Platform during the relevant time period, without regard to whether such apps have any relationship to any live claim or defense.

(D)     Facebook objects to this Interrogatory on the basis that it seeks information only as to time-barred claims.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks all information regarding third parties' access to APIs prior to 2009.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data that do not implicate application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)     Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior Interrogatories, including Interrogatory No. 13.

(G)     Facebook further objects to this Interrogatory on the ground that the Interrogatory seeks information not in Facebook's possession, custody, or control.

(H)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 86**:

Facebook has conducted an investigation into the information Plaintiffs seek and presently understands that it is not possible to create the data set requested.

**INTERROGATORY NO. 27:**

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

**RESPONSE TO INTERROGATORY NO. 27 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory as containing multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33.  Although Facebook has provided two tables of data points relevant to each of the third-party applications for ease of review, Facebook considers this Interrogatory—in conjunction with Interrogatory No.

13—to pose a separate Interrogatory about over 600 different entities, and therefore the below

Response to constitute over 600 discrete Responses.

(B)    Facebook objects to this Interrogatory on the ground that the term "whitelisted" is

vague, ambiguous, and undefined.  For the purposes of this Interrogatory, Facebook will

construe the term "whitelisted" consistent with the Court's Order on Facebook's Motion to

Dismiss, ECF No. 298, to mean applications that were allowed continued access to users'

friends' data for a period of time after Facebook transitioned to Graph API v.2.0, either because

they were granted temporary extension of access to friends permissions under Graph API v. 1.0

or because they were otherwise approved for access to private APIs that allowed them to

query endpoints associated with data fields that may have been associated with a user's friends

after the transition to Graph API v. 1.0.

(C)    Facebook objects to this Interrogatory to the extent it seeks information both as to

"all Third Parties to whom Facebook granted whitelisted access" and "the Third Parties for

which such access was granted," as both clauses appear to seek the same information.  Facebook

will construe the Interrogatory as seeking only "all Third Parties to whom Facebook granted

whitelisted access."

(D)    Facebook objects to this Interrogatory as overly broad, irrelevant to the subject

matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook

objects to this Interrogatory to the extent it seeks information relating to "whitelisted access"

unrelated to application developers being granted access to "sensitive user information" via

friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted"

applications, the sharing of "sensitive user information" with integration partners pursuant to

"data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one

356

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27**

of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior Interrogatories, including Interrogatory No. 13.

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook first to analyze a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control.

(G)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27

**Response No. 87**:

After an extensive investigation, Facebook has identified the lists of third-party applications below.

The first list below consists of apps that requested and were given permission by the app user to access friend permissions at some point during the apps' existence, and were given a one-time extension allowing them to continue to access the fields available through Graph API V1 (potentially including friend data) after the deprecation of Graph API V1 in May 2015.  These extensions were for less than six months, with the exception of one company, which received an extension until January 2016.  The list below provides the name of each third-party application that received a short-term extension, the date the app was created, the date the app's extension to the deprecation of Graph API V1 expired (which was the last date on which the app could have accessed non-public information from the app user's friends), and the app's requested and obtained permissions for friend data.[12]

Three limitations apply to this list.  *First*, it includes apps for which at least one user granted access to a friend-related data field during the app's existence and did not subsequently change that permission.  Facebook maintains records of ███████████████████████ and, until recently, ████████████████████████████████████  If an app ██ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████

*Second*, Facebook does not have information on whether ███████████████████ ████████████████████████████████████████████████████████████

---

[12]  Facebook has provided information about all known permissions for friend-related data fields sought and granted at any time.  Note that the data field names are listed as they appear in Facebook's internal database.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27**

*Third*, this list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

The interaction of these apps with the app installers' friends' privacy settings occurred in the same manner that these settings governed all third-party apps calling the Graph API in the V1 time period, as described in Facebook's Response No. 77 to Interrogatory No. 14.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27

The second list below consists of third-party applications that had access to capabilities which were associated with private APIs that may have allowed third party application developers to query endpoints associated with data fields associated with a user's friends after the transition to Graph API v.2.[13]  The vast majority of capabilities that allowed access to private APIs did not enable third-party apps to access user data.  The private APIs that do enable third-party apps to access user data generally are used for the following limited purposes (not all of which involved third parties gaining access to data associated with a user's friends):

*Integration Partners*: Facebook's integration partners use private APIs to access user data at Facebook's direction and for the purpose of providing Facebook's services to users.  One example of Facebook's integration partnerships was its partnership with Blackberry to offer the Facebook experience on Blackberry devices.

*Business Integrations*: Many of Facebook's private APIs are used by businesses to manage their presences on Facebook and to facilitate transactions or communications with people on Facebook.[14]  The programs using these private APIs allow businesses to manage their content on Facebook, do business on Facebook, or advertise on Facebook.  Some illustrative examples include:

---

[13]  This Response does not include Facebook's Integration Partners, which are addressed in Facebook's responses to Interrogatory Nos. 14 and 15.

[14]  Although the names sound similar, "integration partners" and "business integrations" are very different. Integration partners are third parties (such as device manufacturers) that help Facebook provide Facebook experiences to users; they are Facebook's own service providers.  Business integrations are tools developed either by a third-party business or the business's service provider; the business uses these tools to interact with people on Facebook and to administer its own content and services on Facebook.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27**

- *Merchants*:  Facebook allows merchants to sell products and services on Facebook (such as by using Buy on Facebook).  Facebook offers these merchants – which include vendors such as Ticketmaster, Eventbrite, and Shopify – access to private APIs to upload product information and obtain users' order information and payment details for order fulfillment.

- *Jobs*:  Private APIs allow third-party recruiting and career networking services such as ZipRecruiter, Kalibrr, and Workpop to create job postings on Facebook and to receive job applications from users.

*Media Integrations:* Media businesses use private APIs to access public content or the media company's own posts, so that they can do things like show current topics, issues of interest, or what people are saying about them publicly.  Examples include companies like Huffington Post, Bleacher Report, and Pop Sugar.

*Search Integrations:* Search integrations use private APIs to search public content on Facebook.  One example of a search integration is Microsoft Bing, which uses private search APIs to provide users with relevant search results based on public content on Facebook.

*Beta/Test APIs:* Facebook routinely provides third-party developers access to private APIs to test new functionalities or products before making those APIs available to the public.  For example, Facebook built a private API for developers to test its Reactions API before offering it publicly.  The Reactions API allows a business on Facebook to collect statistical data on the number of reactions ("likes," "wows," "love") to a piece of content posted to its Facebook page.  The Reactions API is now a public API, published and described in Facebook's developer guidance.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27**

*Specialized Consumer Experiences:* In limited cases, consumer-facing apps use private APIs to enable specific functionalities that will not be used by the vast majority of apps.  These include:

- *Games:* Facebook developed private APIs to support certain specialized functionalities used by game apps.  For example, in the past Facebook allowed people to use Facebook's own virtual currency (Facebook Credits) to purchase enhanced in-game features; some functions related to this currency were performed through private APIs that were not made available to the entire developer base.

- *Additional Customized Experiences:* Facebook has developed private APIs to enable select partners to offer custom, seamless experiences for users seeking to more closely integrate their Facebook experiences with other things they like to do, such as listening to music, watching movies, or pursuing and sharing interests and hobbies.  These custom experiences are built by companies such as Dropbox, Spotify, and Netflix.

The following list includes of third-party applications that had access to capabilities which were associated with private APIs that may have allowed third party application developers to query endpoints associated with data fields that may have been associated with a user's friends after the transition to Graph API v.2.  It does not include:

- *Facebook's First-Party Apps*:  A large portion of the apps approved to access capabilities are internal Facebook programs developed to enable the Company's own products.  They do not involve sharing user information with third parties.[15]

---

[15]  The company identified apps as first-party apps when (1) they were labeled as first-party apps in Facebook's records; (2) all of an app's developers and administrators were Facebook employees; or (3) they were identified as first-party apps by Facebook's Partnerships and Platform teams. Facebook's systems do not specifically note

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27

- *Integration Partners*:  Facebook's Integration Partners are addressed in Facebook's responses to Interrogatory Nos. 14 and 15.

- *Never Installed*:  Apps that were approved to access capabilities but were never actually installed by a single user have been omitted.

The list below provides the named of each third-party application, the capabilities associated with private APIs that may have allowed each application to query (but would not have necessarily returned) endpoints associated with user's friends' data fields during the relevant time period, the date ranges during which they were active, and the data fields associated with the APIs they had access to.  Note that the lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

Please note that many apps appear in multiple rows of the spreadsheet. That is because an app may have been approved to access more than one capability.  When that is the case, each capability-app pair is listed on a separate row in order to be able to provide precise dates when Facebook granted the app access to the capability or removed the app from the list authorized to access the capability.

A large portion the listed apps likely were never public because they were test or beta versions of apps that developers created to ensure the apps would work before launching them publicly.  These apps were identified by finding apps with a de minimis number of app installs (ten or fewer) or that followed naming conventions commonly used for test apps (including "test" or "dev" in the app name).

---

when a capability is used by only Facebook's own programs; to distinguish access in this manner required manual review of the relevant capabilities and, at times, apps.  When in doubt, Facebook took the conservative approach of labeling the app a third-party app and including it in this response.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27**

Last, it should be noted that Facebook made clear that before an app could access any non-public information, the app was required to ask the user for permission.  These requirements applied to apps whether they accessed non-public data through public or private APIs.

██████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████
████████████████████████████████ depending on the context.  In some cases, ████████████████████████████████
███████████

    In other cases, ████████████████████████████████
█████████████████████████████████████
████████████████ as described above. ████████████████████
█████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 28

## INTERROGATORY NO. 28:

Describe the criteria Facebook used to determine which Third Parties would be granted whitelisted access.

## RESPONSE TO INTERROGATORY NO. 28 - CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory on the ground that the term "whitelisted" is vague, ambiguous, and undefined.  For the purposes of this Interrogatory, Facebook will construe the term "whitelisted" consistent with the Court's Order on Facebook's Motion to Dismiss, ECF No. 298, to mean applications that were allowed continued access to users' friends' data for a period of time after Facebook transitioned to Graph API v.2.0, either because they were granted temporary extension of access to friends permissions under Graph API v. 1.0 or because they were otherwise approved for access to private APIs that allowed them to query endpoints associated with data fields that may have been associated with a user's friends after the transition to Graph API v. 1.0.

(B)    Facebook objects to this Interrogatory on the ground that the term "criteria" is vague, ambiguous, and undefined.

(C)    Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(D)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to "whitelisted access" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 28

**Response No. 88**:

With regard to particular third parties and particular decisions related to the permissions granted to them, Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be determined by examining Facebook's previous and forthcoming document productions and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it would be for Facebook.

With regard Facebook's broader decision-making processes, the term "whitelisting" refers to a wide variety of situations and does not necessarily indicate access to additional user data beyond what is available through public APIs.  In fact, the term "whitelist" is often used in contexts that have nothing to do with developer access to user data.  For example, Facebook whitelists each user for a specific language, so their Facebook experience is displayed in their preferred language (*e.g.*, Brazilians are whitelisted to Portuguese unless they specify otherwise).  Facebook can also whitelist the number of API calls third-party developers make.  Typically, there is a ███████████████████████████████  When Facebook sees what looks like ███████████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████

Facebook may also whitelist certain partners to allow them access to products for purposes of beta testing.  For example, ████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

████████ It is common to help partners transition their apps during Platform changes to prevent their apps from crashing or causing disruptive experiences for users.

Facebook takes many factors into account when it engages with third parties to enable particular functionalities, solve a problem, address an unmet need, or beta test a new product, which may include providing a third party access to a non-public API.  Facebook works across its Product and Partnerships teams to identify well-known, reputable partners and collaborate with them to develop, approve, and execute product plans to accomplish the shared purpose of the partnership.  The types of data that a partner can access depends on the nature and purpose of the partnership.  Regardless of the reason for whitelisting a particular partner, Facebook is targeted in its approach.  Data access is narrowly limited to what a partner needs to provide the user experience. ██████████████████████████████████

████████████████████████████████████████████

████████████████████ The primary consideration is whether ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

## INTERROGATORY NO. 29 [WITHDRAWN BY PLAINTIFFS]:

Identify by name and time period all Third Parties that were Business Partners of Facebook and were granted access to Facebook Users' Content and Information.

## RESPONSE TO INTERROGATORY NO. 29 [WITHDRAWN BY PLAINTIFFS]:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating access to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreementsand/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(B)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome.  Specifically, the Interrogatory seeks information about every Business Partner that may have had access to any user data over a thirteen-year period.

(C)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to

Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business Partners who were permitted access to any user content and information over the course of at least thirteen years, without respect for whether the partner or particular information has any relationship to any live claim or defense.

(D)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of prior requests, including Interrogatories 14 and 17 and RFPs 12 and 24.

(E)     Facebook objects to this Interrogatory on the basis that the information sought is more appropriately pursued through another means of discovery, such as a request for the production of documents.

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Plaintiffs have withdrawn this Interrogatory.

## INTERROGATORY NO. 30:

Identify all categories of Content and Information available to a Facebook User through the "Access Your Information" or "Download Your Information" tools, such as users' public and private posts, Facebook messenger messages, and any attached content.

**RESPONSE TO INTERROGATORY NO. 30:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the phrase "'Access Your Information' or 'Download Your Information' tools" is vague, ambiguous, and undefined. Without definition, these terms may have various meanings.  For example, the selections and options available to users under certain tools has varied over time and across devices.

(B)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that which types of information are available to users through Facebook's "Access Your Information" or "Download Your Information" tools are not relevant to any live claim.  Facebook further objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook further objects to the Interrogatory on the ground that it seeks information that is public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive. Plaintiffs have access through Facebook's Platform and mobile apps to Facebook's Access Your Information and Download Your Information tools and can readily see what information is available there.  Facebook has also produced all information contained in these tools for the Named Plaintiffs.

(D)     Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior requests, including RFP Nos. 9 and 10.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 89**:

A list of the categories of information that Facebook users can access through the Download Your Information tool is publicly available at the Facebook Help Center, *see What categories of my Facebook data are available to me?*, https://www.facebook.com/help/930396167085762, Table 2, Information you can download

using the Download Your Information tool (last visited Nov. 19, 2020).  That list is also

reproduced below.

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| About Me | Information you added to the **About** section of your timeline like relationships, work, education, where you live and more. It includes any updates or changes you made in the past and what is currently in the **About** section of your timeline. | Downloaded Info |
| Account Status History | The dates when your account was reactivated, deactivated, disabled or deleted. | Downloaded Info |
| Active Sessions | All stored active sessions, including date, time, device, IP address, machine cookie and browser information. | Downloaded Info |
| Address | Your current address or any past addresses you had on your account. | Downloaded Info |
| Ads | Ads you've recently viewed. | Downloaded Info |
| Ads Clicked | Dates, times and titles of ads clicked (limited retention period). | Downloaded Info |
| Ad Topics | A list of topics that you may be targeted against based on your stated likes, interests and other data you put in your timeline. | Downloaded Info |
| Advertising ID | The unique advertising identification numbers provided by your mobile device. These numbers are used to show you ads on the apps you use on your device. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Alternate Name | Any alternate names you have on your account (example: a maiden name or a nickname). | Downloaded Info |
| Apps | All of the apps you have added. | Downloaded Info |
| Articles | Articles you've recently read. | Downloaded Info |
| Autofill Information | Information you've provided, such as your address, that is used to pre-fill messages when you contact a business through Messenger. | Downloaded Info |
| Chat | A history of the conversations you've had on Facebook Chat (a complete history is available directly from your messages inbox). | Downloaded Info |
| Chat Rules | Chat Rules you've accepted. | Downloaded Info |
| Check-ins | The places you've checked into. | Downloaded Info |
| Currency | Your preferred currency on Facebook. If you use Facebook Payments, this will be used to display prices and charge your credit cards. | Downloaded Info |
| Current City | The city you added to the **About** section of your timeline. | Downloaded Info |
| Date of Birth | The date you added to Birthday in the **About** section of your timeline. | Downloaded Info |
| Dating | The number of times you've recently visited the Dating section of Facebook. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Device ID | The unique identification numbers provided by the devices you use to log into Facebook. | Downloaded Info |
| Device Locale | The country and language from which you're accessing Facebook as determined by the devices you're using. | Downloaded Info |
| Education | Any information you added to Education field in the About section of your timeline. | Downloaded Info |
| Emails | Email addresses added to your account (even those you may have removed). | Downloaded Info |
| Email Address Verifications | A history of when you've verified your email address. | Downloaded Info |
| Events | Events you've joined or been invited to. | Downloaded Info |
| Event Contacts You've Blocked | People you've blocked from inviting you to events. | Downloaded Info |
| Event Interactions | The number of times you've recently visited the Events section of Facebook. | Downloaded Info |
| Events Visited | Event pages you've recently visited. | Downloaded Info |
| Facebook Live Videos | Live videos you've recently watched. | Downloaded Info |
| Facebook Watch Topics for Recommendations | A collection of topics that is used to show you relevant videos in the Facebook Watch tab. The topics are based on your previous interaction history | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
|  | with things like links, videos, photos and Pages you've liked. |  |
| Facial Recognition Data | A unique number based on a comparison of the photos you're tagged in. We use this data to help others tag you in photos. | Downloaded Info |
| Family | Friends you've indicated are family members. | Downloaded Info |
| Favorite Quotes | Information you've added to the Favorite Quotes section of the **About** section of your timeline. | Downloaded Info |
| Followers | A list of people who follow you. | Downloaded Info |
| Friends | A list of your friends. | Downloaded Info |
| Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| Friends You See Less | Friends whose activity you've chosen to see less of on Facebook. | Downloaded Info |
| Fundraisers | Fundraisers you've recently viewed. | Downloaded Info |
| Gender | The gender you added to the **About** section of your timeline. | Downloaded Info |
| Groups | A list of groups you belong to on Facebook. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Group Interactions | The number of times you've interacted with Groups on Facebook. | Downloaded Info |
| Groups Visited | Groups you've recently visited. | Downloaded Info |
| Hometown | The place you added to hometown in the **About** section of your timeline. | Downloaded Info |
| ID | A copy of the ID you submitted to confirm your identity and to help improve our automated systems for detecting fake IDs and related abuse. | Personal Data Request |
| Instant Games | Instant Games you've played. | Downloaded Info |
| IP Address Activity | Your recent activity from specific IP addresses. | Downloaded Info |
| IP Address Message Activity | Your recent message activity from specific IP addresses. | Downloaded Info |
| IP Address Payment Activity | Your recent payment activity from specific IP addresses. | Downloaded Info |
| Language Settings | Your preferred language settings. | Downloaded Info |
| Last Location | Your most recent location determined by your device. | Downloaded Info |
| Linked Accounts | Accounts you've linked to your Portal. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Live Video Subscriptions | Scheduled Live videos you've subscribed to. | Downloaded Info |
| Logins | IP address, date and time associated with logins to your Facebook account. | Downloaded Info |
| Logouts | IP address, date and time associated with logouts from your Facebook account. | Downloaded Info |
| Marketplace Categories | Categories you've recently viewed. | Downloaded Info |
| Marketplace Interactions | Your recent interactions on Marketplace. | Downloaded Info |
| Marketplace Items | Items you've recently viewed. | Downloaded Info |
| Marketplace Services | Services you've recently viewed. | Downloaded Info |
| Matched Contacts | Contact information that may be associated with your account. | Personal Data Request |
| Menu Items | Areas of Facebook you've recently accessed through the main menu. | Downloaded Info |
| Messages | Messages you've sent and received on Facebook. Note, if you've deleted a message it won't be included in your download as it has been deleted from your account. | Downloaded Info |
| Messenger Contacts You've Blocked | Contacts you've blocked on Messenger. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Milestone Notifications | Notifications about your activity milestones, such as the number of reactions on a post, you've received and dismissed. | Downloaded Info |
| Mobile Service Provider and Country Code | The service provider and country code associated with your phone number. | Downloaded Info |
| Name | The name on your Facebook account. | Downloaded Info |
| Name Changes | Any changes you've made to the original name you used when you signed up for Facebook. | Downloaded Info |
| News Feed Topics for Recommendations | A collection of topics that is used to show you relevant public posts in parts of your News Feed. The topics are based on your previous interaction history with things like links, videos, photos and Pages you've liked. | Downloaded Info |
| News Topics for Recommendations | A collection of topics that is used to show you relevant news articles in the News tab. The topics are based on your previous interaction history with things like posts, videos, photos and Pages you've liked. | Downloaded Info |
| Notification ID | The identification numbers that we use to send you Facebook notifications on your device. | Downloaded Info |
| Page Notifications | Chat notifications you've dismissed from Pages you visit. | Downloaded Info |
| Page Visits | Pages you've recently visited. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Page Transparency Notices | A list of pages that you've received and dismissed notices from. | Downloaded Info |
| Pages You Admin | A list of pages you admin. | Downloaded Info |
| Pages You've Recommended | Pages you've recommended to others. | Downloaded Info |
| Pending Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| People | People and friends you've interacted with recently, including comments and reactions. | Downloaded Info |
| People Viewed | People you've recently viewed when new friends were suggested to you. | Downloaded Info |
| Phone Numbers | Mobile phone numbers you've added to your account, including verified mobile numbers you've added for security purposes. | Downloaded Info |
| Photos | Photos you've uploaded to your account. | Downloaded Info |
| Photo Effects | A list of the photo effects you've used. | Downloaded Info |
| Photos Metadata | Any metadata that is transmitted with your uploaded photos. | Downloaded Info |
| Platforms | Platforms you've used to log into Facebook, such as the Facebook app or a browser. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Pokes | A list of who's poked you and who you've poked. Poke content from our mobile poke app is not included because it's only available for a brief period of time. After the recipient has viewed the content it's permanently deleted from our systems. | Downloaded Info |
| Political Views | Any information you added to Political Views in the About section of timeline. | Downloaded Info |
| Preferred Language for Videos | The preferred language for videos as determined by videos you've previously viewed. | Downloaded Info |
| Previously Removed Contacts | Friends you've recently removed but added back. | Downloaded Info |
| Primary Location | Your primary location is determined by information we use to support Facebook Products, such as the current city you entered on your profile and your device connection information. | Downloaded Info |
| Profile Visits | People whose profiles you've recently visited. | Downloaded Info |
| Recent Activities | Actions you've taken and interactions you've recently had. | Downloaded Info |
| Recently Visited | Videos and shows you've recently visited. | Downloaded Info |
| Record Details | Details included in some administrative records. | Downloaded Info |
| Registration Date | The date you joined Facebook. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Religious Views | The current information you added to Religious Views in the **About** section of your timeline. | Downloaded Info |
| Removed Friends | People you've removed as friends. | Downloaded Info |
| Saved Post Reminders | Reminders you've received after you've saved a post. | Downloaded Info |
| Screen Names | The screen names you've added to your account, and the service they're associated with. You can also see if they're hidden or visible on your account. | Downloaded Info |
| Secret Conversations | A list of the times you've used Secret Conversations in Messenger. | Downloaded Info |
| Secret Conversations You've Reported | A list of the secret conversations you've reported to Facebook. | Downloaded Info |
| See First | Profiles and Pages you've recently chosen to see first in your News Feed. | Downloaded Info |
| See Less | Profiles and Pages you've recently chosen to see less of in your News Feed. | Downloaded Info |
| Selected Language | The language you've selected to use Facebook in. | Downloaded Info |
| Session Type | Your current active session types. | Downloaded Info |
| Show Pages | A list of the Show Pages you've viewed and the videos you've watched from them. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Shows | A list of the individual videos you've watched. | Downloaded Info |
| Spoken Languages | The languages you added to Spoken Languages in the **About** section of your timeline. | Downloaded Info |
| Status Updates | Any status updates you've posted. | Downloaded Info |
| Time Spent | The amount of time you've spent watching videos from a Show Page. | Downloaded Info |
| Time Viewed | The amount of an individual video you've watched. | Downloaded Info |
| Timezone | The timezone you've selected. | Downloaded Info |
| Work | Any current information you've added to Work in the **About** section of your timeline. | Downloaded Info |
| Videos | Videos you've posted to your timeline. | Downloaded Info |
| Video Creator Pages | Video creator Pages you've recently viewed. | Downloaded Info |
| Videos You've Removed | Videos you've removed from your Watch list. | Downloaded Info |
| Your Facebook Activity | A history of when you've accessed Facebook. | Downloaded Info |

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Your Pinned Posts | Posts you've pinned on your timeline. | Downloaded Info |

## INTERROGATORY NO. 31:

Identify all categories of Content and Information Facebook collects, tracks, and maintains about Facebook Users that are excluded from the Access Your Information or Download Your Information tools, such as advertisements served to a Facebook User, likes, audience selector information, reports of offensive content, or support communications.

## RESPONSE TO INTERROGATORY NO. 31:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the phrase "'Access Your Information' or 'Download Your Information' tools" is vague, ambiguous, and undefined.  Without definition, these terms may have various meanings.  For example, the selections and options available to users under certain tools has varied over time and across devices.

(B)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that which types of information are available to users through Facebook's "Access Your Information" or "Download Your Information" tools are not relevant to any live claim.  Facebook further objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009

and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook further objects to the Interrogatory on the ground that it seeks information that is public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive, to wit, Facebooks data policies, which are publicly available and have already been produced to Plaintiffs.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, this Interrogatory seeks information related all internal business analytics or analyses that include user information, which are analyses that are conducted by thousands of Facebook data scientists and engineers over an enormous amount of data.  Even a large team of engineers working full time for several years likely could not identify all of the information Plaintiffs seek.  Facebook therefore objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(E)      Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 90**:

The parties have met and conferred extensively regarding Plaintiffs' requests that Facebook prepare a list of all of the data points Facebook has or may have collected regarding each of the Named Plaintiffs.  Facebook has repeatedly directed Plaintiffs to Facebook's Data Policy, which contains a comphrensive explanation of the types of data Facebook collects for users, including descriptive lists of the types of data that fall into particular categories.  Plaintiffs have not presented any questions or expressed concerns regarding the detail provided in the Data Policy.

Accordingly, Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be determined by examining Facebook's document productions, particularly all produced versions of Facebook's Data Policy, including, *inter alia*, FB-CA-MDL-00009502, FB-CA-MDL-00303103, FB-CA-MDL-00303116, and FB-CA-MDL-00335292, and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it would be for Facebook.

Facebook also directs Plaintiffs to its present Data Policy, which represents the most comprehensive available list of the types of data Facebook collects about each user.  The present Data Policy is publicly available at https://www.facebook.com/policy.php (last visited Nov. 19, 2020) and is reproduced below:


**Data Policy**

This policy describes the information we process to support Facebook, Instagram, Messenger and other products and features offered by Facebook (Facebook Products or Products). You can find additional tools and information in the Facebook Settings and Instagram Settings.

**What kinds of information do we collect?**

To provide the Facebook Products, we must process information about you. The types of information we collect depend on how you use our Products. You can learn how to access and delete information we collect by visiting the Facebook Settings and Instagram Settings.

**Things you and others do and provide**.

- **Information and content you provide.** We collect the content, communications and other information you provide when you use our Products, including when you sign up for an account, create or share content, and message or communicate with others. This can include information in or about the content you provide (like metadata), such as the location of a photo or the date a file was created. It can also include what you see through features we provide, such as our camera, so we can do things like suggest masks and filters that you might like, or give you tips on using camera formats. Our systems automatically process content and communications you and others provide to analyze

context and what's in them for the purposes described below. Learn more about how you can control who can see the things you share.

- Data with special protections: You can choose to provide information in your Facebook profile fields or Life Events about your religious views, political views, who you are "interested in," or your health. This and other information (such as racial or ethnic origin, philosophical beliefs or trade union membership) could be subject to special protections under the laws of your country.

- **Networks and connections.** We collect information about the people, Pages, accounts, hashtags and groups you are connected to and how you interact with them across our Products, such as people you communicate with the most or groups you are part of. We also collect contact information if you choose to upload, sync or import it from a device (such as an address book or call log or SMS log history), which we use for things like helping you and others find people you may know and for the other purposes listed below.

- **Your usage.** We collect information about how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration of your activities. For example, we log when you're using and have last used our Products, and what posts, videos and other content you view on our Products. We also collect information about how you use features like our camera.

- **Information about transactions made on our Products.** If you use our Products for purchases or other financial transactions (such as when you make a purchase in a game or make a donation), we collect information about the purchase or transaction. This

includes payment information, such as your credit or debit card number and other card information; other account and authentication information; and billing, shipping and contact details.

- **Things others do and information they provide about you.** We also receive and analyze content, communications and information that other people provide when they use our Products. This can include information about you, such as when others share or comment on a photo of you, send a message to you, or upload, sync or import your contact information.

**Device Information**

As described below, we collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use. For example, we use information collected about your use of our Products on your phone to better personalize the content (including ads) or features you see when you use our Products on another device, such as your laptop or tablet, or to measure whether you took an action in response to an ad we showed you on your phone on a different device.

**Information we obtain from these devices includes**:

- **Device attributes:** information such as the operating system, hardware and software versions, battery level, signal strength, available storage space, browser type, app and file names and types, and plugins.

- **Device operations:** information about operations and behaviors performed on the device, such as whether a window is foregrounded or backgrounded, or mouse movements (which can help distinguish humans from bots).

- **Identifiers:** unique identifiers, device IDs, and other identifiers, such as from games, apps or accounts you use, and Family Device IDs (or other identifiers unique to Facebook Company Products associated with the same device or account).

- **Device signals:** Bluetooth signals, and information about nearby Wi-Fi access points, beacons, and cell towers.

- **Data from device settings:** information you allow us to receive through device settings you turn on, such as access to your GPS location, camera or photos.

- **Network and connections:** information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, IP address, connection speed and, in some cases, information about other devices that are nearby or on your network, so we can do things like help you stream a video from your phone to your TV.

- **Cookie data:** data from cookies stored on your device, including cookie IDs and settings. Learn more about how we use cookies in the Facebook Cookies Policy and Instagram Cookies Policy.

**Information from partners.**

Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. These partners provide information about your activities off Facebook—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have a Facebook account or are logged into Facebook. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its

store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.

Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.  To learn more about how we use cookies in connection with Facebook Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

**How do we use this information?**

We use the information we have (subject to choices you make) as described below and to provide and support the Facebook Products and related services described in the Facebook Terms and Instagram Terms. Here's how:

**Provide, personalize and improve our Products.**

We use the information we have to deliver our Products, including to personalize features and content (including your News Feed, Instagram Feed, Instagram Stories and ads) and make suggestions for you (such as groups or events you may be interested in or topics you may want to follow) on and off our Products. To create personalized Products that are unique and relevant to you, we use your connections, preferences, interests and activities based on the data we collect and learn from you and others (including any data with special protections you choose to provide); how you use and interact with our Products; and the people, places, or things you're connected to and interested in on and off our Products. Learn more about how we use information about you to personalize your Facebook and Instagram experience, including features, content and recommendations in Facebook Products; you can also learn more about how we choose the ads that you see.

- **Information across Facebook Products and devices:** We connect information about your activities on different Facebook Products and devices to provide a more tailored and consistent experience on all Facebook Products you use, wherever you use them. For example, we can suggest that you join a group on Facebook that includes people you follow on Instagram or communicate with using Messenger. We can also make your experience more seamless, for example, by automatically filling in your registration information (such as your phone number) from one Facebook Product when you sign up for an account on a different Product.

- **Location-related information:** We use location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near-to provide, personalize and improve our Products, including ads, for you and others. Location-related information can be based on things like precise device location (if you've allowed us to collect it), IP addresses, and information from your and others' use of Facebook Products (such as check-ins or events you attend).

- **Product research and development:** We use the information we have to develop, test and improve our Products, including by conducting surveys and research, and testing and troubleshooting new products and features.

- **Face recognition:** If you have it turned on, we use face recognition technology to recognize you in photos, videos and camera experiences. The face-recognition templates we create may constitute data with special protections under the laws of your country. Learn more about how we use face recognition technology, or control our use of this technology in Facebook Settings. If we introduce face-recognition technology to your

Instagram experience, we will let you know first, and you will have control over whether we use this technology for you.

- **Ads and other sponsored content:** We use the information we have about you-including information about your interests, actions and connections-to select and personalize ads, offers and other sponsored content that we show you. Learn more about how we select and personalize ads, and your choices over the data we use to select ads and other sponsored content for you in the Facebook Settings and Instagram Settings.

Provide measurement, analytics, and other business services.

We use the information we have (including your activity off our Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services. Learn how we share information with these partners.

**Promote safety, integrity and security.**

We use the information we have to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our Products, and promote safety and security on and off of Facebook Products. For example, we use data we have to investigate suspicious activity or violations of our terms or policies, or to detect when someone needs help. To learn more, visit the Facebook Security Help Center and Instagram Security Tips.

**Communicate with you.**

We use the information we have to send you marketing communications, communicate with you about our Products, and let you know about our policies and terms. We also use your information to respond to you when you contact us.

**Research and innovate for social good.**

We use the information we have (including from research partners we collaborate with) to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health and well-being. For example, we analyze information we have about migration patterns during crises to aid relief efforts. Learn more about our research programs.

**How is this information shared?**

Your information is shared with others in the following ways:

Sharing on Facebook Products

People and accounts you share and communicate with

When you share and communicate using our Products, you choose the audience for what you share. For example, when you post on Facebook, you select the audience for the post, such as a group, all of your friends, the public, or a customized list of people. Similarly, when you use Messenger or Instagram to communicate with people or businesses, those people and businesses can see the content you send. Your network can also see actions you have taken on our Products, including engagement with ads and sponsored content. We also let other accounts see who has viewed their Facebook or Instagram Stories.

**Public information** can be seen by anyone, on or off our Products, including if they don't have an account. This includes your Instagram username; any information you share with a public

audience; information in your public profile on Facebook; and content you share on a Facebook Page, public Instagram account or any other public forum, such as Facebook Marketplace. You, other people using Facebook and Instagram, and we can provide access to or send public information to anyone on or off our Products, including in other Facebook Company Products, in search results, or through tools and APIs. Public information can also be seen, accessed, reshared or downloaded through third-party services such as search engines, APIs, and offline media such as TV, and by apps, websites and other services that integrate with our Products.

Learn more about what information is public and how to control your visibility on Facebook and Instagram.

**Content others share or reshare about you**

You should consider who you choose to share with, because people who can see your activity on our Products can choose to share it with others on and off our Products, including people and businesses outside the audience you shared with. For example, when you share a post or send a message to specific friends or accounts, they can download, screenshot, or reshare that content to others across or off our Products, in person or in virtual reality experiences such as Facebook Spaces. Also, when you comment on someone else's post or react to their content, your comment or reaction is visible to anyone who can see the other person's content, and that person can change the audience later.

People can also use our Products to create and share content about you with the audience they choose. For example, people can share a photo of you in a Story, mention or tag you at a location in a post, or share information about you in their posts or messages. If you are uncomfortable with what others have shared about you on our Products, you can learn how to report the content.

**Information about your active status or presence on our Products.**

People in your networks can see signals telling them whether you are active on our Products, including whether you are currently active on Instagram, Messenger or Facebook, or when you last used our Products.

Apps, websites, and third-party integrations on or using our Products.

When you choose to use third-party apps, websites, or other services that use, or are integrated with, our Products, they can receive information about what you post or share. For example, when you play a game with your Facebook friends or use a Facebook Comment or Share button on a website, the game developer or website can receive information about your activities in the game or receive a comment or link that you share from the website on Facebook. Also, when you download or use such third-party services, they can access your public profile on Facebook, and any information that you share with them. Apps and websites you use may receive your list of Facebook friends if you choose to share it with them. But apps and websites you use will not be able to receive any other information about your Facebook friends from you, or information about any of your Instagram followers (although your friends and followers may, of course, choose to share this information themselves). Information collected by these third-party services is subject to their own terms and policies, not this one.

Devices and operating systems providing native versions of Facebook and Instagram (i.e. where we have not developed our own first-party apps) will have access to all information you choose to share with them, including information your friends share with you, so they can provide our core functionality to you.

*Note: We are in the process of restricting developers' data access even further to help prevent abuse. For example, we will remove developers' access to your Facebook and Instagram data if*

*you haven't used their app in 3 months, and we are changing Login, so that in the next version,*

*we will reduce the data that an app can request without app review to include only name,*

*Instagram username and bio, profile photo and email address. Requesting any other data will*

*require our approval.*

**New owner**.

If the ownership or control of all or part of our Products or their assets changes, we may

transfer your information to the new owner.

**Sharing with Third-Party Partners**

We work with third-party partners who help us provide and improve our Products or who

use Facebook Business Tools to grow their businesses, which makes it possible to operate our

companies and provide free services to people around the world. We don't sell any of your

information to anyone, and we never will. We also impose strict restrictions on how our partners

can use and disclose the data we provide. Here are the types of third parties we share information

with:

Partners who use our analytics services.

We provide aggregated statistics and insights that help people and businesses understand

how people are engaging with their posts, listings, Pages, videos and other content on and off the

Facebook Products. For example, Page admins and Instagram business profiles receive

information about the number of people or accounts who viewed, reacted to, or commented on

their posts, as well as aggregate demographic and other information that helps them understand

interactions with their Page or account.

<u>Advertisers</u>.

We provide advertisers with reports about the kinds of people seeing their ads and how their ads are performing, but we don't share information that personally identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us permission. For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We also confirm which Facebook ads led you to make a purchase or take an action with an advertiser.

<u>Measurement partners</u>.

We share information about you with companies that aggregate it to provide analytics and measurement reports to our partners.

<u>Partners offering goods and services in our Products</u>.

When you subscribe to receive premium content, or buy something from a seller in our Products, the content creator or seller can receive your public information and other information you share with them, as well as the information needed to complete the transaction, including shipping and contact details.

<u>Vendors and service providers</u>.

We provide information and content to vendors and service providers who support our business, such as by providing technical infrastructure services, analyzing how our Products are used, providing customer service, facilitating payments or conducting surveys.

<u>Researchers and academics</u>.

We also provide information and content to research partners and academics to conduct research that advances scholarship and innovation that support our business or mission, and enhances discovery and innovation on topics of general social welfare, technological advancement, public interest, health and well-being.

<u>Law enforcement or legal requests</u>.

We share information with law enforcement or in response to legal requests in the circumstances outlined below.

Learn more about how you can control the information about you that you or others share with third-party partners in the Facebook Settings and Instagram Settings.

**How do the Facebook Companies work together?**

Facebook and Instagram share infrastructure, systems and technology with other Facebook Companies (which include WhatsApp and Oculus) to provide an innovative, relevant, consistent and safe experience across all Facebook Company Products you use. We also process information about you across the Facebook Companies for these purposes, as permitted by applicable law and in accordance with their terms and policies. For example, we process information from WhatsApp about accounts sending spam on its service so we can take appropriate action against those accounts on Facebook, Instagram or Messenger. We also work to understand how people use and interact with Facebook Company Products, such as understanding the number of unique users on different Facebook Company Products.

**How can I manage or delete information about me?**

We provide you with the ability to access, rectify, port and erase your data. Learn more in your Facebook Settings and Instagram Settings.

We store data until it is no longer necessary to provide our services and Facebook Products, or until your account is deleted - whichever comes first. This is a case-by-case determination that depends on things like the nature of the data, why it is collected and processed, and relevant legal or operational retention needs. For example, when you search for something on Facebook, you can access and delete that query from within your search history at any time, but the log of that search is deleted after 6 months. If you submit a copy of your government-issued ID for account verification purposes, we delete that copy 30 days after review, unless otherwise stated. Learn more about deletion of content you have shared and cookie data obtained through social plugins.

When you delete your account, we delete things you have posted, such as your photos and status updates, and you won't be able to recover that information later. Information that others have shared about you isn't part of your account and won't be deleted. If you don't want to delete your account but want to temporarily stop using the Products, you can deactivate your account instead. To delete your account at any time, please visit the Facebook Settings and Instagram Settings.

**How do we respond to legal requests or prevent harm?**

We access, preserve and share your information with regulators, law enforcement or others:

- In response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. Thmay include responding to legal

requests from jurisdictions outside of the United States when we have a good-faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards.

- When we have a good-faith belief it is necessary to: detect, prevent and address fraud, unauthorized use of the Products, violations of our terms or policies, or other harmful or illegal activity; to protect ourselves (including our rights, property or Products), you or others, including as part of investigations or regulatory inquiries; or to prevent death or imminent bodily harm. For example, if relevant, we provide information to and receive information from third-party partners about the reliability of your account to prevent fraud, abuse and other harmful activity on and off our Products.

Information we receive about you (including financial transaction data related to purchases made with Facebook) can be accessed and preserved for an extended period when it is the subject of a legal request or obligation, governmental investigation, or investigations of possible violations of our terms or policies, or otherwise to prevent harm. We also retain information from accounts disabled for terms violations for at least a year to prevent repeat abuse or other term violations.

**How do we operate and transfer data as part of our global services?**

We share information globally, both internally within the Facebook Companies, and externally with our partners and with those you connect and share with around the world in accordance with this policy. Your information may, for example, be transferred or transmitted to, or stored and processed in the United States or other countries outside of where you live for the purposes as described in this policy. These data transfers are necessary to provide the services set forth in the Facebook Terms and Instagram Terms and to globally operate and provide our

498

Products to you. We utilize standard contract clauses, rely on the European

Commission's adequacy decisions about certain countries, as applicable, and obtain your consent

for these data transfers to the United States and other countries.

**How will we notify you of changes to this policy?**

We'll notify you before we make changes to this policy and give you the opportunity to

review the revised policy before you choose to continue using our Products.

**Privacy notice for California residents**

If you are a California resident, you can learn more about your consumer privacy rights

by reviewing the California Privacy Notice.

**How to contact Facebook with questions**

You can learn more about how privacy works on Facebook and on Instagram. If you have

questions about this policy, you can contact us as described below. We may resolve disputes you

have with us in connection with our privacy policies and practices through TrustArc. You can

contact TrustArc through its website.


Contact Us
You can contact us online or by mail at:
Facebook, Inc.
ATTN: Privacy Operations
1601 Willow Road
Menlo Park, CA 94025

**INTERROGATORY NO. 32:**

For each Named Plaintiff, identify each category of Content and Information Facebook collects, tracks, and maintains about them and for each category, indicate (1) whether each category has been produced in this action and the Bates Range associated with each category of produced Content and Information; (2) whether each category of Content and Information is available to Facebook Users through the "Access Your Information" or "Download Your Information" tools; and (3) for each category of Content and Information that has not been produced in this action, its location, and the reason it has not been produced.

**RESPONSE TO INTERROGATORY NO. 32:**

Facebook objects to this Interrogatory on the following grounds:

(A)   Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" of the 21 Named Plaintiffs.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL

4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently.  Not only does the Interrogatory embed subparts by asking for information about each of the 21 Named Plaintiffs, the Interrogatory contains multiple subparts describing the type of information demanded about each Named Plaintiff.  Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)    Facebook objects to this Interrogatory on the ground that the phrase "'Access Your Information' or 'Download Your Information' tools" is vague, ambiguous, and undefined. Without definition, these terms may have various meanings.  For example, the selections and options available to users under certain tools has varied over time and across devices.

(C)    Facebook further objects to the Interrogatory on the ground that it seeks the identification of information that are public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive, to wit, the identification of categories of data already produced to Plaintiffs.

(D)    Facebook objects to this Interrogatory on the ground that the request is confusing, vague, and ambiguous.  As drafted, Facebook is not able to meaningfully discern the information requested.

(E)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(F)     Facebook further objects to the Interrogatory on the ground that it seeks information that are public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive, to wit, Facebooks data policies, which have already been produced to Plaintiffs.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, this Interrogatory seeks information related all internal business analytics or analyses that include user information, which are analyses that are conducted by thousands of Facebook data scientists and engineers over an enormous amount of data.  Even a large team of engineers working full time for several years likely could not identify all of the information Plaintiffs seek.  Facebook therefore objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(H)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome, as Plaintiffs have repeatedly indicated that they intend to voluntarily dismiss 11 of the 21 Named Plaintiffs in order to, among other things, reduce the burden on Facebook in producing discovery related to the Named Plaintiffs.  But Plaintiffs have not yet

stipulated to the dismissal of any Named Plaintiffs, so it is not clear which Named Plaintiffs Plaintiffs are seeking discovery on.

(I)      Facebook objects to this Interrogatory to the extent it seeks details regarding "whether each category of Content and Information is available to Facebook Users through the 'Access Your Information' or 'Download Your Information' tools," as the scope and nature of the data made available to users through these tools have no relevance to Plaintiffs' claims.

(J)      Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(K)      Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 91**:

Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be determined by examining Facebook's document productions, particularly Facebook's production of the documents available to Plaintiffs via the Download Your Information Tool, including FB-CA-MDL-00378871–FB-CA-MDL-00405229, FB-CA-MDL-00405251–FB-CA-MDL-00555261, FB-CA-MDL-00555354–FB-CA-MDL-00841017, FB-CA-MDL-00843750–FB-CA-MDL-01115859, FB-CA-MDL-01199605–FB-CA-MDL-01432962, and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it would be for Facebook.

Facebook continues to investigate what other data related to the Named Plaintiffs is relevant and responsive in this action.

**INTERROGATORY NO. 33:**

For all documents produced in this action relating to the Named Plaintiffs' Content and Information, describe any associated data that reflects whether the Content and Information was publicly or privately shared.

**RESPONSE TO INTERROGATORY NO. 33:**

Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for

separate information about "each" of the 21 Named Plaintiffs.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook further objects to the Interrogatory on the ground that it seeks the identification of information that are public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less

expensive, to wit, each the audience limitations each Named Plaintiff has presently applied to items they have shared on the Facebook Platform.

(C)    Facebook objects to this Interrogatory on the ground that the request is confusing, vague, and ambiguous.  Among other things, the term "associated data" is vague and undefined. As drafted, Facebook is not able to meaningfully discern the information requested.

(D)    Facebook objects to this Interrogatory on the ground that it is overly broad and unduly burdensome.  Facebook has produced nearly 900,000 pages of data reflecting the individual actions each Named Plaintiff has taken on the Facebook Platform.  Reconstructing the individual audience settings for each action or object posted would be unduly burdensome and Plaintiffs have not demonstrated a compelling need for this information, which is equally available to them and within their knowledge.

(E)    Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)      Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 92**:

Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be determined by examining Facebook's document productions, particularly Facebook's production of the Named Plaintiffs' current privacy settings[16], historical privacy settings, and data relating to intervening changes thereto, including FB-CA-MDL-00843007–FB-CA-MDL-00843247, FB-CA-MDL-01434763–FB-CA-MDL-0143488, and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it would be for Facebook.

Plaintiffs have also requested that Facebook produce data relating to the individual privacy settings as to each object (*e.g.*, photo, comment, or message) on each of the Named Plaintiffs' profiles.  Facebook continues to investigate what information it can produce in response to this request but presently understands it is not possible to create the data set

---

[16] Facebook's productions of the Named Plaintiffs' privacy settings are "current" as of the day they were pulled for production.  If the Named Plaintiffs subsequently changed their privacy settings, this information will be out of date.

requested in an automated manner and would instead require manual review of Plaintiffs' entire profiles, which constituted nearly 900,000 pages of data when produced in this action.  All of the data Facebook would need to review to provide the requested information is in Plaintiffs' possession, custody, and control, both in the form of the Named Plaintiffs' Facebook profiles and any preservation copies thereof that Plaintiffs have made by, *inter alia*, using the Download Your Information tool.  If Plaintiffs identify a discrete and narrow set of objects for which they would like the individual settings produced, Facebook will investigate whether a narrower production is possible.

However, Plaintiffs have equal access to this information via their Facebook accounts. Accordingly, Facebook directs Plaintiffs to their own Facebook accounts for further information about whether their content and information was publicly or privately shared.

## INTERROGATORY NO. 34:

Identify by name, time period and type of data accessed all Third Parties Facebook has removed or banned from the Platform for violating Facebook Users' privacy or for failure to comply with Facebook's privacy policies.

## RESPONSE TO INTERROGATORY NO. 34 - CONFIDENTIAL:

Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the phrase "violating Facebook users' privacy" is vague, ambiguous, and undefined.  Whether certain actions "violate" a Facebook user's understanding of privacy is subjective and will vary based on the individual user.

(B)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this

Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  The burdens of compiling such information outweigh the utility of the information.

(C)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(D)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook first to analyze a large number of documents that have not yet been identified and produced to any identify any apps over a 13-year time period that violated or were suspected of having violated any one of Facebook's policies.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks the identities of Third Parties "removed or banned" from the Platform for reasons unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission

and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery

Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2

(describing the relevant scope of user information as being that "Facebook shared with or made

accessible to third parties").

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless

made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing

nature of discovery in this action, Facebook responds as follows:

**Response No. 93**:

Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), Facebook

directs Plaintiffs to Facebook's document productions, including FB-CA-MDL-00345547, which

is a table that Facebook understands to be the most comprehensive record of app enforcement

actions maintained by Facebook in the ordinary course of business, and the burden of deriving or

ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it

would be for Facebook.

For ease of review, FB-CA-MDL-00345547 includes the following information: ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

**CONFIDENTIAL**

**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 34**

███████████████████████████████████ The table includes an ████████████████

██████████████████████████ In some instances, █████████████████████████

████████████████████████████████ In other instances, the information in

this field ████████████████████████████████████████████████

███████████████████████████████████████████████.

     Note that, because the table ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Facebook's

records reflect that about ███████ of the apps were ██████████████████ and about ███

█████ had fewer than ███████████. In addition, Facebook confronted a wide variety of

potential policy violations and took a significant number of enforcement actions. Data misuse

was only one of the many issues that Facebook confronted—and one that presented itself very

infrequently compared to other types of violations. But when data misuse violations did occur,

Facebook treated them as a high priority.

     Moreover, this table does not capture all enforcement actions taken by the company. For

example, it does not capture all manual warnings delivered to app developers, nor does it capture

custom enforcement actions such as Facebook's deletion of Aleksandr Kogan's app in December

2015 and Facebook's subsequent pursuit of certifications of deletion from Kogan and related

parties.

DATE:  February 11, 2021                          Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Deborah Stein*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

## VERIFICATION

I, Steven Elia, declare:

I am an Engineering Manager at Defendant Facebook, Inc. and am authorized to make

this verification on its behalf.  I am familiar with the contents of DEFENDANT FACEBOOK,

INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH

SET OF INTERROGATORIES, specifically Facebook's Responses & Objections to

Interrogatory Nos. 8, 9, 10, 11, 15, 26, and 27.  I further declare that the matters set forth in

Facebook's Responses & Objections to Interrogatory Nos. 8, 9, 10, 11, 15, 26, and 27 as

reflected in DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND

OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES are true and

correct to the best of my knowledge, information, and belief, based on my review of documents,

records, and information possessed by or known to Facebook, Inc. and its officers or employees,

and on that basis I allege them to be true.

I declare under penalty of perjury under the laws of the United States and the State of

California that the foregoing is true and correct, and that I executed this Verification on

February 11, 2021 at San Jose, California.

Steven Elia

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

## VERIFICATION

I, Konstantinos Papamiltiadis, declare:

      I am the Vice President, Developer Platforms & Programs at Defendant Facebook, Inc.

and am authorized to make this verification on its behalf.  I am familiar with the contents of

DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS

TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES, specifically Facebook's

Responses & Objections to Interrogatory Nos. 14, 18, 19, 20, 22, 23, 28, 30, 31, 32, 33, and 34. I further declare that the matters set forth in Facebook's Responses & Objections to Interrogatory Nos. 14, 18, 19, 20, 22, 23, 28, 30, 31, 32, 33, and 34 as reflected in DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES are true and correct to the best of my knowledge, information, and belief, based on my review of documents, records, and information possessed by or known to Facebook, Inc. and its officers or employees, and on that basis I allege them to be true.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that I executed this Verification on February 11, 2021 at Palo Alto, California.

Konstantinos Papamiltiadis

Exhibit 10

Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC. CONSUMER   )
PRIVACY USER PROFILE            )
LITIGATION.                     )  **NO. 18-MD-02843 VC (JSC)**
_____ )

                        San Francisco, California
                        Friday, August 14, 2020

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
                    KELLER ROHRBACK LLP
                    1201 Third Avenue, Suite 3200
                    Seattle, Washington  98101
              BY:   **DEREK W. LOESER, ATTORNEY AT LAW**
                    **DAVID J. KO, ATTORNEY AT LAW**


                    BLEICHMAR, FONTI & AULD LLP
                    555 - 12th Street, Suite 1600
                    Oakland, California  94607
              BY:   **LESLEY E. WEAVER, ATTORNEY AT LAW**
                    **ANNE K. DAVIS, ATTORNEY AT LAW**
                    **ANGELICA M. ORNELAS, ATTORNEY AT LAW**
                    **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**

For Defendants:
                    GIBSON, DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166-0193
              BY:   **ORIN SNYDER, ATTORNEY AT LAW**


        **(APPEARANCES VIA ZOOM CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
                       Official Reporter, CSR No. 7445

```
 1   APPEARANCES VIA ZOOM:   (CONTINUED)

 2   For Defendants:
                          GIBSON, DUNN & CRUTCHER LLP
 3                        Trammell Crow Center
                          2001 Ross Avenue, Suite 2100
 4                        Dallas, Texas 75201
               BY:   RUSSELL H. FALCONER, ATTORNEY AT LAW
 5
                          GIBSON, DUNN & CRUTCHER LLP
 6                        333 S. Grand Avenue
                          Los Angeles, California 90071
 7             BY:   DEBORAH L. STEIN, ATTORNEY AT LAW

 8                        GIBSON,  DUNN & CRUTCHER LLP
                          1881 Page Mill Road
 9                        Palo Alto, California 94304
               BY:   MARTIE KUTSCHER CLARK, ATTORNEY AT LAW
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Friday - August 14, 2020**                          **8:27 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |

4      **THE CLERK:**  We're a minute early, but court is now in

5 session.  Let's see.  Calling Civil Action 18-MD-2843, In Re

6 Facebook, Inc. Consumer Privacy User Profile Litigation.

7      Counsel, starting with plaintiff, can you please state

8 your appearance.

9      **MS. WEAVER:**  Sure.  This is Lesley Weaver of Blakemar

10 Fonti & Auld.  With me is Anne Davis and Angelica Ornelas.

11      And I see that Matt Montgomery actually is not -- he

12 should be with us.  So he should probably be elevated.  I

13 apologize.  I missed him before.  Don't tell him.

14      **MR. LOESER:**  Good morning.  You have Derek Loeser from

15 Keller Rohrback.

16      **THE COURT:**  Good morning.

17      **MR. KO:**  Good morning, Your Honor.  Nice to see you

18 again.  David Ko, Keller Rohrback, also on behalf of

19 plaintiffs.

20      **THE COURT:**  Good morning.

21      And here comes Mr. Montgomery.  He's here.

22      All right.  And for Facebook?

23      **MR. SNYDER:**  Good morning, Judge.  It's Orin Snyder

24 from Gibson Dunn with my colleagues, Deb Stein, Martie Kutscher

25 Clark, and Russ Falconer.

1          **THE COURT:**  Good morning.

2     Okay.  Thank you for your statement.

3     Let's see.  It sounds like there are not too many things

4     to discuss.  Let's just start.

5     The search terms you're working on, I will just make this

6     observation.  I do think it would be unreasonable to insist

7     that all terms apply to all custodians.  That just can't be

8     right.  People have different positions.  So I give you that

9     guidance in working on that.

10     Now, with respect to the data about plaintiffs, let's go

11     through.  And why don't plaintiffs tell us what is the data

12     that you're missing that you think is relevant.  So one thing

13     you've identified is the data about what data about the

14     plaintiffs was shared with advertisers.  Is that correct?

15          **MS. WEAVER:**  That is correct in general terms,

16     Your Honor.  Basically, what has been produced to us is

17     user-facing data through an Access Your Account tool, for the

18     most part.

19     Now, I want you to know that we have reviewed all of the

20     plaintiffs' data with more than one pass-through.  We've done

21     targeted searches.  We've had 18 people, and more at times,

22     going through the documents.  So we're pretty familiar with

23     what's there.

24     There are two problems that we have.  The first is that

25     Your Honor ordered us last -- two weeks ago to discuss

```
 1   precisely what has been produced and precisely what is the data
 2   that is being withheld.
 3        And we -- in the course of our meet-and-confer sessions,
 4   Facebook did not identify the examples that they put in their
 5   statement.  We didn't discuss those.  So once again, we are
 6   getting information the first time in the statement.
 7        And it would have been better if we had discussed it,
 8   because when we look at those documents -- we've looked at them
 9   before -- they are not what we're seeking.  And the reason that
10   they're not -- and if you look, there's an example of one of
11   them they gave us.  The content is missing.  So there's an
12   event that says one of the users went to a website, but the
13   content of what they did on the site is stripped away.
14        And our experts say, you know, what did you put in your
15   shopping cart?  What did you access?  How long were you on it?
16        And that data is also married to GPS data --
17             THE COURT:  Okay.  I have the statement --
18             MS. WEAVER:  Yeah.
19             THE COURT:  -- in front of me.
20             MS. WEAVER:  Yes.
21             THE COURT:  Can you put me to the page and the Bates
22   number?
23             MS. WEAVER:  The Bates number of the document -- hang
24   on.
25             THE COURT:  Well, first, the page of the statement so
```

```
 1    I know where to go.
 2            MS. WEAVER:   That is going to be harder for me.
 3    I think it's page 6.   The Bates number -- and I'm going to
 4    ask -- Anne, if you can help me, it's 01037245.
 5            THE COURT:   Don't see that.   It's redacted
 6    information?
 7            MS. WEAVER:   Some of the information was redacted,
 8    yes.   But this information we can discuss in the hearing, if
 9    that is --
10            THE COURT:   No, no.   I understand.   We can -- I'm not
11    worried --
12            MS. WEAVER:   Yeah.
13            THE COURT:   -- about that.
14        I'm just trying to find it.   I don't see it.
15            MS. WEAVER:   Yeah.   Hang on just a moment.
16            THE COURT:   Maybe the sentence at the first page of
17    the --
18            MS. WEAVER:   Yeah, I'm actually looking -- I
19    apologize.   I'm looking for the actual statement.   I have too
20    many things open on my laptop.
21        But for all of the documents that they've identified,
22    Your Honor, these are PDFs that reflect some activity.
23            THE COURT:   I just want to start with -- I want to
24    start with --
25            MS. WEAVER:   Fine.   Okay.   So if you go to page 5 of
```

1    the statement and if we look at, for example, where it says

2    "Ms. Tutt reviewed content on Amtrak.com," it doesn't tell us

3    what the content is or it doesn't tell us --

4              **THE COURT:**  Okay.  Or the --

5              **MS. WEAVER:**  -- what they did.

6              **THE COURT:**  -- other one, that Ms. Tutt viewed content

7    on a news site and --

8              **MS. WEAVER:**  Right.  And it doesn't --

9              **THE COURT:**  -- tell you what the content is.

10             **MS. WEAVER:**  -- tell us what they do.

11             **THE COURT:**  Let me ask Facebook.

12        Do you have that content?

13             **MR. SNYDER:**  Mr. Falconer, I think, will address this.

14             **MR. FALCONER:**  Good morning, Your Honor.  Russ

15   Falconer for Facebook.

16        Our understanding is there is some machine-readable data

17   in some cases that might reflect the off-Facebook activity that

18   Ms. Weaver is describing in a kind of raw, disaggregated way.

19   That information is not associated with the plaintiff's account

20   in the way that the user-created, user-shared content and

21   information is associated with a user account.

22        And so I hear -- I don't know -- confusion and frustration

23   from Ms. Weaver that they feel like they don't understand what

24   we've produced.

25        The Court ordered us to, you know, be as clear as we can

```
 1   on named plaintiffs' data, what has been produced and what has
 2   been withheld.  And what we've tried to do is say that we've
 3   produced all content information that the plaintiffs share on
 4   Facebook and then some of the other categories of information
 5   that we identified in our statement; so device information,
 6   geolocation information, certain other information that is
 7   associated with their account.  And we have been -- I think
 8   we've tried to be clear; and if we failed in this, we
 9   apologize.
10       There is other -- there's Facebook-generated information,
11   information generated by third parties, information received
12   from third parties.  We have not represented that that is
13   comprehensively included in our production.
14       What we have produced are Facebook analytics, third-party
15   data, off-Facebook activity, anything like that that is
16   associated with a user's account.
17       And so that's -- I think the point of departure between
18   the parties right now is maybe the level of generality with
19   which we have described what we have not produced.  But
20   that's -- we've tried to be as clear about the, sort of, large
21   buckets that are not included in the named plaintiff data we've
22   produced to date.
23           THE COURT:  So, for example, when you say Ms. Weaver
24   said, as you said, that the plaintiff viewed content on
25   Amtrak.com, are you saying you don't have any way of
```

1  identifying what that content is that she viewed at that

2  particular time, even though you were able to say she viewed

3  that website at that time?

4      MR. FALCONER:  I think for an individual plaintiff on

5  an individual website, if it was just that question -- could we

6  tell for one of the named plaintiffs what specific content she

7  viewed on the Amtrak website? -- if it was, you know, ten years

8  ago or seven years ago, probably not.  If it was a year ago,

9  maybe.  That data may or may not have been associated with --

10      THE COURT:  Well, if it was this year --

11      MR. FALCONER:  Yeah.

12      THE COURT:  -- with that particular --

13      MR. FALCONER:  Sure.

14      THE COURT:  -- data this year.

15      MR. FALCONER:  The answer is it's possible.  There may

16  be some website-specific data about that named plaintiff; there

17  may not be.  There's some --

18      THE COURT:  Okay.  And so you haven't searched for it,

19  or you're withholding it, or -- I guess, why hasn't it been

20  produced?

21      MR. FALCONER:  So as we understood the Court's

22  mandate or, sort of, the Court's --

23      THE COURT:  No, no, no.  I'm just asking.

24      MR. FALCONER:  Oh.

25      THE COURT:  I'm just asking.

1     **MR. FALCONER:**  Because the reason for that is that

2   just to find it for one named plaintiff would be like a

3   multiweek endeavor, if not longer.  And the reason for that is

4   that -- let's take the Amtrak example.

5     With this off-Facebook activity data, the tables and the

6   database where the data is stored, you know, they've been

7   explained to us like each one of them is a book.  And the book

8   is organized by topic.  The topic that the book is organized by

9   is the advertiser.  It's Amtrak; it's not the named plaintiff.

10    So for every Facebook advertiser there's a book.  Right?

11  There's a table that has some data for advertisement, website

12  activity, that kind of thing.

13    So to gather the information for one named plaintiff on

14  Amtrak, that, we could probably do.  To gather the data for one

15  named plaintiff on every advertiser on every off-Facebook

16  activity that has ever happened, just for one named plaintiff,

17  we have to go into each of those books individually and look

18  for that one named plaintiff, and then we'd have to do it for

19  each of the other 23 named plaintiffs.

20    So that's the reason why we have not undergone that to

21  date.

22    **THE COURT:**  I understand that.  So have you identified

23  every instance that you have that the plaintiff viewed content

24  on some website, whatever it is?

25    **MR. FALCONER:**  Every instance where Facebook has been

1  able to associate that off-Facebook activity with a named

2  plaintiff's account.  Sometimes they can't make the connection.

3  But where it's connected, we've identified it.  That's included

4  in the production.

5            **THE COURT:**  I assume that for this privacy case --

6  right? -- some content is obviously more private than other

7  content and the plaintiffs may not necessarily need or want.

8  They need exemplars.  Right?  And there is a standing argument

9  that you guys are maintaining that they have to defeat and

10  damages and all that.  There are particular instances.  Right?

11  So there may be particular instances where you then have to go

12  do that.

13      In other words, if it's the data that was shared, which is

14  sort of at the heart of the case, you're probably going to have

15  to do some work on that.  Whether it's every instance, probably

16  not; but certainly certain instances.

17      Now, plaintiffs, it sounds like, have a template of where

18  to start.  It may not be Amtrak, but it may be the next one

19  there.  Right?

20            **MR. FALCONER:**  Your Honor, could I be heard on that?

21            **MS. WEAVER:**  Well, may I --

22            **MR. FALCONER:**  Or, go ahead.

23            **MS. WEAVER:**  I would like to respond.

24      So what we're talking about right now and what they've

25  produced is, there's a tool so users can download data.  And

1   even in what they're downloading, there is content missing.

2       But there's another whole bucket of data that they haven't

3   identified to us that is responsive, and that's the first step.

4   We need the identification of the fields of the data that they

5   collect through their third-party relationships, whether it's

6   apps or websites, et cetera.  And it is this database that

7   Facebook searches using algorithms to target the users.

8       What they've given us is sort of the window dressing of

9   the platform activity, and I've identified for you that

10  something is missing even from that.

11      But there is -- and, Your Honor, we've talked to our

12  experts; and maybe it's better to have experts talk or put in a

13  declaration because I can tell you, their position will be that

14  this is, quote/unquote, not associated with the users but that

15  doesn't make sense.

16      There is an event ID, because the reason Facebook is

17  collecting it in the first place is to target people with the

18  data.  So there is a way to go back and find -- and I agree

19  with Mr. Falconer that this data set will be immense.  And that

20  is the scope of the case.  And that's why we said only for the

21  24 because --

22          **THE COURT:**  I'm just going to --

23          **MS. WEAVER:**  Yeah.

24          **THE COURT:**  -- tell you guys, I think maybe you need

25  to think about a special master.

1      There's just no --

2           **MS. WEAVER:**  Yes.

3           **THE COURT:**  I don't have the time or the patience or

4      the expertise to wade through any of this, like the nuance that

5      you're getting into.  So I don't know what to do.

6           **MS. STEIN:**  Your Honor, may I be heard for a moment?

7      So I think the good news on, sort of, your reaction to

8      this is that this exercise was really about, sort of,

9      identifying categories so that we could have a conversation

10     about what's required in this case, because there is a whole

11     lot of information being sought here that has absolutely

12     nothing to do with the issues that are being litigated in this

13     case.

14          **THE COURT:**  No.  I understand that argument.  I don't

15     even know how to figure out what it is that we're even talking

16     about.

17          **MS. STEIN:**  Right.

18          **MS. WEAVER:**  So Facebook --

19          **MS. STEIN:**  So, Your Honor, what's being --

20          **MS. WEAVER:**  Could I --

21          **MS. STEIN:**  -- talked about right now is what's called

22     off-Facebook activity.  And that off-Facebook activity has no

23     relationship to the issues that the dismissal order said are

24     viable right now and that are not stayed.  The order of

25     dismissal --

```
 1            THE COURT:  No.  I read that.  I read it.  I

 2   understand.

 3            MS. STEIN:  Okay.  Good.

 4            THE COURT:  So this --

 5            MS. STEIN:  And so the off-Facebook activity --

 6            THE COURT:  -- this has been previewed -- just, can I

 7   finish?

 8            MS. STEIN:  I'm sorry, Your Honor.

 9            THE COURT:  Because I'm really losing patience with

10   this case.

11       This has been previewed for a while.  So what I was hoping

12   to do is you guys could just tee up what that data is so I can

13   rule if it's discoverable or not.

14       I don't even know how to get to that point.

15            MR. SNYDER:  Your Honor, I think there's a very

16   easy --

17            MS. WEAVER:  If I could, I was waiting.

18       Your Honor, we would like them to identify what they're

19   withholding.  That's it.

20            THE COURT:  But that's a chicken-and-egg problem.

21   That's a chicken-and-egg problem.  And I'm not sure -- and see,

22   this is the problem I'm having.  You said you've now reviewed

23   it all.  What is missing?  You've identified --

24            MS. WEAVER:  So I'll give you examples.  There are no

25   examples --
```

1          **THE COURT:**  You did.

2          **MS. WEAVER:**  Okay.

3          **THE COURT:**  No.  I'm going to let Mr. Snyder talk.

4          **MS. WEAVER:**  Fine.

5          **MR. SNYDER:**  Your Honor, I share your frustration, and

6    I think this is very easy.

7          For example, on advertisement, we have gone, I think as

8    indicated in our statement, above and beyond the call of duty

9    because we didn't really want to just say, "We're not giving

10   you what advertisements you reviewed or ads that you've clicked

11   on, even though it's outside the scope of the case."

12         This case --

13         **THE COURT:**  No, no.  That's an argument.  Please,

14   let's try not to argue.

15         **MR. SNYDER:**  Right.

16         **THE COURT:**  I'm going to decide that at some point.

17         **MR. SNYDER:**  Okay.  So what I would --

18         **THE COURT:**  Just --

19                    (Simultaneous cross-talk.)

20         **THE COURT:**  -- that.

21         **MR. SNYDER:**  What I would respectfully suggest is, we

22   can, Your Honor, tee it up for you in a very simple way,

23   because Judge Chhabria's order is very clear about what's in

24   and what's out.  And then each side can succinctly,

25   efficiently, and clearly make their arguments about what is in

1    and what's out.  And it's not going to be difficult,

2    Your Honor.  I think it's pretty clear.

3        I agree, on this call, people using terminology --

4    "on-platform," "off-platform" -- it all sounds like

5    gobbledegook.  I think there's a very clear, efficient, and

6    efficacious way for us to tee this up in a short statement to

7    Your Honor; and Your Honor can rule on it, if Your Honor wants

8    more argument on it, without us having these dueling

9    Zoom/Hollywood Squares, you know, arguments about what's in and

10   what's out that's not going to really lead to any fair ruling.

11           **THE COURT:**  This is what I need to ask Ms. Weaver, is:

12   Do you know what it is that you want or that you believe exists

13   that you don't have?

14           **MS. WEAVER:**  Yes.

15           **THE COURT:**  You do.  Okay.

16           **MS. WEAVER:**  More or less.  We don't know what form

17   they keep it in or how they keep it.  It is this data set that

18   they mine, yes.

19           **THE COURT:**  Okay.  So is there any reason why, then,

20   we can't adjudicate that dispute as discoverability?

21           **MS. WEAVER:**  We can --

22           **MR. SNYDER:**  I think we can --

23           **MS. WEAVER:**  -- adjudicate that, Your Honor.

24           **THE COURT:**  We can?  Okay.

25           **MR. SNYDER:**  We can and we should.

```
 1            THE COURT:  All right.

 2            MR. SNYDER:  And I think we can do it very simply

 3    without a lot of drama or complication.

 4            THE COURT:  So that's what --

 5            MR. FALCONER:  Your Honor --

 6            THE COURT:  -- I want you to do, then, on this,

 7    I think.

 8        And, I mean, it doesn't have to be the joint letter brief,

 9    whatever.  I mean, it's a big issue.  It kind of goes to the

10    heart of the case.  So I want you to have the ability.  You're

11    going to probably need your experts to some extent -- at least

12    plaintiffs -- to be involved with it.

13        And I probably want four briefs.  Right?  Whoever goes

14    first, second, first, second, so that there's -- my guess is

15    it's not till we get to the second two briefs that we'll really

16    be able to meet there.  That just seems to be the process that

17    we need to do.

18        So you guys work it out, how that's going to be presented.

19    I'm not giving you any limits at all.  You only have the limit

20    of my time and attention span.  So just keep that in mind.

21                         (Laughter.)

22            MS. WEAVER:  And how much time, Your Honor, would you

23    like between briefs and the hearing?  What kind of timing --

24            THE COURT:  We'll put a hearing.  I'll figure it out.

25            MS. WEAVER:  Okay.
```

1        **THE COURT:**  I mean, to be honest, I'm just swamped at

2   the moment.

3        **MS. WEAVER:**  I know.

4        **THE COURT:**  So, but you get it to us.  We'll get

5   through it.  And we will set it for hearing.  I think it's

6   important to have an oral --

7        **MR. LOESER:**  And, Your Honor, if I could be heard for

8   one quick minute on one --

9        **THE COURT:**  Yes.

10        **MR. LOESER:**  This is Derek Loeser.

11        -- just, process point.

12        Where we stand right now, we generally think we know

13   what's missing, and we can describe it in our briefs.

14        Facebook obviously has specific knowledge about what's

15   missing.  And so because they haven't identified specifically

16   what they're withholding, I really think it would be improper

17   for them to argue in their brief that we haven't been specific

18   enough with what we're seeking.  If that is going to be their

19   argument in their brief, then they should comply with your last

20   order, which was to identify specifically what they're

21   withholding.

22        But that's the only --

23        **THE COURT:**  Yeah.  No, I understood.  So that's why

24   I'm doing four briefs.

25        And in the meantime, you should be talking and really

1  trying to narrow.  It is in both sides' interest to have it

2  teed up as accurately as possible for me to decide.  Otherwise,

3  I'm going to make a wrong decision one way or the other because

4  I won't understand.

5          **MR. SNYDER:**  And, Your Honor, it's in everyone's

6  interest to have you not be frustrated with us, which I

7  understand and I think your frustration is well-placed, one.

8          Two, we want Your Honor to continue to preside over

9  discovery; and we would, I think, lose a lot if we had to start

10 fresh with a special master.

11         And mindful of that, we're going to work to narrow the

12 issues.  Maybe we can even eliminate them.  And we have a lot

13 of other work to do in the meantime.  So however long

14 Your Honor needs, we're going to obviously abide and respect

15 that, and we're not going to, you know, ask you to turn around

16 a ruling.

17         There's a lot we have to do on search terms and privilege

18 logs and ADI protocols.  So there's a ton of work for us to do

19 while Your Honor takes -- you know, takes the time necessary to

20 adjudicate this issue, which is ripe now.

21         **THE COURT:**  Yeah.  Just don't put a hearing date.

22 I'll pick it.  So that's not a problem.

23         **MR. LOESER:**  The only thing I would add to that,

24 Your Honor, is that we would like you to be very frustrated

25 with Orin all the time, but not with us.

```
 1                         (Laughter.)
 2          THE COURT:  Well, this week has not been -- I've been
 3   frustrated a lot, and I apologize for that.
 4          MR. SNYDER:  Don't apologize.
 5          MS. WEAVER:  It's tough times.
 6          THE COURT:  There's a lot.  There's just a lot,
 7   scheduling.
 8          MR. SNYDER:  Yes, Your Honor.
 9          THE COURT:  Okay.  So, which leads me to my next
10   point, which is the joint statement -- okay? -- which is, you
11   all are extremely talented, experienced lawyers.  If you can't
12   figure out a way, a process for this statement to work -- it's
13   really, actually, for you.  Right?  The statement is a great
14   way of assessing where we are, what our disputes are,
15   crystallizing it.  It's for you more than me, quite honestly.
16   And if you guys can't figure out together a way to do that,
17   then we've got to go back to zero and start over.  I mean, this
18   should be the easy part.
19        So I'm not going to tell you how to do that joint
20   statement.  The only thing I'm going to tell you is I want it
21   however -- what is -- just even one day, I give you, right,
22   before this?  I take it upon myself; I will make time to read
23   it the night before or early the morning before.  That's my
24   only deadline.  You guys work it out.  Whatever works best for
25   you and gets it.  But the point is, it should really try to
```

1    crystallize it.

2          My own view is -- and with other cases -- is that -- at

3    least with discovery disputes, is if you do time for a reply as

4    opposed to changing what you've already said, that tends to

5    work better.  But I'm not ruling at all.  I want you guys to

6    come up with it.  It's, frankly, below my pay grade to have to

7    tell you how to do it.

8                              (Laughter.)

9          MR. LOESER:  We hear that loud and clear, Your Honor,

10   and we will keep talking to Facebook about it.

11         We just think that it would be really useful for everyone

12   here, including for you, if people talk about things that they

13   put in their statements before it's submitted to the Court.

14   And so that's our mission in trying to come up with a better

15   way to do this.  That's what we're trying to accomplish.

16         THE COURT:  Maybe you could do a statement, a draft,

17   and then you talk about what's in the draft.  Right?  So then

18   you know what's in there before you -- I don't know, but that

19   would --

20         MR. LOESER:  Yeah.  We'll figure it out.

21         THE COURT:  Yes.  I know you guys can figure it out

22   because you're all outstanding lawyers.  That's why you're on

23   this case.

24         Okay.  So then we need to pick our next date.  How about

25   we push it out three weeks, to September 3rd?

```
 1            MR. LOESER:  I think that's the 749th day of March;

 2   so, sounds great.

 3                         (Laughter.)

 4            MS. WEAVER:  That's fine, Your Honor.

 5            MR. SNYDER:  And two months before Election Day,

 6   assuming the post offices --

 7            MS. WEAVER:  There is one.

 8            MR. SNYDER:  -- assuming the post offices and the

 9   polling places aren't shut down permanently.

10            THE COURT:  All right.  Okay.

11            MR. LOESER:  Don't depress us, Orin.

12            THE COURT:  I apologize for having to lecture a little

13   bit, but to be honest, you guys can do better.  I know you can.

14   I know you can.  I have tremendous respect for all of you.

15       Okay.  Great.  I look forward to our next conference.

16   It'll be September 3rd at 8:30 a.m.

17            MR. SNYDER:  Thank you, Judge.

18            MS. WEAVER:  Thank you, Your Honor.

19            MR. SNYDER:  Thank you for everything you're doing.

20   Appreciate it.

21            THE CLERK:  Court's adjourned.

22                  (Proceedings adjourned at 8:51 a.m.)

23                         ---o0o---

24

25
```

1

2                    __CERTIFICATE OF REPORTER__

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Saturday, August 15, 2020

7

8

9    _____

10   Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
            Official Reporter, U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 11

**Hard Questions**

**Does Facebook share my data with advertisers?**
*"We don't share the private information that you put on Facebook with advertisers without your consent."*

**Why do we use that framing?**
- o Though Facebook's policies prohibit sharing of data with data brokers or similar entities, we only make commitments about what Facebook will do.
- o Advertisers who are also developers might get user information through Platform, with user consent.
- o When people make information public, anyone can see it on or off Facebook, so we don't make any non-disclosure commitment for that information.
- o If someone else shares information (including information about you) they control who sees that information.  Also, we may in the future operate a "data cooperative" or other product allowing exchange of information that people haven't given to us directly.

**How does ad targeting work?**
*Key types of targeting*
- o 

**How can people see what you know about them and control their ad experiences?**
*Context menu*
- o Click the "x" or "v" next to any Facebook ad to see who the advertiser is and hide that ad or other ads from the same company.

*Activity Log and Download Your Information (DYI)*
- o See the information you've put on Facebook that may be used for ads.  Delete or change who can see it.

*Ad Preferences (launching summer 2014)*
- o See why you saw a particular ad and what you can do about it.  Also see and modify all your ad clusters.

*Centralized opt-out*
- o Turn off collection and use of third-party behavioral data with one click – not just on FB but across the web.

***See mocks on next page.***



*Context menu (current experience)*

*Ad Preferences context menu (proposed)*

*Ad Preferences*

FB-CA-MDL-00213426

**Behavioral Advertising Announcement**
*(Tentative plans subject to change; late May/early June)*



**Learn More:**

Hi Jane – we want to explain the choices you have over the ads you see.

- **You can choose to opt out:** We want to show you more meaningful ads based on what you do on and off of Facebook, but you can opt out of how this is done by visiting the Digital Advertising Alliance (DAA).
- **You can choose ad categories:** Today we're announcing a new tool called Ad Preferences, which lets you choose info that will influence the ads you see. It's launching today in the US, and will be available everywhere soon.

**Read more about:**

- Ad Preferences
- How we use cookies, pixels, and similar technologies to show you ads on and off Facebook

**Confidential**

## *Location*
### (Maritza Johnson)

Knowing where people are when they interact with our services is useful for designing innovative products, customizing content, and improving our security features. However, location data is generally considered to be sensitive data that deserves a greater level of attention.

In general, we consider the following questions when new products are proposed that leverage location:

- <u>When</u> is the location data collected? Is location data collected when the app is in the <u>foreground</u> (the app is the primary content on the screen and the user is actively engaged), or in the <u>background</u> (the app is running on the phone but the user is not actively engaged with the app)?
- <u>Frequency</u>?
- <u>How</u> is the data point collected?  It's possible to collect the device's location with varying degrees of accuracy (GPS, WiFi, Bluetooth, IP addresses, MAC addresses, etc.).
- What <u>level of granularity</u> is the location data collected and stored? How <u>accurate</u> is the data point?
- <u>Retention</u>, how long do we store it?
- What <u>controls</u> are available?
- Is <u>derivative data</u> produced (ex., ad clusters)?

**Additional considerations depending on the nature of the product and the use of location data**

In cases like Nearby Friends (Aura) where people are intentionally interacting with the feature because it is location based, we offer additional controls and review options so that the user understands what is collected. The combination of the controls, the transparency offered by "Travel History," and the opt-in nature of the product mitigate privacy concerns.

We also offer products that rely on location information as one of many inputs, in some cases, the data used to represent location is less granular or could potentially be less accurate. In those cases, we take a close look at the use of the data, the granularity of the data, the retention policy, and how the data will be stored to minimize the chance that individuals could be linked to the data collected.

<u>**Hard Questions**</u>

**Are you tracking where I go all the time?**
No, unless you recently turned on "Nearby Friends." Visit your Travel History to see what Facebook knows abut your recent whereabouts. If you have chosen not to use this feature, then the Facebook app will only collect your precise location when you open the app if you allow the app to access your location.

**How does Facebook use my location?**
We offer several products that allow you to share your location with your friends like Nearby Friends and Places. We also use location data to customize content in a language that matches the general location where you are using the app and to offer security features.

**When does Facebook collect my location?**
Before the launch of Nearby Friends, the Facebook app did not collect location information when people left the app. The Facebook app collected location data each time the user launched the app, or when the user clicked on the composer box to start a new status.

**How is my location used for advertising?**

Confidential

Facebook currently offers advertisers the ability to target ads based on where people live. For example, a restaurant in Kansas City could choose to show ads to people who live within 10 miles of the zip code where the restaurant is located. The location information Facebook currently uses to target ads comes from people's self-reported Current City, as well as other signals such as their IP address.

**Are you using data from Nearby Friends or Location History to target ads?**
No, at this time we are not using data from Nearby Friends or Location History to
target ads. The launch of this product doesn't impact the way advertisers can target people based on location.

**I want to hide my location from Facebook, how can I turn that off?**
If you're using a mobile app, go to the Settings section on your device and turn off location for the Facebook app. Your IP address will still be used to approximate your location for security features and content localization.

**Can law enforcement get my location history now?**
Your location history is treated in the same way as other data that Facebook collects about you. Law enforcement officials need to go through the same processes to
request it. You can also always delete your location history from the Location
History section of your Activity Log.

**General Context**
- Location-aware services and advertising have become increasingly popular and feasible with the growing popularity of smartphones and other personal devices.
- Geolocation data is recognized as one way that the online and offline worlds can be linked which is a great feature for products, however it introduces additional privacy concerns.
- Regulators worldwide are paying close attention to location data and have said that the sensitive data deserves a greater level of privacy protection.

**Products that use location:**
- Nearby Friends (Aura), https://www.facebook.com/help/629537553762715/
- Travel History
- Site Integrity features (identifying suspicious logins by location of attempts)
- Hunch (to offer local recommendations based on current location)
- FB WiFi (opt-in)
- Measurement for ads – offline measurement, Clicker, Demographics of the World (utilizing the MAC address when people enter a specific range).
- Ads targeting

**Additional background on the uniqueness of location data**
In a study released in March, researchers analyzed the coarse location histories recorded to the nearest hour of 1.5 million mobile phone users. The researchers found that knowing which 23-block area a device was in during four distinct 60-minute periods was enough to uniquely identify 95 percent of location histories in the dataset.
https://www.privacyassociation.org/resource_center/unique_in_the_crowd_the_privacy_bounds_of_human_mobility

**Confidential**

# *Facial Recognition*
## (Emily Sharpe)

**Background:** The facial recognition feature has been the subject of controversy since its launch. After we acquired Face.com, which previously provided the software behind tag suggestions, we took the product offline in order to complete performance improvements. We re-launched the product in the Spring of 2013 in all markets except Canada and Europe.

**Current status of Facebook's facial recognition practices:** Tag suggestions is an ███████████████████ ██████████████████████████████████████████████████████. Unlike other services that offer facial recognition, ████████

- **Notice and Control:** You're informed when someone uploads a photo you're tagged in, and you get added to the audience so you can see it. You can choose to remove the tag, ask the person to remove the photo, or report it to Facebook. Tag review allows you to approve a tag anytime someone tags a photo you're in. You can also turn off tag suggestions so Facebook won't suggest that people tag you when photos look like you, and the template that FB created to enable the tag suggestions feature will also be deleted (although friends will still be able to tag photos of you).
- **Security:** ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████
- **Government access**: We apply strict legal and privacy requirements to all law enforcement requests for photos and facial recognition templates.

**Policy considerations:**

- Regulators in Canada and Europe have expressed strong concerns about our use of facial recognition technology for people who live in their jurisdictions, and the Irish regulator particularly threatened to give us an unfavorable audit report if we didn't commit to stop using facial recognition in Europe without an "opt-in" by each use.
- In the U.S., the National Telecommunications & Information Administration (NTIA) is facilitating a privacy multistakeholder process focused on developing a voluntary, enforceable code of conduct that specifies how the White House's Consumer Privacy Bill of Rights applies to facial recognition. Facebook's facial recognition practices and research have garnered a fair amount of attention during the process, and FB and Google have been pressured by one privacy advocate to present on our practices. Some participants have also focused on FB's large photo collection as being at risk of data harvesting. While we believe our current and planned practices generally align with consensus policy positions, we are working with industry associations to shape the code of conduct.

**Our commitments:**

- We've committed that we won't turn the feature on in Europe unless we agree with the Irish DPC on the type of consent we'll put in place, and that we will consult with the Canadian Privacy Commissioner's Office before offering facial recognition in their country.
- We would likely support (or not actively oppose) NTIA code of conduct principles articulating that 1) companies should tell individuals that they are collecting their facial recognition data, and 2) companies should provide subjects of images with meaningful control over how their images are used to share information with others who would not otherwise know that information.

**Product updates:** In 2014 we're working on a few changes to the way we use facial recognition technology.

- **Face Alerts:** A new, *opt-in* feature that allows people to be notified about photos they're in on Facebook, but haven't been tagged in. They will only be notified about photos they're in the audience to see.

- o  Expected launch is early July (based on EU's team's feedback), and will be available worldwide, including the EU and Canada.
- o  When people opt in to Face Alerts, they'll see these photos in a new section on the "photos of you" page, and these photos will only be available to them.
- o  People can choose to tag these photos to make it part of their identity and timeline.  They can also reject the tag suggestion, preventing people from tagging them in that photo; ask the person who uploaded it to remove the photo; or report it to Facebook.
- o  This feature will be available if your "tag suggestions" setting is turned on.
- **Graph Search.**  We're looking to incorporate facial recognition results into Graph Search.  For celebrities, we would use facial recognition to automatically include photos of a celebrity in search results.  For non-celebrities, we wouldn't automatically integrate photos into search results but would display a distinct "Do you want to tag Sheryl in these photos?" unit next to search results that are informed by facial recognition data.



- **Videos tag suggestions:** We're rolling out a feature that suggest tags in videos.  This feature works just like tag suggestions in photos and, for now, is only available on the web when the uploader of the video clicks the "edit" button.  The underlying technology and settings/controls are the same as tag suggest for photos.  As with all tag suggest features, this will only work if people in the video are your friends.  We are using reactive messaging here in case concerns about "real time facial recognition" surface.


## Hard Questions:

**Do you support regulation of facial recognition technology?**

People's greatest concerns about facial recognition technology don't generally arise from problems with the underlying technology itself, but to problems with how certain people might *use* photos in a way that is inconsistent with individuals' expectations.  We don't think it's helpful to regulate the use of specific technologies.  This only encourages bad actors to come up with new ways to do the same things that aren't yet regulated.  A better approach is to focus on specific activities that raise concern, regardless of what technology is used for those activities.  We support technology neutrality – making sure that regulations focus on practices that raise concerns, not technologies that have both positive and negative uses.

**Facebook talks a lot about user control and its privacy protections, but doesn't that all go out the window when the government gets a warrant and collects all of that data?**

Our facial recognition technology is proprietary and therefore not particularly useful to government investigators.  Our facial recognition software generates a template, which is basically an average of the characteristics of multiple photos of a person. That template is encrypted and requires a "key" to decode it. It can't reliably be used to recognize an individual from among thousands or millions of templates, so if a law enforcement agency tried to use our templates in that way, it wouldn't work properly. We also don't have any reason to believe that existing laws would allow government agencies to compel Facebook to cooperate in a "fishing expedition" for photos, and, if they did, we would vigorously defend the privacy of our users. We aggressively protect our users' data when confronted with law enforcement requests: We scrutinize every government data request that we receive – whether from state, local, federal, or foreign governments. We frequently reject such requests outright, or require the government to substantially scale down its requests, or simply give the government much less data than it has requested. And we respond only as required by law.

**Facebook has the world's largest database of photos.  What are you doing to prevent people from "scraping" the photos so they can combine them with publicly available FB profile data, and then apply commercially available facial recognition technology to identify otherwise-anonymous people walking on the streets or in other photos online?**

We implement legal and technical measures to deter data harvesting (a.k.a. "scraping").  Although we do not discuss specific technical measures for security reasons, we use rate limiters and other methods to detect and deter efforts to harvest publicly available Facebook data.  Our policies also prohibit people who access our site from screen-scraping and similar data harvesting efforts.  We have taken legal action where we have learned that people have attempted to circumvent these measures.

**FB-CA-MDL-00213432**

# *Apps, Acquisition, and Creative Labs*
## (Travis Bright)

For the last few years Facebook has moved towards a federated system of applications compared to our previous work to integrate all featured into the main Facebook app. In addition, we acquired Instagram that has continued to run pretty independent from the rest of Facebook and Mark's statements around WhatsApp indicate that they will run all but completely separate from Facebook. With Creative Lab's focus on incubating new ideas in the form of small projects brought to market quickly (and often as a stand alone app) which increases the trend of "ever more apps". There are some fundamental questions that have to be addressed:

- Do people use the system anonymously, pseudo-anonymously, or with their real name?
- What level of data integration will exist? Nothing, anonymized/aggregated/hashed data mapping, or full data integration (increasing the person's Facebook profile)
- What level of separation are we trying to achieve from the main brand?

**Level of Anonymity**
Facebook has long championed our real name culture. But more and more of our competitors and our own internal apps are breaking away from this because people often perceive real name system with being "heavy weight". To make a fun, lighter experience that often is more ephemeral than traditional Facebook our PMs and Designers are moving towards ███████████████ This complicates our external messaging and our ███████████ ███████ but what is critically important is our company's ability to test new things. Our product teams have to be free to push the boundaries and create new test without being constrained by our previous positions and thoughts. As a policy team that has to speak externally, build relationships, and judge the impact on external people each change will bring this is and will continue to be a problem. We'll need to make sure that all of our statements are focused on the current system and always leave the expectation that change will happen.

**Data Integration**

███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
████

███████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████

FB-CA-MDL-00213433

**One Brand or Many?**

A more recent trend is for product teams to want to distance themselves from Facebook by not directly referencing it or obscuring the link. They feel that different groups of people feel are more concerned with sharing certain data when they think about Facebook. They believe that people mentally associate their friends, co-workers, family members, … along with permanence with Facebook. They don't want Facebook in the name, don't want Facebook in the privacy policy, shown during registration, … And this isn't just for Facebook. Pepper, the new direct sharing app for Instagram is likely to have an external name that doesn't use "Instagram" in it. We obviously can't hide our ownership of these apps but getting back to the product team's need to be able to test things we need to allow them some flexibility to break away. This also comes up when we acquire an app. Obviously, Moves and WhatsApp have never mentioned Facebook in their product before and the mindset seems around keeping them as separate as possible going forward. They have different privacy policies, different content policies, … From a tactical side we need to figure out a way to deal with a world where we have dozens of different DUPs, Privacy Policies, and rules. We need to decide for our internally built apps whether we will allow them the all to have their own custom policies or if we should build out a few tiers of policies and ask them to select the level they need.

**Hard Questions:**

Where do we start with a new app or acquisition? The basic questions:

- Data Policy
    - What data is collected? (PII, location, …)
    - Where does is the data stored?
    - How long is the data stored?
    - Is there any sharing of data between apps and/or Facebook?
    - Will we target ads with this data?
    - Will this system use Facebook's DUP?
- Content Policy
    - What are the rules for using this new system and are they different than Facebook's?
- People Policy
    - Will the system know/collect ages?
    - What is the minimum age?
    - Is this system using real names?
    - Is there reporting? Blocking?
    - Does the system verify accounts? How?
    - Will there be ads? From where?
    - Will we charge for this service?
- Privacy Policy
    - What is the default level of privacy for the system?
    - If this is an existing system what previous promises were made?
    - How are we going to fulfill our Irish DPA/FTC obligations for this system?
    - Will this system use Facebook's Privacy Policy?

There is a quick matrix of common apps and their differences here:
https://docs.fb.com/sheet/ropen.do?rid=osbge49eb2cbdfc004a8ea79e35865b97817b

## Safety Policy Paper
### (Emily Vacher)

**What are our safety goals and priorities for 2014?**

**(1)  Public Policy.**  It is our responsibility to demonstrate our position in the industry as thought leaders regarding safety issues and to support policy makers when they are faced with pressure to legislate in areas that are better handled by empowering users with tools and education.

- Review of proposed safety legislation/policies.
  - Safety is an area in which we typically do not want to encourage legislation or the appointment of eSafety officials.  We will work with country managers/legal when safety related legislation is proposed to minimize the impact to FB.
  - Support in this area includes targeted education and resources for teens and adults, strong partnerships with key safety groups and organizations, and the development of technical solutions and effective reporting channels.
- Identify highest risk jurisdictions and target with appropriate proactive educational campaigns, relationship building, and other strategic engagement.
  - At present, resources are being primarily directed to a few of the highest risk countries, including Australia, New Zealand, Canada, Brazil, US, Singapore (when the comprehensive review is completed, this will be reevaluated.)

**(2)  External relationships and partnerships**.

- Develop and leverage strategically selected domestic and international child safety/advocacy partners who can provide feedback on programs and products, speak to policymakers and press as needed and demonstrate to policymakers and we are aligned with experts.
- Partners include NCMEC, SAB, and international child safety organizations like IWF, SaferNet, Chicos.net, Project RockIt.  We also work cross functionally with both Policy Comms and Security Comms to proactively present our messaging and to reactively deal with media fires and/or misinformation.

**(3)  Product safety**

- Product Reviews: Review all upcoming product and feature releases to ensure they don't violate our core safety principles or put our external relationships at risk.
- Work with cross-industry partners to drive safety innovation in technology, including in the areas of suicide prevention, social resolution, and PhotoDNA.  Additionally, help NCMEC achieve their goals of finding missing kids and ending exploitation through tools like AMBER Alert v2 and video hashing.

**(4)  Teen education and empowerment**.

- Build, pilot and scale a "Youth Ambassador Program": We are currently negotiating with ChildNet International to develop the curriculum for this program, and will initially pilot the program in London, the US, and one other market.
- Work with Policy Programs to identify gaps and develop appropriate educational programs/materials to demonstrate our thought leadership.
  - Bullying Prevention Hub Global Rollout (EMEA, LatAm)
  - Think Before You Share Global Rollout
  - Friend in Need College Campus Tour/Town Halls
  - Internet 101 for Emerging Markets (in development)
- Use data driven research to help us make decisions in safety policy, program development and for talking points with policymakers.

**Confidential**

- o Investigate research possibilities with FOSI, University of New Hampshire CAC Research Center, danah boyd, etc.
- Support country managers by providing safety materials they can use in their countries

**(5) Adult education and empowerment.**
- Engage with organizations who work with adults who parent, support, educate, and mentor children and provide tools, resources, and educational programs, including religious communities, teachers, Scouts, Big Brother/Big Sister, Cal Ripken, Sr. Foundation, pediatricians, school resource officers, etc.
  - o FB 101 For Parents & "Having the Tech Talk"
  - o Leverage FOSI's new "GDP" (Good Digital Parenting) program for opportunities for co-branded parent focused FB educational materials/programs, distribution channels, and research opportunities.

<u>**Hard Questions**</u>

**Why are you now letting kids 13-17 now post publicly?  Isn't this dangerous for them?**

On Facebook, you control who you share with. That can be a single person in a message, a small group, with friends, or with the world.  Before we updated our policies, for people aged 13 through 17, the initial audience of their first post on Facebook was set to "Friends of Friends" – with the option to change it.  After this update, a new teen on Facebook's first post is set to a narrow initial audience of "Friends" only.  It's important to realize that teens are among the savviest people using social media, and whether it comes to civic engagement, activism, or their thoughts on a new movie, they want to be heard. So with this update, people aged 13 through 17 now have the choice to post publicly on Facebook.  While only a small fraction of teens using Facebook might choose to post publicly, this change now gives them the choice to share more broadly, just like on other social media services.

**You say your policy is that you have to be 13 or over to have a FB account but studies have shown that there are millions of kids under 13 on Facebook.  Why doesn't Facebook do more to keep kids off the site?**

- Safety experts agree that there is no singular way to keep underage children off of any platform – so we employ a layered approach to keeping kids under 13 off our site:
  - o People who sign up for a Facebook account are required to type in their age on the very first screen. We use a simple piece of technology called a cookie to ensure that if a teen tries to sign up for FB and indicates that they are 12, they can't simply come back a minute later and say that they're 13+. This helps keep underage kids off of our site, and it's something we've chosen to do (not required of us).
  - o We ask people to notify us if they believe there is an underage user on our site; we have a dedicated compliance channel for these reports; and we delete the accounts of children under 13 as soon as we become aware of them.
- However, one report highlights that most parents with under 13's on Facebook not only know their kids are on our service, but helped them sign up (and lie).
  - o This report (by Danah Boyd, Eszter Hargittai, Jason Schultz and John Palfrey) notes that parents actively assist their children under 13 in joining Facebook even though they know it violates our policy.
  - o The report also highlights the difficulty in implementing age restrictions on the Internet and underlines the need to continually work to keep kids safe online.
  - o We appreciate the attention that these types of reports are giving to child safety, and believe that they provide important opportunities for everyone – industry, government, parents, advocates – to discuss it with the ultimate goal of trying to provide better, safer experiences for kids online.

**FB-CA-MDL-00213436**

**What is Facebook doing to prevent bullying on its site?**

Bullying in any form – from the school playground to online – is unacceptable. Facebook is the industry leader when it comes to bullying prevention, and we help people speak up for each other.  We've created policies, programs, and tools to foster safety, accountability and trust in our community.

- **Policies:**
  - *Real Name Culture* – We've built a network based on authentic identity, so people are more likely to treat each other with respect. It is a violation of our policies to use a fake name or operate under a false identity.
  - *Easy to Use Reporting* – There are 'Report' links on virtually every Facebook page, and anyone in our community can block people who post hurtful content. Harassment, bullying and other forms of abuse are prioritized by our response team.
  - *A Safe Experience for Minors* – Facebook's privacy and visibility settings take into account the unique needs of people between the ages 13 and 17, and are generally more restrictive than the settings for adults.

- **Product Innovation:**
  - *Fostering Compassion* - We've partnered with the Yale Center for Emotional Intelligence to provide youth and adults with valuable tools and strategies to help them effectively address bullying behavior and its consequences.
  - *Conflict Resolution* – We believe in the power of friends to help prevent bullying. That's why we've created tools like Social Reporting that enable people to report bullying and harassment to trusted friends and adults. Our data shows that in over 80% of cases, when a teen asks another teen to remove a photo from our site they don't like, the other teen will comply.  Approximately 3.9 million people use this tool each week.
  - *Support Dashboard* – Everyone should be able to know what happens to reports sent to Facebook. We've created a feature that lets people see whether or not their report has been reviewed and allow them to be notified when a decision is made (note: the dashboard does not cover every report made by users – e.g,. if you report someone for using a fake name.)

- **Digital Citizenship Education:** Consumer education is a key pillar of creating a culture where people treat each other with respect. Together with safety advocates, academics, government and industry, we use our platform to raise awareness of bullying and how to prevent it.
  - *Family Safety Center* – In November 2013 we launched an expansion of our Family Safety Center. We worked with the Yale Center for Emotional Intelligence to develop new content on bullying prevention, including tips, tools, and actual scripts for all stakeholders: parents, educators, and teens, even people accused of bullying. The new hub is also directly tied to reporting on Facebook because we know that it's so important to give people who get bullied or see it happening the resources they need at the moment they need it most.
  - *Bullying Prevention Education* – Facebook has launched several education efforts aimed at inspiring bystanders to take action to stop bullying.  In the US, we've partnered with Time Warner to create a social media pledge (Stop Bullying; Speak Up) to speak up when adults and students see bullying occur – today more than 140,000 people have taken the pledge.

**Are you targeting children with ads that are not appropriate for them?**
We have strict guidelines over what organizations can advertise to people 13 to 17 on Facebook.  This is one reason it is important for teens who set up an account use their real age – to make sure they receive the many protections we offer teens in our community.

Confidential

# *Contact Import*
## (Matt Scutari)

**A Brief History of Facebook Contact Import**
Facebook's contact import functionality (or "Find Friends") is designed to drive engagement and growth by helping people find and add new friends on Facebook.  This is a three-step process:

1. Person uploads his or her contacts to Facebook.
2. Facebook shows the uploader contacts who are also on Facebook and prompts the uploader to add them as friends (drives engagement).
3. Facebook shows the uploader contacts who are <u>not</u> on Facebook and prompts the uploader to invite them to join Facebook (drives growth).

Over the years, contact import functionality has been the subject of significant legal and regulatory attention in various jurisdictions around the world (for Facebook and others).  Facebook has mitigated risks associated with its Find Friends feature in a number of ways, including by displaying notice before a person uploads contacts, providing a way for people to manage and delete the contacts they upload, providing people with granular control over invitations, and restricting what types of data can be uploaded to Facebook's servers from the person's device.

Much of the controversy surrounding Facebook's Find Friends feature has involved our collection and use of the non-user data in connection with facilitating invitations to join Facebook.  Particularly in Europe, non-users are often viewed as owning their personal data, regardless of the source.  However, we take the position that any contact information uploaded by a Facebook user <u>belongs to the uploader</u>.  While this argument has been challenged, it appears to be sustainable to the extent that we're using non-user data <u>only to help the uploader connect with them on Facebook</u> (and potentially to help others connect on Facebook).

Our collection and use of non-user data may become more problematic to the extent we attempt to use non-user data for other purposes. The Irish DPC's 2011 audit report addresses complaints regarding our alleged use of contact information uploaded by users to  create so-called "shadow profiles" of non-users without their knowledge. We maintained that we do not create such "shadow profiles," and stated that non-user data is only used to allow the uploader to send invitations to non- users. Importantly, we relied on the argument that a non-user is clearly informed that Facebook has her contact information when someone sends her an invitation, which offers a link to allow non-users to delete their contact information (although note that we retain a non-usable hashed version of the non-user's contact information in order to prevent any further invitations from being sent to that address). The DPC ultimately found that "the upload of contacts by individuals to facilitate the sending of invitations to friends could operate in compliance with the Data Protection Acts provided full information was provided to non-users in relation to the use of their email address data on receipt of an invitation and any requests for removal are respected."

Other Facebook apps, such as Messenger, Slingshot, and Instagram also have contact import features, but they differ from Facebook's functionality in various ways. For example, Messenger, Slingshot, and Instagram all ██████████████████████████████████████████ (although this may change in the coming months). Additionally, ███████████████████████████████████████████ ███████████████████ However, ██████████████████████████

Note that WhatsApp has also been subject to significant regulatory scrutiny for its contact import functionality, particularly with respect to its collection and use of non-user data.

Confidential                                                FB-CA-MDL-00213438

**Hard Questions**

**Q. Does Facebook collect non-user data?**
A. If people on Facebook choose to upload information about their contacts, Facebook will maintain this information on the uploader's behalf and use it to let the uploader invite people to join Facebook. We give non-users an opportunity to request that Facebook stop using their contact info for friend suggestions whenever a Facebook user sends them an invite to join Facebook. We keep a hashed version of their info to ensure that we honor such requests.

**Q. What does Facebook do with non-user data?**
A. We currently maintain contact information regarding non-users only to allow the Facebook user who uploaded the contacts to invite the non-users to join Facebook. [Note: The growth team is considering using this data for PYMK, so we should be careful to speak about this only in terms of what we do currently.]

**Q. How does Facebook justify collecting and using non-user data when the people to whom the data pertains are not subject to Facebook's privacy policy?**

A.  At this time, we only allow people who uploaded their contacts to Facebook to send invitations to those contacts who are not on Facebook. If the uploader sends an invitation to a non-user, the non-user can request that Facebook stop sending invitations or using the person's contact info for suggestions.

**Q. Does Facebook create "shadow profiles" for non-users?**
A. No.

**Q. What does it mean to "continuously sync" contacts?**
A. "Continuous sync" is an industry buzzword that can mean a number of different things.  Typically, "continuous sync" functionality is not literally continuous, but rather periodic.

**Q. Does Facebook continuously sync contacts?**
Facebook does not continuously sync contacts at this time, but we are always testing new features to make it easier for people to connect on Facebook. Although Messenger, Slingshot, and Instagram do continuously sync contacts, none of these processes are truly continuous.  For example, Slingshot will sync with your address book each time you do a cold restart of the app, and Messenger will periodically check to see if you had added new contacts to your address book.

# Exhibit 12

**Privacy Off-Site - Template**

**Inventory of Status Quo**

What are we doing that's good (perceived or real) from a privacy perspective?  List everything with a brief description of each.



**Product**

*Granular Data Permissions*
████████████████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████████████████████
████████
-Came out of OPC investigation and fits with "just-in-time" consent model outlined by FTC

*Privacy Settings*
-Applications are subject to same privacy settings as users
-Relatively clear and simple opt-out for both Platform and Instant Personalization
-Ability to block and/or report applications that may be misbehaving
-Settings for information accessible to friends' applications

*Social Plugins*
████████████████████████████████████████████████████████
████████
-Positioned this as a privacy innovation at launch, but confusion and backlash from Instant Personalization made message less effective

*Instant Personalization*
-For recent integrations, we've spent a lot of time making the disclosures on partners sites clear and prominent, with easy ability to opt out

████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
**Policy and Enforcement**

-On a high level, ██████████████████████████████████████████████
████████████████████████████████████████████████████
-We require all applications to have a privacy policy and to link to it both in the GDP dialog (required by OPC and FTC) and on the canvas page
-We require applications to ██████████████████████████████████████████

FB-CA-MDL-00149613

██████████ ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████; action ranges from placing a moratorium on
distribution channels to disabling the application and removing all content created
through it, and we've disabled thousands of applications for violating our policies

**Communications/Strategy**

-When we lead with the value proposition and can demonstrate it clearly, we win
(examples: recent IP launches for Bing, Rotten Tomatoes, and to a lesser extent,
Scribd; single sign-on for mobile); being confident in the message and promoting it
through launch events, etc. helps

What are we doing that's bad (perceived or real) from a privacy perspective?

**Product**

*Granular Data Permissions*
-Viewed as a failure from a product perspective because it deters app usage
(example: NYT and its scarily long GDP dialog: http://nyti.ms/gr4bII).  We're
exploring options to replace it, one of which is a ████████████████████████████
███████████████████████████████████████████████████████████
██████████

██████████
-████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████).

*Social Plugins and Connect*
-Confusing experience: Users aren't sure what data is being shared, or what
happens after they click; lots of different blue buttons across the web with little
explanation of the consequences/value proposition
-Don't have a good answer to the question of what passive data we collect when
people land on sites with social plugins or Connect

*Instant Personalization*
-Sharing personal data with third parties without user consent

FB-CA-MDL-00149614

*Read vs. Write Access*

██████████████████████████████████████████████████████████
███████████████████████████████████████████ users view them as very
different

*Connecting Accounts*

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

## Policy and Enforcement

███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████
-Enforcement is imperfect.  For example, there's no way for us to enforce the
requirement that apps ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████
-██████████████████████████████████████████████████████████
████████████████████████████
████████████████████████

## Data Portability

███████████████████████████████████████████████████████████
████████████████████████████ (example: recent back-and-forth with
Google over exporting friends' contact info); need to decide if we're going to be
principled or pragmatic (can't be both)

## Organization

-Lack of ownership over privacy means that we don't have a good understanding of
where we are or a clear vision for where we're going (examples: cycles spent
figuring out the UID issue, what we track through the Like button, why we keep
data and for how long, etc.)
-We allow lots of functionality because we want Platform to be open and believe
that developers will ultimately find uses for it; however, this makes us vulnerable
to criticism
-We err on the side of making it easy for the developer rather than intuitive for the
user

What are our competitors (e.g. Google, Twitter) and other companies doing in this
space and how do we compare?

FB-CA-MDL-00149615

N.B. We're the only major player in the social platform space, and this is likely to continue for the foreseeable future.

**Google**
-Most popular APIs don't come close to ours in terms of volume of usage.  They also don't involve social or personal information (Maps API, for example). This makes them less vulnerable to privacy criticism, but also less powerful.
-OpenSocial and FriendConnect were never widely adopted and, for all intents and purposes, no longer exist.
-An analogous platform for Google would be one that provides access to search and ad data (the core parts of the service).  Google has been very effective at painting us into a corner on data portability (positioning our platform as closed), while at the same time refusing to answer the question of why it doesn't provide a search or ads API.

**Twitter**
-Over 100,000 apps responsible for 75% of all traffic and 60% of all tweets
-Service is different in that everything is public by default, and thus there's no user expectation of privacy
-Not much diversity in apps: Most simply provide an easier way to either consume or publish content.  At launch, most apps focused on filling feature holes that the company had yet to tackle (for example, TwitPics and mobile Twitter apps).  As the company has matured, many of these feature holes have been filled, and development has shifted to three main areas: meme trackers, real-time communication, and business/competitive intelligence.

**Apple**
-App Store has 300,000 applications.
-Mentioned most often as a counterpoint to our open approach; all applications are subject to approval by Apple, outlined in the iPhone SDK agreement, and an NDA forbids developers from disclosing their rejection notices.  Apps are screened for both functional and content violations

What could/should we be doing differently, either to correct existing problems or to improve our positions in the future?

Confidential

FB-CA-MDL-00149616

**Product**

*Granular Data Permission*

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████

*Apps Dashboard*

███████████████████████████████████████████████████████
████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████

*Friends' Data*

███████████████████████████████████████████████████████
████████████████████████████████

*Instant Personalization*

███████████████████████████████████████████████████████
████████████████████████████████

*Social Plugins and Connect*

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

**Policy and Enforcement**

-Anything that improves our enforcement story - particularly for the long tail of developers - and lessens the perception of Platform as the "Wild West"
███████████████████████████████████████████████████████
█████████████████████

**Communications/Strategy**

-Figure out where we want to take a strong stance because we're doing better than others and be vocal about it (for example, the hypocrisy of news outlets that share registrants' personal data with third parties, but then criticize us for things like unintentionally passing UIDs in referrers)
-Continue to focus our message on the value provided to users
-Continue to choose partners and implementations where social makes sense (e.g. review sites like Yelp and Rotten Tomatoes)

**Organization**

-Establish ownership over privacy so that we can better understand status quo and develop a clear position moving forward
-Audit Platform for potential additional privacy landmines (like the UID issue, tracking through social plugins, etc.)

**Parameters**

What changes (if any) to our current practices have been or are likely to be proposed that should be declared off-limits? Consider proposals emanating from internal and external sources.

-Restrictions on the use of cookies: Cookies are a critical piece of the technology that allows people to carry their identity and connections with them around the web
-Shut down instant personalization: Our vision for the future is for the web to be social by default, and this would be a serious hit to that vision

**Global Perspective**

How are our current practices viewed by users and regulators outside of the United States?

N.B.  The rest of the world is behind the U.S. on this issue, and Canada helped provide some additional cover.  As a result, views are largely the same internationally with several exceptions.

-Third-party cookies: There has been a move in the EU to require third parties to ask explicit consent to place cookies when these are not for the domain of the primary website.  This was aimed at third-party ad networks primarily but could equally apply to all Facebook apps.  It is still being worked out so the full impact isn't yet known.  Some outcomes would mean that apps and any ad networks they use would have to ask permission before installing cookies.

-Ad networks: There is a lot of regulatory concern about ad networks.  Where apps use these, the concern may be heightened, as there is a chance for ad network OBA data to be combined with Facebook data.

-Location data: This is especially sensitive in the EU.  Most people are happy that

FB-CA-MDL-00149618

Places has appropriate controls in place.  However, some of the location-based apps using Facebook APIs could be a lot more "on the edge" in regulatory terms.  We need to consider how much freedom we want to give them as the blame for bad practices may be brought back to Facebook.

-"Bad" speech accessible via the API: There have been instances of people using the API to find hate speech and other bad content in public posts.  This could grow as an issue with public authorities using Platform to identify potentially illegal content en masse and asking us to move against it.  This carries significant privacy implications for our users who may be shocked to find their Facebook data accessed in this way.

What steps (if any) should we take to better align our practices with global expectations?

Because the rest of the world (with the exception of Canada) hasn't been following Platform as closely, in general, anything we do to improve our position in the U.S. will be beneficial elsewhere as well.

Confidential

Exhibit 13

.

| | |
|---|---|
| **From:** | Scott Renfro </O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=EC939C23AC4348C6B7F2B4AE6DE65518> |
| **Sent:** | Tuesday, March 04, 2014 2:33 PM |
| **To:** | Maritza Johnson; Rob Sherman; Erin Egan |
| **Subject:** | FW: 3rd party ads data |

On 3/3/14, 2:26 PM, "Aldo King" <aiking@fb.com> wrote:

+ Ed, Shirine, and Mark for reference

Here are most of the places where ████████████████████████████████████

██

████████████████████████████████████████████████████████████████████████████

████████████████ the third party (it calls an FB endpoint) and is matched against the Facebook's FR cookie.

████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████ ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████

██████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████

██████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

██████████████

████████████████████████████████████████████████████████████████████████

████████████████████ ████ partners include DataLogix,
Epsilon, Acxiom, and Experian. ████████████████████████████████████████

████████████████████

Facebook works with DataLogix and Acxiom to help ████████████████████████████

████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████

**Highly Confidential - Attorneys' Eyes Only**

FB-CA-MDL-00203262



On 3/3/14, 6:40 AM, "Scott Renfro" <<u>srenfro@fb.com</u>> wrote:

Can you give me a quick summary of our use of 3rd party data for ads? Feel free to cc relevant folks from ads.

I'm in DC this week for discussions about big data and privacy and ads seems to be the main place we're leveraging non-FB data directly or indirectly.

Highly Confidential - Attorneys' Eyes Only                                        FB-CA-MDL-00203263

# Exhibit 14

US 20170195435A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2017/0195435 A1

Sarukkai (43) **Pub. Date:** **Jul. 6, 2017**

(54) **CORRELATING MEDIA CONSUMPTION DATA WITH USER PROFILES**

(71) Applicant: **Facebook, Inc.**, Menlo Park, CA (US)

(72) Inventor: **Ramesh Rangarajan Sarukkai**, Los Gatos, CA (US)

(21) Appl. No.: **14/985,089**

(22) Filed: **Dec. 30, 2015**

**Publication Classification**

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 29/08* | (2006.01) |
| *H04N 21/45* | (2006.01) |
| *G06T 1/00* | (2006.01) |
| *H04N 21/254* | (2006.01) |
| *H04N 21/4627* | (2006.01) |
| *H04N 21/8358* | (2006.01) |
| *H04N 21/4788* | (2006.01) |
| *H04N 21/258* | (2006.01) |

(52) **U.S. Cl.**

CPC .............. *H04L 67/22* (2013.01); *H04L 67/12* (2013.01); *H04L 67/306* (2013.01); *H04N 21/4788* (2013.01); *H04N 21/4532* (2013.01); *H04N 21/25883* (2013.01); *H04N 21/2541* (2013.01); *H04N 21/4627* (2013.01); *H04N 21/25875* (2013.01); *H04N 21/8358* (2013.01); *G06T 1/0021* (2013.01); *G06T 2201/0064* (2013.01)

(57) **ABSTRACT**

In one embodiment, one or more computer systems of a social-networking system retrieve a user profile for a user associated with a media device. The one or more computer systems of a social-networking system receive media consumption. The one or more computer systems of a social-networking system correlates the user profile and the media consumption data to determine device-based media consumption data associated with content being consumed on the media device. The one or more computer systems of a social-networking system store data that associates the user profile with the device-based media consumption data.



**100**



*FIG. 1*



*FIG. 2*



**FIG. 3**



**FIG. 4**



**FIG. 5**



*FIG. 6*



**FIG. 7**



*FIG. 8*

Case 3:18-md-02843-VC   Document 1086-4   Filed 12/12/22   Page 734 of 837



*FIG. 9*

US 2017/0195435 A1

1

Jul. 6, 2017

## CORRELATING MEDIA CONSUMPTION DATA WITH USER PROFILES

### TECHNICAL FIELD

[0001]   This disclosure generally relates to analyzing media consumption.

### BACKGROUND

[0002]   A social-networking system, which may include a social-networking website, may enable its users (such as persons or organizations) to interact with it and with each other through it. The social-networking system may, with input from a user, create and store in the social-networking system a user profile associated with the user. The user profile may include demographic information, communication-channel information, and information on personal interests of the user. The social-networking system may also, with input from a user, create and store a record of relationships of the user with other users of the social-networking system, as well as provide services (e.g., wall posts, photo-sharing, event organization, messaging, games, or advertisements) to facilitate social interaction between or among users.

[0003]   The social-networking system may send over one or more networks content or messages related to its services to a mobile or other computing device of a user. A user may also install software applications on a mobile or other computing device of the user for accessing a user profile of the user and other data within the social-networking system. The social-networking system may generate a personalized set of content objects to display to a user, such as a newsfeed of aggregated stories of other users connected to the user.

[0004]   A mobile computing device—such as a smartphone, tablet computer, or laptop computer—may include functionality for determining its location, direction, or orientation, such as a GPS receiver, compass, gyroscope, or accelerometer. Such a device may also include functionality for wireless communication, such as BLUETOOTH communication, near-field communication (NFC), or infrared (IR) communication or communication with a wireless local area networks (WLANs) or cellular-telephone network. Such a device may also include one or more cameras, scanners, touchscreens, microphones, or speakers. Mobile computing devices may also execute software applications, such as games, web browsers, or social-networking applications. With social-networking applications, users may connect, communicate, and share information with other users in their social networks.

### SUMMARY OF PARTICULAR EMBODIMENTS

[0005]   Particular embodiments allow a social-networking system to correlate or merge user profile data of a user of the social-networking system with media consumption data. In some embodiments, the social-networking system determines or captures media consumption data through a user device, a media device, or by receiving data from a content provider. In particular embodiments, media consumption data may be captured by or sent to the social-networking system via a user device, a media device, or a content provider. In particular embodiments, a user device may capture media consumption data and allow a social-network to correlate the media consumption data with a user profile.

[0006]   The embodiments disclosed above are only examples, and the scope of this disclosure is not limited to them. Particular embodiments may include all, some, or none of the components, elements, features, functions, operations, or steps of the embodiments disclosed above. Embodiments according to the invention are in particular disclosed in the attached claims directed to a method, a storage medium, a system and a computer program product, wherein any feature mentioned in one claim category, e.g. method, can be claimed in another claim category, e.g. system, as well. The dependencies or references back in the attached claims are chosen for formal reasons only. However any subject matter resulting from a deliberate reference back to any previous claims (in particular multiple dependencies) can be claimed as well, so that any combination of claims and the features thereof are disclosed and can be claimed regardless of the dependencies chosen in the attached claims. The subject-matter which can be claimed comprises not only the combinations of features as set out in the attached claims but also any other combination of features in the claims, wherein each feature mentioned in the claims can be combined with any other feature or combination of other features in the claims. Furthermore, any of the embodiments and features described or depicted herein can be claimed in a separate claim and/or in any combination with any embodiment or feature described or depicted herein or with any of the features of the attached claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0007]   FIG. 1 illustrates an example network environment associated with a social-networking system.

[0008]   FIG. 2 illustrates an example social graph.

[0009]   FIG. 3 illustrates an example network environment.

[0010]   FIG. 4 illustrates an example environment in which a social-networking system may identify a user of a user device.

[0011]   FIG. 5 illustrates an example environment in which a social-networking system may determine media consumption data.

[0012]   FIG. 6 illustrates an example method for correlating user profile data with media consumption data received from a user device.

[0013]   FIG. 7 illustrates an example method for correlating user profile data with media consumption data received from a content provider.

[0014]   FIG. 8 illustrates an example method for correlating user profile data with media consumption data received from a media device.

[0015]   FIG. 9 illustrates an example computer system.

### DESCRIPTION OF EXAMPLE EMBODIMENTS

[0016]   FIG. 1 illustrates an example network environment 100 associated with a social-networking system. Network environment 100 includes a user 101, a client system 130, a social-networking system 160, and a third-party system 170 connected to each other by a network 110. Although FIG. 1 illustrates a particular arrangement of user 101, client system 130, social-networking system 160, third-party system 170, and network 110, this disclosure contemplates any suitable arrangement of user 101, client system 130, social-networking system 160, third-party system 170, and network 110. As an example and not by way of limitation, two or more of

2

client system **130**, social-networking system **160**, and third-party system **170** may be connected to each other directly, bypassing network **110**. As another example, two or more of client system **130**, social-networking system **160**, and third-party system **170** may be physically or logically co-located with each other in whole or in part. Moreover, although FIG. **1** illustrates a particular number of users **101**, client systems **130**, social-networking systems **160**, third-party systems **170**, and networks **110**, this disclosure contemplates any suitable number of users **101**, client systems **130**, social-networking systems **160**, third-party systems **170**, and networks **110**. As an example and not by way of limitation, network environment **100** may include multiple users **101**, client system **130**, social-networking systems **160**, third-party systems **170**, and networks **110**.

[0017] In particular embodiments, user **101** may be an individual (human user), an entity (e.g., an enterprise, business, or third-party application), or a group (e.g., of individuals or entities) that interacts or communicates with or over social-networking system **160**. In particular embodiments, social-networking system **160** may be a network-addressable computing system hosting an online social network. Social-networking system **160** may generate, store, receive, and send social-networking data, such as, for example, user-profile data, concept-profile data, social-graph information, or other suitable data related to the online social network. Social-networking system **160** may be accessed by the other components of network environment **100** either directly or via network **110**. In particular embodiments, social-networking system **160** may include an authorization server (or other suitable component(s)) that allows users **101** to opt in to or opt out of having their actions logged by social-networking system **160** or shared with other systems (e.g., third-party systems **170**), for example, by setting appropriate privacy settings. A privacy setting of a user may determine what information associated with the user may be logged, how information associated with the user may be logged, when information associated with the user may be logged, who may log information associated with the user, whom information associated with the user may be shared with, and for what purposes information associated with the user may be logged or shared. Authorization servers may be used to enforce one or more privacy settings of the users of social-networking system **30** through blocking, data hashing, anonymization, or other suitable techniques as appropriate. Third-party system **170** may be accessed by the other components of network environment **100** either directly or via network **110**. In particular embodiments, one or more users **101** may use one or more client systems **130** to access, send data to, and receive data from social-networking system **160** or third-party system **170**. Client system **130** may access social-networking system **160** or third-party system **170** directly, via network **110**, or via a third-party system. As an example and not by way of limitation, client system **130** may access third-party system **170** via social-networking system **160**. Client system **130** may be any suitable computing device, such as, for example, a personal computer, a laptop computer, a cellular telephone, a smartphone, a tablet computer, or an augmented/virtual reality device.

[0018] This disclosure contemplates any suitable network **110**. As an example and not by way of limitation, one or more portions of network **110** may include an ad hoc network, an intranet, an extranet, a virtual private network

(VPN), a local area network (LAN), a wireless LAN (WLAN), a wide area network (WAN), a wireless WAN (WWAN), a metropolitan area network (MAN), a portion of the Internet, a portion of the Public Switched Telephone Network (PSTN), a cellular telephone network, or a combination of two or more of these. Network **110** may include one or more networks **110**.

[0019] Links **150** may connect client system **130**, social-networking system **160**, and third-party system **170** to communication network **110** or to each other. This disclosure contemplates any suitable links **150**. In particular embodiments, one or more links **150** include one or more wireline (such as for example Digital Subscriber Line (DSL) or Data Over Cable Service Interface Specification (DOCSIS)), wireless (such as for example Wi-Fi or Worldwide Interoperability for Microwave Access (WiMAX)), or optical (such as for example Synchronous Optical Network (SONET) or Synchronous Digital Hierarchy (SDH)) links. In particular embodiments, one or more links **150** each include an ad hoc network, an intranet, an extranet, a VPN, a LAN, a WLAN, a WAN, a WWAN, a MAN, a portion of the Internet, a portion of the PSTN, a cellular technology-based network, a satellite communications technology-based network, another link **150**, or a combination of two or more such links **150**. Links **150** need not necessarily be the same throughout network environment **100**. One or more first links **150** may differ in one or more respects from one or more second links **150**.

[0020] FIG. **2** illustrates example social graph **200**. In particular embodiments, social-networking system **160** may store one or more social graphs **200** in one or more data stores. In particular embodiments, social graph **200** may include multiple nodes—which may include multiple user nodes **202** or multiple concept nodes **204**—and multiple edges **206** connecting the nodes. Example social graph **200** illustrated in FIG. **2** is shown, for didactic purposes, in a two-dimensional visual map representation. In particular embodiments, a social-networking system **160**, client system **130**, or third-party system **170** may access social graph **200** and related social-graph information for suitable applications. The nodes and edges of social graph **200** may be stored as data objects, for example, in a data store (such as a social-graph database). Such a data store may include one or more searchable or queryable indexes of nodes or edges of social graph **200**.

[0021] In particular embodiments, a user node **202** may correspond to a user of social-networking system **160**. As an example and not by way of limitation, a user may be an individual (human user), an entity (e.g., an enterprise, business, or third-party application), or a group (e.g., of individuals or entities) that interacts or communicates with or over social-networking system **160**. In particular embodiments, when a user registers for an account with social-networking system **160**, social-networking system **160** may create a user node **202** corresponding to the user, and store the user node **202** in one or more data stores. Users and user nodes **202** described herein may, where appropriate, refer to registered users and user nodes **202** associated with registered users. In addition or as an alternative, users and user nodes **202** described herein may, where appropriate, refer to users that have not registered with social-networking system **160**. In particular embodiments, a user node **202** may be associated with information provided by a user or information gathered by various systems, including social-network-

3

ing system **160**. As an example and not by way of limitation, a user may provide his or her name, profile picture, contact information, birth date, sex, marital status, family status, employment, education background, preferences, interests, or other demographic information. In particular embodiments, a user node **202** may be associated with one or more data objects corresponding to information associated with a user. In particular embodiments, a user node **202** may correspond to one or more webpages.

[0022]   In particular embodiments, a concept node **204** may correspond to a concept. As an example and not by way of limitation, a concept may correspond to a place (such as, for example, a movie theater, restaurant, landmark, or city); a website (such as, for example, a website associated with social-network system **160** or a third-party website associated with a web-application server); an entity (such as, for example, a person, business, group, sports team, or celebrity); a resource (such as, for example, an audio file, video file, digital photo, text file, structured document, or application) which may be located within social-networking system **160** or on an external server, such as a web-application server; real or intellectual property (such as, for example, a sculpture, painting, movie, game, song, idea, photograph, or written work); a game; an activity; an idea or theory; an object in a augmented/virtual reality environment; another suitable concept; or two or more such concepts. A concept node **204** may be associated with information of a concept provided by a user or information gathered by various systems, including social-networking system **160**. As an example and not by way of limitation, information of a concept may include a name or a title; one or more images (e.g., an image of the cover page of a book); a location (e.g., an address or a geographical location); a website (which may be associated with a URL); contact information (e.g., a phone number or an email address); other suitable concept information; or any suitable combination of such information. In particular embodiments, a concept node **204** may be associated with one or more data objects corresponding to information associated with concept node **204**. In particular embodiments, a concept node **204** may correspond to one or more webpages.

[0023]   In particular embodiments, a node in social graph **200** may represent or be represented by a webpage (which may be referred to as a "profile page"). Profile pages may be hosted by or accessible to social-networking system **160**. Profile pages may also be hosted on third-party websites associated with a third-party server **170**. As an example and not by way of limitation, a profile page corresponding to a particular external webpage may be the particular external webpage and the profile page may correspond to a particular concept node **204**. Profile pages may be viewable by all or a selected subset of other users. As an example and not by way of limitation, a user node **202** may have a corresponding user-profile page in which the corresponding user may add content, make declarations, or otherwise express himself or herself. As another example and not by way of limitation, a concept node **204** may have a corresponding concept-profile page in which one or more users may add content, make declarations, or express themselves, particularly in relation to the concept corresponding to concept node **204**.

[0024]   In particular embodiments, a concept node **204** may represent a third-party webpage or resource hosted by a third-party system **170**. The third-party webpage or resource may include, among other elements, content, a

selectable or other icon, or other inter-actable object (which may be implemented, for example, in JavaScript, AJAX, or PHP codes) representing an action or activity. As an example and not by way of limitation, a third-party webpage may include a selectable icon such as "like," "check-in," "eat," "recommend," or another suitable action or activity. A user viewing the third-party webpage may perform an action by selecting one of the icons (e.g., "check-in"), causing a client system **130** to send to social-networking system **160** a message indicating the user's action. In response to the message, social-networking system **160** may create an edge (e.g., a check-in-type edge) between a user node **202** corresponding to the user and a concept node **204** corresponding to the third-party webpage or resource and store edge **206** in one or more data stores.

[0025]   In particular embodiments, a pair of nodes in social graph **200** may be connected to each other by one or more edges **206**. An edge **206** connecting a pair of nodes may represent a relationship between the pair of nodes. In particular embodiments, an edge **206** may include or represent one or more data objects or attributes corresponding to the relationship between a pair of nodes. As an example and not by way of limitation, a first user may indicate that a second user is a "friend" of the first user. In response to this indication, social-networking system **160** may send a "friend request" to the second user. If the second user confirms the "friend request," social-networking system **160** may create an edge **206** connecting the first user's user node **202** to the second user's user node **202** in social graph **200** and store edge **206** as social-graph information in one or more of data stores **164**. In the example of FIG. **2**, social graph **200** includes an edge **206** indicating a friend relation between user nodes **202** of user "A" and user "B" and an edge indicating a friend relation between user nodes **202** of user "C" and user "B." Although this disclosure describes or illustrates particular edges **206** with particular attributes connecting particular user nodes **202**, this disclosure contemplates any suitable edges **206** with any suitable attributes connecting user nodes **202**. As an example and not by way of limitation, an edge **206** may represent a friendship, family relationship, business or employment relationship, fan relationship (including, e.g., liking, etc.), follower relationship, visitor relationship (including, e.g., accessing, viewing, checking-in, sharing, etc.), subscriber relationship, superior/subordinate relationship, reciprocal relationship, non-reciprocal relationship, another suitable type of relationship, or two or more such relationships. Moreover, although this disclosure generally describes nodes as being connected, this disclosure also describes users or concepts as being connected. Herein, references to users or concepts being connected may, where appropriate, refer to the nodes corresponding to those users or concepts being connected in social graph **200** by one or more edges **206**.

[0026]   In particular embodiments, an edge **206** between a user node **202** and a concept node **204** may represent a particular action or activity performed by a user associated with user node **202** toward a concept associated with a concept node **204**. As an example and not by way of limitation, as illustrated in FIG. **2**, a user may "like," "attended," "played," "listened," "cooked," "worked at," or "watched" a concept, each of which may correspond to a edge type or subtype. A concept-profile page corresponding to a concept node **204** may include, for example, a selectable "check in" icon (such as, for example, a clickable "check in"

4

icon) or a selectable "add to favorites" icon. Similarly, after a user clicks these icons, social-networking system **160** may create a "favorite" edge or a "check in" edge in response to a user's action corresponding to a respective action. As another example and not by way of limitation, a user (user "C") may listen to a particular song ("Imagine") using a particular application (SPOTIFY, which is an online music application). In this case, social-networking system **160** may create a "listened" edge **206** and a "used" edge (as illustrated in FIG. **2**) between user nodes **202** corresponding to the user and concept nodes **204** corresponding to the song and application to indicate that the user listened to the song and used the application. Moreover, social-networking system **160** may create a "played" edge **206** (as illustrated in FIG. **2**) between concept nodes **204** corresponding to the song and the application to indicate that the particular song was played by the particular application. In this case, "played" edge **206** corresponds to an action performed by an external application (SPOTIFY) on an external audio file (the song "Imagine"). Although this disclosure describes particular edges **206** with particular attributes connecting user nodes **202** and concept nodes **204**, this disclosure contemplates any suitable edges **206** with any suitable attributes connecting user nodes **202** and concept nodes **204**. Moreover, although this disclosure describes edges between a user node **202** and a concept node **204** representing a single relationship, this disclosure contemplates edges between a user node **202** and a concept node **204** representing one or more relationships. As an example and not by way of limitation, an edge **206** may represent both that a user likes and has used at a particular concept. Alternatively, another edge **206** may represent each type of relationship (or multiples of a single relationship) between a user node **202** and a concept node **204** (as illustrated in FIG. **2** between user node **202** for user "E" and concept node **204** for "SPOTIFY").

[0027]  In particular embodiments, social-networking system **160** may create an edge **206** between a user node **202** and a concept node **204** in social graph **200**. As an example and not by way of limitation, a user viewing a concept-profile page (such as, for example, by using a web browser or a special-purpose application hosted by the user's client system **130**) may indicate that he or she likes the concept represented by the concept node **204** by clicking or selecting a "Like" icon, which may cause the user's client system **130** to send to social-networking system **160** a message indicating the user's liking of the concept associated with the concept-profile page. In response to the message, social-networking system **160** may create an edge **206** between user node **202** associated with the user and concept node **204**, as illustrated by "like" edge **206** between the user and concept node **204**. In particular embodiments, social-networking system **160** may store an edge **206** in one or more data stores. In particular embodiments, an edge **206** may be automatically formed by social-networking system **160** in response to a particular user action. As an example and not by way of limitation, if a first user uploads a picture, watches a movie, or listens to a song, an edge **206** may be formed between user node **202** corresponding to the first user and concept nodes **204** corresponding to those concepts. Although this disclosure describes forming particular edges **206** in particular manners, this disclosure contemplates forming any suitable edges **206** in any suitable manner.

[0028]  FIG. **3** illustrates an example network environment for some embodiments described in this disclosure. Social-

networking system **160** (or any other system capable of performing steps of the methods described in this disclosure) may be connected via network **110** to a plurality of connected devices **304**. Connected devices **304** may include, without limitation, Internet-enabled television sets **304**a that connect to network **110** through a local internet service provider (ISP), mobile devices **304**b that connect to network **110** through a wireless connection such as a wireless cellular data network, or TVs **304**d that connect to network **110** through a set-top box (STB) or gateway device **304**c. STB/gateway **304**c may be any hardware or software that delivers content or possesses a network interface card (NIC) for connecting to a local area network (LAN). For example, STB/gateway **304**c may be a cable box provided by a multiple-system operator (MSO), such as COMCAST, TIME WARNER, AT&T U-VERSE, or DISH NETWORK. In such examples, STB/gateway **304**c may receive content from MSOs **302**. As another example, STB/gateway **304**c may be a device that streams video from third-party internet sites or services such as over-the-top content (OTT) providers **303**. As an example and not by way of limitation, a gateway device may include devices from ROKU, BOXEE, APPLE TV, or GOOGLE TV that allow users to access content from OTT providers **303** such as NETFLIX, HULU, AMAZON VIDEO, or YOUTUBE. Additionally or alternatively, a gateway device may be a digital video recorder (DVR) or a digital media player (DMP). In some embodiments, STB/gateway **304**c may be a stand-alone device. In other embodiments, the functionality of STB/gateway **304**c may be incorporated into TV **304**d.

[0029]  In general, a user's social connections or activities can be used to customize or personalize the user's experience with a social TV viewing system such as the system of FIG. **3**. Some embodiments may utilize methods to customize a user's experience as described in U.S. patent application Ser. No. 12/759,676 entitled "Token-Activated, Federated Access to Social Network Information," which is incorporated herein by reference. In particular embodiments, connected devices **304** receive content from MSOs **302** or OTT providers **303** while receiving or sending social data to social-networking system **160**. For example, a user watching a particular TV show or movie on either service may choose to share that he or she is currently viewing the program to his or her friends. Conversely, a user browsing the Electronic Programming Guide (EPG) of an MSO **302** or the content navigator of an OTT provider **303** may be presented with social data including the content that his or her friends on social-networking system **160** have watched, are currently watching, or plan to watch. Thus, after exchanging authorization messages **306** with social-networking system **160** to authenticate the user's social-networking identity with his or her connected device **304**, connected devices **304** may receive discover messages **308** that identify content being consumed or watched by his or her friends on the social network, and send share messages **307** to inform social-networking system **160** of what the user has, is, or plans to watch or "consume." Although FIG. **3** depicts these messages as being sent directly between social-networking system **160** and connected devices **304**, in particular embodiments, authorization, share, and discover messages **306**, **307**, and **308** may be exchanged between the provider from which content is being accessed, namely, MSOs **302** and OTT providers **303**. This disclosure contem-

5

plates any suitable means of routing messages from connected devices **304** to social-networking system **160**.

[0030] Although increasingly rare, there are scenarios wherein a particular user of the social-networking system has no means of linking his TV or media device to social-networking system **160**. Unconnected devices **305** lack any means of connecting to Internet/network **110**. For example, a user may not have a local ISP, and only TV service from an MSO. As another example, a user may have both cable service from an MSO as well as interne access from a local ISP, but his or her STB **304**c may not include an NIC. In such configurations, MSO **302** may communicate authorization, share, and discover messages with social-networking system **160**, and unconnected device **305** may communicate with MSOs **302** (e.g., via STB **304**c). In particular embodiments, unconnected device **305** may communicate indirectly with social-networking system **160** via a connected device. For example, and not by way of limitation, mobile device **304**b may record audio or video data from unconnected device **305** and send the data to social-networking system **160**.

[0031] In particular embodiments, content may be delivered to user devices **304** and **305** tagged with content identifiers and metadata. For example, COMCAST may utilize its own proprietary EPG data format that lists the program name, air date, actors, producer, director, etc. In particular embodiments, content providers **302** and **303** may obtain content identifiers and metadata from content databases **301**, such as that provided by ROVI. Each particular piece of content may be sent from devices **304**, or, in particular embodiments, via content providers **302** and **303**, as graph data including a graph object and graph action. Social-networking system **160** may de-duplicate graph data for the same graph object in a graph data store by comparing various attributes about the content object; for example, name, actors, duration, air date, etc. Thus, social-networking system **160** may attribute graph data sent from HULU that a particular user watched the critically-acclaimed feature film "The Marine" to the same graph object as a user currently watching "The Marine" on COMCAST digital cable, irrespective of the source and format of the content metadata.

[0032] FIG. **4** illustrates an example environment in which social-networking system **160** may identify a user of one or more user devices **410**. In the illustrated embodiment, user devices **410** may include a personal computer **410**a, a mobile device **410**b such as a smartphone, a laptop computer **410**c, a gaming console **410**d, a TV **410**e, or any other appropriate user device. User devices **410** may communicate with network **110**, STB/gateway **304**c, or other user devices **410** via a wireless communications protocol such as WIFI or BLUETOOTH.

[0033] In general, social-networking system **160** may identify a user device **410** of user **101** by communicating with a user device **410** via network **110**. In some embodiments, a user device may be identified after the user device communicates with social-networking system **160**. In some embodiments, social-networking system **160** may identify a first user device via communicating with a second user device. As an example, mobile device **410**a may utilize WIFI or BLUETOOTH sniffing to capture a unique device identifier for TV **410**e. The unique device identifier may include, for example, a MAC address, a serial number, a unique product identification number, an IP address, a mul-

ticast domain name system (mDNS) identifier, or any other data that may be used to identify the specific models or manufacturers of TV **410**e. In some embodiments, a unique device identifier for TV **410**e may be for a device associated with TV **410**e. For example, a unique device identifier may identify a router that TV **410**e is connected to, a STB that TV **410**e is connected to, or any other device associated with TV **410**e. In some embodiments, a unique device identifier for TV **410**e may be an identifier assigned when a user device is paired with TV **410**e (e.g., via BLUETOOTH). Once captured, the unique identifier for TV **410**e may be analyzed by mobile device **410**a or sent to social-networking system **160** for analysis. In some embodiments, the captured unique device identifier may be compared to a database of unique device identifiers in order to identify TV **410**e. In particular embodiments, a user device may be identified passively without user input. Additionally or alternatively, a user device may be identified only if a user explicitly provides social-networking system **160** with identification information for the user device. In some embodiments, a notification may request that a user explicitly provide social-networking system **160** with identification information for a user device.

[0034] Social-networking system **160** may utilize the information obtained from user devices **410** to deliver specific content to a user device. For example, if social-networking system **160** determines that user **101** is utilizing an IPHONE as mobile device **410**b, social-networking system **160** may communicate to laptop computer **410**c to display advertisements directed to IPHONE users. As another example, if social-networking system **160** determines that user **101** is utilizing an XBOX as gaming console **410**d, social-networking system **160** may communicate to personal computer **410**a to display advertisements directed to XBOX users.

[0035] In particular embodiments, social-networking system **160** may also identify a user of a user device. In some embodiments, the identity of the user device may be used to identify a user by, for example, cross-referencing the identity of the user device with known user devices for the user. In other embodiments, the user may be identified by other means, such as by the user communicating authentication information to social-networking system **160**. Social-networking system **160** may also access a user profile for the user of the identified user device. In particular embodiments, social-networking system **160** may store information indicating an association between a user device and a user.

[0036] FIG. **5** illustrates an environment in which social-networking system **160** may determine media consumption data. In particular embodiments, media consumption data may include the identity of the media content consumed. In some embodiments, media consumption data includes metadata about the media content which may identify a genre, air date, actor, artist, producer, director, content creator, content provider, television station or network, radio station or network, etc.

[0037] In particular embodiments, media consumption data may include a time, date, duration, or location for the consumption of the media content. For example, if user **101** consumed a television show by watching the show on a television, media consumption data may include the time and date that the user viewed the content. In some embodiments, time or date data may include the time or date that media content will be recorded, such as a time or date of a future recording set on a DVR. In some embodiments,

6

duration data may include the duration that a particular user consumed media content. In some embodiments, media consumption data includes the location that media content is consumed or will be consumed.

[0038] In particular embodiments, media consumption data may include user input data. User input data may include, as an example and not by way of limitation, channel changing behavior, use of a remote control, clickstream data, user interactions with a media device, etc. For example, media consumption may include data that indicates that during a television show, user **101** muted the volume on TV **410***e* when advertisements were displayed. In this example, media consumption data may also indicate that user **101** unmuted TV **410***e* during particular advertisements. As a further example, media consumption data may indicate that user **101** clicked on an advertisement while consuming media using HULU on laptop **410***c*.

[0039] In particular embodiments, social-networking system **160** may receive media consumption data from user device **410**. As discussed further below, social-networking system **160** may utilize various methods to determine media consumption data, such as the identity of what user **101** is watching on a media device, such as TV **410***e*. These methods may include acoustic or visual fingerprinting, analyzing electrical interference, analyzing signals on an HDMI cable, analyzing closed-captioning, analyzing images from an incoming video stream, analyzing explicit signals from user **101**, and analyzing embedded signals, such as watermark data. In particular embodiments, media consumption data may be determined by capturing or analyzing data **530** via sensor **525**.

[0040] In some embodiments, social-networking system **160** may determine device-based media consumption data. In particular embodiments, device-based media consumption data may be media consumption data associated with a particular user device. As an example, user **101** may be watching a show on TV **410***e*. Device-based media consumption for TV **410***e* may be media consumption data for the show being watched on TV **410***e*. In particular embodiments, social-networking system **160** may determine device-based media consumption data by determining an association between media consumption data and a user device. In the above example, TV **410***e* may communicate media consumption data to social-networking system **160** including a unique device identifier indicating an association between the media consumption data and TV **410***e*. As another example, user device **410** may capture media consumption data from TV **410***e* (e.g., by using an acoustic fingerprint) and also capture a unique identifier for TV **410***e* (e.g., via BLUETOOTH) which may indicate an association between the media consumption data and TV **410***e*. In this example, user device **410** may additionally or alternatively send with the media consumption data with a unique identifier for itself, indicating an association between the media consumption data and user device **410**. In some embodiments, social-networking system **160** may determine media consumption data for user **101** by receiving data from TV **410***e*. For example, TV **410***e* may be an internet-enabled TV and may send media consumption data to social-networking system **160** via network **110**.

[0041] In particular embodiments, social-networking system **160** may determine device-based media consumption data by receiving data from content source **510**. As an example, content source **510** may be a content provider, such as an MSO **302** or an OTT provider **303**. The content provider may collect and send to social-networking system **160** device-based media consumption data. In particular embodiments, a content provider may collect and send set-top box data to social-networking system **160**. In particular embodiments, content source **510** may be STB/gateway **304***c*. For example, a set-top box may record media consumption data and send the data to social-networking system **160**.

[0042] FIG. **6** illustrates an example method for correlating user profile data with media consumption data received from user device **410**. In step **610**, user device **410** sends and social-networking system **160** receives identifying information (e.g., information sufficient to retrieve a user profile for a user of user device **410**). In particular embodiments, identifying information may be authentication information (e.g., information uniquely identifying a user, such as a username, email address, or phone number), a unique device identifier for a user device of the user, or any other suitable information. In some embodiments, identifying information may include identifiers obtained via explicit pairing of a user device with a media device (e.g., a unique device identifier, an identifier assigned when a user device paired with a media device, etc.). In some embodiments, known information about a user, such as the user's interests, location, or other known information, may be identifying information. For example, social-network **160** may receive information that identifies a household, but then use known location for one or more members of the household to determine which member is correlated with media consumption data. In step **620**, social-networking system **160** retrieves a user profile of the identified user.

[0043] In step **630**, content provider **600***b* sends media content to media device **600***a*. In particular embodiments, a content provider may be an MSO, an OTT provider, a music streaming service (e.g. SPOTIFY, PANDORA INTERNET RADIO, etc.), a radio broadcaster, or any other provider of media content. In particular embodiments, media content may include video content, such as a TV show, a movie, a video game, a live video stream, etc. Additionally or alternatively, media content may include audio content, such as a radio broadcast, a podcast, an internet radio stream, a live audio stream, etc. In some embodiments, media content may include shared media collections (e.g., a photo album).

[0044] In particular embodiments, a media device may be a TV, a user device, or any other device capable of receiving or allowing a user to consume media content. In some embodiments, a media device may include a TV and a STB/gateway. This disclosure contemplates a media device including a device capable of receiving or consuming media content, any number of set-top boxes, and any number of gateway devices, connected in any suitable arrangement.

[0045] In step **640**, the media content is consumed via media device **600***a*. In particular embodiments, a user may consume media content by viewing or listening to a media device that is producing sound or images corresponding to the media content. As an example, a user may consume media content by viewing a television show. In particular embodiments, consuming media content includes instructing a media device to record media content immediately or in the future. For example, a user may consume media content by instructing a media device that includes a TV and gateway device TIVO to record a television show. In particular embodiments, media content may be consumed when

a user places media content in a queue or list. For example, a user may consume media by placing videos into a queue on NETFLIX.

[0046]   In step **650**, media consumption data may be sent from media device **600***a* to user device **410** or captured from media device **600***a* by user device **410**. As discussed above, media consumption data may include the identity of the media content, metadata, a time, a date, a duration, a location, channel changing behavior, user input data, etc. In some embodiments, media consumption data may be sent to user device **410** via a wireless communications protocol such as WIFI or BLUETOOTH or by any other suitable means. In particular embodiments, discussed further below, user device **410** may capture media consumption data or information sufficient to determine media consumption data from media device **600***a* (e.g., by capturing audio, video, images, electrical interference patterns, and other such information from media device **600***a*).

[0047]   In some embodiments, media consumption data may be captured by acoustic fingerprinting. For example, while user **101** is watching TV **410***e*, a mobile app associated with social-networking system **160** may be running on user device **410** of user **101**. User device **410** may capture environmental data **530** (e.g., audio, images, video, location data, or other data captured from or associated with the environment) using a sensor **525** (e.g., a microphone, camera, GPS, or other sensor). Environmental data **530** may include, for example, audio from a show being viewed on TV **410***e*. In some embodiments, environmental data **530** may be sent to social-networking system **160**, which may then analyze environmental data **530** in order to determine what user **101** is watching on the TV **410***e*, a time, date, or duration, or other media consumption data. For example, social-networking system **160** may compare environmental data **530** that includes environmental sounds to audio of known television shows. Based on the comparison, social-networking system **160** may determine media consumption data, such as the identity of a show user **101** is watching on TV **410***e*. In some embodiments, user device **410** may first analyze environmental data **530** and determine what the user is watching on TV **410***e* before sending data to social-networking system **160**.

[0048]   In some embodiments, social-networking system **160** may utilize environmental data **530** received from multiple users **101** in order to determine whether the multiple users are consuming media separately or together. For example, if two users are in the same room while watching the same TV show, environmental data **530** captured by each users' user device may be similar. Social-networking system **160** may compare environmental data captured from each user and determine that the two users are located in the same environment if the environmental data **530** from each user is substantially similar. As an example, social-networking system **160** may compare GPS or other location data determined via sensor **525** and sent by the users' user devices **410** in order to determine that two or more users are watching the same TV show at the same location. In some embodiments, social-networking system **160** may post content to social-networking system **160** indicating that the two users are watching the same TV show at the same location.

[0049]   In some embodiments, media consumption data may be determined by visual fingerprinting. For example, environmental data **530** including images from an incoming video stream may be captured and analyzed to determine

what a user is currently watching. For example, user **101** may use sensor **525** that includes a camera to capture images of a TV show being consumed on TV **410***e*. In some embodiments, the captured images may be sent to social-networking system **160**. User device **410** or social-networking system **160** may analyze the captured images and compare them to a database of images for known media content. By comparing the captured images with the known images, social-networking system **160** or user device **410** may be able identify a TV show that user **101** is watching and thus determine media content.

[0050]   In some embodiments, social-networking system **160** may utilize phase delay to determine media consumption data. For example, most cable providers utilize a unique time delay in sending signals to customers. Social-networking system **160** may determine this delay by, for example, analyzing environmental data **530** (e.g., environmental sounds or signals from an HDMI cable). Once the delay has been determined, social-networking system **160** may compare it to known delays of content providers. For example, if the delay is determined to be **102** ms, social-networking system **160** may determine that user **101** is watching content from COMCAST if COMCAST has a known delay of **102** ms. Once a content provider is determined, social-networking system **160** may determine media consumption data by cross-referencing environmental data **530** with known schedules of media content for the content provider (e.g., if user **101** is determined to be watching COMCAST at 6 PM, environmental data **530** may be compared to known data about shows being offered by COMCAST at 6 PM).

[0051]   In some embodiments, electrical interference may be utilized to determine media consumption data. For example, media device **600***a* may include a connected device **304** plugged into an electrical outlet in the home of user **101**. Media device **600***a* may also include a TV **410***e* plugged into the same electrical outlet, or any other electrical outlet in the home of user **101**. The connected device **304** may capture electrical interference (e.g., noise) present on a power cord plugged into the electrical outlet. This electrical interference may be introduced into the electrical wiring of the user's home by TV **410***e*. The electrical interference may be due to variance in the electrical load from a television caused by varying sounds or volumes of a television show being displayed. In some embodiments, the electrical interference may be unique for each television show. This electrical interference pattern may be captured and sent to social-networking system **160** by the connected device **304**. Social-networking system **160** may analyze the captured electrical interference pattern and compare it to a database of electrical interference patterns or fingerprints for known television shows. By comparing the captured electrical interference pattern with the stored electrical interference fingerprints, social-networking system **160** may be able match the captured pattern with the pattern of a television show and thus determine media consumption data for the media content being consumed by user **101**.

[0052]   In some embodiments, closed-captioning may be utilized to determine media consumption data. For example, STB/gateway **304***c* that is part of media device **600***a* may receive a video stream from content provider **600***b* that includes closed-captioning information. The STB/gateway **304***c* may analyze the video stream and capture closed-captioning information. The captured closed-captioning information may then be sent to social-networking system

160 where it may be analyzed and compared to closed-captioning data of known television shows. Based on the comparison, social-networking system 160 may match the captured closed-captioning information with closed-captioning of a known television show and thus determine media consumption data for the media content being consumed by a user.

[0053]   In some embodiments, explicit signals embedded in the media content may be utilized to determine media consumption data. In some embodiments, an explicit signal may include a digital watermark, such as an audio or visual watermark. In some embodiments, a digital watermark may be imperceptible to humans without technological aid. For example, a content creator of a movie may embed an audio or visual watermark into the movie. The watermark may include information that identifies media consumption data for the content being displayed (e.g., title, episode number, time, date, etc.). User device 410 may capture all or part of the watermark data (e.g., via sensor 525), which may then be sent to social-networking system 160. Social-networking system 160 may then use data including all or part of the watermark to determine media consumption data for the media content being consumed by a user.

[0054]   In some embodiments, social-networking system 160 may determine media consumption data by analyzing explicit signals from the users. For example, social-networking system 160 may analyze posts of user 101 on social-networking system 160 in order to determine what user 101 is or will be watching. As one example, if user 101 posts "I can't wait to watch 'Lone Survivor' tonight," social-networking system 160 may determine that user 101 is planning to consume the show "Lone Survivor." As another example, if two users are chatting about the show "Lone Survivor," social-networking system 160 may determine that the users are planning to consume the show "Lone Survivor." In some embodiments, explicit signals from a user may include a user pairing a user device with a media device. As an example, a user may explicitly pair a mobile phone with a TV via BLUETOOTH, and either the mobile device or the TV may send data to social-networking system 160 sufficient to determine media data.

[0055]   In some embodiments, signals on an HDMI cable may be utilized to determine media consumption data. For example, a media device may include a connected device that captures electrical patterns of signals travelling across an HDMI cable. These electrical patterns may be unique for each particular piece of media content. The electrical patterns may be captured and sent to social-networking system 160. Social-networking system 160 may analyze the captured electrical patterns and compare them to a database of electrical patterns for known pieces of media content. By comparing the captured electrical patterns with the known electrical patterns, social-networking system 160 may be able match the captured patterns with the patterns of a particular media content and thus determine media consumption data for the media content being consumed by the user.

[0056]   In step 660, user device 410 sends media consumption data to social-networking system 160. In some embodiments, user device 410 may send all or part of the data received in step 650. Additionally or alternatively, user device 410 may send media consumption data generated from the data received in step 650. In some embodiments, user device 410 may send data in step 660 that is the result

of analyzing, processing, parsing, adding to, subtracting from, altering, or modifying the data received in step 650. In particular embodiments, the media consumption data may be, may be used to determine, or may be modified to be device-specific media consumption data.

[0057]   In step 670, social-networking system 160 determines a correlation between the user profile retrieved in step 620 and the media consumption data received in step 660. In particular embodiments, the user profile may be correlated with the media consumption data by using the identifying information sent in step 610. For example, a software application may send the media consumption data, the identifying information, and data that indicates a correlation by indicating that that the media consumption data and the identifying information were sent by the same software application. As another example, and not by way of limitation, a mobile device and a TV may be paired via BLU-ETOOTH. In this example, an application on the mobile device may send data to social-networking system 160 that may determine a correlation, such as an IP address of a STB connected with the TV, a name for a WI-FI access point used by the TV or mobile device, or an identifier assigned during the pairing. In particular embodiments, the correlation may be determined because the same user device 410 sent both the identifying information and the media consumption data to social-networking system 160. For example, user device 410 may send media consumption data, identifying information, and in each case, also send a unique device identifier that indicates a correlation by indicating that both the media consumption data and the identifying information were sent from the same user device 410. In particular embodiments, there may be multiple users associated with a household or with a media device. In such cases, social-networking system 160 may determine which among the multiple users are correlated with media consumption data by using contextual information (e.g., a unique device identifier for a device associated with a particular user, an explicit signal from one of the users, a location of one of the users, or other such information).

[0058]   In particular embodiments, social-networking system 160 may correlate the user profile with the media consumption data by storing user profile data indicating an association. In some embodiments, social-networking system 160 may merge the user profile and the media consumption data.

[0059]   FIG. 7 illustrates an example method for correlating user profile data with media consumption data received from content provider 600b. In step 710, user device 410 sends and social-networking system 160 receives identifying information. In step 720, social-networking system 160 retrieves a user profile of the identified user. In step 730, content provider 600b sends media content to media device 600a. In step 740, the media content is consumed via media device 600a.

[0060]   In step 750, media device 600a sends media consumption data to content provider 600b. In particular embodiments, media consumption data may include set-top box data. As an example, media device 600a may include TV 410e and a STB provided by an MSO content provider 600b. As user 101 consumes media using TV 410e, the STB may send set-top box data to the MSO. Set-top box data may indicate what channel the TV is tuned to, the identity of media content, information about the STB, a time or date, a viewing duration, remote control usage, channel changing

9

behavior, user interactions with an EPG, user interactions with a video on demand (VOD) service, etc.

[0061] In particular embodiments, media consumption data may include user interactions with media device **600***a*, such as clickstream data. For example, media device **600***a* may include personal computer **410***a*. User **101** may consume media content using personal computer **410***a*, by, for example, using content provider NETFLIX. NETFLIX may record the user's interactions with personal computer **410***a*. For example, NETFLIX may receive data indicating that user **101** played part of a movie, added a television show into a queue, or searched for a particular cartoon using NET-FLIX.

[0062] In step **760**, content provider **600***b* sends media consumption data to social-networking system **160**. In some embodiments, content provider **600***b* may send all or part of the data received in step **750**. Additionally or alternatively, content provider **600***b* may send data generated from the data received in step **750**. In some embodiments, content provider **600***b* may send data in step **760** that is the result of analyzing, processing, parsing, adding to, subtracting from, altering, or modifying the data received in step **750**. In particular embodiments, the media consumption data may be, may be used to determine, or may be modified to be device-specific media consumption data.

[0063] In step **770**, social-networking system **160** determines a correlation between the user profile retrieved in step **720** and the media consumption data received in step **760**. In some embodiments, content provider **600***b* may send information to social-networking system in step **760** that allows social-networking system **160** to determine a correlation to user profile information. As an example, content provider COMCAST may send to social-networking system **160** media consumption data associated with media device **600***a*. In this example, COMCAST may also send information that would allow the identification of a user or a media device (e.g., a name, home address, MAC address for a media device, etc.). Social-networking system **160** may then use the information to correlate the media consumption data with the user profile. For example, if content provider **600***b* sends to social-networking system **160** media consumption data along with a user's name and location, social-networking may cross-reference the user's name and location with similar user profile information in a user profile to determine a correlation. As another example, the identifying information sent in step **710** and the media consumption data sent in step **760** may both include a unique device identifier for media device **600***a* or user device **410**, which may indicate a correlation if cross-referenced with known media devices or user devices of a user. In some embodiments, multiple pieces or types of information may be used to determine a correlation. For example, a combination of IP address, mDNS identifier, WIFI name, unique identifier for a user device, unique device identifier for a user (e.g., an email address, phone number, etc.), or other suitable information may allow social-networking system **160** to determine a correlation to user profile information.

[0064] FIG. **8** illustrates an example method for correlating user profile data with media consumption data received from media device **600***a*. In step **810**, user device **410** sends and social-networking system **160** receives identifying information. In step **820**, media device **600***a* sends and social-networking system **160** receives identifying information. In particular embodiments, identifying information

may be authentication information (e.g., information uniquely identifying a user, such as a username, email address, or phone number), a unique device identifier for media device **600***a*, or any other suitable information. In particular embodiments, media device **600***a* may send identifying information directly to social-networking system **160**, as depicted in FIG. **8**. In other embodiments, media device **600***a* may send identifying information to social-networking system **160** via a user device **410**. For example, user device **410** may utilize WIFI or BLUETOOTH sniffing to capture a unique device identifier from media device **600***a* and then send that information to social-networking system **160**.

[0065] In step **830**, social-networking system **160** retrieves a user profile of the identified user. The user may be identified based on identifying information sent from user device **410**, identifying information sent from media device **600***a*, or a combination of the two. In particular embodiments, only step **810** or step **820** may occur. For example, identifying information may sent from media device **600***a*, but not from user device **410**. Media device **600***a* may include a gateway device that communicates to social-networking system **160** via network **110**. Media device **600***a* may send identifying information to social-networking system **160** sufficient to retrieve a user profile for the user of media device **600***a*. As another example, identifying information may sent from user device **410**, but not from media device **600***a*. User device **410** may send identifying information to social-networking system **160** sufficient to retrieve a user profile for the user of user device **410**. In step **840**, content provider **600***b* sends media content to media device **600***a*. In step **850**, the media content is consumed via media device **600***a*.

[0066] In step **860**, media device **600***a* sends media consumption data to social-networking system **160**. The media consumption data may include set-top box data, data indicating user interactions with media device **600***a*, or other media consumption data. For example, media device **600***a* may be an internet-enabled television. The internet-enabled television may send media consumption data to social-network system **160**. In particular embodiments, the media consumption data may be, may be used to determine, or may be modified to be device-specific media consumption data.

[0067] In step **870**, social-networking system **160** determines a correlation between the user profile retrieved in step **830** and the media consumption data received in step **860**. In particular embodiments, the user profile may be correlated with the media consumption data by using the identifying information sent in step **810**. Additionally or alternatively, the user profile may be correlated with the media consumption data by using the identifying information sent in step **820**. For example, the identifying information sent in either step **810** or step **820** and the media consumption data may both include a unique device identifier for media device **600***a*, indicating a correlation.

[0068] FIG. **9** illustrates an example computer system **900**. In particular embodiments, one or more computer systems **900** perform one or more steps of one or more methods described or illustrated herein. In particular embodiments, one or more computer systems **900** provide functionality described or illustrated herein. In particular embodiments, software running on one or more computer systems **900** performs one or more steps of one or more methods described or illustrated herein or provides functionality

10

described or illustrated herein. Particular embodiments include one or more portions of one or more computer systems 900. Herein, reference to a computer system may encompass a computing device, and vice versa, where appropriate. Moreover, reference to a computer system may encompass one or more computer systems, where appropriate.

[0069] This disclosure contemplates any suitable number of computer systems 900. This disclosure contemplates computer system 900 taking any suitable physical form. As example and not by way of limitation, computer system 900 may be an embedded computer system, a system-on-chip (SOC), a single-board computer system (SBC) (such as, for example, a computer-on-module (COM) or system-on-module (SOM)), a desktop computer system, a laptop or notebook computer system, an interactive kiosk, a mainframe, a mesh of computer systems, a mobile telephone, a personal digital assistant (PDA), a server, a tablet computer system, an augmented/virtual reality device, or a combination of two or more of these. Where appropriate, computer system 900 may include one or more computer systems 900; be unitary or distributed; span multiple locations; span multiple machines; span multiple data centers; or reside in a cloud, which may include one or more cloud components in one or more networks. Where appropriate, one or more computer systems 900 may perform without substantial spatial or temporal limitation one or more steps of one or more methods described or illustrated herein. As an example and not by way of limitation, one or more computer systems 900 may perform in real time or in batch mode one or more steps of one or more methods described or illustrated herein. One or more computer systems 900 may perform at different times or at different locations one or more steps of one or more methods described or illustrated herein, where appropriate.

[0070] In particular embodiments, computer system 900 includes a processor 902, memory 904, storage 906, an input/output (I/O) interface 908, a communication interface 910, and a bus 912. Although this disclosure describes and illustrates a particular computer system having a particular number of particular components in a particular arrangement, this disclosure contemplates any suitable computer system having any suitable number of any suitable components in any suitable arrangement.

[0071] In particular embodiments, processor 902 includes hardware for executing instructions, such as those making up a computer program. As an example and not by way of limitation, to execute instructions, processor 902 may retrieve (or fetch) the instructions from an internal register, an internal cache, memory 904, or storage 906; decode and execute them; and then write one or more results to an internal register, an internal cache, memory 904, or storage 906. In particular embodiments, processor 902 may include one or more internal caches for data, instructions, or addresses. This disclosure contemplates processor 902 including any suitable number of any suitable internal caches, where appropriate. As an example and not by way of limitation, processor 902 may include one or more instruction caches, one or more data caches, and one or more translation lookaside buffers (TLBs). Instructions in the instruction caches may be copies of instructions in memory 904 or storage 906, and the instruction caches may speed up retrieval of those instructions by processor 902. Data in the data caches may be copies of data in memory 904 or storage

906 for instructions executing at processor 902 to operate on; the results of previous instructions executed at processor 902 for access by subsequent instructions executing at processor 902 or for writing to memory 904 or storage 906; or other suitable data. The data caches may speed up read or write operations by processor 902. The TLBs may speed up virtual-address translation for processor 902. In particular embodiments, processor 902 may include one or more internal registers for data, instructions, or addresses. This disclosure contemplates processor 902 including any suitable number of any suitable internal registers, where appropriate. Where appropriate, processor 902 may include one or more arithmetic logic units (ALUs); be a multi-core processor; or include one or more processors 902. Although this disclosure describes and illustrates a particular processor, this disclosure contemplates any suitable processor.

[0072] In particular embodiments, memory 904 includes main memory for storing instructions for processor 902 to execute or data for processor 902 to operate on. As an example and not by way of limitation, computer system 900 may load instructions from storage 906 or another source (such as, for example, another computer system 900) to memory 904. Processor 902 may then load the instructions from memory 904 to an internal register or internal cache. To execute the instructions, processor 902 may retrieve the instructions from the internal register or internal cache and decode them. During or after execution of the instructions, processor 902 may write one or more results (which may be intermediate or final results) to the internal register or internal cache. Processor 902 may then write one or more of those results to memory 904. In particular embodiments, processor 902 executes only instructions in one or more internal registers or internal caches or in memory 904 (as opposed to storage 906 or elsewhere) and operates only on data in one or more internal registers or internal caches or in memory 904 (as opposed to storage 906 or elsewhere). One or more memory buses (which may each include an address bus and a data bus) may couple processor 902 to memory 904. Bus 912 may include one or more memory buses, as described below. In particular embodiments, one or more memory management units (MMUs) reside between processor 902 and memory 904 and facilitate accesses to memory 904 requested by processor 902. In particular embodiments, memory 904 includes random access memory (RAM). This RAM may be volatile memory, where appropriate. Where appropriate, this RAM may be dynamic RAM (DRAM) or static RAM (SRAM). Moreover, where appropriate, this RAM may be single-ported or multi-ported RAM. This disclosure contemplates any suitable RAM. Memory 904 may include one or more memories 904, where appropriate. Although this disclosure describes and illustrates particular memory, this disclosure contemplates any suitable memory.

[0073] In particular embodiments, storage 906 includes mass storage for data or instructions. As an example and not by way of limitation, storage 906 may include a hard disk drive (HDD), a floppy disk drive, flash memory, an optical disc, a magneto-optical disc, magnetic tape, or a Universal Serial Bus (USB) drive or a combination of two or more of these. Storage 906 may include removable or non-removable (or fixed) media, where appropriate. Storage 906 may be internal or external to computer system 900, where appropriate. In particular embodiments, storage 906 is non-volatile, solid-state memory. In particular embodiments, storage 906 includes read-only memory (ROM). Where

US 2017/0195435 A1
Jul. 6, 2017

11

appropriate, this ROM may be mask-programmed ROM, programmable ROM (PROM), erasable PROM (EPROM), electrically erasable PROM (EEPROM), electrically alterable ROM (EAROM), or flash memory or a combination of two or more of these. This disclosure contemplates mass storage 906 taking any suitable physical form. Storage 906 may include one or more storage control units facilitating communication between processor 902 and storage 906, where appropriate. Where appropriate, storage 906 may include one or more storages 906. Although this disclosure describes and illustrates particular storage, this disclosure contemplates any suitable storage.

[0074]   In particular embodiments, I/O interface 908 includes hardware, software, or both, providing one or more interfaces for communication between computer system 900 and one or more I/O devices. Computer system 900 may include one or more of these I/O devices, where appropriate. One or more of these I/O devices may enable communication between a person and computer system 900. As an example and not by way of limitation, an I/O device may include a keyboard, keypad, microphone, monitor, mouse, printer, scanner, speaker, still camera, stylus, tablet, touch screen, trackball, video camera, another suitable I/O device or a combination of two or more of these. An I/O device may include one or more sensors. This disclosure contemplates any suitable I/O devices and any suitable I/O interfaces 908 for them. Where appropriate, I/O interface 908 may include one or more device or software drivers enabling processor 902 to drive one or more of these I/O devices. I/O interface 908 may include one or more I/O interfaces 908, where appropriate. Although this disclosure describes and illustrates a particular I/O interface, this disclosure contemplates any suitable I/O interface.

[0075]   In particular embodiments, communication interface 910 includes hardware, software, or both providing one or more interfaces for communication (such as, for example, packet-based communication) between computer system 900 and one or more other computer systems 900 or one or more networks. As an example and not by way of limitation, communication interface 910 may include a network interface controller (NIC) or network adapter for communicating with an Ethernet or other wire-based network or a wireless NIC (WNIC) or wireless adapter for communicating with a wireless network, such as a WI-FI network. This disclosure contemplates any suitable network and any suitable communication interface 910 for it. As an example and not by way of limitation, computer system 900 may communicate with an ad hoc network, a personal area network (PAN), a local area network (LAN), a wide area network (WAN), a metropolitan area network (MAN), or one or more portions of the Internet or a combination of two or more of these. One or more portions of one or more of these networks may be wired or wireless. As an example, computer system 900 may communicate with a wireless PAN (WPAN) (such as, for example, a BLUETOOTH WPAN), a WI-FI network, a WI-MAX network, a cellular telephone network (such as, for example, a Global System for Mobile Communications (GSM) network), or other suitable wireless network or a combination of two or more of these. Computer system 900 may include any suitable communication interface 910 for any of these networks, where appropriate. Communication interface 910 may include one or more communication interfaces 910, where appropriate. Although this disclosure

describes and illustrates a particular communication interface, this disclosure contemplates any suitable communication interface.

[0076]   In particular embodiments, bus 912 includes hardware, software, or both coupling components of computer system 900 to each other. As an example and not by way of limitation, bus 912 may include an Accelerated Graphics Port (AGP) or other graphics bus, an Enhanced Industry Standard Architecture (EISA) bus, a front-side bus (FSB), a HYPERTRANSPORT (HT) interconnect, an Industry Standard Architecture (ISA) bus, an INFINIBAND interconnect, a low-pin-count (LPC) bus, a memory bus, a Micro Channel Architecture (MCA) bus, a Peripheral Component Interconnect (PCI) bus, a PCI-Express (PCIe) bus, a serial advanced technology attachment (SATA) bus, a Video Electronics Standards Association local (VLB) bus, or another suitable bus or a combination of two or more of these. Bus 912 may include one or more buses 912, where appropriate. Although this disclosure describes and illustrates a particular bus, this disclosure contemplates any suitable bus or interconnect.

[0077]   Herein, a computer-readable non-transitory storage medium or media may include one or more semiconductor-based or other integrated circuits (ICs) (such, as for example, field-programmable gate arrays (FPGAs) or application-specific ICs (ASICs)), hard disk drives (HDDs), hybrid hard drives (HHDs), optical discs, optical disc drives (ODDs), magneto-optical discs, magneto-optical drives, floppy diskettes, floppy disk drives (FDDs), magnetic tapes, solid-state drives (SSDs), RAM-drives, SECURE DIGITAL cards or drives, any other suitable computer-readable non-transitory storage media, or any suitable combination of two or more of these, where appropriate. A computer-readable non-transitory storage medium may be volatile, non-volatile, or a combination of volatile and non-volatile, where appropriate.

[0078]   Herein, "or" is inclusive and not exclusive, unless expressly indicated otherwise or indicated otherwise by context. Therefore, herein, "A or B" means "A, B, or both," unless expressly indicated otherwise or indicated otherwise by context. Moreover, "and" is both joint and several, unless expressly indicated otherwise or indicated otherwise by context. Therefore, herein, "A and B" means "A and B, jointly or severally," unless expressly indicated otherwise or indicated otherwise by context.

[0079]   The scope of this disclosure encompasses all changes, substitutions, variations, alterations, and modifications to the example embodiments described or illustrated herein that a person having ordinary skill in the art would comprehend. The scope of this disclosure is not limited to the example embodiments described or illustrated herein. Moreover, although this disclosure describes and illustrates respective embodiments herein as including particular components, elements, feature, functions, operations, or steps, any of these embodiments may include any combination or permutation of any of the components, elements, features, functions, operations, or steps described or illustrated anywhere herein that a person having ordinary skill in the art would comprehend. Furthermore, reference in the appended claims to an apparatus or system or a component of an apparatus or system being adapted to, arranged to, capable of, configured to, enabled to, operable to, or operative to perform a particular function encompasses that apparatus, system, component, whether or not it or that particular function is activated, turned on, or unlocked, as long as that

12

apparatus, system, or component is so adapted, arranged, capable, configured, enabled, operable, or operative. Additionally, although this disclosure describes or illustrates particular embodiments as providing particular advantages, particular embodiments may provide none, some, or all of these advantages.

What is claimed is:

1. A method comprising:

by the one or more computer systems of the social-networking system, retrieving a user profile for a user of the social-networking system, wherein the user is associated with a media device;

by the one or more computer systems of the social-networking system, receiving media consumption data;

by the one or more computer systems of the social-networking system, correlating the media consumption data with the user profile to determine device-based media consumption data associated with media content being consumed on the media device; and

by the one or more computer systems of the social-networking system, storing data associating the user profile with the device-based media consumption data.

2. The method of claim 1, wherein the user profile is retrieved based on a unique device identifier for a user device associated with the user.

3. The method of claim 2, wherein the user device is the media device.

4. The method of claim 1, wherein the user profile is retrieved based on authentication information for the user.

5. The method of claim 1, wherein the media consumption data comprises information uniquely identifying the media content being consumed on the media device.

6. The method of claim 5, wherein the information uniquely identifying the content comprises one or more of:

an acoustic fingerprint;

a video fingerprint;

information about a phase delay;

information about electrical interferences associated with the media device;

information about closed-captioning associated with the content; or a digital watermark.

7. The method of claim 1, wherein the media consumption data comprises set-top box data.

8. The method of claim 7, wherein the set-top box data comprises one or more of:

information indicating a television channel the media device is tuned to;

information indicating the identity of the media content;

information indicating a time or date associated with the media content;

information indicating a viewing duration of the media content;

information indicating use of a remote control; or information indicating channel changing behavior.

9. One or more computer-readable non-transitory storage media embodying software that is operable when executed to:

retrieve a user profile for a user of the social-networking system, wherein the user is associated with a media device;

receive media consumption data;

correlate the media consumption data with the user profile to determine device-based media consumption data associated with media content being consumed on the media device; and

store data associating the user profile with the device-based media consumption data.

10. The media of claim 9, wherein the user profile is retrieved based on a unique device identifier for a user device associated with the user.

11. The media of claim 10, wherein the user device is the media device.

12. The media of claim 9, wherein the user profile is retrieved based on authentication information for the user.

13. The media of claim 9, wherein the media consumption data comprises information uniquely identifying the media content being consumed on the media device.

14. The media of claim 13, wherein the information uniquely identifying the content comprises one or more of:

an acoustic fingerprint;

a video fingerprint;

information about a phase delay;

information about electrical interferences associated with the media device;

information about closed-captioning associated with the content; or

a digital watermark.

15. The media of claim 9, wherein the media consumption data comprises set-top box data.

16. The media of claim 15, wherein the set-top box data comprises one or more of:

information indicating a television channel the media device is tuned to;

information indicating the identity of the media content;

information indicating a time or date associated with the media content;

information indicating a viewing duration of the media content;

information indicating use of a remote control; or

information indicating channel changing behavior.

17. A system comprising: one or more processors; and a memory coupled to the processors comprising instructions executable by the processors, the processors being operable when executing the instructions to:

retrieve a user profile for a user of the social-networking system, wherein the user is associated with a media device;

receive media consumption data;

correlate the media consumption data with the user profile to determine device-based media consumption data associated with media content being consumed on the media device; and

store data associating the user profile with the device-based media consumption data.

18. The system of claim 17, wherein the user profile is retrieved based on a unique device identifier for a user device associated with the user.

19. The system of claim 18, wherein the user device is the media device.

20. The system of claim 17, wherein the user profile is retrieved based on authentication information for the user.

* * * * *

# Exhibit 15

| From: | Matthew Melamed <mmelamed@bfalaw.com> |
|---|---|
| Sent: | Friday, July 9, 2021 3:19 PM |
| To: | Snyder, Orin; Stein, Deborah L.; Falconer, Russ; Kutscher Clark, Martie; Mumm, Laura C. |
| Cc: | Gail Andler; Daniel B. Garrie; dgarrie@jamsadr.com; Lesley Weaver; Anne Davis; Derek Loeser; Cari Laufenberg; David Ko; Chris Springer |
| Subject: | In re Facebook |

Counsel,

In response to your request during our last mediation session that Plaintiffs identify high priority discovery, below are four categories of information we would like you to provide by July 16, 2021. Providing responsive information should not prevent or delay Facebook from providing the other discovery to which Plaintiffs are entitled, nor should it supplant the requirement that Facebook respond to Plaintiffs' discovery requests in full.

1. A data model for the Named Plaintiffs' data. RFP Nos. 9-10, 39-40; Interrogatory Nos. 31-33.
   By "data model," we mean data models, associated data dictionaries, and/or protocols—whatever terminology is used by Facebook—that describes how information and data is collected, sorted, analyzed, searched, and maintained. This also includes descriptions of encryption retention and deletion processes for each kind of data.
2. A list of API and SDK calls used to access the data model identified in #1. RFP No. 37; Interrogatory Nos. 9, 13, 15.
3. A list of third parties with permission to access the capabilities to make each of the API and SDK calls against the Named Plaintiffs' data in #2. RFP Nos. 11-13, 24, 26; Interrogatory No. 14, 16-17, 26-27.
4. The contracts between Facebook and each of the third parties identified in #3. RFP Nos. 11-12, 24-26.

Please reach out if you have any questions.

Thanks,
Matt

Matthew S. Melamed
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
(415) 445-4003
www.bfalaw.com

# Exhibit 16



September 10, 2021

**VIA ELECTRONIC MAIL**

Martie Kutscher Clark
Gibson Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
mkutscherclark@gibsondunn.com

Russell H. Falconer
Gibson Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah L. Stein
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
Gibson Dunn & Crutcher LLP
3161 Michelson Drive,
Irvine, CA 92612-4412 USA
cdavis@gibsondunn.com

Laura C. Mumm
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
lmumm@gibsondunn.com

Re:     *In re Facebook, Inc. Consumer Privacy User Profile*,
        Northern District of California Case No. 3:18-md-02843-VC

Dear Counsel:

At the mediators' request, we send this message as a final attempt to avoid impasse on Facebook's production of the named plaintiffs' data.  We look forward to your response on September 16.

At its core, this case is about what "content and information" (Facebook's term for data and information as set forth in its own terms of service) Facebook took from Plaintiffs, what Facebook told Plaintiffs it would do with their content and information and what Facebook *actually* did with it.  This includes, but is not limited to, sharing it with third parties, negligently allowing third parties to take it and use it for improper purposes and failing to monitor third parties' use, which is precisely what occurred with Cambridge Analytica and Dr. Kogan, the scandal that sparked these consolidated actions.  Facebook asserts it disclosed all its practices as to users' content and information and that users consented to those practices.  To test this assertion, Plaintiffs need to understand whether Facebook's actions matched the conduct Facebook describes in its terms of service and privacy policies.

Gibson Dunn & Crutcher LLP                    **KELLER ROHRBACK L.L.P.**
September 10, 2021                        **BLEICHMAR FONTI & AULD LLP**
Page 2

Plaintiffs opened discovery in this case with the modest request that Facebook describe and identify the kinds of data it has collected on only the nine Named Plaintiffs, as opposed to the hundreds of millions of class members in this action. We have simply asked: what did Facebook collect about users and what did it do with it? RFP No. 9 seeks all documents Facebook has relating to the Named Plaintiffs, including the content and information collected about each of them.. RFP No. 10 seeks documents sufficient to identify the categories of "content and information" Facebook collects, tracks, and maintains about each Named Plaintiff. It has been Plaintiffs' hope that this modest request could serve as a road map for class-wide discovery.

In Discovery Order No. 9, Judge Corley agreed. She identified the proper scope of discovery related to the data Facebook accumulates about the Named Plaintiffs as: (1) data collected from a user's on-platform activity; (2) data obtained from third parties regarding a user's off-platform activity; and (3) data inferred from a user's on- or off-platform activity. Dkt. No. 557.

To date, Facebook has not produced data from categories 2 or 3. Such a production would include Facebook's profiles of the Named Plaintiffs, and data Facebook acquires through its agreements with business partners, including data it bought and sold about Named Plaintiffs from data brokers in the heart of the Class Period. The parties have conferred and communicated at length about this issue, both before and after Judge Corley's order.

Instead, Facebook continues to limit discovery to category 1. Facebook has repeatedly told Plaintiffs it has "produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings)." *E.g.*, Apr. 1, 2021 letter at 2 (attached). The external tool that Facebook created to share with Plaintiffs some small subset of the information Facebook collects about them does not meet the scope of discovery Judge Corley identified or even address the heart of Plaintiffs' claims in this case. Plaintiffs know what they shared on the platform. But Plaintiffs do not know what Facebook collects, infers, embeds and tracks to create data sets about the Plaintiffs. Plaintiffs want to see those data sets and they want to know how Facebook uses them. Plaintiffs can then compare those actions to Facebook's disclosures and the parties can have a meaningful dialogue about the scope of consent.

Because of Facebook's secrecy and refusal to be transparent, there is a significant information asymmetry. Thus, it is impossible for Plaintiffs to identify with specificity the full scope of information Facebook has not produced about the Named Plaintiffs. But some internal Facebook documents give a clue to the types of information it collects about users. For example, Dep. Ex. 3 (attached) defines three broad categories of data Facebook "receive[s] about people": native data, appended data, and behavioral data. *See* Ex. 3 at FB-CA-MDL-00213424. For those types of data, Facebook identifies categories of data it explicitly collects,

Gibson Dunn & Crutcher LLP
September 10, 2021
Page 3

**KELLER ROHRBACK L.L.P.**
**BLEICHMAR FONTI & AULD LLP**

implicitly collects, and infers.  It appears that the Named Plaintiffs' data Facebook has produced is limited to information in the explicit collection category: profile information; posts, likes, shares; and location (checkins).  Facebook has *not* produced all of the Named Plaintiffs' data it implicitly collects— ███████████████████████████████████  And Facebook has *not* produced the Named Plaintiffs' data it infers— ████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████  Nor has Facebook disclosed the extent to which it shares or makes accessible some or all of this data to third parties and what it does to monitor third parties' use of it.

The document at Bates No. FB-CA-MDL-00178902 provides further insight into the types of information Facebook collects about its users that it has not produced (limited to the Named Plaintiffs) here.  Summarizing the value proposition of being able to read data from Facebook's platform, Sam Lessin writes: ████████████████████████████ ████████████████████████████████████████ █████"  Among the data Lessin says Facebook has about each user is ███████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████"  While the context for these descriptions is Facebook's consideration of shifting its business model to one where ██████████ ████████████████████████████, the descriptions quoted above reflect the data Facebook actually collects on its users. Facebook has *not* produced aggregated data about the Named Plaintiffs' friends, derived data about the Named Plaintiffs, Facebook's opinions of the Named Plaintiffs, or data provided by third parties to the graph about the Named Plaintiffs.

Facebook's patents also lend a clue into the kinds of data collects.  For example, Facebook holds a patent titled "Determining user Personality Characteristics From Social Network System Communications and Characteristics" (U.S. Patent No. 9740752), which can be used to identify personality characteristics (e.g., extroversion, agreeableness, conscientiousness, emotional stability, and openness), which can be targeted by marketers on Facebook. Another patent, "Receiving Information About a User from a Third Party Application Based On Action Types" describes how "linguistic data and non-linguistic data associated with the user" are used "in a trained model to predict one or more personality characteristics for the user." These "inferred personality characteristics are stored in connection with the user's provide, and may be used for targeting, ranking, selecting versions of products, and various other purposes." (U.S. Patent 8732802B2 at 2). Examples of personality characteristics include: "extroversion, agreeableness, conscientiousness, emotional stability, and

Gibson Dunn & Crutcher LLP
September 10, 2021
Page 4

**KELLER ROHRBACK L.L.P.**
**BLEICHMAR FONTI & AULD LLP**

openness." The patent further explains that "[e]ach user of the social networking system is associated with a user profile, which is stored in the user profile store. A user profile includes declarative information about the user that was explicitly shared by the user, and may also include profile information inferred by the social networking system. In one embodiment, a user profile includes multiple data fields, each field describing one or more attributes of the corresponding user of the social networking systems."  Each of these patents identify the types of information about Facebook users, including the Named Plaintiffs, that Plaintiffs have sought but which Facebook has not yet produced.  These references are not intended to be complete. Rather, they are only included for the purpose of providing examples of Facebook acknowledging the existence of some aspects of the data Plaintiffs seek.

If Facebook will not make a complete production of all data it has collected about these nine people, Facebook must identify what it is withholding and why.  And even if Facebook does make a complete production, the parties must confer in advance of the production in order to agree on the form of those productions, given the complexities with the kinds of data collected, inferred, aggregated and used.

Regards,

Derek W. Loeser
dloeser@kellerrohrback.com

Lesley E. Weaver
lweaver@bfalaw.com

ATTACHMENT A

.

| | |
|---|---|
| **From:** | Simone LiTrenta </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SIMONEL051> |
| **Sent:** | Thursday, May 08, 2014 4:34 PM |
| **To:** | Matt Scutari; Rob Sherman; Emily Sharpe; Emily Vacher; Maritza Johnson; Travis Bright |
| **Cc:** | Erin Egan |
| **Subject:** | Offsite presentation |
| **Attachments:** | Combined papers.docx |

Hey, all.  Attached is the combined doc of privacy team papers that Marne will be sending out with the rest of global policy team papers.

Now on to the slide deck☺.  If someone has started slides already and can share the format with the group so we can make the look and feel uniform, that would be great.  If someone is a PPT genius and wants to take the lead on combining finished slides into one deck and making minor changes, let me know.  Otherwise, please save your slides to the folder for slides and I can combine.

https://www.dropbox.com/sh/hquhjw021dr3qty/AADBwXtmeiNZJRBZR6-xjlgia

Erin would like to review the slide on the plane Monday morning.  If everyone can finish their slides by COB Friday/Saturday, I can get them to her Sunday night.

If you would like to discuss your slides with Erin, please let me know ASAP and I will find time manana.

Simone



**Confidential**                                                      **FB-CA-MDL-00213423**

**Hard Questions**

**Does Facebook share my data with advertisers?**
> *"We don't share the private information that you put on Facebook with advertisers without your consent."*

**Why do we use that framing?**
- o Though Facebook's policies prohibit sharing of data with data brokers or similar entities, we only make commitments about what Facebook will do.
- o Advertisers who are also developers might get user information through Platform, with user consent.
- o When people make information public, anyone can see it on or off Facebook, so we don't make any non-disclosure commitment for that information.
- o If someone else shares information (including information about you) they control who sees that information.  Also, we may in the future operate a "data cooperative" or other product allowing exchange of information that people haven't given to us directly.

**How does ad targeting work?**
*Key types of targeting*
- o 

**How can people see what you know about them and control their ad experiences?**
*Context menu*
- o Click the "x" or "v" next to any Facebook ad to see who the advertiser is and hide that ad or other ads from the same company.

*Activity Log and Download Your Information (DYI)*
- o See the information you've put on Facebook that may be used for ads.  Delete or change who can see it.

*Ad Preferences (launching summer 2014)*
- o See why you saw a particular ad and what you can do about it.  Also see and modify all your ad clusters.

*Centralized opt-out*
- o Turn off collection and use of third-party behavioral data with one click – not just on FB but across the web.

***See mocks on next page.***

**Confidential**



Context menu (current experience)

Ad Preferences context menu (proposed)

Ad Preferences

**Behavioral Advertising Announcement**
*(Tentative plans subject to change; late May/early June)*



**Learn More:**

Hi Jane – we want to explain the choices you have over the ads you see.

- ***You can choose to opt out:*** We want to show you more meaningful ads based on what you do on and off of Facebook, but you can opt out of how this is done by visiting the <u>Digital Advertising Alliance (DAA)</u>.
- ***You can choose ad categories:*** Today we're announcing a new tool called Ad Preferences, which lets you choose info that will influence the ads you see. It's launching today in the US, and will be available everywhere soon.

**Read more about:**

- <u>Ad Preferences</u>
- <u>How we use cookies, pixels, and similar technologies to show you ads on and off Facebook</u>

**Confidential**

## *Location*
### (Maritza Johnson)

Knowing where people are when they interact with our services is useful for designing innovative products, customizing content, and improving our security features. However, location data is generally considered to be sensitive data that deserves a greater level of attention.

In general, we consider the following questions when new products are proposed that leverage location:

- <u>When</u> is the location data collected? Is location data collected when the app is in the <u>foreground</u> (the app is the primary content on the screen and the user is actively engaged), or in the <u>background</u> (the app is running on the phone but the user is not actively engaged with the app)?
- <u>Frequency</u>?
- <u>How</u> is the data point collected?  It's possible to collect the device's location with varying degrees of accuracy (GPS, WiFi, Bluetooth, IP addresses, MAC addresses, etc.).
- What <u>level of granularity</u> is the location data collected and stored? How <u>accurate</u> is the data point?
- <u>Retention</u>, how long do we store it?
- What <u>controls</u> are available?
- Is <u>derivative data</u> produced (ex., ad clusters)?

**Additional considerations depending on the nature of the product and the use of location data**

In cases like Nearby Friends (Aura) where people are intentionally interacting with the feature because it is location based, we offer additional controls and review options so that the user understands what is collected. The combination of the controls, the transparency offered by "Travel History," and the opt-in nature of the product mitigate privacy concerns.

We also offer products that rely on location information as one of many inputs, in some cases, the data used to represent location is less granular or could potentially be less accurate. In those cases, we take a close look at the use of the data, the granularity of the data, the retention policy, and how the data will be stored to minimize the chance that individuals could be linked to the data collected.

<u>**Hard Questions**</u>

**Are you tracking where I go all the time?**
No, unless you recently turned on "Nearby Friends." Visit your Travel History to see what Facebook knows abut your recent whereabouts. If you have chosen not to use this feature, then the Facebook app will only collect your precise location when you open the app if you allow the app to access your location.

**How does Facebook use my location?**
We offer several products that allow you to share your location with your friends like Nearby Friends and Places. We also use location data to customize content in a language that matches the general location where you are using the app and to offer security features.

**When does Facebook collect my location?**
Before the launch of Nearby Friends, the Facebook app did not collect location information when people left the app. The Facebook app collected location data each time the user launched the app, or when the user clicked on the composer box to start a new status.

**How is my location used for advertising?**

FB-CA-MDL-00213428

Facebook currently offers advertisers the ability to target ads based on where people live. For example, a restaurant  in Kansas City could choose to show ads to people who live within 10 miles of the zip code where the restaurant is located. The location information Facebook currently uses to target ads comes from people's self-reported Current City, as well as other signals such as their IP address.

**Are you using data from Nearby Friends or Location History to target ads?**
No, at this time we are not using data from Nearby Friends or Location History to
target ads. The launch of this product doesn't impact the way advertisers can target people based on location.

**I want to hide my location from Facebook, how can I turn that off?**
If you're using a mobile app, go to the Settings section on your device and turn off location for the Facebook app. Your IP address will still be used to approximate your location for security features and content localization.

**Can law enforcement get my location history now?**
Your location history is treated in the same way as other data that Facebook collects about you. Law enforcement officials need to go through the same processes to
request it. You can also always delete your location history from the Location
History section of your Activity Log.

**General Context**
- Location-aware services and advertising have become increasingly popular and feasible with the growing popularity of smartphones and other personal devices.
- Geolocation data is recognized as one way that the online and offline worlds can be linked which is a great feature for products, however it introduces additional privacy concerns.
- Regulators worldwide are paying close attention to location data and have said that the sensitive data deserves a greater level of privacy protection.

**Products that use location:**
- Nearby Friends (Aura), https://www.facebook.com/help/629537553762715/
- Travel History
- Site Integrity features (identifying suspicious logins by location of attempts)
- Hunch (to offer local recommendations based on current location)
- FB WiFi (opt-in)
- Measurement for ads – offline measurement, Clicker, Demographics of the World  (utilizing the MAC address when people enter a specific range).
- Ads targeting

**Additional background on the uniqueness of location data**
In a study released in March, researchers analyzed the coarse location histories recorded to the nearest hour of 1.5 million mobile phone users. The researchers found that knowing which 23-block area a device was in during four distinct 60-minute periods was enough to uniquely identify 95 percent of location histories in the dataset.
https://www.privacyassociation.org/resource_center/unique_in_the_crowd_the_privacy_bounds_of_human_mobility

**Confidential**

## *Facial Recognition*
### (Emily Sharpe)

**Background:**  The facial recognition feature has been the subject of controversy since its launch.  After we acquired Face.com, which previously provided the software behind tag suggestions, we took the product offline in order to complete performance improvements. We re-launched the product in the Spring of 2013 in all markets except Canada and Europe.

**Current status of Facebook's facial recognition practices:**  Tag suggestions is an ████████████████ ███████████████████████████████████████████████████████ ▆  Unlike other services that offer facial recognition, ██████████████████████████████████████████ ▆

- **Notice and Control:** You're informed when someone uploads a photo you're tagged in, and you get added to the audience so you can see it.  You can choose to remove the tag, ask the person to remove the photo, or report it to Facebook.  Tag review allows you to approve a tag anytime someone tags a photo you're in.  You can also turn off tag suggestions so Facebook won't suggest that people tag you when photos look like you, and the template that FB created to enable the tag suggestions feature will also be deleted (although friends will still be able to tag photos of you).
- **Security:** █████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████
- **Government access**: We apply strict legal and privacy requirements to all law enforcement requests for photos and facial recognition templates.

**Policy considerations:**
- Regulators in Canada and Europe have expressed strong concerns about our use of facial recognition technology for people who live in their jurisdictions, and the Irish regulator particularly threatened to give us an unfavorable audit report if we didn't commit to stop using facial recognition in Europe without an "opt-in" by each use.
- In the U.S., the National Telecommunications & Information Administration (NTIA) is facilitating a privacy multistakeholder process focused on developing a voluntary, enforceable code of conduct that specifies how the White House's Consumer Privacy Bill of Rights applies to facial recognition.  Facebook's facial recognition practices and research have garnered a fair amount of attention during the process, and FB and Google have been pressured by one privacy advocate to present on our practices.  Some participants have also focused on FB's large photo collection as being at risk of data harvesting.  While we believe our current and planned practices generally align with consensus policy positions, we are working with industry associations to shape the code of conduct.

**Our commitments:**
- We've committed that we won't turn the feature on in Europe unless we agree with the Irish DPC on the type of consent we'll put in place, and that we will consult with the Canadian Privacy Commissioner's Office before offering facial recognition in their country.
- We would likely support (or not actively oppose) NTIA code of conduct principles articulating that 1) companies should tell individuals that they are collecting their facial recognition data, and 2) companies should provide subjects of images with meaningful control over how their images are used to share information with others who would not otherwise know that information.

**Product updates:** In 2014 we're working on a few changes to the way we use facial recognition technology.
- **Face Alerts:**  A new, *opt-in* feature that allows people to be notified about photos they're in on Facebook, but haven't been tagged in.  They will only be notified about photos they're in the audience to see.

- o Expected launch is early July (based on EU's team's feedback), and will be available worldwide, including the EU and Canada.
- o When people opt in to Face Alerts, they'll see these photos in a new section on the "photos of you" page, and these photos will only be available to them.
- o People can choose to tag these photos to make it part of their identity and timeline. They can also reject the tag suggestion, preventing people from tagging them in that photo; ask the person who uploaded it to remove the photo; or report it to Facebook.
- o This feature will be available if your "tag suggestions" setting is turned on.
- **Graph Search.** We're looking to incorporate facial recognition results into Graph Search. For celebrities, we would use facial recognition to automatically include photos of a celebrity in search results. For non-celebrities, we wouldn't automatically integrate photos into search results but would display a distinct "Do you want to tag Sheryl in these photos?" unit next to search results that are informed by facial recognition data.
- ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████
- **Videos tag suggestions:** We're rolling out a feature that suggest tags in videos. This feature works just like tag suggestions in photos and, for now, is only available on the web when the uploader of the video clicks the "edit" button. The underlying technology and settings/controls are the same as tag suggest for photos. As with all tag suggest features, this will only work if people in the video are your friends. We are using reactive messaging here in case concerns about "real time facial recognition" surface.

## Hard Questions:

**Do you support regulation of facial recognition technology?**

People's greatest concerns about facial recognition technology don't generally arise from problems with the underlying technology itself, but to problems with how certain people might *use* photos in a way that is inconsistent with individuals' expectations. We don't think it's helpful to regulate the use of specific technologies. This only encourages bad actors to come up with new ways to do the same things that aren't yet regulated. A better approach is to focus on specific activities that raise concern, regardless of what technology is used for those activities. We support technology neutrality – making sure that regulations focus on practices that raise concerns, not technologies that have both positive and negative uses.

**Facebook talks a lot about user control and its privacy protections, but doesn't that all go out the window when the government gets a warrant and collects all of that data?**

Our facial recognition technology is proprietary and therefore not particularly useful to government investigators. Our facial recognition software generates a template, which is basically an average of the characteristics of multiple photos of a person. That template is encrypted and requires a "key" to decode it. It can't reliably be used to recognize an individual from among thousands or millions of templates, so if a law enforcement agency tried to use our templates in that way, it wouldn't work properly. We also don't have any reason to believe that existing laws would allow government agencies to compel Facebook to cooperate in a "fishing expedition" for photos, and, if they did, we would vigorously defend the privacy of our users. We aggressively protect our users' data when confronted with law enforcement requests: We scrutinize every government data request that we receive – whether from state, local, federal, or foreign governments. We frequently reject such requests outright, or require the government to substantially scale down its requests, or simply give the government much less data than it has requested. And we respond only as required by law.

**Confidential**

**Facebook has the world's largest database of photos.  What are you doing to prevent people from "scraping" the photos so they can combine them with publicly available FB profile data, and then apply commercially available facial recognition technology to identify otherwise-anonymous people walking on the streets or in other photos online?**

We implement legal and technical measures to deter data harvesting (a.k.a. "scraping").  Although we do not discuss specific technical measures for security reasons, we use rate limiters and other methods to detect and deter efforts to harvest publicly available Facebook data.  Our policies also prohibit people who access our site from screen-scraping and similar data harvesting efforts.  We have taken legal action where we have learned that people have attempted to circumvent these measures.

**Confidential**

# *Apps, Acquisition, and Creative Labs*
## (Travis Bright)

For the last few years Facebook has moved towards a federated system of applications compared to our previous work to integrate all featured into the main Facebook app. In addition, we acquired Instagram that has continued to run pretty independent from the rest of Facebook and Mark's statements around WhatsApp indicate that they will run all but completely separate from Facebook. With Creative Lab's focus on incubating new ideas in the form of small projects brought to market quickly (and often as a stand alone app) which increases the trend of "ever more apps". There are some fundamental questions that have to be addressed:

- Do people use the system anonymously, pseudo-anonymously, or with their real name?
- What level of data integration will exist? Nothing, anonymized/aggregated/hashed data mapping, or full data integration (increasing the person's Facebook profile)
- What level of separation are we trying to achieve from the main brand?

**Level of Anonymity**

Facebook has long championed our real name culture. But more and more of our competitors and our own internal apps are breaking away from this because people often perceive real name system with being "heavy weight". To make a fun, lighter experience that often is more ephemeral than traditional Facebook our PMs and Designers are moving towards ███████████████ This complicates our external messaging and our ███████ ████████ but what is critically important is our company's ability to test new things. Our product teams have to be free to push the boundaries and create new test without being constrained by our previous positions and thoughts. As a policy team that has to speak externally, build relationships, and judge the impact on external people each change will bring this is and will continue to be a problem. We'll need to make sure that all of our statements are focused on the current system and always leave the expectation that change will happen.

**Data Integration**

██████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████

**One Brand or Many?**

A more recent trend is for product teams to want to distance themselves from Facebook by not directly referencing it or obscuring the link. They feel that different groups of people feel are more concerned with sharing certain data when they think about Facebook. They believe that people mentally associate their friends, co-workers, family members, … along with permanence with Facebook. They don't want Facebook in the name, don't want Facebook in the privacy policy, shown during registration, … And this isn't just for Facebook. Pepper, the new direct sharing app for Instagram is likely to have an external name that doesn't use "Instagram" in it. We obviously can't hide our ownership of these apps but getting back to the product team's need to be able to test things we need to allow them some flexibility to break away. This also comes up when we acquire an app. Obviously, Moves and WhatsApp have never mentioned Facebook in their product before and the mindset seems around keeping them as separate as possible going forward. They have different privacy policies, different content policies, … From a tactical side we need to figure out a way to deal with a world where we have dozens of different DUPs, Privacy Policies, and rules. We need to decide for our internally built apps whether we will allow them the all to have their own custom policies or if we should build out a few tiers of policies and ask them to select the level they need.

**Hard Questions:**

Where do we start with a new app or acquisition? The basic questions:

- Data Policy
    - What data is collected? (PII, location, …)
    - Where does is the data stored?
    - How long is the data stored?
    - Is there any sharing of data between apps and/or Facebook?
    - Will we target ads with this data?
    - Will this system use Facebook's DUP?
- Content Policy
    - What are the rules for using this new system and are they different than Facebook's?
- People Policy
    - Will the system know/collect ages?
    - What is the minimum age?
    - Is this system using real names?
    - Is there reporting? Blocking?
    - Does the system verify accounts? How?
    - Will there be ads? From where?
    - Will we charge for this service?
- Privacy Policy
    - What is the default level of privacy for the system?
    - If this is an existing system what previous promises were made?
    - How are we going to fulfill our Irish DPA/FTC obligations for this system?
    - Will this system use Facebook's Privacy Policy?

There is a quick matrix of common apps and their differences here:
https://docs.fb.com/sheet/ropen.do?rid=osbge49eb2cbdfc004a8ea79e35865b97817b

Confidential

# *Safety Policy Paper*
## (Emily Vacher)

**What are our safety goals and priorities for 2014?**

**(1) Public Policy.** It is our responsibility to demonstrate our position in the industry as thought leaders regarding safety issues and to support policy makers when they are faced with pressure to legislate in areas that are better handled by empowering users with tools and education.

- Review of proposed safety legislation/policies.
  - Safety is an area in which we typically do not want to encourage legislation or the appointment of eSafety officials. We will work with country managers/legal when safety related legislation is proposed to minimize the impact to FB.
  - Support in this area includes targeted education and resources for teens and adults, strong partnerships with key safety groups and organizations, and the development of technical solutions and effective reporting channels.
- Identify highest risk jurisdictions and target with appropriate proactive educational campaigns, relationship building, and other strategic engagement.
  - At present, resources are being primarily directed to a few of the highest risk countries, including Australia, New Zealand, Canada, Brazil, US, Singapore (when the comprehensive review is completed, this will be reevaluated.)

**(2) External relationships and partnerships**.

- Develop and leverage strategically selected domestic and international child safety/advocacy partners who can provide feedback on programs and products, speak to policymakers and press as needed and demonstrate to policymakers and we are aligned with experts.
- Partners include NCMEC, SAB, and international child safety organizations like IWF, SaferNet, Chicos.net, Project RockIt. We also work cross functionally with both Policy Comms and Security Comms to proactively present our messaging and to reactively deal with media fires and/or misinformation.

**(3) Product safety**

- Product Reviews: Review all upcoming product and feature releases to ensure they don't violate our core safety principles or put our external relationships at risk.
- Work with cross-industry partners to drive safety innovation in technology, including in the areas of suicide prevention, social resolution, and PhotoDNA. Additionally, help NCMEC achieve their goals of finding missing kids and ending exploitation through tools like AMBER Alert v2 and video hashing.

**(4) Teen education and empowerment**.

- Build, pilot and scale a "Youth Ambassador Program": We are currently negotiating with ChildNet International to develop the curriculum for this program, and will initially pilot the program in London, the US, and one other market.
- Work with Policy Programs to identify gaps and develop appropriate educational programs/materials to demonstrate our thought leadership.
  - Bullying Prevention Hub Global Rollout (EMEA, LatAm)
  - Think Before You Share Global Rollout
  - Friend in Need College Campus Tour/Town Halls
  - Internet 101 for Emerging Markets (in development)
- Use data driven research to help us make decisions in safety policy, program development and for talking points with policymakers.

FB-CA-MDL-00213435

- o   Investigate research possibilities with FOSI, University of New Hampshire CAC Research Center, danah boyd, etc.
- Support country managers by providing safety materials they can use in their countries

**(5)  Adult education and empowerment.**
- Engage with organizations who work with adults who parent, support, educate, and mentor children and provide tools, resources, and educational programs, including religious communities, teachers, Scouts, Big Brother/Big Sister, Cal Ripken, Sr. Foundation, pediatricians, school resource officers, etc.
  - o   FB 101 For Parents & "Having the Tech Talk"
  - o   Leverage FOSI's new "GDP" (Good Digital Parenting) program for opportunities for co-branded parent focused FB educational materials/programs, distribution channels, and research opportunities.

## Hard Questions

**Why are you now letting kids 13-17 now post publicly?  Isn't this dangerous for them?**

On Facebook, you control who you share with. That can be a single person in a message, a small group, with friends, or with the world.  Before we updated our policies, for people aged 13 through 17, the initial audience of their first post on Facebook was set to "Friends of Friends" – with the option to change it.  After this update, a new teen on Facebook's first post is set to a narrow initial audience of "Friends" only.  It's important to realize that teens are among the savviest people using social media, and whether it comes to civic engagement, activism, or their thoughts on a new movie, they want to be heard. So with this update, people aged 13 through 17 now have the choice to post publicly on Facebook.  While only a small fraction of teens using Facebook might choose to post publicly, this change now gives them the choice to share more broadly, just like on other social media services.

**You say your policy is that you have to be 13 or over to have a FB account but studies have shown that there are millions of kids under 13 on Facebook.  Why doesn't Facebook do more to keep kids off the site?**

- Safety experts agree that there is no singular way to keep underage children off of any platform – so we employ a layered approach to keeping kids under 13 off our site:
  - o   People who sign up for a Facebook account are required to type in their age on the very first screen. We use a simple piece of technology called a cookie to ensure that if a teen tries to sign up for FB and indicates that they are 12, they can't simply come back a minute later and say that they're 13+. This helps keep underage kids off of our site, and it's something we've chosen to do (not required of us).
  - o   We ask people to notify us if they believe there is an underage user on our site; we have a dedicated compliance channel for these reports; and we delete the accounts of children under 13 as soon as we become aware of them.
- However, one report highlights that most parents with under 13's on Facebook not only know their kids are on our service, but helped them sign up (and lie).
  - o   This report (by Danah Boyd, Eszter Hargittai, Jason Schultz and John Palfrey) notes that parents actively assist their children under 13 in joining Facebook even though they know it violates our policy.
  - o   The report also highlights the difficulty in implementing age restrictions on the Internet and underlines the need to continually work to keep kids safe online.
  - o   We appreciate the attention that these types of reports are giving to child safety, and believe that they provide important opportunities for everyone – industry, government, parents, advocates – to discuss it with the ultimate goal of trying to provide better, safer experiences for kids online.

**Confidential**                                                                                                        **FB-CA-MDL-00213436**

**What is Facebook doing to prevent bullying on its site?**

Bullying in any form – from the school playground to online – is unacceptable. Facebook is the industry leader when it comes to bullying prevention, and we help people speak up for each other.  We've created policies, programs, and tools to foster safety, accountability and trust in our community.

- **Policies:**
  - _Real Name Culture_ – We've built a network based on authentic identity, so people are more likely to treat each other with respect. It is a violation of our policies to use a fake name or operate under a false identity.
  - _Easy to Use Reporting_ – There are 'Report' links on virtually every Facebook page, and anyone in our community can block people who post hurtful content. Harassment, bullying and other forms of abuse are prioritized by our response team.
  - _A Safe Experience for Minors_ – Facebook's privacy and visibility settings take into account the unique needs of people between the ages 13 and 17, and are generally more restrictive than the settings for adults.

- **Product Innovation:**
  - _Fostering Compassion_ - We've partnered with the Yale Center for Emotional Intelligence to provide youth and adults with valuable tools and strategies to help them effectively address bullying behavior and its consequences.
  - _Conflict Resolution_ – We believe in the power of friends to help prevent bullying. That's why we've created tools like Social Reporting that enable people to report bullying and harassment to trusted friends and adults. Our data shows that in over 80% of cases, when a teen asks another teen to remove a photo from our site they don't like, the other teen will comply.  Approximately 3.9 million people use this tool each week.
  - _Support Dashboard_ – Everyone should be able to know what happens to reports sent to Facebook. We've created a feature that lets people see whether or not their report has been reviewed and allow them to be notified when a decision is made (note: the dashboard does not cover every report made by users – e.g,. if you report someone for using a fake name.)

- **Digital Citizenship Education:** Consumer education is a key pillar of creating a culture where people treat each other with respect. Together with safety advocates, academics, government and industry, we use our platform to raise awareness of bullying and how to prevent it.
  - _Family Safety Center_ – In November 2013 we launched an expansion of our Family Safety Center. We worked with the Yale Center for Emotional Intelligence to develop new content on bullying prevention, including tips, tools, and actual scripts for all stakeholders: parents, educators, and teens, even people accused of bullying. The new hub is also directly tied to reporting on Facebook because we know that it's so important to give people who get bullied or see it happening the resources they need at the moment they need it most.
  - _Bullying Prevention Education_ – Facebook has launched several education efforts aimed at inspiring bystanders to take action to stop bullying.  In the US, we've partnered with Time Warner to create a social media pledge (Stop Bullying; Speak Up) to speak up when adults and students see bullying occur – today more than 140,000 people have taken the pledge.

**Are you targeting children with ads that are not appropriate for them?**
We have strict guidelines over what organizations can advertise to people 13 to 17 on Facebook.  This is one reason it is important for teens who set up an account use their real age – to make sure they receive the many protections we offer teens in our community.

# *Contact Import*
## **(Matt Scutari)**

**A Brief History of Facebook Contact Import**

Facebook's contact import functionality (or "Find Friends") is designed to drive engagement and growth by helping people find and add new friends on Facebook.  This is a three-step process:

1. Person uploads his or her contacts to Facebook.
2. Facebook shows the uploader contacts who are also on Facebook and prompts the uploader to add them as friends (drives engagement).
3. Facebook shows the uploader contacts who are <u>not</u> on Facebook and prompts the uploader to invite them to join Facebook (drives growth).

Over the years, contact import functionality has been the subject of significant legal and regulatory attention in various jurisdictions around the world (for Facebook and others).  Facebook has mitigated risks associated with its Find Friends feature in a number of ways, including by displaying notice before a person uploads contacts, providing a way for people to manage and delete the contacts they upload, providing people with granular control over invitations, and restricting what types of data can be uploaded to Facebook's servers from the person's device.

Much of the controversy surrounding Facebook's Find Friends feature has involved our collection and use of the non-user data in connection with facilitating invitations to join Facebook.  Particularly in Europe, non-users are often viewed as owning their personal data, regardless of the source.  However, we take the position that any contact information uploaded by a Facebook user <u>belongs to the uploader</u>.  While this argument has been challenged, it appears to be sustainable to the extent that we're using non-user data <u>only to help the uploader connect with them on Facebook</u> (and potentially to help others connect on Facebook).

Our collection and use of non-user data may become more problematic to the extent we attempt to use non-user data for other purposes. The Irish DPC's 2011 audit report addresses complaints regarding our alleged use of contact information uploaded by users to  create so-called "shadow profiles" of non-users without their knowledge. We maintained that we do not create such "shadow profiles," and stated that non-user data is only used to allow the uploader to send invitations to non- users. Importantly, we relied on the argument that a non-user is clearly informed that Facebook has her contact information when someone sends her an invitation, which offers a link to allow non-users to delete their contact information (although note that we retain a non-usable hashed version of the non-user's contact information in order to prevent any further invitations from being sent to that address). The DPC ultimately found that "the upload of contacts by individuals to facilitate the sending of invitations to friends could operate in compliance with the Data Protection Acts provided full information was provided to non-users in relation to the use of their email address data on receipt of an invitation and any requests for removal are respected."

Other Facebook apps, such as Messenger, Slingshot, and Instagram also have contact import features, but they differ from Facebook's functionality in various ways. For example, Messenger, Slingshot, and Instagram all ████████████████████████████████████████████████████████████████████ (although this may change in the coming months). Additionally, ████████ ████████████████████████████████████████ ████████████████████ However, ████████████████████████████████████████████

Note that WhatsApp has also been subject to significant regulatory scrutiny for its contact import functionality, particularly with respect to its collection and use of non-user data.

FB-CA-MDL-00213438

**Hard Questions**

**Q. Does Facebook collect non-user data?**
A. If people on Facebook choose to upload information about their contacts, Facebook will maintain this information on the uploader's behalf and use it to let the uploader invite people to join Facebook. We give non-users an opportunity to request that Facebook stop using their contact info for friend suggestions whenever a Facebook user sends them an invite to join Facebook. We keep a hashed version of their info to ensure that we honor such requests.

**Q. What does Facebook do with non-user data?**
A. We currently maintain contact information regarding non-users only to allow the Facebook user who uploaded the contacts to invite the non-users to join Facebook. [Note: The growth team is considering using this data for PYMK, so we should be careful to speak about this only in terms of what we do currently.]

**Q. How does Facebook justify collecting and using non-user data when the people to whom the data pertains are not subject to Facebook's privacy policy?**

A.  At this time, we only allow people who uploaded their contacts to Facebook to send invitations to those contacts who are not on Facebook. If the uploader sends an invitation to a non-user, the non-user can request that Facebook stop sending invitations or using the person's contact info for suggestions.

**Q. Does Facebook create "shadow profiles" for non-users?**
A. No.

**Q. What does it mean to "continuously sync" contacts?**
A. "Continuous sync" is an industry buzzword that can mean a number of different things.  Typically, "continuous sync" functionality is not literally continuous, but rather periodic.

**Q. Does Facebook continuously sync contacts?**
Facebook does not continuously sync contacts at this time, but we are always testing new features to make it easier for people to connect on Facebook. Although Messenger, Slingshot, and Instagram do continuously sync contacts, none of these processes are truly continuous.  For example, Slingshot will sync with your address book each time you do a cold restart of the app, and Messenger will periodically check to see if you had added new contacts to your address book.

FB-CA-MDL-00213439

# ATTACHMENT B

.

| | |
|---|---|
| **From:** | Douglas Purdy </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DOUGLAS PURDY> |
| **Sent:** | Thursday, August 30, 2012 10:17 AM |
| **To:** | Sam Lessin |
| **Cc:** | Mike Vernal |
| **Subject:** | Re: Platform Business Model Framing |

I am on vacation this week (still), but happy to help.

That said, in wonder if you should just take the pen on the deck moving forward so I can have a day off and not be the bottle neck?

I can send you want I have so far in an hour when I get back to a computer.

On Aug 30, 2012, at 10:11 AM, "Sam Lessin" <sl@fb.com> wrote:

1. Sorry I wasn't clearer about my plans / being out.  That is my bad guys / didn't mean to leave this hanging (obviously super important)
2. Doug, really glad you are framing this up / working on this …
3. Here are my notes on where things are from Friday, I think a lot of it is covered below but I just want to make sure we are in sync here, are presenting all the hard questions for this offsite



FB-CA-MDL-00178902



2

Confidential

FB-CA-MDL-00178903



3

FB-CA-MDL-00178904

**From:** Douglas Purdy <dmp@fb.com>
**Date:** Wednesday, August 29, 2012 12:47 AM
**To:** Mike Vernal <vernal@fb.com>
**Cc:** Sam Lessin <sl@fb.com>
**Subject:** Re: Platform Business Model Framing

working on this.

going to see the attached to frame things up.

On Aug 28, 2012, at 6:15 PM, Mike Vernal <vernal@fb.com> wrote:

Doug - as context, we're having an mteam offsite on Tue + Wed of next week to talk about three-year-plan stuff, and one of the discussions we're going to have is around the Open Graph business model.

Sam is at burning man (not sure when he gets back), and we left it a little ambiguous about who was pulling together what, so I'd like to at least get started pulling together a deck that we can use to frame the conversation.  Can you ask the PMs to pull together a few slides?

Ideally, I think we want to cover:



FB-CA-MDL-00178905



I think Sam is probably the right person to write-up the CRM stuff, but the rest I think the PMs have the context on.

-mike

Confidential

FB-CA-MDL-00178906

Exhibit 17

Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Magistrate Judge

IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)   **NO. 18-MD-02843 VC (JSC)**
—————————————————————   )

San Francisco, California
Wednesday, December 9, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

KELLER ROHRBACK LLP
1201 Third Avenue - Suite 3200
Seattle, Washington  98101
BY: **DEREK LOESER, ATTORNEY AT LAW**
**CARI LAUFENBERG, ATTORNEY AT LAW**
**DAVID J. KO, ATTORNEY AT LAW**

BLEICHMAR, FONTI & AULD LLP
555 12th Street - Suite 1600
Oakland, California  94607
BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
**ANNE K. DAVIS, ATTORNEY AT LAW**
**MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
**ANGELICA M. ORNELAS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:        Marla F. Knox, RPR, CRR, RMR
United States Official Court Reporter

```
 1   APPEARANCES VIA ZOOM:   (CONT'D)

 2   For Defendant:
                             GIBSON, DUNN & CRUTCHER LLP
 3                           1881 Page Mill Road
                             Palo Alto, California  94304
 4                      BY:  MARTIE KUTSCHER CLARK, ATTORNEY AT LAW

 5                           GIBSON, DUNN & CRUTCHER LLP
                             333 South Grand Avenue
 6                           Los Angeles, California  90071
                        BY:  DEBORAH L. STEIN, ATTORNEY AT LAW
 7
                             GIBSON, DUNN & CRUTCHER LLP
 8                           2100 McKinney Avenue - Suite 1100
                             Dallas, Texas  75201
 9                      BY:  RUSSELL H. FALCONER, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Okay.

2              **MS. WEAVER:**  Yep.

3              **THE COURT:**  So the next issue is the named Plaintiffs'

4    data.  And here I actually am kind of confused because Facebook

5    suggested that there may not be any data other than what they

6    have already produced.  And then I don't understand why (video

7    freeze interruption.)

8              **MS. KUTSCHER CLARK:**  Right, Your Honor.

9         So, as we noted in our submission, we learned for the

10   first time in Plaintiffs' sur-reply brief on the named

11   Plaintiffs' data that what they are really seeking is only data

12   about the named Plaintiffs that was shared with third parties.

13        And for us seeing that in the sur-reply brief was a really

14   big aha moment because we had spent literally hundreds of hours

15   meeting and conferring about data that is never shared outside

16   of Facebook.

17        So now that we understand what they are really seeking is

18   the type of data that is actually shared or made accessible to

19   third parties, we have been taking a much closer look at what

20   would be responsive to that.  And as we currently understand,

21   what has been produced really does cover that universe.

22        But we obviously want to be a hundred percent sure that

23   that is correct, and we are talking about a 13-year period, so

24   it is a very long time.

25        So we have been conducting a very careful investigation

within the company to be a hundred percent sure that the

materials produced to date reflect the full scope of any data

that could have been shared or made accessible to third parties

about the named Plaintiffs since 2007.

And if we do come across anything additional, we will

obviously report that to Plaintiffs and discuss a production

format with them, but to date we have not come across anything

that has not been produced already that could have even

potentially been shared with third parties.

**MR. LOESER:** Your Honor, if I may, I think there will

probably be multiple comments in response to that statement.

That makes no sense to us at all.

First of all, the question of their brief, which they

quote in their statement, talks about information, in fact,

shared. And what our brief said in our reply was information

shared or made accessible.

And we were very careful to use that language, "made

accessible," because Facebook has said for a long time that it

doesn't keep records of what it actually shares, which seemed

hard to believe to us.

But in order to avoid a semantic game, we also included

the reference to "made accessible" because whether it was

shared, whether they have records of it, if it was put in a

place or utilized in a way where third parties had access to

it, that substantially expands the universe of potential

1    going on and the way they are describing.  The real virtue of

2    someone under oath testifying is that we can get through the

3    semantics and just figure out really what happened.  So I do

4    think that you are right; that it is time to do that.

5        Facebook can read your order.  They know what they are

6    supposed to do.  I assume they are going to go out and comply

7    in good faith with that order.  And the sure test to whether

8    that happens or not is when we get somebody under oath and they

9    testify about what exists and what doesn't exist.

10            THE COURT:  Why shouldn't we do that?

11            MS. KUTSCHER CLARK:  Your Honor, I would respectfully

12   request that before we move into a deposition, that we have the

13   opportunity to complete our investigation because we are

14   working through that right now because, again, we want to make

15   sure that what we understand is correct.

16       And obviously to even prepare a 30(b)(6) deponent, we

17   would need to complete that sort of investigation.  And I think

18   it is going to take some more time.

19       Again, we are talking about a 13-year period, and data was

20   shared in different ways with different source of third parties

21   over that period.  And this is a pretty large historical

22   exercise to look into.

23            THE COURT:  Right.  But I don't know why we can't -- I

24   mean, you are doing that -- but get something on calendar and

25   the Plaintiffs can draw up their questions, right, because that

1    is going to take some while, no doubt --

2                        (Laughter)

3            **THE COURT:**  -- to negotiate.  And this isn't

4    everything.  This is just, like, let's just figure it out.

5    Like, this is a big -- this is another big issue in the case.

6    We have this disconnect.

7        Let's just figure out:  How do they use this data?  How is

8    it shared?  What do they mean by "made accessible?"

9        Maybe you limit it to a time period, so you don't need to

10   complete the whole thing; right.  I mean, the time period that

11   we are most interested in -- or at least the first one -- is

12   the Cambridge Analytica.  That is how the whole case got here.

13       So what you do is start with a limited time period, and

14   that would probably --

15           **MS. WEAVER:**  We could do that, Your Honor, 2012 to

16   2016 or 2017.

17           **THE COURT:**  Much easier to prepare your witness on.

18   You can then focus your investigation on that.  We are just

19   going to take it in chunks, I guess, in a way.

20       Let's do that because I think we are -- yeah, I keep

21   hearing arguments.  Let's get -- let's get a witness in there.

22       So what I would like you to do is:  Plaintiffs, you should

23   work on that notice.  It is not an everything, all, whatever.

24   This is -- let's just figure out --

25           **MS. WEAVER:**  Targeted.

# Exhibit 18

# Plaintiffs' Exhibit C

EXHIBIT 36

UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEAL

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets



**From:**  Douglas Purdy </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DOUGLAS PURDY>
**Sent:**  Thursday, August 30, 2012 10:17 AM
**To:**  Sam Lessin
**Cc:**  Mike Vernal
**Subj** ████████████████ Business Model Framing

I am ██████████████████ y to help.

That ████████████████ e the pen on the deck moving forward so I can have a day off and not
be t██████

I ca██████████████████ r when I get back to a computer.

On ██████████████████ in" <sl@fb.com> wrote:

1. Sorry I wasn't clearer about my plans / being out.  That is my bad guys / didn't mean to
   leave this hanging (obviously super important)
2. Doug, really glad you are framing this up / working on this …
3. Here are my notes on where things are from Friday, I think a lot of it is covered below
   but I just want to make sure we are in sync here, are presenting all the hard questions for
   this offsite



HIGHLY CONFIDENTIAL                                                              FB-01370841

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets



2

HIGHLY CONFIDENTIAL

FB-01370842

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets



HIGHLY CONFIDENTIAL                                          FB-01370843

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets

**From:** Douglas Purdy <dmp@fb.com>
**Date:** Wednesday, August 29, 2012 12:47 AM
**To:** Mike Vernal <vernal@fb.com>
**Cc:** Sam Lessin <sl@fb.com>
**Subject:** Re: Platform Business Model Framing

working on this.

going to see the attached to frame things up.

On Aug 28, 2012, at 6:15 PM, Mike Vernal <vernal@fb.com> wrote:

Doug - as context, we're having an mteam offsite on Tue + Wed of next week to talk about three-year-plan stuff, and one of the discussions we're going to have is around the Open Graph business model.

Sam is at burning man (not sure when he gets back), and we left it a little ambiguous about who was pulling together what, so I'd like to at least get started pulling together a deck that we can use to frame the conversation.  Can you ask the PMs to pull together a few slides?

Ideally, I think we want to cover:



4

HIGHLY CONFIDENTIAL

FB-01370844

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets



I think Sam is probably the right person to write-up the CRM stuff, but the rest I think the PMs have the context on.

-mike

HIGHLY CONFIDENTIAL                                          FB-01370845

Publicly accessed at: https://dataviz.nbcnews.com/projects/20191104-facebook-leaked-documents/assets

Exhibit 19

**Privacy Eng**



Highly Confidential - Attorneys' Eyes Only

# Exhibit 20

Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
                                    )
                                    )
IN RE:  FACEBOOK, INC.              )   NO. 18-MD-02843 VC
        CONSUMER PRIVACY USER       )
        PROFILE LITIGATION.         )
                                    )
_____)
```

San Francisco, California
Monday, November 4, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

KELLER ROHRBACK LLP
1201 Third Avenue - Suite 3200
Seattle, Washington  98101
BY:  **DEREK W. LOESER, ESQ.**
     **CARI C. LAUFENBERG, ESQ.**

BLEICHMAR, FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, California  94607
BY:  **LESLEY E. WEAVER, ESQ.**
     **JOSHUA D. SAMRA, ESQ.**
     **ANNE K. DAVIS, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                         GIBSON, DUNN & CRUTCHER LLP
                         200 Park Avenue
                         New York, New York  10166-0193
4            BY:   **ORIN SNYDER, ESQ.**

5                         GIBSON, DUNN & CRUTCHER LLP
                         555 Mission Street
6                         San Francisco, California 94105
             BY:   **JOSHUA S. LIPSHUTZ, ESQ.**
7                  **KATHERINE WARREN, ESQ.**

8                         GIBSON, DUNN & CRUTCHER LLP
                         1881 Page Mill Road
9                         Palo Alto, California 94304
             BY:   **MARTIE KUTSCHER CLARK, ESQ.**

10

11   ALSO PRESENT:   Anjeza Hassan, Plaintiff Pro Se

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

 1   were accessible by the third-party apps.

 2        What we cannot produce -- because it's simply not

 3   recorded, it's not the way our platform is constructed -- is

 4   what data was actually shared, physically through the tunnel

 5   between Facebook and the third-party app.  The magnitude of

 6   that data is 2.5 billion times however many apps each of those

 7   2.5 billion people have, times every time you ping Uber and it

 8   pings Facebook back.  And we're talking about -- I don't have

 9   the number, but it's -- it would be in the trillions of data

10   bits.

11             **THE COURT:**  But it sounds like what you're saying --

12   and I want to make sure I'm not misunderstanding you.

13             **MR. SNYDER:**  Sure.

14             **THE COURT:**  It sounds like what you're saying is that

15   what we cannot do is reconstruct -- let's take the scenario

16   where an app is obtaining my information through my friend.

17   Right?

18             **MR. SNYDER:**  Correct.

19             **THE COURT:**  Through interactions with my friend.

20        We cannot determine which of my information the app

21   obtained.  There is just --

22             **MR. SNYDER:**  Through the friend.

23             **THE COURT:**  Through the friend.

24             **MR. SNYDER:**  That would -- right.  Right.

25             **THE COURT:**  But, can we determine -- and so you're

Exhibit 21

| | |
|---|---|
| **From:** | Allison Hendrix [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AHENDRIX] |
| **Sent:** | 7/12/2011 2:26:35 PM |
| **To:** | Melody Quintana [/O=THEFACEBOOK/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MQUINTANA]; Justin Shaffer [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JUSTIN SCHAFFER]; Mitu Singh [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MITUS]; Sam Lessin [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SAM LESSIN]; Katie Zacarian [/O=THEFACEBOOK/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KZACARIAN] |
| **CC:** | Kate O'Neill [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KKONEILL]; Srinivas Narayanan [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SRINIVAS]; Vatsal Mehta [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VATSAL.MEHTA.SV] |
| **BCC:** | mongoose@mongoose.thefacebook.com |
| **Subject:** | RE: Location FAQs |

Does this help?  Let me know if you have any questions or need additional information.

Thank you!

Ali

---

**From:** Melody Quintana
**Sent:** Tuesday, July 12, 2011 2:01 PM
**To:** Justin Shaffer; Mitu Singh; Sam Lessin; Katie Zacarian
**Cc:** Kate O'Neill; Allison Hendrix; Srinivas Narayanan
**Subject:** Re: Location FAQs

+Allison, from a platform policy perspective, could you please provide any insight on question #2 below?

@Justin, Mitu, Srinivas: Thanks for your input!! I'm sanity checking that the following FAQ is accurate. Could you please confirm?

---

**From:** Justin Shaffer <j@fb.com>
**Date:** Mon, 11 Jul 2011 11:06:38 -0700
**To:** Mitu Singh <mitu.singh@fb.com>, Sam Lessin <sl@fb.com>, Information Technology <melody@fb.com>, Katie Zacarian <katie@fb.com>

**Cc:** Kate O'Neill <kkoneill@fb.com>
**Subject:** Re: Location FAQs

Comments inline

---

**From:** Mitu Singh <mitu.singh@fb.com>
**Date:** Mon, 11 Jul 2011 10:55:52 -0700
**To:** Sam Lessin <sl@fb.com>, Melody Quintana <melody@fb.com>, Katie Zacarian <katie@fb.com>, JUSTIN SHAFFER <j@fb.com>
**Cc:** Kate O'Neill <kkoneill@fb.com>
**Subject:** RE: Location FAQs

*+Srinivas*

*Comments in line*

**1. Do apps I use have access to my location information? 185044731544316**

███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████
█████████

████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

**2. Can apps that my friends use access my location information? 186594574725685**

████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████████████████████—███████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████
██████████████

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ .

**3. When I am checked in to a place, what does that place know about me?**
need content — any insight on where I can find an answer?

*I don't believe this is changing.  @Justin or Srinivas, can you confirm?*

████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████ .

FB-CA-MDL-01938269

**From:** Sam Lessin
**Sent:** Monday, July 11, 2011 10:10 AM
**To:** Melody Quintana; Katie Zacarian; Justin Shaffer; Mitu Singh
**Cc:** Kate O'Neill
**Subject:** Re: Location FAQs

████████████████████████████████████████████████████
███████████████████████

Sam

---

**From:** Melody Quintana <melody@fb.com>
**Date:** Mon, 11 Jul 2011 10:02:20 -0700
**To:** Katie Zacarian <katie@fb.com>, Sam Lessin <sl@fb.com>, Justin Shaffer <j@fb.com>, Mitu Singh <mitu.singh@fb.com>
**Cc:** Kate O'Neill <kkoneill@fb.com>
**Subject:** Re: Location FAQs

Sorry, one additional question:

**4. When I'm tagged somewhere, how do I remove the tag?**

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

---

**From:** Katie Zacarian <katie@fb.com>
**Date:** Sun, 10 Jul 2011 22:13:06 -0700
**To:** Sam Lessin <sl@fb.com>, Justin Shaffer <j@fb.com>, Mitu Singh <mitu.singh@fb.com>
**Cc:** Kate O'Neill <kkoneill@fb.com>, Information Technology <melody@fb.com>
**Subject:** Re: Location FAQs

+Justin/Sam/Mitu

Hi Sam and Justin,

Can you help Melody find the answers to these three questions below regarding location?

Thank you,

---

**From:** Melody Quintana <melody@fb.com>
**Date:** Sat, 9 Jul 2011 18:51:41 -0700
**To:** Katie Zacarian <katie@fb.com>, Kate O'Neill <kkoneill@fb.com>
**Subject:** Location FAQs

FB-CA-MDL-01938270

Hey Kate/Katie,

I'm sweeping through the current Places help section and merging the changes with the new Elder content. I'm not 100% sure about the three FAQs listed below — could you help me sanity check that tthey are accurate?

If you want to see the entire set, they're all under "Location" in this master doc:
https://docs.google.com/a/fb.com/document/d/1tofUw5Wh8NknYTFLYsAg0NpDADv2GpfMTId42gxzJFI/edit?hl=en_US&auth key=CKiX5dQC#bookmark=id.t7olcchhe7au

Thanks!
melody

---

**1. Do apps I use have access to my location information? 185044731544316**



**2. Can apps that my friends use access my location information? 186594574725685**



**3. When I am checked in to a place, what does that place know about me?**
need content — any insight on where I can find an answer?

---

FB-CA-MDL-01938271

# Exhibit 22

<div align="center">Pages 1 - 33</div>

<div align="center">UNITED STATES DISTRICT COURT</div>

<div align="center">NORTHERN DISTRICT OF CALIFORNIA</div>

Before The Honorable Vince Chhabria, Judge

IN RE: FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION)
                              )     **NO. 18-md-02843 VC**
_____)
                              San Francisco, California
                              Thursday, March 5, 2020

<div align="center">**TRANSCRIPT OF PROCEEDINGS**</div>

**APPEARANCES**:

For Plaintiff:          KELLER ROHRBACK LLP
                        1201 Third Avenue - Suite 3200
                        Seattle, Washington  98101
                   BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
                        **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                        **DAVID KO, ATTORNEY AT LAW**

                        801 Garden Street
                        Santa Barbara, California  93101
                   BY:  **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street - Suite 1600
                        Oakland, California  94607
                   BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
                        **ANNE K. DAVIS, ATTORNEY AT LAW**

For Defendant Facebook:

                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, California  94105
                   BY:  **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

                        1881 Page Mill Road
                        Palo Alto, California  94304
                   BY:  **MARTIE P. KUTSCHER, ATTORNEY AT LAW**

<div align="center">**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**</div>

Reported By:   Marla F. Knox, RPR, CRR, RMR, Official Reporter

**<u>APPEARANCES:</u> (CONT'D)**

For Defendant Facebook:

                    GIBSON DUNN and CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166
          **BY:  ORIN SNYDER, ATTORNEY AT LAW**


                    333 South Grand Avenue
                    Los Angeles, California  90071
          **BY:  DEBORAH L. STEIN, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - March 5, 2020**                              **2:03 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Case Number 18-MD-2843, In Re: |
| 5 | Facebook Inc. Consumer Privacy User Profile Litigation. |
| 6 | Counsel, for Plaintiffs please state your appearances for |
| 7 | the record. |
| 8 | **MR. LOESER:**  Hi, this is Derek Loeser for Plaintiffs. |
| 9 | With me in my office are Cari Laufenberg and David Ko and also |
| 10 | appearing are Lesley Weaver and Annie Davis and Matt |
| 11 | Montgomery. |
| 12 | **THE CLERK:**  Thank you.  And for Defendant. |
| 13 | **MR. SNYDER:**  Good afternoon, Judge.  It is Orin Snyder |
| 14 | for Facebook from Gibson Dunn, and with me on the phone are |
| 15 | Deborah Stein, Josh Lipshutz and Martie Kutscher. |
| 16 | **THE COURT:**  Okay.  Hi, Everybody.  So it sounds like |
| 17 | everything is going great. |
| 18 | **MR. SNYDER:**  All over the world, Your Honor. |
| 19 | **THE COURT:**  Yeah.  I don't really know where to start |
| 20 | or what to do with you at this point.  I guess -- I will -- let |
| 21 | me start with this:  You know, there is -- for a while now we |
| 22 | have been discussing Facebook's production of the same |
| 23 | documents that it produced to the FTC. |
| 24 | And, you know, the Plaintiffs have been asking for me to |
| 25 | order Facebook to simply turn over all the same documents.  And |

**PROCEEDINGS**

 1   I responded that I thought out of fairness to Facebook, if

 2   Facebook wanted to review all those documents again and, you

 3   know, sort of try to determine whether it produced some stuff

 4   to the FTC that it shouldn't produce to the Plaintiffs --

 5   either because it is privileged or too far afield from this

 6   litigation or something like that -- that that would be

 7   appropriate.

 8       And so I gave them -- I said that they could do that.  It

 9   sounds like from reading your papers, that Facebook is prepared

10   to make that production by the end of this month; that is, all

11   of the stuff that it turned over to the FTC minus whatever it

12   concludes it should withhold for privilege reasons or for

13   relevance reasons in this litigation.

14       I assume that that would cover the vast majority of the

15   documents that the Plaintiffs would want in this litigation.

16   Am I wrong about that?  And if I'm wrong about that, what am I

17   missing?

18       **MR. LOESER:**  So, Your Honor -- this is Derek Loeser.

19   Just before I start, it sounds like someone is on a cell phone

20   or something.  While you were speaking there was probably

21   breathing.  It makes it a little hard to hear the Court.  So if

22   there is a mute someone can press, that would be useful.

23       **THE COURT:**  Do you need -- do you need me to repeat

24   what I said?  I mean the short version --

25       **MR. LOESER:**  No.  I think I heard --

**PROCEEDINGS**

1      **THE COURT:**  Okay, go ahead.

2      **MR. LOESER:**  Sorry.  Yeah, I think the short

3  version -- I guess I will repeat it back to you to make sure I

4  have it -- is whether Facebook's offer to produce FTC materials

5  after its privilege and relevancy review at the end of March is

6  sufficient or not.

7      And here is our concern:  First, on this question of

8  privilege review, there is no privilege remaining for these

9  documents in the Ninth Circuit.

10      So that's -- we will circle back to that later, but

11  Your Honor has indicated that there is --

12      **THE COURT:**  You mean because they waived the privilege

13  by turning it over to FTC?

14      **MR. LOESER:**  Yes.  The Ninth Circuit, with every

15  circuit except for the Eighth Circuit, has rejected any notion

16  that you can voluntarily turn information over to a government

17  agency and retain attorney-client privilege for that

18  information.

19      **THE COURT:**  Yeah, but one of the things --

20      **MR. LOESER:**  Yeah, but --

21      **THE COURT:**  One of the things that we discussed was

22  that -- you know, they might have reasons to do a more careful

23  review in this case than in their interactions with the FTC;

24  right.  So maybe there could have been inadvertent --

25  privileged documents inadvertently produced to the FTC; right?

PROCEEDINGS

1        **MR. LOESER:**  Yeah.  I don't want to distract because I

2   think this might be something we have to brief, and the Court

3   would have to rule on whether there is such a thing as

4   inadvertent production in which you can preserve a privilege.

5        **THE COURT:**  Okay.

6        **MR. LOESER:**  I don't think anything Facebook did when

7   turning documents over to the Government would be considered

8   anything other than a waiver of an attorney-client privilege,

9   but I think --

10        **THE COURT:**  Okay --

11        **MR. LOESER:**  -- what I was --

12        **THE COURT:**  I don't know a lot about -- sorry.  I was

13   just going to say:  I don't know a lot about that issue.  So

14   that may be that is something you ultimately need to brief.

15   That's fine.

16        **MR. LOESER:**  So the heart of your question is the

17   relevancy review and why are we not satisfied with Facebook

18   simply saying they are going to conduct a relevancy review and

19   give us what makes it through their screen.

20        I guess I would put it to you this way:  One, we are very

21   concerned about that review and whether their interpretation of

22   relevance coincides in any meaningful way with our own.  From

23   everything we have heard from Facebook so far, they have a

24   very, very narrow view of what is relevant here.  That's the

25   first concern.

**PROCEEDINGS**

1    The second concern is the whole reason why we spent months

2   fighting with Facebook to get the FTC correspondence was so

3   that we could look and see and evaluate really what was given

4   to the FTC.  And we have that correspondence and we have gone

5   through it.

6    And, frankly, based on your review -- with the exception

7   of some very discrete categories -- there is a very clean

8   overlap between those two matters.  So what we said to Facebook

9   is:  Okay, let's talk about that.  We both have read this

10  correspondence.  Tell us what you think is not relevant by

11  category so we can come to some agreement so you can then do

12  your review once and produce the documents once.

13    What we are very concerned about with the October deadline

14  is the process that Facebook has in mind would involve them

15  unilaterally pulling documents out of production; not telling

16  us what they pulled and not logging it in any way -- which is

17  what they said they are going to do -- and then us having to

18  sit there and try to piece together what has been removed.

19    It is very likely that we would disagree with what they

20  are going to do, and then we would have a fight and motions

21  practice.  And then if we prevail, another production would

22  have to occur.  And that in and of itself --

23    **THE COURT:**  How is that different from -- let's say

24  the FTC action never happened; right.  And you submitted

25  document requests, you know, that were similar to what the FTC

**PROCEEDINGS**

1   didn't ask but the FTC action never happened.  And then

2   Facebook would be going through its documents and deciding what

3   to -- and they would do an initial cut -- they would take an

4   initial cut.  They would have an initial universe of documents

5   and they would go through those, and they would pull out stuff

6   that they conclude is not responsive to your requests.

7        And they would never be required to do a log of the stuff

8   that they pulled out and determined was irrelevant or

9   non-responsive to your request.  So I guess, why should they

10  have to do that here?

11       **MR. LOESER:**  Well, the technical reason why is under

12  Rule 34 if you are reviewing materials and it is a set of

13  materials, you do have to log or provide some information on

14  how you are calling documents out.

15       Here, we are not talking -- we live in a world where they

16  have already done all this work, and they have already produced

17  these documents; and we have asked for them in discovery.  So

18  if they are going to remove something from a production of

19  materials that we have asked for that already exist, the

20  standard mechanism under the discovery rule is for them to tell

21  us how they are removing, what they are removing and what the

22  basis is for -- of it is.

23       But I do think that the point you make it certainly brings

24  to mind, you know, why are we bothering with any of this.  And

25  the reason why we are bothering with it is that we felt the

1   fact that they have already gathered documents based on an

2   investigation that very significantly, if not entirely,

3   overlaps with this case, it is just a much faster way to get

4   this information.

5       Now, I understand Facebook doesn't want this to be faster.

6   But the fact of the matter is they have gathered this

7   information.  They have reviewed it.  They have used search

8   terms and custodians for the production, and we would get a

9   significant head-start here if these materials could be turned

10  over as opposed to having to wait to do this whole mechanism

11  and process over again starting as if it hasn't already

12  happened.  So that's problem one.

13      Problem two is really the question of search terms and

14  custodians, which is something we want to talk about today;

15  and, perhaps, we should talk about it next.  But really, you

16  know, we asked for the FTC materials because it obviously is

17  relevant and overlaps and because it is a means and a method to

18  just get this moving much faster than having to start all over

19  again.

20          **MR. SNYDER:**  Your Honor, may I be heard?  It is Orin

21  Snyder.

22          **THE COURT:**  Sure.

23          **MR. SNYDER:**  How are you, Judge?  Nice to be talking

24  to you on the phone.  Sorry we are not there in person, but

25  thanks for accommodating our request.

**PROCEEDINGS**

1          This is a little bit like either The Twilight Zone or

2     Alice In Wonderland because the roles here seem to be reversed.

3     We, as the Defendant, are eager -- in fact, chomping at the

4     bit -- to prosecute our defenses.  And we are trying to

5     proceed, not only in an efficient manner but in a prompt

6     manner, in getting to document production and then depositions.

7          And we have given search terms and -- to the other side

8     and we are producing the documents, the FTC documents.  We are

9     reviewing them -- not categorically.  We are reviewing them

10    document by document just as you had suggested we do.  We have

11    agreed to provide that by the 31st.

12         What the Plaintiffs are saying is, Judge, we are not even

13    ready to engage on search terms.  We don't want to even give

14    you any Plaintiffs for depositions until we know what search

15    terms you and the FTC agree to and until we basically figure

16    out what theory of the case we want because they are confined

17    now, Your Honor, to the four topics that you identified --

18    having gone through their kitchen sink complaint -- and

19    identified as four potential theories.

20         On those theories we are prepared to produce documents

21    pursuant to the proper document request promptly.  We are

22    working literally every day around the clock to do that.

23         We are not seeking to delay anything.  We intend to comply

24    with the October cutoff date.  We are ready to proceed on the

25    merits of our defenses.

**PROCEEDINGS**

1        And it is the Plaintiffs, Judge, truly -- and we can walk

2    you through how they are holding up things at every turn; and

3    we believe, respectfully, it is because they are not content

4    with these four theories, and they want to search around for

5    something else that they can allege either in the pleading or

6    otherwise.

7        And, Your Honor, the metrics belie any notion of delay

8    here.  Not only did we respond to their 1,400 paragraph

9    Complaint, we produced already 150,000 pages of documents.  We

10   are promptly producing the FTC documents.  We gave them the

11   search terms.

12       We met and conferred with them for over 15 hours.

13          **THE COURT:**  Could I ask you --

14          **MR. SNYDER:**  Ninety --

15          **THE COURT:**  Sorry to interrupt.

16          **MR. SNYDER:**  Sure.

17          **THE COURT:**  Part of the problem with this discussion

18   is, you know, this is nobody's fault; but I don't have the

19   ability based on the amount of time I have spent on this and

20   the amount -- and based on the information you have given me

21   and based on the things that you both are saying here today --

22   I don't have the ability to determine who is in the wrong, who

23   is being unreasonable.  I mean, no matter how --

24          **MR. SNYDER:**  Right.

25          **THE COURT:**  -- no matter how much either of you pound

 1    the podium --

 2        **MR. SNYDER:**  I have a suggestion -- but I have a

 3    suggestion for the Court.  And I think that you said:  Where do

 4    we go and what do we do from here?

 5        We, Facebook, want to follow the Federal Rules of Civil

 6    Procedure with dispatch and the utmost good-faith.  We are

 7    already producing hundreds of thousands of documents before the

 8    parties have even agreed to an ESI protocol, search terms or

 9    custodians.

10        If the Plaintiffs would meet and confer with us on ESI

11    protocol, search terms and custodians, we will get to work in a

12    hurry, Judge; and we will produce whatever is responsive,

13    relevant and non-privileged.

14        **THE COURT:**  I wonder if the best way to move things

15    along is -- I'm interested in both of your thoughts on this --

16    but I wonder if I should try to find a Magistrate Judge who can

17    sit down with you-all -- refer this case to a Magistrate Judge

18    for discovery purposes and have it be somebody who can sit down

19    with you-all in person once every two weeks to sort of make

20    sure that things are still moving; make sure that the

21    Plaintiffs are not unfairly picking at Facebook; to make sure

22    that Facebook is not adopting an artificially narrow definition

23    of relevance; and just to -- you know, is there somebody with

24    the -- and, frankly, somebody who knows something about

25    electronic discovery.

 1          You know, that is not something that I ever -- you know,

 2     as a lawyer in my practice -- as a lawyer I never had to deal

 3     with electronic discovery or hardly ever.  You know, and it is

 4     rare that anything comes up for me as a District Judge.

 5          Maybe what we need is somebody who can really roll up

 6     their sleeves with some expertise on this stuff and help you

 7     cut through it all.

 8          MR. SNYDER:  Your Honor, it is Mr. Snyder.  The issue

 9     there is -- we are always happy to meet with a Magistrate Judge

10     if there is an impasse.

11          What I'm trying to explain -- I guess, not effectively --

12     to the Court is it is so premature because the Plaintiffs are

13     not coming to the table in the ordinary course as a Plaintiff

14     prosecuting a case normally would, which would be chomping at

15     the bit to get custodians, search terms and --

16          THE COURT:  Right.  But, again -- sorry to interrupt

17     but, again, I'm not in a position to know whether that's

18     actually true or not; right.  I don't -- all I know sitting

19     here is that we have two sides in a massive case that are

20     having a tremendous amount of difficulty even, you know,

21     figuring out the terms under which they are going to negotiate

22     the production of discovery, and --

23          MR. SNYDER:  You know what, Judge -- we are okay with

24     that, Judge.  I think -- look, we know -- and I know this

25     sounds overly declarative.  We know that we are not only in

1  good-faith but we are working hard to do the right thing here.

2  And if Your Honor wants a Magistrate Judge to evaluate that, we

3  are confident that the Judge will agree because we are ready to

4  go.

5      We have a year to prove and we think win our case, and we

6  do not want to delay anything.  It really is the Plaintiff who

7  put the brakes on.  So if Your Honor thinks that going in front

8  of a Magistrate Judge is constructive, we are all for it

9  because we do not want this case to be delayed.  We want to go

10  forward on the current schedule.

11          **THE COURT:**  And, you know, maybe --

12          **MR. LOESER:**  Your Honor --

13          **THE COURT:**  -- we set something up where you are just

14  required -- you know, sorry to make you fly all these times;

15  but it is just like an in-person meeting.

16      I mean, I had a real problem case awhile back where I -- I

17  felt the need to do this, and there were just regular in-person

18  meetings with the Magistrate Judge.  And, you know, things

19  got -- things started moving along once I did that.

20      Mr. Loeser?

21          **MR. LOESER:**  Your Honor, it's Derek Loeser.  If I

22  could be heard.

23          **THE COURT:**  Go ahead.

24          **MR. LOESER:**  We don't have any problem with a

25  Magistrate Judge.  We think Magistrate Judge Corley, for

1   example, is someone who has a lot of experience with issues

2   like this.  I will say --

3       **THE COURT:**  That's the person -- that's the person who

4   fixed my last problem case.  Anyway, sorry.  Go ahead.

5       **MR. LOESER:**  We would be in favor of that because I

6   can tell you that, you know, it is nice to hear Mr. Snyder --

7   and I understand that he may not have a great grasp on the

8   meet-and-confers and disputes that have occurred because he

9   hasn't been on any of those meet-and-confer calls -- but I can

10  tell you, we have tried very hard for a very long time to

11  engage Facebook and have a reasonable conversation about search

12  terms and custodians.

13      We have offered up what seemed to us like common-sense

14  solutions; like, why don't we start with what you have already

15  gathered for the FTC.  Why don't we look at the custodians you

16  have used there.  Why don't we look at the search terms.  They

17  rejected all of that.

18      They have no organizational charts they claim; no charts

19  that are -- not called organizational charts but have the same

20  information.  You know, if in discovery it ends up being the

21  case that such materials actually exist, which wouldn't

22  surprise us, I guess Facebook would have some explaining to do.

23      In the absence of any of this detailed information, we

24  have just sort of gone out on the Internet to come up with as

25  much information as we can to put together search terms and

**PROCEEDINGS**

1   custodians.  Facebook has refused to discuss those.

2        So the idea that we have somehow -- Plaintiffs in a

3   litigation want to slow down discovery is pretty ridiculous and

4   obviously untrue.  We would welcome biweekly -- we will sit

5   down with a Magistrate three times a week if that's what it

6   takes.  We will be there as much as we need to be there.  We

7   will fly there.  We want this case to move.  We want to meet

8   the deadline.

9        What we don't want to have happen is what Facebook has

10  structured here, which is they have produced 150,000 documents

11  that relate only to a handful of named Plaintiffs.  The

12  materials are produced in a fashion that makes them largely

13  unusable.  They have achieved what Your Honor said they should

14  not do which is bifurcate discovery.

15       And at the present rate with what they are doing with

16  discovery, meeting that deadline seems very, very challenging.

17  We want to meet that deadline.  We want to come there, and we

18  will talk to anyone that we need to talk to make that happen.

19           **THE COURT:**  Okay.  I think that's what I'm going to

20  do.

21       Are there any -- I mean -- I will preface my question that

22  I'm about to ask you with the statement that I am generally

23  very reluctant to appoint anybody from outside the court

24  system, you know, Special Master, Special Discovery Master,

25  what have you.

1       But I just wanted to check.  I know it happens a lot in

2  MDLs that a Special Discovery Master is appointed, somebody

3  from outside the court.  So even though I'm -- I doubt I would

4  do it.  I just wanted to ask people what they thought about

5  that as opposed to a Magistrate Judge.

6       **MS. STEIN:**  Thank you, Your Honor.  This is Deborah

7  Stein for Facebook just chiming in.  I think we are comfortable

8  with a Magistrate Judge and are happy to participate in that

9  process.

10       You know, I take it from Plaintiffs' Counsel that, you

11  know, he would like someone from Facebook who has been involved

12  in these calls to, you know, address the Court today on this.

13       And I have been involved in the calls.  I don't think that

14  Plaintiffs --

15       **THE COURT:**  Well, I don't need -- I appreciate it, but

16  I don't really want to hear anymore discussion of who is right

17  or wrong.

18       **MS. STEIN:**  Okay.

19       **THE COURT:**  Simply because we can be here for three

20  hours, and I still would not be a position to know who is right

21  or wrong.

22       Do you-all -- do you-all have a suggestion or a request

23  for a Magistrate Judge?

24       **MS. STEIN:**  We are fine, Your Honor, with whoever you

25  would like.  I think that from our perspective, you know, I

**PROCEEDINGS**

1   think what would make sense on a timing front would be whatever

2   Your Honor thinks would make sense for the initial meeting and

3   then, you know, on a going forward basis for the Magistrate to

4   make determinations as to when the next meeting would make

5   sense.

6       There are probably some instances where two weeks, you

7   know, is really too quick.  And maybe there are other instances

8   where, you know, a follow-up call or something is required.

9   But, you know, I think having a standing two-week in-person

10  might be a bit onerous and might make more sense to have it

11  tied to, you know, specific milestones.

12      **MS. WEAVER:**  Your Honor, if I might, this is Lesley

13  Weaver on behalf of Plaintiffs.

14      And just to chime in here, I think -- if I'm hearing the

15  Court correctly, I do think having somebody very skilled in ESI

16  would be very helpful in this case.

17      We think a lot of this production needs to be done in

18  native form.  And that's going to be more complex than, I

19  think, even ordinarily occurs in your run-of-the-mill antitrust

20  or securities case just because of the natural environment a

21  lot of the subject material lives in.

22      Magistrate Judge Corley certainly has that experience.  I

23  think Magistrate Judge Beeler does.  If Your Honor decided that

24  he wanted to consider a Special Master, we would be happy to

25  discuss that.  And Judge Laporte, who is now at JAMS, might be

**PROCEEDINGS**

1    a good candidate given her expertise with ESI as well.  So

2    those are just three options I think we would be comfortable

3    with.

4         **MR. SNYDER:**  Your Honor, may I suggest that we meet

5    and confer and suggest a name if we can agree on one just

6    because we are going to want to get client input on this one.

7    Judge Grewal may have an opinion.

8                        (Laughter)

9         **MR. LOESER:**  Your Honor, Derek Loeser -- I'm sorry, go

10   ahead.

11        **THE COURT:**  Yeah, that's fine.  I mean, even if you

12   agree on a name, you may not get that name just because -- you

13   know, it is going to depend on people's schedules; but why

14   don't you go ahead and send -- go ahead and send Kristen an

15   e-mail telling us what -- you know, whether -- whether the

16   parties want to jointly recommend somebody or jointly request

17   somebody and that can be -- you can do that by Monday.  Does

18   that sound okay?

19        **MR. LOESER:**  Great, Judge.  That sounds fine,

20   Your Honor.  Just won't be any great surprise if the three

21   names we just provided are likely the ones that we think make

22   the most sense.

23        **THE COURT:**  Okay.

24        **MR. LOESER:**  In the meantime we have a collection of

25   issues that we need to advance with all due* dispatch.  And so

1   I'm not sure where that leaves us with those issues.  I think

2   the meet-and-confer process with regard to those issues is

3   frankly at an impasse and it is not any great need to keep

4   going around in circles.

5        So I suppose we will send in this e-mail.  Hopefully we

6   will have an agreement in the next couple of days or if no

7   agreement, the Court can simply indicate who the Special Master

8   will be.  And it would then be the plan to submit these

9   disputes to the Magistrate or Special Master.

10        **THE COURT:**  I'm happy to, you know, make an attempt to

11   cut through some of the stuff if it would be helpful to you.

12        I will start with Facebook.  I have a question of

13   Facebook.  I'm looking at Footnote 2 of Facebook's case

14   management statement.

15        It says (reading):  "Plaintiff's contend Facebook has not

16   completed production of certain FTC correspondence that the

17   parties discussed with the Court.  This is untrue.  Facebook

18   has produced all document demands and correspondence that it

19   agreed to provide from the FTC proceedings."

20        That was a little ambiguous to me.  I don't know if that

21   was just -- it was sort of a mistake in the way you worded it.

22   But "we have produced everything that we agreed to provide."

23        I thought that I ordered you to provide all correspondence

24   between you and the FTC about document production.  So I just

25   wanted to get clear whether you have provided -- whether you

**PROCEEDINGS**

1  have disclosed to the Plaintiffs all correspondence between you

2  and the FTC regarding document production.

3        **MS. KUTSCHER:**  Your Honor, this is Martie Kutscher at

4  Gibson.

5        I think the wording of the footnote was just a little bit

6  unclear.  There was nothing intentional about that wording.  At

7  the last case management conference we had discussed that

8  Facebook had already produced all document demands from the FTC

9  from its 2018/2019 investigation as well as correspondence from

10  the FTC describing the scope of those demands.

11        And we understood that the Court had ordered us to produce

12  the same materials from the earlier FTC proceeding.  So we

13  produced those materials.

14        The parties had separately discussed producing additional

15  correspondence from the 2018/2019 investigation from Facebook

16  regarding the scope of what was produced in that investigation,

17  and that correspondence has been produced.

18        **THE COURT:**  Okay.  A related issue is that the

19  Plaintiffs want search terms that were used to prepare the FTC

20  productions.  I'm not really seeing what is wrong with

21  providing the Plaintiffs with search terms that were used to

22  prepare the FTC productions.  It may -- it may streamline the

23  process of figuring out what search terms to use and what

24  search terms not to use, and I don't see how Facebook is harmed

25  in any real way by providing those to the Plaintiffs.

1          **MS. STEIN:**  Your Honor, this is Deborah Stein again.

2      This is an issue that we have gone around with Plaintiffs

3  on and we actually prepared a joint letter on because it is an

4  important issue.  And for some reason the matter that we had

5  fully briefed did not get presented to Your Honor.

6      We have a concern about this for a variety of reasons.  We

7  do think that it will end up creating inefficiencies because

8  these are different cases with different requests for

9  production.

10     And we have a concern that what is really going on here is

11 that they are looking for the FTC search terms for different

12 reasons than efficiency purposes; that they are looking to sort

13 of second-guess the FTC investigation.  And we have provided

14 them with very broad, lengthy boolean searches that they are

15 free to build upon and make -- propose searches that they think

16 hit upon their actual request for production that are tethered

17 to their request for production and what is at issue in this

18 case as opposed to the FTC case.

19     They are getting the FTC documents from us starting with

20 search terms that have already been used and run and that they

21 are getting the documents for doesn't really advance getting

22 them more documents here.

23          **THE COURT:**  Well, I mean your argument --

24          **MS. STEIN:**  And for some reason we have been unable to

25 get them to either build upon --

PROCEEDINGS

1          **THE COURT:**  Sorry to interrupt.  Hello?

2          **MS. STEIN:**  -- that we have provided them or for them

3     to even provide their own search terms.  I, frankly, have never

4     dealt with a case where Plaintiffs don't send over boolean

5     search terms.  I mean, they are often broader than what we want

6     to see; but, you know, here we just got a list of words that

7     includes things like "likes" and --

8          **MR. SNYDER:**  But before -- Deborah, let me just add to

9     that.  This is Orin Snyder from Gibson Dunn.

10         Your Honor, here is the problem.  They are getting all the

11    FTC documents that relate to the -- to their case.  The FTC

12    investigated other things that have nothing to do with this

13    case at all.  Let's call it X, Y and Z.

14         **THE COURT:**  I know but --

15         **MR. SNYDER:**  And we should not --

16         **THE COURT:**  It sounds like you're arguing -- if I may

17    interrupt, it sounds like what you are saying is that if you

18    turn over the search terms that you used for the FTC documents,

19    then they are going to react in an overzealous way to that and

20    they are going to start demanding stuff that isn't relevant to

21    this litigation, and that is -- it is just going to be a

22    distraction.

23         But that, of course, can be dealt with.  If they start

24    asking -- if receiving those search terms starts causing them

25    to ask for stuff that they shouldn't be entitled to in this

 1   litigation, that can be dealt with at that time.

 2       On the other hand, maybe the search terms that you used

 3   would help inform the search terms that are used in this case.

 4   And it feels a little bit like you are just hiding the ball by

 5   not being willing to give them those search terms.

 6           **MR. SNYDER:**  No, Your Honor.  Your Honor took pains to

 7   identify four potential theories buried in their pleading.  And

 8   the Court held in its decision that the case is limited to

 9   those four theories.

10           **THE COURT:**  For now.

11           **MR. SNYDER:**  -- and anything else -- right.  For now.

12   And, therefore, we should be engaging in discovery based on

13   those theories with search terms and custodians.  They want now

14   discovery into essentially what the FTC asked us to produce

15   that has nothing to do with this case which is a classic

16   fishing expedition.

17           **THE COURT:**  Yeah, but --

18           **MR. SNYDER:**  And we have agreed --

19           **THE COURT:**  -- all I'm asking you to give them is the

20   search terms.

21           **MR. SNYDER:**  Right.

22           **THE COURT:**  I'm not asking you to give them the

23   documents.

24           **MR. SNYDER:**  But the search terms are the key -- it is

25   the same thing effectively, Your Honor, because it identifies

1  areas that have nothing to do with this case, and it would lead

2  not only to unnecessary motion practice but --

3      **THE COURT:**  Oh, there is going to be plenty of

4  unnecessary motion practice in this case.  I don't think we

5  need to worry about that.

6      **MR. SNYDER:**  But the Court has already held at the

7  last CMC, the January one, that not all materials produced to

8  the FTC must be reproduced here.  Giving them the search terms

9  would be an end-run around that ruling.

10     This is not FTC versus Facebook.  This is the Plaintiffs

11  versus Facebook.

12     **THE COURT:**  Why?  Why?  I'm not saying you give them

13  access to the universe of documents searched.  I'm just saying

14  you give them the search terms to help them -- to help them

15  inform their position on what the search terms should be.

16     **MR. SNYDER:**  That's not why they want them.

17     Martie, go ahead.

18     **MS. KUTSCHER:**  One of the bigger issues we are also

19  facing on this issue is what the Plaintiffs requested in their

20  document request was all of the FTC materials and then a slew

21  of other materials.  So they have those requests and they have

22  twenty-some odd additional requests.

23     We are giving them the FTC materials, and the FTC search

24  terms are crafted around those materials.  They are not crafted

25  for the additional searches or the additional requests the

 1   Plaintiffs had made.

 2        So using the FTC search terms as a starting point just

 3   isn't really an effective way to start because those searches

 4   are tailored towards the documents they are already getting

 5   from the FTC productions and really are not tailored or

 6   relevant to the additional document demand, and that's what we

 7   need to figure out, the searches for those demands.

 8        **MR. LOESER:**  Your Honor --

 9        **THE COURT:**  But you can make those arguments after you

10   give them the search terms.  You can make those arguments after

11   you give them the search terms.  You can say:  Here is the

12   search terms, but we can't -- we can't be tied to this because

13   it is going to produce a bunch of stuff that is irrelevant.  I

14   mean, what am I missing?

15        **MR. LOESER:**  Which, Your Honor, is exactly why we want

16   the search terms.  I'm sorry to interrupt, Mr. Snyder, but you

17   know, what we are hearing is a lot of description of things

18   that were after that were inappropriate, and we were searching

19   for materials that were not related to our case.

20        That is all not true.  We want the search terms

21   specifically to identify things that are related to the case.

22   And if it kind of seems like hiding the ball, that's exactly

23   what it is.  These terms resulted in the production of

24   materials for an investigation that significantly overlaps.

25   They are a good starting place.

**PROCEEDINGS**

 1         When we get the terms, we can look at ones.  If they don't

 2   relate to this matter, we will cross them off the list.  If we

 3   want to argue with Facebook about what does or doesn't relate

 4   to matter, then that is the meet-and-confer we were trying to

 5   have with them which they refuse to have.

 6         It just doesn't make sense to claim that these terms are

 7   not helpful or unrelated.  Obviously they are.  They resulted

 8   in the production for an investigation that overlaps

 9   substantially with this case.

10         I can promise the Court and Mr. Snyder and everybody else

11   on the phone, we have no intention of using them

12   inappropriately or for any purpose other than identifying

13   appropriate search terms for the subject matter of our case.

14   We have no other intention.

15         **MR. SNYDER:**  Your Honor, we have -- this is

16   Mr. Snyder.  We have briefed this already.  Your Honor's point,

17   it wouldn't be fair to weigh in without more information; that

18   you need three hours.  If I can respectfully request, this is a

19   big issue for Facebook for reasons that we set forth in our

20   briefing.

21         We believe this should be a threshold issue or be for the

22   Magistrate Judge, and it would be unfair for Your Honor, based

23   on this limited record, to rule on this issue.

24         We are not hiding the ball at all.  This has to do with

25   them getting results of search -- searches that -- Facebook

**PROCEEDINGS**

 1  conducted internally to produce documents to the FTC.

 2      The way the Federal Rules work is the parties meet and

 3  confer and agree on search terms based on the case before them.

 4  And we would respectfully request that once the Magistrate

 5  Judge is in place, this will be the first issue to address; and

 6  that we abide that rather than have it -- frankly, a ruling on

 7  at best a partial record.

 8      **THE COURT:**  It sounds like you are working on briefing

 9  already.  Why don't you submit a letter brief to me, a joint

10  letter, by Monday.  And then I will decide whether to rule on

11  it or kick it to the Magistrate Judge.

12      **MR. SNYDER:**  That sounds great.

13      **MR. LOESER:**  Your Honor, Derek Loeser.  That sounds

14  fine.  We do have the materials already prepared.  In case you

15  are interested in knowing, they weren't filed because after we

16  prepared our portion, Facebook indicated that it would provide

17  us with search terms and custodians.  We waited for that.

18  That's when we got their 9 custodian and 12 search strings

19  which wasn't worth waiting for.  So we have those materials.

20      **THE COURT:**  The only other thing I want to say right

21  now, and I'm going to -- I mean, I have said it a number of

22  times on the record already -- I am concerned -- you know,

23  without making any suggestions about anybody, you know, whether

24  anybody is acting in bad faith or being dilatory or anything

25  like that, I am concerned that Facebook has, you know, often

1    made statements reflecting an unduly narrow view of what should

2    be turned over to the Plaintiffs.

3         And, you know, this is a big case.  I mean, there is often

4    a lot of talk about proportionality and whatnot.  This is a big

5    case.  It is a significant issue.  You know, and there is --

6    this is not the type of case where we are going to be saying:

7    Well, that might end up -- that effort might end up uncovering

8    some relevant information; but, you know, it is just too

9    expensive or difficult, and so we are not going to make

10   Facebook do it.

11        This is really not one of those cases where that is

12   very -- that type of argument is likely to carry the day.  You

13   know, and, as I have said a number of times, you know, the best

14   way to figure out what happened as it relates to the claims

15   that are going forward now is to -- for Facebook to produce all

16   information, all documents about the practices associated with

17   giving third parties access to friends' information and

18   friends' of friends information.

19        And I --

20        **MR. SNYDER:**  Your Honor, may I be heard on that

21   because Your Honor has no basis for concern on that score.

22        If I was there, I would look you in the eyes.  I'm telling

23   you, Judge, we are not only acting in good-faith; we are eager

24   to produce documents, whatever the expense, that are relevant

25   to the issues in this case.

 1          And we have been trying to do that by meeting and

 2     conferring and trying to get moving in accordance with the

 3     Federal Rules of Civil Procedure which is, you ask us for

 4     documents.  We meet and confer on custodians and search terms,

 5     and we produce documents.

 6          We are not saying expense.  What we are saying is --

 7     Your Honor knows the history of the case as well as we do.  It

 8     started in' 18.  Your Honor gave them discovery on five topics.

 9     They filed a Complaint.  Your Honor identified deficiencies in

10     that Complaint.  They filed a new Complaint.  Your Honor sifted

11     through this kitchen sink Complaint and identified the viable

12     potential theories.  And on those theories not only is there no

13     ball hiding, we want to get on with it.  It is not that

14     complicated.

15          **THE COURT:**  I have heard --

16          **MR. SNYDER:**  But, Judge -- what they want to do,

17     Judge, is they really are still looking for a better theory and

18     that's what this is all about.  Otherwise, they would be acting

19     like a Plaintiff and saying:  Okay.  Let's get the search terms

20     and let's get the custodians.

21          Instead, they want to backdoor FTC search terms because

22     they are looking for some other theory of the case.  But I am

23     confident, Your Honor, that when you see our performance on the

24     issues in this case in terms of our production of documents,

25     you will have no basis for concern because we want to get on

**PROCEEDINGS**

1   with it because we think those documents actually are the key

2   to us winning this case.

3          THE COURT:  I can't wait.  Okay.  So we will -- we

4   will hear from you-all on a couple of things by Monday.  And in

5   the meantime, I will look into the possibility of a Magistrate

6   Judge referral for discovery purposes.

7          MR. SNYDER:  Great.  Thank you.

8          MR. LOESER:  Derek Loeser.  Before we all hang up and

9   go our separate ways, can I raise a couple other discrete

10  issues?

11         THE COURT:  Only if it is really quick.

12         MR. LOESER:  Yeah.  One is just this process for

13  having Your Honor receive joint submissions on disputes, and

14  it's just really a housekeeping thing.

15      Under your rules, you know, there is a procedure where

16  each side puts together five pages and submits it to the Court.

17  One of the problems we have been having with these sort of

18  endless meet-and-confers is there is no deadline to actually

19  submit the materiality to the Court.  And that was the basis

20  for our proposal where there would be five days after a

21  meet-and-confer for one party to submit the materials and then

22  three days after that for the other side.

23      I do think it would remove a real practical problem we are

24  having in terms of the speed with which things can get to the

25  Court.

1     **THE COURT:**  Yeah, that's -- I hear you.  And we will

2     let the Magistrate Judge figure out how they want to address

3     that.

4         **MR. LOESER:**  Okay.  And the very last thing is we have

5     a UK Plaintiff which Your Honor has noted before.  The UK

6     Plaintiff we have wishes to withdraw.  We have two other UK

7     Plaintiffs who are prepared to substitute in.  Claims are

8     exactly the same and simply it would be two people substituting

9     in for one substituting out.

10        We have asked Facebook to consent.  They refuse.  They

11    have indicated they are going to oppose our substitutions.  And

12    so if that's really the position they are going to take at this

13    stage of the case that we are in, then we will be filing a

14    motion just asking for substitution for this purpose.

15        **THE COURT:**  Okay.  I mean -- I was -- I may be

16    ignorant on this topic.  I was scratching my head about whether

17    the class could include everybody in the UK or people from the

18    UK.  But assuming it can, I can't imagine denying a request to

19    substitute in Plaintiffs at this relatively early stage in the

20    case.  But -- and maybe Facebook can consider my comment in

21    deciding whether to oppose it.  But if they -- if they want to

22    oppose it, they have a right to do so; and I will decide the

23    motion.

24        **MR. LOESER:**  Okay.  Your Honor, and for Plaintiffs we

25    are looking really forward to a process where there are more

**PROCEEDINGS**

1  than 12 search terms and 9 custodians.  We appreciate the time,

2  Your Honor, has spent dealing with these issues today.

3         **THE COURT:**  All right.  Thank you.

4         **MR. SNYDER:**  Thank you.

5         **MS. STEIN:**  Good night.

6         **MR. LOESER:**  Thank you.

7         (Proceedings adjourned at 1:47 p.m.)

8         ---oOo---

9

10         **CERTIFICATE OF REPORTER**

11      We certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:   Sunday, March 8, 2020

15

16

17

18  _____

19        Marla F. Knox, RPR, CRR

       U.S. Court Reporter

20

21

22

23

24

25