# Exhibit 9-B

# Redacted Version of Document Sought to be Sealed

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Deborah L. Stein
Direct: +1 213.229.7164
Fax: +1 213.229.6164
DStein@gibsondunn.com

April 1, 2021

VIA E-MAIL

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Re:   *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Counsel:

We write in response to Plaintiffs' recent flurry of letters purporting to invoke the parties' expedited dispute protocol and threatening to file a series of accelerated motions to compel. Plaintiffs' letters are an abuse of the parties' dispute protocol, which is intended to address a party's refusal to produce previously-requested information—not to demand information never previously requested or discussed. Plaintiffs' letters also reflect an abusive litigation tactic that is making it nearly impossible to move this case forward. Plaintiffs' letters seek to unravel many months, if not more, of negotiations; ignore rulings Judge Chhabria and Judge Corley have issued; and informally demand information on an expedited schedule that has never been discussed and has no bearing on this case.[1]

Facebook would like this case to move forward quickly and efficiently so that the parties can finally litigate Plaintiffs' live claims on the merits. It is impossible to make progress when Plaintiffs insist on an unfocused, whack-a-mole discovery process that unwinds past agreements and work. The parties dedicate an enormous amount of time and resources to meeting and conferring regarding discovery requests. The meet and confer process that Judge Corley ordered is designed to allow the parties to reach a compromise and move on. Facebook cannot have faith in this process or rely upon agreements the parties

---

[1] In this letter, we respond specifically to Plaintiffs' letters dated March 4, March 1, February 19, and February 11, each of which invoke the parties expedited dispute protocol. Facebook responded separately on March 23 to Plaintiffs' March 18 demand that the parties enter a Rule 53 stipulation. Facebook responded by email on March 22 to Plaintiffs' March 15 demand for certain deposition transcripts and interrogatory responses from government matters. Facebook responded by email on March 21 to Plaintiffs' March 16 letter taking the position that inadvertent, privileged testimony may not be clawed back. Facebook is responding separately to Plaintiffs' additional demand, also in their March 1 letter, for a list of the materials counsel selected for Facebook's deponents to review in advance of their depositions. Facebook will also respond separately to Plaintiffs' letter dated March 9, which raises various complaints with respect to Facebook's 516 pages of responses to Plaintiffs' Fourth Set of Interrogatories.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

have reached when Plaintiffs constantly seek to reopen and expand those agreements. Facebook urges Plaintiffs to reevaluate their approach and to focus on forward progress.

**I.        Plaintiffs' March 1 letter demanding "all data" relating to the Named Plaintiffs.**

Plaintiffs' March 1, 2021 letter demands Facebook produce "all data and information relating to the Named Plaintiffs"—even if the data was not shared with third parties. There is no basis for this overbroad request. After the parties engaged in nearly a year of negotiations, informal discovery, and briefing on Plaintiffs' blanket demand for data "relating" to the Named Plaintiffs, Plaintiffs finally informed the Court on the last page of their sur-reply on Facebook's motion to enforce the partial stay of discovery that they "seek only a holding that the sensitive data Facebook collected about ten Named Plaintiffs and *shared* with third parties is relevant." Plaintiffs conceded: "**Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case**." Dkt. 548 at 9.

Plaintiffs' "renew[ed]" request for "all data" related to the Named Plaintiffs— including data that was never shared—seeks to unwind more than a year of forward progress. It also directly contradicts the representations Plaintiffs made to the Court in their prior briefing, which the Court accepted and relied on in issuing Discovery Order 9.

### A.        Facebook produced more than 1,000,000 pages of user data.

For nearly a year, Plaintiffs insisted that Facebook locate and produce any data Facebook presently has access to that might, in any way, relate to any Named Plaintiff, plus any derivative materials drawing on that data. Plaintiffs demanded all of this information even if it was never shared outside of the Company and even if it is not associated with any particular user.

In response to this request, Facebook discussed with Plaintiffs in **January 2020** that the best way to produce the individual user data that could be within the scope of this case was to produce for each Named Plaintiff the content and information that Facebook associates with each Named Plaintiffs' account. This information is contained in the "Download Your Information" ("DYI") file that Facebook also makes available to users. Facebook's current DYI tool reflects, in human-readable form, the most complete compilation of data Facebook maintains relating to any user, including any individual user data that third parties might have been able to access.

Beginning in February 2020, Facebook produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings). **In total, Facebook produced more than <u>one million pages</u> of individual user data it maintains relating to the Named Plaintiffs**.[2]

Facebook made these productions despite repeatedly expressing concerns that much the data it produced is not probative of any issue in this privacy litigation—which is about data sharing (not the data Facebook maintains). As Judge Chhabria explained in the first line of his Motion to Dismiss Order: "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. . . . [Plaintiffs'] principal allegations are that Facebook: (i) made sensitive user

---

[2] These productions were extremely burdensome and took many months to complete because they required reformatting data that is typically available only on a live website into individual documents for use in litigation. Plaintiffs initially objected to the format in which Facebook produced the materials. Facebook then reproduced documents to address Plaintiffs' formatting concerns. Plaintiffs amended their complaint in August 2020 to substitute new Named Plaintiffs. Facebook subsequently produced the same materials for the new Named Plaintiffs.

information available to countless companies and individuals without the consent of the users, and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information." *Id.* at 1. The more than one-million pages of individual user data Facebook produced far exceed that scope. Facebook's productions of individual user data are overinclusive in that Facebook produced the data it associates with each Named Plaintiffs' account and did not limit its production to data that actually was accessed by or shared with third parties. Facebook also did not limit its productions "sensitive data," as defined in the Court's motion to dismiss order as the only type of data at issue in this case. *See, e.g., id.* at 1, 7, 9, 13.

### B. Plaintiffs demanded vast amounts of additional data—even if never shared.

After Facebook produced the individual user data that Facebook associates with the Named Plaintiffs' accounts—including data outside the scope of this case—Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, as well as any materials derived from that data. In making this demand, Plaintiffs focused largely on a database called Hive and demanded that Facebook produce any data relating to any Named Plaintiff that is currently in that database. Plaintiffs articulated no basis on which the data they demanded could be relevant to their live claims.

The parties met and conferred about Plaintiffs' demand over the course of several months.[3] During those discussions Facebook explained repeatedly that  Facebook further explained that

As Facebook explained, Plaintiffs' blanket demand not only sought large volumes of data having nothing to do with their claims—it was also nearly impossible to satisfy. As Facebook has explained, To provide a visual, if Hive were a library, to satisfy Plaintiffs' demand, Facebook would have to ks For instance, Facebook would have to analyze —even though Facebook already produced underlying data showing the Named Plaintiffs' logins. Plaintiffs' demand asked Facebook to repeat this exercise more than Facebook explained that such a remarkable undertaking would take literally years and would result in the production of massive amounts of internal data tables that are

---

[3] At one point during the parties' extensive discussions on this issue, Facebook asked Plaintiffs if they would, at minimum, agree that if Facebook hypothetically possessed a database that had the ability to receive data, but no ability to output (*i.e.*, share) data, that database would be out of scope. Plaintiffs refused to agree, arguing that the hypothetical database could theoretically create "inferences" from user data that Facebook could use to place advertisements on its platform.

[4] Plaintiffs state that "counsel has demonstrated that Hive tables can be searched by userID [*sic*]." To be clear, as Facebook has repeatedly informed Plaintiffs, individual Hive tables can be searched by user ID only if user ID is one of the fields tracked in the table. The database housing Hive tables is not indexed by user ID such that a single search can be conducted to find which of the 12 million Hive tables contains data related to a particular user ID.

[5] This does not include any data produced in response to subpoenas or as part of Facebook's discovery obligations. Certain Hive data has been produced in those contexts.

irrelevant and immaterial to Plaintiffs' claims, which concern only sensitive individual user data that was *shared* with third parties.

> **C.    The Parties litigated the scope of discoverable user data and Plaintiffs conceded that only shared data is relevant.**

The parties then litigated the scope of discoverable user data in connection with Facebook's motion to enforce the partial stay of discovery. Throughout their briefs, Plaintiffs repeatedly acknowledged that the only data that is relevant to this case is data that was shared with third parties:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." (Dkt. 547-3 at 1).

- "Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on . . . whether Facebook shared that information with third parties." (Dkt. 526 at 5); *see also id.* at 10–11 (acknowledging that Plaintiffs' claims require proof that Facebook shared Plaintiffs' information with third parties).

- "[S]ensitive user information is relevant if Facebook shared it without users' consent." (Dkt. 547-3 at 2).

- "[T]he legal theories upheld at the pleading stage . . . turn . . . on whether Facebook shared [sensitive information] with third parties." (*Id.* at 4).

After four rounds of briefing, on the last page of their sur-reply, Plaintiffs finally conceded what they should have said a year earlier: "***Plaintiffs do not contend that information that was not shared is relevant***." (Dkt. 547-3 at 9 (emphasis added)). This concession—while welcome—raised frustrating and still unanswered questions about why Plaintiffs had forced the parties to spend many hundreds of attorney hours over the previous year negotiating and litigating over the relevance of data that was never shared or made accessible outside of Facebook.

> **D.    Judge Corley held that the discoverable user data in this case is sensitive data shared with third parties.**

In Discovery Order 9, Judge Corley addressed the user data relevant to this case and largely adopted the position Plaintiffs took in their sur-reply brief. The Court held the user data relevant to this case is "information that Facebook collects and shares with third parties about Facebook's users." The Court explained that Plaintiffs' claims "challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information." (Discovery Order 9, Dkt. 557 at 2 (emphasis added).)

Discovery Order 9 further explained that the information "Facebook collects and shares with third parties" is not necessarily limited to the information users post on Facebook (as Facebook had argued) and would also include any *shared* data: (1) collected from a user's on-platform activity; (2) obtained from third parties regarding a user's off-platform activities; and (3) inferred from a user's on or off-platform activity. *Id.*

> **E.    Facebook confirmed it completed its production of discoverable user data.**

To comply with Discovery Order 9, Facebook investigated whether any discoverable user data had not already been produced. We did not identify any such data. Indeed, as stated earlier, the DYI file is *overinclusive* of the universe of discoverable data under Pretrial Order 20 and Discovery Order 9.

Again, this data-privacy litigation relates to Facebook's alleged practice of sharing certain "sensitive" user data with third parties. Third parties who are permitted access to

4

individualized data about Facebook users access that data through application programming interfaces ("APIs"). APIs are a standard industry programming tool, and they allow applications to access data and features of other applications, services, or operating systems. All of the APIs Facebook has made available to third parties query Facebook's Social Graph only and allow access to a subset of the information contained in the Social Graph.[6] Facebook's current "Download Your Information" or "DYI" tool retrieves data from, and allows users to download the information Facebook maintains about them in, the Social Graph. It is the most complete compilation of data Facebook maintains for any user and reflects a human-readable version of the data relating to any user in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties.

  **F. The Court allowed a 30(b)(6) deposition to allow Plaintiffs to confirm Facebook had satisfied is production obligations.**

After Facebook reported its preliminary finding that it completed its productions of discoverable user data, as described in Pretrial Order 20 and Discovery Order 9, Plaintiffs told the Court: "[I]t is, frankly, just impossible for us to believe that." (12/9/2020 Hr'g Tr. at 19:22-23.)

To address Plaintiffs' "disbelief . . . as to how Facebook operates," the Court suggested a 30(b)(6) deposition to narrowly address "the discoverable user data as articulated by Discovery Order 9." *See* 12/9/2020 Hr'g Tr. at 26:6-9; Discovery Order 11, Dkt. 588. Ignoring the Court's instructions, Plaintiffs issued a deposition notice on 12 extraneous topics. Judge Corley quashed this notice—explaining it was "way beyond what she had in mind." *See* 1/15/2021 Hr'g Tr. at 17:12-13. The Court explained, "[w]e just need somebody under oath" (*id.*) to "verify [Facebook's] representation" (*id.* at 35:3-5) that it has produced all discoverable data within the scope of Discovery Order 9.

The 30(b)(6) deposition on discoverable user data was held on February 23, 2021. Facebook designated Konstantinos Papamiltiadis as its witness on this issue. Mr. Papamiltiadis is Facebook's Vice President of Platform Partnerships, has over eight years of experience at Facebook, and has 127 reports. Consistent with Judge Corley's instructions, Mr. Papamiltiadis spent nearly 20 hours preparing to testify about the discoverable user data under Discovery Order 9—including the user data Facebook collects, how Facebook uses different categories of user data, which categories of user data Facebook shares, and how shared categories of user data are reflected in produced materials.

  **G. Plaintiffs declined to use the 30(b)(6) deposition as ordered and reverted to their position that all data relating to the Named Plaintiffs must be produced—even if not shared.**

Rather than use the 30(b)(6) deposition to address the topic the Court ordered, Plaintiffs pursued their own agenda and used the deposition to explore all of the topics in the

---

[6] Facebook uses the term the "Social Graph" to describe the complex web of peoples, places, things, actions, and connections on the Facebook Platform. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience. As Facebook users navigate through Facebook and interact with it—including, for example, by liking posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see. This web of peoples, places, things, actions, and connections are referred to as the "Social Graph."

notice the Court had rejected. At the deposition, Plaintiffs did not even ask the most basic questions about what user data Facebook shares with third parties. Plaintiffs never asked "what categories of user data does Facebook make accessible to third parties?" Nor did they ask whether the materials Facebook has produced reflect the scope of user data accessible to third parties. Plaintiffs instead questioned Mr. Papamiltiadas for hours regarding different types of data Facebook has used only internally (which Plaintiffs were already aware existed)—including "data from third parties about users' off-platform activity," data derived from the Facebook Pixel, and "information . . . associated with users via app-scoped IDs."

Plaintiffs now demand all of that data after they tactically avoided asking Mr. Papamiltiadas whether any of it has been shared or otherwise made accessible to third parties. It has not. Plaintiffs did not even seek to learn whether any of the data they asked about was collected on an individual or aggregate level, whether it is stored (and, if so, for how long), or whether it is anonymized. It is Plaintiffs' burden to demonstrate how information they seek is relevant to live claims. The Court ordered a narrow 30(b)(6) deposition specifically to allow Plaintiffs to understand whether any user data relevant to their claims was yet to be produced, and Plaintiffs deliberately declined to use the deposition to address that issue.

Rather, it seems that after spinning in circles on this issue for more than a year, Plaintiffs have relapsed to their original position that Facebook must locate and produce all data relating in any way, shape, or form, to the Named Plaintiffs—even if it is was not shared and exists only as part of aggregated or anonymized data sets. The Court has already rejected this position. And with Plaintiffs having obtained a ruling from the Court accepting Plaintiffs' earlier position that discoverable user data is limited to data that was shared with third parties, Plaintiffs are judicially estopped from now arguing that user data is discoverable irrespective of whether it was shared. *See, e.g.*, *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779 (9th Cir. 2009) (citing *New Hampshire v Maine*, 532 U.S. 742, 750 (2001)).

Facebook confirms again: Third parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflects a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties. Facebook's productions under Discovery Order 9 are complete.

## II. Plaintiffs' March 4 letter demanding supplemental interrogatory responses relating to "Business Partners."

Plaintiffs' letter demanding that Facebook supplement its responses to Interrogatories 14 and 15, which concern "Business Partners," raises the same concerns about unnecessary re-litigation of previously decided issues. The parties litigated—and Judge Corley decided—this issue **last month**. *See* Dkt. 608. Facebook confirmed, consistent with Judge Corley's Order, that its responses to these Interrogatories are complete. Facebook's responses to Interrogatories 14 and 15 are extraordinarily comprehensive and alone span **195 pages**—most of which are single-spaced tables, using a Size 7 font.

After speaking with Plaintiffs about this issue, we understand Plaintiffs to demand additional information in response to these Interrogatories on two grounds. First, Plaintiffs explained that they believe Judge Corley intended her Discovery Order on Business Partners (Dkt. 608) to "expand the case" beyond Judge Chhabria's Motion to Dismiss Order (and Plaintiffs' Complaint) to reach *all of Facebook's business relationships*. Second, Plaintiffs highlight that Facebook has had business relationships over the past decade with entities that do not appear in Facebook's Interrogatory responses.

6

Plaintiffs position seeks to unwind more than three years of litigation, multiple court orders, and Plaintiffs' own allegations and discovery requests. Neither this case nor the specific Interrogatories at issue concern every business relationship Facebook has ever had.

### A. Judge Chhabria's Motion to Dismiss ruling allowed Plaintiffs' "Business-Partner" allegations to move forward with respect to a finite set of third parties.

In his decision on Facebook's Motion to Dismiss, Dkt. 298, Judge Chhabria made clear that Plaintiffs would *not* be permitted to litigate a sweeping attack on Facebook's entire business and all of its business relationships. Plaintiffs' First Amended Consolidated Complaint was 1,442 paragraphs and 412 pages. Dkt. 257. Judge Chhabria observed, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . . [T]he presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Dkt. 298 at 5-6.

To avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria did not address each of Plaintiffs' improperly pleaded theories and claims. Instead, he concluded that Plaintiffs adequately pleaded "four categories" of potential wrongdoing related to "Facebook's practice of sharing its users' personal information with third parties." *Id.* at 6, 1. He then dismissed certain claims, *id.* at 30, and **stayed all other claims and theories not falling into the four categories of alleged misconduct**. *Id.* at 6 ("All other prioritized claims not addressed by this ruling will be stayed.").

The first two theories Judge Chhabria allowed to move forward concern data-sharing with app developers. Judge Chhabria described the third theory as "sharing sensitive user information with business partners." Dkt. 298 at 8. The fourth theory concerns Facebook's enforcement of its data-use policies with respect to third parties.

The third "Business Partner" theory Judge Chhabria allowed to move forward is about Facebook's alleged practice of entering "data reciprocity" agreements with third parties in connection with arrangements to make certain Facebook functionalities available on third-party devices and platforms. *See* Dkt. 298 at 8. Plaintiffs' Complaint uses the term "Business Partners" to describe "roughly 150" entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems." *See* SACC ¶¶ 430-440.[7] The Complaint alleges that Facebook "gave Business Partners access to users' content and information" to facilitate these partnerships. *Id*. In support of its allegations with respect to "Business Partners," Plaintiffs cite a list of entities Facebook describes as its "integration partners" that Facebook shared with Congress (SACC ¶ 431), and a New York Times article about Facebook's integration partners (SACC ¶¶ 433, 435).

Judge Chhabria similarly explained that the list of "Business Partners" Plaintiffs had identified "came from Facebook itself, which asserted that it had 'integration partnerships' with these companies." Dkt. 298, at 8. Judge Chhabria held that the misconduct Facebook allegedly engaged in with respect to these entities was "relatively straightforward": "Facebook shared information about its users with this non-exclusive list of business

---

[7] These partnerships served two primary purposes: (i) to enable users to access their Facebook accounts or specific Facebook features on devices and platforms built by other companies, such as Blackberry and Apple, before the existence of the "app store"; and (ii) to enable users to connect their Facebook social experiences with other popular apps and websites, like Yahoo and Twitter—if they chose to do so. Some transfer of data was needed to allow users to access their Facebook accounts on devices and platforms built by other companies (like Blackberry) and, if they explicitly chose, to connect their Facebook accounts with other platforms.

partners, and that those companies in turn shared data with Facebook." *Id.* at 8. "These partnerships, the complaint alleges, were built in part on 'data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." *Id*. (internal quotations omitted).

### B. Facebook provided nearly 200 pages of responses to Plaintiffs' Interrogatories regarding "Business Partners."

Plaintiffs' Fourth Set of Interrogatories seeks information about the "Business Partners" alleged in their Complaint. Specifically, Interrogatory 14 seeks a list of "Business Partners" that had access to "Not Generally Available" information about users even if users did not download an app made by the entity.[8] Interrogatory 15 seeks details about the "Not Generally Available" information the so-called "Business Partners" were able to access.

Plaintiffs' own Interrogatories recognize that the "Business Partner" theory does not concern all of Facebook's business relationships. Consistent with Plaintiffs' Complaint and Judge Chhabria's Order, Plaintiffs' Interrogatories defined "Business Partners" as "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."

Facebook served nearly 200 pages of responses to these Interrogatories. As parties typically do in their responses to interrogatories, Facebook also provided definitions that it would use in its response. Facebook offered a definition of "Business Partners" that was intended to add clarity and capture all entities falling into the business partner conduct Judge Chhabria described in Pretrial Order 20. The parties discussed their definitions of "Business Partners" at length over the course of several months.

### C. Plaintiffs litigated the scope of Facebook's Interrogatory responses.

After months of back-and-forth—during which Facebook confirmed it did not withhold any relevant or responsive information based on its definition of "Business Partners"—Plaintiffs insisted on litigating the definition of "Business Partners" that would be used to respond to their Interrogatories.

Judge Corley found the term "Business Partners" to refer to the third category of potential liability identified by Judge Chhabria and deciphered "no meaningful difference between the parties' definitions." Dkt. 608. Judge Corley confirmed that "Business Partners" would include companies with which Facebook had agreements "to exchange information about users' activities with each other," consistent with Judge Chhabria's explanation, even if Facebook did not label them "integration partners," *id*., and she ordered Facebook to confirm it had fully responded to Plaintiffs' requests. *Id.* Facebook confirmed it had.

### D. Plaintiffs now argue Judge Corley's order with respect to "Business Partners" expands the scope of the case to reach all of Facebook's business relationships.

Plaintiffs now seek to relitigate this issue. During a meet and confer, Plaintiffs' counsel represented that they believe Judge Corley intended her Order to greatly "expand" the "Business Partner" theory articulated in Plaintiffs' Complaint and by Judge Chhabria.

---

[8] The Interrogatories define "Not Generally Available" information to be information "to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience." This definition explicitly asks about activities conducted on Facebook (which users can limit the audience for).

8

In Plaintiffs' words, nearly three years into this litigation, Judge Corley "expanded the case" to concern Facebook's relationship with any entity that has ever received a single piece of information relating in any way to people who use Facebook, so long as, at any point in time, that entity told Facebook anything that could be interpreted to concern Facebook users. Plaintiffs take this position even though Plaintiffs' Business Partner allegations refer to a finite number of entities with whom Facebook allegedly entered "data reciprocity" agreements in connection making Facebook functionalities available on third-party devices and platforms. *See* SACC ¶¶ 430-440.

For instance, Plaintiffs' letter claims the "Business Partner" theory now extends to Facebook vendors that performed statistical analyses for Facebook using anonymized data, on the basis that these vendors accessed anonymized information to perform analyses for Facebook and then reported their conclusions back to Facebook. Plaintiffs also claim "Business Partners" include so-called "data brokers"[9] because several years ago Facebook purchased licensed data from certain entities and, under separate agreements, Facebook later engaged different divisions of some of the same companies to measure the success of its advertisements—which required those entities to access certain anonymized advertising data to perform this service. No allegations about relationships of this nature appear in the Complaint, nor is it clear how they could possibly be actionable.[10]

Plaintiffs' extreme and unfounded position would bring nearly every entity with which Facebook has ever interacted within the scope of this case—even where the relationship is clearly disclosed within Facebook's terms and has no relationship to the conduct actually alleged. Indeed, Plaintiffs' letter recites every type of business relationship Facebook's 30(b)(6) deponent said Facebook has had over the years and demands that Facebook update its interrogatory responses to address every entity falling into each category he listed. Plaintiffs seek this information even with respect to relationships that did not include any sort of data sharing, much less the type of arrangements described in Plaintiffs' Complaint and Judge Chhabria's motion to dismiss order.[11]

---

[9] Plaintiffs' selective quoting of Ms. Lee's testimony is tremendously misleading. For instance, when Ms. Lee said, "there was an exchange with partners with Facebook receiving data from these partners," (Tr. 200:14-16) she was referring to a "revenue exchange in return for this data" (Tr. 200:21-201:5). In other words, she was referring to licensed data that Facebook purchased. Moreover, Ms. Lee specifically testified several times that these entities were not provided user data in exchange for the data they sold Facebook. (*See* Tr. 184:22-24 ("[W]e were earlier specifically discussing user data, and we did not provide user data back to these partners."); Tr. 203:25-204:4 ("[A]lthough we were getting user data from data partners like Acxiom, Epsilon, et cetera, to create better targeting options in our platform, we weren't giving back sort of equivalent data to these partners for their use.").)

[10] Facebook's use of vendors and work with measurement partners is clearly disclosed in its Data Policy and thus cannot constitute the type of illicit data-sharing partnership the Court has found actionable. *See* MTD Order, Dkt. 298, at 21-22 (dismissing claims where information sharing at issue was disclosed in Facebook's Data Use Policy); *see also* FB's 6/8/12 Data Use Policy, FB-CA-MDL-00233442 at 00233455 ("We give your information to the people and companies that help us provide, understand and improve the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results." (emphasis added)); *see also* SACC ¶ 561 (quoting same).

[11] The first two categories of entities Mr. Papamiltiadis listed, "device manufacturers and mobile operators that . . . help us build Facebook-like experiences in order to reach a wider audience," Tr. at 25:16-20, and "developer partners . . . [which] are third-party software companies that have access to our APIs and they build experience[s] for both consumers and other businesses," *id*. at 25:21-25, are already accounted for in Facebook's Interrogatory responses. The second two categories described

*(Cont'd on next page)*

9

It is clear that neither Judge Chhabria nor Judge Corley intended to open the door to such wide-ranging and irrelevant inquiries. For starters, it is clear that Judge Chhabria's Motion to Dismiss ruling did not bucket all of Facebook's business relationships into the "Business Partner" theory, which would have expanded the case to include theories of liability going far beyond what Plaintiffs even alleged. To the contrary, Judge Chhabria made clear that his motion to dismiss order allowed four alleged theories of potential liability to move forward and that Plaintiffs' remaining allegations would be stayed. Dkt. 298 at 6.

Judge Chhabria identified specific theories of relief that would move forward to focus this case and make it manageable to litigate—not to allow Plaintiffs to conduct a roving investigation of all of Facebook's business relationships over the past 13 years without stating cognizable claims. Judge Corley's February 1, 2021 order with respect to "Business Partners" certainly did not expand this case to allow such an investigation. The order makes clear that it tracks the third category of potential misconduct described in Judge Chhabria's Motion to Dismiss ruling and that Facebook should identify the entities Judge Chhabria described, even if Facebook does not call some of those entities "integration partners."

We confirm again that our 195 pages of responses to Interrogatories 14 and 15 are complete to the best of our knowledge and consistent with Judge Corley's Discovery Order with Respect to Business Partners. Discovery in this case is ongoing, and should we become aware of any additional responsive information during the course of our ongoing factual investigation, we will update our responses accordingly.

### III. Plaintiffs' February 19 letter demanding additional materials provided to government entities.

Plaintiffs' letter regarding RFP 6 follows the same pattern and raises the same concerns as the letters addressed above. This letter backtracks on more than a year of productive discussions and litigation regarding Plaintiffs' RFPs 6 and 43; inappropriately invokes the parties' expedited dispute resolution protocol to demand materials never previously requested; and seeks materials relating only to events that occurred years after this case was filed.

#### A. Facebook agreed to make cloned productions from certain government matters under RFP 6 to kick-start discovery while the parties negotiated threshold ESI issues.

Plaintiffs served RFP 6 in November 2019. The request demands document productions Facebook provided government entities in matters touching on related issues. The parties extensively negotiated this request and completed negotiating it a year ago, in early 2020.

Facebook largely agreed to produce the materials RFP 6 requests. Even though courts usually frown upon the type of "cloned discovery" requested by RFP 6,[12] Facebook agreed to make certain cloned productions from numerous matters under RFP 6 in a good faith effort to move discovery forward.

As Plaintiffs know, the parties had tremendous difficulty negotiating an ESI Protocol, custodians, and search terms, and have been negotiating these threshold ESI issues for 18 months. To kick-start document discovery during these negotiations, Facebook agreed to

---

by Mr. Papamiltiadis—"business[es] that . . . publish[] on our platform, from news companies to [NGOs]" and "suppliers"—have no apparent relationship to user data and Mr. Papamiltiadis identified none.

[12] *King County v. Merrill Lynch & Co., Inc.*, No. C10-1156-RSM, 2011 WL 3438491, at *3 (W.D. Wash., Aug. 5, 2011) (quotation omitted)

10

produce—and did produce—all of the Facebook documents produced in response to the FTC's document requests during its 2011 and 2019 investigations into Facebook. On top of that, Facebook also agreed to review the Facebook documents it had produced to various other state and federal entities in 9 additional government matters and to produce those documents, so long as they were responsive to Plaintiffs' document requests.

The parties agreed that Facebook would complete its productions under RFP 6 by July 3, 2020. Even though RFP 6 sought documents produced to government entities through "the present" (*i.e.*, through November 2019, when RFP 6 was served), Facebook ultimately agreed to produce responsive documents it had produced to government entities through April 15, 2020.

### B.   After the parties reached an agreement on cloned discovery, Plaintiffs sought more.

Facebook understood the parties' negotiations regarding materials from government matters were complete. However, after the parties completed negotiating RFP 6, Plaintiffs issued RFP 43, which sought additional materials exchanged in 10 government matters, including: "All privilege logs, interrogatory responses, written reports, correspondence and deposition transcripts." During the parties' meet and confer discussions, Plaintiffs told us that they issued this RFP because the parties had agreed RFP 6 would apply only to document productions but Plaintiffs in fact wanted any other piece of paper to have exchanged hands with any government entity in any matter touching on related issues. Facebook objected to this request in June 2020.

Six months after Facebook served its responses and objections to RFP 43, on December 10, 2020, Plaintiffs sent Facebook a letter stating they would agree to limit the scope of RFP 43 to deposition transcripts from government matters and any written discovery responses Facebook provided government entities. Then, in a subsequent meet and confer, Plaintiffs informed Facebook that their revised request for written discovery responses also included a demand for all of Facebook's counsel's formal and informal correspondence with the government. On February 12, 2021, Plaintiffs filed a motion to compel all materials demanded under RFP 43. Facebook responded on February 18.

### C.   After filing a motion to compel certain materials from government matters, Plaintiffs return to RFP 6 to seek additional materials they did not include in their motion.

On February 19, *one day after Facebook responded to Plaintiffs' motion to compel*, Plaintiffs sent Facebook another letter demanding *additional* materials from government matters—this time supposedly under the ambit of RFP 6, which the parties had finished negotiating a year earlier. Plaintiffs' letter invokes RFP 6 to demand that Facebook now review and produce any document productions made in the 10 government matters since April 2020. It further demands that Facebook produce materials created and provided to the FTC pursuant to a consent decree that was entered in July 2020.

#### 1.   There is no basis for additional cloned productions—Facebook produced the cloned materials it agreed to provide, and the parties now have their own search terms.

As an initial matter, the parties completed negotiating RFP 6 in April 2020 and reached an agreement on the scope of Facebook's productions in response to that RFP. Plaintiffs' efforts to revisit that agreement a year later undermines the time and effort the parties put into negotiating and compromising discovery requests and makes it difficult for the meet and confer process to work effectively.

11

In any case, RFP 6 does not request the documents Plaintiffs seek. Plaintiffs defined the "Relevant Time Period" for this request as materials provided to government entities "through the present" (*i.e.*, through November 2019). Despite Plaintiffs' November 2019 cut-off, Facebook agreed to produce materials in response to RFP 6 that had been produced to government entities through April 2020. The parties agreed Facebook would complete its production of these materials by July 3, 2020. Facebook did.

There is no good-faith basis for Plaintiffs' demand that Facebook now review and produce additional cloned productions from government matters. As explained above, courts typically reject blanket demands for document productions from other actions for two reasons. First, "compelling a responding party to do duplicate searches—one for responsive documents in their custody and control and one for all documents in their custody and control that were previously produced in other litigation—is definitionally unduly burdensome." *Goro v. Flowers Foods, Inc.*, No. 17-CV-02580-JLS-JLB, 2019 WL 6252499 *18 (S.D. Cal., Nov. 22, 2019); *accord In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods Liability Lit.*, MDL No. 2672, 2017 WL 4680242 (N.D. Cal., Oct., 18, 2017) (Corley, M.J.) (rejecting cloned discovery requests). Second, cloned discovery "is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the subject case." *King County*, 2011 WL 3438491, at *3 (quotation omitted).

Facebook agreed to jump-start document discovery, while the parties negotiated threshold ESI issues, by reviewing and producing certain materials produced to government entities. The parties have now negotiated search strings *for a year* and finally appear to have reached agreement to use search strings that hit on approximately 6 million documents. On the eve of finalizing that agreement, Plaintiffs seek to substantially expand that universe by requiring Facebook to also engage in an ongoing review of all documents produced in numerous government matters for any additional responsive documents.

It is neither practical nor reasonable to expect Facebook to continue to track every document produced in numerous other actions (handled by multiple law firms) and to review every one of those documents for responsiveness—in addition to approximately 6 million documents identified through search strings. This is precisely why courts generally reject requests for cloned discovery. To the extent documents have been produced to government entities since April 15, 2020 that are responsive to Plaintiffs' RFPs, the parties have agreed to search for those materials by running the agreed-upon and court-ordered search terms against the agreed-upon and court-ordered custodians. Plaintiffs' request that Facebook separately review its ongoing productions to government entities is unreasonable, unduly burdensome, and not proportional to the needs of the case.

### 2. Materials created for the FTC after July 2020 are neither responsive to RFP 6 nor relevant to this case.

Finally, Plaintiffs' letter demands materials Facebook agreed to create and produce to the FTC, as part of the FTC's ongoing monitoring of Facebook under a consent decree that was entered in July 2020.[13] These materials fall outside of the timeframe of RFP 6. They also appear to be among the materials Plaintiffs requested originally through RFP 43 (which seeks "written reports" to the government) but later told Facebook and the Court they had dropped from their request.

---

[13] Plaintiffs also seem to request categories of materials Facebook put on legal hold for periods of 6 months to 5 years under the FTC's 2011 consent decree. To the extent these materials remained on hold when this action was filed and are captured by the negotiated custodians and search terms, they will be produced.

12

More fundamentally, materials created for the FTC after July 2020 and as part of the FTC's forward-looking monitoring of Facebook have no conceivable relevance to this case, which was filed in March 2018 and concerns conduct before that date.

**IV.    Plaintiffs February 11 letter regarding "Developer Manuals."**

Finally, Plaintiffs invoke the parties' dispute resolution protocol to compel the immediate production of materials over which there is no dispute and no apparent urgency. Plaintiffs' February 11, 2021 letter demands—under threat of an immediate motion to compel—that Facebook produce within 8 days, what they describe as "manuals" relating to Facebook's systems that were created over the course of a decade. While not entirely clear, Facebook understands this request to seek every iteration of its developer website to have been published since 2007, because this site provides technical instructions to application developers regarding how to use Facebook's systems.

Plaintiffs are correct that the parties discussed this request previously. However, these discussions took place **a year ago** in March 2020 and related to a demand that Facebook produce "developer manuals" in connection with an ESI deposition Plaintiffs had noticed. Judge Corley ultimately ruled that the noticed deposition would not move forward. Plaintiffs did not follow up with this document demand again until a meet and confer held in November 2020. During that meet and confer, Plaintiffs' counsel informed Facebook that it should *not* prioritize collection and production of the developer documents and should instead focus on other targeted collections.

Three months later, during a meet and confer held on February 11, 2021, Plaintiffs (out of nowhere) demanded that Facebook locate and produce all "developer manuals" within one week, in anticipation of an upcoming 30(b)(6) deposition. Facebook urged Plaintiffs to clarify their request and to identify any specific, targeted documents they believed they needed for the deposition—explaining it would be difficult to locate, collect, and produce a large volume of materials within a matter of days.

Plaintiffs did not clarify their request or limit it to specific documents. Instead, hours after the meet and confer, Plaintiffs sent Facebook a letter purporting to invoke the parties' dispute protocol with respect to "developer manuals."

There is no outstanding dispute with respect to these documents. As Facebook understands, Plaintiffs seek different versions of its developer website that have been published over time. Facebook does not object to producing the current version of Facebook's developer website (which Plaintiffs can access at developers.facebook.com) or any prior versions of the website Facebook maintains to the extent they have been archived internally at Facebook. But the Wayback Machine appears to maintain more than 30,000 saved instances of past versions of the developer website. If there are specific versions of the site that Plaintiffs seek, they should identify them. The parties should meet and confer to clarify what specific information Plaintiffs are seeking and define an appropriate set of responsive materials.

Finally, as Facebook has told Plaintiffs numerous times, the parties must agree upon a schedule for Facebook to produce documents in response to targeted requests. Plaintiffs' ongoing demands that Facebook immediately locate and produce one-off materials significantly interfere with Facebook's ability to produce responsive documents found among the millions of documents hitting on the parties' agreed-upon search strings. Facebook encourages Plaintiffs to limit, narrow, and clarify their requests and to work with Facebook to develop a production schedule.

Sincerely,

Deborah L. Stein

14