GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:19-CV-04591-VC <br><br> **FACEBOOK, INC.'S MOTION TO DEPOSE FORMER NAMED PLAINTIFFS** <br><br> Discovery Special Master Daniel Garrie, Esq. |

1

**TABLE OF CONTENTS**

2

Page

3    I.     INTRODUCTION                                                                           1

4    II.    BACKGROUND                                                                             2

5          A.    Plaintiffs have previously attempted to shield potential class representatives
                 from discovery.                                                                   2
6
          B.    The former Named Plaintiffs had participated in the case for years before their
7                voluntary dismissal.                                                              4

8          C.    Plaintiffs' objections to absent class member discovery is contrary to their own
                 approach to third party discovery in this case.                                  5
9
     III.   ARGUMENT                                                                               5
10
          A.    Depositions of absent class members who are former Named Plaintiffs are
11               warranted because they have all injected themselves into the litigation.          6

12         B.    Factors articulated by courts in determining the propriety of absent class
                 member discovery all weigh in favor of deposing the former Named Plaintiffs.     9
13
          C.    Plaintiffs' case law is mischaracterized or distinguishable.                       13
14
     IV.    CONCLUSION                                                                             14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

FACEBOOK, INC.'S MOTION FOR A PROTECTIVE ORDER AGAINST PRODUCTION OF API CALL LOGS
CASE NO. 3:18-MD-02843-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Antoninetti v. Chipotle, Inc.*,
  No. 06cv2671-BTM, 2011 WL 2003292 (S.D. Cal. May 23, 2011) ...............................6

*Arredondo v. Delano Farms Co.*,
  No. 1:09-cv-1247-MJS, 2014 WL 5106401 (E.D. Cal. Oct. 10, 2014) ..........................8

*Burnett v. Ford Motor Co.*,
  No. 3:13-cv-14207, 2015 WL 3540886 (S.D. W. Va. June 4, 2015)..................6, 7, 9, 11

*In re Drassinower*,
  No. 3:21-cv-1370-JLS-AHG, 2021 WL 3772328 (S.D. Cal. Aug. 25, 2021) ..........6, 7, 8, 9, 11, 12

*FedEx Ground Package Sys.*, No. 3:05-MD-527-MDL-1700, 2007 U.S. Dist. LEXIS 16205 (N.D. Ill.
  Mar. 5, 2007)...........................................................................................................7

*Lierboe v. State Farm Mut. Auto Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003)......................................................................................10

*McPhail v. First Command Fin. Planning, Inc.*,
  251 F.R.D. 514 (S.D. Cal. 2008)....................................................................................8

*Moreno v. Autozone, Inc.*,
  No. C-05-4432 MJJ (EMC), 2007 WL 2288165 (N.D. Cal. Aug. 3, 2007) ...................8

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
  926 F.3d 528 (9th Cir. 2019).........................................................................................10

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
  993 F.3d 774 (9th Cir. 2021)...........................................................................5, 6, 9, 11

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  Nos. 09-c-7666, 11-c-1468, 2012 WL 1533221 (N.D. Ill. Apr. 27, 2012) ....................6

*Roberts v. Electrolux Home Products, Inc.*,
  No. SACV 12-1644 CAS (VBKx), 2013 WL 4239050..................................................13

*Tierno v. Rite Aid Corp.*,
  No. C-05-2520-TEH, 2008 WL 2705089 (N.D. Cal. Jul. 8, 2008)..............................6, 8

*TransUnion LLC v. Ramirez*,
  141 S.Ct. 2190 (2021) ...............................................................................................6, 11

*Vedachalam v. Tata Am. Int'l Corp.*,
  No. C-06-00963 CW (EDL), 2011 WL 13161567, at *1 (N.D. Cal. Aug. 12, 2021)..................12

Gibson, Dunn &

Crutcher LLP

1

## I.      INTRODUCTION

2          Facebook respectfully seeks an order confirming its right to depose absent class members to

3 oppose class certification and support its defenses in this case—including absent class members who

4 were previously Named Plaintiffs and have reserved their rights to rejoin the litigation.

5          Absent class members are likely to have testimony relevant to Facebook's defenses and

6 arguments against class certification.  Plaintiffs seek to certify a massive class of all U.S. Facebook

7 users dating back to 2007, which would include hundreds of millions of individuals.  Facebook has

8 the right to test whether individuals in the expansive putative class are similarly situated, had similar

9 privacy expectations, conducted themselves similarly on Facebook and elsewhere, are adequately

10 represented by the class representatives Plaintiffs ultimately propose, and have Article III standing.[1]

11 Indeed, the U.S. Supreme Court and Ninth Circuit have recently emphasized that absent class

12 members' standing is a critical factor in whether a class may be certified.  Facebook has a right to

13 demonstrate that many putative class members lack viable claims and Article III standing.  Absent

14 class members who previously were litigants in this case for more than two years are particularly well

15 situated for Facebook to investigate these issues.

16          Plaintiffs, however, take the extraordinary and unjustified position that Facebook is entitled to

17 seek discovery about only eight members of a putative class that would include hundreds of millions

18 of individuals.  These eight individuals have been hand selected by Plaintiffs' counsel to remain

19 Named Plaintiffs in this case after counsel has had more than three years to evaluate the claims of

20 nearly 40 different individuals who have been Named Plaintiffs at various points in this case, with the

21 benefit of approximately one-million pages of data Facebook produced about these individuals.

22 Plaintiffs' objections to Facebook deposing absent class members does not even seem to come from

23 the individuals Facebook seeks to depose.  Rather, this appears to be an objection from Plaintiffs'

24 counsel, who do not want Facebook to depose anyone who may provide testimony helpful to

25 Facebook.  Plaintiffs' counsel cannot artificially narrow Facebook's defenses and class certification

26 arguments to a handful of individuals they have cherry-picked from an extraordinarily large putative

27

28

---

[1] This is a non-exclusive list.  Facebook reserves all rights with respect to the information it may need from absent class members to provide its defenses and oppose class certification.

Gibson, Dunn &
Crutcher LLP

1    class, and their efforts to do so put in question their adequacy to represent the enormous class they

2    seek to certify.

3    The absent class members Facebook currently seeks to depose are not absent class members

4    chosen at random or who would be unfairly burdened by appearing for a deposition. All of the absent

5    class members Facebook currently seeks to depose chose to file the underlying class actions against

6    Facebook that were consolidated into this MDL, were Named Plaintiffs in this MDL (with attendant

7    obligations and expectations) for more than two years, made personal allegations against Facebook,

8    and demanded extensive discovery from Facebook. Moreover, even though these individuals

9    dismissed their claims, they did so without prejudice, remain putative class members, and Plaintiffs

10   have purportedly reserved the right to re-add them to the case as Named Plaintiffs at any time. Given

11   Facebook's right to obtain absent-class-member discovery, it is more than appropriate for Facebook

12   to begin with individuals who injected themselves in this lawsuit.

13   Clear authority, Plaintiffs' own statements, and Judge Corley's prior instructions, all make clear

14   that Facebook has every right to depose absent class members including former Named Plaintiffs.

## II.    BACKGROUND

16   **A.    Plaintiffs have previously attempted to shield potential class representatives from**

17   **discovery.**

18   Over the last three-and-a-half years, this case has seen a rotating cast of Named Plaintiffs. The

19   Consolidated Complaint that Plaintiffs filed on September 21, 2018 and First Amended Consolidated

20   Complaint, asserted claims on behalf of dozens of Named Plaintiffs. In April 2020, Plaintiffs moved

21   for leave to amend for the purposes of introducing new Named Plaintiffs. Dkt. 397. Judge Chhabria

22   granted that motion. Dkt. 482. Approximately 9 of the originally Named Plaintiffs dropped out of the

23   case at that time, and approximately 5 new Named Plaintiffs filed claims (some of whom also then

24   shortly thereafter voluntarily dismissed their claims).

25   In September of 2020, Plaintiffs told the Court that they would "reduce[] the number of

26   individuals who will be class representatives to ten, down from the twenty-three." Dkt. 526 at 5; Dkt.

27   583 at 8. Instead of dismissing thirteen plaintiffs' claims, Plaintiffs proposed leaving those individuals

28   in the case but "de-prioritizing" them in an attempt to excuse them from participating in any discovery,

2

while reserving the right to "re-prioritize" them at any time. During a meet-and-confer held on September 29, 2020, Facebook rejected Plaintiffs' proposal, as such an approach would allow "de-prioritized" Plaintiffs to remain parties to the litigation without having to participate in discovery. Shortly thereafter, Facebook memorialized this position in a letter to Plaintiffs. *See* Exhibit A (Oct. 14, 2020 Letter from A. Swanson to L. Weaver).

In response, on December 4, 2020 Plaintiffs proposed a different stipulation that hardly differed from their original proposal: the former Named Plaintiffs would dismiss their claims, but "without prejudice and allow them to proceed as absent class members or as named plaintiffs in the future." *See* Exhibit B (Dec. 4, 2020 Proposed Stipulation of Voluntary Dismissal Without Prejudice as to Plaintiffs). Furthermore, Plaintiffs proposed that "all discovery served on the Withdrawn Plaintiffs [i.e. former Named Plaintiffs] [would be] deemed withdrawn" and that the former Named Plaintiffs "[would] not [be] subject to further discovery unless they were to resume serving as named plaintiffs in the future." *Id.*; *see also* Dkt. 583 at 9. Facebook again rejected this proposal, noting that Plaintiffs' revolving door approach to Named Plaintiffs would permit "Withdrawn Named Plaintiffs" to avoid participating in any discovery while reserving the option to rejoin as parties to the case at any time. As Facebook explained, such an approach would unfairly prejudice Facebook, who could ultimately face claims by parties from whom it had not had the benefit of full discovery.

At a hearing that occurred five days later, Judge Corley recognized that Facebook's desire to retain deposition rights against former Named Plaintiffs was understandable and valid, explaining that "[t]he Defendants often want to go beyond the named Plaintiffs and take a few [depositions of absent class members] . . . they say: This person was a named Plaintiff. It is not too burdensome on them [to be deposed]. I'm sure Facebook would be happy to depose them." *See* Exhibit C (Dec. 9, 2020 Hr'g Tr.) at 50:15-21. Plaintiffs' counsel even agreed with this and invited Facebook to depose former Named Plaintiffs, stating: "To be clear, a lot of these Plaintiffs . . . want to be deposed by you." *Id.* at 50:7-9. Judge Corley ultimately held that if certain Named Plaintiffs wanted to withdraw, neither party was waiving their arguments. *See id.* at 49:24-50:6. Facebook was not waiving its right to seek discovery from withdrawn parties, and they were not waiving their right to seek leave of Court to rejoin the case for good cause later.

FACEBOOK, INC.'S MOTION FOR A PROTECTIVE ORDER AGAINST PRODUCTION OF API CALL LOGS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

After this hearing, the parties agreed to a pared-down version of Plaintiffs' Stipulation of Voluntary Dismissal that dismissed these individuals' claims without prejudice. Unlike the prior versions of the stipulation Plaintiffs had proposed, the version the parties entered does not include any restriction on or waiver of Facebook's right to seek discovery as to those individuals. *See* Dkt. 590 at 2. All such restrictions were expressly removed from the stipulation. Plaintiffs now seek to write those restrictions back into the stipulation, even though the parties did not agree to them and Judge Corley did not order them.

Under Plaintiffs' vision of how discovery should proceed in this case, Plaintiffs' counsel would be able to constantly introduce new Named Plaintiffs into the case and remove without prejudice any Named Plaintiff they determine has weak claims (rendering them "absent" class members)— effectively insulating such individuals from discovery, while maintaining the ability to use them as potential class representatives later in the case once discovery is at or near completion. This scenario is particularly concerning given that Plaintiffs' Counsel apparently continues to represent many of the former Named Plaintiffs. *See* Exhibit D (Email from C. Laufenberg to K. Herbert, et al. on November 18, 2021). This type of gamesmanship is not permitted.

**B.     The former Named Plaintiffs had participated in the case for years before their voluntary dismissal.**

This lawsuit was filed in 2018. From its inception to December 2020 (when the Stipulation of Voluntary Dismissal was filed), the former Named Plaintiffs were active participants in the litigation. All of them asserted claims against Facebook. *See* Dkt. 491 at ¶¶ 35-59, 101-124, 133-140, 148-163, 172-211. All of them propounded dozens of discovery requests on Facebook, including with respect to their own Facebook accounts. Facebook has produced hundreds of thousands of documents with respect to these individuals. As just one example, Facebook produced more than 50,000 documents related to Charnae Tutt in response to Plaintiffs' requests for production. They also served personalized responses and objections to Facebook's interrogatories, and were each identified as individuals likely to have discoverable information that Plaintiffs may use to support their claims in Plaintiffs' initial disclosures. *See* Exhibit E (Plaintiffs' Initial Disclosures). Facebook notes that the

1  twelve Named Plaintiffs with the largest DYI files—i.e. the most extensive Facebook activity—all
2  dismissed their claims without prejudice.

3       Facebook also previously sought the depositions of and served notices of deposition on each
4  of these individuals in January 24, 2020—now almost two years ago and long before these
5  individuals dismissed their claims without prejudice.  Plaintiffs refused to allow those depositions—
6  which were unquestionably proper at that time—to move forward.  Now, Plaintiffs claim that because
7  these same individuals chose to exit the case without prejudice (with purported express reservation to
8  rejoin at any time), Facebook cannot depose them even at the pre-class certification stage, despite
9  their participation in the case for years, asserting personal claims against Facebook, and responding
10  to and propounding written discovery.

11  **C.    Plaintiffs' objections to absent class member discovery is contrary to their own**
12  **approach to third party discovery in this case.**

13       Despite objecting to Facebook's right to depose absent class members including former
14  Named Plaintiffs on the grounds that they purportedly are not "necessary" or "relevant," Plaintiffs
15  have nonetheless sought extensive third-party discovery in this case.  Plaintiffs have served
16  approximately sixty document subpoenas on a hodge-podge of miscellaneous third parties; they
17  previously expressed their intent to take dozens of third party depositions; and just last week noticed
18  a 30(b)(6) deposition of PricewaterhouseCoopers.  In other words, while Plaintiffs are burdening
19  dozens of third parties with an avalanche of discovery requests, they take the position that Facebook
20  is only entitled to seek discovery from eight active parties to the case and cannot seek any discovery
21  from non-parties *who were previously Named Plaintiffs* and reserved their right to rejoin the case
22  later.  Discovery is a two-way street.  If it is Plaintiffs' position that Facebook cannot seek discovery
23  from nonparties, Plaintiffs should withdraw all third-party subpoenas immediately.

24                          **III.    ARGUMENT**

25       Facebook has a right to depose absent class members in this case.  Recent U.S. Supreme
26  Court and Ninth Circuit and authority—issued ***after*** the case law on which Plaintiffs rely—make
27  clear that, if a significant portion of a putative class lacks standing, the case cannot be certified.  *See*
28  *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 792-93 (9th

FACEBOOK, INC.'S MOTION FOR A PROTECTIVE ORDER AGAINST PRODUCTION OF API CALL LOGS
CASE NO. 3:18-MD-02843-VC

Cir. 2021) (holding that, if more than a *de minimis* number of class members lack standing, a putative class cannot be certified); *see also TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2207 (2021) ("Every class member must have Article III standing in order to recover individual damages.").  In order to show absent class members lack standing, a defendant obviously needs the ability to seek discovery from them.

A.     **Depositions of absent class members who are former Named Plaintiffs are warranted because they have all injected themselves into the litigation.**

A long line of cases issued well before *TransUnion* and *Olean*, and which Plaintiffs ignore, also recognize that absent class member discovery is frequently appropriate.  This is especially true here, where the absent class members Facebook seeks to depose are former Named Plaintiffs that asserted personal allegations against Facebook, participated in discovery, were identified as individuals with relevant information in Plaintiffs' initial disclosures, and otherwise injected themselves into the litigation.

The law on discovery directed to absent class members is flexible.  Courts in this circuit have long recognized that discovery from absent class members is "neither prohibited nor sanctioned explicitly" by the Federal Rules.  *Tierno v. Rite Aid Corp.*, No. C-05-2520-TEH, 2008 WL 2705089, at *6 (N.D. Cal. Jul. 8, 2008).  This is particularly true where the absent class members have "injected" themselves into the litigation.  *Antoninetti v. Chipotle, Inc.*, No. 06cv2671-BTM (WMc), 2011 WL 2003292, at *1 (S.D. Cal. May 23, 2011) (citing cases).  Indeed, there is ample case law illustrating courts' support of permitting the depositions of absent class members (including pre-certification, as here), particularly in instances where, as here, they are former named plaintiffs.

In *Burnett v. Ford Motor Co.*, the absent class members that the defendant sought to depose— and that the court ultimately allowed to be deposed—were "not ordinary absent class members being singled out for intrusive discovery."  No. 3:13-cv-14207, 2015 WL 3540886, at *3 (S.D. W. Va. June 4, 2015).  Rather, each of them, as here, "were previously named parties, who affirmatively interjected themselves into the prosecution of the claims and maintained their representative roles until opting for voluntary dismissals."  *Id.*; *see also id.*, at *2 ("[A]ll four of the proposed deponents were named plaintiffs in the litigation for nearly two years" and that "when these individuals agreed

to participate in the case in a representative capacity, they should have realized that they would be expected to respond to discovery requests at some point in the proceeding."). Also as is the case here, those former named plaintiffs in *Burnett* had "filed numerous motions . . . served [defendant] with discovery requests; served multiple third-party subpoenas; responded to [defendant's] motions; [and] participated by counsel in scheduling conferences." *Id.* Put another way, the proposed deponents, as former named plaintiffs, were not "garden variety absent class member[s] entitled to a shield from discovery." *Id.* (quoting *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, Nos. 09-c-7666, 11-c-1468, 2012 WL 1533221, at *5 (N.D. Ill. Apr. 27, 2012)). These factors supported the *Burnett* court's order denying plaintiffs' motion for a protective order as to the former named plaintiffs the defendant sought to depose.

Similarly, in *In re Drassinower*, the defendant noticed the deposition of a then-named plaintiff, who thereafter was removed from the case. *See* Case No. 3:21-cv-1370-JLS-AHG, 2021 WL 3772328, at *1 (S.D. Cal. Aug. 25, 2021). The defendant then issued a deposition subpoena to the former named plaintiff, to which the plaintiff filed a motion to quash. *See id.* The court denied the motion to quash and concluded that the deposition was not being noticed for an improper purpose because the former named plaintiff "[h]ad inserted herself in the litigation, and, as a former named plaintiff who signed up to represent the class, a deposition [would] not [be] unduly burdensome." *Id.* As was the case in *Burnett* and as is the case here, the person who the defendant sought to depose "[was] not a mere absent class member but [was] a former named plaintiff who ha[d] injected herself into the litigation." *See id.*, at *7.

The facts here are virtually indistinguishable from the facts in *Burnett* and *In re Drassinower*. There is no question that these individuals injected themselves into the litigation. *See* Dkt. 491 at ¶¶ 35-59, 101-124, 133-140, 148-163, 172-211. Each of them have asserted claims against Facebook and have all responded to Facebook's interrogatories with detailed responses and objections. *See, e.g.*, Exhibit F (Plaintiff Rafael Amezcua's Responses and Objections to Defendant Facebook Inc.'s First Set of Interrogatories). Further, Facebook has produced hundreds of thousands of documents pertaining to these individuals' Facebook accounts. Facebook is entitled to take the depositions it noticed when these individuals were Named Plaintiffs, despite Plaintiffs' ploy of dismissing these

individuals in an effort to shield them from discovery despite their prolonged and deep involvement in the case.  *Compare FedEx Ground Package Sys.*, No. 3:05-MD-527-MDL-1700, 2007 U.S. Dist. LEXIS 16205, at *24-27 (N.D. Ill. Mar. 5, 2007) (compelling the deposition of a former named plaintiff who was dropped from the case prior to his scheduled deposition and observing that "Plaintiffs appear to have deliberately changed [former named plaintiff's] circumstances."). Facebook should be able to depose these absent class members for this reason alone.

Moreover, there is no question that these individuals expect to give deposition testimony and will not be unduly burdened.  *See In re Drassinower*, 2021 WL 3772328, at *7; *Burnett*, 2015 WL 3540886, at *2 (similar).  Facebook first noticed the depositions of the then-Named Plaintiffs in January 2020, long before they were voluntarily dismissed from the case.  And indeed, Plaintiffs' counsel invited their depositions, telling the Court and Facebook:  "To be clear, a lot of these Plaintiffs . . . want to be deposed by you."  Ex. C at 50:7-9.  Judge Corley similarly recognized that "Defendants often want to go beyond the named Plaintiffs and take a few – the first person they point to is – they say: This person was a named Plaintiff.  It is not too burdensome on them.  I'm sure Facebook would be happy to depose them."  *Id.* at 50:17-21.

Plaintiffs attempt to distinguish *In re Drassinower* in their December 1 submission by arguing that "the defendant noticed the deposition of a named plaintiff who withdrew nine days ***after*** service of the notice"—whereas here, "the former Named Plaintiffs withdrew almost a year before Facebook noticed their depositions."  Plaintiffs' facts are wrong.  Facebook first noticed these individuals' depositions *almost two years ago*, in January 2020, and has been attempting to take these individuals' depositions ever since.  Facebook is not, as Plaintiffs' December 1 submission suggests, noticing these individuals for the very first time a year after they were dismissed from the case.  Nor is it selecting them at random.  Plaintiffs cannot be heard when now claiming that Facebook should have tried to take these individuals' depositions sooner, before they voluntarily dismissed themselves from the case—which is preposterous, given that Facebook has been trying to do exactly that for nearly two years but has been unable to over Plaintiffs' objections.

1

**B.      Factors articulated by courts in determining the propriety of absent class member**

2

**discovery all weigh in favor of deposing the former Named Plaintiffs.**

3

Plaintiffs argue that "[d]iscovery from absent class members is permitted only where" specific

4

criteria are met that were set out in *McPhail v. First Command Fin. Planning, Inc.*, 251 F.R.D. 514

5

(S.D. Cal. 2008).  Plaintiffs are wrong.  To be clear, the Ninth Circuit has not addressed the standard

6

a party must meet to conduct depositions of absent class members.  District courts in the Ninth

7

Circuit have articulated a variety of factors courts can consider when assessing the propriety of

8

absent-class-member depositions.  *McPhail* is a Southern District of California case that articulates

9

one set of factors.  The Northern District—where this case is pending—has stated that the law on

10

discovery directed to absent class members is "flexible."  *See Tierno*, 2008 WL 2705089, at *6.

11

There are no exhaustive or absolute criteria that must be met.

12

Courts in the Northern District of California have found that discovery of absent class

13

members is permissible—especially prior to class certification—if the discovery is not sought to take

14

undue advantage of class members or to harass class members, and is necessary to trial preparation or

15

class certification issues.  *See Moreno v. Autozone, Inc.*, No. C-05-4432 MJJ (EMC), 2007 WL

16

2288165, at *1 (N.D. Cal. Aug. 3, 2007).  The Ninth Circuit has reiterated the significance of these

17

latter factors in holding that, if a significant portion of a putative class lacks standing, the case cannot

18

be certified.  *See Olean*, 993 F.3d at 792-93.

19

The Southern District of California articulated factors similar to *Moreno* in *McPhail*,

20

including: (1) the discovery is not designed to take advantage of class members or reduce the size of

21

the class; (2) the discovery is necessary; (3) responding to discovery requests would not require the

22

assistance of counsel; and (4) the discovery seeks information that is not already known by the

23

proponent.  *See McPhail*, 251 F.R.D. at 517; *see also Arredondo v. Delano Farms Co.*, No. 1:09-cv-

24

1247-MJS, 2014 WL 5106401, at *5 (E.D. Cal. Oct. 10, 2014) ("[A]s a general rule, discovery from

25

absent class members may be permitted when reasonably necessary, not conducted for an improper

26

purpose, and not unduly burdensome in the context of the case and its issues.").  If anything, Special

27

Master Garrie should consider the factors articulated by *Moreno*: that (1) the discovery is not sought

28

to take undue advantage of class members or to harass class members, and (2) is necessary to the trial

Gibson, Dunn &
Crutcher LLP

FACEBOOK, INC.'S MOTION FOR A PROTECTIVE ORDER AGAINST PRODUCTION OF API CALL LOGS
CASE NO. 3:18-MD-02843-VC

preparation or opposition to class certification.   But even if Special Master Garrie considers the *McPhail* factors, each of the factors weigh in favor of Facebook deposing absent class members, including the former Named Plaintiffs.

      ***The discovery is not designed to take advantage of putative class members.***   As former Named Plaintiffs, deposing these absent class members would not take undue advantage of them. Nor would the depositions be burdensome.  In both *Burnett* and *In re Drassinower*, the courts found the mere fact that the absent class members whom the defendants sought to depose were former named plaintiffs strongly persuasive that depositions would not burden them or take advantage of them and that they should expect having to participate in discovery.  *See In re Drassinower*, 2021 WL 3772328, at *7; *Burnett*, 2015 WL 3540886, at *2 (similar).

      ***The discovery is necessary (and relevant).***   In their December 1 submission, Plaintiffs contend that absent class member depositions are not necessary or relevant.  They are both.  In concluding the absent class member's deposition was necessary and relevant in *In re Drassinower*, the court considered the facts that the absent class member (a former named plaintiff) "ha[d] asserted verified facts relevant to the legal theories on which th[e] action [was] based . . . [and] provided detailed responses to [defendant's] interrogatories, requests for admission, and requests for production."  *See* 2021 WL 3772328, at *8.  There is no question that the former Named Plaintiffs here would be relevant for the same reasons.  Indeed, Plaintiffs already conceded their relevance when they listed the former Named Plaintiffs as individuals likely to have discoverable information that Plaintiffs may use to support their claims in Plaintiffs' initial disclosures.  *See* Ex. E.

      Additionally, the *In re Drassinower* court found that the deposition was necessary for the defendant's opposition to class certification.  *See* 2021 WL 3772328, at *8; *see also id.*, at *6 ("The deposition is reasonably necessary for preparation for opposing class certification due to lack of commonality[.]").  Likewise, Facebook's ability to depose absent class members is necessary to Facebook's preparation for opposing class certification and illustrating that Plaintiffs lack Article III standing.  In particular, Facebook has the right to test whether individuals in Plaintiffs' expansive putative class are similarly situated, had similar privacy expectations, conducted themselves similarly on Facebook and elsewhere, are adequately represented by the class representatives Plaintiffs

10

Gibson, Dunn &
Crutcher LLP

ultimately propose, and have Article III standing.  The Ninth Circuit and U.S. Supreme Court have emphasized that absent class members' standing is a critical factor in whether a class may be certified.  *See Olean*, 993 F.3d at 792-93 (holding that, if more than a *de minimis* number of class members lack standing, a putative class cannot be certified); *see also Ramirez*, 141 S.Ct. at 2213 (concluding that "[n]one of the 8,185 class members other than the named Plaintiff Ramirez suffered a concrete harm," stating "[n]o concrete harm, no standing," and remanding to Ninth Circuit for its determination as to whether class certification would be appropriate in light of its conclusion about standing.).  Facebook must be afforded the opportunity to test absent class members' lack of standing to assess that *de minimis* threshold—and there are no better absent class members to test than the former Named Plaintiffs.  These rights far outweigh Plaintiffs' litigation tactics and interest in trying to shield these absent class members from discovery.  And, as far as Facebook can tell, Plaintiffs' objections to Facebook deposing these individuals is not driven by the personal circumstances of the former Named Plaintiffs at all, but rather Plaintiffs' desire to shield individuals from discovery whom they realize cut against class certification.

Plaintiffs argue in their December 1 submission that "[i]n a class action, all that is required to establish standing is that one named plaintiff meets the Article III requirements."  In support of that statement, Plaintiffs rely on *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, a case that pre-dates *Olean* and *TransUnion* and is not controlling.  That case—which decertified the class in question as a result of a lack of standing—found only that if an individual plaintiff lacks standing, "the court need never reach the class action issue."  926 F.3d 528, 532 (9th Cir. 2019) (quoting *Lierboe v. State Farm Mut. Auto Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003)).  It does not follow that only one named plaintiff must satisfy Article III standing for the class to be certified. *Compare Olean*, 993 F.3d at 791 ("Plaintiffs must establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of Defendants' alleged . . . conduct.  If a substantial number of class members in fact suffered no injury, the need to identify those individuals will predominate.") (internal citations and quotation marks omitted); *see also TransUnion*, 141 S.Ct. at 2211-12 (Article III prohibits certification of a class and a damages award where the majority of class members lack actual injury).

*These absent class members would not require extensive preparation by counsel for their depositions.*  In *In re Drassinower*, the court noted that the defendant sought to depose the absent class member only on her "personal experiences," asking that she "testify about what she remembers" and "provide factual support for the allegations she adopted in the complaint and her verified discovery responses." *Id.*, at *8.  The court also found it persuasive that the absent class member had a relationship with class counsel.  *Id.*; *see also Burnett*, 2015 WL 3540886, at *3 (noting that the universal concern that an absent class member would incur legal fees as a consequence of the deposition was not applicable to a scenario where the absent class member had a relationship with class counsel).  Similarly, Facebook intends to depose the former Named Plaintiffs only on their personal knowledge about their Facebook accounts, privacy settings, online presence generally, and other facts undergirding their allegations in the complaint against Facebook.  These are not expert depositions.  And Plaintiffs' counsel has also confirmed that they represent at least four of the five former Named Plaintiffs that Facebook seeks to depose during Phase I (it is unclear whether they represent Mr. Lloyd).  *See* Ex. D.

*The depositions will reveal information not already known.*  Plaintiffs argue that these depositions would not unearth information not already known by Facebook because "Facebook already possesses deeply intimate knowledge about all of the Plaintiffs and absent members, including how they were harmed in the case."  This also is not true.  This is a case in which plaintiffs allege they were harmed when sensitive information they shared on Facebook was shared with third parties.  Facebook has no way of knowing what information these former Named Plaintiffs believe is sensitive, what their expectations of privacy on Facebook were, what steps they take to protect their privacy off of Facebook, or how they believe they were harmed by Facebook's conduct.  Indeed, many of these former Named Plaintiffs alleged they suffered injuries like emotional distress, anxiety, and stress (*see, e.g.*, Dkt. 491 at ¶¶ 108, 116, 124, 140, 155, 163, 179, 187, 203, 211)—Facebook does not, and cannot know anything about these claimed injuries and is entitled to discovery about them.

In considering this factor in *In re Drassinower*, the court found the former named plaintiff's written discovery responses alone insufficient because they were "identical to those of the other

Gibson, Dunn & Crutcher LLP

named plaintiffs" and that the deposition would be necessary to probe those discovery responses further.  *See* 2021 WL 3772328, at *8.  Likewise, these former Named Plaintiffs' discovery responses and the allegations they assert in the complaint are all substantially similar to discovery responses and allegations of plaintiffs still in the case.

## C.  Plaintiffs' case law is mischaracterized or distinguishable.

In their December 1, 2021 submission to Special Master Garrie, Plaintiffs cite several cases that they claim stand for the proposition that "courts do not support depositions of absent class members who were former named plaintiffs."  All of the cases are either incorrectly characterized or distinguishable from this case.

In *Vedachalam v. Tata Am. Int'l Corp.*, the absent class members who submitted but then withdrew declarations in support of class certification were not, as Plaintiffs claim, former named plaintiffs.  Plaintiffs in that case had submitted 46 declarations from proposed class members in support of their motion for class certification, and the defendant took the depositions of at least 28 of them, with "several more" scheduled to occur prior to the class certification cutoff.  *See* No. C-06-00963 CW (EDL), 2011 WL 13161567, at *1 (N.D. Cal. Aug. 12, 2021).  Three of the declarants were unable to "sit for a deposition under any circumstances for various personal reasons," and as a result withdrew their declarations.  *See id.*  The court found the defendant's insistence in taking these three particular depositions "a possible attempt to unduly burden these class members" and inflict personal hardship.  *See id.*  The court also determined that the depositions were not likely necessary because the case was a breach of contract dispute and the "documents themselves," which were in the defendant's control, were likely "the most important evidence[.]"  *See id.*, at *2.

The court in *In re Drassinower* itself distinguished *Vedachalam*—it noted that, as a former named plaintiff, the absent-class member the defendant sought to depose had agreed to participate in the case and could not now avoid discovery by withdrawing from the case.  *See In re Drassinower*, 2021 WL 3772328, at *8.  This same reasoning applies here.

*Roberts v. Electrolux Home Products, Inc.* did not consider the propriety of deposing absent class members at all.  In that case, two plaintiffs sought to withdraw as named plaintiffs due to personal and family health concerns.  *See* No. SACV 12-1644 CAS (VBKx), 2013 WL 4239050, at

13

Gibson, Dunn &
Crutcher LLP

*1.  The issue in that case was whether the defendant would be permitted to depose those individuals *prior to their withdrawal*.  *See id.*  Given the immediate health concerns and other circumstances, the court found that the two named plaintiffs should be permitted to withdraw "and need not sit for a deposition *prior to withdrawal*."  *See id.*, at *2.  It did not address whether deposing them later would be proper.  And in any event, Plaintiffs here have never suggested that the voluntarily dismissed former Named Plaintiffs have any personal or family health concerns that would bar them from sitting for a deposition.

## IV.    CONCLUSION

Facebook respectfully requests that the Special Master grant Facebook's motion confirming its right to depose absent class members—including certain absent class members who were previously Named Plaintiffs.

FACEBOOK, INC.'S MOTION FOR A PROTECTIVE ORDER AGAINST PRODUCTION OF API CALL LOGS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

1   Dated:  December 6, 2021          **GIBSON, DUNN & CRUTCHER, LLP**

2
                    By:  */s/ Russ Falconer*
3
                    Orin Snyder (*pro hac vice*)
                    osnyder@gibsondunn.com
4
                    200 Park Avenue
                    New York, NY 10166-0193
5
                    Telephone:  212.351.4000
                    Facsimile:  212.351.4035
6
                    Deborah Stein (SBN 224570)
7
                    dstein@gibsondunn.com
                    333 South Grand Avenue
8
                    Los Angeles, CA 90071-3197
                    Telephone:  213.229.7000
9
                    Facsimile:  213.229.7520

10
                    Joshua S. Lipshutz (SBN 242557)
                    jlipshutz@gibsondunn.com
11
                    1050 Connecticut Avenue, N.W.
                    Washington, DC 20036-5306
12
                    Telephone:  202.955.8500
                    Facsimile:  202.467.0539
13
                    Kristin A. Linsley (SBN 154148)
14
                    klinsley@gibsondunn.com
                    Martie Kutscher (SBN 302650)
15
                    mkutscherclark@gibsondunn.com
                    555 Mission Street, Suite 3000
16
                    San Francisco, CA 94105-0921
                    Telephone:  415.393.8200
17
                    Facsimile:  415.393.8306

18
                    Russ Falconer (*pro hac vice*)
                    rfalconer@gibsondunn.com
19
                    2001 Ross Avenue, Suite 2100
                    Dallas, TX 75201-2911
20
                    Telephone:  214.698.3100
                    Facsimile:  214.571.2900
21
                    *Attorneys for Defendant Facebook, Inc.*
22

23

24

25

26

27

28

FACEBOOK, INC.'S MOTION FOR A PROTECTIVE ORDER AGAINST PRODUCTION OF API CALL LOGS
CASE NO. 3:18-MD-02843-VC

# EXHIBIT A

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Alexander Swanson
Direct: +1 213.229.7907
Fax: +1 213.229.6907
ASwanson@gibsondunn.com

October 14, 2020


VIA E-MAIL (LWEAVER@BFALAW.COM)

Lesley Weaver, Esq.
Bleichmar Fonti & Auld LLP
555 12th Street
Suite 1600
Oakland, CA 94607

Re:    In re Facebook, Inc. Consumer Privacy User Profile Litigation (N.D. Cal.), Case No.
       3:18-md-02843-VC

Dear Counsel:

We write in response to your letter dated September 24, 2020, which proposes that the
parties "prioritize" discovery for 10 of the 24 Named Plaintiffs, whom counsel "anticipate[s]
proposing . . . as class representatives."  During a meet-and-confer on September 29,
Plaintiffs clarified two things concerning the September 24 letter.  First, Plaintiffs made clear
that they wish to reserve the right to identify any Named Plaintiff as a class representative,
whether or not he or she is included on Plaintiffs' list of 10 prioritized Named Plaintiffs.
Second, although your letter was framed as a proposal, Plaintiffs clarified that they do not
intend to have the 14 non-prioritized Named Plaintiffs respond to Facebook's discovery
requests, including requests that have been pending for months.

As we explained when we spoke, Facebook does not accept Plaintiffs' proposal because,
among other reasons, it would allow 14 Named Plaintiffs to remain parties to the action
without participating in discovery.  Plaintiffs cannot unilaterally dispose of their discovery
obligations by identifying *potential* class representatives—particularly given Plaintiffs'
position that any Named Plaintiff could be substituted as a class representative at any time.
If particular Named Plaintiffs do not wish to participate in discovery, they are able to
withdraw as Named Plaintiffs and dismiss their claims.  But they cannot remain parties to the
action and reserve their right to serve as class representatives while avoiding their discovery
obligations.  Judge Corley has never suggested otherwise.  Please advise immediately if any
of the Plaintiffs are nonetheless going to ignore Facebook's outstanding interrogatories.

Facebook served nine to ten discrete interrogatories on all 24 Named Plaintiffs on August 21,
2020.  Responses to these interrogatories were originally due on September 24, 2020, but
based on Plaintiffs' representation that it would be time-consuming to coordinate responses

**GIBSON DUNN**

Lesley Weaver, Esq.
October 14, 2020
Page 2

for **_all 24 Named Plaintiffs_**, Facebook agreed to extend the deadline by six weeks to November 5, 2020—allowing 10 weeks in total.  As we stated on the September 29 meet-and-confer call, November 5 remains the deadline for the responses of all 24 Named Plaintiffs.  Absent a protective order, any Named Plaintiff's refusal to respond by the agreed-upon deadline would be an abuse of the discovery process and a waiver of any objections to the interrogatories.

Sincerely,

Alexander Swanson

104114939.3

# EXHIBIT B

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>*Akins et al. v. Facebook, Inc.*,<br>Case No. 3:18-cv-05714-VC;<br><br>*O'Hara, et al., v. Facebook, Inc., et al.*,<br>Case No. 3:18-cv-03709-VC<br><br>*McDonnell v. Facebook Inc.*,<br>3:18-cv-05811-VC<br><br>*Miller et al. v. Facebook, Inc.*,<br>Case No. 3:18-cv-05770-VC<br><br>*Schinder v. Facebook Inc.*,<br>3:18-cv-02571-VC<br><br>*Staggs v. Facebook, Inc.*,<br>3:18-cv-05754-VC | **STIPULATION AND [PROPOSED] ORDER RE: VOLUNTARY DISMISSAL WITHOUT PREJUDICE AS TO PLAINTIFFS RAFAEL AMEZCUA, SHELLY FORMAN, BRANDON HERMAN, TABIELLE HOLSINGER, WILLIAM LLOYD, KIMBERLY ROBERTSON, TONYA SMITH, SCOTT SCHINDER, DUSTIN SHORT, CHARNAE TUTT JULIANA WATSON, ANNIE WENZ** |

## STIPULATION OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE AS TO PLAINTIFFS

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and Civil Local Rule 7-12, Consolidated Plaintiffs ("Plaintiffs") and Defendant Facebook Inc. ("Facebook") (collectively "the Parties") in this action hereby stipulate to the voluntary dismissal of Plaintiffs Rafael Amezcua, Shelly Forman, Brandon Herman, Tabielle Holsinger, William Lloyd, Kimberly Robertson,, Scott Schinder, Tonya Smith, Dustin Short, Charnae Tutt, Juliana Watson, and Annie Wenz ("Withdrawn Plaintiffs"), without prejudice and allowing them to proceed as absent class members or as named plaintiffs in the future, each party to bear its own costs. This stipulation does not operate as to dismiss any other Plaintiffs in this action. The parties agree that all discovery served on the Withdrawn Plaintiffs is deemed withdrawn and they are not subject to further discovery unless they were to resume serving as named plaintiffs in the future. The Parties shall abide by this Stipulation pending approval by the Court.

Dated: _____, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:     /s/ *DRAFT*_____
         Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

BLEICHMAR FONTI & AULD LLP

By:     /s/ *DRAFT*_____
         Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

GIBSON, DUNN, & CRUTCHER LLP

By: */s/  DRAFT*
Deborah Stein

Orin Snyder (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
osnyder@gibsondunn.com

Deborah Stein (SBN 224570)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7164
Facsimile:  213.229.6164
dstein@gibsondunn.com

Joshua S. Lipshutz (SBN 242557)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539
jlipshutz@gibsondunn.com

Kristin A. Linsley (SBN 154148)
Martie Kutscher (SBN 302650)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306
klinsley@gibsondunn.com
mkutscherclark@gibsondunn.com

*Attorneys for Defendant Facebook, Inc.*

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: _____

_____

THE HONORABLE VINCE CHHABRIA
UNITED STATES DISTRICT JUDGE

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of December, 2021, at Oakland, California.

/s/ *DRAFT*
_____
Lesley E. Weaver

**CERTIFICATE OF SERVICE**

I, Lesley E. Weaver, hereby certify that on December 6, 2021, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ DRAFT
_____
Lesley E. Weaver

4839-0556-4115, v. 2

EXHIBIT C

Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Magistrate Judge

IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)  **NO. 18-MD-02843 VC (JSC)**
_____      )

San Francisco, California
Wednesday, December 9, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**


**APPEARANCES VIA ZOOM:**

For Plaintiffs:

                KELLER ROHRBACK LLP
                1201 Third Avenue - Suite 3200
                Seattle, Washington  98101
        BY: **DEREK LOESER, ATTORNEY AT LAW**
            **CARI LAUFENBERG, ATTORNEY AT LAW**
            **DAVID J. KO, ATTORNEY AT LAW**

                BLEICHMAR, FONTI & AULD LLP
                555 12th Street - Suite 1600
                Oakland, California  94607
        BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
            **ANNE K. DAVIS, ATTORNEY AT LAW**
            **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
            **ANGELICA M. ORNELAS, ATTORNEY AT LAW**



**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**




Reported By:        Marla F. Knox, RPR, CRR, RMR
                    United States Official Court Reporter

1  **APPEARANCES VIA ZOOM:   (CONT'D)**

2  For Defendant:

3                         GIBSON, DUNN & CRUTCHER LLP
                           1881 Page Mill Road
                           Palo Alto, California  94304

4                  BY:  **MARTIE KUTSCHER CLARK, ATTORNEY AT LAW**

5                         GIBSON, DUNN & CRUTCHER LLP
                           333 South Grand Avenue

6                         Los Angeles, California  90071
                   BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**

7

8                         GIBSON, DUNN & CRUTCHER LLP
                           2100 McKinney Avenue - Suite 1100
                           Dallas, Texas  75201

9                  BY:  **RUSSELL H. FALCONER, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   <u>Wednesday - December 9, 2020</u>                          <u>10:00 a.m.</u>

2                        P R O C E E D I N G S

3                            ---000---

4       **THE CLERK:**  Court is now in session.  The Honorable

5   Jacqueline Scott Corley is presiding.

6       Calling civil action 18-md-2843, In Re: Facebook Inc.

7       Go ahead and start.

8       **THE COURT:**  All right.  Good morning, everyone.  You

9   don't have to make your appearances.  And thank you for your

10  status update.

11      Let's just go through and talk through the things and see

12  where we are at and what we can do.

13      So the first issue is search terms for the 5 through 8

14  group.  And I'm not sure if there is anything to discuss here.

15  I think the Plaintiffs said they were hopeful the parties could

16  work out the schedule, and I don't believe Facebook said

17  anything about it.

18      So, Ms. Weaver, or whoever from the Plaintiff wants to

19  address that.  Is there anything to discuss?

20          **MS. WEAVER:**  Not from our perspective, Your Honor.

21          **MS. DAVIS:**  No.

22          **THE COURT:**  Okay.  Great.  We will just knock that

23  off.

24      Now, the second thing was RFPs 14 to 17, Plaintiffs' RFPs.

25      And Facebook seemed to suggest that the search terms had

1  been agreed to for those, but Plaintiffs seem to suggest that

2  they had not.  So I don't know where we are with that.

3          **MS. WEAVER:**  Mr. Ko will address that.

4          **MR. KO:**  This is David Ko on behalf of Plaintiffs.

5      So really the reason why we identified that issue in our

6  statement -- two reasons -- I mean, I think this is likely

7  coming at a head such that we will brief this to you shortly.

8      To answer your question, the reason why these RFPs are not

9  actually covered by the -- or this dispute, more specifically,

10  is not covered by the RFPs and the search strings is that we

11  are seeking a targeted search and a certain -- and a specific

12  group of materials that we believe Facebook should produce

13  pursuant to a targeted search.

14      And that is separate from the documents that they may

15  potentially produce that are, you know, possibly responsive to

16  these RFPs.

17      And just to add some color to that, you know, the search

18  strings that we agreed to -- and, quite frankly, that you

19  ordered in Discovery Order Number 8, I believe -- there are

20  actually only one search string that specifically relates to

21  these -- that solely relates to these RFPs.

22      And so -- and in this next round of negotiations, I think

23  there are only about three or four strings that the parties are

24  actually negotiating such that these strings may produce

25  potentially relevant information.

1    So what we are asking for is something different than I

2    think what Facebook is saying.  We are just saying:  Look,

3    there are these five categories of information that are

4    responsive to these RFPs; and we believe that they can produce

5    this information pursuant to targeted searches.

6        And that is, again, distinct from any of the search string

7    negotiations.

8            THE COURT:  Why is it distinct?

9            MR. KO:  Well, this has a pretty long and tortured

10   history.  We have been going back and forth with Facebook on

11   this since January.

12       Actually, we engaged in an extensive letter writing

13   campaign from February to April; and we have gone back and

14   forth with them.

15       And they said clearly that:  A, this information is

16   actually irrelevant.  B, that they don't have any responsive

17   documents anyways.  And C, even if they did, that they would be

18   highly confidential and protected.

19       So, you know, we found that hard to believe because these

20   by -- just to provide some context, these RFPs seek documents

21   related to how Facebook values, quantifies and monetizes the

22   user content information at issue in this case.

23       And they said:  Look, we don't have anything responsive to

24   those requests.

25       We found that hard to believe; right.  I mean, they are a

1   company -- this is a company that last year alone generated

2   $70 billion in revenue, you know, 98 percent of which came from

3   third parties.

4        So they said -- we said let's try to provide some

5   clarification so here are -- so this dispute matured to a point

6   where we said:  Here are five specific categories that we

7   believe will be responsive to this request.

8        Can you please run targeted searches on them?  And they

9   said no.

10       And they said:  Why don't we do -- why don't we go with

11  the search string negotiations and see if we can actually come

12  up with some documents that may potentially be responsive to

13  the requests.

14       And we gave that a shot.  And we thought that maybe that

15  they would run targeted searches in connection with that

16  negotiation process, but what has become evident is that they

17  do not want to.  And so I think, you know, at this point --

18       **THE COURT:**  Well, did you propose them as part of the

19  search string submission?

20       **MR. KO:**  We proposed one string -- two strings, excuse

21  me, that relates solely to 1417.  But, remember, we had a

22  finite number of strings we could negotiate and propose.

23       And so we took those somewhat off the table, right,

24  because there were other strings that we were negotiating that

25  we believe were responsive to other discovery requests because

1    we didn't have -- in the normal course we would say:  Look,

2    here are, you know, 10 or 15 strings that could have been

3    responsive to these requests.

4         And they said -- well, you know, we only could propose a

5    few to, Your Honor.  Obviously we ended up proposing only 29 or

6    27 for you to rule on.  And so that -- that is one response to

7    your question.

8         The other response --

9              **THE COURT:**  I guess I don't really understand.  I

10   mean, the limit was there to require to prioritize.  It wasn't

11   so that you could -- that is just sort of a different matter.

12        I mean, it seems like the nub of it -- from what I

13   understand -- is Facebook says they don't really have what you

14   are looking for, and you say that they do.

15        And maybe what you need to do is take that 30(b)(6), and

16   you will identify it; and then they will have to produce it, as

17   opposed to in a way you are kind of shooting in the dark.

18             **MR. KO:**  Well, that's one way of doing it, but I

19   think -- two responses to that.

20        One, the documents that will be produced here are not

21   pursuant -- are really not the type of documents that will be

22   produced pursuant to custodial searches.

23        These are financial documents that relate to, for example,

24   marketing and business brands, financial documents that

25   underlie their 10Ks and 10Qs.

```
 1        So these aren't -- you know, it's not, you know, Cari
 2   Laufenberg, let's find all her documents that talk about this.
 3   It is actually a non-custodial search in the relevant
 4   department where we pull that material.
 5        And I think -- it identifies --
 6             THE COURT:  What would it be?  What would it be?
 7             MS. WEAVER:  Your Honor, let me give an example
 8   because I think we do want the e-mails.  But accounting
 9   documents where Facebook is assessing the value of the data
10   that its getting, we know that, for example, in their
11   accounting documents it will be there.  And that is a targeted
12   search.  And those documents aren't targeted by the search
13   terms.
14        The search terms right now are only being applied to a
15   selected number of --
16             THE COURT:  I understand that.  For e-mails and things
17   like that, it wouldn't be an accounting document.  So that --
18             MS. WEAVER:  Exactly.
19             THE COURT:  -- I understand.
20             MS. KUTSCHER CLARK:  Your Honor --
21             MS. WEAVER:  -- take the 30(b)(6), I think that is a
22   good idea.  Apologies.
23             THE COURT:  Yeah.  Was that Ms. Kutscher?
24             MS. KUTSCHER CLARK:  Yes, Your Honor, thank you.
25        The issue we are having here is that the RFPs at issue
```

1    seek valuation documents about very particular types of

2    valuations.

3         They are asking about documents how Facebook values

4    individual pieces of user data; how Facebook values the named

5    Plaintiffs' data.

6         What we have been telling Plaintiffs -- and we have

7    investigated this extensively -- is that Facebook simply

8    doesn't value information that way.  So to the best of our

9    knowledge there wouldn't be responsive materials.

10        The other issue here is that the RFPs ask for documents

11   sufficient to show this type of information.

12        So we are running the search strings because typically

13   when you don't think there are documents about something

14   specific and you are asking for documents specific --

15   sufficient to show that information, you run search strings.

16   So you figure out if they are there.

17        And that's what we are trying to do; run the search

18   strings.  Figure out if there are any documents that show the

19   extensive valuation.  We don't think there are.

20        From our perspective, we think the first step here is to

21   run the search strings.  See if they return anything seeking

22   the type of information Plaintiffs are seeking, and then we can

23   take it from there.

24        The other issue we are having is that after Plaintiffs

25   sought that type of information, they did send us the letter

1   that Mr. Ko is describing.  And the letter asks for these very

2   five very broad categories of documents.  It asks for

3   Facebook's marketing plans, Facebook's business plans.

4       And Plaintiffs now seem to be taking the position that

5   Facebook should produce all documents responsive to their

6   letter, so all of its marketing plans, all of its business

7   plans, even if they don't show the type of information sought

8   in the RFPs.

9       So one of the issues that the parties started discussing

10  yesterday is:  Is Facebook required to produce documents

11  responsive to the RFPs or is Facebook required to produce

12  information responsive to this letter that really strays pretty

13  far from what the RFPs ask for?

14          **THE COURT:**  Well, this is what I would say:  What you

15  are required to produce is -- obviously the valuation of this

16  data is at issue.  That is relevant to a claim in the case.

17      And so what you need to do is figure out how you get

18  there.  There must be something.  And it may not be it's at the

19  micro level that the Plaintiffs were wondering.  So maybe it is

20  a more macro level.  Maybe it is simply:  How much money does

21  Facebook make in a year, in a month, in a week, in a day from

22  selling this information; right?  That's one way of evaluating

23  it.

24      Now, maybe that's not precisely called for by the RFP.  So

25  what?

1    What the RFP calls for -- you know what they want; right?

2  And so the RFPs are kind of like a starting point.  And now

3  have a discussion and try to narrow it and get out what it is

4  they are trying to do.

5    I don't think you would dispute that any financial

6  document -- like the financial documents are going to be one

7  way of valuing it.  Maybe not every marketing plan,

8  obviously -- obviously.  Facebook must have a million marketing

9  plans.  But specific marketing plans.  And you have a

10  discussion.

11    So the RFPs are a starting point.  I wouldn't get too

12  caught up in that.  We all agree that how Facebook values this

13  data, some way, is relevant.  And so let's figure out a way of

14  getting those.  That's what I would say on that.

15        **MR. LOESER:**  Your Honor, if I may just very briefly --

16        **MS. STEIN:**  Your Honor, I think the fundamental

17  disconnect is that Facebook doesn't sell user data, so Facebook

18  doesn't value user data in the way that Plaintiffs would like

19  it to exist.

20    It just -- it is not something that is part of Facebook's

21  business model.  So I think we have been talking past each

22  other.

23    And we are happy to meet and confer with them to see if

24  there is something else that Facebook does value, but it

25  doesn't -- because it doesn't sell user information and user

1  data, it's literally just not something that goes into their

2  valuations.

3       **THE COURT:**  Or they trade it or whatever it is.  Or

4  maybe as Ms. Weaver said, the 30(b)(6) -- did we lose -- oh,

5  no, there she is.  She just moved on me.

6       **MS. WEAVER:**  We just moved.  You moved too,

7  Your Honor.

8       **THE COURT:**  Did I?  I don't know.  Apparently we have

9  a new thing of Zoom that you can move the screens, but that

10  doesn't seem to be working.  Anyway -- and figure it out.

11      But I guess I would say is that I hear what you are

12  saying, Ms. Stein.  So that's what you should be discussing.

13  Like, there is going to be some way -- it has some value,

14  somehow or another because of (inaudible) -- and for some

15  purpose, whatever it is.  And then, you know, if -- it is not

16  going to be a line item, obviously, that puts a value on it.

17      And so that just sort of should be what the discussions

18  should be about.  I can see that is going to be different from

19  search terms.  If it is coming from financial documents, that

20  is something different.  Okay.

21      **MR. LOESER:**  Sorry to interrupt.  I guess, just by way

22  of making it clear and so that we all understand what you are

23  saying, there is search strings; and that will get certain

24  information, e-mail, other things.

25      And then there is all this other information that is not

1   even -- it is not even possible that it would be unearthed by

2   those search strings.  That is the targeted search information.

3        That is what we will be meeting and conferring and

4   negotiating more with Facebook.  I mean, it hasn't been going

5   on a long, long time.

6        I am very happy to hear you describe the process where,

7   you know, we start with RFPs and then we engage in these very

8   lengthy and substantive conversations about how to clarify

9   them, and that's what the letters often have to do with.

10       So I do think that that process that you described is what

11  has happened here, and I think it is important that we continue

12  to utilize that process so that requests can be clarified in

13  letters and so on.

14            THE COURT:  And narrowed.  Always narrowed.

15            MR. LOESER:  Or narrowed.  Or if they are really

16  unclear -- as Facebook often claims they are -- then whether it

17  is narrowed or just made more clear, one way or another it

18  becomes evident what it is we are searching for.

19            THE COURT:  Yeah.  I always like to say is sort of

20  when -- obviously not in a bigger complex -- but when I have

21  disputes, I will say to one side:  What is it that you want?

22  Just describe to me -- not -- when somebody starts reading to

23  me their document requests, I stop them.  No.  No.  Just tell

24  me in plain English what is it that you want.  And then have

25  the other side respond.  Do you have that or what do you have;

```
 1   right?  That's what it should be.

 2       I do want to go back, though, to the -- what is little A

 3   in the Plaintiffs' statement, the search terms and the

 4   schedule, because the final proposals are due December 24th.

 5       And were you able to work something out with that or --

 6           MS. KUTSCHER CLARK:  We are --

 7           MS. WEAVER:  We are still negotiating that, I believe.

 8   Go ahead, Martie.  My apologies.

 9           MS. KUTSCHER CLARK:  No, no, no.  I was just going to

10   say the parties met and conferred about it yesterday, and we

11   are working through some proposals.

12       One thing the parties have started discussing is whether

13   there should be a little bit of a detente around the holidays

14   this year.

15           THE COURT:  Oh, that's exactly what I wanted to do.  I

16   actually wanted to impose one.

17                          (Laughter)

18           THE COURT:  I did it in one of my other cases in Juul

19   over Thanksgiving.  I forbid the parties from communicating

20   with each other from Thursday, Friday, Saturday and Sunday.

21   And I would like to do the same thing in here.

22           MR. LOESER:  Just like the Battle of the Bulge,

23   Your Honor.

24           MS. WEAVER:  That's right.  That's exactly right.

25           THE COURT:  So I will let you figure out what it is;
```

```
 1   but you need, I would say, five business days.  That would be
 2   my proposal.  Really the case will move along; go along.  Five
 3   business days, no communications between the two sides for
 4   those five days in a row and you figure out what they are.
 5        So important.  So important.  So important especially -- I
 6   mean, you know, people are not going to be -- I mean, it's a
 7   stressful time right now.  It is a stressful time, and we all
 8   need a break and to be able to just chill and focus on the most
 9   important things -- this case is important -- but the most
10   important things.  So I would like you to agree to a five-day
11   detente.  It can be longer if you want but at least five days.
12             MS. WEAVER:  Agreed.
13             MR. MONTGOMERY:  Your Honor, can you impose no
14   communication within our firm as well?
15             THE COURT:  Mr. Montgomery, yeah --
16                       (Laughter)
17             MS. KUTSCHER CLARK:  The challenges.
18             MS. STEIN:  I do rely on opposing counsel for Netflix
19   recommendations so --
20                       (Laughter)
21             MS. WEAVER:  We can make an exception.
22             THE COURT:  The Queens Gambit, have you guys watched
23   that?  I finished that last night.
24             MR. LOESER:  Excellent.  That is -- a very good
25   recommendation, if you haven't seen it, which we have now
```

1   enjoyed is Ted Lasso.

2         **THE COURT:**  Ted Lasso, okay.  I don't know that one.

3         **MR. LOESER:**  Your Honor, this might be testing the

4   limits of your judicial authority; but if you could turn off

5   social media for five days --

6         **THE COURT:**  For the entire country?

7         **MS. WEAVER:**  Yes.

8                     (Laughter)

9         **THE COURT:**  Perhaps.

10        **MS. KUTSCHER CLARK:**  I think our client would be

11  opposed to that.

12        **MS. WEAVER:**  Yes, we understand the difficult position

13  you are in.

14                    (Laughter)

15        **THE COURT:**  All right.  So, Mr. Montgomery, I will

16  strongly recommend that -- internally as well to the extent it

17  can be done -- and really, you know, no judges should be

18  imposing deadlines for whatever between Christmas and New

19  Year's; right.  So you should be able to check out for that

20  time.

21      Okay.  Great.

22        **MS. WEAVER:**  Just to be clear, it was in our proposal

23  to end it on December 24th.  So we are fine with the

24  moratorium.

25        **THE COURT:**  It sounds like everyone is which is good.

1    Okay.

2              **MS. WEAVER:**  Yep.

3              **THE COURT:**  So the next issue is the named Plaintiffs'

4    data.  And here I actually am kind of confused because Facebook

5    suggested that there may not be any data other than what they

6    have already produced.  And then I don't understand why (video

7    freeze interruption.)

8              **MS. KUTSCHER CLARK:**  Right, Your Honor.

9         So, as we noted in our submission, we learned for the

10   first time in Plaintiffs' sur-reply brief on the named

11   Plaintiffs' data that what they are really seeking is only data

12   about the named Plaintiffs that was shared with third parties.

13        And for us seeing that in the sur-reply brief was a really

14   big aha moment because we had spent literally hundreds of hours

15   meeting and conferring about data that is never shared outside

16   of Facebook.

17        So now that we understand what they are really seeking is

18   the type of data that is actually shared or made accessible to

19   third parties, we have been taking a much closer look at what

20   would be responsive to that.  And as we currently understand,

21   what has been produced really does cover that universe.

22        But we obviously want to be a hundred percent sure that

23   that is correct, and we are talking about a 13-year period, so

24   it is a very long time.

25        So we have been conducting a very careful investigation

1    within the company to be a hundred percent sure that the

2    materials produced to date reflect the full scope of any data

3    that could have been shared or made accessible to third parties

4    about the named Plaintiffs since 2007.

5         And if we do come across anything additional, we will

6    obviously report that to Plaintiffs and discuss a production

7    format with them, but to date we have not come across anything

8    that has not been produced already that could have even

9    potentially been shared with third parties.

10        **MR. LOESER:**  Your Honor, if I may, I think there will

11   probably be multiple comments in response to that statement.

12   That makes no sense to us at all.

13        First of all, the question of their brief, which they

14   quote in their statement, talks about information, in fact,

15   shared.  And what our brief said in our reply was information

16   shared or made accessible.

17        And we were very careful to use that language, "made

18   accessible," because Facebook has said for a long time that it

19   doesn't keep records of what it actually shares, which seemed

20   hard to believe to us.

21        But in order to avoid a semantic game, we also included

22   the reference to "made accessible" because whether it was

23   shared, whether they have records of it, if it was put in a

24   place or utilized in a way where third parties had access to

25   it, that substantially expands the universe of potential

1    information.

2        Also, as, Your Honor --

3        **THE COURT:**  That's what I heard Facebook just say.

4    They agree.

5        **MS. KUTSCHER CLARK:**  Yeah.

6        **THE COURT:**  It is made accessible, not just shared.

7        **MS. KUTSCHER CLARK:**  Yes.

8        **MR. LOESER:**  Then, perhaps, we need some clarification

9    on what they interpret "made accessible" to mean because it

10   doesn't mean the same thing as actually shared.

11       And so if we could hear clearly from Facebook that they

12   agree with that, that would be helpful.

13       Second, the nature of the information that Facebook was

14   ordered to produce is such that it is impossible to believe

15   that there isn't information that exists.

16       We are talking about entirely distinct categories of

17   information from what they have produced.  They have produced

18   the information that users post.  As Your Honor well knows,

19   what they didn't produce was all the information collected

20   from -- off platform activities and inferred from and about on

21   and off platform activity.

22       And it is, frankly, just impossible for us to believe that

23   while the universe of potential discoverable information was

24   expanded threefold, actually, there isn't anything that fits

25   those categories, categories which were derived from our review

1   of Facebook's production to see what else do they do and what

2   else do they do with it.

3         So it just -- it just seems baffling to me that after all

4   of this fighting and all their effort to keep us from getting

5   this information, they are now coming back and claiming it

6   doesn't really exist.

7               **MS. KUTSCHER CLARK:**  Your Honor --

8         **MS. STEIN:**  So, Your Honor, respectfully, we are not

9   doing anything to prevent Plaintiffs from getting information.

10        We spent months dealing with Plaintiffs taking the

11  position that even if the data was in a black box that was

12  inaccessible to anyone, that they would want to know what was

13  in that black box.  So they did a complete 180 in their

14  sur-reply brief.

15        Leaving that aside, we are trying to figure out whether

16  there is anything else to be produced.  The inferences that

17  Mr. Loeser just mentioned -- Facebook does not share or make

18  accessible inferences with third parties, period, full stop.

19        Those inferences are the way that Facebook has its

20  business model.  It uses those inferences to run its business.

21  It does not sell those inferences.  It doesn't share those

22  inferences.  It does not make them accessible.

23        That is why companies come to Facebook and ask Facebook to

24  help with targeted advertising because we, Facebook, will not

25  share those inferences with anyone.  That would destroy

1    Facebook's business model.

2         **MS. WEAVER:**  So, if I may, we have received no

3    production of data Facebook receives from third parties.

4         We have received no inferred data.  And this is the

5    semantic game that Facebook has played since the beginning that

6    analysts and governments have challenged.

7         Facebook says:  We do not sell your data.  And it may be

8    true that they don't put it in a box and hand the data over the

9    way you do a widget.  They do sell inferences.

10        And what we need to know is how our clients were targeted

11   based on the amalgamation and analysis of all the data that

12   Facebook is pulling from everywhere.  So we want the inferred

13   data.

14        I want to know if I have been targeted as a 50-year-old

15   woman in Oakland as having a higher insurance risk or a

16   different financial risk.

17        That is how Facebook makes its money, and they have

18   refused to be transparent about this all around the world.  But

19   we are in this lawsuit.  They keep telling us they don't

20   make -- and this ties back to the revenue argument.

21        Let us see how they make their money.  Maybe they are

22   right.  But all we have been doing is fighting with the

23   lawyers.  It is time for evidence.

24        We would love a 30(b)(6).  We would love documents.  We

25   would love data.  All we have been getting right now is sitting

1    in Facebook Zoom meet-and-confers and positions.   And we are

2    ready for the evidence.

3             **MS. KUTSCHER CLARK:**   Your Honor, I have two quick

4    responses.

5             **MR. KO:**   Your Honor --

6             **THE COURT:**   Let's let Ms. Kutscher go.

7             **MR. KO:**   Okay, Martie.

8             **THE COURT:**   We can't hear you -- at least I can't hear

9    her.

10            **MS. KUTSCHER CLARK:**   Can you hear me now?   I'm

11   speaking more loudly.   Okay.

12       First of all, this case is not about targeted advertising.

13   Judge Chhabria said very clearly in his Motion To Dismiss order

14   that the case is not about targeted advertising.   Plaintiffs

15   conceded that the case is not about targeted advertising in the

16   briefing on this issue.

17       In terms of the inferences, the off-Facebook activity, it

18   is not correct that none of that information has been produced.

19       The information we produced previously includes thousands

20   and thousands of pages of users off-platform activity.   It also

21   includes massive lists of user's interests that Facebook has

22   derived from their activity on and off the platform.

23       During the briefing Plaintiffs were asking for more of

24   that information.   They were asking for information the

25   Plaintiffs are not able to see themselves that Facebook might

1   have in those categories.

2        What we have been doing is trying to find out -- and we

3   have conducted extensive, extensive investigations at Facebook

4   to understand whether there is any additional information in

5   any of those categories that could have potentially been made

6   available to a third party in any way, shape or form.

7        And the answer we are repeatedly getting is no.  What has

8   been produced represents the universe of what could have been

9   made available in any way to a third party.

10       But, again, we are continuing to conduct this

11   investigation because we want to be a hundred percent sure, and

12   that is what we are working on.  But, in the meantime, we have

13   not come across any type of information that is ever made

14   accessible; has ever been made accessible that is outside what

15   has already been produced.

16       **MS. WEAVER:**  Your Honor, we view this as them trying

17   to re-litigate an order that you already issued in Discovery

18   Order Number 9.

19       The scope of the case is whether private information sent

20   in voice -- let's say Facebook Messenger was used and

21   amalgamated with our information to target the Plaintiffs and

22   either --

23       **THE COURT:**  No, no, no, no.  I don't think so.  I

24   don't think so; right.  This is -- this came from Cambridge

25   Analytica and that they had access to information.

1          **MS. WEAVER:**  Right.

2          **THE COURT:**  Right.

3          **MS. WEAVER:**  Right.  And they used it to -- they

4    targeted lazy liberals to stay home and not vote in the

5    election.  This is exactly Cambridge Analytica.  They drew

6    inferences about people and crafted messages to them to get

7    them to stay home.

8          Or it recently came out that 3.5 million African Americans

9    were targeted with message to influence their voting behavior.

10   This is squarely within Cambridge Analytica, and this is

11   exactly the case.

12         So people need to understand how they are being --

13         **THE COURT:**  What did you mean in your sur-reply by

14   "shared"?  I guess that's the question.

15         **MS. WEAVER:**  Or reasonable made accessible.  Yeah, I

16   mean, that's -- the issue is --

17         **THE COURT:**  What is -- to the point, what does "made

18   accessible" mean?

19         **MS. WEAVER:**  Right.  So I -- I'm Cambridge Analytica,

20   and I want information so that I can target individuals who I

21   think will respond to my messaging in an election.  And our

22   nine named Plaintiffs, many of them feel they were targeted in

23   this way.

24         So Facebook ran its algorithm based on all of the data

25   that it had, and it didn't separate the private and the

```
 1   public -- at least Facebook has never even taken that position

 2   in this case -- and said:  Here are the people.

 3        So they are targeting, and we want to see --

 4        THE COURT:  Have they provided the named -- the names

 5   of those people?

 6        MS. WEAVER:  No.  They just allowed the messages to go

 7   through to them, so they are targeted.

 8        THE COURT:  So Cambridge Analytica didn't have that

 9   information then?

10        MS. WEAVER:  Cambridge Analytica also got data but

11   also targeted them.  It's both.

12        THE COURT:  Okay.  And so it is the data that

13   Cambridge Analytica then got?

14        MS. WEAVER:  That's a piece of it, and it is also how

15   they are targeted going forward.

16        What we don't know is what the business partners and --

17   that is a separate -- Cambridge Analytica got it through an

18   app, through Kogan's app.

19        But what is also going on is the data sharing -- which the

20   business partners and the white listed apps -- and we are not

21   getting the data that they have on the Plaintiffs.  We don't

22   have one shred of data.  All we have is this, you know, the

23   actual platform activity.

24        So we need -- what we would really like is to take some

25   evidence on this, Your Honor, because --
```

1          **THE COURT:**  You mean the 30(b)(6)?

2          **MS. WEAVER:**  That would be great.

3          **THE COURT:**  Well, I think that is probably where we

4    are at now.  I think --

5          **MS. WEAVER:**  That would be great.

6          **THE COURT:**  I think there is this disconnect, right,

7    or disbelief -- I guess I should say more than disconnect -- as

8    to how Facebook operates.  And so we just need somebody under

9    oath saying:  No, this is how it operates.

10         **MR. KO:**  Your Honor, just one last thing on this --

11   not to belabor the point -- I wish I could share my screen

12   right now.  I'm looking at Facebook's data use policy right now

13   in the section that says "information that we share."

14        And included in that category are sharing with third-party

15   partners, and that includes partners who use Analytica

16   services, measurement partners, partners offering goods and

17   services in our products, advertisers, vendors and service

18   providers, researchers and academics, law enforcement or

19   pursuant to legal request.

20        So they, by their own admission in public and pursuant to

21   their data use policy, talk about the information that they

22   share --

23         **MS. WEAVER:**  Share.

24         **MR. KO:**  -- with third parties.  So I know Ms. Stein

25   said full stop, they don't share anything.  That's --

1          **THE COURT:**  No, no, no, that's not what she said.

2    What she said is they produced what they shared, not that they

3    don't share anything.

4          **MS. WEAVER:**  But that's not --

5          **MS. STEIN:**  I said that we don't share inferences.

6          **MS. WEAVER:**  All we had was a subset of user's

7    platform activity.  I'm sorry, Deb.

8          **MS. STEIN:**  I said we don't share inferences.  That is

9    what I said.

10         **MS. KUTSCHER CLARK:**  Your Honor, I think a big piece

11   of what is getting lost here is third parties frequently draw

12   their own inferences, and that might have been what happened in

13   Cambridge Analytica.  We know that happens in other settings.

14      So Facebook shares various categories of information, and

15   third parties might use that information in different ways.

16   They might combine that with information they have.  We don't

17   have visibility into that.

18      But once the information is shared, third parties might

19   use it to form their own conclusions; but that's not

20   information we would have.

21         **MS. WEAVER:**  But we don't even have the data that

22   Cambridge Analytica got; right?

23         **THE COURT:**  I don't know.  Is that true?

24         **MS. KUTSCHER CLARK:**  I believe you do because

25   Cambridge Analytica only received data that Kogan was able to

1    access through his app and what --

2         **MS. WEAVER:**  Can you identify to us by Bates number

3    which documents those are because I don't believe we have that.

4         **MS. KUTSCHER CLARK:**  That's not the way the materials

5    have been produced.

6         What we have produced is the universe of data that could

7    have been made accessible to third parties.

8         We did not produce nor was there a request specifically

9    for information requested by Kogan.

10        **MR. LOESER:**  So, Your Honor, just -- this is an

11   interesting discussion, and I think Your Honor has rightly

12   identified that the parties, frankly, are just -- these are

13   lawyers talking about things that -- we need evidence.  A

14   30(b)(6) is an excellent idea.

15        We just don't believe how -- their description of what is

16   or is not shared or made accessible.  We need to put somebody

17   under oath and have them testify about that.

18        The documents that we have seen in their production that

19   describe their practices talk about sharing; talk about

20   absorbing off-platform activity; talk about sharing inferences.

21        The ADI investigation where they sent their own

22   questionnaires out to apps asked the apps to identify any

23   information that was obtained from Facebook and inferences

24   drawn from it.

25        And so there is a huge disconnect between what we think is

1    going on and the way they are describing.  The real virtue of

2    someone under oath testifying is that we can get through the

3    semantics and just figure out really what happened.  So I do

4    think that you are right; that it is time to do that.

5         Facebook can read your order.  They know what they are

6    supposed to do.  I assume they are going to go out and comply

7    in good faith with that order.  And the sure test to whether

8    that happens or not is when we get somebody under oath and they

9    testify about what exists and what doesn't exist.

10        **THE COURT:**  Why shouldn't we do that?

11        **MS. KUTSCHER CLARK:**  Your Honor, I would respectfully

12   request that before we move into a deposition, that we have the

13   opportunity to complete our investigation because we are

14   working through that right now because, again, we want to make

15   sure that what we understand is correct.

16        And obviously to even prepare a 30(b)(6) deponent, we

17   would need to complete that sort of investigation.  And I think

18   it is going to take some more time.

19        Again, we are talking about a 13-year period, and data was

20   shared in different ways with different source of third parties

21   over that period.  And this is a pretty large historical

22   exercise to look into.

23        **THE COURT:**  Right.  But I don't know why we can't -- I

24   mean, you are doing that -- but get something on calendar and

25   the Plaintiffs can draw up their questions, right, because that

1    is going to take some while, no doubt --

2                            (Laughter)

3          **THE COURT:**  -- to negotiate.  And this isn't

4    everything.  This is just, like, let's just figure it out.

5    Like, this is a big -- this is another big issue in the case.

6    We have this disconnect.

7          Let's just figure out:  How do they use this data?  How is

8    it shared?  What do they mean by "made accessible?"

9          Maybe you limit it to a time period, so you don't need to

10   complete the whole thing; right.  I mean, the time period that

11   we are most interested in -- or at least the first one -- is

12   the Cambridge Analytica.  That is how the whole case got here.

13         So what you do is start with a limited time period, and

14   that would probably --

15         **MS. WEAVER:**  We could do that, Your Honor, 2012 to

16   2016 or 2017.

17         **THE COURT:**  Much easier to prepare your witness on.

18   You can then focus your investigation on that.  We are just

19   going to take it in chunks, I guess, in a way.

20         Let's do that because I think we are -- yeah, I keep

21   hearing arguments.  Let's get -- let's get a witness in there.

22         So what I would like you to do is:  Plaintiffs, you should

23   work on that notice.  It is not an everything, all, whatever.

24   This is -- let's just figure out --

25         **MS. WEAVER:**  Targeted.

```
1              THE COURT:  Targeted disagreement, limited period of
2     time.
3              MS. WEAVER:  We propose maybe Thursday, January 14th,
4     or Friday, January 15th, for the data, 30(b)(6) and --
5              THE COURT:  I don't want to talk to you guys -- I
6     don't want to do that right now.  You guys do that.
7              MS. WEAVER:  Okay.  We will work it out.
8              MS. STEIN:  I also really -- respectfully to
9     Ms. Weaver's point of getting something on calendar -- we need
10    to know what the topics are.  We need to agree on the notice
11    and the subject --
12             THE COURT:  I agree with that.  I was thinking early
13    February especially since we have that five days in there.
14             MS. WEAVER:  Fine.
15             THE COURT:  You need to give them notice first.
16             MS. WEAVER:  Fine.  We will do that.
17             MR. LOESER:  I think we should maybe have a schedule
18    for when the notice should be completed or else I can see this
19    dragging out forever.
20             THE COURT:  So that's up to you.  What would you like
21    your deadline to be?
22             MR. LOESER:  Why don't we take, folks, seven days
23    enough to draft our notice?
24             MS. WEAVER:  Yes.
25             THE COURT:  And, perhaps, Facebook can respond within
```

```
1   seven days with adjustments if this falls on New Year's Eve,
2   which it probably does.  So maybe add a few more days there.
3   But I think that's plenty of time to negotiate this targeted
4   notice.
5          MS. KUTSCHER CLARK:  Your Honor, I'm just looking at
6   the calendar quickly.  If Plaintiff took seven days to give the
7   notice, that means Facebook would have to respond over the
8   holidays even if we had two weeks to respond.
9          THE COURT:  So extend that.
10         MS. KUTSCHER CLARK:  So I think we would need until at
11  least early January, probably the second week in January, to
12  respond if we are not going to interfere with people's
13  holidays.
14         MS. WEAVER:  So maybe January 11th, Martie?
15         THE COURT:  That's what I was going to suggest.
16  January 11th.
17         MS. KUTSCHER CLARK:  So we would get the notice on the
18  16th?
19         THE COURT:  By the 16th.
20         MS. KUTSCHER CLARK:  And respond by the 11th?
21         THE COURT:  Yeah.
22         MR. KO:  Well, why don't we -- maybe I'm speaking out
23  of turn on my side -- but why don't we give ourselves a little
24  more time to put together the notice then if -- you know, one
25  week from today, we could -- I'm thinking maybe Friday, the
```

1  Monday after that?

2          **MR. LOESER:**  Why don't we take ten days, and then it

3  balances out a little bit.  That's fine.

4          **THE COURT:**  Well, let's see.  So if you gave it to

5  them by the 18th.

6          **MR. KO:**  The 18th.

7          **THE COURT:**  Right.  Then we have two weeks of the

8  holidays.  One week is going to be a non-working week, and

9  there are five days in there.

10     Does the 11th still work for that with Facebook or how

11  about until the 13th?

12          **MS. KUTSCHER CLARK:**  Yeah.

13          **THE COURT:**  This is your initial response, right, your

14  initial response.  So I think the 11th.  That gives you the

15  entire week of the 4th.

16          **MS. KUTSCHER CLARK:**  Okay.  I think it would be

17  helpful to have a little bit of guidance on the scope of this

18  and what the topics would be, which would hopefully help to

19  limit the number of disputes that might arise.

20     As we understand, the topics should be limited to the

21  sharing or accessibility of user data during the 2012 to 2016

22  time period; is that right?

23          **THE COURT:**  Yeah.  The topic is -- we went through

24  this long motion on this production and the off-platform and

25  what was covered by Judge Chhabria.  Issued the order.  And now

1   it is like we already produced everything, whatever.  It is to

2   figure out that question.  It is to figure out that question.

3          **MS. WEAVER:**  We would view it as what is responsive to

4   Discovery Order Number 9, Your Honor.  That is how we would

5   frame --

6          **THE COURT:**  That's that order; right?

7          **MS. WEAVER:**  Exactly.

8          **MR. KO:**  The three categories they identified, Judge

9   Corley --

10         **THE COURT:**  Discovery Order Number 9, perfect.

11         **MS. WEAVER:**  Exactly.

12         **THE COURT:**  Limited to discovery --

13         **MS. KUTSCHER CLARK:**  Could I just ask a clarifying

14  question because I think the parties have had a little bit of a

15  disconnect here.

16     We read Discovery Order Number 9, particularly in light of

17  Plaintiffs' briefing, to relate only to data that was shared or

18  otherwise made accessible, as Mr. Loeser puts it, to third

19  parties and is not generally about all of the data in those

20  categories that Facebook has ever collected.  It is about what

21  was shared.

22         **THE COURT:**  This is a 30(b)(6) to figure out what

23  Facebook does.  So now no doubt the deponent will talk about

24  information that they collect but don't share; right.

25     And then we will talk about whether that is responsive or

1    not.  This is so the Plaintiffs can figure out this is what

2    Facebook does.

3        This is to sort of to verify the representation that yes,

4    we collect this information -- inferential data, but it is not

5    made accessible to third parties.

6        So they would have to talk about it; right?  They would

7    have to talk about that.  And if it is not made accessible,

8    then what do they do with it?

9        **MR. LOESER:**  Your Honor, we really need a

10   clarification because I think it does avoid another huge

11   semantic game over what "made accessible" means.

12       And so I think that is the right way to go.  I think that

13   will allow us to understand what is the information and what

14   did you do with it.  That's --

15       **THE COURT:**  Okay.  All right.  So the next topic was

16   the privacy settings data.  I don't know what to do -- to say

17   about that.

18       **MS. WEAVER:**  Your Honor, Leslie Weaver on behalf of

19   the Plaintiffs.

20       So we -- this is the issue.  What has been produced to us

21   is not the way the data exists on the platform.  And so when

22   there is a post, normally I can restrict it to my friends Deb

23   and Martie, and you can see that.

24       And they have asked us to identify what, you know, we

25   contend is really at the heart of the case, which to us is what

was intended for restricted audiences.

And we can't do that in the format that they produced it. This is again the Facebook platform activity.  They produced it without consulting us as to format, and we just need to get -- we just need that information.  It is obviously at the heart of the case.

We are doing the best that we can to respond to their interrogatories with our own information.  Like, we can see Facebook Messenger messages are restricted, so we have identified those; and we are talking extensively with the named Plaintiffs.  They have been doing a lot of work, but we can't identify the posts right now because we can't see how they were restricted.  It's that simple.

**THE COURT:**  I guess one question I have for Facebook, I thought one potential argument you had was that the Plaintiffs did not restrict their data.  You know, so it wasn't private data.  Is that right?

**MS. KUTSCHER CLARK:**  Your Honor, that might be true of certain data.  The bigger issue for us is that Plaintiffs are suing Facebook alleging that Facebook shared their, quote-unquote, sensitive information.

And we have asked them to tell us what information they think is sensitive.

They have told us they can't do that unless we produce a version of their accounts that shows next to each item on their

1    account what the privacy setting was.

2        We have looked into this extensively, and Facebook

3    accounts are not made for production in litigation and simply

4    can't be produced in that format.

5        As I understand, to produce a Facebook account in the

6    format Plaintiffs are asking for it, we would actually need to

7    have engineers write new code.

8        To locate the privacy settings for individual items on an

9    account, someone actually has to manually click on every single

10   item and follow a link which will then display the privacy

11   setting.  It is not metadata.  It is not something that can

12   just be displayed next to the item.

13       Plaintiffs have access to their accounts, and they are

14   able to do that.  They can log into their accounts.  They can

15   look at the posts they are concerned about.  They can look at

16   any information on their account they are concerned about.

17   Click the link and see what the privacy setting is.

18       What they want is for one of us or for someone at Facebook

19   to click through every single item on their account -- and

20   there are hundreds of thousands of pages, many of which might

21   have 20, 30 items on them -- and then follow the link.

22   Screen-shot the pages and produce them back to them.

23       Again, this is something Plaintiffs can do.  We have

24   suggested that there might be a way to make it easier if

25   Plaintiffs would look at their accounts and tell us what

```
 1   information they are concerned about.
 2        The accounts include all sorts of stuff.  They include
 3   restaurant reviews, newspaper articles, cartoons, stuff that is
 4   not conceivably sensitive.
 5        If they would tell us what information they think is
 6   sensitive -- and this was one of their interrogatories -- we
 7   could maybe take this limited list or a more targeted list of
 8   posts and pull it for them, and we would be willing to do that.
 9        But what doesn't make sense is to have Facebook have an
10   engineer or someone else click through hundreds and hundreds of
11   thousands of pages of every single thing on the named
12   Plaintiffs' profiles to then follow links to the privacy
13   settlings when presumably Plaintiffs have a sense of what they
14   thought was sensitive when they alleged that Facebook shared
15   their sensitive information.
16             MS. WEAVER:  I can respond to this, Your Honor.
17             THE COURT:  Yes.
18             MS. WEAVER:  We have identified categories.  What it
19   seems Facebook wants us to do and what their interrogatories
20   asked was us to identify by Bates number in what they produced
21   what is sensitive by actual -- each post.
22        So we have begun the process of going through that, but
23   here is the disconnect:  They produced a snapshot in time of
24   Facebook activity.  They want us now to go to evidence -- you
25   know, the Facebook -- users have not produced their own
```

```
 1    Facebook platform to Facebook because Facebook has it.

 2         I don't know how we would produce it to Facebook.  I can

 3    go with a Plaintiff and look right now at a post and find what

 4    is restricted there post-by-post.  And, of course, this would

 5    be millions or, perhaps, billions of posts.  But that's fine.

 6    This case is a lot of work.

 7         But that privacy restriction today may not be the same

 8    privacy restriction that is in the snapshot in time that they

 9    produced.

10         So we have given them examples.  And I don't even know how

11    to get that into evidence because that privacy restriction that

12    they are looking at online hasn't been produced at all.  This

13    is -- this is the conundrum.

14         We have given them examples, examples of health and

15    medical information, private information about families.

16         They will depose these people.  These people will explain

17    what they thought was private.  And we will do whatever work

18    Your Honor tells us to do, and we are engaging in this subset

19    of a subset review right now to honor that.

20         But at the end of the day, that is not going to be the

21    basis of our claims.  That is not the evidence we are going to

22    present at trial, and it's convoluted.

23         I would just say:  Let's wait until they -- we can see

24    everything.  And the other thing is, this response will also be

25    informed once we get all the data on the nine named Plaintiffs
```

```
 1    in Discovery Order Number 9.
 2         We have given them interim responses but it will change.
 3    Once these Plaintiffs understand everything that Facebook has
 4    collected about them, their responses to these questions are
 5    going to look very different.
 6              MR. LOESER:  Your Honor --
 7              MS. STEIN:  May I respond to that, Your Honor?
 8              THE COURT:  Yes.  Go ahead, Ms. Stein.
 9              MS. STEIN:  So respectfully, you know, Plaintiffs have
10    discovery obligations too.  Facebook has been working its tail
11    off.  We have provided almost 500 pages in interrogatory
12    responses.  We are reviewing millions of documents here.
13         When we originally served RFPs, you may recall Plaintiff
14    said:  We don't want to do this as RFPs.  Serve
15    interrogatories.
16         We served interrogatories.  We gave them lots of extra
17    time.  We literally got one page of substantive responses back
18    to our interrogatories.  What we are asking about is
19    information about Plaintiffs' allegations.  What is the
20    sensitive information?
21         Plaintiffs have all of this at their -- in -- in their
22    possession, custody and control.  They know in their heads --
23    we can't figure out what they thought was sensitive; what they
24    alleged to be was sensitive.  That is exclusively in Plaintiffs
25    custody and control.
```

1    And what we need to know here -- and what Plaintiffs have

2   an obligation to do -- is to sort through their information,

3   tell us what was sensitive.  They didn't want to do this by

4   producing.  We produced everything for them that was in their

5   accounts.

6    They now want us to click through news articles, other

7   things that they are posting and provide every privacy setting.

8   We are not asking about the privacy setting.  That's not what

9   we asked.

10    We asked what was the sensitive information, and

11   Plaintiffs said:  We don't know what was sensitive.  It depends

12   on whether it was marked private.  That's not true.  What was

13   sensitive would be a subset of it.

14    Not everything that is marked private is sensitive.

15   People repost other people's posts.  They put up restaurant

16   reviews, newspaper articles.  That may be all marked private,

17   but that's not the sensitive information that matters here.

18    It is critically important that Plaintiffs do their

19   obligation in discovery and not keep pushing everything onto

20   Facebook to do.

21    **MR. LOESER:**  Your Honor, just very briefly, I think

22   again, we are just kind of having a practical problem; and a

23   30(b)(6) may be helpful here as well.

24    The practical problem is Facebook maintains data.  They

25   have a platform for users to post things, and they produced a

1   bunch of information but not in the format in which it is kept.

2        The practical problem is:  Is it possible for them to

3   produce the information in the format in which it is kept as a

4   result of which the Plaintiffs can easily respond to their

5   discovery requests.

6        **THE COURT:**  Well, can I just ask you first, though,

7   why do the Plaintiffs need -- I mean, if the answer to the

8   interrogatory is anything that was marked private or was

9   restricted in some way is sensitive, then say that.

10       **MS. WEAVER:**  We have, Your Honor.

11       **MS. LAUFENBERG:**  Your Honor --

12       **MS. WEAVER:**  Go ahead, Cari.

13       **THE COURT:**  Then that's one answer.  And then another

14   answer is -- and then you go through what the person

15   identified, regardless of what the privacy settings are; right.

16       Now, it may turn out that you identified something as

17   sensitive; but you didn't -- your client didn't use any privacy

18   setting.  Okay.

19       **MS. WEAVER:**  Here is the problem -- yeah, here is the

20   problem with that -- I mean, we will do whatever you order.

21   And if you want us to do that with this subset of information,

22   which, by the way, is not everything they have ever posted.

23       **THE COURT:**  I understand.  You can only do it on what

24   has been produced.  I understand.

25       **MS. WEAVER:**  Here is the issue:  I am an individual.

1   These are humans in the middle of a pandemic with jobs, and we

2   are asking them to go back and look through every post they

3   ever made on Facebook.  And we are going to have to ask them to

4   do that again which we will do.  That is what this case is

5   demanding.

6        I can't remember what I posted in 2007 or 2009.  And when

7   I look at the post, I can't remember if it was private to me

8   then or not.  If I looked and saw that I only shared it with

9   Cari, I would know oh, that is sensitive.  But they would be

10  guessing to say -- and we have given them examples of

11  categories.  Like I said, medical information, we can give them

12  categorical examples.

13       And for these Plaintiffs -- for some of them it is

14  political stuff.  Some of it is not.  They have different

15  comfort zones with what they shared.  We can go back and view

16  this, but --

17            THE COURT:  Are the examples tethered to the specific

18  posts?

19            MS. WEAVER:  Yes.  And we can --

20            THE COURT:  Ms. Stein is shaking her head no.

21            MS. WEAVER:  So we have given them categories of

22  messages, and we have told them we will give them examples and

23  we are amending further.

24            THE COURT:  So that's what you need to do.

25            MS. WEAVER:  Okay.

```
 1            THE COURT:  You need to -- like if you are -- you
 2   can't just say medical and health information.  What does that
 3   mean?
 4            MS. WEAVER:  Fine.  We can find examples.
 5            THE COURT:  Give them an example; right?
 6            MS. WEAVER:  Yes.
 7            THE COURT:  If it is the fact that I visited this or,
 8   you know, shared with my friend this website about this drug;
 9   right.  I mean, that is different; right.
10      So you need to tether it to examples.  And they just need
11   to answer to the extent they can.  That's all it is, is to the
12   extent they can do, based on what they have now.
13      What you have said is you can't figure out what the
14   privacy setting was in 2007.  Well, then, Facebook can't demand
15   that you base your answer based on that if you don't know what
16   it is.
17            MS. WEAVER:  Right.  Okay.
18            MS. STEIN:  And, Your Honor --
19            MS. WEAVER:  Thank you, Your Honor.  We will do that.
20            MS. STEIN:  We have never taken the position that
21   their answer should be tethered to privacy settings.  What we
22   have asked is what Plaintiffs in their allegations considered
23   to be sensitive and to identify the posts.
24      Now, back in 2007 you couldn't click -- you couldn't
25   individually identify individual posts by privacy setting.  It
```

1    was more -- more of a default for how you posted generally.

2    There weren't individual options when you posted something.

3        So, you know, respectfully having Plaintiffs just say:

4    Anything we marked private was also sensitive, I, frankly,

5    don't think is a good-faith answer to an interrogatory

6    response.  It is just saying everything -- if everything was

7    marked private in 2007, '08, '09 and so on, that includes, you

8    know, public information that they were posting or reposting

9    someone else's public post and it happened to be marked

10   private, that doesn't make it sensitive.

11       And I think that Plaintiffs have more of an obligation to

12   do an investigation in responding to interrogatories just the

13   way Facebook did; right.

14       I mean, Facebook when we drafted our 500-page response, we

15   spent hundreds, if not thousands of hours, you know, working on

16   those responses and conducting investigations.

17       Now, maybe we did too much.  And if we did too much, then,

18   you know, shame on us; and we will know that going forward.

19   But, you know, I do think that Plaintiffs have an obligation to

20   tell us what is sensitive and not just say:  It was under our

21   privacy setting; ergo it was sensitive.

22            **THE COURT:**  It would obviously have to be more

23   specific.  Look, they are going to amend their responses.  They

24   will be as robust as they can.  I don't think you can expect

25   them to identify every single one that is on there, but it

```
 1   should be pretty robust, right, and tethered to actual posts;
 2   right.
 3        Like political posts, that is what Cambridge Analytica is
 4   about, sensitive information.  Here is examples of posts that I
 5   never expected would be made accessible to third parties.
 6        MS. LAUFENBERG:  Can I offer -- this is Cari
 7   Laufenberg on behalf of Plaintiffs.  Can I offer one additional
 8   informative overlay, which is:  The way that this information
 9   has been produced, it is completely uncontextual.
10        So, in other words, you get information by category.  And
11   so what we see are a long laundry list of posts that our
12   clients made, but you don't see what they are made in response
13   to.
14        So, again, that is making our jobs very difficult here.
15   We are being incredibly diligent.  We have produced hundreds of
16   pages in response to these interrogatories.  We are continuing
17   to work.  We will amend.
18        We can only work with what we have been given, and what we
19   have been given is incredibly limited and makes it a tortuous
20   task for our clients.
21        So we need to have contextual information in order to
22   assess the sensitive -- whether this is sensitive information.
23        MS. WEAVER:  We are not sure that the responses will
24   be accurate because -- and that puts us in an impossible
25   situation.  It is not that we are not willing to do the work.
```

1   It is that we don't know how to get the answers right.

2        **MS. STEIN:**  Yeah.  We would certainly be open, if

3   Plaintiffs wanted to, you know, reprint something, you know, if

4   they don't like the format.

5        And, by the way, we reproduced their accounts in response

6   to requests that we provide things in a different format.  We

7   already went through that exercise once.  But if it is easier

8   for Plaintiffs to print things out, you know, from their own

9   account and do it that way, we are totally open to Plaintiffs

10  using it that way instead of pointing to documents that have

11  already been produced by us.

12       **MS. WEAVER:**  Maybe we can make some progress, Deb.

13  Can I ask this:  Does Facebook maintain the limited audience

14  information on the nine Plaintiffs' posts and activity?  And if

15  so, can you produce that to us?

16       **MS. KUTSCHER CLARK:**  The only way to do it is to go to

17  the live website and on the live website click each individual

18  post and follow a link to see the setting.

19       And that's what we have been trying to convey.  The only

20  other way we could even produce the account information --

21  I believe we have discussed this previously -- is to produce

22  back to you guys a live link of the Facebook accounts which is

23  what your clients already have.

24       **MS. WEAVER:**  So how did Facebook --

25       **MS. KUTSCHER CLARK:**  And none of that would be Bates

1  numbered.

2          **MS. WEAVER:**  Let me just ask --

3          **THE COURT:**  I'm going to have to stop you.  I have to

4  go at 11:00.  We have, like, two minutes.  So we can't do this.

5  You guys just have to figure this out.  So there is a couple of

6  others things --

7          **MS. WEAVER:**  We will.

8          **THE COURT:**  -- I want to address.  On the additional

9  custodians, Mr. Zuckerberg, Ms. Sandberg, I think you should

10  wait until all the documents are produced.  Those will be very

11  targeted once -- so I don't see any problem waiting for that.

12      On the voluntary dismissal of the named Plaintiffs, it is

13  without prejudice; and they don't have to agree.  Well, look,

14  it happens all the time that a judge will deny class cert based

15  on the adequacy of the named Plaintiff.

16      And if the Judge gives the named Plaintiff the opportunity

17  to put forth a new named Plaintiff, then they have that

18  opportunity.  We are not cutting that off now.

19      It is not depriving Facebook of any discovery because if

20  those people are put up later, then they get the discovery as

21  to those named Plaintiffs.

22          **MS. STEIN:**  Your Honor, our issue in the

23  stipulation -- and I think, frankly, we worked through some of

24  this with Plaintiffs yesterday.

25          **THE COURT:**  Okay.

1      **MS. STEIN:**  We -- we are fine stipulating to the

2  dismissal of certain named Plaintiffs without prejudice to

3  their being in the class.  We don't want to waive any right in

4  there, and I think Plaintiffs said that they are fine; that we

5  don't need to.

6      What we were struggling with is that we don't -- if any

7  Plaintiff wants to drop, that's fine.  But they need to fish or

8  cut bait but that specific named Plaintiff because it's -- you

9  know, otherwise they should stay in case and, you know,

10  proceed; but they are supposed to be representatives here.

11      **THE COURT:**  No, no, no, I don't understand.  I think

12  that's where I disagree with you.

13      I think to get through the burden arguments and all that

14  and to make -- they narrowed the class reps they were putting

15  forward on the motion.

16      Should Judge Chhabria deny the motion and should he give

17  them the opportunity -- he may or may not.  He may not do it.

18  It is going to be up to Judge Chhabria to put forth different

19  class reps; right.  It could be these people.  It could be

20  somebody else.  I mean, presumably the ten they put up they

21  think are their ten best anyway.

22      No.  I don't think they have to -- I disagree with you.  I

23  don't think that's the case.

24      **MS. STEIN:**  Well, Facebook wants to preserve its

25  objections as to their being able to come back as named

1   representatives.

2          **THE COURT:**  Of course.  You can preserve -- what I'm

3   saying is nobody has to give away anything.  You can make that

4   argument.  What I'm saying is we are not going to hold this up

5   so that they agree with your argument.  You can preserve your

6   argument.  They can preserve their argument.

7          **MS. WEAVER:**  To be clear, a lot of these Plaintiffs

8   are disappointed, Deb.  I'm not kidding.  They want to be

9   deposed by you.  So --

10         **MS. STEIN:**  You know --

11         **THE COURT:**  Well --

12         **MS. STEIN:**  We can arrange that, Leslie.

13         **THE COURT:**  No, no, no, Ms. Weaver.

14         **MS. WEAVER:**  Yes.

15         **THE COURT:**  Right.  When we get to our sort of absent

16  class member discovery -- I've had this come up in a few

17  cases -- they put forth, right, because the Defendants often

18  want to go beyond the named Plaintiffs and take a few -- the

19  first person they point to is -- they say:  This person was a

20  named Plaintiff.  It is not too burdensome on them.  I'm sure

21  Facebook would be happy to depose them.  So --

22         **MS. WEAVER:**  My co-Counsel is going to be mad at me.

23         **MR. LOESER:**  Your Honor, in the ten seconds that is

24  left, I do want to just make a point that is something that has

25  been pervasive which is a lot of arguments we have heard from

1   Facebook can be addressed by our better understanding of how

2   data is maintained.

3        So, for example, this whole issue of how they produced the

4   on-platform activity comes down to:  How does Facebook maintain

5   this data and can they produce it in a way that is in a native

6   format where we can answer their questions easily by looking at

7   the data instead of this sort of weird treasure hunt we have to

8   go on through live Facebook pages to try and match up with

9   their Bates productions?

10       I would suggest that of the 30(b)(6) topics that are

11  really critical here is one that is just focused on how data is

12  maintained for these various subjects.  We could avoid a lot of

13  fighting if we just had a better understanding of how the data

14  is maintained for these different areas that we keep arguing

15  about.

16       **THE COURT:**  And we tried getting experts together

17  months ago, months ago.  If you want to do it, put it in your

18  30(b)(6) and we will see --

19       **MS. STEIN:**  Well --

20       **MS. WEAVER:**  We tried that, Your Honor.

21       **MS. STEIN:**  We would strenuously object to that

22  because we went through months and months of informal ESI

23  discussions.  We have been down this road.  We have had all

24  these meet-and-confers.

25       The bottom line is Plaintiffs just don't believe us.  And

 1   we do all of this work as counsel to provide this information

 2   informally, and they just don't believe us.

 3        **MR. LOESER:**  Sometimes it is because our experts are

 4   telling us something very different.  We like you very much.

 5   It is not anything personal, Deb.  It is just when our experts

 6   tell us:  That is impossible that Facebook doesn't maintain

 7   this in a way that they can use it and easily access it.

 8       We just need -- it is no offense intended to anyone.  We

 9   just need evidence.  (Inaudible) can only go so far.

10        **MS. WEAVER:**  If you give us the verifications to the

11   interrogatories, we will know who at least is giving you the

12   information.  We can just depose them, but we have got to start

13   taking evidence.

14        **THE COURT:**  On the privilege log, can you submit a

15   stipulation by the 18th that was on the briefing, on the ADI?

16        **MS. WEAVER:**  Yes.

17        **MR. KO:**  Yes, Your Honor.

18        **THE COURT:**  I know that was Plaintiffs' proposal, so

19   I'm really asking Facebook.

20        **MS. STEIN:**  I think Martie --

21        **MS. KUTSCHER CLARK:**  What is the question, Your Honor,

22   about briefing?

23        **THE COURT:**  The briefing schedule on the ADI

24   privilege.  By the 18th, just stipulate to the briefing

25   schedule.

1        **MS. KUTSCHER CLARK:**  Your Honor, I don't think we will

2    be in a position to agree to a briefing schedule until we

3    receive Plaintiffs' challenges to the privilege log.  And this

4    is something we discussed extensively previously; that we need

5    to see what the challenges are.

6        We are going to need to meet and confer with them about

7    the challenges so that we understand the scope and nature of

8    what is being briefed before we set a schedule on it.

9        **THE COURT:**  Okay.  I have to go.  I have got the call.

10    So sorry.  I'm out of time.  I can't resolve that.  When is our

11    next conference, January what?  It is not going to be this

12    year.

13                        (Laughter)

14        **MR. LOESER:**  I'm guessing it is not the 1st.

15        **THE COURT:**  That is correct.

16        **MS. WEAVER:**  The 8th?

17        **THE COURT:**  The 8th?

18        **MS. STEIN:**  If we can make it the 15th, that would be

19    better on our end.

20        **THE COURT:**  The 15th at 8:30.

21        **MS. WEAVER:**  Works for us, Your Honor.

22        **THE COURT:**  Okay.  I will see you then.  I will do the

23    best I can after today.

24        **MR. LOESER:**  Thank you, Your Honor.

25                (Proceedings adjourned at 11:04 a.m.)

---oOo---


### CERTIFICATE OF REPORTER

        We certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Thursday, December 10, 2020


_____

                Marla F. Knox, RPR, CRR
                  U.S. Court Reporter

# EXHIBIT D

## Chin, May

| | |
|---|---|
| **From:** | Matthew Melamed <mmelamed@bfalaw.com> |
| **Sent:** | Monday, December 6, 2021 10:45 AM |
| **To:** | Snyder, Orin; Stein, Deborah L.; Falconer, Russ; Kutscher Clark, Martie; Mumm, Laura C. |
| **Cc:** | Derek Loeser; Cari Laufenberg; David Ko; Chris Springer; Benjamin Gould; Lesley Weaver; Anne Davis; Josh Samra; Angelica Ornelas |
| **Subject:** | RE: In re Facebook |

[WARNING: External Email]

Counsel,

We're reaching out again regarding the email below, concerning whether the Named Plaintiffs may review documents Facebook has marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."  Please provide us the courtesy of an answer today.

Thanks,
Matt

---

**From:** Matthew Melamed
**Sent:** Wednesday, December 1, 2021 2:37 PM
**To:** Snyder, Orin <OSnyder@gibsondunn.com>; Stein, Deborah L. <DStein@gibsondunn.com>; Falconer, Russ <RFalconer@gibsondunn.com>; Kutscher Clark, Martie <MKutscherClark@gibsondunn.com>; Mumm, Laura C. <LMumm@gibsondunn.com>
**Cc:** Derek Loeser <dloeser@KellerRohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; David Ko <dko@kellerrohrback.com>; Chris Springer <cspringer@kellerrohrback.com>; Benjamin Gould <bgould@KellerRohrback.com>; Lesley Weaver <LWeaver@bfalaw.com>; Anne Davis <ADavis@bfalaw.com>; Josh Samra <JSamra@bfalaw.com>; Angelica Ornelas <aornelas@bfalaw.com>
**Subject:** In re Facebook

Counsel,

It appears that the Protective Order, Dkt. No. 122, may be read to prevent Plaintiffs from sharing documents Facebook has marked "CONFIDENTIAL" with the Named Plaintiffs, and prevents Plaintiffs from sharing documents marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" with the Named Plaintiffs.  Because providing information to the Named Plaintiffs is important for a number of reasons, including preparing them for depositions, we request that Facebook agree that Plaintiffs may show documents Facebook has marked "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" with the Named Plaintiffs.

The Protective Order permits the disclosure of "CONFIDENTIAL" documents to "officers, directors, and employees" of the receiving party "to whom disclosure is reasonably necessary for this litigation" and who have signed the Acknowledgement and Agreement to Be Bound.  Dkt. No. 122 at 9.  Please confirm your understanding that the Named Plaintiffs are within that designation.  If you do not have that understanding, please let us know whether we have Facebook's permission to permit the Named Plaintiffs to review documents Facebook designated "CONFIDENTIAL."  *See id.* (providing that the designating party may "permit[] in writing" the disclosure of documents designated "CONFIDENTIAL").

The Protective Order does not include a provision permitting the Named Plaintiffs to review documents designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."  *See id.* at 10-11.  Please let us know whether we have Facebook's permission to permit the Named Plaintiffs to review documents Facebook designated "HIGHLY CONFIDENTIAL –

ATTORNEYS' EYES ONLY." *See id.* at 10 (providing that the designating party may "permit[] in writing" the disclosure of documents designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY").

Please provide your responses by Thursday, December 2.

Thank you,
Matt

Matthew S. Melamed
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
(415) 445-4003
www.bfalaw.com

# EXHIBIT E

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' INITIAL DISCLOSURES** |

Plaintiffs, by and through Co-Lead Counsel for Plaintiffs and the Proposed Class, make the following initial disclosures pursuant to Federal Rule of Civil Procedure ("Rule") 26(a)(1) with the following witnesses listed below.

## GENERAL LIMITATIONS AND EXCEPTIONS

The initial disclosures are made upon a good faith review of information reasonably available to Plaintiffs at this time. Plaintiffs reserve the right to modify, amend, or otherwise supplement these disclosures, pursuant to Rule 26(e), as additional information becomes available through formal and informal discovery and investigation. Additionally, Plaintiffs make these disclosures without waiver of attorney-client privilege, work product doctrine, or other applicable privilege or doctrine, and reserve the right to object to production and/or introduction into evidence any document within the categories described herein on the basis of privilege, relevance, materiality, confidence, or otherwise appropriate.

## I.        INITIAL DISCLOSURES

Subject to the foregoing reservations and exceptions, and without waiver thereof, Plaintiffs respond to the initial disclosure items under Rule 26(a)(1) as follows:

**A.     The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

**RESPONSE:**

Based on the information currently available to Plaintiffs, each of the individuals, facilities, or entities below is likely to have discoverable information that Plaintiffs may use to support their claims, along with the subject of such information. The individuals listed below are represented by Plaintiffs' counsel and should be contacted only through Co-Lead Counsel:

- Steven Akins (thaturmoil@gmail.com; steven.t.akins.3@facebook.com; stevenakins@hotmail.com)

- Jason Ariciu (jariciu@gmail.com; jariciu@att.net; jasedwa@facebook.com)

- Samuel Armstrong (armstrong9692@gmail.com; loveecheese@facebook.com)

- Rev. Anthony Bell (whfcmembers@verizon.net; newbellbackup@gmail.com)

- Bridgett Burk (missourichick@gmail.com; deletedsoul@gmail.com)

- Brendan Carr (brendan.m.carr3@gmail.com; bman03@sbcglobal.net; bcarr333@facebook.com)

- Terry Fischer (tlfischer975@yahoo.com)

- Shelly Forman (forman4227@gmail.com)

- Mary Beth Grisi (marybeth.cheslock@gmail.com; marybeth.cheslock@facebook.com)

- Tabielle Holsinger (belle123abc@gmail.com; belle.holsinger@facebook.com; tabielleholsinger@boisestate.edu; holsinger4clerk@gmail.com)

- Taunna Lee Johnson (briefspace@hotmail.com; taunnaj@facebook.com; taunna2008@yahoo.com; taunna@mail.com)

- Olivia Johnston (Ojohnston00@gmail.com; johns364@csusm.edu)

- Tyler King (damendesigns@aol.com; contact.tylerking@gmail.com)

- Ashley Kmieciak (ashleypierce1991@gmail.com; ashpierce24@facebook.com)

- William Lloyd (will.1@juno.com; 100008249950332@facebook.com)

- Rev. Ian Miller (rev.ianmiller@yahoo.com)

- Jordan O'Hara (zapj080@aa.edu; ohara@uoregon.edu; jordan.ohara11@gmail.com; cavalierofcarnage@gmail.com; jordan.ohara.92@facebook.com)

- Kimberly Robertson (kimee98@comcast.net; kimberly.robertson.129@facebook.com)

- Scott Schinder (scottschinder@gmail.com; scottschinder@facebook.com; sschinder@nyc.rr.com; scottschinder@aol.com)

- Cheryl Senko (cherylsenko@att.net; cheryl@mayfieldcollisioncenter.com; cheryl.senko@facebook.com)

- Dustin Short (short109290@gmail.com; dustinshort82185@yahoo.com)

- Tonya Smith (tonyasmith_74@yahoo.com; tonyaranismith@facebook.com)

- Charnae Tutt (idontcharba@gmail.com; ctuttking@gmail.com; mrstuttmccladdie@gmail.com; king_lukemccladdie@live.com)

- Juliana Watson (juliana0404@hotmail.com)

These individuals likely will have information regarding the content and information they provided to Facebook; regarding their communications, including but not limited to correspondence, with Facebook; and/or regarding injury they incurred as a result of Defendants' failure to properly protect Facebook users' content and information from misuse or unauthorized access.

Further, Plaintiffs anticipate that current and former agents of Defendant Facebook will have discoverable information to the extent they have knowledge regarding Facebook's relationships with business partners and apps, including the identity of these third parties, what content and information these third parties accessed, whose content and information was accessed, how that content and information was used, and whether Facebook had notice of its use; Facebook's security practices, including what actions Facebook took or omitted to control how third parties accessed and used users' content and information; the monetary gain Facebook accrued from the access it allowed third parties; and relevant data-misuse or data-compromise events affecting Facebook. Such witnesses include Facebook current and former officers such as Chairman and CEO Mark Zuckerberg, COO Sheryl Sandberg, CFO David Wehner, and other Facebook officers and employees with the knowledge the relevant information discussed above.

Plaintiffs anticipate that current and former Facebook business partners and app developers may have discoverable information to the extent they have knowledge regarding

Facebook's relationships with business partners and apps, including the identity of these third parties, what content and information these third parties accessed, whose content and information was accessed, how that content and information was used, and whether Facebook had notice of its use; Facebook's security practices, including what actions Facebook took or omitted to control how third parties accessed and used users' content and information; the monetary gain Facebook accrued from the access it allowed third parties. Known business partners are listed at Plaintiffs' First Amended Consolidated Complaint ("Complaint") ¶ 484, and known app developers, including whitelisted apps, are listed at Complaint ¶¶ 506-510.

Current and former employees of any other third party entities, including government agencies, may have discoverable information to the extent they have knowledge regarding Facebook's relationships with business partners and apps, including the identity of these third parties, what content and information these third parties accessed, whose content and information was accessed, how that content and information was used, and whether Facebook had notice of its use; Facebook's security practices, including what actions Facebook took or omitted to control how third parties accessed and used users' content and information; the monetary gain Facebook accrued from the access it allowed third parties; and relevant data-misuse or data-compromise events affecting Facebook.

Plaintiffs also anticipate that the following non-prioritized Defendants may have discoverable information:

- Stephen Kevin Bannon | 840 N. Lexington St., Arlington, VA 22205
- Aleksandr Kogan (a/k/a Aleksandr Spectre) | 1285 Main St. Apt. # 312, Buffalo, NY 14209

Finally, Plaintiffs anticipate that current and former employees of the following unnamed Defendant and Non-Defendant Co-Conspirators are likely to have discoverable information:

- Cambridge Analytica LLC
- Cambridge Analytica Commercial LLC
- Cambridge Analytica Holdings LLC

- Cambridge Analytica Limited

- Cambridge Analytica (UK) Limited

- Cambridge Analytica Political LLC

- SCL Elections Limited

- SCL Group Limited

- SCL USA Inc.

- Global Science Research Limited

**B.     A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

**RESPONSE:**

Based on the information currently available to Plaintiffs, Plaintiffs may use the following documents currently in their possession, custody, or control to support their claims:

1.      Correspondence Facebook sent to Plaintiffs and the proposed Class notifying them about the misuse of their content and information relating to ThisIsYourDigitalLife ("TIYDL") and any other business partner and/or app developer;

2.      Documents regarding Facebook's policies and procedures during the proposed Class Period; and

3.      Documents regarding damages suffered by Plaintiffs and the proposed Class, including but not limited to actual or attempted identity theft, credit monitoring, related out-of-pocket costs, fraud reports, police reports, and correspondence regarding the same, as well as documents regarding Plaintiffs' efforts to mitigate, prevent, and address their damages.

To the extent such documents are not equally available to, or already in the custody of Defendants, Plaintiffs will begin producing these documents on a rolling basis, after an ESI protocol is agreed upon, and pursuant to the Protective Order entered in this action.

Plaintiffs expect that the majority of the documents supporting their claims are in the possession, custody, or control of Defendants.

C.   **A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

**RESPONSE:**

Plaintiffs seek damages pursuant to their privacy claims, breach of contract and unjust enrichment claims, negligence claims, as well as statutory damages.  The calculation of damages will likely involve expert analysis following Defendants' production of documents bearing on such issues.  Expert disclosures are governed by Rule 26 and damage computations will be exchanged pursuant to the Federal Rules and any case management order setting forth disclosure deadlines.

D.   **For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

**RESPONSE:**

Not applicable to Plaintiffs.

Dated: December 10, 2019                         Respectfully submitted,


KELLER ROHRBACK L.L.P.                     BLEICHMAR FONTI & AULD LLP

By:   */s/ Derek W. Loeser*                       By:   */s/ Lesley E. Weaver*
        Derek W. Loeser                                       Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)         Lesley E. Weaver (SBN 191305)
Lynn Lincoln Sarko (admitted *pro hac vice*)      Anne K. Davis (SBN 267909)
Gretchen Freeman Cappio (admitted *pro hac vice*) Joshua D. Samra (SBN 313050)
Cari Campen Laufenberg (admitted *pro hac vice*)  555 12th Street, Suite 1600
Benjamin Gould (SBN 250630)                       Oakland, CA 94607
1201 Third Avenue, Suite 3200                     Tel.: (415) 445-4003
Seattle, WA 98101                                 Fax: (415) 445-4020
Tel.: (206) 623-1900                              lweaver@bfalaw.com
Fax: (206) 623-3384                               adavis@bfalaw.com
dloeser@kellerrohrback.com                        jsamra@bfalaw.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of:

**PLAINTIFFS' INITIAL DISCLOSURES**

via Email and U.S. Mail on this 10th day of December, 2019 to the person(s) set forth below:

Orin Snyder
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com

*Counsel for Defendant Facebook, Inc.*

Kristin A. Linsley, Esq.
Joshua Seth Lipshutz
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
jlipshutz@gibsondunn.com
BLutz@gibsondunn.com

*Counsel for Defendant Facebook, Inc.*

David Evan Ross
**ROSS ARONSTAM & MORITZ LLP**
100 S. West Street
Suite 400
Wilmington, DE 19801
dross@ramllp.com

*Counsel for Defendant Facebook, Inc.*

Carl S Burkhalter
Evan P. Moltz
**MAYNARD COOPER & GALE PC**
AmSouth Harbert Plaza, Suite 2400
1901 6th Avenue North
Birmingham, AL 35203-2618
cburkhalter@maynardcooper.com
emoltz@maynardcooper.com

*Counsel for Defendant Facebook, Inc.*

Ashlee Nicole Lin
Mark Christopher Scarsi
**MILBANK TWEED HADLEY &
MCCLOY LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067-3019
anlin@milbank.com

*Counsel for Defendants Cambridge Analytica
LLC and SCL Group*

Jennifer Anne Beckage
Myriah Jaworski
**BECKAGE PLLC**
Liberty Building
420 Main Street
Suite 1110
Buffalo, NY 14202
mjaworski@beckage.com
jbeckage@beckage.com

*Counsel for Defendant Aleksandr Kogan*

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on December 10, 2019.

/s/ Sarah Skaggs
Sarah Skaggs

EXHIBIT F

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFF RAFAEL AMEZCUA'S RESPONSES AND OBJECTIONS TO DEFENDANT FACEBOOK INC.'S FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court's orders in this action, and the parties' agreements and conferences among counsel, Plaintiff Rafael Amezcua, through counsel, objects and responds to the Interrogatories served by Defendant Facebook Inc. ("Facebook") on August 21, 2020.

## PRELIMINARY STATEMENT

1.      Plaintiff's responses to the Interrogatories are made to the best of Plaintiff's current knowledge, information, and belief.  Plaintiff reserves the right to supplement or amend any response in the future should such supplementation or amendment be revealed to be necessary or appropriate.

2.      Plaintiff's responses are based on the understanding that Facebook seeks only information that is within Plaintiff's possession, custody, and control.

3.      Plaintiff's responses and objections are not and should not be construed as admissions relating to the accuracy, relevance, presence, or absence of any facts or information referenced in any Interrogatory.

4.      Plaintiff construes Facebook's Interrogatories as not seeking information protected by the attorney-client privilege, work product doctrine, or other applicable privilege or protection.

## OBJECTIONS TO DEFINITIONS

1.      Plaintiff objects to the definition of "You," and "Your" as it is overbroad in that it includes persons acting on Plaintiff's behalf, such as "Your counsel in this matter"; and because it calls for legal conclusions with respect to the term "guardians."

## OBJECTIONS TO INSTRUCTIONS

1.      Plaintiff objects to Facebook's Instructions to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all Social Media Platforms other than Facebook that You have used to share personal family photographs or videos.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 1:**

1.      Plaintiff objects to Interrogatory No. 1 to the extent that the information sought by that Interrogatory is otherwise equally accessible to Facebook as to Plaintiff.

2.      Plaintiff objects to Interrogatory No. 1 in that it is vague and ambiguous with respect to the terms "share" and "personal." Plaintiff will respond to the best of Plaintiff's current knowledge, information, belief, and understanding of those terms. For the purpose of responding to this Interrogatory, Plaintiff construes "Social Media Platforms other than Facebook" to mean LinkedIn, Twitter, Instagram, Snapchat, Myspace, Youtube, Reddit, Periscope, Discord, Tumblr, WhatsApp, Google+, Pinterest, Skype, Tinder, Grindr, Bumble, Match.com, Coffee Meets Bagel, and OkCupid.

3.      Plaintiff objects to Interrogatory No. 1 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. For example, whether Plaintiff used other Social Media Platforms to share "personal family photographs or videos" has no bearing on whether Plaintiff consented to or was harmed by Facebook's actions.

4.      Plaintiff's response to Interrogatory No. 1 is designated CONFIDENTIAL pursuant to the Protective Order entered in this action.

Subject to and without waiving these objections, Plaintiff states that he used Twitter, Instagram, Snapchat, Myspace, and YouTube to share personal family photographs or videos.

**INTERROGATORY NO. 2:**

Identify all Social Media Platforms other than Facebook that You have used to share personal perspectives regarding politics, religion, relationships, work, or family.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 2:**

1.      Plaintiff objects to Interrogatory No. 2 to the extent that the information sought by that Interrogatory is otherwise equally accessible to Facebook as to Plaintiff.

2.      Plaintiff objects to Interrogatory No. 2 in that it is vague and ambiguous with respect to the terms "share" and "personal perspectives." Plaintiff will respond to the best of Plaintiff's current knowledge, information, belief, and understanding of those terms. For the purpose of responding to this Interrogatory, Plaintiff construes "Social Media Platforms other than Facebook" to mean LinkedIn, Twitter, Instagram, Snapchat, Myspace, Youtube, Reddit, Periscope, Discord, Tumblr, WhatsApp, Google+, Pinterest, Skype, Tinder, Grindr, Bumble, Match.com, Coffee Meets Bagel, and OkCupid.

3.      Plaintiff objects to Interrogatory No. 2 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. For example, whether Plaintiff used other Social Media Platforms to share "personal perspectives" has no bearing on whether Plaintiff consented to Facebook's actions.

4.      Plaintiff's response to Interrogatory No. 2 is designated CONFIDENTIAL pursuant to the Protective Order entered in this action.

Subject to and without waiving these objections, Plaintiff states that he has used Twitter, Instagram, Snapchat, Myspace, and YouTube to share personal perspectives regarding politics, religion, relationships, work, or family.

**INTERROGATORY NO. 3:**

Identify each of Your Facebook Friends whom You have no specific recollection of meeting in person more than once before the date of service of these interrogatories.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 3:**

1.      Plaintiff objects to Interrogatory No. 3 in that it is vague, ambiguous, and overbroad with respect to the phrase "specific recollection" and to the extent it seeks information that a reasonable person might not remember.

2.      Plaintiff objects to Interrogatory No. 3 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. Whether Plaintiff has met a Facebook Friend in person does not speak to whether Plaintiff consented to or is harmed by Facebook's sharing Plaintiffs' information with third parties. In addition, whether Plaintiff had Facebook Friends whom Plaintiff met only once is not relevant to Plaintiff's interest in keeping

information private. Finally, any implication that Plaintiff should not have become Facebook Friends with someone Plaintiff met only once runs counter to how Facebook publicly represents its Platform and purpose.

3.　　Plaintiff objects to Interrogatory No. 3 as it unduly violates Plaintiff's and third parties' rights to privacy.

Plaintiff stands on these objections.

**INTERROGATORY NO. 4:**

Identify each of Your Facebook Friends whom You have no specific recollection of ever meeting in person before the date of service of these interrogatories.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 4:**

1.　　Plaintiff objects to Interrogatory No. 4 in that it is vague, ambiguous, and overbroad with respect to the phrase "specific recollection."

2.　　Plaintiff objects to Interrogatory No. 4 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. For example, the number of times Plaintiff has met a Facebook Friend in person does not speak to whether Plaintiff consented to or is harmed by Facebook's sharing Plaintiffs' information with third parties. In addition, whether Plaintiff had Facebook Friends whom Plaintiff never met is not relevant to Plaintiff's interest in keeping information private. Finally, any implication that Plaintiff should not have become Facebook Friends with someone Plaintiff never met runs counter to how Facebook publicly represents its Platform and purpose.

3.　　Plaintiff objects to Interrogatory No. 4 as it unduly violates Plaintiff's and third parties' rights to privacy.

Plaintiff stands on these objections.

**INTERROGATORY NO. 5:**

Identify all computers, smartphones, tablets, personal digital assistants, or other electronic devices that You used to access Facebook. Your response should, at minimum, include the make, model, and serial number of the device.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 5:**

1.     Plaintiff incorporates the Preliminary Statement, Objections to Definitions, and Objections to Instructions as though set forth fully in this Response. Plaintiff further objects to Interrogatory No. 5 on the following grounds:

2.     Plaintiff objects to Interrogatory No. 5 to the extent that the information sought by that Interrogatory is otherwise equally accessible to Facebook as to Plaintiff, and the burden of deriving or ascertaining the information is substantially the same for Facebook as it is for Plaintiff.

3.     Plaintiff's response to Interrogatory No. 5 is designated CONFIDENTIAL pursuant to the Protective Order entered in this action.

Subject to and without waiving these objections, Plaintiff states that he has used an Apple iPhone XS, serial number C39XNE03KPHG, a Lenovo laptop, serial number PF0W4BEM, and a Dell laptop, serial number 8ZB05H2. Plaintiff has also used additional smartphones and laptops to access Facebook but does not recall the specific models or serial numbers of those devices. Pursuant to Fed. R. Civ. P. 33(d), Plaintiff also directs Facebook to documents produced in this action, Bates labelled PLAINTIFFS00005645-00005734.

**INTERROGATORY NO. 6:**

Identify all entities other than Cambridge Analytica that You believe have misused sensitive information from Your Facebook Account, as alleged in, for example, Paragraphs 529, 944, and 949 of the Complaint.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 6:**

1.     Plaintiff objects to Interrogatory No. 6 to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, and any other applicable privilege or protection.

2.     Plaintiff objects to Interrogatory No. 6 to the extent that the information sought by that Interrogatory is in Facebook's control and not yet produced to Plaintiff.

3.     Plaintiff objects to Interrogatory No. 6 to the extent that it requires Plaintiff to search for information that is not reasonably known, accessible, or obtainable by Plaintiff.

4.      Plaintiff objects to Interrogatory No. 6 as it calls for legal conclusions and is vague with respect to the term "misused" and to the extent that it seeks information beyond relevant facts, including Plaintiff's counsels' analyses or opinions, which may be appropriately sought through contention interrogatories, which are not appropriate or justified at this early stage.

Subject to the foregoing objections, Plaintiff provides the following non-exclusive list of entities: Facebook, Inc., and individuals and entities associated with Cambridge Analytica LLP, including but not limited to those described in paragraphs 214, 215, and 219-28 of Plaintiffs' Second Amended Consolidated Complaint, ECF No. 491.

**INTERROGATORY NO. 7:**

Identify all of Your Facebook Friends whom You instructed not to share or repost information that You posted on Facebook. For the avoidance of doubt, "instructed" as used in this Interrogatory refers to direct communications between You and Your Facebook Friends, and shall not include Your selection of privacy controls, app settings, or other settings associated with your Facebook Account

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 7:**

1.      Plaintiff objects to Interrogatory No. 7 in that it is vague, ambiguous, and undefined with respect to the terms "instructed" and "share or repost."

2.      Plaintiff objects to Interrogatory No. 7 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. For example, whether Plaintiff "instructed" a Facebook Friend not to share or repost information has no bearing on Plaintiffs' consent nor on whether Facebook violated user's privacy by sharing information with partners and other third parties.  Likewise, whether Plaintiff "instructed" a Facebook Friend not to share or repost information has no bearing on Plaintiff's expectation of privacy on the platform with respect to Facebook's sharing of information in violation of its privacy policies.

3.      Plaintiff objects to Interrogatory No. 7 as it unduly violates Plaintiff's and third parties' rights to privacy.

Plaintiff stands on these objections.

6

**INTERROGATORY NO. 8:**

Identify all of Your Facebook Friends to whom You gave permission to share or repost information that You posted on Facebook. For the avoidance of doubt, "gave permission" as used in this Interrogatory refers to direct communications between You and Your Facebook Friends, and shall not include Your selection of privacy controls, app settings, or other settings associated with your Facebook Account.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 8:**

1.      Plaintiff objects to Interrogatory No. 8 in that it is vague, ambiguous, and undefined with respect to the terms "gave permission" and "share or repost."

2.      Plaintiff objects to Interrogatory No. 8 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. For example, whether Plaintiff "gave permission" to a Facebook Friend to "share or repost" information has no bearing on Plaintiffs' consent nor on whether Facebook violated user's privacy by sharing information with partners and other third parties.  Likewise, whether Plaintiff "instructed" a Facebook Friend not to share or repost information has no bearing on Plaintiff's expectation of privacy on the platform with respect to Facebook's sharing of information in violation of its privacy policies.

3.      Plaintiff objects to Interrogatory No. 8 as it unduly violates Plaintiff's and third parties' rights to privacy.

Plaintiff stands on these objections.

**INTERROGATORY NO. 9:**

Identify each person to whom You have knowingly disclosed the password to Your Facebook Account.

**RESPONSE AND OBJECTIONS TO INTERROGATORY NO. 9:**

1.      Plaintiff objects to Interrogatory No. 9 because it seeks information that is not relevant to the claims and defenses at issue in this litigation. For example, whether Plaintiff "knowingly disclosed the password to [Plaintiff's] Facebook Account" information has no bearing on Plaintiff's expectation of privacy on the Platform nor whether Facebook violated Plaintiff's privacy and its policies when sharing information with third parties.

2.     Plaintiff's response to Interrogatory No. 9 is designated CONFIDENTIAL pursuant to the Protective Order entered in this action.

Subject to and without waiving these objections, Plaintiff states that: Facebook possesses Plaintiff's password. Plaintiff has not otherwise knowingly disclosed the password to his Facebook Account.

Dated: November 5, 2020                              Respectfully submitted,

KELLER ROHRBACK L.L.P.                    BLEICHMAR FONTI & AULD LLP

By:    _/s/ Derek W. Loeser_____          By:    _/s/ Lesley E. Weaver_____
       Derek W. Loeser                                      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)          Lesley E. Weaver (SBN 191305)
Lynn Lincoln Sarko (admitted *pro hac vice*)       Anne K. Davis (SBN 267909)
Gretchen Freeman Cappio (admitted *pro hac vice*)  Joshua D. Samra (SBN 313050)
Cari Campen Laufenberg (admitted *pro hac vice*)   555 12th Street, Suite 1600
Benjamin Gould (SBN 250630)                        Oakland, CA 94607
1201 Third Avenue, Suite 3200                      Tel.: (415) 445-4003
Seattle, WA 98101                                  Fax: (415) 445-4020
Tel.: (206) 623-1900                               lweaver@bfalaw.com
Fax: (206) 623-3384                                adavis@bfalaw.com
dloeser@kellerrohrback.com                         jsamra@bfalaw.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

**VERIFICATION**

I, Rafael Amezcua, verify that I have read the foregoing responses to DEFENDANT

FACEBOOK INC.'S FIRST SET OF INTERROGATORIES, and that the answers contained

therein are true and correct to the best of my information, knowledge, and belief. I verify under

penalty of perjury that the foregoing is true and correct.


DATED: October 30 , 2020                    _____

RAFAEL AMEZCUA