# Exhibit 56

# Filed Under Seal

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel 650.849.5300
www.gibsondunn.com

Martie Kutscher Clark
Direct: +1 650.849.5348
Fax: +1 650.849.5048
MKutscherClark@gibsondunn.com

February 24, 2020

VIA ELECTRONIC MAIL

Lesley Weaver
Matthew Montgomery
Anne Davis
Bleichmar Fonti & Auld LLP
555 12th Street
Suite 1600
Oakland, CA 94607

Re:   *In re Facebook, Inc. Consumer Privacy User Profile*, Northern District of California
      Case No. 3:18-md-02843-VC

Counsel:

     I write to address several issues raised during the parties' recent meet-and-confer efforts, including the issues addressed in Plaintiffs' letters dated February 12, February 11, and January 31. The topics discussed below represent Facebook's understanding of the still-relevant issues outstanding between the parties. Any issue or argument raised by Plaintiffs in their serial discovery letters that has not been addressed by Facebook does not represent an implied agreement to Plaintiffs' position or adoption of any representation made by Plaintiffs.

### I. Plaintiffs' litigation strategy is impeding efficient collection, review, and production of materials.

     Facebook is committed to meeting the discovery deadlines set by the Court and to engaging in a meaningful and productive meet and confer process in order to do so. The most efficient way for Facebook to produce large numbers of documents to Plaintiffs in a timely manner is to conduct a consistent and unified document collection and review process. Plaintiffs' numerous inconsistent demands for collection, review, and production of specific categories of materials on arbitrary and unilaterally-determined deadlines impedes this process, as does Plaintiffs' vexatious strategy of manufacturing a constant flow of discovery disputes and proposed joint letters to the Court that demand Facebook's immediate attention, and frequently regard issues that are baseless and not ripe for dispute.

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 2

      At Plaintiffs' request, the parties have now spent more than 12 meet and confer hours negotiating nearly every word Facebook wrote in response to Plaintiffs' Second Set of Requests for Production—not to mention the countless additional hours Facebook has spent responding to serial emails and letters from Plaintiffs raising needless and untimely questions and disputes regarding Facebook's responses.  Rather than waste additional time debating Facebook's initial written responses to Plaintiffs' RFPs, the parties should finalize their ESI Protocol and agree to search terms and custodians.  These outstanding issues are the primary impediments to Facebook's collecting and producing the materials Plaintiffs seek, and cooperation and an agreement on search terms would largely obviate the need for continued discussion regarding the scope of several RFPs.

      To this end, Facebook encourages Plaintiffs to engage in a meaningful discussion regarding search terms.  As you are aware, Plaintiffs initially proposed a deadline of February 7 for the parties to exchange search terms.  Facebook agreed to and complied with that deadline by providing proposed search terms and custodians.  Regardless, Plaintiffs declined to engage in this process, remarkably claiming Plaintiffs are not able to draft search terms for their own RFPs without seeing the search terms that were used to collect materials responsive to a different set of document requests prepared by the FTC in a different action.

      If Plaintiffs believe the FTC's document demands reflect the full scope of documents that should be produced in this action, Facebook would be happy to limit the scope of production in this case to the materials produced to the FTC.  Facebook, however, understands Plaintiffs' RFPs to request all materials produced to the FTC (RFP 6) plus 24 categories of additional materials (RFPs 7-30).  Facebook is in the process of reviewing its FTC productions and will produce in this case all non-privileged documents produced to the FTC that are also relevant to this case (more on that below).  In order for Facebook to collect and produce materials responsive to Plaintiffs' 24 other categories of demands, the parties must agree to search terms and custodians tailored to those requests.

      Two weeks after Plaintiffs' deadline to provide proposed searches, Plaintiffs circulated on Friday a letter that seems only to object to Facebook's proposal without making any meaningful effort to provide proposed searches.  The list of over 230 broad and arbitrary words that Plaintiffs claim should be included in any search—including "academic research," "applications," "basic info," "compliance," "consent," "everyone," "likes," "news feed," "public," "tracking," "Steve Bannon," "valuation," "switcharoo," and "user content"—is egregiously overreaching and obviously a non-starter.  This proposal does not appear to be a good faith effort to negotiate searches with Facebook but rather a thinly veiled attempt to support Plaintiffs' groundless position that—unlike plaintiffs in any other litigation—Plaintiffs here are not able to propose searches to locate documents responsive to *their own*

GIBSON DUNN

Lesley Weaver
February 24, 2020
Page 3

*RFPs* without reviewing the searches used to locate documents responsive to different requests in a different action.

Facebook separately urges Plaintiffs to cease delaying the parties' efforts to agree to an ESI protocol. During the parties' three separate meet and confer discussions regarding the protocol—each of which lasting 2 or more hours—Plaintiffs' counsel have shown little willingness to compromise on the extremely burdensome and unnecessary requirements and processes they seek to impose on Facebook, which find no support in the Federal Rules or the Northern District's rules. We have been surprised by these positions, given Plaintiffs' refusal to countenance inclusion of seemingly noncontroversial language regarding Rule 26(b)(1)'s proportionality requirements and counsel's obligations to cooperate and act in good faith.

Plaintiffs' tactic of engineering constant discovery disputes while refusing to cooperate in good faith to negotiate search terms, custodians, and an ESI Protocol is counterproductive. We do hope that we share the similar goal of advancing discovery in a collaborative fashion and that Plaintiffs are not trying to manufacture a record to portray Facebook's efforts in a false light. While Facebook recognizes that Plaintiffs can choose to litigate their case however they wish, Facebook hopes Plaintiffs will reconsider this approach, so the parties can reach agreement on search terms, custodians, and an ESI Protocol and make meaningful progress.

Until that time, Facebook will continue its efforts to make large, rolling productions of materials that do not require these agreements. To that end, even though the parties have not agreed to search terms, custodians, or an ESI Protocol, Facebook has produced more than 47,000 pages of materials to date and anticipates producing nearly 100,000 additional pages—if not more—in the next two weeks.

## II.     ESI Protocol

The parties have now exchanged numerous draft ESI Protocols and have met and conferred regarding their proposed Protocols on three separate occasions. Facebook has made a number of compromises to date to facilitate an agreement, and—to that end—the parties have made a great deal of progress.

During the parties' most recent ESI discussion on February 14, 2020, Plaintiffs raised a number of ESI questions. Below are responses to the questions Plaintiffs raised, which we hope will provide a basis for further productive meet and confer efforts:

- **Retention Policy**: Plaintiffs asked Facebook to consider sharing its document retention policy so Plaintiffs can "understand the normal state of the world."

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 4

> Facebook agrees to provide Plaintiffs a copy of Facebook's Electronic Message Retention Policy, which provides that the Company ordinarily retains emails and Workplace Chats for two years. Facebook may—and often does—adjust the length of this retention period based on legal holds, regulations, security and privacy concerns, or business considerations. Facebook refers Plaintiffs to its December 9, 2019 letter regarding ESI-related issues for more details on this subject.

- **Data Sources in Section D(d)(1)-(3)**: Plaintiffs asked Facebook to confirm that the data sources listed (slack data, RAM, temporary files, and so forth) are all associated with individual devices and hard drives. They are. All excluded data sources are those that would be sourced from individual workstations and/or devices. To reiterate, Facebook does not anticipate any unique relevant information would exist in these types of files.

- **Data Source in Section D(d)(4)**: Plaintiffs asked Facebook to confirm their understanding of the scope of this exclusion. To be clear, the data in the frequently updated metadata fields listed in Section D(d)(4) would be preserved at the moment a document is preserved (*e.g.*, a native word document would indicate who the last editor was) and the exclusion would not require Facebook to preserve this data on an historical or ongoing basis (*i.e.*, Facebook will not pursue all iterations of the last edited metadata). Where this data does exist in a native document, however, Facebook does not agree that this data is relevant, reliable, or an accurate reflection of meaningful information as, among other things, the "last accessed" date can reflect automated processes such as virus scans rather than actual access by a custodian.

- **Data Sources in Section D(d)(5)-(8)**: Plaintiffs asked Facebook to consider striking these exclusions or, alternatively, providing greater clarity as to the burden of preserving all of these sources, regardless of whether a custodian has identified them as containing potentially relevant information. Facebook maintains that these data sources are not reasonably accessible and it would be disproportionately burdensome to require Facebook to forensically image, extract, collect, process, review and/or produce from them if a custodian has not identified them as a location of unique, non-duplicative potentially relevant information. Facebook relies on custodial interviews to determine the locations, including physical devices, that may contain relevant information. To the extent that a custodian identifies unique relevant information on a laptop or mobile device, Facebook will collect and review

**GIBSON DUNN**

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 5

>   that data.  To require Facebook to forensically image all information on all devices, regardless of whether they may contain unique, non-duplicative relevant information, would be tremendously burdensome and go far beyond Rule 26(b)(1)'s proportionality requirements.

- **Voicemails**:  Plaintiffs asked whether Facebook archives voicemails to email. Facebook does not archive voicemail to email.  As discussed, Facebook employees typically do not leave or receive voicemails, as the vast majority of Facebook employees do not even have a desk phone or landline with voicemail.  To the extent that a custodian identifies relevant voicemails, Facebook will collect and review that data.

- **Instant Messages and Chats**:  Plaintiffs asked Facebook to clarify what categories of messaging data are not chronicled to an email archive system. Facebook chronicles chat data created in Facebook Workplace, which is the most common form of employee-to-employee business communication at Facebook.  The instant message systems contemplated in Section D(d)(8) are any other messaging applications that Facebook employees may have access to or use – including those not provided or approved by Facebook for workplace communications, or located on personal devices or accounts. To the extent that a custodian identifies relevant instant messages and chats, Facebook will collect and review that data.

- **Hit Reports**:  Plaintiffs asked Facebook to consider adding language regarding exchanging hit reports, formerly located in Section H(2)(iii). Facebook will agree to adding the following language back in to the search protocol:

  *If the Producing Party contends any of the terms proposed by the Requesting Party would recall an excessive number of documents, the Producing Party will provide hit report for each of the disputed terms run across the data sets collected from the proposed custodians, after global de-duplication.  The list or report should include the number of documents that hit on each term, the number of unique documents that hit on each disputed term (documents that hit on a particular term and no other term on the list), and the total number of documents that would be returned by using the proposed search term list including the disputed terms (including families).  With respect to any search term for which the Producing Party believes there exists a modification that will reduce the number of irrelevant documents returned by the search term, the Producing Party will meet and confer with the Requesting Party to discuss*

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 6

*in good faith any such modification. For any terms that a Producing Party believes are burdensome, overly broad, and/or objectionable and for which there does not appear to be any modification that would resolve such issues, the Producing Party will meet and confer with the Requesting Party to discuss in good faith its objections to such search terms.*

- **Metadata Fields**: Plaintiffs asked Facebook to reconsider their request that Facebook produce each document with over 40 categories of metadata. Facebook has previously sought to streamline this set of metadata to focus on the categories likely to convey meaningful data without unnecessarily encumbering Facebook and its vendor. Beyond the increased burden, many of the categories of metadata Plaintiffs have requested cannot be provided without the development of complex custom scripts (and the attendant expense) and others are duplicative of one another. In the interest of compromise, however, Facebook agrees to provide the following metadata fields, in addition to those included on its prior redline of Appendix A: FILEEXT, ATTACHNAME, TIMEZONEPROCESSED, SUBJECT, ITEMTYPE, PAGECOUNT, ATTACHCOUNT, HASHIDDENDATA, MESSAGE ID, and APPLICATION.

- **Documents Protected from Discovery**: Plaintiffs objected to Facebook's inclusion of language regarding the parties' obligations and rights under Federal Rule of Evidence 502(d) and (e) on the bases that (i) this language was new to the latest draft of the Protocol and (ii) the Protective Order covers some of the same issues. Regarding timing, Facebook has previously proposed a stipulation under Rule 502—Plaintiffs did not provide any comments or objections. If Plaintiffs would prefer to enter into that separate stipulation, Facebook does not object to removing this language from the ESI Protocol, but will require the parties to agree to a Rule 502 stipulation before the ESI Protocol is entered. Further, the language proposed is distinct from that included in the Protective Order, as it directly addresses how the parties should treat inadvertently disclosed ESI. Because Plaintiffs have not objected to the actual language of the revision or the proposed stipulation and the inclusion of this language does not impose any burdens on either party, Plaintiffs have no reasonable basis to be objecting to it.

- **Document Threading**: Facebook maintains that it should be permitted to employ document threading technology to reduce its review, production, and privilege logging burdens where all of the messages in the chain are fully contained in the Last In Time Email, including having the same attachments,

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 7

senders, and recipients. Document threading is commonly applied and is a widely accepted technology employed to reduce a party's production and logging burden particularly where, as here, one party is producing most of the documents. *See, e.g.*, S.D.N.Y. Standing Order, M10-468, II(E) at 6. Plaintiffs have objected to threading on the basis that they would lose the ability to rely on metadata to search for and review each individual message in a thread, even though the Last In Time Email would reflect the same senders, recipients, and attachments of all emails in the thread and any other relevant data (*e.g.*, data and time) would be available on the face of any document containing an email chain. This concern is outweighed by the burden that producing and logging each document in a chain would impose. In Facebook's experience, limiting production to last in time emails commonly reduces production populations by 20 percent. In a case of this magnitude, increasing production costs by 20 percent or more cannot be justified.

### III.     Government productions and RFP 6

RFP 6 broadly requests all materials provided to any U.S. or U.K. government entity in any action with a subject matter that relates to this case. Courts generally reject such requests for "cloned discovery." *See King County v. Merrill Lynch & Co., Inc.*, No. C10-1156-RSM, 2011 WL 3438491 at *3 (W.D. Wash. Aug. 5, 2011) (rejecting "'[c]loned discovery,' requesting all documents produced or received during other litigation or investigations."); *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Lit.*, MDL No. 2672 CRB (JSC), 2017 WL 4680242 at *1 (N.D. Cal. Oct. 18. 2018). Facebook therefore agreed to produce the materials it produced to government bodies to the extent those materials are separately responsive to Plaintiffs' substantive RFPs. It bears noting that Plaintiffs' RFPs are extremely broad and, among other things, seek "all documents" touching on a host of topics—including, but not limited to, Facebook's efforts to curb and investigate violations of any platform policy, Facebook's internal policies, any misuse of data from Facebook's platform, certain third party agreements, all "user testing," and various monetary considerations.

Plaintiffs asked whether Facebook will apply the same limitation to the document productions that Facebook provided the FTC. It will not. As Facebook has informed Plaintiffs repeatedly, Facebook will re-review its FTC productions and produce in this action all relevant, non-privileged materials produced to the FTC. Facebook will produce these

**GIBSON DUNN**

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 8

materials by March 31.[1]  Facebook also endeavors to produce a large portion of additional materials responsive to RFP 6 by that date.

Plaintiffs informally demanded that Facebook provide a list of all U.S. and U.K. government actions described in RFP 6.  Facebook will provide Plaintiffs with a list of related U.S. government actions by February 27, 2020.  To the extent Plaintiffs seek additional details about these actions, Plaintiffs should propound a proper interrogatory.

Investigatory actions in the U.K. or elsewhere are not relevant to this action and will not be included in the information Facebook provides on February 24.  Although Plaintiffs purport that their proposed class includes U.K. residents, only one named Plaintiff, Bridget Peters, resides in the U.K.  To date she has declined to participate in litigation activities,[2] and we now understand that she is voluntarily dismissing her claims.

## IV. Custodial information and RFP 7

As discussed above, on February 7, Facebook provided Plaintiffs a set of proposed custodians, along with its proposed search terms.  Plaintiffs declined to provide proposed

---

[1] Contrary to Plaintiffs' assertions, Facebook has not failed to provide or satisfy any agreed-upon deadlines to produce FTC materials.  As agreed, on December 26, Facebook produced to Plaintiffs all FTC document demands from the FTC's 2018-2019 investigation, along with all correspondence defining the scope of the FTC's demands.  Plaintiffs sought production of the same materials from the FTC's earlier pre-2012 investigation by January 2.  Judge Chhabria denied this request, stating both in his order and at the January 8 Case Management Conference that materials from the FTC's pre-2012 investigation likely bear little relevance to this action and need not be produced on an expedited basis.  Despite this holding, Facebook agreed to gather and produce these older materials by February 7.  In response to Plaintiffs' additional request for correspondence from Facebook regarding the FTC's document demands, Facebook also agreed to produce that correspondence on February 7.  On February 7, Facebook produced each of these categories of materials.  Plaintiffs demanded for the first time on February 13 that Facebook begin producing its FTC document productions within 7 days and complete production of those materials within 21 days.  Plaintiffs issued this demand as an ultimatum, along with a proposed joint letter to the Court and demanded that Facebook either agree to Plaintiffs' deadlines or fill out its portion of the joint letter.  Facebook informed Plaintiffs that raising its proposed production deadline in this manner was an abuse of the Court's discovery procedures and meet and confer processes.  Once we had a meaningful opportunity to consider Plaintiffs' proposed deadline and consult with our client, we agreed to produce the FTC productions by March 31.

[2] Ms. Peters did not serve her initial disclosures, which were due on December 10, 2019.  Facebook provided Ms. Peters three extensions of time to serve her disclosures, with a final deadline of January 31, 2020.  Three weeks later, we still have not received Ms. Peters' disclosures.  Ms. Peters has also failed to respond to Facebook's first interrogatory, which merely sought the email address or username associated with her Facebook account, so that Facebook is able to identify her account.  A response to this interrogatory was due on January 6, 2020.  Ms. Peters did not serve a response or request an extension of time to provide this basic information.

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 9

custodians. Although Plaintiffs contend they require additional information before they will propose custodians, Facebook provided the specific information Plaintiffs requested.

As Facebook has informed Plaintiffs on numerous occasions, Facebook does not maintain organizational charts. In lieu of receiving organizational charts, Plaintiffs therefore requested the organizational information that Facebook created for the FTC and provided in response to the FTC's requests for organizational information. Facebook agreed to (and did) provide these materials on February 7, which consist of descriptions of Facebook's organization, custodial descriptions, and cost center spreadsheets. For the avoidance of doubt, these materials are Bates numbered FB-CA-MDL00013395, FB-CA-MDL00013408, FB-CA-MDL-00013411, and FB-CA-MDL-00013435.

The materials provided describe Facebook's business and reporting structure and were sufficient to identify proposed custodians during the FTC investigation. They also far exceed the materials used to negotiate custodians in other litigation in which Facebook is a party. In Plaintiffs' February 12 letter, Plaintiffs nevertheless contend that this information is not sufficient and is "outdated." Plaintiffs further complain about the sufficiency of these materials in their February 21 letter. Facebook is perplexed by these assertions. Facebook provided Plaintiffs the precise documents they demanded, which were largely *created for the FTC* (Facebook's primary regulator) in the context of the FTC proceedings. Further, the custodial information is dated 2018 and cost center data has been provided for the period of 2012 to 2018. This is squarely within the timeframe of Plaintiffs' claims.

Rather than pose any specific questions regarding custodians and Facebook's organizational structure, Plaintiffs' February 12 letter purports to task Facebook with drafting additional information regarding potential custodians and sources of responsive information, without indicating what specific details Plaintiffs seek. Parties regularly negotiate custodians with Facebook without receiving the detailed information that Facebook created for the FTC and without demanding the ambiguous, additional written materials Plaintiffs now request. Given Plaintiffs' never-enough approach and apparent refusal to engage in a meaningful conversation regarding custodians, Facebook does not believe it will be practical or efficient for it to take on the guess-work of satisfying Plaintiffs through a vague writing assignment. If Plaintiffs are requesting that Facebook *create* documentation reflecting its organizational structure at a particular time not covered by the FTC documents provided, Plaintiffs may issue an interrogatory and Facebook will respond in due course. Facebook is also amenable to informally responding to reasonable requests for information relating to its proposed custodians and organization, and will endeavor to answer such questions to the extent they are reasonably specific and tailored in good faith to facilitate a meaningful discussion regarding custodians.

GIBSON DUNN

Lesley Weaver
February 24, 2020
Page 10


We are in receipt of Plaintiffs' letter of Friday demanding employment information and other details for a list of approximately 90 Facebook employees. While Facebook is evaluating Plaintiffs' demand, the list of individuals for whom Plaintiffs seek detailed descriptions is extremely broad, would impose tremendous burdens on Facebook, and does not seem reasonably tailored in good faith. While Facebook will, of course, work with Plaintiffs to provide sufficient information for the parties to negotiate custodians, Facebook feels compelled to note that it regularly negotiates custodians with other litigants without a problem and without burdensome requests of this nature.

## V.  Named Plaintiffs' materials/RFPs 9-10

Plaintiffs demanded that Facebook produce all documents uniquely associated with the Named Plaintiffs' accounts by February 21. On February 15, Facebook produced all account data it has been able to identify for named Plaintiffs Anthony Bell, Olivia Johnston, Jordan O'Hara, and Bridgett Burk. This production included over 24,000 pages and more than 10 MB of data. These data sets are quite voluminous and take a great deal of time to prepare. Facebook intends to make ongoing rolling productions of these materials with respect to the additional Named Plaintiffs, with all data sets relevant to a particular named Plaintiff produced at least 14 days before that named Plaintiffs' noticed deposition date. Plaintiffs received an additional production of 10,500 pages today, and we anticipate that all of the named Plaintiffs' account information will be produced by the end of March.

## VI.  Access to user data/RFPs 11-13 and 26-27

As the parties have discussed, RFPs 11-13 and 26-27, which generally seek information regarding third parties' access to user data, reflect a misunderstanding of Facebook's systems and Facebook does not have materials responsive to the requests as framed. Facebook has therefore agreed, in a good faith effort to move forward on this issue, to provide a written explanation of the systems at issue, so that the parties may engage in a more fruitful discussion regarding what relevant materials Facebook may be able to provide. Facebook did not agree to provide these materials by February 12. Facebook stated that it could likely prepare these materials within a few weeks. We will endeavor to provide these written materials by February 27, 2020.

## VII.  Monetary valuations/RFPs 14-17

RFPs 14-17 seek documents relating to, describing, and assessing the "monetary or retail value" of the named Plaintiffs' or other Facebook users' content and information. Facebook has explained to Plaintiffs that it does not engage in the types of valuations described by Plaintiffs' requests but that it is continuing to assess what, if any, information it may be able to locate in response to Plaintiffs' RFPs. Facebook will endeavor to follow up

Lesley Weaver
February 24, 2020
Page 11

regarding what, if any, information it may be able to locate and produce on these subjects by March 6. As with many other RFPs, we encourage Plaintiffs to propose search terms that would encapsulate the materials they seek.

Further, during the parties' meet and confer efforts, Plaintiffs expanded the scope of these RFPs and now demand various categories of financial documents, including marketing and business plans, documents prepared for venture capitalists and potential investors, and documents underlying Facebook's public reporting of revenues.[3] Plaintiffs demanded that Facebook begin producing these documents by February 21. The new categories of materials Plaintiffs have identified as potentially responsive to RFPs 14-17 are extraordinarily broad, have no clear relationship to Plaintiffs' claims, and concern Facebook's highly-sensitive business and financial information.

Facebook asked Plaintiffs how the confidential financial information it seeks relates to the claims at issue in this case. Plaintiffs were not able to provide a coherent response. Facebook requests that Plaintiffs articulate in writing how their expansive request for irrelevant and highly-sensitive business information is relevant and proportionate to the needs of the case. *See* Fed. R. Civ. Proc. 26(b)(1); *see also Gilead Sciences, Inc. v. Merck & Co, Inc.*, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016) (After the 2015 amendments to Rule 26, it is "[n]o longer . . . good enough to hope that the information sought might lead to the discovery of admissible evidence . . . a party seeking discovery . . . must show, before anything else, that the discovery sought is proportional to the needs of the case.").

**VIII.    User notifications/RFP 18**

In response to RFP 18, Facebook agreed to provide Facebook's communications to users regarding the Cambridge Analytica events. Facebook is continuing to assess Plaintiffs' request for additional materials in response to this request and will endeavor to provide a position by February 27.

**IX.    App developer investigation/RFPs 19-21**

RFP 19 seeks a broad array of documents and communications related to Facebook's App Developer Investigation ("ADI"). ADI is an attorney-driven investigation intended to evaluate any potential litigation risks following the Cambridge Analytica events. The investigation and the materials sought in RFP 19 are therefore privileged.

---

[3] Plaintiffs list various other "categories" of materials they believe would be responsive to these requests, which—broadly speaking—repeat Plaintiffs' demand for materials reflecting valuations of user data. Again, Facebook does not value user data in the manner Plaintiffs suggest.

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 12

Plaintiffs demanded that Facebook agree to individually log all privileged materials responsive to RFP 19. This is not possible or practical. Nor it is required. Plaintiffs' request seeks categorically privileged materials—it is akin to a request for all communications with Gibson Dunn regarding this action. In the case of ADI, there are hundreds of thousands, if not millions, of privileged documents and communications potentially responsive to Plaintiffs' request. A privilege log detailing each document would be extraordinarily burdensome to prepare and would likely take a team of attorneys working full time many months to complete. This burden is vastly disproportionate to the needs of the case—particularly given that, in response to RFP 20, Facebook has agreed to produce the list of Apps provided to the Massachusetts Attorney General that have been suspended as a result of ADI. In response to RFP 21, Facebook has further agreed to produce communications between Facebook's ADI team and third-party app developers relating to ADI. These categories of materials are surely the most relevant documents related to ADI, and Plaintiffs have offered no rationale that would justify requiring Facebook to undertake the great expense, burden, and delay that would be associated with preparing a privilege log detailing all ADI materials.

Plaintiffs asked if Facebook will produce non-privileged materials responsive to RFP 19. Non-privileged materials responsive to this request are captured by Plaintiffs' other RFPs, including RFPs 13, 20, 21, 31 and 32. Facebook has agreed to produce materials responsive to these requests, including (i) a list of apps suspended as a result of ADI, (ii) communications between Facebook's ADI team and third-party app developers related to ADI, and (iii) cease and desist letters sent to app developers.

### X.   PwC Documents/RFP 22-23

In response to RFP 22, Facebook will produce new copies of the PwC assessment reports with limited redactions for sections that are not relevant to the case and contain highly sensitive information. In response to RFP 23, Facebook further agrees to search for documents identified in the PwC assessment reports as having been relied on by PwC and to produce those materials to the extent they can be identified. Facebook will produce these materials by March 20.

### XI.   Documents regarding data misuse/RFP 32

RFP 32 broadly seeks "all documents concerning misuse of data" prior to the deprecation of Graph API v.1, including all documents and communications from any investigations, examinations, inquiries, and audits. This request is extraordinarily overboard, given that it broadly reaches "all documents and communications" related to Facebook's efforts curb and investigate data misuse—as opposed to documents regarding actual incidents of data misuse. Accordingly, Facebook agreed to produce cease-and-desist letters

GIBSON DUNN

Lesley Weaver
February 24, 2020
Page 13

sent to app developers relating to policy violations involving the use of user data—which reflect actual findings of data policy violations—and it encouraged Plaintiffs to narrow their request.

Plaintiffs now purport to narrow RFP 32 "to documents regarding the misuse of data that involves third parties' access, use, transmission, receipt, collection and analysis of users' content and information on and off the Platform." Facebook fails to see how Plaintiffs' proposed revision operates to narrow their request. Facebook encourages Plaintiffs to make a good faith effort to further limit the materials they seek through RFP 32. Facebook further notes that agreeing to search terms for this request would likely obviate the need for continued negotiations regarding the request's scope, and Facebook encourages Plaintiffs to engage in this process.

## XII. Documents regarding user testing/RFP 36

RFP 36 seeks "all documents" regarding so-called "user testing, evaluation and analysis of Facebook's Privacy Controls and App Settings." Facebook asked Plaintiffs how the requested materials are relevant to Plaintiffs' claims. While Plaintiffs vaguely contend such materials are relevant "to the issues of consent, deceit, and good faith," it remains unclear *how* the broad swath of requested materials relate to the issues identified. Facebook encourages Plaintiffs to articulate a coherent explanation for how the materials requested actually relate to the specific claims at issue and to appropriately narrow their request proportionate to the needs of the case.

## XIII. Requests for piecemeal collection and production/RFPs 24-25, 28-31, and 34

Plaintiffs seek immediate, piecemeal collection and production of materials responsive to RFPs 24-25, 28-31, and 34. As an initial matter, the piecemeal collection and review Plaintiffs demand is not possible, given that the parties have not yet agreed to search terms and custodians, and Plaintiffs have refused to engage in this process. Further, as noted above, Facebook will not undertake piecemeal collections and reviews—which are highly inefficient. Once the parties agree to search terms and custodians, Facebook will collect, review, and produce responsive materials.

Facebook has proposed search terms for RFPs 24-25, 28, 31, and 34. To the extent Plaintiffs believe that Facebook's proposed search terms do not reach relevant issues, Plaintiffs are encouraged to propose meaningful modifications. Below, Facebook addresses the additional issues Plaintiffs raise with respect to each of these RFPs but reiterates that reaching an agreement with respect to search terms and custodians would likely obviate the need to resolve the issues Plaintiffs raise.

GIBSON DUNN

Lesley Weaver
February 24, 2020
Page 14

**RFP 24**:  RFP 24 seeks "documents sufficient to show" the third parties who would have had access to user information other than through Platform.  In response to RFP 24, Facebook agreed to produce its final agreements with integration partners and device manufacturers, which Facebook identified in good faith—at the outset of discovery and before the parties negotiate search terms—as the materials likely to convey the information sought and relevant to the claims and issues remaining in dispute.  Plaintiffs have used Facebook's preliminary effort to identify relevant materials as an opportunity to demand a broader investigation.  To the extent Plaintiffs seek additional information regarding user data, Plaintiffs should seek this information through the discovery process, rather than demand representations of counsel through informal meet and confer discussions.

Plaintiffs separately wrote Facebook asking it to produce immediately in response to this RFP certain spreadsheets and lists identified in leaked, confidential materials from a different matter.  As discussed, Facebook intends to engage in a single document collection and review effort.  As Facebook understands the request, the identified materials will be captured by Facebook's proposed search methodology and will be collected and produced at an appropriate time.

**RFP 25:**  RFP 25 broadly seeks all documents relating to all agreements or partnerships described in RFP 24.  Given the extremely board scope of this request, Facebook agreed to produce agreements with its integration partners and device manufacturers responsive to this RFP and requested that Plaintiffs narrow the RFP's scope with respect to additional materials.  Plaintiffs now request that Facebook produce "internal Facebook communications or communications between Facebook and the third parties at issue regarding third party access to users' content and information not generally available through platform."  Facebook is confused by Plaintiffs' proposed revision, which seems to broaden the scope of requested materials.  As Facebook understood Plaintiffs' original request, Plaintiffs sought documents regarding Facebook's *agreements* with specific third parties.  Plaintiffs' supposed narrowing language now seems to expand the scope of Plaintiffs' request to seek all internal communications or communications with the third parties regarding any third party access to content not available through platform, *irrespective of whether those communications relate to any specific agreement or third party*.  If this is not what Plaintiffs meant to propose, please clarify.  If it is, Facebook continues to assert that Plaintiffs' request is overly broad, unduly burdensome, and disproportionate to the needs of the case, and it requests that Plaintiffs propose alternate language that actually narrows the request.  Negotiating search terms for RFP 25 would likely obviate the need for continued negotiations regarding the RFP's scope.  Facebook again encourages Plaintiffs to engage in this process.

GIBSON DUNN

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 15

**RFPs 28-30**: RFPs 28-30 broadly seek "all documents" relating to Facebook's monitoring of, enforcement of, and measures and controls to prevent violations of Facebook's Platform Policy, Data Policy, and SSR. Given the breadth of these requests, Facebook agreed to produce the final, formal, written Policies that governed access to Facebook consumer data by third-party applications. Although Plaintiffs have proposed narrowing these requests to concern only those policies regarding user data, the requests remain extraordinarily broad in that they seek all formal and informal policies, all internal and external policies, and "all documents" relating to each one of these policies. To the extent Plaintiffs seek additional materials beyond those Facebook agreed to produce, Facebook requests that Plaintiffs make additional efforts to narrow their requests. Negotiating search terms for these requests would likely obviate the need for continued negotiations on these RFPs. Facebook again encourages Plaintiffs to engage in this process.

**RFP 31**: RFP 31 broadly seeks "all documents" relating to any audit or investigation performed by Facebook or any third party, concerning compliance with any provision of any Facebook policy concerning user data. This request is extraordinarily broad, and encompasses hundreds of thousands—perhaps millions—of pages of materials, the vast majority of which likely have no bearing on Plaintiffs' claims. Facebook therefore agreed to produce cease-and-desist letters sent to app developers relating to policy violations involving the use of user data and asked Plaintiffs to consider narrowing their request. Rather than propose narrowing language, Plaintiffs ask Facebook to narrow their request for them. It is Plaintiffs' burden—not Facebook's—to propose a request that is reasonably tailored to elicit documents and information relevant to Plaintiffs' claims and proportionate to the needs of the case. However, as stated previously, Facebook proposes narrowing RFP 31 to relevant cease and desist letters. Once again, agreeing to search terms for this request would likely obviate the need for the parties to agree on specific narrowing language.

**RFP 34**: RFP 34 requests "all documents" relating to, what Plaintiffs call, "the conditioning of Third Parties' access to" user data on purchases or payments. Given that Facebook does not "condition" access to user data on purchases or payments, Facebook agreed to produce the Policies and agreements that governed access to Facebook consumer data by third parties. Plaintiffs contend they additionally seek "all communications and analyses on the topic of conditioning third party access to" user data on purchases or payments. Given that Plaintiffs' request is based on the false premise that Facebook "conditions" third party access to user data on purchases or payments, Facebook does not have any documents in its possession, custody, or control of the sort Plaintiffs describe.

Facebook looks forward to continuing to meet and confer with Plaintiffs on the topics discussed above.

**GIBSON DUNN**

Lesley Weaver
February 24, 2020
Page 16


Regards,

Martie Kutscher Clark

cc: Derek Loeser, David Ko, Cari Laufenberg