# Exhibit 58

# Filed Under Seal

Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION)
                               )   **NO. 18-md-02843 VC**
_____)
                                San Francisco, California
                                Thursday, March 5, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          KELLER ROHRBACK LLP
                        1201 Third Avenue - Suite 3200
                        Seattle, Washington  98101
                   BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
                        **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                        **DAVID KO, ATTORNEY AT LAW**

                        801 Garden Street
                        Santa Barbara, California  93101
                   BY:  **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street - Suite 1600
                        Oakland, California  94607
                   BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
                        **ANNE K. DAVIS, ATTORNEY AT LAW**

For Defendant Facebook:

                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, California  94105
                   BY:  **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

                        1881 Page Mill Road
                        Palo Alto, California  94304
                   BY:  **MARTIE P. KUTSCHER, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:   Marla F. Knox, RPR, CRR, RMR, Official Reporter

**<u>APPEARANCES:</u> (CONT'D)**

For Defendant Facebook:

                      GIBSON DUNN and CRUTCHER LLP
                      200 Park Avenue
                      New York, New York  10166
        BY:  **ORIN SNYDER, ATTORNEY AT LAW**

                      333 South Grand Avenue
                      Los Angeles, California  90071
        BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**

| | |
|---|---|
1 | **Thursday - March 5, 2020**                              **2:03 p.m.**

2 |                     **P R O C E E D I N G S**

3 |                            ---000---

4 |     **THE CLERK:**  Calling Case Number 18-MD-2843, In Re:

5 | Facebook Inc. Consumer Privacy User Profile Litigation.

6 |     Counsel, for Plaintiffs please state your appearances for

7 | the record.

8 |     **MR. LOESER:**  Hi, this is Derek Loeser for Plaintiffs.

9 | With me in my office are Cari Laufenberg and David Ko and also

10 | appearing are Lesley Weaver and Annie Davis and Matt

11 | Montgomery.

12 |     **THE CLERK:**  Thank you.  And for Defendant.

13 |     **MR. SNYDER:**  Good afternoon, Judge.  It is Orin Snyder

14 | for Facebook from Gibson Dunn, and with me on the phone are

15 | Deborah Stein, Josh Lipshutz and Martie Kutscher.

16 |     **THE COURT:**  Okay.  Hi, Everybody.  So it sounds like

17 | everything is going great.

18 |     **MR. SNYDER:**  All over the world, Your Honor.

19 |     **THE COURT:**  Yeah.  I don't really know where to start

20 | or what to do with you at this point.  I guess -- I will -- let

21 | me start with this:  You know, there is -- for a while now we

22 | have been discussing Facebook's production of the same

23 | documents that it produced to the FTC.

24 |     And, you know, the Plaintiffs have been asking for me to

25 | order Facebook to simply turn over all the same documents.  And

1    I responded that I thought out of fairness to Facebook, if

2    Facebook wanted to review all those documents again and, you

3    know, sort of try to determine whether it produced some stuff

4    to the FTC that it shouldn't produce to the Plaintiffs --

5    either because it is privileged or too far afield from this

6    litigation or something like that -- that that would be

7    appropriate.

8        And so I gave them -- I said that they could do that.  It

9    sounds like from reading your papers, that Facebook is prepared

10   to make that production by the end of this month; that is, all

11   of the stuff that it turned over to the FTC minus whatever it

12   concludes it should withhold for privilege reasons or for

13   relevance reasons in this litigation.

14       I assume that that would cover the vast majority of the

15   documents that the Plaintiffs would want in this litigation.

16   Am I wrong about that?  And if I'm wrong about that, what am I

17   missing?

18           **MR. LOESER:**  So, Your Honor -- this is Derek Loeser.

19   Just before I start, it sounds like someone is on a cell phone

20   or something.  While you were speaking there was probably

21   breathing.  It makes it a little hard to hear the Court.  So if

22   there is a mute someone can press, that would be useful.

23           **THE COURT:**  Do you need -- do you need me to repeat

24   what I said?  I mean the short version --

25           **MR. LOESER:**  No.  I think I heard --

**PROCEEDINGS**

1          **THE COURT:**  Okay, go ahead.

2          **MR. LOESER:**  Sorry.  Yeah, I think the short

3     version -- I guess I will repeat it back to you to make sure I

4     have it -- is whether Facebook's offer to produce FTC materials

5     after its privilege and relevancy review at the end of March is

6     sufficient or not.

7          And here is our concern:  First, on this question of

8     privilege review, there is no privilege remaining for these

9     documents in the Ninth Circuit.

10         So that's -- we will circle back to that later, but

11    Your Honor has indicated that there is --

12         **THE COURT:**  You mean because they waived the privilege

13    by turning it over to FTC?

14         **MR. LOESER:**  Yes.  The Ninth Circuit, with every

15    circuit except for the Eighth Circuit, has rejected any notion

16    that you can voluntarily turn information over to a government

17    agency and retain attorney-client privilege for that

18    information.

19         **THE COURT:**  Yeah, but one of the things --

20         **MR. LOESER:**  Yeah, but --

21         **THE COURT:**  One of the things that we discussed was

22    that -- you know, they might have reasons to do a more careful

23    review in this case than in their interactions with the FTC;

24    right.  So maybe there could have been inadvertent --

25    privileged documents inadvertently produced to the FTC; right?

1            **MR. LOESER:**  Yeah.  I don't want to distract because I

2    think this might be something we have to brief, and the Court

3    would have to rule on whether there is such a thing as

4    inadvertent production in which you can preserve a privilege.

5            **THE COURT:**  Okay.

6            **MR. LOESER:**  I don't think anything Facebook did when

7    turning documents over to the Government would be considered

8    anything other than a waiver of an attorney-client privilege,

9    but I think --

10           **THE COURT:**  Okay --

11           **MR. LOESER:**  -- what I was --

12           **THE COURT:**  I don't know a lot about -- sorry.  I was

13   just going to say:  I don't know a lot about that issue.  So

14   that may be that is something you ultimately need to brief.

15   That's fine.

16           **MR. LOESER:**  So the heart of your question is the

17   relevancy review and why are we not satisfied with Facebook

18   simply saying they are going to conduct a relevancy review and

19   give us what makes it through their screen.

20       I guess I would put it to you this way:  One, we are very

21   concerned about that review and whether their interpretation of

22   relevance coincides in any meaningful way with our own.  From

23   everything we have heard from Facebook so far, they have a

24   very, very narrow view of what is relevant here.  That's the

25   first concern.

1    The second concern is the whole reason why we spent months

2  fighting with Facebook to get the FTC correspondence was so

3  that we could look and see and evaluate really what was given

4  to the FTC.  And we have that correspondence and we have gone

5  through it.

6    And, frankly, based on your review -- with the exception

7  of some very discrete categories -- there is a very clean

8  overlap between those two matters.  So what we said to Facebook

9  is:  Okay, let's talk about that.  We both have read this

10 correspondence.  Tell us what you think is not relevant by

11 category so we can come to some agreement so you can then do

12 your review once and produce the documents once.

13    What we are very concerned about with the October deadline

14 is the process that Facebook has in mind would involve them

15 unilaterally pulling documents out of production; not telling

16 us what they pulled and not logging it in any way -- which is

17 what they said they are going to do -- and then us having to

18 sit there and try to piece together what has been removed.

19    It is very likely that we would disagree with what they

20 are going to do, and then we would have a fight and motions

21 practice.  And then if we prevail, another production would

22 have to occur.  And that in and of itself --

23    THE COURT:  How is that different from -- let's say

24 the FTC action never happened; right.  And you submitted

25 document requests, you know, that were similar to what the FTC

1   didn't ask but the FTC action never happened.  And then

2   Facebook would be going through its documents and deciding what

3   to -- and they would do an initial cut -- they would take an

4   initial cut.  They would have an initial universe of documents

5   and they would go through those, and they would pull out stuff

6   that they conclude is not responsive to your requests.

7        And they would never be required to do a log of the stuff

8   that they pulled out and determined was irrelevant or

9   non-responsive to your request.  So I guess, why should they

10  have to do that here?

11       **MR. LOESER:**  Well, the technical reason why is under

12  Rule 34 if you are reviewing materials and it is a set of

13  materials, you do have to log or provide some information on

14  how you are calling documents out.

15       Here, we are not talking -- we live in a world where they

16  have already done all this work, and they have already produced

17  these documents; and we have asked for them in discovery.  So

18  if they are going to remove something from a production of

19  materials that we have asked for that already exist, the

20  standard mechanism under the discovery rule is for them to tell

21  us how they are removing, what they are removing and what the

22  basis is for -- of it is.

23       But I do think that the point you make it certainly brings

24  to mind, you know, why are we bothering with any of this.  And

25  the reason why we are bothering with it is that we felt the

1  fact that they have already gathered documents based on an

2  investigation that very significantly, if not entirely,

3  overlaps with this case, it is just a much faster way to get

4  this information.

5       Now, I understand Facebook doesn't want this to be faster.

6  But the fact of the matter is they have gathered this

7  information.  They have reviewed it.  They have used search

8  terms and custodians for the production, and we would get a

9  significant head-start here if these materials could be turned

10 over as opposed to having to wait to do this whole mechanism

11 and process over again starting as if it hasn't already

12 happened.  So that's problem one.

13      Problem two is really the question of search terms and

14 custodians, which is something we want to talk about today;

15 and, perhaps, we should talk about it next.  But really, you

16 know, we asked for the FTC materials because it obviously is

17 relevant and overlaps and because it is a means and a method to

18 just get this moving much faster than having to start all over

19 again.

20          **MR. SNYDER:**  Your Honor, may I be heard?  It is Orin

21 Snyder.

22          **THE COURT:**  Sure.

23          **MR. SNYDER:**  How are you, Judge?  Nice to be talking

24 to you on the phone.  Sorry we are not there in person, but

25 thanks for accommodating our request.

**PROCEEDINGS**

1      This is a little bit like either The Twilight Zone or

2  Alice In Wonderland because the roles here seem to be reversed.

3  We, as the Defendant, are eager -- in fact, chomping at the

4  bit -- to prosecute our defenses.  And we are trying to

5  proceed, not only in an efficient manner but in a prompt

6  manner, in getting to document production and then depositions.

7      And we have given search terms and -- to the other side

8  and we are producing the documents, the FTC documents.  We are

9  reviewing them -- not categorically.  We are reviewing them

10  document by document just as you had suggested we do.  We have

11  agreed to provide that by the 31st.

12      What the Plaintiffs are saying is, Judge, we are not even

13  ready to engage on search terms.  We don't want to even give

14  you any Plaintiffs for depositions until we know what search

15  terms you and the FTC agree to and until we basically figure

16  out what theory of the case we want because they are confined

17  now, Your Honor, to the four topics that you identified --

18  having gone through their kitchen sink complaint -- and

19  identified as four potential theories.

20      On those theories we are prepared to produce documents

21  pursuant to the proper document request promptly.  We are

22  working literally every day around the clock to do that.

23      We are not seeking to delay anything.  We intend to comply

24  with the October cutoff date.  We are ready to proceed on the

25  merits of our defenses.

**PROCEEDINGS**

1      And it is the Plaintiffs, Judge, truly -- and we can walk

2   you through how they are holding up things at every turn; and

3   we believe, respectfully, it is because they are not content

4   with these four theories, and they want to search around for

5   something else that they can allege either in the pleading or

6   otherwise.

7      And, Your Honor, the metrics belie any notion of delay

8   here.  Not only did we respond to their 1,400 paragraph

9   Complaint, we produced already 150,000 pages of documents.  We

10   are promptly producing the FTC documents.  We gave them the

11   search terms.

12      We met and conferred with them for over 15 hours.

13      **THE COURT:**  Could I ask you --

14      **MR. SNYDER:**  Ninety --

15      **THE COURT:**  Sorry to interrupt.

16      **MR. SNYDER:**  Sure.

17      **THE COURT:**  Part of the problem with this discussion

18   is, you know, this is nobody's fault; but I don't have the

19   ability based on the amount of time I have spent on this and

20   the amount -- and based on the information you have given me

21   and based on the things that you both are saying here today --

22   I don't have the ability to determine who is in the wrong, who

23   is being unreasonable.  I mean, no matter how --

24      **MR. SNYDER:**  Right.

25      **THE COURT:**  -- no matter how much either of you pound

1    the podium --

2           **MR. SNYDER:**  I have a suggestion -- but I have a

3    suggestion for the Court.  And I think that you said:  Where do

4    we go and what do we do from here?

5           We, Facebook, want to follow the Federal Rules of Civil

6    Procedure with dispatch and the utmost good-faith.  We are

7    already producing hundreds of thousands of documents before the

8    parties have even agreed to an ESI protocol, search terms or

9    custodians.

10          If the Plaintiffs would meet and confer with us on ESI

11   protocol, search terms and custodians, we will get to work in a

12   hurry, Judge; and we will produce whatever is responsive,

13   relevant and non-privileged.

14          **THE COURT:**  I wonder if the best way to move things

15   along is -- I'm interested in both of your thoughts on this --

16   but I wonder if I should try to find a Magistrate Judge who can

17   sit down with you-all -- refer this case to a Magistrate Judge

18   for discovery purposes and have it be somebody who can sit down

19   with you-all in person once every two weeks to sort of make

20   sure that things are still moving; make sure that the

21   Plaintiffs are not unfairly picking at Facebook; to make sure

22   that Facebook is not adopting an artificially narrow definition

23   of relevance; and just to -- you know, is there somebody with

24   the -- and, frankly, somebody who knows something about

25   electronic discovery.

1          You know, that is not something that I ever -- you know,

2     as a lawyer in my practice -- as a lawyer I never had to deal

3     with electronic discovery or hardly ever.  You know, and it is

4     rare that anything comes up for me as a District Judge.

5          Maybe what we need is somebody who can really roll up

6     their sleeves with some expertise on this stuff and help you

7     cut through it all.

8          **MR. SNYDER:**  Your Honor, it is Mr. Snyder.  The issue

9     there is -- we are always happy to meet with a Magistrate Judge

10    if there is an impasse.

11         What I'm trying to explain -- I guess, not effectively --

12    to the Court is it is so premature because the Plaintiffs are

13    not coming to the table in the ordinary course as a Plaintiff

14    prosecuting a case normally would, which would be chomping at

15    the bit to get custodians, search terms and --

16         **THE COURT:**  Right.  But, again -- sorry to interrupt

17    but, again, I'm not in a position to know whether that's

18    actually true or not; right.  I don't -- all I know sitting

19    here is that we have two sides in a massive case that are

20    having a tremendous amount of difficulty even, you know,

21    figuring out the terms under which they are going to negotiate

22    the production of discovery, and --

23         **MR. SNYDER:**  You know what, Judge -- we are okay with

24    that, Judge.  I think -- look, we know -- and I know this

25    sounds overly declarative.  We know that we are not only in

1  good-faith but we are working hard to do the right thing here.

2  And if Your Honor wants a Magistrate Judge to evaluate that, we

3  are confident that the Judge will agree because we are ready to

4  go.

5      We have a year to prove and we think win our case, and we

6  do not want to delay anything.  It really is the Plaintiff who

7  put the brakes on.  So if Your Honor thinks that going in front

8  of a Magistrate Judge is constructive, we are all for it

9  because we do not want this case to be delayed.  We want to go

10  forward on the current schedule.

11         **THE COURT:**  And, you know, maybe --

12         **MR. LOESER:**  Your Honor --

13         **THE COURT:**  -- we set something up where you are just

14  required -- you know, sorry to make you fly all these times;

15  but it is just like an in-person meeting.

16      I mean, I had a real problem case awhile back where I -- I

17  felt the need to do this, and there were just regular in-person

18  meetings with the Magistrate Judge.  And, you know, things

19  got -- things started moving along once I did that.

20      Mr. Loeser?

21         **MR. LOESER:**  Your Honor, it's Derek Loeser.  If I

22  could be heard.

23         **THE COURT:**  Go ahead.

24         **MR. LOESER:**  We don't have any problem with a

25  Magistrate Judge.  We think Magistrate Judge Corley, for

1   example, is someone who has a lot of experience with issues

2   like this.  I will say --

3        **THE COURT:**  That's the person -- that's the person who

4   fixed my last problem case.  Anyway, sorry.  Go ahead.

5        **MR. LOESER:**  We would be in favor of that because I

6   can tell you that, you know, it is nice to hear Mr. Snyder --

7   and I understand that he may not have a great grasp on the

8   meet-and-confers and disputes that have occurred because he

9   hasn't been on any of those meet-and-confer calls -- but I can

10  tell you, we have tried very hard for a very long time to

11  engage Facebook and have a reasonable conversation about search

12  terms and custodians.

13       We have offered up what seemed to us like common-sense

14  solutions; like, why don't we start with what you have already

15  gathered for the FTC.  Why don't we look at the custodians you

16  have used there.  Why don't we look at the search terms.  They

17  rejected all of that.

18       They have no organizational charts they claim; no charts

19  that are -- not called organizational charts but have the same

20  information.  You know, if in discovery it ends up being the

21  case that such materials actually exist, which wouldn't

22  surprise us, I guess Facebook would have some explaining to do.

23       In the absence of any of this detailed information, we

24  have just sort of gone out on the Internet to come up with as

25  much information as we can to put together search terms and

**PROCEEDINGS**

1  custodians.  Facebook has refused to discuss those.

2      So the idea that we have somehow -- Plaintiffs in a

3  litigation want to slow down discovery is pretty ridiculous and

4  obviously untrue.  We would welcome biweekly -- we will sit

5  down with a Magistrate three times a week if that's what it

6  takes.  We will be there as much as we need to be there.  We

7  will fly there.  We want this case to move.  We want to meet

8  the deadline.

9      What we don't want to have happen is what Facebook has

10  structured here, which is they have produced 150,000 documents

11  that relate only to a handful of named Plaintiffs.  The

12  materials are produced in a fashion that makes them largely

13  unusable.  They have achieved what Your Honor said they should

14  not do which is bifurcate discovery.

15      And at the present rate with what they are doing with

16  discovery, meeting that deadline seems very, very challenging.

17  We want to meet that deadline.  We want to come there, and we

18  will talk to anyone that we need to talk to make that happen.

19          **THE COURT:**  Okay.  I think that's what I'm going to

20  do.

21      Are there any -- I mean -- I will preface my question that

22  I'm about to ask you with the statement that I am generally

23  very reluctant to appoint anybody from outside the court

24  system, you know, Special Master, Special Discovery Master,

25  what have you.

1    But I just wanted to check.  I know it happens a lot in

2    MDLs that a Special Discovery Master is appointed, somebody

3    from outside the court.  So even though I'm -- I doubt I would

4    do it.  I just wanted to ask people what they thought about

5    that as opposed to a Magistrate Judge.

6         **MS. STEIN:**  Thank you, Your Honor.  This is Deborah

7    Stein for Facebook just chiming in.  I think we are comfortable

8    with a Magistrate Judge and are happy to participate in that

9    process.

10        You know, I take it from Plaintiffs' Counsel that, you

11   know, he would like someone from Facebook who has been involved

12   in these calls to, you know, address the Court today on this.

13        And I have been involved in the calls.  I don't think that

14   Plaintiffs --

15        **THE COURT:**  Well, I don't need -- I appreciate it, but

16   I don't really want to hear anymore discussion of who is right

17   or wrong.

18        **MS. STEIN:**  Okay.

19        **THE COURT:**  Simply because we can be here for three

20   hours, and I still would not be a position to know who is right

21   or wrong.

22        Do you-all -- do you-all have a suggestion or a request

23   for a Magistrate Judge?

24        **MS. STEIN:**  We are fine, Your Honor, with whoever you

25   would like.  I think that from our perspective, you know, I

 1   think what would make sense on a timing front would be whatever

 2   Your Honor thinks would make sense for the initial meeting and

 3   then, you know, on a going forward basis for the Magistrate to

 4   make determinations as to when the next meeting would make

 5   sense.

 6       There are probably some instances where two weeks, you

 7   know, is really too quick.  And maybe there are other instances

 8   where, you know, a follow-up call or something is required.

 9   But, you know, I think having a standing two-week in-person

10   might be a bit onerous and might make more sense to have it

11   tied to, you know, specific milestones.

12       **MS. WEAVER:**  Your Honor, if I might, this is Lesley

13   Weaver on behalf of Plaintiffs.

14       And just to chime in here, I think -- if I'm hearing the

15   Court correctly, I do think having somebody very skilled in ESI

16   would be very helpful in this case.

17       We think a lot of this production needs to be done in

18   native form.  And that's going to be more complex than, I

19   think, even ordinarily occurs in your run-of-the-mill antitrust

20   or securities case just because of the natural environment a

21   lot of the subject material lives in.

22       Magistrate Judge Corley certainly has that experience.  I

23   think Magistrate Judge Beeler does.  If Your Honor decided that

24   he wanted to consider a Special Master, we would be happy to

25   discuss that.  And Judge Laporte, who is now at JAMS, might be

1    a good candidate given her expertise with ESI as well.  So

2    those are just three options I think we would be comfortable

3    with.

4         **MR. SNYDER:**  Your Honor, may I suggest that we meet

5    and confer and suggest a name if we can agree on one just

6    because we are going to want to get client input on this one.

7    Judge Grewal may have an opinion.

8                        (Laughter)

9         **MR. LOESER:**  Your Honor, Derek Loeser -- I'm sorry, go

10   ahead.

11        **THE COURT:**  Yeah, that's fine.  I mean, even if you

12   agree on a name, you may not get that name just because -- you

13   know, it is going to depend on people's schedules; but why

14   don't you go ahead and send -- go ahead and send Kristen an

15   e-mail telling us what -- you know, whether -- whether the

16   parties want to jointly recommend somebody or jointly request

17   somebody and that can be -- you can do that by Monday.  Does

18   that sound okay?

19        **MR. LOESER:**  Great, Judge.  That sounds fine,

20   Your Honor.  Just won't be any great surprise if the three

21   names we just provided are likely the ones that we think make

22   the most sense.

23        **THE COURT:**  Okay.

24        **MR. LOESER:**  In the meantime we have a collection of

25   issues that we need to advance with all due* dispatch.  And so

**PROCEEDINGS**

1    I'm not sure where that leaves us with those issues.  I think

2    the meet-and-confer process with regard to those issues is

3    frankly at an impasse and it is not any great need to keep

4    going around in circles.

5         So I suppose we will send in this e-mail.  Hopefully we

6    will have an agreement in the next couple of days or if no

7    agreement, the Court can simply indicate who the Special Master

8    will be.  And it would then be the plan to submit these

9    disputes to the Magistrate or Special Master.

10        **THE COURT:**  I'm happy to, you know, make an attempt to

11   cut through some of the stuff if it would be helpful to you.

12        I will start with Facebook.  I have a question of

13   Facebook.  I'm looking at Footnote 2 of Facebook's case

14   management statement.

15        It says (reading):  "Plaintiff's contend Facebook has not

16   completed production of certain FTC correspondence that the

17   parties discussed with the Court.  This is untrue.  Facebook

18   has produced all document demands and correspondence that it

19   agreed to provide from the FTC proceedings."

20        That was a little ambiguous to me.  I don't know if that

21   was just -- it was sort of a mistake in the way you worded it.

22   But "we have produced everything that we agreed to provide."

23        I thought that I ordered you to provide all correspondence

24   between you and the FTC about document production.  So I just

25   wanted to get clear whether you have provided -- whether you

1  have disclosed to the Plaintiffs all correspondence between you

2  and the FTC regarding document production.

3       **MS. KUTSCHER:**  Your Honor, this is Martie Kutscher at

4  Gibson.

5       I think the wording of the footnote was just a little bit

6  unclear.  There was nothing intentional about that wording.  At

7  the last case management conference we had discussed that

8  Facebook had already produced all document demands from the FTC

9  from its 2018/2019 investigation as well as correspondence from

10 the FTC describing the scope of those demands.

11      And we understood that the Court had ordered us to produce

12 the same materials from the earlier FTC proceeding.  So we

13 produced those materials.

14      The parties had separately discussed producing additional

15 correspondence from the 2018/2019 investigation from Facebook

16 regarding the scope of what was produced in that investigation,

17 and that correspondence has been produced.

18      **THE COURT:**  Okay.  A related issue is that the

19 Plaintiffs want search terms that were used to prepare the FTC

20 productions.  I'm not really seeing what is wrong with

21 providing the Plaintiffs with search terms that were used to

22 prepare the FTC productions.  It may -- it may streamline the

23 process of figuring out what search terms to use and what

24 search terms not to use, and I don't see how Facebook is harmed

25 in any real way by providing those to the Plaintiffs.

1          **MS. STEIN:**  Your Honor, this is Deborah Stein again.

2      This is an issue that we have gone around with Plaintiffs

3  on and we actually prepared a joint letter on because it is an

4  important issue.  And for some reason the matter that we had

5  fully briefed did not get presented to Your Honor.

6      We have a concern about this for a variety of reasons.  We

7  do think that it will end up creating inefficiencies because

8  these are different cases with different requests for

9  production.

10     And we have a concern that what is really going on here is

11 that they are looking for the FTC search terms for different

12 reasons than efficiency purposes; that they are looking to sort

13 of second-guess the FTC investigation.  And we have provided

14 them with very broad, lengthy boolean searches that they are

15 free to build upon and make -- propose searches that they think

16 hit upon their actual request for production that are tethered

17 to their request for production and what is at issue in this

18 case as opposed to the FTC case.

19     They are getting the FTC documents from us starting with

20 search terms that have already been used and run and that they

21 are getting the documents for doesn't really advance getting

22 them more documents here.

23          **THE COURT:**  Well, I mean your argument --

24          **MS. STEIN:**  And for some reason we have been unable to

25 get them to either build upon --

1        **THE COURT:**  Sorry to interrupt.  Hello?

2        **MS. STEIN:**  -- that we have provided them or for them

3   to even provide their own search terms.  I, frankly, have never

4   dealt with a case where Plaintiffs don't send over boolean

5   search terms.  I mean, they are often broader than what we want

6   to see; but, you know, here we just got a list of words that

7   includes things like "likes" and --

8        **MR. SNYDER:**  But before -- Deborah, let me just add to

9   that.  This is Orin Snyder from Gibson Dunn.

10       Your Honor, here is the problem.  They are getting all the

11  FTC documents that relate to the -- to their case.  The FTC

12  investigated other things that have nothing to do with this

13  case at all.  Let's call it X, Y and Z.

14       **THE COURT:**  I know but --

15       **MR. SNYDER:**  And we should not --

16       **THE COURT:**  It sounds like you're arguing -- if I may

17  interrupt, it sounds like what you are saying is that if you

18  turn over the search terms that you used for the FTC documents,

19  then they are going to react in an overzealous way to that and

20  they are going to start demanding stuff that isn't relevant to

21  this litigation, and that is -- it is just going to be a

22  distraction.

23       But that, of course, can be dealt with.  If they start

24  asking -- if receiving those search terms starts causing them

25  to ask for stuff that they shouldn't be entitled to in this

 1    litigation, that can be dealt with at that time.

 2        On the other hand, maybe the search terms that you used

 3    would help inform the search terms that are used in this case.

 4    And it feels a little bit like you are just hiding the ball by

 5    not being willing to give them those search terms.

 6            MR. SNYDER:  No, Your Honor.  Your Honor took pains to

 7    identify four potential theories buried in their pleading.  And

 8    the Court held in its decision that the case is limited to

 9    those four theories.

10            THE COURT:  For now.

11            MR. SNYDER:  -- and anything else -- right.  For now.

12    And, therefore, we should be engaging in discovery based on

13    those theories with search terms and custodians.  They want now

14    discovery into essentially what the FTC asked us to produce

15    that has nothing to do with this case which is a classic

16    fishing expedition.

17            THE COURT:  Yeah, but --

18            MR. SNYDER:  And we have agreed --

19            THE COURT:  -- all I'm asking you to give them is the

20    search terms.

21            MR. SNYDER:  Right.

22            THE COURT:  I'm not asking you to give them the

23    documents.

24            MR. SNYDER:  But the search terms are the key -- it is

25    the same thing effectively, Your Honor, because it identifies

**PROCEEDINGS**

1    areas that have nothing to do with this case, and it would lead

2    not only to unnecessary motion practice but --

3         **THE COURT:**  Oh, there is going to be plenty of

4    unnecessary motion practice in this case.  I don't think we

5    need to worry about that.

6         **MR. SNYDER:**  But the Court has already held at the

7    last CMC, the January one, that not all materials produced to

8    the FTC must be reproduced here.  Giving them the search terms

9    would be an end-run around that ruling.

10        This is not FTC versus Facebook.  This is the Plaintiffs

11    versus Facebook.

12        **THE COURT:**  Why?  Why?  I'm not saying you give them

13    access to the universe of documents searched.  I'm just saying

14    you give them the search terms to help them -- to help them

15    inform their position on what the search terms should be.

16        **MR. SNYDER:**  That's not why they want them.

17        Martie, go ahead.

18        **MS. KUTSCHER:**  One of the bigger issues we are also

19    facing on this issue is what the Plaintiffs requested in their

20    document request was all of the FTC materials and then a slew

21    of other materials.  So they have those requests and they have

22    twenty-some odd additional requests.

23        We are giving them the FTC materials, and the FTC search

24    terms are crafted around those materials.  They are not crafted

25    for the additional searches or the additional requests the

1  Plaintiffs had made.

2      So using the FTC search terms as a starting point just

3  isn't really an effective way to start because those searches

4  are tailored towards the documents they are already getting

5  from the FTC productions and really are not tailored or

6  relevant to the additional document demand, and that's what we

7  need to figure out, the searches for those demands.

8          **MR. LOESER:**  Your Honor --

9          **THE COURT:**  But you can make those arguments after you

10 give them the search terms.  You can make those arguments after

11 you give them the search terms.  You can say:  Here is the

12 search terms, but we can't -- we can't be tied to this because

13 it is going to produce a bunch of stuff that is irrelevant.  I

14 mean, what am I missing?

15         **MR. LOESER:**  Which, Your Honor, is exactly why we want

16 the search terms.  I'm sorry to interrupt, Mr. Snyder, but you

17 know, what we are hearing is a lot of description of things

18 that were after that were inappropriate, and we were searching

19 for materials that were not related to our case.

20     That is all not true.  We want the search terms

21 specifically to identify things that are related to the case.

22 And if it kind of seems like hiding the ball, that's exactly

23 what it is.  These terms resulted in the production of

24 materials for an investigation that significantly overlaps.

25 They are a good starting place.

**PROCEEDINGS**

1      When we get the terms, we can look at ones.  If they don't

2  relate to this matter, we will cross them off the list.  If we

3  want to argue with Facebook about what does or doesn't relate

4  to matter, then that is the meet-and-confer we were trying to

5  have with them which they refuse to have.

6      It just doesn't make sense to claim that these terms are

7  not helpful or unrelated.  Obviously they are.  They resulted

8  in the production for an investigation that overlaps

9  substantially with this case.

10     I can promise the Court and Mr. Snyder and everybody else

11  on the phone, we have no intention of using them

12  inappropriately or for any purpose other than identifying

13  appropriate search terms for the subject matter of our case.

14  We have no other intention.

15     **MR. SNYDER:**  Your Honor, we have -- this is

16  Mr. Snyder.  We have briefed this already.  Your Honor's point,

17  it wouldn't be fair to weigh in without more information; that

18  you need three hours.  If I can respectfully request, this is a

19  big issue for Facebook for reasons that we set forth in our

20  briefing.

21     We believe this should be a threshold issue or be for the

22  Magistrate Judge, and it would be unfair for Your Honor, based

23  on this limited record, to rule on this issue.

24     We are not hiding the ball at all.  This has to do with

25  them getting results of search -- searches that -- Facebook

1    conducted internally to produce documents to the FTC.

2        The way the Federal Rules work is the parties meet and

3    confer and agree on search terms based on the case before them.

4    And we would respectfully request that once the Magistrate

5    Judge is in place, this will be the first issue to address; and

6    that we abide that rather than have it -- frankly, a ruling on

7    at best a partial record.

8        **THE COURT:**  It sounds like you are working on briefing

9    already.  Why don't you submit a letter brief to me, a joint

10   letter, by Monday.  And then I will decide whether to rule on

11   it or kick it to the Magistrate Judge.

12       **MR. SNYDER:**  That sounds great.

13       **MR. LOESER:**  Your Honor, Derek Loeser.  That sounds

14   fine.  We do have the materials already prepared.  In case you

15   are interested in knowing, they weren't filed because after we

16   prepared our portion, Facebook indicated that it would provide

17   us with search terms and custodians.  We waited for that.

18   That's when we got their 9 custodian and 12 search strings

19   which wasn't worth waiting for.  So we have those materials.

20       **THE COURT:**  The only other thing I want to say right

21   now, and I'm going to -- I mean, I have said it a number of

22   times on the record already -- I am concerned -- you know,

23   without making any suggestions about anybody, you know, whether

24   anybody is acting in bad faith or being dilatory or anything

25   like that, I am concerned that Facebook has, you know, often

1    made statements reflecting an unduly narrow view of what should

2    be turned over to the Plaintiffs.

3         And, you know, this is a big case.  I mean, there is often

4    a lot of talk about proportionality and whatnot.  This is a big

5    case.  It is a significant issue.  You know, and there is --

6    this is not the type of case where we are going to be saying:

7    Well, that might end up -- that effort might end up uncovering

8    some relevant information; but, you know, it is just too

9    expensive or difficult, and so we are not going to make

10   Facebook do it.

11        This is really not one of those cases where that is

12   very -- that type of argument is likely to carry the day.  You

13   know, and, as I have said a number of times, you know, the best

14   way to figure out what happened as it relates to the claims

15   that are going forward now is to -- for Facebook to produce all

16   information, all documents about the practices associated with

17   giving third parties access to friends' information and

18   friends' of friends information.

19        And I --

20        **MR. SNYDER:**  Your Honor, may I be heard on that

21   because Your Honor has no basis for concern on that score.

22        If I was there, I would look you in the eyes.  I'm telling

23   you, Judge, we are not only acting in good-faith; we are eager

24   to produce documents, whatever the expense, that are relevant

25   to the issues in this case.

1    And we have been trying to do that by meeting and

2    conferring and trying to get moving in accordance with the

3    Federal Rules of Civil Procedure which is, you ask us for

4    documents.  We meet and confer on custodians and search terms,

5    and we produce documents.

6        We are not saying expense.  What we are saying is --

7    Your Honor knows the history of the case as well as we do.  It

8    started in' 18.  Your Honor gave them discovery on five topics.

9    They filed a Complaint.  Your Honor identified deficiencies in

10   that Complaint.  They filed a new Complaint.  Your Honor sifted

11   through this kitchen sink Complaint and identified the viable

12   potential theories.  And on those theories not only is there no

13   ball hiding, we want to get on with it.  It is not that

14   complicated.

15           **THE COURT:**  I have heard --

16           **MR. SNYDER:**  But, Judge -- what they want to do,

17   Judge, is they really are still looking for a better theory and

18   that's what this is all about.  Otherwise, they would be acting

19   like a Plaintiff and saying:  Okay.  Let's get the search terms

20   and let's get the custodians.

21       Instead, they want to backdoor FTC search terms because

22   they are looking for some other theory of the case.  But I am

23   confident, Your Honor, that when you see our performance on the

24   issues in this case in terms of our production of documents,

25   you will have no basis for concern because we want to get on

1   with it because we think those documents actually are the key

2   to us winning this case.

3           THE COURT:  I can't wait.  Okay.  So we will -- we

4   will hear from you-all on a couple of things by Monday.  And in

5   the meantime, I will look into the possibility of a Magistrate

6   Judge referral for discovery purposes.

7           MR. SNYDER:  Great.  Thank you.

8           MR. LOESER:  Derek Loeser.  Before we all hang up and

9   go our separate ways, can I raise a couple other discrete

10  issues?

11          THE COURT:  Only if it is really quick.

12          MR. LOESER:  Yeah.  One is just this process for

13  having Your Honor receive joint submissions on disputes, and

14  it's just really a housekeeping thing.

15      Under your rules, you know, there is a procedure where

16  each side puts together five pages and submits it to the Court.

17  One of the problems we have been having with these sort of

18  endless meet-and-confers is there is no deadline to actually

19  submit the materiality to the Court.  And that was the basis

20  for our proposal where there would be five days after a

21  meet-and-confer for one party to submit the materials and then

22  three days after that for the other side.

23      I do think it would remove a real practical problem we are

24  having in terms of the speed with which things can get to the

25  Court.

1          **THE COURT:**  Yeah, that's -- I hear you.  And we will

2   let the Magistrate Judge figure out how they want to address

3   that.

4          **MR. LOESER:**  Okay.  And the very last thing is we have

5   a UK Plaintiff which Your Honor has noted before.  The UK

6   Plaintiff we have wishes to withdraw.  We have two other UK

7   Plaintiffs who are prepared to substitute in.  Claims are

8   exactly the same and simply it would be two people substituting

9   in for one substituting out.

10      We have asked Facebook to consent.  They refuse.  They

11  have indicated they are going to oppose our substitutions.  And

12  so if that's really the position they are going to take at this

13  stage of the case that we are in, then we will be filing a

14  motion just asking for substitution for this purpose.

15         **THE COURT:**  Okay.  I mean -- I was -- I may be

16  ignorant on this topic.  I was scratching my head about whether

17  the class could include everybody in the UK or people from the

18  UK.  But assuming it can, I can't imagine denying a request to

19  substitute in Plaintiffs at this relatively early stage in the

20  case.  But -- and maybe Facebook can consider my comment in

21  deciding whether to oppose it.  But if they -- if they want to

22  oppose it, they have a right to do so; and I will decide the

23  motion.

24         **MR. LOESER:**  Okay.  Your Honor, and for Plaintiffs we

25  are looking really forward to a process where there are more

**PROCEEDINGS**

1    than 12 search terms and 9 custodians.  We appreciate the time,

2    Your Honor, has spent dealing with these issues today.

3            **THE COURT:**  All right.  Thank you.

4        **MR. SNYDER:**  Thank you.

5        **MS. STEIN:**  Good night.

6        **MR. LOESER:**  Thank you.

7                (Proceedings adjourned at 1:47 p.m.)

8                       ---oOo---

9

10                  **CERTIFICATE OF REPORTER**

11           We certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:   Sunday, March 8, 2020

15

16

17

18   _____

19              Marla F. Knox, RPR, CRR
                U.S. Court Reporter

20

21

22

23

24

25