# Exhibit B

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Rosemarie T. Ring (SBN 220769)
  rring@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
Heather L. Richardson (SBN 246517)
  hrichardson@gibsondunn.com
Colin B. Davis (SBN 273942)
  cdavis@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PERMISSION TO SERVE 30(B)(6) NOTICE ON FACEBOOK REGARDING FTC COMPLAINTS AND CONSENT ORDERS**<br><br>Judge: Hon. Vince Chhabria<br>Special Master Daniel Garrie<br><br>JAMS Ref. No.: 1200058674 |

Plaintiffs' motion to serve a *third* Rule 30(b)(6) notice should be denied. The Notice is untimely—coming well after the Court-ordered deadline for 30(b)(6) depositions—and lacks good cause. It seeks, under the guise of FTC-related testimony, to re-depose Facebook about essentially Plaintiffs' entire case. The Notice is so overbroad to be meaningless and unduly burdensome, covers irrelevant topics such as the FTC's "allegations" and compliance, and is cumulative of other discovery. Plaintiffs' misguided, eleventh-hour attempt to further extend fact discovery should fail.

**1. The FTC Notice Is Untimely.** With the exception of a few topics not germane here, Plaintiffs asked for a deadline that all 30(b)(6) depositions be completed by June 30, 2022. Plaintiffs got their wish. Accordingly, the time for service of 30(b)(6) deposition notices has come and gone.

Plaintiffs have long insisted on completing 30(b)(6) depositions before the close of fact discovery. After serving their 30(b)(6) notice in March 2022, for instance, Plaintiffs claimed taking 30(b)(6) depositions "in late May and early June 2022" would be "far too late" and "highly prejudicial." Dkt. 882 at 1, 4. Plaintiffs later asked "that Facebook be ordered … to complete 30(b)(6) depositions by the end of June." Dkt. 939 at 1. Hence, at the June 9, 2022 hearing, Judge Chhabria noted that he and the parties were "in agreement that *all 30(b)(6) depositions* need to be completed by the end of June," with specified exceptions, and that "after July 22nd, there will be *no more 30(b)(6) depositions*." Ex. A at 46:8-13.[1] That is precisely what the Court ordered: "By June 30, 2022: Depositions of the 30(b)(6) witnesses to be completed," subject to three exceptions. Dkt. 941.

Since then, Plaintiffs have repeatedly acknowledged the June deadline. Just days ago, they stipulated to "a deadline of June 30, 2022 to complete Rule 30(b)(6) depositions, except for certain topics for which the Court set a separate deadline of July 22, 2022." Dkt. 979, *so ordered*, Dkt. 983; *see also* Dkt. 964 at 2. When asked why this Notice was not time-barred, Plaintiffs had no meaningful response. Ex. 2 at 6. They contend the June deadline applies only to "testimony on issues identified in Plaintiffs' March notice," Mot. at 3, but this made-up limitation is not mentioned in the Court's orders and would render meaningless both the June deadline for 30(b)(6) depositions and the Court's three identified exceptions to the deadline. Dkts. 941, 983.[2] And despite having ample opportunity, Plaintiffs failed to seek amendment of the June deadline or mention new 30(b)(6) topics at the July 26 hearing. Instead, they served the now-withdrawn FTC Notice the very next morning, on July 27. Because Plaintiffs' motion was "made after the time" for 30(b)(6) depositions "ha[d] expired" and they cannot show that they "failed to act [sooner] because of excusable neglect," their belated, unjustified request for relief must be denied. Fed. R. Civ. P. 6(b)(1)(B); *see, e.g.*, *Korvink v. Home Depot USA, Inc.*, 2022 WL 411423 (E.D. Cal. Feb. 10, 2022) (denying motion "to take [an] untimely noticed deposition[]" because plaintiffs were not "diligent" "within the [ordered] timeframe").

**2. Plaintiffs Cannot Show Good Cause.** Under the Amended Deposition Protocol, "[e]ach side may serve *one* Rule 30(b)(6) deposition notice" as of right. Dkt. 789 (the "Protocol") § III.4. In March 2022, Plaintiffs served Facebook with a 30(b)(6) deposition notice listing ten topics (Ex. B)—that is all that they are entitled to. "Additional Rule 30(b)(6) deposition notices may be served" only after a meet and confer and "upon a showing of good cause to the Special Master." Dkt. 789 § III.4.

---

[1] Lettered exhibits are attached hereto; citations to numbered exhibits refer to exhibits attached to Plaintiffs' motion.

[2] At the June hearing, the Court asked when Plaintiffs' 30(b)(6) notice was served and Facebook's counsel replied, "March." Ex. A at 39:2-3 (cited in Mot. at 3). Nothing in this exchange limited the scope of the deadline for "[d]epositions of the 30(b)(6) witnesses to be completed" ordered by the Court. Dkt. 941. Similarly inapposite is the "second 30(b)(6) notice," Mot. at 3, that Plaintiffs served on April 21, 2022, long before a deadline was set. That Facebook did not object to this second notice did not release Plaintiffs from the requirements of the Protocol, but underscores the lack of any excuse for Plaintiffs' untimely request to serve a *third* 30(b)(6) notice.

Plaintiffs primarily argue that the Notice's topics are "relevant," Mot. at 1-3. They are not, and in any event, the standard is "good cause," which Plaintiffs fail to show here.

*First*, the FTC matters are not new issues. Plaintiffs have been aware of the FTC actions from the outset. Indeed, the FTC is mentioned *72 times* in the operative complaint, *see* Dkt. 491, and was addressed in the Court's decision partially dismissing Plaintiffs' claims, *see, e.g.*, Dkt. 298 at 26 n.13. Accordingly, the "good cause standard" has not been met here because "the party seeking to modify the scheduling order has been aware of the facts and theories … since the inception of the action." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013).

*Second*, good cause is lacking because the Notice "is unreasonably cumulative [and] duplicative" of earlier discovery, and Plaintiffs have "had ample opportunity to obtain the information by discovery." Fed. R. Civ. P. 26(b)(2)(C). The FTC has been discussed in at least 25 depositions, including a 30(b)(6) deposition of PwC on compliance with the 2012 FTC consent decree. Plaintiffs have asked about, *inter alia*, "actions … Facebook was required to undertake as a result of th[at] decree" (Ex. C at 57:17-19), the "intent of the 2012 FTC consent decree" (Ex. D at 443:3-6), and "privacy protection [processes] … buil[t] as part of compliance with the FTC consent order" (Ex. E at 72:4-7)—grounds that Plaintiffs apparently now seek to retread in another 30(b)(6) deposition. When Facebook noted the significant overlap between the Notice's topics and the previously noticed 30(b)(6) topics,[3] Plaintiffs did not really disagree. *See* Ex. 2 at 3-4. More is required to show good cause where Facebook has already provided 89 hours of 30(b)(6) testimony across 18 depositions of 12 witnesses who have prepared over 500 hours. This offered ample opportunity for discovery on FTC issues, and, again, Plaintiffs have not argued otherwise. *See id.* at 3. But Plaintiffs must actually ask the questions if they believe that further FTC-related discovery is relevant. It is not, and Plaintiffs seem to agree: for example, just last week, they deposed a Facebook employee who testified that he worked on FTC order-related compliance efforts, but Plaintiffs *did not ask a single follow-up question*. Ex. F at 34:25-35:10. Plaintiffs' tactical choices at that deposition and in others are no basis to impose on Facebook the substantial burden of preparing multiple witnesses to testify on such broad topics. Over 20 depositions remain for the final month of fact discovery, including more 30(b)(6) testimony on previously noticed topics. That should be the parties' focus—not a new, redundant Notice on irrelevant issues known to Plaintiffs for years.

*Third*, the Notice fails to "describe with reasonable particularity the matters for examination," Fed. R. Civ. P. 30(b)(6), and is not "narrowly tailored to … relevant discovery," Protocol § III.4. For Rule 30(b)(6) to "effectively function, the party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute"; an "overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task." *Mailhoit v. Home Depot USA, Inc.*, 2012 WL 12884049, at *2 (C.D. Cal. 2012). Plaintiffs nevertheless seek testimony concerning nearly all "allegations" in the FTC's complaints. Ex. 1 at 8; Ex. 2 at 5. If meant literally, such testimony from Facebook is irrelevant: the FTC's "allegations" are not facts at issue here and only the FTC can explain the meaning or basis of its pleadings. Further, Facebook's understanding of the FTC's "allegations" is privileged. Alternatively, if Plaintiffs seek testimony about the underlying facts, the topic is so overbroad and vague as to make it functionally impossible to prepare and provide testimony on facts, spanning over

---

[3] For example, Topic 2.B of the Notice concerns "Facebook's compliance with" its "disclosure obligations to users," Ex. 1 at 9, but Plaintiffs already sought 30(b)(6) testimony regarding Facebook's "Statement of Rights and Responsibilities, Data Use Policies, Privacy Policies, [and] disclosures" concerning "the sharing of User's Data or Information with Third Parties" and "use of Users' Data or Information by Third Parties," Ex. B at 11.

a decade, somehow related to the FTC's 70 pages of pleadings that is not duplicative of other discovery. Plaintiffs tacitly admit as much, arguing that "the FTC's allegations … dovetail with Plaintiffs' allegations." Mot. at 2. In other words, Plaintiffs seek a new, redundant and improper 30(b)(6) deposition on the entirety of this litigation. *See Skladzien v. St. Francis Reg. Med. Ctr.*, 1996 WL 807353, at *1 (D. Kan. 1996) (seeking testimony on allegations "does not provide with reasonable particularly the matters [for] examination"); *Franklin v. Ryko Corp.*, 2008 WL 11334493, at *4, *10 (C.D. Cal. 2008) (similar). Rule 30(b)(6) cannot be used to provide Plaintiffs with a discovery do-over, especially given the extensive efforts undertaken so far to prepare witnesses and the substantial amount of time and resources that would be required to redo this testimony.

Next, Plaintiffs seek testimony concerning "compliance with the 2012 and 2020 FTC orders." Ex. 1 at 9. This too is overbroad and irrelevant. In fact, in denying Plaintiffs' related motion to compel documents, the Special Master already ruled that discovery concerning compliance with the 2020 FTC consent decree is disproportionate to the needs of the case because it "concern[s] a new, redesigned privacy policy that Facebook implemented in 2020, years after the relevant time period." Dkt. 886 ¶ 8. Whether this ruling "concern[ed] Facebook's understanding of how the requirements imposed by the 2020 consent order differ from what it was doing before," Mot. at 2, is irrelevant—the testimony sought does not concern Facebook's "understanding" of any new requirements imposed in 2020, which would be privileged. Rather, like Plaintiffs' denied motion to compel, the Notice concerns Facebook's "compliance with" the 2020 FTC order. Ex. 1 at 9.

Moreover, the topic of Facebook's compliance with the 2012 FTC consent decree is "unreasonably cumulative" and duplicative of fact depositions that Plaintiffs already took and have noticed for the coming weeks, as well as topics already covered in Facebook's 30(b)(6) depositions. *See supra* n.4; Fed. R. Civ. P. 26(b)(2)(C)(i). Further, Plaintiffs already took a 30(b)(6) deposition of PwC and received PwC's independent assessment reports concerning compliance with the 2012 FTC consent decree as well as related documents from Facebook and PwC. There has been no showing that additional 30(b)(6) testimony is warranted here.

Contrary to Plaintiffs' claim, Mot. at 3, the second affirmative defense—that Plaintiffs cannot seek any relief already addressed by the 2019 Consent Decree, Dkt. 373 at 125—did not put the decree at issue for fact discovery purposes. Plaintiffs never previously raised this during any meet and confer. *See generally* Ex. 2. Had they done so, Facebook would have clarified that this defense involves an issue of law, not fact. The decree speaks for itself, and to the extent the relief Plaintiffs seek coincides with that decree's terms, any such claim for relief is moot. This is a legal question, and Facebook has not "waived any claim of attorney-client privilege" by raising it. *See* Mot. at 3. Plaintiffs do not explain what relevance factual discovery (beyond the text of the decree) could serve. Plaintiffs have no private right of action for enforcement here and do not contend otherwise.

*Last,* these fundamental substantive defects are not new. Facebook has been raising them all along. While Plaintiffs purport to have conferred in good faith "during a video meet and confer on August 4," Mot. at 1, the parties' correspondence makes clear that "discussion focused on procedural issues," not "the improperly noticed topics," and did not satisfy the "meet-and-confer requirements," Ex. 2 at 12-13. *See also* Dkt. 789 § III.4 (parties must "confer in good faith about the matters for examination in advance of a Party serving a Rule 30(b)(6) deposition notice.") After August 4, Plaintiffs spent several days avoiding answering Facebook's questions that form the basis of this opposition before unilaterally declaring that the process had run its course and filing this motion. Ex. 2 at 1-2. Plaintiffs' perfunctory attempt to check the meet-and-confer box and failure to consider Facebook's queries in earnest dooms their motion; it should be denied.

Sincerely,

*/s/ Rosemarie T. Ring*
Rosemarie T. Ring

cc:    Lesley E. Weaver, Derek W. Loeser

105660619.18

# EXHIBIT A

Pages 1 - 57

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:                          )
                                )
    FACEBOOK, INC.,             )
    CONSUMER PRIVACY USER       )   **NO. 3:18-MD-02843-VC**
    PROFILE LITIGATION          )
                                )
_____ )
                                )
This document relates to:       )
                                )
    ALL ACTIONS.                )
_____ )

San Francisco, California
Thursday, June 9, 2022

**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

For the Plaintiffs:

        KELLER ROHRBACK, LLP
        1201 Third Avenue
        Suite 3200
        Seattle, Washington 98101
        BY: **DEREK WILLIAM LOESER**
        **CARI CAMPEN LAUFENBERG**
        **DAVID J. KO**
        **ADELE AILEEN DANIEL**
        **EMMA MARGUERITE WRIGHT**
        **ATTORNEYS AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

TRANSCRIPTION SERVICE BY:    Dipti Patel, CET-997
                             Liberty Transcripts
                             7306 Danwood Drive
                             Austin, Texas 78759
                             (847) 848-4907

**APPEARANCES VIA ZOOM VIDEOCONFERENCE: (CONTINUED)**

For the Plaintiffs:

                                  KELLER ROHRBACK, LLP
                                  300 Lakeside Drive, Suite 1000
                                  Oakland, California 94612
                                  **BY: BENJAMIN BLYSTAD GOULD**
                                  **ATTORNEY AT LAW**

                                  BLEICHMAR FONTI & AULD LLP
                                  555 12th Street, Suite 1600
                                  Oakland, California 94607
                                  **BY: LESLEY ELIZABETH WEAVER**
                                  **ANNE KATHLEEN DAVIS**
                                  **MATTHEW SETH MELAMED**
                                  **ATTORNEYS AT LAW**

For the Defendants:

                                  GIBSON, DUNN & CRUTCHER LLP
                                  555 Mission Street, Suite 3000
                                  San Francisco, California 94105
                                  **BY: ROSEMARIE THERESA RING**
                                  **ATTORNEY AT LAW**

                                  GIBSON, DUNN & CRUTCHER LLP
                                  200 Park Avenue
                                  New York, New York 10166
                                  **BY: ORIN SNYDER**
                                  **ATTORNEY AT LAW**

                                  GIBSON, DUNN & CRUTCHER LLP
                                  333 South Grand Avenue
                                  Los Angeles, California 90071
                                  **BY: DEBORAH LYNN STEIN**
                                  **ATTORNEY AT LAW**

                                  GIBSON, DUNN & CRUTCHER LLP
                                  2100 McKinney Avenue, Suite 1100
                                  Dallas, Texas 75201
                                  **BY: RUSSELL HARRIS FALCONER**
                                  **ATTORNEY AT LAW**

                                  GIBSON, DUNN & CRUTCHER LLP
                                  1881 Page Mill Road
                                  Palo Alto, California 94304
                                  **MARTIE KUTSCHER-CLARK**
                                  **ATTORNEY AT LAW**

1    So anyway --

2        **MS. RING:**  Allegedly, Your Honor.

3        **THE COURT:**  Well, on this one --

4        **MS. RING:**  Plaintiffs are definitely tallying it up.

5        **THE COURT:**  On this one --

6        **MS. RING:**  Plaintiffs are definitely tallying it up.  Don't

7    worry.

8        **THE COURT:**  In this one, I don't think -- for this

9    deposition, I don't think we need to use the word "allegedly."

10       **MS. RING:**  Okay.  That's fair.

11       **THE COURT:**  So that's fine.  So the -- oh, let's get back to

12    the dates, Ms. Ring.  So Mr. Loeser is asking me to order all of

13    the 30(b)(6) witnesses to be produced by June 30th.  And --

14       **MS. RING:**  And I was asking please don't do that only

15    because I think it will compound the issue that I was trying to

16    describe.

17       I have not personally been on a case before where -- you

18    know, we've been trying to -- we've identified, I've lost track

19    now, but maybe nine witnesses trying to identify those that

20    actually have the best knowledge of particular topics or aspects

21    of topics.  And the topics are so broad and ill-defined that it's

22    very hard to prepare a witness to address them.

23       And if we push forward without any acknowledgment of that,

24    we end up having depositions where the whole time is spent

25    complaining about they can't answer this question, they can't

39

1   answer that question.

2       **THE COURT:**  But when were these 30(b)(6) notices served?

3       **MS. RING:**  March.

4       **THE COURT:**  Okay.

5       **MS. RING:**  March.

6       **THE COURT:**  Right.  But it's -- I mean, again, we're in June

7   now, right?

8       **MS. RING:**  Yes.

9       **THE COURT:**  I mean is this a problem -- this is a rhetorical

10  question, but my question is, is this a problem of your client

11  not being cooperative with you or is that part of the problem?

12      **MS. RING:**  It is not.

13      **THE COURT:**  You know --

14      **MS. RING:**  It is not.  And that's why I say -- I ask please

15  don't order these depositions to go forward June 30th because it

16  is -- again, the topics are so broad and ill-defined.

17      I mean these witnesses -- I wrote these, you know, stats

18  down because we've had seven depositions -- since the last CMC,

19  it's been two months.  We've had seven depositions.  Witnesses

20  have provided 40 hours of testimony on six of the ten topics, and

21  they've spent over 500 hours preparing for them.

22      The ones that remain -- the only ones we've asked to go into

23  July are very specific, okay.  One of them concerns targeted

24  advertising which, Your Honor, that has been -- in my view, that

25  is the reason for the dispute over the named plaintiff data.  And

1    it's been a very difficult issue, I think a legitimate issue that

2    Facebook raised.

3        But in any event, we've given up.  It's fine.  We're going

4    to give it to them.  But it's a very particularized topic that's

5    very hard to get your arms around, and we've asked -- you know,

6    we did offer a date for that one, by the way, June 13th.  You

7    know, we didn't hear back so then we offered July dates which

8    plaintiffs responded to and accepted.  So I'm surprised to hear

9    them asking now for an earlier date.

10       The other one is for the video.  And this is one that we did

11   address in our statement.  I'm sure you saw it.  But that is one

12   that, again, we could have just objected.  I mean Judge Corley --

13   the parties went through what seemed from the outside a horrible

14   process to go through and identify all the custodians and

15   identify all the search terms.

16       And there were many search terms that were for video, and

17   that was supposed to be done, over.  A month after the Special

18   Master was appointed, oh, there are suddenly new video document

19   requests for which now plaintiffs want new search terms after

20   Judge Corley shut that down several times.  So now we have new

21   search terms.  We're collecting from new custodians.

22       There are hundreds of thousands of documents now that

23   because of plaintiff's search terms they want us to review, and

24   they say we want them before the deposition.  That's why the

25   deposition is -- we've proposed dates in July because we cannot

1   get through the hundreds of thousands of new documents that,

2   again, we could have just stood on our objection but we didn't.

3   We said fine, we'll do it.

4   **THE COURT:**  So what are the 30(b)(6) depositions that you

5   are proposing take place in July?

6   **MS. RING:**  The advertising related ones, Your Honor, and the

7   video.  All of the others have either occurred or are set to

8   occur in June.  The only two we'd ask --

9   **THE COURT:**  And so those are --

10   **MS. WEAVER:**  (Indiscernible).

11   **MS. RING:**  I'm sorry.  That's not true.  I'm sorry.

12   Sorry, Liz.  That's true.

13   There's also one more topic -- Topic 5, I believe -- which

14   concerns basically this was -- this is one that we put on hold by

15   mutual agreement because it was the topic of the proceedings

16   before the Special Master concerning named plaintiffs' data.

17   Plaintiffs now a week or two ago said we should take this off

18   hold because we're not getting to the end of those proceedings,

19   thankfully, and so we've been meeting and conferring over the

20   scope of that topic.

21   When we had that meet and confer, it was described as all

22   systems relating to how data comes into Facebook, how it is

23   sorted, used, how derivative data is created for any purpose, and

24   how data flows out of Facebook.  So it's basically everything.

25   So we need to narrow this topic.  It is going to be

42

1   impossible to identify 100 witnesses who could testify to such a

2   thing.  So that's the other one that's going into July.  And if

3   we're forced -- you know, if we're forced to do it by the end of

4   June, we're going to be right back here with more complaints of

5   how we did not have a prepared witness, we did not have agreement

6   on what the topics covered.

7        We can reach agreement, and we can get a witness who can

8   actually testify on these topics.  But we need until, you know,

9   July.  And we've proposed dates in the middle of July.

10       There's still three months left of discovery.  This is not

11  delay.  This is not because Facebook has ever said no.  Since I

12  joined this case, Facebook hasn't said no to one thing I've

13  asked.  This is because, again, for the video, we've got huge new

14  document requests --

15       **THE COURT:**  I'm tempted to ask if they've responded to all

16  of your calls, but I'm not going to ask that.

17       **MS. RING:**  Yes, they do, and my texts.  Yes.  Yes.

18       **MR. LOESER:**  Your Honor, maybe we need to hit rewind here

19  for a second on this 30(b)(6) deposition.  Maybe this will help

20  finish this part of the conversation.

21       Plaintiffs get no value out of a 30(b)(6) deposition with an

22  unprepared witness.  That's why we sent them a notice in

23  December.  As of March we had heard nothing about any problems

24  they had with the topics.  The deposition started, it was clear

25  --

43

1        **MS. RING:**  Your Honor?

2        **MR. LOESER:**  I'm sorry, Ms. Ring.

3        **MS. RING:**  That's not true.  I'm sorry.

4        **MR. LOESER:**  There are a lot of things you said that were

5    untrue, but I didn't interrupt you (indiscernible).

6        **MS. RING:**  Well -- yes, okay.

7        **MR. LOESER:**  So there were -- it became clear at the very

8    first deposition that when Facebook prepared the witness, it made

9    decisions about what the witness would and wouldn't be prepared

10   for.  We don't have to guess about whether that's true because

11   Facebook's lawyer decided to say that on the record in the middle

12   of the deposition all the things he did and didn't prepare the

13   witness for.

14       That set in motion a process where we provided even more

15   information.  We are now telling Facebook in advance of the

16   deposition -- we're sending a detailed email saying these are the

17   specific things we want to talk about, and then we sent the

18   documents.  And in the very first deposition, there was a large

19   number of documents because, frankly, the parties forgot that we

20   were supposed to exchange the documents.

21       But in the subsequent ones, like in the deposition that I

22   took, I think there was something like 35 documents or 50

23   documents.  And then after a couple of days of this, for the last

24   day which hasn't happened yet, I told Facebook's lawyer these are

25   the remaining four documents, like literally I want the witness

44

1   to be familiar with these documents.  I want him to be able to

2   say what Facebook's position is on these documents.

3       And, frankly, the plaintiffs are willing to be that

4   specific, and we have provided so much notice because we really

5   want to know Facebook's actual corporate testimony on these

6   topics.  So we meet and confer and meet and confer and we will

7   still do that.  But we need to complete these depositions.

8       Now if Rose is making an impassioned plea for a little more

9   time, okay, you know, we can go into July for things that should

10  have been done in April.  But the problem is we have depositions

11  we've taken in which we're now sending them letters saying these

12  are whatever number of topics that the witness wasn't ready for,

13  give us another witness to answer these questions.

14      So we need a deadline.  We need a time at which we'd get

15  their testimony because, as Your Honor well knows, these are the

16  depositions which inform us of who else to depose.  And we're

17  taking all these depositions of people before we've had the

18  30(b)(6) on the topic.

19      So that's the problem we're in.  Ms. Ring, I understand her

20  concerns about wanting to make sure the witnesses are prepared.

21  We want these witnesses prepared.  We just are running out of

22  time.  So if we need to have a couple of more weeks to get it

23  done, fine, but let's get it done.  Let's not keep dragging this

24  out forever with witnesses that can't answer questions.

25      And, frankly, Facebook needs to figure out a better way to

1  have their witnesses prepared to provide Facebook's position on

2  the documents we're providing to these witnesses, and that has

3  not happened over and over again.

4      **THE COURT:**  Well, so it sounds like for now what I should do

5  is just order, again, that, you know, the 30(b)(6) depositions be

6  completed by June 30th with the exception of these three and that

7  these three -- the advertising, the video, and Topic 5 -- I don't

8  know what's the best way to describe Topic 5 -- but that those

9  three be completed by what date?  July 21st?

10      **MS. RING:**  Plaintiff just asks for days the week of the --

11  Your Honor, if you could, we would like this to end, also, okay.

12      **THE COURT:**  Yeah.  So July 21st --

13      **MS. RING:**  So July 30th.

14      **THE COURT:**  July 21st will be the deadline for completion of

15  those three -- we'll make it July 22nd since that's a Friday,

16  completion of those additional three 30(b)(6) depositions.

17      **MS. WEAVER:**  Your Honor, there's an additional problem that

18  Mr. Loeser alluded to which is, for example, on Topics 4 and

19  Topic 10, the witnesses showed up and they provided testimony on

20  some topics but not others.  So we immediately wrote letters

21  saying please give us -- so those are additional depositions that

22  have not even been scheduled.  Like on Topic 10 --

23      **THE COURT:**  Right.  But I mean don't those need to take

24  place in June, as well?

25      **MS. WEAVER:**  That would be -- as long as with that

46

1    clarification, we're fine with that, Your Honor.

2         **MS. RING:**  Your Honor, look, some of these -- I don't think

3    you want to hear the details of this, and we'll just take it back

4    to the mediator and the Special Master.  But, you know, it's not

5    fair to say that these witnesses are not prepared to testify

6    about documents.  These are 30(b)(6) depositions.  If you ask a

7    witness what did -- who has nothing to do with the documents --

8         **THE COURT:**  Hold on a second.  So I thought we were sort of

9    in agreement that all 30(b)(6) depositions need to be completed

10   by the end of June and -- with the exception of these three which

11   will be completed by July 22nd.

12        What -- so meaning after July 22nd, there will be no more

13   30(b)(6) depositions unless, again, somebody doesn't -- you know,

14   the lawyers instruct the witnesses not to answer questions or

15   there's some other failure on the part of Facebook that requires,

16   you know, the depositions to be taken yet again.

17        Why do we need to talk about anything else relating to the

18   30(b)(6) depositions at this point?

19        **MS. RING:**  I'll take my cue from you and stop.

20        **THE COURT:**  Okay.

21        **MS. RING:**  I was just --

22        **THE COURT:**  So --

23        **MS. RING:**  Well, actually, I'm sorry.  I do think this is

24   important to address.  I was trying to account for the

25   circumstance where if there are, believe it or not, Your Honor,

1    situations where plaintiffs are asking for something that we

2    don't think is covered by the topic.

3        So plaintiffs will say then we have not finished all the

4    30(b)(6)s because they want a witness on X, and we say X is not

5    covered by the topic.  So our view in that case would be we are

6    done, and plaintiffs' view is we are not done.  So --

7        **THE COURT:**  And that needs to be addressed by this Special

8    Master and then if --

9        **MS. RING:**  Agreed.

10       **THE COURT:**  -- he rules and you disagree, appeal it to me.

11       **MS. RING:**  Agreed.  Thank you.

12       **MR. LOESER:**  The process.

13       Okay.  Your Honor, I am at my last issue, which --

14       **THE COURT:**  Okay.

15       **MR. LOESER:**  -- (indiscernible) here, and that is documents

16   pertaining to financial information.  We got a --

17       **THE COURT:**  Documents pertaining to what?

18       **MR. LOESER:**  Financial information.

19       **THE COURT:**  Oh, yeah.

20       **MR. LOESER:**  Damages information.

21       We had this as an odyssey to get this information.  We are

22   finally starting to receive some information about revenue that

23   relates to matters at issue in the case claims, for example,

24   revenue obtained by Facebook as a result of whitelisting certain

25   plaintiffs.

# EXHIBIT B

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND AMENDED NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and

30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc.

("Facebook"), on dates and at times to be determined by the parties.  Please take notice that due

to the disruptions to travel and accompanying shelter-in-place orders caused by the COVID-19

outbreak, the deposition of Facebook will occur via remote means on and will be coordinated by

Veritext Legal Solutions, with a business address at 101 Montgomery St., Suite 450, San

Francisco, CA 94104. Contact Veritext's calendar team at ahenderson@veritext.com to retrieve

the necessary credentials to access the remote deposition, as well as information related to any

technical assistance you may require to assist with carrying out the virtual deposition.

Alternatively, if circumstances permit and the parties agree, the matter may be taken in whole or

part in-person and virtually. Those who wish to appear in the physical presence of another do so at their own election; however, this noticing party is not requiring the in-person physical attendance of counsel, the witness or any other party to this action.

The deposition will be taken before a person authorized by law to administer oaths under Federal Rules of Civil Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays, until the examination is completed.

Pursuant to Rule 30(b)(6), Defendant is hereby notified of its duty to designate one or more officers, directors, managing agents or other persons most knowledgeable or qualified to testify on its behalf concerning the matters set forth below. Each such designee produced to testify has an affirmative duty to have first reviewed all Documents, reports, and other matters known or reasonably known or available to Facebook and to familiarize himself or herself with all potential witnesses known or reasonably available to provide informed, binding answers at the deposition. Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of the person(s) designated to testify with respect to the matters specified below. The deposition will continue on the day noticed and for additional days, if necessary, excluding Sundays and holidays, until completed.

Under Federal Rules of Civil Procedure 30(b)(2) and 34, Defendant is requested to produce the documents responsive to the requests listed on Schedule B no fewer than five days before the deposition is to take place.

Plaintiffs reserve the right to notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-duplicative topics.

**NOTICE IS FURTHER GIVEN** that Plaintiffs reserve the right to conduct this

deposition utilizing the secure web-based deposition option afforded by Veritext or, in the alternative, video teleconferencing (VTC) services or telephonically to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone. Also take notice that Plaintiffs reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions or a digital reporter utilizing state-of-the-art digital recording equipment. Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of California. Take note that the deposition officer may also be remote and out of the presence of the deponent via one of the options above for the purposes of providing the oath/affirmation to the deponent and capturing the proceeding. Plaintiffs further reserve the right to utilize the following: (1) Record the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in Realtime; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer, deponent, parties and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.  Please contact the noticing attorney no less than five (5) calendar days prior to the deposition to provide all necessary credentials, call-in numbers, firm name, email address, services, testing and information, if necessary, for those who will attend and/or participate in the deposition in order that participation and connection can be arranged and details provided sufficiently in advance of the proceeding(s).  A list of all parties or

attorneys for parties on whom this Notice of Deposition is being served is shown on the

accompanying proof of service.


Dated: March 1, 2022


KELLER ROHRBACK L.L.P.

By:     */s/ Derek W. Loeser*
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

BLEICHMAR FONTI & AULD LLP

By:     */s/ Lesley E. Weaver*
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' SECOND AMENDED NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

via Email on this 1st day of March, 2022 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
Kelly E. Herbert
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com
kherbert@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
Matt Buongiorno
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com
mbuongiorno@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on March 1, 2022.

*/s/ Sarah Skaggs*
Sarah Skaggs

## SCHEDULE A

**I.    DEFINITIONS AND RULES OF CONSTRUCTION**

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.     "API" refers to an application programming interface.

2.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

3.     "App Developer" refers to any person or company that develops an App, software experience, game, plugin, or website that accesses User Data from Facebook's APIs or other Facebook software.

4.     "App Publisher" refers to any person or company who publishes an App on Facebook's platform.

5.     "App Settings" means the selectors on the Facebook App that purported to allow Facebook Users to prevent their Content and Information from being shared with applications. *See* SACC ¶¶ 310-321.

6.     "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

7.     "Communication" means any contact, oral or documentary, formal or informal, at any time or place or under any circumstances whatsoever, whereby information of any nature is transmitted or transferred, including correspondence, and references to notes, letters, memorandum, e-mail, reports, or any other document by which information is passed or

conveyed from one individual or entity to another.

8.      "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or Databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

9.      "Content and Information" refers to the definition in footnote 2 of the Second Amended Consolidated Complaint ("SACC"), referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable user data and anonymized Data or information that is capable of being de-anonymized. *See* SACC ¶¶ 263-264. Content and Information includes but is not limited to Personal Information.

10.      "Data" or "Information" refers to Personal Information, Content and Information, and Data collected and derived about Users, including information ordered relevant in the Court's October 29, 2020 Order, Dkt. No. 557 ("Discovery Order No. 9"), which defines the discoverable User Data at issue in this case to include "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

11.      "Data Brokers" refer to companies that specialize in collecting personal Data or Data about companies, mostly from public records but sometimes sourced privately, and selling

or licensing such information to third parties for a variety of uses.

12.     "Default" means the Privacy Setting or App Setting that Facebook selected for Users, and which required Users to take affirmative steps to change.

13.     "Document(s)" includes any data, document, ESI, or electronic media stored in any medium and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34 and Federal Rules of Evidence 101(4)(6), and 1101, including, but not limited to programming source code, electronic or computerized data compilations, any writing, drawing, graph, chart, photography, phonorecord, Communications, electronic chats, instant messaging (including ephemeral ones), encrypted or self-destructing messages, email Communications, notebooks, diaries, reports, logs, digitally encoded Data, Database, graphic, other electronically stored information from Personal computers, sound recordings, photographs, hard copy Documents. and/or other Data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the preceding sentence, a Person is deemed to be in control of a document if the Person has the right or ability to secure the document or a copy thereof from another Person having actual possession thereof, including, but not limited to, work product contracted by You from others. Documents that are identical but in the possession of more than one Person or entity are separate documents

within the meaning of this term. Also, a draft or non-identical copy is a separate document within the meaning of this term.

14.　　"Discovery Order No. 9" refers to the Court's October 29, 2020 Order, Dkt. No. 557, that defined the discoverable data at issue in this case to include "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

15.　　"Electronically-Stored Information" or "ESI" means the complete original and any non -identical copy (whether different from the original because of notations, different metadata, or otherwise) of any electronically created or stored information, including, but is not limited to, the following:

  a.　All items covered by Fed. R. Civ. P. 34(a)(1)(A);

  b.　Information or Data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (e.g., author, recipient, file creation date, file modification date, etc.), system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code;

  c.　Internal or external web sites, intranets and extranets;

  d.　Output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, Database files, unorganized data, charts, graphs and outlines, e-mail, instant messaging, SMS, MMS, or other text messaging,, Facebook Messenger, WhatsApp, AOL Instant Messenger (or similar programs), and other electronic correspondence (whether active, archived, unsent, or in a sent or deleted - items folder), word- processing

files, spreadsheets, databases, presentation files, video recordings, and sound recordings, regardless of how or where the information is stored, including if it is on a mobile device, bulletin board programs, screenshots/screengrabs, screen sharing recordings, webcasts, screencasts, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic Data exists in an active file, a deleted file, or file fragment;

e.   Activity listings of electronic mail receipts and/or transmittals; and

f.   Any and all items stored on computer memories, hard disks, floppy disks, CDROM, magnetic tapes of all types, microfiche, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (e.g., DropBox, Box, OneDrive, or SharePoint), or on any other media for digital Data storage, or transmittal, such as, but not limited to, personal digital assistants, (e.g., iPhones), cellular or smart phones (e.g., iPhones, tablets, BlackBerrys, iPhone, or Samsung Galaxy), personal digital assistants, or any other means for digital storage and/or transmittal and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

8.      "Friend" refers to a User whose Data or Information became accessible to a Third Party because they were Facebook friends with another User. "Friends" is the plural of Friend.

16.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

17.     "Integration Partnership" refers to any Facebook Partner for whom the purpose of the partnership was to support the functionality of the Facebook App on a device or platform.

18.     "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

19.     "Partner(s)" refers to the definition provided in Order re: Business Partners Discovery Dispute (Dkt. No. 608), as confirmed in the Special Master's Order re: Business Partners, issued November 2, 2021, Whitelisted Partners (as defined herein) and includes persons, apps and entities who accessed user information directly as well as those who were able to target users based on information derived about them by Facebook.

20.     "Personal Information" under California law at Cal. Civ. Code § 1798.140(o)(1) is information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

    a.  Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

    b.  Characteristics of protected classifications under California or federal law.

    c.  Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

    d.  Biometric information.

    e.  Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a

consumer's interaction with an Internet Web site, application, or advertisement.

    f.   Geolocation Data.

    g.   Audio, electronic, visual, thermal, olfactory, or similar information.

    h.   Professional or employment-related information.

    i.   Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

    j.   Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

21.    "Policies and Procedures" includes any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your principals, directors, officers and employees to follow in performing their jobs.

22.    "Users' Privacy Settings" means the audience selectors on the Facebook App that purported to allow Facebook users to control with whom their information was shared.

23.    The "Special Master's Order Re: Plaintiffs' Motion to Compel Production of Plaintiff Data" refers to the order of that named issued by the Special Master on November 29, 2021.

24.    "Third Parties" include the following:

    a.   Apps, App Developers, App Publishers, Whitelisted Partners, and Partners;

    b.   Data Brokers;

    c.   Any person or company with which Facebook has or had an integration

       partnership; and

    d.   Advertisers, to the extent these are not already covered in prior categories above.

25.    "Terms of Service" refers to the documents to which a User or Third Party must agree to in order to use or access Facebook.

9.    "User" means a person who maintains or has maintained a Facebook account in the United States. "Users" is the plural of User.

10.    "Use Case" refers the purpose for an entity to obtain User Data.

11.    "API Version" refers to both major version and minor version of an API (*e.g.* Version 2.0 is different from Version 2.1).

26.    "Whitelisted Partners" means any entity or person provided access to a capability, such as permission to read or write informaiton via a specific API call, that was not provided to all entities or persons.  "Whitelist," "Whitelisted," or "Whitelisting" refers to this practice.

27.    "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys, accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

28.    Words used in the plural include the singular, and words used in the singular include the plural.

## II.    RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, the relevant time period for purposes of this Notice is January 1, 2007 through the present.

### III.    MATTERS FOR TESTIMONY

1.      Your organizational structure, including (i) the names of departments or other organizational designations within Facebook, their functions, and their structure within Facebook and (ii) employees in each department (including their responsibilities and chain of command), as (i) and (ii) relate to:

    a.   The calculation of revenues, gross profits, net profits, goodwill, impairments and assets recognized by Facebook relating to Users' Data or Information, including but not limited to Facebook's public reporting of same;

    b.   The process for drafting, evaluating, approving, modifying, issuing and monitoring the effectiveness of the Statement of Rights and Responsibilities, Data Use Policies, Privacy Policies, disclosures, public statements, Facebook messages or posts by CEO Zuckerberg, Sandberg or any Facebook executive that concern: (i) the sharing of Users' Data or Information with Third Parties, (ii) the use of Users' Data or Information by Third Parties, including identification of those responsible for these functions; and (iii) Cambridge Analytica or inquiries, investigations, public response, media reports, regulatory or governmental hearings into concerns arising out of the Cambridge Analytica scandal; and

    c.   Communications with shareholders, financial stakeholders, regulatory or governmental entities, and the public arising out of the Cambridge Analytica scandal.

2.      Identification, by category, of the type of Data or Information to which Facebook sold, made accessible, made available, or allowed Third Parties to use to target Users, including:

    a.   The types of User Data or Information Facebook shared, made accessible or permitted Third Parties to target;

b. The purposes for which such Data or Information was shared or made accessible, or permitted Third Parties to target;

c. The format or formats through which it is shared or made accessible, or made available to Third Parties to target; and

d. How Facebook ensured Third Parties' Use of such Data or Information was limited to the Use Case.

3. An overview of the processes of developing Privacy or App Settings or other controls made available to Users to prevent or limit their Data or Information from being accessed by Third Parties, including the dates during which each such Privacy or App Setting or other controls were available, the Data and Information covered by each Setting or control, and the Default setting for each, including:

a. How Privacy or App Settings or other privacy designations associated with Users' Data and Information were (or were not) communicated to Third Parties such that Third Parties could comply with them;

b. Processes, reviews, investigations, inquiries, studies, analyses, and Communications relating to Users' Privacy or App Settings, their efficacy, including user experience, customer service, internal regulators, whether internal or by third parties; and

c. Facebook's monitoring and enforcement of contractual terms with Third Parties regarding their use of Users' Data or Information, including enforcement of Policies regulating access to such Data or Information beyond the Use Case.

4. Facebook's processes of pseudonymization, de-identification, re-identification, association, and deletion of User Data and Information.

5.      The systems, repositories, databases, and other sources (collectively herein, "Systems" or "System" when singular) containing or referencing any Data that can be associated with a User and, for each:

     a.  The schemas, response schemas, and fields for the System;

     b.  The type of Data stored or referenced in the System;

     c.  How the data is stored in or referenced by the System;

     d.  The other Systems that interact with that data, and the manner by which that interaction occurs;

     e.  The manner by which Data from the System is made accessible to Third Parties, or affects in any way the way Data stored or referenced elsewhere is made available to Third Parties.

6.      The development of Friend Sharing, including but not limited to: its purpose and identification of those involved in its development; how the technology functioned; the APIs and permissions associated with Friend Sharing; the communication of this technology to users, including the drafting of Facebook's Terms of Service, SRR and Data and Privacy Policies relating Friend sharing; and the revenue impact and net profits for Facebook relating to Friend sharing throughout the Class Period.

7.      The decision to Whitelist particular apps or partners, and how Facebook determined which entities to Whitelist, including:

     a.  The most efficient way to identify each Whitelisted entity (including but not limited to apps and partners) throughout the Class Period; the purpose of such Whitelisting; what Data or Information each Whitelisted entity had access to; for what period of time; and whether the access granted exceeded the Use Case;  and

when such Whitelisting ceased; and calls logs or any other tracking of third-party Whitelisted apps or partners that had access to and made use of Friend Sharing APIs and permissions;

b. The most efficient way to establish payments, revenues, exchanged value, actual or promised, Facebook received for permitting Whitelisting capabilities, and the revenues and net profits Facebook recognized related to Whitelisting throughout the Class Period, including the evaluation of the benefits, including goodwill, barter or exchange benefits; and

c. Identification of those with decision-making responsibility relating to whitelisting throughout the Class Period, beginning with those with final and decisive authority.

8. The methods, tools, technologies, databases, project management tools, task lists, or other internal sources Facebook used to track Third Parties and Data Brokers, including:

a. The type and purpose of Data and Information Facebook received;

b. The type and purpose of Data and Information Facebook provided;

c. The Payments, consideration, actual or promised, Facebook provided or received for engaging in such exchanges; and

d. The evaluation of the Benefits to Facebook of the information provided or received for engaging in such exchanges.

9. Video content and information relating to video content, requested or obtained, available to or accessed, interacted with, or shared by users on or via the Facebook platform, specifically:

a. The amount of such content and how the amount of such content has changed or varied over time;

b.   the records or information that Facebook has regarding such content and users' access to, interactions with or sharing of such content;

c.   Actions taken or decisions made by Facebook in order to enable users to access, interact with, or share such content, and when such actions were taken or decisions were made;

d.   Access by Third Parties to Data and Information related to users' access to, interaction with, or sharing of video content on or via the Facebook platform, and whether and how such access has changed or varied over time, including but not limited to APIs, permissions and capabilities providing access to Facebook users' video related content and information; and

e.   Which persons employed at any time by Facebook have the most knowledge related to the topics listed in paragraphs a through d above.

10. Facebook's calculation of revenues, gross profits, and net profits recognized by Facebook relating to Users' Data or Information, including but not limited to how Facebook monetized User Data or Information, how Facebook quantified the value of sharing User Data or Information, and Facebook's business and marketing strategy regarding the monetization and quantification of User Data or Information.

## **SCHEDULE B**

Pursuant to Fed. R. Civ. P. 30(b)(5) and 34, Plaintiffs request the production of or identification by Bates number of the following, at least 5 business days before testimony on one or more of the deposition topics identified in Schedule A request, via e-mail or file transfer:

1.      All documents which the person Facebook designates to testify on its behalf has consulted or reviewed or plans to consult in preparation for the deposition and has relied upon or will rely upon for testimony concerning the above deposition topics.

2.      A curriculum vitae for the person Facebook designates to testify on its behalf.

# EXHIBIT C

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4

5    IN RE: FACEBOOK, INC.

     CONSUMER PRIVACY USER

6    PROFILE LITIGATION

     _____/

7                              MDL No. 2843

8                              Case No. 18-md-02843-VC-JSC

     This document relates to:

9

     ALL ACTIONS

10   _____/

11

12

13              ***CONFIDENTIAL***

14

15

16        REMOTE VIDEOTAPED DEPOSITION OF

17           ANTONIO GARCIA-MARTINEZ

18   _____

19       WEDNESDAY, FEBRUARY 23, 2022

20

21

22

23   REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

24   JOB NUMBER 5072301

25

                                    Page 1

1    THE WITNESS:  If you're asking me how I        10:10:13
2  would describe the relationship with legal in the     10:10:17
3  legal context, I would not use that language, no.     10:10:19
4  That's not how I would --                    10:10:22
5  BY MR. KO:                                10:10:23
6    Q.  No, I'm not asking -- go ahead.          10:10:23
7    A.  That's it.  I -- that's not how I would      10:10:26
8  describe it under the terms of this conversation.     10:10:28
9  No.                                    10:10:31
10    Q.  Yeah, and I'm not asking you how you would  10:10:33
11  describe -- how you would describe your           10:10:35
12  relationship.                            10:10:41
13    Earlier you had said that you were in a       10:10:43
14  constant conversation with Facebook privacy and      10:10:45
15  legal teams.  Correct?                      10:10:47
16    A.  Correct.                          10:10:49
17    Q.  And did -- did that include a conversation  10:10:49
18  about what you could and could not get away with in   10:10:55
19  terms of a legal rubric or model that would forgive   10:10:58
20  or at least defensively excuse Facebook's next       10:11:04
21  depredation with user data?                   10:11:09
22    A.  Again, I think that language, which is,     10:11:12
23  again, the language of literary nonfiction, I think   10:11:14
24  mischaracterizes the actual relationship that I had   10:11:18
25  with Ed Palmieri and Erin Egan and all the rest of   10:11:21

Page 54

1  them.                                10:11:25
2    This is posed in a very literary light       10:11:26
3  that obvious heightens the tensions in the         10:11:28
4  conversation and makes it seem like it was a very    10:11:32
5  adversarial dialectic which, in actual, everyday     10:11:34
6  practice, was not.                         10:11:37
7    Q.  Okay.  So were you making -- it seems like  10:11:39
8  you were making misrepresentations about this        10:11:41
9  paragraph in your book, then.  Correct?          10:11:44
10    MR. FALCONER:  Objection.  Form.            10:11:46
11    THE WITNESS:  My editor would call it a       10:11:47
12  "literary flourish."                        10:11:49
13  BY MR. KO:                                10:11:51
14    Q.  Okay.  Was there a general culture at     10:11:51
15  Facebook that you noticed when you were there to     10:11:57
16  downplay privacy and legal issues at the expense of  10:12:00
17  innovation and development?                   10:12:04
18    A.  Not to my recollection.  Privacy was taken  10:12:08
19  very seriously.                           10:12:10
20    Q.  And you yourself, did you believe that     10:12:11
21  your ability to innovate was more important than     10:12:16
22  privacy or legal issues that existed at the time     10:12:19
23  you were there?                          10:12:24
24    A.  No.  If I had thought that, I wouldn't     10:12:24
25  have engaged so seriously with the privacy and      10:12:29

Page 55

1  legal team.  No.  That was not my opinion at the     10:12:31
2  time.                                  10:12:33
3    Privacy was not a joke at Facebook.          10:12:40
4    Q.  And what's the basis of that statement?     10:12:43
5    A.  The fact that I had to spend so much of my  10:12:47
6  time actually dealing with it.                 10:12:49
7    Q.  And the people that you had to -- well,    10:12:53
8  this time consisted of dealing with these three     10:12:59
9  individuals that we described before.  Correct?      10:13:02
10    A.  Correct.                          10:13:03
11    Q.  Was there ever a time when you became     10:13:04
12  aware of the Facebook Privacy Program?            10:13:07
13    A.  I'm sorry.  Is that reference to a        10:13:11
14  particular organization or set of policies?         10:13:13
15    Q.  The latter.                        10:13:17
16    THE VIDEO OPERATOR:  It looks likes he's      10:13:24
17  frozen.  Oh, there he is.                    10:13:25
18    Mr. Martinez, you froze for a minute, so I    10:13:35
19  don't think they got that answer.              10:13:38
20    THE WITNESS:  Oh, okay.  I'll repeat that.    10:13:39
21    When you say "privacy program," are you      10:13:41
22  referring to a specific organization or set of       10:13:43
23  policies, or are you just using that term          10:13:46
24  generally?                              10:13:49
25    I'm not familiar with a capital P,          10:13:50

Page 56

1  capital P, "Privacy Program."                 10:13:53
2  BY MR. KO:                                10:13:55
3    Q.  That is helpful.  Yes, I am referring to   10:13:55
4  an actual program titled the "Facebook Privacy       10:13:57
5  Program."                               10:13:59
6    Did you become familiar with that at all      10:14:00
7  during your time at Facebook?                  10:14:02
8    A.  The term doesn't ring a bell at the       10:14:05
9  moment, but that doesn't mean that it wasn't        10:14:07
10  referred to as such.  I'm not sure.  It doesn't      10:14:09
11  ring an immediate bell.  I don't immediately recall   10:14:11
12  it, no.                                 10:14:13
13    Q.  When you joined Facebook, were you aware    10:14:15
14  of the consent decree that Facebook entered into     10:14:17
15  with the FTC regarding certain privacy issues?       10:14:20
16    A.  I was aware of it at the time, yeah.       10:14:25
17    Q.  Are you aware of the actions, in general   10:14:28
18  terms, that Facebook was required to undertake as a  10:14:31
19  result of that consent decree?                 10:14:34
20    A.  In very general -- in very general terms,   10:14:37
21  although, again, broadly, I was -- obviously, legal   10:14:40
22  that -- I was not a lawyer when I was at Facebook,   10:14:44
23  and so I -- you know, I couldn't really opine on     10:14:46
24  FTC legal issues.                         10:14:50
25    But, yeah, I was broadly aware of a          10:14:51

Page 57

15 (Pages 54 - 57)

1    consent decree, yes.                    10:14:53
2        Q.   Was it ever communicated to you during   10:14:55
3    your time at Facebook that you had to comply with   10:14:57
4    any portion of the consent decree?        10:15:01
5        A.   I can't recall, to be honest.  I'm sure it   10:15:08
6    was brought up in legal conversations with those   10:15:10
7    three individuals, but I can't recall, in the many   10:15:12
8    meetings I had, a specific instance of that   10:15:16
9    happening.                            10:15:18
10        MR. FALCONER:  And before Mr. Ko asks his   10:15:20
11   next question, Mr. Garcia-Martinez, I just want to   10:15:21
12   remind you:  To the extent that you do recall the   10:15:23
13   contents of any specific conversations you had with   10:15:26
14   lawyers at Facebook, don't reveal the contents of   10:15:28
15   those privileged communications as you answer   10:15:31
16   Mr. Ko's questions.                     10:15:33
17        THE WITNESS:  Understood.          10:15:35
18   BY MR. KO:                            10:15:42
19        Q.   And as a result of the FTC consent decree,   10:15:43
20   were you aware of -- or did you become aware of any   10:15:45
21   specific provisions that were made known to you   10:15:50
22   that you specifically had to comply with as product   10:15:52
23   manager of the ads-targeting team?        10:15:57
24        A.   As I just answered, if there was a meeting   10:16:03
25   or instance in which the specific obligation of the   10:16:07

Page 58

1    consent decree of the targeting team was brought   10:16:10
2    up, I can't recall them, but that doesn't mean it   10:16:13
3    didn't happen, necessarily.              10:16:16
4        Q.   And going back to my original question   10:16:17
5    about the -- or my earlier question with respect to   10:16:19
6    the Facebook Privacy Program, are you aware of   10:16:22
7    whether or not Facebook had to enact any sort of   10:16:25
8    program including but not limited to the Facebook   10:16:29
9    Privacy Program as a result of the FTC consent   10:16:30
10   decree?                             10:16:34
11        A.   Again, I wasn't employed in a legal   10:16:37
12   capacity, so the full implications of this consent   10:16:39
13   decree would not have been my responsibility or   10:16:42
14   charge.  So I --                       10:16:45
15        Q.   Did you -- yeah.  Go ahead.  Sorry.   10:16:47
16        A.   No, that -- that's it.           10:16:49
17        Q.   Did you ever become familiar with an   10:16:52
18   entity -- well, did -- I assume you know who   10:16:54
19   PricewaterhouseCoopers is.  Correct?      10:16:58
20        A.   Yes.                         10:17:00
21        Q.   And other than them being a Big Five   10:17:01
22   accountant, did you also become aware that they   10:17:06
23   audited certain privacy issues as well?     10:17:09
24        A.   I don't think -- I wasn't directly   10:17:15
25   involved with whatever their auditing function was   10:17:16

Page 59

1    at Facebook, so I wouldn't know the details of how   10:17:18
2    that -- how that actually worked.         10:17:21
3        Q.   During your time at Facebook from April of   10:17:22
4    2011 to April of 2013, did you ever have any   10:17:24
5    communications with any individuals at PwC?   10:17:29
6        A.   I sent a lot of messages and email when I   10:17:35
7    was at Facebook.  So me absolutely attesting to a   10:17:38
8    negative that something never happened in my time   10:17:44
9    there, I think, is very difficult for me to do.   10:17:47
10        Broadly, did I have an ongoing          10:17:49
11   conversation with PwC?  No.  That doesn't mean that   10:17:50
12   I wasn't cc'd on an email or wasn't involved in   10:17:54
13   some message potentially.  But, broadly, I was not   10:17:57
14   involved with PricewaterhouseCoopers as my --   10:18:00
15        Q.   Were you ever -- do you ever recall   10:18:04
16   interacting with them in any fashion -- email,   10:18:07
17   phone conversation, meeting -- during your time at   10:18:11
18   Facebook?                           10:18:14
19        A.   I think I just answered that question.  I   10:18:15
20   sent lots of email and lots of messages when I was   10:18:17
21   at Facebook.  For me to absolutely attest that I   10:18:20
22   didn't send a message in what are probably tens of   10:18:22
23   thousands if not hundreds of thousands of messages   10:18:25
24   is very difficult for me to say under oath.   10:18:28
25        I'm not sure, to be quite honest.       10:18:30

Page 60

1        I certainly can't say I never, in the   10:18:32
2    history of my life, ever interacted with someone   10:18:34
3    from PricewaterhouseCoopers while I was at   10:18:37
4    Facebook.  I can't make that statement.     10:18:39
5        Q.   Fair enough.                   10:18:41
6        Fair to say, though, that you don't recall   10:18:42
7    interacting with them on any sort of regular basis   10:18:44
8    during your time at Facebook.  Correct?    10:18:49
9        A.   Yes.  On a regular basis, I did not   10:18:53
10   interact with PricewaterhouseCoopers to the best of   10:18:55
11   my recollection.                       10:18:58
12        Q.   Fair to say that you don't recall   10:18:59
13   interacting with them on any sort of limited basis   10:19:01
14   either.  Correct?                      10:19:04
15        A.   I would refer to my earlier answer on that   10:19:06
16   question.                            10:19:09
17        Q.   Do you have any recollection at all of   10:19:11
18   interacting with any individual at PwC during your   10:19:13
19   time at Facebook?                      10:19:17
20        A.   Seems to me this is the third time   10:19:20
21   we're -- we're confronting this question.   10:19:21
22        Q.   Do you have any recollection at all of   10:19:29
23   interacting with any individual at PwC during your   10:19:30
24   time at Facebook?                      10:19:33
25        A.   Fourth time.  Like I said before, I sent   10:19:35

Page 61

16 (Pages 58 - 61)

# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE:  FACEBOOK, INC.,      MDL No. 2843

 5   CONSUMER USER PROFILE        Case No.

 6   LITIGATION                   18-md-02843-VC-JSC

     _____

 7   This document relates to:

 8   ALL ACTIONS

     _____

 9                 **CONFIDENTIAL**

10

11      ZOOM DEPOSITION OF FACEBOOK's 30(b)(6)

12      CORPORATE REPRESENTATIVE - ALLISON HENDRIX

13   (Reported Remotely via Video & Web Videoconference)

14      Palo Alto, California (Deponent's location)

15                 Friday, June 3, 2022

16                      Volume II

17

18   STENOGRAPHICALLY REPORTED BY:

19   REBECCA L. ROMANO, RPR, CSR, CCR

20   California CSR No. 12546

21   Nevada CCR No. 827

22   Oregon CSR No. 20-0466

23   Washington CCR No. 3491

24   JOB NO. 5178383

25   PAGES 348 - 669
```

                                        Page 348

CONFIDENTIAL

1 detect all potentially abusive behavior by third          11:54:39
2 parties on its platform?
3        MR. HUR:  Objection.  Vague as to time.
4        THE DEPONENT:  It is fair -- yes, we --
5 we can't place the platform 100 percent.          11:55:01
6    Q.  (By Mr. Ko)  Is it fair to say that third
7 parties access large amounts of user information
8 throughout the relevant time period?
9    A.  Say that again, please.
10    Q.  Is it fair to say that third parties          11:55:17
11 accessed large amounts of user information
12 throughout the relevant time period?
13    A.  What do you mean by "large amounts"?
14    Q.  Do you recall we spoke about the FTC
15 consent decree in 2012 in your prior deposition?          11:55:32
16    A.  I believe so.  I don't remember.
17    Q.  Well -- fair enough.
18        You are aware the consent decree that
19 Facebook entered into in 2012 with the FTC,
20 correct?          11:55:56
21    A.  Yes.
22    Q.  And you're also aware of the subsequent
23 enforcement action in 2019 in which Facebook paid
24 $5 billion to resolve the FTC's allegations against
25 Facebook, right?          11:56:07

Page 441

1    A.  Yes.          11:56:16
2    Q.  The FTC consent decree and the subsequent
3 enforcement action in 2019 related to how Facebook
4 was going to ensure that user information was
5 protected.          11:56:31
6        Would you agree with me on that?
7    A.  No.
8    Q.  Okay.  Do you not believe that the FTC
9 consent decree related to the protection of
10 Facebook's users' information?          11:56:53
11        MR. HUR:  Objection.  Asked and answered.
12        THE DEPONENT:  I agree it related
13 to the -- to user information, just not that we
14 were going to 100 percent ensure compliance.
15    Q.  (By Mr. Ko)  Okay.  What do you mean by          11:57:11
16 not ensuring 100 percent compliance?
17    A.  Well, just like there's laws that
18 prohibit you from murdering people or from
19 stealing.  And law -- law enforcement, as we
20 unfortunately know today, can't prevent these          11:57:31
21 crimes from happening.  But the expectation with
22 society is that they do their best, whether through
23 automated or manual means, just very similar to the
24 online environment.
25        So there's just -- that's -- I hope that          11:57:46

Page 442

1 example helps like...          11:57:49
2    Q.  Sure, it does.
3        The intent of the 2012 FTC consent decree
4 with Facebook related to how Facebook was going to
5 ensure that user information was protected,          11:58:08
6 correct?
7        MR. HUR:  Objection.  Calls for
8 speculation.
9        THE DEPONENT:  Yes.  I -- I don't feel
10 comfortable interpreting the legal orders.  But we          11:58:20
11 did agree to do privacy programs and improve many
12 things, both then and -- and now.
13    Q.  (By Mr. Ko)  And the privacy programs
14 were in connection with ensuring that user
15 information was protected.          11:58:36
16        Would you agree with me on that?
17    A.  When you say "ensuring user information
18 was protected," am I misconstruing you that you're
19 viewing that as an absolute?  Like how do you mean?
20 Like that's where I'm struggling.          11:58:50
21    Q.  Yeah.  Let's operate under the universe
22 of intent because I think your explanation was
23 helpful.
24        Obviously, I understand that Facebook
25 couldn't actually ensure that every piece of          11:59:00

Page 443

1 Facebook user information was, in fact, protected.          11:59:02
2        But under the universe of the intent
3 paradigm that you had provided -- helpfully
4 provided to me, it was certainly Facebook's intent
5 that in connection with the privacy program          11:59:18
6 established, pursuant to the FTC consent decree,
7 that Facebook was going to try to ensure that user
8 information was protected.
9        Do you agree with me on that?
10        MR. HUR:  Objection.  Form.          11:59:34
11        THE DEPONENT:  I don't agree with the way
12 you're characterizing it, no.
13    Q.  (By Mr. Ko)  Did the FTC consent decree
14 relate in any way to how user information was going
15 to be made accessible to third parties?          11:59:54
16    A.  I don't remember the specifics of how the
17 order then pertained to changing our products.
18    Q.  Did the privacy program that you had
19 referenced a moment ago, that was created in
20 connection with the FTC consent decree, did that          12:00:23
21 privacy program relate to how Facebook user
22 information was going to be protected in any
23 manner?
24        MR. HUR:  Objection to scope.
25        THE DEPONENT:  What do you mean by          12:00:39

Page 444

25 (Pages 441 - 444)

# EXHIBIT E

HIGHLY CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
    IN RE:  FACEBOOK, INC.,      MDL No. 2843
 4  CONSUMER USER PROFILE        Case No.
    LITIGATION                   18-md-02843-VC-JSC
 5  _____
 6  This document relates to:
 7  ALL ACTIONS
 8
    _____
 9
10
11
12              **HIGHLY CONFIDENTIAL**
13         ZOOM DEPOSITION OF ROBERT SHERMAN
14  (Reported Remotely via Video & Web Videoconference)
15        Washington, D.C. (Deponent's location)
16              Thursday, July 28, 2022
17                    Volume 1
18
19
20
    STENOGRAPHICALLY REPORTED BY:
21  REBECCA L. ROMANO, RPR, CSR, CCR
    California CSR No. 12546
22  Nevada CCR No. 827
    Oregon CSR No. 20-0466
23  Washington CCR No. 3491
24  JOB NO. 5307165
25  PAGES 1 - 314
```

                                        Page 1

1 were made seriously over and above what was            12:24:36
2 minimally agreed to.
3     Q.  Had Facebook made the decision to create
4 a privacy program before it entered the 2012
5 consent order with the FTC?            12:24:48
6     A.  I don't think I can answer that, because
7 any information that I would have had about that
8 would have been when I was outside counsel to
9 Facebook.
10     Q.  I'm -- I'm just asking as a factual            12:24:59
11 question.  I'm not asking for the deliberations.
12 And you can -- you know, I'll leave it to your
13 counsel and you to decide what response, but as a
14 factual -- just a yes-or-no question.
15        Had Facebook made the decision to create            12:25:16
16 a pri- -- a privacy program before entering into
17 the 2012 consent order with the FTC?
18        MR. HUR:  If we can take a break to
19 confer about whether something is covered by
20 privilege or not, then we can certainly do that.            12:25:30
21        THE DEPONENT:  Yeah.  I think it would be
22 helpful just to take a minute to -- for me to
23 clarify that.
24        MR. MELAMED:  Happy to go off the record.
25        THE VIDEOGRAPHER:  Okay.  We're off the            12:25:39
                                                    Page 70

1 record.  It's 12:25 p.m.            12:25:41
2        (Recess taken.)
3        THE VIDEOGRAPHER:  We're back on the
4 record.  It's 12:34 p.m.
5     Q.  (By Mr. Melamed)  Before we went off the            12:34:57
6 record, I had asked you a question that you needed
7 to confer with counsel about, so I'd like to ask
8 the same question.
9        Did Facebook make the decision to create
10 a privacy program before it entered the 2012            12:35:07
11 concert order with the FTC?
12        MR. HUR:  And at this point, I will
13 instruct the witness, based on our discussion
14 during the break, to exclude from his answer any
15 knowledge that was derived from communications            12:35:23
16 between the company and him as outside counsel at
17 the time, for the purpose of seeking his legal
18 advice.
19        THE DEPONENT:  So when I joined the
20 company, which was in March or April of 2012, the            12:35:39
21 company had a number of different privacy
22 protections and processes in place, including the
23 privacy review process that I testified earlier I
24 participated in.
25        Subsequent to that, and as a part of the            12:35:54
                                                    Page 71

1 compliance with the FTC order, the company built            12:35:59
2 additional processes relating to privacy
3 protection.
4     Q.  (By Mr. Melamed)  What additional
5 processes related to privacy protection did the            12:36:06
6 company build as part of compliance with the FTC
7 consent order?
8     A.  You'd probably -- you'd have to look at
9 the order and the submissions to the FTC to know
10 comprehensively.            12:36:31
11        In general, my sense is that around that
12 time we were developing a series of processes for
13 things like risk assessment for escalation of
14 privacy decisions within the company and for
15 external assessment of privacy program practices            12:36:49
16 by -- by a third-party assessor, among other
17 things.
18     Q.  That third-party assessor that you're
19 referencing turned out to be
20 PricewaterhouseCoopers, correct?            12:37:02
21     A.  Yes.
22     Q.  Do you remember I asked you a few
23 questions, when we were looking at Exhibit 634, to
24 which you responded it would help if I could
25 provide the -- the Newsroom document that was being            12:37:13
                                                    Page 72

1 referenced?            12:37:19
2     A.  Yes.
3        (Exhibit 635 was marked for
4 identification by the court reporter and is
5 attached hereto.)            12:37:21
6        MR. MELAMED:  So I've introduced as
7 Exhibit 635 the Newsroom document from Facebook,
8 dated March 16th, 2018, that contains the phrase
9 that was in the email.
10        And I can refer you specifically -- it's            12:37:35
11 on page 3 of Exhibit 635.  There's a subheader that
12 says "How Things Have Changed."
13        And the second paragraph starts with the
14 language that was quoted in Mr. Reynolds' initial
15 email in Exhibit 634, and that quote is "In 2014,            12:37:55
16 after hearing feedback from the Facebook
17 community."
18     A.  I see that.  And thank you for tracking
19 it down for me.
20     Q.  So I think reviewing that paragraph            12:38:12
21 should be sufficient to help you determine whether
22 you can answer those questions.
23        So let me know after you've read that
24 paragraph.
25     A.  Okay.  Thank you.            12:38:21
                                                    Page 73

19 (Pages 70 - 73)

# EXHIBIT F

**HIGHLY CONFIDENTIAL ROUGH DRAFT**

1          UNCERTIFIED REALTIME ROUGH DRAFT OF

2          EDDIE O'NEIL TAKEN 8/10/2022

3

4                         ***

5   THIS REALTIME ROUGH DRAFT IS UNEDITED AND

6   UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

7   STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S

8   NOTE, A MISSPELLED PROPER NAME/OR NONSENSICAL WORD

9   COMBINATIONS.  PURSUANT TO CCP SECTION 2025.540(b),

10  IT MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE

11  CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS.

12  THIS REALTIME ROUGH DRAFT TRANSCRIPT MAY NOT BE

13  CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR

14  CONTRADICT THE CERTIFIED TRANSCRIPT OF THE

15  DEPOSITION PROCEEDINGS AS PROVIDED BY THE

16  DEPOSITION OFFICER.  THIS DOCUMENT IS NOT TO BE

17  RELIED UPON IN WHOLE OR IN PART AS THE OFFICIAL

18  TRANSCRIPT.  THIS UNCERTIFIED REALTIME ROUGH DRAFT

19  VERSION HAS NOT BEEN REVIEWED OR EDITED BY THE

20  CERTIFIED SHORTHAND REPORTER FOR ACCURACY.

21

22  ACCEPTANCE OF THIS REALTIME ROUGH DRAFT IS AN

23  AUTOMATIC FINAL COPY ORDER.  I AGREE NOT TO SHARE,

24  GIVE, COPY, SCAN, FAX, OR IN ANY WAY DISTRIBUTE THE

25  REALTIME ROUGH DRAFT IN ANY FORM (WRITTEN OR

**HIGHLY CONFIDENTIAL ROUGH DRAFT**

 1   COMPUTERIZED) TO ANY PARTY.  HOWEVER, MY OWN

 2   EXPERTS, CO-COUNSEL, CLIENT(S) AND STAFF MAY HAVE

 3   LIMITED INTERNAL USE OF SAME WITH THE UNDERSTANDING

 4   THAT I AGREE TO DESTROY ALL REALTIME ROUGH DRAFTS

 5   AND/OR COMPUTERIZED FORMS, IF ANY, AND REPLACE SAME

 6   WITH THE FINAL TRANSCRIPT AND/OR FINAL COMPUTERIZED

 7   FORM, UPON ITS COMPLETION.

 8

 9

10        Acceptance of this realtime draft is an

11   automatic final copy order.

12

13

14             THE VIDEOGRAPHER:  Okay.  We on the

09:11:49 15   record at 9:11 a.m. Pacific Time on August 10th,

16   2022.  This is the deposition of Eddie O'Neil.  We

17   are here in the matter of Facebook Consumer Privacy

18   User Profile Litigation.

19             I'm John Macdonell the videographer with

09:12:04 20   Veritext.

21             Before the reporter swears the witness

22   would counsel please identify themselves beginning

23   with the noticing attorney please.

24             MS. LAUFENBERG:  Cari Laufenberg with

09:12:14 25   Keller Rohrback on behalf of plaintiffs and with me

2

**HIGHLY CONFIDENTIAL ROUGH DRAFT**

09:12:18  1  today is Adele Daniel from Keller Rohrback as well.

2  THE COURT REPORTER:  Mr. Schwing, you're

3  on mute.

4  MR. SCHWING:  Boy, I'm already having

09:12:28  5  troubles here.  Thank you Cari or whoever siad it,

6  Rebecca.

7  Austin Schwing with Gibson Dunn and I

8  represent the defendant and with me is

9  Matt Buongiorno, Phuntso Wangdra and Ian Chen.

09:12:43 10  THE COURT REPORTER:  At this time, I will

11  ask counsel to agree on the record that there is no

12  objection to this deposition officer administering

13  a binding oath to the deponent via remote

14  videoconference, starting with the noticing

09:12:43 15  attorney, please.

16  MS. LAUFENBERG:  No objection here,

17  Rebecca.

18  MR. SCHWING:  No objection.

19  THE COURT REPORTER:  If you could raise

09:13:03 20  your right hand for me, please.

21  THE DEPONENT:  (Complies.)

22  THE COURT REPORTER:  You do solemnly

23  state, under penalty of perjury, that the testimony

24  you are about to give in this deposition shall be

09:13:03 25  the truth, the whole truth and nothing but the

3

⬆

**HIGHLY CONFIDENTIAL ROUGH DRAFT**

09:13:03  1  truth?

        2            THE DEPONENT:  I do.

        3

        4

09:13:03  5

        6

        7

        8

        9

09:13:03 10

        11

        12

        13

        14

09:13:03 15

        16

        17

        18

        19

09:13:03 20

        21

        22

        23

        24

09:13:03 25

**HIGHLY CONFIDENTIAL ROUGH DRAFT**

09:51:45  1  frame.

2     Q.   Okay.

3     A.   I think that's the right time frame.

4     Q.   And is there -- are there different

09:51:53  5  responsibilities that you had a director of product

6  management than you did as a product manager?

7     A.   I don't remember my recollection my title

8  changed but my responsibilities did not.

9     Q.   Okay.  And during that time frame of 2016

09:52:16  10  to 2022, which about five almost six years correct?

11     A.   Almost six years yes.

12     Q.   Yeah.

13           What were some of the major projects that

14  you worked on during that time frame?

09:52:37  15     A.   I worked on a project related to third

16  party experiences inside the Facebook app.  I think

17  that was called instant experiences.  I worked on

18  the AR -- Augmented reality camera.  I worked on --

19  I very briefly worked on something in the ads org.

09:53:31  20  I very briefly worked on -- an ad -- I'm pretty

21  sure I'm not going to remember what this is.

22     Q.   Did you say the ads org ORG?

23     A.   Yes, the ads organization.

24     Q.   Okay.

09:53:45  25     A.   But that would -- I think that was only

**HIGHLY CONFIDENTIAL ROUGH DRAFT**

09:53:48  1  essentially a matter of weeks.  I worked on the

2  response to Cambridge Analytica.  And then worked

3  on building out the -- worked on the compliance

4  program for developer platform.  So FTC order.  And

09:54:08  5  I worked on some of Meta verse project.

6       Q.   Okay.?

7       A.   Again like that list is that exhaustive I

8  don't want to leave the impression that's an

9  exhaustive list.

09:54:36  10      Q.   That's understood.  Thank you.

11           I think in your -- in your DC AG

12  testimony, you stated that in your role as director

13  of product management that you -- that you -- there

14  were a couple of different aspects to your role.

09:54:56  15          And I don't -- and I just want to -- I

16  just want to clarify that you still believe to be

17  correct than we don't have to spent a lot of time

18  we don't supply indicate what's already been done.

19          You said one part of your role relates to

09:55:08  20  the consumer app platform, and the other majority

21  of your role is focused on privacy commitments and

22  the work that we do.  Related to products for

23  third-party developers; is that still accurate?

24      A.   Yes, that -- yes.  It's -- it's accurate

09:55:32  25  it's probably I think it's incomplete in the --