Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY A SETTLEMENT CLASS AND GRANT PRELIMINARY SETTLEMENT APPROVAL**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor<br>Hearing Date: March 2, 2023<br>Hearing Time: 10:00 a.m. PST (via Zoom) |

# TABLE OF CONTENTS

Page

NORTHERN DISTRICT OF CALIFORNIA PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS: REFERENCE TABLE........................................................... xi

NOTICE OF MOTION AND MOTION .................................................................................1

STATEMENT OF THE ISSUES TO BE DECIDED...................................................................3

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................3

I.     INTRODUCTION ................................................................................................3

II.    THE SETTLEMENT IS THE RESULT OF YEARS OF HARD-FOUGHT LITIGATION............................................................................................................5

     A.     A brief summary of the litigation........................................................................5

     B.     A summary of the mediation efforts and agreement to settle. ................................8

     C.     A summary of changed practices and FTC monitoring that address Plaintiffs' allegations. .......................................................................................10

III.   SETTLEMENT TERMS .......................................................................................12

     A.     Benefits to Class Members are unprecedented in size.........................................12

     B.     The Settlement Class definition largely combines the two classes defined in the operative complaint.........................................................................................14

     C.     The estimated class size is in the range of 250–280 million.................................16

     D.     The Settlement allows Co-Lead Counsel to seek fees and costs and the Named Plaintiffs to seek service awards. .............................................................17

     E.     The Settlement's release is coextensive with the Ninth Circuit's "identical factual predicate" requirement. ..............................................................18

IV.   THE SETTLEMENT MERITS PRELIMINARY APPROVAL........................................18

     A.     The strengths and risks of Plaintiffs' case. ...........................................................19

          1.     Comparing the strengths and risks of the contract-related claims. ............21

               a.     General strengths and weaknesses ................................................21

               b.     Maximum recovery and discount applied.....................................22

          2.     Comparing the strengths and risks of the VPPA claim.............................23

               a.     General strengths and weaknesses ................................................23

b.    Maximum recovery and discount applied....................................25

3.    Comparing the strengths and risks of the SCA claim. ............................26

a.    General strengths and weaknesses .................................................26

b.    Maximum recovery and discount applied....................................27

4.    Comparing the strengths and risks of the negligence claim. ...................27

a.    General strengths and weaknesses .................................................27

b.    Maximum recovery and discount applied....................................28

5.    Comparing the strengths and risks of the deceit-by-concealment claim..........................................................................................................28

a.    General strengths and weaknesses .................................................28

b.    Maximum recovery and discount applied....................................29

6.    Comparing the strengths and risks of the privacy-based torts. .................29

a.    General strengths and weaknesses .................................................29

b.    Maximum recovery and discount applied....................................30

7.    Comparing the strengths and risks of the deprioritized claims.................30

a.    General strengths and weaknesses .................................................30

b.    Maximum recovery and discount applied....................................32

8.    Comparing the strengths and risks of the dismissed claims. ...................33

a.    General strengths and weaknesses .................................................33

b.    Maximum recovery and discount applied....................................33

9.    Risk of damages being deemed duplicative.............................................34

B.    Further litigation would be expensive, complex, and lengthy. ..............................34

C.    The risks associated with certifying a class and maintaining the case as a class action through trial. ........................................................................................35

D.    The relief offered in the Settlement is more than adequate. ................................37

1.    The Settlement Fund is fair, reasonable, and adequate.............................37

2.    The Plan of Allocation is reasonable. ......................................................37

3.    Facebook has ended or is subject to FTC monitoring of the data sharing practices challenged by Plaintiffs..................................................38

a. Facebook no longer makes non-public friend data available to apps without explicit authorization from the user whose data is being shared. ...................................................................................39

b. Facebook has substantially enhanced its monitoring of third-party data use. ..............................................................................40

c. Facebook has substantially limited APIs that emit information indicating users requested or obtained specific videos on Facebook. .........................................................................................44

E. The Settlement is informed by extensive discovery. .............................44

F. Based on decades of experience litigating and settling class actions, counsel believes the Settlement is an outstanding result. ...................................46

G. Governmental participation is not a factor at issue here........................46

H. The Settlement also satisfies the *Bluetooth* factors................................46

V. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ...............................47

A. The Settlement Class satisfies the Rule 23(a) prerequisites. .................48

1. The class is sufficiently numerous.............................................48

2. There are common questions of law and of fact. ......................48

3. The Settlement Class Representatives' claims are typical of Settlement Class Members' claims...........................................49

4. The Settlement Class Representatives and Class Counsel will—and have—fairly and adequately protected the interests of the Settlement Class.............................................................................................49

B. The Settlement Class satisfies Rule 23(b)(3)........................................51

1. Common issues of law and fact predominate. ..........................51

2. Class treatment is superior. .......................................................53

VI. THE PROPOSED NOTICE PROGRAM, SETTLEMENT ADMINISTRATOR, AND PROCESS FOR OPT-OUTS AND OBJECTIONS SHOULD BE APPROVED ...54

A. The proposed Notice Plan.....................................................................54

1. Class notice ...............................................................................54

2. CAFA notice .............................................................................55

B. The Settlement Administrator................................................................55

1. Selection process.......................................................................55

          2.      The Settlement Administrator's estimated claims rate ..............................56

      C.      Opt-outs and objections: timeline, instructions, and forms ...................................56

VII.   THE PROPOSED FINAL APPROVAL HEARING SCHEDULE...................................56

VIII.  CONCLUSION.......................................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alkayali v. Hoed*,
No. 3:18-cv-777-H-JMA, 2018 WL 3425980 (S.D. Cal. July 16, 2018) .........................21, 22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)............................................................................................................47

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018).......................................................................................37

*In re Apple Inc. Device Performance Litig.*,
50 F.4th 769 (9th Cir. 2022) ........................................................................................18, 19

*Artifex Software, Inc. v. Hancom, Inc.*,
No. 3:16-cv-06982-JSC, 2017 WL 4005508 (N.D. Cal. Sept. 12, 2017) ...............................21

*Betorina v. Randstad US, L.P.*,
No. 3:15-cv-03646-EMC, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017)................................46

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...............................................................................17, 46, 47

*Calhoun, et al. v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .................................................................................27

*City & Cty. of San Francisco v. Philip Morris, Inc.*,
No. 4:96-cv-02090-DLJ, 1998 WL 230980 (N.D. Cal. Mar. 3, 1998) ..................................29

*Cotter v. Lyft, Inc.*,
176 F. Supp. 3d 930 (N.D. Cal. 2016) ............................................................................19, 20

*Cotter v. Lyft, Inc.*,
193 F. Supp. 3d 1030 (N.D. Cal. 2016) .......................................................................18, 19, 46

*Cummings v. Connell*,
402 F.3d 936 (9th Cir. 2005) ..............................................................................................28

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ..............................................................................................24

*Ellsworth v. U.S. Bank, N.A.*,
No. 3:12-cv-02506-LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014) ................................36

*In re Facebook Biometric Info. Priv. Litig.*,
326 F.R.D. 535 (N.D. Cal. 2018).......................................................................................37

*In re Facebook Biometric Info. Priv. Litig.*,
No. 3:15-cv-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018)...................................37

*In re Facebook Biometric Information Privacy Litigation*,
No. 15-cv-03747-JD (N.D. Cal.) ...........................................................................................37

*In re Facebook Internet Tracking Litigation*,
No. 12-md-02314-EJD (N.D. Cal.)........................................................................................33

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ..............................................................................32, 33

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020), *cert. denied sub nom. Facebook, Inc. v. Davis*,
209 L. Ed. 2d 464, 141 S. Ct. 1684 (2021) ......................................................................22, 30

*In the Matter of Facebook, Inc.*,
No. C-4365 (Apr. 27, 2020)........................................................................................... *passim*

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638
F. App'x 594 (9th Cir. 2016) ...............................................................................................25

*Fraser v. Team Health Holdings, Inc.*,
No. 4:20-cv-04600-JSW, 2022 WL 971579 (N.D. Cal. Mar. 31, 2022) ...............................32

*Fuller v. Capitol Sky Park*,
120 Cal. Rptr. 131 (Ct. App. 1975) ......................................................................................32

*Gill v. Hearst Pub. Co.*,
40 Cal.2d 224 (1953) ...........................................................................................................30

*Golan v. Free Eats.com, Inc.*,
930 F.3d 950 (8th Cir. 2019) ...............................................................................................25

*Guyana Tel. & Tel. Co, Ltd. v. Melbourne Int'l Commc'ns, Ltd.*,
329 F.3d 1241 (11th Cir. 2003) ...........................................................................................34

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .........................................................................................51, 53

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ...............................................................................................18

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ..................................................................................20

*In re Hyundai & Kia Fuel Economy Litig.*,
926 F.3d 539 (9th Cir. 2019) (en banc) ......................................................................36, 52, 53

*Jabbari v. Wells Fargo & Co.*,
   965 F.3d 1001 (9th Cir. 2020) ........................................................30, 36

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014) ..................................................................36

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   No. 3:19-md-02913-WHO, 2022 WL 2343268 (N.D. Cal. June 28, 2022) ...........................52

*Martin v. Sysco Corp.*,
   No. 1:16-cv-00990-DAD-SAB, 2019 WL 3253878 (E.D. Cal. July 19, 2019).....................46

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015).............................................................20

*In re Mexico Money Transfer Litig.*,
   267 F.3d 743 (7th Cir. 2001) ..................................................................31

*Murray v. GMAC Mortg. Corp.*,
   434 F.3d 948 (7th Cir. 2006) ..............................................................31, 52

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006) ...............................................................48

*In re Netflix Priv. Litig.*,
   No. 5:11-cv-00379-EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ..........................26

*Ngu v. City Bail Bonds*,
   286 Cal. Rptr. 3d 550 (Ct. App. 2021)..........................................................33

*Opperman v. Path, Inc.*,
   No. 3:13-cv-00453-JST, 2016 WL 3844326 (N.D. Cal. July 15, 2016)............................28

*Oracle Corp. v. SAP AG*,
   734 F. Supp. 2d 956 (N.D. Cal. 2010) ..........................................................22

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ..................................................................49

*Patel v. Facebook, Inc.*,
   932 F.3d 1264 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 937 (2020)........................37

*Reade v. New York Times Co.*,
   No. 2:22-cv-00543-WBS-KJN, 2022 WL 2396083 (E.D. Cal. July 1, 2022) ........................30

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ..................................................................49

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ............................................... 19

*Slaven v. BP Am., Inc.*,
190 F.R.D. 649 (C.D. Cal. 2000) .......................................... 48

*Smith v. Cardinal Logistics Mgmt. Corp.*,
No. 3:07-cv-02104-SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ................... 53

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ........................................... 4, 50

*Tavaglione v. Billings*,
847 P.2d 574 (Cal. 1993) ................................................ 34

*In re TikTok, Inc., Consumer Priv. Litig.*,
565 F. Supp. 3d 1076 (N.D. Ill. 2021) ................................... 26

*Trosper v. Stryker Corp.*,
No. 5:13-cv-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ............... 50

*Tureen v. Equifax, Inc.*,
571 F.2d 411 (8th Cir. 1978) ........................................... 20

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .................................................... 51

*Uppal v. CVS Pharmacy, Inc.*,
No. 3:14-cv-02629-VC, 2015 WL 1089062 (N.D. Cal. Sept. 11, 2015) .............. 46

*Valliere v. Tesoro Refin. & Mktg. Co. LLC*,
No. 4:17-cv-00123-JST, 2020 WL 13505042 (N.D. Cal. June 26, 2020) ............ 49

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
No. 3:15-md-02672-CRB, 2017 WL 2212783 (N.D. Cal. May 17, 2017) ............. 19

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................................................... 48

*Wolf v. Permanente Medical Group, Inc.*,
No. 3:17-cv-05345-VC, 2018 WL 5619801 (N.D. Cal. Sept. 14, 2018) ............. 17

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
No. 5:16-md-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ............ 50

*Young v. Wideawake Death Row Ent., LLC*,
No. 2:10-cv-01019-CAS, 2011 WL 13371881 (C.D. Cal. May 16, 2011) ............ 22

**Statutes**

15 U.S.C. § 15(a) ..........................................................................................................19

15 U.S.C. § 1681a(d)(1) ...............................................................................................32

15 U.S.C. § 1681n(a) .....................................................................................................32

18 U.S.C. § 1964(c) .......................................................................................................32

18 U.S.C. § 2510(15) .....................................................................................................52

18 U.S.C. § 2702(a)(1) ...................................................................................................52

18 U.S.C. § 2702(b)(2) ..................................................................................................26

18 U.S.C. § 2707(c) ..................................................................................................26, 27

18 U.S.C. § 2710 .................................................................................................... *passim*

18 U.S.C. § 2710(a)(4) ..................................................................................................24

18 U.S.C. § 2710(b)(1) ..................................................................................................23

18 U.S.C. § 2710(c)(2)(A) .............................................................................................23

18 U.S.C. § 2710(c)(2)(B) .............................................................................................19

**Rules**

Fed. R. Civ. P. 23 ...............................................................................................1, 47, 54

Fed. R. Civ. P. 23(a) ................................................................................................47, 48

Fed. R. Civ. P. 23(a)(2) .................................................................................................48

Fed. R. Civ. P. 23(a)(3) .................................................................................................49

Fed. R. Civ. P. 23(a)(4) .................................................................................................49

Fed. R. Civ. P. 23(b)(3) .....................................................................................51, 52, 53

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................54

Fed. R. Civ. P. 23(e) ........................................................................................................4

Fed. R. Civ. P. 23(e)(1) .............................................................................................1, 54

Fed. R. Civ. P. 30(b)(6) .............................................................................................7, 45

Fed. R. Civ. P. 53 ........................................................................................................8

**Other Authorities**

34A Cal. Jur. 3d Fraud and Deceit § 114 ...................................................................31

Carolyn L. Carter & Jonathan Sheldon, *Unfair and Deceptive Acts and Practices*
    app. A (10th ed. 2021) ........................................................................................31

December 31, 2021, Meta Platforms, Inc., *available at*
    https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/14039b47-2e2f-
    4054-9dc5-71bcc7cf01ce.pdf................................................................................16

Facebook, *Facebook Unveils Platform for Developers of Social Applications*
    (May 24, 2007), https://about.fb.com/news/2007/05/facebook-unveils-
    platform-for-developers-of-social-applications/ ...................................................16

U.S. Census Bureau, *U.S. Adult Population Grew Faster Than Nation's Total
    Population From 2010 to 2020* (Aug. 12, 2021),
    https://www.census.gov/library/stories/2021/08/united-states-adult-
    population-grew-faster-than-nations-total-population-from-2010-to-2020.html ...................16

U.S. Dep't. of Justice, Off. of Juvenile Justice and Delinquency Programs,
    *Statistical Briefing Book: Juvenile Population Characteristics* (released on
    Oct. 13, 2021), *available at* https://www.ojjdp.gov/ojstatbb/population/
    qa01104.asp ........................................................................................................17

## NORTHERN DISTRICT OF CALIFORNIA PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS: REFERENCE TABLE

| GUIDANCE SECTION | GUIDANCE TOPIC | PAGE(S) WHERE GUIDANCE IS DISCUSSED |
|---|---|---|
| 1(a) | Differences between settlement class and class in complaint | 14–16 |
| 1(b) | Differences between released claims and claims in complaint | 18 |
| 1(c) | Recovery under settlement; potential recovery; discount | 22–23, 25–26, 27, 28, 29, 30, 32, 33, 34 |
| 1(d) | Other cases, if any, affected by settlement | 18 |
| 1(e) | Proposed allocation plan | 37–38 |
| 1(f) | Claims rate | 56 |
| 1(g) | Reversion, if any | 37, 47 |
| 2(a) | Settlement administrator | 55–56 |
| 2(b) | Class member data; costs of administration | 55–56; *see also* Exhibit 1-B (the Declaration of Steven Weisbrot) |
| 3 | Notice | 54; *see also* Exhibits 1-B – 1-F to the Settlement Agreement |
| 4 | Opt-outs | 56; *see also* Exhibit 1-D to the Settlement Agreement |
| 5 | Objections | 56; *see also* Exhibit 1-D to the Settlement Agreement |
| 6 | Fees and costs | 17 |
| 7 | Service awards | 17–18 |
| 8 | *Cy pres* | N/A |
| 9 | Timeline | 56–57 |
| 10 | CAFA notice | 55 |
| 11 | Comparable outcomes | 12–14 |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on March 2, 2023, at 10:00 a.m. PST, or as soon

thereafter as this matter may be heard, before the Honorable Vince Chhabria in Courtroom 4 of

the United States District Court for the Northern District of California, located at 450 Golden

Gate Avenue, San Francisco, California, the Court-appointed Named Plaintiffs and proposed

Settlement Class Representatives Steven Akins, Jason Ariciu, Anthony Bell, Bridgett Burk,

Terry Fischer, Tyler King, Jordan O'Hara, and Cheryl Senko ("Named Plaintiffs" or

"Plaintiffs"), on behalf of themselves and the putative Class, by and through Co-Lead Counsel,

shall and hereby does, respectfully move the Court for entry of an Order, pursuant to Federal

Rule of Civil Procedure 23, in the above-captioned action (the "Action"): (1) certifying this

Action as a class action for the purposes of settlement; (2) granting preliminary approval of a

settlement in the amount of $725,000,000 to resolve the Action (the "Settlement"); (3) approving

the form and substance of the proposed Notice of Proposed Settlement of Class Action ("Class

Notice"), the Summary Notice ("Summary Notice"), the In-App Notice ("In-App Notice"), the

Claim Form ("Claim Form"), the manner and timing of disseminating notice to the Class (the

"Notice Plan"), and the selection of Angeion Group as Claims Administrator; (4) setting

deadlines for Class Members to exercise their rights in connection with the proposed Settlement;

and (5) scheduling a hearing date for final approval of the Settlement and Plan of Allocation and

application(s) for attorneys' fees and expenses ("Settlement Hearing").[1]

---

[1] Capitalized terms shall have the same meaning as set forth in the Class Action Settlement
Agreement and Release dated December 22, 2022 (the "Settlement Agreement"), attached as
Exhibit 1 to the Declaration of Derek W. Loeser and Lesley E. Weaver in Support of Plaintiffs'
Motion for Preliminary Approval of Class Action Settlement Pursuant to Federal Rule of Civil
Procedure 23(e)(1) ("Co-Lead Counsel Decl."). In addition, these terms have the following
meaning as used herein: (1) "Facebook" means Meta Platforms, Inc., d/b/a Meta, and formerly
known as Facebook; (2) "Gandhi Decl." means the Declaration of Jay C. Gandhi in Support of
Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement; (3) "Baker
Decl." means the Declaration of Lynn A. Baker in Support of Plaintiffs' Motion for
Preliminary Approval of Class Action Settlement Pursuant to Federal Rule of Civil Procedure

This Motion is based on the Memorandum of Points and Authorities below, the Co-Lead Counsel Declaration, the Settlement Agreement and exhibits thereto,[2] the Gandhi Declaration, the Baker Declaration, the Named Plaintiff declarations, and the papers and pleadings filed in this action.

---

23(e)(1); (4) "Elia Decl." means the Declaration of Steven Elia in Support of Settlement, Dkt. 1094; (5) "Dunphy Decl." means the Declaration of Elizabeth Dunphy in Support of Settlement, Dkt. 1095; (6) "Akins Decl." means the Declaration of Steven Akins in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; (7) "Ariciu Decl." means the Declaration of Jason Ariciu in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; (8) "Bell Decl." means the Declaration of Anthony Bell in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; (9) "Burk Decl." means the Declaration of Bridgett Burk in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; (10) "Fischer Decl." means the Declaration of Terry Fischer in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; (11) "King Decl." means the Declaration of Tyler King in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; (12) "O'Hara Decl." means the Declaration of Jordan O'Hara in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval; and (13) "Senko Decl." means the Declaration of Cheryl Senko in Support of Plaintiffs' Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval. Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

[2] The attachments to the Settlement Agreement include: the proposed Preliminary Approval Order (Exhibit 1-A); the Settlement Administration Protocol & Notice Plan as set forth in the Declaration of Steven Weisbrot of Angeion Group, LLC ("Weisbrot Decl.") (Exhibit 1-B); the Summary Notice (Exhibit 1-C); the Class Notice (Exhibit 1-D); the In-App Notice (Exhibit 1-E); the Claim Form (Exhibit 1-F); the proposed Final Judgment (Exhibit 1-H); and the Escrow Agreement (Exhibit 1-I).

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided on this Motion are:

1.   Whether the proposed Settlement on the terms and conditions set forth in the Stipulation warrants preliminary approval;

2.   Whether to certify this Action as a class action for purposes of settlement;

3.   Whether the Court should approve the form and substance of the proposed Summary Notice, Class Notice, In-App Notice, and Claim Form, as well as the Settlement Administration Protocol & Notice Plan, Summary Notice, including the selection of Angeion Group as Claims Administrator;

4.   Whether the Court should set deadlines for Class Members to exercise their rights in connection with the proposed Settlement; and

5.   Whether the Court should schedule a Settlement Hearing to determine whether the Settlement, Plan of Allocation, and forthcoming applications for attorneys' fees and expenses should be finally approved.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

After more than four years of intensive litigation, the Named Plaintiffs have achieved an extraordinary outcome on behalf of the Class. The proposed Settlement of $725,000,000 is the largest recovery ever achieved in a data privacy class action and the most Facebook has ever paid to resolve a private class action. The amount of the recovery is particularly striking given that Facebook argued that its users consented to the practices at issue, and that the class suffered no actual damages. Plaintiffs dispute these characterizations, but acknowledge that they faced tremendous risks in this novel and complex case. In addition to the monetary relief obtained by Plaintiffs, Facebook has meaningfully changed the practices that gave rise to Plaintiffs' allegations, as set forth in the declarations of two Facebook employees with knowledge of those

facts.[3] Significantly, since this case started, Facebook has ceased allowing third parties to access data about users through their friends, has meaningfully enhanced its ability to restrict and monitor how third parties acquire and use Facebook users' information, and developed more robust tools to tell users what information Facebook collects and shares about them.

Discovery in this case was hard fought, and Plaintiffs have worked painstakingly to obtain the evidence required to inform the proposed Settlement. Plaintiffs reviewed and analyzed nearly 2 million documents, and hundreds of pages of responses to interrogatories. They prepared for and conducted 45 depositions, including more than 110 hours of 30(b)(6) deposition testimony over 20 days, and were preparing to take about a dozen more depositions when the parties reached an agreement in principle to settle. This record has enabled Plaintiffs to plumb their case's strengths and weaknesses, and it has convinced them that the proposed Settlement is an outstanding resolution of this case.

The Settlement was achieved through contested, arms-length mediation sessions, both informal and formal, guided by the Hon. Jay C. Gandhi (Ret.), whose involvement was critical to the ultimate resolution. During each mediation session, and between sessions, Judge Gandhi assessed the case's factual and legal issues, and responded to the parties' respective arguments and positions. The parties were also assisted by Judge Corley who, though she was no longer assigned to the case after confirmation to the District Court, made herself available to help the parties finalize the Settlement Agreement. This Settlement is the result of a thorough, adversarial process. As a condition of the Settlement, and in exchange for payment of the Settlement Amount, Plaintiffs, on behalf of the proposed Settlement Class, agreed to release their claims and all potential claims that could have been brought based on the identical factual predicate as those alleged in the complaint.

At this preliminary approval stage, the Court must determine whether the settlement is "fundamentally fair, adequate, and reasonable" under Rule 23(e). *Staton v. Boeing Co.*, 327 F.3d

---

[3] These declarations will be filed by Facebook.

938, 959 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.

1998)). It is that, and more. In Plaintiffs' view, it represents an outstanding result for the Class.

Judge Gandhi, the lead settlement mediator, concluded that:

> Based upon my experience as a former federal judge and class action litigator, my knowledge of the issues in dispute, my review of the substantial factual and legal materials presented before and during the mediation, the rigor of the Parties' negotiations, the relative strengths and weaknesses of the Parties' positions, and the benefits achieved by the Settlement, I believe the Settlement – a non-reversionary fund of $725 million – represents a reasoned and sound resolution of this exceptionally uncertain and notable litigation.

Gandhi Decl. ¶ 19.

Plaintiffs respectfully request that the Court preliminarily approve the proposed

Settlement so that the Class can move one step closer to benefitting from this historic resolution.[4]

## II.   THE SETTLEMENT IS THE RESULT OF YEARS OF HARD-FOUGHT LITIGATION

Litigating these claims presented extraordinary challenges, far beyond those in a normal

consumer MDL. Because of the asymmetry of information regarding Facebook's actual data

sharing practices, Plaintiffs were seeking discovery about entirely unknown categories of data

and data processing, learning about Facebook's proprietary systems without knowing the

language Facebook uses to describe them. Further, Facebook's vigorous defense required

Plaintiffs to devote enormous resources in response. Plaintiffs were ultimately successful in

obtaining evidence that enabled Plaintiffs to assess their likelihood of success at class

certification, summary judgment, and trial, and to thereby evaluate ongoing litigation risk. Some

of the key evidence that Plaintiffs adduced that through these efforts are described in the Co-

Lead Counsel Declaration filed herewith.

### A.   A brief summary of the litigation.

In June 2018, the Judicial Panel on Multidistrict Litigation initially consolidated eight

---

[4] In submitting this proposed Settlement, Plaintiffs have followed this District's *Procedural Guidance for Class Action Settlements*. Included in this motion is a reference chart showing where each relevant section of the *Guidance* is discussed or addressed.

underlying actions and assigned them to this Court. Dkt. 1; Co-Lead Counsel Decl. ¶ 9. Others followed shortly thereafter; ultimately, 42 cases were consolidated.[5] In July 2018, the Court appointed the undersigned as Co-Lead Counsel for Plaintiffs in the consolidated cases. Dkt. 102; Co-Lead Counsel Decl. ¶ 9. Upon appointment, Co-Lead Counsel filed a consolidated complaint, which they would subsequently amend. *See* Dkt. 152-2 (consolidated complaint); Dkt. 257 (amended consolidated complaint); Co-Lead Counsel Decl. ¶¶ 11, 16. The operative complaint in this action is a superseding operative complaint that aggregated claims brought by litigants around the country. Co-Lead Counsel evaluated all of those claims and identified certain ones to prioritize. The Court granted Plaintiffs' motion to stay certain "non-prioritized" claims, and the parties proceeded to litigate the 12 prioritized claims. Dkt. 190; Co-Lead Counsel Decl. ¶¶ 12–13.

In September 2019, following two rounds of extensive briefing and two lengthy hearings, the Court issued an order granting in part and denying in part Facebook's motion to dismiss the amended consolidated complaint. Dkt. 298; Co-Lead Counsel Decl. ¶ 17. The Court characterized Plaintiffs' principal allegations as comprising "four categories of wrongdoing." Dkt. 298 at 6. The first category concerned apps' access to the friends of those Facebook users who had installed the apps ("friend sharing"). Dkt. 298 at 6–7; Co-Lead Counsel Decl. ¶¶ 17, 114. The second was Facebook's continued friend sharing with "whitelisted apps," even after it had announced it would end friend sharing. Dkt. 298 at 7–8; Co-Lead Counsel Decl. ¶¶ 17, 114. The third concerned Facebook's practice of sharing sensitive information with business partners without having disclosed the practice to users or their friends. Dkt. 298 at 8–9; Co-Lead Counsel Decl. ¶¶ 17, 114. And the fourth was Facebook's failure to restrict or monitor third parties use of Facebook users' sensitive information, in spite of its stated policies. Dkt. 298 at 9; Co-Lead Counsel Decl. ¶¶ 17, 114.

---

[5] U.S. Judicial Panel on Multidistrict Litigation, *MDL Statistics Report – Distribution of Pending MDL Dockets by District* (report date as of Dec. 15, 2022), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-December-15-2022.pdf.

While the Court denied aspects of Facebook's motion to dismiss, it also pared down portions of Plaintiffs' case. By and large, the Court ruled, Plaintiffs' allegations about the first category of misconduct—friend sharing—were not actionable. *See* Dkt. 298 at 2 (noting that Facebook disclosed friend sharing for some portion of the time period); *id.* at 30–41 (granting Facebook's motion to dismiss certain claims in part based on this disclosure). The Court's discussion of the fourth category of misconduct likewise narrowed Plaintiffs' potential paths to victory. *See id.* at 36 (discussing, but not deciding, that certain contractual clauses may constitute waivers of liability for ordinary negligence). Plaintiffs' contract, negligence, statutory, and certain privacy claims were upheld.

Following the Court's motion-to-dismiss order, the parties engaged in a lengthy and thorough discovery process. Over the course of three years, Plaintiffs served 99 interrogatories, 54 requests for admission, and 90 requests for production on Facebook. Co-Lead Counsel Decl. ¶ 76. Plaintiffs ultimately secured nearly 6 million pages of documents; significant volumes of structured data, including the Method Table, the Capabilities tool, and data regarding the Named Plaintiffs in a series of structured data exports; and more than 500 pages of interrogatory responses from Facebook. *Id.* ¶ 76, 77. Plaintiffs also procured 70,267 documents from three former Facebook employees and 335,544 documents from other third parties. *Id.* ¶¶ 79–80. Between December 2021 and August 2022, Plaintiffs deposed 34 former and current Facebook employees; 13 different corporate representatives put forward by Facebook pursuant to Rule 30(b)(6); and a corporate representative from PricewaterhouseCoopers, which conducted privacy audits of Facebook. *Id.* ¶¶ 72, 89, 93. All told, Plaintiffs took approximately 310 hours of depositions.

Plaintiffs also responded to discovery requests from Facebook, which served 100 interrogatories, about 40 requests for admission, and 42 requests for production on each of the Named Plaintiffs. *Id.* ¶ 73. Named Plaintiffs produced 21,484 documents, which included information that they had posted on the Facebook platform and documents about their activities on non-Facebook social media, such as LinkedIn or Twitter. *Id.* ¶ 74. Facebook also deposed

each of the eight Named Plaintiffs, all of whom spent significant time preparing for testimony and responding to written discovery. Co-Lead Counsel Decl. ¶¶ 82–84; Akins Decl. ¶ 14; Ariciu Decl. ¶ 14; Bell Decl. ¶ 15; Burk Decl. ¶ 14; Fischer Decl. ¶ 14; King Decl. ¶ 14; O'Hara Decl. ¶ 14; Senko Decl. ¶ 14.

Discovery issues were first handled by the Court, who later referred discovery to then-Magistrate Judge Corley. Dkt. 390; Co-Lead Counsel Decl. ¶ 29. Judge Corley subsequently conducted more than 20 hearings and issued more than a dozen orders, many of which addressed more than one dispute. Co-Lead Counsel Decl. ¶ 29. In March 2021, Judge Corley suggested that the parties retain a discovery mediator to further assist them, and the parties retained the Honorable Gail Andler (Ret.) and Daniel Garrie to serve in that role. Dkt. 662; Co-Lead Counsel Decl. ¶ 34. Between April and October 2021, the discovery mediators conducted 17 discovery mediations. Co-Lead Counsel Decl. ¶ 35.

In July 2021, the Court appointed Mr. Garrie as Special Discovery Master pursuant to Rule 53. Special Master Garrie ultimately issued dozens of substantive discovery orders between the date of his appointment and the Settlement-related stay in August 2022. Dkt. 708; Co-Lead Counsel Decl. ¶ 36.

Discovery was difficult and contentious. Extensive motion practice was required. Through these efforts Plaintiffs obtained critical evidence and advanced this case to resolution.

## B.  A summary of the mediation efforts and agreement to settle.

On August 26, 2022, the parties informed the Court that they had reached a settlement in principle. Dkt. 1014; Co-Lead Counsel Decl. ¶ 102. The negotiations that led to the agreement were protracted.[6] Resolution required two mediators, including in-person sessions and dozens of videoconferences and telephone calls with the mediators, and even more between the parties after the settlement in principle was reached. Co-Lead Counsel Decl. ¶ 96; Gandhi Decl. ¶¶ 14–16.

---

[6] No counsel from any other case, including cases consolidated in this MDL, participated in the settlement negotiations on behalf of Plaintiffs.

The parties retained former Magistrate Judge Jay C. Gandhi (Ret.) to serve as the settlement mediator in June 2021. Co-Lead Counsel Decl. ¶ 97. The parties provided him with extensive materials, including mediation statements and detailed responses to questions. Co-Lead Counsel Decl. ¶ 97; Gandhi Decl. ¶¶ 12–13. Plaintiffs conducted several telephonic meetings with Judge Gandhi, as well as a joint telephonic meeting with Facebook on September 10, 2021. Co-Lead Counsel Decl. ¶ 97; Gandhi Decl. ¶ 14.

On November 20, 2021, the parties and Judge Gandhi met via Zoom for an all-day mediation session in which each side gave a detailed presentation about claims, defenses, and evidence gathered to date. Co-Lead Counsel Decl. ¶ 98; Gandhi Decl. ¶¶ 12–14. The mediation ended without resolution. As aggressive litigation continued, the parties also continued to meet with and periodically update Judge Gandhi on the litigation. Co-Lead Counsel Decl. ¶ 98; Gandhi Decl. ¶¶ 14–15.

On April 18, 2022, the parties met in person with Judge Gandhi in San Francisco for a second full-day mediation. Despite the parties' extensive discussions with him, both separately and jointly, the session again ended without a resolution. Co-Lead Counsel Decl. ¶ 99; Gandhi Decl. ¶ 15. In the ensuing months, each party spoke separately with Judge Gandhi, updating him on case developments and using him as an intermediary to exchange multiple settlement demands and offers. Co-Lead Counsel Decl. ¶ 99; Gandhi Decl. ¶¶ 15–16.

In the late spring and early summer of 2022, Plaintiffs again met in person with Judge Gandhi to discuss the status of the case and potential paths to resolution. Over the next few months, the parties continued to speak with him and he engaged in shuttle diplomacy. Co-Lead Counsel Decl. ¶ 100; Gandhi Decl. ¶¶ 14–15.

After multiple additional sessions, including one more in-person meeting and numerous calls and videoconferences, the parties reached an agreement in principle to settle. Co-Lead Counsel Decl. ¶ 101; Gandhi Decl. ¶ 16.

On August 26, 2022, the parties executed a term sheet and informed the Court that they had reached an agreement in principle to settle the case. Dkt. 1014; Co-Lead Counsel Decl.

¶ 102. The term sheet, however, left some issues unresolved. As a result, extensive negotiations continued. The disputed issues included the language and scope of the release, notice and administration costs, how best to achieve effective reach for noticing the settlement, and aspects of confirmatory discovery relating to Facebook's cessation of certain practices. Co-Lead Counsel Decl. ¶ 102.

Despite their best efforts, the parties were not able to reach agreement on the unresolved issues, as well as others that arose as the parties sought to finalize the settlement agreement. On October 13, 2022, the parties asked Judge Corley if she would be willing to mediate the remaining obstacles to agreement. Judge Corley agreed. The parties provided Judge Corley with information regarding the unresolved issues and met with her via Zoom in multiple sessions in October and November 2022. The parties made significant progress, and after several more weeks of direct negotiations, a settlement agreement finally was executed on December 22, 2022. *Id.* ¶ 103.

**C.    A summary of changed practices and FTC monitoring that address Plaintiffs' allegations.**

Prior to reaching final terms on the Settlement Agreement, through both formal and informal discovery, Plaintiffs confirmed that the data sharing practices challenged by Plaintiffs have either been ended by Facebook or are subject to an intensive monitoring program under a 2020 FTC Consent Order. These changes and the FTC monitoring program are set forth in the declarations of two current Facebook employees, Steven Elia and Elizabeth Dunphy, and summarized in the Co-Lead Counsel Declaration at paragraphs 117–150. Most of the changes discussed in the Elia and Dunphy Declarations were implemented after the Action was initiated.

First, Facebook has deprecated capabilities and APIs[7] that enabled third parties to obtain non-public friend data and no longer provides "whitelisted" access to this information. *See* Elia Decl. ¶¶ 12–17 (describing the elimination of whitelisting and deprecation of APIs and

---

[7] In this context, a "capability" refers to permission given to a third party to access certain data on the Facebook platform. An "API," or application programming interface, is an electronic means by which third parties may interact with Facebook.

capabilities that provided access to non-public friend data); *see also* Co-Lead Counsel Decl. ¶¶ 117–121. The last of these deprecations occurred in January 2020. Elia Decl. ¶ 15. This means that Facebook now does not enable any "friend sharing," *see supra* at 6–7 (defining "friend sharing")—including the kind of friend sharing that made users' friends' videos, or the friends' interactions or comments on videos, available to third parties. Elia Decl. ¶¶ 18, 20. Significantly, Facebook has also confirmed, in a sworn declaration, that it has no plans to revise or restore any methods that would permit third parties to access private friend data without the explicit authorization of each user whose data would be emitted via their friend. *Id.* ¶ 17.

Second, Facebook has substantially improved its ability to restrict and monitor third parties' access to and use of Facebook user data to protect that data from potential misuse, in addition to a 2020 FTC Consent Order. Included among the improvements Facebook has enacted since the onset of this litigation are:

- The initiation of periodic reassessments of app developers' and partners' access to and use of a broad range of Facebook user data. Dunphy Decl. ¶ 11 (describing App Re-Review, implemented in 2021); *id.* ¶ 12 (describing Partner Grant Re-Review, implemented in 2021); *id.* ¶ 13 (describing Data Use Checkup, implemented in 2020).

- The initiation of risk-based assessments to determine whether to apply an increased level of monitoring than the periodic processes. *Id.* ¶ 15 (describing the Product Risk Assessment and Third Party Risk Assessment, implemented in 2021); *id.* ¶ 16 (describing the Data Protection Assessment, implemented in 2021); *id.* ¶ 17 (describing Enhanced Privacy Policy Review, implemented in 2021).

- The 2019 deprecation of "quiz apps" that provide minimal utility to users relative to the risks involved with their access to user data.[8] *Id.* ¶ 23.

- The substantial increase in resources dedicated to monitoring third-party app developers and enforcing Facebook policies. *Id.* ¶ 24 (describing the growth of the "DevOps" team).

Third, Facebook has made significant changes to the information available through the Download Your Information ("DYI") tool, and its disclosures and controls regarding third party

---

[8] ThisIsYourDigitalLife, which acquired from Facebook user information that was sold to Cambridge Analytica, was a quiz app.

advertising and Facebook's collection of users' off-Platform activity. *See* Co-Lead Counsel Decl. ¶ 145 (describing the increased number of categories of information made available in the DYI tool); *id.* ¶ 146–147 (describing the disclosure of additional details to users about targeted advertising); *id.* ¶ 148 (describing updates to the Ad Preferences feature in 2019); *id.* ¶ 149 (describing the 2019 and 2020 implementations of tools permitting users to opt out of targeted advertising); *id.* ¶ 150 (describing the initiation of an Off-Facebook Activity tool, made available to users starting in 2020).

## III.   SETTLEMENT TERMS[9]

### A.   Benefits to Class Members are unprecedented in size.

The Settlement creates a non-reversionary Settlement Fund of $725 million, conferring an enormous benefit on the Settlement Class. This is an outstanding result for several reasons.

*First*, to Plaintiffs' knowledge, this is the largest amount recovered by users in any U.S. data-privacy class action, including data-breach class actions, which often involve some measure of out-of-pocket economic harm. The chart below identifies the only such cases counsel have identified that resulted in a settlement fund of $75 million or more.

| Case Name | Claims | Common Fund | Status |
|---|---|---|---|
| *In re: Facebook, Inc. Consumer Privacy User Profile Litigation* | • **SCA**<br>• **VPPA**<br>• **Contract**<br>• **Deceit**<br>• **Invasion of Privacy**<br>• **Negligence**<br>• **California Privacy Claims**<br>• **(Nonprioritized claims: RICO, Conversion, Misappropriation, Trespass, State Consumer Protection Claims)** | **$725,000,000** | **Moving for preliminary approval** |
| *In re Facebook Biometric Information Privacy Litigation*, No. 15-cv-03747-JD (N.D. Cal.) | • Illinois BIPA | $650,000,000 | Final approval granted (2021) |
| *In re Equifax Inc. Consumer Data Security Breach Litigation*, No. 17-md-02800-TWT | • FCRA<br>• Contract | $380,500,000 – $505,500,000 | Final approval granted (2020); affirmed on |

---

[9] The Settlement's comprehensive Notice Plan is discussed separately below. *See infra* § VI.A.

| Case Name | Claims | Common Fund | Status |
|---|---|---|---|
| (N.D. Ga.) | • Negligence<br>• State Consumer Protection Claims<br>• State Privacy Claims<br>• Declaratory Judgment | | appeal |
| *In re: T-Mobile Customer Data Security Breach Litigation*, MDL No. 3019 (W.D. Mo.) | • Breach of Confidence<br>• Contract<br>• Invasion of Privacy<br>• Negligence<br>• State Consumer Protection Claims<br>• State Privacy Claims<br>• Declaratory Judgment | $350,000,000 | Preliminary approval granted (2022) |
| *In re Capital One Consumer Data Security Breach Litigation*, No. 19-md-02915-AJT-JFA (E.D. Va.) | • Breach of Confidence<br>• Contract<br>• Negligence<br>• State Consumer Protection Claims<br>• State Privacy Claims<br>• Declaratory Judgment | $190,000,000 | Final approval granted (2022) |
| *In re Yahoo! Inc. Consumer Data Security Breach Litigation*, No. 16-md-02752-LHK (N.D. Cal.) | • Contract<br>• Fraud<br>• Negligence<br>• State Consumer Protection Claims<br>• Declaratory Judgment | $117,500,000 | Final approval granted (2020); affirmed on appeal |
| *In re Anthem, Inc. Data Breach Litigation*, No. 15-md-02617-LHK (N.D. Cal.) | • Contract<br>• Fraud<br>• Negligence<br>• State Consumer Protection Claims<br>• State Privacy Claims | $115,000,000 | Final approval granted (2018) |
| *Rivera v. Google LLC*, No. 2019-CH-00990 (Ill. Cir. Ct.) | • Illinois BIPA | $100,000,000 | Final approval granted (2022) |
| *In re TikTok, Inc., Consumer Privacy Litigation*, No. 20-cv-04699 (N.D. Ill.) | • Computer Fraud and Abuse Act<br>• VPPA<br>• Illinois BIPA<br>• Contract<br>• Invasion of Privacy<br>• State Consumer Protection Claims<br>• State Privacy Claims | $92,000,000 | Final approval granted (2022); appeal voluntarily dismissed |
| *In re Facebook Internet Tracking Litigation*, No. 12-md-02314-EJD (N.D. Cal.) | • Breach of Contract | $90,000,000 | Final approval granted (2022); appeal pending |
| *In re Zoom Video Communications, Inc.* | • Contract | $85,000,000 | Final approval |

| Case Name | Claims | Common Fund | Status |
|---|---|---|---|
| *Privacy Litigation*, No. 20-cv-02155-LB (N.D. Cal.) | • Invasion of Privacy<br>• State Consumer Protection Claims<br>• State Privacy Claims | | granted (2022); appeal pending |
| *Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12-cv-04069 (N.D. Ill.) | • TCPA | $76,000,000 | Final approval granted (2017); affirmed on appeal |
| *In re: Capital One Telephone Consumer Protection Act Litigation*, No. 12-cv-10064 (N.D. Ill.) | • TCPA | $75,455,098.74 | Final approval granted (2015) |

The Net Settlement Fund will be used to compensate Settlement Class Members for the harms they suffered as a result of Facebook's alleged wrongdoing. It will be allocated to each Authorized Claimant who submits a claim by the Claims Submission Deadline based on the amount of time the Authorized Claimant has had an activated Facebook account. *See infra* § IV.D.2.

*Second*, the size of the Settlement is even more striking in light of the risks faced by Plaintiffs in this hard-fought litigation. These risks are discussed at length below, but one is particularly pertinent when considering the amount of money Facebook has agreed to pay to resolve this case: there is no dispute that Facebook is a service for which users do not have to pay a monetary fee. If this case went to trial, Plaintiffs could prove Article III injury—but on this evidentiary record over such a long class period, Facebook would vigorously contest actual damages on a classwide basis. In addition, Plaintiffs have uncovered little evidence that the risk of identity theft or similar harm—often a risk in data-breach cases—could be shown for all class members from 2007 to the present so as to establish actual damages classwide. Against this backdrop, and in light of the other risks discussed below, Plaintiffs believe that the proposed Settlement is a significant achievement.

## B. The Settlement Class definition largely combines the two classes defined in the operative complaint.

The Settlement Agreement defines the Settlement Class as "all Facebook users in the United States during the Class Period," which runs from May 24, 2007 to December 22, 2022,

inclusive. Settlement Agreement ¶¶ 20, 46. The definition also includes the usual exclusions of individuals affiliated with Facebook, Plaintiffs' counsel, discovery neutrals, and the Court.[10]

The differences between this definition and the classes proposed in the operative complaint are minimal. The operative complaint proposed two primary classes. The first was a class of "all Facebook users in the United States and in the United Kingdom whose content and information, generated when they were eighteen years of age or older, was collected by Facebook and published and-or disclosed to third parties without their authorization or consent from January 1, 2007 to the present." Dkt. 491 ¶ 764(A). The second class was identical, except that it was for users "whose content and information" was "generated when they were less than eighteen years" old. *Id.* ¶ 764(B). There were also state-based subclasses asserting deprioritized claims. *Id.* ¶ 764(A)(i)-(xxv).

For the most part, the Settlement Class definition combines the operative complaint's two classes into a single definition. There is nothing in the claims, the allegations, or the evidence developed that merits treating minors differently than adults, and a single definition is easier for Class Members to understand and the Settlement Administrator to administer.

Two other differences between the Settlement Class and the classes in the operative complaint are (1) the exclusion of U.K. Facebook users, and (2) removal of the phrase, "whose content and information . . . was collected by Facebook and published and/or disclosed to third parties without their authorization or consent." As for the first difference, the Court dismissed U.K. Facebook users' claims, noting that they can proceed in their home courts. Dkt. 571. The second difference stems from the fact that Facebook asserts that it cannot identify which users' content and information was disclosed to third parties on an individual basis. Facebook also does

---

[10] Excluded from the Class is "Meta and its employees, alleged co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; counsel for any plaintiff whose case was consolidated into this MDL and their employees, including but not limited to the undersigned counsel for Plaintiffs and the undersigned counsel's employees; the Special Master, Discovery Mediators, and Settlement Mediators who participated in this case and their staff; and the Judges and Court staff to whom this Action is or was assigned." Settlement Agreement ¶ 46.

not admit that any users' information was published or disclosed to third parties without the users' consent.

One last minor difference is that the Class Period now starts on May 24, 2007, not May 1, 2007. That is because May 24, 2007 is the date on which Facebook launched the Facebook Platform, which is what enabled third parties to access Facebook user data. Before May 24, 2007, Facebook was a closed system that did not share information with third parties.[11]

## C.   The estimated class size is in the range of 250–280 million.

Although there is evidence from which the parties can reasonably estimate the class size, Facebook informs Plaintiffs that it does not have the ability to identify the precise number due to a lack of records that can account for duplicate accounts. As set forth in Facebook's public securities filings, Facebook itself relies on sampling and estimates regarding the number of Facebook users at any given time, and estimates the number of duplicate and false accounts.[12] This means that class size precision is simply not possible.

Nevertheless, Plaintiffs can provide a useful, if estimated, *range* for class size. The Class Administrator has estimated class size at about 250 million persons. Weisbrot Decl. ¶ 20. Another approximation—one that errs on the side of overestimation—can be produced from population statistics. According to the Census Bureau, the U.S. adult (18+) population in 2020 was about 258 million.[13] And according to U.S. Department of Justice statistics, the U.S.

---

[11] Facebook, *Facebook Unveils Platform for Developers of Social Applications* (May 24, 2007), https://about.fb.com/news/2007/05/facebook-unveils-platform-for-developers-of-social-applications/.

[12] *See, e.g.*, SEC Form 10-K for the fiscal year ended December 31, 2021, Meta Platforms, Inc., *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/14039b47-2e2f-4054-9dc5-71bcc7cf01ce.pdf, at 4–5 (section titled "Limitations of Key Metrics and Other Data") (last visited Dec. 22, 2022).

[13] U.S. Census Bureau, *U.S. Adult Population Grew Faster Than Nation's Total Population From 2010 to 2020* (Aug. 12, 2021), https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html.

population of persons 13 to 17, inclusive, was about 21 million in 2020.[14] If we make the

purposely unrealistic assumption that all these persons are Facebook users, the total class,

rounding up to the nearest ten million, would be about 280 million.

Thus, Plaintiffs' working estimate of class size is in the range of 250 to 280 million.

**D.     The Settlement allows Co-Lead Counsel to seek fees and costs and the Named
Plaintiffs to seek service awards.**

As set forth in the Settlement, Plaintiffs will submit their fee request in their motion for

final approval. Plaintiffs will seek fees for Co-Lead Counsel and counsel whose work was

authorized by Co-Lead Counsel and the Court in an amount not exceeding 25% of the Settlement

Fund, the benchmark percentage for a reasonable fee award in this Circuit. *In re Bluetooth*

*Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). Given the enormous amount of

work that was necessary to litigate this case, resulting in tens of millions of dollars of lodestar,

the fee request will be well within the multiplier range commonly awarded. *See Wolf v.*

*Permanente Medical Group, Inc.*, No. 3:17-cv-05345-VC, 2018 WL 5619801, at *2 (N.D. Cal.

Sept. 14, 2018) (citing cases). In addition, there is no clear sailing agreement. Settlement

Agreement ¶ 82. Approval of the Settlement is expressly not contingent upon approval of

Plaintiffs' fee request, and Facebook has reserved its right to oppose Plaintiffs' fee request. *Id.*

¶¶ 82, 122. Moreover, if the Court's resolution of Plaintiffs' sanctions motion results in

Facebook or Gibson Dunn paying the class for certain fees and expenses associated with

sanctionable misconduct, such payments will increase the amount of the Settlement Fund paid

directly to the Class. *See generally* Dkt. 1061.

Under the Settlement, the eight Named Plaintiffs, who each individually spent more than

one hundred hours responding to discovery in this action and each of whom was deposed, will

ask for appointment as Settlement Class Representatives and seek approval of Service Awards of

up to $15,000 each. Settlement Agreement ¶ 84; Akins Decl. ¶ 14; Ariciu Decl. ¶ 14; Bell Decl.

---

[14] *See* U.S. Dep't. of Justice, Off. of Juvenile Justice and Delinquency Programs, *Statistical
Briefing Book: Juvenile Population Characteristics* (released on Oct. 13, 2021), *available at*
https://www.ojjdp.gov/ojstatbb/population/ qa01104.asp.

¶ 15; Burk Decl. ¶ 14; Fischer Decl. ¶ 14; King Decl. ¶ 14; O'Hara Decl. ¶ 14; Senko Decl. ¶ 14. As with Plaintiffs' fee request, approval of the Settlement is expressly not contingent upon the payment or amount of Service Awards to the Named Plaintiffs. Settlement Agreement ¶ 122.

**E.     The Settlement's release is coextensive with the Ninth Circuit's "identical factual predicate" requirement.**

In exchange for Class benefits, the Settlement Agreement proposes to release specified parties, including Meta and its current and former directors and officers, from all the claims asserted as part of this MDL as well as claims that have not been asserted but are "arising out of the identical factual predicate as the allegations" in the Action. Settlement Agreement ¶ 73; *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992)). This is "construed as broadly as possible under Ninth Circuit law." Settlement Agreement ¶ 73. The release does *not* include relief arising out of the pending motion for sanctions. *Id.* Other than the cases that are part of this MDL, Plaintiffs' position is that no other cases will be affected by the Settlement. *Cf. Standing Order for Civil Cases Before Judge Vince Chhabria* ("Standing Order"), ¶ 57 ("Absent extraordinary circumstances, the Court will not enjoin current or future litigation in other courts based on conduct covered by the release.").

## IV.     THE SETTLEMENT MERITS PRELIMINARY APPROVAL

To approve a class settlement, a court must determine that the settlement is "fair, reasonable, and adequate." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 780 (9th Cir. 2022) (quoting Fed. R. Civ. P. 23(e)(2)); *see also Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035 (N.D. Cal. 2016). The first step in this determination is considering whether to preliminarily approve the proposed settlement.[15]

"[D]istrict courts should review class action settlements just as carefully at the initial stage as they do at the final stage." *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d at 1037; *see also*

---

[15] *See generally* U.S.D.C., N.D. Cal., *Procedural Guidance for Class Action Settlements* ("N.D. Cal. Procedural Guidance"), https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (last modified Aug. 4, 2022).

Standing Order ¶ 57 (citing cases). Because the Settlement here was reached "before class certification, the district court must apply a 'higher standard of fairness.'" *Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) (quoting *Hanlon*, 150 F.3d at 1026); *see Apple Device Performance*, 50 F.4th at 776 ("settlement prior to class certification requires extra scrutiny").

> This Court looks at a number of factors in its review, including:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.[16]

*Cotter*, 193 F. Supp. 3d at 1035 (quoting *Hanlon*, 150 F.3d at 1026). As explained below, these factors as well as others strongly favor preliminary approval.

## A.   The strengths and risks of Plaintiffs' case.

Plaintiffs have vigorously pursued their claims and believe they are meritorious though, in many respects, novel. But Plaintiffs also face substantial risks in continuing to litigate—risks that might defeat any recovery at all.

The substantive strengths and risks of Plaintiffs' claims are addressed below, generally by category of claim. Plaintiffs also provide an estimate of maximum recovery on each claim and explain the discount they have applied to that recovery for settlement purposes.[17]

---

[16] The last factor cannot be addressed now because Class Members haven't yet had the chance to react.

[17] Plaintiffs do not analyze punitive damages here, even though some of the claims allow their recovery. *See, e.g.*, 18 U.S.C. § 2710(c)(2)(B) (VPPA). Plaintiffs have no intention of arguing against the imposition of punitive damages—indeed, they have always believed that recovering such damages would be a distinct possibility at trial. But even in an antitrust class action, where treble damages are automatic, *see* 15 U.S.C. § 15(a), "courts generally determine fairness . . . based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009). Unlike treble antitrust damages, punitive damages are inherently unpredictable and discretionary. For that reason, they typically play a limited role in determining the fairness of a settlement. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab.*

In addition to the merits-based risks discussed below, there are several procedural risks that apply with equal weight across all claims. First, though the Settlement was reached only after the parties engaged in extensive discovery, the Court has not yet certified a litigation class. The risks associated with certifying a class for litigation purposes are addressed separately. *Infra* § IV.C.

Second, there is the risk of an unfavorable summary-judgment ruling on complex issues such as consent, the remedy of actual damages, or certain statutory requirements. *See, e.g.*, *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015) (summary judgment for defendant on VPPA claim). There is also the risk of an adverse jury verdict at trial. *Cf. Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 664 (S.D.N.Y. 2015) (approving settlement and noting that jury verdict "could have turned on, among other factors, the persuasiveness of each side's expert witnesses" and "the justifications advanced by" the defendant for its practices). Although Plaintiffs believe they have the evidence to get this case to a jury and could present a compelling case at trial, the novel claims and complex issues here create a wide range of potential outcomes. This risk weighs equally on both parties, *Cotter*, 176 F. Supp. 3d at 944, and has been incorporated by them into the Settlement value. And on top of this kind of determinable risk, the novel issues in this case also create uncertainty that could frustrate precise measurement.

Finally, even after a favorable jury verdict, Facebook would still have arguments for why this Court, the Ninth Circuit, or the Supreme Court should reduce or overturn the verdict. *Cf., e.g.*, *Tureen v. Equifax, Inc.*, 571 F.2d 411 (8th Cir. 1978) (overturning jury verdict for plaintiff in action against consumer-reporting firm for invasion of privacy). And because of Facebook's resources and the systemic importance of the issues, it would be likely to pursue an aggressive appellate strategy. Hence, there is concrete value in providing sure relief to the Class now.

---

*Litig.*, No. 3:15-md-02672-CRB, 2017 WL 2212783, at *24 (N.D. Cal. May 17, 2017) (explaining that, because "any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award" (quoting *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 155 (E.D. La. 2013))).

1.  *Comparing the strengths and risks of the contract-related claims.*

    a.  *General strengths and weaknesses*

Plaintiffs assert contract-based claims—breach of contract and breach of the implied covenant of good faith and fair dealing—based on Facebook's violations of promises it made to users about the privacy of their data, including how third parties could use data. Among other things, Facebook promised to allow apps to use friends' data only "in connection with the person that gave the permission and no one else," and promised to "not give [users'] content or information to advertisers without [their] consent." *See* Dkt. 491 ¶¶ 516, 550. Also, in 2015, Facebook promised that it would no longer allow friend sharing at all.

Plaintiffs gathered evidence suggesting that Facebook violated these promises. Plaintiffs believe, for example, that documents from the ADI support Plaintiffs' allegations that many developers routinely used friends' data in ways other than in connection with the person who gave permission, affecting huge numbers of users. *See, e.g.*, Dkt. 1050-3 at 8–11 (identifying other instances of developers accessing friend data).

Despite this evidence, however, there remain significant risks in continuing to litigate these claims. Facebook has not produced and has represented that it does not maintain records that would allow Plaintiffs to identify specific apps that obtained specific Facebook user information. *See* Dkt. 1006-1 at 226:4–8. For that reason, Plaintiffs would need to prove their case through general practices. Dkt. 347. While Plaintiffs believe this is a viable path, it may not be as compelling to a jury as direct evidence.

The remedy Plaintiffs would seek for Facebook's breaches of contract, restitution, comes with its own benefits and risks. "California law permits plaintiffs to seek disgorgement of a defendant's unjust enrichment as a restitutionary remedy for breach of contract."[18] *Alkayali v.*

---

[18] "The terms 'disgorgement,' 'unjust enrichment,' and 'restitution,' although formally distinct, have confusing and often overlapping meanings within the law. . . . In this context, disgorgement and unjust enrichment are synonymous, and both describe a species of equitable relief available under the broader heading of restitutionary remedies." *Alkayali*, 2018 WL 3425980, at *6 n.4; *see also Artifex Software, Inc. v. Hancom, Inc.*, No. 3:16-cv-06982-JSC,

*Hoed*, No. 3:18-cv-777-H-JMA, 2018 WL 3425980, at *6–7 (S.D. Cal. July 16, 2018) (citing *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 939 (2009)). Pursuing this remedy would not require Plaintiffs to demonstrate their own quantifiable loss: benefiting "'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." *Id.* (quoting *Restatement (Third) of Restitution and Unjust Enrichment* § 1 cmt. a (2011)). Indeed, disgorgement is particularly appropriate where, as here, "actual damages are difficult to prove." *Young v. Wideawake Death Row Ent., LLC*, No. 2:10-cv-01019-CAS (JEMx), 2011 WL 13371881, at *2–3 (C.D. Cal. May 16, 2011).

But pursuing this remedy is not without risks. Quantifying Facebook's enrichment is one hurdle: associating particular profits with the broad misconduct at issue in this case could prove difficult, and the Court could reject the assumptions required of such calculations. Facebook might also argue that disgorgement is unavailable because Plaintiffs did not convey anything of quantifiable value to Facebook; even if Plaintiffs conveyed their data, "[i]t would not be equitable, logical, or legally permissible to award plaintiffs" a disgorgement remedy for "property that they never lost or gave away." *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956 (N.D. Cal. 2010). Plaintiffs disagree with these arguments and believe the law is on their side. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–600 (9th Cir. 2020), *cert. denied sub nom. Facebook, Inc. v. Davis*, 209 L. Ed. 2d 464, 141 S. Ct. 1684 (2021). But the arguments present risks which Plaintiffs considered in reaching this Settlement.

### b.   *Maximum recovery and discount applied*

Plaintiffs' theory is that Facebook earned revenue it should not have from certain third parties. These include third parties that used data in ways that breached Facebook's agreement with its users. They also include the "whitelisted" third parties that were still allowed to engage in friend sharing even after Facebook claimed it had deprecated the practice.

---

2017 WL 4005508, at *3 (N.D. Cal. Sept. 12, 2017) ("Unjust enrichment is not a cause of action, . . . or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. It is synonymous with restitution.").

Motion to Certify a Settlement          22          MDL No. 2843
Class and Grant Preliminary                           Case No. 18-md-02843-VC
Settlement Approval

The goal, then, is to measure the amount of revenue that Facebook received from these third parties due to the improper data use and whitelisting. Because this revenue came from advertising, one possible method of measurement would involve two steps. Step one: assess the total amount of advertising revenue received from the relevant third parties. Step two: estimate the portion of that advertising revenue that the third parties would not have paid Facebook if they had not been whitelisted and or allowed to misuse data. Taking into account discovery reflecting the relevant revenue and discovery reflecting the expected impact of lost profits, this analysis produces a wide range of possible recoveries. As tentatively estimated by Plaintiffs' expert, these possible recoveries range from a significant fraction of the settlement amount at the low end to several times the settlement amount at the high end.

Assumptions are built into this analysis that Facebook could challenge. Facebook could contest the connection between the contractual breaches and its revenue. And even if that connection were established, Facebook could challenge the amount by which relevant third parties would have decreased their advertising spend. The risk, as well as the discount, are increased still further by arguments that could be made against restitution in these circumstances, and the other potential legal challenges discussed above.

### 2. Comparing the strengths and risks of the VPPA claim.

#### a. General strengths and weaknesses

The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning a consumer and provides for statutory damages of at least $2,500. 18 U.S.C. §§ 2710(b)(1), 2710(c)(2)(A). The VPPA would be a hotly contested issue in this case. As an initial matter, the VPPA has a two-year statute of limitations, and Facebook would likely argue that the putative class member's claims are at least partially barred by it. *Id.* § 2710(c)(3).

Plaintiffs believe they would be likely to prevail on lack of consent. *See id.* § 2710(b)(2)(B). Plaintiffs also believe that the evidence they have obtained in discovery supports a finding that Facebook was a video tape service provider—i.e., that it was "engaged in

the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4); *see* Dkt. 298 at 35 (citing *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)).

Further, whether Facebook shared "personally identifiable information," could be disputed. Facebook may argue that the way it transmitted data electronically disqualifies it under the Ninth Circuit's test for "personally identifiable information." On this point, both sides have arguments. *Compare Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (holding that personally identifiable information means information that readily permits an ordinary person to identify a particular person as having requested, watched, or obtained videos) *with id.* at 986 ("[M]odern technology may indeed alter—or may already have altered—what qualifies under the statute. A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual."). Given the evidentiary record here, this element of the Plaintiffs' VPPA claim warrants a discount.

Another significant risk under this claim comes from Facebook's lack of relevant records. Facebook reports that it lacks information reflecting individual third parties' requests for video content from individual users, and the data that was returned with respect to those requests. This lack of records might require Plaintiffs to rely on aggregate, not individualized evidence—to prove that so many third parties had so much access and made so many requests for video-related information that it is near certain that every Facebook user was affected. *See* Dkt. 1050-3 at 8–10 (providing an example of this analysis in the context of friend permissions). Facebook would likely challenge that approach as a factual and legal matter.

Finally, even if Plaintiffs prevailed at trial on their VPPA claim, an award of statutory damages could face a due process challenge and might be reduced. The Ninth Circuit recently made clear in *Wakefield v. ViSalus, Inc.* that "aggregated statutory damages . . . are subject to constitutional limitation in extreme situations—that is, when they are 'wholly disproportioned' and 'obviously unreasonable' in relation to the goals of the statute and the conduct the statute prohibits." 51 F.4th 1109, 1123 (9th Cir. 2022) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*,

251 U.S. 63, 67 (1919)). In *Wakefield*, the plaintiffs had received a jury award of about $925 million in statutory damages under the Telephone Consumer Protection Act. The Ninth Circuit vacated the award and remanded for the district court to determine whether the damages were "so severe and oppressive" that they violate the defendant's due process rights. *Id.* at 1125. The same due-process concerns could be present here. *See id.* at 1124–25 (explaining that, though Congress set a floor of statutory damages at $500 for each violation of the TCPA, "in the mass communications class action context, vast cumulative damages can be easily incurred, because modern technology permits hundreds of thousands of automated calls and triggers minimum statutory damages with the push of a button"). Thus, as a court in this district has concluded in another class settlement involving statutory damages, "[g]iven the class size, it is not plausible that class members could recover the full amount of the statutory penalties in any event." *Fraley v. Facebook, Inc*., 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).

   b. *Maximum recovery and discount applied*

  Plaintiffs will assume that the VPPA's $2,500 in statutory damages would be awarded per person rather than per violation, because per-violation damages, if applied in a case like this, would almost certainly face a due-process challenge. Nevertheless, if per-person statutory damages are awarded, the maximum recovery would be astronomical. That figure cannot be used to estimate what Plaintiffs, if successful, could actually *collect*, however. *See Fraley*, 966 F. Supp. 2d at 944 (noting that recovery of full statutory damages was not plausible because such a judgment would "threaten Facebook's existence").

  Such a verdict may also be reduced. If, as *Wakefield* suggests, due-process problems are created by total liability of $925 million, it is unrealistic to expect this Court, the Ninth Circuit, or the Supreme Court to allow liability of hundreds of times more given the volume of users in this case. *See Wakefield*, 51 F.4th at 1124–25. This is especially true if a class is unable to quantify actual damages, which is a risk given this evidentiary record. *Id.* at 1120. And a reduction of statutory damages under the VPPA could be substantial. *See Golan v. Free*

*Eats.com, Inc.*, 930 F.3d 950, 962–63 (8th Cir. 2019) (reducing statutory damages of $1.6 billion under the TCPA to $32 million, a 98% reduction).

Prior VPPA settlements have represented, at most, a fraction of maximum theoretical statutory damages. *See In re TikTok, Inc., Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1089–90 (N.D. Ill. 2021) (preliminarily approving a $92 million settlement for an 89-million-person class asserting VPPA *and* other statutory claims, noting that "[s]ettlements under the VPPA typically achieve *cy pres*-only relief worth a few dollars or less per class member"); *In re Netflix Priv. Litig.*, No. 5:11-cv-00379-EJD, 2013 WL 1120801, at *7 (N.D. Cal. Mar. 18, 2013) (approving class action settlement in a VPPA case with a *cy pres*-only distribution because settlement amount would have resulted in $0.15 per class member). Given the strong possibility of a large due process damages reduction on this record, it makes sense to factor it into the maximum possible recovery. In addition, a further discount is appropriate to reflect the risks that the VPPA claim faces on the merits.

### 3. *Comparing the strengths and risks of the SCA claim.*

#### a. *General strengths and weaknesses*

Plaintiffs' other statutory claim alleges that Facebook shared "the contents of a communications with someone who is not party to that communication" in violation of the SCA. Dkt. 298 at 33 (citing 18 U.S.C. § 2702). The SCA provides that "a person entitled to recover" will receive statutory damages of not less than $1,000. 18 U.S.C. § 2707(c).

Plaintiffs obtained some evidence that they believe supports the claim. For instance, they procured documents that Plaintiffs believe suggest that Facebook made its users' communications uniformly available to third parties with the required permissions and that these third parties accessed these communications.

The most serious risk presented by the SCA claim, however, is the statute's "consent" exception to liability, which is quite different from the VPPA's. The SCA does not require that consent be manifested in a special form or format, and there is consent to divulge an electronic communication if that consent is provided either by the sender or the recipient. 18 U.S.C.

§ 2702(b)(2). Based on the record in this case, Facebook may be able to persuasively argue that users consented through either the sender's or the recipient's agreements with a third-party app or other entity. Thus, while Facebook bears the burden of demonstrating consent, *Calhoun, et al. v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021), Plaintiffs bear the substantial risk that Facebook could meet that burden.

In addition, even if Plaintiffs could overcome the consent exception to the SCA, they would still face the same due process concerns for an award of statutory damages under the SCA as under the VPPA. *See supra* § IV.A.2.

### b. Maximum recovery and discount applied

Because the SCA provides for $1,000 in statutory damages, 18 U.S.C. § 2707(c), the maximum recovery under this claim would be in the hundreds of billions—a figure that could be reduced for due-process reasons as discussed above. Plaintiffs believe that a severe discount is also required due to Facebook's consent defense.

## 4.   Comparing the strengths and risks of the negligence claim.

### a.   General strengths and weaknesses

Plaintiffs also allege that Facebook was liable for negligence and gross negligence in failing to adequately monitor third parties' access to sensitive user information. Plaintiffs have procured substantial evidence that they believe supports their allegations that Facebook had a duty to all of its users to take reasonable care to protect their data, and that it failed to meet that duty. For example, Plaintiffs believe that the evidence indicates that Facebook violated its duty to adequately monitor third parties' use of data and to take meaningful steps to ensure that they were using it only in accordance with Facebook's terms. *See, e.g.*, Dkt. 1050-3 at 8–11.

Regardless, the negligence claim presents hurdles. First, Facebook may contend that Plaintiffs assumed the risk by agreeing to third parties' individual terms and conditions regarding the use of their Facebook data.

Second, Plaintiffs might face a challenge in quantifying the damages from Facebook's negligence. Because the conduct exposed different types of users' information to different types

of third parties that used it for different purposes, proceeding on this claim through class certification may invite compelling arguments that quantifiable actual damages theories may not predominate. *See, e.g.*, *Opperman v. Path, Inc.*, No. 3:13-cv-00453-JST, 2016 WL 3844326, at *14–15 (N.D. Cal. July 15, 2016) (discussing issues with valuing privacy on a classwide basis). This means that Plaintiffs might elect to pursue nominal damages, which are appropriate "where the amount of damages is uncertain." *Id.* at *16 (quoting *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 5:11-cv-01846-LHK, 2012 WL 2571719, at *28 (N.D. Cal. June 30, 2012)).

### b. *Maximum recovery and discount applied*

Plaintiffs believe an award of nominal damages would, on this record, be the likeliest result of any trial on the negligence claim. Assuming that the amount of nominal damages would be $1 per class member, a negligence litigation class could receive damages of $250 to $280 million at trial. *See Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005) ("[T]here is no justification for awarding nominal damages to only the named class representatives. . . . [E]very member is entitled to nominal damages, just as if each one had brought his or her own lawsuit."). Even so, for the reasons offered above, litigating that claim poses substantial risk, which requires a discount.

### 5. *Comparing the strengths and risks of the deceit-by-concealment claim.*

### a. *General strengths and weaknesses*

Deceit by concealment requires proving that Facebook had a duty to disclose a material fact to Plaintiffs and intentionally concealed that fact with the intent to defraud them. Dkt. 298 at 37. Plaintiffs must also prove that they were unaware of the concealed fact, would have acted differently if they were aware of it, and sustained some damage as a result. *Id.*

Evidence supports certain of Plaintiffs' allegations. After publicly announcing the deprecation of friend permissions, Facebook permitted selected third parties to access friend permissions through the undisclosed process of "whitelisting" and permitted others access to friend information through undisclosed "capabilities." Co-Lead Counsel Decl. ¶ 115; *see* Elia Decl. ¶¶ 8–13. Once Facebook chose to speak about the deprecation of friend permissions, it had

to "speak the whole truth to the end that [it would] not conceal any facts which materially qualify those stated." *City & Cty. of San Francisco v. Philip Morris, Inc.*, No. 4:96-cv-02090-DLJ, 1998 WL 230980, at *3 (N.D. Cal. Mar. 3, 1998).

Nevertheless, the claim presents several hurdles. Plaintiffs would have to demonstrate that users would have acted differently had they known that Facebook provided continued access to friend data, which Facebook would argue requires the type of individualized question that would prevent classwide treatment. And, as with several of the other claims analyzed above, discerning a manageable classwide method for calculating actual damages for this claim on this record might be difficult. Given this difficulty, it is likely that Plaintiffs would have sought nominal damages.

### b. Maximum recovery and discount applied

Plaintiffs believe an award of nominal damages would be the likeliest result of a trial on the deceit-by-concealment claim on this record. Like the other claims addressed above for which nominal damages are the realistic best result, these damages would likely amount to an aggregate award of approximately $250 to $280 million, assuming nominal damages of $1 per person.

Nevertheless, achieving that success would be difficult, as it would require Plaintiffs to demonstrate that users would have acted differently had they known that Facebook continued to make friend permissions available. A large discount should therefore be applied to this award.

### 6. Comparing the strengths and risks of the privacy-based torts.

### a. General strengths and weaknesses

Plaintiffs' privacy-based torts—their claims for public disclosure of private facts, intrusion upon seclusion, and violation of the right of privacy under the California Constitution—rely on showing that Plaintiffs had a reasonable expectation that their information would be kept private and that Facebook's disclosure of that information was highly offensive or serious. Both considerations are judged from the perspective of a reasonable Facebook user. Dkt. 298 at 30, 32. Plaintiffs believe the evidence supports Plaintiffs' allegation that they have a reasonable expectation of privacy where Facebook "represented to [users] that their information

would not be [shared], but then proceeded to [share] it anyway." *Facebook Internet Tracking*, 956 F.3d at 603.

There are, however, risks associated with proving these privacy-based torts at trial on this record. Plaintiffs would be required to prove that the disclosure of users' information was highly offensive or serious, i.e., so offensive as to "shock the ordinary sense of decency or privacy." *Gill v. Hearst Pub. Co.*, 40 Cal.2d 224, 231 (1953); *see Reade v. New York Times Co.*, No. 2:22-cv-00543-WBS-KJN, 2022 WL 2396083, at *6 (E.D. Cal. July 1, 2022) (requiring the private facts to be "embarrassing, uncomplimentary, discreditable, indecent, derogatory, or reprehensible"). Facebook could assert that much of the information disclosed does not meet that threshold.

### b.   Maximum recovery and discount applied

Plaintiffs believe an award of nominal damages, on this record, would be the likeliest result of a trial on the privacy-based torts. These damages would amount to an aggregate award of $250 to $280 million, assuming nominal damages of $1 per class member.

However, many different kinds of user information were disclosed under many different circumstances to many different third parties. In this context, and on this record, it may be difficult to avoid individualized issues related to whether the disclosed information was highly offensive. A large discount is appropriate.

### 7.   *Comparing the strengths and risks of the deprioritized claims.*

#### a.   General strengths and weaknesses

Plaintiffs deprioritized certain claims for a reason. *See Jabbari v. Wells Fargo & Co.*, 965 F.3d 1001, 1008 (9th Cir. 2020) ("Only rarely will a class assert every possible claim that might offer relief."). These claims, broadly speaking, fall into three categories.

*First* are the claims that arise from non-California consumer-protection or privacy statutes or common-law rights of privacy. These claims first face a choice-of-law stumbling block: both the Class Members and Facebook agreed that the user-Facebook relationship would be governed by California law. Dkt. 298 at 21. In addition, many consumer-protection statutes

require an "ascertainable loss," or a "loss of money or property," *see* Carolyn L. Carter & Jonathan Sheldon, *Unfair and Deceptive Acts and Practices* app. A (10th ed. 2021), two requirements that Plaintiffs may not be able to satisfy here. *See* Dkt. 298 at 13 (no economic loss). And many consumer-protection statutes only provide for actual damages rather than statutory damages, Carter & Sheldon, *supra*, at app. A, which might present an insurmountable obstacle in this case. As for state privacy claims, whether statutory or common-law, they face many of the same problems as the prioritized California privacy claims. Finally, even if these deprioritized consumer-protection or privacy claims prevailed, any damages would simply duplicate the damages available under the prioritized consumer-protection and privacy claims.

On top of these problems, there are class-certification considerations, on this record and for these claims. Plaintiffs would argue that California law governs all of their claims, particularly given the contractual choice-of-law provision. Such an argument would favor class certification, since a single body of law would apply to the class as a whole. *Cf. Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("Reliance on federal law avoids the complications that can plague multi-state classes under state law . . . ."). Proceeding with claims from many different states, by contrast, risks creating individual issues that may defeat class certification. *See In re Mexico Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) ("It is best to bypass marginal theories if their presence would spoil the use of an aggregation device that on the whole is favorable to holders of small claims.").

*Second*, the deprioritized claims include certain common-law theories not asserted by the prioritized claims: fraudulent misrepresentation, negligent misrepresentation, and conversion. Damages available under the misrepresentation claims likely would duplicate those available under the prioritized deceit claim, *see* 34A Cal. Jur. 3d Fraud and Deceit § 114, even if such claims were viable on the merits. A conversion claim would need to prove that Facebook interfered with users' property rights in their personal information. To show interference with those rights, however, the Plaintiffs would presumably have to show that Facebook did something with the information that it was not allowed to do under its agreements with users.

The proof for such a claim, and the relief available under it, would simply duplicate Plaintiffs' contract claims.

*Third*, the deprioritized claims include federal statutory claims under the Fair Credit Reporting Act (FRCA) and RICO. A claim under FCRA, in Plaintiffs' view, seems ill-suited to these facts, since it is unlikely that much if any of the personal information at issue in this case qualifies as a "consumer report," 15 U.S.C. § 1681a(d)(1), and it is unclear how consumer-report status could be adjudicated on a classwide basis. A claim under RICO would require proof that Facebook, along with one or more other entities, formed a RICO "enterprise." This requirement could create several complications. For one thing, it would either unduly narrow this case by focusing on Facebook's dealings with a very small number of other entities, or likely make it unmanageable by requiring specific details about Facebook's dealings with many distinct entities. Another problem is that proving an enterprise requires more than routine commercial relationships prompted by the contracting parties' "individual economic interests." *Fraser v. Team Health Holdings, Inc.*, No. 4:20-cv-04600-JSW, 2022 WL 971579, at *11 (N.D. Cal. Mar. 31, 2022) (citing cases). But this description, discovery has revealed, accurately captures the relationships between Facebook and third parties. Finally, RICO requires an injury in one's "business or property," a requirement that could present serious problems here. *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019).

### b. Maximum recovery and discount applied

The damages available under the deprioritized consumer-protection and privacy claims, as well as the damages available under the deprioritized common-law claims, would simply duplicate damages available under prioritized claims. Such duplicative damages would likely constitute an impermissible double recovery. *See Fuller v. Capitol Sky Park*, 120 Cal. Rptr. 131, 134 (Ct. App. 1975) (discussing California's policy against double recovery). For that reason, these deprioritized claims have *de minimis* value.

FCRA allows successful class members to recover statutory damages of $1,000 each and RICO allows for the trebling of actual damages. *See* 15 U.S.C. § 1681n(a); 18 U.S.C. § 1964(c).

The realistic value of both of these claims, however, is *de minimis* because they are so unlikely to succeed, and, in the case of the RICO claim, strategically undesirable to prosecute.

### 8.   *Comparing the strengths and risks of the dismissed claims.*

#### a.   *General strengths and weaknesses*

In ruling on Facebook's motion to dismiss, the Court dismissed Plaintiffs' right-of-publicity claim. For substantially the reasons the Court gave when dismissing that claim, Plaintiffs would be unlikely to revive it in an appeal. *See In re Facebook*, 402 F. Supp. 3d at 803.

As part of its larger rejection of Plaintiffs' theory of economic loss, *see id.* at 784, the Court dismissed the UCL claim because Plaintiffs had "not adequately alleged lost money or property," *id.* at 804. Reviving the UCL claim would also be risky, given the procedural history and evidentiary record in this case. True, the Ninth Circuit has since recognized that plaintiffs proceeding under California law have standing to seek profits unjustly *earned* through the use of the plaintiffs' data. *Facebook Internet Tracking*, 956 F.3d at 599–600. It is unsettled, however, whether Plaintiffs would be successful arguing at this juncture of this case that the *Internet Tracking* holding would mean that the data at issue here "has independent economic value to an individual user" that the user can *lose* through a defendant's unauthorized disclosure. *In re Facebook*, 402 F. Supp. 3d at 784. And in any event, Plaintiffs unjust enrichment damages theory might largely overlap with this theory of economic harm.

#### b.   *Maximum recovery and discount applied*

Plaintiffs have found no authority suggesting that a right-of-publicity claim would entitle them to damages that their other privacy tort claims would not. Similarly, because "the only monetary remedy available" to a private UCL plaintiff is "restitution," i.e., unjust enrichment, *Ngu v. City Bail Bonds*, 286 Cal. Rptr. 3d 550, 555 (Ct. App. 2021) (citing *Clark v. Superior Court*, 235 P.3d 171, 175 (Cal. 2010)), Plaintiffs think it unlikely, on this record, that a UCL claim could supply them with any monetary relief that their contract-based claims would not. Since these claims could provide only duplicative relief, could pose risks, and would be revived, if at all, only after an appeal, Plaintiffs ascribe *de minimis* value to them.

### 9. *Risk of damages being deemed duplicative.*

Finally, in addition to the claim-specific risks described above, Plaintiffs might also receive a ruling that some tort damages they seek are duplicative. While there are arguments to the contrary, Facebook could argue that damages for the deceit, negligence, and privacy claims all compensate for the same thing: injury from misuse of their personal information. If that is the case, damages on the claims could not be stacked on top of each other. *See Tavaglione v. Billings*, 847 P.2d 574, 580 (Cal. 1993) ("Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence.").

Facebook might also argue that Plaintiffs cannot receive both compensatory damages and unjust enrichment. Plaintiffs think this argument would be unlikely to succeed under California law, although they acknowledge it has sometimes succeeded elsewhere and in other contexts. *See Guyana Tel. & Tel. Co, Ltd. v. Melbourne Int'l Commc'ns, Ltd.*, 329 F.3d 1241, 1249 (11th Cir. 2003) (Florida law).

A judgment that is accused of double-dipping may be vulnerable to reduction. Thus, although it is difficult to put a concrete number on the risk that certain kinds of relief may be deemed duplicative, it must be taken into account in valuing the claims here. If that overall risk is accounted for in addition to the discounts applied to the individual claims, the cumulative value of the claims makes $725 million an excellent recovery for the Class.

### B. Further litigation would be expensive, complex, and lengthy.

This case has already been extremely expensive, complex, and lengthy. Plaintiffs' costs for consulting experts, deposition-related services, the discovery mediators, and the Special Master, among other expenses, already comprise many millions of dollars. Further litigation would require Plaintiffs to incur additional deposition-related expenses, considerable additional expenses for testifying experts, and expenses related to the Special Master's continued involvement, not to mention the expenses that Plaintiffs would ultimately incur in preparing for and conducting a weeks-, or more likely, months-long trial. These additional expenses would

ultimately be deducted from the Class's recovery.

Further litigation would also involve complexity at almost every level. Presentation of briefs and arguments would require the extensive expert analysis and synthesis of complex data logs and tables, such as those regarding Named Plaintiffs' data. The parties and the Court would be faced with the complexity of addressing class certification and summary judgment across 11 claims covering a proposed class period approaching 15 years on behalf of a class that could present manageability issues, but that certainly numbers in the hundreds of millions. And those briefs (and others) would address complex legal issues, including whether the aggregate information Facebook produced is sufficient to establish Plaintiffs' claims and whether the broad disclosure of information already disclosed to a limited audience is a compensable harm.

Lastly, it is likely that litigation would continue for many years. There remain two substantial and time-consuming procedural hurdles to reach before Plaintiffs could prepare to present their case to the jury: class certification and summary judgment. Moreover, it is certain that there would be a host of other issues for the Court or the Special Master to decide. The parties would likely seek a lengthy jury trial, which would further burden an already burdened Court as well as the empaneled jurors. And this case would not end with a jury verdict. Given the novelty of the claims and the complexity of the facts, one or both parties would almost certainly appeal. The risk of long-lasting litigation is further increased by the considerable resources available both to Facebook and to their counsel. In sum, absent settlement, it could be years before this Action is finally resolved.

## C.   The risks associated with certifying a class and maintaining the case as a class action through trial.

In assessing the likelihood that a litigation class would be certified by this Court and then upheld on appeal, Plaintiffs see their claims as falling into three broad categories.

Plaintiffs believe a litigation class would be certified for at least some of the claims— their contract claims, their VPPA claim, and their negligence claim—although they recognize the possibility that the Court might not ultimately agree. Plaintiffs have developed the aggregate

Case 3:18-md-02843-VC   Document 1096   Filed 12/22/22   Page 48 of 73

evidence related to Facebook's general practices that could support certification of each of these claims. *See* Dkt. 347 at 1–2 (absent particularized data, "the best way to assess the merits and to determine whether class certification is appropriate is almost certainly to conduct discovery on Facebook's general practices"). Moreover, the contract claims concern standard provisions that apply uniformly to every person using Facebook's platform, *see, e.g.*, *Ellsworth v. U.S. Bank, N.A.*, No. 3:12-cv-02506-LB, 2014 WL 2734953, at *20 (N.D. Cal. June 13, 2014) ("identical mortgage contracts" supports certification), and are all governed by California law, *see* Dkt. 298 at 21 (recognizing the parties' agreement that California law applies). Similarly, the VPPA claim is based on ways that Facebook made video-related information available for all users, and is governed by federal law. And, regarding the negligence claim, Facebook's duty to exercise due care over its users' data and, if so, the nature of that duty, is the same for all individuals in the Class. Because Facebook's conduct to all individuals in the Class was uniform, whether Facebook breached that duty is a common issue too. *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014).

Claims in the other two categories present greater risks that a litigation class might not be certified. Plaintiffs' SCA claim falls into its own category; certification of that claim may present greater challenges because Facebook's consent defense might create individual issues at trial. *See supra* § IV.A.3 (explaining consent under the SCA). Finally, there are the claims that Plaintiffs deem less likely to be certified—the deceit-by-concealment and privacy-based tort claims—because Facebook could argue that the individualized issues would predominate. *See supra* §§ IV.A.5, IV.A.6. Notably, however, while these individualized issues may weigh against certifying these claims for litigation purposes, they do not weigh against certification of the claims for settlement. "A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) (en banc); *see also Jabbari*, 965 F.3d at 1005–06.

**D.     The relief offered in the Settlement is more than adequate.**

> **1.  The Settlement Fund is fair, reasonable, and adequate.**

The amount of this Settlement creates a non-reversionary Settlement Fund of $725

million. As discussed above, that figure is as much as, if not more than, the amount produced by

a realistic discount of the maximum recovery available at trial. *See supra* § IV.A.

Moreover, if approved, the Settlement would be the largest data privacy or data breach

class action settlement ever achieved in the United States. Co-Lead Counsel Decl. ¶ 105. The

common fund would be more than 10% higher than the next largest such settlement, which was

the $650 million settlement in the *Facebook Biometric* case—and there, the class had not only

already been certified and Facebook's summary judgment motion denied, but the Ninth Circuit

had denied Facebook's appeal of the order certifying the class, and the Supreme Court had

denied Facebook's petition for a writ of certiorari. *In re Facebook Biometric Info. Priv. Litig.*,

326 F.R.D. 535 (N.D. Cal. 2018) (class certification order); *In re Facebook Biometric Info. Priv.

Litig.*, No. 3:15-cv-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018) (denial of parties'

cross-motions for summary judgment); *Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019)

(affirming district court order certifying the class), *cert. denied*, 140 S. Ct. 937 (2020).

> **2.  The Plan of Allocation is reasonable.**

The proposed Plan of Allocation uses "allocation points" to divide the Net Settlement

Fund—i.e., the Settlement Fund less fees, costs, and expenses—among "Authorized Claimants,"

i.e., Class Members with valid claims. For each calendar month at any time during the Class

Period during which the Authorized Claimant was a Facebook user with an activated account,

one allocation point is assigned. The Net Settlement Fund is then allocated to each Authorized

Claimant pro rata based on each Authorized Claimant's share of all allocation points assigned.

This Plan of Allocation is fair, adequate, and reasonable because it attempts to reimburse

Class Members based on the probable size of their injuries. *See In re Anthem, Inc. Data Breach

Litig.*, 327 F.R.D. 299, 332 (N.D. Cal. 2018) (holding that an allocation plan that compensates

based on injury is fair, adequate, and reasonable, and citing cases). Through confirmatory

discovery, Facebook has confirmed generally there is a positive correlation with the amount of third parties' access to users' information and the amount of time users have been on the platform. Co-Lead Counsel Decl. ¶ 109. The allocation points are therefore assigned based on the amount of time an Authorized Claimant has been an activated Facebook user. *Id.*

Unfortunately, information that might enable a more precise measure of injury is not available. While the evidence establishes that each user was individually harmed, Facebook does not retain the information needed to precisely quantify that harm on an individual basis. It cannot, for example, supply Plaintiffs with information about the third parties that had access to each individual user's information through that user's friends, or determine precisely how much or how often each user's information was accessed or misused. Co-Lead Counsel Decl. ¶ 108. Under these circumstances, as the accompanying Declaration of Lynn A. Baker provides, the Plan of Allocation is reasonable. *See generally* Baker Decl.

### 3. Facebook has ended or is subject to FTC monitoring of the data sharing practices challenged by Plaintiffs.

The evidence produced demonstrates that the data sharing practices challenged by Plaintiffs have either been ended by Facebook or are subject to an intensive monitoring program under a 2020 FTC Consent Order. The requirements in the 2020 FTC Consent Order cover the injunctive relief Plaintiffs would have otherwise sought.[19] Even if Plaintiffs were successful in obtaining injunctive relief in this case, Facebook would mount a legal challenge to Plaintiffs' ability to do so on these facts. The Court may have found these arguments persuasive.

Moreover, Facebook has provided sworn declarations showing that the practices challenged by Plaintiffs have either been ended or are subject to monitoring by the FTC. *See generally* Elia Decl., Dunphy Decl. In its order resolving Facebook's motion to dismiss, the Court stated that "[t]he core allegations in the complaint describe four categories of wrongdoing by Facebook": (1) "[g]iving app developers access to sensitive user information"; (2)

---

[19] *See* Order Modifying Prior Decision and Order, *In the Matter of Facebook, Inc.*, No. C-4365 (Apr. 27, 2020), *available at* https://www.ftc.gov/system/files/documents/cases/c4365 facebookmodifyingorder.pdf.

"[c]ontinued disclosure to whitelisted apps"; (3) "[s]haring sensitive user information with business partners"; and (4) "[f]ailure to restrict the use of sensitive information." Dkt. 298 at 6–10. Facebook has limited the way it shares information with third parties that address the allegations in each of these four categories. Facebook implemented many of these changes after this Action was commenced. Co-Lead Counsel Decl. ¶¶ 6, 117, 121, 142–144.

### a. Facebook no longer makes non-public friend data available to apps without explicit authorization from the user whose data is being shared.

The Court's analysis of the first two categories of wrongdoing focused on "friend sharing"—i.e., enabling third parties to access information about a Facebook user's friend through the user, without explicit permission from the user's friend. For the first category, the Court construed Plaintiffs' core allegation to be that "when users accessed apps on the Facebook platform, the app developers were not merely able to obtain information about the users they were interacting with; they were also able to obtain information about the users' Facebook friends that the users themselves had access to." Dkt. 298 at 6–7. For the second, the Court construed Plaintiffs' core allegation to be "that Facebook, despite its promises to restrict access, continued to allow a preferred list of app developers to access the information of users' friends." *Id.* at 7–8.

The evidence shows that Facebook no longer makes friend data available to third parties. As explained in the Elia Declaration, Facebook permitted apps to place API calls for friend data—data or information associated with the app user's friends—through April 30, 2015, when it deprecated Graph API Version 1 and launched Graph API Version 2. Elia Decl. ¶¶ 8, 10. Even though Graph API Version 2 did not have friend permissions, and therefore did not permit apps to access friend data as a matter of course, Facebook whitelisted approximately 60 apps, providing them the ability to continue using Graph API Version 1 and enabling them to continue to access friend data. *Id.* ¶¶ 11–12. In addition, certain third parties were given access to "capabilities," which gave them the ability to obtain friend information. *Id.* ¶¶ 13–14. These facts—access to friend data via Graph API Version 1 before 2015, whitelisted and capability

access to friend information after 2015—are at the heart of Plaintiffs' allegations. *See* Dkt. 298 at 6–9; Complaint §§ IV.B, C, F, H.

According to Mr. Elia's declaration, Facebook implemented a code change that disabled friend permissions for all apps on March 28, 2018. Elia Decl. ¶ 14. Facebook also undertook an effort to identify all capabilities permitting access to APIs capable of emitting private friend information and deprecated all of them as to third parties. *Id.* ¶ 16. Mr. Elia declared that Facebook "has no plans to re-enable friend permissions for third parties, or to revive or restore capabilities permitting third parties' access to private friend information." *Id.* "[T]o the best of my knowledge and understanding," Mr. Elia summarizes, Facebook "does not still permit third parties to access any friend information without explicit authorization from the user whose data is being emitted via their friend." *Id.* ¶ 17. Additionally, as addressed in detail below and in the Dunphy Declaration, Facebook has undertaken substantial changes regarding vetting which third parties have access to user data, and efforts to ensure that user consent is obtained and that third parties comply with use policies—all of which is subject to FTC oversight. Facebook has therefore addressed the primary basis for Plaintiffs' allegations underlying the first two categories of wrongdoing.

### b.  *Facebook has substantially enhanced its monitoring of third-party data use.*

Plaintiffs alleged that though "Facebook purported to have a policy preventing app developers from using information for any purpose other than enhancing the interaction between the app and the person who was using the app on the Facebook platform," Facebook "did nothing to enforce this policy." Dkt. 298 at 9. This was the essence of what the Court characterized as the fourth category of alleged wrongdoing.

Evidence provided by Facebook now shows, however, that it has made operational changes that reflect serious and substantial steps to enforce its policy. Many of these changes were enacted in 2020 and 2021, after the Court entered its order granting in part and denying in part Facebook's motion to dismiss. According to the Dunphy Declaration, Facebook now does the following:

First, Facebook has continued to refine its "App Review," a process first implemented in 2014. Dunphy Decl. ¶ 7. As it now functions, Facebook evaluates an App's proposed use of Covered Information, which includes the type of private user data at issue in this case,[20] against the permissible use cases for such information and the developer's compliance with Facebook's Platform Terms to determine whether to approve or deny the request for access to the information. *Id.* ¶ 7(a). App Review is also designed to ensure that the privacy policies of Apps developers have submitted for approval are in compliance with Platform Terms. *Id.* ¶ 7(b). Beginning in February 2019, Facebook implemented "Partner Grant Review" for developers that seek access to Partner APIs. *Id.* ¶ 8.

Second, Facebook now conducts periodic reassessments and testing of third-party apps with access to Covered Information to identify actual or potential violations of its Platform Terms. *Id.* ¶ 10. These periodic reassessments are called "App Re-Review," and occur at least once every year. *Id.* During App Re-Review, a team of DevOps (Developer Operations) reviewers "assess each App using a set of standard questions designed to identify potential violations of Platform Terms." *Id.* ¶ 11(a). The questions include whether the app's privacy policy is clear about the data it collects about the user, explains the purposes for which the app is using that data, and explains clearly how the user may request that their data be deleted. *Id.* ¶ 11(b). They also aim to determine whether the app appears to use data acquired from Facebook for making eligibility determinations (such as for housing, credit, insurance, immigration status,

---

[20] "'Covered Information' means information from or about an individual consumer including, but not limited to: (a) a first or last name; (b) geolocation information sufficient to identify a street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging User identifier or a screen name; (d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("IP") address, User ID, or other persistent identifier that can be used to recognize a User over time and across different devices, websites or online services; (g) a Social Security number; (h) a driver's license or other government issued identification number; (i) financial account number; (j) credit or debit information; (k) date of birth; (l) biometric information; (m) any information combined with any of (a) through (l) above; or (n) Nonpublic User Information. 'Nonpublic User Information' means any User profile information (i.e., information that a User adds to or is listed on a User's Facebook profile), or User-generated content (e.g., status updates, photos), that is restricted by one or more Privacy Settings." Dunphy Decl. ¶ 1 n.1.

or government benefit), for discriminatory decisions (such as those based on race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical, or genetic condition), or for surveillance, each of which violate Facebook's terms. *Id.* If the answer to any of the questions is yes, the app is referred to the DevOps Enforcement team for enforcement. *Id.* Facebook also engages in a similar process, called "Partner Grant Re-Review," for apps that access Covered Information through Partner APIs. *Id.* ¶ 12. App Re-Review and Partner Grant Re-Review were implemented on or about September 7, 2021. *Id.* ¶¶ 11(d), 12(d).

Third, for continued use of certain high-tier products, Facebook now requires an app to annually self-certify that it is in continued compliance with applicable terms and that its use of Covered Information complies with permissible purposes or uses for that type of information. *Id.* ¶ 13. Facebook obtains self-certifications through its Data Use Checkup tool, which presents an app administrator with a list of the apps with Facebook data that require self-certification. *Id.* ¶ 13(a)-(c). If an app fails to complete its Data Use Checkup self-certification within 60 days, Facebook initiates an automated process to progressively reduce the app's access to Facebook APIs for a period of 30 days. *Id.* ¶ 13(d). If the app has still not completed the Data Use Checkup self-certification after 30 days, Facebook completely blocks the app's access to Facebook APIs until the self-certification is complete. *Id.* Facebook implemented the Data Use Checkup self-certification process in 2020. *Id.* ¶ 13(e).

Fourth, Facebook performs additional review of data use by apps in "higher-risk tiers." *Id.* ¶ 14. It categorizes each app in one of five risk tiers based on two risk evaluations: a "Product Risk Assessment," which evaluates the risks inherent to the APIs the app uses, and a "Third Party Risk Assessment," which evaluates the risks specific to the app itself (such as the volume of app users). *Id.* ¶ 15; *see id.* ¶ 15(a)-(b) (describing the Product Risk Assessment); ¶ 15(c) (describing the Third Party Risk Assessment); ¶ 15(d)-(g) (describing how the Product Risk Assessment and Third Party Risk Assessment are used to generate the "E.1 Covered Third Party Risk Assessment" tiers). The framework was first introduced in August 2021, refined through

September 2021, and implemented as an automated process on October 18, 2021. *Id.* ¶ 15(f).

Apps that are in one of the four highest risk tiers are subjected to a Data Protection Assessment. *Id.* ¶ 16. Each such app must, at least once each year, complete a questionnaire and submit documentary evidence concerning its data usage, data sharing, privacy policies, use of service providers, tech provider relationships, and data security. *Id.* Only apps whose developers provide answers and evidence that are acceptable, or those subjected to a follow-up investigation that confirms the app is in compliance with Facebook's Platform Terms, pass the Data Protection Assessment. *Id.* ¶ 16(b). If a developer fails to respond, even if only in part, Facebook gradually lessens the app's ability to make API calls over the course of thirty days and deactivates the app if the developer has not responded at the end of that time period. *Id.* ¶ 16(c). The Data Protection Assessment process commenced on or about August 9, 2021. *Id.* ¶ 65(d).

Fifth, Facebook has implemented a process called "Enhanced Privacy Policy Review." *Id.* ¶ 17. In Enhanced Privacy Policy Review, Facebook's DevOps team annually assesses each of the apps in the highest risk category of the E.1 Covered Third Party Risk Assessment analysis. *Id.* The assessment reviews each such app's privacy policy in full to ensure it is compliant with Facebook's Platform Terms and attempts to identify any potential violations of other Platform Terms. *Id.* If the privacy policy is not compliant, or any potential violations are identified, the app is referred for enforcement. *Id.* The Enhanced Privacy Policy Review process commenced on or about August 16, 2021. *Id.* ¶ 17(d).

Sixth, Facebook has enhanced and initiated additional automatic processes to monitor third parties' use of user data, including:

- Running a weekly automated check on developers' privacy policies for any app that has requested data from certain APIs in the past 90 days to ensure that the webpage is still available, a process that began on or about March 23, 2021. *Id.* ¶ 19.

- Deprecating or altering APIs to limit data access, such as: deprecating friends data APIs in 2014; deprecating several Facebook Login API features, including those that provided access to users' religion, political

views, and relationship details, in 2019; and enabling the removal of quiz apps in 2019. *Id.* ¶ 23.

Seventh, Facebook has substantially expanded its monitoring and enforcement teams. *Id.* ¶ 24. The DevOps team grew significantly between 2013 and 2018, grew again to include approximately 90 full-time employees and nearly 400 vendors in 2019, and grew once more to include more than 100 full-time employees and nearly 500 supporting vendors by 2021. *Id.* ¶ 24(a)-(c). The DevOps team now includes cybersecurity experts and former law enforcement officers such as former federal prosecutors and FBI agents. *Id.* ¶ 24(d).

> c. *Facebook has substantially limited APIs that emit information indicating users requested or obtained specific videos on Facebook.*

Plaintiffs asserted in the VPPA claim that Facebook made available to third-party developers and partners personal identifying information about users and users' friends that revealed the videos they requested or obtained, without proper consent. Plaintiffs undertook significant effort through discovery to learn about the permissions, capabilities, and APIs third parties used to access video-related information, including information shared via friend sharing because, as explained above, users whose information was shared via friend sharing did not have the opportunity to review and agree to the terms and conditions of the third party who received their information. Co-Lead Counsel Decl. ¶ 122. The Elia Declaration describes the significant changes that Facebook has made in this area, including that Facebook no longer makes any APIs, capabilities, or permissions available to any third parties that would permit the third party to request information about a user's friend's videos, or the friend's likes, interactions, or comments with those videos, unless the friend has themself provided access to that information directly to the third party. Elia Decl. ¶ 18.

## E.   The Settlement is informed by extensive discovery.

Discovery has required years of diligent efforts by Plaintiffs to obtain relevant evidence. The parties did not agree to a settlement in principle until fact discovery was nearly complete. Thus, the Settlement is informed by extensive knowledge of nonpublic facts related to Plaintiffs'

allegations, facts that informed their understanding of the claims and the risks of continued litigation.

Plaintiffs propounded 99 interrogatories, 54 requests for admission, and 90 requests for production over more than three years. Co-Lead Counsel Decl. ¶ 76. By the time the parties agreed to the settlement in principle:

- Facebook served more than 500 pages, and an Excel file with more than 1 million lines of data, in response to Plaintiffs' interrogatories.

- Facebook produced nearly 6 million pages of documents and significant volumes of structured data, including the Method Table, the Capabilities tool, and data regarding the Named Plaintiffs in a series of structured data exports.

- Plaintiffs deposed 34 former and current Facebook employees.

- Plaintiffs elicited 20 days of Rule 30(b)(6) testimony, totaling 110 hours, from 13 different corporate designees, on 29 discrete subtopics.

*Id.* ¶¶ 4, 72, 76–77.

In addition, Plaintiffs procured 70,267 documents responsive to subpoenas from three former Facebook employees, and 335,544 documents responsive to subpoenas from other third parties, including 165,875 documents from Acxiom, a data broker; 154,116 documents from FTI Consulting, an ADI consultant; 7,802 documents from Stroz Friedberg, another ADI consultant; and 5,160 documents from PricewaterhouseCoopers, which acted as Facebook's privacy auditor pursuant to the 2012 FTC Consent Order. *Id.* ¶¶ 79–80. Plaintiffs also conducted a Rule 30(b)(6) deposition of PricewaterhouseCoopers. *Id.* ¶ 93. Depositions of FTI Consulting and Stroz Friedberg were pending when the parties agreed in principle to settle.

Finally, Plaintiffs participated in more than 40 hearings before the Court, Judge Corley, and Special Master Garrie, as well as regular sessions with the discovery mediators, many of which resulted in Facebook's disclosure of relevant, substantive information about Named Plaintiffs' data, the extent of Facebook's records, and Facebook's document retention policies, among other issues. *Id.* ¶¶ 31, 43.

This extensive discovery has provided Plaintiffs the basis for an informed evaluation of the strengths and weaknesses of their claims, and the fairness, reasonableness, and adequacy of the Settlement. *See Uppal v. CVS Pharmacy, Inc.*, No. 3:14-cv-02629-VC, 2015 WL 1089062, at *1 (N.D. Cal. Sept. 11, 2015) ("[S]ignificant formal and informal discovery, investigation, research, and litigation has been conducted such that counsel for the Parties at this time are able to reasonably evaluate their respective positions.").

## F.   Based on decades of experience litigating and settling class actions, counsel believes the Settlement is an outstanding result.

Proposed Class Counsel, who together have more than 50 years of experience litigating class actions, believe that the Settlement reflects a groundbreaking result. *Cf.* Gandhi Decl. ¶ 20 (crediting counsel for both parties' "expertise and experience in these types of complex class actions"). To their knowledge, not only is the Settlement the largest ever U.S. settlement in a data privacy or data breach class action, but it is also the largest amount Facebook appears ever to have paid, in a settlement or a verdict, to private litigants. The Settlement is even more outstanding considering the procedural posture of this case—the Court has not yet certified it as a class action—and Plaintiffs' novel theories and claims, which increase the risk that this Court, the jury, or an appellate court may find Plaintiffs' theories unavailing. The $725 million Settlement is an outstanding result.

## G.   Governmental participation is not a factor at issue here.

This factor is not at issue because there is no government participation in this case. *Betorina v. Randstad US, L.P.*, No. 3:15-cv-03646-EMC, 2017 WL 1278758, at *9 (N.D. Cal. Apr. 6, 2017); *see also Martin v. Sysco Corp.*, No. 1:16-cv-00990-DAD-SAB, 2019 WL 3253878, at *6 (E.D. Cal. July 19, 2019).

## H.   The Settlement also satisfies the *Bluetooth* factors.

Because this Court "review[s] class action settlements just as carefully at the initial stage as [it] do[es] at the final stage . . . rather than kicking the can down the road," *Cotter*, 193 F. Supp. 3d at 1037, the Court should also analyze the three *Bluetooth* factors at this stage.

Evaluation of these factors assists the Court in determining whether Plaintiffs' counsel have "allowed pursuit of their own self-interests and that of class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947. Here, evaluation of the *Bluetooth* factors militates further in favor of granting preliminary settlement approval.

First, this is not a circumstance where the class will "receive[] no monetary distribution but class counsel are amply rewarded." *Id.* The overwhelming majority of the Settlement Fund, the largest ever in a data privacy class action, and the most money Facebook has ever paid to resolve a class action brought by private parties in the United States, will be distributed to the Settlement Class. As set forth in the Settlement Agreement, Class Counsel will request no more than 25% of the Settlement Fund. Second, the Settlement Agreement does not include a "clear sailing" agreement. *Id*. Rather, with the exception of any fees Facebook or its counsel may pay as sanctions, all attorneys' fees will be payable solely from the Settlement Fund in a percentage to be determined by the Court. Settlement Agreement ¶ 82; Co-Lead Counsel Decl. ¶ 104. The fees are therefore not being paid by Facebook in exchange for Plaintiffs' acceptance of an unfair class settlement. *Bluetooth*, 654 F.3d at 947. Third, there is no reversion of any amount of the Settlement Fund to Facebook. *See id*. Rather, the Settlement Agreement establishes a non-reversionary Settlement Fund whereby the entire amount, less attorneys' fees and costs, will be paid out to claimants. Settlement Agreement ¶ 49; Co-Lead Counsel Decl. ¶ 104.

## V.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

Although the parties have settled, the Court must nevertheless certify that the Class satisfies Rule 23. Rule 23(a) requires (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition, the class must satisfy one of Rule 23(b)'s subsections. However, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there [will] be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

A.      **The Settlement Class satisfies the Rule 23(a) prerequisites.**

   1.   *The class is sufficiently numerous.*

Numerosity requires the proposed class to be so numerous that joinder is impracticable. Fed. R. Civ. P. 23(a). Numerosity is generally satisfied when the class exceeds forty members. *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Here it is easily established. Though Facebook has been unable to specify the size of the proposed Settlement Class, it is almost certainly larger than 200 million Facebook users.

   2.   *There are common questions of law and of fact.*

Commonality requires that the action involve "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single [common] question" will do. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (quoting Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n. 110 (2003)). Where claims "derive from a common core of salient facts, and share many common legal issues," commonality is met. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006).

The class claims primarily derive from Facebook's failure to abide by and enforce its user-data policies. Facebook's decision to allow third parties to access user data in violation of its terms and failure to sufficiently monitor the third parties' use of that data forms a core of salient facts. This common conduct raises common questions, resolution of which will generate common answers "apt to drive the resolution of the litigation" for the Class as a whole. *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Plaintiffs' remaining claims are for SCA violations and VPPA violations. *See* Dkt. 298. These claims target a uniform practice or a unified course of conduct. The common legal and factual questions arising from Plaintiffs' claims, all under California or federal law, include whether Facebook violated its user agreements; whether Facebook acted intentionally; whether Facebook disclosed its conduct to class members; whether Facebook allowed third parties to access user information; whether that information is

"sensitive"; whether class members suffered harm as a result of Facebook's conduct; and whether the class is entitled to damages. *See* Dkt. 491 ¶ 769. These more than suffice to meet the commonality requirement.

### 3. The Settlement Class Representatives' claims are typical of Settlement Class Members' claims.

Typicality requires the class representatives' claims to be typical of the claims of the proposed class. Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020). Where a plaintiff suffered a similar injury and other class members were injured by the same course of conduct, typicality is satisfied. *See Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).

Here, the experiences of the Settlement Class Representatives match the experiences of the millions of other Facebook users in the United States that make up the Settlement Class: Facebook adopted practices that permitted app developers and business partners to receive Settlement Class Representatives' information, and Facebook then failed to enforce its user-data policies against those third parties. Dkt. 298 at 6–9. Facebook's conduct violated its promises and legal obligations to the Settlement Class Representatives and all Settlement Class Members. Because the Settlement Class Representatives' allegations involve the "same course of conduct," which is "not unique to the named plaintiffs," typicality is satisfied here. *Valliere v. Tesoro Refin. & Mktg. Co. LLC*, No. 4:17-cv-00123-JST, 2020 WL 13505042, at *5 (N.D. Cal. June 26, 2020) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

### 4. The Settlement Class Representatives and Class Counsel will—and have—fairly and adequately protected the interests of the Settlement Class.

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class." To determine adequacy, courts ask two questions: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action

vigorously on behalf of the class?" *Staton*, 327 F.3d at 957 (citing *Hanlon*, 150 F.3d at 1020).

First, the proposed Settlement Class Representatives do not have any interests antagonistic to the other Settlement Class Members, whose interests they will continue to vigorously protect. *See, e.g.*, *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 5:16-md-02752-LHK, 2020 WL 4212811, at *4–5 (N.D. Cal. July 22, 2020); Akins Decl. ¶ 23; Ariciu Decl. ¶ 23; Bell Decl. ¶ 24; Burk Decl. ¶ 23; Fischer Decl. ¶ 23; King Decl. ¶ 23; O'Hara Decl. ¶ 23; Senko Decl. ¶ 23. The representatives are aligned with Settlement Class Members in their interest in proving that Facebook gave their information to third parties without their consent. And they are aligned in seeking compensation and restitution from Facebook for the resulting harm.

Second, the proposed Settlement Class Representatives understand their duties as class representatives, have agreed to consider and protect the interests of absent Settlement Class Members, and have actively participated in this Action and Settlement. Akins Decl. ¶¶ 5, 23–24; Ariciu Decl. ¶¶ 5, 23–24; Bell Decl. ¶¶ 5, 24–25; Burk Decl. ¶ 5, 23–24; Fischer Decl. ¶ 5, 23–24; King Decl. ¶¶ 5, 23–24; O'Hara Decl. ¶¶ 5, 23–24; Senko Decl. ¶¶ 5, 23–24. The proposed Settlement Class Representatives have provided their counsel with necessary factual information, are aware of and willing to carry out their obligations as class representatives, and have regularly communicated with their counsel regarding various issues pertaining to this case, and will continue to do so until the case closes. *See generally* Named Plaintiff declarations. They have responded to demanding discovery requests and prepared and sat for lengthy depositions. Akins Decl. ¶¶ 8–16; Ariciu Decl. ¶¶ 8–16; Bell Decl. ¶¶ 8–17; Burk Decl. ¶¶ 8–16; Fischer Decl. ¶¶ 8–16; King Decl. ¶¶ 8–16; O'Hara Decl. ¶¶ 8–16; Senko Decl. ¶ 8–16. Their participation easily meets the adequacy requirement. *See Trosper v. Stryker Corp.*, No. 5:13-cv-0607-LHK, 2014 WL 4145448, at *43 (N.D. Cal. Aug. 21, 2014) ("All that is necessary is a 'rudimentary understanding of the present action and . . . a demonstrated willingness to assist counsel in the prosecution of the litigation.'" (quoting *In Re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 120 (C.D. Cal. 2007) (citation omitted))).

In addition, proposed Class Counsel are highly qualified lawyers who have successfully prosecuted high-stakes complex cases and consumer class actions. *See* Co-Lead Counsel Decl., Exs. 5–6. They have devoted the resources necessary to see this case through despite great risk. *Id.* ¶¶ 151–154. Their capable representation in this case has included consolidating and amending the complaint, surviving Facebook's motion to dismiss, pursuing discovery, and litigating discovery disputes through the appointment of three additional judicial officers. *See generally* Co-Lead Counsel Decl.

## B.   The Settlement Class satisfies Rule 23(b)(3).

Plaintiffs seek certification under Rule 23(b)(3). Courts certify Rule 23(b)(3) classes when: (i) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This Class satisfies both prerequisites.

### 1.   *Common issues of law and fact predominate.*

The predominance inquiry under Rule 23(b)(3) focuses on whether the "common questions present a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (citation and quotation omitted). If so, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (citation and quotation omitted). Even if just one common question predominates, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1778 (3d ed. 2005) (footnotes omitted)).

The common questions in this case, described above, can be resolved for all members of the Settlement Class in a single adjudication. Facebook's data policies were common to all Settlement Class Members; whether Facebook violated the terms of those agreements can be answered on a classwide basis. Although the identity of third parties who accessed information

might have differed from user to user, Facebook's data sharing practices and policies did not. Discovery has yielded no evidence that Facebook altered its practices based on the identity of the user. Whether Facebook's practices were intentional or negligent is a question that focuses on Facebook's conduct and thus can be answered for the class as a whole. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, No. 3:19-md-02913-WHO, 2022 WL 2343268, at *35 (N.D. Cal. June 28, 2022) (explaining that claims that "require common proof of the defendant's conduct" are appropriate for class certification). Similarly, whether Facebook meets the definition of "video tape service provider," and other statutory definitions under the VPPA and SCA, can be answered for the class as a whole. *See* 18 U.S.C. §§ 2710, 2702(a)(1), 2510(15).

Common issues predominate in part because a choice-of-law provision applies California law to the non-federal claims. *See* Dkt. 298 at 21. Accordingly, this case avoids the challenges of a nationwide class based on a variety of state-law claims. *See Murray*, 434 F.3d at 953 ("Reliance on federal law avoids the complications that can plague multi-state classes under state law . . . ."). And Plaintiffs' deceit-by-concealment claim is well-suited to class certification: "[P]redominance is 'readily met' in cases alleging consumer fraud." *In re Hyundai*, 926 F.3d at 559 (quoting *Amchem*, 521 U.S. at 625).

Rule 23(b)(3) lists four non-exclusive factors "pertinent" to a predominance finding:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Here, these factors weigh in favor of a predominance finding. Settlement Class Members' interest in controlling separate actions is low, given the efficiencies of collectively adjudicating

the many common legal and factual questions, as well as the risks and expense of litigating this case. The JPML already made the decision to consolidate the actions concerning this controversy into this lead case and made findings suggesting the desirability of concentrating the litigation of the claims in this forum. *See* Dkt. 1. Although litigating this Action has been difficult, managing millions of individual cases would present exponentially more difficulties. In any event, "[a] class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *In re Hyundai*, 926 F.3d at 558.

### 2. *Class treatment is superior.*

Rule 23(b)(3)'s "superiority" element "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023.

Here, class treatment is superior to the litigation of hundreds or thousands of individual claims. "From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Id.* The damages sought by each Settlement Class Member, when weighed against their risks, are not so large as to counsel against certification. *See Smith v. Cardinal Logistics Mgmt. Corp.*, No. 3:07-cv-02104-SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008).

The sheer number of separate trials that would be required also favors certification. *Id.* Even if Settlement Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   THE PROPOSED NOTICE PROGRAM, SETTLEMENT ADMINISTRATOR, AND PROCESS FOR OPT-OUTS AND OBJECTIONS SHOULD BE APPROVED

### A.     The proposed Notice Plan

#### 1.   *Class notice*

Rule 23 requires the Court to direct the best notice practicable to all class members who would be bound by a proposed settlement. *See* Fed. R. Civ. P. 23(c)(2)(B), (e)(1). The proposed Notice Plan meets those standards. Weisbrot Decl. ¶¶ 11, 15, 44.

The proposed notice plan is described in extensive detail by the Weisbrot Declaration at paragraphs 12–44. It will include in-app notification, media notice, a social media campaign, a paid search campaign, publication notice, sponsored class action website listings, active listening, a legal influencer campaign, media monitoring, a dedicated settlement website, a toll-free telephone line, and, as needed, additional efforts to stimulate a higher claims rate. The Settlement Administrator estimates that the media notice campaign by itself will reach approximately 92.44% of Settlement Class Members—a percentage that far exceeds the 70% reach characterized as the "norm" and a "high percentage" by the Federal Judicial Center—and that each class member will be exposed to the notice an average of three times (which does not include, and is therefore in addition to, direct email and in-app notice). *Id.* ¶¶ 13–14. For that reason, the Settlement Administrator believes that this notice plan is the best practicable one in these circumstances. *Id.* ¶ 63.

As this District's guidance recommends, the draft notice includes contact information for class counsel; the address for the settlement website (which will include, among other things, links to the notice, claim form, and, important documents in the case such as, when filed on the docket, the preliminary approval order, motions for preliminary and final approval for attorneys' fees); instructions on how to access the case docket via PACER or in person; the date and time of the final approval hearing, clearly stating that the date may change without further notice to the class; and a note to class members to check the settlement website or PACER to confirm the date. Co-Lead Counsel Decl., Ex. 1-D; Weisbrot Decl. ¶¶ 43–44, 63.

### 2. CAFA notice

The Settlement Administrator will provide notice pursuant to the Class Action Fairness Act within ten days of the filing of the Settlement Agreement. Weisbrot Decl. ¶ 42.

## B.     The Settlement Administrator

### 1. Selection process

The parties propose Angeion Group as the settlement administrator. Settlement Agreement ¶ 45. They do so only after evaluating bids from three prospective settlement administrators. Plaintiffs' counsel had a phone call with each prospective settlement administrator before each submitted their bids. Plaintiffs' counsel then had a follow-up call with each bidder regarding proposed revisions from their initial bid, and received a second bid from each. The initial and revised bids were shared with Facebook's counsel. Plaintiffs' counsel discussed and received bids for a number of methods of notice, including in-app, email, mail, text, and publication notice. Only after receiving and evaluating the revised bids did the Parties select Angeion Group.

Co-Lead Counsel have no history of engagements with Angeion Group over the past two years. Angeion has considerable experience as the appointed settlement administrator in large class action settlements involving Facebook and other social media or technology platforms. *See* Weisbrot Decl. ¶¶ 8–10. In its declaration, Angeion details the extensive data security measures it has established to securely handle class members' data. *See id.* ¶¶ 55–59. It also maintains comprehensive insurance coverage, including sufficient Errors & Omissions coverage. *Id.* ¶ 60. The parties would not have selected Angeion absent their comfort with its procedures for securely handling class member data.

Angeion has estimated the anticipated costs of issuing notice and administering the Settlement as between $3,500,000 and $4,225,000. *Id.* ¶ 61. These costs will be paid out of the Settlement Fund. Settlement Agreement ¶ 62. The Parties have agreed that, if there are any additional and unanticipated notice and administrative costs, they will meet in good faith to determine the source of payment for those costs. *Id.* If the parties cannot reach agreement on the

source of payment for these additional costs, they will mediate the dispute. *Id.*

The estimated costs of notice and administration are more than reasonable when compared to the value of the Settlement and in light of the size of the Settlement Class. At the high end, the estimated anticipated costs are only 0.58% of the $725 million Settlement Fund.

### 2. The Settlement Administrator's estimated claims rate

The task of estimating the claims rate in this case is substantially more complex than in most class actions. This is largely because, as addressed above in § III.C, Facebook cannot identify the precise size of the Settlement Class. However, the Settlement Administrator has provided examples of claims rates in other cases sharing some of the characteristics present here. Weisbrot Decl. ¶ 54. The Notice Plan proposed here is intended to exceed those rates.

### C.    Opt-outs and objections: timeline, instructions, and forms

The proposed schedule ensures that class members have at least 119 days from the issuance of the order granting preliminary approval to opt out or object to the Settlement, and 35 days to opt out or object to the motion for attorneys' fees and costs. N.D. Cal. Procedural Guidance ¶ 9. The opt-out form and instructions for objecting are in plain language and clearly prompt those who wish to opt-out or to object to provide the specific information each action requires. Co-Lead Counsel Decl., Ex.1-D at Question 16. The notice clearly informs class members of the opt-out deadline and how to opt out, and requires that they supply only the information needed to opt out of the settlement. *Id.* Similarly, the notice informs class members of the objection deadline and instructs them to send their written objections to the Court, tells them that the Court can only approve or deny the Settlement and cannot change its terms, and clearly identifies the objection deadline. *Id.* at Question 17.

### VII.    THE PROPOSED FINAL APPROVAL HEARING SCHEDULE

Plaintiffs' [Proposed] Order Granting Preliminary Approval of Class Action Settlement, filed herewith, includes the following proposed schedule for the approval process:

| EVENT | PROPOSED TIME FOR COMPLIANCE |
|---|---|
| Meta shall pay or cause to be paid a portion of the Settlement Fund in an amount sufficient to effectuate the Notice Plan to the Settlement Administrator | 14 days following preliminary approval order |
| Notice shall begin to be disseminated to Settlement Class Members consistent with the Notice Plan | 14 days following preliminary approval order |
| Meta shall, for the purpose of facilitating Notice, provide or cause to be provided to the Settlement Administrator information about the Settlement Class Members required by the Settlement Administrator to effectuate the Notice Plan | 30 days following preliminary approval order |
| Meta shall pay or cause to be paid into the Escrow Account all subsequent amounts for Notice and Administration Costs (as invoiced by the Settlement administrator or Escrow Agent and approved by Class Counsel) (the "Periodic Payments") within thirty (30) calendar days after the submission of an invoice by the Settlement Administrator or Escrow Agent | 30 days following submission of invoice by Settlement Administrator (following preliminary approval order) |
| Class Counsel shall file all papers in support of the application for Attorneys' Fees and an Expenses Award and/or for Service Awards | 84 days following preliminary approval order |
| Class Counsel shall file all papers in support of the application for the Final Approval Order and Final Judgment | 104 days following preliminary approval order |
| Deadline to oppose application for Attorneys' Fees and Expenses Award and/or for Service Awards | 114 days following preliminary approval order |
| Deadline for objections and opt-outs | 119 days following preliminary approval order |
| Deadline to file reply papers regarding objections to the settlement and to update the Court regarding notice and administration | 128 days following preliminary approval order |
| Settlement Class Members who wish to make a claim must do so by submitting a claim | 149 days following preliminary approval order |

## VIII.   CONCLUSION

Plaintiffs have achieved an outstanding result in this complex, vigorously fought privacy class action against Facebook. We are pleased to present the Settlement to the Court for its review. Plaintiffs respectfully request that the Court preliminarily approve the $725 million non-reversionary Settlement, certify the Settlement Class, appoint the undersigned as Class Counsel and the Named Plaintiffs as Settlement Class Representatives, order dissemination of notice to

Settlement Class Members in accordance with the proposed Notice Plan, set a date for the Final

Approval Hearing, and stay all related cases until and if the Court denies approval of this

Settlement.

Dated: December 22, 2022                              Respectfully submitted,


KELLER ROHRBACK L.L.P.                            BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                       By:    */s/ Lesley E. Weaver*
      Derek W. Loeser                                      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)          Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)   Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                 Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)          Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                        Joshua D. Samra (SBN 313050)
Emma M. Wright (admitted *pro hac vice*)           555 12th Street, Suite 1600
Daniel Mensher (admitted *pro hac vice*)           Oakland, CA 94607
Michael Woerner (admitted *pro hac vice*)          Tel.: (415) 445-4003
Matthew Gerend (admitted *pro hac vice*)           Fax: (415) 445-4020
1201 Third Avenue, Suite 3200                      lweaver@bfalaw.com
Seattle, WA 98101                                  adavis@bfalaw.com
Tel.: (206) 623-1900                               mmelamed@bfalaw.com
Fax: (206) 623-3384                                aornelas@bfalaw.com
dloeser@kellerrohrback.com                         jsamra@bfalaw.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com
ewright@kellerrohrback.com
dmensher@kellerrohrback.com
mwoerner@kellerrohrback.com
mgerend@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400

MOTION TO CERTIFY A SETTLEMENT      58      MDL NO. 2843
CLASS AND GRANT PRELIMINARY      CASE NO. 18-MD-02843-VC
SETTLEMENT APPROVAL

Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of December, 2022, at Oakland, California.

*/s/ Lesley E. Weaver*
Lesley E. Weaver

## <u>CERTIFICATE OF SERVICE</u>

I, Julie Law, hereby certify that on December 22, 2022, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Julie Law*
Julie Law