Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **DECLARATION OF DEREK W. LOESER AND LESLEY E. WEAVER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(e)(1)**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor<br>Hearing Date: March 2, 2023<br>Hearing Time: 10:00 a.m. (via Zoom) |

TABLE OF CONTENTS

**Page**

A.   Introduction ............................................................................................... 1

    1.   Investigation, Filing, and Consolidation ............................................ 2

    2.   Motions to Dismiss ............................................................................ 4

    3.   Motions to Amend and Dismiss the U.K. Plaintiffs ........................... 5

    4.   Motions to Relate .............................................................................. 5

B.   Discovery .................................................................................................. 6

    1.   Overview of Discovery Litigation ..................................................... 6

        a.   Appointment of Judge Corley .............................................. 7

            (i)   Discovery Protocol ................................................... 7

            (ii)   Meet and Confers ..................................................... 7

        b.   Appointment of Discovery Mediators ................................... 8

        c.   Appointment of Discovery Special Master ............................ 8

    2.   Discovery Obtained by Plaintiffs Through These Extensive Discovery Processes ........................................................................... 8

        a.   FTC Materials ....................................................................... 8

        b.   Custodian Selection and Search Terms ................................. 9

        c.   Privileged Documents .......................................................... 9

        d.   Named Plaintiffs' Data ......................................................... 9

        e.   Documents Related to the App Developer Investigation ........ 10

        f.   Production of Financial Documents ....................................... 11

        g.   Documents Related to Facebook's Arrangements with Business Partners ................................................................. 11

        h.   The "Secret Sauce" Memorandum .......................................... 12

        i.   Production of the Zuckerberg Notebooks ............................... 12

        j.   Documents from the Files of Mark Zuckerberg and Sheryl Sandberg ...... 13

        k.   Documents Related to Cambridge Analytica Case Studies ...... 14

l.      Documents Related to PricewaterhouseCoopers LLP ..............................14

3.      Plaintiffs' Discovery Obligations .............................................................15

      a.      Early Depositions of Named Plaintiffs .............................15

      b.      Depositions of Former Named Plaintiffs ..........................16

      c.      Plaintiffs' Responses to RFPs 31–34 .................................16

      d.      Responses to Interrogatories 15–16 ...................................17

4.      Sanctions Motion ......................................................................................17

C.      Discovery ...........................................................................................................17

1.      Discovery Plaintiffs Produced .................................................................18

2.      Discovery Plaintiffs Received and Reviewed...........................................18

      a.      Discovery Plaintiffs Received from Facebook ..................18

      b.      Documents Plaintiffs Received from Former Facebook Employees.........19

      c.      Documents Plaintiffs Received from Third Parties ...........19

3.      Depositions Plaintiffs Defended ..............................................................22

4.      Depositions Plaintiffs Took ......................................................................23

      a.      Depositions of Current and Former Facebook Employees.....23

      b.      30(b)(6) Depositions .........................................................25

5.      Depositions of Third Parties .....................................................................26

D.      Settlement ..........................................................................................................27

1.      The Settlement Negotiations were Hard-Fought and Extensive............................27

2.      Benefits Obtained for Class Members .....................................................29

3.      Suspended Practices During the Ongoing Litigation................................31

      a.      Whitelisting Third Parties' Access to Data and Friend Sharing...............31

      b.      VPPA ..................................................................................34

      c.      Monitoring .........................................................................35

            (i)      Privacy Review ....................................................35

            (ii)     Initial Review of Third-Party Access to Covered Information......36

(iii)   Periodic Reassessment ..................................................................36

(iv)   Risk-Based Assessments ...............................................................37

(v)   Monitoring ....................................................................................37

(vi)   Enforcement..................................................................................38

d.   Facebook's Expanded Disclosures to Users ............................................39

E.   Conclusion ...........................................................................................................40

I, Derek W. Loeser, and I, Lesley E. Weaver, declare and state as follows:

Derek W. Loeser is a partner at the law firm of Keller Rohrback L.L.P. ("Keller Rohrback") and Lesley E. Weaver is a partner at the law firm of Bleichmar Fonti & Auld LLP ("Bleichmar Fonti & Auld"). We are Co-Lead Counsel for Plaintiffs in the above-captioned matter. We submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement Pursuant to Federal Rule of Civil Procedure 23(e)(1). We have personal knowledge of the information contained herein, and, if called as a witness, we could and would testify competently thereto.

## A.    Introduction

1.       Plaintiffs have achieved an outstanding result in the case. The $725 million Settlement is the largest settlement ever of a privacy class action, and the most Defendant Facebook[1] has ever paid to resolve a private class action.

2.       Keller Rohrback and Bleichmar Fonti & Auld represent current and former Facebook users. This lawsuit, which arose from but is considerably broader than the Cambridge Analytica scandal, centers around allegations that Facebook shared or made accessible to third parties sensitive user information without the consent of users and failed to prevent those third parties from selling or otherwise misusing user data. This declaration is an overview of the work performed by Co-Lead Counsel that was necessary to understand the claims and defenses in this case, evaluate them, and ultimately elect to reach this Settlement rather than continue to litigate and take this case to trial.

3.       This case began in March 2018. It addresses a matter of great public concern—implicating Facebook's handling of vast amounts of consumer data over a class period beginning in mid-2007 and extending through December 2022—and presents numerous novel issues of fact and law.

4.       This case was fiercely litigated. To obtain evidence to prove their claims, Co-Lead Counsel spent hundreds of hours in discovery hearings and mediation, at times attending at

---

[1] "Facebook" means Meta Platforms, Inc., d/b/a Meta, and formerly known as Facebook.

least one, if not two, sessions per week; conducted over 110 hours of 30(b)(6) deposition testimony over 20 days from 13 witnesses; deposed 34 fact witnesses; procured evidence from 28 third parties; and reviewed and analyzed millions of documents and lines of data. These efforts produced evidence that has helped Plaintiffs evaluate the strengths of the claims and defenses in this action, as well as the risks. We acknowledge and are thankful for the work of this Court, Judge Corley, Special Master Garrie, and Judge Andler over the course of this case in assisting the parties in mediating discovery issues.

5. The evidence obtained by Co-Lead Counsel was instrumental to the successful outcome of the litigation and Plaintiffs' analysis of whether challenged practices continue at Facebook. In addition to the monetary relief secured here, beginning before and continuing over the course of the litigation Facebook changed the practices challenged in the Complaint. Plaintiffs developed an understanding of these changes in litigation and confirmatory discovery. Facebook confirms these changes in the Declaration of Steven Elia in Support of Settlement ("Elia Declaration" or "Elia Decl."), filed at Dkt. 1094, and the Declaration of Elizabeth Dunphy in Support of Settlement ("Dunphy Declaration" or "Dunphy Decl."), filed at Dkt. 1095, and discussed in detail below.

6. In light of what has been achieved in this case, and the changes and improvements by Facebook, many of which were implemented during this litigation, we submit that the Settlement is an outstanding result that merits Court approval.

**1.  Investigation, Filing, and Consolidation**

7. Co-Lead Counsel began investigating Facebook's unauthorized sharing of user data with third-party apps in March 2018.[2] The investigation was precipitated by news that Cambridge Analytica had obtained the personal information of as many as 87 million Facebook users collected by the MyDigitalLife application (also known as ThisIsYourDigitalLife), a quiz application deployed on Facebook that was marketed as a tool used by psychologists that claimed to help users better understand their personalities.

---

[2] Facebook, Inc. was reincorporated as Meta Platforms, Inc., effective October 28, 2021.

8.      In connection with the investigation, attorneys and paralegals at Keller Rohrback and Bleichmar Fonti & Auld communicated with over five hundred current and former Facebook users about their practices concerning personal information and expectations of privacy on Facebook, and scoured public reports and dockets for information about Facebook's data-sharing practices.

9.      As early as March 20, 2018, certain plaintiffs filed the first of several class action complaints against Facebook arising from the Cambridge Analytica news. On June 6, 2018, the Judicial Panel on Multidistrict Litigation consolidated many of the cases into this lead case, *In re: Facebook, Inc., Consumer Privacy User Profile Litigation*. *See* Dkt. 1. The Court appointed Derek Loeser of Keller Rohrback and Lesley Weaver of Bleichmar Fonti & Auld as Co-Lead Counsel. *See* Dkt. 102. Keller Rohrback's and Bleichmar Fonti & Auld's firm resumes are attached hereto as Exhibits 5 and 6, respectively.

10.     Plaintiffs sought limited discovery prior to Facebook's initial motion to dismiss. They received permission in August 2018 to seek discovery on Facebook's relationship and interactions with Aleksandr Kogan and the ThisIsYourDigitalLife app. Dkt. 130. Plaintiffs then served Facebook with five requests for production ("RFPs") and five interrogatories. Facebook served its responses on Plaintiffs in early September 2018.

11.     After evaluating those responses and the existing complaints, Plaintiffs filed a Consolidated Complaint later that month. Dkts. 148, 152-2.

12.     The Consolidated Complaint included prioritized claims for violations of the Stored Communications Act ("SCA"), violations of the Video Privacy Protection Act ("VPPA"), deceit by concealment or omission under California law, violations of the California unfair competition law, violation of the California common law right to privacy, violation of the California Constitution, and common law claims for invasion of privacy, breach of contract, negligence and gross negligence, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Dkt. 148. Plaintiffs brought prioritized claims against Facebook and the Doe Defendants 1–100. *Id.*

13.     Because this was an MDL proceeding, the Consolidated Complaint became the superseding and controlling complaint for the proceeding. Thus, all claims and defendants named in the other consolidated cases were incorporated into the Consolidated Complaint. Plaintiffs sought approval to stay twenty-nine additional claims asserted in the consolidated action against a subset of five Defendants—the "non-prioritized" claims and Defendants. *See* Dkt. 156. The Court granted Plaintiffs' request to stay the non-prioritized claims pending resolution of the motions to dismiss but directed Plaintiffs to litigate the non-prioritized Defendants' motions to dismiss. Dkt. 190.

### 2.     Motions to Dismiss

14.     Facebook and the non-prioritized Defendants moved to dismiss Plaintiffs' Consolidated Complaint in November 2018, Plaintiffs opposed, and the parties fully briefed the motion. *See* Dkts. 183, 184, 188, 208, 211, 233, 234.

15.     The Court granted Defendant Mercer's motion to dismiss for lack of personal jurisdiction on January 28, 2019. Dkt. 240. The Court heard argument on the remaining motions to dismiss in early February 2019. The hearing lasted more than four and a half hours. During the hearing, the parties addressed numerous issues highlighted by the Court, including Article III standing and Plaintiffs' allegations about whether they switched from "public" to "friends only" privacy settings. At the end of the hearing, the Court granted Plaintiffs' request to file an amended complaint.

16.     Plaintiffs filed their First Amended Consolidated Complaint two weeks later. Dkt. 257. Facebook renewed its motion to dismiss. The parties presented full briefing and extensive oral argument on the motion. Dkts. 261, 266, 267.

17.     On September 9, 2019, the Court denied Facebook's motion to dismiss claims for violations of the VPPA and negligence and gross negligence under California law; granted in part and denied in part Facebook's motion to dismiss claims for violations of the SCA, and claims under California law for deceit by concealment, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, public disclosure of private facts,

intrusion into private affairs, and violation of the constitutional right to privacy; and granted in full Facebook's motion to dismiss claims for violations of California's Unfair Competition Law and violation of the right of publicity. Dkt. 298. The Court also summarized four categories of alleged wrongdoing by Facebook that informed Plaintiffs' claims: (1) giving app developers access to sensitive user information; (2) continued disclosure to whitelisted apps; (3) sharing sensitive user information with business partners; and (4) failing to restrict the use of sensitive information. *Id.* at 6–9.

18.     Facebook moved for certification under 28 U.S.C. § 1292(b), seeking immediate interlocutory appeal of the Court's ruling on injury-in-fact. Dkt. 318. Plaintiffs opposed, and the Court denied Facebook's motion in late October 2019. Dkts. 324, 330.

19.     Facebook served its Answer to the First Amended Complaint in February 2020. Dkt. 373.

### 3.     Motions to Amend and Dismiss the U.K. Plaintiffs

20.     In spring 2020, Plaintiffs sought to amend their complaint for the purpose of substituting certain Named Plaintiffs in place of others who had withdrawn or wished to withdraw. Dkt. 397. Facebook opposed the amendment insofar as it sought to substitute Named Plaintiffs residing in the United Kingdom. Dkt. 442. In July 2020, the Court granted Plaintiffs' motion. Dkt. 482. Plaintiffs promptly filed a Second Amended Consolidated Complaint. Dkt. 491.

21.     The parties then briefed and argued Facebook's Motion to Dismiss the U.K. Plaintiffs. Dkts. 503, 516. The Court granted Facebook's motion in November 2020. Dkt. 571. This order limited the class to U.S. residents.

22.     In an effort to streamline discovery, the parties stipulated to the dismissal of twelve of the Named Plaintiffs in December 2020. Dkt. 590.

### 4.     Motions to Relate

23.     Co-Lead Counsel monitored state and federal dockets for potentially related cases throughout the course of litigation. In September 2018, Plaintiffs moved pursuant to Civil Local

Rules 3-12 and 7-11 to relate seven separate actions to this litigation: *Rankins v. Facebook Inc.*, No. 3:18-cv-05350-VC (N.D. Cal. Aug. 30, 2018), *Hwang v. Facebook, Inc.*, No. 3:18-cv-05357-JSW (N.D. Cal. Aug. 30, 2018), *Akins, et al. v. Facebook, Inc.*, No. 3:18-cv-05714-LB (N.D. Cal. Sept. 18, 2018), *Staggs, et al. v. Facebook, Inc.*, No. 3:18-cv-05754-EDL (N.D. Cal. Sept. 19, 2018), *Kmieciak, et al. v. Facebook, Inc.*, No. 3:18-cv-05752-DMR (N.D. Cal. Sept. 19, 2018), *Miller, et al. v. Facebook, Inc.*, No. 3:18-cv-05770-VC (N.D. Cal. Sept. 20, 2018), and *McDonnell, et al. v. Facebook, Inc.*, No. 3:18-cv-05811-JSC (N.D. Cal. Sept. 21, 2018). Dkts. 135, 144, 145, 147.

24.     The Court related all of these actions. *See* Dkts. 155, 161.

25.     In September 2019, Plaintiffs moved to relate *Hassan v. Facebook, Inc.*, No. 19-cv-01003-JST (N.D. Cal.). Dkt. 293. The Court related the action. Dkt. 311. That same month, Facebook moved to relate *Zimmerman v. Facebook, Inc.*, No. 3:19-cv-04591-WHO (N.D. Cal.). Dkt. 307. The Court related the action. Dkt. 320.

26.     In August 2021, Plaintiffs moved to relate *Kiss v. Flo Health, Inc. et al.*, No. 3:21-cv-04333-JD (N.D. Cal.). Dkt. 723. The Court denied the motion. Dkt. 735.

**B.     Discovery**

**1.     Overview of Discovery Litigation**

27.     Obtaining the facts necessary to substantiate the claims and position the case for success required Co-Lead Counsel's vigilance and perseverance. The parties engaged in near-daily emails, hundreds of letters and ongoing video conferences; mediation sessions before two Discovery Mediators (Judge Gail Andler (Ret.) and Daniel Garrie); and multiple motions to compel before the Court, U.S. Magistrate Judge Jaqueline Scott Corley,[3] and Special Master Daniel Garrie. As just one example of the extensive commitment required to conduct discovery, at Judge Corley's direction, at the outset of the pandemic, the parties met and conferred two to three times weekly by video conference between June 2020 and May 2021. The conferences

---

[3] While this case was in discovery, Magistrate Judge Corley was confirmed as a U.S. District Court Judge for the Northern District of California.

frequently lasted two hours each, and, due to the scope and complexity of novel issues, required the involvement of numerous counsel. This information is relevant to the Settlement to assure the Court that these claims were fully litigated and vetted.

28.     What follows are highlights of the discovery process and disputes relevant to this Motion for Preliminary Approval in which the parties engaged over the course of the last three years.

### a.     Appointment of Judge Corley

29.     In March 2020, the Court referred this action for all discovery purposes to then Magistrate Judge Corley. Dkt. 390. Judge Corley conducted more than 20 hearings and issued more than a dozen orders, many of which addressed more than one dispute.

### (i)     Discovery Protocol

30.     The parties agreed to a process for bringing disputes before Judge Corley that required the parties to comply with several procedures before bringing a discovery dispute before the Court. Dkt. 393.

31.     For several months after discovery was referred to her, Judge Corley held discovery conferences approximately every two weeks, and thereafter on a monthly basis with some exceptions. The parties submitted joint status reports on the various discovery issues before each of the hearings. *See* Discovery Hearing Tr. 5:6–16, Apr. 17, 2020.

### (ii)     Meet and Confers

32.     Judge Corley initially instructed the parties to meet and confer by video conference three times per week for at least two hours, unless they agreed that fewer meetings were necessary. Dkt. 404. The parties met and conferred three times per week from late April 2020 until mid-August 2020. At that time, the parties determined that a twice-weekly schedule would be more productive.

33.     The parties continued to meet and confer twice weekly until April 2021, when they began mediation sessions with Discovery Mediator Andler. Ultimately, pursuant to Judge Corley's instruction, the parties met and conferred for over two hundred hours. Due to the

breadth of the issues, the extensive relevant time period, and the technical nature of many disputes, all of these conversations required the attendance of multiple counsel representing each party.

### b. Appointment of Discovery Mediators

34. In March 2021, as a result of the complexity of the discovery disputes, Judge Corley suggested, and the parties agreed, to retain Judge Andler of JAMS to serve as a discovery mediator. Dkt. 646. At Judge Andler's request, the parties agreed that Daniel Garrie, a JAMS mediator and arbitrator, would assist Judge Andler in the discovery mediation of the parties' often technically complex disputes. Dkt. 662.

35. Discovery Mediators Judge Andler and Mr. Garrie conducted seventeen separate mediation sessions between April and October 2021. Each session lasted at least two hours, and some lasted about five hours. Each session was attended by multiple attorneys representing each party including, at the Discovery Mediators' request, co-lead counsel. During this time, the parties also continued to meet and confer once a week.

### c. Appointment of Discovery Special Master

36. In July 2021, the Court additionally appointed Discovery Special Master Garrie. Dkt. 708. Between the date of his appointment and the date the parties notified the Court that they had reached an agreement in principle to settle the case, Special Master Garrie issued approximately 40 discovery orders in this litigation, as well as additional protocols and amended orders.

### 2. Discovery Obtained by Plaintiffs Through These Extensive Discovery Processes

### a. FTC Materials

37. Early in the case, Plaintiffs sought production of materials related to a Federal Trade Commission's ("FTC") investigation and subsequent enforcement actions against Facebook that resulted in the payment of $5 billion to the FTC. The proceedings arose from allegations that Facebook deceived users about their ability to control the privacy of their personal information—allegations closely related to those here. Plaintiffs requested all discovery

and information Facebook had disclosed to the FTC. The parties met and conferred extensively on this issue in late 2019 and early 2020, and discussed the materials with the Court at a hearing on January 8, 2020. Dkt. 366. Facebook subsequently produced these documents in March and April of 2020. *See* Dkt. 400. These materials provided insight into what practices Facebook had discontinued and which are subject to oversight by the FTC.

### b.   Custodian Selection and Search Terms

38.   The parties engaged in extensive negotiations and litigation regarding custodians and search strings lasting nearly a year.

39.   In the end, the process for selecting custodians and search terms, which spanned from February 2020 to April 2021, resulted in 138 search terms that were applied to 85 unique groupings of the 81 initial custodians. These terms yielded production of significant amounts of evidence, including internal emails, analyses and information about what user data was shared with third parties. In total, Facebook produced more than five million pages of documents.

### c.   Privileged Documents

40.   Facebook began producing privilege logs in August 2020. Under the governing protocol, Plaintiffs timely challenged appropriate documents on those logs by individually reviewing information provided on the log and documents and crafting document-specific challenges to each privilege designation. The parties continued to negotiate Plaintiffs' challenges to the privilege designation of certain documents throughout 2020, 2021, and 2022. As a result of these negotiations, Plaintiffs obtained production of more than sixty thousand documents that were previously withheld.

### d.   Named Plaintiffs' Data

41.   Plaintiffs' discovery regarding the data that Facebook collects on its users was greatly informed by the exemplar data pertaining to each of the Named Plaintiffs, and information regarding Facebook's use of that data. This discovery is at the core of Plaintiffs' claims regarding Facebook's collection, use, and disclosure of user data, and to Plaintiffs' efforts to certify this class. Plaintiffs first sought this discovery formally in November 2019.

42.     In August 2020, Plaintiffs sought permission to move to compel additional Named Plaintiffs' data. *Id.* at 2–3. Judge Corley concluded that the dispute was ripe and ordered briefing on the scope of discoverability of data related to Named Plaintiffs. Dkt. 508 (setting briefing schedule); Dkts. 515, 526, 537, 548 (the parties' briefs). On October 29, 2020, Judge Corley issued an order concluding that "discoverable user data at issue includes" three categories of information: (1) information "collected from a user's on-platform activity"; (2) information "obtained from third parties regarding a user's off-platform activities"; and (3) information "inferred from a user's on or off-platform activity." Dkt. 557 at 2. Plaintiffs took multiple 30(b)(6) depositions and obtained significant discovery relating to Named Plaintiffs.

43.     Over two years, Plaintiffs filed dozens of submissions to the Court and Special Master addressing Named Plaintiffs' data disputes. During that time, Plaintiffs participated in six hearings before the Court concerning the disputes, participated in five half-day hearings held by the Special Master to explore Facebook's data systems, sent scores of emails and letters to Facebook, and met and conferred with Facebook dozens of times regarding the production of Named Plaintiffs' data. Throughout this process, Plaintiffs engaged the assistance of technical experts to analyze Facebook's responses, testimony, and document production; to draft questions for Facebook regarding the data systems it uses to maintain data relating to Named Plaintiffs; and to craft proposals for production of data from these systems. Plaintiffs obtained production of data from Hive, Switchboard files and other Named Plaintiff data.

### e.     Documents Related to the App Developer Investigation

44.     Facebook's App Developer Investigation ("ADI") began in March 2018 as part of Facebook's public response to the Cambridge Analytica scandal. The publicly-stated purpose of the ADI was to investigate whether third-party apps improperly accessed or misused the information of Facebook users. Dkt. 877 at 12. The parties engaged in extensive and protracted motions practice regarding the ADI. Production of ADI documents was critical to discovering what Facebook learned when it investigated improper access to user data by third parties.

Plaintiffs ultimately obtained over 358,000 documents following rulings by Judge Corley and Special Master Garrie. *See* Sanctions briefing. Dkt 1052-2 at 14.

### f. Production of Financial Documents

45.     In November 2019, Plaintiffs issued discovery requests seeking basic financial information about how Facebook monetizes, quantifies, and ultimately values the user data and information at issue in this case. These requests were relevant to calculating damages. Information about how Facebook and third parties valued or otherwise quantified user data would be a starting point for Plaintiffs to determine the monetary value to assign the claims at issue in this litigation.

46.     Plaintiffs raised the issue with Judge Corley in April 2020. Dkt. 413. After extensive litigation and hearings on the issue, and rulings by Judge Corley and the Special Master, and negotiations with the Discovery Mediators, Facebook produced relevant and responsive financial information in the spring of 2022. This included evidence that permitted Plaintiffs to analyze the revenue impact to Facebook relating to the data sharing practices challenged by Plaintiffs. Facebook completed this production in August 2022.

### g. Documents Related to Facebook's Arrangements with Business Partners

47.     Soon after the Court's order on the Motion to Dismiss, in October 2018, Plaintiffs asked Facebook to identify the business partners with which Facebook has shared its users' content and information, including the contracts and agreements Facebook had with these partners. Judge Corley ultimately ruled in early 2021 that Facebook "shall identify all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner.'" Dkt. 608 at 2. The Special Master reiterated that Order and Facebook ultimately produced significant discovery relating to Facebook's relationships with business partners which bore directly on the contested issue of what user data Facebook shared with them.

### h.    The "Secret Sauce" Memorandum

48.    On December 17, 2020, Plaintiffs asked Facebook to produce a document referenced in a complaint filed against Facebook for violation of federal antitrust laws in the United States District Court of the District of Columbia. Complaint, *State of New York et al. v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C. Dec. 9, 2020), Dkt. 4. The complaint discussed a 2008 internal report called "Facebook Secret Sauce" (the "Secret Sauce Report") that allegedly identified as one of the four pillars of Facebook's success the fact that it was responsive to users' desire for privacy and gave them control over their data. *Id.* ¶ 76. Plaintiffs' request for this report noted that it was responsive to several of Plaintiffs' RFPs. Facebook offered to produce the report under conditions unacceptable to Plaintiffs. Plaintiffs continued to raise the issue directly with Facebook and during the parties' discovery mediation sessions. Facebook eventually agreed to produce the Secret Sauce Report.

49.    After briefing, the Special Master granted Plaintiffs' motion to compel on January 31, 2022 and ordered Facebook to produce (i) subsequent iterations of the Secret Sauce Report, (ii) metadata associated with the previously-produced version of the report, (iii) relevant, non-privileged communications to which other iterations of the report are attached, and (iv) relevant, non-privileged communications that are in its existing review set and are relevant to Plaintiffs' RFPs. Dkt. 827 ¶ 14. The Special Master also required a good faith effort to identify and search additional custodians for relevant, non-privileged documents to be produced reflecting discussions that informed any iteration of the Secret Sauce Report. *Id.* Facebook moved for reconsideration of the Special Master's order on February 2, 2022. The Special Master denied it. Dkt. 846.

50.    Facebook ultimately produced 24 documents consisting of iterations of the Secret Sauce Report and communications regarding the same.

### i.    Production of the Zuckerberg Notebooks

51.    Plaintiffs identified an excerpt from Mark Zuckerberg's personal notebooks included in journalist Steven Levy's book *Facebook: The Inside Story*, as well as in an article

adapted from his book published in Wired magazine on February 12, 2020. Both the book and article detail entries from Zuckerberg that address issues relevant to Plaintiffs' claims, such as the gaps between Facebook's internal and public-facing statements regarding user privacy. According to Levy, Zuckerberg used these notebooks to "convey a detailed version of this product vision" to others. *The Inside Story* at 118.

52. Plaintiffs first brought the notebooks to Facebook's attention in their April 3, 2020 Rule 30(b)(6) deposition notice. On September 29, 2021, the Special Master issued an order granting Plaintiffs' motion to compel and ordering Facebook to search for the notebooks and report back on its findings. *Id.* Pursuant to the Special Master's order, Facebook engaged in an investigation to locate the notebooks. On November 12, 2021, it reported that it had not found the documents. Special Master Garrie held an *ex parte* with Facebook hearing to discuss what steps were taken in the search. On January 3, 2022, Plaintiffs inquired with the Special Master on the status of the search; the Special Master reported that Facebook had agreed to take additional steps to locate the materials. On January 27, 2022, after litigating the matter to a close, Facebook informed the Special Master and Plaintiffs that it had not located any existing notebooks, in full or in part.

### j.    Documents from the Files of Mark Zuckerberg and Sheryl Sandberg

53. Shortly after the Court's motion to dismiss order, Plaintiffs sought discovery from Facebook's senior executives, Mark Zuckerberg and Sheryl Sandberg. In their initial February 2020 proposal of custodians whose files should be collected, reviewed, and produced, Plaintiffs included Mark Zuckerberg and Sheryl Sandberg. Dkt. 753, Ex. A at 2. Ultimately, though, the parties were only able to agree on a set of 72 initial custodians that did not include Zuckerberg or Sandberg, and the Court ordered the addition of nine others, who did not include Zuckerberg or Sandberg, on May 15, 2020. Dkt. 436.

54. By November 2020, Plaintiffs believed they had sufficient cause based on the documents produced to date to request that Facebook add Zuckerberg and Sandberg as document

custodians. There was extensive discovery mediation and litigation over search terms and processes to search for documents relating to these executives.

55.     As a result of this process, Plaintiffs secured the production of 5,428 documents custodial to Zuckerberg and 11,852 documents custodial to Sandberg. Plaintiffs were preparing to use many of these documents in the scheduled depositions of Zuckerberg and Sandberg.

### k.     Documents Related to Cambridge Analytica Case Studies

56.     Documents produced by Facebook referred to certain case studies and reports relating to Facebook's work with Cambridge Analytica that had not been produced. Plaintiffs asked Facebook to produce the documents. After negotiating the request, Facebook was unwilling to produce the information sought by Plaintiffs. Plaintiff moved to compel production of the documents in January 2022 before the Special Master. Special Master Garrie ordered Facebook to produce all non-privileged case studies and presentations addressing work by Facebook on behalf of the Trump campaign or any PAC active in the 2016 presidential campaign in which Facebook interacted with Cambridge Analytica or any of its affiliates. Dkt. 832. In April 2022, Facebook produced over one hundred documents totaling over one thousand pages related to the case studies.

### l.     Documents Related to PricewaterhouseCoopers LLP

57.     PricewaterhouseCoopers LLP ("PwC") was retained by Facebook in connection with its 2012 Consent Decree with the FTC. Specifically, PwC was tasked with providing independent biannual assessments of Facebook's Privacy Program and submitted four separate reports to Facebook (who in turn provided these reports to the FTC) in 2013, 2015, 2017, and 2019. Significantly, PwC's 2019 report concluded, among other things, that "Facebook's privacy controls were not operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information."[4]

---

[4] Emily Birnbaum, *Latest audit faulted Facebook for failing to protect user privacy*, The Hill (July 26, 2019, 6:56 PM), https://thehill.com/policy/technology/454978-independent-audit-finds-facebook-did-not-effectively-protect-user-privacy/.

58.     Plaintiffs sought PwC discovery of the evidence underlying this report. It took PwC nearly two years to produce all documents sought by Plaintiffs. Facebook also identified many of the relevant employees after Judge Corley ordered it to do so. Dkt. 420. Discovery related to PwC's assessment reports was vital to understanding Plaintiffs' monitoring claim. The discovery was also important to identify other custodians and deponents.

### 3.     Plaintiffs' Discovery Obligations

#### a.     Early Depositions of Named Plaintiffs

59.     On January 24, 2020, Facebook served deposition notices on each of the then-Named Plaintiffs. At this time, the parties had not yet agreed to a deposition protocol or to the lifting of the 10-deposition limit imposed on each party. The parties were also still negotiating search terms and other aspects of the production of ESI discovery. As a result, there had been very little meaningful document production.

60.     Plaintiffs objected to the depositions on these bases on February 19, 2020, and proposed postponing the depositions until 90 days following completion or substantial completion of Facebook's production of documents relevant to a given Named Plaintiff. Facebook continued to seek depositions beginning in March, and continuing in April and May.

61.     Ultimately, these depositions were delayed due to the onset of the COVID-19 pandemic and the parties' need to negotiate a remote deposition protocol.

62.     In November 2021, the parties agreed to schedule two Named Plaintiff depositions in December 2021 with others to follow in January 2022 and thereafter. Plaintiffs spent many hours scheduling and preparing witnesses on that timeline. Facebook took the depositions of Named Plaintiffs Cheryl Senko and Tyler King on December 10, 2021 and December 20, 2021, respectively, but postponed all other depositions on January 18, 2022. Ultimately, the depositions of the Named Plaintiffs resumed in early March 2022 and concluded at the end of April 2022.

### b. Depositions of Former Named Plaintiffs

63.     On December 6, 2021, Facebook moved the Special Master to order depositions of the individuals who had formerly been Named Plaintiffs but had withdrawn from that role. Facebook argued that it had retained the right to take the former Named Plaintiffs' depositions even though they had been voluntarily dismissed from the case and were now akin to absent class members.

64.     The parties exchanged further briefing and on December 16, 2021, Special Master Garrie denied Facebook's motion. On December 23, 2021, Facebook appealed the ruling to Judge Corley, Dkt. 782, who, on January 12, 2022, denied the motion without prejudice to renewal after all current Named Plaintiffs' depositions had been taken. Dkt. 805.

### c. Plaintiffs' Responses to RFPs 31–34

65.     Facebook's RFPs 31 through 34 sought documents sufficient to show posts on Plaintiffs' off-Facebook social media accounts depicting (i) any personal family photographs or videos that are substantially similar to any personal family photographs or videos the Plaintiff shared on Facebook and (ii) any personal perspectives regarding politics, religion, relationships, work, and family that are substantially similar to such personal perspectives that the Plaintiff shared on Facebook. These RFPs also sought documents sufficient to show any privacy settings or restrictions placed on these posts." Plaintiffs objected to the requests because Facebook already had access to any potentially relevant public posts, and any nonpublic information could not be relevant and sharing that information would violate Plaintiffs' privacy rights. Dkt. 834. In addition, Plaintiffs raised concerns about the vague definition of "substantially similar." *Id.* ¶ 9.

66.     The parties discussed the dispute in a November 9, 2021 meet-and-confer. *Id.* ¶ 4. Facebook brought the issue to mediation in December 2021. Plaintiffs responded to Facebook's position by letter on January 4, 2022. *Id.* ¶ 6. The Discovery Mediators declared impasse on January 13. *Id.* ¶ 7.

67.     On January 20, 2022, Facebook moved to compel Plaintiffs' responses to RFPs 31–34. *Id.* ¶ 8. Plaintiffs opposed the motion. *Id.* ¶ 9. The Special Master ruled in Facebook's

favor on February 8, 2022. *Id.* ¶¶ 11–15. Plaintiffs provided supplemental responses to RFPs 31–34 accordingly.

### d.   Responses to Interrogatories 15–16

68.   In November 2021, after meeting and conferring with Plaintiffs on their responses to Facebook's Third Set of Interrogatories, Facebook informed Plaintiffs that it intended to move to compel production of Interrogatories 15 and 16. The parties mediated the dispute in December 2021. Facebook submitted the issue for impasse, which the Special Master declared on January 13, 2022.

69.   On January 21, 2022, Facebook moved to compel Plaintiffs to respond to Interrogatories 15 and 16. *See* Dkt. 845 ¶ 5. In general, Interrogatories 15 and 16 asked Plaintiffs to identify, to their knowledge, certain apps and devices that their Facebook friends used between January 1, 2007 and December 31, 2009. *Id.* ¶ 2. Plaintiffs objected to this discovery and opposed the motion on a number of grounds, including burden and proportionality.

70.   On February 10, 2022, the Special Master ruled in Facebook's favor, ordering Plaintiffs to respond to Interrogatories 15 and 16, which Plaintiffs completed by April 2022.

### 4.   Sanctions Motion

71.   At the February 2022 case management conference, the Court invited Plaintiffs to file a motion for sanctions based on how discovery had proceeded in the action. Dkt. 863. Plaintiffs filed their motion for sanctions, Dkt. 879, and Facebook responded, Dkt. 911. Additional briefing has also been filed. Dkt. 1050-3; *see also* Dkts. 998, 1079, 1080. The matter is under submission and is expressly carved out from the Settlement Agreement.

## C.   Discovery

72.   This case involved an extraordinary amount of discovery on both sides, including the production of approximately 1,940,253 documents by the parties and third parties, totaling over 9,660,682 pages; 34 fact depositions by the parties; approximately 20 days of 30(b)(6) deposition testimony; and dozens of discovery disputes including those summarized above. The

parties were actively engaged in discovery for nearly three years—from early November 2019 to late August 2022.

### 1.  Discovery Plaintiffs Produced

73.    The parties exchanged significant written discovery in this case. Facebook propounded 100 interrogatories, 39–41 requests for admission (per Plaintiff), and 42 requests for production.

74.    Plaintiffs produced 21,484 documents totaling 91,099 pages, including information that Plaintiffs posted on the Facebook platform, such as shares, posts, likes, and messages; spam emails received by the Plaintiffs; and significant documentation regarding Plaintiffs' non-Facebook social media accounts, such as LinkedIn or Twitter. These documents established what data Plaintiffs shared with restricted audiences only and what apps they used, and were thus related to harm and standing.

75.    Plaintiffs produced 1,622 pages of responses to Facebook's interrogatories, requests for production, and requests for admissions.

### 2.  Discovery Plaintiffs Received and Reviewed

#### a.  Discovery Plaintiffs Received from Facebook

76.    Plaintiffs propounded 99 interrogatories, 54 requests for admission, and 90 requests for production. Facebook provided more than 500 pages of interrogatory responses, and produced nearly 6 million pages of documents. These documents included, among other materials, Plaintiffs' DYI files—which made up nearly one million pages of the documents produced—and other information made available on the Facebook user platform, internal documentation and communications regarding ADI and other app review programs at Facebook, communications with third party app developers, and internal communications regarding the Cambridge Analytica scandal and Facebook's response.

77.    Facebook also produced significant volumes of structured data, including the Method Table, the Capabilities tool, and data regarding the Named Plaintiffs in a series of structured data exports.

78.     Plaintiffs have undertaken the effort of reviewing and understanding this extraordinary amount of discovery. In addition to their initial review, discovery analysts were also tasked with evaluating documents for, among other things, potential deponents; information relevant to the four categories of misconduct; production errors and improper withholding; and evidence that would support Plaintiffs' remaining claims and class certification. Discovery analysts were also tasked with conducting targeted searches and piecing together narratives from disparate email threads and documents, such as enforcement strategies or actions taken against a developer over time. They authored numerous review summaries highlighting the most important evidence for other members of the team, as well as identifying issues for which Plaintiffs needed to develop additional evidence.

### b.     Documents Plaintiffs Received from Former Facebook Employees

79.     Plaintiffs also received documents produced by three former Facebook employees relating to their employment at Facebook. Plaintiffs subpoenaed each of these former employees then met and conferred with their counsel several times during the last year and exchanged numerous letters clarifying and, in some circumstances, limiting the scope of Plaintiffs' requests. Three former employees—James Barnes, Joseph Chancellor, and Carl Sjogreen—produced 70,267 documents in response to Plaintiffs' subpoenas.

### c.     Documents Plaintiffs Received from Third Parties

80.     Plaintiffs obtained and reviewed significant discovery from numerous third parties. The types of third parties Plaintiffs subpoenaed include, for example, developers of applications that accessed Facebook's user data (e.g., NationBuilder, CubeYou, Inc., Flo Health Inc., and X1 Discovery, Inc.), business partners with whom Facebook exchanged user data (e.g., DNP Imagining Comm.), and data brokers that provided off-platform data to Facebook in exchange for money or in-kind data (e.g., Acxiom LLC). It also includes entities engaged by Facebook to provide auditing support and other services to Facebook (e.g., Ernst & Young LLP, Infostar LLC, PwC, FTI Consulting, Inc. and Stroz Friedberg, LLC). In total, Plaintiffs subpoenaed 58 third parties, resulting in the production of 335,544 documents from 28 third

parties. This discovery helped reveal what information Facebook shared with third parties about users and how Facebook was compensated for that, as well as Facebook's vigilance in monitoring third party access. Some highlights of Plaintiffs' third-party discovery include the following productions:

A.      On February 2, 2020, Plaintiffs served a subpoena on PwC for documents relating to its engagement to audit and assess Facebook's Privacy Program and its privacy-related processes or controls. PwC made productions on April 24, 2020, May 19, 2020, June 19, 2020, September 28, 2021, and July 25, 2022, totaling 5,160 documents.

B.      On February 11, 2020, Plaintiffs served a subpoena on Ernst & Young LLP ("E&Y") for documents relating to its assessment of Facebook user data and its assessment of Facebook's potential liability arising out of Plaintiffs' claims. E&Y made productions on June 5, 2020 and August 25, 2020, totaling 1,473 documents.

C.      On March 10, 2020, Plaintiffs subpoenaed Flo Health for documents relating to Facebook user data it provided to and received from Facebook. Flo Health made productions on May 18, 2020 and July 28, 2020, totaling 32 documents.

D.      On March 11, 2020, Plaintiffs served DNP for documents relating to its engagement with Facebook to access Facebook user data for the purpose of allowing Walgreens' customers to access their Facebook photos at kiosks in Walgreens' retail locations. Dkt. 491 ¶ 513. DNP made productions on April 17, 2020 and June 23, 2020, totaling 68 documents.

E.      On June 19, 2020, Plaintiffs served a subpoena on Lodestone for documents relating to its engagement to test or monitor Facebook's privacy-related features and functionalities. Lodestone made productions on September 23, 2020 and April 26, 2021, totaling 90 documents.

F.      On June 19, 2020, Plaintiffs subpoenaed Stroz Friedberg for documents relating to its engagement with Facebook to audit third parties. Stroz Friedberg made productions on May 30, 2022, July 27, 2022, and August 19, 2022, totaling 7,802

documents. Stroz Friedberg has also identified additional documents in response to Plaintiffs' subpoena but paused all productions efforts with respect to these documents following the Court's order staying discovery. Dkt. 1015.

G.      On July 23, 2020, Plaintiffs subpoenaed 3DNA Corp. (d.b.a. NationBuilder) for documents relating to its access to user and friend data acquired through apps on Facebook's platform. NationBuilder made productions on October 2, 2020 and February 14, 2021, totaling 83 documents.

H.      On July 23, 2020, Plaintiffs served CubeYou for documents relating to Facebook user information accessed from Facebook's platform. On November 5, 2020, CubeYou produced 116 documents in response to Plaintiffs' subpoena.

I.      On August 14, 2020, Plaintiffs subpoenaed X1 Discovery for documents relating to Facebook user information accessed from Facebook's platform. On September 18, 2020, X1 produced 546 documents in response to the subpoena.

J.      On October 2, 2020, Plaintiffs subpoenaed Acxiom for documents relating to its relationship with Facebook to share and receive user data. Acxiom responded on December 21, 2020, with a small production consisting of its contract with Facebook to exchange information and the litigation hold it issued in this matter. On March 17, 2021, Plaintiffs served a supplemental subpoena adding 9 requests for additional documents relating to Acxiom's relationship with Facebook. From August 2021 to September 2021, Acxiom produced 165,875 documents in response to the subpoena.

K.      On December 2, 2020, Plaintiffs served FTI Consulting for documents relating to its engagement with Facebook to audit third parties. FTI Consulting was initially represented by attorneys from Winston & Strawn LLP. Plaintiffs met and conferred with Winston & Strawn attorneys on February 8, 2021, and exchanged several letters regarding Plaintiffs' subpoena. Plaintiffs were later informed that Gibson, Dunn & Crutcher LLP attorneys represented FTI Consulting with respect to Plaintiffs' subpoena.

FTI Consulting made productions on June 24, 2022, August 12, 2022, and August 16, 2022, totaling 154,116 documents.

81.     In addition to Plaintiffs' efforts in seeking discovery from third parties under Fed. R. Civ. P. 45, Plaintiffs also sought documents from state and federal agencies under freedom of information act laws. Most significantly, Plaintiffs sent several requests under the Freedom of Information Act, 5 U.S.C. § 552, to the FTC for records relating to its investigation and inquiry of Facebook's privacy practices, including documents relating to the 2012 Consent Decree and 2019 Settlement. Plaintiffs received over 2,800 documents in response to these FOIA requests.

### 3.     Depositions Plaintiffs Defended

82.     Starting in December 2021 and continuing throughout early 2022, Facebook conducted depositions of all eight Named Plaintiffs.

83.     Plaintiffs' counsel worked with the Named Plaintiffs to prepare for these depositions, including by attending multiple separate preparatory sessions over videoconference and telephone. During these intensive sessions, Plaintiffs reviewed and discussed documents that the Named Plaintiff had produced, their discovery responses, relevant documents produced by Facebook, anticipated lines of questioning, and the overall strategy and goals for the depositions. Counsel's preparation for these depositions was significant, including a re-review of all documents and discovery responses provided by each Plaintiff and the development of a specific deposition preparation plan for each Plaintiff. For example, Facebook asked each Plaintiff to identify every Facebook friend they had ever met in person and specific questions about their relationships with each Facebook friend and specific posts. Given the volume of activity on the platform, preparation was exceedingly detailed and time intensive. Such preparation was critical to ensure the Plaintiffs responsible for representing the best interests of millions of potential class members were prepared for their depositions. Each Named Plaintiff was extremely dedicated to this case and spent far beyond the average number of hours to respond to discovery in this action, as discussed in their respective declarations, attached hereto as composite **Exhibit 7**, as follows:

| EXHIBIT | NAMED PLAINTIFF DECLARATION |
|---------|------------------------------|
| 7-A | Declaration of Steven Akins |
| 7-B | Declaration of Jason Ariciu |
| 7-C | Declaration of Anthony Bell |
| 7-D | Declaration of Bridgett Burk |
| 7-E | Declaration of Terry Fischer |
| 7-F | Declaration of Tyler King |
| 7-G | Declaration of Jordan O'Hara |
| 7-H | Declaration of Cheryl Senko |

84.     In addition, before their depositions, Plaintiffs all re-reviewed relevant case documents, including the complaint, discovery responses, dispositive orders, and the deposition notices.

**4.     Depositions Plaintiffs Took**

**a.     Depositions of Current and Former Facebook Employees**

85.     Plaintiffs conducted fact witness depositions of thirty-four former and current Facebook employees identified from Plaintiffs' independent research, Facebook's initial disclosures, its list of document custodians, and Plaintiffs' review of documents produced by Facebook.

86.     To prepare for these depositions, Plaintiffs carefully analyzed documents produced by Facebook and, where pertinent, third parties. Some deponents appeared on tens of thousands of documents.

87.     The parties had already scheduled depositions set to take place in late August and September 2022, by which time the case was stayed. Among the scheduled depositions were those of three current and former Facebook senior executives: Javier Olivan, Sheryl Sandberg, and Mark Zuckerberg.

88.     Plaintiffs took the following depositions (the position noted is the deponent's last known position at Facebook):

| Current and Former Facebook Employees | | |
| --- | --- | --- |
| **Deponent** | **Position** | **Deposition Date(s)** |
| Jackie Chang | Director of Platform Product Partnerships | December 16, 2021 |
| Eugene Zarashaw | Engineering Director | December 22, 2021 |
| Sam Lessin | Vice President of Product Management | January 13, 2022 |
| Jeremy Galen | Product Manager | January 26, 2022 |
| Grace Molnar | Global Developer Policy Operations | February 3, 2022 |
| Steven Elia | Software Engineering Manager | February 16, 2022 |
| Antonio Garcia-Martinez | Product Manager | February 23, 2022 |
| Anne Lewis | Senior Program Manager | March 3, 2022 |
| Shirine Sajjadi | Privacy & Policy Manager | March 4, 2022 |
| Mike Vernal | Vice President of Search, Local, and Developer Products | March 18, 2022 |
| Deborah Liu | Vice President, Facebook App Commerce | March 25, 2022 |
| Matt Trainer | Head of Program Management, Facebook Marketing Partner Program | March 30, 2022 |
| Bill Fusz | Head of Operations Global Developer | April 7, 2022 |
| Aldo King | Privacy Program Manager | April 8, 2022 |
| Luke Conlan | Developer Operations Project Manager | April 21, 2022 |
| Justin Osofsky | Chief Operating Officer, Instagram | April 26, 2022 |
| Douglas Purdy | Director of Product Management | May 24, 2022 |
| Anne-Marie Lentini | Technical Program Manager | June 15, 2022 |
| Yul Kwon | Director of Product Management | June 20, 2022 |
| Vladimir Fedorov | Data Engineer | June 24, 2022 |
| Luke Shepard | Engineering Manager, Platmobile | June 28, 2022 |
| Carl Sjogreen | Director of Product Management | June 30, 2022 |
| Mustafa Khan | Marketing & Operations Specialist | July 13, 2022 |
| Monika Bickert | Head of Global Policy Management | July 13, 2022 July 14, 2022 July 20, 2022 |
| Robert Sherman | Vice President and Deputy Chief Privacy Officer for Policy | July 28, 2022 |
| Eddie O'Neil | Director of Product Management; Head of Platform | August 10, 2022 |
| Konstantinos Papamiltiadis | Vice President | August 12, 2022 |
| Monica (Walsh) Mosseri | Product Partnerships Manager | August 15, 2022 |
| Erin Egan | Vice President of Public Policy; Chief Privacy Officer of Public Policy | August 18, 2022 |
| Steve Satterfield | Director of Privacy and Public Policy | August 19, 2022 |

| Dan Rose | Vice President of Partnerships | August 23, 2022 |
|---|---|---|
| Ime Archibong | Head of New Product Experimentation | August 24, 2022 |
| Reagan Williams | Director of Business Engineering | August 25, 2022 |
| Allison Hendrix | Public Policy Director on Privacy and Data Policy | August 26, 2022 |

### b.     30(b)(6) Depositions

89.     Plaintiffs elicited 110 hours of 30(b)(6) testimony over twenty days from thirteen corporate representatives of Facebook on more than ten topics containing dozens of subtopics. Topics included the types of data and information that Facebook sold, made accessible, or allowed third parties to use; the processes of developing Facebook's privacy and app settings and other controls made available to users which Facebook asserted could prevent or limit user data or information from being accessed by third parties; and Facebook's processes of pseudonymization, de-identification, re-identification, association, and deletion of user data and information, as well as how the Facebook platform functioned, which third parties were given access to friend data through APIs, permissions and capabilities and changes made to the Facebook platform to address and eliminate friend sharing, related whitelisting and other practices at issue in the case.

90.     As with lay-witness depositions, deposing Facebook's corporate designees required an enormous amount of preparation. Many of the depositions concerned complex and technical matters, requiring significant research, expert assistance and close study of Facebook's productions.

91.     The 30(b)(6) depositions were document-intensive as Plaintiffs sought binding, corporate testimony regarding key information, including admissions in documents produced by Facebook and provided to the witnesses in advance of the depositions. This testimony was extremely helpful to curing the information asymmetry between the parties on certain issues, including what data Facebook collects about users and to what extent it shares it with users, as well as specific technical facts relating to the statutory claims, including VPPA and SCA.

### 5. Depositions of Third Parties

92.     Plaintiffs served deposition subpoenas on three third parties, PwC, Stroz Friedberg, and FTI Consulting.

93.     On December 3, 2021, Plaintiffs served a deposition subpoena on PwC pursuant to Rule 30(b)(6). Plaintiffs met and conferred with counsel for PwC on December 17, 2021, January 21, 2022, and February 11, 2022, about the scope of Plaintiffs' subpoena. Plaintiffs took the 30(b)(6) deposition of PwC on July 26, 2022.

94.     On March 7, 2022, Plaintiffs served a deposition subpoena on Stroz Friedberg pursuant to Rule 30(b)(6), one of two forensic investigators Facebook employed in the ADI to investigate developers for data misuse. On March 31, 2022, counsel for Stroz Friedberg (which was then represented by Gibson, Dunn & Crutcher LLP, the same counsel that represents Facebook) served responses and objections to Plaintiffs' deposition subpoena on behalf of Stroz Friedberg. Plaintiffs exchanged correspondence with counsel for Stroz Friedberg regarding these subpoenas. Gibson Dunn attorneys later informed Plaintiffs that Stroz Friedberg was represented by Latham & Watkins LLP. Plaintiffs met and conferred with Latham attorneys who represented Stroz Friedberg about Plaintiffs' subpoena on May 4, 2022, July 8, 2022, and August 4, 2022. Plaintiffs were scheduled to depose Stroz Friedberg on September 16, 2022, but the deposition was postponed following the Court's order staying discovery. Dkt. 1015.

95.     On March 7, 2022, Plaintiffs served a deposition subpoena for the deposition on FTI Consulting pursuant to Rule 30(b)(6). FTI Consulting was the second forensic consulting company retained by Facebook to assist with the ADI. On March 31, 2022, counsel for FTI Consulting (Gibson Dunn, the same counsel that represents Facebook) served responses and objections to Plaintiffs' deposition subpoena. Plaintiffs met and conferred with counsel for FTI Consulting regarding Plaintiffs' deposition subpoena on May 10, 2022 and June 13, 2022. Plaintiffs and counsel for FTI Consulting also included discussions of this deposition subpoena on the agenda for Plaintiffs' bi-weekly meet and confers with Facebook from May 2022 to

August 2022. Plaintiffs were scheduled to depose FTI Consulting on August 30, 2022 but this deposition was postponed following the Court's order staying discovery. Dkt. 1015.

**D.    Settlement**

**1.    The Settlement Negotiations were Hard-Fought and Extensive**

96.    Resolution of this action was extraordinarily hard fought and required two mediators, days of in-person mediation, and dozens of videoconferences and telephone calls with the mediators to reach the initial agreement. Intensive discussions continued for months even after the agreement in principle was reached.

97.    The parties retained former federal Magistrate Judge Jay C. Gandhi to serve as the settlement mediator in June 2021. The parties provided Judge Gandhi with extensive litigation materials, including mediation statements, summaries of pleadings and key discovery from the litigation, and detailed responses to questions provided by Judge Gandhi. Plaintiffs conducted several telephonic meetings with Judge Gandhi, as well as a joint telephonic meeting with Facebook on September 10, 2021. Judge Gandhi's experience mediating class actions, including data privacy cases, and involvement throughout the lengthy negotiation process are set forth in the Declaration of Jay C. Gandhi, attached hereto as **Exhibit 3**.

98.    On November 20, 2021, the parties and Judge Gandhi met via Zoom for an all-day mediation session. Plaintiffs started the mediation with a detailed, evidentiary-based presentation discussing the claims and the evidence developed to date. Facebook gave a presentation of its own. After several hours of discussion, the mediation ended without resolution. Litigation ensued for many more months, during which time the parties continued to meet with Judge Gandhi. Plaintiffs provided Judge Gandhi with updates regarding the litigation, including the results of motions practice and discovery.

99.    On April 18, 2022, the parties met in person with Judge Gandhi in San Francisco for a second full day mediation. Despite extensive discussion with the mediator, both separately and jointly, the day ended without a resolution. In the ensuing months, Plaintiffs continued to provide Judge Gandhi with discovery orders issued in the case, key pleadings and key evidence

obtained by Plaintiffs. The parties also spoke separately with Judge Gandhi on multiple occasions through which settlement demands and offers were exchanged. No agreement was reached through those efforts.

100.     On May 27, 2022, Plaintiffs met in person with Judge Gandhi in San Francisco to discuss the status of the case and potential paths for resolution. Over the ensuing several months, the parties spoke with Judge Gandhi on multiple occasions, and he engaged in shuttle diplomacy. At the same time the parties pressed forward with the litigation.

101.     On August 17, 2022, Plaintiffs met again with Judge Gandhi and Facebook. Progress was made regarding a potential resolution and after several days, an agreement in principle was reached on the dollar amount of the settlement.

102.     Over the ensuing several weeks, the parties negotiated other terms of the agreement, requiring numerous calls and videoconferences, often contentious. On August 26, 2022, the parties were able to execute a term sheet that set forth certain key terms, including the settlement amount, but did not resolve others. As a result, extensive negotiations continued after the term sheet was executed. Despite best efforts, the parties were not able to reach agreement on these open issues, and others that arose as the parties sought to finalize the settlement agreement, including language of the release, notice and administration costs, form of notice, and aspects of the confirmatory discovery Facebook agreed to provide through which Plaintiffs could evaluate whether to accept Facebook's position on injunctive relief. Discussions of these issues, and especially Facebook's position on injunctive relief, were extensive and contentious.

103.     After a month and a half of near daily negotiations, on October 13, 2022, the parties agreed to ask Judge Corley if she would be willing to mediate the remaining obstacles to agreement. Judge Corley agreed. The parties provided Judge Corley with information regarding the unresolved issues and met with her via Zoom initially on October 17, 2022 and then on three subsequent dates, November 7, 8, and 14, 2022. The parties made significant progress on open issues with Judge Corley, and after several more weeks of direct negotiations with each other, a settlement agreement finally was executed on December 22, 2022. A true and correct copy of the

Settlement Agreement is attached hereto as **Exhibit 1**. Annexed as exhibits to the Settlement

Agreement are the following documents:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1-A | [proposed] Preliminary Approval Order |
| 1-B | Declaration of Steven Weisbrot of Angeion Group, LLC re: Settlement Administration Protocol & Notice Plan |
| 1-C | Summary Notice |
| 1-D | Class Notice |
| 1-E | In-App Notice |
| 1-F | Claim Form |
| 1-G | [proposed] Final Approval Order |
| 1-H | [proposed] Final Judgment |
| 1-I | Escrow Agreement |

### 2.      Benefits Obtained for Class Members

104.    Under the proposed Settlement, Facebook will pay $725 million into a non-reversionary fund for class benefits, notice and administration costs, attorneys' fees and expenses in the amount determined by the Court, and service awards for the Settlement Class Representatives approved by the Court.

105.    To our knowledge, the proposed Settlement of $725 million is the largest amount made available to users in any U.S. data privacy or data breach class action.

106.    The Settlement Fund represents a significant benefit to the Class, which will be used to compensate Settlement Class Members for the harms suffered that resulted from Facebook's alleged violations in this case.

107.    The proposed Plan of Allocation, attached hereto as **Exhibit 2**, uses "allocation points" to divide the Net Settlement Fund among Authorized Claimants. For each calendar month in the Class Period at any time during which an Authorized Claimant was a Facebook user, one allocation point is assigned to the Authorized Claimant. The Net Settlement Fund will then be allocated to each Authorized Claimant pro rata based upon each Authorized Claimant's share of the total allocation points assigned to all Authorized Claimants.

108.     The design of this Plan of Allocation is driven in part by the fact that information enabling a more precise measure of damages does not exist. While the evidence establishes that aggregate harm was imposed on the class, and is sufficient to establish that each user was individually harmed, evidence to specifically identify the degree of that harm on each user is not available. Facebook was unable to supply Plaintiffs with information about the number or identity of all third parties that may have had access to each user's information through that user's friends, let alone information about precisely how much or how often each user's information was accessed or misused. Facebook was unable to provide Plaintiffs or the Settlement Administrator with information about how many friends each user has had. As such, the metrics to precisely quantify each Authorized Claimant's damage are not available.

109.     Through confirmatory discovery, Facebook has confirmed that the amount of third parties' access to users' information has a positive correlation with the amount of time those users have been on the platform. Relying on that information, Plaintiffs have designed a Plan of Allocation that assigns points based on the amount of time an Authorized Claimant has been an activated Facebook user. As set forth in the Declaration of Professor Lynn A. Baker, attached hereto as **Exhibit 4**, the Plan of Allocation is fair, adequate, and reasonable.

110.     This is a common fund settlement. There will be no reversion of the Settlement Fund to Facebook once the Settlement becomes final, irrespective of the number of Claims paid or the amounts to be paid to claimants from the Net Settlement Fund.

111.     In addition to the monetary relief provided by the Settlement, this litigation has benefitted Class Members in other ways. As well as the business-practice changes set forth below, which have occurred since this litigation began in March 2018, the litigation has resulted in some of the only—if not the only—public disclosure of business practices that resulted in the Cambridge Analytica scandal and related whitelisting and friend-sharing, as well as Facebook's monitoring of what user data third parties obtained and how they used it. Through Co-Lead Counsel's efforts, Facebook was also required to produce a massive volume of documents and communications related to the ADI. That discovery included internal Facebook communications

and memoranda concerning individual apps and developers prepared by Facebook's consultants FTI Consulting and Stroz Friedberg. In addition, the litigation secured unprecedented discovery on the information that Facebook collects and maintains about its users.

112.    The public availability of much of this discovery promotes a key goal of this litigation for Plaintiffs, which is to disclose Facebook's practices to Class Members so that Facebook's consent process is meaningful.

113.    Significant discovery from this action has been made public and relied on by others worldwide. For example, the Irish Council for Civil Liberties, a non-profit human rights organization, told the European Commission that the "materials unsealed in th[is] case are revelatory."[5] In fact, the organization "examined thousands of pages of documentation and depositions of Meta engineers" from this litigation and used them to urge that the Commission act to ensure Facebook's compliance with the EU Digital Markets Act and General Data Protection Regulation.[6]

### 3.    Suspended Practices During the Ongoing Litigation

#### a.    Whitelisting Third Parties' Access to Data and Friend Sharing

114.    In the motion to dismiss order, the Court identified four categories of misconduct alleged in the complaint. Dkt. 298 at 6–9. The first involved "friend sharing," wherein Facebook allowed third-party app developers to access non-public information about the Facebook friends of users who had installed the app (referred to as "friend information'). Facebook permitted such access even though the friend whose information was accessed had *no* connection to the third party. A user who installs and uses an app has the opportunity to review and agree to the terms and conditions of the app; a friend of that user has no such opportunity and has not consented to sharing information with the app. *Id*. at 6–7. The second category of misconduct was continuing to allow developers to obtain this non-public friend information through "whitelisting," after

---

[5] Letter Irish Council for Civil Liberties to European Commission Vice President Margrethe Vestager at 2 (Nov. 17, 2022), https://www.iccl.ie/wp-content/uploads/2022/11/ICCL-to-Commission-17-November-2022.pdf.

[6] *Id*. at 1.

Facebook publicly stated that it no longer permitted this type of access, as a result of its transition from Graph API V.1 to V.2. *Id*. at 7–8. The third was providing "business partners" with Facebook user data, including non-public friend information, without appropriate disclosure or consent. *Id*. at 8–9. The fourth was failing to monitor apps and app developers and to restrict them from misusing user data acquired from Facebook. *Id*. at 9.

115.     Over the course of the litigation, it became apparent that the term "business partner" was not a term universally used by Facebook to describe the third parties who were given access to Facebook user information. Nonetheless, as alleged, certain third parties, not limited to the developers of apps, could access Facebook user data, including non-public friend information, via private APIs and capabilities after the transition to Graph API V.2. Elia Decl. ¶¶ 11, 13. This was done by "whitelisting" the third parties or providing them access to special, non-public "capabilities." *See id.*

116.     Friend sharing was one of the focuses of the complaint and discovery in this case. Facebook's Data Use Policy for much of the class period stated that the third party that obtained friend information was only allowed to use the information to enhance the experience of the Facebook user who installed the app. *See* Dkt. 491 ¶ 544. But Plaintiffs alleged that, in practice, app developers violated this provision by using friend information more broadly.

117.     Though litigation and confirmatory discovery, Plaintiffs have confirmed that Facebook no longer permits and has no intention of permitting third parties to obtain friend information without the direct, express consent of the Facebook user. *See also* Elia Decl. ¶¶ 12–17. Some of these changes occurred before, and others after this litigation commenced in March 2018. A detailed description of changes Facebook implemented that eliminated friend sharing is set forth in the Elia Declaration. Plaintiffs summarize key changes below.

118.     By May 2015, most apps were transitioned from Graph API V.1, which had friend permissions, to Graph API V.2, which did not. Apps created after April 30, 2015 did not have access to Graph API Version 1, and therefore never had access to friend permissions through Graph API Version 1. *Id*. ¶ 10. Following the Cambridge Analytica scandal, Facebook revealed

that it had allowed certain third parties to continue accessing friend information after the transition to Graph API V.2. This was accomplished through "whitelisting," an undisclosed process that gave special permission to certain apps and partners to continue having access to APIs that emitted friend data, as well as other data, such as "read_stream" data. *Id.* ¶¶ 11–12, 15. On March 28, 2018, Steven Elia reviewed and approved a code change that disabled friend sharing for all apps, such that even if any remained on a whitelist for friend permissions, if the whitelisted app made a call for friend information gated by a permission, no such data would be returned. *Id.* ¶ 14. Facebook no longer engages in "whitelisting for Graph API Version 1 (which included friend permissions)." *Id.* ¶ 12.

119.    In discovery, Plaintiffs learned of other ways in which third parties could potentially obtain data beyond the scope of consent, including but not limited to friend information, through certain capabilities and APIs. Specifically, thunderhill and Titan_api capabilities and Social Context APIs also potentially enabled third parties to obtain friend information. On April 30, 2019, Facebook deprecated use of Social Context APIs, and as of July 30, 2019 "Facebook connections that requested the 'context' field would fail." *Id.* ¶ 15. In addition, on December 4, 2019 and November 1, 2019, Facebook deprecated thunderhill and Titan_api capabilities, respectively, for third parties, thus preventing any friend sharing through these capabilities. *Id.*

120.    From 2018 through 2020, several capabilities were deprecated or otherwise modified to return no friend information to third parties, such that the practice of sharing non-public friend information with third parties without explicit authorization from the user whose data is being emitted via their friend has ended. *Id*. ¶ 15–17. Facebook has confirmed that is has no plans to revise or restore APIs or capabilities permitting third parties' access to private friend information without explicit authorization from the user whose data is being emitted via their friend. *Id*. ¶¶ 12, 16–17.

121.    The changes Facebook made to its whitelisting practices after the Cambridge Analytica scandal broke, and in several respects after this litigation commenced, ensures that

Facebook no longer provides third parties with access to private friend information without the express consent of the Facebook user whose information is obtained. *See id.* ¶ 17. From Plaintiffs' perspective, this is an important accomplishment that moots the need for injunctive relief as to these issues.

        **b.**        **VPPA**

122.    Plaintiffs asserted in the VPPA claim that Facebook made available to third-party developers and partners personal identifying information about users and users' friends that revealed the videos they requested or obtained, without proper consent. Plaintiffs undertook significant effort through discovery to learn about the permissions, capabilities, and APIs third parties used to access video-related information, including information shared via friend sharing because, as explained above, users whose information was shared via friend sharing did not have the opportunity to review and agree to the terms and conditions of the third party who received their information.

123.    Through document discovery and probing Rule 30(b)(6) and 30(b)(1) depositions, Plaintiffs sought to establish that Facebook provided permissions and capabilities to numerous third parties that could allow the third parties to access information about the videos that a user or user's friend had obtained. *See id.* ¶ 18.

124.    Although Graph API V.2, introduced in 2014, was not supposed to include permissions that allowed friend sharing, approximately 60 third parties were whitelisted for continued access for Graph API V.1. *See id.* ¶¶ 10–11. As noted above, still other third parties were given continued access to certain "capabilities" that in some cases were the functional equivalent of the friend-sharing permissions. *Id.* ¶ 13.

125.    Facebook has submitted sworn testimony that it no longer permits this most worrisome kind of third-party access to video content. The Declaration of Steven Elia describes the significant changes that Facebook has made in this area, including that Facebook has now disabled its friend-sharing permissions and capabilities, including those that allowed access to information about a user's friend's videos. *Id.* ¶¶ 17, 18. Mr. Elia also avers that he does not

believe there is any remaining action, capability, or permission "that makes users' friends' videos or the friends' likes, interactions, or comments on videos available to third parties," unless the friend has installed and uses the third-party app in question. *Id.*

### c. Monitoring

126.     As noted above, the fourth category of misconduct alleged in the complaint was Facebook's failure to adequately monitor third party use of Facebook user data, and to protect Facebook user data from third party misuse. Through litigation and confirmatory discovery, Plaintiffs have confirmed that Facebook's practices have changed substantially, and provide greater protection than was the case when this litigation commenced.

127.     Facebook's current systems and protocols for the review of third-party access to and use of Facebook user information are described in the Dunphy Declaration. Many systems that existed before the filing of this case have been enhanced, and additional capabilities have been added. Plaintiffs note the following changes that have occurred since this litigation commenced.

### (i) Privacy Review

128.     The Privacy Review process, implemented at scale in October 2020 and subsequently refined, is set forth in paragraphs 3–5 of the Dunphy Declaration. The process includes the following steps, among others:

a. Project Guidance. The owner of the Project ("Project Owner") liaises with their privacy cross-functional ("PXFN") team for guidance on how to anticipate and minimize privacy risks throughout Project design.

b. Project Intake. To initiate a Privacy Review, the Project Owner completes an intake form. The standard product intake form in Launch Manager includes questions relating to data collection, data sharing, data use, notice and consent, safeguards and risks, and mitigations.

c. Project Review. A PXFN team will be designated to review the Project information. During the review process, the PXFN team works to identify potential risks to the privacy, confidentiality, or integrity of User data and to identify mitigations to minimize those risks.

d. Privacy Decision. The PXFN reviewers sign off on the Privacy Decision in

Launch Manager, which indicates whether the Project was approved, approved pending Implementation Review, rejected, or closed.

### (ii)    Initial Review of Third-Party Access to Covered Information

129.    In 2014, Facebook initiated App Review.[7] Dunphy Decl. ¶ 7. It has since refined the process, such that now, a team of Developer Operations ("DevOps") reviewers evaluates the App's use of Covered Information against the permissible use cases for such information and the developer's compliance with Meta's Platform Terms and Developer Policies and decides whether to approve or deny the App's request for access to Covered Information. *Id.*

130.    In February 2019, Facebook created the Partner Grant Review Process, through which Meta's Partnerships team evaluates the use of Covered Information by developers with access to Partner APIs and compliance with Meta's Platform Terms. *Id.* ¶ 8.

### (iii)    Periodic Reassessment

131.    Around September 7, 2021, Facebook initiated a process called App Re-Review, through which at least once every twelve months, Meta conducts assessments and operational testing of all developer Apps with access to Covered Information through one or more Public API products to identify violations or potential violations of Platform Terms. *Id.* ¶ 11.

132.    Around September 7, 2021, Facebook initiated a process called the Partner Grant Re-Review Process, through which at least annually, Meta's Partnerships team evaluates partner Apps' use of covered Information and developers' compliance with Meta's Platform Terms. *Id.* ¶ 12.

133.    In 2020, Meta implemented a process called the Data Use Checkup ("DUC"), through which Meta requires developers to annually (i) certify continued compliance with applicable Meta terms, and (ii) certify that each one of their purpose(s) or use(s) for Covered Information complies with Meta's permissible purpose(s) or uses(s) for that type of Covered Information in order to maintain access to permissions, capabilities, and/or features associated with E.1 API products. *Id.* ¶ 13. If an administrator fails to complete the DUC within 60 days,

---

[7] Defined terms in this section have the same definitions as those set forth in the Declaration of Elizabeth Dunphy in Support of Settlement, Dkt. 1095.

Meta initiates an automated process through which it progressively reduces the App's access to Facebook's APIs over the course of 30 days, at the end of which Meta blocks the App's access to Facebook APIs altogether. If the administrator completes the App's self-certification, Meta restores the App's access. *Id.* ¶ 13(d).

### (iv)   Risk-Based Assessments

134.   In addition to initial and periodic assessments, between August and October 2021, Meta implemented a process to classify Apps by risk tier based on two separate evaluations of risk: (i) an evaluation of the risks inherent to the API products used by the App (the "Product Risk Assessment") and (ii) an evaluation of risk characteristics specific to the App itself (for example, volume of Users) (the "Third Party Risk Assessment"). *Id.* ¶¶ 14–15. Meta uses the Product Risk assessment and the Third Party Risk Assessment to determine the risk tier of the Developer (A-E), and then uses this classification to determine the level of monitoring processes to apply to the Developer. *Id.* ¶ 15(g).

135.   On October 18, 2021, Meta implemented an automated process to apply the Developer Third Party Risk Assessment framework to all Developers on a daily basis. *Id.* ¶ 15(f).

136.   On or about August 9, 2021, Meta implemented the Data Protection Assessment that is now required for Apps in the four highest risk tiers. Once a year, these Apps must complete a questionnaire that collects information concerning the developer's adherence to Platform Terms. *Id.* ¶ 16.

137.   On or about August 16, 2021, Meta implemented a process called the Enhanced Privacy Policy Review through which Meta's DevOps team conducts an assessment of each Tier E App's privacy policy at least once every twelve months in order to identify violations or potential violations of Platform Terms. *Id.* ¶ 17.

### (v)   Monitoring

138.   Meta uses multiple automated processes to monitor third parties' use of Facebook user data. *Id.* ¶ 18. Among them, on March 23, 2021, Meta implemented an automated privacy

policy scanning process, which allows Meta to confirm that privacy policy links that Apps are required to provide to Meta are functional. *Id.* ¶ 19.

139.    In addition, Meta performs automated rate limiting and automated removal of unused permissions and features processes to mitigate risks related to Meta's Platform Terms by mediating and/or limiting the volume and categories of Covered Information available to third party developers. *Id.* ¶ 20.

140.    Meta also uses granular data permissions processes that are designed to ensure that Covered Third Parties are not able to access certain categories of Covered Information without prior and unrevoked consent from the User. *Id.* ¶ 21.

141.    Meta also uses signals-based monitoring processes that are designed to collect and analyze information from various sources to identify potential Platform Terms violations. These signals, if indicative of a potential policy violation, may (1) trigger an Ad Hoc Review process, which can lead to a direct enforcement action or referral to a comprehensive investigation conducted by DevOps, or (2) be referred directly to DevOps to initiate an investigation. *Id.* ¶ 22.

142.    Meta has further mitigated the risk of data misuse by third parties by deprecating API products or by altering their design to limit data access or constrain appropriate use. *Id.* ¶ 23. Changes made after this litigation commenced include:

- In 2018, Meta deprecated several Facebook Login API features, including those that had provided access to religion, political views, and relationship details. *Id.* ¶ 23(b).

- In 2019, Meta changed its Platform Policies to enable the removal of "quiz Apps" that provide minimal utility to Users relative to the risks involved with their access to sensitive User data. Meta also designed a process for limiting the data access of any remaining or subsequently identified minimum utility Apps on the platform. *Id.* ¶ 23(c).

### (vi)    Enforcement

143.    Over many years, including after this litigation was commenced, Meta has significantly increased resources dedicated to monitoring third-party apps and enforcing its policies. *Id*. ¶ 24. Changes include:

- The DevOps team grew significantly between 2013 and 2018, and it supplemented its enforcement efforts with individuals from other teams across the company (e.g., Legal, Policy, Data Science, Engineering, Privacy). *Id.* ¶ 24(a).

- By 2019, the DevOps team had grown to include approximately 90 full-time employees and close to 400 supporting vendors across the world. *Id.* ¶ 24(b). By 2021, the DevOps team had grown to include more than 100 full-time employees and nearly 500 supporting vendors. *Id.* ¶ 24(c).

### d.    Facebook's Expanded Disclosures to Users

144.    Since this litigation began in March 2018, Facebook has made significant changes to the information available to Facebook users through the Download Your Information or "DYI" tool.

145.    Before this litigation commenced, Facebook made approximately 53 categories of user data available to Facebook users through the DYI tool. Now Facebook makes approximately 121 categories of user data available to Facebook users through this tool. The added categories of information provide important insight into Facebook's collection and use of user data at issue in this litigation, including the following categories of information:

- <u>Ads</u>: Ads you've recently viewed.

- <u>Facebook Live Videos</u>: Live videos you've recently watched.

- <u>Facebook Watch Topics for Recommendations</u>: A collection of topics that is used to show you relevant videos in the Facebook Watch tab. The topics are based on your previous interaction history with things like links, videos, photos and Pages you've liked and Live videos you've recently watched.

- <u>Recently Visited</u>: Videos and shows you've recently visited.

- <u>Your Topics</u>: A collection of topics that is determined by your activity on Facebook that are used to recommend posts to you in Feed, News and Watch.

146.    Similarly, Facebook has made substantial changes to the disclosures and controls regarding third party advertising and off-Facebook activity that it makes available to users after this litigation began.

147.    Starting in 2019, Facebook provided users with additional details about targeted advertisements, including when advertisers uploaded user contact information and if advertisers

worked with other marketing partners to run the advertisements. Also starting in 2019, Facebook provided users more detailed information about why they are targeted by specific advertisements, including the interests or categories that matched a given user with a specific advertisement. Facebook also started publicizing to users where that information came from, such as from websites they visited or pages they liked.

148.    Similarly, Facebook updated its Ad Preferences feature in 2019 to show users more information about businesses that upload lists with their contact information, including information about businesses that uploaded and used such lists for advertising as well as information about data brokers, advertising agencies, and other marketing partners that uploaded and shared such lists with other advertisers.

149.    Also starting in 2019, Facebook provided users with controls permitting them to opt out of advertising based on uploaded lists that are matched to users' profiles. In 2020, Facebook expanded these controls to enable users to opt out of targeted advertising by multiple advertisers at once, to the extent that those advertisers are using targeted advertising lists uploaded by the same business account. In 2021, Facebook added controls to enable users to also opt out of targeted advertising using Facebook categories off of the Facebook platform.

150.    Starting in January 2020, Facebook has made available to users an "Off-Facebook Activity" tool. Facebook's Off-Facebook Activity tool enables Facebook users to view activity shared by businesses and organizations that users visit off the Facebook platform, download details of their off-Facebook activity, disconnect off-Facebook activity history from their accounts, and manage whether off-Facebook activity is saved with their account. The Off-Facebook Activity tool also enables Facebook users to disconnect their previous and future off-Facebook activity from their accounts.

E.    **Conclusion**

151.    More than four years have now passed since we were appointed as Co-Lead Counsel in this action. During that time, we faced substantial challenges, starting with the asymmetry of information and the complexities that arose from it.

152.     Another challenge is the novelty of the case. This is not a "data breach" case but a case about whether Facebook shared information users intended to be shared only with restricted audiences with third parties. The legal issues presented by the practices—issues involving disclosure, consent, privacy, and injury—had never arisen in this context before, for the simple reason that Facebook is unique. No other social media platform is as large or holds as much sensitive information about its users. In tackling the issues raised by this case, the Court's order on the motion to dismiss provided important guidance by which Plaintiffs directed their discovery efforts. That order will continue to be a landmark by which litigants and other courts chart their course.

153.     Another difficulty is the scope of this case, which is massive in both time period and subject matter. As the Court noted in its motion to dismiss order, "[w]hile the initial lawsuits focused largely on Facebook's conduct that was the subject of the Cambridge Analytica scandal, the case now includes allegations stemming from the subsequent revelations about Facebook's wider information-sharing practices." Dkt. 298 at 5.

154.     There can also be no doubt that the case was hotly litigated. Our firms poured significant resources into this action to go toe to toe with Facebook and its counsel.

155.     Despite these difficulties, Plaintiffs have secured the largest privacy-related class action settlement in history. The settlement reflects our best estimate of the balance between reward and the risks of continuing to litigate. We are proud to present that settlement to the Court for preliminary approval.

//

//

Loeser and Weaver Decl. in Supp.
of Pls.' Mot. for Prelim. Approval                    41                          MDL No. 2843
                                                                        Case No. 18-md-02843-VC

* * *

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and to the best of our knowledge.

Dated: December 22, 2022                    By: _____
                                                        Derek W. Loeser

Dated: December 22, 2022                    By: _____
                                                        Lesley E. Weaver