# Defendant's Exhibit 7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

 5   PRIVACY USER PROFILE LITIGATION) Case No.

 6   _____) 18-md-02843-VC

 7   This document relates to:      )

 8   ALL ACTIONS                    )

 9   _____)

10

11

12

13    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16    REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17            FACEBOOK INC. REPRESENTATIVE,

18            KONSTANTINOS PAPAMILTIADIS

19            TUESDAY, FEBRUARY 23, 2021

20

21

22   Reported by:

23   Ashala Tylor, CSR #2436, CLR, CRR, RPR

24   JOB NO. 4473154

25   PAGES 1 - 280
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

 5   PRIVACY USER PROFILE LITIGATION) Case No.

 6   _____) 18-md-02843-VC

 7   This document relates to:      )

 8   ALL ACTIONS                    )

 9   _____)

10

11

12

13

14

15

16        Videotaped deposition of FACEBOOK, INC.

17   REPRESENTATIVE, KONSTANTINOS PAPAMILTIADIS taken via

18   virtual Zoom, commencing at 9:10 a.m. and ending at

19   3:58 p.m., on Tuesday, February 23, 2021, before Ashala

20   Tylor, CSR No. 2436, RPR, CRR, CLR.

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   APPEARANCES OF COUNSEL:

2   FOR THE PLAINTIFF:

3        BLEICHMAR FONTI & AULD LLP

4        BY:  LESLEY E. WEAVER, ESQ.

5             ANNE DAVIS, ESQ.

6             MATTHEW MONTGOMERY, ESQ.

7             MATTHEW MELAMED, ESQ.

8        555 12th Street, Suite 1600

9        Oakland, California  94607

10       415.445.4003

11       lweaver@bfalaw.com

12       adavis@bfalaw.com

13       mmmontgomery@falaw.com

14       mmelamed@bfalaw.com

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   A P P E A R A N C E S (continued)

 2   FOR PLAINTIFFS:

 3           KELLER ROHRBACK LLP

 4           BY:  DAVID KO, ESQ.

 5                CARI C. LAUFENBERG, ESQ.

 6                DAVID LOESER, ESQ.

 7           1201 Third Avenue, Suite 3200

 8           Seattle, Washington  98101-3052

 9           206.623.3384

10           dko@kellerrohrback.com

11           claufenberg@kellerrohrback.com

12           dloeser@kellerrohrback.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    A P P E A R A N C E S (continued)

2    FOR THE DEFENDANT FACEBOOK, INC.:

3         GIBSON, DUNN & CRUTCHER LLP

4         BY:  DEBORAH STEIN, ESQ.

5              MARTIE KUTSCHER CLARK, ESQ.

6         333 S. Grand Avenue, 47th Floor

7         Los Angeles, California  90071

8         213.229.7000

9         dstein@gibsondunn.com

10        mkutscherClark@gibsondunn.com

11                  - and -

12        GIBSON DUNN & CRUTCHER LLP

13        BY:  LAURA MUMM, ESQ.

14        200 Park Avenue, 47th Floor

15        New York, New York  10166

16        212.351.4000

17        lmumm@gibsondunn.com

18

19   Also Present:

20        Ian Chen, In-House Facebook Counsel

21        Kimberly Decker, Videographer

22

23

24

25
```

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    I N D E X

 2   WITNESS          EXAMINATION BY              PAGE

 3   KONSTANTINOS PAPAMILTIADIS

 4                    Ms. Weaver                  9, 171

 5

 6                    E X H I B I T S

 7   NO.              DESCRIPTION                 PAGE

 8   Exhibit 1    Plaintiffs' Amended Notice of      10

 9                Deposition of Defendant Facebook,

10                Inc. Pursuant to Federal Rule of

11                Civil Procedure 30(b)(6)

12   Exhibit 2    Discovery Order No. 9              10

13                (Dkt. Nos. 515, 526, 537, 548)

14   Exhibit 3    Email from Simone LiTrenta to      49

15                Matt Scutari and others, 5-8-14,

16                FB CA MDL 00213423 - 443

17   Exhibit 4    Email exchange, top one from      240

18                Simon Cross to Steven Elia,

19                1-29-15, FB-CA-MDL-00227697 - 699

20   Exhibit 5    Excel spreadsheet,               265

21                FB-CA-MDL-01434884.csv

22   Exhibit 6    Excel spreadsheet,               266

23                FB-CA-MDL-01434885.csv

24                Instruction Not to Answer

25                    Page 91, LIne 9
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Tuesday, February 23, 2021 | |
| 2 | 9:10 a.m. | |
| 3 | --oOo-- | |
| 4 | | |
| 5 | THE VIDEOGRAPHER:  Good morning.  We are | 09:10 |
| 6 | going on the record at 9:10 a.m. on February 23rd of | 09:10 |
| 7 | 2021.  All participants are attending remotely. | 09:10 |
| 8 | Audio and video recording will continue to | 09:10 |
| 9 | take place unless all parties agree to go off the | 09:10 |
| 10 | record. | 09:10 |
| 11 | This is Media Unit 1 of the recorded | 09:10 |
| 12 | deposition of Facebook, Inc. representative, | 09:10 |
| 13 | Konstantinos Papamiltiadis, taken by counsel for the | 09:10 |
| 14 | plaintiffs in the matter of Facebook, Inc. Consumer | 09:10 |
| 15 | Privacy User Profile Litigation filed in the | 09:10 |
| 16 | United States District Court, Northern District of | 09:10 |
| 17 | California, Case Number 18-md-02843-VC. | 09:10 |
| 18 | My name is Kimberly Decker from Veritext | 09:10 |
| 19 | Legal Solutions and I'm the videographer.  The court | 09:10 |
| 20 | reporter is Ashala Tylor.  I'm not related to any | 09:10 |
| 21 | party in this action, nor am I financially | 09:11 |
| 22 | interested in the outcome. | 09:11 |
| 23 | Counsel and all present will now state | 09:11 |
| 24 | their appearances and affiliations for the record. | 09:11 |
| 25 | If there are any objections to proceeding, please | 09:11 |

Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | state them at the time of your appearance, beginning | 09:11 |
| 2 | with the noticing attorney. | 09:11 |
| 3 | MS. WEAVER:  Good morning, everybody.  I'm | 09:11 |
| 4 | Lesley Weaver, co-lead counsel for plaintiffs and | 09:11 |
| 5 | from Bleichmar Fonti & Auld. | 09:11 |
| 6 | MS. DAVIS:  Good morning.  Anne Davis also | 09:11 |
| 7 | for plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 8 | MR. MONTGOMERY:  Matthew Montgomery for | 09:11 |
| 9 | plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 10 | MR. MELAMED:  Matt Melamed for plaintiffs, | 09:11 |
| 11 | Bleichmar Fonti & Auld. | 09:11 |
| 12 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 13 | plaintiffs from Keller -- | 09:11 |
| 14 | THE REPORTER:  I'm sorry, one more time, | 09:11 |
| 15 | please. | 09:11 |
| 16 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 17 | plaintiffs from Keller Rohrback. | 09:11 |
| 18 | MR. KO:  David Ko of Keller Rohrback also | 09:11 |
| 19 | on behalf of the plaintiffs.  Good morning. | 09:12 |
| 20 | MR. LOESER:  Good morning.  Derek Loeser | 09:12 |
| 21 | from Keller Rohrback for plaintiffs. | 09:12 |
| 22 | MS. STEIN:  Are you ready for defendant? | 09:12 |
| 23 | Deborah Stein from Gibson, Dunn on behalf | 09:12 |
| 24 | of defendant Facebook. | 09:12 |
| 25 | MS. CLARK:  Martie Kutscher Clark from | 09:12 |

Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Gibson, Dunn also on behalf of Facebook. | 09:12 |
| 2 | MS. MUMM:  Laura Mumm from Gibson, Dunn on | 09:12 |
| 3 | behalf of Facebook. | 09:12 |
| 4 | MR. CHEN:  And this is Ian Chen.  I am | 09:12 |
| 5 | in-house counsel for Facebook. | 09:12 |
| 6 | THE VIDEOGRAPHER:  Would the court | 09:12 |
| 7 | reporter please swear in the witness. | 09:12 |
| 8 | | 09:13 |
| 9 | KONSTANTINOS PAPAMILTIADIS, | 09:13 |
| 10 | being first duly sworn or affirmed to testify | 09:13 |
| 11 | to the truth, the whole truth, and nothing but | 09:13 |
| 12 | the truth, was examined and testified as follows: | 09:13 |
| 13 | THE REPORTER:  Proceed, Counsel. | 09:13 |
| 14 | EXAMINATION | 09:13 |
| 15 | BY MS. WEAVER: | 09:13 |
| 16 | Q.   Good morning.  And thank you very much for | 09:13 |
| 17 | being here this morning and as we adjust to this new | 09:13 |
| 18 | process. | 09:13 |
| 19 | May I address you as K.P. throughout the | 09:13 |
| 20 | deposition or would you prefer Mr. Papamiltiadis? | 09:13 |
| 21 | A.   I don't need to ask counsel's permission | 09:13 |
| 22 | to answer that question.  I guess you can. | 09:13 |
| 23 | Q.   All right.  You come prepared. | 09:13 |
| 24 | I'm going to start by marking a couple of | 09:13 |
| 25 | exhibits, and I think that you've practiced with | 09:13 |

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 09:57 |
| 2 | Q.   Do you have an Exhibit 3? | 09:57 |
| 3 | A.   So we're going to 3? | 09:57 |
| 4 | Q.   We are going to 3. | 09:58 |
| 5 | A.   Okay.  I don't see it yet. | 09:58 |
| 6 | Q.   I think you might need to refresh. | 09:58 |
| 7 | Do you have Exhibit 3 yet? | 09:58 |
| 8 | A.   Yes. | 09:58 |
| 9 | Q.   Okay. | 09:58 |
| 10 | MS. WEAVER:  For the record, Exhibit 3 is | 09:58 |
| 11 | an email dated May 8, 2014, with some attachments. | 09:58 |
| 12 | Q.   Have you seen Exhibit 3 before? | 09:58 |
| 13 | A.   No, I haven't. | 09:58 |
| 14 | Q.   Okay.  Did -- | 09:58 |
| 15 | MS. STEIN:  Why don't you give the witness | 09:58 |
| 16 | an opportunity to review the document. | 09:58 |
| 17 | MS. WEAVER:  Okay.  Thanks, Deb.  You were | 09:58 |
| 18 | about to get in trouble. | 09:58 |
| 19 | Q.   So there's the cover email, K.P., but if | 09:58 |
| 20 | you look at the attachment, and I direct your | 09:58 |
| 21 | attention to the Bates number that ends with 424. | 09:58 |
| 22 | Remember the -- if you look at the bottom there. | 09:58 |
| 23 | THE WITNESS:  Yes, I've seen those pages, | 09:58 |
| 24 | yes. | 09:59 |
| 25 | | |

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                        09:59

 2        Q.    Okay.  And when did you last see them?     09:59

 3        A.    Either yesterday or Friday.                09:59

 4        Q.    When did you first see them?               09:59

 5        A.    Maybe Friday.                              09:59

 6        Q.    Okay.  You hadn't seen them before Friday? 09:59

 7        A.    No.                                        09:59

 8        Q.    Is that right?  Okay.                      09:59

 9              Do you have an understanding as to what    09:59

10   Exhibit 3 is?                                         09:59

11        A.    I don't know the contents of the email,    09:59

12   but I think I can understand the page that you asked  09:59

13   me to look at, what it meant to be.                   09:59

14        Q.    Okay.  And what is your understanding?     09:59

15        A.    It's definition of different data that     09:59

16   Facebook may have accessed.                           09:59

17        Q.    Okay.  And let me back up again.  This is  09:59

18   foundational.  Do people communicate by email at      09:59

19   Facebook?                                             09:59

20        A.    It's one of the ways to communicate, yes.  09:59

21        Q.    How else do people communicate in the      09:59

22   course of doing business at Facebook?                 09:59

23        A.    We use a version of the product that is    09:59

24   designed for the business world called Workplace.     09:59

25   We use a version of our Messenger product, which is   10:00
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    also an example, a device called Workset.  We use        10:00

 2    emails.  We use Zoom.  We use other                       10:00

 3    videoconferencing facilities.  We use our telephones      10:00

 4    to call each other.  Different ways.                      10:00

 5         Q.   And people text as well; is that right?         10:00

 6         A.   We don't like text messaging.  We have our      10:00

 7    own messaging apps.                                       10:00

 8         Q.   Just out of curiosity, is the Facebook          10:00

 9    Messenger that people that work at Facebook use, is       10:00

10    that different than the Facebook Messenger that           10:00

11    users on the platform use, or is it the same?             10:00

12         A.   I mean I use Messenger the same way you         10:00

13    would use it.  But internally I don't use that            10:00

14    version of the product.  I use an Enterprise              10:00

15    personal product --                                       10:00

16         Q.   Okay.                                           10:00

17         A.   -- which is called Workset.                     10:00

18         Q.   And what's the difference functionally          10:00

19    between those two?                                        10:00

20              MS. STEIN:  Objection.  This is like way        10:00

21    beyond the scope about what employees at Facebook         10:00

22    use.                                                      10:01

23              MS. WEAVER:  Okay.  Fine.  It's fine.  I        10:01

24    was trying to establish a foundation, but I guess we      10:01

25    can come back to that in another deposition.              10:01
```

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So, K.P., back to Exhibit 3.  Do you who | 10:01 |
| 2 | Simone LiTrenta is? | 10:01 |
| 3 | A.   No. | 10:01 |
| 4 | Q.   Okay.  Looking at just the cover email, do | 10:01 |
| 5 | you recognize the names of anybody on this email as | 10:01 |
| 6 | individuals who work at Facebook? | 10:01 |
| 7 | A.   I recognize Matt Scutari, Rob Sherman, and | 10:01 |
| 8 | Erin Egan. | 10:01 |
| 9 | Q.   And you understand that those are | 10:01 |
| 10 | employees of Facebook during the time this email was | 10:01 |
| 11 | written; is that right? | 10:01 |
| 12 | A.   That is 2014?  Yes, I believe so. | 10:01 |
| 13 | Q.   Okay.  And do you believe Exhibit 3 to be | 10:01 |
| 14 | an email sent by employees at Facebook in the | 10:01 |
| 15 | regular course of business? | 10:01 |
| 16 | A.   Yes, that looks like. | 10:01 |
| 17 | Q.   Okay.  Do you have an understanding as to | 10:01 |
| 18 | what the materials that are attached to this email | 10:02 |
| 19 | are? | 10:02 |
| 20 | A.   I think it's a set of definitions that -- | 10:02 |
| 21 | or slides that were meant to be presented at an | 10:02 |
| 22 | off-site. | 10:02 |
| 23 | Q.   Okay.  And what is -- do you know what the | 10:02 |
| 24 | global policy team is? | 10:02 |
| 25 | A.   Yes. | 10:02 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What is it? | 10:02 |
| 2 | A.   It's a team that is responsible for our | 10:02 |
| 3 | relationships with governments and regulators. | 10:02 |
| 4 | Q.   Okay.  And just again by way of | 10:02 |
| 5 | understanding how Facebook functions, you see | 10:02 |
| 6 | there's a Dropbox hyperlink here in the email? | 10:02 |
| 7 | A.   Yes. | 10:02 |
| 8 | Q.   Does Facebook also use Dropbox? | 10:02 |
| 9 | MS. STEIN:  Objection to form.  This | 10:02 |
| 10 | isn't -- not an ESI depo and he is not testifying | 10:02 |
| 11 | about what Facebook uses internally.  Let's focus on | 10:02 |
| 12 | the subjects that he's here for. | 10:02 |
| 13 | MS. WEAVER:  I'm trying to understand if | 10:02 |
| 14 | this document is complete, and that's a little bit | 10:02 |
| 15 | difficult to do.  So are you going to instruct him | 10:03 |
| 16 | not to answer? | 10:03 |
| 17 | MS. STEIN:  Is there a reason why you | 10:03 |
| 18 | think the document is not complete? | 10:03 |
| 19 | MS. WEAVER:  Okay.  Let me question. | 10:03 |
| 20 | Q.   So is it true that Facebook -- people use | 10:03 |
| 21 | Dropbox at Facebook to share document files? | 10:03 |
| 22 | A.   Can I answer? | 10:03 |
| 23 | Q.   Yes. | 10:03 |
| 24 | A.   Sorry, I was looking at the document. | 10:03 |
| 25 | Q.   No problem. | 10:03 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A. It's -- it's true that for files that are | 10:03 |
| 2 | concise that are too big to send by email we would | 10:03 |
| 3 | use Dropbox. | 10:03 |
| 4 | Q. Okay. Is there any way to know whether or | 10:03 |
| 5 | not a hard copy version of a document like this was | 10:03 |
| 6 | everything that was contained in the hyperlink or | 10:03 |
| 7 | would you have to see it in native form? | 10:03 |
| 8 | MS. STEIN: Objection to form. | 10:03 |
| 9 | Lesley, next. | 10:03 |
| 10 | BY MS. WEAVER: | 10:03 |
| 11 | Q. Please answer the question. | 10:03 |
| 12 | A. I'm not sure I understand exactly what you | 10:03 |
| 13 | saying. I don't even know what you have printed | 10:03 |
| 14 | out, so I cannot really establish whether it's a | 10:03 |
| 15 | complete document or not. | 10:03 |
| 16 | Q. Okay. Is there -- normally -- let me ask | 10:03 |
| 17 | this. Does Facebook maintain document like -- | 10:04 |
| 18 | documents like this in PDF form or are they native? | 10:04 |
| 19 | MS. STEIN: Objection to form. | 10:04 |
| 20 | Lesley, move on. | 10:04 |
| 21 | BY MS. WEAVER: | 10:04 |
| 22 | Q. Please answer the question. | 10:04 |
| 23 | MS. STEIN: It's not an ESI deposition. | 10:04 |
| 24 | Move on. | 10:04 |
| 25 | MS. WEAVER: I'm trying to understand this | 10:04 |

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | document, which we gave to you ahead of time, and | 10:04 |
| 2 | whether or not it's complete.  So please allow him | 10:04 |
| 3 | to answer. | 10:04 |
| 4 | MS. STEIN:  Ask him if he knows whether | 10:04 |
| 5 | it's complete.  Don't ask him about things that have | 10:04 |
| 6 | nothing to do with what he's here to testify about | 10:04 |
| 7 | here today.  He's not authorized on behalf of | 10:04 |
| 8 | Facebook to talk about Dropbox, email, messaging | 10:04 |
| 9 | that gets used internally. | 10:04 |
| 10 | BY MS. WEAVER: | 10:04 |
| 11 | Q.   So, K.P., can I ask you, is there any kind | 10:04 |
| 12 | of -- for Dropbox is there any -- well, just -- I'll | 10:04 |
| 13 | move on.  I'll come back to it. | 10:04 |
| 14 | So looking back at Exhibit 3, and turning | 10:04 |
| 15 | to the first page ending at Bates number 424 -- | 10:04 |
| 16 | A.   424, yes. | 10:05 |
| 17 | Q.   -- it says "Ads and Measurement" on top. | 10:05 |
| 18 | Do you see that? | 10:05 |
| 19 | A.   Yes. | 10:05 |
| 20 | Q.   And you said earlier that you know who Rob | 10:05 |
| 21 | Sherman is; is that right? | 10:05 |
| 22 | A.   Yes, I do. | 10:05 |
| 23 | Q.   And who is he? | 10:05 |
| 24 | A.   He's the VP of privacy. | 10:05 |
| 25 | Q.   And he's still at Facebook; is that right? | 10:05 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes, he is. | 10:05 |
| 2 | Q.   Okay.  And do you have an understanding as | 10:05 |
| 3 | to what this page represents? | 10:05 |
| 4 | A.   I think that's a list of things that | 10:05 |
| 5 | supposing Facebook receives about people. | 10:05 |
| 6 | Q.   Okay.  And, in fact, it says at the top of | 10:05 |
| 7 | the document "What kinds of information does | 10:05 |
| 8 | Facebook receive about people?"  Is that correct? | 10:05 |
| 9 | A.   Uh-huh, that's what it says, yes. | 10:05 |
| 10 | Q.   Fair enough. | 10:05 |
| 11 | So did you talk to Mr. Sherman to prepare | 10:05 |
| 12 | for your deposition today? | 10:05 |
| 13 | A.   No, I haven't spoken to him. | 10:05 |
| 14 | Q.   Did you speak to anybody other than your | 10:06 |
| 15 | counsel to prepare for your deposition today? | 10:06 |
| 16 | A.   No, I haven't. | 10:06 |
| 17 | Q.   And how long did you take to prepare for | 10:06 |
| 18 | your deposition? | 10:06 |
| 19 | A.   I think I already answered that question. | 10:06 |
| 20 | I been preparing for this deposition for as long as | 10:06 |
| 21 | I have been at Facebook. | 10:06 |
| 22 | Q.   Fair enough. | 10:06 |
| 23 | A.   It's a collective -- collective knowledge | 10:06 |
| 24 | of my last 8 and a half years of being employed at | 10:06 |
| 25 | this company. | 10:06 |

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And specifically to prepare for | 10:06 |
| 2 | this deposition in response to this notice, how much | 10:06 |
| 3 | time did you spend preparing? | 10:06 |
| 4 | A.   I don't know.  Between, you know, calls | 10:06 |
| 5 | with my counsels and homework that I have done for | 10:06 |
| 6 | myself, I would say 15-20 hours. | 10:06 |
| 7 | Q.   Okay.  Thank you. | 10:06 |
| 8 | And looking back now at the page that we | 10:06 |
| 9 | were looking at ending in Bates number 424, do you | 10:06 |
| 10 | see that it describes three categories of data on | 10:06 |
| 11 | the left? | 10:06 |
| 12 | A.   Yes. | 10:06 |
| 13 | Q.   And it says "Native Data, Appended Data | 10:07 |
| 14 | and Behavioral Data."  Do you see that? | 10:07 |
| 15 | A.   Yes. | 10:07 |
| 16 | Q.   Do you have an understanding as to what | 10:07 |
| 17 | native data is? | 10:07 |
| 18 | A.   I can see that the definition of that is | 10:07 |
| 19 | data collected through our website apps and branded | 10:07 |
| 20 | products. | 10:07 |
| 21 | Q.   Okay.  And is that consistent with your | 10:07 |
| 22 | understanding? | 10:07 |
| 23 | A.   Yes, it makes sense. | 10:07 |
| 24 | Q.   Okay.  And then what is appended data? | 10:07 |
| 25 | MS. STEIN:  Object to form. | 10:07 |

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Data that is -- what? | 10:07 |
| 2 | MS. STEIN:  Objection to form. | 10:07 |
| 3 | BY MS. WEAVER: | 10:07 |
| 4 | Q.   I'll repeat the question.  What is | 10:07 |
| 5 | appended data? | 10:07 |
| 6 | MS. STEIN:  Same objection. | 10:07 |
| 7 | THE WITNESS:  It's -- sorry.  I have to | 10:07 |
| 8 | look at the document while you're talking.  I don't | 10:07 |
| 9 | mean to talk over you. | 10:07 |
| 10 | It's okay I answer the question now? | 10:07 |
| 11 | BY MS. WEAVER: | 10:07 |
| 12 | Q.   Yes. | 10:07 |
| 13 | A.   Okay.  It's data provided by third | 10:07 |
| 14 | parties. | 10:07 |
| 15 | Q.   I'm sorry, data provided by -- I just | 10:07 |
| 16 | didn't hear you. | 10:07 |
| 17 | A.   Third parties. | 10:08 |
| 18 | Q.   Okay.  So for the record, appended data is | 10:08 |
| 19 | data provided by third parties; is that correct? | 10:08 |
| 20 | A.   Yes, as it is defined here, yes. | 10:08 |
| 21 | Q.   Okay.  And what is behavioral data? | 10:08 |
| 22 | MS. STEIN:  Objection to form. | 10:08 |
| 23 | THE WITNESS:  Sorry, I need to switch back | 10:08 |
| 24 | to see -- you don't want to talk.  Okay. | 10:08 |
| 25 | So it's data collected for activity on | 10:08 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | third parties using the Facebook product. | 10:08 |
| 2 | BY MS. WEAVER: | 10:08 |
| 3 | Q.   Okay.  And as you sit here today, are | 10:08 |
| 4 | there any other kinds of information Facebook | 10:08 |
| 5 | receives about people other than these three | 10:08 |
| 6 | categories? | 10:08 |
| 7 | A.   I don't think so. | 10:08 |
| 8 | Q.   Okay.  Let's return to our discussion of | 10:08 |
| 9 | native data.  Do you have an understanding as to why | 10:08 |
| 10 | the word "native" is being used?  What does that | 10:08 |
| 11 | mean?  Is it the same as raw data? | 10:09 |
| 12 | MS. STEIN:  Objection to form. | 10:09 |
| 13 | THE WITNESS:  Every piece of data has a | 10:09 |
| 14 | degree of rawness associated with it.  Depends how | 10:09 |
| 15 | you define raw. | 10:09 |
| 16 | BY MS. WEAVER: | 10:09 |
| 17 | Q.   Okay.  I just didn't quite hear.  Every | 10:09 |
| 18 | piece of data has a particular -- | 10:09 |
| 19 | A.   (Indecipherable).  I'm joking. | 10:09 |
| 20 | They -- if you are talking about raw data, | 10:09 |
| 21 | what do you mean? | 10:09 |
| 22 | Q.   Okay.  Well, I'm trying to learn from you, | 10:09 |
| 23 | so let me ask you. | 10:09 |
| 24 | A.   The IP address -- the IP address is raw | 10:09 |
| 25 | data. | 10:09 |

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Uh-huh, okay.  Good. | 10:09 |
| 2 | A.   But it comes through activity that happens | 10:09 |
| 3 | on a native Facebook app.  The "native" means, in my | 10:09 |
| 4 | mind, the way I see the definition there, as | 10:09 |
| 5 | activity that's happening on Facebook platform. | 10:09 |
| 6 | Q.   Okay.  So for the record, native data is | 10:09 |
| 7 | data relating to activity on the Facebook platform; | 10:09 |
| 8 | is that right? | 10:09 |
| 9 | A.   Correct. | 10:09 |
| 10 | Q.   Okay.  And so when we -- when this | 10:09 |
| 11 | document says "Facebook websites, apps and branded | 10:09 |
| 12 | products," do you have an understanding as to what | 10:10 |
| 13 | that refers to? | 10:10 |
| 14 | A.   The branded products specifically? | 10:10 |
| 15 | Q.   Yes. | 10:10 |
| 16 | A.   I think there is an example there like | 10:10 |
| 17 | Facebook Wi-Fi, which probably nothing that we have | 10:10 |
| 18 | here in the U.S. but is broadly used in India.  But | 10:10 |
| 19 | I think you mentioned like Portal earlier, which is | 10:10 |
| 20 | not installed for, I guess, the 2012-2017 period, | 10:10 |
| 21 | but it's something that's being used right now. | 10:10 |
| 22 | Q.   Okay.  Can you think of any other branded | 10:10 |
| 23 | apps in the United States that were used during 2012 | 10:10 |
| 24 | to 2017? | 10:10 |
| 25 | A.   Facebook branded apps?  Messenger, | 10:10 |

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Instagram. | 10:10 |
| 2 | Q.   Great.  Thank you. | 10:10 |
| 3 | And then on the right it seems -- this | 10:10 |
| 4 | chart seems to further break down categories of | 10:10 |
| 5 | native data.  Do you see that? | 10:10 |
| 6 | A.   Yes. | 10:10 |
| 7 | Q.   Okay.  And there's a column or really a | 10:10 |
| 8 | box that says "Explicitly collect."  Do you see | 10:10 |
| 9 | that? | 10:11 |
| 10 | A.   Yes. | 10:11 |
| 11 | Q.   And then it lists profile info, email | 10:11 |
| 12 | address, phone number, et cetera.  And then below | 10:11 |
| 13 | that it says "Implicitly collect."  And it lists a | 10:11 |
| 14 | number of data.  And then under that it says "Infer | 10:11 |
| 15 | from engagement on the site."  Do you see all of | 10:11 |
| 16 | those boxes? | 10:11 |
| 17 | A.   Yes. | 10:11 |
| 18 | Q.   Okay.  Do you have an understanding as to | 10:11 |
| 19 | what "Explicitly collect" means? | 10:11 |
| 20 | A.   Explicitly collect -- I'm sorry, I'm | 10:11 |
| 21 | looking back.  Explicitly collect is something the | 10:11 |
| 22 | user has submitted on their own. | 10:11 |
| 23 | Q.   Okay.  And so that means that a user has | 10:11 |
| 24 | taken an action to share the data; is that fair? | 10:11 |
| 25 | A.   Correct. | 10:11 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And so what does "Implicitly | 10:11 |
| 2 | collect" mean? | 10:11 |
| 3 | MS. STEIN:  Object to form. | 10:11 |
| 4 | THE WITNESS:  So that would mean | 10:11 |
| 5 | activities related to data. | 10:11 |
| 6 | BY MS. WEAVER: | 10:11 |
| 7 | Q.   I'm sorry, did you -- | 10:11 |
| 8 | A.   So -- so -- just to draw the distinction, | 10:12 |
| 9 | right, this is data that we collect during someone's | 10:12 |
| 10 | use of the Facebook app.  So the IP address or the | 10:12 |
| 11 | device information is not something that the user | 10:12 |
| 12 | would have to type in and say, hey, this is my IP | 10:12 |
| 13 | address.  It's something that we would collect when | 10:12 |
| 14 | a user uses Facebook because we would know which IP | 10:12 |
| 15 | address they are accessing Facebook from. | 10:12 |
| 16 | Q.   Is it fair to say that the kinds of data | 10:12 |
| 17 | that Facebook implicitly -- implicitly collects is | 10:12 |
| 18 | data that Facebook observes? | 10:12 |
| 19 | A.   Observes?  It's confusing me.  So what do | 10:12 |
| 20 | you mean by that? | 10:12 |
| 21 | Q.   Okay.  No, I'm just trying to understand | 10:12 |
| 22 | and put it in English for a layperson by -- so you | 10:12 |
| 23 | understand what I'm trying to do here.  So let me | 10:12 |
| 24 | try to ask a better question. | 10:12 |
| 25 | Is it fair to say that the data that is | 10:12 |

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | implicitly collected by Facebook is not expressly | 10:12 |
| 2 | shared by users? | 10:12 |
| 3 | MS. STEIN:  Objection to form. | 10:12 |
| 4 | THE WITNESS:  So they may not be explicit | 10:13 |
| 5 | shared because they submit the data to us, but they | 10:13 |
| 6 | have agreed to share that data because they have | 10:13 |
| 7 | agreed to the privacy policies -- | 10:13 |
| 8 | BY MS. WEAVER: | 10:13 |
| 9 | Q.   Okay. | 10:13 |
| 10 | A.   -- that make it clear that we will have | 10:13 |
| 11 | access to this kind of data. | 10:13 |
| 12 | Q.   Okay.  And do you see where it says | 10:13 |
| 13 | "Device identifiers" here? | 10:13 |
| 14 | A.   Yes. | 10:13 |
| 15 | Q.   And it lists a number of identifiers.  Do | 10:13 |
| 16 | you see that? | 10:13 |
| 17 | A.   Yes. | 10:13 |
| 18 | Q.   Okay.  And what is UDID? | 10:13 |
| 19 | A.   I think it's another way of calling the | 10:13 |
| 20 | Android ID. | 10:13 |
| 21 | Q.   And then what is IDFA? | 10:13 |
| 22 | A.   It's an Apple identifier. | 10:13 |
| 23 | Q.   And Google Ad ID, do you see that? | 10:13 |
| 24 | A.   Yes. | 10:13 |
| 25 | Q.   And what is that? | 10:13 |

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I think that's an ID used specifically | 10:13 |
| 2 | around Google ads. | 10:13 |
| 3 | Q.   Okay.  So does Facebook implicitly collect | 10:13 |
| 4 | device identifiers? | 10:13 |
| 5 | A.   We have access to those identifiers. | 10:14 |
| 6 | Q.   Okay.  And it also collects location | 10:14 |
| 7 | device, GPS, Wi-Fi, IP address, phone number, | 10:14 |
| 8 | carrier and device type; is that right? | 10:14 |
| 9 | A.   Yes. | 10:14 |
| 10 | MS. STEIN:  Object.  Objection to form. | 10:14 |
| 11 | BY MS. WEAVER: | 10:14 |
| 12 | Q.   Okay.  And then there's this box that says | 10:14 |
| 13 | "Infer from engagement on the site."  Do you see | 10:14 |
| 14 | that? | 10:14 |
| 15 | A.   Yes, I do. | 10:14 |
| 16 | Q.   What does that refer to? | 10:14 |
| 17 | A.   Information we may have that may be | 10:14 |
| 18 | derived by your activity on the platform. | 10:14 |
| 19 | Q.   And how is it derived? | 10:14 |
| 20 | A.   By web pages you like, what public figures | 10:14 |
| 21 | you may follow, these kind of things. | 10:14 |
| 22 | Q.   So is there a level of analysis in that | 10:14 |
| 23 | inference?  Like how does that actually happen with | 10:14 |
| 24 | the data? | 10:14 |
| 25 | A.   If, for example, you like Beyonce's page, | 10:14 |

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | we will assume that you have a strong affinity with | 10:15 |
| 2 | her music, and so that may suggest that you're -- | 10:15 |
| 3 | that you both -- you know, you like music for a | 10:15 |
| 4 | certain kind, for a certain genre, and you like | 10:15 |
| 5 | Beyonce.  That's how we would infer that. | 10:15 |
| 6 | Q.  How did you know? | 10:15 |
| 7 | So how does Facebook retain that | 10:15 |
| 8 | information once it draws that inference? | 10:15 |
| 9 | A.  You know, there would be -- | 10:15 |
| 10 | MS. STEIN:  Objection. | 10:15 |
| 11 | THE WITNESS:  There would be a list of | 10:15 |
| 12 | potential interest that would be derived by your | 10:15 |
| 13 | affinity to certain entities on the platform, | 10:15 |
| 14 | certain businesses on the platform. | 10:15 |
| 15 | BY MS. WEAVER: | 10:15 |
| 16 | Q.  And how does Facebook record those | 10:15 |
| 17 | interests, if you will? | 10:15 |
| 18 | MS. STEIN:  Objection to form. | 10:15 |
| 19 | THE WITNESS:  I mean -- I mean you have to | 10:15 |
| 20 | take action.  We wouldn't, you know, like have the | 10:15 |
| 21 | so-called record of that.  We would see if you ever | 10:16 |
| 22 | liked Beyonce's page and if you followed Beyonce. | 10:16 |
| 23 | That would be a signal. | 10:16 |
| 24 | BY MS. WEAVER: | 10:16 |
| 25 | Q.  Okay.  And so how does that signal come | 10:16 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | through in terms of data to Facebook and where does | 10:16 |
| 2 | it keep it? | 10:16 |
| 3 | A.   Well, that happens within Facebook itself, | 10:16 |
| 4 | right?  I'm not talking about you liking Beyonce's | 10:16 |
| 5 | website. | 10:16 |
| 6 | Q.   Right. | 10:16 |
| 7 | A.   I'm talking about you liking Beyonce's | 10:16 |
| 8 | page on Facebook. | 10:16 |
| 9 | Q.   Okay.  I'm just trying to understand -- | 10:16 |
| 10 | well, let me go back.  For the explicitly collect | 10:16 |
| 11 | data, right, where does Facebook maintain that data? | 10:16 |
| 12 | MS. STEIN:  Objection.  Form. | 10:16 |
| 13 | THE WITNESS:  What do you mean? | 10:16 |
| 14 | BY MS. WEAVER: | 10:16 |
| 15 | Q.   Well, I'm trying to understand.  Facebook | 10:16 |
| 16 | receives explicitly collected data; is that right? | 10:16 |
| 17 | A.   Yes. | 10:16 |
| 18 | Q.   And where does it receive it and where | 10:16 |
| 19 | does it go?  Where does the data go? | 10:16 |
| 20 | A.   It's a -- it's a very complicated | 10:16 |
| 21 | question, so let me try to answer it may be with, | 10:16 |
| 22 | you know, like a high-level perspective. | 10:17 |
| 23 | So when you come to Facebook for the first | 10:17 |
| 24 | time in your life you will create an account, right? | 10:17 |
| 25 | To create an account you need to provide the | 10:17 |

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | username and a password.  And then it will ask you a | 10:17 |
| 2 | couple of questions.  What is your first name?  What | 10:17 |
| 3 | is your last name?  What is your date of birth, and | 10:17 |
| 4 | so on and so on. | 10:17 |
| 5 | All that information lives in some, you | 10:17 |
| 6 | know, database somewhere, right?  The next time you | 10:17 |
| 7 | come to Facebook you decide to post a photo of | 10:17 |
| 8 | yourself, you know, celebrating your birthday.  That | 10:17 |
| 9 | information lives somewhere in a distributed | 10:17 |
| 10 | database, right? | 10:17 |
| 11 | Then some people will start liking your | 10:17 |
| 12 | page, saying -- will most likely be your friends. | 10:17 |
| 13 | That information is captured somewhere about who has | 10:17 |
| 14 | liked your photo. | 10:17 |
| 15 | Then the next day you come in and you -- | 10:17 |
| 16 | you like Beyonce's page because you just saw her two | 10:17 |
| 17 | months and you want to keep up with her work.  That | 10:18 |
| 18 | information is captured somewhere. | 10:18 |
| 19 | But all that information is available | 10:18 |
| 20 | to -- to you, right?  You can go into your Facebook | 10:18 |
| 21 | settings and you can find all that information. | 10:18 |
| 22 | Q.   Okay.  When you say it is captured | 10:18 |
| 23 | somewhere, where is the somewhere? | 10:18 |
| 24 | A.   It depends on, you know, what is that you | 10:18 |
| 25 | are looking for, right?  It's not a single place. | 10:18 |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Use your example.  I go on Facebook's | 10:18 |
| 2 | website and I take an action.  Where is that | 10:18 |
| 3 | captured?  You said it's captured somewhere.  Where | 10:18 |
| 4 | is the somewhere? | 10:18 |
| 5 | A.   Well, if it's about an activity, it maybe | 10:18 |
| 6 | something like Hive. | 10:18 |
| 7 | Q.   Okay. | 10:18 |
| 8 | A.   That's a database. | 10:18 |
| 9 | Q.   And what if it's a like? | 10:18 |
| 10 | A.   Again, it's an activity. | 10:18 |
| 11 | Q.   Okay.  What if it's something that | 10:18 |
| 12 | Facebook infers?  Where is it captured? | 10:18 |
| 13 | A.   The inference? | 10:18 |
| 14 | Q.   Yes. | 10:19 |
| 15 | A.   Probably nowhere. | 10:19 |
| 16 | Q.   Okay.  How is the inference drawn or | 10:19 |
| 17 | created?  Is there a program that runs on it?  Is | 10:19 |
| 18 | there a query? | 10:19 |
| 19 | A.   It's machine learning. | 10:19 |
| 20 | Q.   It's machine learning? | 10:19 |
| 21 | A.   Yes. | 10:19 |
| 22 | Q.   Okay.  And what are the programs that | 10:19 |
| 23 | engage in that kind of machine learning? | 10:19 |
| 24 | A.   Again, I guess I'm going to level a little | 10:19 |
| 25 | bit the conversation. | 10:19 |

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | If you ever liked Beyonce's page, that | 10:19 |
| 2 | would recapture it on your, you know, like personal | 10:19 |
| 3 | profile.  And if any advertiser, let's say, | 10:19 |
| 4 | Beyonce's label wants to advertise against an | 10:19 |
| 5 | audience of people that like Beyonce, they would | 10:19 |
| 6 | basically identify that in their ad campaign | 10:19 |
| 7 | settings and then we would find whoever may like | 10:19 |
| 8 | Beyonce's page and we will deliver on that about | 10:19 |
| 9 | Beyonce to them.  Very, very high level. | 10:19 |
| 10 | Q.   I understand the functioning that you're | 10:19 |
| 11 | describing.  I don't understand where the data goes | 10:19 |
| 12 | and how Facebook draws the inference. | 10:19 |
| 13 | A.   I'm really sorry, but I'm having a hard | 10:20 |
| 14 | time hearing.  Is it me or is it your mic? | 10:20 |
| 15 | MS. WEAVER:  I'm not having a hard time | 10:20 |
| 16 | hearing. | 10:20 |
| 17 | MS. STEIN:  It's the mic. | 10:20 |
| 18 | MS. WEAVER:  Oh, okay.  Can you hear me | 10:20 |
| 19 | now or is it -- | 10:20 |
| 20 | Q.   Okay.  So I'll repeat the question. | 10:20 |
| 21 | Where -- well -- how does Facebook infer data from | 10:20 |
| 22 | engagement on the site? | 10:20 |
| 23 | A.   It's mainly driven by your connections or | 10:20 |
| 24 | affiliations with specific entities on the website. | 10:20 |
| 25 | Q.   And -- | 10:20 |

Page 70

| | | |
|---|---|---|
| 1 | A.   And by "entities" I mean in most cases -- | 10:20 |
| 2 | THE REPORTER:  I'm sorry, "I mean in most | 10:20 |
| 3 | cases"... | 10:20 |
| 4 | BY MS. WEAVER: | 10:20 |
| 5 | Q.   And -- | 10:20 |
| 6 | THE REPORTER:  I'm sorry, "I mean in most | 10:20 |
| 7 | cases"... | 10:20 |
| 8 | THE WITNESS:  Pages, Facebook pages. | 10:20 |
| 9 | THE REPORTER:  Thank you. | 10:20 |
| 10 | BY MS. WEAVER: | 10:20 |
| 11 | Q.   Let me move on.  I'm going to return to | 10:20 |
| 12 | that because I think we need to drill down a little | 10:20 |
| 13 | bit.  But I'll just go to "Appended Data."  Do you | 10:21 |
| 14 | see that category? | 10:21 |
| 15 | A.   Yes. | 10:21 |
| 16 | Q.   And so appended data is data that Facebook | 10:21 |
| 17 | receives from third parties; is that right? | 10:21 |
| 18 | A.   Yes. | 10:21 |
| 19 | Q.   Okay.  And you see it refers to data | 10:21 |
| 20 | brokers there? | 10:21 |
| 21 | A.   Yes. | 10:21 |
| 22 | Q.   What is a data broker? | 10:21 |
| 23 | A.   It's -- sorry. | 10:21 |
| 24 | MS. STEIN:  Are you asking him to read | 10:21 |
| 25 | from the document or are you asking him his | 10:21 |

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | understanding? | 10:21 |
| 2 | MS. WEAVER:  I'm asking Facebook what a | 10:21 |
| 3 | data broker is. | 10:21 |
| 4 | THE WITNESS:  According to this document | 10:21 |
| 5 | it's a -- a list of third parties, including, you | 10:21 |
| 6 | know, like public records, DMVs or auto | 10:21 |
| 7 | registration, you know, authorities, supermarkets, | 10:21 |
| 8 | retailers and so on that provide access to certain | 10:21 |
| 9 | information. | 10:21 |
| 10 | BY MS. WEAVER: | 10:21 |
| 11 | Q.   Do you know what a data broker is? | 10:21 |
| 12 | A.   My definition of data broker? | 10:21 |
| 13 | Q.   Yes. | 10:22 |
| 14 | A.   Anybody that has access to a broad set of | 10:22 |
| 15 | data. | 10:22 |
| 16 | Q.   Okay.  Is Facebook a data broker? | 10:22 |
| 17 | A.   No. | 10:22 |
| 18 | Q.   Okay.  Did you talk to anybody -- well, | 10:22 |
| 19 | strike that. | 10:22 |
| 20 | Do you see where it says "Partner | 10:22 |
| 21 | categories" on this document? | 10:22 |
| 22 | A.   Yes. | 10:22 |
| 23 | Q.   What does that refer to? | 10:22 |
| 24 | A.   I guess a list of different categories I | 10:22 |
| 25 | listed myself.  It's also documented here. | 10:22 |

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And so do you see to the right there it | 10:22 |
| 2 | says "Public records, auto registration data, | 10:22 |
| 3 | supermarket loyalty cards, retail purchases, credit | 10:22 |
| 4 | card purchases," et cetera, on the right? | 10:22 |
| 5 | A.   Yes. | 10:22 |
| 6 | Q.   And is it your understanding that those | 10:22 |
| 7 | are examples of the kind -- kinds of data that | 10:22 |
| 8 | Facebook collects from data brokers? | 10:22 |
| 9 | A.   Yes.  I don't know if it's exhaustive or | 10:23 |
| 10 | not, but I would imagine that it is exhaustive. | 10:23 |
| 11 | Q.   Thank you.  And then underneath that do | 10:23 |
| 12 | you see where it says "Advertisers"? | 10:23 |
| 13 | A.   Yes. | 10:23 |
| 14 | Q.   What is an advertiser? | 10:23 |
| 15 | A.   Someone that is running marketing | 10:23 |
| 16 | companies on Facebook. | 10:23 |
| 17 | Q.   Okay.  And then there's a parenthetical | 10:23 |
| 18 | that refers to "Custom audiences, offline conversion | 10:23 |
| 19 | measurement."  Do you see that? | 10:23 |
| 20 | A.   Yes. | 10:23 |
| 21 | Q.   What is custom audiences? | 10:23 |
| 22 | A.   A custom audience is a reference to a | 10:23 |
| 23 | products whereby a business can upload and encrypt | 10:23 |
| 24 | its -- a version of their database of customers for | 10:23 |
| 25 | the purpose of running a campaign that targets those | 10:23 |

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | customers. | 10:23 |
| 2 | Q.   Okay.  I want to break that down a little | 10:23 |
| 3 | bit. | 10:23 |
| 4 | MS. WEAVER:  I'm not seeing that on my | 10:23 |
| 5 | live feed. | 10:23 |
| 6 | Could you read his response back, please. | 10:24 |
| 7 | (The record was read by the | 10:24 |
| 8 | court reporter, as requested) | 10:24 |
| 9 | BY MS. WEAVER: | 10:24 |
| 10 | Q.   Okay.  And when you say "encrypt," what do | 10:24 |
| 11 | you mean? | 10:24 |
| 12 | A.   They wouldn't upload the raw data.  They | 10:24 |
| 13 | would upload a version of that data. | 10:24 |
| 14 | THE REPORTER:  I'm sorry, could you repeat | 10:24 |
| 15 | that last part, please? | 10:24 |
| 16 | THE WITNESS:  They wouldn't upload raw | 10:24 |
| 17 | customer data.  They would upload encrypted personal | 10:24 |
| 18 | or hashed personal data. | 10:24 |
| 19 | BY MS. WEAVER: | 10:24 |
| 20 | Q.   Thank you.  And when you say "raw customer | 10:24 |
| 21 | data," what do you mean? | 10:24 |
| 22 | A.   Email addresses. | 10:24 |
| 23 | Q.   Anything else? | 10:24 |
| 24 | A.   No. | 10:24 |
| 25 | Q.   And what does "offline conversion | 10:24 |

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | measurement" mean? | 10:24 |
| 2 | A.   So imagine that you see an ad campaign | 10:24 |
| 3 | from Walmart, but you don't necessarily click on | 10:25 |
| 4 | that to buy the specific thing that they advertise. | 10:25 |
| 5 | But eventually you visit the Walmart and you end up | 10:25 |
| 6 | purchasing something, not necessarily the same item | 10:25 |
| 7 | from Walmart. | 10:25 |
| 8 |         If Walmart wanted to track the offline | 10:25 |
| 9 | conversion, the fact that you purchased something | 10:25 |
| 10 | from them in their retail location, they could | 10:25 |
| 11 | actually made available some encrypted data again | 10:25 |
| 12 | back to us, and we would confirm to them that a | 10:25 |
| 13 | certain percentage of people that have interacted | 10:25 |
| 14 | with Walmart offline have actually seen the ads that | 10:25 |
| 15 | Walmart has run. | 10:25 |
| 16 | Q.   So what does "conversion" mean in that | 10:25 |
| 17 | sentence?  Purchase? | 10:25 |
| 18 | A.   It's defined by the advertiser.  Because | 10:25 |
| 19 | the -- the advertiser may optimize for store visits | 10:25 |
| 20 | versus others that may optimize for purchases, | 10:26 |
| 21 | right?  So -- | 10:26 |
| 22 | Q.   So conversion is taking some action as | 10:26 |
| 23 | defined by the advertiser; is that correct? | 10:26 |
| 24 | A.   Correct. | 10:26 |
| 25 | Q.   And that could also include engaging in -- | 10:26 |

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | well, strike that. | 10:26 |
| 2 | Could conversion also include a like or | 10:26 |
| 3 | agreeing to become a member of a group? | 10:26 |
| 4 | A.   "No" in that context because we are | 10:26 |
| 5 | talking about offline conversion. | 10:26 |
| 6 | Q.   Got it.  Does advertisers here also | 10:26 |
| 7 | include political campaigns? | 10:26 |
| 8 | A.   I'm looking at the -- sorry.  Sorry.  I | 10:26 |
| 9 | need to answer that, I guess.  What do you mean?  In | 10:26 |
| 10 | what context? | 10:26 |
| 11 | Q.   Do political campaigns advertise? | 10:26 |
| 12 | A.   Yes, they do. | 10:26 |
| 13 | Q.   Okay.  And when they are seeking | 10:26 |
| 14 | conversion, are they seeking to encourage certain | 10:26 |
| 15 | actions by Facebook users? | 10:26 |
| 16 | MS. STEIN:  Objection to form. | 10:27 |
| 17 | THE WITNESS:  Yeah, but that wouldn't | 10:27 |
| 18 | include, you know, like what people voted.  It would | 10:27 |
| 19 | probably include if they read, or if they donated, | 10:27 |
| 20 | or if they took an action on their website, | 10:27 |
| 21 | depending on what the campaign is actually optimized | 10:27 |
| 22 | for. | 10:27 |
| 23 | BY MS. WEAVER: | 10:27 |
| 24 | Q.   Got it. | 10:27 |
| 25 | A.   But, no, the conversion wouldn't be that I | 10:27 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | voted for Biden or I voted for Trump.  That's not -- | 10:27 |
| 2 | THE REPORTER:  I'm sorry, could you please | 10:27 |
| 3 | slow down.  The last part? | 10:27 |
| 4 | THE WITNESS:  Oh, sorry. | 10:27 |
| 5 | THE REPORTER:  "The conversion"... | 10:27 |
| 6 | THE WITNESS:  The conversion that | 10:27 |
| 7 | political campaigns are tracking have to do with | 10:27 |
| 8 | fundraising, donations, registration, this kind of | 10:27 |
| 9 | things. | 10:27 |
| 10 | BY MS. WEAVER: | 10:27 |
| 11 | Q.   Okay.  And so Facebook provides conversion | 10:27 |
| 12 | measurement information back to the advertisers | 10:27 |
| 13 | which could include political campaigns; is that | 10:27 |
| 14 | right? | 10:27 |
| 15 | MS. STEIN:  Objection to form. | 10:27 |
| 16 | THE WITNESS:  Yes. | 10:27 |
| 17 | BY MS. WEAVER: | 10:27 |
| 18 | Q.   And then do you see on the right of | 10:27 |
| 19 | Advertisers it says "Existing customer | 10:27 |
| 20 | relationships"?  Do you see that?  It's to the right | 10:27 |
| 21 | of Advertisers. | 10:28 |
| 22 | A.   Yes. | 10:28 |
| 23 | Q.   What does "Existing customer | 10:28 |
| 24 | relationships," that subcategories of advertisers, | 10:28 |
| 25 | refer to? | 10:28 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   And so going back to our example earlier,      10:28

2    if -- if you are Walmart again, and you know that --    10:28

3    let's say there are thousands of people that            10:28

4    attempted to purchase a TV from Walmart's website       10:28

5    and you have an understanding of the email addresses    10:28

6    of those people.  Then you can encrypt those email      10:28

7    addresses, make them available to Facebook to create    10:28

8    what we call a custom audience.                         10:28

9          And then Facebook will, you know, like --        10:28

10   can target those specific users to the extent that      10:28

11   they are also Facebook users, of course, with an ad     10:28

12   that offers them, let's say, a discount for that        10:28

13   specific TV.                                            10:28

14      Q.   What do you mean by "encrypt"?                  10:28

15      A.   Again we -- we want to have access to           10:29

16   their raw email addresses.  We will have access to      10:29

17   hashed personal email addresses and then we will        10:29

18   match them with the hashed personal email address we    10:29

19   have on record and find those users that have both a    10:29

20   Walmart account and a Facebook account.                 10:29

21      Q.   So what is the difference between               10:29

22   encryption and hashing?                                 10:29

23      A.   It's same thing in that sense.                  10:29

24      Q.   It is the same thing?                           10:29

25      A.   Yeah.                                           10:29

                                              Page  78

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q. Is it true that hashing has two inputs -- | 10:29 |
| 2 | well, let me go back. Is it fair to say that | 10:29 |
| 3 | encryption has two inputs so that if you have a key, | 10:29 |
| 4 | you can associate data point together; is that fair? | 10:29 |
| 5 | MS. STEIN: Object to form. He's not here | 10:29 |
| 6 | as a technical expert, so... | 10:29 |
| 7 | You can give your high-level | 10:29 |
| 8 | understanding, if you have one. | 10:29 |
| 9 | THE WITNESS: Yes, I don't -- I don't | 10:29 |
| 10 | want -- I don't want to talk about, you know, like | 10:29 |
| 11 | encryption. But it's important here, I think, to | 10:29 |
| 12 | take away is that we don't have access to those | 10:29 |
| 13 | email addresses and they don't have access to the | 10:30 |
| 14 | people who we ended up identifying as users who have | 10:30 |
| 15 | both a Facebook account and a Walmart account. | 10:30 |
| 16 | BY MS. WEAVER: | 10:30 |
| 17 | Q. Okay. Well, just looking at this page, | 10:30 |
| 18 | you see that there's the word "Hashed data matching" | 10:30 |
| 19 | on it? It's below -- it's in the native data box | 10:30 |
| 20 | there. | 10:30 |
| 21 | A. Yes. | 10:30 |
| 22 | Q. Do you see where it says "Hashed data | 10:30 |
| 23 | matching"? | 10:30 |
| 24 | A. Yes. | 10:30 |
| 25 | Q. What is hashed data matching? | 10:30 |

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   This is the data that we were talking | 10:30 |
| 2 | about used for custom audience. | 10:30 |
| 3 | Q.   So could you, please, explain what hashed | 10:30 |
| 4 | data matching is? | 10:30 |
| 5 | A.   If an advertiser has information about a | 10:30 |
| 6 | user, a customer of theirs, like their email | 10:30 |
| 7 | address -- I didn't realize that we can actually be | 10:30 |
| 8 | based on phone number or home address, but if it | 10:30 |
| 9 | seems to be the case, then that's basic data that we | 10:30 |
| 10 | can use to match those users on the Facebook site. | 10:30 |
| 11 | Q.   And do you see that there's an arrow here | 10:30 |
| 12 | that goes from "Email address, phone number and | 10:30 |
| 13 | address," it's a dotted line but goes to "Hashed | 10:31 |
| 14 | data matching," and then it goes down to "Appended | 10:31 |
| 15 | Data"?  Do you see that? | 10:31 |
| 16 | A.   Yes, I do.  I do see that. | 10:31 |
| 17 | Q.   Okay.  And so what's your understanding of | 10:31 |
| 18 | what those arrows mean? | 10:31 |
| 19 | A.   No idea. | 10:31 |
| 20 | Q.   Okay.  Is it indicating that there is | 10:31 |
| 21 | hashed data matching of email address, phone number | 10:31 |
| 22 | and address with appended data? | 10:31 |
| 23 | A.   I'm not sure if it's entirely true for all | 10:31 |
| 24 | categories.  I know that based on our conversation | 10:31 |
| 25 | earlier, that this is definitely how a customer | 10:31 |

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | audiences work. | 10:31 |
| 2 | Q.   And then going now back to the appended | 10:31 |
| 3 | data chart.  Do you see where it says "Purchase | 10:31 |
| 4 | history," near "Advertisers"? | 10:31 |
| 5 | A.   Yes. | 10:31 |
| 6 | Q.   What does that refer to? | 10:31 |
| 7 | A.   Activity that leads to purchase on a | 10:31 |
| 8 | third-party website. | 10:32 |
| 9 | Q.   Okay.  And so that is data -- go ahead. | 10:32 |
| 10 | A.   It's similar to the example we discussed | 10:32 |
| 11 | before, right?  The targeting on the Walmart side | 10:32 |
| 12 | may have happened on the fact that you added | 10:32 |
| 13 | something from your cart and you never, you know, | 10:32 |
| 14 | like, completed the purchase. | 10:32 |
| 15 | But there may be other scenarios where the | 10:32 |
| 16 | advertiser is looking at your purchase history, | 10:32 |
| 17 | whether it is offline or online -- I think that | 10:32 |
| 18 | probably refers to offline -- to match you with a | 10:32 |
| 19 | specific ad campaign that they run. | 10:32 |
| 20 | Q.   Okay.  So Facebook is getting data about, | 10:32 |
| 21 | for example, that I had something in my cart that I | 10:32 |
| 22 | didn't purchase; is that right? | 10:32 |
| 23 | MS. STEIN:  Object to form. | 10:32 |
| 24 | THE WITNESS:  No, not that, no. | 10:32 |
| 25 | | |

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 10:32 |
| 2 | Q.   Okay.  Who has it?  You just gave that as | 10:32 |
| 3 | an example. | 10:32 |
| 4 | A.   Yeah, but that is a logic that takes place | 10:32 |
| 5 | on the advertiser's side. | 10:32 |
| 6 | Q.   Okay. | 10:32 |
| 7 | A.   The advertiser selects the marketing team | 10:32 |
| 8 | on the advertiser side to decide what kind of | 10:32 |
| 9 | campaign they want to run.  And they create a | 10:33 |
| 10 | segment of their customers that they want to target | 10:33 |
| 11 | with their ad campaign, and then they will decide | 10:33 |
| 12 | what creative they want to use, like how the ad is | 10:33 |
| 13 | going to look like. | 10:33 |
| 14 | Q.   Right.  But this is a list of information | 10:33 |
| 15 | that Facebook receives, right? | 10:33 |
| 16 | MS. STEIN:  Objection to form. | 10:33 |
| 17 | THE WITNESS:  The information we receive | 10:33 |
| 18 | is not the activities.  It's hashed email addresses | 10:33 |
| 19 | or hashed phone numbers from the advertisers. | 10:33 |
| 20 | BY MS. WEAVER: | 10:33 |
| 21 | Q.   Okay.  Looking at this chart here, it's | 10:33 |
| 22 | labeled, "What kinds of information does Facebook | 10:33 |
| 23 | receive?" correct? | 10:33 |
| 24 | MS. STEIN:  Objection to form. | 10:33 |
| 25 | (Background audio interference.) | 10:33 |

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  Somebody needs to put their | 10:33 |
| 2 | phones on mute or their computers on mute. | 10:34 |
| 3 | Q.    Returning to the document, sir, isn't this | 10:34 |
| 4 | page a list of information that Facebook receives | 10:34 |
| 5 | about people? | 10:34 |
| 6 | MS. STEIN:  Objection to form. | 10:34 |
| 7 | THE WITNESS:  We received information that | 10:34 |
| 8 | an associate hashed email address with a Walmart | 10:34 |
| 9 | customer. | 10:34 |
| 10 | MS. WEAVER:  Okay.  Tat's -- I'll just | 10:34 |
| 11 | move to strike as nonresponsive.  We will move on. | 10:34 |
| 12 | Q.    Going back to this category that says | 10:34 |
| 13 | "Both."  Do you see that, near Appended Data? | 10:34 |
| 14 | A.    Yes. | 10:34 |
| 15 | Q.    What does "both" mean? | 10:34 |
| 16 | MS. STEIN:  Objection to form. | 10:34 |
| 17 | THE WITNESS:  A combination of advertisers | 10:34 |
| 18 | and data brokers, I assume. | 10:34 |
| 19 | THE REPORTER:  I'm sorry, could you repeat | 10:34 |
| 20 | that, please.  Information? | 10:34 |
| 21 | THE WITNESS:  A combination of advertisers | 10:34 |
| 22 | and data brokers. | 10:34 |
| 23 | BY MS. WEAVER: | 10:34 |
| 24 | Q.    Okay.  And so does this document reflect | 10:34 |
| 25 | that Facebook receives from both customized | 10:34 |

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | third-party data and enhanced customer databases? | 10:34 |
| 2 | MS. STEIN:  Objection to form.  The | 10:35 |
| 3 | document speaks for itself. | 10:35 |
| 4 | MS. WEAVER:  I'm here to depose him about | 10:35 |
| 5 | the document, Deb.  It was identified ahead of time. | 10:35 |
| 6 | Please answer the question. | 10:35 |
| 7 | MS. STEIN:  Yeah, Lesley, this document is | 10:35 |
| 8 | all about targeted advertising, and you've been | 10:35 |
| 9 | going on for about an hour about targeted | 10:35 |
| 10 | advertising which isn't even in this case.  It's | 10:35 |
| 11 | outside the scope of this case. | 10:35 |
| 12 | MS. WEAVER:  You can instruct him not to | 10:35 |
| 13 | answer if you want, but I'm actually -- | 10:35 |
| 14 | MS. STEIN:  Lesley, I've let this witness | 10:35 |
| 15 | testify for an hour about targeted advertising.  So | 10:35 |
| 16 | if you want to ask him about the scope of this | 10:35 |
| 17 | deposition, you're free to, but suggesting that just | 10:35 |
| 18 | because you sent us a document about targeted | 10:35 |
| 19 | advertising -- | 10:35 |
| 20 | MS. WEAVER:  Deb, stop lecturing and | 10:35 |
| 21 | wasting my minutes with the witness, please. | 10:35 |
| 22 | MS. STEIN:  Lesley, I am stating my | 10:35 |
| 23 | position for the record.  This is a 30(b)(6) | 10:35 |
| 24 | deposition on a specific set of topics.  You've gone | 10:35 |
| 25 | beyond the scope.  I've been very liberal in that. | 10:35 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I will let the witness continue answering | 10:35 |
| 2 | some more questions, but if it continues focusing on | 10:35 |
| 3 | targeted advertising, then we're going to have to | 10:36 |
| 4 | move on. | 10:36 |
| 5 | BY MS. WEAVER: | 10:36 |
| 6 | Q.   So the question -- I'm sorry, K.P. -- the | 10:36 |
| 7 | question is this:  Does Facebook receive information | 10:36 |
| 8 | from advertisers and data brokers that includes | 10:36 |
| 9 | customized third-party data and enhanced customer | 10:36 |
| 10 | databases? | 10:36 |
| 11 | MS. STEIN:  Objection to form. | 10:36 |
| 12 | THE WITNESS:  I don't know the definition | 10:36 |
| 13 | of an "enhanced customer database." | 10:36 |
| 14 | BY MS. WEAVER: | 10:36 |
| 15 | Q.   Okay. | 10:36 |
| 16 | A.   But customers' third-party data that are | 10:36 |
| 17 | usually reflect to Facebook, yes, that's no | 10:36 |
| 18 | different from my understanding of how customer | 10:36 |
| 19 | audiences work. | 10:36 |
| 20 | Q.   Thank you. | 10:36 |
| 21 | And does Facebook also receive behavioral | 10:36 |
| 22 | data? | 10:36 |
| 23 | A.   In what context? | 10:36 |
| 24 | Q.   Well, I'm just reading from the chart.  Do | 10:36 |
| 25 | you see where it says "Behavioral Data"? | 10:36 |

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        A.   Okay.  In the context of this document --    10:36

2        Q.   Yes.                                          10:36

3        A.   -- not in the context of appended data?      10:36

4   Yes, we do collect.                                     10:36

5        Q.   Yes.  I'm so sorry.  So I'll ask the         10:36

6   question again.  Does Facebook also receive            10:36

7   behavioral data about people?                          10:36

8        A.   Yes.                                          10:36

9        Q.   Okay.  And do you see where it says "Web     10:36

10  pixels" here?                                           10:36

11       A.   Yes.                                          10:37

12       Q.   What does that refer to?                      10:37

13       A.   It refers to the different implementation    10:37

14  of the Facebook pixel that is used in conjunction --   10:37

15  in conjunction with ad campaigns most of the time.     10:37

16       Q.   Okay.  And what is a conversion pixel?       10:37

17       A.   It's a pixel that is strategically          10:37

18  placed -- "strategically" meaning it's down to the     10:37

19  advertiser -- on the page, on their website that       10:37

20  tracks the effectiveness of their ad campaign          10:37

21  depending on their -- their objective of the           10:37

22  company.                                                10:37

23       Q.   Okay.  And then "Web SDK," do you see        10:37

24  that?                                                   10:37

25       A.   Yes.                                          10:37
```

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What does that refer to? | 10:37 |
| 2 | A.   So this is the version of the SDK that is | 10:37 |
| 3 | used by websites. | 10:37 |
| 4 | Q.   Okay.  And did that change over time? | 10:37 |
| 5 | A.   Yes, we update the SDKs quite regularly. | 10:38 |
| 6 | Q.   Okay.  And "Mobile SDK," what is that? | 10:38 |
| 7 | A.   This is the SDK that is used by native | 10:38 |
| 8 | apps, meaning iOS and Android. | 10:38 |
| 9 | Q.   Okay.  I just want to go back to | 10:38 |
| 10 | behavioral data for a minute.  What is behavioral | 10:38 |
| 11 | data as opposed to appended data? | 10:38 |
| 12 | A.   I think we discussed about that before. | 10:38 |
| 13 | So I'll try to repeat my previous response. | 10:38 |
| 14 | So behavioral data is activities happening | 10:38 |
| 15 | on third-party sites that are being captured through | 10:38 |
| 16 | a Facebook product, a pixel or an SDK. | 10:38 |
| 17 | Q.   Okay.  I see that I guess the videographer | 10:38 |
| 18 | would like to take a quick break.  So do you want to | 10:38 |
| 19 | just -- is that comfortable for you, K.P., to take a | 10:38 |
| 20 | break for a little bit here? | 10:38 |
| 21 | A.   Yes, I need a coffee. | 10:38 |
| 22 | MS. WEAVER:  Okay.  So why don't we come | 10:38 |
| 23 | back at, do you want to say, 10:50? | 10:38 |
| 24 | THE WITNESS:  10 minutes from now? | 10:38 |
| 25 | MS. WEAVER:  Yeah, does that work?  Well, | 10:39 |

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    1   11 minutes?  Okay.  Great.                        10:39

      2                 THE VIDEOGRAPHER:  We are off the record   10:39

 2                 10:39   3    at       a.m.

      10:39

 3    4            (Recess.)                                 10:39

                   10:39   5              (Off record:     a.m.)

 4    10:39

 5    6            (On record:  10:53 a.m.)                  10:39

 6    7                 THE VIDEOGRAPHER:  We are on the record at  10:53

 7                 10:53   8         a.m.

 8    10:53

 9    9   BY MS. WEAVER:                                     10:53

10   10        Q.   Hello, K.P.  You understand you are still   10:53

11   11   under oath, correct?                               10:53

12   12        A.   Yes, I do.                               10:53

13   13        Q.   Okay.  Returning to where we left off, we  10:53

14   14   were discussing behavioral data before the break.  10:53

15   15   Do you recall that?                                10:53

16   16        A.   Yes, I do.                               10:53

17   17        Q.   And you testified that behavioral data is  10:53

18   18   activities happening on third-party sites that are  10:53

19   19   captured through a Facebook product, a pixel, or an  10:53

20   20   SDK; is that correct?                              10:53

21   21        A.   Correct.                                 10:53

22   22             MS. STEIN:  Object to form.              10:53

23   23   BY MS. WEAVER:                                     10:53

24   24        Q.   And so to the right here do you see it   10:53

25   25   says "Website browsing behavior, Conversions,      10:53
```

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | (example, purchases) off Facebook"?  Do you see | 10:53 |
| 2 | that? | 10:54 |
| 3 |     A.   Yes, I do. | 10:54 |
| 4 |     Q.   Okay.  So does this reflect that Facebook | 10:54 |
| 5 | receives browsing behavior and conversions off | 10:54 |
| 6 | Facebook about users? | 10:54 |
| 7 |       MS. STEIN:  Objection to form. | 10:54 |
| 8 |       THE WITNESS:  Yeah.  So at a very high | 10:54 |
| 9 | level, whenever someone is using the pixel, and to | 10:54 |
| 10 | the extent that they use the pixel in different | 10:54 |
| 11 | parts of their website, we would be able to have an | 10:54 |
| 12 | understanding of the purchase flow, if that's what | 10:54 |
| 13 | they are optimizing. | 10:54 |
| 14 | BY MS. WEAVER: | 10:54 |
| 15 |     Q.   Okay.  And do you see here where it says | 10:54 |
| 16 | "Explicit actions (likes, logins) off Facebook"? | 10:54 |
| 17 |     A.   Yes. | 10:54 |
| 18 |     Q.   Do you see that?  What does that refer to? | 10:54 |
| 19 |       MS. STEIN:  Objection.  Asked and | 10:54 |
| 20 | answered. | 10:54 |
| 21 |       You can answer. | 10:54 |
| 22 |       THE WITNESS:  This is in relation to the | 10:54 |
| 23 | web SDK and refers to activities captured in -- this | 10:54 |
| 24 | is for the purpose of those examples via the | 10:55 |
| 25 | Facebook log-in button and a like button. | 10:55 |

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                        10:55

 2         Q.   Okay.  And do you see at the bottom of the  10:55

 3    page here it refers to "Onavo"?                       10:55

 4         A.   Yes.                                        10:55

 5         Q.   And what is Onavo?                          10:55

 6         A.   Onavo is a -- an app we acquired some       10:55

 7    five, six years ago, if I'm not mistaken, that's      10:55

 8    offers the users the ability to compress the data     10:55

 9    from all apps that they used on their phones to save  10:55

10    on data charges.                                      10:55

11         Q.   So it was called Onavo Protect; is that     10:55

12    correct?                                              10:55

13         A.   I don't remember the exact name of the      10:55

14    app.                                                  10:55

15         Q.   Do you recall that it was a VPN, a virtual  10:55

16    private network?                                      10:55

17              MS. STEIN:  Objection to form.              10:55

18              THE WITNESS:  Yes.                          10:55

19    BY MS. WEAVER:                                        10:55

20         Q.   And so did it effectively route all of the  10:55

21    user's activity through Facebook servers?             10:55

22              MS. STEIN:  Object to form.                 10:55

23              THE WITNESS:  Through Facebook servers?     10:55

24    BY MS. WEAVER:                                        10:55

25         Q.   Uh-huh.                                     10:56
```

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

|   |   |   |
|---|---|---|
| 1 | A.   I don't think so.  That was an independent | 10:56 |
| 2 | company. | 10:56 |
| 3 | Q.   Right.  But didn't it route all of users' | 10:56 |
| 4 | activity through Facebook servers? | 10:56 |
| 5 | MS. STEIN:  Objection to form.  Beyond the | 10:56 |
| 6 | scope. | 10:56 |
| 7 | MS. WEAVER:  It relates directly to the | 10:56 |
| 8 | data that Facebook was collecting through Onavo. | 10:56 |
| 9 | Q.   Isn't it true that Facebook suspended | 10:56 |
| 10 | Onavo? | 10:56 |
| 11 | MS. STEIN:  Objection to form.  Beyond the | 10:56 |
| 12 | scope.  This witness is not testifying about -- | 10:56 |
| 13 | MS. WEAVER:  Are you instructing him not | 10:56 |
| 14 | to answer my question about Onavo? | 10:56 |
| 15 | MS. STEIN:  That it's not subject to this | 10:56 |
| 16 | testimony.  He's not here -- he knows it -- he's not | 10:56 |
| 17 | designated -- | 10:56 |
| 18 | MS. WEAVER:  State an objection to form or | 10:56 |
| 19 | instruct him not to answer.  Please don't fill my | 10:56 |
| 20 | record with your speeches. | 10:56 |
| 21 | MS. STEIN:  Okay.  It's not a speech.  I'm | 10:56 |
| 22 | explaining that this witness came prepared to | 10:56 |
| 23 | testify about certain things.  He's not a company | 10:56 |
| 24 | witness on suspensions, so he's not answering the | 10:56 |
| 25 | question. | 10:56 |

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 10:56 |
| 2 | Q.   Do you see to the right of the word | 10:56 |
| 3 | "Onavo" here, K.P., where it says "Opt-in panel: | 10:56 |
| 4 | all device network activity"?  Do you see that? | 10:57 |
| 5 | A.   Yes, I see that. | 10:57 |
| 6 | Q.   What does that refer to? | 10:57 |
| 7 | A.   Again, only guess. | 10:57 |
| 8 | Q.   What -- what do you believe it means? | 10:57 |
| 9 | MS. STEIN:  The witness should not guess. | 10:57 |
| 10 | If he knows, he can answer.  If he does not know, he | 10:57 |
| 11 | should not answer. | 10:57 |
| 12 | THE WITNESS:  I don't know. | 10:57 |
| 13 | BY MS. WEAVER: | 10:57 |
| 14 | Q.   Okay.  Does that refer to the fact that | 10:57 |
| 15 | Facebook received all device network activity | 10:57 |
| 16 | through Onavo? | 10:57 |
| 17 | MS. STEIN:  Objection.  The witness just | 10:57 |
| 18 | said he doesn't know. | 10:57 |
| 19 | BY MS. WEAVER: | 10:57 |
| 20 | Q.   You can answer the question. | 10:57 |
| 21 | A.   I don't know. | 10:57 |
| 22 | Q.   Okay.  Did you have any personal | 10:57 |
| 23 | involvement with Onavo? | 10:57 |
| 24 | A.   No, I didn't. | 10:57 |
| 25 | Q.   Okay.  Do you know who did? | 10:57 |

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It's a very broad question.  So in what | 10:57 |
| 2 | capacity? | 10:57 |
| 3 | Q.   Who oversaw the Onavo project from within | 10:57 |
| 4 | Facebook?  It was a partnership, correct? | 10:57 |
| 5 | A.   No, it's not a partnership.  It's an | 10:57 |
| 6 | acquisition. | 10:57 |
| 7 | Q.   Okay.  So who oversaw that acquisition? | 10:57 |
| 8 | A.   On the Facebook side or -- | 10:57 |
| 9 | Q.   Yes. | 10:58 |
| 10 | A.   -- after the acquisition? | 10:58 |
| 11 | Q.   On the Facebook side. | 10:58 |
| 12 | A.   I don't know. | 10:58 |
| 13 | Q.   Okay.  What about after the acquisition? | 10:58 |
| 14 | A.   The -- I guess the CEO of Onavo. | 10:58 |
| 15 | Q.   Okay.  Move on. | 10:58 |
| 16 | Do you know what an opt-in panel is? | 10:58 |
| 17 | A.   I don't know. | 10:58 |
| 18 | Q.   So I'll turn to the next page on this | 10:58 |
| 19 | document.  And that's the one beginning at 425.  Do | 10:58 |
| 20 | you see that?  It says "Hard Questions" at the top? | 10:58 |
| 21 | A.   Yes. | 10:58 |
| 22 | Q.   Okay.  And then do you see where it says | 10:58 |
| 23 | "Does Facebook share my data with advertisers?"  Do | 10:58 |
| 24 | you see that? | 10:58 |
| 25 | A.   I see that. | 10:58 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    And in quotes it says "We don't share the          10:58

2    private information that you put on Facebook with         10:58

3    advertisers without your consent."  Do you see that?     10:58

4    A.    I see that.                                         10:58

5    Q.    And do you see that it's in quotations?             10:58

6    A.    Yes.                                                10:59

7    Q.    And is that in quotations because that was          10:59

8    Facebook's policy at the time?                            10:59

9         MS. STEIN:  Objection to form.  If the               10:59

10   witness knows what the people who wrote this --           10:59

11        MS. WEAVER:  Please stop coaching him and            10:59

12   telling him to say that he doesn't know.                  10:59

13        MS. STEIN:  Lesley -- Lesley, do not                 10:59

14   accuse me of coaching.  You've gotten --                  10:59

15        MS. WEAVER:  That's strike one.                      10:59

16   Q.    Okay.  Go ahead, K.P.                               10:59

17        MS. STEIN:  Excuse me?                               10:59

18   BY MS. WEAVER:                                            10:59

19   Q.    I'll ask the question again.  Do you know           10:59

20   at this point in time whether Facebook's policy was,      10:59

21   "We don't share the private information that you put      10:59

22   on Facebook with advertisers without your consent"?       10:59

23   A.    I can only speak at a high level.  This             10:59

24   has always been not just the policy but the way we        10:59

25   operated as a business.                                   10:59

Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   Okay.  Thank you.                        10:59

 2        And then do you see it says "Why do we use    10:59

 3   that framing?" right below it?                     10:59

 4        A.   Yes, yes.                                10:59

 5        Q.   Okay.  And then there's a bullet point   10:59

 6   that says "Though Facebook's policies prohibit     11:00

 7   sharing of data with data brokers or similar       11:00

 8   entities, we only make commitments about what      11:00

 9   Facebook will do."  Do you see that?               11:00

10        A.   Yes, I do.                               11:00

11        Q.   Okay.  So is it a true statement that at 11:00

12   this time Facebook's policy prohibited sharing of  11:00

13   data with data brokers or similar entities?        11:00

14        A.   Yes.                                     11:00

15        Q.   Okay.  And do you have an understanding as 11:00

16   to what the "We only make commitments about what   11:00

17   Facebook will do," what does that mean?            11:00

18        A.   It means that Facebook as a business only 11:00

19   makes public commitments about things that are     11:00

20   within our control.                                11:00

21        Q.   Okay.  And so I just want to direct your 11:00

22   attention to the bottom bullet point there in the  11:00

23   second sentence.  Do you see where it says "Also, we 11:00

24   may in the future operate a 'data cooperative,' or 11:01

25   other product allowing exchange of information that 11:01
```

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | people haven't given to us directly"?  Do you see | 11:01 |
| 2 | that? | 11:01 |
| 3 |      A.   I see that. | 11:01 |
| 4 |      Q.   Okay.  Do you know what a data cooperative | 11:01 |
| 5 | is as it's expressed here? | 11:01 |
| 6 |      A.   It would probably mean some sort of a | 11:01 |
| 7 | partnership with data brokers. | 11:01 |
| 8 |      Q.   Okay.  And do you know if Facebook did | 11:01 |
| 9 | engage in a data cooperative with data brokers? | 11:01 |
| 10 |      A.   No. | 11:01 |
| 11 |      Q.   No, you don't know, or, no, they did not? | 11:01 |
| 12 |      A.   No, we haven't. | 11:01 |
| 13 |      Q.   Okay.  What is -- a little bit lower | 11:01 |
| 14 | there, do you see "Facebook Exchange" referenced? | 11:01 |
| 15 |      A.   Yes. | 11:01 |
| 16 |      Q.   What does that refer to? | 11:01 |
| 17 |      A.   I don't know. | 11:01 |
| 18 |      Q.   Okay.  There's a question here "How can | 11:02 |
| 19 | people see what you know about them and control | 11:02 |
| 20 | their ad experiences?"  Do you see that? | 11:02 |
| 21 |      A.   Yes, I see that. | 11:02 |
| 22 |      Q.   And there's something there that says | 11:02 |
| 23 | "Context menu."  Do you see it? | 11:02 |
| 24 |      A.   Yes. | 11:02 |
| 25 |      Q.   What is that? | 11:02 |

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Sorry, I'm searching back so I can see | 11:02 |
| 2 | you. | 11:02 |
| 3 | So there is a -- an option for every app | 11:02 |
| 4 | that you see on your feed to check who is the | 11:02 |
| 5 | advertiser and why you may have been targeted. | 11:02 |
| 6 | Q.    Okay.  And can you -- that was during the | 11:02 |
| 7 | time period in 2012 to 2017? | 11:02 |
| 8 | A.    My -- I don't know exactly when that | 11:02 |
| 9 | option was added, but I believe it was always there. | 11:02 |
| 10 | Q.    Okay.  And "Activity Log and Download Your | 11:02 |
| 11 | Information (DYI)."  Do you see that? | 11:02 |
| 12 | A.    Yes. | |
| 13 | Q.    And it says "See the information you've | 11:03 |
| 14 | put on Facebook that may be used for ads."  Do you | 11:03 |
| 15 | see that? | 11:03 |
| 16 | A.    Yes. | 11:03 |
| 17 | Q.    So is it true that -- well, let me back | 11:03 |
| 18 | up.  What is the activity log? | 11:03 |
| 19 | A.    It's a list of every single action you | 11:03 |
| 20 | have taken on Facebook. | 11:03 |
| 21 | Q.    Okay.  And what is "Download Your | 11:03 |
| 22 | Information"? | 11:03 |
| 23 | A.    It's a user-friendly way of downloading -- | 11:03 |
| 24 | it's a file basically, but it's a user-friendly file | 11:03 |
| 25 | of everything that Facebook held -- all the | 11:03 |

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | information that Facebook has for you. | 11:03 |
| 2 |     Q.   Okay.  And going back to the activity log, | 11:03 |
| 3 | it's a list of every single action you have taken on | 11:03 |
| 4 | Facebook.  Do you mean on the platform? | 11:03 |
| 5 |     A.   I believe it's on the platform, yes. | 11:03 |
| 6 |     Q.   Okay.  So is it limited to only the | 11:03 |
| 7 | activity on the platform? | 11:03 |
| 8 |     A.   The Facebook activity log, yes. | 11:04 |
| 9 |     Q.   Okay.  And back to the DYI.  You say it's | 11:04 |
| 10 | all the information that Facebook has for you; is | 11:04 |
| 11 | that correct? | 11:04 |
| 12 |     A.   Yes. | 11:04 |
| 13 |     Q.   What do you mean by that? | 11:04 |
| 14 |     A.   It includes from things from like the | 11:04 |
| 15 | information you submitted when you created your | 11:04 |
| 16 | account, to the photos that you may have uploaded, | 11:04 |
| 17 | to the pixels of your friends you may have liked, to | 11:04 |
| 18 | the ads you may have seen, the videos you may have | 11:04 |
| 19 | watched.  It's a -- it's a very lengthy, you know, | 11:04 |
| 20 | like document with different things. | 11:04 |
| 21 |     Q.   Okay.  So going back to the previous page | 11:04 |
| 22 | where we were talking about appended data, does the | 11:04 |
| 23 | DIY tool include appended data? | 11:04 |
| 24 |     A.   No. | 11:04 |
| 25 |     Q.   Okay.  Does it include behavioral data? | 11:04 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection to form. | 11:04 |
| 2 | THE WITNESS:  Yes, it does. | 11:05 |
| 3 | BY MS. WEAVER: | 11:05 |
| 4 | Q.   Okay.  So it includes the conversions and | 11:05 |
| 5 | purchases off Facebook? | 11:05 |
| 6 | A.   I don't know about that, but it includes | 11:05 |
| 7 | the apps that you have logged in.  It includes, I | 11:05 |
| 8 | think, the websites that you may have liked, and so | 11:05 |
| 9 | on. | 11:05 |
| 10 | Q.   Okay.  Does the Do It Yourself network | 11:05 |
| 11 | include the native data that was inferred from | 11:05 |
| 12 | engagement on the site? | 11:05 |
| 13 | MS. STEIN:  Objection to form. | 11:05 |
| 14 | THE WITNESS:  I think you're referring to | 11:05 |
| 15 | the DYI file? | 11:05 |
| 16 | BY MS. WEAVER: | 11:05 |
| 17 | Q.   Yes.  I'll ask the question again.  Sorry. | 11:05 |
| 18 | Does the DIY file include native data that | 11:05 |
| 19 | is inferred from engagement on the site? | 11:05 |
| 20 | MS. STEIN:  Objection to form. | 11:05 |
| 21 | THE WITNESS:  It should include interests, | 11:05 |
| 22 | which are inferred data, so yes. | 11:05 |
| 23 | BY MS. WEAVER: | 11:05 |
| 24 | Q.   Does it also include behaviors? | 11:05 |
| 25 | MS. STEIN:  Objection to form. | 11:05 |

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  What's the objection? | 11:06 |
| 2 | MS. STEIN:  "Behaviors" is a very vague | 11:06 |
| 3 | term, Lesley. | 11:06 |
| 4 | MS. WEAVER:  No.  It's listed right here | 11:06 |
| 5 | on the document.  So I'm going to restate the | 11:06 |
| 6 | question. | 11:06 |
| 7 | Q.  Does the DIY tool also include the native | 11:06 |
| 8 | data that's inferred from the engagement on the site | 11:06 |
| 9 | like behaviors as listed in this document? | 11:06 |
| 10 | MS. STEIN:  Objection to form. | 11:06 |
| 11 | THE WITNESS:  So I will answer with, you | 11:06 |
| 12 | know, like a high-level understanding that the DYI | 11:06 |
| 13 | file includes the pages that you liked.  And by | 11:06 |
| 14 | default, that's a behavior. | 11:06 |
| 15 | BY MS. WEAVER: | 11:06 |
| 16 | Q.  Does Facebook engage in -- okay.  But | 11:06 |
| 17 | just -- sorry.  Just go back to that question. | 11:06 |
| 18 | Do you know, as you sit here today, | 11:06 |
| 19 | whether the DIY tool includes native data inferred | 11:06 |
| 20 | from engagement on the site, including interests and | 11:06 |
| 21 | behaviors as identified on this chart? | 11:06 |
| 22 | MS. STEIN:  Objection to form. | 11:06 |
| 23 | THE WITNESS:  DYI file includes activities | 11:06 |
| 24 | such as you liking a page that may suggest an | 11:07 |
| 25 | interest and, by default, explain a behavior or | 11:07 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | describe a behavior. | 11:07 |
| 2 | BY MS. WEAVER: | 11:07 |
| 3 | Q.   Okay.  But is that to be inferred from the | 11:07 |
| 4 | engagement on the site? | 11:07 |
| 5 | A.   It's driven by your activities happening | 11:07 |
| 6 | on the Facebook website or the Facebook apps. | 11:07 |
| 7 | Q.   Okay.  Going back to the page ending in | 11:07 |
| 8 | 425.  We were near the bottom of the page there. | 11:07 |
| 9 | A.   Yes. | 11:07 |
| 10 | Q.   Do you see where it says "Centralized | 11:07 |
| 11 | opt-out"? | 11:07 |
| 12 | A.   Yes. | 11:07 |
| 13 | Q.   What does that refer to? | 11:07 |
| 14 | A.   So this refers to the ability of the user | 11:07 |
| 15 | to turn off any kind of activity around behavioral | 11:07 |
| 16 | data captured through our SDKs -- | 11:07 |
| 17 | THE REPORTER:  I'm sorry, "Behavioral | 11:08 |
| 18 | data" -- | 11:08 |
| 19 | THE WITNESS:  -- and pixel. | 11:08 |
| 20 | THE REPORTER:  I'm sorry, "Behavioral | 11:08 |
| 21 | data"... | 11:08 |
| 22 | THE WITNESS:  -- captured through the SDKs | 11:08 |
| 23 | and pixel. | 11:08 |
| 24 | THE REPORTER:  Thank you. | 11:08 |
| 25 | | |

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 11:08 |
| 2 | Q.   And what is third-party behavioral data | 11:08 |
| 3 | again? | 11:08 |
| 4 | A.   I think we exhausted that, but I will go | 11:08 |
| 5 | back to the definition as it's being offered in a | 11:08 |
| 6 | previous page:  Website, browser behaviors, | 11:08 |
| 7 | conversations, explicit actions, mobile apps | 11:08 |
| 8 | installed, and so on. | 11:08 |
| 9 | Q.   And is that contained in the DYI tool or | 11:08 |
| 10 | the DYI file? | 11:08 |
| 11 | MS. STEIN:  Object to form.  Objection to | 11:08 |
| 12 | form. | 11:08 |
| 13 | THE WITNESS:  I'm sorry, how can a file | 11:08 |
| 14 | include activities as you have already opted out? | 11:08 |
| 15 | BY MS. WEAVER: | 11:08 |
| 16 | Q.   Okay.  What I'm asking is whether the DIY | 11:08 |
| 17 | tool collects third-party behavioral data as it's | 11:08 |
| 18 | referred to there? | 11:08 |
| 19 | A.   I'm sorry, I feel like I'm repeating | 11:08 |
| 20 | myself.  But the DYI file identified the apps that | 11:09 |
| 21 | you used, the websites that you may have liked and | 11:09 |
| 22 | so on.  So it captures behavioral data as per -- | 11:09 |
| 23 | Q.   Okay. | 11:09 |
| 24 | A.   -- the definition of the previous page. | 11:09 |
| 25 | Q.   Does it collect all third-party behavioral | 11:09 |

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | data? | 11:09 |
| 2 | MS. STEIN:  Objection to form. | 11:09 |
| 3 | THE WITNESS:  All?  I don't know. | 11:09 |
| 4 | BY MS. WEAVER: | 11:09 |
| 5 | Q.   Yeah.  Okay. | 11:09 |
| 6 | How would you find out? | 11:09 |
| 7 | A.   I would have to look at the DYI file. | 11:09 |
| 8 | Q.   Okay.  And have you looked at any DYI | 11:09 |
| 9 | files to prepare for your deposition today? | 11:09 |
| 10 | A.   No, I have not, because that would be a | 11:09 |
| 11 | violation of my commitment to users' privacy. | 11:09 |
| 12 | Q.   Did you look at DYI files for any of the | 11:09 |
| 13 | named plaintiffs in this action to prepare for the | 11:09 |
| 14 | deposition? | 11:09 |
| 15 | A.   No, because that would be in violation of | 11:09 |
| 16 | my commitment to users' privacy. | 11:09 |
| 17 | Q.   To prepare -- | 11:10 |
| 18 | A.   I would be fired -- | 11:10 |
| 19 | Q.   If your -- | 11:10 |
| 20 | A.   -- if I look -- | 11:10 |
| 21 | Q.   If your lawyers had you look at the | 11:10 |
| 22 | plaintiffs' DYI files to prepare for deposition in | 11:10 |
| 23 | this action? | 11:10 |
| 24 | A.   I would be fired. | 11:10 |
| 25 | Q.   Okay.  Well, we'll table that. | 11:10 |

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Can you look at your -- | 11:10 |
| 2 | A.    No one here -- | 11:10 |
| 3 | Q.    Can you look at your own -- | 11:10 |
| 4 | A.    I can only look at mine. | 11:10 |
| 5 | Q.    -- DYI -- oh, okay.  So can you look at | 11:10 |
| 6 | your own DYI file to determine whether or not all | 11:10 |
| 7 | third-party behavioral data is included in it? | 11:10 |
| 8 | A.    I can, but not right now. | 11:10 |
| 9 | Q.    Okay.  Right. | 11:10 |
| 10 | Okay.  Give me a moment here. | 11:10 |
| 11 | Okay.  So let's turn for a moment to the | 11:11 |
| 12 | page ending in 3428.  It says "Location" at top. | 11:11 |
| 13 | Do you know who Maritza Johnson is? | 11:11 |
| 14 | A.    No, I don't. | 11:11 |
| 15 | Q.    Okay.  And do you see, it says, "Knowing | 11:11 |
| 16 | where people are when they interact with our | 11:11 |
| 17 | services is useful for designing innovative | 11:11 |
| 18 | products"?  Do you see that? | 11:11 |
| 19 | A.    Yes, I do see that. | 11:11 |
| 20 | Q.    So did Facebook track people's -- users' | 11:11 |
| 21 | location? | 11:11 |
| 22 | A.    Facebook will have an understanding of the | 11:11 |
| 23 | user's location based on different signals. | 11:11 |
| 24 | Q.    Okay.  And you see here it says -- when | 11:11 |
| 25 | you say "different signals," what do you mean? | 11:11 |

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     A.   Like if someone is using the app from       11:11

2   their mobile phone and they have allowed us access   11:11

3   to their GPS, we would have a precise, you know,     11:11

4   understanding of that location.  If someone is       11:12

5   accessing Facebook through their computer, we will   11:12

6   try to determine their location from an IP address   11:12

7   and so on.                                           11:12

8     Q.   Okay.  And do you see where it says, "Is      11:12

9   derivative data produced (example, ad clusters)?"    11:12

10   It's the last bullet point --                       11:12

11     A.   Ah.                                           11:12

12     Q.   -- on the top.                                11:12

13     A.   Yes.                                          11:12

14     Q.   Okay.  So the question is, what is            11:12

15   derivative data?                                     11:12

16     A.   Could I read the whole thing quickly just    11:12

17   to make sure I'm --                                  11:12

18     Q.   Absolutely, of course.                        11:12

19          (Pause while witness peruses document.)       11:12

20     A.   Okay.                                          11:12

21     Q.   What is derivative data?                       11:12

22          MS. STEIN:  I will just instruct the          11:13

23   witness to make sure that you only testify about     11:13

24   things that you know, and that if there are things   11:13

25   in this document that you don't know or are not a    11:13

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | company term, to please, you know, tell the | 11:13 |
| 2 | examiner, because you should not be testifying | 11:13 |
| 3 | beyond the scope of what your -- what's at issue in | 11:13 |
| 4 | this deposition and -- | 11:13 |
| 5 | MS. WEAVER:  This is completely within the | 11:13 |
| 6 | scope, Deb, and that's improper coaching. | 11:13 |
| 7 | Q.   So, sir, do you know what derivative data | 11:13 |
| 8 | is? | 11:13 |
| 9 | A.   I think there is an example for derivative | 11:13 |
| 10 | data there. | 11:13 |
| 11 | Q.   I'm sorry? | 11:13 |
| 12 | A.   Ad clusters.  Ad cluster is derivative | 11:13 |
| 13 | data. | 11:13 |
| 14 | Q.   Okay.  That's an example of derivative | 11:13 |
| 15 | data? | 11:13 |
| 16 | A.   Yes. | 11:13 |
| 17 | Q.   Okay.  How is it derived, if you will? | 11:13 |
| 18 | How are ad clusters derived? | 11:13 |
| 19 | MS. STEIN:  Objection to form. | 11:13 |
| 20 | THE WITNESS:  So at a very high level, an | 11:13 |
| 21 | ad cluster would be people that live in | 11:13 |
| 22 | San Francisco, and how this would be determined is | 11:14 |
| 23 | based on their location.  Not their -- necessarily | 11:14 |
| 24 | their current location, but their consistent | 11:14 |
| 25 | location. | 11:14 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | And so that will potentially allow us to | 11:14 |
| 2 | create a cluster of people that live in | 11:14 |
| 3 | San Francisco with some degree of accuracy, so that | 11:14 |
| 4 | we don't necessarily include people that are | 11:14 |
| 5 | visiting San Francisco, in an ad campaign that is | 11:14 |
| 6 | targeting people that live in San Francisco. | 11:14 |
| 7 | BY MS. WEAVER: | 11:14 |
| 8 | Q.   And how is derivative data created?  Like | 11:14 |
| 9 | is that -- is that an algorithm that runs on the | 11:14 |
| 10 | explicit or implicit data and then reaches that | 11:14 |
| 11 | conclusion?  Or how -- how is that actually -- | 11:14 |
| 12 | A.   Those are things that are -- | 11:14 |
| 13 | MS. STEIN:  Objection to form. | 11:14 |
| 14 | You may answer. | 11:14 |
| 15 | THE WITNESS:  Those are things that are | 11:14 |
| 16 | figured out in realtime. | 11:14 |
| 17 | BY MS. WEAVER: | 11:15 |
| 18 | Q.   Okay.  So -- | 11:15 |
| 19 | A.   By machine that are learning algorithms | 11:15 |
| 20 | that are employed to identify and scan for | 11:15 |
| 21 | information. | 11:15 |
| 22 | Q.   Okay.  So for the record, ad clusters are | 11:15 |
| 23 | developed through machine learning or algorithms | 11:15 |
| 24 | applied to data, realtime data; is that fair? | 11:15 |
| 25 | MS. STEIN:  Objection to form. | 11:15 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Applied -- applied to the | 11:15 |
| 2 | native data based on the previous definition, yes. | 11:15 |
| 3 | BY MS. WEAVER: | 11:15 |
| 4 | Q.   Okay.  And where does that data that -- | 11:15 |
| 5 | the derived data -- strike that. | 11:15 |
| 6 | Where is the derived data stored? | 11:15 |
| 7 | A.   The derived data is stored -- not stored | 11:15 |
| 8 | anywhere.  It's calculated in realtime.  There is no | 11:15 |
| 9 | point in -- | 11:15 |
| 10 | Q.   Is it retained? | 11:15 |
| 11 | A.   -- wasting, you know, a storage space for | 11:15 |
| 12 | these kind of things that are dynamic in nature. | 11:15 |
| 13 | Q.   Okay.  And is it contained in the DYI | 11:15 |
| 14 | file? | 11:15 |
| 15 | A.   That -- how is that relevant for you? | 11:15 |
| 16 | Q.   I get to ask the questions. | 11:16 |
| 17 | A.   No, I mean -- I'm -- I'm thinking loudly. | 11:16 |
| 18 | That a user's information, when it is -- so the -- | 11:16 |
| 19 | okay.  So let me take a step back. | 11:16 |
| 20 | That data that we are talking about are | 11:16 |
| 21 | anonymized.  They are not associated with a given | 11:16 |
| 22 | user.  And so it wouldn't show up in a -- in user's | 11:16 |
| 23 | DYI file. | 11:16 |
| 24 | Q.   Okay.  And when -- | 11:16 |
| 25 | MS. STEIN:  I'm just waiting for my feed | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    here.

 2            Oh, could you read his answer back,

 3    please.                                           11:16

 4                    (The record was read by the       11:17

 5                    court reporter, as requested)     11:17

 6    BY MS. WEAVER:                                    11:17

 7        Q.   And what do you mean by "associated"?    11:17

 8        A.   Like we have a broad understanding of who 11:17

 9    lives in San Francisco but we don't know exactly who 11:17

10    lives in San Francisco.                           11:17

11        Q.   Okay.  But the data's collected from     11:17

12    individual users, right?                          11:17

13        A.   It depends.                              11:17

14        Q.   On what?                                 11:17

15        A.   It depends on whether the data has been  11:17

16    collected because some are explicitly said "I live 11:17

17    in San Francisco."  Some people have their hometown 11:17

18    identified on Facebook, some people don't.        11:17

19        Q.   Right, but it's still one individual.  The 11:17

20    source of the -- the -- originally is one user,   11:17

21    right?                                            11:17

22            MS. STEIN:  Objection to form.            11:17

23    BY MS. WEAVER:                                    11:17

24        Q.   Because either I live in San Francisco or 11:17

25    I indicated -- I mean, all of this data comes from 11:17
```

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | individuals, right? | 11:17 |
| 2 | A.   Some of the data -- sorry.  Again, if -- | 11:17 |
| 3 | if it's -- according to the previous definition, if | 11:17 |
| 4 | it's native data, that means that you have provided | 11:17 |
| 5 | that information. | 11:18 |
| 6 | Q.   Okay.  So let's -- okay.  Let's talk -- | 11:18 |
| 7 | A.   Like you have defined San Francisco -- | 11:18 |
| 8 | Q.   Right. | 11:18 |
| 9 | A.   -- to be your hometown. | 11:18 |
| 10 | Q.   Perfect. | 11:18 |
| 11 | A.   Okay. | 11:18 |
| 12 | Q.   So it's associated with me initially, | 11:18 |
| 13 | right? | 11:18 |
| 14 | A.   You have specifically suggested to your | 11:18 |
| 15 | Facebook friends by basically filling in that | 11:18 |
| 16 | specific field that Facebook asked you to do that | 11:18 |
| 17 | your hometown is San Francisco.  You may live in | 11:18 |
| 18 | Denver, but your hometown appears to be | 11:18 |
| 19 | San Francisco. | 11:18 |
| 20 | Q.   Okay.  So an algorithm runs on this data | 11:18 |
| 21 | and it creates an ad cluster and puts me -- when | 11:18 |
| 22 | does it become disassociated with me?  Because it | 11:18 |
| 23 | was initially associated, correct? | 11:18 |
| 24 | A.   That association will never cease to exist | 11:18 |
| 25 | unless you basically go there and suggest that you | 11:18 |

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | move to Denver. | 11:18 |
| 2 | Q.   Okay.  I'm just -- honestly, K.P., I'm | 11:18 |
| 3 | trying to understand your answer. | 11:18 |
| 4 | You said the data that we are talking | 11:18 |
| 5 | about is not associated with specific users.  We | 11:18 |
| 6 | just talked about -- | 11:19 |
| 7 | A.   Yes, please. | 11:19 |
| 8 | Q.   -- it was associated with an individual | 11:19 |
| 9 | user because they're from San Francisco. | 11:19 |
| 10 | A.   Yes. | 11:19 |
| 11 | Q.   So when does it become disassociated? | 11:19 |
| 12 | A.   But I'm trying to explain to you the | 11:19 |
| 13 | distinction between data that comes from native | 11:19 |
| 14 | data, to use your -- | 11:19 |
| 15 | Q.   Okay. | 11:19 |
| 16 | A.   -- the definition in this document, versus | 11:19 |
| 17 | behavioral data. | 11:19 |
| 18 | Q.   Okay.  And -- | 11:19 |
| 19 | A.   So -- no, no, no, no.  Sorry.  I have to | 11:19 |
| 20 | be super precise here. | 11:19 |
| 21 | There are two kinds of native data.  There | 11:19 |
| 22 | are native data that come because you have, as a | 11:19 |
| 23 | user, indicated that your hometown is San Francisco. | 11:19 |
| 24 | Q.   Right. | 11:19 |
| 25 | A.   And there is native data that comes from | 11:19 |

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | your activity.  So if -- hypothetically speaking, I | 11:19 |
| 2 | don't -- I don't know exactly what period of time we | 11:19 |
| 3 | are going to be looking at, but let's say for the | 11:19 |
| 4 | last three -- the last 30 days you have accessed | 11:19 |
| 5 | Facebook from an IP address in -- in San Francisco, | 11:19 |
| 6 | that is still, according to our definition, native | 11:19 |
| 7 | data.  But it's -- it's not data that's -- it's | 11:19 |
| 8 | directly explicitly, you know, like, documented by | 11:19 |
| 9 | the user, but it's in data inferred by their | 11:20 |
| 10 | activity. | 11:20 |
| 11 | Q.   Okay.  And so the -- | 11:20 |
| 12 | A.   Still native. | 11:20 |
| 13 | Q.   I understand. | 11:20 |
| 14 | By the way, would you use a different word | 11:20 |
| 15 | than native data?  Is there another way to reference | 11:20 |
| 16 | that? | 11:20 |
| 17 | A.   I would probably use on-site activity. | 11:20 |
| 18 | Q.   On-site activity? | 11:20 |
| 19 | A.   Versus off-site activity. | 11:20 |
| 20 | Q.   Okay.  Perfect. | 11:20 |
| 21 | Do you -- would you use the -- the words | 11:20 |
| 22 | "appended data" or is there another term for that? | 11:20 |
| 23 | A.   I haven't heard that term until recently. | 11:20 |
| 24 | Until this -- | 11:20 |
| 25 | Q.   Okay.  Do you have another understanding | 11:20 |

Page 112

| | | |
|---|---|---|
| 1 | of how people at Facebook refer to it? | 11:20 |
| 2 | A.   Customer data provided by third parties or | 11:20 |
| 3 | something -- | 11:20 |
| 4 | Q.   Okay. | 11:20 |
| 5 | A.   -- like that. | 11:20 |
| 6 | Q.   All right.  And then what about behavioral | 11:20 |
| 7 | data; is there another term of art at Facebook used | 11:20 |
| 8 | to reference that? | 11:20 |
| 9 | A.   That's my definition of offline activity. | 11:20 |
| 10 | Q.   Offline activity.  Okay. | 11:20 |
| 11 | A.   Oh, sorry, off-site activity. | 11:20 |
| 12 | Q.   Off-site.  I see.  Okay. | 11:20 |
| 13 | So going back to what we're talking about, | 11:21 |
| 14 | the -- there is an algorithm that runs on the native | 11:21 |
| 15 | data and it creates, as you were supposing, an ad | 11:21 |
| 16 | cluster, right? | 11:21 |
| 17 | A.   Yes. | 11:21 |
| 18 | Q.   Where is that data stored?  Where is the | 11:21 |
| 19 | ad cluster data stored? | 11:21 |
| 20 | A.   It's not stored anywhere.  It's dynamic. | 11:21 |
| 21 | Q.   Okay.  It's dynamic.  Is it purged?  I | 11:21 |
| 22 | mean, it exists at some point and then it doesn't | 11:21 |
| 23 | exist?  What happens to it? | 11:21 |
| 24 | A.   Okay.  At the very high level, if we are | 11:21 |
| 25 | talking about the specific scenario that a business | 11:21 |

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is operating in San Francisco wants to target | 11:21 |
| 2 | users in San Francisco, they will run the campaign | 11:21 |
| 3 | for, let's say, two days; they will target specific | 11:21 |
| 4 | users that live in that area.  They may target only | 11:21 |
| 5 | females or only men, people of a certain age, people | 11:21 |
| 6 | of a certain profession, depending on, you know, | 11:21 |
| 7 | like, what sort of campaign they want to run, right? | 11:21 |
| 8 | So that will all be effectively identified | 11:21 |
| 9 | as a potential audience of, let's say for the sake | 11:21 |
| 10 | of the argument, 20,000 users.  They still have no | 11:22 |
| 11 | access to the information.  They only understand | 11:22 |
| 12 | what is the potential audience their ad campaign can | 11:22 |
| 13 | reach. | 11:22 |
| 14 | And then when they start, you know, like, | 11:22 |
| 15 | placing the advertisement, then their advertisement | 11:22 |
| 16 | is going to go into an auction.  That auction may | 11:22 |
| 17 | actually, you know, allow others to beat against | 11:22 |
| 18 | that same audience.  So if there is a competitor of | 11:22 |
| 19 | this service, or another service that wants to | 11:22 |
| 20 | target people with similar characteristics that live | 11:22 |
| 21 | in San Francisco, they may or may not see the first | 11:22 |
| 22 | ad.  So it's the highest bidder that will have the | 11:22 |
| 23 | ad show up. | 11:22 |
| 24 | So all that is so, you know, like, | 11:22 |
| 25 | calculated in realtime that there is no way for us | 11:22 |

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | to actually store that information anywhere. | 11:22 |
| 2 | Q.   Okay.  So let me ask this:  So I'm -- say | 11:22 |
| 3 | I'm being targeted in that ad campaign.  Is there a | 11:22 |
| 4 | way for me to find out that I was targeted by those | 11:22 |
| 5 | categories that the advertiser chose? | 11:22 |
| 6 | A.   You can see it only if that ad campaign | 11:23 |
| 7 | shows up to you. | 11:23 |
| 8 | Q.   Okay.  And only in realtime?  And there's | 11:23 |
| 9 | no record of it after that? | 11:23 |
| 10 | A.   I think you can actually see the -- the | 11:23 |
| 11 | information in realtime.  But if you go to the DYI | 11:23 |
| 12 | file, you can see probably ad campaigns that you | 11:23 |
| 13 | have been displayed -- or you have seen yourself, or | 11:23 |
| 14 | you have clicked. | 11:23 |
| 15 | Q.   Okay.  But if they were -- | 11:23 |
| 16 | A.   You know -- | 11:23 |
| 17 | Q.   -- targeted to me and I didn't take an | 11:23 |
| 18 | action, it's not in the DYI file; is that right? | 11:23 |
| 19 | A.   You -- you will see the ad campaigns that | 11:23 |
| 20 | ended up showing up on your feed, but you wouldn't | 11:23 |
| 21 | see any ad campaigns that, for whatever reason, you | 11:23 |
| 22 | haven't seen, because there was another advertiser | 11:23 |
| 23 | that won the bid. | 11:23 |
| 24 | Q.   Got it. | 11:23 |
| 25 | And so let's talk about the information | 11:23 |

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is used to create the derived data. How do you | 11:23 |
| 2 | determine what information can be used to apply | 11:24 |
| 3 | those algorithms? | 11:24 |
| 4 | A. I need to clarify that question. | 11:24 |
| 5 | Q. Yeah, it's -- so is only public | 11:24 |
| 6 | information used to create derived data? | 11:24 |
| 7 | MS. STEIN: Objection to form. | 11:24 |
| 8 | THE WITNESS: Okay. So are you talking | 11:24 |
| 9 | about derived data in the context of location, or | 11:24 |
| 10 | you're talking about derived data broadly? | 11:24 |
| 11 | BY MS. WEAVER: | 11:24 |
| 12 | Q. Well, what is derived data broadly? | 11:24 |
| 13 | A. I mean, I don't know of any use of derived | 11:24 |
| 14 | data broadly, but I'm trying to understand exactly | 11:24 |
| 15 | how you want me to answer the question in a | 11:24 |
| 16 | thoughtful way. | 11:24 |
| 17 | Q. Okay. Well, derived data is the product | 11:24 |
| 18 | of an algorithm running on realtime data; is that a | 11:24 |
| 19 | fair definition? | 11:24 |
| 20 | A. I think the -- the definition that we were | 11:24 |
| 21 | talking about was a strict association with the | 11:24 |
| 22 | location information and the idea of creating ad | 11:25 |
| 23 | clusters based on location information. | 11:25 |
| 24 | Q. That was an example, right? | 11:25 |
| 25 | A. Yes. | 11:25 |

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But at large, is it fair to say that | 11:25 |
| 2 | derived data is created through algorithms running | 11:25 |
| 3 | on realtime data? | 11:25 |
| 4 | MS. STEIN:  Objection to form. | 11:25 |
| 5 | THE WITNESS:  I cannot talk about that. | 11:25 |
| 6 | But derived data is a -- a broad, you know, like, | 11:25 |
| 7 | industry term that you can use, and it's a legal | 11:25 |
| 8 | term as well, as far as I understand.  It can be | 11:25 |
| 9 | used in different context and it doesn't always | 11:25 |
| 10 | require realtime processing. | 11:25 |
| 11 | BY MS. WEAVER: | 11:25 |
| 12 | Q.   Okay.  So let's -- we can stick with your | 11:25 |
| 13 | example then if you like for now. | 11:25 |
| 14 | What if I sent a -- a private -- a message | 11:25 |
| 15 | in Facebook Messenger to one friend saying "I used | 11:25 |
| 16 | to live in San Francisco" and I've never posted | 11:25 |
| 17 | anything publicly about it.  Is that information | 11:25 |
| 18 | used to create the derived data for ad clusters? | 11:26 |
| 19 | A.   No. | 11:26 |
| 20 | Q.   Why not? | 11:26 |
| 21 | A.   That's a private conversation between you | 11:26 |
| 22 | and your friend -- | 11:26 |
| 23 | Q.   Okay. | 11:26 |
| 24 | A.   -- that -- | 11:26 |
| 25 | Q.   So how does the algorithm distinguish -- | 11:26 |

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | let me ask this:  When the data is being run on | 11:26 |
| 2 | algorithms, is it segregated by public or private | 11:26 |
| 3 | data? | 11:26 |
| 4 | A.   So your definition of public or private is | 11:26 |
| 5 | what, if I may say? | 11:26 |
| 6 | Q.   If a user designated something private or | 11:26 |
| 7 | restricted audience. | 11:26 |
| 8 | A.   Okay.  Let's take a little bit of a step | 11:26 |
| 9 | back.  Because what we define as public data is | 11:26 |
| 10 | basically your first name, your last name, your | 11:26 |
| 11 | profile picture. | 11:26 |
| 12 | Q.   Okay. | 11:26 |
| 13 | A.   Anything else that comes with a -- an | 11:26 |
| 14 | audience selection doesn't necessarily belong -- | 11:26 |
| 15 | it's not necessarily by default public.  It may have | 11:26 |
| 16 | a limited audience.  It may be just you, if it's | 11:26 |
| 17 | things like your birthday, or it may be friends -- | 11:27 |
| 18 | or accessible to your friends. | 11:27 |
| 19 | What we always, you know, like, like to | 11:27 |
| 20 | suggest that communications that happen over | 11:27 |
| 21 | messenger is also by default private, meaning that | 11:27 |
| 22 | it's -- the content of your exchanges with your | 11:27 |
| 23 | friends belong to you and your friends.  So that | 11:27 |
| 24 | wouldn't be considered public information.  But it | 11:27 |
| 25 | wouldn't be considered necessarily private | 11:27 |

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | information because it's not accessible by anybody | 11:27 |
| 2 | in that -- it's a private conversation but it's not | 11:27 |
| 3 | private data in that sense. | 11:27 |
| 4 | Q.   And when Facebook is, let's say -- we can | 11:27 |
| 5 | just stick with your ad clusters example.  When it | 11:27 |
| 6 | is using the algorithm to create derived data, such | 11:27 |
| 7 | as ad clusters, is it using that world of | 11:27 |
| 8 | information that you just described that is not | 11:27 |
| 9 | public? | 11:27 |
| 10 | A.   We would be using native data such as your | 11:27 |
| 11 | registered home location and things like your IP | 11:28 |
| 12 | address to determine where you live. | 11:28 |
| 13 | Q.   Okay.  But what I'm trying to say is -- | 11:28 |
| 14 | and I gave you a different example.  So if you | 11:28 |
| 15 | could, just follow my example.  Okay. | 11:28 |
| 16 | A.   We wouldn't.  I think I made -- | 11:28 |
| 17 | Q.   Okay. | 11:28 |
| 18 | A.   -- that point that -- | 11:28 |
| 19 | Q.   When I -- when I look -- | 11:28 |
| 20 | A.   -- you telling your friends you live in | 11:28 |
| 21 | San Francisco is your business and it's not for us | 11:28 |
| 22 | to use in any kind of ads. | 11:28 |
| 23 | Q.   Okay.  And that's because reading messages | 11:28 |
| 24 | and using that content and making it available to | 11:28 |
| 25 | advertisers would violate Facebook's policies, | 11:28 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 11:28 |
| 2 | A.    Reading private communications between you | 11:28 |
| 3 | and your friends would be a violation of our | 11:28 |
| 4 | commitment to your privacy. | 11:28 |
| 5 | Q.    Okay.  Switching topics just for a second. | 11:28 |
| 6 | You know what capabilities are; is that | 11:28 |
| 7 | right? | 11:29 |
| 8 | A.    In what -- | 11:29 |
| 9 | Q.    In connection with -- in connection with | 11:29 |
| 10 | APIs? | 11:29 |
| 11 | A.    Yes, I do. | 11:29 |
| 12 | Q.    Okay.  Sorry. | 11:29 |
| 13 | So are you familiar with the read stream | 11:29 |
| 14 | capability? | 11:29 |
| 15 | A.    Read stream is an API but there is an | 11:29 |
| 16 | associated capabilities. | 11:29 |
| 17 | Q.    Yeah.  And what is that? | 11:29 |
| 18 | A.    It's an API that allows a third party to | 11:29 |
| 19 | access someone's News Feed. | 11:29 |
| 20 | Q.    Okay.  And what does "read stream" mean in | 11:29 |
| 21 | particular? | 11:29 |
| 22 | A.    It's a very poorly, you know, like, | 11:29 |
| 23 | defined -- | 11:29 |
| 24 | Q.    It should probably be for the period 2012 | 11:29 |
| 25 | to 2017. | 11:29 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

|   |   |   |
|---|---|---|
| 1 | A.   Yes.  So the News Feed is also referred as | 11:29 |
| 2 | stream. | 11:29 |
| 3 | Q.   Uh-huh. | 11:29 |
| 4 | A.   And that API and the corresponding | 11:29 |
| 5 | capability effectively describes the ability to read | 11:29 |
| 6 | the stream. | 11:29 |
| 7 | Q.   Okay. | 11:29 |
| 8 | A.   In other words, read the News Feed. | 11:29 |
| 9 | Q.   Okay.  And are you aware at any point in | 11:30 |
| 10 | time if third parties were allowed to read Facebook | 11:30 |
| 11 | Messenger messages? | 11:30 |
| 12 | MS. STEIN:  Objection. | 11:30 |
| 13 | BY MS. WEAVER: | 11:30 |
| 14 | Q.   Through -- through API capabilities? | 11:30 |
| 15 | MS. STEIN:  Objection to form.  And we're | 11:30 |
| 16 | talking about 2012 to 2017. | 11:30 |
| 17 | You may answer. | 11:30 |
| 18 | THE WITNESS:  Between 2012 and 2017, I | 11:30 |
| 19 | don't think we made the -- the Messenger API -- the | 11:30 |
| 20 | current version of the Messenger API available. | 11:30 |
| 21 | THE REPORTER:  I'm sorry.  That -- that... | 11:30 |
| 22 | THE WITNESS:  So I'm -- between 2012 and | 11:30 |
| 23 | 2017, the current version of the Messenger API was | 11:30 |
| 24 | not available.  I think the only way for third | 11:30 |
| 25 | parties to access Messenger was through the Inbox | 11:30 |

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | API. | 11:30 |
| 2 | MS. WEAVER:  I'm sorry, I just need to | 11:30 |
| 3 | look really quickly. | 11:31 |
| 4 | Q.   What is the Inbox API? | 11:31 |
| 5 | A.   It's an API that allows a third party to | 11:31 |
| 6 | access a user's Messenger conversation. | 11:31 |
| 7 | Q.   Okay.  And what do those third parties -- | 11:31 |
| 8 | strike that. | 11:31 |
| 9 | What access were they given to -- | 11:31 |
| 10 | A.   So the third -- | 11:31 |
| 11 | Q.   -- use Messenger conversation? | 11:31 |
| 12 | A.   Yeah.  The third parties that had access | 11:31 |
| 13 | to the Inbox API were app third parties that | 11:31 |
| 14 | replicated core Facebook functionality, including | 11:31 |
| 15 | messaging.  So we call those integrations device | 11:31 |
| 16 | integrations because they were replicating | 11:31 |
| 17 | Facebook -- the Facebook app. | 11:31 |
| 18 | Q.   Are you aware -- are you familiar with the | 11:31 |
| 19 | company Royal Bank of Canada, RBC? | 11:31 |
| 20 | A.   Yes.  Yes. | 11:31 |
| 21 | Q.   Did -- did they have access to Messenger | 11:31 |
| 22 | inboxes during this time period? | 11:32 |
| 23 | A.   They had the access to an API that allowed | 11:32 |
| 24 | them to write into someone's inbox. | 11:32 |
| 25 | Q.   And why? | 11:32 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   But -- but not to read. | 11:32 |
| 2 | Q.   Okay.  And why -- | 11:32 |
| 3 | A.   Why? | 11:32 |
| 4 | Q.   -- did they have that access? | 11:32 |
| 5 | A.   Because we were testing the ability for a | 11:32 |
| 6 | Royal Bank of Canada customer that wants to wire | 11:32 |
| 7 | money to friends to tell them through Messenger that | 11:32 |
| 8 | they have successfully wired the money. | 11:32 |
| 9 | Q.   So I'm going to turn to the page ending | 11:32 |
| 10 | with 429 now.  It's just the next page of the same | 11:32 |
| 11 | document. | 11:32 |
| 12 | Oh, strike it.  I will move on. | 11:32 |
| 13 | Going, actually, to the page ending in | 11:33 |
| 14 | 430.  What is "facial recognition" as used in this | 11:33 |
| 15 | document? | 11:33 |
| 16 | A.   Can I take a quick moment to read the | 11:33 |
| 17 | document? | 11:33 |
| 18 | Q.   Of course.  Sorry. | 11:33 |
| 19 | A.   Thank you. | 11:33 |
| 20 | (Pause while witness peruses document.) | 11:33 |
| 21 | A.   I'm sorry, there's a little bit of | 11:33 |
| 22 | background noise.  I don't know where it's coming. | 11:33 |
| 23 | MS. WEAVER:  I think that's Ms. Stein. | 11:33 |
| 24 | But maybe not. | 11:33 |
| 25 | MS. STEIN:  Sorry.  Sorry. | 11:33 |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Oh.  Okay. | 11:33 |
| 2 | MS. STEIN:  I will -- I will mute.  The | 11:33 |
| 3 | gardeners are here.  Hazards of -- | 11:33 |
| 4 | MS. WEAVER:  Yes. | 11:33 |
| 5 | MS. STEIN:  -- of COVID. | 11:33 |
| 6 | BY MS. WEAVER: | 11:33 |
| 7 | Q.   I'm going to direct your attention just to | 11:33 |
| 8 | a few pages here. | 11:33 |
| 9 | A.   Okay. | 11:33 |
| 10 | Q.   Great. | 11:33 |
| 11 | So what is facial recognition, the facial | 11:33 |
| 12 | recognition feature that's referred to in this | 11:34 |
| 13 | document? | 11:34 |
| 14 | A.   And do you want me to read what is defined | 11:34 |
| 15 | in this document or shall I tell you -- | 11:34 |
| 16 | Q.   Just tell me -- | 11:34 |
| 17 | A.   -- what my understanding? | 11:34 |
| 18 | Q.   -- your understanding. | 11:34 |
| 19 | Yes, sorry. | 11:34 |
| 20 | A.   So it's a -- it's a code that allows us to | 11:34 |
| 21 | understand who may be shown or seen in a picture, in | 11:34 |
| 22 | a photo. | 11:34 |
| 23 | Q.   Okay.  And how does it work? | 11:34 |
| 24 | A.   Technically? | 11:34 |
| 25 | Q.   Yes. | 11:34 |

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A. Through a combination of pattern matching | 11:34 |
| 2 | and other characteristics. | 11:34 |
| 3 | Q. Combination of? I just didn't understand | 11:34 |
| 4 | you. Could you repeat it again. | 11:34 |
| 5 | A. Pattern matching. | 11:34 |
| 6 | Q. Pattern -- | 11:34 |
| 7 | A. So we try to see patterns. | 11:34 |
| 8 | Q. Pattern -- pattern matching? | 11:34 |
| 9 | A. Yes. | 11:34 |
| 10 | Q. Okay. And what patterns? It's looking at | 11:34 |
| 11 | people's faces for those patterns; is that correct? | 11:34 |
| 12 | A. Yeah. Would analyze certain | 11:34 |
| 13 | characteristics of your face and try to, you know, | 11:34 |
| 14 | create a matching with a pattern. And then when we | 11:35 |
| 15 | see a similar pattern, we can associate this back to | 11:35 |
| 16 | you. | 11:35 |
| 17 | Q. Okay. And so if you turn to the second | 11:35 |
| 18 | page here ending in 3431, do you see where it says | 11:35 |
| 19 | "Graph Search"? It's in bold. | 11:35 |
| 20 | A. Yeah. | 11:35 |
| 21 | Q. Okay. And then it says, "We're looking to | 11:35 |
| 22 | incorporate facial recognition results in Graph | 11:35 |
| 23 | Search." | 11:35 |
| 24 | Do you see that? | 11:35 |
| 25 | A. Yes. | 11:35 |

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q. Do you -- what is Graph Search? | 11:35 |
| 2 | A. Graph Search is our own version of | 11:35 |
| 3 | searching within the graph. | 11:35 |
| 4 | Q. And what do you mean by graph? | 11:35 |
| 5 | A. Everything at Facebook is the graph. Any | 11:35 |
| 6 | entity, any connection that's affecting the part of | 11:35 |
| 7 | the graph. | 11:35 |
| 8 | Q. Okay. Is it a relational database? | 11:35 |
| 9 | A. It's not a -- a database per se. The | 11:35 |
| 10 | graph is -- I don't know. It's a -- it's an | 11:35 |
| 11 | abstract thing that describes basically every single | 11:36 |
| 12 | connection and entity on -- on the platform. | 11:36 |
| 13 | Q. Okay. So if somebody is using Graph | 11:36 |
| 14 | Search, they are searching all over Facebook's | 11:36 |
| 15 | entire network; is that right? | 11:36 |
| 16 | A. Sort of, because there may be exceptions | 11:36 |
| 17 | to that. Like people that opt out from -- | 11:36 |
| 18 | Q. Okay. | 11:36 |
| 19 | A. -- from that they wouldn't have their | 11:36 |
| 20 | results in that. | 11:36 |
| 21 | Q. If people opt out, are they still in the | 11:36 |
| 22 | graph? | 11:36 |
| 23 | A. They can opt out from being discovered | 11:36 |
| 24 | through Graph Search. | 11:36 |
| 25 | Q. But they're still in the graph? | 11:36 |

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    But they are still in the graph, yes. | 11:36 |
| 2 | Q.    Is there any way to be removed from the | 11:36 |
| 3 | graph? | 11:36 |
| 4 | A.    You have to delete your Facebook account. | 11:36 |
| 5 | Q.    Okay.  And if I go to delete my Facebook | 11:36 |
| 6 | account, what is deleted?  Is all the data relating | 11:36 |
| 7 | to me deleted? | 11:36 |
| 8 | A.    Your interactions with public entities | 11:36 |
| 9 | will not be deleted. | 11:36 |
| 10 | Q.    So how do you identify all of the data to | 11:37 |
| 11 | delete? | 11:37 |
| 12 | A.    My -- my response would be anything that | 11:37 |
| 13 | lives in the "Download Your Information" file is | 11:37 |
| 14 | going to disappear. | 11:37 |
| 15 | Q.    What about all the rest of the data in the | 11:37 |
| 16 | graph? | 11:37 |
| 17 | A.    Again, the only exception here would be, | 11:37 |
| 18 | you know, like, your interactions with public | 11:37 |
| 19 | entities.  If you end -- ended up commenting on | 11:37 |
| 20 | United's page you didn't like their service, that | 11:37 |
| 21 | is, by default, public and is not personal | 11:37 |
| 22 | information.  And, to some extent, it belongs also | 11:37 |
| 23 | to United because you did that on their entity. | 11:37 |
| 24 | Q.    So -- | 11:37 |
| 25 | A.    But pretty much every -- everything else | 11:37 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is associated to you will be deleted. | 11:37 |
| 2 | Q.   Okay.  And when you say "is associated to | 11:37 |
| 3 | me," what do you mean? | 11:37 |
| 4 | A.   Any kind of on-site or off-site activity. | 11:37 |
| 5 | Q.   What about derived data? | 11:37 |
| 6 | A.   The derived data, again, if we are talking | 11:38 |
| 7 | about location?  Are we? | 11:38 |
| 8 | Q.   No.  Just in general.  Derived data in | 11:38 |
| 9 | general. | 11:38 |
| 10 | A.   Oh.  In general? | 11:38 |
| 11 | Q.   Yeah. | 11:38 |
| 12 | A.   Derived data may be your interest like we | 11:38 |
| 13 | discussed before that may be inferred from you | 11:38 |
| 14 | liking Beyonce's page, that will show up in the DYI | 11:38 |
| 15 | file.  So, yes, they will be deleted. | 11:38 |
| 16 | Q.   Okay.  You -- you referred earlier to data | 11:38 |
| 17 | that is not associated with individuals.  Do you | 11:38 |
| 18 | recall that? | 11:38 |
| 19 | A.   I need to play back my -- you know, like, | 11:38 |
| 20 | my sentence.  Okay.  What about it? | 11:38 |
| 21 | Q.   You -- okay.  So there is data that is not | 11:38 |
| 22 | associated with individual users; is that right? | 11:38 |
| 23 | A.   Overall? | 11:38 |
| 24 | Q.   Yes. | 11:38 |
| 25 | A.   Yes, we -- we do have some information | 11:38 |

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is not associated with specific users. | 11:38 |
| 2 |     Q.   Right. | 11:38 |
| 3 |     A.   Like United's page on Facebook is not | 11:38 |
| 4 | associated with specific users. | 11:38 |
| 5 |     Q.   Okay.  We'll put a pin in this and we'll | 11:38 |
| 6 | come back to it.  Because I think really drilling in | 11:39 |
| 7 | on what Facebook can identify about me specifically | 11:39 |
| 8 | is at the heart of this deposition. | 11:39 |
| 9 |       Okay.  So going back to facial | 11:39 |
| 10 | recognition.  Do you see the bullet point below?  It | 11:39 |
| 11 | says "Storing face templates."  Do you see that? | 11:39 |
| 12 |     A.   Yes. | 11:39 |
| 13 |     Q.   And it says, "The Privacy XFN team is | 11:39 |
| 14 | currently exploring the feasibility of storing face | 11:39 |
| 15 | templates in both the US and EU even after a user | 11:39 |
| 16 | turns off the tag suggest setting." | 11:39 |
| 17 |       Do you see that? | 11:39 |
| 18 |     A.   Yes. | 11:39 |
| 19 |     Q.   What is the Privacy XFN team? | 11:39 |
| 20 |     A.   It's a team that we have that reviews | 11:39 |
| 21 | every single product that we are launching from a | 11:39 |
| 22 | privacy perspective. | 11:39 |
| 23 |     Q.   Okay.  And what is a face template? | 11:39 |
| 24 |     A.   I think I referred to that as a pattern | 11:39 |
| 25 | area. | 11:39 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And do you know whether or not | 11:39 |
| 2 | Facebook actually did store face templates in the US | 11:39 |
| 3 | after users turned off the tag suggest setting? | 11:40 |
| 4 | A.   I don't know. | 11:40 |
| 5 | Q.   Who would know? | 11:40 |
| 6 | A.   I don't know. | 11:40 |
| 7 | Q.   Who at Facebook was in charge for facial | 11:40 |
| 8 | tech -- recognition technology at this time? | 11:40 |
| 9 | A.   I don't know. | 11:40 |
| 10 | Q.   Who is Emily Sharpe? | 11:40 |
| 11 | A.   I -- I don't know.  I've heard that name | 11:40 |
| 12 | just recently. | 11:40 |
| 13 | Q.   Okay.  So I'd like for you to turn to the | 11:40 |
| 14 | next page.  It says "Apps, Acquisition, and Creative | 11:40 |
| 15 | Labs" and it has the name of Travis Bright | 11:40 |
| 16 | underneath it.  Do you see that? | 11:40 |
| 17 | A.   Yes. | 11:40 |
| 18 | Q.   And this is page 3433. | 11:40 |
| 19 | Who is Travis Bright? | 11:40 |
| 20 | A.   I don't know. | 11:40 |
| 21 | Q.   Okay.  So I'm going to direct your | 11:40 |
| 22 | attention to the last paragraph there where it says, | 11:40 |
| 23 | it begins, "The next step up from this is sharing of | 11:40 |
| 24 | anonymized, aggregated, or hashed data." | 11:41 |
| 25 | Do you see that? | 11:41 |

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   And you said next page? | 11:41 |
| 2 | Q.   I'm on the -- sorry.  I'm on the bottom | 11:41 |
| 3 | paragraph on the page ending with 3433. | 11:41 |
| 4 | A.   Oh, okay. | 11:41 |
| 5 | Sorry, which sentence? | 11:41 |
| 6 | Q.   Well, let's do this.  Do you see where it | 11:41 |
| 7 | says "Data Integration"? | 11:41 |
| 8 | A.   Yes. | 11:41 |
| 9 | Q.   Okay.  So there it says, "Facebook's data | 11:41 |
| 10 | is hugely valuable but comes with a lot of | 11:41 |
| 11 | restrictions we've either placed on ourselves or by | 11:41 |
| 12 | external parties (regulators)." | 11:41 |
| 13 | Do you see that? | 11:41 |
| 14 | A.   Yes. | 11:41 |
| 15 | Q.   And it says a little bit lower there, | 11:41 |
| 16 | "Some apps want to take advantage of the data we | 11:41 |
| 17 | have while some are trying to simplify their app by | 11:41 |
| 18 | running it independently." | 11:41 |
| 19 | Do you see that? | 11:41 |
| 20 | A.   Yes. | 11:41 |
| 21 | Q.   And so they use as an example Slingshot | 11:41 |
| 22 | here and says it's "stored in Parse completely | 11:41 |
| 23 | separate from Facebook data." | 11:41 |
| 24 | Do you see that? | 11:42 |
| 25 | A.   Yes. | 11:42 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What is Parse? | 11:42 |
| 2 | A.   A Parse is a product that Facebook | 11:42 |
| 3 | acquired a long time ago that provide -- provided | 11:42 |
| 4 | cloud services to mobile apps. | 11:42 |
| 5 | Q.   Got it. | 11:42 |
| 6 | And then looking forward, it says, "Even | 11:42 |
| 7 | Slingshot needed APIs built to allow Facebook to | 11:42 |
| 8 | extract data for reporting and search warrants." | 11:42 |
| 9 | Do you see that? | 11:42 |
| 10 | A.   Let me see.  Where are you now? | 11:42 |
| 11 | Q.   I'm sorry.  It's two sentences -- here, | 11:42 |
| 12 | I'll go at the sentence ahead.  "You only need a | 11:42 |
| 13 | phone to create an account, aliases used in the app | 11:42 |
| 14 | aren't linked to Facebook profiles, and they are | 11:42 |
| 15 | showing ads so don't even need demographic or | 11:42 |
| 16 | aggregated data." | 11:42 |
| 17 | Do you see that? | 11:42 |
| 18 | A.   Yes. | 11:42 |
| 19 | Q.   And then it says, "But even Slingshot | 11:42 |
| 20 | needed APIs built to allow Facebook to extract data | 11:42 |
| 21 | for reporting and search warrants." | 11:42 |
| 22 | Do you see that? | 11:42 |
| 23 | A.   Yes. | 11:42 |
| 24 | Q.   Do you have any familiarity with Slingshot | 11:42 |
| 25 | and building APIs for it? | 11:42 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   No. | 11:42 |
| 2 | Q.   Okay.  Now, it -- it's referring to | 11:42 |
| 3 | Facebook extracting data for reporting and search | 11:43 |
| 4 | warrants.  Do you see that? | 11:43 |
| 5 | A.   Yes, I do see that. | 11:43 |
| 6 | Q.   Does Facebook do that? | 11:43 |
| 7 | A.   Export data for search warrants? | 11:43 |
| 8 | Q.   Yeah. | 11:43 |
| 9 | A.   I think we are obliged to do that by the | 11:43 |
| 10 | regulation and policy enforcement -- sorry -- | 11:43 |
| 11 | Q.   Okay. | 11:43 |
| 12 | A.   -- criminal enforcement authority. | 11:43 |
| 13 | THE REPORTER:  I'm sorry.  By the -- | 11:43 |
| 14 | BY MS. WEAVER: | 11:43 |
| 15 | Q.   And when Facebook extracts data -- | 11:43 |
| 16 | THE REPORTER:  I'm sorry.  I'm sorry.  By | 11:43 |
| 17 | the what authority? | 11:43 |
| 18 | THE WITNESS:  I'm sorry? | 11:43 |
| 19 | THE REPORTER:  You said something | 11:43 |
| 20 | authority.  What authority? | 11:43 |
| 21 | THE WITNESS:  I don't know if that's the | 11:43 |
| 22 | right term, criminal authorities. | 11:43 |
| 23 | BY MS. WEAVER: | 11:43 |
| 24 | Q.   Criminal authorities? | 11:43 |
| 25 | A.   Yeah. | 11:43 |

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  Thank you. | 11:43 |
| 2 | BY MS. WEAVER: | 11:43 |
| 3 | Q.   And when Facebook extracts data for search | 11:43 |
| 4 | warrants, is it doing for -- it for specific | 11:43 |
| 5 | individuals sometimes? | 11:43 |
| 6 | A.   I haven't been involved in the process, so | 11:43 |
| 7 | I don't know. | 11:43 |
| 8 | Q.   Okay.  Do you know if Facebook uses the | 11:43 |
| 9 | DIY tool to provide authorities with data in | 11:43 |
| 10 | response to search warrants? | 11:44 |
| 11 | A.   My understanding is that, yes, we do. | 11:44 |
| 12 | Q.   And do you use any other search methods to | 11:44 |
| 13 | provide information for search warrants? | 11:44 |
| 14 | A.   I don't know. | 11:44 |
| 15 | Q.   Who would know? | 11:44 |
| 16 | A.   I don't know. | 11:44 |
| 17 | Q.   Okay.  So here, going back to the | 11:44 |
| 18 | paragraph where we started, it says "The next step | 11:44 |
| 19 | up from this is sharing of anonymized, aggregated, | 11:44 |
| 20 | or hashed data." | 11:44 |
| 21 | Do you see that? | 11:44 |
| 22 | A.   Yes. | 11:44 |
| 23 | Q.   And what is anonymized data? | 11:44 |
| 24 | A.   Anonymized is any data that cannot be | 11:44 |
| 25 | associated with a specific user. | 11:44 |

Page 134

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.