Pages 1 - 48

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
IN RE:                          )
                                )
     FACEBOOK, INC.,            )
     CONSUMER PRIVACY USER      )    NO. 3:18-MD-02843-VC
     PROFILE LITIGATION         )
                                )
   _____)
                                )
This document relates to:       )
                                )
     ALL ACTIONS.               )
   _____)
```

San Francisco, California
Thursday, March 2, 2023

**<u>TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS</u>**

(APPEARANCES ON FOLLOWING PAGE)

TRANSCRIPTION SERVICE BY:      Dipti Patel, CET-997
                               Liberty Transcripts
                               7306 Danwood Drive
                               Austin, Texas 78759
                               (847) 848-4907

```
APPEARANCES VIA ZOOM VIDEOCONFERENCE:

For the Plaintiff:
                              KELLER ROHRBACK LLP
                              1201 Third Avenue Suite 3200
                              Seattle, Washington 98101
                         BY: DEREK WILLIAM LOESER
                              CARI CAMPEN LAUFENBERG
                              DAVID J. KO
                              BENJAMIN GOULD
                              ATTORNEYS AT LAW

                              KELLER ROHRBACK, LLP
                              300 Lakeside Drive, Suite 1000
                              Oakland, California 94612
                         BY: BENJAMIN BLYSTAD GOULD
                              ATTORNEY AT LAW

                              BLEICHMAR FONTI & AULD LLP
                              555 12th Street, Suite 1600
                              Oakland, California 94607
                         BY: LESLEY ELIZABETH WEAVER
                              ANNE KATHLEEN DAVIS
                              MATTHEW SETH MELAMED
                              ATTORNEYS AT LAW

For the Defendants:
                              GIBSON, DUNN & CRUTCHER LLP
                              555 Mission Street, Suite 3000
                              San Francisco, California 94105
                         BY: ROSEMARIE THERESA RING
                              ATTORNEY AT LAW

                              GIBSON, DUNN & CRUTCHER LLP
                              1881 Page Mill Road
                              Palo Alto, California 94304
                         BY: MARTIE KUTSCHER-CLARK
                              ATTORNEY AT LAW

For the Intervenor:
                              DICELLO LEVITT
                              485 Lexington Avenue
                              Suite 1001
                              New York, New York 10017
                         BY: CORBAN RHODES
                              DAVID BERGER
                              ATTORNEYS AT LAW
```

| | |
|---|---|
| 1 | **Thursday - March 2, 2023**             **10:45 A.M.** |

**P R O C E E D I N G S**

---O0O---

**THE CLERK:**  Calling Case Number 18-MD-2843, In re Facebook, Inc. Consumer Privacy User Profile Litigation.

Counsel, please state your appearances for the record starting with the plaintiff, then defendant, then intervenor plaintiff.

**MR. LOESER:**  Good morning, Your Honor.

It's Derek Loeser from Keller Rohrback.  And with me from Keller Rohrback is Cari Laufenberg, David Ko, and Benjamin Gould.

**THE COURT:**  Good morning.

**MR. LOESER:**  Good morning.

**MS. WEAVER:**  Good morning, Your Honor.

Lesley Weaver from Bleichmar Fonti; and with me from my firm, Ann Davis and Matthew Melamed.

**THE COURT:**  Good morning.

**MS. WEAVER:**  Good morning.

**MS. RING:**  Good morning, Your Honor.

Rose Ring from Gibson Dunn.  And with me is Martie Kutscher Clark.

**THE COURT:**  Good morning.

**MS. RING:**  Good morning.

**MR. RHODES:**  Good morning, Your Honor.

1        Corban Rhodes from DiCello Levitt on behalf of the proposed

2    intervenor plaintiffs, State of New Mexico.  And also joining me

3    is my colleague, David Berger.

4        **THE COURT:**  Good morning.  Okay.  So you're not with the New

5    Mexico Attorney General's office.  You're with a firm that is

6    litigating this case on behalf of New Mexico?

7        **MR. RHODES:**  Correct, by special designation.  Yes, we

8    represent the state.

9        **THE COURT:**  What was the firm called again?

10       **MR. RHODES:**  DiCello Levitt.

11       **THE COURT:**  Great.  Thank you.  And welcome to the party.

12       **MR. RHODES:**  Thank you, Your Honor.

13       **THE COURT:**  Okay.  So I think maybe we could -- you know,

14   you saw my list of questions.  I guess this is for Mr. Loeser

15   mostly, but anyone is free to chime in.  You saw my list of

16   questions.  There was only one that was kind of semi -- that was

17   substantive.

18       And that was the question about, you know, the absence of

19   any form of injunctive relief, or some sort of structural reform

20   or something like that in the settlement agreement.

21       And I tried to make clear in my question, that that's not

22   necessarily something that is of concern to me, but I think we

23   want -- because, you know, in a case like this, it's not clear to

24   me that there needs to be any kind of injunctive relief or

25   structural reform, particularly when you have, you know, a

1    variety of government agencies, you know, in Facebook's business,

2    shall we say?

3        And they're probably better equipped to figure out what sort

4    of reforms are appropriate and how to monitor Facebook.  But

5    nonetheless, I thought it would be appropriate to get a clearer

6    understanding of -- you know, of all the things you say that

7    Facebook is no longer doing in the wake of the Cambridge

8    Analytica scandal and in the wake of all these lawsuits.

9        Which of those things is Facebook required to refrain from

10   doing as a result of government action?  And which of those

11   things has Facebook voluntarily stopped doing?  Does that

12   question make sense?

13       **MR. LOESER:**  That question does make sense, Your Honor, and

14   we're prepared to do our best to answer it.  And so with the

15   Court's permission, I'll just launch into how we looked at the

16   issue --

17       **THE COURT:**  Okay.

18       **MR. LOESER:**  -- and a little background kind of how we got

19   where we are.

20       You know, sometimes in class settlements, there is

21   injunctive relief, sometimes not.  We sued Facebook over certain

22   practices relating to data sharing and how they were collecting

23   and using their data.  And during the course of the parties'

24   litigation, we obviously learned a tremendous amount about what

25   those practices were.

6

1    We also learned a tremendous amount about whether those
2    practices were continuing.  And in the course of reaching a
3    resolution, we carefully evaluated both by analyzing the
4    discovery we had, but also by some very extensive confirmatory
5    discovery with Facebook, whether they had stopped these practices
6    or not, because frankly, that's why we sued them, and we thought
7    it was important that the conduct not be continuing as part of
8    deciding whether to settle the case.
9    And I think Your Honor noted and saw that in the
10   declarations that were submitted by Facebook employees, Mr.
11   Dunphy (phonetic) and Mr. Alia (phonetic), that shows the work
12   that we've done to go through and really get them to definitively
13   state under oath, as part of supporting the settlement whether
14   the conduct was continuing or not.
15   Those declarations do not answer the question that Your
16   Honor has now posed, which is which of these changes were
17   mandated by the consent order and which ones were voluntary?  And
18   the short answer is, it's a mix.  And the long answer is what I
19   think makes the most sense, instead of going through the dozens
20   of changes in those declarations, I'll just use some examples to
21   show you kind of how it came about to be what it is now and
22   what's presented in those declarations.
23   And so the best example is the one Your Honor noted, which
24   is friendship.  The consent order does not require Facebook to
25   stop engaging in friendship.  Instead, what the consent

7

1    order --

2        **THE COURT:**  Why don't you just define friendsharing so that

3    we're on the same page as to what we're talking about?

4        **MR. LOESER:**  Sure.  Friendsharing is, and there's lots of

5    different names for it.  The one that's most descriptive I think

6    is consented by proxy.

7        And so the way this used to operate on the Facebook

8    platform, one of your friends, if they installed an app, could

9    provide access to the third party that runs that app with all of

10   that person's friends, Facebook user, content information, that

11   that person had shared with that friend.

12       And so it was a way of instead of getting consent from each

13   person from whom that third party got the information, they got

14   the consent from the one person who installed that.  And that's

15   what we saw in Cambridge Analytica, that's how you go from

16   300,000 people who install an app to 87 million people whose

17   information is then conveyed via or to that third party.  And so

18   that's the -- that's how we conceive a friend show, which is a

19   strange sounding concept.

20       But so -- but the consent order does not say -- there's

21   nothing here that says Facebook, you are not to engage in any of

22   this consent by proxy friendsharing type behavior.  Instead, what

23   it says is you're not to engage in misrepresentations regarding

24   how you collect and share information.  And to the extent you're

25   going to share information in ways that go beyond a user's

1  privacy settings, you have to get their express consent to do

2  that.

3       And so all of the litany of changes that are described in

4  the declarations are specific changes regarding friendsharing

5  that were voluntary.  So Facebook decided Facebook now does not

6  engage in friendsharing.  Facebook has deprecated, and it gets

7  very technical very quickly.  But the method by which information

8  is conveyed to a third party is via something called an API.

9  Another method is via permissions and capabilities.

10      And Facebook has deprecated all of the ways that information

11  is -- friendsharing information is communicated via those

12  particular technical means.  And that's something that occurred,

13  you know, Facebook would say, prior to the consent order even

14  happening.  They had -- they told the world they were going to

15  stop engaging in friendsharing, and they did in many respects,

16  but then they had these API's and other mechanisms where

17  (indiscernible).  And since the lawsuit was filed and over the

18  course of time since then, they have stopped doing all that.

19      And all of those changes are technically they're voluntary,

20  because the consent order doesn't say you can't do this anymore.

21  There's a lot of other aspects of that.  And you can see in the

22  way, that version it's really very detailed.  It describes

23  specifically that particular APIs they stopped using.  The

24  particular video related API's and all the others.  And so all of

25  that whole package would be things that directly expressly the

1    consent order doesn't require.  But they voluntarily did these

2    things in order to stop engaging in this practice.

3         Another example that gets a lot of airtime in the

4    declarations is the third-party monitoring of data use.  That's

5    an example of a group of changes that really is expressly

6    required by the FTC order.  The FTC order has very specific and

7    detailed requirements for privacy review, or how the panel -- the

8    assessor is chosen, what the assessor does, what reports are

9    created, what levels of review exist.  And it's mostly the Dunphy

10   declaration walks through all of those things.

11        And not -- I can't say every single one of them you'll find

12   in the consent order, but the vast bulk of them are consent order

13   requirements.  And then there's other things they've done, I

14   think, would be fairly put that flow from it.  And then there's

15   some other new things that are voluntary, but the bulk of it is

16   the substance of the consent order.

17        So there's this mix, and I think the Court's concern, and

18   what you've indicated really is, okay, so what stops them from

19   doing it all over again?  Because an injunction obviously would

20   stop them from doing it all over again.  And I think that the

21   answer that is obvious from the things that are expressly

22   required, and the FTC order is the FTC order clearly says you

23   can't do this.  The FTC is, as you say, in their business, I

24   would stop them.

25        I think for the voluntary changes, those are -- it's a

10

1    really important question, and I think there's a really good

2    answer for what has to happen and what Facebook has to do.  These

3    are things Facebook chose not to do, but having stopped doing

4    them based upon the consent order, they can't just willy nilly

5    restart.

6        Instead, since the consent order generally governs how they

7    collect and use information, and has a whole process for

8    reporting and analyzing and ultimately providing to the FTC and

9    the DOJ what they're doing with the information, in order to

10    restart those practices, they would have to run through that

11    process, which is an onerous process.

12        The FTC really is in Facebook's business, as I'm sure Ms.

13    Ring will describe for you, and has described for us.  And so to

14    restart those things, it's not a matter of flipping the switch.

15    It would be a pretty onerous process to get those things going

16    and to not get into a lot of trouble with the FTC for restarting

17    them.

18        The one other thing I would add to that, which we think is

19    important, and that is the release in this case covers conduct up

20    through December 21st, 2022.  If Facebook restarts these

21    practices, and we believe they aren't properly disclosed, they

22    don't have proper consent, the plaintiffs, of course, can sue

23    them again for new conduct.  And I'd like to think the last five

24    years provided them with strong incentive not to do that.

25        **THE COURT:**  Okay.

1    **MR. LOESER:**  That's how we analyze it, and where we come out

2    on what's voluntary, what's required, and what keeps Facebook

3    from doing it all over again.

4        **THE COURT:**  You know, the motion to intervene by New Mexico

5    reminded me that there are, you know, the State Attorneys

6    General, who are, you know, pursuing actions against Facebook

7    based on this stuff, too.  I assume -- and this may be a question

8    for Ms. Ring, or maybe even Mr. Rhodes, but I assume that the

9    some of those lawsuits involve requests for injunctive relief as

10   well.

11       **MR. LOESER:**  Yeah, I assume so.  And having heard now, I'm

12   sure every AG that's involved is listening.  If they haven't done

13   that, perhaps they should, but --

14       **THE COURT:**  Well, maybe they shouldn't.

15       **MR. LOESER:**  -- that's normal.

16       **THE COURT:**  Maybe they shouldn't, because the -- you know,

17   the FTC is on top of it.  I have no idea.  But --

18       **MR. LOESER:**  And frankly, Your Honor, I haven't really

19   studied.  I did see New Mexico's complaint and did spin through

20   it.  But I'm sure their counsel can indicate whether they are

21   seeking (indiscernible).

22       We, for whatever, for what it's worth to us, we carefully

23   evaluated the question, and determined that in this case, with

24   this settlement for consumers, that wasn't necessary.  What the

25   AGs decide, really, they have a different set of animating

1  concerns, and I'm sure it will be guided by that.

2      **THE COURT:**  Okay.

3      Ms. Ring, did you have anything you wanted to add on that

4  question?

5      **MS. RING:**  I don't, Your Honor.  This was the product of

6  very vigorous litigation, confirmatory discovery, et cetera.  And

7  Mr. Loeser and Ms. Weaver are definitely the best proponents for

8  this to the Court.

9      **THE COURT:**  Okay.  So let's now talk about -- I mean, there

10  are a few other sort of little housekeeping things, but maybe we

11  could talk about the New Mexico thing now.  And I don't think

12  there's anything really for me to decide right now.

13      But Mr. Rhodes, I guess I don't have a full understanding of

14  why you're here and what it is you're trying to protect?  I mean,

15  you heard the discussion that I had with the -- in the first

16  case.  I mean, the way I've always thought of these class action

17  settlements is that, you know, you have a settlement, you have a

18  release.

19      You're careful to make sure that the release only releases

20  claims of the class members, and only claims based on the

21  identical factual predicate.  And beyond that, if there are other

22  lawsuits, future lawsuits, it's for the courts presiding over

23  those lawsuits to figure out the effect, if any, of this

24  settlement on those future lawsuits.  So I guess I don't yet have

25  a great understanding of why you're here or what you want right

1    at this moment?

2         **MR. RHODES:**  Well, I hope I can clarify that for you.  And

3    first of all, let me say thank you very much for allowing us to

4    speak today and for including us.

5         First and foremost, Your Honor, our intent in bringing the

6    motion was to ensure that Your Honor had all the relevant facts

7    when deciding how to rule on the settlement agreement, and

8    including whether or not that settlement agreement will have an

9    impact beyond this case and to some of the other cases that Your

10   Honor alluded to and is aware of.

11        We asked Facebook six weeks ago to give us their position,

12   and we only received it just two days ago.  They should have done

13   that as a matter of course pursuant to the district's procedural

14   guidance on class action settlements.  So we don't believe that

15   it is appropriate for Facebook to simply reserve rights and not

16   tell the world, not tell class members, not tell the Court, and

17   not tell litigants in other cases, how the settlement agreement

18   they believe will impact the rights in those other cases.

19        So what Facebook said to us two days ago, is that with

20   respect to certain claims, and I'm talking about the parens

21   patriae and restitution claims, its position was, "That the

22   release in the proposed MDL settlement if granted final approval

23   by the MDL court, operates to release that claim."

24        And with respect to other claims, all of our other claims,

25   including traditional enforcement measures, like civil penalties,

14

1    Facebook reserves all rights, meaning it may later claim that the

2    settlement agreement release all of those claims as well, but

3    it's not going to say right now.

4         **THE COURT:**  Well, then I mean, it doesn't matter what

5    Facebook says about that, right?  I mean, if the -- if an

6    attorney general is taking an enforcement action to an exercise

7    of the state's police powers, to impose penalties on Facebook for

8    conduct that was covered by that was addressed by this lawsuit, I

9    mean, of course, the settlement would not prevent an attorney

10   general from doing that.  I mean, I don't -- that's not -- that's

11   a nonissue, right?

12        So surely you didn't intervene, or move to intervene, to try

13   to establish the Attorney General's can exercise their police

14   power.  We all know that they can.  And that nothing about this

15   settlement can prevent them from doing that, right?

16        **MR. RHODES:**  Well, I completely agree with you, Your Honor.

17   And the class plaintiffs agree, and they're in their motion

18   papers, they clearly state --

19        **THE COURT:**  So you're really -- it seems to me that the only

20   real reason you could be here is because you're concerned about

21   the effect of this settlement on efforts by the New Mexico

22   Attorney General to seek restitution for New Mexico citizens who

23   the attorney general contends was harmed by this conduct.  That's

24   the only -- I mean, that's the only, like, genuine reason you

25   must be here today, right?

1    **MR. RHODES:**  Well, I think Your Honor is correct, that if it

2    were just a matter of, you know, Facebook taking a clearly

3    erroneous position about enforcement measures, then we probably

4    would not have gone the lengths to intervene here.

5        But we do think that Facebook has an obligation to be clear

6    about its position with respect to the settlement agreements

7    impact beyond this case.  And it has not been clear about that,

8    either with respect to restitution type claims, or with respect

9    to enforcement type claims.

10       So with respect to restitution claims, perhaps it'll be

11   helpful to compare that statement that we received two days ago

12   saying that the release in the proposed MDL operates to release

13   those claims to what Facebook filed last night, which states the

14   very first line and their response says Facebook does not contend

15   that the proposed settlement, in this case the MDL, if approved,

16   would release any portion of the claims brought by New Mexico.  I

17   don't know how to read those two statements as consistent with

18   each other.

19       And then what they seem to have done, it appears to us, is

20   to pivot.  And instead of saying, well, the claims are not

21   released, per se, by the settlement agreement.  But we may bring

22   an argument for claim preclusion or issue preclusion.  So first

23   of all, I think we need to be -- we want clarity, and perhaps

24   we've gotten some clarity just by bringing this issue into the

25   light of day.

1    And if -- you know, if nothing more, and Facebook has in

2    fact clarified that their position is the settlement agreement

3    does not in fact release claims, and they're just talking about

4    some, you know, res judicata or collateral estoppel issue that

5    they might raise in a future court, then I think that that

6    certainly is valuable.  That argument doesn't make sense --

7    **THE COURT:**  Why is it valuable?  I mean, what's the

8    distinction you're drawing between --

9    **MR. RHODES:**  Because, Your Honor --

10   **THE COURT:**  -- releasing the claims and application of claim

11   preclusion?  What I mean, isn't it essentially the same thing?

12   **MR. RHODES:**  Well, Your Honor, I think that -- I'm sorry,

13   can you state your question again?

14   **THE COURT:**  Sure.  You seem to be drawing a distinction

15   between the release of claims on the one hand, and the

16   application of claim preclusion in a future case on the other

17   hand, and it seems to me that those two things are the same.  And

18   so I don't understand.  You're saying there's value in having --

19   in Facebook having used the word claim preclusion instead of

20   releasing the claims, and I'm just not understanding the

21   difference between those two things.

22   **MR. RHODES:**  Yeah.  Yes, Your Honor.  And I struggled with

23   that, as well.

24   And I want to preface this by saying that we just for the

25   first time received this claim or issue preclusion argument from

17

1    Facebook last night.  But this morning, as I was reviewing the

2    proposed judgment that has been filed in this case, they're

3    asking you to enter a judgment in this case.  And it's a two-page

4    document.

5        And all it says is that the Court is enforcing the

6    settlement agreement, and that the settlement agreement is the

7    only available remedy to class members.  So I don't see how claim

8    preclusion or issue preclusion could possibly apply to the

9    Court's order, right?

10       The claims can only be precluded in a future litigation, if

11   they are in fact released by the settlement.  Because as we all

12   know, you don't have to understand New Mexico law.  Specifically,

13   it's the same as the law anywhere else.  Collateral estoppel or

14   res judicata requires that an underlying issue in both cases was

15   actually decided in the prior court, in Your Honor's court.  And

16   the only issue actually being decided, is the enforceability of

17   the settlement agreement.

18       So it frankly just doesn't make sense to us to say that oh,

19   no, what we meant was not that the settlement -- the settlement

20   agreement releases the claims, but that we might later argue res

21   judicata or collateral estoppel.  I hope that helps clarify --

22   that's how I interpreted their statements.

23       And frankly, if Your Honor is confused, I'm confused as

24   well, because we don't think that what they filed last night

25   matches what they said to us on Tuesday.  That's extremely

1  concerning because, again, this is not a, you know, a new issue

2  that we just raised this week.  We asked them six weeks ago, more

3  than six weeks ago, to give us their position so that we can

4  understand it (indiscernible).

5      **THE COURT:**  And I guess I just -- the reason I'm confused is

6  because I don't quite understand what you want from me in this

7  case.  That's why I'm confused.  I don't understand you know,

8  your -- I don't understand your discussion of res judicata claim

9  preclusion versus the effect of the release?

10      I don't -- you know, I -- and I don't understand what, if

11  anything, you want me to do?  I mean, are you -- let me just ask

12  you one quick yes or no question.  Are you asking me to deny the

13  motion for preliminary approval of the settlement agreement?

14      **MR. RHODES:**  No.

15      **THE COURT:**  Okay.

16      **MR. RHODES:**  No, Your Honor.

17      **THE COURT:**  So then the question of -- there may be open

18  questions, as there always are in settlement agreements, in class

19  action settlement agreements, there may be open questions about

20  what claims are barred in future lawsuits, or what type of relief

21  can be recovered in future lawsuits.

22      But again, that's all I can do is make sure that the release

23  says that claims -- you know, claims based on the identical

24  factual predicate are released, and not anything more than that.

25  And beyond -- and I need to make sure that class members are

1   adequately notified that claims based on the identical factual

2   predicate are released.

3       But how that would apply in a future case, I mean, that's

4   just not for me to get involved in, right?  And I don't even

5   understand what you're arguing.  I mean, if you're arguing -- are

6   you arguing that -- well, I mean, do you agree with what I've

7   said so far?

8     **MR. RHODES:**  I completely agree, Your Honor, that it is not

9   for you to get involved, or put your thumb on the scale of what

10  Facebook might argue vis a vis claim preclusion or issue

11  preclusion or any (indiscernible) --

12    **THE COURT:**  So then why -- then why are you here?  I mean,

13  why have you filed a motion to intervene?

14    **MR. RHODES:**  Your Honor, because we believe that Facebook

15  has an obligation under the Northern District guidance to provide

16  clarity to class members, to the Court, and in particular, to

17  litigants in other cases, about how the settlement and

18  particularly the settlement release is going to impact those

19  cases.

20      Subsection 1(d) for example of that guidance says, "Any

21  other cases that will be affected by the settlement, the parties

22  are required to provide an explanation of what claims will be

23  released in those cases if the settlement is approved."  Facebook

24  never did that.

25      Additionally, Your Honor, within one day, and this is

20

1    Section 13 of the Northern District guidance within -- and I'm

2    quoting here,

3              "Within one day of filing the preliminary approval

4              motion, the defendants should serve a copy on counsel

5              for any plaintiffs with pending litigation, whether at

6              the trial court or at appellate court level, whether

7              active or stayed, asserting claims on a representative

8              basis that defendants believe may be released by virtue

9              of the settlement."

10   We didn't receive that any such notification.  And so it was

11   a surprise to us when two days ago, Facebook took the position

12   for the first time apparently, that our claims explicitly in

13   their words would be released by the settlement agreement in this

14   case.

15        So to answer Your Honor's question about what are we asking

16   the Court to do?  We're not asking the Court to issue any kind of

17   advisory opinion.  All we're asking the Court to do is require

18   that Facebook follow the Northern District guidelines and take a

19   position and make that position public about whether or not the

20   settlement agreement in its opinion, is going to extinguish

21   claims in other cases.

22        **THE COURT:**  And so are you asking me to decline to approve -

23   - preliminarily approve this agreement until such time as

24   Facebook does that?

25        **MR. RHODES:**  If Facebook refuses to take a position, I think

1   that would be very telling and very problematic, and certainly

2   something that the Court would have to take into consideration in

3   deciding whether to grant preliminary approval, but all Facebook

4   has to do is take that position.  But what we don't think is

5   appropriate is for it to simply reserve rights and thereby

6   preserve the argument, not tell class members, whether or not it

7   plans to extinguish claims in other cases.

8        Let me just say one other thing.  You know, class wide

9   notice is going to go out, if the preliminary approval motion is

10  granted to hundreds of thousands if not millions of New Mexico

11  users.  How are those users to understand what the impact of the

12  settlement is going to be on the parallel case that their

13  attorney general is bringing?

14       So perhaps, you know, if I'm a New Mexico consumer, and I

15  say, well, you know, I would rather have my attorney general

16  litigating claims for restitution, you know, money that's going

17  to actually come to me in my pocket, I would rather have those

18  claims litigated by the New Mexico Attorney General.  How are

19  they to know whether or not the settlement has any impact on

20  their ability to recover in our action in New Mexico, if Facebook

21  is not being clear about it?

22       So that's what we're asking for Your Honor is for Facebook

23  to take a clear position.  Now, I think that clear position will

24  be very telling.  And, you know, the consequences that flow from

25  that, you know, remain to be seen, but I think it's a

1    (indiscernible) --

2        **THE COURT:**  So part of it is like no -- you know, part of

3    the concern you seem to be expressing is that people need to be

4    notified if the attorney general is seeking restitution on their

5    behalf in New Mexico, right?

6        And if the attorney general is seeking restitution on their

7    behalf, maybe the attorney general will end up getting more money

8    for them than what the plaintiffs got for them in the settlement

9    agreement.

10       And so maybe they would prefer to -- maybe they would prefer

11   to opt out of the settlement agreement so that the attorney

12   general can continue to pursue restitution on their behalf.  Is

13   that what you're saying?

14       **MR. RHODES:**  Yes.  Yes, I think that's right.

15       **THE COURT:**  Okay.  And implicit in that seems to be an

16   acknowledgment that if they receive restitution in this case, if

17   they receive money in this case, then the New Mexico Attorney

18   General cannot continue to seek restitution on their behalf.

19       **MR. RHODES:**  I would assume that for sake of argument today.

20   I frankly have a --

21       **THE COURT:**  But if the New Mexico Attorney General is

22   pursuing an action on behalf of New Mexico Facebook users seeking

23   a court order requiring Facebook to pay restitution to the users,

24   for anybody who's a member of the class, that New Mexico can't

25   get that, right?  They can't get an order requiring Facebook to

1  pay restitution to New Mexico Facebook users for the type of

2  information sharing that we're talking about in this case.

3      **MR. RHODES:**  Well, I assumed that there would not be a

4  double recovery in any case.  And so you know, that might be an

5  argument that Facebook could make in the New Mexico case.  But I

6  don't (indiscernible) --

7      **THE COURT:**  You're saying at a minimum, there would be an

8  offset?

9      **MR. RHODES:**  I think that's -- I haven't done the research,

10  Your Honor, but I would be willing to assume that for sake of

11  argument here.  That at a minimum, there will be an offset, but

12  that doesn't mean that the claims for restitution would be

13  extinguished assuming that, you know, the recovery here is

14  something less than 100 percent of damages.

15      And you know, of course, that would be an issue that would

16  have to be litigated again, you know, in the New Mexico court.

17  But --

18      **THE COURT:**  But the attorney general is seeking restitution

19  on behalf of the user, right?

20      **MR. RHODES:**  To be clear, our complaint alleges both civil

21  penalties --

22      **THE COURT:**  Right.

23      **MR. RHODES:**  -- as well as restitution and injunction to

24  answer Your Honor's question from (indiscernible).

25      **THE COURT:**  It seems obvious that the attorney -- if the

1   attorney general wants to seek civil penalties or an injunction,

2   it seems obvious -- should be obvious to everybody that this case

3   cannot interfere with the New Mexico Attorney General's police

4   power to do that.

5        But on the restitution point, I'm just trying to pin you

6   down.  You know, you're accusing Facebook of being sort of

7   squirrely in its responses, but I'm having trouble understanding

8   your responses.  Are you taking the position that the New Mexico

9   Attorney General could continue to seek restitution on behalf of

10  a Facebook user in New Mexico if the Facebook user is part of

11  this class, part of the settlement agreement and has received

12  money as a result of being in this class?

13       Is that what you're saying, that you're trying to preserve

14  here -- because you're trying to preserve New Mexico's rights to

15  seek restitution on behalf of a user who -- on behalf of a user

16  who already received money as a result of this class settlement?

17       **MR. RHODES:**  Your Honor, I want to be careful about

18  answering your question.  I could envision a number of scenarios.

19       So I think at a minimum, what is required is for class

20  members to be aware of what Facebook's position is with respect

21  to double recovery, or you know, restitution recovery in

22  enforcement actions.  Whether or not, you know, a class member

23  who recovered something less than 100 percent could be entitled

24  to restitution from the state to bridge the gap to get them to

25  100 percent, I don't know standing here today.

1    **THE COURT:**  Okay.  So now that we've had this discussion,

2    can you just tell me what it is you want me to do, if anything?

3    **MR. RHODES:**  Yes.  We would like Your Honor to order that

4    Facebook provide a clear position on what the impact is of the

5    settlement agreement language on New Mexico's claims.  Both the

6    restitution claims, because on the restitution claims, as I

7    understand it, we've heard two different answers.  On Tuesday, we

8    heard that those claims will be released and --

9    **THE COURT:**  Okay.  I just want to know --

10   **MR. RHODES:**  Yeah.

11   **THE COURT:**  I don't want argument.  I just want a clear

12   answer on what you want me to do.

13   **MR. RHODES:**  Yes.  Okay.

14   **THE COURT:**  At one point in this discussion, it seemed like

15   you were saying you want me to just go ahead and preliminarily

16   approved the settlement.  At another point in the discussion, it

17   seemed like you wanted me to require them to change the notice.

18   At another point, it seemed like you were asking me to

19   require them, Facebook, to say something out loud that they --

20   you think they haven't said yet?  So I just want to get clarity

21   from you.  What are you asking me for in connection with this

22   motion for preliminary approval?

23   **MR. RHODES:**  To order Facebook to provide what the Northern

24   District guidance requires, which is to provide their position on

25   whether or not claims, all claims in the New Mexico action are

1   impacted by the settlement, and how an explanation of how those

2   claims are impacted?  And to date I don't believe we have a clear

3   position on Facebook on any of those things, as I've outlined.

4       **THE COURT:**  Okay.  Anybody want to respond to any of that?

5       **MR. LOESER:**  Ms. Ring looks like she's about to respond.

6   And I certainly don't want to get in the way of that response.

7       **MS. RING:**  Thank you.

8       I mean, Your Honor, I think this exchange sort of

9   illustrates the point.  I will say I've never heard the Northern

10  District guidance interpret it this way.  As you know, we send

11  Kapa notices to all the state AG's.

12      A release in this case does not release claims asserted by

13  the state of New Mexico or indeed any state, so it just doesn't

14  fall within the guidance.  And I think this is where, in your

15  discussions with Mr. Rhodes, a release versus preclusion so --

16      **THE COURT:**  Which was the – could I ask about the -- I just

17  pulled up the class action guidelines.  I just want to glance at

18  that the language with an eye towards the point you just made.

19  Where is it again?  Where's this provision?

20      **MR. RHODES:**  Your Honor, there are two relevant provisions.

21  One is the first is under 1(d).  And that's what's required to be

22  in the motions for preliminary approval.

23      **THE COURT:**  Okay.  Got it.

24      **MR. RHODES:**  And then the other is Item 13, which is the

25  notice requirement for one day after preliminary approval was

1    filed.

2         **THE COURT:**   Okay.   Great.   Thank you.   Go ahead, you can

3    continue.

4         **MS. RING:**   Thank you.   The release just doesn't apply to the

5    states.   It applies to the members of the class.

6         And so we just don't -- again, I've never seen this

7    guidance.   I never heard anyone argue that it applies in this

8    way.   But I think this is part of the disconnect.

9          So I should say, Your Honor, a colleague of mine is

10   handling the New Mexico case and has been corresponding with Mr.

11   Rhodes.   And I think in his effort to be -- even try to be clear

12   this confusion between release and preclusion, they're not

13   exactly the same thing as you said, they're related, though,

14   right?

15        I mean, to the extent the state is asserting a claim that's

16   grounded in restitution, because in parens patriae, they're

17   essentially standing in the shoes of the class members who are

18   releasing their claims in this case.

19        So I think in his effort in that email, he said that the

20   release would operate to, you know, effect to the extent the

21   state is asserting claims in parens patriae, in the standing in

22   the shoes of the consumers, the members of this class that it

23   would operate to release the claims.

24        And so I don't know how much clearer we can be in that the

25   release doesn't apply to the state of New Mexico.   However, if

1    later, and I should say too, there's a lot going on in this case.

2    I mean, there's still a motion for preliminary or a motion to

3    dismiss for lack of personal jurisdiction to be litigated, et

4    cetera.

5         I don't know how this litigation is going to unfold and

6    develop.  But if at some point, there is an argument that the

7    release in this case applies to prevent double recovery, et

8    cetera, all we're saying is, we'll reserve our rights to raise

9    that argument.  And that's true for --

10   **THE COURT:**  But it's not -- it would not just be -- it's not

11   just potentially an argument about double recovery.  It's also

12   potentially an argument that well, that they released their

13   claims for restitution in this case.  And therefore, the attorney

14   general cannot bring an action on -- cannot recover restitution.

15        It's not that they're precluded from bringing a claim.  It's

16   not that they -- it's not that the attorney general has released

17   the claim.  But the attorney general is precluded from recovering

18   restitution on behalf of any restitution on behalf of Facebook

19   users who are part of the class, right?  I mean, that would be

20   the argument you would want to preserve the right to make.

21        **MS. RING:**  Your Honor, I believe so.  But this is the

22   problem.

23        I don't -- until that's -- and that's why this issue would

24   be one that's litigated in front of the New Mexico State court.

25   I don't know exactly what the argument would be.  But you know,

29

1   at the time -- you know, or at the time that it would be raised.

2   I don't know what the case will look like, what claims will still

3   be in, which claims will be out.

4        You know, we'll have to refer back.  The identical factual

5   predicate rule, as you know will come into play.  All of that

6   will have to be analyzed.  And that's why it's just -- again,

7   it's just the same in every case that I've settled like this.

8   We're just reserving our rights.  We just don't know how it's

9   going to play out.

10       **THE COURT:**  I mean, the -- as I'm trying to, I mean, I find

11  all of this really interesting because I used to work in the city

12  attorney's office, and we would bring actions, you know, on

13  behalf of our citizens.  And so I could sit here and talk to you

14  about this for hours, but I'm trying to limit myself to what is

15  really my responsibility, right?

16       And it seems to me that it is not my responsibility to

17  decide the effect of this settlement, this proposed settlement on

18  an action brought by the New Mexico Attorney General.  But it is

19  my responsibility to make sure that issues are flagged for class

20  members when they are trying to decide whether to opt out of the

21  settlement or not, right.

22       I mean, that's -- it seems to me that that's what my

23  responsibility is limited to.  And so you know, the one point

24  that that Mr. Rhodes made that resonated with me a little bit is

25  should there be something in the notice, that says, you know, if

1    you participate as a class member here, right, this could affect

2    the ability of -- I mean, I'm talking, I'm speaking off the top

3    of my head, so it's not -- I'm not using the right language.

4        But should there be something in the notice that makes the

5    point that, you know, if you are a member of this class, and if

6    you -- you know, if you don't opt out, that could affect the

7    ability of, you know, a government entity to, you know, seek

8    recovery on your behalf in a separate lawsuit, or, you know,

9    something like that, just to flag the issue for people so they've

10   received notice of it.

11       **MS. RING:**  I understand that.  I guess -- and when Mr.

12   Rhodes said it, I thought about what the implications of that

13   would be.  I mean, what case wouldn't you have to do that in

14   going forward?  I mean, it's just I've never dealt -- I've never

15   seen this issue come up.  And I think this is probably why

16   because it applies in every case.

17       **THE COURT:**  I think that's a good point.  But in most cases,

18   there are not -- and I don't know what -- I don't know which

19   other attorneys general have filed actions in -- you know,

20   against Facebook for this conduct.

21       But in most cases, there are, you know, when you have a

22   class action settlement, you don't have these pending lawsuits by

23   attorneys general against the defendant, you know, seeking to

24   recover on behalf of class members, right?  And it seems like you

25   do here.

1     So in these class action settlements, when we have

2    situations like that sometimes we tweak the notice, to -- you

3    know, to flag the issue for, you know, people who might receive

4    recovery under those other lawsuits.

5     **MS. RING:**  Well, Your Honor, I would say, and we've talked

6    about this before.  I've represented Meta for many years.  I have

7    a lot of other tech clients.  And I would say it's actually more

8    often than not that that's the case that there is also a pending

9    investigation.  And I've never -- again, I think I've never seen

10   anything like this added to the notice.

11    **THE COURT:**  Okay.  But what would be -- aside from that,

12   what would be wrong with adding something like that to the

13   notice?  I mean, it doesn't take any -- you know, it doesn't take

14   any position on it.  But it says, look, you know, just so you

15   know, there are actions by government entities, you know,

16   seeking, you know, recovery against Facebook, and by

17   participating in the settlement, that could affect your ability

18   to, you know, receive any recovery from those actions or

19   something like that.

20    **MS. RING:**  I think in those -- I think that would be very

21   confusing for consumers.  It's basically to say, rather than

22   looking at what Rule 23 requires is, given the claim --

23    **THE COURT:**  Well, wait.  Hold on.  Let me interrupt you for

24   a second.  It's a true statement, right?  I mean, you would agree

25   with that statement.

32

1    I mean, Facebook is reserving its rights to argue that in

2    the New Mexico case, the attorney general can't recover

3    restitution for anybody who was part of this class.  And so it

4    seems to me that it's a true statement that if you participate in

5    this class settlement, your ability to recover through an action

6    by your attorney general could be affected, right?

7        **MS. RING:**  No, I also find this issue very interesting, Your

8    Honor.  I researched it about ten years ago.  I haven't looked at

9    it, you know, recently.

10    But I think that is the problem with trying to be so

11    definitive on this.  I don't know the answer to the question.

12    You know, I don't know if the argument would be this is

13    restitution, and therefore that's the basis for -- you know, that

14    any claim by the State AG would be precluded.  I actually don't

15    know if it would be for that reason.

16    But I think that going back to Rule 23, and what we're

17    looking at here, the question is just in light of -- you know, in

18    light of the allegations and the claims that have been asserted

19    here, is this settlement fair, adequate, and reasonable?  It's

20    not do you want someone else to be litigating this claim on your

21    behalf?  That's a different question.

22    And the question for you is, is this settlement fair,

23    adequate, and reasonable based on these claims?  Again, this is I

24    think, why this just doesn't come up.

25        **THE COURT:**  Well, no.  But my job is also --

1    **MS. RING:**  That's a separate --

2    **THE COURT:**  It's not my only job.  My job is also to make

3    sure I have a duty to the absent class members.

4    **MS. RING:**  Yes.

5    **THE COURT:**  To ensure that they're adequately informed of

6    the issues associated with opting -- being part of the case be

7    part of the class or opting out of the class.

8    **MS. RING:**  Right.

9    But this is introducing an issue again that I just -- I

10   don't think goes, it doesn't seem to me to go to that question.

11   Who do you want to be litigating this on your behalf?  These

12   class members have class counsel, right?

13   So the question is, is this settlement fair, adequate, and

14   reasonable given the claims asserted here, not do you think you

15   could maybe get a better recovery if someone else were litigating

16   them.  They had the absent class members.  That's why you

17   appointed class counsel in this case.  So I think it's

18   (indiscernible) --

19   **THE COURT:**  Right.

20   But if I'm an absent class member, and I love my attorney

21   general.  And I think I have like the ultimate confidence that my

22   attorney general will, you know, recover a lot of money for me in

23   connection with the, you know, lawsuit about the Cambridge

24   Analytica scandal, you know, shouldn't I be informed of the

25   existence of that lawsuit, so I can take it into account when

1    deciding whether to participate in this class action?

2        **MS. RING:**  But how do you weigh that?  Then you say, well,

3    the attorney general might be able to get more money for you?  I

4    mean, I just -- I don't think that, again, they have appointed

5    class counsel, that was -- that is charged with determining

6    whether this settlement is fair, reasonable, and adequate based

7    on these claims.

8        Now, to the extent that there are other claims asserted by

9    the State AG's that are not covered, in other words, the release,

10   it would not be based on the same, the identical factual

11   predicate, they are free to continue pursuing those claims,

12   restitution and all.  But to the extent they're based on the

13   identical factual predicate, no.  This is the deal.  This is the

14   settlement that they have to evaluate whether they want to opt in

15   or out of.  And part of that decision, I don't think is would you

16   rather have someone else litigating on your behalf?

17       And moreover, Your Honor, I would say that's -- we have Kapa

18   notice that I -- you know, when that requirement came into being,

19   I think that was a good thing.  Notice goes out to all the state

20   Ag's.  They can comment on -- you know, which they often do in

21   these situations.  But this is something different altogether.

22   Would you rather have us litigating this claim on your behalf?

23   Rule 23, a private class action, they have counsel, and they're

24   here today.

25       **THE COURT:**  Well, the other -- I mean, the other issue that

1   you sort of touched on in your comment is that, like, for any

2   attorney general who is bringing an action seeking restitution on

3   behalf of Facebook users in their state, like, it's so obvious,

4   that there could be implications that this case could have

5   implications for that case.

6       And you know, we've had one attorney general show up two

7   days before the hearing on preliminary approval when, you know,

8   the motion for preliminary approval of the class action

9   settlement was filed, like, what, like three months ago or

10  something like that?

11      And you know, and everybody's aware of the case.  I mean,

12  it's just -- I find it remarkable that, you know, if this were --

13  you know, if this were such an issue, why didn't the New Mexico

14  Attorney General come in long ago, to -- you know, to protect an

15  apparent interest in seeking restitution on behalf of New Mexico

16  Facebook users.

17      But I want to ask Mr. Loeser on the -- as you're an

18  experienced, you know, plaintiffs class action lawyer, and I want

19  to ask you particularly on the issue of notice, right.  Do you

20  agree with Ms. Ring that, well, it doesn't matter, you don't have

21  to notify them of this other -- these other actions and the

22  possibility of this settlement affecting your recovery in these

23  other actions, because the Court has determined that this

24  settlement is reasonable?

25      **MR. LOESER:**  Well --

1    **THE COURT:**  Or do you think it's important to notify class

2    members of the possibility that a recovery in another action

3    brought on their behalf by the attorney -- by an attorney general

4    could be affected by their participation in this settlement?

5    **MR. LOESER:**  Yeah.  I think it's a difficult question.  And

6    I guess, just thinking out loud about it, I have not seen this

7    before where an attorney general has showed up in a consumer case

8    and involved itself to suggest there needs to be a communication

9    about that attorney general's case in the consumer case.

10    I think like you said, it's pretty obvious to the attorneys

11    general, you know, when there's a consumer class action it

12    provides relief to the consumers, and typically the attorneys

13    general are proceeding on behalf of police powers and others and

14    their recoveries just completely different.

15    I guess what worries me about creating what would kind of be

16    a new paradigm for dealing with overlapping attorney general in

17    consumer cases, which as Ms. Ring said, I think it's a pretty

18    common, is I worry about confusing class members with this,

19    because it's not like there's an attorney general action that has

20    attained some relief, and you're being asked to choose between

21    two buckets of relief, one might be better than the other.

22    Instead, you're presented with something that's basically

23    saying it's possible that sometime in the future, you could do

24    better than this.  And I'm not exactly sure what the wording

25    would be to make it really, really clear that like you're giving

37

1  up a bird in the hand and a really outstanding result.  Frankly,

2  I think that's why you aren't going to see more AG's here,

3  perhaps.

4      But for something that might happen and not only might

5  happen or might not happen, but under the normal operations of

6  the identical factual predicate concept, that will be likely

7  litigated in that other case.  So the attorney general will have

8  an opportunity in New Mexico to explain why what its seeking,

9  restitution or otherwise, is not duplicative.

10      And so I guess I don't have a -- it's not entirely clear to

11  me if this could be done in a way that doesn't result in a bunch

12  of people opting out of the settlement, threatening the existence

13  of the settlement, frankly, for -- because there is a point at

14  which there's so many opt outs the settlement goes away for

15  something that is a speculative future relief.

16      And I would really wonder why the attorneys general would

17  want to jeopardize the settlement, which is what this would do,

18  when in their own action, they can pursue other recoveries that

19  are not compensatory.  And that's normally where they focus their

20  time, because the standards are better.  And the relief is

21  frankly, easier, and the penalties are enormous.  And they don't

22  have the problems that frankly, we face in these consumer cases

23  which -- and we articulate in our motion, which is how do you

24  prove damages and the like?

25      So I guess my trying to put some corners around what I just

38

1    said, I would be really concerned about attorneys general's

2    insisting that we include language in a notice that may result in

3    people opting out for some possible, but certainly not clear

4    recovery, when they have an opportunity to litigate the effect of

5    the release in their own case, potentially jeopardizing the

6    settlement.

7         Leaving class members in a situation where maybe our case

8    just gets dismissed, maybe they aren't successful, or maybe they

9    just pursue their statutory penalties.  That to me seems like the

10   list of worries that I would have about changing the notice to

11   accommodate this attorney general's intervention.

12        **MS. RING:**  And --

13        **THE COURT:**  I mean, it would be one thing if an attorney

14   general came in and said, you know, we are pursuing recovery on

15   behalf of class members in our state, and we are confident that

16   we're going to -- this settlement is not very good.  And we're

17   confident that we're going to be able to recover more on behalf

18   of people in our state.

19        So we urge you to reject this settlement, or at least carve

20   out of the settlement the people who we are representing in the

21   state of New Mexico?  I mean, that would be -- you know, I think

22   you would have to – you know, that would be a serious issue.  And

23   I would think attorneys general would have the right to come in

24   and say something like that if they believed it.

25        **MR. LOESER:**  On a preserved issue, Your Honor, because under

1    the normal opt out and objection, you know, Rule 23, certainly if

2    the New Mexico Attorney General decides it doesn't like the

3    settlement and wants to object to it, or on some capacity, it's

4    not entirely clear what the standing is in that sense, but

5    certainly opt out -- and, again, not entirely clear how they

6    would opt out when everyone seems to agree they're not a class

7    member.

8         But it does seem like they could certainly go out on the

9    airwaves and make the point that, you know, you should reject the

10   settlement, because we're going to do better for you.  I don't

11   hear them saying that.  I certainly haven't heard any feedback

12   from any attorneys general that they have a problem with this

13   settlement, the recovery, the relief that's obtained and the

14   like.

15        **MS. RING:**  And let me if I might add, Your Honor, just think

16   about the incentives here, especially in this case.  This is a

17   case that we've been litigating for 2018.  Everybody knows about

18   it.  The state attorneys general, you know, some may be

19   investigating.  Only a few have filed complaints.

20        And then if the standard becomes their civil litigants who

21   litigate a case for five years, and then at the end of it, the

22   state attorney generals come in and say no, now we want to

23   litigate.  We're not going to get relief for consumers that's

24   timely.

25        **MR. RHODES:**  Well, Your Honor, can I respond to that last

40

1    point?

2        We haven't just filed our case.  Our case has been pending

3    for years.  So I don't think that that's a concern here at least.

4    To answer Your Honor's question about why didn't we file this

5    earlier?  I think the answer is one, in the preliminary approval

6    notice class plaintiffs at Page 18 said, "Other than the cases

7    that are part of this MDL, plaintiffs position is that no other

8    cases will be affected by the settlement."

9        Now, I understand that's plaintiffs position, but according

10   to defendants, that's not true.  That is not true, according to

11   defendants, and that is not in the record anywhere.  And you

12   know, we received --

13       **THE COURT:**  Well, wait a minute.  Hold on.  Let's just take

14   a step back for a second.

15       You have an action in which you're seeking to recover

16   reimbursement on behalf of Facebook users.  This is a class

17   action that seeks to recover reimbursement -- or reimbursements

18   not the right word -- restitution, damages, whatever you want to

19   call it, right.  Seeks to recover money.

20       You have an action that seeks to recover money for Facebook

21   users.  This is an action that seeks to recover money for

22   Facebook users.  That's all you need to know to understand that

23   this action might affect your action.  And the outcome of this

24   action might affect your action.  That's all you need to know.

25   You don't need to know what the plaintiffs say in the motion for

1    preliminary approval.  You don't need to -- but where have you

2    been?  Where have you been all these years?

3        **MR. RHODES:**  Your Honor, I don't -- respectfully, I

4    disagree.  I think that the scope of the release, is it makes a

5    difference, you know, between one case and another.

6        For example, I mean, they could have easily carved us out

7    from the release explicitly.  I mean, that happens, you know, in

8    cases.  They chose not to do that.  Fine.  So that -- you know,

9    that's just one example of --

10       **THE COURT:**  Yeah.  But why weren't you -- I mean, do you

11   have a problem with the release language?

12       **MR. RHODES:**  I didn't until two days ago, because, again,

13   what was said in the preliminary approval papers was that the

14   release and the settlement agreement were not going to release

15   claims outside of the MDL.

16       And now all of this -- and we followed up with Facebook, you

17   know, six weeks ago, to confirm that that was their position as

18   well, not having heard anything from them under the -- you know,

19   the notification procedures under the guidance.

20       And so we were proactive and followed up with them.  And by

21   the way, we had to follow up with them, I had to follow up with

22   them three separate times to get them to respond to that.  They

23   finally responded to us two days ago, and we filed the motion the

24   very same day, because that was the very first time --

25       **THE COURT:**  Mr. Rhodes, I'm going to ask you to stop

42

1  complaining about Facebook's communications with you.  Because,

2  you know, if this was a genuine concern for the New Mexico

3  Attorney General, you should have been here a long time ago.  And

4  it's obvious that you should have been here a long time ago.  And

5  I'm still trying to wrap my mind around what exactly you're

6  trying to accomplish.  So stop trashing Facebook.  It's not --

7  you're the one on the sort of low ground right now procedurally,

8  okay?

9       All right.  Let's -- for a moment, let's turn to -- let's

10  turn to the other issues that I raised in my order.  I know that

11  you've addressed many of them, maybe you've even addressed all of

12  them.  But do you want to run through them and let me know where

13  they stand?

14       **MS. WEAVER:**  Yes, Your Honor.  We're happy to do that.

15       We have filed amended proposed -- an amended proposed

16  preliminary approval order, incorporating a couple of issues that

17  you've identified.  We have a red line for you at Docket 1114-3

18  in the (indiscernible) --

19       **THE COURT:**  Yeah.  I went through all of that.  All of that

20  looked good.  What I want to do is go through the -- just my

21  order now and just see what's been addressed and what still needs

22  to be discussed.

23       **MS. WEAVER:**  The two that I would say we haven't addressed

24  in terms of forms are the opt out form and the objection form.

25       **THE COURT:**  Okay.

1    **MR. RHODES:**  I think, Lesley, before we get there, though,

2    should we --

3    **MS. WEAVER:**  Yeah.

4    **MR. RHODES:**  I just have your order in my hand, Your Honor.

5    And after the -- oh, I'm sorry, go ahead.  The injunction issue

6    comes up later.

7    **MS. WEAVER:**  So your second bullet point was should the

8    settlement website include an opt-out form.

9    **THE COURT:**  Yeah.

10   **MS. WEAVER:**  We sent a draft over to Facebook.  We think it

11   would be fine to include that.  Your Honor's ordered it before,

12   so we'd be happy to submit something to the Court today.

13       And the same answer is true for the objection form.  We sent

14   a draft over to Facebook yesterday.  We think it could clarify,

15   and I think we're all interested in having clear notice to the

16   class.  That's plaintiff's (indiscernible) --

17   **THE COURT:**  Okay.  Great.  What else?  Anything else?

18   **MS. WEAVER:**  I think --

19   **THE COURT:**  Oh, yeah.  The next question.  I don't think

20   you've answered the next question yet about why does it -- why

21   should the objection state whether the objector has sold or

22   otherwise transferred the right to their recovery?

23   **MS. WEAVER:**  Right.  The issue there is just transparency,

24   Your Honor.  We want to understand the context for objections and

25   learn whether or not for example, a professional objector is out

1    there aggregating objections or who -- you know, why it is that

2    people are objecting.

3    **THE COURT:**  Okay.  Got it.  And then the injunction -- the

4    injunction point?

5    **MR. LOESER:**  The injunction point, and we heard the

6    conversation earlier, Your Honor, in the prior case.  It was our

7    -- it is our intention to comply with the standing order.  We

8    don't believe that the language in the final order is an

9    injunction.  And we really do believe it's for the next court,

10   such as the New Mexico court, to decide what the identical

11   factual predicate release covers and what it does not.

12       I gather from looking back over the order that your concern

13   is with the language permanently barred?

14   **THE COURT:**  Right.

15   **MR. LOESER:**  And I think for that --

16   **THE COURT:**  It's not a big -- I understand none of this is a

17   big deal.  But I do -- it always makes me a little uncomfortable

18   to seem like I'm enjoining somebody from filing a future lawsuit.

19   **MR. LOESER:**  Yeah.  And that's certainly not our intention

20   with the language here.  I mean, we had in mind the standing

21   order is really just intended to be a release.  I think that --

22   you know, when these words, every word gets negotiated, frankly,

23   and I don't want to just say, we'll change the words, and I want

24   to hear from Ms. Ring on what would be changed there.

25       But if there's wordsmithing, that just makes it clearer that

1  there's nothing about this that's intended to be an objection or

2  an injunction, then obviously, we're happy to consider that.  I

3  do think that just, I'll put words into Ms. Ring's mouth for a

4  minute, and then she can tell me (indiscernible).

5      I think it's kind of boilerplate language that finds its way

6  in a lot of releases.  It's not always the same language.  In

7  Jabbari, for example, we didn't have the mention of permanently

8  barred.  Instead, we had compromise, settled, discharged, and

9  release, but the idea was intending to be the same.

10     **MS. RING:**  Your Honor, I'm again, finding myself with very

11 little to add on this point, which I think is a good thing for

12 our purposes today.  It's kind of language that's generally

13 included, but none of us think of this as an injunction, so --

14     **THE COURT:**  Okay.  Is there anything -- does that cover

15 everything that was in my order?  I think it does.

16     **MR. LOESER:**  I think we --

17     **MS. RING:**  Yes.

18     **MR. LOESER:**  -- made all the other changes and submitted

19 amended forms, notice orders, et cetera to comply with all your

20 other suggestions.

21     **THE COURT:**  Okay.  So it seems to me that the only -- and

22 let -- so let me just say that I do not have any significant

23 concerns about this settlement agreement.  I think that based on

24 the record that is currently before me, it's a reasonable

25 settlement.  I don't think that this is a case that requires some

1    sort of injunctive relief or structural reform, for the reasons

2    that Mr. Loeser and Ms. Ring have articulated.  And I -- you

3    know, I think it's a reasonable settlement.

4        And the only, you know, small question I have is whether,

5    you know, the one we've been discussing, which is whether the

6    notice should say anything about these AG actions.  But I

7    understand what you all are saying about that.  I mean, are we

8    really going to be, you know, including in these class action

9    settlement notices information about, you know, government

10   investigations, or government lawsuits whenever they -- whenever

11   they're occurring in parallel.

12       And you know, the idea that an attorney general action could

13   recover more money for a Facebook user than what the Facebook

14   user could get through this settlement seems pretty fanciful to

15   me.  Especially since, you know, as I understand these laws, you

16   know, it's about seeking restitution for the user.  How do you

17   measure restitution in a case like this?  So I don't know.

18       But I will think about it.  I will think about that issue a

19   little more.  If I feel that there's some additional briefing I

20   need for that, I'll ask you for it.  But that's really the gist.

21   So you know, that's really the only issue I'll be thinking about.

22   And I want to make sure to, you know, spend the time that's

23   necessary to think it through carefully before making a final

24   decision.

25       **MR. LOESER:**  Well, thank you, Your Honor.  And obviously,

47

1   it's been a long road and a bumpy road, we're eager to get to the
2   end of the road.
3        And the schedule, as you can see, is pretty elongated as is.
4   And it's a huge class.  And so there's time required.  But we're
5   -- we are really pleased to be here at this point after what's
6   been a pretty intense run.  And so we are eager to just get
7   things moving as quickly as we can and get on with it.
8        And we really appreciate the Court's close attention and
9   careful attention to this case.
10       **THE COURT:**  Right.  Yeah.  And I won't take long to figure
11  it out, but I just want to spend a little more time thinking
12  about it.
13       All right.  Thank you.
14       **COUNSEL:**  Thank you, Your Honor.
15       **THE CLERK:**  Court is adjourned.
16            (Proceedings adjourned at 11:51 a.m.)
17                         ---oOo---
18
19
20
21
22
23
24
25

48

# C E R T I F I C A T E

1

2          I, DIPTI PATEL, court-approved transcriber, certify that the

3     foregoing is a correct transcript from the official electronic

4     sound recording of the proceedings in the above-entitled matter.

5

6     *Dipti Patel*

7     _____

8     DIPTI PATEL, CET-997

9     LIBERTY TRANSCRIPTS                    Date: Mach 6, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25