Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor<br>Hearing Date: September 7, 2023<br>Hearing Time: 1:00 p.m. |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................2

II.   OVERVIEW OF CLASS COUNSEL'S SUCCESSFUL EFFORTS ...............................4

      A.    Class Counsel File and Amend Their Complaint and Overcome Facebook's
            Motion to Dismiss. ................................................................................4

      B.    After Discovery Begins, Numerous Disputes Cause the Court to Refer
            Discovery to Judge Corley. ...................................................................5

      C.    The Difficulty and Complexity of Discovery Escalate. ...........................5

      D.    The Parties' Unresolved Discovery Disputes Lead to the Appointment of
            Discovery Mediators and then a Special Discovery Master. ....................6

      E.    Class Counsel Prevail on Numerous Motions to Compel Despite Intense
            Opposition. ..........................................................................................7

            1.    Class Counsel engage in successful motion practice before the
                  Special Master. ...........................................................................7

            2.    Class Counsel are successful in labor-intensive disputes over ADI
                  and the Named Plaintiffs' data. ....................................................7

            3.    Resistance intensifies in late 2021 and early 2022. .......................8

      F.    Plaintiffs Prevail on Key Contested Motions and Discovery Accelerates. ..........9

      G.    Class Counsel Take 300 Hours of Depositions, Securing Over 13,000 Pages
            of Testimony. ........................................................................................9

      H.    After Vigorous Settlement Negotiations, Class Counsel Achieve the
            Proposed Settlement ............................................................................10

III.  THE COURT SHOULD GRANT CLASS COUNSEL'S REQUESTED FEES ............10

      A.    A 25% Fee Is Warranted in Light of the Exceptional Result That Class
            Counsel's Efforts Achieved in the Face of Unusually Significant Risks. .............11

            1.    Class Counsel achieved exceptional success. ............................12

            2.    This case presented a heightened risk of total loss. ....................13

            3.    Keller Rohrback and BFA alone shouldered the financial burdens—
                  and did so on a fully contingent basis. ......................................15

4.   While this action is unprecedented, the requested fee percentage is not. ........................................................................................16

5.   This case generated significant public benefits beyond the common fund. .......................................................................................19

B.   A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee, Which Is 1.99 Times Class Counsel's Lodestar .............................................21

1.   The total hours were necessary to achieve success for the class. ..............22

2.   The 1.99 multiplier is below average for settlements of comparable size. .......................................................................................25

C.   Class Counsel's Expenses Are Reasonable. ........................................................29

D.   The Service Awards Are Reasonable. ................................................................29

IV.   CONCLUSION .........................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Plains All Am. Pipeline L.P.*,
No. CV-15-4113-PSG, 2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) ........................... 15, 30

*In re Apple Inc. Device Performance Litig.*,
50 F.4th 769 (9th Cir. 2022) ........................................................................................... 29

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ............................................................................... 12, 18, 22

*Brawner v. Bank of Am. Nat'l Ass'n*,
No. 3:14-cv-02702-LB, 2016 WL 161295 (N.D. Cal. Jan. 14, 2016) .................................. 30

*District of Columbia v. Facebook, Inc.*,
Civ. No. 2018-CA-008715-B (D.C. Super. Ct. June 1, 2023) ............................................. 15

*In re Facebook Biometric Info. Priv. Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021) .......................................................................... 17, 26

*In re Facebook Internet Tracking Litig.*,
No. 5:12-md-02314-EJD, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) .......................... 26

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......................................................................... 13, 15

*Fields v. Kijakazi*,
24 F.4th 845 (2d Cir. 2022) ............................................................................................. 18

*Golan v. Free Eats.com, Inc.*,
930 F.3d 950 (8th Cir. 2019) ........................................................................................... 14

*In re Google LLC St. View Elec. Commc'ns Litig.*,
611 F. Supp. 3d 872 (N.D. Cal. 2020), *aff'd sub nom. In re Google Inc. St.
View Elec. Commc'ns Litig.*, 21 F.4th 1102 (9th Cir. 2021) ............................................. 14

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) (*en banc*) ............................................................................ 15

*Kerr v. Screen Extras Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975), *abrogated on other grounds by City of Burlington
v. Dague*, 505 U.S. 557 (1992) .......................................................................................... 27

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420-YGR, 2017 WL 4872978 (N.D. Cal. Oct. 27, 2017) *vacated
  as moot* and remanded, 777 F. App'x 231 (9th Cir. 2019) ................................................... 29

*In re Media Vision Tech. Sec. Litig.*,
  913 F. Supp. 1362 (N.D. Cal. 1996) ................................................................................. 29

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  No. 4:14-MD-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017), *aff'd*,
  768 F. App'x 651 (9th Cir. 2019) ...................................................................................... 30

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ..................................................................................... 12, 30

*In re Optical Disk Drive Prods. Antitrust Litig.*,
  959 F.3d 922 (9th Cir. 2020) ............................................................................... 11, 16, 21

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ..................................................................................... 29, 30

*Rutti v. Lojack Corp., Inc.*,
  No. SACV-06-350-DOC, 2012 WL 3151077 (C.D. Cal. July 31, 2012) ........................... 29

*Stanger v. China Elec. Motor, Inc.*,
  812 F.3d 734 (9th Cir. 2016) ............................................................................................ 26

*Steiner v. Am. Broad. Co.*,
  248 F. App'x 780 (9th Cir. 2007) ..................................................................................... 26

*Stetson v. Grissom*,
  821 F.3d 1157 (9th Cir. 2016) ......................................................................................... 24

*In re Toyota Motor. Corp. Unintended Acceleration Marketing, Sales Practices,
  and Products Liab. Litig.*,
  No. 10-ml-2151 (C.D. Cal., June 17, 2013) ...................................................................... 17

*In re Urethane Antitrust Litig.*,
  No. 04-md-1616-JWL (D. Kan. July 29, 2016) ................................................................. 17

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ................................................................................. *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  No. 2672 CRB, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) ......................................... 24

*Wren v. RGIS Inventory Specialists*,
  No. 06-CV-05778-JCS, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ............................... 29

*In re Zoom Video Communications Privacy Litig.*,
    No. 20-cv-02155-LB, 2022 WL 1593389 (N.D. Cal. Apr. 21, 2022)....................................26

**Other Authorities**

David L. Noll, *What Do MDL Leaders Do? Evidence from Leadership
    Appointment Orders*, 24 Lewis & Clark L. Rev. 433 (2020) ................................................15

Fed. R. Civ. P. 23(h) ........................................................................................................ 10, 19

Fed. R. Civ. P. 30(b)(1)...........................................................................................................9

Fed. R. Civ. P. 30(b)(6)...........................................................................................................4

5 *Newberg and Rubenstein on Class Actions* § 15:80 (6th ed. 2023)........................................11

5 *Newberg and Rubenstein on Class Actions* § 15:81 (6th ed. 2023)........................................19

## <u>NOTICE OF MOTION</u>

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

 **PLEASE TAKE NOTICE THAT** on Thursday, September 7, 2023 at 1:00 pm, or as soon thereafter as counsel may be heard, before the Honorable Vince Chhabria, Courtroom 4, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs hereby move the Court for: (1) approval of an attorneys' fee award of 25% of the common fund; (2) reimbursement of the expenses counsel incurred litigating this action; and (3) service awards of $15,000 for each of the eight Named Plaintiffs in this action. Plaintiffs' motion is based on this notice, the accompanying Memorandum in Support, the Declaration of Derek W. Loeser and Lesley E. Weaver in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Co-Lead Counsel Decl.") and the exhibits thereto, including the Declaration of Jill Dessalines ("Dessalines Decl.") (Ex. E), the Declaration of Professor William B. Rubenstein ("Rubenstein Decl.") (Ex. F), and the Declaration of Professor Brian T. Fitzpatrick ("Fitzpatrick Decl.") (Ex. G); the declarations of the Named Plaintiffs in Support of Preliminary Settlement Approval, Dkt. 1096-8; the complete files and records in this action; and such other evidence as the Court may allow.

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided on this Motion are:

1.      Whether Class Counsel should be awarded attorneys' fees in the amount of 25% of the common fund, which provides a multiplier of 1.99 on their total lodestar[1];

2.      Whether Class Counsel should be reimbursed for the reasonable and necessary expenses they incurred in litigating this action; and

3.      Whether each of the eight Named Plaintiffs and Settlement Class Representatives should receive service awards of $15,000 each.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

The parties' $725 million settlement is the largest data-privacy recovery in history and the largest private settlement Facebook has ever agreed to. Nothing about this unprecedented result came easily or quickly. To achieve this recovery, Class Counsel devoted 149,928.65 hours of work and $4,101,608.09 in out-of-pocket expenses over nearly five years of intense litigation. Without this work, the Settlement could not have been achieved.

As compensation for their successful efforts, Class Counsel now seek a fee of 25% of the common fund, equal to their $91,234,005.50 lodestar with a 1.99 multiplier. Four considerations support the conclusion that this fee is reasonable compensation for Class Counsel's successes and efforts.

*First*, nearly every aspect of this case demanded an extraordinary investment of resources. Class Counsel faced aggressive opposition, which, at times, made progress slow and exceedingly difficult. Nonetheless, Class Counsel successfully compelled production of critical

---

[1] For purposes of this motion, "Class Counsel" means Co-Lead Counsel (Derek W. Loeser and Lesley E. Weaver) and their law firms, Keller Rohrback L.L.P. and Bleichmar Fonti & Auld LLP. The hours, lodestar, and multiplier presented herein include Class Counsel (who are responsible for 99.5% of all hours billed in the case) as well as Bankruptcy and Participating Counsel, who performed limited work under Co-Lead Counsel's oversight (*see* Dkts. 119, 121) and are collectively responsible for 0.5% of all hours billed in the case.

documents and testimony, almost all of which required intensive motion practice, including appeals, before the Court and/or the Special Master. Due to these efforts, Class Counsel brought to light practices that Facebook long sought to conceal, and are now public. Negotiations over what became the $725 million Settlement spanned more than a year, and a resolution was reached only after Class Counsel obtained evidence critical to proving the claims.

*Second*, Class Counsel achieved these results while working on a contingent basis, shouldering the risk of total loss for nearly five years. There was no guarantee of recovering anything, much less a $725 million common fund. The risk was real, given the novelty of the claims, the state of the law, and the complexity of the facts. These risks were compounded by Facebook's aggressive approach to this case. All of these risks were borne by only two firms.

*Third*, a 25% fee award is well within the range awarded in other large settlements. Based on empirical analysis, Professor Brian T. Fitzpatrick determined that the largest privacy settlements have yielded average awards of 22%. He also determined that non-securities class action settlements in the $500 million to $1 billion range have had average fee awards of 20.3%, with awards higher than 25% in half of those settlements.

*Fourth*, a lodestar cross-check confirms that a 25% award is reasonable. Jill Dessalines, former in-house counsel at McKesson Corporation, reviewed 97,997 billing entries and determined that the work was highly efficient. Separately, Professor William B. Rubenstein relied on empirical evidence to conclude the total blended billing rate is 16.5% below this District's average, and that the requested 1.99 multiplier is well below the 3.20 average multiplier awarded in class actions of this magnitude.

Thus, in these circumstances, Class Counsel respectfully submit that their request for 25% of the common fund, though substantial, is justified. The unprecedented size of the settlement is the product of Class Counsel's concentrated and successful efforts, and their requested fee reflects the scale of that effort and the risks they have borne for years.

In addition, Class Counsel seek reimbursement for $4,101,608.09 in litigation expenses reasonably and necessarily incurred in litigating this action. Relative to the complexity of this

case and the large recovery, these expenses are modest.

Finally, Class Counsel seek $15,000 service awards for each of the eight Named Plaintiffs. These individuals' efforts were extraordinary: they worked extensively with Class Counsel, invested over 100 hours of time each to respond to 100 interrogatories and dozens of requests for admission and requests for production from Facebook, and sat for 49 hours of often invasive deposition testimony. The Named Plaintiffs persevered on behalf of the Class and deserve substantial service awards for their dedicated time and effort.

## II.   OVERVIEW OF CLASS COUNSEL'S SUCCESSFUL EFFORTS

Achieving success here required extraordinary dedication and persistence.[2] Some statistics may help illustrate the work required. During the litigation, Class Counsel:

- Filed 37 discovery motions comprising more than 360 pages of briefs and more than 10,500 pages of exhibits, which yielded 88 separate discovery orders;

- Participated in more than 22 hours of hearings before this Court, more than 12 hours of hearings before Judge Corley, more than 50 hours of hearings before the Special Master, and more than 110 hours of mediation sessions before discovery mediators appointed by Judge Corley;

- Procured the discovery of 1,322,459 documents (5,106,352 pages) and 2.5 gigabytes of structured data from Facebook; 70,267 documents (173,966 pages) from former Facebook employees; and 435,537 documents (1,674,420 pages) from third parties;

- Conducted 34 fact depositions and an additional 20 days of testimony from 13 Facebook corporate designees pursuant to Rule 30(b)(6), for a total of 306 hours and 13,251 pages of on-the-record testimony, during which they asked about 721 exhibits; and

- Defended eight Named Plaintiff depositions, totaling 49 hours and 2,203 pages of on-the-record testimony, during which they were asked about 119 exhibits.

Co-Lead Counsel Decl. ¶¶ 11-13. The successful efforts behind these numbers are summarized below.

## A.   Class Counsel File and Amend Their Complaint and Overcome Facebook's Motion to Dismiss.

On July 27, 2018, the Court appointed Derek Loeser and Lesley Weaver as Co-Lead

---

[2] A more detailed history of the litigation is provided in the Co-Lead Counsel Declaration.

Counsel. Dkt. 102. After appointment, Class Counsel spent hundreds of hours researching legal theories and conducting additional factual investigation to draft an amended complaint. *See* Co-Lead Counsel Decl. ¶¶ 14-16, 21-22. They selected 12 claims for prioritization in their September 2018 Consolidated Complaint. *Id.* ¶ 22.

The parties then litigated Facebook's first motion to dismiss. After 114 pages of briefing, and several hours of oral argument, the Court permitted Plaintiffs to amend their complaint, terminating Facebook's motion to dismiss. *Id.* ¶¶ 24, 26.

Three weeks later, Class Counsel filed the First Amended Consolidated Complaint. *Id.* ¶ 27. Facebook again moved to dismiss, the parties again briefed Facebook's motion fully, and the Court again heard several hours of argument. *Id.* ¶¶ 27-28. On September 9, 2019, the Court issued an order rejecting the majority of Facebook's arguments and allowing the bulk of the case to proceed. *Id.* ¶ 29.

## B.   After Discovery Begins, Numerous Disputes Cause the Court to Refer Discovery to Judge Corley.

After Facebook's motion to dismiss was largely denied, and their request for interlocutory appeal denied (*id.* ¶ 30), discovery commenced. Discovery disputes quickly accumulated. *Id.* ¶¶ 37-40. For example, prolonged discussions and disagreements arose from Plaintiffs' request that Facebook produce organizational charts, and from the parties' negotiation of a protocol for the production of electronically stored information. *See id.* ¶ 37 (detailing these and other disputes). Faced with so many disputes, the Court referred the case for all discovery purposes to Judge Corley. *Id.* ¶ 43.

## C.   The Difficulty and Complexity of Discovery Escalate.

At the time of the first hearing before Judge Corley, Facebook's production of documents was incomplete, consisting primarily of information from each of the Named Plaintiffs' Facebook accounts and a subset of documents previously produced to the FTC. Co-Lead Counsel Decl. ¶ 46. Class Counsel reviewed all of these documents before seeking additional document discovery. *Id.*

To address escalating discovery disputes, in spring 2020, Judge Corley ordered the

parties to meet and confer at least three times weekly by video conference. *Id.* ¶ 47. The parties later agreed to reduce the meet and confers to twice weekly. The scope of issues discussed on each call was broad, requiring the participation of numerous partners and associates who had a specialized understanding of different parts of the case. Co-Lead Counsel Decl. ¶¶ 47-48. The requirement to meet and confer multiple times per week continued until the end of the discovery mediation process in the summer of 2021, and then restarted in the winter of 2022 pursuant to the discovery mediators' guidance. *Id.* ¶ 48.

Despite the frequent meet and confers, the parties did not reach agreement easily. Negotiating discovery custodians and search strings, for example, took almost a year and was completed only after motion practice and scores of meet-and-confer sessions and written communications. *Id.* ¶¶ 49-55. While they were pursuing discovery against Facebook, Class Counsel also served subpoenas on more than 50 non-parties, including app developers, business partners, data brokers, and privacy auditors. *Id.* ¶ 57. Each of the subpoenas required conferring with the non-parties to discuss the scope of production. *Id.* These efforts proved worthwhile. The subpoenas yielded more than 435,000 documents, or more than 1.67 million pages, which advanced Class Counsel's understanding of the ways that third parties—data brokers, app developers, "business partners," and others—accessed and used Facebook users' information. *Id.* ¶ 58.

**D.    The Parties' Unresolved Discovery Disputes Lead to the Appointment of Discovery Mediators and then a Special Discovery Master.**

Between March 2020 and March 2021, Facebook produced over 300,000 documents. Class Counsel also took two 30(b)(6) depositions in February 2021. *Id.* ¶¶ 56, 97. However, the number and tenor of the parties' disputes led to the appointment of discovery mediators, which was intended to encourage counsel to resolve matters. *Id.* ¶¶ 64-65. As discovery mediator, the parties selected Judge Gail Andler (Ret.) of JAMS, who in turn concluded that the technical nature of some disputes called for the assistance of Daniel Garrie, an electronic discovery expert at JAMS. *Id.* ¶ 65. The parties agreed to Mr. Garrie's involvement. *Id.*

Between April 15 to July 21, 2021, Class Counsel and Facebook met jointly with the

discovery mediators 12 times, for multiple hours each session, totaling more than 45 hours. Co-Lead Counsel Decl. ¶ 66. In addition, Class Counsel and Facebook held extensive *ex parte* meetings with the mediators. *Id.* The mediated issues ran the gamut (including the App Developer Investigation, the use of technology assisted review, or "TAR," the case schedule, deposition scheduling, Named Plaintiffs' data, the scope of 30(b)(6) testimony, the production of financial documents, and more). *Id.* ¶¶ 67-68. Mediation led to some progress, but even minor discovery issues continued to occupy a great deal of time. The number of discovery disputes that remained after several months of discovery mediation suggested that a "backstop" in the form of a Special Master was needed. *Id.* ¶¶ 68, 71. Ultimately, at a June 2021 case management conference, Facebook agreed to accept a Special Master to oversee discovery, and in July 2021, the Court appointed Daniel Garrie as Special Master. *Id.* ¶ 74.

**E.     Class Counsel Prevail on Numerous Motions to Compel Despite Intense Opposition.**

### *1.   Class Counsel engage in successful motion practice before the Special Master.*

Following Mr. Garrie's appointment, many longstanding discovery disputes were resolved. Doing so was time- and resource-intensive, requiring the parties to exhaust discovery mediation before a dispute could be submitted to the Special Master. *Id.* ¶¶ 75-76. The Special Master ultimately granted in whole or in part more than a dozen motions brought by Class Counsel. These motions spanned the breadth of the case, forcing Facebook to produce Mark Zuckerberg's and Sheryl Sandberg's custodial files, additional Named Plaintiff data, ADI-related documents, financial data, and more. *See id.* ¶¶ 75, 81-108.

### *2.   Class Counsel are successful in labor-intensive disputes over ADI and the Named Plaintiffs' data.*

Two disputes stand out for the effort required and their impact on the case: disputes about the production of additional documents related to the ADI, and disputes about the sources and production of Named Plaintiff data.

Class Counsel received a full production of ADI-related documents only after initially litigating the issue from January 2020 to July 2021, securing an order from Judge Corley that the ADI was not categorically privileged, arguing about further production before the Special

Master, receiving favorable orders from the Special Master, defeating Facebook's appeal to Judge Corley, and obtaining an order requiring fuller production of ADI-related documents. *See id.* ¶¶ 81-87, 115-119.

Class Counsel view the ADI documents as highly probative. They show that Facebook routinely provided tens of thousands of other apps and app developers with access to users' friends' information, including apps far more widely used than the app Cambridge Analytica used to get Facebook user data. *See*, *e.g.*, Dkt. 1050-3 at 9-11 (identifying four other apps or app developers that could each likely access information from over 1 billion Facebook users). More information about these practices is now publicly known as a result of this litigation.

The dispute over the Named Plaintiffs' data was similar in duration, complexity, and importance. Class Counsel obtained several favorable orders from Judge Corley on the scope of discoverable data, conducted early 30(b)(6) depositions to establish what data Facebook collected, continued to litigate the issue and secured a favorable order from the Special Master, and defeated Facebook's appeal. The parties then participated in six months of subsequent hearings, conferences, and further litigation to implement the Special Master's order. Co-Lead Counsel Decl. ¶¶ 88-100, 120-132. In Class Counsel's view, the evidence about the Named Plaintiffs' data revealed Facebook's internal data storage, analytic, and mining processes and significantly advanced the merits of the case.

### 3. *Resistance intensifies in late 2021 and early 2022.*

In the fall of 2021, Facebook's approach to discovery intensified. In October 2021, when Plaintiffs moved to compel disclosure of more of the Named Plaintiffs' data, Facebook called the motion an "opportunistic, wasteful, and abusive" attempt to "hunt for anything to stall this case before it finally reaches the merits." Dkt. 1085-11 at 2. In a brief submitted to the Special Master in January 2022, Facebook asked that Plaintiffs be sanctioned for filing a motion to compel, arguing that it was "the latest unfortunate example" of an "ongoing strategy of declaring impasse on issues with no prior good faith engagement . . . in an effort to drum up as many frivolous discovery disputes as possible." That same month, Facebook argued that Plaintiffs should be

prevented from raising any more discovery issues because the substantial-completion deadline was approaching. *See* Dkt. 1087-3 at 6-7, 12-14. This period culminated in Facebook's representation to the Court in February 2022 that it had, in fact, substantially completed discovery. Dkt. 829 at 11. Class Counsel disagreed. *Id.* at 1.

**F.      Plaintiffs Prevail on Key Contested Motions and Discovery Accelerates.**

In January 2022, Judge Corley upheld Special Master Garrie's rulings on two of the most important discovery issues: the ADI and the Named Plaintiffs' data. Co-Lead Counsel Decl. ¶¶ 115, 121. At a February 10, 2022 case management conference, the Court invited Plaintiffs to file a sanctions motion for discovery misconduct. *Id.* ¶ 167. In the following months, Facebook began producing long-withheld documents and produced others at a faster pace, though substantial disputes persisted about the ADI production, 30(b)(6) depositions, and Facebook's privilege log. *See* Co-Lead Counsel Decl. ¶¶ 112-164.

**G.      Class Counsel Take 300 Hours of Depositions, Securing Over 13,000 Pages of Testimony.**

Between December 2021 and August 2022, Class Counsel deposed 47 individuals and conducted more than 306 hours of depositions on 54 days, resulting in more than 13,250 pages of testimony, and marked more than seven hundred exhibits. *Id.* ¶¶ 13, 141-149. This included 34 fact depositions of current and former Facebook employees pursuant to Rule 30(b)(1), *see id.* ¶ 142 (listing deponents), and 110 hours of 30(b)(6) testimony. *See id.* ¶ 146 (detailing topics). Depositions of Mark Zuckerberg, Sheryl Sandberg, and current COO Javier Olivan were a few weeks away when the parties notified the Court of their settlement in principle. *Id.* ¶ 145.

The depositions were labor-intensive. Due to the intensity of discovery disputes, the Special Master attended nearly every deposition. *Id.* ¶ 141. Many lines of questioning were highly technical, requiring the assistance of consulting experts. Class Counsel also found that, until Facebook's witnesses were confronted with detailed documentary evidence, they were often unable or unwilling to answer relevant questions. Even then, many witnesses remained evasive. On top of this, 30(b)(6) depositions routinely included disputes before the Special Master about the permissible scope of questioning.

Throughout this time, the parties continued to mediate discovery disputes. *Id.* ¶¶ 112-113.

**H.   After Vigorous Settlement Negotiations, Class Counsel Achieve the Proposed Settlement.**

Resolving this litigation was nearly as difficult as the litigation itself. The parties held their first joint mediation session in October 2021 in front of Judge Jay Gandhi (Ret.) and made detailed presentations. *Id.* ¶ 177. Another all-day mediation session occurred in November 2021, and the parties consulted with Judge Gandhi between those sessions. *Id.* ¶ 178. However, at the end of this initial process, the parties remained too far apart to make any progress on resolution. Class Counsel therefore focused on procuring additional evidence. *Id.*

In late 2021, and especially in 2022, Class Counsel made great strides in collecting probative evidence, as noted above. The parties remained in contact with Judge Gandhi, and met for a full-day in-person mediation session in April 2022. *Id.* ¶ 179. In that session, the parties made some progress but remained far apart. They mediated again in May and August 2022, while Judge Gandhi engaged in shuttle diplomacy. *Id.* ¶¶ 180-181. By this time, Class Counsel had successfully obtained ADI documents and Named Plaintiff data, taken many depositions, and won the right to depose the Company's most senior executives. Finally, in August 2022, the parties agreed in principle that a $725 million nonreversionary fund would be established for Class members. *Id.* ¶ 182.

After agreeing to this component of the settlement, the parties engaged in months of intense negotiations over additional terms. *Id.* ¶ 183. However, the parties remained deadlocked on some key issues. Eventually, the parties asked Judge Corley to mediate the remaining obstacles to reaching agreement. *Id.* She agreed, meeting with the parties on October 17, November 7, November 8, and November 14, 2022. *Id.* Assisted by Judge Corley, the parties resolved the key terms. Negotiations continued throughout November and December, with the parties often speaking multiple times every day. The parties executed the settlement agreement on December 22, 2022. *Id.*.

**III.   THE COURT SHOULD GRANT CLASS COUNSEL'S REQUESTED FEES**

Under Rule 23(h), the Court's role is to determine whether the requested fee is

"reasonable." Fed. R. Civ. P. 23(h). In a common-fund settlement, "courts have discretion" to use "either the lodestar method or the percentage-of-recovery method," and courts using the percentage-of-recovery method are encouraged "to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable." *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 929-30 (9th Cir. 2020).

Class Counsel's fee request is for 25% of the $725 million common fund, equal to Class Counsel's lodestar with a 1.99 multiplier.[3] The 25% percentage is similar to the average of 22% in the largest privacy settlements and comparable to (although slightly above) the average award of 20.3% in non-securities class action settlements in the $500 million to $1 billion range. Fitzpatrick Decl. ¶ 22 tbl. 2.

As to the lodestar cross-check, Class Counsel's investment of 149,928.65 hours of work is worth more than $91,234,005.50 at market rates. In light of the success achieved, the risks borne through nearly five years of litigation, and the other factors discussed below, the 1.99 multiplier sought here is appropriate.

Thus, while the requested fee is substantial, "some high fund cases involve significant risks, require enormous investments of money and time, and may appropriately trigger a healthy percentage award." 5 *Newberg and Rubenstein on Class Actions* § 15:80 (6th ed. 2023). This is such a case: the $725 million settlement was a direct result of Class Counsel's diligence. The requested fee is justified by the successful result and the work necessary to achieve it.

**A.    A 25% Fee Is Warranted in Light of the Exceptional Result That Class Counsel's Efforts Achieved in the Face of Unusually Significant Risks.**

The Ninth Circuit has observed that no "particular percentage" is reasonable or unreasonable "in the abstract, without reference to all the circumstances of the case," but uses a 25% benchmark as a starting point for analysis. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (quotation and citation omitted).

---

[3] Any fee awarded from the Settlement Fund will be reduced by the $800,217.38 already paid as sanctions. Dkt. 1104 at 52. Thus, while a 25% fee is equal to $181,250,000, the Settlement Fund would pay $180,449,782.62.

The Ninth Circuit has provided district courts with "several factors" they "may consider in assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954 (9th Cir. 2015). These factors are (1) whether class counsel "achieved exceptional results for the class"; (2) whether the case was risky for class counsel; (3) "the range of fee awards out of common funds of comparable size"; (4) the burdens that counsel for class shouldered while litigating the case, and whether they were borne on contingency; and (5) whether counsel's performance "generated benefits beyond the cash settlement fund." *Vizcaino*, 290 F.3d at 1048-50. Each factor supports the requested fee.

### 1. *Class Counsel achieved exceptional success.*

"Foremost" among the "considerations" in calculating a fee is "the benefit obtained for the class," *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011), and "[e]xceptional results are a relevant circumstance." *Vizcaino*, 290 F.3d at 1048. Here, Class Counsel achieved a result that is exceptional by any measure: the $725 million recovery is the largest settlement in any private litigation against Facebook and the largest data privacy settlement ever. The size of the settlement is unprecedented and conveys the important message that privacy has real value. Facebook is paying almost three-quarters of a billion dollars for business practices that it claimed were consensual, routine, and outside the law's reach. It is especially remarkable when considering the Class's maximum realistic recovery at trial and the risks Plaintiffs would have faced if they had continued litigating. *See* Dkt. 1096 at 21-36.

Throughout the litigation, Class Counsel demanded fair compensation for the Class's claims rather than taking the easier, less risky path of settling prematurely and for too little. *See* Dkt. 1104 at 2, 50; *see also* Co-Lead Counsel Decl. ¶¶ 177-178. While Class Counsel's work has proven exceptionally successful, that success was not immediate. They persisted. *See, e.g.*, Dkt. 1104 at 10-26. It was only well after Class Counsel began to gather compelling evidence for Plaintiffs' claims that serious settlement negotiations began. Before then, the parties' views on an appropriate settlement amount were simply too far apart. Co-Lead Counsel Decl. ¶¶ 177-180.

### 2. *This case presented a heightened risk of total loss.*

Because Class Counsel have worked on a contingent basis, "[r]isk is a relevant circumstance." *Vizcaino*, 290 F.3d at 1048. With no guarantee of recovering anything for their efforts, Keller Rohrback and BFA alone advanced 149,179.4 attorney hours and $4,101,608.09 in expenses, while facing unusually heightened risks of no recovery, for nearly five years. Those risks were material throughout this action, even at the time of settlement.

#### a. Risks arose from novel legal issues and the challenge of obtaining relief.

This case posed a substantial risk of recovering less or nothing—particularly when assessed *ex ante*, without the benefit of the Court's rulings on key issues such as whether any plaintiff suffered injury-in-fact and whether (and to what extent) Facebook users consented to the disclosure and monetization of their data.

Even now, the law, as applied to the record here, remains uncertain on several crucial questions. *See, e.g.,* Dkt. 1096 at 21-25. One was the difficulty of proving actual damages. Unlike where a plaintiff suffers a readily observable injury, this action broadly challenged Facebook's alleged business practice of misusing data—a practice whose impact on individual users is difficult to quantify. Indeed, the argument that Plaintiffs could show no damages was the main thrust of Facebook's motion to dismiss, and it was partially successful. *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019). Facebook has continued to argue that damages cannot be proven because "Facebook is a free service." Dkt. 1097 at 11.

Even the claims that stand a better chance of class certification on these facts—the negligence, VPPA, and contract claims—have risks and challenges. For the negligence claim, the difficulties of proving classwide damages means that the maximum realistic recovery at trial would be nominal damages for each class member—around $250 million in total. *See* Dkt. 1096 at 28.

At the other end of the spectrum, maximum statutory liability under the VPPA claim—though large—is largely theoretical in this action, as that amount, if awarded, could easily be

slashed for due-process reasons. *See id.* at 24-26; *Golan v. Free Eats.com, Inc.*, 930 F.3d 950, 962-63 (8th Cir. 2019) (reducing $1.6 billion in Telephone Consumer Protection Act statutory damages by 98% to $32 million).

Finally, the contract claims could theoretically support a maximum amount of restitution several times larger than the settlement based on the amount of revenue that Facebook received from third parties due to the improper data use and whitelisting. However, Facebook would vigorously contest whether class-wide restitution is available at all on the theory that Plaintiffs did not convey anything of quantifiable value to Facebook. *See* Dkt. 1097 at 12-13. Beyond that legal argument, it was not clear that the Court or a jury would accept Plaintiffs' quantification of the revenue or agree that it flowed from Facebook's misconduct.

> b.   Risks arose from the possibility that no litigation class could be certified.

As explained in the preliminary-approval motion, not all of the claims—especially the SCA claim, deceit claim, and privacy-based tort claims—could realistically secure class certification for litigation purposes on these facts. Dkt. 1096 at 35-36. Failure to certify a litigation class would be a death knell to this case.

> c.   Risks arose from the challenges of proving liability and overcoming defenses.

Beyond the legal risks, this action involved serious difficulties of proof. One challenge is that Facebook has consistently said it lacks records identifying specific apps that obtained specific user information. In the absence of direct evidence, the "technical challenges involved in demonstrating that any one individual class member's privacy was violated" presented a distinct risk. *In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 888 (N.D. Cal. 2020), *aff'd sub nom. In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102 (9th Cir. 2021).

A different risk was presented by the user agreements that Facebook relied on to show consent. Although the scandal that led to this litigation involved "friend sharing" by an app, an important and potentially determinative question was whether Facebook users had consented to this practice. In its motion-to-dismiss ruling, the Court concluded that, from 2009 forward, users

largely *had* consented. *Facebook*, 402 F. Supp. 3d at 777. While that conclusion did not require the outright dismissal of legal claims, it significantly limited the facts covered by those claims. And if litigation had proceeded, Facebook would have argued that users had consented to *all* the practices at issue—an argument that recently succeeded when a court entered summary judgment for Facebook in a case founded on the same set of core facts as this action. Co-Lead Counsel Decl., Ex. H (Order Granting Facebook, Inc.'s Motion for Summary Judgment in *District of Columbia v. Facebook, Inc.*, Civ. No. 2018-CA-008715-B, (D.C. Super. Ct. June 1, 2023)).

d.  <u>Aggressive adversaries heightened the risk.</u>

Both Facebook and Gibson Dunn were unrelenting adversaries. *Vizcaino*, 142 F. Supp. 2d at 1303 ("Class Counsel's risk was even greater, and their work made more difficult, because Microsoft is one of the nation's largest and most formidable companies and it, and several law firms, defended the case vigorously for several years."). Their aggressive approach slowed Plaintiffs' progress for sizeable stretches of this case, heightening the risk of loss and requiring Class Counsel to invest much more money and work, and for a longer duration, than would have otherwise been required.

### 3.  *Keller Rohrback and BFA alone shouldered the financial burdens—and did so on a fully contingent basis.*

The risks outlined above were concentrated because only two firms, Keller Rohrback and BFA, performed substantially all litigation work and shouldered all litigation expenses.

In large MDLs, risk and expense are often spread among several firms through a leadership structure that, in effect, assigns the plaintiff-side legal work to a group of firms. *See generally* David L. Noll, *What Do MDL Leaders Do? Evidence from Leadership Appointment Orders*, 24 Lewis & Clark L. Rev. 433, 447-54 (2020). Here, the Court appointed only two attorneys as Co-Lead Counsel with no executive or steering committee of firms to support them, directing that other firms could perform common benefit work only upon motion. Dkts. 120, 121; *see also* Dkts. 119, 433 (authorizing work by other counsel for limited purposes). This structure concentrated litigation risk at two firms rather than spreading it across many. *Cf. In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 572 (9th Cir. 2019) (*en banc*) (affirming a

district court's enhanced fee to a firm that had "assumed more risk than other firms"). The structure had obvious advantages for the Class—it promoted efficiency and avoided duplication of effort—but it necessarily imposed greater risks on the two firms here.

No client paid for this work at the end of each month. Rather, for nearly five years, Keller Rohrback and BFA performed all of this work while facing serious risk of total loss. Nor was that risk hypothetical. Just this month, in litigation brought by the District of Columbia Attorney General based on nearly identical facts, the D.C. Superior Court granted summary judgment in Facebook's favor. Co-Lead Counsel Decl., Ex. H at 17.

Keller Rohrback and BFA also funded material case expenses. They hosted voluminous electronic discovery, paid deposition expenses, and retained experts to assist in highly technical aspects of discovery. In 2021, the already sizeable expenses mushroomed as discovery mediators, the Special Master, and the settlement mediator became actively engaged.

### 4.   *While this action is unprecedented, the requested fee percentage is not.*

In *Vizcaino*, the Ninth Circuit indicated that it is appropriate to consider "the range of fee awards out of common funds of comparable size," although no "particular percentage" is reasonable or unreasonable "in the abstract, without reference to all the circumstances of the case." 290 F.3d at 1048, 1050 (quotation and citation omitted). Here, the requested 25% fee is within the range awarded in comparably sized cases—including the largest data privacy and data breach class settlements.

#### a.   The largest data-privacy and data-breach settlements support the fee.

Empirical research performed by Professor Brian Fitzpatrick confirms what Ninth Circuit case law holds: there is no "bright-line rule" requiring fee awards to decrease as settlement funds increase. *Optical Disk*, 959 F.3d at 933; *cf. Vizcaino*, 290 F.3d at 1046, 1050 (awarding 28% fee from $96.89 million common fund). Professor Fitzpatrick finds that the average fee award was 22% in data-privacy and data-breach class settlements of $100 million or more (excluding this settlement). Fitzpatrick Decl. ¶ 22 tbl. 2.

Among these cases, the impact of any "scaling" for fund size was limited. For the three

largest settlements—*Facebook Biometric*, *Equifax* and *Capital One*, where settlement amounts ranged from $650 million to $190 million—fee awards ranged from 15% to 28%. *Id.* These data points indicate that Class Counsel's requested 25% fee is within "the range of fee awards" in comparable cases. *Vizcaino*, 290 F.3d at 1050.

The reasonableness of the request is even more pronounced when one examines the largest case in this data set, the $650 million settlement in *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617 (N.D. Cal. 2021). There, while Judge Donato awarded a 15% fee, counsel invested only one-fifth of the time Class Counsel have invested here. *Id.* at 631-32. The 15% award resulted in a multiplier of 4.71, which the court found acceptable. *Id.* at 633.

Circumstances here are far different. The additional investment of time that this litigation required is reflected in Class Counsel's much lower multiplier of 1.99. Thus, while Class Counsel's requested fee percentage is higher than in *Facebook Biometric*, "the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted." *Vizcaino*, 290 F.3d at 1050.

### b.   Other large class settlements support the fee.

More generally, the fee requested here is within the range of fees awarded in comparable class action settlements of $500 million to $1 billion. Professor Fitzpatrick's research has found that since 2008, in the 10 non-securities class action settlements in the $500 million to $1 billion range, the average fee award was 20.3% and the median was 20.7%. Fitzpatrick Decl. ¶ 21 & tbl. 1.

While the fee percentage requested here is higher, the data confirm that 25% is well within the range awarded in settlements of comparable size. Fully half of the settlements in the set of comparable settlements awarded fees *above* 25%, including a 33.3% fee award in an $835 million antitrust settlement, *In re Urethane Antitrust Litig.*, No. 04-md-1616-JWL (D. Kan. July 29, 2016), and a 26.4% fee award in a $757 million consumer settlement, *In re Toyota Motor. Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liab. Litig.*, No. 10-ml-2151 (C.D. Cal., June 17, 2013). *See also* Fitzpatrick Decl., tbl. 1.

The average multiplier in these 10 settlements was 2.87, Fitzpatrick Decl., tbl. 1, and prior studies have found average multipliers of 2.39 to 4.50 in broader groups of large settlements. Rubenstein Decl. ¶ 43 & tbl. 2. Class Counsel's meaningfully lower 1.99 multiplier indicates that their fee request is reasonable even if the percentage is above average. *See Vizcaino*, 290 F.3d at 1050 ("[T]he lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted.").

c.   The requested fee is not a windfall.

Finally, the concern that sometimes leads to lower fee percentages in larger settlements is to avoid paying counsel too much for too little work. *See Bluetooth*, 654 F.3d at 942 (referring to "windfall profits for class counsel in light of the hours spent on the case"). But that analysis must be case-specific: no "particular percentage" is reasonable or unreasonable "in the abstract, without reference to all the circumstances of the case." *Vizcaino*, 290 F.3d at 1048 (quotation and citation omitted). Here, the requested fee will not create a windfall for Class Counsel.

*First*, a potential windfall may arise where minimal effort quickly yields a large recovery. *See Fields v. Kijakazi*, 24 F.4th 845, 856 (2d Cir. 2022) (explaining that "windfall" suggests some "unearned advantage," such as a "contingency-fee representation that succeeds immediately and with minimal effort, suggesting very little risk of nonrecovery"). The opposite occurred here: the hard-earned result is the product of enormous effort, not happenstance. Day by day and motion by motion, Class Counsel litigated for nearly five years and forced Facebook to produce damaging evidence of how it discloses and monetizes users' private data.

*Second*, this is not a case where class size drove the result. While the class is large, if litigation had continued, there was no certainty about whether it could be certified, or the amount of damages (if any) that might be available. Instead, numerous uncertainties created a large range of potential recoveries—and for some claims, the most likely recovery was significantly below the settlement amount.

*Third*, unlike a case with "very little risk of nonrecovery," *Fields*, 24 F.4th at 856, for nearly five years, Class Counsel have borne the significant risk of a total loss while performing

(and funding) more than 149,000 hours of work with no guarantee of recovering anything.

*Fourth*, counsel should be rewarded for sustained, successful work that increases the total recovery for class members. By contrast, mechanically reducing the fee percentage as the settlement amount increases creates poor incentives and may encourage premature and undervalued settlements. *See* Fitzpatrick Decl. ¶ 24 (citing cases).

*Fifth*, the reasonable multiplier confirms that the requested percentage of 25% is not an unearned windfall. Because the multiplier measures the relationship between counsel's work and the requested fee, a reasonable multiplier ensures that the percentage is appropriate, regardless of the size of the common fund. "Given that a high multiplier is the best measuring stick of a windfall, courts ought to use the high multiplier to police windfalls, regardless of the size of the fund, rather than use the size of the fund as a policing mechanism." 5 *Newberg and Rubenstein on Class Actions* § 15:81. As detailed below, Class Counsel's multiplier is well below the average in settlements of comparable size. Similarly, Professor Fitzpatrick concludes that because "the fee requested here would yield a much smaller lodestar multiplier than is typical in a case of this size," "granting this fee request would not result in any sort of 'windfall'" and "the usual justification for cutting the percentage in a big case is therefore inapposite." Fitzpatrick Decl. ¶ 25. Thus, a multiplier of 1.99 is strong evidence that Class Counsel's requested fee is reasonable. Fed. R. Civ. P. 23(h).

### 5. *This case generated significant public benefits beyond the common fund.*

#### a. Facebook ceased and modified practices.

During settlement discussions, Class Counsel required that Facebook provide declarations regarding the changes it had made to practices that gave rise to Plaintiffs' claims: Facebook's disclosure of private friend information to third parties and its failure to monitor third party use of Facebook users' data. The Elia Declaration confirms that Facebook has disabled friend permissions for all apps, attempted to identify and deprecate all APIs capable of emitting private friend information to third parties, and does not intend to re-enable friend permissions or capabilities for third parties. Dkt. 1094. The Dunphy Declaration also describes

the substantial operational improvements Facebook made in monitoring third party access to and use of Facebook users' information. Dkt. 1095.

These changes benefit all Facebook users. Notably, these changes were mostly made in 2020 and 2021—after the Court entered its order granting in part and denying in part Facebook's motion to dismiss, and after discovery was well under way.

   b. <u>The case allowed the public to scrutinize Facebook's data practices.</u>

Facebook users, regulators, and the public in general have benefitted from the public disclosure of previously hidden facts about how Facebook extracts and uses its users' data.

For example, the public disclosure of documents produced in this litigation has had an important benefit for U.S. national security. The Chair and Vice Chair of the Senate Select Committee on Intelligence cited unsealed documents from this case in a letter to Mark Zuckerberg. The letter expressed concerns based on "ongoing litigation and discovery" that Facebook may not have been candid about the access it had given developers from "high-risk jurisdictions" to user data that could be used to facilitate espionage.[4] The document referenced in the letter, Dkt. 1100-6, was one of the ADI-related documents produced due to Class Counsel's efforts.

In addition, the documents made available here have had an impact beyond U.S. borders. The Irish Council for Civil Liberties, a non-profit human rights organization, submitted a formal letter on November 17, 2022 to the European Commission's Executive Vice President based on unsealed documents and testimony from this action. The letter says that the documents "reveal a data free-for-all inside Meta" that violates certain data-privacy laws.[5] Unsealed documents also

---

[4] Press Release: Warner & Rubio Question Meta on Internal Documents Revealing Developers in China, Russia, Other Nations Had Access to User Data (Feb. 6, 2023), *available at* https://www.warner.senate.gov/public/index.cfm/2023/2/warner-rubio-question-meta-on-internal-documents-revealing-developers-in-china-russia-other-nations-had-access-to-user-data.

[5] Letter from Dr. Johnny Ryan to Margrethe Vestager, Executive Vice President, European Commission (Nov. 17, 2022), *available at* https://www.iccl.ie/wp-content/uploads/2022/11/ICCL-to-Commission-17-November-2022.pdf.

brought widespread media attention to Facebook's practices.[6] That coverage both demonstrates the importance of this litigation and embodies how private litigation, through the public disclosure of important facts, can be a public good.

      c.   The case solidified privacy rights in social media.

Finally, the law established by this Court provides another valuable public benefit. Specifically, the Court's motion to dismiss order applied longstanding common law principles to social media, helping establish, or at least solidify, two crucial points that will reverberate beyond this case. First, "[w]hen you share sensitive information with a limited audience . . . , you retain privacy rights and can sue someone for violating them," even when the sharing happens on a social media platform. Dkt. 298 at 2. And second, "a privacy invasion is itself the kind of injury that can be redressed in federal court, even if the invasion does not lead to some secondary economic injury like identity theft," because the privacy invasion establishes Article III standing. *Id.* As tech companies continue to collect more information and control more aspects of our lives, the Court's decision will help ensure that future privacy violations are capable of redress.

**B.**    **A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee, Which Is 1.99 Times Class Counsel's Lodestar.**

The Ninth Circuit has "encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable." *Optical Disk*, 959 F.3d at 930 (citing *Online DVD-Rental*, 779 F.3d at 949); *see Vizcaino*, 290 F.3d at 1050 (lodestar "measures the lawyers' investment of time in the litigation" and "may provide a useful perspective on the reasonableness of a given percentage award").

A lodestar is "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable

---

[6] *See, e.g.*, Natasha Lomas, *Unsealed docs in Facebook privacy suit offer glimpse of missing app audit*, TechCrunch (Sept. 16, 2022), https://techcrunch.com/2022/09/16/unsealed-docs-in-facebook-privacy-suit-offer-glimpse-of-missing-app-audit; Sam Biddle, *Facebook Engineers: We Have No Idea Where We Keep All Your Personal Data*, The Intercept, Sept. 7, 2022, 7:00 am, https://theintercept.com/2022/09/07/facebook-personal-data-no-accountability.

hourly rate for the region and for the experience of the lawyer." *Bluetooth*, 654 F.3d at 941
(citation omitted). The court may then apply a "multiplier" to the lodestar, considering "the
quality of representation, the benefit obtained for the class, the complexity and novelty of the
issues presented, and the risk of nonpayment.'" *Id.* at 941–42 (quoting *Hanlon v. Chrysler Corp.*,
150 F.3d 1011, 1029 (9th Cir. 1998)).

Here, the lodestar, derived by multiplying each timekeeper's hours by their current hourly
rate, is $91,234,005.50. The requested fee of 25% (or $181.25 million) represents a multiplier of
1.99, which is below average in comparably sized settlements—and particularly appropriate
given the extraordinary results achieved in this high-risk case, as detailed above.

### 1. The total hours were necessary to achieve success for the class.

Class Counsel, Bankruptcy Counsel and Participating Counsel expended more than
149,000 hours on this case. As detailed below, these hours were reasonable, well-documented,
and necessary to effectively litigate this challenging case and achieve an exceptional result. Class
Counsel also anticipates spending an additional 10,000 hours to complete settlement approval,
administration, and any potential additional litigation. Co-Lead Counsel Decl. ¶¶ 204-209.

### a.   Counsel's hours and staffing are reasonable.

The record-breaking settlement is the direct result of Class Counsel's dogged efforts
during the nearly five years of exceptionally challenging litigation.

From the outset, Class Counsel worked to litigate this challenging case as efficiently as
possible. Within the two firms, the highest-stakes litigation work was primarily handled by only
11 core lawyers, defined as partners and associates who billed more than 2,000 hours over the
case. The steps that Class Counsel took to ensure efficiency are discussed in detail in the
accompanying Declaration. *Id.* ¶¶ 194-197. Specific staffing decisions that illustrate Class
Counsel's efficiency include:

- Document analysis: Class Counsel developed a comprehensive coding protocol that
  enabled review to proceed efficiently based on a defined set of parameters.

- Use of technology: Class Counsel used predictive coding to rank documents and
  review those likeliest to be relevant.

- Designated lead authors: Class Counsel designated specific individuals to lead particular issues in briefs, letters, and other communications with the Court, other judicial officers, and opposing counsel. This effort enabled substantial efficiencies based on subject-matter expertise gained throughout the litigation.

- Depositions: To increase efficiency, deposing attorneys and others supporting them developed expertise in key subject matters, including Facebook policies, engineering and APIs, revenue and financial information, and partnerships.

To provide independent scrutiny, Class Counsel engaged an expert, Jill Dessalines, to audit counsel's time for efficiency. Ms. Dessalines—the former Senior Vice President of McKesson Corporation, with decades of experience in complex litigation, supervising outside counsel, and reviewing their fees—personally reviewed all 97,997 of counsel's individual time entries. Dessalines Decl. ¶ 12. She assessed the total hours billed, seeking to eliminate redundancy, inefficiency, or excessiveness; the ratio of partner time to associate and support-staff time; the time spent on each task category compared to the whole; and the appropriateness of staffing. *Id*. ¶¶ 13-14. Where Ms. Dessalines proposed time be cut, Class Counsel has done so.

Based on this review, Ms. Dessalines concluded that this action was "prosecuted with a very high degree of efficiency and with reasonable amounts of time spent on its overall prosecution." *Id*. ¶ 28. She recognized that only two law firms performed substantially all of the work, and this "resource compression" led to efficiency from the "relatively small number of billers" and "reduced opportunities to devote excessive time to litigation tasks." *Id*. ¶ 29. Indeed, she recommended writing off only 0.37% of Class Counsel's time, almost 30 times lower than the percentage of write-offs that "large corporate consumers of legal services" would typically consider to be "fairly standard and not an indication of overbilling by outside counsel." *Id*. ¶¶ 20, 26, 33. Ms. Dessalines further concluded "that the ratio of partner time to associate and support staff time across all task categories was reasonable and appropriate" and using "the proper level of expertise was a key driver of efficient case management and significantly impacted the reasonableness" of Class Counsel's hours. *Id*. ¶ 32.

Analysis by Professor William Rubenstein provides further support. He found that total lodestar hours are reasonable compared to hours expended in cases with settlements of comparable size. He identified seven cases with settlement sizes ranging from $525 million to

$925 million (in 2023 dollars), and concluded that total lodestar hours were 24% below the 198,038-hour average across the comparison cases (and, excluding the high outlier case, 27% above the 118,211-hour average of the remaining six cases). Rubenstein Decl. ¶¶ 32, 33 & n. 27. These hours, he concluded, "are accordingly in the normal range for a litigation of this size and, to the extent the total falls above the median case in my database, much of the excess is likely attributable (in whole or part)" to the litigation conduct of Facebook and its counsel. *Id*. ¶ 33. Ultimately, Professor Rubenstein found "significant support for the conclusion – particularly for cross-check purposes – that Class Counsel have neither churned artificial hours nor padded their lodestar." *Id*. ¶ 35.

In addition to past time, Class Counsel estimate that after final approval they will spend at least an additional 10,000 hours in this litigation—an estimate they base on related work they have already performed in this case and prior experience with class settlements. Co-Lead Counsel Decl. ¶¶ 204-209. Although Class Counsel's multiplier of 1.99 does *not* include this future time, courts in this District have concluded that a lodestar cross-check properly includes time reasonably anticipated for settlement approval, claims administration, and payment. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017). Based on Class Counsel's blended rate, $604, an additional 10,000 hours would add $6,040,000 to the lodestar.  If included, the total lodestar would be $97,274,005.50, yielding a multiplier of 1.86.  Co-Lead Counsel Decl. ¶ 206.

### b.   The lodestar rates are reasonable.

Reasonable hourly rates "should reflect what the attorney would normally command in the relevant marketplace." Manual for Complex Litigation (Fourth) § 14.122 (2004). Applying this standard, multiple courts have recently made fee awards supported by Class Counsel's hourly rates and corresponding lodestar. *See* Co-Lead Counsel Decl. ¶ 214 (BFA); *id.* ¶ 220 (Keller Rohrback).

To assist the Court's review, Professor Rubenstein compared the lodestar rates here to hourly rates approved during 2022 by judges in this District overseeing class action settlements.[7] Rubenstein Decl. ¶¶ 16-20. Evaluating counsel's blended hourly rate—the total lodestar divided by the total number of hours—he found that the blended rate of $609 is 18.2% below the median and 16.5% below the average. *Id.* ¶¶ 26-28. This finding, Professor Rubenstein notes, not only reflects the reasonableness of the lodestar rates, "but it also demonstrates that work was appropriately delegated to more cost-effective labor when appropriate." *Id.* ¶ 28.

Professor Rubenstein also found that the individual rates billed here were reasonable. He found that the rates of partnership-track attorneys here were consistent with other approved rates (on average, only 3.8% above the trend line). *Id.* ¶ 20. The total average rate for staff attorneys ($475) fell 5.0% above the median case in the comparison group ($453) and 4.0% below the mean of the four comparison cases ($495). *Id.* ¶¶ 22-23. And the total average rate for paralegals ($363) fell 24.4% above the median ($292) and 21.7% above the mean ($298) of the four comparison cases. *Id.* ¶¶ 24-25. If wage-and-hour cases are excluded, however, the total average paralegal rate exceeds the median ($354) by only 2.3%, and the average ($328) by 10.5%. *Id.* More importantly, even if all paralegal time here were billed at the average rate of $328, the lodestar would decrease by only 1.1% and the multiplier would increase by only 0.02. *Id.*

### 2. *The 1.99 multiplier is below average for settlements of comparable size.*

Courts have long used multipliers to establish appropriate incentives for contingency fee counsel to litigate difficult cases and address the risk of non-payment. *See* Rubenstein Decl. ¶¶ 37-39. As the Ninth Circuit has explained: "'[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases.' This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases." *Vizcaino*, 290 F.3d at

---

[7] For purposes of a cross-check analysis, it is appropriate to use counsel's current billing rates, as this motion does. *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016).

1051 (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) (citation omitted)).

Here, the multiplier of 1.99 is below the average multiplier awarded in comparably large cases. Professors Rubenstein and Fitzpatrick provide detailed empirical analysis of multipliers, and their results show that (a) multipliers tend to rise as the fund size increases, and (b) the multiplier here is below average in a case of this size. Specifically:

- Professor Rubenstein found that studies of cases with common fund settlements over $44.6 million have resulted in average multipliers of 2.39 or higher, with the average multiplier trending higher as the common fund value increased. *See* Rubenstein Decl. ¶ 42 (average multipliers of 2.39 in cases of $44.6 million or more, 2.72 in cases of $67.5 million or more, 4.50 in cases of $100 million or more, and 3.18 in cases of $175.5 million or more). The average multiplier across these four studies is 3.20, significantly above Class Counsel's requested multiplier. *Id.*

- Similarly, Professor Fitzpatrick found that Class Counsel is seeking a "much smaller lodestar multiplier than is typical in a case of this size." Fitzpatrick Decl. ¶ 25. In non-securities settlements between $500 million and $1 billion since 2008, Professor Fitzpatrick found a mean multiplier of 2.87 and a median of 2.90, which are more than 40% higher than the multiplier here. *Id.* ¶ 21 & tbl. 1.

The Ninth Circuit has approved multipliers similar to and significantly above these averages. In *Vizcaino*, 290 F.3d at 1051, the Ninth Circuit affirmed a "multiplier of 3.65," and higher multipliers are regularly awarded. *See, e.g.*, *Steiner v. Am. Broad. Co.*, 248 F. App'x 780, 783 (9th Cir. 2007) (multiplier of 6.85 "falls well within the range of multipliers that courts have allowed"). Courts in this District have also recently approved multipliers in privacy-related litigation that are substantially larger than Class Counsel seeks here.[8]

In addition to being lower than average, the requested multiplier is reasonable in light of the circumstances. As the Ninth Circuit explains, the lodestar may be adjusted "upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness'

---

[8] *See, e.g.*, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD, 2022 WL 16902426, at *12-13 (N.D. Cal. Nov. 10, 2022) (3.28 multiplier in a $90 million settlement); *In re Zoom Video Communications Privacy Litig.*, No. 20-cv-02155-LB, 2022 WL 1593389, at *3 (N.D. Cal. Apr. 21, 2022) (3.17 multiplier in an $85 million settlement; *see* Plaintiffs' Attorneys' Declaration in Support of Motion for Attorneys' Fees, Dkt. 218 (Jan. 28, 2022) for the multiplier); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 632-33 (N.D. Cal. 2021), *aff'd*, No. 21-15553, 2022 WL 822923 (9th Cir. Mar. 17, 2022) (4.71 multiplier in a $650 million settlement).

factors." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016) (quotation

omitted). Some nonexclusive reasonableness factors are identified by another frequently cited

Ninth Circuit case:

> (1) the time and labor required, (2) the novelty and difficulty of the questions
> involved, (3) the skill requisite to perform the legal service properly, (4) the
> preclusion of other employment by the attorney due to acceptance of the case, (5)
> the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations
> imposed by the client or the circumstances, (8) the amount involved and the
> results obtained, (9) the experience, reputation, and ability of the attorneys, (10)
> the 'undesirability' of the case, (11) the nature and length of the professional
> relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds*

*by City of Burlington v. Dague*, 505 U.S. 557 (1992); *see also Vizcaino*, 290 F.3d at 1051

(affirming district court's award of 3.65 multiplier based on *Kerr* factors).

Many of these factors—including the time, labor, and unusual skill and commitment this

case demanded; the novel and difficult legal and factual questions presented; and the exceptional

result—are addressed at length above (*supra* at Sec. II) and in the Co-Lead Counsel Declaration.

Professor Rubenstein found that "Class Counsel took large risks in litigating this case from

inception to settlement" based on several factors:

- **Novelty:** The novelty of the issues, such that "almost nothing in the 424-page
  amended consolidated complaint in this case could have been recycled from past
  cases";

- **Complexity:** The "intricacy and detail" in the factual, legal, and technical aspects of
  this case;

- **Uncertainty:** The "uniquely unpredictable" outcome, with "one of the largest
  corporations in the world strongly opposing Class Counsel's approach to each factual
  and legal contention";

- **High stakes, high expense, and unshared risk:** This is the largest private settlement
  Meta has executed, and the case was marked by especially aggressive defense and
  only two relatively small firms shouldering "essentially 100% of the work for the
  Plaintiff class";

- **Well-funded defendant and powerful defense firm:** Class Counsel faced
  Facebook's "almost unlimited resources" and Gibson Dunn, "one of the largest, most
  expensive, and well-respected firms in the country," whose "skill, depth, resources,
  and tenacity" meant "Class Counsel's risk was increased significantly";

- **Opportunity costs:** In Professor Rubenstein's words, "[i]t is fair to conclude that Class Counsel's extraordinary devotion of time and resources for about five years to this complex case" prevented them from pursuing simpler, less risky, actions" with higher expectations of settlement and recovery;

- **Non-piggyback case:** The independence of Class Counsel's work from government enforcement actions.

Rubenstein Decl. ¶¶ 45-46.

As to results, Professor Rubenstein found that the $725 million settlement amount is an "extraordinary sum" which falls "in the top 1%" of all common fund class action settlements; citing the scope of the class, direct delivery of cash compensation, and simple claims process; noted the highly adversarial nature of the litigation; and recognized the "important and unique public service" Class Counsel provided, including helping to establish "legal limits" in "a critical and developing field." *Id.* ¶ 47. Professor Rubenstein concluded:

> These ten risks and six results are evidence that Class Counsel, consisting of two relatively small law firms, took significant risks in investing substantial capital and labor in highly adversarial litigation without the promise of an easy return on that investment, and Class Counsel shouldered that risk superbly, prevailing at each critical juncture and generating a record-setting recovery for the class. This contextual review provides strong support for the conclusion that Class Counsel's 1.99 multiplier is reasonable.

*Id.* ¶ 48.

Moreover, the experience, reputation, and ability of Co-Lead Counsel support the multiplier. Litigating a case of this magnitude, complexity and nuance required exceptional skill. Derek Loeser is a senior partner in Keller Rohrback's nationally recognized Complex Litigation Group. Co-Lead Counsel Decl., Ex. C. He has helped recover billions of dollars for consumers, retirees, governments, and institutions. *Id.* He has served in leadership roles in major complex cases across the country. *Id.* Lesley Weaver is the practice head of her firm's antitrust and consumer practice. *Id.*, Ex. B. She has both tried and litigated complex class actions, served in significant roles in cases of national impact, and helped recover billions of dollars for consumers and others. *Id.* Mr. Loeser and Ms. Weaver were supported by other highly experienced and

capable attorneys. *See id.*, Exs. B & C. In sum, Co-Lead Counsel were well equipped to undertake the work this case required.

## C.     Class Counsel's Expenses Are Reasonable.

Class Counsel also moves for recovery of $4,101,608.09 in out-of-pocket expenses incurred during this litigation, which are itemized in Co-Lead Counsel's Declaration. *Id.* ¶¶ 222-228.

These reasonable expenses were necessary to prosecute this case and are of the type that are typically approved for reimbursement by courts.[9] *See In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1372 (N.D. Cal. 1996) (awarding "necessary expenses incurred in furnishing effective representation"). They include travel costs, filing fees, service of process, hearing transcripts, photocopies, database licensing and hosting, deposition and court reporter fees, internet-based research costs, court fees, and research and expert consulting costs. They also include expenses for the discovery mediators and Special Master whose efforts helped break the discovery logjam in this case. Co-Lead Counsel Decl. ¶ 227.

## D.     The Service Awards Are Reasonable.

Finally, Class Counsel respectfully request that the Court authorize service awards of $15,000 each for the eight Named Plaintiffs and Settlement Class Representatives. The Ninth Circuit has "repeatedly held that reasonable incentive awards to class representatives are permitted." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785-87 (9th Cir. 2022) (quotation marks and citation omitted). Indeed, service awards are "fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Service awards "are

---

[9] *See, e.g., Rutti v. Lojack Corp., Inc.*, No. SACV-06-350-DOC (JCx), 2012 WL 3151077, *12 (C.D. Cal. July 31, 2012) (listing reimbursable expenses as including "travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, documents scanning, and visual equipment"); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420-YGR, 2017 WL 4872978, at *1 (N.D. Cal. Oct. 27, 2017) *vacated as moot* and remanded, 777 F. App'x 231 (9th Cir. 2019) (approving expenses for document repository/hosting services); *see also Wren v. RGIS Inventory Specialists*, No. 06-CV-05778-JCS, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011) (award of expenses should be supported by "an itemization listing the expenses by category and the total amount advanced for each category") *supplemented*, 2011 WL 1838562 (N.D. Cal. May 13, 2011).

intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958-59.

Service awards of $15,000 are within the range approved within this Circuit, and have been entered where class representatives have participated in ways comparable to the Named Plaintiffs' activities here.[10] The total of $120,000 in service awards requested here constitutes 0.0165% of the total settlement fund, further demonstrating that the amount is appropriate. *See Online DVD-Rental*, 779 F.3d at 947-48 (approving service awards in part because they amounted to 0.17% of the settlement fund).

The Named Plaintiffs agreed to serve as class representatives. Dkt. 1096-8 (Akins Decl. ¶¶ 5, 24; Ariciu Decl. ¶¶ 5, 24; Bell Decl. ¶¶ 5, 25; Burk Decl. ¶¶ 5, 24; Fischer Decl. ¶¶ 5, 24; King Decl. ¶¶ 5, 24; O'Hara Decl. ¶¶ 5, 24; Senko Decl. ¶¶ 5, 24). Each named Plaintiff individually spent more than 100 hours responding to discovery in this action, among other work. *See id.* (Akins Decl. ¶ 14; Ariciu Decl. ¶ 14; Bell Decl. ¶ 15; Burk Decl. ¶ 14; Fischer Decl. ¶ 14; King Decl. ¶ 14; O'Hara Decl. ¶ 14; Senko Decl. ¶ 14). They communicated and worked with Class Counsel, presented their individual experiences with Facebook to demonstrate common claims, searched for and provided documentation to support their claims, reviewed pleadings, produced hundreds or thousands of documents, prepared for and sat for lengthy depositions, consulted with Class Counsel regarding potential settlement remedies, and carefully

---

[10] *See Andrews v. Plains All Am. Pipeline L.P.*, No. CV-15-4113-PSG (JEMx), 2022 WL 4453864, at *5 (C.D. Cal. Sept. 20, 2022) (approving $15,000 awards for class representatives who spent between 130 and 200 hours on case activities including searching for and providing facts for use in the complaint, helping class counsel analyze claims, sitting for deposition, and reviewing and approving the settlement); *see also Brawner v. Bank of Am. Nat'l Ass'n*, No. 3:14-cv-02702-LB, 2016 WL 161295, at *6 (N.D. Cal. Jan. 14, 2016) (approving $15,000 award for a named plaintiff who spent about 80 to 100 hours on the case); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *11 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) ("Awards of $20,000 each" for assisting in litigation, preparing for and having their depositions taken, searching for and producing documents spanning many years, and conferring with counsel throughout the litigation are justified and "consistent with service awards in other cases.") (collecting cases).

reviewed the Settlement Agreement. *See generally id.* The Named Plaintiffs' commitment to the Class's interests and desire to hold Facebook accountable to the entire Class was essential to the successful and timely prosecution of this class action and warrants the reasonable service awards requested here.

In addition, the Named Plaintiffs, in stepping forward to act as class representatives, exposed themselves to extremely invasive discovery by the very company they accused of violating their privacy. Among the documents each produced were many requested *specifically* because they contained or referenced sensitive information. And each Named Plaintiff was then aggressively questioned under oath about those documents and other highly private information, including sensitive health issues, relationships with family and friends, and political and religious views. *See id.* (Akins Decl. ¶¶ 15-16; Ariciu Decl. ¶¶ 15-16; Bell Decl. ¶¶ 16-17; Burk Decl. ¶¶ 15-16; Fischer Decl. ¶¶ 15-16; King Decl. ¶¶ 15-16; O'Hara Decl. ¶¶ 15-16; Senko Decl. ¶¶ 15-16). For their dedication and perseverance, the Named Plaintiffs deserve service awards of $15,000 each.

## IV.    CONCLUSION

For the reasons set forth above, Class Counsel respectfully moves the Court to (i) award them attorney fees of 25% of the settlement fund, minus $800,217.38 in fees already paid by Facebook and its counsel as sanctions pursuant to Dkt. 1104 at 52; (ii) award $4,101,608.09 in expenses that were incurred during this litigation, minus $124,861.13 in expenses already paid by Facebook and its counsel as sanctions pursuant to Dkt. 1104 at 52; and (iii) authorize a $15,000 service award to each of the Named Plaintiffs.

Dated: June 21, 2023

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:   */s/ Derek W. Loeser*
      Derek W. Loeser

By:   */s/ Lesley E. Weaver*
      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Emma M. Wright (admitted *pro hac vice*)
Daniel Mensher (admitted *pro hac vice*)
Michael Woerner (admitted *pro hac vice*)
Matthew Gerend (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com
ewright@kellerrohrback.com
dmensher@kellerrohrback.com
mwoerner@kellerrohrback.com
mgerend@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of June, 2023, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

**CERTIFICATE OF SERVICE**

I, Sarah Skaggs, hereby certify that on June 21, 2023, I electronically filed the foregoing

with the Clerk of the United States District Court for the Northern District of California using the

CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ *Sarah Skaggs*
Sarah Skaggs