Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **DECLARATION OF DEREK W. LOESER AND LESLEY E. WEAVER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor<br>Hearing Date: September 7, 2023<br>Hearing Time: 1:00 p.m. |

**Contents**

I.  SUMMARY .................................................................................1

    A.  Overview of Litigation Process ....................................................1

    B.  Class Counsel's Hours and Lodestar .............................................2

    C.  Summary Case Statistics ................................................................4

        a.  Complaints and Motion to Dismiss Briefing ..........4

        b.  Court Appearances .............................................4

        c.  Discovery...........................................................5

II. CLASS COUNSEL'S WORK ON THE CASE .......................................6

    A.  March 2018 through September 9, 2019: Case Commencement through the Motion to Dismiss Order .............................................6

        1.  Investigation, Filing, and Consolidation............................6

        2.  Limited Discovery and the Consolidated Complaint ..........7

        3.  Motions to Dismiss............................................................8

    B.  September 19, 2019 through March 10, 2020: Initial Case Management and Discovery After the Motion-to-Dismiss Order through the Appointment of Judge Corley ....................................9

        1.  Competing Proposals on Case Schedules and Bifurcation ..9

        2.  Early Discovery Disputes ................................................10

        3.  Discovery Served, Responses, and Production.................11

    C.  March 11, 2020 through March 22, 2021: Escalation of Unresolved Discovery Disputes Culminating in the Appointment of the Discovery Mediators ..................................................................12

        1.  Plaintiffs Are Required to Review Everything Produced to Date Before Seeking Additional Documents...................12

LOESER AND WEAVER DECL. IN SUPP.        i        MDL NO. 2843
OF PLS.' MOT. FOR FEES, EXPENSES,                CASE NO. 18-md-02843-VC
AND SERVICE AWARDS

|  |  | 2. | The Parties Are Ordered to Meet and Confer Thrice Weekly .......................................................................... 12 |
|  |  | 3. | Disputes Over Custodians and Search Terms .................. 13 |
|  |  | 4. | Discovery Served, Responses, and Production ................ 14 |
|  |  | 5. | Facebook Seeks to Depose the Named Plaintiffs ............. 16 |
|  | D. | | March 23, 2021 through July 20, 2021: Appointment of the Discovery Mediators Through the Appointment of Special Master Garrie ................................................................................... 16 |
|  |  | 1. | Appointment of the discovery mediators .......................... 16 |
|  |  | 2. | Mediation of Discovery Disputes ..................................... 17 |
|  |  | 3. | Discovery Served, Responses, and Production ................ 18 |
|  | E. | | July 21, 2021 through December 15, 2021: Adjudication of Discovery Motions By the Special Master and Commencement of Settlement Discussions ............................................................. 18 |
|  |  | 1. | Appointment of the Special Master .................................. 18 |
|  |  | 2. | Continued Mediation of Discovery Disputes .................... 19 |
|  |  | 3. | Select Discovery Disputes, Motions and Hearings .......... 20 |
|  |  |  | a. | ADI .......................................................................... 20 |
|  |  |  | b. | Named Plaintiff Data ........................................... 22 |
|  |  |  | c. | Zuckerberg and Sandberg Custodial Files ............ 24 |
|  |  | 4. | Discovery Served, Responses, and Production ................ 26 |
|  | F. | | December 16, 2021 through August 26, 2022: Commencement of Depositions of Facebook's Fact and Corporate Witnesses, Discovery Disputes Continue, and the Parties Reach Agreement in Principle to Settle ........................................................................ 26 |
|  |  | 1. | Continued Discovery Disputes ......................................... 26 |
|  |  | 2. | Select Discovery Appeals, Motions, and Hearings .......... 27 |
|  |  |  | a. | ADI .......................................................................... 27 |
|  |  |  | b. | Named Plaintiff Data ........................................... 28 |

|  |  | c. | Cambridge Analytica-Related Documents | 31 |
|  |  | d. | "Secret Sauce" | 31 |
|  | 3. | Depositions Taken by Plaintiffs | | 32 |
|  |  | a. | Facebook Witnesses | 33 |
|  |  | b. | Rule 30(b)(6) Testimony | 35 |
|  |  | c. | Third-Party Discovery | 37 |
|  | 4. | Depositions of Named Plaintiffs | | 38 |
|  | 5. | Privilege Disputes | | 39 |
|  | 6. | Discovery Requests, Motions, and Hearings | | 41 |
|  | 7. | Sanctions | | 41 |
| G. | August 27, 2022 through December 22, 2022: Confirmatory Discovery and Finalizing the Settlement | | | 42 |
|  | 1. | Settlement Negotiations and Confirmatory Discovery | | 43 |
|  | 2. | Sanctions Hearing and Supplemental Briefs | | 45 |
| H. | December 23, 2022 through May 31, 2023: Settlement Administration and Communications with Class Members | | | 46 |
| I. | Throughout, Class Counsel Litigated the Case Efficiently | | | 47 |

III.   BENEFITS OBTAINED FOR THE CLASS ................................ 48

| A. | An Unprecedented Monetary Recovery | 48 |
| B. | Practices Suspended or Improved During the Litigation | 49 |
| C. | Public Disclosure | 49 |

IV.   ANTICIPATED POST-APPROVAL WORK ................................ 50

V.   ADDITIONAL RATE INFORMATION ................................ 51

| A. | Bleichmar Fonti & Auld LLP | 51 |
| B. | Keller Rohrback L.L.P. | 53 |

VI.   CLASS COUNSEL'S EXPENSES ................................ 54

VII.    OTHER FIRMS' WORK ON THE CASE ...............................................58

VIII.   OTHER EXHIBITS .................................................................................59

I, Derek W. Loeser, and I, Lesley E. Weaver, declare and state as follows:

1.      Derek W. Loeser is a partner at the law firm of Keller Rohrback L.L.P. ("Keller Rohrback") and Lesley E. Weaver is a partner at the law firm of Bleichmar Fonti & Auld LLP ("Bleichmar Fonti & Auld"). We are Co-Lead Counsel for Plaintiffs in the above-captioned matter. We submit this declaration in support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Expenses, and Service Awards (the "Motion"). Specifically, we submit this declaration in support of Class Counsel's request for attorneys' fees and expenses. The Motion also seeks incentive awards for each of the Named Plaintiffs, who have already provided declarations that provide information supporting this request.  *See* Dkt. 1096-8.

2.      We have personal knowledge of the information contained herein, and, if either of us is called as a witness, we each could and would testify competently thereto.[1]

## I.      SUMMARY

### A.      Overview of Litigation Process

3.      The Settlement achieved in this case—a common fund of $725 million, the most ever paid to settle a U.S. privacy class action and the most ever paid by Facebook to resolve any private litigation—is a direct result of Class Counsel's relentless efforts and refusal to settle for less before those efforts bore full fruit. The litigation involved novel issues from the start, including whether Facebook users had been harmed at all by Facebook's disclosure of their information. The litigation was also novel because the proposed class was uncommonly large, numbering in the hundreds of millions, and the class period was uncommonly long, more than a decade.

4.      To achieve this extraordinary result, counsel dedicated 149,928.65 hours of time, and many hundreds of hours in hearings, depositions, negotiations and meet and confer sessions.

---

[1] "Class Counsel" means Co-Lead Counsel (Derek W. Loeser and Lesley E. Weaver) and their law firms, Keller Rohrback L.L.P. and Bleichmar Fonti & Auld LLP.  The hours, lodestar, and multiplier presented herein include Class Counsel (who are responsible for 99.5% of all hours billed in the case) as well as Bankruptcy and Participating Counsel, who performed limited work under Co-Lead Counsel's oversight (*see* Dkts. 119, 121 ,433) and are collectively responsible for 0.5% of all hours billed in the case.

Class Counsel brought more than 50 motions that were overwhelmingly successful before a series of neutrals—this Court, Judge Corley, Court-appointed Discovery Mediators, and a Special Master.

5.      The Settlement is built on the evidence Class Counsel received through these efforts. While we cannot divulge the course of the parties' negotiations, we can state that they were worlds apart when settlement mediation commenced in Autumn 2021. Class Counsel's determination ultimately led to a far better Settlement that will return meaningful economic value to Facebook's users, and will deter Facebook and other similarly-situated companies from disclosing users' information against their users' wishes.

6.      We dedicated tremendous resources to litigating against one of the world's richest companies, represented by one of world's largest and best-resourced law firms. We are immensely proud of our team's joint efforts in achieving this Settlement, and the many people who worked very hard to accomplish it, especially the core team.

**B.      Class Counsel's Hours and Lodestar**

7.      From the inception of Class Counsel's investigation in March 2018 through December 22, 2022, Class Counsel spent 149,179.4 hours litigating this action, with a combined lodestar of $90,522,944.00 at current rates.[2] Counsel's total hours, which include the participation of Participating and Bankruptcy counsel whom the Court approved to assist Co-Lead Counsel in this matter (Dkts. 119, 121, 433), increases the total slightly to 149,928.65 hours, with a total lodestar of $91,234,005.50. Applied to the requested 25% fee request ($181.25 million), this yields a multiplier of 1.99.

8.      The chart below summarizes the hours and lodestar for the following time periods. We have selected these time periods because they align with transition points in the litigation. Class Counsel's efforts during each of these time periods are detailed below in § II.

_____

[2] Unless otherwise specifically mentioned, all hours and lodestar in this declaration reflect Co-Lead Counsel's time, and are rounded estimates using current billing rates (as is conventional).

The list of each biller whose time is counted as part of Class Counsel's hours and lodestar in this case, along with the biller's experience level and billing rate, is at Exhibit A.[3]

- <u>March 2018 through September 9, 2019</u>: Case Commencement Through the Motion to Dismiss Order

- <u>September 10, 2019 through March 10, 2020</u>: Initial Case Management and Discovery After the Motion-to-Dismiss Order Through the Appointment of Judge Corley

- <u>March 11, 2020 through March 22, 2021</u>: Escalation of Unresolved Discovery Disputes Culminating in the Appointment of the Discovery Mediators

- <u>March 23, 2021 through July 20, 2021</u>: Appointment of the Discovery Mediators Through the Appointment of Special Master Garrie

- <u>July 21, 2021 through December 15, 2021</u>: Adjudication of Discovery Motions By the Special Master and Commencement of Settlement Discussions

- <u>December 16, 2021 through August 26, 2022</u>: Commencement of Depositions of Facebook's Fact and Corporate Witnesses, Discovery Disputes Continue, and the Parties Reach Agreement in Principle to Settle

- <u>August 27, 2022 through December 22, 2022</u>: Confirmatory Discovery and Finalizing the Settlement

- <u>December 23, 2022 through May 31, 2022</u>: Settlement Administration and Communications with Class Members

9.       We also provide an accounting of the approved work of other counsel who were authorized by the Court to perform specific tasks in the litigation below in § VII. Four firms billed a total of 47.45 hours, with a total lodestar of $32,567.00, pursuant to the Court's orders on common benefit work. Dkts. 121, 433. An additional firm, appointed to oversee the bankruptcy of Cambridge Analytica, billed a total of 701.8 hours, with a lodestar of $678,494.50. Dkt. 119.

---

[3] Class Counsel has written off some of the time it reasonably expended litigating this case. That time includes time spent on tasks related to case administration (such as regular collection and review of time records), and time from individuals who billed fewer than 50 hours to this litigation. Class Counsel has also written off time as proposed by Jill Dessalines, the independent expert Class Counsel retained to review their time.

Together, those five firms' time comprises 0.50% of the total hours billed by counsel and 0.78% of the total lodestar. The remaining time and lodestar was incurred solely by Class Counsel.

10.     Finally, we anticipate approximately 10,000 additional hours of time before this litigation is completed. As discussed in more detail below, this would increase Class Counsel's total hours to 159,928.65 and lodestar to $97,274,005.50 (using a blended rate of $604), yielding a multiplier of 1.86.

## C.     Summary Case Statistics

11.     The scale of this litigation was massive. Co-Lead Counsel filed over 1,000 pages of pleadings and other briefing; participated in more than 22 hours of hearings before Judge Chhabria, more than 12 hours of hearings before Judge Corley, and more than 50 hours of hearings before the Special Master; prepared for and participated in more than 100 meet and confers with opposing counsel; participated in 31 discovery mediation sessions; and filed 37 motions to compel discovery.

12.     These efforts yielded 88 separate discovery orders from this Court, Judge Corley, and Special Master Garrie, and ultimately resulted in more than 1,828,263 documents—totaling more than 6,954,738 pages—produced by Facebook and third parties. Co-Lead Counsel deposed 34 fact witnesses and took more than 110 hours of testimony from corporate designees under Rule 30(b)(6). The documents and depositions yielded evidence that Co-Lead Counsel used to advance Plaintiffs' claims and secure the proposed $725 million settlement.

13.     Below are some summary statistics about the litigation.

      **a.     Complaints and Motion to Dismiss Briefing**

- Three Consolidated Complaints
- Two Rounds of Motions to Dismiss Briefing

      **b.     Court Appearances**

- District Court

    ○ 22:42 hours of hearings (18 hearings) before this Court

- o 12:02 hours of hearings (22 hearings) before Judge Corley

- Special Master Garrie

  - o More than 50 hours of hearings (18 hearings) before Special Master Garrie

    **c.**    **Discovery**

- Meet and Confers

  - o More than 100 meet and confers, spanning more than 200 hours

- Discovery Mediation

  - o 112.8 hours of mediation, spanning 31 sessions

- Motions to Compel and For Sanctions

  - o 37 affirmative motions, comprising 368 pages (10,520 pages of exhibits)

  - o 11 oppositions to Facebook's motions, comprising 82 pages (425 pages of exhibits)

- Discovery Issues Mediated

  - o More than 60 discrete issues.

- Total Number and Page Count of Discovery Orders Issued By This Court, Judge Corley, and Special Master Garrie

  - o 15 orders by this Court (43 pages)

  - o 26 orders by Judge Corley (77 pages)

  - o 47 orders by Special Master Garrie (207 pages)

- Documents Produced By Facebook and Third Parties

  - o Facebook: 1,322,549 documents (5,106,352 pages)

    - ▪ 2.538 gigabytes of structured data

  - o Former Facebook employees: 70,267 documents (173,966 Pages)

LOESER AND WEAVER DECL. IN SUPP.        5        MDL NO. 2843
OF PLS.' MOT. FOR FEES, EXPENSES,                CASE NO. 18-MD-02843-VC
AND SERVICE AWARDS

- o Third parties: 435,537 documents (1,674,420 pages)

- Fact and 30(b)(6) Depositions Taken By Class Counsel

    - o 34 fact depositions

    - o 21 days of highly technical Rule 30(b)(6) depositions

    - o 312:21 hours of testimony

    - o 13,251 pages of transcription generated

    - o 721 exhibits marked

- Fact Depositions Defended By Class Counsel

    - o 8 days of depositions of Named Plaintiffs

    - o 49:06 hours of testimony

    - o 2,203 pages of transcription generated

    - o 119 exhibits marked

## II. CLASS COUNSEL'S WORK ON THE CASE

**A. March 2018 through September 9, 2019: Case Commencement through the Motion to Dismiss Order**

14. Class Counsel's primary activities during this period were the initial investigation, the drafting of a consolidated complaint and an amended consolidated complaint, and briefing of and hearings on defendants' motions to dismiss those complaints.

### 1. Investigation, Filing, and Consolidation

15. Class Counsel began investigating Facebook's unauthorized sharing of user data with third-party apps in March 2018, when newspapers revealed Cambridge Analytica's purchase and ongoing use of Facebook user data in political consulting activities.[4]

---

[4] Carole Cadwalladr and Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian (Mar. 17, 2018), https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election; Matthew Rosenberg et al., *How Trump Consultants Exploited the Facebook Data of Millions*, The New York Times (Mar. 17, 2018), https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

16.     In connection with their investigations, Class Counsel communicated with over five hundred current and former Facebook users about the personal information they had posted and shared on Facebook, as well as about their expectations of privacy on the platform. They also scoured public reports and dockets for information about Facebook's data-sharing practices.

17.     On June 6, 2018, the Judicial Panel on Multidistrict Litigation consolidated eight cases related to the Cambridge Analytica scandal in this Court. Dkt. 1. (Forty-two cases were ultimately consolidated by the JPML in total.) The next day, the Court ordered those seeking appointment as lead counsel to file applications by June 21, 2018. Dkt. 2. Lesley Weaver and Derek Loeser were among 33 attorneys who submitted applications. Dkts. 31 and 41.

18.     On July 27, 2018, the Court issued an order appointing Lesley Weaver and Derek Loeser as co-lead counsel. Dkt. 102. No other firms were appointed to serve, either on an executive committee or in any other role.

19.     In August 2018, Class Counsel filed briefs proposing a protocol for common benefit work and expenses, Dkt. 114, and defining the contours of Class Counsel's duties and authority, Dkt. 115. They also filed a letter brief seeking authorization to retain bankruptcy counsel to represent the class's interests in the Cambridge Analytica and SCL USA Inc. bankruptcy proceedings. Dkt. 117.

20.     In response, the Court issued orders approving Plaintiffs' request to hire bankruptcy counsel, setting forth the duties and authority of Class Counsel, and establishing a protocol for common benefit work and expenses, which required that all common benefit work be performed solely by Co-Lead Counsel and their firms, with extremely limited exceptions. Dkts. 119, 120, 121, 433.

**2.      Limited Discovery and the Consolidated Complaint**

21.     Plaintiffs sought narrow discovery prior to Facebook's initial motion to dismiss. They received permission in August 2018 to seek discovery on Facebook's relationship and interactions with Aleksandr Kogan and the ThisIsYourDigitalLife app. Dkt. 130. Plaintiffs then

served Facebook with five requests for production ("RFPs") and five interrogatories. Facebook served its responses on Plaintiffs in early September 2018.

22.     After evaluating those responses and the existing complaints, Plaintiffs filed a Consolidated Complaint later that month. Dkts. 148, 152-2. The 257-page Consolidated Complaint incorporated every claim asserted by each of the 42 consolidated actions. The fifty claims comprised three categories: 12 prioritized claims, 9 prioritized consumer protection act claims alleged in the alternative, and 29 non-prioritized claims. Dkt. 152-2.

23.     In October 2018, Plaintiffs asked the Court to treat the Consolidated Complaint as a superseding, master consolidated complaint, and to stay all non-prioritized claims and all claims against non-prioritized defendants. Dkt. 156.  This was an effective procedural tool for managing a high-profile and complex litigation such as this one.  The Court granted Plaintiffs' request to stay the non-prioritized claims pending resolution of the motions to dismiss but directed Plaintiffs to litigate the non-prioritized Defendants' motions to dismiss. Dkt. 190. The Consolidated Complaint became the superseding and controlling complaint for the MDL.

### 3.     Motions to Dismiss

24.     Facebook and the non-prioritized Defendants moved to dismiss Plaintiffs' Consolidated Complaint in November 2018, Plaintiffs opposed, and the parties fully briefed the motion. *See* Dkts. 183, 184, 188, 208, 211, 233, 234.

25.     The Court granted Defendant Mercer's motion to dismiss for lack of personal jurisdiction on January 28, 2019. Dkt. 240. Plaintiffs voluntarily dismissed two of the other non-prioritized defendants without prejudice. Dkt. 263.

26.     The Court heard argument on the remaining motions to dismiss in early February 2019. Dkt. 247. The hearing lasted more than four and a half hours. During the hearing, the parties addressed numerous issues, including standing and Plaintiffs' allegations about whether they switched from "public" to "friends only" privacy settings. The Court indicated that it would allow Plaintiffs to re-plead to address concerns it expressed in the hearing. Plaintiffs agreed to amend the complaint to do so, and the Court terminated Facebook's motion to dismiss as moot.

27.     Plaintiffs filed their First Amended Consolidated Complaint two weeks later. Dkt. 257. The First Amended Complaint was 412 pages and comprised 49 claims—12 prioritized claims, 9 priority consumer protection act claims alleged in the alternative, and 28 non-prioritized claims.

28.     Facebook filed another motion to dismiss. The parties presented full briefing and extensive oral argument on the motion. Dkts. 261, 266, 267, 274.

29.     On September 9, 2019, the Court denied in part and granted in part Facebook's motion to dismiss. Dkt. 298. The Court also summarized four categories of alleged wrongdoing by Facebook that underlay Plaintiffs' claims: (1) giving app developers access to sensitive user information; (2) continued disclosure to whitelisted apps; (3) sharing sensitive user information with business partners; and (4) failing to restrict the use of sensitive information. *Id.* at 6–9.

30.     Facebook moved for certification under 28 U.S.C. § 1292(b), seeking an immediate appeal of the Court's ruling on injury-in-fact. Dkt. 318. Plaintiffs opposed, and the Court denied Facebook's motion in late October 2019. Dkts. 324, 330.

31.     Facebook served its Answer to the First Amended Complaint in February 2020. Dkt. 373.

**B.     September 19, 2019 through March 10, 2020: Initial Case Management and Discovery After the Motion-to-Dismiss Order through the Appointment of Judge Corley**

**1.     Competing Proposals on Case Schedules and Bifurcation**

32.     On October 28, 2019, the parties filed a joint case management statement. Dkt. 326. Facebook sought to bifurcate discovery, with a first phase focused solely on the issue of standing (including through summary judgment), with other merits discovery, class certification, and potentially a second summary judgment motion to follow. Facebook proposed litigating the standing question without providing any discovery as to what information it collected about users and what third parties had access to. Plaintiffs opposed Facebook's bifurcation proposal, arguing that merits and class discovery should proceed together.

33.     On November 4, 2019, the Court held a case management conference. Dkt. 333. On November 13, 2019, the Court requested supplemental briefs regarding how to proceed with discovery. Dkt. 338. Plaintiffs argued that if Facebook sought to litigate merits questions first, it would have to waive one-way intervention. *See* Dkt. 340.

34.     On December 4, 2019, the Court entered an order denying Facebook's request to phase discovery. Dkt. 347.

35.     On December 9, 2019, the Court requested letter briefs regarding the parties' proposed discovery deadlines, including whether merits and class-certification discovery should proceed at the same time. Dkt. 349; *see* Dkt. 353 (Plaintiffs' letter brief).

36.     On December 13, 2019, the Court entered a case management schedule with the close of fact discovery set for January 22, 2021. Dkt. 356.

### 2.     Early Discovery Disputes

37.     Despite numerous meet-and-confers, the parties reached impasse on many issues, including Facebook's failure to produce organizational charts or other information sufficient to identify potential custodians, selection of custodians, search of electronically stored information, production of Facebook's correspondence with the U.S. Federal Trade Commission ("FTC"), production of documents produced to the FTC in connection with the 2012 and 2018 investigations, production of financial information, production of documents related to PricewaterhouseCoopers ("PwC") audits of Facebook's Privacy Program, and the protocol governing discovery of electronically stored information.

38.     Early in discovery, Plaintiffs sought production of materials related to an FTC investigation and subsequent enforcement actions against Facebook that resulted in the payment of $5 billion to the FTC. The FTC actions arose from allegations that Facebook deceived users about their ability to control the privacy of their personal information—allegations closely related to those here. Plaintiffs requested discovery and information Facebook had disclosed to the FTC. Facebook opposed these requests.

39.     The parties met and conferred extensively on the FTC-documents issue and raised it with the Court by the end of 2019. *See* Dkt. 358. The parties were unable to resolve Plaintiffs' requests. After a hearing on January 8, 2020, the Court ordered Facebook to produce these materials dating from before 2012. Dkt. 366. Facebook finished producing these documents at the end of April 2020. *See* Dkt. 400.

40.     The parties also disputed the relevant time period for responsive materials. The Complaint defined the class period as starting on January 1, 2007, but Facebook proposed defining the relevant period as beginning March 20, 2012. Following the January 2020 case management conference, Facebook revised its position to propose a relevant period beginning January 1, 2009. *See* Dkt. 374. In early March 2020, the Court granted Plaintiffs' motion to compel discovery dating back to 2007. Dkt. 381.

### 3.     Discovery Served, Responses, and Production

41.     Between September 10, 2019 and March 10, 2020, Plaintiffs propounded 31 requests for production and one interrogatory. Among other things, the discovery sought documents relating to each of the Named Plaintiffs, including which third parties Facebook had permitted to access their information; documents sufficient to show the monetary value of providing third parties access to each Named Plaintiff's content and information; documents related to the App Developer Investigation; and documents related to the privacy controls and app settings Facebook made available to users. Facebook served 43 pages of responses and objections.

42.     Between September 10, 2019 and March 10, 2020, Facebook served one interrogatory on each of the then-Named Plaintiffs. In response, Plaintiffs provided an aggregate 159 pages of responses and objections.

43.     On March 10, 2020, the Court referred the case for all discovery purposes to Judge Corley. Dkt. 390.

**C.    March 11, 2020 through March 22, 2021: Escalation of Unresolved Discovery Disputes Culminating in the Appointment of the Discovery Mediators**

44.    For months after discovery disputes were referred to her, Judge Corley held discovery conferences approximately every two weeks.[5] Before each hearing, the parties submitted joint status reports on discovery disputes and issues. *See* Discovery Hearing Transcript, 5:6–16 (Apr. 17, 2020).

45.    Class Counsel's work during this period required is best understood in the context of two orders that established the course of discovery for the next year.

**1.    Plaintiffs Are Required to Review Everything Produced to Date Before Seeking Additional Documents**

46.    At the time of the first hearing in front of Judge Corley, Facebook's production was primarily comprised of: (i) tens of thousands of pages of atomized information from each of the then-Named Plaintiffs' Facebook accounts, which Co-Lead Counsel was required to review to identify what was missing; and (ii) the FTC documents discussed above. Review of these documents was time-consuming.

**2.    The Parties Are Ordered to Meet and Confer Thrice Weekly**

47.    In the face of the parties' inability to make progress on discovery negotiations, Judge Corley entered an order in May 2020 requiring the parties to meet and confer at least three times weekly by video conference. Dkt. 420 at 2. (The parties later agreed, with Judge Corley's permission, to reduce the meet and confers to twice weekly.) This resulted in an extensive investment of partner and associate time.

48.    The parties' mandatory thrice-weekly meet and confer sessions typically addressed multiple discovery issues, and averaged over an hour each. Although over the course of discovery the parties met and conferred substantially more than 100 times for more than 200 hours, most of these meetings occurred from March 11, 2020 through March 22, 2021. The

---

[5] The discovery conferences occurred on April 17, 2020; May 1, 2020; May 15, 2020; May 29, 2020; June 19, 2020; July 13, 2020; July 31, 2020; August 14, 2020; September 4, 2020; September 25, 2020; November 5, 2020; December 9, 2020; January 15, 2021; and March 4, 2021.

meetings during this period covered a broad range of issues and required the participation of a number of partners and associates with knowledge of different parts of this multifaceted case. The requirement to meet and confer multiple times per week continued until the end of the discovery mediation process in the summer of 2021, and then restarted in the winter of 2022 pursuant to the discovery mediators' guidance.

### 3.   Disputes Over Custodians and Search Terms

49.   The parties disputed which search terms the Defendant would use to search its electronic databases and whose custodial files would be searched using those terms. The dispute over search terms and custodians lasted more than a year. Plaintiffs were required to develop search-term-by-search-term, and custodian-by-custodian negotiation and briefing.

50.   Plaintiffs sought to accelerate the determination of search methodology by asking Facebook to produce the custodians and search terms that Facebook employed when producing documents to the FTC. Facebook took the position that this information was privileged. *See* Dkts. 377, 388.

51.   Plaintiffs asked the Court to compel production of the search terms used for both the 2012 and 2018-2019 FTC proceedings. *See* Dkt. 388. Judge Corley then ordered Facebook to identify the custodians and search terms that it utilized in response to the FTC's 2018-2019 investigation and to endeavor to identify terms used and custodians searched in connection with the 2012 investigation. Dkt. 394.

52.   Because the parties could not agree, in early May 2020, Judge Corley established a schedule for negotiations related to custodians. Facebook ultimately agreed to a list of 72 custodians, but the parties continued to disagree about 9 other custodians. Dkt. 428. The parties filed a joint discovery letter concerning the dispute. Dkt. 431. At a May 15, 2020 status conference, Judge Corley ordered that all 9 disputed custodians should be included, ordering Facebook to search the custodial files of 81 custodians. Dkt. 436. She then ordered the Plaintiffs to provide an initial list of 10 of these custodians for purposes of negotiating search terms. *Id.*; Dkt. 449.

53.     The parties continued to meet and confer via videoconference, email, and letter regarding search terms to be used. They agreed that Facebook would interview individual custodians in order to develop tailored search terms and answer questions related to electronically stored information ("ESI"). *See* Dkt. 449. By time of the July 2020 case management conference, the parties had agreed on a protocol for selecting and negotiating search terms and were about to begin negotiations over the terms themselves. *See* Dkt. 469.

54.     Throughout the summer and into the fall of 2020, the parties continued to negotiate search terms. *See, e.g.*, Dkt. 504. For each search term, Plaintiffs were required to explain why it was appropriate, but also why it should apply to each particular custodian. The negotiations ended up necessitating multiple spreadsheets with dozens of columns. In September 2020, Plaintiffs sought Judge Corley's guidance. *See* Dkt. 522.

55.     In the end, the process for selecting custodians and search terms, which spanned February 2020 to April 2021, resulted in 138 search terms that were applied to 85 unique groupings of the 81 initial custodians. Many of the custodians that Plaintiffs fought to include became key witnesses whom Plaintiffs deposed or whose depositions were being scheduled when the Court stayed proceedings. This success was built on a year's worth of toil.

**4.      Discovery Served, Responses, and Production**

56.     Between March 11, 2020 and March 22, 2021, Plaintiffs served on Facebook 27 requests for production and 28 interrogatories, which sought evidence that went to the core of Plaintiffs' claims, such as documents and information related to Facebook's APIs (the way it permitted third parties to access data), the privacy settings it made available, schematics of databases that contained user information, information about policies for whitelisting third parties and the identities of all whitelisted entities, payments received from third parties for access to friends' data, and the financial impact of eliminating access to friends' data. Facebook served more than 1150 pages of written responses and objections to this discovery. Facebook produced 301,859 documents to Plaintiffs during this period.

57.     Between February 2020 and March 2021, Plaintiffs served subpoenas on 45 non-parties, including the independent auditor of Facebook's Privacy Program (PricewaterhouseCoopers LLP ("PwC")), the consultants hired to conduct the ADI, data brokers, application developers and business partners. They met and conferred with the subpoenas' recipients, most more than once. Many of these third parties were represented by outside counsel who resisted discovery. Efforts to obtain discovery from third parties, including through service of 16 additional document subpoenas and three subpoenas for 30(b)(6) deposition testimony, continued up to settlement.

58.     Third parties ultimately produced more than 435,537 documents, comprising more than 1.6 million pages. This discovery was important to understanding Facebook's processes and controls for monitoring app developers, the development and results of Facebook's ADI, the methods third parties used to access users' data, and key terms relating to the data flow between Facebook and third parties. This information (and more) assisted Plaintiffs in identifying key custodians and pointing out where Facebook's production was incomplete, and included evidence probative of Plaintiffs' claims.

59.     Plaintiffs also sought documents from state and federal agencies under freedom-of-information laws, including to the FTC for records relating to its investigation and inquiry of Facebook's privacy practices. Plaintiffs received over 2,800 documents in response to these FOIA requests. Documents obtained through FOIA requests provided an important cross-check on Facebook's production of FTC correspondence, discovery responses, and documents.

60.     Between March 11, 2020 and March 22, 2021, Facebook served 21 Requests for Production and 9 or 10 Interrogatories on each of the then-Named Plaintiffs (resulting in a total of 420 Requests for Production and 225 Interrogatories to which Plaintiffs had to respond). Among other interrogatories, Facebook asked the Named Plaintiffs to describe every Facebook friend they had and to confirm whether they had met in person. The Named Plaintiffs served more 1100 pages of written responses and objections. Plaintiffs produced 14,164 documents to Facebook during this period.

### 5.     Facebook Seeks to Depose the Named Plaintiffs

61.     On January 24, 2020, Facebook served deposition notices on each of the then-Named Plaintiffs. At this time, the parties had not agreed to a deposition protocol or to the lifting of the 10-deposition limit imposed on each party (at that time, there were more than 10 Named Plaintiffs). The parties were also still negotiating search terms and other aspects of the production of ESI, including Named Plaintiffs' data. Nor had Plaintiffs completed production of documents in response to Facebook's written discovery requests.

62.      Plaintiffs opposed Facebook's efforts to depose the Named Plaintiffs before Facebook had finished producing their data. Plaintiffs proposed postponing the depositions until 90 days following completion or substantial completion of Facebook's production of documents relevant to a given Named Plaintiff. Facebook continued to seek depositions from March through May 2020. Ultimately, these depositions were delayed, and the onset of the pandemic forced the parties to negotiate a remote deposition protocol.

### D.     March 23, 2021 through July 20, 2021: Appointment of the Discovery Mediators Through the Appointment of Special Master Garrie

63.     Class Counsel's primary activities during this period related to discovery mediation. Through active participation in the discovery mediation process, Class Counsel determined that appointment of a Special Discovery Master would assist them in moving discovery forward. This time period ends with the appointment of Special Master Garrie.

### 1.     Appointment of the discovery mediators

64.     During a March 4, 2021 discovery conference, Judge Corley suggested that the parties engage a discovery neutral to facilitate resolution of disputes because they were too numerous.

65.     The parties agreed to retain the Honorable Judge Gail Andler (Ret.) of JAMS to serve as a discovery mediator, consistent with Judge Corley's instructions. Dkt. 646. With the consent of all parties, Judge Andler was joined by Daniel Garrie, a JAMS mediator and arbitrator, to assist in mediating the often technically complex disputes. Dkt. 662.

### 2.    Mediation of Discovery Disputes

66.    Between April 15, 2021 and July 21, 2021, Class Counsel and Facebook met jointly with the discovery mediators 12 times for more than 45 hours. In addition, Class Counsel met separately with the mediators for more than 12 hours.

67.    Issues addressed included: disputed ADI materials; production of documents from relevant government investigations, including deposition transcripts and discovery responses; production of exhibits to deposition transcripts already produced from other relevant proceedings; production deficiencies and the use of Technology Assisted Review (TAR); confidentiality issues pertaining to confidential documents publicly disseminated elsewhere; disputed search terms; Plaintiffs' discovery responses; production of non-custodial ESI; production of Named Plaintiffs' data; production of financial information related to Facebook's monetization of user data; Facebook's interrogatory responses; deposition subpoenas (served on both Facebook and Plaintiffs); production of Zuckerberg's notebooks reflecting plans for monetization of user data; production of Facebook's "secret sauce" memo regarding monetization of user data; obtaining deposition dates; and the case schedule.

68.    At the mediators' instructions, the parties identified both "big" issues (the production of ADI materials, Facebook's deficient production and the use of TAR, and production of non-custodian ESI) and "small" issues that the mediators hoped might be resolved swiftly. With the mediators' assistance, the parties did make some progress. However, even small matters such as deposition scheduling required hours of discovery mediation to resolve. Indeed, the discovery mediators ultimately declared aspects of nearly all of the above-listed issues at impasse.

69.    For "big" issues, resolution took even more time and greater resources. The dispute over production of ADI materials, which spanned nearly the entirety of the active litigation of this action, is addressed below. During this period, ADI was a topic at nearly every mediation session. Similarly, the use of technology assisted review (TAR) and non-custodial

ESI, though addressed at nearly every mediation session, and during the parties' still-weekly meet and confers, were not resolved during this period.

70.     Mediation of TAR is illustrative of problems faced in discovery mediation. Facebook proposed utilizing TAR to accelerate document production, a proposal that was discussed during early discovery mediation sessions. After consultation with the discovery mediators and a consulting expert, Plaintiffs agreed that TAR could help speed up document production, and the parties spent three months attempting to negotiate a TAR protocol. When it became clear that the discovery mediators believed the protocol should embrace some degree of transparency and testing to ensure that relevant documents were being produced, Facebook reversed course. Within days of Plaintiffs agreeing that they would accept a mediator's proposal without prior review, Facebook informed Plaintiffs that it no longer wanted to implement TAR. By then, Plaintiffs had expended more than 100 hours attending mediations, consulting with their expert, and drafting proposals to implement TAR.

71.     Ultimately, only a few issues were resolved without briefing, with other progress stymied by the fact that the discovery mediators could not compel Facebook's compliance. This led Plaintiffs to propose the appointment of a Special Master.

### 3.     Discovery Served, Responses, and Production

72.     Between March 23, 2021 and July 20, 2021, Facebook produced 42,790 documents to Plaintiffs.

### E.     July 21, 2021 through December 15, 2021: Adjudication of Discovery Motions By the Special Master and Commencement of Settlement Discussions

73.     Class Counsel's primary activities during this period concerned the litigation of numerous discovery disputes before Special Master Garrie, the continued discovery mediation of disputes, and the establishment of a deposition protocol.

### 1.     Appointment of the Special Master

74.     In July 2021, due to the complex nature and number of the parties' discovery disputes, the Court appointed Discovery Special Master Garrie. Dkt. 708.

75.     Ultimately, Special Master Garrie issued scores of discovery orders in this litigation, the large majority of which required Facebook to provide discovery. The discovery that Plaintiffs won through this process bore directly on the merits. In addition to the ADI and Named Plaintiffs data production, addressed in more detail below, Plaintiffs successfully moved for, among others, the production of Mark Zuckerberg's and Sheryl Sandberg's custodial documents; the ability to depose individuals who had previously been deposed by the FTC or SEC in proceedings that touched on similar issues; the production of documents related to the monetization of user data, which enabled calculation of the harms suffered by users; and documents related to case studies and reports relating to Facebook's work with Cambridge Analytica.

76.     Special Master Garrie enacted a protocol for resolving discovery disputes that required the discovery mediators to declare impasse before the parties could submit briefing on an issue. Dkt. 733. The protocol required moving papers to be filed within ten calendar days of the mediators' declaration of impasse. It also required a separate statement denoting the discovery request, any responses, the relevant history, the opposition, and an executive summary of the argument. Under the protocol, the Special Master issued a tentative ruling on a discovery issue within six business days after the filing of the reply—at least thirty-three days after the declaration of impasse—and any request for reconsideration had to be brought within four business days after the tentative ruling.

**2.     Continued Mediation of Discovery Disputes**

77.     All the while, discovery mediation continued. Between July 21, 2021 and December 15, 2021 the parties met jointly with the discovery mediators eight times, for more than 30 hours.

78.     Issues addressed included the production of Named Plaintiffs' data; the production of non-custodial ESI; the production of documents from and deposition of high-level Facebook employees including Mark Zuckerberg and Sheryl Sandberg; the production of relevant requests Facebook received from and the responses it provided to government

investigations; the production of the "secret sauce" memo and Mark Zuckerberg's notebooks; Facebook's deficient document production; and the schedule for depositions.

79.     New issues that moved from meet and confers to mediation included the production of API developer docs, which Plaintiffs sought in order to continue to develop evidence of the pervasive flow of user data from Facebook to third parties, even in the absence of internal records logging such data flow; production of API call logs; Facebook's objections to discovery served by Plaintiffs' on third parties; Facebook's request for production of Named Plaintiffs' medical records and email addresses; and Plaintiffs' discovery responses.

80.     Plaintiffs ultimately prevailed on almost all of these issues, either through discovery mediation or, more often, via motion practice once the discovery mediators declared impasse.

### 3.     Select Discovery Disputes, Motions and Hearings

#### a.     ADI

81.     Facebook's ADI began in March 2018 as part of a public response to the Cambridge Analytica scandal. The ADI's publicly stated purpose was to investigate whether third-party apps improperly accessed or misused user information.

82.     Plaintiffs' Request for Production No. 19 sought documents and communications related to the ADI. Facebook took the position from the outset that the ADI was an attorney-driven investigation intended to evaluate litigation risks following the Cambridge Analytica scandal, and therefore that all materials related to the ADI were privileged and/or protected work-product (other than a narrow subset of communications Facebook produced with a few third-party app developers that were investigated). The parties met and conferred about Facebook's objection, and Plaintiffs brought it to the Court's attention in their April 2020 Joint Status Update. Dkt. 413. Plaintiffs continued to raise the ADI in the bi-weekly hearings and Plaintiffs requested that the parties brief Facebook's assertion of work-product protection over the ADI. Facebook told the court that there was "no urgent need" for briefing. Joint Status Update, Dkt. 449 (May 28, 2020).

Loeser and Weaver Decl. in Supp.          20          MDL No. 2843
of Pls.' Mot. for Fees, Expenses,          Case No. 18-md-02843-VC
and Service Awards

83.     Judge Corley directed Facebook to state a position on whether certain ADI documents were privileged. Dkt. 877, Ex. 12. She proposed ruling on a subset of ADI documents, so as to provide the parties with legal guidance for the remainder of the documents. *Id.*, Ex. 13. She instructed the parties to create a privilege log of sample documents related to the ADI in July 2020. Dkt. 513. After several months of the back-and-forth on how this exercise would work, the parties selected six exemplar apps investigated by the ADI for which Facebook would create privilege logs. Dkt. 599. In January 2021, the Court directed Plaintiffs to select a number of entries on those privilege logs for in camera review. Dkt. 602. The parties further briefed the issue throughout February 2021, with Plaintiffs moving to compel production of documents related to the ADI. *See, e.g.*, Dkts. 611, 613.

84.     After briefing and in camera review, Judge Corley allowed Facebook to present additional evidence on privilege. Dkt. 877, Ex. 5. Judge Corley also explained that she believed the ADI would have been performed even without anticipated litigation. *Id.* She ordered the parties to meet and confer about how to proceed in light of this guidance. Dkt. 655. In July and August 2021, Facebook submitted declarations on privilege. Dkts. 700-1, 720.

85.     Judge Corley subsequently ordered that the ADI was not protected work product, because Facebook would have launched it even in the absence of anticipated litigation. Dkt. 736. In that order, she directed Facebook to (a) produce documents related to the six exemplar apps chosen by the parties, and (b) work with Special Master Garrie regarding the production of additional materials. *Id.*

86.     The parties met and conferred extensively regarding additional ADI documents to be produced, without resolution. *See, e.g.*, Dkt. 877 at 18. Special Master Garrie conducted a Saturday videoconference hearing where Plaintiffs again sought production of categories of documents previously identified to Facebook. *Id.* at 20.

87.     Following the over-four-hour hearing, Special Master Garrie ordered Facebook to produce all ADI reports, audits, interviews, consultant memoranda, and communications. Dkt. 766. In response to Facebook's motion for reconsideration, Special Master Garrie amended his

order to provide that production of communications would await in camera review of 6,000 previously logged documents. *Id.* The Special Master ultimately reviewed these documents and found that most of them were relevant and discoverable as explained in further detail below.

### b. Named Plaintiff Data

88. For over two years, Plaintiffs sought discovery relating to the data that Facebook collects on each of the Named Plaintiffs and how it uses that information—which was at the core of Plaintiffs' claims. Plaintiffs also sought this data to satisfy the adequacy, typicality and commonality requirements of Rule 23 as well as to address Facebook's argument that the Named Plaintiffs lack standing because they have no evidence that their information has been shared.

89. In November 2019, Plaintiffs first served discovery requests seeking documents and information showing the data that Facebook collects on each of the Named Plaintiffs and how it uses that information.

90. From March 2020 to July 2020, the parties met and conferred regularly about discovery of data relating to Named Plaintiffs. Plaintiffs sought discovery relating to Facebook's data architecture to search for ways to identify Plaintiffs' data on an individual or class-wide basis. However, Facebook refused to provide any additional information, telling Plaintiffs on more than one occasion to "Google" such information.

91. In July 2020, Plaintiffs asked that Facebook be required to identify what data it maintains about the Named Plaintiffs and whether it would produce it. Dkt. 484 at 3. Judge Corley required Plaintiffs to complete their review of produced documents first. Thereafter, the parties were to update the Court on what had and had not been produced. Dkt. 487 at 1-2.

92. Plaintiffs' review showed that Facebook had produced information almost exclusively from its "Download Your Information" Tool ("DYI Tool"), which Facebook had already made available to all users outside litigation. *See* Dkt. 495 at 2–3; Dkt. 877, Ex. 34 at 1–2. The tool provided a subset of users' activity on the Facebook platform but does not include all of the information Facebook collects about users' off-Facebook activity or inference that Facebook draws from users' activity. *See id.*; Dkt. 495 at 2–3. Other documents, however,

appeared to show that Facebook maintained additional types of data. Dkt. 877, Ex. 65. Facebook also appeared to connect and integrate information generated from users' on-platform activity with user information it obtained from third parties and users' off-platform activity. *Id.*, Exs. 63, 64, 65.

93.     In August 2020, Plaintiffs raised these concerns with the Court. Dkt. 495 at 2–3. In September 2020, Judge Corley concluded that the parties' dispute over what data was relevant was ripe for resolution. Dkt. 508.

94.     In September and October 2020, the parties briefed the issue of what information that Facebook collects and shares about the Named Plaintiffs is discoverable. *See, e.g.*, Dkts. 515, 526, 537, 548.

95.     On October 29, 2020, Judge Corley issued an order concluding that "discoverable user data at issue includes" three categories of information: (1) information "collected from a user's on-platform activity"; (2) information "obtained from third parties regarding a user's off-platform activities"; and (3) information "inferred from a user's on or off-platform activity." Dkt. 557 at 2.

96.     Following Judge Corley's order, Plaintiffs requested that Facebook identify materials responsive to Judge Corley's Discovery Order so that the parties could discuss production. Dkt. 583 at 1–2. Facebook stated in a December 2020 joint status report and at a hearing that while it was still investigating, it believed it had already produced all information related to the Named Plaintiffs that could have been shared with third parties. *Id.* at 9; Tr. of Dec. 9, 2020 Discovery Hearing at 17:17-18:9. Plaintiffs were concerned that, despite Facebook's representations, all discoverable data had not yet been produced. Dkt. 583 at 1-2; Tr. of Dec. 9, 2020 Discovery Hearing at 18:10–19:1, 19:8–20:6. After hearing this dispute, Judge Corley allowed Plaintiffs to take a 30(b)(6) deposition on the categories of discoverable user data as listed in her order. Dkt. 588 at 1.

97.     A month later, after the parties disputed the topics to be covered at the 30(b)(6) deposition, Judge Corley ordered the parties to conduct these depositions in February 2020 and

limited the scope to "discoverable user data" as she had defined it in her October 28 order. Dkt. 602 at 1. On February 23, 2021 and February 24, 2021, Plaintiffs took 30(b)(6) depositions of Facebook on these topics. For Plaintiffs, these depositions "confirmed that Facebook [was] withholding significant amounts of data relating to the Named Plaintiffs." Dkt. 631 at 2. Facebook disputed this conclusion.

98.    After these depositions, Plaintiffs continued to seek all documents related to the data that Facebook collects on the Named Plaintiffs and how it shares that information. *See* Dkt. 877, Ex. 60. Facebook refused. *Id.*, Ex. 32.

99.    Following the appointment of the discovery mediators, Plaintiffs continued to seek information about the data that Facebook maintains on the Named Plaintiffs in an effort to minimize the burden of producing that data. Dkt. 877, Ex. 33 at internal exhibit 15. On October 6, 2021, the discovery mediators declared impasse on the issue of "Production of Named Plaintiffs' data in compliance with" Judge Corley's October 29, 2020 order. The parties then submitted briefing. Dkt. 877, Exs. 34, 61.

100.    On November 29, 2021, the Special Master issued an order finding that "Facebook appears to maintain data related to the Named Plaintiffs that was not produced in response" to Plaintiffs' discovery request and requiring Facebook to provide additional information relating to the data systems that could contain additional data relating to the Named Plaintiffs. Dkt. 779-3.

### c.    Zuckerberg and Sandberg Custodial Files

101.    Shortly after the Court's motion to dismiss order, Plaintiffs sought discovery from Facebook executives Mark Zuckerberg and Sheryl Sandberg. In their initial February 2020 proposal of custodians whose files should be collected, reviewed, and produced, Plaintiffs had included Mark Zuckerberg and Sheryl Sandberg. Ultimately, however, the parties agreed to a set of 72 initial custodians that did not include Zuckerberg or Sandberg, and the Court-ordered addition of nine others did not include them either. Dkts. 431, 436.

102.    By November 2020, Plaintiffs believed that documents produced in discovery gave them sufficient cause to request Zuckerberg and Sandberg as additional document custodians. Plaintiffs raised the issue with Judge Corley, who deemed the request premature. Dkt. 588 at 2.

103.    Plaintiffs renewed their request in a July 22, 2021 mediation session and the Discovery Mediators declared impasse on September 10, 2021. The parties briefed the issue in September and October 2021.

104.    On October 21, 2021, the Special Master granted Plaintiffs' motion to compel and ordered the parties to submit a joint proposed protocol for searching and collecting Zuckerberg's and Sandberg's files. Pursuant to this order, the parties exchanged several emails and met and conferred regarding a protocol. On November 19, 2021, the parties submitted a joint brief outlining their respective proposals.

105.    On January 19, 2022, the Special Master issued a protocol for the search and production of documents from Zuckerberg and Sandberg. Dkt. 815. Facebook moved for partial reconsideration of this protocol.

106.    The Special Master then held a March 11, 2022 hearing on the issue. Ultimately, he required Plaintiffs to prioritize certain search strings and revise others, and required Facebook to perform a "richness" analysis on a statistically significant sample of hits from these search strings. Dkt. 881.

107.    The Special Master later issued several orders requiring Facebook to produce more non-privileged documents from Zuckerberg and Sandberg and asking the parties to propose additional search strings. Facebook moved for reconsideration of one of these orders, which the Special Master modified. *See* Dkt. 920.

108.    As a result of this process, Plaintiffs secured the production of 5,428 documents from Zuckerberg and 11,852 from Sandberg. When the case settled, Plaintiffs were preparing to use many of these documents in the scheduled depositions of Zuckerberg and Sandberg.

### 4. Discovery Served, Responses, and Production

109. Between July 21 and December 15, 2021, Plaintiffs served 27 additional requests for production, seeking documents and information related to topics including: Facebook employees' relevant testimony before legislative bodies; specific, identified tools used to track access by third parties to access information; third party access to APIs and other tools related to videos; and relevant communications with the Board of Directors. Facebook served more than 100 pages of written responses and objections to this discovery. Facebook produced 174,560 documents to Plaintiffs during this period.

110. Between July 21, 2021 and December 15, 2021, Facebook served 21 additional Requests for Production and 18 additional Interrogatories on each of the Named Plaintiffs (resulting in a total of 189 Requests for Production and 162 Interrogatories to which Plaintiffs had to respond). Among other information, Facebook asked for documents and information relating to the Named Plaintiffs' activities on other social media platforms, including the privacy settings of any personal family photographs or videos, and any personal religious or political opinions, similar to those they posted on Facebook. The Named Plaintiffs served more 580 pages of written responses and objections to this discovery. Plaintiffs produced 322 documents to Facebook during this time period.

### F. December 16, 2021 through August 26, 2022: Commencement of Depositions of Facebook's Fact and Corporate Witnesses, Discovery Disputes Continue, and the Parties Reach Agreement in Principle to Settle

111. Class Counsel's primary activities during this period reflected a rapid acceleration of discovery as the case moved towards the fact discovery cutoff.

### 1. Continued Discovery Disputes

112. In January 2022, the Special Master amended the protocol for resolving discovery disputes in order to accelerate the resolution of discovery disputes. Dkt. 821. This protocol required the parties to submit a joint spreadsheet to the Special Master and discovery mediators every week. The spreadsheet identified current outstanding issues, whether impasse was declared, and summarized the parties' positions on each issue. For each issue the discovery

mediators determined to be at impasse, the Special Master would either determine that briefing was unnecessary and issue a tentative ruling or provide the parties with three days to submit briefing—limited to three pages of argument and 100 pages of exhibits—before holding a hearing, at one of the parties' request, within 48 hours and issuing a tentative ruling. Following the Special Master's tentative ruling, the parties were permitted to submit a two-page motion for reconsideration within 48 hours.

113.    The spreadsheet, referred to as the issue tracker or tracker, identified issues the parties believed would benefit from discovery mediation and which were ripe for motion practice. The discovery mediators required the parties to meet and confer twice weekly concerning the issues reflected on the tracker, starting in February 2022 and continuing through at least June 2022, and to submit an updated tracker weekly. Among other information, the tracker included a summary of each side's position.

114.    Beginning in August 2022, because of the backlog of discovery disputes reflected on the tracker, the Special Master allowed the parties to file motions without mediating, as long as the parties had met and conferred in good faith (as is typical in litigation). This change further enhanced the Special Master's ability to efficiently resolve disputes. Dkt. 989. This protocol required the parties to request a hearing, if they wanted one, within 48 hours, at which point the Special Master would issue a tentative ruling; the parties then had 24 hours to submit a motion for reconsideration should they wish to challenge the ruling.

### 2.    Select Discovery Appeals, Motions, and Hearings

#### a.    ADI

115.    Facebook appealed the Special Master's amended ADI order to Judge Corley, who affirmed it. Dkt. 806.

116.    Meanwhile, Special Master Garrie conducted his in camera review of the 6,000 documents and found that a "substantial number" were relevant. He ordered Facebook to produce all ADI communications, later amending the order to make clear that Facebook need not

produce communications from non-custodians or produce or log certain emails involving attorneys. Dkt. 828.

117.    At the February 10, 2022 case management conference, the Court ordered Facebook to complete its ADI production within 21 days. On March 10, 2022, Facebook informed Plaintiffs that it had done so.

118.    During meet and confers in late March and early April 2022, Facebook informed Plaintiffs of previously undisclosed limitations on its ADI production. After two additional orders regarding the rate of production, Facebook continued to produce ADI-related documents through July 2022.

119.    As a result of Plaintiffs' efforts, Facebook produced hundreds of thousands of documents and communications related to its ADI including the scope of user information and data that was accessed by third parties – documents and communications Facebook had successfully shielded from discovery under privilege assertions in other related cases.

### b.    Named Plaintiff Data

120.    On December 29, 2021, Special Master Garrie issued an Amended Order requiring Facebook to provide descriptions of the purpose of each system and the business units that use each system. Dkt. 793 ¶¶ 21-23 (amended order).

121.    Facebook appealed the Special Master's Named Plaintiff data order to Judge Corley, who affirmed it. Dkt. 807.

122.    From January 2022 to March 2022, the Special Master engaged with the Parties in an investigation of the sources of Named Plaintiffs' data. He held multiple hearings with Facebook engineers and requested documentation to develop understanding of the data sources containing Named Plaintiffs' data.

123.    On March 22, 2022, the Special Master issued an order requiring Facebook to submit a proposed protocol for production of Named Plaintiff data, and Plaintiffs to submit a response. Dkt. 982, Ex. O. The parties provided their respective submissions in April 2022. *Id.* at Ex. P.

124.    On May 17, 2022, the Special Master held a hearing with the parties to identify and resolve areas of disagreement with respect to the proposed protocols. Dkt. 982 ¶ 15. Following the hearing, the parties continued to disagree about three issues: "selection of Hive tables for production;[] production of data related to apps installed by friends of Named Plaintiffs; and whether Facebook should search cold storage for Named Plaintiff data in Hive." *Id.* at ¶ 16. The Special Master requested briefing on these three issues and ordered Facebook to provide additional information regarding the Hive tables. *Id.*

125.    On June 6, 2022, the parties entered their submissions in response to the Special Master's request for additional information. *Id.* at ¶ 17. In their brief, Plaintiffs argued for the production of schema for the 137 Hive tables preserved in cold storage for this litigation and the production of snapshots from the Switchboard system relating to the Named Plaintiffs. Dkt. 982, Ex. V.

126.    At the Special Master's request, the parties submitted supplemental briefs regarding the 137 Hive tables and Switchboard snapshots. Dkt. 982, Exs. W, X.

127.    On July 5, 2022, the Special Master issued an order regarding the production of Named Plaintiffs' data. This order required Facebook to produce the following data over a one-month schedule: (1) "user objects and associations to those objects in [Facebook's] TAO system for each Named Plaintiff, along with the TAO schema for such data," and "Named Plaintiffs' 'set permissions' (audience controls on a post);" (2) "Named Plaintiff data from Switchboard system," (3) "the following types of Named Plaintiff data in Hive regardless of whether it appears in the DYI files: off-platform activity, ad interests, ad click data, ad impressions data, and custom audience data," as well as the names, of the tables from which this Hive data will be produced, "how Facebook identified the tables, and the schema for such data'" (4) the schema for "11,051 Hive tables" identified in Facebook's April 11, 2022 submission and the schema for "all 137 preserved Hive tables that contain user identifiers;" (5) "updated privacy settings for each Named Plaintiff;" and (6) "data regarding interactions that friends of the Named Plaintiffs had with businesses/apps using Facebook Login." Dkt. 982 ¶¶ 29-34. In addition, the Special

Master entered a procedure for the identification of Hive tables to be searched for Named Plaintiff data. *Id.* ¶ 35.

128.    Following the Special Master's July 1, 2022 order, Facebook produced key evidence relating to the Named Plaintiffs. This included 106 Switchboard snapshots, spanning over 170,000 pages, which contain detailed information about the Named Plaintiffs.

129.    The information contained in these records included granular detail about the information Facebook uses to track the Named Plaintiff data that it collects. Unlike the previously produced DYI files (which included only of a list of hashed alphanumeric identifiers and dates and times associated with the Named Plaintiffs, the Switchboard Data contained the full alphanumeric identifier for each cookie associated with the Named Plaintiffs' devices, the accounts associated with that cookie, the number of times that cookie was seen, and the data and time it was seen. The Switchboard data positioned Plaintiffs to seek additional information about how Facebook collects data about the Named Plaintiffs and how it uses that information: specifically, about how the cookie identifiers are maintained and what information is associated to them.

130.    In addition, following the Special Master's July 1, 2022 order, the parties each submitted a list of 250 Hive tables to be searched for Named Plaintiff data and Facebook submitted a spreadsheet estimating the amount of data in cold storage for each of the tables that contain such data. Dkt. 1009 ¶ 1. On August 23, 2022, the Special Master issued a scheduling order requiring the parties to meet and confer and to each submit a proposal for searching Hive data in cold storage for data relating to the Named Plaintiffs which the parties provided on August 26, 2022.

131.    In total, Plaintiffs submitted 8 formal and letter briefs to the Special Master concerning Named Plaintiff data during this time period alone, exchanged numerous letters and emails with Facebook and the Special Master, attended four half- and full-day hearings held by the Special Master, and met and conferred with Facebook repeatedly on the issue of the production of Named Plaintiff data. Throughout this process, Plaintiffs engaged extensively with

their technological experts to analyze the systems Facebook uses to maintain data relating to Named Plaintiffs, to make sense of the information Facebook was required to disclose, and to craft proposals for it to provide additional information and produce data.

132.    As a result of Plaintiffs' efforts, Facebook was required to disclose previously non-public information about the way it stores and makes use of user information, produced thousands of pages of additional documents relating to the Named Plaintiffs, and was in the process of producing additional information when the discovery stay issued.

### c.    Cambridge Analytica-Related Documents

133.    After Plaintiffs reviewed Facebook documents referring to certain case studies and reports about Facebook's work with Cambridge Analytica, Plaintiffs asked Facebook to produce these studies and reports. Facebook refused. Plaintiff moved to compel in January 2022 before the Special Master. Facebook opposed and sought fees from Plaintiffs for pursuing what it deemed a frivolous motion. Special Master Garrie ordered Facebook to produce all non-privileged case studies and presentations addressing work by Facebook on behalf of the Trump campaign or any PAC active in the 2016 presidential campaign in which Facebook interacted with Cambridge Analytica or any of its affiliates. Dkt. 832.

134.    Facebook moved for reconsideration of the Special Master's order, which was denied. Dkt. 835. In April 2022, Facebook produced over one hundred documents totaling over one thousand pages related to the case studies.

### d.    "Secret Sauce"

135.    On December 17, 2020, Plaintiffs asked Facebook to produce a document referenced in an antitrust complaint filed against Facebook. Dkt. 827; *see* Complaint, *New York et al. v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C. Dec. 9, 2020) ("Complaint, *New York v. Facebook*"), Dkt. 4. The complaint discussed a 2008 internal document called the Facebook "Secret Sauce" Report that allegedly identified as one of the four pillars of Facebook's success the fact that it was responsive to users' desire for privacy and gave them control over their data.

Complaint, *New York v. Facebook* ¶ 76. Facebook refused to produce it. Dkt. 827. Plaintiffs continued to raise the issue directly with Facebook and in discovery mediation.

136.    On August 18, 2021, the parties discussed with the discovery mediators whether Facebook would produce the Secret Sauce Report. During this session, Facebook agreed to provide the report, which it produced the next month.

137.    Plaintiffs' review of the Secret Sauce Report revealed missing metadata. The report also indicated that it was intended to be updated regularly. On September 25, 2021, Plaintiffs asked Facebook to produce the document electronically, along with any associated metadata, and produce all subsequent versions of the document. Facebook did not respond. On December 23, 2021, Plaintiffs raised the issue with the discovery mediators, who declared impasse.

138.    On January 11, 2022, Plaintiffs moved to compel (i) the reproduction of the Secret Sauce Report with metadata, (ii) the production of all subsequent iterations of the report, and (iii) the production of all related communications.

139.    After briefing, the Special Master granted Plaintiffs' motion to compel on January 31, 2022. Dkt. 827 ¶ 14. The Special Master also required a good faith effort to identify and search additional custodians for relevant, non-privileged documents to be produced reflecting discussions that informed any iteration of the Secret Sauce Report. *Id.* Facebook moved for reconsideration, which the Special Master denied. Dkt. 846.

140.    Facebook ultimately produced 24 documents consisting of iterations of the Secret Sauce Report and communications regarding them. These documents contain information relevant to users' expectations of privacy and Facebook's improper sharing of user information with third parties.

### 3.    Depositions Taken by Plaintiffs

141.    Plaintiffs deposed 34 fact witnesses and conducted depositions of corporate designees over 21 days. The resulting testimony lasted 312 hours and 21 minutes and resulted in 13,251 transcribed pages. Pursuant to the Deposition Protocol, Dkt. 755, the Special Master

attended almost every one of these depositions, missing only a few due to scheduling conflicts
(including, in several instances, that Plaintiffs were taking multiple depositions at the same time).

### a.   Facebook Witnesses

142.    Plaintiffs took the following depositions (the position noted is the deponent's last
known position at Facebook):

| Current and Former Facebook Employees | | |
|---|---|---|
| **Deponent** | **Position** | **Deposition Date(s)** |
| Jackie Chang | Director of Platform Product Partnerships | December 16, 2021 |
| Eugene Zarashaw | Engineering Director | December 22, 2021 |
| Sam Lessin | Vice President of Product Management | January 13, 2022 |
| Jeremy Galen | Product Manager | January 26, 2022 |
| Grace Molnar | Global Developer Policy Operations | February 3, 2022 |
| Steven Elia | Software Engineering Manager | February 16, 2022 |
| Antonio Garcia-Martinez | Product Manager | February 23, 2022 |
| Anne Lewis | Senior Program Manager | March 3, 2022 |
| Shirine Sajjadi | Privacy & Policy Manager | March 4, 2022 |
| Mike Vernal | Vice President of Search, Local, and Developer Products | March 18, 2022 |
| Deborah Liu | Vice President, Facebook App Commerce | March 25, 2022 |
| Matt Trainer | Head of Program Management, Facebook Marketing Partner Program | March 30, 2022 |
| Bill Fusz | Head of Operations Global Developer | April 7, 2022 |
| Aldo King | Privacy Program Manager | April 8, 2022 |
| Luke Conlan | Developer Operations Project Manager | April 21, 2022 |
| Justin Osofsky | Chief Operating Officer, Instagram | April 26, 2022 |
| Douglas Purdy | Director of Product Management | May 24, 2022 |
| Anne-Marie Lentini | Technical Program Manager | June 15, 2022 |
| Yul Kwon | Director of Product Management | June 20, 2022 |
| Vladimir Fedorov | Data Engineer | June 24, 2022 |
| Luke Shepard | Engineering Manager | June 28, 2022 |
| Carl Sjogreen | Director of Product Management | June 30, 2022 |
| Mustafa Khan | Marketing & Operations Specialist | July 13, 2022 |
| Monika Bickert | Head of Global Policy Management | July 13, 2022 July 14, 2022 July 20, 2022 |
| Robert Sherman | Vice President and Deputy Chief Privacy Officer for Policy | July 28, 2022 |
| Eddie O'Neil | Director of Product Management; Head of Platform | August 10, 2022 |

| Current and Former Facebook Employees | | |
|---|---|---|
| **Deponent** | **Position** | **Deposition Date(s)** |
| Konstantinos Papamiltiadis | Vice President | August 12, 2022 |
| Monica (Walsh) Mosseri | Product Partnerships Manager | August 15, 2022 |
| Erin Egan | Vice President of Public Policy; Chief Privacy Officer of Public Policy | August 18, 2022 |
| Steve Satterfield | Director of Privacy and Public Policy | August 19, 2022 |
| Dan Rose | Vice President of Partnerships | August 23, 2022 |
| Ime Archibong | Head of New Product Experimentation | August 24, 2022 |
| Reagan Williams | Director of Business Engineering | August 25, 2022 |
| Allison Hendrix | Public Policy Director on Privacy and Data Policy | August 26, 2022 |

143. To prepare for these depositions, Plaintiffs conducted exhaustive factual review, including analysis of documents produced by Facebook and third parties. Review was often completed on an accelerated timeline because Facebook frequently produced previously withheld documents related to deponents just weeks or days before the depositions due to privilege disputes and other production delays. Some deponents were the authors or recipients of many tens of thousands of documents. Plaintiffs also completed outside factual research related to each deponent. The attorneys who conducted these depositions developed expertise in areas including Facebook policies, engineering and APIs, revenue and financial information, and partnerships, to increase the efficiency of preparing for and conducting the depositions.

144. These depositions yielded important evidence and helped to identify areas where Facebook's discovery responses were incomplete. For example, deponents identified internal tools used to track the identity of third parties that had been whitelisted for certain API capabilities that Facebook had stated publicly would be deprecated, as well as to track third parties that had been provided extra "capabilities" to access bespoke APIs that, in many instances, provided them access to friends' information that Facebook said was no longer accessible.

145. Additional depositions were scheduled for dates shortly after the discovery stay, including the depositions of three current and former Facebook senior executives: Javier Olivan, Sheryl Sandberg, and Mark Zuckerberg.

b.      **Rule 30(b)(6) Testimony**

146.    In addition to fact depositions, Plaintiffs elicited 110 hours of 30(b)(6) testimony over 21 days from thirteen corporate representatives of Facebook and one corporate representative of PwC, the independent assessor of Facebook's privacy program. The position noted is the deponent's last known position:

| Fed. R. Civ. P. 30(b)(6) Depositions | | | |
|---|---|---|---|
| **Designee** | **Position** | **Topic(s)** | **Deposition Date** |
| Konstantinos Papamiltiadis | Vice President, Platform Partnerships | Data Format, Nature, and Location | February 23, 2021 |
| Amy Lee | Product Marketing Director, Facebook for Business & Commerce | Monetization and Valuation of Data | February 24, 2021 |
| Allison Hendrix | Head of Data Policy Management | 1, 2(b), 2(d), 3, 6 [partial] | May 5, 2022 |
| Simon Cross | Head of Product, Cross-Meta Support | 6, 7 | May 9, 2022 |
| Simon Cross | Head of Product, Cross-Meta Support | 6, 7 | May 12, 2022 |
| Mike Clark | Director of Product Management | 4 | May 18, 2022 |
| Amy Lee | Product Marketing Director, Facebook for Business & Commerce | 10 | May 19, 2022 |
| Michael Duffey | Manager, eDiscovery Case Management | ESI Preservation | June 2, 2022 |
| Allison Hendrix | Head of Data Policy Management | 1, 2(b), 2(d), 3, 6 [partial] | June 3, 2022 |
| Simon Cross | Head of Product, Cross-Meta Support | 2(a), 2(c), 6, 7, 8 | June 6, 2022 |
| Simon Cross | Head of Product, Cross-Meta Support | 2(a), 2(c), 6, 7, 8 | June 20, 2022 |
| Simon Cross | Head of Product, Cross-Meta Support | 2(a), 2(c), 6, 7, 8 | June 21, 2022 |
| Mayur Patel | Software Engineer in Data Privacy | 4 | June 30, 2022 |
| Chris Casorio | Manager, Meta Business Group Risk | 2, 4, 5, 8, 9 (Data Brokers) | July 20, 2022 |
| Michael Fahey | Head of Facebook App Data Engineering | 9(a), 9(b) | July 21, 2022 |
| Steven Elia | Software Engineering Manager | 9(d) | July 21, 2022 |

| Fed. R. Civ. P. 30(b)(6) Depositions | | | |
|---|---|---|---|
| **Designee** | **Position** | **Topic(s)** | **Deposition Date** |
| Steven Elia | Software Engineering Manager | 9(d) | July 22, 2022 |
| David Miller | Sr. Director of Product Management | 9(c) | July 22, 2022 |
| Carolyn Holcomb | Privacy Assurance Leader and ESG Partner, PricewaterhouseCoopers | PwC Topics 1, 2, 3. | July 26, 2022 |
| Isabella Leone | Privacy & Policy Manager | 2, 8 (Targeted Advertising) | August 5, 2022 |
| Harrison Fisk | Vice President, Engineering | 5 | August 16, 2022 |
| Amy Lee | Product Marketing Director, Facebook for Business & Commerce | 10 | August 18, 2022 |
| Allison Hendrix | Head of Data Policy Management | 1, 2(b), 2(d), 3, 6 [partial] | August 26, 2022 |

Topics included the types of data and information that Facebook sold, made accessible, or allowed third parties to use to target users; the processes of developing Facebook's Privacy and App Settings and other controls made available to users which Facebook asserted could prevent or limit user data or information from being accessed by third parties; Facebook's processes of pseudonymization, de-identification, re-identification, association, and deletion of user data and information; the process used to identify strategic and other partners whose access to friend and other data would be whitelisted following the implementation of the Facebook Graph API Version 2; Facebook's Privacy Program, and numerous other highly technical issues.

147.   Preparing to depose Facebook's corporate designees required an enormous amount of preparation. Like the fact witnesses, Facebook's corporate designees were not predisposed to volunteer information. Thus, the 30(b)(6) depositions were unusually document-intensive—Plaintiffs' counsel found that until Facebook's witnesses were confronted with documentary evidence, they were generally unwilling to answer questions about relevant topics. Even when shown documents, including documents the witness him or herself authored, witnesses professed a surprising lack of knowledge. Moreover, most of the topics were highly technical, and required mastery of certain APIs, Facebook's byzantine lingo, and the way its

thousands of systems communicated with one another. Preparation went beyond the person taking the deposition, requiring several internal teams and conversations with consulting experts to strategize, review documents, prepare the outline, and research the deponent, all to ensure that Plaintiffs elicited the testimony necessary to support their claims and class certification.

148.    Moreover, the parties engaged in numerous disputes about the proper scope of the 30(b)(6) topics. Facebook repeatedly sent letters just days before a 30(b)(6) deposition was to occur that described issues—issues that Plaintiffs believed to be within the defined topics—that the deponent would not be prepared to address. This resulted in numerous hearings before the Special Master and the need to depose multiple corporate designees on the same 30(b)(6) topics. In addition, Plaintiffs were required by the Special Master to identify to Facebook, in advance, all the documents they intended to use during 30(b)(6) depositions.

149.    The 30(b)(6) depositions involved a great deal of work but yielded important evidence. For example, during a 30(b)(6) deposition of Facebook regarding the preservation of ESI, the designee testified that Facebook had preserved 137 tables in cold storage from its Hive database for this litigation. June 2 30(b)(6) Tr. at 69:13-21. The same designee also testified that Facebook used a previously undisclosed system, "Switchboard," to collect Facebook user data about the Named Plaintiffs not captured by the DYI Tool. June 2 30(b)(6) Tr. at 40:4–5. Facebook's representative testified that the Switchboard snapshots contain, for instance, information about users' privacy settings (*id.* at 56:9-12), relationships between users (*id.* at 64:22–65:4), and information about Named Plaintiffs' involvement in Pages, Groups, and advertising accounts (*id.* at 55:2–5). Plaintiffs also learned critical information about strategic and other partners whose access to friend data was whitelisted, and the reasons for these decisions.

### c.    Third-Party Discovery

150.    Plaintiffs served subpoenas for deposition testimony on three third parties: PwC (Facebook's Privacy Program auditor), Stroz Friedberg, and FTI Consulting.

151.    On December 3, 2021, Plaintiffs served a subpoena for the deposition testimony pursuant to Rule 30(b)(6) of PwC. Plaintiffs met and conferred with counsel for PwC on December 17, 2021, January 21, 2022, and February 11, 2022, about the scope of Plaintiffs' subpoena. Plaintiffs took the 30(b)(6) deposition of PwC on July 26, 2022.

152.    On March 7, 2022, Plaintiffs served a subpoena for the deposition testimony pursuant to Rule 30(b)(6) of Stroz Friedberg, one of the forensic investigators Facebook employed to investigate developers for data misuse. On March 30, 2022, Gibson Dunn served responses and objections to Plaintiffs' deposition subpoena on behalf of Stroz Friedberg. Plaintiffs exchanged correspondence with attorneys from Gibson Dunn regarding these subpoenas. Gibson Dunn attorneys later clarified that Stroz Friedberg was represented by Latham & Watkins LLP. Plaintiffs met and conferred with Latham attorneys who represented Stroz Friedberg about Plaintiffs' subpoena on May 4, 2022, July 8, 2022, and August 4, 2022. Plaintiffs were scheduled to depose Stroz Friedberg on September 16, 2022 and had already substantially completed preparation for this deposition, which had been rescheduled several times, but it was postponed following the Court's order staying discovery. Dkt. 1015.

153.    On March 7, 2022, Plaintiffs served a subpoena for the deposition testimony pursuant to Rule 30(b)(6) of FTI Consulting, another forensic consulting company. On March 30, 2022, Gibson Dunn served responses and objections to Plaintiffs' deposition subpoena on behalf of FTI Consulting. Plaintiffs met and conferred with attorneys from Gibson Dunn regarding Plaintiffs' deposition subpoena to FTI Consulting on May 10, 2022 and June 13, 2022. Plaintiffs and Gibson Dunn attorneys also included Plaintiffs' deposition subpoena on the agenda for their bi-weekly meet and confers from May 2022 to August 2022. Plaintiffs were scheduled to depose FTI Consulting on August 30, 2022 and had largely completed preparation to take this deposition, but it was postponed following the Court's order staying discovery. Dkt. 1015.

### 4.    Depositions of Named Plaintiffs

154.    In November 2021, the parties agreed to schedule two Named Plaintiff depositions in December 2021, with others to follow in January 2022 and thereafter. Plaintiffs

spent many hours scheduling and preparing witnesses on that timeline. Facebook took the depositions of Named Plaintiffs Cheryl Senko and Tyler King on December 10, 2021 and December 20, 2021. The depositions of the Named Plaintiffs resumed in early March 2021 and concluded at the end of April 2021.

155.    Plaintiffs' counsel worked with the Named Plaintiffs and, as authorized by Dkt. 433, their referring counsel to prepare for these depositions, including by attending multiple separate preparatory sessions over videoconference and telephone. During these sessions, Plaintiffs reviewed and discussed documents and discovery responses and discussed possible lines of questioning. Counsel's preparation for these depositions included a re-review of all documents and discovery responses provided by each Named Plaintiff and the development of a specific deposition preparation plan for each Named Plaintiff. Such preparation was critical for Plaintiffs responsible for representing the best interests of millions of potential class members.

156.    On December 6, 2021, Facebook moved the Special Master to order depositions of the former Named Plaintiffs. After briefing, Special Master Garrie denied Facebook's motion and Facebook appealed to Judge Corley, Dkt. 782, who, on January 12, 2022, denied the motion without prejudice to renewal after all current Named Plaintiffs' depositions had been taken. Dkt. 805.

### 5.    Privilege Disputes

157.    Facebook began producing privilege logs in August 2020. Under the parties' protocol, Plaintiffs timely challenged appropriate documents on those logs by individually reviewing documents and information provided on the log and crafting document-specific challenges to each privilege designation, and the parties continued to negotiate Plaintiffs' challenges to the privilege designation of certain documents throughout 2020 and 2021.

158.    Before January 2022, Facebook had logged fewer than 10,000 documents as privileged. On January 28, 2022, Facebook produced an amended categorical privilege log— which used standardized descriptions to indicate the reason for privilege designation—that brought the total number of logged documents to 14,132.

159.    In March 2022, Facebook served another amended categorical privilege log with over 180,000 new entries—an over tenfold increase. After that large increase in the number of purportedly privileged documents, Plaintiffs reached out to Facebook to discuss how to resolve disputes arising from the new log and, after several meet and confers, provided a written proposal for challenges. The parties agreed that Plaintiffs would identify up to nine categories of documents at a time to challenge. Facebook would then review a statistically significant sample of documents in each challenged category before meeting and conferring with Plaintiffs over their challenges.

160.    In April 2022, Plaintiffs spent more than 150 hours evaluating Facebook's categorical privilege log document by document, as the agreed-to process required. Plaintiffs issued their challenges to Facebook and identified the nine categories of documents to prioritize for resolution. Facebook then began identifying and reviewing a statistically significant sample of those documents. After reviewing a sample of over 3,000 documents, Facebook wholly withdrew its assertion privilege over 63% of the sample. In addition, it produced over 300 previously withheld documents with redactions, and withdrew its designation of work product on over a dozen additional documents—effectively de-designating nearly three-quarters of the sampled documents.

161.    After the parties met and conferred about this result, Facebook agreed to re-review all withheld documents from the categorical privilege log. It ultimately produced over fifty thousand previously withheld documents to Plaintiffs and altered the privilege designations for thousands more.

162.    As Facebook began to produce de-designated documents on a rolling basis, the parties also raised this issue with the Court. Case Management Conference Hearing Transcript, 14:18–17:17 (June 9, 2022). The Court ordered Facebook to produce a new privilege log addressing this re-review by June 24, 2022. *Id*. at 19:23–20:5.

163.    Facebook produced a new privilege log addressing this re-review and continued to produce de-designated documents throughout summer 2020. Dkt. 1050-3. The parties continued to negotiate Plaintiffs' challenges to the new privilege log until the stay of discovery.

164.    A privilege log provides limited insight into what the designating party has withheld. Despite the information asymmetry, Plaintiffs' efforts secured over fifty thousand documents that otherwise would never have been produced. These de-designated documents ultimately provided important evidence in support of Plaintiffs' case. For example, previously withheld documents suggested that "apps can store any data they get," another used Cambridge Analytica as an example of the portability of Facebook user data, and a third wondered "how much of a better place" Facebook would be in if a 2015 plan to build a more centralized privacy and data use organization "had been implemented three years ago." *See id.* at 24.

### 6.    Discovery Requests, Motions, and Hearings

165.    Between December 16, 2021 and August 26, 2022, Plaintiffs served 65 interrogatories and 54 requests for admission. The Court entered the stay before Facebook was required to respond to all of this discovery. Facebook produced 698,503 documents to Plaintiffs during this time period.

166.    Between December 16, 2021 and August 26, 2022, Facebook served an additional 71 Interrogatories and from 21 to 23 Requests for Admission on each Named Plaintiff. The Court entered the stay before Plaintiffs were required to respond to this discovery. Plaintiffs produced 1,505 documents to Facebook during this time period.

### 7.    Sanctions

167.    At the February 2022 case management conference, the Court invited Plaintiffs to file a motion for sanctions. Dkt. 847.

168.    Seeking sanctions in this action was a large undertaking. Plaintiffs had to review several years of complex litigation records that had produced a huge collection of filings, correspondence, discovery, and other documents. Plaintiffs conducted a painstaking review and

had lengthy internal discussions to ensure that their decisions regarding the scope of their sanctions motion were as principled, thoughtful, serious, and well-informed as possible.

169.    Due to the sheer size of the litigation, some litigating attorneys had developed specific knowledge about certain aspects of the litigation. The sanctions motion touched on all of those aspects.

170.    In their motion for sanctions, Plaintiffs sought reimbursement of fees and expenses. To support that request, Plaintiffs first gathered and reviewed time entries and expenses. That process was a time-consuming enterprise, given the duration and complexity of the litigation. And because that review was intimately tied to legal decisions about the scope of our sanctions motion, review of time and expenses could not be delegated to non-attorneys.

171.    Replying to Facebook's response to the sanctions motion was also time-consuming, requiring a further search of the record, further legal research, and internal discussion. It also required Plaintiffs to update the Court on what they had learned since the filing of their motion.

172.    Meanwhile, discovery continued—and as it continued, Plaintiffs learned more about what they saw as discovery misconduct. Plaintiffs filed a supplemental brief in support of sanctions in early August 2022. Because the supplemental brief contained so much new material, it required considerable additional work.

173.    In total, Plaintiffs' three briefs related to sanctions comprised 110 pages. In support of those briefs, they filed three detailed declarations by Co-Lead Counsel, to which were attached a total of 142 exhibits.

**G.    August 27, 2022 through December 22, 2022: Confirmatory Discovery and Finalizing the Settlement**

174.    Co-Lead Counsel's primary activities during this period involved contentious negotiations to reduce the settlement in principle to a written settlement agreement, preparing the motion for preliminary settlement approval, and conducting confirmatory discovery to validate Facebook's assertions that it had ceased most of the practices that gave rise to Plaintiffs' claims.

### 1. Settlement Negotiations and Confirmatory Discovery

175. Like the litigation itself, the settlement negotiations were extraordinarily hard fought and difficult. Resolution required the assistance of two mediators, six days of formal mediation spanning 11 months, and dozens of videoconferences and telephone calls with the mediators, and even more between the parties, after the settlement in principle was reached.

176. The parties retained former federal Judge Jay Gandhi to serve as the settlement mediator in June 2021. Plaintiffs provided Judge Gandhi with extensive litigation materials, including mediation statements, summaries of pleadings and key discovery from the litigation, and detailed responses to questions provided by Judge Gandhi. Plaintiffs conducted several telephonic meetings with Judge Gandhi, as well as a joint telephonic meeting with Facebook on September 10, 2021.

177. The parties' first joint mediation session occurred on October 8, 2021. At that session, each side made a presentation to the other, and to Judge Gandhi, summarizing the strengths of their position. Plaintiffs' presentation, delivered by Co-Lead Counsel, reflected a deep dive into the documents already produced, including several produced shortly before in response to Judge Corley's order granting Plaintiffs' motion to compel the production of ADI-related documents, which supported their key claims. More than 10 attorneys worked on the presentation, almost all of whom met in person at Keller Rohrback's Seattle office to finalize their preparation.

178. On November 20, 2021, the parties and Judge Gandhi met via Zoom for an all-day mediation session. Plaintiffs started the mediation with a lengthy presentation discussing the claims and the evidence developed to date. Facebook gave a presentation of its own, which provided a different interpretation of the facts and law. After several additional hours of discussion, the mediation ended without resolution. The parties were much too far apart in their assessments of the litigation to make meaningful progress. Therefore, litigation continued, during which time the parties continued to meet with Judge Gandhi. Plaintiffs provided Judge Gandhi with updates regarding the litigation, including the results of motions practice and discovery.

179.     On April 18, 2022, the parties met in person with Judge Gandhi in San Francisco for a second full day mediation. Despite extensive discussion with the mediator, both separately and jointly, the day once again ended without a resolution. In the ensuing months, Plaintiffs continued to provide Judge Gandhi with discovery orders issued in the case, key pleadings and key evidence obtained by Plaintiffs. The parties also spoke separately with Judge Gandhi on multiple occasions through which settlement demands and offers were exchanged but without any agreement.

180.     On May 27, 2022, Plaintiffs met in person with Judge Gandhi in San Francisco to discuss the status of the case and potential paths for resolution. Over the ensuing several months, the parties spoke with Judge Gandhi on multiple occasions and engaged in shuttle diplomacy, while Plaintiffs pressed forward with the litigation.

181.     On August 17, 2022, Plaintiffs met again with Judge Gandhi and Facebook. Progress was made regarding a potential resolution and after several days, an agreement in principle was reached on the dollar amount of the settlement. Over the ensuing several weeks, the parties negotiated other terms of the agreement, requiring numerous calls and videoconferences, which were often contentious.

182.     On August 26, 2022, the parties were able to execute a term sheet that set forth certain key terms such as the settlement amount, but did not resolve others. As a result, extensive negotiations continued after the term sheet was executed. Despite best efforts, the parties were not able to reach agreement on these open issues. Other disputes arose as the parties sought to finalize the settlement agreement.

183.     After several months of nearly daily negotiations, on October 13, 2022, the parties agreed to ask Judge Corley if she would be willing to mediate the remaining obstacles to agreement. Judge Corley agreed. The parties provided Judge Corley with information regarding the unresolved issues and met with her via Zoom initially on October 17, 2022 and then on three subsequent dates, Nov. 7, 8, and 14, 2022. The parties made significant progress on open issues

LOESER AND WEAVER DECL. IN SUPP.  44  MDL NO. 2843
OF PLS.' MOT. FOR FEES, EXPENSES,    CASE NO. 18-MD-02843-VC
AND SERVICE AWARDS

with Judge Corley, and after more than an additional month of lengthy and intense direct negotiations with each other, a settlement agreement was executed on December 22, 2022.

184.    Following extensive and hard-fought negotiations, the parties finalized key terms and Facebook provided declarations from high-level employees Steven Elia and Elizabeth Dunphy. Dkts. 1094, 1095. Those declarations provided that Facebook had ceased the practices giving rise to Plaintiffs' claims, including regarding friend sharing and many video-related permissions, and had meaningfully improved its efforts to limit the number of third-party apps with access to Facebook users' sensitive data and more effectively monitor those apps' use of Facebook user data.

### 2.    Sanctions Hearing and Supplemental Briefs

185.    The Court held a hearing on Plaintiffs' sanctions motion on September 15, 2022. Nearly all the attorneys working on this case were involved in the preparation for this hearing.

186.    During the hearing, the Court asked two additional questions about how the sanctions would be allocated and whether that allocation might affect the compensatory nature of the sanctions. To answer the questions properly, Plaintiffs held internal discussions, conducted extensive legal research, and filed a letter brief. Dkt. 1061.

187.    Then, in November 2022, the Court asked Plaintiffs "to submit billing records for the attorney's fees incurred as a result of the alleged misconduct associated with the App Developer Investigation and the named plaintiff data," and invited a supplemental brief in support of the fees. Dkt. 1073. Plaintiffs filed a detailed declaration and supplemental brief, and submitted billing records in camera. Dkts. 1079, 1080..

188.    On February 9, 2023, the Court issued an order sanctioning Facebook and Gibson Dunn. Dkt. 1104. Any order awarding fees and expenses should deduct the total amounts that have already been paid by Facebook and its counsel pursuant to the sanctions order. Dkt. 1104 at 52. Specifically, the fee award should be reduced by $800,217.38, and the reimbursement of expenses should be reduced by $124,861.13. *Id.*

**H.     December 23, 2022 through May 31, 2023: Settlement Administration and Communications with Class Members**

189.     As part of the Court's March 29, 2023, Preliminary Approval Order, the Court appointed Angeion Group ("Angeion" or the "Settlement Administrator") to provide notice to Class Members, process claims, and otherwise administer the Settlement. Angeion, in coordination with Class Counsel and Facebook, subsequently began the process of providing notice to the Class through in-app notification as well as a robust media campaign consisting of print publication, social media notice, programmatic display advertising and search engine marketing, among other forms of media notice.

190.     Over the last several months, Class Counsel has had near daily contact with Angeion and Meta's counsel to ensure that the notice program ran smoothly and on schedule, and met the requirements of the Court's Preliminary Approval Order. Class Counsel's monitoring of the administration process including attending weekly (or more frequent) video conferences to receive status updates and discuss any issues that arose with regard to administering the notice and claims programs and reviewing weekly reporting prepared by Angeion. Class Counsel also worked with Angeion and Facebook to verify that the in-app notice program was implemented as planned.

191.     According to its counsel, Facebook, in coordination with Class Counsel and Angeion, facilitated in-app notification over three phases—starting with 1.8 million notices per day for 4 days, then increasing to 20.8 million notices per day for 12 days and culminating with 50 million notices per day for 5 days. In total, 685 million in-app notifications were provided to Class Members who are current Facebook users between April 12, 2023 and May 11, 2023.

192.     Class Counsel also engaged with Class Members and refined the settlement website and claim form to ensure that Class Members were able to easily access information regarding the Settlement, select their preferred method of payment, and ensure they could submit claims which allowed them to fully reflect their time as Facebook users during the Class Period.

Class Counsel recently updated the Court regarding the most substantive amendments to the website and claim form. *See* Dkts. 1134, 1136.

193.    Class Counsel has also been closely monitoring the filing of claims. During several weeks of the notice program, Class Members were filing in excess of 600,000 claims per day, with a peak during the week of April 22, 2023 of 889,000 claims per day. As of June 20, 2023, Class Members have filed 15,009,329 claims, although these claims have not yet been validated and assessed for duplicates. Class Counsel are also promptly responding to Class Member inquiries regarding the Settlement on a daily basis. As of June 20, 2023, Class Counsel have addressed more than 1,800 inquiries from Class Members. This is in addition to the calls, emails, and other correspondence the Settlement Administrator has received directly. Class Counsel expects it will spend substantial time working through the claim deadline, August 25, 2023, and beyond.

## I.    Throughout, Class Counsel Litigated the Case Efficiently

194.    Class Counsel made numerous decisions that enabled them to litigate this complex case with unusual efficiency.

195.    First, a core group of just 11 partners and associates, including us, led the litigation. As a result, each of these individuals developed institutional knowledge of the ins and outs of the complex proceedings and intimate knowledge of relevant terms, technology, and evidence. This saved the time and effort of continuously needing to educate team members on aspects of this sometimes sprawling case with which they were not familiar.

196.    Second, Class Counsel ensured that these core individuals met frequently. These meetings increased efficiency by ensuring that this litigation was consistently pursued with shared goals. These meetings saved time by preventing tangential efforts before they started. Instead, Class Counsel stayed focused on the steps required to keep the litigation effort moving forward in a unified directly.

197.    Third, Class Counsel made specific staffing decisions to further promote efficiency, including:

- Use of technology: Class Counsel used predictive coding, based on their linear review of early document productions, that helped rank unreviewed documents based on their likely relevance. Then, the documents were batched out for review with those likeliest to be relevant collected in the earliest batches. In this way, "hot" documents were likely to be quickly surfaced, coded, and circulated to the litigating attorneys.

- Document analysis: Class Counsel developed a comprehensive coding protocol that enabled the large number of staff attorneys and document review analysts required to review the documents in this case to do so based on a defined set of parameters. These protocols evolved over time, as Class Counsel's understanding of the documents grew.

- Designated lead authors: Class Counsel designated specific individuals to lead all efforts to communicate about particular issues in briefs, letters, and other communications with the Court, Judge Corley, the Special Master, the discovery mediators, and opposing counsel. This effort enabled substantial efficiencies based on subject-matter expertise and the parties' positions gained throughout the litigation.

- Depositions: To increase the efficiency of preparing for and conducting depositions, the taking attorneys, and the staff attorneys and document reviewers supporting them, developed expertise in key subject-matter areas including Facebook policies, engineering and APIs, revenue and financial information, and partnerships.

## III.   BENEFITS OBTAINED FOR THE CLASS

### A.   An Unprecedented Monetary Recovery

198.   Under the proposed Settlement, Facebook will pay $725 million into a non-reversionary fund for class benefits, notice and administration costs, attorneys' fees and expenses in the amount determined by the Court, and any service awards for the Settlement Class Representatives approved by the Court.

199.   To our knowledge, the proposed Settlement of $725 million is the largest amount recovered in any private U.S. data privacy or data breach class action. It is also the largest amount Facebook has ever paid to resolve a private class action.

Loeser and Weaver Decl. in Supp.
of Pls.' Mot. for Fees, Expenses,
and Service Awards                          48                          MDL No. 2843
                                                                     Case No. 18-md-02843-VC

B.     **Practices Suspended or Improved During the Litigation**

200.     As set forth in detail in our declaration in support of preliminary approval, Dkt. 1096-1, and in the Elia and Dunphy Declarations, Dkts. 1094 and 1095, Facebook has suspended practices at the heart of this litigation, including whitelisting third parties' access to data and friend sharing, implemented improved privacy controls, meaningfully enhanced monitoring of third party apps' data use, and significantly expanded disclosures and controls regarding third party targeted advertisements. Dkt. 1096-1 ¶¶ 114-150. The changes are critically important and a substantial benefit to Facebook users. While many factors prompted Facebook to make these changes, including FTC oversight and activity, it is nonetheless the case that this litigation was ongoing during the time that many of the changes were implemented.

C.     **Public Disclosure**

201.     In addition to the monetary relief provided by the Settlement, this litigation has benefitted Class Members in other ways. In addition to making the business-practice changes set forth above, this litigation has also resulted in some of the only—if not *the* only—independent insight into and public disclosure of the conduct that resulted in the Cambridge Analytica scandal. Through Co-Lead Counsel's efforts, Facebook was forced to produce a massive volume of documents and communications related to the ADI, including many meaningful and highly relevant discovery that no other plaintiff or governmental entity was able to obtain in related litigation. That discovery included internal Facebook communications and memoranda concerning individual apps and developers prepared by Facebook's consultants FTI Consulting and Stroz Friedberg. In addition, the litigation secured unprecedented discovery on the information that Facebook collects and maintains about its users, including the revelation of the Switchboard files.

202.     Discovery from this action has enabled others to ensure Facebook is complying with its obligations to users worldwide. For example, the Irish Council for Civil Liberties, a non-profit human rights organization, told the European Commission that the "materials unsealed in th[is] case are revelatory." In fact, the organization "examined thousands of pages of

documentation and depositions of Meta engineers" from this litigation and used them to urge that the Commission act to ensure Facebook's compliance with the EU Digital Markets Act and General Data Protection Regulation.[6]

203.    The public disclosure of a previously non-public document in this litigation has also led to a Congressional inquiry regarding developers in "high-risk jurisdictions," including China, Russia, Iran, and North Korea. Specifically, Senate Select Committee on Intelligence Chairman Mark Warner and Vice Chairman Marco Rubio cited a document unsealed at Dkt. 1100-6 in a letter to Facebook noting that they were "startled to learn," due to discovery in this case, "that Facebook had concluded that a much wider range of foreign-based developers, in addition to [Chinese]-based device-makers, also had access to" Facebook users' data that could be used for espionage.[7]

## IV.    ANTICIPATED POST-APPROVAL WORK

204.    Class Counsel's obligation to serve the Class will not end when and if the Court finally approves the proposed Settlement. The Settlement must be administered, implemented, defended, and enforced until its benefits have been delivered to all eligible Class Members.

205.    Based on their previous experience in class actions, Class Counsel anticipate expending approximately 10,000 additional hours on post-approval work. These hours are a deliberately conservative estimate of the time that Class Counsel will spend furthering and protecting the Class's interests after final approval, should final approval be given.

---

[6] Letter from Dr. Johnny Ryan to Margrethe Vestager, Executive Vice President, European Commission (Nov. 17, 2022), *available at* https://www.iccl.ie/wp-content/uploads/2022/11/ICCL-to-Commission-17-November-2022.pdf.

[7] Letter from Senators Mark R. Warner & Marco Rubio to Mark Zuckerberg, CEO, Meta Platforms, Inc. (Feb. 6, 2023), *available at* https://www.warner.senate.gov/public/index.cfm/2023/2/warner-rubio-question-meta-on-internal-documents-revealing-developers-in-china-russia-other-nations-had-access-to-user-data [https://perma.cc/E96F-2YV8].

206. Based on Class Counsel's blended rate, $604, an additional 10,000 hours would add $6,040,000 to the lodestar.[8] If included, the total lodestar would be $97,274,005.50, yielding a multiplier of 1.86.

207. Class Counsel's post-approval work will include guiding Class Members through the settlement administration and allocation process, defending the Settlement against challenges to it, and working with the Settlement Administrator and Defendant to ensure the Settlement terms are carried out and to address any Class Members' concerns and communications.

208. The number of Class Members—and the number of claims filed—suggests that Class Counsel will be required to spend a significant amount of time supervising the administration of the settlement, straightening out any unanticipated issues that may arise, and communicating with Class Members.

209. Class Counsel's estimate of post-approval time reasonably assumes that if this Court approves the proposed Settlement and awards fees and expenses, its approval or award (or both) will be appealed. These appeals can require a great deal of work. That was the case, for example, when multiple objectors appealed the class certification, settlement approval, and fee award in *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC, which Co-Lead Counsel Loeser's firm then successfully defended.

## V.    ADDITIONAL RATE INFORMATION

### A.    Bleichmar Fonti & Auld LLP

210. This section of the declaration is submitted by Lesley E. Weaver.

211. Bleichmar Fonti & Auld LLP has over 25 attorneys based out of offices in five cities. It has recovered more than $17 billion for investors and consumers since the firm was formed in 2014. Its achievements have been profiled in publications including the Wall Street Journal and the New York Times.

---

[8] The blended rate is calculated by dividing Class Counsel's total lodestar by their total hours.

212.     Bleichmar Fonti & Auld attorneys have, in recent years, been selected for leadership roles in numerous high-profile cases, including groundbreaking data privacy cases in addition to this one, including *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-02155 (N.D. Cal.), a nationwide class action alleging that's Google's digital ad auction system violates the company's contractual promise not to share or sell its account holders' personal information; consumer class actions including *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability*, No. 17-md-02777 (N.D. Cal.), multidistrict litigation concerning Fiat Chrysler Automobiles' alleged cheating on emissions testing of Dodge and Jeep trucks marketed as environmentally friendly; and numerous securities fraud cases, including *The Police Retirement System of St. Louis v. Granite Construction Inc.*, No. 19-cv-04744 (N.D. Cal.), *In re Teva Securities Litigation*, No. 17-cv-00558 (D. Conn.), and *Owen v. Elastos Foundation*, No. 19-cv-5462 (S.D.N.Y.).

213.     Bleichmar Fonti & Auld's hourly rates are reviewed and adjusted annually. Based on our regular monitoring of prevailing market rates charged by attorneys of comparable skill, experience, and qualifications in the San Francisco Bay Area and other major metropolitan areas, we adjust our rates so that they are in line with those charged by counsel performing similar national class action work. Our rates are substantially lower than a number of firms and consistent with many others.

214.     Fee awards supported by Bleichmar Fonti & Auld's then-current hourly rates and corresponding lodestar have been approved in numerous class action settlements: *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices & Products Liability*, No. 17-md-02777 (N.D. Cal.), ECF No. 561 (May 3, 2019); five separate settlements in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litig.*, MDL No. 2672 (N.D. Cal.)— Audi C02 Cases, MDL 2672, Docket No. 7244 (Mar. 2, 2020); 3.0-liter TDI Settlement, 2017 WL 3175924 (July 21, 2017); Bosch Settlement, 2017 WL 2178787 (May 17, 2017); 2.0-liter TDI Settlement, 2017 WL 1047834 (Mar. 17, 2017), and Porsche Gasoline Settlement, Docket No. 8088 (Nov. 9, 2022); *The Police Retirement System of St. Louis v. Granite Construction Inc.*,

No. 19-cv-04744 (N.D. Cal.), ECF No.303 (Mar. 17, 2022), *In re Teva Securities Litig.*, No. 17-cv-00558 (D. Conn.), ECF No. 963 (June 2, 2022), *In re Farm-Raised Salmon and Salmon Prods Litig.*, No. 1:19-cv-21551 (S.D. Fla.), ECF No. 543 (Oct. 12, 2022), and *In re Disposable Contact Lens Antitrust Litig.*, No. 3:15-MD-02626 (M.D. Fla.), ECF No. 1363 (Oct. 12, 2022).

215.   The Bleichmar Fonti & Auld attorneys and legal professionals for whose work compensation is sought are set forth in Ex. A*; see* Ex. B (Bleichmar Fonti & Auld's firm resume and attorney biographies).

**B.     Keller Rohrback L.L.P.**

216.   This section of the declaration is submitted by Derek W. Loeser.

217.   Keller Rohrback L.L.P. has over 60 attorneys in seven cities, and its Complex Litigation practice group has spent more than 35 years fighting corporate abuse and pursuing litigation on behalf of consumers, whistleblowers, government entities, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States. The firm prides itself on serving the public interest by taking on cases that make a tangible difference in our communities. To date, Keller Rohrback has recovered over $75 billion for the individual, institutional and governmental plaintiffs the firm represents.

218.   Keller Rohrback attorneys have, in recent years, been appointed to leadership roles in numerous high-profile cases, including *In re National Opiate Litigation,* MDL 2804, an important MDL seeking to hold opioid manufacturers and distributors accountable for devastating communities across the country; *In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation,* MDL 2913 (N.D. Cal.), another case with important public health implications relating to the marketing of Juul e-cigarette products; *Jabbari v. Wells Fargo,* No. 15-02159 (N.D. Cal.), the Wells Fargo unauthorized account consumer class action; *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litigation,* MDL No. 2785 (D. Kan.), the MDL concerning EpiPen price-gouging allegations; *In Re: Blackbaud, Inc., Customer Data Breach Litigation,* MDL 2972 (D.S.C.), the MDL regarding Blackbaud's

massive data breach; and *In re: T-Mobile Customer Data Security Breach Litigation,* MDL 3019 (W.D. Mo.), the MDL regarding T-Mobile's massive data breach.

219.     Keller Rohrback's hourly rates are reviewed and adjusted annually. Based on our regular monitoring of prevailing market rates charged by attorneys of comparable skill, experience, and qualifications in Seattle and other major metropolitan areas, we adjust our rates so that they are in line with those charged by counsel performing similar national class action work. Our rates are substantially lower than a number of firms, but consistent with many others.

220.     Fee awards supported by Keller Rohrback's then-current hourly rates and corresponding lodestar have been approved in numerous class action settlements. Recent examples include *In Re: Volkswagen Clean Diesel Marketing, Sales Practices, and Prod. Liability Litig.* No. 15-md-02672 (N.D. Cal), No. 15-md-02672-CRB, Dkt. 8088 (N.D. Cal. Nov. 9, 2022); *Rollins v. Dignity Health*, No. 13-cv-01450-JST, Dkt. 115 (N.D. Cal. July 15, 2022); *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, MDL No. 2785, Dkt. 2622 (D. Kan. July 11, 2022); *Southern Cal. Gas Leak Cases*, Coord. Proc. No. 4861 (Cal. Super. Ct. Apr. 29, 2022); *Fox et al. v. Iowa Health System*, Case No. 3:18-cv-00327, Dkt. 115 (W.D. Wis. Mar. 4, 2021); and *In re Chrysler-Dodge-Jeep "EcoDiesel" Marketing, Sales, Practices, and Products Liability Litig.*, MDL No. 2777, Dkt. 561 (N.D. Cal. May 3, 2019).

221.     The Keller Rohrback attorneys and legal professionals for whose work compensation is sought are set forth in Ex. A; *see* Ex. C (Keller Rohrback L.L.P.'s firm resume & attorney biographies).

## VI.     CLASS COUNSEL'S EXPENSES

222.     Class Counsel also respectfully requests $4,101,608.09 in litigation expenses incurred to date in connection with the prosecution of this case. Counsel incurred these expenses with full knowledge that they might never be reimbursed, and that any potentiality of reimbursement was unlikely to occur for many years.

223.    Below is a summary of these expenses, identified by the category of expense and the amount incurred in each category.

| Category | Total |
|---|---|
| Federal Express / Local Courier | 3,451.70 |
| Postage Charges | 3,301.76 |
| Long Distance | 584.07 |
| In-House Photocopying | 31,857.95 |
| Outside Photocopying | 19,957.04 |
| Hotels | 24,418.84 |
| Meals | 14,655.27 |
| Air Travel | 35,104.52 |
| Deposition Costs | 425,277.64 |
| Lexis/Westlaw | 103,711.25 |
| Court Fees | 15,792.00 |
| Witness/Expert Fees | 400,057.12 |
| Investigation Fees / Service Fees | 1,375,618.44 |
| Transcripts | 14,201.91 |
| Ground Transportation | 11,285.38 |
| Other | 1,623,333.20 |
| **TOTAL** | **$ 4,101,608.09** |

224.    The vast majority of expenses submitted for reimbursement (99.74%) were incurred by Class Counsel, are based on information maintained contemporarily in the ordinary course by Class Counsel and supported by invoices or other appropriate documentation.  Class Counsel have reviewed these expenses, believe them to be an accurate record of the expenses

incurred by Class Counsel in this matter and have concluded that they are fair, reasonable and necessary for the efficient and effective prosecution of this litigation.

225.    Co-Lead Counsel also attest that the expenses set forth here comply with Co-Lead Counsel's respective firm policies governing reimbursement as well as the Common Benefit Order, Dkts. 121, 433.  To the extent any expenses did not comply with Co-Lead Counsel's respective firm policies or the Common Benefit Order, those expenses (or portion of expenses) were excluded from the expenses set forth above.

226.    Those minimal expenses reflected here that were incurred by Bankruptcy and Participating Counsel (0.26%) were collected by Co-Lead Counsel who ensured that the expenses were for the common benefit of Plaintiffs, timely submitted, and reasonable as required by the Common Benefit Orders, Dkts. 121, 433. As explained further below, Co-Lead Counsel reimbursed bankruptcy counsel, Lowenstein Sandler, for its expenses.

227.    Of the expenses set forth above, the vast majority, approximately 95%, consist of the following eight expenses:

- The largest amount, $1,553,322.24 (or 37.8% of the total expenses) was expended on JAMS for services provided by the discovery mediators and settlement mediator, as well as by the Special Master. Class Counsel split these costs with Defendant. This expense is reflected in the "Other" category;

- The second largest amount, $1,198,562.00 (or 29.2% of the total expenses) was expended on Relativity database licenses and services related to the hosting of over 2 million documents obtained and analyzed in this case. This expense is reflected in the "Investigation Fees/Service Fees" category;

- The third largest amount, $425,277.64 (or 10.4% of the total expenses) was expended on Veritext for deposition related services including hosting remote depositions as well as stenographer services.  This expense is reflected in the "Deposition Costs" category;

- The fourth largest amount, $400,057.12 (or 9.75% of the total expenses) was expended on consultants who provided expert advice to Class Counsel on damages, data analysis and other key aspects of establishing support for Plaintiffs' claims.  This expense is reflected in "Witness/Expert Fees" category;[9]

- The fifth largest amount, $103,711.25 (or 2.5% of the total expenses) was expended on online legal research. This is reflected in the "Lexis/Westlaw" category;

- The sixth largest amount, $84,100.20 (or 2.0% of the total expenses) was expended on Gryphon Strategies who provided research services in support of Plaintiffs' claims. This is reflected in the "Investigation Fees/Services Fees" category;

- The seventh largest amount, $60,683.97 (or 1.48%) was expended on retention of bankruptcy counsel, Lowenstein Sandler, including a $50,000 retainer and reimbursement of expenses related to the litigation, $10,683.97—both are reflected in the "Other" category above. The $10,683.97 is comprised of the following types of expenses: $67.60 in postage; $412.65 in long distance charges; $200.00 in court fees; $297.84 in in-house photocopying; $93.00 in meals; $5,529.38 in online legal research charges; $3,527.14 in transcripts; $531.36 in ground transportation; and $25.00 in miscellaneous charges; and

- The eighth largest expense is comprised of the remaining expenditures in the Investigation Fees/Service Fees category which are comprised of: $57,669.84 (or 1.4% of the total expenses) on case-related software, $24,134.96 (or 0.59% of the total expenses) in potential client outreach costs, $8,456.47 (or 0.21% of the total

---

[9] Class Counsel also retained several experts who provided opinions with regard to Class Counsel's fee request, Professor William B. Rubenstein, Professor Brian T. Fitzpatrick and Jill Dessalines.  These expenses have been paid by Co-Lead Counsel and are not being submitted for reimbursement.

expenses) toward process servers, $1,449.38 (or 0.04% in total expenses) paid to discovery-related vendors, and $1,245.59 (or 0.03% in total expenses) in other internet-based research expenses.

228.     The remaining expenses collectively comprise approximately 4% of the total expenses incurred to date. These include:

- Air travel ($35,104.52), Hotels ($24,418.84), Meals ($14,655.27) – these expenses were fairly limited due to the pandemic;

- Ground transportation such as taxis and other car ride services ($11,285.38);

- In-house photocopying ($31,857.95);

- Outside vendor photocopying ($19,957.04);

- Court fees ($15,792.00);

- Transcripts ($14,201.91);

- Various miscellaneous charges in the "Other" category ($8,326.99)—these expenses include out-of-office computer usage charges, various electronic storage devices to aid in the collection or production of documents, research materials and press releases;

- FedEx and other courier charges ($3,451.70);

- Postage charges ($3,301.76); and

- Long distance charges ($584.07).

## VII.   OTHER FIRMS' WORK ON THE CASE

229.     In addition to Class Counsel, five other firms have billed time pursuant to the Court's approval.

| Firm | Hours | Lodestar |
|---|---|---|
| Lowenstein Sandler LLP | 701.8 | $678,494.50 |
| Cohen Milstein Sellers & Toll PLLC | 20.25 | $12,142.50 |
| Motley Rice LLC | 13.80 | $9,510.00 |
| Gustafson Gluek PLLC | 7.00 | $6,392.50 |
| Schonbrun Seplow Harris Hoffman & Zeldez, LLP | 6.40 | $4,522.00 |

230.     Co-Lead Counsel retained Lowenstein Sandler LLP to represent Plaintiffs in the Cambridge Analytica and SCL USA Inc. bankruptcy cases, *see* Dkt. 119, including litigating a motion seeking relief from the automatic stay and seeking and obtaining discovery concerning the debtors. *See* Ex. D (Declaration of Michael S. Etkin).

231.     Cohen Milstein Sellers & Toll PLLC, Gustafson Glueck PLLC, Motley Rice LLC, and Schonbrun Seplow Harris Hoffman & Zeldez, LLP engaged in common benefit work pursuant to Dkts. 121 and 433. Because these firms each had clients among the class representatives in this action, the firms were instrumental in communicating with their clients and ensuring that they met their obligations under the discovery rules and as class representatives.

232.     In total, these five firms have billed 749.25 hours and generated a lodestar of $711,061.50 for work undertaken pursuant to the Court's orders cited above, a *de minimis* amount compared to Co-Lead Counsel. Specifically, these five firms' combined time is 0.5% of the total hours and 0.78% of the total lodestar.

## VIII.   OTHER EXHIBITS

233.     Attached hereto as **Exhibit A** is a true and correct copy of the list of each biller whose time is counted as part of Class Counsel's hours and lodestar in this case, along with the biller's experience level and billing rate.

234.     Attached hereto as **Exhibit B** is a true and correct copy of Bleichmar Fonti & Auld LLP's firm resume and attorney biographies.

235.     Attached hereto as **Exhibit C** is a true and correct copy of Keller Rohrback L.L.P.'s firm resume and attorney biographies.

236.     Attached hereto as **Exhibit D** is a true and correct copy of the Declaration of Michael S. Etkin in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards, dated June 18, 2023.

237.     Attached hereto as **Exhibit E** is a true and correct copy of the Declaration of Jill Dessalines in Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Expenses, and Service Awards, dated June 19, 2023.

238.     Attached hereto as **Exhibit F** is a true and correct copy of the Declaration of William B. Rubenstein in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards, dated June 20, 2023.

239.     Attached hereto as **Exhibit G** is a true and correct copy of the Declaration of Brian T. Fitzpatrick in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards, dated June 20, 2023.

240.     Attached hereto as **Exhibit H** is a true and correct copy of the Order Granting Facebook, Inc.'s Motion for Summary Judgment in *District of Columbia v. Facebook, Inc.*, Civ. No. 2018-CA-008715-B, (D.C. Super. Ct.), dated June 1, 2023.


We declare under penalty of perjury that the foregoing is true and correct and to the best of our knowledge.

Dated June 21, 2023

By: _____
　　Derek W. Loeser

By: _____
　　Lesley E. Weaver