Kendrick Jan, CA SBN 105149
Kendrick Jan, APC
225 Broadway, Suite 2220
San Diego, CA 92101
Telephone:  (619) 607-9750
kj@jan-law.com

John J. Pentz, Esq., MA Bar No. 561907
18 Damon Street,
Wayland, MA 01778
Telephone: (978) 261-5725
jjpentz3@gmail.com
(*pro hac vice* forthcoming)

Counsel for Objectors Sarah Feldman and Jill Mahaney

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 |
| | Case No. 18-md-2834-VC |
| | CLASS ACTION |
| This Document Relates to: | OBJECTION OF CLASS MEMBERS SARAH FELDMAN AND JILL MAHANEY TO PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND MOTION FOR ATTORNEYS' FEES |
| ALL ACTIONS | |
| | Judge:  Hon. Vince Chabria |
| | Courtroom: 4, 17th Fl. |
| | Hearing date:  September 7, 2023 |
| | Hearing time:  1:00 p.m. |

# OBJECTION

In the captioned matter, Class members Sarah Feldman and Jill Mahaney hereby object to final approval of the proposed settlement and PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS, as follows:

## I.      INTRODUCTION AND OBJECTION PREREQUISITES

### A.      Objectors' Class membership/standing

Objector Sarah Feldman meets the definition of membership in and is a member of the Class in the captioned matter. *See* Dkt. No. 1130, p. 2.  She has submitted a claim in the proposed settlement and has been assigned Correlation ID 3b642fd5-3ab0-4eea-b438-0b0ab9b62eb6.  As a Class member, Sarah has standing to object to Plaintiffs' Motion for Final Settlement Approval and Plaintiffs' Motion for Attorneys' Fees.

Objector Jill Mahaney meets the definition of membership in and is a member of the Class in the captioned matter. *See* Dkt. No. 1130, p. 2.  She has submitted a claim in the proposed settlement and has been assigned Correlation ID 9964f46b-7db1-41ff-9924-58a319a3500a.  As a Class member, Jill has standing to object to Plaintiffs' Motion for Final Settlement Approval and Plaintiffs' Motion for Attorneys' Fees.

The objections of Class members Feldman and Mahaney stated in section II.A and II.C., below, apply to the entire class, and the objection stated in section II.B., below, relates to Class members who have used Facebook since prior to 2010.  *See* FRCP Rule 23(e)(5)(A).

### B.      Objectors' personal information

Sarah Feldman:  Sarah Feldman's current address is 812 Haight Avenue, Alameda, CA 94501.  The email address and telephone number associated with the Sarah Facebook account are:  sarahlfeldman@yahoo.com and current phone number (513) 256-5230.  Sarah has been a Facebook user since 2009.  Sarah's believes her Facebook account URL to be: Facebook.com/sarah.feldman104.   Represented by counsel John J. Pentz, Sarah has previously made objections in the following cases:  *In re: Facebook Internet Tracking Litigation*, Case No. 5:12-MD-2314-EJD (currently on appeal to the Ninth Circuit as Case No. 22-16903); and *In re: Apple Inc. Device Performance Litigation*, Case No. 5:18-md-02827-EJD (9th Cir. Case No. 21-15758) (reversed).  Sarah has not "sold or otherwise transferred the right to their recovery in this Action to another person or entity."

Jill Mahaney:  5466 Carlsbad Boulevard, Carlsbad, CA 92008.  The email address and telephone number associated with the Jill Mahaney's Facebook account are: jnmahaney@gmail.com and current phone number is (209) 404-3102; her current email and phone number are the same.  Jill has been a Facebook user since 2007.  Jill believes her Facebook account URL to be: Facebook.com/Jill.Mahaney.  Jill has never before made an objection to a class action settlement and she has not "sold or otherwise transferred the right to their recovery in this Action to another person or entity."

Objectors should be contacted through their legal counsel, see below.

### C.      Identification of Objectors' counsel

Objectors are represented by attorneys Kendrick Jan and John Pentz.  Attorney Jan is licensed to practice law in the State of California and is a member of the bar of the United States District Court, Northern District of California; his contact information is:  Kendrick

Jan, Attorney, Kendrick Jan, APC, 225 Broadway, Suite 2220, San Diego, California 92101; telephone: 619.231.7702.  Attorney Pentz is licensed to practice law in the State of Massachusetts and the Ninth Circuit, and will seek admission to the United States District Court, Northern District of California, *pro hac vice* in the captioned matter; his contact information is: John Pentz, Attorney, 18 Damon Street, Wayland, Massachusetts, 01778; telephone: 978.261.5725.  (Note:  This objection is prepared and submitted with assistance of counsel.)

> **D.      Notice of intent to appear at Fairness Hearing**

Objectors Feldman and Mahaney intend to appear through counsel at the September 7, 2023 final approval hearing ("Fairness Hearing") to provide perspective and argument in support of this objection.

> **E.      Objectors do not intend to call witnesses**

Objectors Feldman and Mahaney do not intend to call witnesses at the September 7, 2023 Fairness Hearing.

## II.      OBJECTIONS AND ARGUMENT

Objectors Feldman and Mahaney object to Plaintiffs' Motion for Final Settlement Approval and Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards, as follows:

> **A.      The proposed $725 million settlement represents an unjustifiable 99.9% discount of available statutory damages, and is neither fair, reasonable nor adequate**

The Video Privacy Protection Act of 1988 ("VPPA"), at 18 U.S. Code § 2710, provides mandatory minimum statutory damages of $2,500 per aggrieved individual,

which in this case establishes calculable minimum damages of $625 billion.    A $725 million settlement – or three dollars ($3) per Class member – in a case which has a potential value of $625 billion is woefully inadequate to satisfy the requirements of Rule 23(e)(2). In *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1123 (9th Cir. 2022), the Ninth Circuit declined to extend to statutory damages the *State Farm* limit on punitive damage multipliers.  Therefore, there is no legal basis for arguing that Plaintiffs are limited to ten times their actual damages.[1]

When asked to approve a proposed settlement, the district court must balance the value of the claims being surrendered against what is being offered in exchange; otherwise, the court's approval is uninformed and arbitrary, and meaningful findings of fairness, reasonableness and adequacy cannot be made.  The Northern District has promulgated guidelines to assist in this evaluation.  The District's *Procedural Guidance for Class Action Settlements* requires that Class Counsel provide the court with "the class recovery under the settlement (including details about and the value of injunctive relief), the potential class recovery if plaintiffs had fully prevailed on each of their claims, claim by claim, and a justification of the discount."  This requirement is a prescribed means of addressing the first, second, and fourth factors set forth in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1997) – strength of case, risk, and the amount of settlement – in a way that permits meaningful application of those factors.

---

[1] 18 U.S.C. § 2710 itself specifies recovery shall be for "actual damages *but not less than liquidated damages in an amount of $2500.*"  (Emphasis added.)

A class action settlement amount must be reasonable as a function of the relationship between maximum potential recovery and a discount according to the risk of continued litigation.  As explained by the Seventh Circuit, a judge must "quantify the net expected value of continued litigation to the class, *since a settlement for less than that value would not be adequate*.  Determining that value would require estimating the range of possible outcomes and ascribing a probability to each point on the range."  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-285 (7th Cir. 2002) (emphasis added).

> Some arbitrary figures will indicate the nature of the analysis that we are envisaging.  Suppose a high recovery were estimated at $5 billion, medium at $200 million, low at $10 million.  Suppose the midpoint of the percentage estimates for the probability of victory at trial was .5 percent for the high, 20 percent for the medium, and 30 percent for the low… Then the net expected value of the litigation, before discounting, would be $68 million… [O]ur point is that the judge made no effort to translate his intuitions about the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if it was not settled now into numbers that would permit a responsible evaluation of the reasonableness of the settlement.

*Id*. at 285.

The due process limitation described in *Wakefield*, *supra*, is a check for oppressiveness to the defendant that is applied *after* a judgment or verdict is rendered.  When analyzing a proposed settlement, the court should apply the same oppressiveness standard *only after* it has calculated recoverable damages in view of litigation risk.  In this case, the court's three-part analysis should begin with a calculation of aggregated statutory damages, followed by a discount according to risk of continued litigation, and then proceeded to a cross-check and possible adjustment for *Wakefield* oppressiveness.  This is what this Court's own rules specify.

As an illustration, assume the VPPA claim, having survived a motion to dismiss, has at least a 1% chance of success at trial.[2]  Applying this 1% to the potential aggregate statutory damages of $625 billion yields the figure of $6.25 billion.  Barring punitive effect, this is the minimum amount required for a settlement of this case to be approved as adequate in every Circuit in the country.  No Circuit, including the Ninth, permits a case to be settled for less than its likely litigation value, which is calculated by multiplying potential damages by the likelihood of success.   "[I]n every instance [the court must] compare the terms of the compromise with the likely rewards of litigation."  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson* 390 U.S. 414, 424-25 (1968); *Acosta v. Trans Union, LLC*, 240 F.R.D. 564 (CD CA 2007) ("court must apprise itself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated") (*quoting Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).  By this measure, the settlement approved by the district court is about $5.5 billion short.

*Acosta, supra*, is particularly instructive and relevant to the facts of this case. *Acosta* was a class action for violation of the Fair Credit Reporting Act ("FCRA"), with potential statutory damages of $2 billion.  After finding that the settlement represented "not even one-fifth of one percent of the litigation value of these claims" the court denied approval to the settlement.[3]  240 F.R.D. at 578.  "Were Plaintiffs' claims against Trans

---

[2]  Appellants use the conservative number of 1% for purposes of illustration, only.  If Class Counsel contend the case has a lower than 1% chance of success, this Court should require them to explain why they filed a frivolous case.

[3] By way of comparison, one-fifth of one percent of the litigation value of the claims in this case would be $1.25 billion.  In the case cited by Class Counsel, the court's due process

Union and Equifax grounded in such a tenuous basis that they were hopelessly doomed to fail in court, such a colossal discrepancy between their apparent litigation value and the value of the Settlement may be acceptable.  That is not true here." *Id*.  The same could be said of this case, where the settlement is just 0.1% of the litigation value of the claims being settled.  Class Counsel has failed to make the case that Class claims are "hopelessly doomed to fail in court."  Barring such a showing, approval of the proposed settlement is not permissible.

Assuming a 1% chance of success at trial and an adequate settlement value of $6.25 billion, this Court then, and only then, should subject that figure to the *Wakefield* test for constitutional excessiveness.  If the Court determines the amount of $6.25 billion is constitutionally excessive, it should then determine the *maximum amount* that would not violate due process, i.e., set the adequacy threshold at that number.  Since Facebook has previously stipulated to and paid a $5 billion fine to the DOJ for violation of a prior privacy consent order, the Court should find that the amount of $5 billion is *prima facie* not constitutionally excessive.  Indeed, Facebook has borne that amount and again gone out and violated individual privacy rights.[4]  This indicates that $5 billion does not exceed the amount reasonably necessary to deter Facebook from ongoing and knowing invasions of third-party privacy rights.

---

analysis supported a reduction of the jury's award by ninety-eight percent.  *Golan v. FreeEats.com Inc.,* 930 F.3d 950 (8th Cir. 2019).  In this case, a similar percentage reduction against statutory damages would allow for a recovery of $12.5 billion.

[4] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Objectors contend that, at most, Facebook's remaining defenses may warrant a modest discount of the total damages for violation of the VPPA and that the Class would be far better off taking this case to trial – even if the jury award were ultimately reduced per *Wakefield* – than they are with the $725 million settlement.  It may be reasonable for Plaintiffs to elect to settle this case for the amount of $5 billion,[5] in order to eliminate the risk that Facebook will establish its consent defense at trial.  Anything less than this amount is not sufficient to outweigh each Class member's interest in going to trial and having a chance of recovering substantially more than three dollars.

In a recent statutory damages class action against Facebook in this Circuit, the district court rejected a proposed settlement that represented 5.7% of total aggregated statutory damages, after that case had survived an appeal of class certification.  *See In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617, 621 (N.D. Cal. 2021).  The court ultimately approved a settlement representing 6.8% of aggregate statutory damages.  *Id*. at 622.

Based on potential damages and the likelihood of success on the merits, the Court should reject the proposed $725 million settlement as inadequate.

---

[5] Facebook's voluntary $5 billion payment in the FTC action would appear to undermine any argument that a net $5 billion verdict for violation of the VPPA would violate due process.  If Facebook could pay $5 billion to resolve the FTC enforcement action, it could certainly find a way to pay $5 billion to settle this lawsuit in which all significant legal questions have been resolved in favor of the Plaintiffs.

**B.   The Settlement fails to treat Class members equitably relative to each other because it fails to account for the far stronger consent defense available to defendant for Class members who joined Facebook after 2009**

Class Counsel concede in their briefing the Court concluded that from late 2009 forward, users had consented to Facebook giving access to its users personal information shared with friends.[6]   Document 1139 at pp. 20-21.   The Court also describes that "Plaintiffs [with Facebook accounts prior to roughly 2009] may pursue claims based on information-sharing with app developers." Document 298, p. 2.   Objector Feldman started using Facebook in 2009 and objector Mahaney started in 2007, both prior to any disclosure by Facebook regarding information-sharing.   Class members who joined Facebook prior to 2010 have much stronger claims that should be more generously compensated by the settlement.   Class Counsel's arguments that Facebook's disclosure of privacy violations justified the discount of the value of Class claims should not apply to the claims of these Class members.   "Significant differences in contested claims or defenses have the potential to cause significant differences in claim value, which should be reflected in any fair settlement. … 'An agreement that gives the same monetary remedy to all members of the class, despite significant differences in the nature of their claims … may not be fair

---

[6] The Court's analysis related to Facebook's public disclosure of its earlier privacy violations.   Document 298, p. 2 ("In particular, from roughly 2009 to 2015, Facebook disclosed its practice of allowing app developers to obtain, through a user's Facebook friends, any information about the u8ser that the friends had access to.")   It appears, however, the actual date of the public disclosure was in 2010, not 2009.   *See* New York Times, December 18, 2018, *As Facebook Raised a Privacy Wall, It Carved an Opening for Tech Giants*, a true and correct copy of which is attached hereto as Exhibit A.

and reasonable.'"  *Murray v. Grocery Delivery E-Services USA Inc.,* 55 F.4th 340,346 (1st Cir. 2022).

The settlement's equal apportionment of compensation across all members and months/years violates Rule 23(e)(2)(D).  The Court should order an apportionment of the settlement proceeds that allows for the unavailability to Facebook of disclosure and consent defenses, thus allowing a greater recovery to those Class members who began using Facebook prior to 2010.[7]

### C. Class Counsel should receive less than the average percentage fee in megafund recoveries of $500 million or more, which is 12.9%

Class Counsel are requesting an attorney's fee of 25% of the $725 million settlement, even though this Circuit and legal commentators have clearly documented and recommended that the amount of fee percentages should fall as the amount of a settlement rises above $100 million.  A $725 million class action settlement like this one is clearly in the megafund category that requires that the fee be *substantially* less than 25%.  This case settled for less than one-tenth of one percent of available statutory damages, making the results achieved factor one that requires a significant downward adjustment.

The Ninth Circuit has recognized "[w]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead."  *In re Bluetooth Headset Products Liability Litigation*, 654 F. 3d 939, 942-943 (9th Cir. 2011).  This Court

---

[7] In the alternative, the Court should consider refusing to certify the Class as currently defined, and direct the class be divided into two subclasses, each with separate counsel. *See* FRCP Rule 23(c)(5).

should follow the approach taken by two Northern District judges and "look to empirical research on megafund cases," as Judge Chen did in *Alexander v. FedEx Ground Package Sys.*, 2016 WL 3351017, at *2-3 (N.D. Cal.  June 15, 2016).[8]  Judge Chen ultimately awarded fees of 16.4% of the $226,500,000 common fund, citing to *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015), in which Judge Koh awarded fees of 10.5% of a $435 million settlement.  The $725 million Settlement fund in this case is significantly higher than these two Northern District megafund cases, suggesting a reasonable fee would be no more than a figure in the 10.5%-16.4% range.

Consistent with empirical research and the two California megafund cases cited above, fees well below the 25% benchmark are warranted in this case.  Indeed, a percentage fee at the lower end of the megafund range for settlements above $500 million is warranted.

Class Counsel's fee should not exceed 10%, which is just below the market rate for a settlement of this size, according to Brian Fitzpatrick.  *See An Empirical Study of Class Action Settlements and Their Fee Awards*, at p. 839 (mean percentage fee for settlements between $500 million and $1 billion is 12.9).  A 10 % fee here results in a fee of $72.5 million, which represents a more than generous fee for a recovery of less than one-tenth of

---

[8] Judge Chen relied on Eisenberg & Miller's study reviewing 68 "megafund" cases settled over a 16 year period, which found the median attorney fee award in megafund cases was 10.2% of the fund and the mean was 12%.  Judge Chen favored Eisenberg & Miller's study as it covered a longer period of time and more cases than Brian Fitzpatrick's frequently cited study *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7. EMPIRICAL LEGAL STUD 811, 2010 at p. 839 (mean percentage fee for settlements between $250 million and $500 million is 17.8%).

one percent, in a case where Class Counsel failed to present evidence permitting the Class to be certified.

However, because a fee award in the amount of Class Counsel's lodestar represents a presumptively reasonable fee, *see Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010), a fee award of $90,433,788.12[9] – equivalent to 12.5% of the settlement fund – would be an appropriate fee in this case.   Each of the *Vizcaino* factors is fully subsumed in the lodestar. *Id.*, at 553.

## CONCLUSION

Regarding Plaintiffs' Motion for Final Settlement Approval:   For the foregoing reasons, this Court should: (1) deny approval of the proposed settlement; and (2) order apportionment of the settlement fund in a fashion that provides greater compensation for Class members who joined Facebook prior to 2010 or, alternatively, order the Class be divided into subclasses and appoint separate counsel accordingly.

Regarding Plaintiffs' Motion for Attorneys' Fees, etc.:   If the Court approves the proposed settlement, then for the foregoing reasons, this Court should award Class Counsel a common fund percentage fee of no more than $72.5 million or, in the alternative, a fee equal to Class Counsel's net lodestar of $90,433,788.12.

---

[9] Per Class Counsel's Declaration in Support of Plaintiffs' Motion for Attorneys' Fees, etc., Class Counsel has been compensated by a Court-ordered sanction paid by defendant Facebook in the amount of $800,217.38, which amount should be credited against Class Counsel's lodestar and any lodestar-supported fee award.  Likewise, any cost award should be reduced by $124,861.13 for costs earlier awarded and paid as a sanction.  *See* Document 1140, p. 45, para. 188.

Respectfully submitted,

*/s/ Kendrick Jan*                       
Kendrick Jan
Kendrick Jan, APC
225 Broadway, Suite 2220
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

*/s/ John J. Pentz*                       
John J. Pentz, *pro hac vice* forthcoming
18 Damon Street
Wayland, MA 01778
Phone: (978) 261-5725
jjpentz3@gmail.com

Attorneys for Class members/Objectors
Sarah Feldman and Jill Mahaney

## CONFIRMATION OF CLASS MEMBER/OBJECTOR SARAH FELDMAN

By her signature below, Class member/objector Sarah Feldman confirms her objections as set forth in the foregoing OBJECTION OF CLASS MEMBERS SARAH FELDMAN, CAMERON JAN, AND JILL MAHANEY TO FINAL SETTLEMENT APPROVAL OF SETTLEMENT AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES.

Date: 7/17/2023

Sarah Feldman

<u>CONFIRMATION OF CLASS MEMBER/OBJECTOR JILL MAHANEY</u>

By her signature below, Class member/objector Jill Mahaney confirms her objections as set forth in the foregoing OBJECTION OF CLASS MEMBERS SARAH FELDMAN AND JILL MAHANEY TO PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL OF SETTLEMENT AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, ETC.

Date: 7/18/23

Jill Mahaney

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was filed with the Clerk of Court using CM/ECF on July 19, 2023, and as a result has been served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


By: *s/ Kendrick Jan*

EXHIBIT A

# *As Facebook Raised a Privacy Wall, It Carved an Opening for Tech Giants*

Internal documents show that the social network gave Microsoft, Amazon, Spotify and others far greater access to people's data than it has disclosed.

By Gabriel J.X. Dance, Michael LaForgia and Nicholas Confessore

Dec. 18, 2018

For years, Facebook gave some of the world's largest technology companies more intrusive access to users' personal data than it has disclosed, effectively exempting those business partners from its usual privacy rules, according to internal records and interviews.

The special arrangements are detailed in hundreds of pages of Facebook documents obtained by The New York Times. The records, generated in 2017 by the company's internal system for tracking partnerships, provide the most complete picture yet of the social network's data-sharing practices. They also underscore how personal data has become the most prized commodity of the digital age, traded on a vast scale by some of the most powerful companies in Silicon Valley and beyond.

The exchange was intended to benefit everyone. Pushing for explosive growth, Facebook got more users, lifting its advertising revenue. Partner companies acquired features to make their products more attractive. Facebook users connected with friends across different devices and websites. But Facebook also assumed extraordinary power over the personal information of its 2.2 billion users — control it has wielded with little transparency or outside oversight.

Facebook allowed Microsoft's Bing search engine to see the names of virtually all Facebook users' friends without consent, the records show, and gave Netflix and Spotify the ability to read Facebook users' private messages.

The social network permitted Amazon to obtain users' names and contact information through their friends, and it let Yahoo view streams of friends' posts as recently as this summer, despite public statements that it had stopped that type of sharing years earlier.

Facebook has been reeling from a series of privacy scandals, set off by revelations in March that a political consulting firm, Cambridge Analytica, improperly used Facebook data to build tools that aided President Trump's 2016 campaign. Acknowledging that it had breached users' trust, Facebook insisted that it had instituted stricter privacy protections long ago. Mark Zuckerberg, the chief executive, assured lawmakers in April that people "have complete control" over everything they share on Facebook.

*[Facebook's strategy in times of crisis: delay, deny and deflect.]*

But the documents, as well as interviews with about 50 former employees of Facebook and its corporate partners, reveal that Facebook allowed certain companies access to data despite those protections. They also raise questions about whether Facebook ran afoul of a 2011 consent agreement with the Federal Trade Commission that barred the social network from sharing user data without explicit permission.

In all, the deals described in the documents benefited more than 150 companies — most of them tech businesses, including online retailers and entertainment sites, but also automakers and media organizations. Their applications sought the data of hundreds of millions of people a month, the records show. The deals, the oldest of which date to 2010, were all active in 2017. Some were still in effect this year.

*[Here are five takeaways from The Times's investigation.]*

In an interview, Steve Satterfield, Facebook's director of privacy and public policy, said none of the partnerships violated users' privacy or the F.T.C. agreement. Contracts required the companies to abide by Facebook policies, he added.

Still, Facebook executives have acknowledged missteps over the past year. "We know we've got work to do to regain people's trust," Mr. Satterfield said. "Protecting people's information requires stronger teams, better technology and clearer policies, and that's where we've been focused for most of 2018." He said that the partnerships were "one area of focus" and that Facebook was in the process of winding many of them down.

Facebook has found no evidence of abuse by its partners, a spokeswoman said. Some of the largest partners, including Amazon, Microsoft and Yahoo, said they had used the data appropriately, but declined to discuss the sharing deals in detail. Facebook did say that it had mismanaged some of its partnerships, allowing certain companies' access to continue long after they had shut down the features that required the data.

With most of the partnerships, Mr. Satterfield said, the F.T.C. agreement did not require the social network to secure users' consent before sharing data because Facebook considered the partners extensions of itself — service providers that allowed users to interact with their Facebook friends. The partners were prohibited from using the personal information for other purposes, he said. "Facebook's partners don't get to ignore people's privacy settings."

EXHIBIT A

Data privacy experts disputed Facebook's assertion that most partnerships were exempted from the regulatory requirements, expressing skepticism that businesses as varied as device makers, retailers and search companies would be viewed alike by the agency. "The only common theme is that they are partnerships that would benefit the company in terms of development or growth into an area that they otherwise could not get access to," said Ashkan Soltani, former chief technologist at the F.T.C.

Mr. Soltani and three former employees of the F.T.C.'s consumer protection division, which brought the case that led to the consent decree, said in interviews that its data-sharing deals had probably violated the agreement.

"This is just giving third parties permission to harvest data without you being informed of it or giving consent to it," said David Vladeck, who formerly ran the F.T.C.'s consumer protection bureau. "I don't understand how this unconsented-to data harvesting can at all be justified under the consent decree."

Details of the agreements are emerging at a pivotal moment for the world's largest social network. Facebook has been hammered with questions about its data sharing from lawmakers and regulators in the United States and Europe. The F.T.C. this spring opened a new inquiry into Facebook's compliance with the consent order, while the Justice Department and Securities and Exchange Commission are also investigating the company.

Facebook's stock price has fallen, and a group of shareholders has called for Mr. Zuckerberg to step aside as chairman. Shareholders also have filed a lawsuit alleging that executives failed to impose effective privacy safeguards. Angry users started a #DeleteFacebook movement.

This month, a British parliamentary committee investigating internet disinformation released internal Facebook emails, seized from the plaintiff in another lawsuit against Facebook. The messages disclosed some partnerships and depicted a company preoccupied with growth, whose leaders sought to undermine competitors and briefly considered selling access to user data.



Richard Allan, a Facebook vice president, testifying before Parliament last month next to Mr. Zuckerberg's vacant seat. The company is under fire from both American and European lawmakers.  Agence France-Presse — Getty Images

As Facebook has battled one crisis after another, the company's critics, including some former advisers and employees, have singled out the data-sharing as cause for concern.

"I don't believe it is legitimate to enter into data-sharing partnerships where there is not prior informed consent from the user," said Roger McNamee, an early investor in Facebook. "No one should trust Facebook until they change their business model."

## An Engine for Growth

Personal data is the oil of the 21st century, a resource worth billions to those who can most effectively extract and refine it. American companies alone are expected to spend close to $20 billion by the end of 2018 to acquire and process consumer data, according to the Interactive Advertising Bureau.

Few companies have better data than Facebook and its rival, Google, whose popular products give them an intimate view into the daily lives of billions of people — and allow them to dominate the digital advertising market.

EXHIBIT A

Facebook has never sold its user data, fearful of user backlash and wary of handing would-be competitors a way to duplicate its most prized asset. Instead, internal documents show, it did the next best thing: granting other companies access to parts of the social network in ways that advanced its own interests.

Facebook began forming data partnerships when it was still a relatively young company. Mr. Zuckerberg was determined to weave Facebook's services into other sites and platforms, believing it would stave off obsolescence and insulate Facebook from competition. Every corporate partner that integrated Facebook data into its online products helped drive the platform's expansion, bringing in new users, spurring them to spend more time on Facebook and driving up advertising revenue. At the same time, Facebook got critical data back from its partners.

The partnerships were so important that decisions about forming them were vetted at high levels, sometimes by Mr. Zuckerberg and Sheryl Sandberg, the chief operating officer, Facebook officials said. While many of the partnerships were announced publicly, the details of the sharing arrangements typically were confidential.



Sheryl Sandberg, Facebook's second-in-command, at a Senate hearing in September. The data-sharing deals were vetted at senior levels, sometimes by her and Mr. Zuckerberg, Facebook officials said.  Jim Watson/Agence France-Presse — Getty Images

By 2013, Facebook had entered into more such partnerships than its midlevel employees could easily track, according to interviews with two former employees. (Like the more than 30 other former employees interviewed for this article, they spoke on the condition of anonymity because they had signed nondisclosure agreements or still maintained relationships with top Facebook officials.)

So they built a tool that did the technical work of turning special access on and off and also kept records on what are known internally as "capabilities" — the special privileges enabling companies to obtain data, in some cases without asking permission.

The Times reviewed more than 270 pages of reports generated by the system — records that reflect just a portion of Facebook's wide-ranging deals. Among the revelations was that Facebook obtained data from multiple partners for a controversial friend-suggestion tool called "People You May Know."

The feature, introduced in 2008, continues even though some Facebook users have objected to it, unsettled by its knowledge of their real-world relationships. Gizmodo and other news outlets have reported cases of the tool's recommending friend connections between patients of the same psychiatrist, estranged family members, and a harasser and his victim.

Facebook, in turn, used contact lists from the partners, including Amazon, Yahoo and the Chinese company Huawei — which has been flagged as a security threat by American intelligence officials — to gain deeper insight into people's relationships and suggest more connections, the records show.

Some of the access deals described in the documents were limited to sharing non-identifying information with research firms or enabling game makers to accommodate huge numbers of players. These raised no privacy concerns. But agreements with about a dozen companies did. Some enabled partners to see users' contact information through their friends — even after the social network, responding to complaints, said in 2014 that it was stripping all applications of that power.

As of 2017, Sony, Microsoft, Amazon and others could obtain users' email addresses through their friends.

EXHIBIT A



One of Facebook's device partners was Huawei, a Chinese company flagged as a security threat by United States intelligence.  Wang Zhao/Agence France-Presse — Getty Images

Facebook also allowed Spotify, Netflix and the Royal Bank of Canada to read, write and delete users' private messages, and to see all participants on a thread — privileges that appeared to go beyond what the companies needed to integrate Facebook into their systems, the records show. Facebook acknowledged that it did not consider any of those three companies to be service providers. Spokespeople for Spotify and Netflix said those companies were unaware of the broad powers Facebook had granted them. A spokesman for Netflix said Wednesday that it had used the access only to enable customers to recommend TV shows and movies to their friends.

"Beyond these recommendations, we never accessed anyone's personal messages and would never do that," he said.

A Royal Bank of Canada spokesman disputed that the bank had had any such access. (Aspects of some sharing partnerships, including those with the Royal Bank of Canada and Bing, were first reported by The Wall Street Journal.)

Spotify, which could view messages of more than 70 million users a month, still offers the option to share music through Facebook Messenger. But Netflix and the Canadian bank no longer needed access to messages because they had deactivated features that incorporated it.

These were not the only companies that had special access longer than they needed it. Yahoo, The Times and others could still get Facebook users' personal information in 2017.

Yahoo could view real-time feeds of friends' posts for a feature that the company had ended in 2012. A Yahoo spokesman declined to discuss the partnership in detail but said the company did not use the information for advertising. The Times — one of nine media companies named in the documents — had access to users' friend lists for an article-sharing application it had discontinued in 2011. A spokeswoman for the news organization said it was not obtaining any data.

Facebook's internal records also revealed more about the extent of sharing deals with over 60 makers of smartphones, tablets and other devices, agreements first reported by The Times in June.

Facebook empowered Apple to hide from Facebook users all indicators that its devices were asking for data. Apple devices also had access to the contact numbers and calendar entries of people who had changed their account settings to disable all sharing, the records show.

Apple officials said they were not aware that Facebook had granted its devices any special access. They added that any shared data remained on the devices and was not available to anyone other than the users.

EXHIBIT A

Facebook enabled Apple devices to conceal that they were asking for data, making it impossible for users to disable sharing.  Alisa Yuldybaeva/EPA, via Shutterstock

Facebook officials said the company had disclosed its sharing deals in its privacy policy since 2010. But the language in the policy about its service providers does not specify what data Facebook shares, and with which companies. Mr. Satterfield, Facebook's privacy director, also said its partners were subject to "rigorous controls."

Yet Facebook has an imperfect track record of policing what outside companies do with its user data. In the Cambridge Analytica case, a Cambridge University psychology professor created an application in 2014 to harvest the personal data of tens of millions of Facebook users for the consulting firm.

Pam Dixon, executive director of the World Privacy Forum, a nonprofit privacy research group, said that Facebook would have little power over what happens to users' information after sharing it broadly. "It travels," Ms. Dixon said. "It could be customized. It could be fed into an algorithm and decisions could be made about you based on that data."

## 400 Million Exposed

Unlike Europe, where social media companies have had to adapt to stricter regulation, the United States has no general consumer privacy law, leaving tech companies free to monetize most kinds of personal information as long as they don't mislead their users. The F.T.C., which regulates trade, can bring enforcement actions against companies that deceive their customers.

Besides Facebook, the F.T.C. has consent agreements with Google and Twitter stemming from alleged privacy violations.

Facebook's agreement with regulators is a result of the company's early experiments with data sharing. In late 2009, it changed the privacy settings of the 400 million people then using the service, making some of their information accessible to all of the internet. Then it shared that information, including users' locations and religious and political leanings, with Microsoft and other partners.

Facebook called this "instant personalization" and promoted it as a step toward a better internet, where other companies would use the information to customize what people saw on sites like Bing. But the feature drew complaints from privacy advocates and many Facebook users that the social network had shared the information without permission.

The F.T.C. investigated and in 2011 cited the privacy changes as a deceptive practice. Caught off guard, Facebook officials stopped mentioning instant personalization in public and entered into the consent agreement.

Under the decree, the social network introduced a "comprehensive privacy program" charged with reviewing new products and features. It was initially overseen by two chief privacy officers, their lofty title an apparent sign of Facebook's commitment. The company also hired PricewaterhouseCoopers to assess its privacy practices every two years.

But the privacy program faced some internal resistance from the start, according to four former Facebook employees with direct knowledge of the company's efforts. Some engineers and executives, they said, considered the privacy reviews an impediment to quick innovation and growth. And the core team responsible for coordinating the reviews — numbering about a dozen people by 2016 — was moved around within Facebook's sprawling organization, sending mixed signals about how seriously the company took it, the ex-employees said.

Critically, many of Facebook's special sharing partnerships were not subject to extensive privacy program reviews, two of the former employees said. Executives believed that because the partnerships were governed by business contracts requiring them to follow Facebook data policies, they did not require the same level of scrutiny. The privacy team had limited ability to review or suggest changes to some of those data-sharing agreements, which had been negotiated by more senior officials at the company.

EXHIBIT A

Facebook officials said that members of the privacy team had been consulted on the sharing agreements, but that the level of review "depended on the specific partnership and the time it was created."

In 2014, Facebook ended instant personalization and walled off access to friends' information. But in a previously unreported agreement, the social network's engineers continued allowing Bing; Pandora, the music streaming service; and Rotten Tomatoes, the movie and television review site, access to much of the data they had gotten for the discontinued feature. Bing had access to the information through last year, the records show, and the two other companies did as of late summer, according to tests by The Times.



Facebook continued the access for Pandora, the music-streaming service, and other companies even after an F.T.C. agreement led to an official change in policy.  Shannon Stapleton/Reuters

Facebook officials said the data sharing did not violate users' privacy because it allowed access only to public data — though that included data that the social network had made public in 2009. They added that the social network made a mistake in allowing the access to continue for the three companies, but declined to elaborate. Spokeswomen for Pandora and Rotten Tomatoes said the businesses were not aware of any special access.

Facebook also declined to discuss the other capabilities Bing was given, including the ability to see all users' friends.

Microsoft officials said that Bing was using the data to build profiles of Facebook users on Microsoft servers. They declined to provide details, other than to say the information was used in "feature development" and not for advertising. Microsoft has since deleted the data, the officials said.

## Compliance Questions

For some advocates, the torrent of user data flowing out of Facebook has called into question not only Facebook's compliance with the F.T.C. agreement, but also the agency's approach to privacy regulation.

"There has been an endless barrage of how Facebook has ignored users' privacy settings, and we truly believed that in 2011 we had solved this problem," said Marc Rotenberg, head of the Electronic Privacy Information Center, an online privacy group that filed one of the first complaints about Facebook with federal regulators. "We brought Facebook under the regulatory authority of the F.T.C. after a tremendous amount of work. The F.T.C. has failed to act."

According to Facebook, most of its data partnerships fall under an exemption to the F.T.C. agreement. The company argues that the partner companies are service providers — companies that use the data only "for and at the direction of" Facebook and function as an extension of the social network.

But Mr. Vladeck and other former F.T.C. officials said that Facebook was interpreting the exemption too broadly. They said the provision was intended to allow Facebook to perform the same everyday functions as other companies, such as sending and receiving information over the internet or processing credit card transactions, without violating the consent decree.

When The Times reported last summer on the partnerships with device makers, Facebook used the term "integration partners" to describe BlackBerry, Huawei and other manufacturers that pulled Facebook data to provide social-media-style features on smartphones. All such integration partners, Facebook asserted, were covered by the service provider exemption.

EXHIBIT A

Since then, as the social network has disclosed its data sharing deals with other kinds of businesses — including internet companies such as Yahoo — Facebook has labeled them integration partners, too.

Facebook even recategorized one company, the Russian search giant Yandex, as an integration partner.

Facebook records show Yandex had access in 2017 to Facebook's unique user IDs even after the social network stopped sharing them with other applications, citing privacy risks. A spokeswoman for Yandex, which was accused last year by Ukraine's security service of funneling its user data to the Kremlin, said the company was unaware of the access and did not know why Facebook had allowed it to continue. She added that the Ukrainian allegations "have no merit."



The Russian company Yandex, which has been accused of funneling information to the Kremlin, had access to Facebook data as recently as last year.  Mikhail Metzel/TASS, via Getty Images

In October, Facebook said Yandex was not an integration partner. But in early December, as The Times was preparing to publish this article, Facebook told congressional lawmakers that it was.

An F.T.C. spokeswoman declined to comment on whether the commission agreed with Facebook's interpretation of the service provider exception, which is likely to figure in the F.T.C.'s ongoing Facebook investigation. She also declined to say whether the commission had ever received a complete list of partners that Facebook considered service providers.

But federal regulators had reason to know about the partnerships — and to question whether Facebook was adequately safeguarding users' privacy. According to a letter that Facebook sent this fall to Senator Ron Wyden, the Oregon Democrat, PricewaterhouseCoopers reviewed at least some of Facebook's data partnerships.

The first assessment, sent to the F.T.C. in 2013, found only "limited" evidence that Facebook had monitored those partners' use of data. The finding was redacted from a public copy of the assessment, which gave Facebook's privacy program a passing grade over all.

Mr. Wyden and other critics have questioned whether the assessments — in which the F.T.C. essentially outsources much of its day-to-day oversight to companies like PricewaterhouseCoopers — are effective. As with other businesses under consent agreements with the F.T.C., Facebook pays for and largely dictated the scope of its assessments, which are limited mostly to documenting that Facebook has conducted the internal privacy reviews it claims it had.

How closely Facebook monitored its data partners is uncertain. Most of Facebook's partners declined to discuss what kind of reviews or audits Facebook subjected them to. Two former Facebook partners, whose deals with the social network dated to 2010, said they could find no evidence that Facebook had ever audited them. One was BlackBerry. The other was Yandex.

EXHIBIT A



Steve Satterfield, Facebook's director of privacy and public policy, said the sharing deals did not violate privacy rules because the partners functioned as extensions of the social network.  Isopix/REX/Shutterstock

Facebook officials said that while the social network audited partners only rarely, it managed them closely.

"These were high-touch relationships," Mr. Satterfield said.

*A correction was made on Dec. 19, 2018: An earlier version of this article misstated the year that Yahoo ended a feature on its website that incorporated Facebook user data. The feature was discontinued in 2012, not 2011.*

Matthew Rosenberg contributed reporting. Research was contributed by Grace Ashford, Susan C. Beachy, Doris Burke and Alain Delaquérière.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Facebook Offered Users Privacy Wall, Then Let Tech Giants Around It

EXHIBIT A