Kendrick Jan, CA SBN 105149
Kendrick Jan, APC
225 Broadway, Suite 2220
San Diego, CA 92101
Telephone:  (619) 607-9750
kj@jan-law.com

John J. Pentz, Esq., MA Bar No. 561907
18 Damon Street,
Wayland, MA 01778
Telephone: (978) 261-5725
jjpentz3@gmail.com
(*pro hac vice* forthcoming)

Counsel for Objectors Sarah Feldman and Jill Mahaney

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| IN RE: FACEBOOK INC. CONSUMER PRIVACY USER PROFILE LITIGATION | ) ) ) ) ) ) | MDL No. 2843<br><br>Case No. 18-md-2834-VC<br><br>CLASS ACTION |
| OPPOSITION OF CLASS<br>This Document Relates to:<br><br>ALL ACTIONS | ) ) ) ) ) ) ) ) ) | DECLARATION OF JOHN PENTZ IN SUPPORT OF OPPOSITION OF SARAH FELDMAN AND JILL MAHANEY TO PLAINTIFFS ADMINISTRATIVE MOTION FOR PARTIAL RELIEF FROM STAY |

I, John J. Pentz, declare as follows:

1.      I am an attorney licensed by the Massachusetts Board of Bar Overseers (MA Bar

No. 561907), with a business address of 18 Damon Street, Wayland, MA 01778.  I

represent Class member/objector Sarah Feldman ("Sarah") in the captioned matter and

1            Declaration of John J. Pentz in
Support of Opposition to Plaintiffs'
Administrative Motion (Discovery)

make this declaration pursuant to N.D.Cal. Civil L.R. 7-11 in support of the Opposition of Class members/Objectors Sarah Feldman and Jill Mahaney to Plaintiffs Administrative Motion for Partial Relief from Stay, as follows:

2.      Objector Sarah Feldman is my sister-in-law.  Sarah has filed two other objections in the past 10 years, in: (1) *In re Apple Inc, Device Performance Litig*.; and (2) *In re Facebook Internet Tracking Litig*.  Copies of Ms. Feldman's opening briefs in *Apple* and *Facebook Internet Tracking* are attached hereto as *Exhibits A and B*.

3.      There is no retainer agreement between Sarah and me, and no retainer agreement between Sarah and my co-counsel Kendrick Jan.

4.      Sarah has been promised nothing for acting as an objector and she understands any settlement of her objection or related appeal, and any recovery of fees by her counsel, would require this Court's approval.

5.      My client is currently away from home and unavailable to provide a declaration.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Dated:  July 24, 2023


                                        *s/ John J Pentz*
                                        John J. Pentz

Declaration of John J. Pentz in
                                        Support of Opposition to Plaintiffs'
                                        Administrative Motion (Discovery)

EXHIBIT A

**Nos. 21-15758 (L) and 21-15762 (C)**
(Consolidated with Nos. 21-15761 and 21-15763)

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

In re: APPLE INC. DEVICE PERFORMANCE LITIGATION,

NAMED PLAINTIFFS AND
SETTLEMENT CLASS MEMBERS
*Plaintiffs-Appellees*,
v.
SARAH FELDMAN; HONDO JAN,
*Objectors-Appellants*, and
DEBORAH PANTONI,
*Objector-Appellant*
v.
APPLE INC.,
*Defendant-Appellee.*

---

On Appeal from the Northern District of California
Civil Action No. 5:18-md-02827-EJD
Hon. Edward J. Davila

---

## JOINT OPENING BRIEF OF APPELLANTS SARAH FELDMAN,
## HONDO JAN, AND DEBORAH PANTONI

---

Kendrick Jan
Kendrick Jan, APC
402 W. Broadway, Ste. 1520
San Diego, CA 92101
(619) 231-7702
kj@jan-law.com

John J. Pentz
Law Offices of John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776
(978) 985-4668
jjpentz3@gmail.com

Jan L. Westfall
29896 Blue Water Way
Menifee, CA 92584
(619) 940-2880
jlwestfall.esq@gmail.com

*Attorneys for Feldman & Jan*                    *Attorney for Pantoni*

EXHIBIT A

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................iv

INTRODUCTION ..........................................................................................................1

JURISDICTIONAL STATEMENT ...............................................................................3

STATEMENT OF ISSUES ............................................................................................4

STATUTORY AND REGULATORY AUTHORITIES ................................................5

STATEMENT OF THE CASE .......................................................................................6

    A.    Background ......................................................................................6

    B.    Lawsuits are filed ...........................................................................8

    C.    Plaintiffs' allegations and Defendant's motions to dismiss ...............8

    D.    The proposed Settlement ...............................................................11

    E.    Preliminary approval .....................................................................12

    F.    Class Counsel's fee request ...........................................................15

    G.    Class member objections ...............................................................15

    H.    Settlement approval and fee awards ...............................................15

SUMMARY OF ARGUMENT .....................................................................................17

    SETTLEMENT .............................................................................................17

    ATTORNEYS' FEES ....................................................................................18

    INCENTIVE AWARDS ................................................................................19

EXHIBIT A

STANDARD OF REVIEW ............................................................................21

ARGUMENT .............................................................................................23

I.    The district court erred in certifying the Settlement Class
and approving a Settlement binding on all Class members
where the requirements of Rule 23 were not satisfied...................................23

    A.    The Class was not adequately represented by Named
Plaintiffs whose claims were not typical of iPhone
owners able to attest to performance issues ..................................................26

    B.    A unified Class defined by common injury was
bifurcated by the Settlement into two subclasses,
with neither having separate representation and only
one entitled to share in the Settlement ..................................................29

    C.    An overall assessment that a settlement is fair
cannot substitute for the procedural protections
of Rule 23, including those required by amended
Rule 23(e)(2) ..................................................................................33

        1.    The Claim Form denies former iPhone owners
the ability to make a claim ........................................................36

        2.    The Settlement ignores Class-wide injury and
uniform damages, and inequitably denies a
majority of the Class the right to make a claim .......................38

II.    The district court abused its discretion and breached its
fiduciary duty to the Class by awarding an unreasonable
fee far in excess of awards in similar cases and based on
an inflated lodestar..........................................................................40

    A.    The district court's analysis of the *Vizcaino* factors
(and the megafund rule) suggested fees below the
non-megafund benchmark were warranted .........................................44

        1.    Results achieved...........................................................................44

EXHIBIT A

2. The district court abused its discretion in its risk factor analysis ...................................................45

3. The district court failed to meaningfully consider awards in similar cases with recoveries above $250 million ................................47

B. The district court abused its discretion when performing its lodestar analysis ...........................................49

1. The district court abused its discretion by allowing inclusion of hours spent in other cases, including the JCCP Action ...........................54

2. The district court should not have allowed excessive repetitive billing and inflated rates for discovery and document review to be included in lodestar ...................................................57

3. A multiplier should not be applied to paralegal fees in Class Counsel's lodestar ................................60

C. Applying the district court's multiplier to a correct lodestar would save the Class at least $13.6 million...........................63

III. The preferential payments to Named Plaintiffs are prohibited and create a conflict between the Named Plaintiffs and absent Class members ...................................................65

CONCLUSION ...................................................72

STATEMENT OF RELATED CASES ...................................................74

CERTIFICATE OF COMPLIANCE...................................................75

CERTIFICATE OF SERVICE ...................................................76

ADDENDUM ...................................................A 1

EXHIBIT A

# TABLE OF AUTHORITIES

## Cases

*Alexander v.FedEx Ground Package Sys.,*
No. 05-cv-00038, 2016 WL 3351017
(N.D. Cal. June 15, 2016) ................................................................48

*Allen v. Bedolla,*
787 F.3d 1218 (9th Cir. 2015) ........................................................24

*Amchem Prod. v. Windsor,*
521 U.S. 591 (1997)..............................................24, 29, 30, 33

*Boeing Co. v. Van Gemert,*
444 U.S. 472 (1980)........................................................................40

*Central Railroad & Banking Co. v. Pettus,*
113 U.S. 116 (1885)........................................................67, 68, 71

*Chambers v. Whirlpool Corp.,*
980 F.3d 645 (9th Cir.2020) ..........................................................21

*Chemical Bank v. Jaffe & Schlesinger, P.A.,*
19 F.3d 1306 (9th Cir. 1994) ............................................51, 55, 56

*Churchill Village, L.L.C. v. General Electric,*
361 F.3d 566 (9th Cir. 2004) ..................................................53, 56

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy,*
305 F.3d 943 (9th Cir. 2002) ..........................................................21

*Davis v. City and County of San Francisco,*
976 F.2d 1536 (9th Cir. 1992) ..................................................60, 61

*Democratic Party of Wash. State v. Reed,*
388 F.3d 1282 (9th Cir. 2004) ........................................................50

*Dennis v. Kellogg Co.,*

EXHIBIT A

    697 F.3d 858 (2012)........................................................................22, 23, 24

*Devlin v. Scardelletti,*
   536 U.S. 1 (2002) .............................................................................3

*Dewey v. Volkswagen AG,*
   681 F. 3d 170 (3d Cir. 2012) ...........................................................34

*Florida v. Dunne,*
   915 F.2d 542 (9th Cir.1990) ............................................................43

*Garcia v. Resurgent Cap. Servs., L.P. ,*
   No. 11-1253-EMC, 2012 WL 3778852
    (N.D. Cal. Aug. 30, 2012) ..............................................................50

*General Telephone Co. of Southwest v. Falcon,*
   457 U.S. 147 (1982).......................................................................28

*Goldberger v. Integrated Res., Inc.,*
   209 F.3d 43 (2d Cir. 2000) .............................................................45

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ..........................................21, 23, 27

*Hansberry v. Lee,*
   311 U.S. 32 (1940).................................................................26, 29

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983)...................................................44, 50, 51, 53

*In re Anthem Inc. Data Breach Litig.,*
   No. 15-MD-02617, 2018 WL 3960068
   (N.D. Cal. Aug. 17, 2018)...............................................................46

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) ...........................................21, 47, 64

*In re Cardinal Health Inc. Sec. Litig.,*
   528 F. Supp. 752 (S.D. Ohio 2007) ...............................................41

EXHIBIT A

*In re Cendant Corp. Sec. Litig.*,
   404 F.3d 173 (3d Cir. 2005). .................................................................53, 54

*In re Dry Max Pampers Litig.*,
   724 F.3d 713 (6th Cir. 2013) ..............................................................69

*In re Equity Funding Corp. of America Securities Litig.*,
   438 F.Supp. 1303 (C.D. Cal. 1977) ....................................................62

*In re General Motors Corp. Pick Up Truck Fuel Tank Prods.*
   *Liab. Litig.,* 55 F.3d 768 (3d Cir.1995) ..............................................31, 54

*In re High-Tech Employee Antitrust Litig.*,
   No. 11-CV-02509-LHK, 2015 WL 5158730
   (N.D. Cal. Sept. 2, 2015) .....................................................................48

*In re HP Inkjet Printer Litig.*,
   716 F.3d 1173 (9th Cir. 2013) ............................................................21

*In re Joint Eastern and Southern Dist. Asbestos Litigation*,
   982 F.2d 721(2d Cir. 1992) *mod. on reh'g sub nom.*
   *In re Findley*, 993 F.2d 7 (2d Cir.1993) .............................................30

*In re Mego Financial Corp. Securities Litig.*,
   213 F.3d 454 (9th Cir. 2000) ..............................................................21

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ..............................................................40

*In re Online DVD Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ..............................................................67

*In re Volkswagon Clean Diesel*
   914 F.3d 623 (9th Cir. 2019) ..............................................................54

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ..............................................40, 43, 50

*In re Wells Fargo &Co. S'holder Derivative Litig.*,
   845 Fed. Appx. 563 (9th Cir. 2021)....................................................63

EXHIBIT A

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    445 F.Supp. 3d 508 (N.D. Cal. 2020) ...........................................................57

*Johnson v. NPAS Sols. LLC*,
    975 F.3d 1244 (11th Cir.2020) ....................................................67, 68, 69, 70

*Melito v. Experian Mktg. Sols., Inc*.,
    923 F.3d 85 (2d Cir. 2019), *cert. denied*
    *sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019) .......................................68

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)..................................................................................60, 62

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ........................................................................32

*Oja v. U.S. Army Corps of Eng'rs*,
    440 F.3d 1122 (9th Cir. 2006) ......................................................................22

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999).......................................................................................30

*Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*,
    526 F.2d 1196 (9th Cir. 1975) ......................................................................60

*Rodriguez v. West Publishing Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...........................................................40, 68, 71

*Sea Coast Foods, Inc. v. Lu–Mar Lobster & Shrimp, Inc.*,
    260 F.3d 1054 (9th Cir.2001) .......................................................................21

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ........................................................27, 31, 70, 71

*Trustees v. Greenough*,
    105 U.S. 527 (1882) ......................................................................67, 68, 71

*United States v. Clifford Matley Family Tr.*,
    354 F.3d 1154 (9th Cir. 2004) ......................................................................22

EXHIBIT A

*Vizcaino v. Microsoft Corp.*,
    290 F. 3d 1043 (9th Cir. 2002) ...........................................18, 40, 44, 48, 49

*Vogel v. Harbor Plaza Ctr., LLC*,
    893 F.3d 1152 (9th Cir. 2018) ......................................................51, 53

*Wagner v. NTSB*,
    86 F.3d 928 (9th Cir. 1996) ...............................................................22

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ..........................................32

## Rules and Statutes

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1332(d) ............................................................................3

Fed. R. App. Proc. 4(a)(1)(A) and 4(a)(3) .......................................3

Fed. R. Civ. Proc. 23 ...........................................................23, 24, 27, 33

Fed. R. Civ. Proc. 23(a) ......................................................23, 25

Fed. R. Civ. Proc. 23(b)(3) ...............................................23, 24, 26

Fed. R. Civ. Proc. 23(c)(5).................................................................30

Fed. R. Civ. Proc. 23(e)(2)(A-D).......................... 5, 26, 33, 34, 35, 37, 38

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ...........................3, 9

California Computer Data Access and Fraud Act
    (Cal. Penal Code § 502(c)(4) and (c)(5) ..........................................9

## Other Authorities

Advisory Committee Notes, 2018,
    Rule 23, Subdivision (e)(2), Paragraphs (A) and (B)...........................34, 35

EXHIBIT A

Barnett, William P. *There is No Conservative Case
for Class Actions*, 22 FED. SOC. REV. 192, 195 (2021) ...........................45, 47

Eisenberg, Theodore and Miller, Geoffrey P. *Attorney
Fees and Expenses in Class Action Settlements
(1993-2008)*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010)......................48, 49

Eisenberg, Theodore and Miller, Geoffrey P. *Incentive
Awards to Class Action Plaintiffs an Empirical Study*,
53 UCLA LAW REVIEW 1303 (2006)...............................................68

Fitzpatrick, Brian. *An Empirical Study of Class Action
Settlements and Their Fee Awards*, 7 J. EMPIRICAL
LEGAL STUD.811(2010) ...............................................................49

https://www.whistleout.com/CellPhones/Guides/this-is-
how-long-youll-keep-iphone ........................................................37

https://www.apple.com/iphone-13/?cid=CDM-USA-
DM-P0021402-484902 ...............................................................37

https://companiesmarketcap.com/apple/marketcap/ .................................6

Laffey Matrix ...................................................................................62

Rubenstein, William B. 5 Newberg on Class Actions,
§17:4 (5th ed. 2020) ..................................................................69

Rubenstein, William B. 5 Newberg on Class Actions,
§3:51 (5th ed. 2020) ..................................................................27

Third Circuit Task Force on Selection of Class
Counsel, 208 F.R.D. 340, 348 (2002)...........................................46

EXHIBIT A

## INTRODUCTION

Following widespread reports of performance issues with Apple's smart phones, and a public acknowledgement and apology by Apple, a group of iPhone owners filed a class action lawsuit alleging violations of federal and state laws in connection with the impaired performance of their iPhones and the iOS software updates designed to throttle iPhone processing speeds.

But unlike the consumers who discovered the defect, the Named Plaintiffs who sued on behalf of the Class did not allege having individually experienced impaired performance attributable to Apple's iOS updates. Instead, recognizing the ability to perceive or attribute the throttled performance was beyond the ken of the average iPhone owner, Named Plaintiffs pled that every Class member was injured by slowed iPhone performance and relied on third party studies to establish the critical elements of injury and damage.

At the settlement stage, however, Named Plaintiffs disregarded their allegations of uniform Class member injury and agreed to a settlement that compensates only those who were aware of and therefore able to attest to diminished iPhone performance, and a claim form that ignores the Class definition and compensates only *current* iPhone owners. Less than 2.5% of the Class filed claims.

1

EXHIBIT A

Ultimately, Named Plaintiffs and Class Counsel failed to adequately represent the Class in three ways: (1) their settlement-stage abandonment of a uniform theory of damages and former iPhone owners; (2) their inability to represent the interests of distinct subclasses created by the Settlement; and (3) their substantial incentive awards created a conflict of interest.

The court overcompensated Class Counsel for their pedestrian performance by applying an unwarranted multiplier to a substantially inflated lodestar, resulting in an unmerited, unreasonably high percentage fee in this megafund settlement – a fee that exceeds this Circuit's benchmark percentage for non-megafund cases.

Finally, the court awarded $216,000 to 132 Named Plaintiffs for their inadequate representation of the Class, even though some of the Named Plaintiffs were not Class members and very few conferred any value at all upon the absent Class members.

EXHIBIT A

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over the state claims alleged in this action under 28 U.S.C. §1332(d) because the suit is a class action in which the citizenship of one or more plaintiffs differed from that of the defendant and the aggregate amount in controversy exceeded $5,000,000. The court also had federal question jurisdiction in this matter pursuant to 28 U.S.C. §1331 because Plaintiffs alleged defendant Apple Inc. violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

This Court has appellate jurisdiction because this is an appeal following entry of a final judgment. 28 U.S.C. §1291. The district court's orders granting final approval and attorney's fees, expenses and service awards were entered on March 17, 2021. ER-12, 33. The amended final judgment was entered on March 23, 2021. ER-4. Appellants Hondo Jan and Sarah Feldman timely filed their Notice of Appeal on April 13, 2021, and an Amended Notice of Appeal on April 28, 2021. ER-258, 263. Appellant Deborah Pantoni timely filed her Notice of Appeal on April 16, 2021. ER-260. Fed. R. App. Proc. 4(a)(1)(A) and 4(a)(3). Appellants objected to the Settlement and so have standing to appeal. ER-123, 136. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

3

EXHIBIT A

## STATEMENT OF ISSUES

1.     Did the district court abuse its discretion by certifying a settlement class where the whole class was not adequately represented and approving a settlement that does not match the theory of the case set forth in the complaint? Raised at ER-126, 137, overruled at ER-33.

2.     Did the division of the class into two de facto subclasses, one comprised of iPhone owners able to attest to having experienced diminished performance and a second comprised of iPhone owners unable to so attest, prevent certification where the two subclasses were not separately represented by named plaintiffs advocating on behalf of their distinct interests?   Raised at ER-125, overruled at ER-33.

3.     Did the district court abuse its discretion by approving a settlement that excludes a vast majority of the class from compensation?  Raised at ER-123, 144, overruled at ER-33.

4.     Did the district court abuse its discretion by approving a settlement and related claim form that prevent claims of class members who no longer own their eligible iPhone, where former owners are included in the Settlement Class definition and subject to the same release as current owners who are able to file claims?  Raised at ER-137, overruled at ER-33.

EXHIBIT A

5.     Did the district court violate Rule 23(e)(2)(D) by approving a settlement that does not treat "class members equitably relative to each other"? Raised at ER-123, 137, overruled at ER-33.

6.     Did the court abuse its discretion by awarding attorneys' fees of $80.6 million, or 26% of the settlement amount of $310 million, based on a multiplier applied to a lodestar inflated by inclusion of insufficiently documented, redundant, and unnecessary work of attorneys whose work did not benefit the class?  Raised at ER-131, 137, overruled at ER-12, 21.

7.     Did the district court abuse its discretion by applying a risk multiplier to paralegal fees?  Raised at ER-131, 138, overruled at ER-12.

8.     Are the district court's incentive awards to named plaintiffs, including non-class members, unauthorized by and inconsistent with Supreme Court precedent?  Raised at ER-130, 137-138, 153, overruled at ER-12 & -24.


## STATUTORY AND REGULATORY AUTHORITIES

Statutes and Rules are set forth in an Addendum following the brief.


5

EXHIBIT A

# STATEMENT OF THE CASE

### A.  Background

Defendant-Appellee Apple Inc. is a world leader in the massive smart device market.  During years relevant to this case, Apple's smart devices, including its ubiquitous iPhones, "represented at least 70% of Apple's overall revenue" (ER-245), contributing substantially to Apple's position as the largest company in the world with a market capitalization in the range of $2.521 trillion.[1]

Apple's several generations of iPhones run on Apple's proprietary smart device operating systems ("iOS").  "In 2015, reports of unexplained shutdowns of Apple devices began surfacing, with consumers complaining their devices were suddenly shutting down even though the batteries were more than 30% charged … Complaints accelerated in the autumn of 2016 and were accompanied by reports of unexplained heating."  ER-34.  In response to these product issues, beginning in 2017 Apple released updated software versions iOS 10.2.1 and iOS 11.2.

Apple invited customers to download and install the iOS updates to their iPhones without informing them the updates contained software code intended to impair iPhone functions in order to moderate poor battery performance.  ER-256.

---

[1] As of Sept. 1, 2021.  *See* https://companiesmarketcap.com/apple/marketcap/

6

EXHIBIT A

Dkt. 244, p. 174, ¶ 508. A majority of Apple's iPhone customers download updates shortly after release.[2]

Rather than fixing the iPhone problems, these iOS updates allegedly "concealed [them] by secretly throttling the Devices' performance to reduce the number of unexpected shutdowns to a more manageable volume." ER-34. An independent report based on an analysis of 100,000 iPhones concluded "the decrease in performance of the affected iPhones was caused by the iOS 10.2.1 and iOS 11.2 updates, and not the normal decreased function that would be caused by an aging battery." ER-249. On December 20, 2017, Apple admitted to "one of the largest consumer frauds in history, affecting hundreds of millions of Apple Devices across the globe." ER-241. On December 28, 2017, Apple issued an additional statement regarding the throttling effect of the subject iOS updates (described by Plaintiffs as an "Apology"). ER-243. Regulators in the United States, Canada and several other countries then began investigating Apple's conduct. ER-244, ER-237 (listing investigations and prosecutions). At about that

---

[2] For example, at Apple's 2018 World Wide Developers Conference, Apple's Senior Vice President of Software Engineering, Craig Federighi, stated "half of our customers upgraded to iOS 11 in just seven weeks. It's incredible. Now as we stand here today, 81 percent of our over a billion active iOS devices are running our latest release." ER-247, n. 33.

EXHIBIT A

same time, in connection with these issues, Apple offered a $50 credit toward battery replacement to iPhone customers.  ER-111.

Despite Apple's acknowledgment of and apology for its throttling of iPhone performance, Plaintiffs contend "there was no way for ordinary consumers to quantify these [inklings of reduced functionality] or give them credence."  ER-248.

## B.    Lawsuits are filed

In early 2018, sixty-six class actions related to Apple's throttling software updates and purported iPhone defects were filed in various federal district courts around the country ("Federal Actions"), and four class actions were filed in the California Superior Court and consolidated into a single JCCP action which proceeded independently from this case.  ER-36.

In mid-2018, the Federal Actions were consolidated in the Northern District of California into this MDL proceeding.  ER-36.

## C.    Plaintiffs' allegations and Defendant's motions to dismiss

In the controlling Second Consolidated Amended Complaint ("SCAC") filed on November 30, 2018, 132 plaintiffs from 50 states, U.S. territories and foreign countries sued on behalf of "all persons worldwide who purchased, owned, used or leased one or more of Apple's Devices."  ER-241.  The SCAC alleged

EXHIBIT A

Apple sold its iPhones without disclosing a known defect, then attempted to conceal the defect through software updates that slowed processing speeds to mitigate battery drain and avoid unexplained power offs.

Plaintiffs' SCAC included 76 causes of action: Counts 1-16 alleged violations of federal and California law, including statutory claims (e.g. computer fraud, consumer fraud, unfair competition, etc.), traditional tort claims (e.g. fraud, trespass to chattels, etc.), and common law and contract claims (e.g. money had and received, breach of contract, etc.); Counts 17-76 alleged violations of the consumer protection statutes of every other of the United States, Puerto Rico, the U.S. Virgin Islands, and the United Kingdom. ER-238-240.

Following Apple's motions to dismiss, the court found Plaintiffs had sufficiently pled damages under the Computer Fraud and Abuse Act 18 U.S.C. §1030 *et seq.* (specifically as to 18 U.S.C. §1030(a)(5)(A)), California's Computer Data Access and Fraud Act, Cal. Penal Code § 502(c)(4) and (c)(5), and California's common law trespass to chattels, each including allegations that the iOS updates impaired the function of the iPhones by substantially slowing their processing speed. E.g., "The Complaint's allegations that the iOS updates slowed processor speeds in Plaintiffs' iPhones readily fit [the definition of damage under the CFAA.]" ER-227. While iPhone owners consented to these iOS

9

EXHIBIT A

downloads, the district court found Plaintiffs had sufficiently "alleged that Apple concealed the throttling effect of the iOS updates" and "never gave permission for Apple to cause damage to their iPhones."  ER-226.

In their motion to dismiss, Apple argued that none of the Named Plaintiffs alleged having experienced either unexpected power offs or manifestations of the throttling software.  In their opposition, Plaintiffs made clear that Class claims and damages did not depend on any Class member's subjective experience of the throttling effects of the iOS updates:

> Apple instead is really complaining about the absence of two particular allegations, neither of which are relevant to Plaintiffs' theories of damages—first, whether any individual personally experienced a UPO, and second, whether any individual personally experienced a manifestation of the throttling software.  Apple premises both objections on a fundamental mischaracterization of plaintiffs' theory; ***Apple manufactures a straw-man at odds with the SAC***, and then attacks the SAC for not alleging facts to support Apple's preferred theory.  Apple's gambit should be rejected.

ER-230 (emphasis added).

Plaintiffs stressed that their case was based on injury shared by all members of the proposed class:

> ***Apple now argues that plaintiffs must allege additional individualized experiences, beyond the uniform injury sustained by all Plaintiffs.***  This mischaracterizes the theory of the case and mischaracterizes the data. …  Apple's

10

EXHIBIT A

software Updates "impaired" the availability "of normal CPU performance, which is damage regardless of any particular customer's observations. ***The previously available CPU performance was artificially reduced for everyone, uniformly – no Device was exempt from throttling.***

ER-232 (emphasis added).

### D.    The proposed Settlement

The parties accepted a mediator's settlement proposal following a September 27, 2019 mediation, just 14 months after the filing of Plaintiffs' consolidated complaint and five months after the district court ruled on Apple's motion to dismiss.   The Settlement provides for a $310 million minimum Settlement amount,[3] and defines the "Settlement Class" as "all former or current U.S. owners of iPhone 6, 6 Plus, 6s, 6s Plus, 7, 7 Plus, and SE devices running iOS 10.2.1 or later (for iPhone 6, 6 Plus, 6s, 6s Plus, and SE devices) or iOS 11.2 or later (for iPhone 7 and 7 Plus devices), and who ran these iOS versions before December 21, 2017."   ER-203.

Although Plaintiffs had alleged "there was no way for ordinary consumers to quantify these [inklings of reduced functionality] or give them credence" (ER-248), the Settlement requires claimants to certify under penalty of perjury they

---

[3] The Settlement has a scaling feature, but the paltry number of claims submitted fell far short of the number necessary to trigger any higher amount.  ER-214.

EXHIBIT A

"experienced diminished performance on the eligible [iPhone] when running iOS 10.2.1 or iOS 11.2 before December 21, 2017" (ER 205) – the precise requirement Plaintiffs had earlier referred to as Apple's "straw man." ER-248. The attestation requirement conflicts with the uniform theory of damages that animated Plaintiffs' case, thereby *throttling* Settlement claims and effectively guaranteeing Apple would pay no more than the minimum $310 million Settlement amount.

Further, the Claim Form inexplicably restricts claims to current owners of subject iPhones, even though the Settlement Class definition includes both current *and* former owners. ER-203.

### E. Preliminary approval

At the May 15, 2020 preliminary approval hearing, counsel for Apple explained the claim requirements: "So it's not everybody who owned one of those devices. It's not even everybody who owned one of those devices and ever upgraded or updated their system to the latest iOS software, and **so it's a very, very narrow group**." ER-187 (emphasis added).

Counsel continued:

> [a]nd that's why the claim form, frankly, has an attestation requirement as well. It's not just if you downloaded the software. The claim in [t]his case is that you experienced some sort of impact on performance ... So for us that was a very critical and material component to negotiating this settlement.

12

EXHIBIT A

ER-190.

Apple's attorney further explained that, by contrast, the release covers all Settlement Class members, even those not able to make a claim: "Now I need to stress the class is very broad. In Apple's view it will cover every single device that was potentially impacted." ER-192.

Regarding the dichotomy between the broad Class definition and the narrow sub-set of Class members able to make a claim, Apple's counsel explained:

> The additional piece that is required in the claim form is to attempt to align the compensation and recovery in this case with the theory of injury, which again wasn't just everyone who owned a device. There was a defect theory that your honor dismissed on the pleadings that would have possibly captured that, but if those people who have experienced or can attest under penalty of perjury that they observed some impact on the performance of their device.

ER-192-3.

Thus, although the court had determined that none of the Named Plaintiffs alleged or needed to allege awareness of any specific manifestations of the software throttling (ER-219, 223-4),[4] the settlement fund compensates only Class

---

[4] "[U]nlike with the defect theory, here the Court concludes that Plaintiffs adequately plead injury based on allegations that iOS updates were designed to reduce the processing speed of their phones in order to prevent UPO's. While Apple characterizes this as a power management feature, Apple does not contest that the iOS updates performed this function. Because the [SCAC] adequately alleges that the iOS updates affected *all Plaintiffs alike*…" ER-223-4.

13

EXHIBIT A

members able to certify they had experienced such an impact on their iPhones. Unsurprisingly, Apple's counsel conceded the parties never expected the settlement to exceed the $310 million minimum settlement amount: "No one expects this, [that] the amounts reach the ceiling of the proposed settlement … Most likely the parties anticipate that it will be at the $310 million number." ER-194.

On May 27, 2020, the district court granted preliminary approval to the Settlement and the Class definition.

### F.   Class Counsel's fee request

Class Counsel requested a fee award of "$87,730,000, or 28.3%" of $310 million.  ER-12.  Class Counsel submitted a lodestar totaling $36,103,148, and included in that number the work of JCCP Counsel, foreign liaison counsel, and paralegals.  ER-26.  JCCP Counsel alone accounted for "9,678.8 hours … and $3,993,154.55 of the total."  ER-26, 165.  International liaison counsel made up $547,037 (ER-122) and paralegals added at least another $2,846,443.  ER-72, et seq. (paralegals shown as Category 06).

Apple objected to Class Counsel's percentage fee request, arguing that fees should be limited to lodestar because the Settlement does not establish a common

14

fund.  ER-103.  Apple also objected to inclusion of excessive, redundant and unnecessary hours in the lodestar.  ER-119.

### G.    Class member objections

Over 75 timely objections were filed on behalf of 145 objectors.  ER-50. Appellants Pantoni, Jan, and Feldman objected to adequacy of representation, the mismatch between the class definition, pled claims and claim requirements, the requested attorneys' fees, overstatement of lodestar, subjecting paralegal fees to a lodestar multiplier, and incentive awards. ER-123, 136.

### H.    Settlement approval and fee awards

On March 17, 2021, the district court granted final certification of the Settlement Class and gave final approval to the Settlement.  ER-43.  In approving the Settlement, the court relied on the late-filed expert declaration of Michael A. Williams estimating diminution in value damages, which was filed on December 11, 2020, *after* the first fairness hearing.  ER-48 referencing Dkt. 591.[5]  Based on an estimated Class size of 90 million, the settlement represents approximately $3.44 per device.  Out of 90 million Class members, only 2,268,860 claims were approved, an effective rate of less than 2.5%.  ER-41.

---

[5] Unless otherwise stated, "Dkt." shall refer to the N.D. Cal docket in Civil Action No. 5:18-md-02827.

15

EXHIBIT A

The district court denied Class Counsel's fee request because the resulting multiplier of 2.43 would have been too "high," and instead awarded $80,600,000, 26% of the $310 million Settlement fund, which it calculated by multiplying an inflated lodestar by its chosen maximum multiplier of 2.232. ER-26. Even though the district court allowed that JCCP counsel's work may have "increased inefficiency and duplication without any benefit to the class," the court took no action to reduce the exaggerated lodestar. ER-28. JCCP counsel's hours and fees of $3,993,154 (ER-26), when multiplied by the court's 2.232 multiplier, account for $8,912,720 of the court's fee award. Applying the same multiplier to international liaison counsel's fees and paralegal charges added an extra $4,727,805 to the court's fee award.

The district court also awarded the 132 Named Plaintiffs, including eleven non-Class-member foreign nationals, awards of either $1,500 or $3,500, depending on whether they had been deposed, for a total of $216,000.

EXHIBIT A

# SUMMARY OF ARGUMENT

## SETTLEMENT

Named Plaintiffs failed to adequately represent the interests of the Class by agreeing to a Settlement that does not conform to the theory of damages pled in their Complaint, and that restricts compensation to a tiny subset of the Class able to attest to current ownership and impaired performance.  The attestation requirement created a subclass defined by subjective awareness of performance issues.  The Named Plaintiffs had not themselves alleged having experienced performance issues, and were aware the average Class member could not attest to performance issues caused by the iOS software updates.

The subclass of iPhone owners unable to make the Claim Form's performance attestation were inadequately represented in this case, as were Class members who no longer own their phones and are thus ineligible to file a claim.  Clearly, for these Class members, further litigation of this case is preferable to a settlement that provides them nothing.  Similarly, for Class members able to make claims, Named Plaintiffs' failure to allege subjective awareness of impaired performance rendered them inadequate representatives for Class members able to so attest.

17

EXHIBIT A

## ATTORNEYS' FEES

The district court committed at least three errors: (1) awarding an unmerited percentage fee; (2) calculating the percentage fee using a padded lodestar; and (3) inappropriately applying a multiplier to paralegal fees.

The district court's fiduciary duty to the Class compels it to set the fee at the lowest reasonable percentage, not the highest. This duty required the district court to consider and explain why a 17.5% fee, as suggested by the Appellants, would result in unjust enrichment of the Class. ER-148. A 17.5% fee of $54,250,000 would be in line with empirically-determined market rates and provide Class Counsel with a substantial return on their investment of permissible time, while not unjustly enriching the class.

The district court misapplied the *Vizcaino* factors pertaining to results achieved and risk. Seventy cases were filed by 41 separate law firms within months of Apple's acknowledgement of the throttling effect of its iOS updates. There was virtually no chance this case would go to trial, given Apple's pre-litigation admissions and early offer of restitution. The district court grossly overstated the risk of litigation in determining a "risk" multiplier.

The district court also misconstrued the results achieved. While the court anticipated payment of $25 per claim, the Settlement recovered just $3.44 per

18

EXHIBIT A

iPhone,[6] in contrast to Apple's pre-litigation offer to all iPhone owners providing a $50 credit toward battery purchase/replacement. The Settlement's reduced benefit to consumer Class members cannot be regarded as worthy of the "results achieved" multiplier awarded by the district court.

Rejecting the percentage fee requested by Class Counsel, the district court awarded attorneys' fees based on a lodestar plus multiplier, using an inflated lodestar that included the unproductive, redundant, and unnecessary work of scores of attorneys whose work did not benefit the Class. Also, allowing inclusion of the work of counsel in extraneous actions in Class Counsel's lodestar was an abuse of the district court's discretion.

The district court also abused its discretion by applying a multiplier to paralegal fees. While paralegals' fees may be charged to the Class at rates higher than the actual cost to the firms employing them, paralegal lodestar should not be enhanced by a lodestar multiplier when calculating Class Counsel's fee award.

## INCENTIVE AWARDS

Incentive awards of any amount are prohibited by Supreme Court precedent, and the district court should have denied approval of the requested service awards on that basis alone. Even if such awards were permissible, the district court

---

[6] Claims were made on a per iPhone – not per Class member – basis. ER-209.

EXHIBIT A

abused its discretion by approving service awards for many Named Plaintiffs who contributed nothing to the result.

Named Plaintiffs' service awards dwarf their claims by a factor of 50, an inducement that rewards their abandonment of Class-wide claims.

In particular, the payment of service awards to 11 foreign nationals who are not members of the Settlement Class, who do not represent certified foreign classes, and whose work achieved nothing for the Class, represents the height of abuse of such awards, lending further support to the Supreme Court's wise policy of forbidding them from the outset.

EXHIBIT A

## STANDARD OF REVIEW

**Standard of Review as to settlement approval.**  A district court's decision to approve a class action settlement is reviewed for abuse of discretion.  *In re Bluetooth Prod. Liab. Litig.*, 654 F 3d 935, 940 (9th Cir. 2011).  Whether the district court applied the correct legal standard is reviewed de novo.  *Sea Coast Foods, Inc. v. Lu–Mar Lobster & Shrimp, Inc.*, 260 F.3d 1054, 1058 (9th Cir. 2001).  "Settlements that take place prior to formal class certification require a higher standard of fairness."  *In re Mego Financial Corp. Securities Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *citing Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

**Standard of review as to the award of attorneys' fees.**  A district court's "award of fees and costs to class counsel, and its method of calculation," is reviewed for abuse of discretion.  *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 656 (9th Cir. 2020), *quoting In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1177 (9th Cir. 2013).  We review de novo the "legal bases" of a fee award.  *Chambers, quoting Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 956 (9th Cir. 2002).  "A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Dennis v. Kellogg*

21

EXHIBIT A

*Co.*, 697 F.3d 858 (2012) (internal citations omitted). Whether paralegal fees may be enhanced by a multiplier is a legal question reviewed *de novo*.

**Standard of review as to incentive awards.** Incentive awards are reviewed *de novo*, as this appeal presents a purely legal question of first impression in this Circuit. *Wagner v. NTSB*, 86 F.3d 928, 930 (9th Cir. 1996) ("Purely legal questions are reviewed de novo."). *Cf. Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1127 (9th Cir. 2006) ("We ... review de novo the district court's application of the Federal Rules of Civil Procedure ...."); *United States v. Clifford Matley Family Tr.*, 354 F.3d 1154, 1159 n.4 (9th Cir. 2004) ("We review de novo interpretations of the Federal Rules of Civil Procedure.")

EXHIBIT A

## ARGUMENT

### I.   The district court erred in certifying the Settlement Class and approving a Settlement binding on all Class members where the requirements of Rule 23 were not satisfied

Prior to certifying a settlement class and approving a settlement, a court must ensure the four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are satisfied.  In addition, in a damages class action, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members."

Rule 23 and Ninth Circuit precedent require a court to make detailed findings that the prerequisites of the rule have been satisfied prior to certification of the settlement class.  *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (*citing Hanlon*, 150 F.3d at 1026).

Here, the district court's findings regarding class certification consist of four terse sentences: "On May 27, 2020, the Court preliminarily approved the Class.  Nothing has occurred that changes this Court's previous determination that class certification is appropriate under Rule 23.  The requirements of Rule 23(a) and (b) are fully satisfied.  Accordingly, the Court grants final certification of the

EXHIBIT A

Settlement Class."[7]  This abbreviated approach to class certification fails to satisfy Ninth Circuit's requirements.  *Dennis* 697 F.3d at 864.  *See also Allen v. Bedolla* 787 F.3d 1218, 1223–1224 (9th Cir. 2015) (vacating settlement and class certification where district court did not satisfy procedural requirements and "because the record before us does not allow us to undertake even our deferential substantive review.").

In *Amchem Prod. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court clarified that the requirements of Rule 23 continue to apply in a settlement context:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.

*Amchem* at 620.

---

[7] In its preliminary approval order, the district court similarly failed to provide any analysis to support its holding, stating: "this Court preliminarily finds, for the purpose of settlement only, that the Settlement Class meets all the prerequisites of [FRCP Rule 23] for class certification, including numerosity, commonality, typicality, and predominance of common issues, superiority and that the Named Plaintiffs and Class Counsel are adequate representatives of the Settlement Class." ER-196.

EXHIBIT A

In a case alleging common injury shared by 90 million iPhone owners, the prerequisites of Rule 23(a) should easily be satisfied. The commonality of injury and uniformity of damages were the predominant feature of the Class complaint; the complaint did not include any allegation of personal experience of impaired performance. The court acknowledged this key point in its Order on MTD. ER-219.

After motions to dismiss, the case was winnowed down to computer intrusion claims the district court found had been alleged on a class-wide basis. Apple sought to defeat these claims by arguing that none of the Named Plaintiffs alleged having personally experienced the effects of the throttling software. The court rejected this argument, finding the theory of the case does not rest on individual experience of impaired performance, as plaintiffs had adequately alleged that *all* iPhones running the specified iOS updates suffered from impaired performance. ER-224. Thus, following the motion to dismiss, it seemed the Named Plaintiffs – individuals who had downloaded the iOS software but not alleged awareness of impaired performance – could adequately represent the interests of all iPhone owners who had downloaded the iOS updates.

In the course of settlement negotiations, however, Named Plaintiffs and Class Counsel abandoned Class-wide damages and agreed to a Settlement

EXHIBIT A

explicitly designed to compensate only a small subset of the Class who *could* attest to personal experience of performance issues. By allowing individual subjective experience to prevail over Class claims, the Settlement disregards the predominance requirements of Rule 23(b)(3).[8] Moreover, because the Settlement is not fair to the vast majority of the Class – whose claims were extinguished for no consideration – Class members were neither adequately represented nor equitably treated within the meaning of Rules 23(e)(2)(A) and (D), and the district court erred in approving the Settlement.

## A. The Class was not adequately represented by Named Plaintiffs whose claims were not typical of iPhone owners able to attest to performance issues

As a matter of constitutional due process, a court may give preclusive effect to a judgment against unnamed/absent parties only if they were adequately represented. *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940) ("members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present"). *See also* William

---

[8] Had this case included one or more Plaintiffs who alleged personal awareness of the performance issues in their complaints, the intra-class conflict would have been apparent from the outset, and the court could have required the establishment of subclasses at an earlier time. Simply because the Plaintiffs waited until settlement to bring the conflict to the fore does not excuse the failure to require adequate representation for each subclass.

EXHIBIT A

B. Rubenstein, 5 Newberg on Class Actions, §3:51 (5th ed. 2020) ("adequate representation" is the "*sine qua non* of class action law.").

Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel prosecute the action vigorously on behalf of the class. *See e.g., Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir. 2003) and *Hanlon v. Chrysler Corp*. 150 F.3d 1011, 1020 (9th Cir. 1998). The adequacy of representation requirement assumes representative parties will zealously pursue the claims of absent class members with whom they share a common litigation interest.

Here, the broader Class defined by the Settlement was not adequately represented under Rule 23 because the Named Plaintiffs and Class Counsel agreed to settle the claims of the vast majority of the Class for no compensation, without regard to Class-wide injury and damages. In the circumstances of this case, no zealous representative would agree to compromise the legal claims of tens of millions of uniformly injured class members for zero compensation.

Neither was the compensated subclass adequately represented. The district court recognized that none of the Named Plaintiffs had alleged personal awareness of the performance issues. ER-219 ("Plaintiffs concede that they do not plead that

27

EXHIBIT A

any named plaintiff personally experienced an Unexpected Power Off ("UPO"), and they do not plead that any named plaintiff experienced manifestations of the throttling software."). Despite this, however, the Settlement compensates only the narrow sub-set of Class members whose awareness of impaired performance is not shared by Named Plaintiffs; since the alleged claims of Named Plaintiffs' were not *typical* of this subclass they had no incentive to maximize their recovery.

The Supreme Court has repeatedly stressed that allegations of named plaintiffs must by typical of the class they seek to represent. *See e.g.*, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ("We have repeatedly held that 'a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'") (Internal citations omitted.). Based on their allegations, it is not clear whether the Named Plaintiffs are even able – in good faith – to make claims on the Settlement fund.

The district court found Plaintiffs had alleged damages capable of proof on a class-wide basis. With the Settlement, however, the Named Plaintiffs allowed individualized experience of performance issues to become the overriding, determinative, *predominant* issue in establishing whether a class member could receive compensation. The terms of the Settlement created an intra-Class conflict,

28

EXHIBIT A

by limiting compensation to those few Class members who had subjective awareness of iPhone performance issues during the class period.

### B. A unified Class defined by common injury was bifurcated by the Settlement into two subclasses, with neither having separate representation and only one entitled to share in the Settlement

With the motion to dismiss it became apparent the Class included individuals, like the Named Plaintiffs, who had not comprehended the impaired performance alleged in the complaint, as well as others who *were* aware of performance issues. Once they abandoned Class-wide claims and damages, the Named Plaintiffs no longer had commonality of interest with the subclass cognizant of performance issues and were not competent to represent the interests of this subclass. *See Amchem* at 627 (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected."). *See also Hansberry,* 311 U.S. at 43-43.

The conflict between subclasses became fixed when Named Plaintiffs chose to ignore the Class-wide impaired performance and resulting uniform damages, and agreed to a Settlement that restricted claims to the subclass aware of impaired performance. ER-210-212.

A Class initially defined by common injuries related to the download of throttling software was thus divided into two groups by the parties' negotiations

29

EXHIBIT A

and by the Settlement based on a theory of injury not found in the Complaint, according to the non-uniform, individualized, subjective experience of iPhone performance issues. When Named Plaintiffs chose to advocate for what Apple's counsel described as a "very, very narrow group" (ER-187), it became apparent there were competing, separate groups within the Class, whose uniform legal claims were now being differentiated by a subjective standard. "[T]he adversity among subgroups requires that members of each subgroup cannot be bound to a settlement except by consents given by those who understand their role is to represent solely the members of their respective subgroups." *Amchem*, 521 U.S. at 627, *citing In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 742–743 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (2d Cir. 1993).

The conflict within the Class was readily apparent. In such a case the appropriate action is to create subclasses. *Cf. Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under [Rule 23(c)(5)], with separate representation to eliminate conflicting interests of counsel."), *citing Amchem*, 521 U.S., at 627 (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals

30

EXHIBIT A

affected"). When Settlement approval was sought, it was incumbent on the court to require separately represented subclasses, with separate counsel, to ensure adequate representation of the newly competing interests and theories of recovery of the respective subclasses.

Though the Settlement favors the subclass aware of impaired performance, as noted above, that subclass was nonetheless inadequately represented in this action. Abundant legal authority has established that representatives of one group of claimants to a settlement cannot adequately represent the interests of another group when their interests are adverse. *See e.g.*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("[W]e must be concerned that the individual owners had no incentive to maximize the recovery of the government entities; they could skew the terms of the settlement to their own benefit."). *Cf. Staton v. Boeing*, 327 F. 3d 939, 958 (9th Cir. 2003) (presence of both rank and file and supervisory employees in one class was acceptable because both groups were represented). If Named Plaintiffs were not aware of performance problems, then they are not competent to represent the claimant subclass.

The subclass defined by awareness of performance issues is also problematic because a class cannot be defined by purely subjective criteria.

EXHIBIT A

Courts have consistently rejected class and subclass definitions based on subjective criteria. *See, e.g. Mullins v. Direct Digital, LLC,* 795 F.3d 654, 660 (7th Cir. 2015) ("[C]lasses that are defined by subjective criteria, such as by a person's state of mind, fail the objectivity requirement."). *See Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (Class membership must be "determinable from objective, rather than subjective, criteria.").

Here defining a subclass by subjective criteria is particularly cynical because Named Plaintiffs and Class Counsel acknowledged that ordinary consumers had "no way" to understand the fact or cause of reduced iPhone functionality. See ER-248. ("Users of Apple devices immediately began reporting reduced functionality, but there was no way for ordinary consumers to quantify these inklings or give them credence.")

Over 97% of Class members did not submit a Claim Form, and there is no way to determine what portion of the Class was eligible to do so.

The district court abused its discretion by allowing a purely subjective criterion to define the subclass of members able to make a claim, rendering the subclass unidentifiable until after claims are filed. The court also erred by certifying a broader Class when only a small subclass – unidentifiable prior to the

EXHIBIT A

claims process – was able to receive compensation through the Settlement. Because of the new and subjective theory of damage adopted by the parties at the settlement stage, the vast majority of iPhone owners should not be included in the Class and should not be compelled to give a release. Because neither subclass was adequately represented, the district court should not have certified the Settlement Class.

### C. An overall assessment that a settlement is fair cannot substitute for the procedural protections of Rule 23, including those required by amended Rule 23(e)(2)

An overall assessment that a settlement is fair (e.g., that the $310 million settlement fund here was adequate) cannot be substituted for the structural protections provided by the requirements of Rule 23.

> The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments – checks shorn of utility – in the settlement-class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind – class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

*Amchem*, 521 U.S. 591, at 621 (1997).

33

EXHIBIT A

As amended in 2018, Rule 23(e)(2) specifies that a court must consider whether: "the class representatives and class counsel have adequately represented the class" and "[look] to the *conduct of the litigation and of the negotiations leading up to the proposed settlement*. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement." Advisory Committee Notes, Rule 23, 2018 Amendments, Subdivision (e)(2), Paragraphs (A) and (B) (emphasis added). "[T]he focus at this point is on the actual performance of counsel acting on behalf of the class." *Id*.

As described *supra,* neither the excluded subclass nor the claimant subclass was adequately represented. Lack of adequacy cannot be excused by claiming "no harm, no foul." When a Settlement includes inadequately represented class members, it must be vacated, without regard to whether "the class members' interests were actually damaged." *Dewey v. Volkswagen AG*, 681 F. 3d 170, 189 n.19 (3d Cir. 2012). The Settlement is not adequate for all Class members and does not treat Class members equitably relative to each other in violation of Rule 23(e)(2)(C) and (D).

Rule 23(e)(2)(C) requires a court to consider whether "the relief provided for the class is adequate" (providing factors to consider) and Rule 23(e)(2)(D) requires the district court consider whether "the proposal treats class members

34

EXHIBIT A

equitably relative to each other." These sections of the rule focus on "a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern." Advisory Committee Notes, 2018, Rule 23, Subdivision (e)(2), Paragraphs (C) and (D).

The $310 million Settlement represents a recovery of no more than $3.44 per phone. Weighed against the uniformly suffered iPhone damages, the per-phone recovery is insignificant. The district court found "[T]he $25 cash payment per eligible device is comfortably in the middle of [the] estimated damages range." ER-46-7. But the district court's analysis is flawed because it fails to consider the value of the Settlement for the entire Class, as opposed to the claimants. It was never contemplated that each Class member would receive $25 per eligible device. That would have required a settlement fund of $2.25 billion, net of attorney's fees. The court abused its discretion by failing, as required by Rule 23(e)(2)(C), to consider the value of the $310 million Settlement relative to the damages it recognized were uniformly suffered by Class members.

Under Rule 23(e)(2)(D), a district court may only approve a settlement if "the proposal treats class members equitably relative to each other." As described above, the terms of Settlement divided the Class into two subclasses, one able to make a claim on the Settlement fund, another which could not. The Claim Form,

35

EXHIBIT A

an integral part of the Settlement, is the vehicle by which the majority of the Class was excluded from making claims. The Claim Form specifically excluded two groups of Class Members.

### 1. The Claim Form denies former iPhone owners the ability to make a claim

The Settlement Class consists of "*all former or current* U.S. owners of [subject iPhones who ran the subject iOS updates prior to December 21, 2017]." (Emphasis added.) ER-203-4. This was reiterated in the Class Notice. ER-214 ("You are a member of the Settlement Class if *you are or were* (1) a United States owner of [a subject iPhone]…" (Emphasis added)).

The Claim Form Instruction, however, states: "Eligibility. The Settlement will provide a cash payment if you *are* the owner of an eligible device…" (Emphasis added.) ER-212. Likewise, the Electronic Claim Form requires a claimant attest to current ownership. ER-210 ("Please select only one option … I *am* the owner of an iPhone [6 series]; [or] I *am* the owner of an iPhone [7 series]…" (Emphasis added.)).[9]

---

[9] The printed Claim Form also requires attestation that the Class member is an owner of a subject iPhone on the date the Claim is signed. ER-212.

EXHIBIT A

While the Settlement Class includes current and former iPhone owners, the court-approved Claim Forms – both electronic and print versions – deny former owners the ability to make a claim. The Claims period ended October 6, 2020 – 33.5 months after the Class period closed on December 21, 2017. Consumers keep their iPhones for an average of 31 months,[10] so it is very likely most Class members no longer owned their subject iPhones during the Claims process and would not have been able to sign a Claim form attesting to current ownership.[11]

The clear disconnect between the definition of the Settlement Class (former and current owners) and the court-approved Claim Forms (current owners only) renders former owners unable to register a claim and subjects them to inequitable treatment relative to other Class members in violation of Rule 23(e)(2)(D).

---

[10] https://www.whistleout.com/CellPhones/Guides/this-is-how-long-youll-keep-iphone

[11] For perspective, this action relates to the iPhone 6 and 7 series. The iPhone 7 was introduced September 7, 2016, and Apple has just released its iPhone 13 line. Some Class members are likely on their third or fourth phone since owning a 6 or 7 series. *See* https://www.apple.com/iphone-13/?cid=CDM-USA-DM-P0021402-484902

37

EXHIBIT A

### 2. The Settlement ignores Class-wide injury and uniform damages, and inequitably denies a majority of the Class the right to make a claim

The distribution of Settlement proceeds also neglects an additional subset of Class members whose causes of action survived Apple's motion to dismiss. For the vast majority of Class members – who, like claimants, were victims of computer intrusion and trespass to chattels – the Settlement imposes an inequitable apportionment of relief relative to actual damages in violation of Rule 23(e)(2)(D).

The excluded Class members give up all their claims and rights, but receive *nothing* from the settlement, even though all Class members suffered the same impairment of iPhone performance and uniform damages. The Settlement clearly does not treat Class members equitably relative to each other, and the district court erred by failing to so find.

The Settlement broadly releases the legal claims of all Class members, but compensates only those who can declare under penalty of perjury "I am the owner of [a subject Apple device]" and "I experienced diminished performance on my [subject Apple device] when running [a subject iOS] before December 21, 2017. ER-210-13.

38

EXHIBIT A

Only 2.27 million claims were received from Class members able to attest they currently own[12] a subject iPhone that had, following installation of a subject iOS, suffered "diminished performance" some three or four years earlier. The other 87.7 million Class members, including those who no longer own their outdated iPhones or have no recollection of impaired performance, will not be compensated – even though all Class members suffered the same impaired performance and damages testified to by Plaintiffs' experts.

The district court erred by approving a Settlement that provides inadequate relief for the Class in violation of Rule(e)(2)(C), and that fails to treat "class members equitably relative to each other" in violation of Rule(e)(2)(D). The district court's Settlement approval should be reversed.

---

[12] The Notice to Class members states "you may be entitled to settlement benefits if you *are or were* [an owner of a subject iPhone]." The Claim Form requires that a claimant attest to being a current owner through use of the language "I am the owner of [a subject iPhone]." Oddly, only those who have sold their subject iPhones – and thus cannot make a claim – have actually realized the damages that support the court's reasonableness finding.

39

EXHIBIT A

## II. The district court abused its discretion and breached its fiduciary duty to the Class by awarding an unreasonable fee far in excess of awards in similar cases and based on an inflated lodestar

Class Counsel sought a percentage fee of 28.3% of the $310 million Settlement Amount. The availability of a percentage fee is consistent with the "common fund doctrine." Grounded in equity, this exception to the American Rule "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

When class counsel are seeking a common fund fee, however, their interest is adverse to the interest of their class clients, and this Court has long held that a district court has a fiduciary duty to protect the interests of the class at the fee-setting stage. *See e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) ("As a fiduciary for the class, the district court must 'act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.'"); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994) (same); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) (court has fiduciary role for class at fee-setting stage).

40

EXHIBIT A

When making an attorneys' fee award, the district court, in its fiduciary role, must act in the best interest of the absent Class. That duty, however, is commonly eclipsed by class counsel's interest in recovering the highest possible fee.

The common practice of beginning the fee analysis with class counsel's request prejudices the class and is inconsistent with the court's fiduciary duty.

> [C]ases that employ the percentage approach arbitrarily tend to start their analysis with the attorneys' request, rather than an objective marker, such as the hours worked…. [C]ourts tend to anchor their analysis to the percentage first requested by counsel [which] allows plaintiffs' counsel to set the baseline based on its biased valuation of its work…. [C]ourts have shown a propensity to adjust the requested amount by only a few percentage points, if at all. This anchoring effect allows plaintiffs' counsel to manipulate the fee award they are likely to receive by simply requesting a higher percentage.

*In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 762-763 (S.D. Ohio 2007) (internal citations omitted).

This is precisely what occurred here. Because Class Counsel requested a supra-competitive fee of $87,730,000 – 28.3% of $310 million and well beyond this Circuit's benchmark – the court properly identified the windfall that would result from such a fee. The court ultimately knocked the percentage down by just a couple of points, however, and settled on a 26% fee award – only 2.3% less than the requested fee and unjustifiably higher than the non-megafund benchmark. The court's analysis started with Class Counsel's excessive request and flirted

41

EXHIBIT A

with an empirically reasonable percentage award, then turned to a lodestar calculation to arrive at an excessive and unmerited 26% fee award. The most plausible explanation for the court's fee award is that it was anchored to Class Counsel's absurd request of 28.3%, because it does not pass muster under any reasonable metric.

In working its way to a fee, the district court first determined "the better approach is to look at empirical research on megafund cases" (ER-23), but then ignored those studies and cases. After referencing empirical research finding the median fee award in megafund class actions is 10.2% and Northern District cases relying on those findings, the court veered off into a lodestar analysis, not to cross-check a reasonable 10%-16% fee award, but to arrive at a fee far in excess of the empirically supported range, and within a few points of Class Counsel's request. ER-27. The court used the lodestar methodology to back into a 26% fee award, but failed to scrutinize a proffered lodestar loaded with redundant, unnecessary, and unproductive work.

The district court had a fiduciary duty to consider the empirically supported percentage fee urged by Appellants and to explain why that proposed level of compensation – and resulting increase in funds available for payment of class claims – would unjustly enrich the Class. The court was not free to proceed to a

42

EXHIBIT A

26% fee before it had considered the reasonableness of the lower fee suggested by the Appellants. A 17.5% fee of $54,250,000, as advocated by Appellants (ER-137), would represent a generous multiplier of Class Counsel's corrected lodestar and would be more consistent with the court's fiduciary duty to award a fee no greater than an amount below which the Class would be unjustly enriched.

This court has held "in common fund cases, no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other." *In re: Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291 (9th Cir. 1994). Most importantly, "the district court should be guided by the fundamental principle that fee awards out of common funds be 'reasonable under the circumstances.'" *Id., quoting Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir.1990). While the court had discretion to award fees either as a percentage of the fund or based on a reasonable lodestar, that discretion is constrained by a fiduciary duty to protect the interests of absent class members at the fee-setting stage. The court erred by disregarding its duty to the Class, by failing to consider Appellants' fee recommendation, by applying an unwarranted multiplier to a lodestar bloated by hours not spent for the benefit of the Class, and by finding a "downward adjustment to the [non-megafund] benchmark is not appropriate." ER-27.

EXHIBIT A

A.   **The district court's analysis of the *Vizcaino* factors (and the megafund rule) suggested fees below the non-megafund benchmark were warranted**

In considering whether to depart from the Ninth Circuit's 25% non-megafund benchmark, the district court considered five factors:  "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." (Citations omitted.) ER-17.  The court further noted "[t]he "most critical factor" in determining appropriate attorneys' fee awards "is the degree of success obtained."" ER-17, *citing Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

1.   **Results achieved**

Regarding the results achieved, the court failed to examine the actual per iPhone recovery achieved by the Settlement.  The Settlement represents a recovery of approximately $3.44 per eligible device.[13]   By way of comparison, prior to the initiation of litigation, Apple had indicated its willingness to

---

[13] The district court made a clear error in finding "[t]he $25 cash payment per eligible device is comfortably in the middle of [the] estimated damage range," as the Settlement does not provide anything close to $25 per iPhone.  ER-46.  It appears the court was confusing a per claim recovery based on a low projected claim rate (i.e., no more than 18%) with the actual per iPhone Settlement value of $3.44.

44

EXHIBIT A

compensate consumers by offering a $50 credit per iPhone, sixteen times the per eligible device recovery created by the Settlement.

In fact, the $310 million represents a recovery of only 14% of what the district court determined were reasonable $25 damages.  The district court's chosen method of measuring the degree of success (i.e., based on per claimant recovery and ignoring the low number of claims received) merely rewarded Class Counsel for abandoning the interests of a majority of the Class and achieving an extremely low 2.5% claims rate.  The results achieved warrant a downward adjustment from the 25% benchmark and only a modest, if any, multiplier.

### 2. The district court abused its discretion in its risk factor analysis

The district court overstated the risk of litigation, as the risk of not settling was very low from the outset.  Corporations are risk-averse and inclined to settle large class actions filed against them, regardless of the merits.  *See* William P. Barnett, *There is No Conservative Case for Class Actions*, 22 Fed. Soc. Rev. 192, 195 (2021).  In this case, Apple explained it settled "to avoid the expenses, uncertainties, delays and other risks inherent in continued litigation of the MDL" even though it was confident it would prevail on the merits.  ER-20.  *See also Goldberger v. Integrated Res.*, 209 F.3d 43, 52 (2nd Cir. 2000) (no appreciable risk of non-recovery because virtually all class actions settle).

45

EXHIBIT A

The district court also disregarded the risk-diminishing effect of governmental investigations and the virtual stampede of case filings that followed Apple's public statements regarding the throttling effect of the subject iOS updates and its offer to compensate consumers through a $50 credit. Sixty-six separate federal cases and four state cases were filed in the hope of making fees on a virtually guaranteed settlement. As Apple described, "the many law firms that vied to represent the class demonstrates that the plaintiffs' bar viewed this matter as a lucrative and desirable – rather than risky and precarious – engagement." ER-103.

Relying on the fact that only three motions to serve as lead counsel were filed (in contrast to *In re Anthem Inc. Data Breach Litig.*, 2018 WL 3960068, at *27 (N.D. Cal. Aug. 17, 2018), where 18 firms filed such motions), the court here suggests other attorneys were discouraged by the risk of the litigation. ER-20. In practice, firms typically agree to support one or another lead-counsel candidate in exchange for assurances related to sharing of work and fees. *See* Third Circuit Task Force on Selection of Class Counsel, 208 F.R.D. 340, 348 (2002) ("voluntary agreements among lawyers may create cartel-like groupings that favor some lawyers…[and] may also result in overstaffing and padded hours. In order to reach a 'deal', lead counsel may have to 'cut in' so many lawyers that the

EXHIBIT A

representation of the class becomes inefficient and the ultimate fee request becomes inflated.") *See also* Barnett, 22 Fed. Soc. Rev. at 195. Ignoring this reality, the district court misinterpreted the decision by 38 law firms to defer to counsel with the pole position in the race to be lead counsel, and erred in viewing this as an indication of risk.

Further evidence of the limited risk to which Class Counsel was exposed was Apple's decision to enter into early mediation, which allowed the case to settle just 14 months after consolidation in the Northern District of California. Indeed, "the parties [ ] reached resolution and the litigation never progressed to the phases that entail the most risky, time-intensive, and difficult endeavors." ER-103.

### 3. The district court failed to meaningfully consider awards in similar cases with recoveries above $250 million

This Court has recognized "[w]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth Headset Products Liability Litigation*, 654 F. 3d 939, 942-943 (9th Cir. 2011).

47

EXHIBIT A

In considering awards made in similar cases (*Vizcaino* factor five), the district court recognized the $310 million as a megafund:

> the size of the Settlement is a function of the number of devices at issue, estimated to be 90 million... Class Counsel's work in litigating this case up to the point of reaching settlement would have been the same whether there were 10,000, 100,000, 1,000,000 or more devices at issue.

ER-27.

Rather than looking to Class Counsel's cherry-picked cases as a basis for comparison, the court stated that it would follow the approach taken by two Northern District judges and "look to empirical research on megafund cases," as Judge Chen did in *Alexander v. FedEx Ground Package Sys.*, No. 05-cv-00038, 2016 WL 3351017, at *2-3 (N.D. Cal. June 15, 2016). Judge Chen ultimately awarded fees of 16.4% of the $226,500,000 common fund, citing to *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015), in which Judge Koh awarded fees of 10.5% of a $435 million settlement.[14] The $310 million Settlement fund in this case falls almost exactly in the middle of these two Northern District megafund cases cited by Judge Davila,

---

[14] Judge Koh relied on Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements (1993-2008)*, 7 J. Empirical Legal Studies 248 (2010) which reviewed 68 "megafund" settlements and found median attorney fees were 10.2% of the fund and the mean was 12%.

EXHIBIT A

suggesting a reasonable fee would be somewhere in the 10.5%-16.4% range. But the district court abused its discretion by ignoring the empirical research and similar cases and awarding 26%, a fee even higher than the Ninth Circuit's 25% benchmark in small-value class cases. ER-23.

Consistent with empirical research and the two California megafund cases cited in the district court's fee order, fees well below the 25% benchmark are warranted in this case. In summarizing its review of the *Vizcaino* factors the court found "no single factor or combination of factors supports the requested 28.3% … [which] far exceeds the mean and median percentages reported in both the Eisenberg & Miller study and the Fitzpatrick study." ER-24. Instead of choosing a percentage fee in line with these empirical studies, however, the court elected to "proceed with a lodestar calculation to evaluate whether there is a basis to deviate upward or downward from the 25% benchmark." ER-24-5.

**B.**   **The district court abused its discretion when performing its lodestar analysis**

Having determined the *Vizcaino* factors did not support class counsel's 28.3% fee request (ER-24), the district court then turned to a lodestar analysis to determine the appropriate fee. The court found Class Counsel's requested "2.43

49

EXHIBIT A

multiplier is high" and any "award exceeding a 2.232 multiplier[15] would result in "windfall profits" for Class Counsel.  ER-26-7.

The court's fee methodology makes a precise calculation of Class Counsel's lodestar essential.  A fee applicant bears the "burden of "documenting the appropriate hours expended" in the litigation and therefore must submit evidence supporting the hours worked." *Garcia v. Resurgent Cap. Servs., L.P.*, No. 11-1253-EMC, 2012 WL 3778852, at *4 (N.D. Cal. Aug. 30, 2012) (*quoting Hensley v. Eckerhart*, 461 U.S. 424, 433 and 437).[16]  The court must be provided sufficient details "to form a judgment on whether [the fee applicant's] fees were legitimate" in order to determine "whether the work was an appropriate basis for fees." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1282, 1286 (9th Cir. 2004).  *See also Garcia* at * 24 (Lodestar filings must "contain enough specificity

---

[15]The court did not explain, nor can Appellants determine, where the curiously precise figure of 2.232 came from.  But it is clear that it did not emerge from a rigorous consideration of this Circuit's fee factors, or correspond to the real risk of non-recovery in this case.

[16] Whether in a fee shifting or common fund case, the same reasonable standards apply and lodestar must be precisely calculated and relate directly and intimately to the prosecution of the litigation at hand.  *See In re WPPSS, supra*, 19 F.3d 1291, 1304 (principles developed in fee shifting cases are applicable to common fund fee awards when they make sense in common fund context).  There is no "cogent argument" why the rules of lodestar calculation should differ in fee-shifting and common fund contexts, including the rule requiring sufficient detail to permit a court to determine whether particular hours furthered the litigation. *Id*.

50

EXHIBIT A

as to individual tasks to ascertain whether the amount of time spent performing them was reasonable."). A district court "does not discharge its duty simply by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018). Rather, it must disallow inclusion of "excessive, redundant, or otherwise unnecessary" hours in lodestar. *Hensley*, 461 U.S. at 434.

Here, Class Counsel failed to carry its burden of establishing the reasonableness of its claimed $36,103,148 lodestar, and the district court violated its fiduciary duty to the Class by accepting all of Class Counsel's claimed hours at face value. Other than broad categorization of work performed, Class Counsel provided no supporting detail whatsoever for its proffered lodestar. Accordingly, the district court's lodestar analysis was uninformed and its findings were without necessary information or perspective.

Further, Class Counsel included in their lodestar more than $3.9 million incurred in a parallel state litigation, but that time is improperly charged to *this* Class.[17] *See Chemical Bank v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1309 (9th Cir. 1994) (counsel who litigate a parallel state action are not entitled to a fee

---

[17] In addition, JCCP Counsel failed to identify timekeepers by title or categorize their work.

51

EXHIBIT A

award where state counsel do "not formally represent [ ] [the federal] class," even though their "activities in representing others [may] incidentally benefit the class."). For the same reason, the fees of international liaison counsel must be excluded from lodestar charged to this exclusively U.S. Class.

The district court found Class Counsel's lodestar was $36,103,148 (ER-26), thereby accepting thousands of hours of excessive, redundant, and otherwise unnecessary attorney time of no benefit to the Class [18] which unjustifiably increased the actual lodestar by millions of dollars. [19] After the padding is removed, the fee award actually represents a multiplier far in excess of the number the court determined to be a maximum, to the substantial detriment of the Class.

By accepting at face value all the lodestar submitted by the 40 firms that billed time to this case – including for work without supporting detail, work by JCCP Counsel, and international liaison counsel's fees – the district court failed

---

[18] The district court appointed Cotchett, Pitre & McCarthy LLC and Kaplan, Fox & Kilsheimer LLP as interim co-lead counsel, and in addition appointed attorneys from 23 firms to the Plaintiffs' Executive Committee, and attorneys from an additional 14 firms to the Steering Committee. ER-105. Charges from 40 firms, including at least 275 timekeepers, are included in lodestar.

[19] Apple calculates that at least $7,100,000 of excessive and duplicative charges are included in the submitted lodestar. ER-104.

EXHIBIT A

to discharge its fiduciary duty to the Class. [20] *See Vogel* 893 F.3d at 1160 (9th Cir. 2018) (the court erred "by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case."). *See also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004) (attorneys in unsuccessful Florida suit not entitled to fees out of a N.D. Cal class action common fund regardless of whether they advanced the litigation; they did not seek fees on behalf of a successful party and were not themselves parties).

Class Counsel have the burden of establishing the work included in lodestar added value and was not merely duplicative or superfluous. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 200 (3d Cir. 2005) ("[C]ounsel's proof must be specific: it must show what its efforts were, how they created a benefit, and why that benefit would not have been created absent its efforts."). *See also Hensley* at 436. The benefit conferred by the work of 275 timekeepers was not discernable from the summary documents provided with Class Counsel's fee motion. The district court should have required the filing of sufficiently detailed

---

[20] By Apple's description, Class Counsel "inflated the lodestar by unnecessarily soliciting and including more than 120 named plaintiffs in the consolidated complaints ... This extra work was unnecessary.... the vast majority of the 120 Named Plaintiffs have contributed nothing for the class's benefit, except generating more work for Plaintiffs' counsel." ER-121-2.

EXHIBIT A

time records to allow determination of what time was spent in the successful pursuit of the Class' interest, and what time was not.

While Class Counsel may elect to share their fees as permitted by law, fees for unrelated, duplicative, or unproductive work may not be included in Class Counsel's lodestar to the detriment of the Class. *See In re Volkswagon Clean Diesel* 914 F.3d 623, 645 (9th Cir. 2019) ("The mere fact that a non-designated counsel worked diligently and competently with the goal of benefiting the class is *not* sufficient to merit compensation. Instead, only attorneys `whose efforts create, discover, increase, or preserve' the class's ultimate recovery will merit compensation from that recovery." *Quoting Cendant* at 197 (*quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 820 n.39 (3d Cir. 1995)).

1. **The district court abused its discretion by allowing inclusion of hours spent in other cases, including the JCCP Action**

The court does not anywhere find the JCCP Action or the international actions added value.[21]  As described by Apple, JCCP counsel's "work on the parallel action increased inefficiency and duplication without any benefit to the

_____

[21] Non-U.S. individuals are not part of the settlement Class.  ER-39.

54

EXHIBIT A

class members." ER-28. JCCP Counsel does not represent parties in this litigation—they represented plaintiffs suing in a different forum, where no class was ever certified.[22] Charging the MDL Class for JCCP Counsel's work on behalf of other representative plaintiffs in different proceedings is clear legal error, as this Court held in *Chemical Bank, supra*.

> The [state] action was never part of the MDL 551 action, but instead was parallel litigation. By its terms, however, the settlement of MDL 551 also resolved the [state] litigation…. Although the district court conceded that the [state] counsel's efforts may have benefited the Class Plaintiffs, it concluded that the litigation undertaken by the [state] counsel was not sufficiently related to the class action involving Class Counsel. The court found that the state court proceeding was an independent, somewhat parallel action in a different forum. It was not undertaken by MDL Counsel. It was not waged on behalf of the entire Class, and the entire Class would not have shared all potentially attainable benefits. The two actions were distinct and detached…. The [state] counsel did not represent the Class Plaintiffs in MDL 551, but represented distinct plaintiffs in another proceeding in state court. No money judgment or settlement fund was generated in that litigation.

*Chemical Bank,* 19 F.3d at 1307-1309.

---

[22] While JCCP plaintiffs may be absent members of the settlement Class, the district court did not find JCCP Counsel's work benefited the Class in any way. Rather, the court found the JCCP Action was separately pursued and followed its "own lengthy litigation history, including demurrers, amended complaints, discovery, etc. …" ER-36.

EXHIBIT A

The foregoing quotation applies with equal force to this case, and *Chemical Bank* compels exclusion of the JCCP lodestar from the fee calculations in this MDL case. *See also Churchill,* 361 F.3d at 579.

In obvious disregard of its fiduciary duty to the Class, the district court conceded Apple's objection to inclusion of JCCP Counsel's lodestar had "some merit," but decided it didn't matter, stating "[e]ven if JCCP Counsel's roughly $4 million in attorneys' fees are excluded from the lodestar, the lodestar would decrease to $32,103,148.05 and this adjusted lodestar would have an insignificant impact on the multiplier." ER-28-9. This is demonstrably false, and it also represents a missed opportunity for the court to fulfill its fiduciary duty to the Class. If Apple's argument regarding JCCP Counsel has merit, then the district court abused its discretion by failing to exclude JCCP Counsel's lodestar from its fee calculation, which would have saved the Class over $8 million. If a fiduciary duty to the Class means anything, then it compels the Court to reasonably exercise its discretion in a way that reduces the fee to Class Counsel, not the opposite.

The impact of JCCP Counsel's lodestar on fees and the multiplier is hardly negligible, as the district court held. Eliminating JCCP Counsel's $3,993,154 from the lodestar pushes the multiplier far higher than the 2.232 the court held was the maximum permissible enhancement. When combined with international

56

EXHIBIT A

liaison counsel's charges of $547,037, these unproductive, redundant, and unnecessary fees total $4,540,191, which when subjected to the district court's 2.232 multiplier cost the Class at least $10,133,706 – hardly an "insignificant impact."

> ### 2. The district court should not have allowed excessive repetitive billing and inflated rates for discovery and document review to be included in lodestar

Following objections, Class Counsel reduced document review rates to a maximum of $350 per hour. The Dearman Declaration, however, indicates over 13,700 hours of "Tier 1" document review time that could have been performed by amply qualified project attorneys at a much lower hourly rate.[23] In *Wells Fargo*, Judge Tigar issued an order to show cause why he should not appoint an expert to determine the true market rate for contract and staff attorneys, which was intended to "determine what actual clients typically pay for contract attorneys' services when a law firm utilizes those contract attorneys' services…" *In re Wells Fargo & Co. S'holder Derivative Litig..* 445 F. Supp. 3d 508, 529 (N.D. Cal. 2020). Based on class counsel's admission regarding the actual amount paid for their services, Judge Tigar required that all contract attorneys be billed to the class

---

[23] Tier I document review typically consists of "coding" documents into a database for a more extensive later review.

EXHIBIT A

at their actual cost, or $42.50/hour.  *Id*. at 531.[24]  This same rate should apply regardless of the label attached to the discovery-review attorney.

Class Counsel included in its lodestar charges of $4,566,693 for "Tier 1" document review.  ER-100.  Applying a market rate of $42.50 to the 13,703 hours of first-pass document review time yields a fair market cost of $582,377.  This means Class Counsel's lodestar was overstated by $3,984,316 for low level document review, costing the Class $8,892,993.[25]

The district court also failed to consider the amount charged to the class for discovery related work as a whole.  Apart from Tier I document review, written discovery and document production alone cost the class $12,114,524.29 after application of the multiplier.  It is hard to understand how Plaintiffs' attorneys spent 3,576.6 hours propounding written discovery and 6,653.65 hours on document production – where class members had almost no documentation related to any of the claims in the case, other than their proof of purchase and form

---

[24] Judge Tigar also endorsed a rule requiring contract attorneys to be treated as a cost, but noted that no court has yet required that.  *Id*. at 528.  This Court should now adopt this practice as a rule in this Circuit.

[25] I.e. ($4,566,693 - $582,377) x 2.232 = $8,892,993.

EXHIBIT A

warranties.  The 4,673 hours devoted to non-expert depositions is also excessive, in a case where Class Counsel took only 10 depositions and defended only nine. ER-162-3.

For this Court's convenience, the entire billing related to discovery is provided in the following table:

| **Description of category** | **Hours** | **Lodestar** | **Total (with 2.232 multiplier)** |
|---|---|---|---|
| Written Discovery | 3,576.60 | $2,357,991.00 | $5,263,035.91 |
| Document Production | 6,653.65 | $3,069,663.25 | $6,851,488.37 |
| Tier I Document Review | 13,702.77 | $4,566,693.50 | $10,192,859.89 |
| Depositions non- expert | 4,673.10 | $2,482,860.00 | $5,541,743.52 |
| Expert Discovery | 67.40 | $51,827.00 | $115,677.86 |
| Discovery Motions | 2,450.00 | $1,676,624.00 | $3,742,224.77 |
| Other Discovery | 4,986.90 | $2,731,102.00 | $6,095,819.66 |
| **Totals** | 36,110.42 | $16,936,760.75 | $37,802,849.99 |

ER-100.

By way of comparison, counsel in the JCCP actions did most of the same work as MDL Class Counsel, including "initial investigation….to develop

59

EXHIBIT A

theories of liability "draft[ing] and extensively research[ing]" two complaints,[26] "draft[ing] and propound[ing] two sets of Requests for Production of Documents," and reviewing the same 7 million documents produced by Apple, but they needed only 9,679 hours to accomplish *all* of their work – including discovery – in contrast to the 35,110.42 hours spent by Class Counsel on discovery alone. Once the multiplier is applied, Class Counsel's excessive $16.9 million billed exclusively for discovery efforts cost the Class a preposterous $37.8 million. The district court's cursory lodestar review ignored these issues.

### 3.   A multiplier should not be applied to paralegal fees in Class Counsel's lodestar

The Supreme Court and this Court permit paralegal fees to be included as part of an attorneys' fee award in fee-shifting cases in order to "encourage [ ] cost-effective delivery of legal services." *See Missouri v. Jenkins*, 491 U.S. 274, 288-289 (1989) ("reasonable attorney's fee" provided for by statute should compensate the work of paralegals, as well as that of attorneys."). *See also Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.* 526 F.2d 1196, 1210, n. 19 (9th Cir. 1975); *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1543 (9th

---

[26] The number of hours Class Counsel billed to "Pleadings" should have raised red flags. MDL counsel billed lodestar of $2,374,609, resulting in charges to the Class of $5,300,127. ER-100.

EXHIBIT A

Cir. 1992)[27] ("It simply is not reasonable for a lawyer to bill, at her regular hourly rate, for tasks that a non-attorney employed by her could perform at a much lower cost.").

Clearly, however, "cost-effective delivery of legal services" is lost when a paralegal is billed at \$475/hour,[28] and that hourly rate is then subjected to a 2.232 multiplier – which in this non-fee shifting case resulted in an hourly charge to the Class of up to \$1,060 for paralegal services.[29]  In their objection, Appellants argued the "payment of a reasonable "market rate," without a lodestar multiplier adequately compensates Class Counsel for the work performed by their paralegals. Any attorney's fee award that includes a multiplier of a paralegal's market rate provides an unsupportable windfall to Class Counsel."  ER-154.

At least one court has held that paralegal time is not properly subjected to a risk enhancement. "The Court finds it unreasonable to multiply the hourly rate

---

[27] Vacated in part on other grounds *Davis,* 984 F.2d 345 (9th Cir. 1993).

[28] This amount is \$100/hour greater than the \$350 cap on licensed attorneys performing document review in this case.  ER-70.

[29]  Counsel Levin Sedran & Berman bills paralegals at between \$450 and \$475/hour.  ER-92.

EXHIBIT A

requested by any contingency factor. *Although they provide a valuable service, for which compensation should be given, paralegals are not members of the bar and do not share in the attorneys' risk of litigation.*"  *In re Equity Funding Corp. of America Securities Litig.,* 438 F.Supp. 1303, 1330 (C.D. Cal. 1977) (internal citations omitted) (emphasis added).

Class Counsel should be compensated for paralegal services at a reasonable market rate, and no more.  Class Counsel's lodestar includes paralegal time billed at rates of between $125 and $475 per hour.  The district court abused its discretion by approving above market-rate paralegal charges of up to $475 per hour, well over twice the Laffey Matrix rate of $206.[30]  ER-157.  Once appropriate market-rate hourly charge(s) are determined, subjecting those rates to a multiplier undermines the policy of *Missouri v. Jenkins, supra.*  The district court disregarded Appellants' objection and applied its 2.232 multiplier to the full

---

[30]  Of the 84 paralegals who performed services in the captioned matter, 71 were charged at rates up to 2.3 times the Laffey Matrix rate (with combined fees of $2,753,453). Applying the district court's 2.232 multiplier, these paralegal services alone account for $6,145,707, or 7.6%, of the court's $80.6 million *attorneys' fee* award.

EXHIBIT A

$2,846,443 [31] of Class Counsel's paralegal charges, thus costing the Class $3,506,818 (i.e., ($2,846,443 x 2.232) - $2,846,443 = $3,506,818).[32]

The district court erred by failing to consider this issue. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 845 Fed. Appx. 563, 565 (9th Cir. 2021) (court errs by summarily dismissing objections without analysis or reasoning). This concern presents a legal issue of first impression for this Court and may be considered *de novo*.

### C. Applying the district court's multiplier to a correct lodestar would save the Class at least $13.6 million

Applying the district court's maximum 2.232 multiplier to a corrected lodestar, once JCCP Counsel's fees and international liaison fees are removed, and paralegal charges are treated as a cost, reduces the fee to $66,959,474,

---

[31] The amount of $951,918 was used in Appellants' objection, which was filed prior to Class Counsel filing their Supplemental Declaration of Mark J. Dearman in support of their attorneys' fee motion. A review of Exhibit 43 to that declaration shows paralegal fees of $2,866,443 are included in the proffered lodestar. ER-72-99.

[32] Class Counsel has also included in their lodestar "Investigator" charges of $88,999, billed at rates of $325-$475 per hour. Subjecting these charges to the district court's lodestar multiplier – rather than treating the charges as an expense – results in an overcharge to the Class of $109,647.

EXHIBIT A

representing a savings to the Class of $13,640,526.[33, 34]  This is not *de minimis*

amount, but represents an overcharge of 17% of the court-awarded fee.

Viewed another way, the court-awarded attorneys' fees of $80,600,000,

less $2,846,443 in paralegal fees, cross-checked against a reduced lodestar of

$28,716,514 yields a 2.71 multiplier,[35] which by the district court's own findings

is too high and results in windfall profits for Class Counsel.  See ER-27 ("[A]n

award exceeding a 2.232 multiplier would result in "windfall profits for class

counsel in light of the hours spent on the case."  In *re Bluetooth Headset Prods.*

*Liability Litig.,* 654 F. 3d at 942.").  This evidences clear error requiring reversal

and remand.

---

[33] I.e., ($80,600,000 - (2.232 x ($3,993,155 + $547,037 + $2,846,443)) + $2,846,443 = $66,959,474, and $80,600,000 - $66,959,474 = $13,640,526.

[34] If Tier 1 discovery was included in lodestar at $42.50/hour with charges totaling $582,377, the savings to the Class would grow to $22,533,517.

[35] I.e., ($80,600,000 - $2,846,443) ÷ ($36,103,148 - $4,540,191 - $2,846,443) = 2.71.  If Tier 1 discovery was included in lodestar at $42.50/hour, the multiplier would grow to 3.14.

EXHIBIT A

In contrast, a market-rate, empirically-supported 17.5% fee of $54,250,000, yields a multiplier of 1.78,[36] a more than adequate bonus to account for risk and results in this MDL.

### III. The preferential payments to Named Plaintiffs are prohibited and create a conflict between the Named Plaintiffs and absent Class members

The district court granted each of the 132 Named Plaintiffs, including ten non-Class-member foreign nationals, "service awards" in the amount of either $1,500 or $3,500 (if deposed), for a total award amount of $216,000. ER-32. As argued below, Supreme Court precedent prohibits such awards in any amount, but they are particularly egregious here as the Named Plaintiffs did not allege the subjective awareness of impaired iPhone performance required to make a Claim. ER-219. Presumably, without the service award inducement, no Named Plaintiff would have agreed to the Settlement or the Claim Form, since no rational plaintiff would consent to a settlement that provides him/her nothing. Nevertheless, the Named Plaintiffs agreed to a Claim Form that prevents them and most other typical Class members from making a claim, rendering them inadequate. They

---

[36] I.e. ($54,250,000 - $2,846,443) ÷ ($36,103,148 - $4,450,191- $2,846,443) = 1.78. If Tier 1 discovery was included in lodestar at $42.50/hour with charges totaling $582,377, the multiplier would rise to 2.07.

EXHIBIT A

have not earned a service award in this case, since their settlement negotiations harmed the Class through the disregard of economic damages uniformly suffered by Class members.

While all the service awards in this case were unearned, the most egregious abuse of the incentive award concept occurred when the district court awarded service awards to ten *foreign* plaintiffs whose cases were not certified as class actions, and who are ineligible to file claims since they are not members of the certified Settlement Class of "all former or current U.S. owners of [the subject iPhones]." The foreign plaintiffs have only their individual claims against Apple pending in the district court. While Apple is free to settle those cases on an individual basis, it is not at liberty to raid the U.S. Class' settlement fund to do so. Apple and the court treated the Settlement like a slush fund to get rid of all of Apple's litigation headaches. Permitting a defendant to settle the individual claims of *non-class-members* with monies taken from a settlement fund created for the exclusive benefit of another class – which the non-class members did nothing to help create – is a particularly egregious and impermissible abuse of incentive awards.

The Eleventh Circuit held last year that two U.S. Supreme Court precedents bar the granting of service or incentive awards of any kind, even when, unlike

EXHIBIT A

here, they have been earned. *See Johnson v. NPAS Sols. LLC*, 975 F.3d 1244 (11th Cir.2020). As the Eleventh Circuit put it, the ubiquity of incentive awards is the product of "inertia and inattention," and "we are not at liberty to sanction a device or practice, however widespread, that is foreclosed by Supreme Court precedent." *Id*. at 1259-60.

The two landmark cases first authorizing recovery of attorney's fees from a common fund, *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad & Banking Co. v. Pettus* (1885), specifically prohibit recovery of any amounts by representative plaintiffs for personal services and private expenses. *Johnson* at 1257. These two seminal cases have been ignored by modern courts when rationalizing awards to lead plaintiffs, whether as a bounty for obtaining a settlement, or compensation for hours spent on litigation tasks or exposure to reputational risk. None of these rationales can surmount the constraints established by *Greenough* and *Pettus* which, while allowing reasonable compensation for counsel's services, plainly prohibit compensating named plaintiffs for personal services. *Id*. at 1258.

While there are Ninth Circuit decisions upholding incentive or service awards to lead class action plaintiffs, [37] those decisions should yield to the

---

[37] *See e.g., In re Online DVD Rental Antitrust Litig.,* 779 F.3d 934 (9th Cir. 2015).

EXHIBIT A

controlling Supreme Court precedent followed by the Eleventh Circuit in *Johnson*. Just as with the decision of the Second Circuit[38] cited by the *Johnson* court in footnote 8 of its opinion, *id.*, the decisions of the Ninth Circuit should not control because they do not grapple with *Greenough* and *Pettus*, nor do they cite to any original authority for such awards. The class action industry has simply grown to expect service awards will be given, and courts have commonly stopped asking about the legal basis for such awards. Somehow, that for which there was no statutory or case authority became commonplace, and routine has now become justification for these awards that have been "created out of whole cloth." *Johnson* at 1259.

This Circuit did not pioneer incentive awards; the concept seems rather to have simply been imported from other Circuits that were early adopters. Indeed, in *Rodriguez,* this Court, in observing "incentive *awards* are fairly typical in class action cases" cited to *Newberg on Class Actions* and Theodore Eisenberg and Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs an Empirical Study,* 53 UCLA Law Review 1303 (2006). *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Of course, treatises are not authority for the awards

---

[38] *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019).

EXHIBIT A

they observe and describe, and *Newberg* has updated its section on incentive awards to acknowledge that incentive awards appear to have been "created out of whole cloth" and "few courts have paused to consider the legal authority for incentive awards." William B. Rubenstein, 5 *Newberg on Class Actions* §17:4 (5th ed. 2020). *See also In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) ("To the extent that incentive awards are common, they are like dandelions on an unmowed lawn – present more by inattention than by design.").

While the district court acknowledged Appellants' objection to the service awards "raises a valid issue," it rightly left the task of overruling Circuit precedent to this Court. ER-32. This Court should closely consider the Eleventh Circuit's rationale in *Johnson* and hold that incentive or service awards are prohibited by longstanding Supreme Court precedent.

The $3,500 "service awards" are 140 times, and the $1,500 awards 60 times, as large as each class member's "negotiated" $25 recovery.[39] These payments

---

[39] As in *Johnson*, an extremely low claims rate in this case has pushed the expected claimant recovery closer to $80-$100, but that is simply a function of the fact that over 97% of the class is unable to attest to slowed performance or current ownership – and therefore is ineligible to file a claim. It would be a perverse irony to reward the Named Plaintiffs for agreeing to an unsuccessful claims process that left over 97% of the class uncompensated.

EXHIBIT A

divorce the interests of Named Plaintiffs from the interests of the absent Class members. This case illustrates the pernicious effects of service awards to a greater degree than *Johnson* did. The Named Plaintiffs should receive *nothing* from the claims process because they have not alleged awareness of diminished performance on their iPhones following download of the subject iOS. The Named Plaintiffs would not have agreed to a claim form requiring an attestation that none of them can in good faith execute, *unless* they were being separately compensated in an amount that makes them indifferent to the claims process. *See Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003) ("[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

In this case, even more so than in *Johnson*, the service awards drove a wedge between the Named Plaintiffs and the vast majority of other Class members; a clear conflict of interest was created that induced the Named Plaintiffs – in consideration of their service awards – to consent to the Settlement.

In agreeing to the Settlement and the associated Claim Form, the Named Plaintiffs breached their duties to the Class they were charged with representing.

EXHIBIT A

For this reason alone they should be denied service awards.[40]  The service awards effectively bought the consent of Named Plaintiffs to a settlement in which 97% of the Class could not participate – even though Named Plaintiffs alleged *all* Class members experienced slower performance, and their expert testified to uniform economic damage suffered by *all* Class members.

This Court should hold that service fees or incentive awards of any kind are prohibited by *Greenough* and *Pettus* and no longer permitted in this Circuit.  In the alternative, this Court should reverse the service awards approved by the district court because the Named Plaintiffs breached their duties of adequacy and loyalty to the class by agreeing to a settlement in which only an insignificant fraction of the Class is eligible to participate.  Approving service awards in these circumstances will encourage settlements in which representative parties are unable to participate, and that sell out the interest of absent class members while compensating representative plaintiffs for a job poorly done.

---

[40] This Circuit has consistently refused to approve incentive awards that divorce a representative plaintiff's interests from the interests of the represented class.  *See Rodriguez, v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009), and *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003).

EXHIBIT A

At the very least, this Court must overrule the service awards made to non-Class-member foreign nationals who were never appointed as representatives of any foreign class.

## CONCLUSION

This Court should reverse the district court's approval of the Settlement and remand for further proceedings.  In the alternative, this Court should reverse the district court's award of attorneys' fees and remand with instruction to recalculate lodestar without inclusion of excessive, redundant and unnecessary hours, exclude paralegal fees from any multiplier, and reverse the district court's approval of incentive awards.

EXHIBIT A

Dated: September 30, 2021

Respectfully submitted,

Sarah Feldman and Hondo Jan,
by their attorneys:

*/s/ Kendrick Jan*
Kendrick Jan, SBN 105149
Kendrick Jan, APC
402 West Broadway, Ste. 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

*/s/ John J. Pentz*
John J. Pentz, Esq.,
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

and

Deborah Pantoni,
by her attorney:

*/s/ Jan L. Westfall*
29896 Blue Water Way
Menifee, CA 92584
Phone: (619) 940-2880
jlwestfall.esq@gmail.com

EXHIBIT A

# STATEMENT OF RELATED CASES

## (CIRCUIT RULE 28-2.6)

The undersigned attorneys or self-represented party states the following:

I am aware of one or more related cases currently pending in this Court.  The case number and name of each related case and its relationship to this case are:

The below cases are generally styled *In re: Apple Inc. Device Performance Litigation*, and are consolidated with Case no. 21-15758:

**No. 21-15758** (L) (Appellants Feldman & Jan)

**No. 21-15762** (C) (Appellant Pantoni,
filing joint brief with No. 21-15758)

**No. 21-15761** (C) (Appellant Best Companies, Inc., filing separately)

**No. 21-15763** (C) (Appellant St. John, filing separately)

Signature:   s/Kendrick Jan          Date: 9/30/2021

Signature:   s/Jan L. Westfall          Date: 9/30/2021

74

EXHIBIT A

EXHIBIT B

No. 22-16903

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

PERRIN AIKENS DAVIS, et al.,
*Plaintiffs-Appellees*,

v.

META PLATFORMS, INC., FKA FACEBOOK, INC.
*Defendant-Appellee*,

v.

SARAH FELDMAN and HONDO JAN,
*Objectors-Appellants*.

_____

On Appeal from the Northern District of California
Civil Action No. 5:12-md-2314-EJD
Hon. Edward J. Davila

_____

## APPELLANTS' OPENING BRIEF

_____

Kendrick Jan
Kendrick Jan, APC
225 Broadway, Suite 2220
San Diego, CA 92101
(619) 231-7702
kj@jan-law.com

John J. Pentz
Law Offices of John J. Pentz
18 Damon Street
Wayland, MA 01778
(978) 985-4668
jjpentz3@gmail.com

*Attorneys for Appellants Feldman & Jan*

EXHIBIT B

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION .........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................3

STATEMENT OF ISSUES ...........................................................................4

STATUTORY AUTHORITIES ....................................................................4

STATEMENT OF THE CASE ......................................................................5

SUMMARY OF ARGUMENT .....................................................................7

STANDARD OF REVIEW .........................................................................10

ARGUMENT ..............................................................................................11

    I.     THE DISTRICT COURT APPLIED AN INCORRECT
          LEGAL STANDARD WHEN EVALUATING AND
          APPROVING THE PROPOSED SETTLEMENT .........................11

        A.    The district court applied an incorrect standard
             in using disgorgement as the measure of actual
             class damages .........................................................................11

        B.    The district court applied the incorrect standard
             by adopting Class Counsel's contention that
             *State Farm* establishes due process limits on the
             Recoverability of statutory damages ......................................14

            (1)    The district court incorrectly applied *State
                  *Farm*'s limits on punitive damages when
                  analyzing settlement of a compensatory
                  damages claim ..............................................15

EXHIBIT B

(2)   The Wiretap Act's separate provision for punitive damages renders its $10,000 per violation statutory damages entirely compensatory ............................................................... 17

C.   The district court failed to compare potential damages for each claim with the proposed settlement recovery and to justify the astronomical discount, in violation of the Northern District's Procedural Guidance and the Circuit's *Hanlon* factors ............................ 21

II.   THE CLASS WAS DEPRIVED OF DUE PROCESS BY THE FAILURE OF CLASS NOTICE ............................................. 30

CONCLUSION ................................................................................................. 36

STATEMENT OF RELATED CASES ............................................................. 38

CERTIFICATE OF COMPLIANCE ................................................................. 39

CERTIFICATE OF SERVICE .......................................................................... 40

ADDENDUM ...................................................................................... A-1–16

EXHIBIT B

# TABLE OF AUTHORITIES

## CASES

*Acosta v. Trans Union, LLC*,
   240 F.R.D. 564 (CD CA 2007)..................................................26, 27

*Bateman v. American Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010) ...........................................12, 17, 19

*BMW of North America, Inc. v. Gore*,
   517 U.S. 559 (1996).........................................................................15

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,
   532 U.S. 424 (2001).................................................................15, 16

*Davis v. Facebook, Inc.*,
   956 F.3d 589 (9th Cir. 2020) .........................................................14

*Devlin v. Scardelletti*,
   536 U.S. 1 (2002)...............................................................................3

*Haggart v. Woodley*,
   809 F.3d 1336 (Fed. Cir. 2016) ....................................................31

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...........................................1, 10, 22

*In re Bluetooth Prod. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .........................................................10

*In re Facebook Biometric Info. Privacy Litig.*,
   522 F. Supp.3d 617 (N.D. Cal. 2021)................................24, 28, 29

*In re Facebook Biometric Information Privacy Litigation*,
   N.D. Cal. Case No. 3:15-CV-03747-JD .......................................32

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
   N.D. Cal. No 18-md-02483-VC ..............................................25, 28

iii

EXHIBIT B

*In re: Facebook, Inc. Internet Tracking Litigation,*
 956 F.3d 589 (9th Cir. 2020) ................................................................5, 20, 33

*In re Hyundai and Kia Fuel Economy Litigation,*
 926 F.3d 539 (9th Cir. 2019) ................................................................31

*In re Mego Financial Corp. Securities Litig.,*
 213 F.3d 454 (9th Cir. 2000) ................................................................10

*In re Online DVD-Rental Antitrust Litigation,*
 779 F.3d 934 (9th Cir. 2015) ................................................................10, 31

*Jacobson v. Rose,*
 592 F.2d 515 (9th Cir. 1978) ................................................................12

*Lane v. Facebook, Inc.,*
 696 F.3d 811 (9th Cir. 2012) ................................................................30

*Phillips Petroleum Co. v. Shutts,*
 472 U.S. 797 (1985) ................................................................ 30, 31, 34, 35

*Protective Comm. For Indep. Stockholders of TMT,*
 390 U.S. 414 (1968) ................................................................26

*Reynolds v. Beneficial Nat'l Bank,*
 288 F.3d 277 (7th Cir. 2002) ................................................................23

*Rodriguez v. W. Publ'g Corp.,*
 563 F.3d 948 (9th Cir. 2009) ................................................................32

*Saucillo v. Peck,*
 25 F.4th 1118 (9th Cir. 2022) ................................................................10

*Sea Coast Foods, Inc. v. Lu–Mar Lobster & Shrimp, Inc.,*
 260 F.3d 1054 (9th Cir. 2001) ................................................................10

*Six Mexican Workers v. Arizona Citrus Growers,*
 697 F.2d 1333 (9th Cir. 1990) ................................................................10

EXHIBIT B

*St. Louis, I.M. & S. Ry. Co v. Williams,*
251 U.S. 63 (1919) ........................................................................ 16, 17, 18, 21

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
538 U.S. 408 (2003) ............................................................................... *passim*

*Torrisi v. Tucson Elec. Power Co.,*
8 F.3d 1370 (9th Cir.1993) ...............................................................10

*Trailer Ferry Inc. v. Anderson,*
390 U.S. 414 (1968).............................................................................26

*U.S. v. Facebook, Inc.,*
456 F. Supp.3d 115 (D.D.C. 2020).....................................................24

*Wakefield v. ViSalus, Inc.,*
51 F.4th 1109 (9th Cir. 2022) .................................................. *passim*

*Weinberger v. Kendrick,*
698 F.2d 61, 74 (2d Cir. 1982) .........................................................27

**STATUTES**

The Federal Wiretap Act

    10. U.S.C. § 2520 .................................................................11, 17

    10. U.S.C. § 2520(b)(2) .....................................................12, 17, 20

    10. U.S.C. § 2520(c)(2)(A).................................................11, 20

    10. U.S.C. § 2520(c)(2)(B)................................... 11, 12, 13, 18, 20

Federal Rules of Civil Procedure

    Rule 23 ............................................................................ *passim*

    Rule 23(b)(3) ...............................................................................29

EXHIBIT B

Rule 23(c)(2)(B) ............................................................................................. 30

Rule 23(e) ...................................................................................................... 31

Rule 23(e)(2) ...............................................................................................4, 9

Rule 23(e)(2)(A) ............................................................................................. 29

Rule 23(e)(2)(D) ............................................................................................. 29

*Procedural Guidance for Class Action Settlements*
N.D. Cal ...............................................................................................8, 9, 22

EXHIBIT B

## INTRODUCTION

Ninth Circuit law is silent about what factors a district court should consider when a settlement proposes to dramatically compromise available aggregate statutory damages.

The *Hanlon/Churchill* factors followed in this Circuit provide no guidance to courts asked to approve an astronomical discount of recoverable statutory damages. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

Recently, this Court addressed the test for whether a statutory damages class judgment violates constitutional due process, *see Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120 (9th Cir. 2022), and *declined* to adopt the Supreme Court's limitations on punitive damages for aggregated statutory damages. *Id*. at 1122. This case presents the question of first impression as to how courts are to apply due process limits in the context of a class action settlement, rather than a judgment. Here, Class Counsel compromised the Class's aggregate statutory damages claims for less than 0.0073% of total statutory damages. There is no basis in Ninth Circuit law for approving such a radical discount of the Class's potential recovery. A recovery of less than one-ten-thousandth of available damages suggests the case lacked merit, which is inconsistent with this Court's prior determinations regarding concrete damages and available causes of action.

1

EXHIBIT B

The Federal Wiretap Act provides for statutory damages of $10,000 to each Class member for Facebook's violation.[1]  With over 124 million class members, the aggregated statutory damages for Facebook's violation of the Wiretap Act total at least one trillion two hundred forty billion dollars ($1,240,000,000,000).  The parties settled the case for ninety million dollars ($90,000,000), representing a discount against statutory damages of $1,239,910,000,000.  The district court, in approving the settlement, held that Appellants failed to "explain why *10% recovery* plus injunctive relief is unfair."  Dkt. 289, p. 14, l. 1-2 (emphasis added).  Yet, twenty-one days earlier, this Court had held that litigants are not limited to a single digit multiplier of actual losses when recovering statutory damages.[2]  *See Wakefield, supra*, at 1122.  The district court's approval of the settlement was based on Class Counsel's legally incorrect assertion that class damages are tied to disgorgement and class recovery would be capped at $900 million.

---

[1]  The Wiretap Act contains no provision restricting enforcement of claims through a class action or capping/limiting available statutory damages in a class action to a particular collective dollar amount.

[2]  The district court erred by accepting Class Counsel's contention that actual damages are confined to Facebook's purported profits on the sale of private class member information, and again erred by suggesting that *State Farm*'s single digit punitive damages multiplier must be applied to calculate maximum recoverable damages.  *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 424-6 (2003).

EXHIBIT B

Furthermore, settlement notice to the class failed to provide class members with a clear statement of class claims and their rights in those claims, thus violating Rule 23 and constitutional due process.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction in this matter pursuant to 28 U.S.C. §1331 because plaintiffs alleged defendant Facebook violated the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* As well, the district court had diversity jurisdiction over the state claims alleged in this action under 28 U.S.C. §1332(d) because the suit is a class action in which the citizenship of one or more plaintiffs differed from that of the defendant and the aggregate amount in controversy exceeded $5,000,000.

This Court has appellate jurisdiction because this is an appeal following entry of a final judgment. 28 U.S.C. §1291. The district court's Order Granting Motion for Final Approval of Class Action Settlement; Granting Motion for Attorneys' Fees, Expenses, and Service Awards; Judgment was entered on November 10, 2022. Dkt. 289. Appellants Sarah Feldman and Cameron Jan timely filed their Notice of Appeal on December 8, 2022. Dkt. 293. Appellants objected to the Settlement and so have standing to make this appeal. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

3

EXHIBIT B

## STATEMENT OF ISSUES

1.     Did the district court apply an incorrect legal standard when considering the compromise of statutory damages in a settlement context?

2.     Did the district court abuse its discretion by approving a settlement that compromises statutory damages by over 99.9927% without first calculating and considering gross statutory damages?

3.     Did the district court abuse its discretion by finding class representatives and class counsel *adequately represented* the interests of the class within the meaning of Rule 23(e)(2) when they settled class member claims for 0.0073% of calculable statutory damages?

4.     Does the settlement, which provides a *gross* recovery of 73¢ on a class member's claim valued at $10,000.00, give *adequate relief* within the meaning of Rule 23(e)(2)?

5.     Did class notice comport with Rule 23 and satisfy constitutional due process?

## STATUTORY AND REGULATORY AUTHORITIES

Statutes and Rules are set forth in an Addendum following the brief.

4

EXHIBIT B

## STATEMENT OF THE CASE

The first class action complaint in this case was filed on September 30, 2011, in the Northern District of California in *Davis v. Facebook, Inc.*, Case No. 5:11-cv-04834-PSG, stating causes for violations of the Federal Wiretap Act, the Stored Electronic Communication Act, and the Federal Computer Fraud and Abuse Act. The Judicial Panel on Multidistrict Litigation subsequently ordered *Davis* and other cases consolidated in an MDL styled *In re: Facebook, Inc. Internet Tracking Litigation*, Case No. 5:12-md-02314-EJD-NC, out of which this appeal arises.

Plaintiffs sued Facebook for tracking their online activities without their consent, whether or not they were logged-in to Facebook, stating common law and statutory causes of action in contract and tort. A series of three amended consolidated class action complaints were filed in the district court. Facebook filed successful motions to dismiss each of these complaints, leading to an appeal.

On April 9, 2020, this Court issued its opinion affirming in part and reversing in part the district court's order(s) granting Facebook's several Motions to Dismiss (i.e., on the First, Second, and Third Amended Complaints). *In re: Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589 (9th Cir. 2020). This Court affirmed the district court's dismissal of causes of action for violation of the Federal Stored Communications Act, breach of contract, and breach of the implied covenant of good faith and fair dealing, but determined plaintiffs had standing to bring claims for

5

EXHIBIT B

invasion of privacy, intrusion on seclusion, trespass to chattels, fraud, and larceny. This Court further determined that plaintiffs had standing to bring, and had adequately pled the elements of, causes for violation of the Federal Wiretap Act, the California Invasion of Privacy Act, and California's Computer Data Access and Fraud Act, all of which the district court had dismissed.

Facebook unsuccessfully sought a writ of certiorari from the Supreme Court. After remand to the district court, this case went into a procedural holding pattern, with the court issuing four orders extending deadlines while the parties negotiated a settlement. On February 14, 2022, Class Counsel filed a Motion for Settlement Class Certification and Preliminary Approval of Class Action Settlement.

The Third Amended Complaint, filed August 25, 2017, is the most recent and apparently operative complaint in this case. It contains *only two* causes of action (breach of contract and breach of the implied covenant of good faith and fair dealing), the same two causes this Court found had been correctly dismissed by the district court. No complaint conforming to this Court's April 9, 2020 opinion was ever filed.[3]

As consideration for the settlement, Facebook agrees to pay a gross amount of $90 million and promises to destroy any still-retained data collected in violation

---

[3] No operative complaint was on file – or posted to the settlement website – at the time of Settlement, Preliminary Approval, or Final Approval.

EXHIBIT B

of the privacy and property rights of class members between April 22, 2010, and September 26, 2011.

The district court granted preliminary approval of the settlement, and ordered notice consistent with the Notice Plan, on March 31, 2022. Document 241. Class Counsel filed their Motion for Final Approval on August 23, 2022. Document 254. Appellants timely filed their objection on September 11, 2022. Document 265. The district court held a final approval hearing on October 27, 2022, and issued its Order Granting Motion for Final Approval of Class Action Settlement and Judgment on November 10, 2022. ER-3–27. Appellants timely filed their Notice of Appeal on December 8, 2022. ER-153.

## SUMMARY OF ARGUMENT

The district court abused its discretion by applying an incorrect standard to its evaluation of the settlement, which represents the smallest percentage of recoverable damages in the history of class action settlements. The district court erroneously believed that plaintiffs' recovery was limited to ten times disgorgement damages when it held that the settlement was 10% of maximum damages. In fact, this Court had rejected that standard in a decision issued three weeks before the district court approved the settlement. The ordinary ten-to-one ratio limit applies only to punitive damage awards, not aggregated statutory damages.

EXHIBIT B

The settlement is by no means the largest privacy settlement Facebook has agreed to during the past three years in the Northern District, and whether the settlement was at the time "the tenth largest privacy rights settlement of its kind" is irrelevant under the *Hanlon* factors. Fairness Hearing Transcript, ER-37. The critical question is whether $90 million is an appropriate discount of the $1.24 *trillion* aggregate statutory damages suffered by the 124 million class members in light of plaintiffs' likelihood of prevailing on the merits.

The procedural guidelines of the Northern District of California obligated Class Counsel to provide the District Court with "the potential class recovery if plaintiffs had fully prevailed on each of their claims, claim by claim, and a justification of the discount applied to the claims."[4] *Procedural Guidance for Class Action Settlements*, Addendum, A-5. The court failed to enforce Class Counsel's obligation; consequently, the court was never informed of the potential class recovery or provided any justification for the extreme discount presented by the settlement.

The settlement proposes to compromise statutory damages by 99.9927%, providing a gross recovery of only 73¢ for every $10,000 in available statutory

---

[4] This procedural guideline is consistent with the Rule 23, Notes of Advisory Committee-2009 Amendment, Subdivision (e)(1), which describe that at the preliminary approval stage "The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation."

EXHIBIT B

damages, yet the district court failed to examine and explain the massive discount in light of the case's merits. Such a monumental discount against statutory damages cannot – without proper analysis and sufficient justification – be regarded as adequate within the meaning of Rule 23(e)(2). The court's uninformed analysis was grounded in an incorrect assumption that limitations on post-trial punitive damages apply to statutory damages in a settlement setting, and no effort to justify the drastic discount against statutory damages was made.

At the time of settlement there was no operative complaint on file with the court, in violation of the Northern District's *Procedural Guidance for Class Action Settlements*. *See* Addendum, A-5 (requiring Class Counsel explain the "differences between claims to be released and the claims in the operative complaint"). Here, Class Counsel neither explained nor mentioned to the district court the enormous difference between the claims being released and the claims contained in the operative complaint – indeed, no operative complaint conforming to the 2020 opinion of this Court was ever filed.

Class notice failed to adequately inform class members regarding the claims that survived appeal and that were being compromised by the proposed settlement, and their interest in those claims, without which information class members could not evaluate the proposal and meaningfully exercise their right to opt out of the class settlement.

EXHIBIT B

# STANDARD OF REVIEW

A district court's decision to approve a class action settlement is reviewed for abuse of discretion. *Saucillo v. Peck*, 25 F.4th 1118, 1129 (9th Cir. 2022). *In re Bluetooth Prod. Liab. Litig.*, 654 F 3d 935, 940 (9th Cir. 2011). The award of statutory damages is likewise reviewed for an abuse of discretion. *Six Mexican Workers v. Arizona Citrus Growers*, 697 F.2d 1333, 1339-40 (9th Cir. 1990). Whether the district court applied the correct legal standard is reviewed *de novo*. *Sea Coast Foods, Inc. v. Lu–Mar Lobster & Shrimp, Inc.*, 260 F.3d 1054, 1058 (9th Cir. 2001). "Settlements that take place prior to formal class certification require a higher standard of fairness." *In re Mego Financial Corp. Securities Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *citing Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

This Court reviews "de novo whether notice of a proposed settlement satisfies due process." *In re Online DVD-Rental Antitrust Litigation* 779 F.3d 934, 946 (9th Cir. 2015). *See also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir.1993).

EXHIBIT B

**ARGUMENT**

## I. THE DISTRICT COURT APPLIED AN INCORRECT LEGAL STANDARD WHEN EVALUATING AND APPROVING THE PROPOSED SETTLEMENT

### A. The district court applied an incorrect standard in using disgorgement as the measure of actual class damages

The district court applied the wrong legal standard when it simply assumed, without explanation, that disgorgement of the amount Facebook purportedly earned from selling Class Member's web-surfing data would represent a 100% recovery of damages in this case. Dkt. 289, p. 13, l. 16 through p. 14, l. 2. This assumption – which undergirds the court's rejection of Appellants' objection and is foundational to its settlement approval – was entirely incorrect and worked to the substantial prejudice of the Class.

The Wiretap Act defines statutory damages as the greater of disgorgement[5] or $10,000 per violation.[6] If the sum calculable under 18 U.S.C. § 2520(c)(2)(A) is less than $10,000, then $10,000 is the statutory damage pursuant to (c)(2)(B). *See* Addendum, A-3. Hence, for purposes of analyzing available damages under the

---

[5] 18 U.S.C. § 2520, provides that disgorgement may only be considered as one of the two addends – along with actual damages suffered by plaintiff – that together equal a sum available for award under § 2520(c)(2)(A). This calculation becomes irrelevant if less than the $10,000 defined by § 2520(c)(2)(B).

[6] The district court made no finding as to *actual damages*, nor did it attempt to calculate the sum of damages available under § 2520(c)(2)(A).

EXHIBIT B

Wiretap Act in this case, disgorgement becomes irrelevant, and 18 U.S.C. § 2520(c)(2)(B) controls and dictates that damages are $10,000 per class member.[7]

Frequently, "statutes combine deterrence, compensatory, and punitive goals in a single lump sum." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1123 (9th Cir. 2022). That is not the case with 18 U.S.C. § 2520, which, in addition to statutory damages, provides for separate "punitive damages."[8] *See* 18 U.S.C. § 2520(b)(2). *See also Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010) ("Congress provided for punitive damages in addition to any actual or statutory damages … which further suggests that the statutory damages provision has a compensatory, not punitive, purpose.") Here, principles of statutory construction compel the conclusion that Congress intended the $10,000 statutory damages to compensate a victim for the intangible injury to a person's privacy interests that are otherwise difficult to quantify, and that the specified amount is within Congress's "broad discretion in awarding damages." *Wakefield,* 51 F.4th at 1120.

---

[7] The statutory damages are only $10,000 per class member if they are limited to one violation per class member. The Federal Wiretap Act provides for $10,000 statutory damages *for each violation* of the Act, and the Act was arguably violated each time Facebook captured the URL of a website visited by a Facebook user.

[8] "Punitive damages are traditionally designed to punish and deter and thus may exceed the aggrieved party's actual loss." *Jacobson v. Rose* 592 F.2d 515, 520 (9th Cir. 1978).

EXHIBIT B

There is absolutely no basis for using the arbitrary figure of $90 million to cabin the Class's recovery in this case. Nothing in the record explains this number. Facebook denies making even one dollar from the tracking histories that it captured. Fairness Hearing Transcript at ER-83 ("There was nothing obtained unjustly. There would be nothing to disgorge because, as we said in our papers, this was a bug. It was collecting information. It was not – it was not being tethered to the advertising apparatus at the company. It wasn't being monetized or used… What is the amount to be disgorged? I kept saying it's zero.").[9]

Therefore, there was absolutely no basis in the record for the district court's use of the arbitrary figure of $90 million in finding that the settlement recovered "10%" of potential damages. Disgorgement was a red herring made up out of whole cloth by Class Counsel to distract the district court from the settlement's patent inadequacy. Notwithstanding Class Counsel's assertion that "it would be difficult to prove unjust enrichment above $90 million" (Document 254, p. 15, l. 8), disgorgement is not the measure of statutory damages in any event. Here, the Wiretap Act's statutory damages of $10,000 per violation is the default damage amount. *See* 18 U.S.C. § 2520(c)(2)(B), Addendum, A-3.

---

[9] If the disgorgement figure did not come from Facebook, it is difficult to imagine where Class Counsel came up with that number. Typically, a defendant will share its revenue numbers with class counsel as part of a mediation. Here, Facebook continues to this day to deny that it received any revenue from the illegally captured internet histories.

EXHIBIT B

In Congress' estimation, the concrete injury to a person's privacy and reputational interests is worth $10,000 to the average person. *See Davis v. Facebook, Inc.,* 956 F.3d 589 (9th Cir. 2020) ("Plaintiffs have adequately alleged that Facebook's tracking and collection practices would cause harm or a material risk of harm to their interest in controlling their personal information."). Who is to say that $10,000 is not an actual monetary approximation of the harm a person suffers when they lose control of their personal information? The district court had no authority to overrule Congress on this point. And if $10,000 is the proper measure of individual harm, then $1,240,000,000,000 is the aggregate amount of harm suffered by a class of 124 million.

The district court applied the wrong standard when examining the settlement by using disgorgement as the measure of class damages. This Court should make a *de novo* finding that the correct standard requires analysis using calculable statutory damages of $10,000 per class member.

### B. The district court applied the incorrect standard by adopting Class Counsel's contention that *State Farm* establishes due process limits on the recoverability of statutory damages

Compounding the district court's fundamental error in limiting actual damages to the $90 million by which Class Counsel claimed Facebook was unjustly enriched through the sale of improperly-gathered data, the court further erred by assuming without analysis that a court would be limited to entry of a post-trial

EXHIBIT B

judgment of no more than ten times those arbitrary damages. ER-15–16. Contrary to this Court's holding in *Wakefield*, *supra*, the district court here adopted and applied Class Counsel's argument that *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 424-6 (2003) controls the court's analysis of available statutory damages in this case. *See* ER-15–16 ("single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution") ("By Class Counsel's calculations, the settlement fund is 10% of the potentially recoverable statutory damages.").[10]

> **(1)** **The district court incorrectly applied *State Farm*'s limits on punitive damages when analyzing settlement of a compensatory damages claim**

"Compensatory and punitive damages serve different purposes. … Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" *State Farm*, *supra*, 538 U.S. at 416, citing *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001). "Punitive damages are imposed for purposes of retribution and deterrence." *State Farm*, *supra*, at 416, *citing BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).

---

[10] Nowhere in either their Motion for Preliminary Approval or Motion for Final Approval do Class Counsel discuss damages, including unjust enrichment claims, in the context of the Wiretap Act.

EXHIBIT B

*State Farm*'s due process analysis of punitive damages – establishing a standard of reasonableness and proportionality to harm and general damages recovered – would apply if the district court were being asked to consider whether a supplementary punitive damages award, on top of a compensatory damages award, was "grossly excessive" or an "arbitrary punishment." *See State Farm*, *supra*, at 416, citing *Cooper Industries, supra*, at 433. The district court, however, was not asked to examine an award of punitive damages, and, as this Court held last October, *State Farm*'s standards expressly *do not* apply in a class action brought for aggregated statutory damages. *See Wakefield*, *supra*, 51 F.4th at 1122 (declining to extend *State Farm's* punitive damages limits to statutory damages cases). "We stress that only rarely will an aggregated statutory damages award meet the exacting [*St. Louis, I.M. & S. Ry. Co v. Williams*, 251 U.S. 63 (1919)] standard and exceed constitutional limitations where the per-violation amount does not." *Id*. at 1123.

Here, the district court mistakenly determined that available compensatory damages were limited to disgorgement of Facebook's mythical $90 million unjust enrichment, then multiplied that artificial number by ten to yield a denominator of $900 million, thereby producing the erroneous conclusion that $90 million is a 10% recovery of maximum damages. The district court's employment of *State Farm*'s limitation on punitive damages in the context of a statutory damages settlement is legal error requiring reversal.

EXHIBIT B

### (2) The Wiretap Act's separate provision for punitive damages renders its $10,000 per violation statutory damages entirely compensatory

"Punitive damages are imposed for purposes of retribution and deterrence," and compensatory damages are meant to provide redress for damages "plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm,* 538 U.S. at 416. Some statutory damages comprise punishment, deterrence, *and* compensation in their scope. 18 U.S.C. § 2520, however, provides $10,000 as the measure of *compensatory damages* only, and provides separately for the recovery of punitive damages. *See* 18 U.S.C. § 2520(b)(2), Addendum, A-2 .

Where Congress makes provision for punitive damages separate and apart from defined-amount statutory damages, the implication is that statutory damages are compensatory in nature. *See Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010) ("Congress provided for punitive damages in addition to any actual or statutory damages … which further suggests that the statutory damages provision has a compensatory, not punitive, purpose.")

Congress has broad discretion in the establishment of statutory damages. *See St. Louis I.M. & S. Ry. Co. v. Williams,* 251 U.S. 63, 67 (1919). Here, as in *Williams*, it cannot be said that the $10,000 per violation statutory damages is wholly disproportionate or obviously unreasonable[11] in light of the Wiretap Act's important

---

[11] "When the penalty is contrasted with the overcharge possible in any instance it of

17

EXHIBIT B

purpose of securing uniform adherence to laws protecting Americans' internet privacy or the "numberless opportunities for committing the offense" that Facebook possessed and exploited. *Id.* at 67.

Appellants acknowledge this Court's holding that "aggregation [of statutory damages] can, in extreme circumstances, result in awards that may greatly outmatch any statutory compensation and deterrence goals, resulting in awards that are largely punitive."[12] *Wakefield*, *supra*, 51 F.4th at 1122. And, "where statutory damages no longer serve purely compensatory or deterrence goals, consideration of an award's reasonableness and proportionality to the [statutory] violation and injury takes on heightened constitutional importance." *Id.* at 1222-23.

The fact that Congress provided for punitive damages separate and apart from statutory damages of $10,000 compels the conclusion that the 18 U.S.C. § 2520(c)(2)(B) statutory damages are compensatory only. True, when aggregated such damages "have the capacity to 'expand the potential statutory damages so far beyond the actual damages suffered that the statutory damages come to *resemble*

---

course seems large, but, as we have said, its validity is not to be tested in that way. When it is considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence … we think it properly cannot be said to be so *severe and oppressive* as to be wholly disproportioned to the offense or obviously unreasonable." (Emphasis added.) *St. Louis I.M. & S. Ry. Co. v. Williams,* 251 U.S. 63, 67 (1919).

[12] It is unclear why *Wakefield* disassociates deterrence from punishment in contrast to *State Farm,* 538 U.S. at 416.

EXHIBIT B

punitive damages." *Wakefield* 51 F.4th at 1122 (emphasis added). Here, however, even though class-wide statutory damages for violation of the Wiretap Act total $1.24 trillion, Congress did not intend these compensatory damages to be punitive in measure and has nowhere suggested a cap on available damages. *See Wakefield* 51 F.4th at 1124 ("We are constrained by a statute's language and interpret statutes with awareness that Congress could have enacted limits as to damages, including in large class action litigations…"). *See also Bateman v. American Multi-Cinema, Inc.,* 623 F.3d 708, 720 (9th Cir. 2010) ("Had Congress been sufficiently concerned about disproportionate damages as a result of class actions, it would have limited class availability or aggregate damages.")

In the context of FACTA's compensatory statutory damages – which were not capped in the case of class actions – this Court held:

> "'In the absence of such affirmative steps to limit liability,' we held, 'we must assume that Congress intended FACTA's remedial scheme to operate as it was written.' *Id.* at 722–23. As a result, we concluded that to refuse to follow the statute's text, in that instance by limiting class action availability to avoid 'enormous' potential liability,' would 'subvert congressional intent.' *Id.* at 723. Because the appropriate penalty for statutory violations is a legislative decision best left to Congress, courts should disregard the plain statutory language directing damages and allowing class action and other aggregation only in the most egregious of circumstances.

*Wakefield* 51 F.4th at 1124

The district court never analyzed the provisions of 18 U.S.C. § 2520(b)(2), (c)(2)(A), and (c)(2)(B), and never performed the simple, mechanical calculation of

EXHIBIT B

aggregated statutory damages available to the class under the Wiretap Act. Instead, without identifying the important interests Congress sought to protect through the Wiretap Act and the unequal position occupied by Facebook when it illicitly and without consent monitored class member internet usage, the district court, at the prompting of Class Counsel, determined that disgorgement of profits establishes the limit of actual damage.[13]

While this Court has held that aggregated statutory damage awards could violate due process in "certain extreme circumstances" and has established a basic due process analysis for such awards, the district court ignored available statutory damages and failed to engage in the analysis necessary to make any adjustments to those damages. *See Wakefield* at 1121-22 ("An aggregated award could, like a per-violation award, be wholly disproportioned to the prohibited conduct (and its public importance) and greatly exceed any reasonable deterrence value."). The district court never measured the settlement against the important privacy interests sought to be protected by the Wiretap Act and never considered whether the settlement would have even a modest deterrent effect.

---

[13] This Court's earlier analysis of disgorgement of profits was in the context of standing related only to "California common law trespass to chattels and fraud, statutory larceny, and violation of the CDAFA." *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 599-601 (9th Cir. 2020). Disgorgement has nothing to do with plaintiffs' standing to make claims under the Wiretap Act.

EXHIBIT B

Unless the district court first made a finding that the $10,000 statutory damages provided by the Wiretap Act are wholly disproportionate or obviously unreasonable considering the statute's purpose, it was bound to use the $10,000 per violation amount when beginning its evaluation of the proposed settlement. *See St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919). The district court never made such a finding. In this regard, the district court clearly applied the wrong legal standard.

It is certain, however, that the $90 million settlement approved by the district court will have absolutely no deterrent effect on a company worth in excess of $500 billion.[14]

## C. The district court failed to compare potential damages for each claim with the proposed settlement recovery and to justify the astronomical discount, in violation of the Northern District's Procedural Guidance and the Circuit's *Hanlon* factors

When asked to approve a proposed settlement the district court must balance the value of the claims being surrendered against what is being offered in exchange; otherwise, the court's approval is uninformed and arbitrary, and meaningful findings of fairness, reasonableness, and adequacy cannot be made. The Northern District has promulgated guidelines to assist in this evaluation. The District's *Procedural*

---

[14] In view of the public importance of the privacy rights protected by the Wiretap Act, a settlement of 1% of available statutory damages, $12.4 billion, would not be an excessive deterrent or violate due process.

EXHIBIT B

*Guidance for Class Action Settlements* requires that Class Counsel provide the court with "the class recovery under the settlement (including details about and the value of injunctive relief), the potential class recovery if plaintiffs had fully prevailed on each of their claims, claim by claim, and a justification of the discount." Addendum, A-5. This requirement is a prescribed means of addressing the first, second, and fourth factors set forth in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1997) – strength of case, risk, and the amount of settlement – in a way that permits meaningful application of those factors.

Class Counsel actually concede that they failed to satisfy their requirement to inform the court about the risks of continued litigation because it was too much work: "I had 40 pages of the brief we had to cut out showing the strengths and weaknesses of the case because it was really too much to file." Fairness Hearing Transcript at ER-55. This is astonishing, given that a candid discussion of the strengths and weaknesses of the case is perhaps the most important thing to be included in a motion for settlement approval. By omitting the most critical information relevant to a settlement approval analysis, Class Counsel prevented the district court from discharging its duty to compare the likely result of continued litigation with the settlement amount.

A class action settlement amount must be reasonable as a function of the relationship between maximum potential recovery and a discount according to the

EXHIBIT B

risk of continued litigation. As explained by the Seventh Circuit, a judge must "quantify the net expected value of continued litigation to the class, *since a settlement for less than that value would not be adequate*. Determining that value would require estimating the range of possible outcomes and ascribing a probability to each point on the range." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-285 (7th Cir. 2002) (emphasis added).

> Some arbitrary figures will indicate the nature of the analysis that we are envisaging. Suppose a high recovery were estimated at $5 billion, medium at $200 million, low at $10 million. Suppose the midpoint of the percentage estimates for the probability of victory at trial was .5 percent for the high, 20 percent for the medium, and 30 percent for the low… Then the net expected value of the litigation, before discounting, would be $68 million… [O]ur point is that the judge made no effort to translate his intuitions about the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if it was not settled now into numbers that would permit a responsible evaluation of the reasonableness of the settlement.

*Id*. at 285.

The above description applies equally to the district court in this case. Judge Davila failed to "translate his intuitions" in arriving at his conclusion that $90 million is sufficient compensation for the trillion dollars in class member claims proposed to be released by this settlement. After this Court reversed the district court's dismissal of the plaintiffs' most valuable claims, including the Federal Wiretap Act claim, this case had cleared one of the major hurdles to recovery on the

EXHIBIT B

merits.  Assuming the case has only a 1% chance of success at trial – which is conservative given plaintiffs' win on appeal – this case would demand a settlement in the range of $12.4 billion (i.e., 1% of $1.24 trillion).[15]

In another recent statutory damages class action against Facebook in this Circuit, the district court rejected a proposed settlement that represented 5.7% of total aggregated statutory damages, after that case had survived an appeal of class certification.  *See In re Facebook Biometric Info. Privacy Litig.*, 522 F.Supp.3d 617, 621 (N.D. Cal. 2021).[16]  The court ultimately approved a settlement representing 6.8% of aggregate statutory damages.  *Id.* at 622.[17]

---

[15] A settlement of this amount would also be fully consistent with the purposes of the Federal Wiretap Act, in light of Facebook's considerable net worth and prior conduct.  A $90 million settlement seems unlikely to have much deterrence value to a company that recently paid a $5 billion fine to the DOJ for failing to abide by a prior consent order regarding its privacy practices.  *See U.S. v. Facebook, Inc.*, 456 F. Supp. 3d 115 (D.D.C. 2020).  It would appear that something substantially greater than $90 million is required to deter Facebook in its unceasing efforts to amass a treasure-trove of personal information about its users.

[16] Unlike this case, *Facebook Biometric* did not sell its users' biometric data to other companies for revenue.  It used the data exclusively internally for face-tagging on the Facebook platform, which arguably enhanced users' experience.  Facebook Biometric is a "pure" statutory damages class action that obtained a settlement representing at least 6.8% of recoverable aggregate statutory damages.

[17] Facebook recently settled a privacy class action in the Northern District for $725 million in a case involving 250 million class members, or $3 per class member.  Though that case had lower available maximum per class member statutory damages (i.e. between $1,000 and $2,500), using *only* the same ratio of class members to dollar recovery would suggest at least $375 million settlement would be appropriate in the instant case; if adjustment is made for this case's greater available statutory damages and fewer class members, a settlement of $1.49 billion would be

EXHIBIT B

The *Facebook Biometric* settlement, which likewise included a promise by Facebook to discontinue its misconduct, should establish a benchmark for this and other statutory damage class actions. The court in that case first rejected a settlement that represented less than 6% of potentially recoverable statutory damages. Consequently, Facebook agreed to contribute an additional $100 million in order to settle a case that sought only statutory damages provided by Illinois statute. Facebook should be willing to pay at least as much to settle this case in which plaintiff's internet histories were illicitly captured, resulting in actual concrete harm to plaintiffs' privacy interests.

In its decision, the district court conflated the adequacy-of- settlement analysis with the *State Farm* due process test to support an incorrect finding that the settlement represents a 10% recovery of maximum damages. The due process limitation described in *Wakefield*, *supra*, however, is a check for oppressiveness to the defendant that is applied only *after* a judgment or verdict is rendered.

When analyzing a proposed settlement, the court should apply the *Wakefield* oppressiveness standard *only after* it has calculated recoverable damages in view of litigation risk. In this case, the district court's three-part analysis should have begun with a calculation of aggregated statutory damages, followed by a discount

---

appropriate by comparison. *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, N.D. Cal. No 18-md-02843-VC, Docket No. 1096.

EXHIBIT B

according to risk of continued litigation, and then proceeded to a cross-check – and, if necessary, an adjustment – for *Wakefield* oppressiveness.  This is what the Northern District's own rules specify.

As an illustration, assume this case, having survived an appeal challenging standing and the ability to state a claim, has at least a 1% chance of success at trial.[18] Applying this 1% to the potential aggregate statutory damages of $1.24 trillion yields the figure of $12.4 billion.  Barring punitive effect, this is the minimum amount required for a settlement of this case to be approved as adequate in every Circuit in the country.  No Circuit, including the Ninth, permits a case to be settled for less than its likely litigation value, which is calculated by multiplying potential damages by the likelihood of success.  "[I]n every instance [the court must] compare the terms of the compromise with the likely rewards of litigation."  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *Acosta v. Trans Union, LLC*, 240 F.R.D. 564 (C.D. Cal. 2007) ("court must apprise itself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated") (*quoting Weinberger*

---

[18] Of course, this case likely has a far higher chance of success on the merits, given its procedural posture and the fact that, by this Court's opinion, it has survived motions to dismiss.  Appellants use the conservative number of 1% for purposes of illustration, only.  If Class Counsel contend the case has a lower than 1% chance of success, this Court should require them to explain why they filed a frivolous case.

EXHIBIT B

*v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982)).  By this measure, the settlement approved by the district court is about $12.3 billion short.

*Acosta, supra*, is particularly instructive and relevant to the facts of this case. *Acosta* was a class action for violation of the Fair Credit Reporting Act ("FCRA"), with potential statutory damages of $2 billion.  After finding that the proposed settlement represented "not even one-fifth of one percent of the litigation value of these claims" the court denied approval to the settlement.[19] *Acosta*, *supra*, 240 F.R.D. at 578.  "Were Plaintiffs' claims against Trans Union and Equifax grounded in such a tenuous basis that they were hopelessly doomed to fail in court, such a colossal discrepancy between their apparent litigation value and the value of the Settlement may be acceptable.  That is not true here."  *Id*.  The same could be said of this case, where the settlement is just 0.0073% of the litigation value of the claims being settled.  Class Counsel has failed to make the case that their claims are "hopelessly doomed to fail in court."  Barring such a showing, approval of the proposed settlement is not permissible – it simply cannot be adjudged adequate.

After arriving at an adequate settlement value of $12.4 billion, the court then, and only then, should have subjected that figure to the *Wakefield* test for

---

[19] One-fifth of one percent of the litigation value of the claims in this case would be $2.5 billion.  While this amount may still be insufficient compensation for the litigation value of the Wiretap Act claims, at least it is in the ballpark for starting a discussion.  $90 million is absurd.

27

EXHIBIT B

constitutional excessiveness.  If the court determined that the amount of $12.4 billion was constitutionally excessive, it should then have determined the *maximum amount* that would not violate due process, *i.e.*, the constitutional limit, and set the minimum adequate settlement amount at that figure.  For example, since Facebook has previously stipulated to and paid a $5 billion fine to the DOJ for violation of a prior privacy consent order, the court could have found the amount of $5 billion is *prima facie* not constitutionally excessive.  Indeed, Facebook has borne that amount and again gone out and violated individual privacy rights.[20]  This indicates that $5 billion does not exceed the amount reasonably necessary to deter Facebook from ongoing and knowing invasions of third-party privacy rights.[21]

The Class would be far better off taking this case to trial with a 1% chance of winning a verdict of $1.2 trillion, even if that judgment were ultimately reduced to $5 billion by the guidelines set forth in *Wakefield,* than they are with the $90 million settlement that is dwarfed by the $650 million settlement in *Facebook Biometric* and $750 million in *Facebook Consumer Privacy*.  *See In re Facebook*

---

[20]  *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, N.D. Cal. No 18-md-02483-VC.

[21]  As pointed out by another objector, if the settlement paid minimum statutory damages of $10,000 to each of the 1.55 million valid claimants, a fair, reasonable and adequate settlement could be funded for $15.5 billion, far less than the $1.2 trillion number that gave the district court pause.  It could also be pointed out that it would take a settlement of $150 million to provide just *current class claimants* with a 1% recovery of available statutory damages.

EXHIBIT B

*Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617, 621 (N.D. Cal. 2021). *Facebook Biometric* had 9.4 million class members with potential aggregate statutory damages of approximately $9 billion and settled for $650 million. In this case, which has 124 million class members and potential aggregate damages of $1.2 trillion, a settlement for $90 million cannot be regarded as adequate when compared to *Facebook Biometric*[22] – certainly not without a determination that substantially greater litigation risk existed in this case, which topic was never addressed by Class Counsel or the district court.[23]

---

[22] This case and *Facebook Biometric* were in almost identical procedural posture at the time of settlement, each having survived a challenge to standing in this Court.

[23] On the other hand, if due process concerns really do limit recovery in this case to $900 million or less, then the proposed settlement class fails to satisfy the superiority requirement of Rule 23(b)(3). Each class member could sue individually and recover the statutory amount of at least $10,000, plus attorney's fees. If the very act of certifying a class compromises the class members' due process rights to the statutory damages provided by Congress, then aggregation of claims, a procedural device, adversely impacts class members' substantive rights, in violation of the Rules Enabling Act. The proposed settlement also fails the Rule 23(e)(2)(A) and (C) adequacy requirements for the same reasons. No adequate lead plaintiff or class counsel would pursue class litigation when doing so will provide inadequate relief of less than $1 for every $10,000 claim.

29

EXHIBIT B

## II. THE CLASS WAS DEPRIVED OF DUE PROCESS BY THE FAILURE OF CLASS NOTICE

Class notice in this case was nothing more than a procedural nicety that failed to provide absent class members with a reasonable description of the action being pursued on behalf of the class. It was practically impossible for class members to glean a useful understanding of what was being compromised by the settlement and to make an informed decision about whether to opt out of this case and sue on their own for statutory damages of $10,000, plus attorney's fees.

Rule 23(c)(2)(B)[24] – in connection with both the certification notice and 23(e)(1) settlement notice – establishes that notice to the class "must *clearly and concisely state* in plain, easily understood language: … (iii) the *class claims*, issues, or defenses." (Emphasis added.) Without adequate 23(e)(1) notice, absent class members cannot understand what they are giving up as part of the settlement.

The Supreme Court has held that class notice must be the "best practicable" and "should describe the action and the plaintiffs' rights in it." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). "[A] fully descriptive notice [ ] sent … to each class member, with an explanation of the right to 'opt out,' satisfies due process." *Id.* at 812. The Supreme Court has established that, at a minimum, due

---

[24] *See* Addendum, A-11.

30

EXHIBIT B

process requires a description of both the action underlying the class action and plaintiffs' rights in that action.

Beyond requiring a description of the action and class members' rights in that action, there are no rules dictating the contents of a notice.[25] The Federal Circuit has held "either notice or the method by which additional information is provided, must provide 'all necessary information for any class member to become fully apprised and make any relevant decisions.'" (Internal citations omitted.) *Haggart v. Woodley*, 809 F.3d 1336, 1349 (Fed. Cir. 2016). This Circuit has held that "[b]efore the district court approves a class settlement under Rule 23(e), it is 'critical' that class members receive adequate notice." *In re Hyundai and Kia Fuel Economy Litigation* 926 F.3d 539 (9th Cir. 2019). "Rule 23(e) requires notice that describes 'the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 945–946 (9th Cir. 2015). To satisfy Rule 23(e)(1), settlement notice must "present information about a proposed settlement

---

[25] The Rule 23(e) "standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, and it does not require an estimate of the potential value of those claims." *Lane v. Facebook, Inc.* (9th Cir. 2012) 696 F.3d 811, 826. *See also In re Online DVD-Rental Antitrust Litigation* (9th Cir. 2015) 779 F.3d 934, 945–946. However, *Lane* and *Online DVD* do not change the obligation of class notice to provide a description of class claims and class member rights in those claims consistent with *Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797, 812.

EXHIBIT B

neutrally, simply, and understandably." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009).

Notice in the instant case failed to describe either the action or class members' rights being pursued by the action. See Class Notice, ER-144–152. Absent from the district court's memorandum and order is any finding that class notice provided a description of either the action or class members' rights protected by the action – both fundamental due process requirements of any Rule 23 settlement notice.

Instead, the court approved notice – under the heading "What is this lawsuit about?" – gave the following description of class claims:

> This lawsuit alleges that the Defendant improperly obtained and collected data from Facebook Users in the United States who visited non-Facebook websites that displayed the Facebook Like button between April 22, 2010 and September 26, 2011, inclusive.[26]

Class Notice, ER-146.

No description of the actual causes of action being pursued or individual class member interests in those causes appears anywhere in the notice.[27]

---

[26] This same description is given on the settlement website's FAQ page.

[27] By way of comparison, the notice provided class members in *In re Facebook Biometric Information Privacy Litigation*, Case No. 3:15-CV-03747-JD, stated specifically that "Facebook users … sued Facebook claiming [violation] of the Illinois Biometric Information Privacy Act (BIPA). That law says companies can't collect, store, or give out "biometric data," which includes things like face or fingerprint scans, without first giving notice and getting consent. This case alleges that Facebook used facial recognition technology to create face templates—unique templates that can be used to identify users in photos, that these templates are

EXHIBIT B

Under the heading "What claims am I releasing if I stay in the Settlement Class?" the notice states:

> Unless you exclude yourself from the Settlement, you cannot sue, continue to sue, or be part of any other lawsuit against the Defendant about any of the legal claims this Settlement resolves. The "Released Claims" section in the Settlement Agreement describes the legal claims that you give up ("release") if you remain in the Settlement Class. The Settlement Agreement can be found at www.FBInternetTracking Settlement.com.

Class Notice, ER-148.

There is, however, no "Released Claims section" in the Settlement Agreement.[28]

Class members hoping to find a meaningful description of "class claims, issues, and defenses" were left to documents posted to the settlement website. The website provided six different class action complaints, in three different captioned matters, the most recent of which – the operative Third Amended Consolidated Class Action Complaint ("TACAC") – was filed in August 2017 and stated causes of action for Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing, only. These two causes of action were earlier dismissed by the district court, which dismissal was affirmed by this Court. *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 611 (9th Cir. 2020). Class Counsel failed to

---

covered by BIPA, and that Facebook did this without the proper notice and consent."

[28] The settlement agreement includes a "RELEASES" section and a "CERTAIN DEFINITIONS" section, both of which use the phrase "Released Claims," but neither references the Federal Wiretap Act.

EXHIBIT B

subsequently file a fourth amended class action complaint that conformed to this Court's 2020 opinion and there was no operative complaint on file when the action was tentatively settled and settlement notice given to the class.

Class Counsel did not post on the settlement website a copy of this Court's opinion in *In re Facebook, Inc. Internet Tracking Litigation*, and without the filing of a post-opinion fourth amended complaint class members were left thinking the only claims being advanced by class plaintiffs and Class Counsel were the TACAC's contractual causes, which were by ruling of this Court no longer enforceable against Facebook.

Remarkably, the district court describes this Court's 2020 opinion in this case as identifying "operative claims" without regard to the fact that actual class notice did not "clearly and concisely state in plain, easily understood language: … (iii) the *class claims*." *See* Rule 23(c)(2)(B). This Court's 2020 opinion cannot supplant necessary class notice; certainly not when the opinion was never posted to the settlement website and class members were not otherwise directed to seek it out to better understand what claims Class Counsel was advocating on their behalf.

Best practicable class notice requires the district court to consider "all the circumstances" of the case when determining what is required to "describe the action and the plaintiffs' rights." *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). When describing a class member's rights in the action – as opposed to class

34

EXHIBIT B

members' rights in the *settlement* of the action – class notice should, at the very least, identify statutory claims that provide compensatory damages available to individual class members.   In this case every class member's right to make a statutory claim worth $10,000 is being compromised for $0.73.  Common sense and due process instruct that class members be informed, at the very least, of the statute that provides for available statutory damages, and thereby given the minimal means of exploring that claim.  Nowhere in the class notice are class members told they have a claim under the Wiretap Act.  Further, what appears to be the controlling TACAC misinforms class members by leading them to believe the claims being negotiated and compromised are those that in reality no longer exist.

Class notice is supposed to simply and understandably present class members with information sufficient to inform them of the claims underlying a class action and their rights in those claims.  By failing to adequately inform class regarding claims being released, the notice deprived them of the critical information central to the most important decision they had to make – whether to stay in the settlement or opt out and sue on their own for the $10,000, plus fees, Congress provided for them. *Phillips Petroleum* 472 U.S. at 812.  Here, class notice left class members guessing about their rights and hid that substantial individual statutory damages were being sold for a net recovery of less than the price of a postage stamp.  The notice's lack of a clear statement of claim(s), including references to statutes giving rise to same,

35

EXHIBIT B

along with the absence of any description of class member rights in those claims, violates Rule 23 and constitutional due process.

Appellants ask this Court to consider *de novo* the notice provided to class members and to find it fails to meet the standards of both Rule 23 and constitutional due process.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's approval of the settlement and remand to the district court with guidance as to how the district court should analyze the settlement in the context of the litigation value of the case and in light of *Wakefield*'s due process concerns.

This Court should further find the class notice violated Rule 23 and constitutional due process standards and direct the district court to provide notice to the class that clearly and concisely describes the claims being compromised by the settlement, including without limitation for violation of the Wiretap Act – including a description of the availability of individual statutory damages, plus attorney's fees, under the act – and advises that the only way to obtain those full damages is to opt out of this case.

EXHIBIT B

Respectfully submitted,

Appellants Sarah Feldman and
Hondo Jan,
by their attorneys:


/s/ Kendrick Jan
Kendrick Jan, SBN 105149
Kendrick Jan, APC
225 Broadway, Ste. 2220
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com


/s/ John J. Pentz
John J. Pentz, Esq.,
18 Damon Street
Wayland, MA 01778
Phone: (978) 261-5725
jjpentz3@gmail.com

EXHIBIT B

# STATEMENT OF RELATED CASES

## (CIRCUIT RULE 28-2.6)

**9th Cir. Case No: 22-16903**

The undersigned attorney or self-represented party states the following:

I am aware of one or more related cases currently pending in this Court.  The case number and name of each related case and its relationship to this case are:

**Case No. 22-16904** (Appellant Eric Alan Isaacson)
**Case Name:**  *Perrin Davis, et al., v. Meta Platforms, Inc.*
 **Case relationship:**  Cases No. 22-16903 and No. 22-16904 arise out of the same final order and judgment issued in N.D. Cal. Civil Action No. 5:12-md-2314-EJD.

Signature:   __s/John Pentz_____          Date: 4/19/2023

EXHIBIT B