Roy M. Bartlett (SBN101563)
BARTLETT LAW FIRM
2872 Ygnacio Valley Rd.
Ste. 451
Walnut Creek CA 94598
Tel.: (925) 324-5150
roy@lawrmb.com

Benjamin J. Vernia*
Michigan Bar No. P47693
District of Columbia Bar No. 441287
THE VERNIA LAW FIRM
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
Tel. (202) 349-4053
Fax (866) 572-6728
bvernia@vernialaw.com
*  *Pro hac vice application pending*

*Attorneys for Objectors,*
    *Stewart Harris and Ryan Cino*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | ) ) ) ) ) ) Civil Action No. 3:2018md02843 |

### OBJECTIONS OF STEWART HARRIS AND RYAN CINO
### TO CLASS ACTION SETTLEMENT

NOW COME Settlement Class Members Stewart Harris and Ryan Cino (collectively "Objectors"), by and through their undersigned counsel, and for their objections to the settlement this Court preliminarily approved on March 29, 2023 [ECF No. 1130], state the following:

**I.     INTRODUCTION**

This class action arises out of 42 consolidated lawsuits alleging that the social media operator Facebook permitted third parties to access improperly Facebook users' private information, and failed to monitor that access. Following years of litigation, Class Counsel and Facebook negotiated a settlement. Class Counsel has moved to certify the Class and approve the Proposed Settlement. *See* Plaintiff's Notice of Motion and Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval [ECF 1096, and attachments] (Motion).

Objectors do not object to the certification of the class or the amount of the Settlement Fund. Based on Objectors' review of the docket entries in this class action, and the Plaintiff's Motion to Certify a Settlement Class and Grant Preliminary Settlement Approval [ECF No. 1096], Class Counsel have obtained Facebook's agreement to pay a substantial dollar amount – perhaps the most available under the complex circumstances of this case.

Objectors have identified, however, several deficiencies in the existing settlement proposal's method of distributing the fund, and the release provided in exchange for it. While these shortcomings can, and should be, overcome through amendments to ensure that the settlement is "fair, reasonable, and adequate" (Fed. R. Civ. P. 23(e)(2)), without changes the settlement is unfair and should be disapproved.

**II.    LEGAL STANDARD**

Federal Rule of Civil Procedure 23(e) requires court approval of any settlement of a class action. *Linney v. Cellular Alaska Partnership*, 1997 WL 450064 at *4, (N.D. Cal. 1997). "In evaluating settlement agreements under Rule 23(e), a district court must determine whether the settlement is fundamentally fair, adequate and reasonable." *Id.* (citing *Officers for Justice v. Civil*

*Service Commission,* 688 F.2d 615, 625 (9th Cir. 1982)). "The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Officers for Justice*, 688 F.2d at 625.

"When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 483–84 (4th Cir. 2020) (internal citation omitted). "And the court may approve the proposed settlement 'only on finding that [the proposed settlement] is fair, reasonable, and adequate.'" *Id.* at 484 (quoting Fed. R. Civ. P. 23(e)(2)). When considering the adequacy of a proposed settlement, the court must "weigh the likelihood of the plaintiffs recovery on the merits against the amount offered in the settlement." *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 841 (E.D. Va. 2016). Any settlement that provides "meaningless relief to the putative class" is not "fair, reasonable, and adequate." *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017).

"It has been remarked that the district court takes on the role of fiduciary for absent class members, or that of a skeptical client, who critically examines the settlement's terms and implementation." *Mitchinson v. Love's Travel Stops & Country Stores, Inc.*, No. 1:15-cv-01474-DAD-BAM, 2016 WL 7426115 at *8, E.D. Cal. 2016 (*citing Pointer v. Bank of America*

*National Association*, No. 2:14-cv-00525-KJM-CKD, 2016 WL 696582 at *12 (E.D. Cal. 2016). *See also In re Paxil Litigation*, 218 F.R.D. 242, 245 (C.D. Cal. 2003) ("The Court is a fiduciary for the absent class members and must conduct an independent and 'rigorous analysis' of the moving party's claims to examine whether the requirements are met." *See General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982). "The court takes the role of fiduciary seriously." *Dearaujo v. Regis Corp.*, Nos. 2:14-cv-01408-KJM-AC, 2:14-cv-01411-KJM-AC, 2016 WL 359473 at *10 (E.D. Cal. 2016). "The district court must act as a fiduciary, protecting the interests of absent class members by scrutinizing the settlement's fairness in light of the well-established factors." *Kim v. Allison*, 8 Fed.4th 1170, 1178 (9th Cir. 2021).

"The likelihood of recovery involves weighing the strength of the plaintiffs' case on the merits against the relief offered in settlement." *Rikers v. Gibbons*, No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012 at *3 (D. Nev. 2010). "In determining the probability of the plaintiff's success on the merits, there is no particular formula by which that outcome must be tested." *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 445 (E.D. Cal. 2013).

### III.     OBJECTIONS

####    A.     Objectors[1]

#####       i.     **Stewart Harris**

Stewart Harris is a Settlement Class member residing in Florida.  Mr. Harris is a retired law school professor and podcaster, who joined Facebook as a user in or around September 2010. As of July 1, 2023, Mr. Harris has 1,421 Facebook "friends," and is followed by 477 people. Mr. Harris also maintains a Facebook page for his podcast, *Your Weekly Constitutional*. That page has approximately 48,000 followers.

#####       ii.     **Ryan Cino**

Ryan Cino is a Settlement Class member residing in Georgia. Mr. Cino is a Chief Technology Officer and Software Engineer, who joined Facebook as a user in 2005. As of July 23, 2023, Mr. Cino has 623 Facebook "friends."

####    B.     **The Proposed Settlement's Distribution Method Disproportionately Compensates Certain Class Members**

Under the Proposed Settlement [ECF 1096-2 at 22-23 ¶¶ 103-104], the Class Period runs from May 24, 2007 to December 22, 2022. *Id.* at 4 ¶ 20. A separate Plan of Allocation governs the distribution of the $750 million Settlement Fund. [ECF 1096-3] Paragraph 5 of the Plan of Allocation provides:

> 5.     **Distribution to Authorized Claimants.** The Net Settlement Fund – including, to the greatest extent practicable, all interest earned on the Settlement Fund – shall be allocated to each Authorized Claimant pro rata by reference to the total number of

---

[1] Objectors may be contacted through undersigned counsel. The information required by Fed. R. Civ. P. 23(e)(5) and Paragraph 15 of the Court's Order Granting Preliminary Approval of Class Action Settlement [ECF 1130] at 4 ¶ 15 is being provided in written declarations accompanying these Objections.

allocation points assigned to all Authorized Claimants. Allocation points shall be assigned as follows:

> a. For each calendar month at any time during which an Authorized Claimant was a Facebook user with an activated account during the Class Period, such Authorized Claimant shall be assigned one allocation point.
>
> b. For purposes of this section, (i) the period from the first day of the Class Period to May 31, 2007, inclusive, shall be deemed a calendar month; and (ii) if the period that elapses between the first day of the month in which the Class Period ends and the day on which the Class Period ends is less than a full calendar month, such period shall be deemed a calendar month.

*Id.* [ECF 1096-3 at 1 (ECF page 3)]. Thus, under the proposed settlement, persons who used Facebook during the Class Period would receive a share proportionate solely to the number of months during the Class Period in which they had an activated account.[2] Messrs. Harris and Cino object to the equal treatment of all users, without regard to the number of friends who may have exposed them to third-party privacy invasion, and to the equivalent treatment of months late in the Class Period, which appear to have presented no – or a far smaller – potential of exposure than earlier months. Both of these problems could be solved easily.

      i.      **The Payment Method Under-Compensates Users Most Likely to Have Been Harmed**

Pursuant to Fed. R. Civ. P. 23(e)(5)(A), this objection applies to the subsets of Class Members, who: A) currently possess between 200-500 Facebook "friends"; and B) currently

---

[2] Neither the Proposed Settlement Agreement [ECF No. 1096-2] nor the Plan of Allocation [1096-3] define "activated account." We assume for the purpose of this Objection that this status refers to user accounts that have been created, but that have been neither "deactivated" or "deleted". *See* Facebook, *Deactivating or Deleting Your Account* (available at https://www.facebook.com/help/250563911970368/?helpref=related_articles).

A deactivated account that has not been deleted may be "reactivated." *See id.* ("Reactivate your Facebook account" option).

possess more than 500 Facebook "friends."

Because the primary gravamen of this lawsuit is the potential exposure of Class Members' private information by virtue of their *friends'* use of third-party applications, the probability that any given user's information was compromised almost certainly depends on the number of Facebook friends they had during the period in which third-party applications could access that information. Because the current Plan of Allocation fails to account for this factor, it over-compensates users with few Facebook friends, and under-compensates those – like Objectors – who possess a large number.[3]

We can represent the average probability that any given Facebook friend used a third-party application that exposed a user's private information as $P^{avg}$. Assuming that the probability of one friend using a third-party application is independent of (and the same, on average) as another's, for a person with a number of friends $n$, the total probability that any Class Member's private information was exposed as a result of their friends' use of third-party applications, is:

$$P^{tot} = n \times P^{avg}$$

Since Class Members vary in their number of friends ($n$, above), their total probability varies directly with the number of their friends.

Counsel for the class has represented:

> While the evidence establishes that aggregate harm was imposed on the class, and is sufficient to establish that each user was individually harmed, evidence to specifically identify the degree of that harm on each user is not available. Facebook was unable to supply Plaintiffs with information about the number or identity of all third parties that may have had access to each user's information through that user's friends, let alone

---

[3] The Objectors do not intend hereby to imply that Facebook users with lower number of friends are somehow unpopular. There are undoubtedly many factors that influence Facebook usage that have little or nothing to do with an individual user's overall popularity. For example, it may differ by age cohort, with younger Internet users less likely to use Facebook than older user.

information about precisely how much or how often each user's information was accessed or misused. Facebook was unable to provide Plaintiffs or the Settlement Administrator with information about how many friends each user has had. As such the metrics to precisely quantify each Authorized Claimant's damage are not available.

See Loeser and Weaver Decl. in Support of Plaintiff's Mot. for Prelim. Approval [ECF 1096-1] at 30 ¶ 108. This statement raises several questions.

First, it implies that the probability of exposure of each Class Member's private information is 100% (*i.e.,* the evidence "is sufficient to establish that each user was individually harmed"). Even assuming that were true, the *degree* of harm likely still varies based on the number of friends each Class Member has: more friends likely equates to more third-party applications used, and those applications' developers almost certainly varied in the volume and breadth of Class Members' private information they accessed.

Class counsel also declares that "Facebook was unable to provide Plaintiffs or the Settlement Administrator with information about how many friends each user has had." While it may be impossible to construct each Class Members' historical friend count (*i.e.,* how many friends each user "has had" at various points during the Class Period), Facebook certainly has access to users' *current* friend count, which Objectors believe can be used as a reasonable proxy for the size of users' past friend networks.[4]

There is no doubt that Facebook is capable of determining Class Members' numbers of

---

[4] Third-party application developers may no longer be able to access lists of users' friends by accessing Facebook's social graph. Facebook's social graph is a complex set of data and their relationships, representing Facebook's users, their information and content, and links among people and data such as Facebook posts. It is accessed (by both Facebook and third-party developers) through Facebook's Graph Application Programming Interface (API). See Facebook, *Graph API* (available at https://developers.facebook.com/docs/graph-api). Currently, third-party developers' calls to the *friends* API call will return a list of only those users who have also installed the developer's application.

Facebook friends. Indeed, Facebook does not keep that information private from other users. Any user's total number of friends is listed below their name, and to the right of their profile picture on the webpage generated for their user ID.[5] For example:



While using the current count of a Class Member's friends on Facebook can only approximate the number of friends that person had during the Class Period – and, therefore, reflect the likelihood and extent of their private information's exposure, it would certainly improve upon the proposed Plan of Allocation, which makes no such allowances.

A 2016 analysis (*i.e.*, during the heart of the Class Period) found that 40.41% of Facebook users had between 0 and 200 "friends," while 38.35% fell between 200 and 500, and just 20.79% had over 500.[6] Objectors propose that the Plan of Allocation weight the total points calculated for each user by a factor varying proportionally by these categories:

- 1 for those between 0 and 199 "friends" (*i.e.*, the same allocation point total otherwise calculated);
- 2 for those with 200-500 "friends" (*i.e.*, 2x the allocation point total otherwise calculated); and
- 3 for those with 501 or more "friends" (*i.e.*, 3x allocation point total otherwise

---

[5] Facebook's smartphone application likewise displays the count of friends below the profile information on the user's profile page.

[6] *See* Statista, *Average number of Facebook friends of users in the United States in 2016* (2023, *but citing* a 2016 survey conducted by Fracti) (available at https://www.statista.com/statistics/398532/us-facebook-user-network-size/).

calculated).

    ii.    **The Payment Method Over-Compensates Some Users**

<u>Pursuant to Fed. R. Civ. P. 23(e)(5)(A), this objection applies to the subset of Class Members who had activated accounts prior to January 2020.</u>

The Plan of Allocation also fails to take into account the very small chance that Facebook users' private information was disclosed to third-party applications in the last 23 months of the Class Period, which runs from May 24, 2007 to December 22, 2022. [ECF 1096-2 at 4 ¶ 20], but the parties appear to have determined through discovery that Facebook made the final changes necessary to prevent third-party applications from accessing friends' private information (the "deprecation" of "capabilities and APIs") no later than January 2020. *See* Motion [ECF 1096] at 10-11 ("The last of these deprecations occurred in January 2020"); *see also* Declaration of Steven Elia in Support of Settlement ("Elia Declaration) [ECF 1094] at 4 ¶ 15. Thus, although Facebook users faced no apparent risk of privacy invasion from January 2020 to December 2022, use during those months is treated equally with that during earlier periods.

Even if some credit should be provided to Class Members for post-January 2020 Facebook use, there is neither factual nor legal justification for making those 23 months equivalent under the Plan of Allocation to those during which privacy exposure has been proved.

Accordingly, Messrs. Harris and Cino object to this treatment, and request that the Court *modify the proposed settlement to double the number of allocation points accorded to months from May 2007 to December 2019*. This amendment would impose very little administrative burden, since the Settlement Administrator must already ascertain the start and end months for each Class Member, and the mathematical process called for in the Plan of Allocation can be revised to increase the Allocation Points for those months before January 2020.

The proposed amendment would ensure that all Class Members whose claims are released under the settlement would receive some compensation, while recognizing that Class Members were most at risk during periods prior to January 2020.

C.    **The Release Is Overly Broad.**

<u>Pursuant to Fed. R. Civ. P. 23(e)(5)(A), the following objections apply to all Class Members.</u>

The proposed settlement in this case arises in the unusual context of a company that is continually beset by allegations of misuse of its users private data. *In just this past month*, Meta has been accused of violating Norway's ban on behavioral advertising,[7] and Facebook lost its appeal to the Court of Justice of the European Union, which upheld a German court's decision that German antitrust regulators could consider technology companies' compliance with privacy requirements.[8]

In light of Meta's continuing failure to comply with statutory and common law privacy rights of the users of its platforms, it is vital that any settlement agreement be limited to the allegations made in this class action suit, which were the basis for discovery and negotiation of the proposed settlement. Any broader release would deprive class members of substantive rights, and would bestow on Meta – and, potentially, third parties – an immunity windfall.

---

[7]    W. Granthan-Phillips, *Meta faces $100K daily fine from Norway regulator over privacy concerns in user advertising*, Associated Press (Jul. 17, 2023) (available at https://www.msn.com/en-us/news/us/meta-faces-100k-daily-fine-from-norway-regulator-over-privacy-concerns-in-user-advertising/ar-AA1dYWda).

[8]    *See* Case C-252/21, *Meta Platforms Inc and Others v Bundeskartellamt,* ECLI:EU:C:2023:537 (Jul. 4, 2023) (available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:62021CJ0252).

OBJECTION OF STEWART HARRIS            11            MDL NO. 2843
AND RYAN CINO            CASE NO. 3:2018md02843
TO CLASS ACTION SETTLEMENT

i. **The Definition of "Released Parties" Jeopardizes Class Members' Potential Claims Against Other Meta Platforms and Even Third Parties**

Although this action concerns Facebook's struggles to protect its users' private information, the proposed settlement agreement defines "Released Parties" expansively:

> 72. "Released Parties" means Meta and all of Meta's current and former directors, officers, members, administrators, agents, insurers, beneficiaries, trustees, employee benefit plans, representatives, servants, employees, attorneys, parents, subsidiaries, divisions, branches, units, shareholders, investors, successors, predecessors, and assigns, and all other individuals and entities acting on Meta's behalf.

Proposed Settlement [ECF 1096-2] at 14 ¶ 72.[9] In the unusual circumstances of this case, the breadth of this definition risks releasing unlitigated claims against other Meta-owned social media and messaging platforms, and even the third-party application developers who misused Class Members' private information.

First, Meta Platforms, Inc., owns and operates not only Facebook, but also the social media platforms Instagram and Threads, and the messaging platforms Messenger and WhatsApp. Class Counsel's motion makes no mention of discovery regarding Meta's management of users' private information on these non-Facebook platforms. *Cf.* Motion [ECF 1096, with attachments]. When the overbroad definition of "Released Parties" is combined with the overbroad definition

---

9      This paragraph tracks the definition of "Meta" in ¶ 32:

> "Meta" or "Defendant" means Meta Platforms, Inc., formerly known as Facebook, Inc., and refers to the named defendant Facebook, Inc., as well as all of Meta's current and former directors, officers, members, administrators, agents, insurers, beneficiaries, trustees, employee benefit plans, representatives, servants, employees, attorneys, parents, subsidiaries, divisions, branches, units, shareholders, investors, successors, predecessors, and assigns, and all other individuals and entities acting on Meta's behalf.

Proposed Settlement [ECF 1096-2] at 6 ¶ 32.

of "Released Claims" (discussed below), the agreement risks immunizing these other Meta platforms for privacy violations other than those specifically addressed in this case.

In addition, third parties – including the application developers who misused Facebook users' data as alleged in this case – may argue that they fall within the scope of the concluding phrase "all other individuals and entities acting on Meta's behalf." This difficulty arises out of: 1) the likely existence of enforceable contracts between Facebook and third-party application developers; and 2) the inherent mutuality of contracts. It would be difficult to narrow this phrase without also failing to include some persons or entities that legitimately "act[ed] on Meta's behalf" (and so ought to be released). A simpler solution would be to expressly exclude those who should not be immunized through this agreement, for example, by adding the following sentence at the end of ¶ 72: "'Released Parties' does not include third-party application developers."

### ii. The Definition of "Released Claims" May Be Interpreted In Other Cases to Provide Meta With an Immunity Windfall

The proposed Settlement Agreement is also overbroad with respect to the claims it releases. The operative paragraph reads:

> 73.  "Released Claims" means, with respect to Settlement Class Members, any and all claims, demands, rights, damages, arbitrations, liabilities, obligations, suits, debts, liens, and causes of action pursuant to any theory of recovery (including, but not limited to, those based in contract or tort, common law or equity, federal, state, or local law, statute, ordinance, regulation, decree, or order) of every nature and description whatsoever, ascertained or unascertained, suspected or unsuspected, existing or claimed to exist, including known or unknown claims as of the Notice Date by all of the Releasing Parties that were asserted or could have been asserted *based on, relating to, or arising out of the identical factual predicate as the allegations in the Action, <u>including but not limited to</u>* sharing or otherwise making accessible user data and data about users' friends with/to third parties (including but not limited to third-party developers, whitelisted parties, business partners, advertisers, and data brokers), and monitoring and enforcement of third parties' access to and use and/or sharing of user data with other third

> parties. This release expressly excludes relief arising out of the pending motion for sanctions in the Action at ECF Nos. 879, 911, 922, 984, and 999. The Parties reserve all rights, including appellate rights, to challenge orders regarding the pending motion for sanctions. The definition of "Released Claims" shall be construed as broadly as possible under Ninth Circuit law to effect complete finality over this Action. For the avoidance of doubt, the Parties agree that nothing in the Plan of Allocation or any other provision contained herein shall in any way limit the scope of the Release.

Proposed Settlement [ECF 1096-2] at 15 ¶ 73 (emphasis added). Although Class Counsel assures the Court and Class Members that the release is consistent with the Ninth Circuit's limitation on the scope of class action settlements to those claims with an "identical factual predicate," Motion at 18 [ECF 1096] (*citing Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010)), the operative paragraph can, and should be, amended.

The problem arises from the phrase highlighted in underlined italic font, above – "including but not limited to" – and its insertion before the description of the very factual predicate that would be at issue in any subsequent privacy litigation against Meta. If "including but not limited to" modified the *type of claim* that might be made, it would be consistent with the identical factual predicate rule of *Hesse*. Instead, it muddles the *factual predicate* of this case, raising questions that neither Class Members nor future courts should have to resolve.

The settlement in *Hesse* provides a good example: there, Sprint settled a class action in Kansas alleging that:

> … Sprint's surcharges to recoup federal regulatory fees violated consumer protection laws, represented a breach of contract, and resulted in unjust enrichment. The relevant regulatory fees were defined in the settlement agreement to include only specified fees imposed to recover the cost of compliance with federally mandated programs.

*Hesse*, 598 F.3d at 585. Despite this narrow focus, the settlement agreement more broadly released claims pertaining to "surcharges, regulatory fees or excise taxes, *including but not limited to the Regulatory Fees*; and all other causes of action … *whether based on federal, state,*

*or local statute …*" *Id.*, 598 F.3d at 586 (emphasis added). When Sprint was sued in Washington state for improperly passing on a state tax, the District Court dismissed the case for *res judicata* based on the Kansas case's release. *Id.*, 598 at 586 n. 3. The Ninth Circuit reversed, finding that the Washington class was inadequately represented in the Kansas action for it to bind them, and that the Washington case did not arise from the identical factual predicate as the Kansas one.

Maybe a future court in a case unrelated to Facebook's third-party data sharing and monitoring will review this case's settlement agreement, apply *Hesse,* and permit the new case to proceed, but maybe it will not, because the phrase "including but not limited to" renders the factual predicate here too vague. (Indeed, it is more vague than the Kansas case's settlement agreement reviewed in *Hesse*, which at least defined the federal regulations at issue there.) In the absence of such a clear definition of what Facebook is alleged to have done, future plaintiffs and judges will be compelled to go outside the Settlement Agreement itself, and review the docket of this case – and possibly the 42 cases it consolidated – to determine the scope of this release.

The simple solution is to strike that phrase. If Meta believes that the remaining description of the factual allegations[10] are insufficient to cover the conduct resolved through the settlement, then additional, more specific terms should be proposed, so that Class Members may

---

[10]    The proposed settlement agreement currently includes the specific phrases:

> ... sharing or otherwise making accessible user data and data about users' friends with/to third parties (including but not limited to third-party developers, whitelisted parties, business partners, advertisers, and data brokers), and monitoring and enforcement of third parties' access to and use and/or sharing of user data with other third parties ….

Proposed Settlement [ECF 1096-2] at 15 ¶ 73

be fully informed as to the claims they are releasing, and so that future plaintiffs and judges may more readily and accurately ascertain the factual predicate of this suit and its settlement.

## IV. CONCLUSION

For all of the foregoing reasons, Objectors, Stewart Harris and Ryan Cino respectfully request that the Court deny final approval of the proposed settlement because the method of distributing the Settlement Fund overcompensates some Class Members, and because the Proposed Settlements' definitions of "Released Parties" and "Released Claims" are overbroad. Counsel for Objectors intends to appear at the Final Approval Hearing.

Respectfully submitted,

\_\_/s/_____

Roy M. Bartlett (SBN101563)
BARTLETT LAW FIRM
2872 Ygnacio Valley Rd.
Ste. 451
Walnut Creek CA 94598
Tele.: (925) 324-5150
roy@lawrmb.com

Benjamin J. Vernia*
Michigan Bar No. P47693
District of Columbia Bar No. 441287
THE VERNIA LAW FIRM
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
Tel. (202) 349-4053
Fax (866) 572-6728
bvernia@vernialaw.com
* *Pro hac vice application pending*

*Attorneys for Objectors,*
  *Stewart Harris and Ryan Cino*

**CERTIFICATE OF SERVICE AND
ATTESTATION OF COMPLIANCE WITH CIVIL L.R. 25(h)(3)**

I hereby certify that on July 26, 2023, I filed the foregoing Objections via CM/ECF with the Clerk of United States District Court for the Northern District of California.

I further attest, pursuant to Civil L.R. 25(h)(3), that each of the other Signatories have concurred in the filing of the document, and that this attestation shall serve in lieu of their signatures on the Objections.

> Benjamin J. Vernia*
> Michigan Bar No. P47693
> District of Columbia Bar No. 441287
> THE VERNIA LAW FIRM
> 1455 Pennsylvania Ave., N.W., Suite 400
> Washington, D.C. 20004
> Tel. (202) 349-4053
> Fax (866) 572-6728
> bvernia@vernialaw.com
>
> * *Pro hac vice application pending*
>
> *Attorney for Objectors,
>    Stewart Harris and Ryan Cino*