Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
1330 Broadway, Suite 630
Oakland, California 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' (1) MOTION FOR FINAL APPROVAL AND (2) MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor<br>Hearing Date: Sept. 7, 2023<br>Hearing Time: 1:00 p.m. (via Zoom) |

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ..............................................................................................1

II.     UPDATED CLAIMS INFORMATION.......................................................................2

     A.    Claims ....................................................................................................2

     B.    Opt Outs .................................................................................................3

     C.    Communications With Potential Class Members .................................................4

III.    RESPONSES TO OBJECTIONS ...........................................................................5

     A.    The Objections to the Amount of the Settlement Should Be Rejected...................6

     B.    The Objection to the Class Definition Should Be Rejected.................................11

     C.    The Objections to the Release Should Be Rejected...........................................11

          1.    Released Claims...................................................................................12

          2.    Released Parties ...................................................................................14

     D.    The Objection to the Requested Fees Should Be Rejected...................................16

     E.    The Objections to the Plan of Allocation Should Be Rejected............................20

          1.    The Original Plan of Allocation Is Preferable to the Proposal Made
               by the Harris/Cino Objection.................................................................20

          2.    The Pentz Objectors' Argument Against the Plan of Allocation
               Lacks Merit. .......................................................................................23

     F.    The Other Objections Should Be Rejected or Not Considered............................25

          1.    Objections That Do Not Provide Required Information Should Not
               Be Considered......................................................................................25

          2.    Objections Relating to the Failure to Make Facebook Change Its
               Behavior.............................................................................................25

          3.    Objections Concerning the Requested Service Award. ...............................26

          4.    The Objection Relating to Notice Should Be Rejected. ..............................27

CONSOL. REPLY ISO MOTS. FOR FINAL              i             MDL NO. 2843
APPROVAL AND ATT'Y FEES,                              CASE NO. 18-md-02843-VC
EXPENSES, AND SERVICE AWARDS

| | 5. | The Objection Purporting to Identify Legal Error Should Be Rejected | 28 |
| | 6. | Several Objections Simply Do Not Apply | 29 |
| IV. | CONCLUSION | | 29 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Trans Union, LLC*,
 240 F.R.D. 564 (C.D. Cal. 2007) ............................................................................9

*Acosta v. Trans Union, LLC*,
 243 F.R.D. 377 (C.D. Cal. 2007) ............................................................................9

*Alexander v. FedEx Ground Package Sys., Inc.*,
 No. 05-cv-00038-EMC, 2016 WL 3351017 (N.D. Cal. June 15, 2016)............................17, 18

*Allen v. Bedolla*,
 787 F.3d 1218 (9th Cir. 2015) ................................................................................5

*In re Bluetooth Headset Prods. Liab. Litig.*,
 654 F.3d 935 (9th Cir. 2011) ................................................................................17

*Byrne v. Santa Barbara Hosp. Servs., Inc.*,
 No. EDCV 17-00527 JGB (KKx), 2018 WL 10483678 (C.D. Cal. Dec. 14,
 2018) ..................................................................................................................4

*Chun-Hoon v. McKee Foods Corp.*,
 716 F. Supp. 2d 848 (N.D. Cal. 2010) ...................................................................19

*Churchill Vill., L.L.C. v. Gen. Elec.*,
 361 F.3d 566 (9th Cir. 2004) ................................................................................5

*Class Plaintiffs v. City of Seattle*,
 955 F.2d 1268 (9th Cir. 1992) ..............................................................................20

*In re Corrugated Container Antitrust Litig.*,
 659 F.2d 1322 (5th Cir. Unit A 1981) ...................................................................22

*Cruz v. Sky Chefs, Inc.*,
 No. C-12-02705 DMR, 2014 WL 7247065 (N.D. Cal. Dec. 19, 2014)...................................5

*In re Facebook Internet Tracking Litig.*,
 2022 WL 16902426 ......................................................................................7, 13

*Hefler v. Wells Fargo & Co.*,
 No. 16-cv-05479-JST, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ....................................20

CONSOL. REPLY ISO MOTS. FOR FINAL
APPROVAL AND ATT'Y FEES,
EXPENSES, AND SERVICE AWARDS

iii

MDL NO. 2843
CASE NO. 18-MD-02843-VC

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ................................................................................12

*In re High-Tech Emp. Antitrust Litig.*,
No. 11–cv–02509–LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ...............................18

*In re Initial Pub. Offering Sec. Litig.*,
721 F. Supp. 2d 210 (S.D.N.Y. 2010)...........................................................................7

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ..................................................................................8

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) ................................................................................6

*Moore v. Verizon Commc'ns Inc.*,
No. C 09-1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013)...................................25

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*,
688 F.2d 615 (9th Cir. 1982) ................................................................................11

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ................................................................................26

*In re Optical Disk Drive Prods. Antitrust Litig.*,
959 F.3d 922 (9th Cir. 2020) ................................................................................16

*Perdue v. Kenny A. ex. rel. Winn*,
559 U.S. 542 (2010)...........................................................................................19

*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)............................................................................................8

*Radcliffe v. Experian Info. Sols. Inc.*,
715 F.3d 1157 (9th Cir. 2013) ................................................................................9

*Razo v. AT&T Mobility Servs., LLC*,
No. 1:20-cv-0172 JLT HBK, 2023 WL 3093845 (E.D. Cal. Apr. 26, 2023) ....................26, 27

*Rieckborn v. Velti PLC*,
No. 13-cv-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) .................................20

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ..............................................................................7, 8

*Smith v. CRST Van Expedited, Inc.*,
  No. 3:10-cv-01116-IEG (WMC), 2012 WL 12953429 (S.D. Cal. Apr. 23, 2012)...................4

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ...................................................................................................19

*In re TracFone Unlimited Serv. Plan Litig.*,
  112 F. Supp. 3d 993 (N.D. Cal. 2015) .....................................................................................25

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) .................................................................................................17

*Wakefield v. ViSalus, Inc.*,
  51 F.4th 1109 (9th Cir. 2022) ..............................................................................................9, 10

*In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*,
  MDL No. 1735, No. 2:06-cv-00225-PMP-PAL, 2010 WL 786513 (D. Nev.
  Mar. 8, 2010)...............................................................................................................................7

## Other Authorities

Robert Klonoff, *Class Actions Objectors: The Good, the Bad, and the Ugly*,
  89 Fordham L. Rev. 475 (2020) .................................................................................................7

## I.      INTRODUCTION

Since this Court granted preliminary approval of the proposed settlement, more than 13 million claims have been preliminarily validated. That number does not include more than 1.6 million additional submitted claims that have not yet been preliminarily reviewed, in addition to claims that have not yet been, but will be, submitted before the August 25 deadline. This is among the most validated claims ever submitted in a class action. Class Counsel and Angeion have collectively responded to more than 158,000 individual inquiries about the settlement, while the Settlement Website has been visited by more than 61 million unique visitors. In short, class notice and administration have been extremely successful, especially given the number of potential claimants and length of the Class Period. The submission of more than 13 million facially valid claims to date is a remarkable outcome.

As expected, not every class member has agreed to participate in this settlement. Roughly 20,000 opt outs were timely submitted, constituting 0.008% of the estimated Class. In addition, 76 Class Members filed objections, reflecting just 0.00003% of the estimated Class. The bulk of the objections have focused on a desire for a larger recovery, including many requests for individual recoveries ranging from tens of thousands to hundreds of millions of dollars per person. Two objections criticize the allocation method and four the request for attorneys' fees. Class counsel has carefully considered each objection and has addressed them all in their Motion for Final Approval (Dkt. 1145) or below.

Given the complexity and importance of this case, the novel issues it raised, the vigorous advocacy involved, the success of the notice program, the large number of claims filed, and the resources the parties and Court invested in driving this case to resolution, Plaintiffs request that the Court grant final approval to the settlement, and grant Plaintiffs' request for attorneys' fees, expenses, and service awards.

## II.    UPDATED CLAIMS INFORMATION

### A.    Claims

As of August 2, 19,027,181 claims have been submitted. Supplemental Declaration of Steven Weisbrot of Angeion Group, LLC in Support of Motion for Final Approval of Class Action Settlement ("Weisbrot Decl.") ¶ 8. The August 25 claim submission deadline is still three weeks away, and Plaintiffs will update the Court with final numbers at that time.

The Settlement Administrator has conducted an initial review of the 17,371,380 online claims submitted by July 27. *Id.* ¶ 9. Of those claims, the Settlement Administrator has determined that 1,156,787 of the claims are duplicative, meaning that a claimant has submitted more than one claim. *Id.* For each duplicate claim, only one is accepted. Of the remaining online claims submitted by July 27, the Settlement Administrator's preliminary fraud review has identified 3,131,829 that have indicia of fraud and which are subject to further verification.[1] *Id.* ¶ 10. The Settlement Administrator has therefore preliminarily determined that 13,082,764 valid claims have been submitted online. That number does not include the 1,635,256 online submissions received between July 28 and August 2, or the 20,545 hard copy submissions. *Id.* ¶¶ 8-10. Based on an estimated Class of 250 million, and counting only the 13,082,764 preliminarily validated claims, this reflects an estimated claims rate of approximately 5.2%.

Plaintiffs believe that the number of preliminarily valid claims submitted to date is among the highest ever submitted in a common fund settlement. The 5.2% claims rate remains

---

[1] Because this is a matter of great public interest, the Parties anticipated the possibility that attempts to submit fraudulent claims would follow. Consistent with the Settlement Agreement, the Settlement Administrator and the Parties have used the "best practices and all reasonable efforts and means to identify and reject duplicate and/or fraudulent claims." Dkt. 1096-2 ¶ 96; *see* Weisbrot Decl. ¶¶ 10-11. As a result of these measures, Plaintiffs currently report the total number of claims at 13,082,764 and estimated claims rate at 5.2%. The Settlement Administrator may preliminarily validate additional claims following further review.

substantially higher than rates found sufficient to support final approval in other data-privacy and

data-breach cases. *See* Dkt. 1145 at 11-12 (citing settlements approved with claims rates of 0.6%,

1%, 1.4%, 1.8%, nearly 2%, and 3.6%). The Settlement Administrator's anti-fraud efforts will

also increase the amount recovered by each Class Member who submits a valid claim. If the

Court grants Plaintiffs' request for fees, expenses, and service awards, a tentative calculation

shows the preliminarily validated claimants will receive an average of approximately $40 (higher

than the previously reported preliminary calculation of an average of $35 per valid claimant).[2]

## B.    Opt Outs

The Settlement Administrator received 21,595 opt outs. Weisbrot Decl. ¶ 14. The July 26

deadline for opting out has passed, though additional opt outs postmarked by that date may

continue to be delivered to the Settlement Administrator. Based on an initial review, the

Settlement Administrator has determined that 20,212 unique Class Members have submitted opt

out requests. *Id.* The rest are duplicative, meaning that the same Class Member has opted out

multiple times. The Settlement Administrator will only count one opt-out per Class Member. The

20,212 unique opt outs represent merely 0.008% of the estimated Class. This is a lower

percentage of opt outs than often occurs in approved class actions. *See, e.g.*, Dkt. 1145 at 12-13

(citing cases approving settlements with opt out rates of 4.86%, 0.56%, 0.11%, and 0.017%).

In addition, the Settlement Administrator has determined that as of July 31, there are

3,942 individuals who submitted both claims and opt outs. Weisbrot Decl. ¶ 15. For purposes of

the analysis in this reply brief, Plaintiffs are counting these as claims and not opt outs. Treating

---

[2] The amount each Class Member who submits a valid claim receives may be more or less
depending on other factors, including the number of valid claims received by the claim
submission deadline, the amount of time other claimants were on Facebook during the Class
Period, and the Settlement Administrator's final costs for notice and administration services.

them as opt outs, however, would have a negligible effect on the claims rate. After the claims period ends, the Settlement Administrator will contact each Class Member who submitted both a claim and an opt out to ask which option they prefer. If the Class Member does not respond, Plaintiffs have instructed the Settlement Administrator to prefer the claim. *See Smith v. CRST Van Expedited, Inc.*, No. 3:10-cv-01116-IEG (WMC), 2012 WL 12953429, at *3 (S.D. Cal. Apr. 23, 2012) (approving such a procedure); *see also Byrne v. Santa Barbara Hosp. Servs., Inc.*, No. EDCV 17-00527 JGB (KKx), 2018 WL 10483678, at *8 n.5 (C.D. Cal. Dec. 14, 2018) (similar).

## C.        Communications With Potential Class Members

The notice program has been an overwhelming success. Dkt. 1145 at 4-6. As a result, as of August 2, more than 61 million unique visitors have visited the Settlement Website, with more than 95 million page views; more than 2 million visitors to the Settlement Website have engaged with the chatbot; more than 154,000 emails received and answered; more than 33,000 calls have been made to the toll-free telephone number in calls cumulatively lasting more than 150,000 minutes; and more than 2,800 callers have left messages requesting a copy of the Long Form Notice or the Claim Form be mailed to them, and the Settlement Administrator has fulfilled each such request. Weisbrot Decl. ¶¶ 4-7.

In addition, Plaintiffs' counsel continue to receive phone and email inquiries from potential Class Members. As of July 31, Plaintiffs' counsel had received approximately 2,500 communications that predominantly concern questions about whether the individual is a Class Member, how to file a claim, and other settlement-related information. Declaration of Derek W. Loeser and Lesley E. Weaver in Support of Consolidated Reply ("Co-Lead Counsel Decl.") ¶ 3. Plaintiffs' counsel have responded to each inquirer, except for those that did not provide contact information or who counsel could not reach despite trying (such as when the individual did not

answer and their voicemail box was full) and, in one instance, where counsel believed that the individual presented potential safety concerns. *Id.* ¶ 4.

## III.    RESPONSES TO OBJECTIONS

Since Plaintiffs filed their motion for final approval, they have received 33 additional objections to the Settlement. *See* Dkt. 1158 (11 additional objections forwarded by the Court); Dkt. 1160 (18 additional objections forwarded by the Court after July 30); Dkts. 1147, 1152, 1154, 1155 (4 objections filed via ECF). In total, Plaintiffs received 76 objections to the Settlement. *See* Dkts. 1144 (43 objections addressed in Plaintiffs' opening brief), 1147, 1152, 1154, 1155, 1158, 1160.

Given the estimated Class size, the case's public importance, and the media coverage it has received, this is an extremely small number of objections. Objections to a settlement are expected. *See Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("[I]t is the nature of a settlement, as a highly negotiated compromise . . . that '[i]t may be unavoidable that some class members will always be happier with a given result than others.'") (quoting *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982)). But only 0.00003% of the estimated Class here—fewer than one of every 3.3 million estimated Class Members—submitted objections. The low number and percentage of objections supports the conclusion that the Settlement is fair, reasonable, and adequate. *Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement approval with an objection

rate of 0.05%, more than 1600 times greater than here). Below, Plaintiffs categorically address each of the objections they received since July 10.[3]

A.      **The Objections to the Amount of the Settlement Should Be Rejected.**

A number of objections received since July 10 say the $725 million settlement amount is too low. *See* Dkt. 1158-1, objs. 45, 47, 49, 50, 51, 53; Dkt. 1160-1, objs. 55-72. These objections are often coupled with objectors' demands for large individual payments to themselves. *See* Dkt. 1158-1, obj. 47 (filed by same objector who filed objections 33, 39, and 41); *id.*, obj. 51; *id.*, obj. 52 & Dkt. Dkt. 1160-1, obj. 67 (filed by same objector who filed objections 26 and 37); Dkt. 1160-1, objs. 55, 61-62, 64-66, 68-69, 72.

Plaintiffs are sympathetic to objectors who seek a larger Settlement. It is understandable that some members of the vast Class wanted to recover (and require Facebook to pay) more, but, as Plaintiffs previously explained, such objections do not account for the unprecedented recovery of $725 million. Dkt. 1145 at 17-18. Nor do they account for the risks faced by Plaintiffs, including the risk that they would recover nothing at all if litigation continued. *Id.* at 9-10; Mot. for Prelim. Approval, Dkt. 1096 at 19-36. Settlement is a compromise. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers for Justice*, 688 F.2d at 625).

None of the objections affect the conclusion that this compromise is exceptional. Critically, none of these objectors address that this is the largest privacy settlement ever achieved, nor do they address that no individual suffered out of pocket damages in this case. The

---

[3] Seven of the objections were postmarked after the July 26 deadline. *See* Dkt. 1130 ¶ 15; *see also* Dkt. 1145 at 13 n.7 ("Objections must be filed with the Court and are due by **July 26, 2023**.") (emphasis in original). Plaintiffs nevertheless address the substance of those late-postmarked objections below.

class is receiving dollars it never spent, based on a successful yet novel legal theory of unjust enrichment.

The Pentz Objectors also argue that the Settlement is too small, but they advance a baseless method for calculating the lowest approvable settlement amount. Dkt. 1147.[4] The objection contends that amount is $6.25 billion, which it arrives at by: (1) calculating the maximum theoretical statutory damages available for Plaintiffs' Video Privacy Protection Act claim, which they say is $625 billion, *Id.* at 4-5; (2) asserting that the claim must have had at least a 1% chance of success at trial, *id.* at 7; and (3) concluding that 1% of $625 billion is the minimum approvable settlement value, *id.* One of the same objectors, represented by the same counsel representing her here, made a similar argument in *In re Facebook Internet Tracking Litigation*, arguing that the proper comparison was $1.24 trillion in statutory damages—and their objection was overruled. No. 5:12-MD-02314-EJD, 2022 WL 16902426, at *7 (N.D. Cal. Nov. 10, 2022).

The Ninth Circuit has declined to use mechanical calculations to evaluate settlements, instead favoring a holistic approach that "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965

---

[4] This objection is filed by attorney John Pentz and co-counsel Kendrick Jan on behalf of Sarah Feldman, Mr. Pentz's sister-in-law, and Jill Mahaney, Mr. Jan's niece. Dkts. 1150-3 at 2; 1150-1 at 2; 1150-2. Courts have decribed Mr. Pentz as a "serial objector" and have found his objections to be filed in "bad faith." *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp. 2d 210, 214-215 (S.D.N.Y. 2010) (identifying Pentz as a "serial" objector, finding "evidence of bad faith or vexatious conduct" by Pentz and other attorneys for objectors, and requiring Pentz to post an appeal bond); *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, MDL No. 1735, No. 2:06-cv-00225-PMP-PAL, 2010 WL 786513, at *1-2 (D. Nev. Mar. 8, 2010) (requiring bond, noting that Pentz has "a documented history" of filing appeals from settlement approvals and then dismissing them "when [he and his clients] were compensated by the settling class or [their] counsel"); Robert Klonoff, *Class Actions Objectors: The Good, the Bad, and the Ugly*, 89 Fordham L. Rev. 475, 490 n.86, 499 (2020) (discussing Mr. Pentz's history, and citing cases).

(9th Cir. 2009). In *Rodriguez*, the Ninth Circuit expressly distinguished its approach from the mechanical approach the Pentz Objectors urge here. *See id.*; *see also, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) ("reject[ing]" objectors' assertion that district courts must compare the "specific monetary value" of statutory claims to the settlement award).

More generally, there is no authority for the idea that there is a formulaic "lowest possible approvable settlement amount" in evaluating whether a proposed settlement is fair, reasonable, and adequate under Rule 23, and (it follows) no authority for the Pentz Objectors' manner of calculating one. While the objection states that "[n]o Circuit, including the Ninth, permits a case to be settled for less than its likely litigation value, which is calculated by multiplying potential damages by the likelihood of success," Dkt. 1147 at 7, the opinions it cites in support merely stand for the well-established proposition that the Court should compare the settlement terms with the likely rewards of litigation and consider the probabilities of success if litigation were to continue. *See id.* (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968) and *Acosta v. Trans Union, LLC*, 240 F.R.D. 564 (C.D. Cal. 2007)).[5] They do not support the Pentz Objectors' assertion that this is a math exercise. *See Rodriguez*, 563 F.3d at 965 (rejecting any "particular formula" for quantification). Plaintiffs have presented the required information to the Court. Dkt. 1145 at 9-10; Dkt. 1096 at 19-37; *see* Dkt. 1140-7 ¶ 26 (Declaration of Prof. Fitzpatrick, who states: "In their preliminary approval motion, class counsel analyzed these factors"—including the possible results versus the risks and complexities of proceeding with litigation—"in more detail than I have seen before in other such motions.").

---

[5] *Protective Committee* concerns bankruptcy reorganization, not a class action settlement. 390 U.S. at 418.

The *Acosta* case in particular does not help the Pentz Objectors' arguments. There, the court did not deny final approval based simply on a comparison of the settlement value to the potential litigation value of the plaintiffs' claims. Instead, its denial was based on an "unacceptable volume and degree of deficiencies" in the settlement, including "inherent structural deficiencies" plaguing the distribution of benefits and the court's observation that the entire "process by which the parties reached [the] proposed settlement was flawed." *See generally* 240 F.R.D. at 571-86, superseded by *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007).

Moreover, the initial settlement there did not have a concrete economic value and the court concluded that its "estimate of the Settlement's cash value" was "less than $1 million." *Id.* at 578. The low and speculative amount of that proposed settlement is distinguishable from the substantial, specific recovery achieved by Plaintiffs here. And the settlement *ultimately* approved in *Acosta* resulted in the reporting agency TransUnion paying $15 million into a $45 million common fund settlement. *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1162 (9th Cir. 2013). Fifteen million dollars is less than the 1% benchmark the Pentz Objectors propose as the floor for an approvable settlement, based on the objection's representation that TransUnion's potential statutory damages in *Acosta* reached $2 billion. Dkt. 1147 at 7.

Even accepting for argument's sake the Pentz Objectors' calculation-based theory, they fail to consider the reductions that would likely need to be made to a statutory VPPA recovery based on due process concerns. Otherwise, the $625 billion amount would all-but-certainly be found to exceed the limits of due process, even with a favorable verdict. *See Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1124-25 (9th Cir. 2022) (remanding a $925.25 million statutory damages award for re-evaluation and likely reduction because it may violate due process). If

TCPA statutory damages of $925.25 million caused due process concerns, it is overwhelmingly likely that a VPPA statutory damages recovery of $625 billion—over 600 times larger—would as well. Thus, though the Pentz Objection posits a mathematical model—1% of the VPPA statutory damages available at trial equals the floor of a settlement—it does not provide a realistic estimate for the damages that Plaintiffs could possibly recover through continued litigation and success at trial.[6] *See also* Dkt. 1096 at 26 (citing approved VPPA settlements representing a fraction of maximum theoretical statutory damages).

The Pentz Objection improperly characterizes the due process issue here as a concern about what Facebook could afford to pay. *See* Dkt. 1147 at 9 n.5 (stating that Facebook's voluntary settlement of the 2020 FTC Consent Order for $5 billion "would appear to undermine any argument that a net $5 billion verdict for violation of the VPPA would violate due process"). The due process concern arises from the offense, not the offender. *See Wakefield*, 51 F.4th at 1120-21 (the question is whether a statutory damages award violates due process because it is "'wholly disproportioned to the offense and obviously unreasonable'" (quoting *St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919))). Moreover, the Pentz Objectors' suggested amount of $625 billion is more than two orders of magnitude greater than the $5 billion settlement reached with the FTC.

In sum, neither the Pentz Objectors nor the others undermine the conclusion that the $725 million settlement amount is an excellent recovery. In the end, Plaintiffs agree with the

---

[6] Objection no. 56 echoes the Pentz Objection by asserting that, based on the previous estimate of 15 million Class Members who had filed claims, the VPPA recovery alone is $37.5 billion. Dkt. 1160-1, obj. 56 at 12. Thus, it continues, "Class Members are likely to receive pennies on the dollar for their claims, or perhaps $35.00, despite the existence of a minimum claim of $2,500 under the Video Privacy Protection Act." *Id.* at 14. This objection should be rejected for the same reasons as the Pentz Objection.

Harris/Cino Objectors: "Class Counsel have obtained Facebook's agreement to pay a substantial dollar amount—perhaps the most available under the complex circumstances of this case." Dkt. 1154 at 2.

## B.     The Objection to the Class Definition Should Be Rejected.

The objection at Dkt. 1155 (the "All of Us or None Objection") expresses concern that the class definition is unclear regarding whether it includes non-natural persons. Dkt. 1155 at 6. The Settlement Class preliminary certified by the Court is: "All Facebook users in the United States between May 24, 2007, and December 22, 2022, inclusive." Dkt. 1130 ¶ 2. Plaintiffs disagree that this class definition is ambiguous. Indeed, context provides further clarity. The preliminary certification order provides that only *individuals* can opt out of the settlement. *See id.* ¶ 16 (requests for exclusion must "be personally signed by the individual seeking exclusion" and "state that the individual seeking exclusion was a Facebook user during the Class Period"). That is consistent with the allegations and claims in the case, which focused on the *individual* harms suffered by Facebook users. *See* Dkt. 298 at 1 ("This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties.").

## C.     The Objections to the Release Should Be Rejected.

Two objections, Dkt. 1152 (the "*Klein* Objection") and Dkt. 1154 (the "Cino/Harris Objection") raise issues with the release in the Settlement Agreement.[7] Both objections identify

---

[7] Two other identical objections generally assert that the release will cause Facebook users to "lose a significant amount of their ability to act against Facebook." Dkt. 1160-1, obj. nos. 58, 60. Though Plaintiffs disagree with the word "significant," they agree that the release will preclude Facebook users from asserting claims based on the identical factual predicate against the Released Parties. That's what a settlement is. *Cf. Officers for Justice v. Civil Service Comm'n of City and Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) ("[I]n exchange

concerns with the Released Claims provision, and the Cino/Harris objection also identifies a concern with the Released Parties provision. Neither objection prevents the Court from approving the Settlement as fair, reasonable, and adequate.

1. **Released Claims**

Paragraph 73 of the Settlement Agreement, Dkt. 1096-2, identifies Released Claims. The part of the provision at issue provides that the release covers "known or unknown claims as of the Notice Date by all of the Releasing Parties that were asserted or could have been asserted based on, relating to, or arising out of the identical factual predicate as the allegations in this Action, including but not limited to sharing or otherwise making accessible user data and data about users' friends with/to third parties (including but not limited to third-party developers, whitelisted parties, business partners, advertisers, and data brokers), and monitoring and enforcement of third parties' access to and use and/or sharing of user data with other third parties." Dkt. 1096-2 ¶ 73.[8]

That the Released Claims are limited to those "that were asserted or could have been asserted based on, relating, to, or arising out of the identical factual predicate as the allegations in this Action" is consistent with Ninth Circuit precedent and this Court's standing order. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590-92 (9th Cir. 2010) (limiting release to claims based on the

---

for the saving of cost and elimination of risk, the parties each give up something they might have won." (citation omitted)).

[8] Objections no. 58 and 60 quote paragraph 78 of the Settlement Agreement, which releases the parties from "legal proceedings that may arise from 'facts other than, different from, or in addition to, those they know or believe to be true with respect to the claims released by this Settlement Agreement." Dkt. 1160-1, obj nos. 58, 60. But that provision is limited by the very next sentence to the "Released Claims" provision in paragraph 73. Therefore, the Release does not provide the "near blanket legal immunity to Facebook" the objectors say it does.

"identical factual predicate" as that underlying the settled case); Standing Order for Civil Cases Before Judge Vince Chhabria ¶ 54 (citing *Hesse*).

The *Klein* Objection. The *Klein* Objection, brought by the proposed class representatives in a pending antitrust case, *Klein v. Meta Platforms, Inc.*, No. 3:20-cv-08570 (N.D. Cal.), expresses concern that the release may be improperly read to release the claims asserted there. Having voiced that concern, however, the *Klein* Objectors themselves disagree that the release may be read in that way. "The *Klein* Consumer Plaintiffs do not believe the *Consumer Privacy User Profile* release applies to their case against Facebook." Dkt. 1152 at 5. It continues, "The underlying predicates [of] the *Klein* Consumer Class's antitrust claims vastly differ from those of the claims at issue here (none of which are antitrust claims)." *Id.* at 6.

Nevertheless, "[o]ut of an abundance of caution," the *Klein* Objectors ask the Court to add a sentence to the release—"This Release shall not bar or otherwise limit claims asserted the case captioned *Klein v. Meta Platforms, Inc.*, Case No. 3:20-cv-08570 (N.D. Cal.)." *Id.* at 1, 5. This proposal for a case-specific carveout risks creating more problems than it attempts to solve. Facebook is a defendant in numerous pending lawsuits, and including a specific carve-out of the *Klein* action may be used to argue that other actions against Facebook that are not similarly carved out are intended to be released. Furthermore, whether any action is released should be litigated and determined by the court presiding in that action, not this one, especially when there is the possibility for amendment of the allegations in *Klein* and other pending cases. This is at least the second settlement in which the *Klein* plaintiffs have requested this carve-out, and their request should be denied here, as it was previously. *See In re Facebook Internet Tracking Litig.*, 2022 WL 16902426, at *10 ("The Court overrules this objection without determining whether the claims asserted in *Klein* are released by this Settlement Agreement.").

Class counsel conferred with the *Klein* plaintiffs on multiple occasions and the *Klein* submission reflects this position. Dkt. 1152 at 1.

The Harris/Cino Objection. The Harris/Cino Objection's concern with the Released Claims provision is that the phrase "'including but not limited to,'" and the language that follows that clause describing the types of claims that are released "muddles the *factual predicate* of this case." Dkt. 1154 at 14 (emphasis in original). They argue it raises the possibility that "a future court in a case unrelated to Facebook's third-party data sharing and monitoring" may not let that case proceed due to the release. *Id.* at 15.

This concern is misguided. The language in the release that follows "including but not limited to" identifies specific examples of released claims that are within the identical factual predicate. These include "sharing or otherwise making accessible user data and data about users' friends with/to third parties (including but not limited to third-party developers, whitelisted parties, business partners, advertisers, and data brokers), and monitoring and enforcement of third parties' access to and use and/or sharing of user data with other third parties." Dkt. 1096-2 ¶ 73. The language thereby summarizes the complex factual predicate of this case in order to assist Class Members and future courts to determine the scope of the release without having to delve into the lengthy complaint and extensive docket. The release cannot reasonably be read to extend beyond the identical factual predicate of the claims asserted in this litigation. That is the very purpose of the "identical factual predicate" language.

## 2. Released Parties

The Harris/Cino Objectors express two concerns about the Released Parties provision, found at paragraph 72 of the Settlement Agreement.

One of the Harris/Cino Objectors' concerns is that the clause releasing "all other individuals and entities acting on Meta's behalf" could be understood to include "the third-party application developers who misused Class Members' private information." Dkt. 1154 at 12. This concern is based on the theory that any party with an enforceable contract with Meta may be understood to be acting on its behalf. *Id.* at 13. That is a strained reading of the Released Parties provision. Entities that acted on Meta's behalf include, for example, its retained counsel—not third-party developers who entered contracts to develop Facebook apps that may, indirectly, have benefitted Facebook. Indeed, Facebook took the position that the third party whose actions sparked this litigation—Aleksandr Kogan, who sold data to Cambridge Analytica—was acting in violation of Facebook's policies. *See* Dkt. 261-1 at 21. Further, Facebook invoked a third-party exculpatory clause with respect to third parties. And Facebook has actively engaged in litigation with certain third-party developers who have violated its terms of service.[9] Based on these positions, it is clear that Facebook does not consider third-party application developers as "acting on Meta's behalf." The Harris/Cino Objectors' proposed addition of the sentence, "'Released Parties' does not include third-party application developers," at the end of the Released Parties provision is unnecessary.

The second of the Harris/Cino Objectors' concerns is that, because the definition of Released Parties includes "all of Meta's . . . subsidiaries [and] divisions," it improperly includes Instagram, Threads, Messenger, and WhatsApp. Dkt. 1154 at 12. (Note that Threads launched to users in July 2023, well after the Class Period and after the Settlement Agreement was

---

[9] Jessica Romero, *Taking Legal Action Against Those Who Abuse Our Platform* (Aug. 27, 2020), https://about.fb.com/news/2020/08/taking-legal-action-against-those-who-abuse-our-platform/.

executed.[10]) But Released Parties are only released by the Settlement to the extent covered by the Released Claims provision. As addressed above, the Released Claims are limited to those based on the identical factual predicate as the claims here. The claims here concerned Facebook's third party data sharing described extensively in the complaint, such as friend sharing and whitelisting. No other claims are released.

**D.      The Objection to the Requested Fees Should Be Rejected.**

Since Class Counsel filed their motion for attorneys' fees, only two objections—the Pentz Objection and Objection no. 56—have objected to the request. Dkt. 1147; Dkt. 1160-1, obj. 56. They raise two arguments against the fee requested here. Each should be rejected.

<u>First</u>, the Pentz Objectors argue that the fee request is unwarranted because the size of the Settlement is too small. That contention is incorrect for reasons already explained. To the contrary, the size of the Settlement is remarkable in light of the challenges the Class has faced and would face if litigation proceeded.

<u>Second</u>, the Pentz Objectors argue that the fee award *must* be lower than 25% in light of the Settlement Fund's size. But it is simply wrong to assert that a percentage award should be mechanically lowered as a settlement fund increases, no matter the circumstances. *See* Dkt. 1147 at 11 (maintaining that the settlement fund's size "requires that the fee be substantially less than 25%" (emphasis omitted)).

In fact, the Ninth Circuit has consistently disagreed with that view, rejecting any "bright-line rule" requiring fee awards to decrease as settlement funds increase. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 933 (9th Cir. 2020). It has held that no "particular

---

[10] *Introducing Threads: A New Way to Share With Text*, Meta (July 5, 2023), https://about.fb.com/news/2023/07/introducing-threads-new-app-text-sharing/.

percentage" is reasonable or unreasonable "in the abstract, without reference to all the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (quotation and citation omitted). And—perhaps most relevant here—it has clarified *when* fee percentages should be lowered in light of a settlement's size: when a "benchmark" award of 25% would confer "windfall profits . . . *in light of the hours spent on the case*." *In re Bluetooth Headset Prods. Liab. Litig.*,654 F.3d 935, 942 (9th Cir. 2011) (emphasis added).

Whether a benchmark award is unreasonable here, then, depends heavily on its relationship to the hours spent on the case. As Class Counsel have explained, the hours spent on the case—and the lodestar cross-check that takes those hours into account—show that a 25% fee would be reasonable in these circumstances. Dkt. 1139 at 18-19, 21-25. Tellingly, the Pentz Objectors do not contend that the hours spent on this case have been excessive. Nor do they challenge Class Counsel's lodestar rates. Nor do they claim that a 1.99 multiplier would be out of line with comparable settlements. Instead, the Pentz Objectors' argument for a lower fee rests on the assumption that the lodestar cross-check should be disregarded. They fail to explain why the lodestar should be disregarded, especially given the Ninth Circuit's case law.[11]

In fact, the cases on which the Pentz Objectors rely highlight the importance of a lodestar cross-check in these circumstances. They rely most heavily on *Alexander v. FedEx Ground Package Sys., Inc.*, No. 05-cv-00038-EMC, 2016 WL 3351017 (N.D. Cal. June 15, 2016). But, like the Ninth Circuit in *Bluetooth*, *Alexander* stressed that percentages can decrease as settlement size increases simply to prevent a windfall in light of the amount of work performed.

---

[11] Objection no. 56 similarly misreads *Bluetooth*, contending that a fee award of 25% in a megafund case constitutes a windfall when evaluated against the time invested and result obtained. Dkt. 1160-1, obj. 56 at 17.

For that reason, *Alexander* noted, "in megafund cases, **the lodestar cross-check assumes particular importance**." *Id.* at *2 (emphasis added). In *Alexander*, that cross-check yielded "a multiplier of approximately 4," well above the 1.99 multiplier sought here and above even the typical multiplier in similarly sized cases. *Id.* at *3. *Alexander* also expressed concerns that the lodestar was unreasonably large. *See id.* ("[T]he risk of an inflated lodestar . . . counsels caution in applying an extraordinary multiplier."). Here, by contrast, the Pentz Objectors do not challenge the reasonableness of the lodestar and even seem to concede that the lodestar is not inflated. *See* Dkt. 1147 at 13 (asking in the alternative that counsel be awarded their lodestar).

The Pentz Objectors also cite *In re High-Tech Emp. Antitrust Litig.*, No. 11–cv–02509–LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015). There, however, the court employed the lodestar method, *id.* at *7-8, and found that a multiplier of 2.2 was appropriate for class counsel, *id.* at *11. A multiplier of 2.2 here would produce a fee larger than the one that Class Counsel are requesting.

Next, the Pentz Objectors cite Brian Fitzpatrick—one of Class Counsel's experts—in support of the assertion that "the market rate for a settlement of this size" is approximately 10%. Dkt. 1147 at 12. That assertion is incorrect and does not address Professor Rubenstein's or Professor Fitzpatrick's evaluation of this case. *See* Dkt. 1140-6 ¶¶ 30-48; Dkt. 1140-7 ¶¶ 21-27. In fact, as Professor Fitzpatrick himself has explained, the mean and median fee rates for comparable settlements are 20.3% and 20.7% respectively, and *half* of those settlements approved fee awards of higher than 25%. Dkt. 1140-7 ¶ 21 & tbl. 1. The Pentz Objectors' arguments for a much lower fee award are not only inconsistent with Ninth Circuit law but are also factually incorrect. And the average multiplier in comparably sized class actions—a number

that different studies have in the range of 2.39 to 4.50—is materially higher than the 1.99 multiplier sought here. Dkt. 1140-6 ¶¶ 42-43.

In the alternative, the Pentz Objectors argue that, because "Class Counsel's lodestar represents a presumptively reasonable fee," only the lodestar should be awarded. Dkt. 1147. This is a tacit admission that the hours billed are appropriate. The dispute is whether counsel should be compensated with a 1.99 multiplier for the considerable risk they undertook. To support their side of that dispute, Objectors cite *Perdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542 (2010), a case that addresses federal fee-shifting provisions. Here, a fee is being requested under the common-fund doctrine, not under a federal fee-shifting provision. The rules that govern fees awarded under federal fee-shifting statutes do not apply to fees awarded under the common-fund doctrine. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 967-68 (9th Cir. 2003) (noting, among other things, that percentage fees are proper in common-fund cases). The Pentz Objectors' reliance on *Kenny A.*, therefore, is misplaced.

Finally, Objection no. 56 asserts that a negative multiplier should be applied. Dkt. 1160-1, obj. 56 at 15-17. It, too, relies on *Kenny A.* for the proposition that a multiplier is "appropriate only in rare or exceptional cases." For the reasons addressed immediately above, *Kenny A.* is inapt. The objection also relies on *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010), for the proposition that "'a negative multiplier evinces that undertaking this litigation was not a wise use of class counsel's time and resources.'" Dkt. 1160-1, obj. 56 at 16. But in *Chun-Hoon*, class counsel *requested* fees in an amount lower than their lodestar. 716 F. Supp. 2d at 853-54. The case does not apply here. The objection further asserts that a negative multiplier is appropriate because of "the low value of the settlement to the class members who submit a

claim." Dkt. 1160-1, obj. 56 at 16-17. As set forth above in § III.A, Plaintiffs believe the Settlement is a remarkable achievement.

**E.      The Objections to the Plan of Allocation Should Be Rejected.**

An allocation plan, like a settlement, needs to be fair, reasonable, and adequate. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992); *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 4207245, at *12 (N.D. Cal. Sept. 4, 2018). Plaintiffs' proposal meets that standard and merits approval. Because plans of allocation are often constrained by imperfect information and must balance increased precision against increased administrative costs, "[c]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Rieckborn v. Velti PLC*, No. 13-cv-03889-WHO, 2015 WL 468329, at *8 (N.D. Cal. Feb. 3, 2015) (quotation and citation omitted). Here, the Plan of Allocation was carefully designed by counsel and supported by the expert declaration of Professor Lynn A. Baker. *See* Dkt. 1096-5. The liberal standard for plans of allocation is amply satisfied here, contrary to the two objections to it.

**1.      The Original Plan of Allocation Is Preferable to the Proposal Made by the Harris/Cino Objection.**

The parties proposed a Plan of Allocation that assigns points to Class Members based on the time they had an activated Facebook account, and then allocates funds based on each Class Member's points. Dkt. 1096-3 ¶ 5. The Plan of Allocation is designed to roughly track the probable degree to which third parties had access to Class Members' private information—which is the injury that underlies this litigation. Facebook has confirmed that there is a positive correlation between the length of time users have been on the platform and the amount of third parties' access to users' information. Information that might allow a more precise measure of injury (the number of third parties with access to a user's friends, the number of friends a user

had over the course of the Class Period, etc.) is not available. Dkt. 1096-1 ¶ 108; Dkt. 1096-5 ¶ 18.

The Harris/Cino objection proposes an alternative Plan of Allocation. They make two points. First, they argue that the Plan of Allocation ought to account for the number of friends Class Members had over the Class Period. While they acknowledge that that historical number is unavailable, they say that the Plan of Allocation may use the number of friends Class Members currently have as a proxy. Second, the Harris/Cino objection claims that because January 2020 marked the last change that Facebook made to prevent friend sharing by third parties, the Plan of Allocation should not allocate as many points to the portion of the Class Period following January 2020.

The assumption behind Harris/Cino's first proposal is that current friends "can be used as a reasonable proxy for the size of users' past friend networks." Dkt. 1154 at 8. Harris/Cino, however, provide no real support for this assumption. One problem, of course, is that the number of a user's friends can vary greatly over time. There is no reason to think that friend count in 2023 accurately reflects a user's friend count in 2019, let alone in 2007.

Another equally important problem is that the *rate* of change in a user's current friend count can vary greatly over time. The number of friends could grow steadily, but it could also stay the same for a long time and increase (or decrease) rapidly. Steady growth would make a user's current friend count a poor proxy for historical friends. It would be an even worse proxy if a user's friend count stays the same for a long time but then, near the end of the Class Period, suddenly increases or decreases (the user gets a new job, moves to a new city, or gets divorced). A more reasonable and manageable metric was simply how long a user was on Facebook. If there is little reason to believe that current friend count will accurately reflect historical friend

count, and if, as here, it would meaningfully increase administrative costs to include users' current friend count in the allocation formula, then the balance of costs and benefits swings decisively against the change that Harris/Cino propose. *See* Dkt. 1096-5 ¶ 16 (noting that the benefits of "fine-tuning individual awards" must be balanced against "administrative costs"); *see also In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1329 (5th Cir. Unit A 1981) (affirming an allocation formula in part because the proposed alternative "would be costly, complex, and burdensome").

In their second proposal regarding the Plan of Allocation, the Harris/Cino objection argues that, after January 2020, Class Members faced only a "very small chance" that their "private information was disclosed to third-party applications." Dkt. 1154 at 10. Insofar as the objection focuses on "friend sharing," that is consistent with Facebook's representations. However, data sharing and third-party misuse did not abruptly stop in 2020,[12] and Facebook continued to improve controls over what was shared and how third parties targeted users after then. *See* Dkt. 1095 ¶¶ 11(d), 12(d), 15(f), 16(d), 17(d), 19(c) (identifying enhanced processes for overseeing third-party developers' access to and use of Facebook user data that were implemented after 2020).[13] Further, claims that arise from this portion of the Class Period have strengths that claims from different times do not have. Facebook has no statute-of-limitations defense against claims from this period, for example. Considered as a whole, the time-based Plan of Allocation that Plaintiffs propose is a fair, adequate and reasonable approach to calculating

---

[12] Mike Clark, The Facts on News Reports About Facebook Data, Meta (Apr. 6, 2021), https://about.fb.com/news/2021/04/facts-on-news-reports-about-facebook-data/.

[13] *See also* Removing Certain Ad Targeting Options and Expanding Our Ad Controls, Meta (Mar. 30, 2022), https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expanding-our-ad-controls.

each claimant's recovery. Users who signed up after 2020 still will receive some payment, reflecting the ongoing risk they face, but they will receive less than those who were on the platform longer.

In short, Class Counsel carefully evaluated all potential claims, over time, and ultimately concluded that too many variables, even for individual class members, exist to perform a meaningful comparative analysis of each claim relating to the multitude of apps and practices that disclosed data to third parties over a fifteen-year period, especially given the volume of data shared and accounts at issue. A more pragmatic and reasonable approach is to adopt an objective formula based on the number of years a user had a Facebook account.

### 2.    The Pentz Objectors' Argument Against the Plan of Allocation Lacks Merit.

The Court's motion-to-dismiss ruling determined that, for Class Members who signed up before 2009, Facebook's consent defense to sharing friend data with apps did not prevail as a matter of law, at least at the pleading stage. Therefore, say the Pentz Objectors, the Settlement should accord increased value to the claims of Class Members who signed up before 2009, because those claims are "much stronger." Dkt. 1147 at 10. This argument appears to challenge not only (1) the Plan of Allocation, which does not assign increased value to those Class Members' claims, but also (2) whether Plaintiffs have appropriately evaluated the value of the class's claims and (3) whether there is an intraclass conflict of interest that requires subclasses. *See id.* at 10-11 & n.7.

However it is construed, this argument is incorrect. First, it exaggerates the effect of the Court's motion-to-dismiss ruling. For one thing, the Court noted that under the VPPA claim, Facebook *uniformly lacked* a consent defense to sharing friend data with apps; the Court's differentiation between users who signed up before and after 2009 applied only to the other

Consol. Reply ISO Mots. for Final
Approval and Att'y Fees,
Expenses, and Service Awards

23

MDL No. 2843
Case No. 18-md-02843-VC

claims. *See* Dkt. 298 at 35. More fundamentally, the Court said that it could not "conclude *as a matter of law* that early Facebook users consented to the later-announced information-sharing policy." *Id.* at 27 (emphasis added). That limited ruling hardly guaranteed success against Facebook's consent defense, which the company retained. Had litigation continued, it would have been sure to argue at summary judgment or trial that the evidence supported its consent defense against users who signed up before 2009. And indeed, Facebook's consent defense against users who signed up before 2009 arguably had considerable force, because even before 2009, Facebook's Privacy Policy stated that third-party apps might access their information:

> If you, *your friends*, or members of your network use any third-party applications developed using the Facebook Platform ("Platform Applications"), *those Platform Applications may access and share certain information about you with others in accordance with your privacy settings*. You may opt-out of any sharing of certain or all information through Platform Applications on the Privacy Settings page. In addition, third party developers who have created and operate Platform Applications ("Platform Developer"), may also have access to your personal information (excluding your contact information) if you permit Platform Applications to access your data. Before allowing any Platform Developer to make any Platform Application available to you, Facebook requires the Platform Developer to enter into an agreement which, among other things, requires them to respect your privacy settings and strictly limits their collection, use, and storage of your information.

Co-Lead Counsel Decl., Ex. 2, at 3 (emphasis added).

Second, the Pentz Objectors are simply incorrect that only those users who signed up before 2009 had good arguments against the defense that they consented to Facebook's sharing of friend data with apps. Discovery revealed that users who signed up after 2009 had potent arguments that they did not consent to the *way* in which Facebook shared friend data with apps. After 2009, Facebook's agreements with its users promised that apps would use friend data only "in connection with the person that gave the permission"—i.e., the user who actually downloaded the app and agreed to its terms of service—"and no one else." Dkt. 491 ¶ 516.

Evidence, however, established that Facebook did not prohibit apps from using friend data beyond the scope of that limited consent. *See* Dkt. 1050-3 at 8-11 (summarizing documents showing that Facebook was aware of likely widespread app misuse of friend data affecting millions, if not billions, of users). So the Pentz Objectors are simply wrong to claim that Class Members who signed up before 2009 have "much stronger" arguments on consent, or more valuable legal claims, than those of other Class Members—especially to such an extent that it would make the Settlement or Plan of Allocation unfair, unreasonable or inadequate.

**F.      The Other Objections Should Be Rejected or Not Considered.**

      **1.      Objections That Do Not Provide Required Information Should Not Be Considered.**

Three objections received since July 10 do not provide information required for consideration and cannot be considered.

Objection no. 44 states that the objector was not a Facebook user during the Class Period. Dkt. 1158-1, obj. 44. Thus, the objector is not a Class Member and his objection cannot be considered. *See, e.g.*, *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1008 (N.D. Cal. 2015) (only class members have standing to object to a proposed class settlement). Objection no. 69 does not state that the objector was a Facebook user during the Class Period, and should therefore not be considered for the same reason. Dkt. 1160-1, obj. 69. And Objection no. 46 fails to provide any reason for the objection. *See* Dkt. 1158-1, obj. 46. It, too, cannot be considered. *See Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *10 (N.D. Cal. Aug. 28, 2013).

      **2.      Objections Relating to the Failure to Make Facebook Change Its Behavior.**

Objection nos. 58 and 60 state that the Settlement "fail[s] to protect Facebook users from future exploitation by Facebook." Dkt. 1160-1, objs. 58, 60. Plaintiffs addressed similar

objections in their opening brief, Dkt. 1145 at 18-19, and their response remains the same. First,
Facebook remains under the continued (and active) scrutiny of the Federal Trade Commission,
which includes monitoring whether Facebook is sharing user data without appropriate user
authorization and how Facebook has improved its monitoring of third parties' use of such data.
*Id.* at 19. Second, as a condition of executing the Settlement Agreement, Class Counsel required
Facebook to provide sworn declarations establishing that it ceased the practices giving rise to this
claim. *Id.* Moreover, the release does not cover claims that are based on allegations that post-date
the Settlement Agreement.

### 3. Objections Concerning the Requested Service Award.

Objection no. 56 states that the proposed $15,000 service awards are too high because of
the disparity between what the Named Plaintiffs and Class Members would receive. Dkt. 1160-1,
obj. 56. Plaintiffs addressed a similar objection in their opening brief. Dkt. 1145 at 23. The
objection relies on *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015), which
supports the service award requested here. There, the Court approved $5,000 incentive awards
for nine recipients, totaling 0.17% of the total settlement fund. *Id.* at 947-48. Here, Plaintiffs seek
$15,000 incentive awards for eight recipients, totaling just 0.0165% of the total settlement fund.
And though the $15,000 awards are larger than those approved in *In re Online DVD-Rental
Antitrust Litig.*, that case does not establish a cap on service awards. Plaintiffs have provided
authority supporting service awards of up to $ 20,000 where class representatives have
participated comparable to the Named Plaintiffs' activities here. Dkt. 1139 at 30 n.10.

The other case cited in Objection no. 56 approved a $5,000 service award to a class
representative who only spent approximately 40 hours on the case, faced a "speculative 'risk of
reputational injury,'" and who the opinion does not indicate was deposed. *Razo v. AT&T*

*Mobility Servs., LLC*, No. 1:20-cv-0172 JLT HBK, 2023 WL 3093845, at \*27-32 (E.D. Cal. Apr.

26, 2023). Notably, *Razo* also discusses opinions where courts approved service awards of

$25,000 and $15,000 for involvement in cases comparable to the Named Plaintiffs' involvement

here. *Id.* at \*31.

### 4.   The Objection Relating to Notice Should Be Rejected.

Objection no. 49 states, "Americans that missed the 24 hr notice should not have their

right to sue violated by this 'Class Action' suit." Dkt. 1158-1, obj. 49. Objection no. 59 similarly

states that there exist "indications that some class members did not receive adequate notice of the

proposed settlement." Dkt. 1160-1, obj. 59. Neither provides further support for these

contentions.

The overwhelming majority of Class Members received far more than 24-hours' notice of

their rights under the proposed Settlement. Notice was issued beginning on April 12 and, as of

July 11, more than 93% of the target audience of 252 million Americans had received notice,

each with an average frequency of more than 3 times. Dkt. 1145 at 4-6; Dkt. 1145-2 ¶ 9. The

notice program far exceeded the Federal Judicial Center's description of a notice plan that

reaches 70% of class members as a "high percentage" and within the "norm." Dkt. 1096-2 at 53

¶ 14 (quoting Barbara J. Rothstein & Thomas E. Willging, Fed. Jud. Ctr., *Managing Class*

*Action Litigation: A Pocket Guide for Judges* 27 (3d ed. 2010)).

Objection nos. 55, 61, 62, 65, and 66 state, in near identical language, that the Settlement

is vague as to the terms of the settlement. Dkt. 1160-1, objs. 55, 61, 62, 65, 66. Plaintiffs

disagree. The settlement comports with due process, was evaluated and approved by the Court,

and sets for the terms in plain language. If these individuals had questions about the Settlement

they could have done what millions of potential Class Members did: visited the Settlement

Website, used the chatbot or reviewed the FAQs available there, reached out to the Settlement Administrator, or contacted Class Counsel. In any event, it appears that these objections may be more interested in securing additional money for themselves than in assisting the Class. After stating their nearly identical objections, each offers to "settle" for $15,000. *Id.*

5.       **The Objection Purporting to Identify Legal Error Should Be Rejected.**

The All of Us or None Objection also asserts that the Preliminary Approval Order and Plaintiffs' final approval motion get the legal standards wrong. Dkt. 1155 at 6-8. Specifically, it expresses concern that Plaintiffs ignore the requirement that the Settlement resulted from arms-length negotiations and that the settlement treats Class Members equitably. *Id.* at 7-8.

The objection is wrong on both points. *See* Dkt. 1096 at 4 ("[t]he Settlement was achieved through contested, arms-length mediation sessions"); *id.* at 37-38 (explaining the proposed Plan of Allocation); Dkt. 1096-4 ¶ 17 (settlement mediator Judge Gandhi declared: "I can attest that the Parties' Settlement is the product of forceful, oppositional advocacy and independent, arm's-length negotiations conducted in good faith"); Dkt. 1096-5 ¶ 20 (Professor Baker declared: "the point system proposed here provides a fair and reasonable way of providing horizontal equity among the claims against the Net Settlement Fund"; and "claimants whose likely amount of damage is greater are awarded more points than those whose likely amount of damage is smaller"). The Court's preliminary approval order was premised on its review of these statements, as well as others. *See* Dkt. 1130 at 1 ("[T]his Court has reviewed the Settlement entered into by the Parties, all exhibits thereto, the record in this case, and the Parties' arguments"); *cf. id.* ¶ 1 ("This Court reviews class action settlements just as carefully at the initial stage as it does at the final stage."). There is no legal error.

6.      **Several Objections Simply Do Not Apply.**

Finally, the remaining objections raise issues that appear to be irrelevant to this case.

- Objection no. 48 asks the Court to investigate Facebook technology because of the objector's interest to "lower the online cyber security risk." Dkt. 1158-1, obj. 48. The case is not about generalized online cybersecurity risks.

- Objection no. 50 opines that "there is a national security risk posed with giant corporations" that "shar[e] this information to 3rd parties." *Id.*, obj. 50. The case does not concern national security risks.

- Objection no. 54, which states it is on behalf of Facebook users who "had an active cellular network telephone service contract inclusive of their own legal name," is difficult to understand. Dkt. 1158-1, obj. 54. It appears to primarily concern a service plan taken out in the objector's name on a stolen mobile phone. *Id.* The objector has stated his intention to appear at the final approval hearing, and Plaintiffs will be happy to address his objection based on his further explanation of its basis.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the settlement be approved, and their motion for reimbursement of expenses and award of fees be granted.

Dated: August 4, 2023                          Respectfully submitted,

KELLER ROHRBACK L.L.P.                    BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                 By:    */s/ Lesley E. Weaver*
         Derek W. Loeser                                   Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)         Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)  Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)         Joshua D. Samra (SBN 313050)
Benjamin Gould (SBN 250630)                       1330 Broadway, Suite 630
Emma M. Wright (admitted *pro hac vice*)          Oakland, California 94612
Daniel Mensher (admitted *pro hac vice*)          Tel.: (415) 445-4003
Michael Woerner (admitted *pro hac vice*)         Fax: (415) 445-4020
Matthew Gerend (admitted *pro hac vice*)          lweaver@bfalaw.com
1201 Third Avenue, Suite 3200                     adavis@bfalaw.com

Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com
ewright@kellerrohrback.com
dmensher@kellerrohrback.com
mwoerner@kellerrohrback.com
mgerend@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

mmelamed@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of August, 2023, at Oakland, California.

/s/ Lesley E. Weaver
Lesley E. Weaver

**CERTIFICATE OF SERVICE**

I, Julie Law, hereby certify that on August 4, 2023, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Julie Law*
Julie Law