1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Vince Chhabria, District Judge

4

5    In re:                        )
                                   )
6    FACEBOOK, INC. CONSUMER       )   No. 18MD02843-VC
     PRIVACY USER PROFILE          )
7    LITIGATION,                   )
                                   )
8    _____)

9                                  San Francisco, California
                                   Thursday, September 7, 2023
10
        TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
11                 RECORDING 1:06 - 2:09 = 63 MINUTES

12   APPEARANCES:

13   For Plaintiffs:
                                   Keller Rohrback LLP
14                                 1201 Third Avenue, Suite 3200
                                   Seattle, Washington 98101
15                            BY:  DEREK W. LOESER, ESQ.
                                   BENJAMIN B. GOULD, ESQ.
16                                 CARI C. LAUFENBERG, ESQ.
                                   DAVID KO, ESQ.
17
                                   Keller Rohrback LLP
18                                 801 Garden Street, Suite 301
                                   Santa Barbara, California
19                                    93101
                              BY:  CHRIS SPRINGER, ESQ.
20
                                   Bleichmar Fonti & Auld LLP
21                                 555 12th Street, Suite 1600
                                   Oakland, California 94607
22                            BY:  LESLEY ELIZABETH WEAVER, ESQ.
                                   ANNE K. DAVIS, ESQ.
23                                 MATTHEW MELAMED, ESQ.

24

25            (APPEARANCES CONTINUED ON NEXT PAGE)

```
                                                               2

 1  APPEARANCES:  (Cont'd.)

 2  For Defendant Facebook, Inc.:
                              Gibson, Dunn & Crutcher LLP
 3                            555 Mission Street
                              Suite 3000
 4                            San Francisco, California
                                94105
 5                      BY:   ROSEMARIE T. RING, ESQ.
                              TIMOTHY LOOSE, ESQ.
 6
     For Sarah Feldman and
 7     Jill Mahaney:          Kendrick Jan, APC
                              225 Broadway, Suite 2220
 8                            San Diego, California 92101
                        BY:   KENDRICK M. JAN, ESQ.
 9
                              2 Clock Tower Place
10                            Suite 260G
                              Maynard, Massachusetts 01754
11                      BY:   JOHN J. PENTZ, III, ESQ.

12  For Stewart Harris and
      Ryan Cino:              The Vernia Law Firm
13                            1455 Pennsylvania Avenue NW
                              Suite 400
14                            Washington, D.C. 20004
                        BY:   BEN VERNIA, ESQ.
15
                        BY:   ROY BARTLETT, ESQ.
16
     For Klein Objectors:
17                            Hagens Berman Sobel & Shapiro
                              715 Hearst Avenue, Suite 300
18                            Berkeley, California 94710
                        BY:   SHANA SCARLETT, ESQ.
19
     For All of Us or None,
20     Dorsey Nunn and Roe 1: Legal Services for Prisoners
                                With Children
21                            4400 Market Street
                              Oakland, California 94608
22                      BY:   ERIC SAPP, ESQ.

23  For Raul Gallardo:
                        BY:   RAUL GALLARDO
24                            Pro Se

25
```

3

1 | Transcribed by:                 Echo Reporting, Inc.
                                    Contracted Court Reporter/
2                                   Transcriber
                                    echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1  <u>Thursday, September 7, 2023</u>                      <u>1:06 p.m.</u>

2                   P-R-O-C-E-E-D-I-N-G-S

3                       --oOo--

4          THE CLERK:  Now calling civil case 18-2843, In Re

5  Facebook, Inc., Consumer Privacy User Profile Litigation.

6     Will counsel please state your appearances for the

7  record, starting with the Plaintiff.

8          MS. WEAVER (via Zoom):  Good afternoon, your

9  Honor.  Leslie Weaver of Bleichmar, Fonti and Auld, on

10  behalf of the Plaintiffs.  With me today are my partners,

11  Anne Davis and Matthew Melamed.

12          THE COURT:  Hello.

13          MS. DAVIS (via Zoom):  Hello.

14          MR. LOESER (via Zoom):  Good morning, your Honor.

15  Derek Loeser from Keller Rohrback.  With me is Cari

16  Laufenberg, Chris Springer, Ben Gould, and David Ko.

17          THE COURT:  Hi.

18     Are the Defendants on there somewhere?  Ms. Ring, I

19  think you're mute.

20          MS. RING:  I was, your Honor.  I'm sorry.  Rose

21  Ring, Gibson, Dunn and Crutcher, on behalf of Meta.  I'm

22  joined today by my colleague, Tim Loose.

23          THE COURT:  Hi.

24          MS. RING:  Hi.

25          THE COURT:  All right.  And then do the objectors

5

1  want to introduce themselves in order of appearance?

2          MR. JAN:  Good afternoon, your Honor.  Kendrick

3  Jan for Objectors Feldman and Mahaney.  I'm here with Mr.

4  Pentz, who will be -- I think he's still on here.  He'll be

5  managing the comments to the Court.

6          THE COURT:  Hi.

7          MR. PENTZ (via Zoom):  Good afternoon, your Honor.

8  John Pentz for Mahaney and Feldman.

9          THE COURT:  Hi.

10          MR. VERNIA (via Zoom):  Your Honor,

11  Ben Vernia on behalf of Objectors Stewart Harris and Ryan

12  Cino.  I'm here with my co-counsel, Roy Bartlett.

13          THE COURT:  Hi.

14          MR. BORDEN (via Zoom):  Good afternoon, your

15  Honor.  Matt Borden on behalf of Zimin Hang and ClaimClam.

16          THE COURT:  Hi.

17          MS. SCARLETT (via Zoom):  Good afternoon, your

18  Honor.  Shana Scarlett from Hagens Berman Sobel and Shapiro,

19  on behalf of the Klein Plaintiffs.

20          THE COURT:  Hi.

21          MR. GALLARDO (via Zoom):  And Raul Gallardo, pro

22  se.

23          THE COURT:  Hello, Mr. Gallardo.

24      Okay.  Before we get to the Objectors, as I

25  indicated --

1          MR. SAPP (via Zoom):  Your Honor --

2          THE COURT:  I'm sorry.  Was somebody else

3    speaking?

4          MR. SAPP:  Eric Sapp of Legal Services for

5    Prisoners with Children, for Objectors Dorsey and Objector

6    Roe 1, your Honor.

7          THE COURT:  Hi.  Sorry I missed you.

8      Okay.  Before we -- before we get to the Objectors, I

9    indicated that everybody would have two minutes to respond

10   to what the Plaintiffs put in their reply about your --

11   about your objections.  We'll get to that in just a second.

12   And I think Bavna gave you the order -- your order of

13   appearance, is that correct?

14         THE CLERK:  (Nodding head.)

15         THE COURT:  Okay.  I guess, Ms. Weaver or Mr.

16   Looser, I was looking through your motion again earlier

17   today, and I couldn't -- it's not clear that you said out

18   loud anywhere in your attorney's fees motion exactly how

19   much you are seeking in attorney's fees.  So, what's the

20   number that you're seeking in attorney's fees?

21         MR. LOESER:  Sure, your Honor.  And we noticed the

22   same thing when we were going through.  So, we prepared

23   an --

24         THE COURT:  Was that an accident that you were

25   unable to -- you didn't say the number out loud on the -- on

7

1  the brief?

2           MR. LOESER:  We're just not good at math.  So, we

3  didn't want to make an error.

4           THE COURT:  You're not?

5           MR. LOESER:  No.  We -- it was just an oversight,

6  and -- but I can tell you the numbers.  In fact, I can walk

7  through all of the numbers.  But, to start with the top line

8  number, the total amount if 25 percent is awarded, after you

9  deduct the amount of the sanction that's already been paid

10 by Facebook to Gibson Dunn, the total amount is

11 $180,449,782.62.

12          THE COURT:  So, Nick Bosa money?

13          MR. LOESER:  That's right.  In a good year.  The

14 -- since we're talking about numbers --

15          THE COURT:   I think it's actually more than Nick

16 Bosa.  I think Nick Bosa's contract is for $170 million, if

17 I remember.

18          MR. KO (via Zoom):  Five years.

19          MR. LOESER:  Yeah.  Over how many -- we have a

20 sports fan sitting next to me.  So, he can tell me how many

21 years is that contract, over how many years, five years.

22 How much of that is guaranteed?

23          MR. KO:  A significant portion.

24          MR. LOESER:  Yeah.  It's a good --

25          THE COURT:  One hundred and twenty million

8

1  dollars.  How -- how much of yours is guaranteed?

2           MR. LOESER:  Well, as of right now, you know --

3           THE COURT:  None of it.

4           MR. LOESER:  -- remains to be seated.  Yeah.

5  Exactly.  None of it is guaranteed.  In fact, it takes a

6  long time to get it.

7           THE COURT:  That is true.

8           MR. LOESER:  Other numbers, your Honor, the total

9  amount of the service awards for all the named Plaintiffs is

10 $120,000.  A number that I know you've been interested in in

11 other --

12          THE COURT:  Since you gave me that number, could I

13 -- could I just ask you one quick question I had about that?

14 Did each of the Plaintiffs who are receiving service awards

15 get their depositions taken?

16          MR. LOESER:  Yes.

17          THE COURT:  Okay.

18          MR. LOESER:  Yeah.  And the total expense number,

19 your Honor, at present is $3,976,000 and some change.  There

20 were some additional claims administration issues to be

21 sorted out that will raise that price a big for Anjion

22 (phonetic) to -- to address, some issues involving matching

23 claims and people.  And -- and that is -- it's always

24 fascinating to me in different cases the different amounts

25 settlement administrators charge.  We've very carefully and

1  closely managed this, and I think the Anjion folks know well

2  that we've been really careful to make sure that the work is

3  done well, that all claims are properly handled and also

4  that the expense stays to what has been bid plus the sort of

5  change order type stuff that will be coming down the pike to

6  finish this job.

7       The next settlement fund after all the -- the fees and

8  costs and expenses are -- are taken out would be

9  $536,028,471.  And at the current number of claims, which is

10  a -- a bit of a moving target because the claims

11  administrator is still processing claims, the -- at present,

12  the preliminary number of validated claims is $17,762,467.

13  As Ms. Weaver will talk about when going over some of the

14  administration details, there were many more filed claims

15  than that, but through the -- the fraud review process, a

16  number of claims have been rejected.  There's still several

17  million to be processed.  But, at present, as I said, 17 --

18  over 17 million claims, which is the most we've ever seen

19  and, as far as I'm aware, the most that's ever been

20  submitted in a -- in a class action.

21       If you do the math on that, which I know is another

22  number that you're often interested, if you simply assumed

23  all class members received the same amount, which is not how

24  the plan of allocation works, based on that number of

25  claims, assuming that all of those claims are fully

10

1   validated and if there were no more claims, that works out
2   to about $30.18 per class member.
3       Of course, there's a wide range of what class members
4   will receive because of the way the plan of allocation
5   works, which is based on months on the platform.  Some
6   people receive multiples of that.  Some people will receive
7   fractions of that.
8           THE COURT:  And it seems like that number, average
9   number, $30, is -- you know, to the extent that it's maybe a
10  little lower than we might have expected, it's because such
11  an incredibly large number of people made claims in this --
12  in this case, right?  I was -- I was kind of blown away by
13  how many people made claims.
14          MS. WEAVER:  Just to give you an update, your
15  Honor, to date, the total number of claims filed as of --
16  these are -- this is our data as of September 1st -- is
17  28,651,916.  That is, as far as we can tell, the number of
18  claims ever filed in a class action in the United States.
19  So, the preliminary validated number, 17,762,467 also is the
20  highest number of validated claims.  The delta between those
21  two is subject to analysis.  About 2 million appear to be
22  duplicates.  About 8 million had indicia of fraud.  And, so,
23  we're undergoing a validation process.  And then the final
24  step after for -- even for these 17 million is we are
25  matching the data with data that Facebook has provided to

1  Anjion to confirm those numbers.  And, so, that's the

2  process.  So, it's about 17 million.

3      And then, as to your point on the $30 per person, just

4  to expand slightly on what Mr. Loeser said, if a class --

5  there are 188 months in our class period.  We are proposing

6  an allocation of one point per month.  So, you could see

7  there could be an extreme range.  Thirty is just a -- really

8  a median.

9          THE COURT:  Okay.  I'm happy -- unless -- unless

10  you all have anything, you'll have an opportunity to kind of

11  summarize your position as you respond to the Objectors.

12  But, unless you have anything pressing now, I'll turn to the

13  Objectors to give them a chance to state their cases.

14          MR. LOESER:  That's fine, your Honor.  We're --

15  we're ready to proceed.

16          THE COURT:  Okay.  And then, as I -- as I

17  indicated in the roder, you'll be -- you'll be muted right

18  at the two minute mark unless I interrupt you with

19  questions.  We have to be fair to everybody involved, and I

20  can't be -- can't be, you know, giving you more time than

21  that.  So, hopefully, you've had an opportunity to prepare

22  and make sure you get a chance to say what you want to say

23  in those two minutes.  And I think it was Mr. Pentz who was

24  going to go first, is that right?

25          MR. PENTZ:  Thank you, your Honor.  That's fine.

12

1  Yes, I'm prepared.

2          THE COURT:  All right.  Go ahead.

3          MR. PENTZ:  Our objection -- we have three

4  objections, but our primary one is that the settlement is --

5  represents simply too small a percentage of the potential

6  statutory damages, in particular, under the Video Protection

7  Privacy Act, which carries $2500 as a minimum statutory

8  penalty where the damages are otherwise difficult to

9  quantify.  And this is precisely such a case.

10      And the -- the Plaintiffs' only response to our

11 argument that it represents one-tenth of one percent of

12 potential damages is to point to the due process problem

13 that might be created were the Plaintiffs to win a, you

14 know, trial verdict for the full $625 billion, which is what

15 $2500 times the number of class members would yield.

16      However, we concede that that verdict would be unlikely

17 to be upheld.  But the question is how do you apply the

18 Wakefield due process limitations in the context of a class

19 action settlement, and that precise issue is currently

20 before the Ninth Circuit in another Facebook appeal that we

21 will be arguing in January.  So, the Court might want to

22 consider holding off on deciding this case until -- until

23 the Ninth Circuit weighs in.  It's an identical issue.

24 There the --

25          THE COURT:  Well, a preliminary question is just

13

1 is it realistic that I would award anything remotely close

2 to the maximum penalties or that a jury -- I don't know if

3 it's a jury issue or a judge issue -- or that a judge --

4 that a jury would award anything remotely close to the

5 maximum penalties.  I can't imagine that would happen in

6 this case.

7        MR. PENTZ:  Well, I'm not sure if there's any

8 discretion.  The Court has to apply -- award either the

9 minimum statutory damages or -- or else find that there's a

10 defense to the -- to the claim.  I don't know that the Court

11 can award, for example, $500 --

12        THE COURT:  The Court doesn't have discretion to

13 -- to reduce the amount of statutory damages?

14        MR. PENTZ:  Well, yes, the Court -- the Court has

15 discretion under Wakefield after the fact.  But first you'd

16 be starting from a very high number, and the question is

17 would that be reduced to -- you know, we raised these issues

18 in our objection to -- to 6 billion, to -- to 1 billion.  I

19 mean, we're talking a number higher than what the -- what

20 the Plaintiffs were able to obtain here.  And you can't

21 simply point to Wakefield and say, Well, there's a due

22 process issue.  Therefore, it will be lower.  Therefore,

23 this very low number relative to the potential damages

24 passes muster.  They're not talking in terms of what's the

25 risk of prevailing on that claim at trial.

14

1      As the Court said in <u>Acosta</u>, if this case is doomed to

2 fail at trial, then perhaps this -- this settlement is okay.

3 But unless that's the case, then certainly this -- this case

4 is stronger than the settlement amount, although, you know,

5 in absolute terms, it looks like a high number.  But you

6 have to remember how many class members there are here and,

7 you know, they're getting $30 for a $2500 claim.

8      I'd like to move on to the other primary objection we

9 made, which is the people who signed up prior to 2009 have

10 far stronger claims, and your Honor found in one -- in the

11 order on -- I believe it might have been discovery, but your

12 Honor found that people who -- who signed up prior to 2009

13 were entitled to pursue a claim under the VPPA, whereas

14 other class members were not.  And that has to be reflected

15 in the settlement.

16      You know, we're not arguing that the settlement should

17 be limited only to those people, although that certainly

18 would be one reasonable argument on the facts.  But if -- if

19 the -- in the allocation, the fact that these class members

20 prior to 2009 -- that signed up prior to 2009, had viable

21 claims that could go forward, whereas the rest of the class

22 does not, should be --

23           THE COURT:  No, the -- the whole class has viable

24 VPPA claims I thought, right?  I'm not sure I understand

25 what you're talking about.  I mean, I -- I ruled that --

15

1          MR. PENTZ:  Well, I think the consent -- consent

2    defense is what --

3          THE COURT:  Right.  But that does not -- not as it

4    relates to the VPPA.  I said that the -- Facebook can't win

5    on the motion to dismiss on the consent defense as to -- as

6    to any class members on the VPPA claim.  It was only on the

7    -- on the -- the common law claims.

8          MR. PENTZ:  You're correct, your Honor.  I stand

9    corrected.  That's true.

10          THE COURT:  So, I don't understand.  I don't

11    understand what you're saying?

12          MR. PENTZ:  Well, with regard to the other claims,

13    all the other claims that are being compensated as part of

14    the settlement, class members who signed up prior to 2009

15    have stronger claims on those non-VPPA claims, and --

16    because they're viable, whereas your Honor held that the

17    consent defense was strong for class members that signed up

18    after 2009.

19          THE COURT:  Well, I guess you're right on some

20    level.  But, you know, we don't really know how strong the

21    -- you know, the -- the claims were post-2009.  I mean, it

22    was just the pleadings stage, and Facebook presumably would

23    have had consent defenses on the -- on the -- with respect

24    to the class members from post-2009.  And then the other

25    thing is with respect to pre-2009, I mean, you never know

16

what discovery is going to bring up.  I mean, you know, it
may be that discovery on surviving claims reveals evidence
that support claims that had previously been dismissed, and
perhaps the Plaintiffs could have revived those claims of
the class members pre-2009.  We just don't really -- we just
don't really know.  But isn't the -- isn't the main point
that, you know, we can't be parsing through this multi-year
class -- this multi-year period from this class and that,
you know, this massive number of class members to identify,
you know, all potential differences because we'll just --
that will just prevent us from approving any settlement,
because there's always a potential argument that somebody is
being treated slightly worse than somebody else, et cetera.
I mean, we don't have to achieve perfection in these
settlements, right?

MR. PENTZ:  That's correct, your Honor.  It's just
that the -- the consent defense has -- is such a clear
cutoff, and it's question that's going to be asked anyway as
part of the claims process, when did you first become a
Facebook user.  Therefore, that -- that difference between
class members jumps out as perhaps the strongest one among
all -- you know, I would agree there are probably, you know,
many many many, maybe 10 or more differences that we could
come up with that relate to the claims or defenses in this
case, but certainly the consent defense is a primary one

17

1    that I think it will be fairly easy to recognize in this --

2    in the settlement by simply giving those people credit for

3    two times every year that they were a member.

4            THE COURT:  Okay.  You want to -- I'll give you --

5    since I interrupted you a couple of times, I'll give you 30

6    more seconds to -- to wrap up.

7            MR. PENTZ:  Okay.  Well, the third objection we

8    have is to fees, and I think, you know, class counsel has to

9    decide which method of compensation they -- are they

10   requesting fees based on the percentage of the fund method

11   or are they requesting it based on the lodestar multiplier

12   method.  And if they're requesting it based on the

13   percentage, which they are, then the fact that they have a

14   -- a very high lodestar and that they would get a -- you

15   know, a lower lodestar multiplier if they were to get the

16   market rate, which I think we can all agree here is

17   somewhere between 18 and 20 percent, that -- that's simply

18   -- if they want to be paid on a percentage of the fund

19   basis, then they -- they need to accept a lower lodestar

20   because the fact that they've run up such a huge lodestar

21   here relative to the amount of their recovery is something

22   that class counsel should have to eat rather than the class.

23           THE COURT:  Okay.  Thank you.

24       Who's next?

25           MR. VERNIA:  Your Honor, Ben Vernia for Stewart

18

1   Harris and Ryan Cino, along with --

2          THE COURT:  Okay.

3          MR. VERNIA:  -- Roy Bartlett.  Good afternoon.

4      We brought two pairs of objections.  The first pair

5   relates to the -- the scope and nature of the release, the

6   -- the statement of release in the settlement agreement.

7      I think it's clear from -- from the news and also from

8   the vast number of people who submitted claims here that

9   future privacy related litigation with Facebook is a

10  substantial risk which -- which should counsel for careful

11  attention to the scope of the release that's being offered

12  here.

13         And we have two principal objections.  One is -- the

14  first one relates to the claims that are released.  There is

15  a phrase in the release.  Specifically, it says, "included

16  but not limited to," and then it described some of the

17  conduct, the most salient conduct that's known to be in the

18  case.  And we think that that basically will create a Trojan

19  Horse that -- that someone down the road could use to either

20  dissuade a class or individual plaintiff from bringing a

21  suit or to get one dismissed.  It's -- it's surplusage.  We

22  don't really believe that class counsel's opposition

23  addresses this, really recites the presence of specific

24  examples.

25         THE COURT:  Okay.  I understand that objection.

*Echo Reporting, Inc.*

19

1    That objection's overruled.

2        What's your other objection?

3            MR. VERNIA:  Your Honor, the other one relates to

4    the scope of the release parties.  First of all, there is --

5    and this sort of comes in two parts.  One is there's a

6    reference to Meta subsidiaries besides Facebook.  And, to

7    your knowledge, this case has been all about Facebook and

8    not about anybody else at Meta, not about Instagram, not

9    about Threads, although, you know, class counsel has

10   basically pointed out that the release would, nevertheless,

11   be limited to -- to the language described earlier.  We

12   don't believe that there's any basis for including other

13   Meta subsidiaries.

14       And, finally, your Honor, with respect to release,

15   there is -- there is language that -- that basically

16   releases those who acted on behalf of Meta, which third

17   party developers could argue basically relieves this of

18   responsibility.

19       Facebook has not --

20           THE COURT:  I don't see how they would win that

21   argument.  I -- the objection's overruled.

22           MR. VERNIA:  Okay.  Thank you, your Honor.  The --

23           THE COURT:  Anything else?

24           MR. VERNIA:  We also had two -- two objections

25   relating to the plan of allocation.  If we have time, I'll

1  go over those briefly.

2         THE COURT:  Thirty seconds.

3         MR. VERNIA:  Okay.  One related to popularity,

4  there is no basic weighting for popularity, even though much

5  of the conduct that's at issue increases exposure with --

6  with an individual who uses popularity.

7      And the other one is for post January 2020 conduct

8  which -- which the class counsel has already asserted with

9  respect to friend sharing was essentially nonexistent after

10 -- after January 2020, yet those months are counted the same

11 as others.

12        THE COURT:  Okay.  Thank you.

13     And for the Plaintiffs, I mean, if I -- if I've

14 overruled an objection in the middle of the discussion, you

15 don't have to address it.  If you want to address some of

16 the ones that I didn't, you know, immediately overrule,

17 you're welcome to do that.

18     All right.  Who's next?

19        MR. SAPP:  Good afternoon, your Honor.  Eric Sapp

20 of Legal Services for Prisoners with Children, for Objectors

21 All of us or None, a Community Organization, Mr. Dorsey Nunn

22 and Objector Roe 1, who declines to provide his identity for

23 fear of privacy violations.

24     Your Honor, this group of Objectors has two lines of

25 objection.  The first has to do with the legal standard

21

1   deployed in the preliminary approval order and as signaled

2   may be applied in the final approval decision making process

3   and, secondly, the -- we claim that the class definition is

4   vague in not specifying whether person -- whether users

5   applies only to natural persons or includes corporate

6   entities.

7        To respond to the reply brief from Plaintiffs,

8   Plaintiffs responds to the class definition argument by

9   citing the opt out procedure as articulated in the

10  preliminary approval order as --

11          THE COURT:  Yeah, I thought their reply was a

12  little vague on -- on that objection that you made, and I am

13  going to want to hear from them on that.

14          MR. SAPP:  And -- yes, your Honor.  And I would

15  point out that our objection is not that it is clear that

16  non-natural persons are covered but, rather, that it is not

17  clear whether they are or not.  And, so, pointing to aspects

18  of the context that support their reading doesn't defeat the

19  -- the fact that there are other aspects of the context that

20  support a contrary reading.

21          THE COURT:  For what it's worth, I've always

22  assumed that non-natural persons would not be covered by

23  this settlement, and it was sort of obvious to me, but maybe

24  I missed something, and I'm happy to hear from the

25  Plaintiffs on that.

1           MR. SAPP:  And, as to the objection regarding the

2  legal standard, so, the preliminary approval order doesn't

3  go through the 23(e)(2) factors at all individually, which

4  certainly in the final approval, the Court would be

5  obligated to go through those factors individually as found

6  by the Ninth Circuit in Briseno v. Henderson and related

7  cases.

8           In the preliminary approval order, there was sort of a

9  rehearsal at least of the 23(a) factors.  However, those

10  were just conclusory statements by your Honor rather than

11  reasons articulat -- reasoned articulations as to -- to

12  those findings, even on a preliminary basis.

13           It is our belief that the level of rigorous scrutiny

14  that, for example, the Olean en banc court emphasized, you

15  know, this phrase "rigorous scrutiny" for class action

16  settlements is repeated multiple times in the Olean en banc,

17  and it also is in some of the Supreme Court's jurisprudence

18  like Walmart.

19           And, last but not least, I would just add that -- point

20  out also that under Officers for Justice, the Ninth

21  Circuit's 1982 opinion, which has not been overruled, that

22  all nonfrivolous objections require a reasoned response from

23  the District Court, and therefore, unless the -- the

24  preceding speaker's objections were found to be frivolous,

25  which I do not believe your Honor stated, there would still

23

1 be an obligation on the Court to articulate the reason for

2 objecting -- for -- the reason for overruling each objection

3 that is nonfrivolous.

4      And, last but not least, I'll just close by pointing

5 out that however the exact numbers are, you know, I -- I did

6 my math based on the original reported figure of 725 million

7 as the total settlement.  This seems to be a slap on the

8 wrist to a corporation that is alleged by Plaintiffs to have

9 committed dozens of egregious privacy violations, fraud, et

10 cetera.  And just to put it in perspective, that amounts to

11 about three percent of net profits for -- as Meta reported

12 for 2022, which is about -- which means about -- inflation

13 affected them as much as this suit is going to affect them.

14      If you relate it to the category of goodwill that Meta

15 reported on its balance sheet for 2022, which was 20 billion

16 -- 20.3 billion in goodwill, which has to do with the sort

17 of reputational value of -- of the company that isn't

18 included in other intangible assets like patent or

19 copyright, that amounts to, again, about 3.5 percent of its

20 goodwill assets.

21          THE COURT:  Okay.  Thank you.  I -- the objection

22 about legal error is overruled.  I gave very rigorous

23 scrutiny to the settlement at the preliminary approval stage

24 as should be reflected in the -- not only in the order but

25 the transcript of the hearing.  But I am interested in

24

1    hearing from the Plaintiffs on your point about non-natural

2    persons.

3        Okay.  Who's next?

4            MS. SCARLETT:  Shana Scarlett from Hagens Berman,

5    representing the Klein Plaintiffs.  We are the --

6            THE COURT:  Great.

7            MS. SCARLETT:  -- named Plaintiffs in the Klein

8    action pending before Judge Donato.

9            THE COURT:  Okay.

10           MS. SCARLETT:  Your Honor, we don't come here

11   lightly.  I respect very much Derek Loeser and Leslie

12   Weaver's work.  Obviously we're very familiar with them, but

13   we're here to give Facebook every opportunity to indicate

14   whether or not it intends to assert this release against the

15   claims in the Klein action.

16       The Klein action alleges a broad scope of conduct from

17   2007 to the present where Facebook acquired and maintains

18   its monopoly through data use and collection practices.

19   There were --

20           THE COURT:  Can I cut you off?

21           MS. SCARLETT:  Absolutely, your Honor.

22           THE COURT:  I don't -- I don't see how Facebook

23   could assert that this release applies to that case.  But,

24   ultimately, if Facebook wants to try to assert that, I'm

25   sure Judge Donato is capable of deciding the issue.

25

1      So, that objection is overruled, and I don't think it

2  would be appropriate to -- to start carving out individual

3  cases for the reasons stated by the Plaintiffs in their

4  reply.

5            MS. SCARLETT:  Thank you very much, your Honor.

6            THE COURT:  Thank you.

7        Who's next?

8            MR. BORDEN:  Good afternoon, your Honor.  Matt

9  Borden on behalf of Zimin Hang and the ClaimClam Plaintiffs.

10            THE COURT:  Hi.

11            MR. BORDEN:  I -- I have good news, which is that

12  Mr. Hang and ClaimClam are withdrawing their objections.

13  And the solution that we reached is that they submitted the

14  claims with the identifying information on them.  The claims

15  will be paid out directly to the class members.

16        I did want to take the rest of my two minutes if --

17            THE COURT:  Well, I mean, if your clients have

18  withdrawn their objections, then you don't have two minutes.

19  I'm sorry.

20            MR. BORDEN:  Okay.

21            THE COURT:  Okay.  Who's next?  Mr. Gallardo?

22            MR. GALLARDO:  Yeah.  How you doing, your Honor?

23            THE COURT:  Good.  How are you?

24            MR. GALLARDO:  I'm doing great.  Fantastic.  I

25  just fee like in light of the harm that I suffered as one of

26

1  the members of the class and the extent of the Defendant's

2  wrongdoing, I feel greatly that proposed settlement is not

3  fair, reasonable and/or adequate.

4      The objection I'm raising here today is based on

5  procedural flaws in the settlement process.  One prime

6  example would be the notice of settlement itself is to vague

7  as to the terms of the settlement, and details are not

8  readily available online.  So, therefore, it's impossible

9  for me as a class member to understand what I've been asked

10 to agree to.

11     And, basically, as (indiscernible), I -- it's unfair

12 that, you know, in my regards, not being compensated.  You

13 know what I'm saying?  At least, you know, justly, you know.

14 It's just, you know, the $30, whatever, that -- that's --

15 it's not -- it doesn't fit the -- doesn't fit the crime.  It

16 just doesn't.  And I've submitted the same claims.  We -- I

17 actually had two accounts, but, you know, we were only

18 dealing with one, like how they -- they put it.  But, you

19 know -- you know, a lot of -- a lot of stuff is compromised.

20 And, you know, to me, that -- that's valid, though.  You

21 know what I'm saying?  And, you know, not only social life

22 but private life is affected  So, that's all I'm asking,

23 just to be fairly, equally compensated.  You know what I'm

24 saying?  Like, you know, what's a few more people who

25 objected to it actually, you know, are asking the -- the

27

1  courts today were -- you know, at least I had a

2  conversation.  You know what I'm saying?  But $30 is

3  breadcrumbs.

4          THE COURT:  Okay.  Thank you, Mr. Gallardo.  If I

5  could ask you to mute your screen so that  background noise

6  doesn't come from your -- from your screen as -- as the

7  other lawyers are talking.

8          MR. GALLARDO:  Okay.  I apologize, sir.

9          THE COURT:  Okay.  Do the Plaintiffs wish to

10 respond to that and, you know, add -- add at all to what

11 they've presented in their papers?

12         MR. LOESER:  Yes, your Honor.  And I think what

13 makes sense is to take them in order.  Ms. Weaver is going

14 to address a couple of them, and I'll address a couple of

15 them.

16     I do want to say that both of us have been doing this a

17 long time.  We do respect and appreciate the role that

18 Objectors, particularly good faith Objectors, can play.  It

19 does give us the opportunity to explain and clarify.  For

20 example, discussions of the plan of allocation can be

21 helpful to understanding of how the plan of allocation

22 works.

23     As you know and as I've discussed with you in a prior

24 case, there is also the issue of serial objectors, which is

25 just kind of a problem in class actions that never seems to

28

1  really go away.  And, fortunately, here we have overall very

2  few objections.  You know, in the <u>Jabari</u> case, the -- what I

3  -- what we thought were and what the Court believed were

4  meritless objections, delayed the distribution by over two

5  years.  So, we're hoping very much that that does not happen

6  here.

7       The -- the first objection -- and I'll try and keep my

8  remarks very brief.  Hopefully two minutes will do it, but

9  it may be a little bit longer for each one.  But for -- for

10 Mr. Pentz, who obviously we've seen in a loot of class

11 action cases, his primary objection was that he believes the

12 settlement is too small, focuses on the VPPA claim.  Of

13 course, we litigated that claim for five years.  We're very

14 familiar with the risks that those -- that that claim

15 presents.  We're familiar with prior settlements that

16 address those claims and the challenges we faced with regard

17 to those claims.

18      Mr. Pentz doesn't discuss any of those risks in his --

19 in his objection.  Instead, he just adds up and does the

20 math on what the total statutory award could be.  Our

21 response to him was not simply limited to the due process

22 concerns that that award presents but are very much based on

23 the risk that that claim presents.

24      Your Honor is absolutely right that the Court has

25 discretion ultimately when deciding whether there has been a

29

1  due process violation.  You know, we have obviously a --

2          THE COURT:  I don't think there's a due process

3  violation.  I don't have discretion to reduce the penalties

4  based on sort of the culpability of the conduct or anything

5  like that.

6          MR. LOESER:  I believe that's true, your Honor.  I

7  think that the statutory amount is the amount that's

8  required if you prove a violation.

9          THE COURT:  Okay.

10         MR. LOESER:  Of course, proving a violation is a

11 -- is a whole nother thing that happens before you get just

12 providing the -- the statutory amount.  But your discretion

13 would come in when determining the total amount.  And we've

14 seen, and the Ninth Circuit has addressed recently in a TCPA

15 case just how that limitation works and -- and how eye

16 opening and important it is for Plaintiffs to consider.  You

17 can go to trial, get a huge judgment, and have it remanded

18 because it violated due process.

19     So, we took that into account.  The Ninth Circuit is

20 very focused on whether a settlement is the result of arm's-

21 length negotiations and the absence of collusion.  I think

22 this Court can be very competent that that was true here in

23 spades and that our evaluation of the claim took into

24 account the actual risks of the claim and what we believed

25 was a likely recovery.

30

1    So, I think that Mr. Pentz's attack on the VPPA portion

2 is completely without merit and lacks any support in the law

3 and specifically in any prior resolution of any VPPA claim.

4    His other issue, your Honor, goes to the plan of

5 allocation.  The idea that folks who signed up before 2009

6 are somehow better situated than the rest of the class, I

7 completely agree with your Honor's comments on -- on several

8 respects.  Certainly, there is a concern about atomizing

9 class.  It's a very long class period, and there are

10 strength and weaknesses in different areas, and it, frankly,

11 comes out in the wash.  But, more specifically, it's just

12 not true that persons who signed up before 2009 won't face a

13 consent defense.

14    As your Honor noted, that was a decision on the

15 pleadings.  And I'm -- I'm not sure Mr. Pentz saw, but

16 Facebook submitted a statement in support of preliminary

17 approval in this case, and if there were any doubt as to

18 whether Facebook believed those -- that they had a consent

19 defense for that time period, that doubt should have been

20 resolved by their statement.  This is from Docket 1097, and

21 I'll just read the sentence, your Honor.  What Facebook

22 stated was:

23         "Because friend sharing disclosures

24         in Facebook data use policies before

25         2009 were materially the same but not

31

1            before the Court at the motion to

2            dismiss stage, the remaining pre-2009

3            claims would also have been subject to

4            dismissal on the same grounds."

5       So, there really isn't any doubt about what Facebook

6  would do.

7       The other point your Honor made about claims that could

8  be developed in discovery, we very much believe that the

9  scope of use exceeded the scope of consent, and we very much

10  intended to and would have presented discovery to -- to get

11  around the consent defense for the entire class, including

12  (indiscernible).  So, in those -- both of those respects,

13  Mr. Pentz --

14            THE COURT:  So, in other words, just to be precise

15  about it, you would -- you would have sought leave to amend

16  to add back claims that were supported by discovery that you

17  did?

18            MR. LOESER:  Yes, yes.  And, you know, to dig into

19  it a little bit deeper, the issue, your Honor, was that

20  there was a restriction for using data only with regard to

21  the person who downloaded or installed the app.  We believe

22  the evidence showed that they went beyond that and they used

23  that information more widely, and that was a claim that we

24  would add for everybody, including the pre-2009 people.

25            THE COURT:  Okay.

1        MR. LOESER:  So, the last issue Mr. Pentz raised

2   went to our fees, and, yeah, I think his criticism is -- is

3   without merit.  It's also just like absolutely incorrect

4   under the law.  So, there's not a requirement in the Ninth

5   Circuit to choose definitively the percentage method or the

6   lodestar method.  In fact, it doesn't even make sense to

7   suggest that because the Ninth Circuit has encouraged courts

8   to utilize the lodestar cross-check when evaluating the

9   percentage.  That's precisely what we've done here.  When

10  the lodestar cross-check is applied, the multiplier is very

11  modest relative to what typically is awarded in large class

12  actions.  So, he's simply -- it's simply an incorrect

13  statement of the law.

14       I think that sums up our view on Mr. Pentz.  I -- just

15  one sort of final thought.  In -- in Jabari, Mr. Pentz

16  objected to our fees and appealed, and I just went -- I was

17  just curious to see what he said in his appeal and went and

18  read his Ninth Circuit brief, and what he told the Ninth

19  Circuit was that -- and we were class counsel in the case,

20  as your Honor knows, that class counsel should be awarded a

21  fee that provided for a 2.5 multiplier "regardless of what

22  percentage that fee represents."

23       So, hard to square that here.  We're well below 2.5.

24  We simply submit that this objection --

25        THE COURT:  Maybe he thought you did a better job

33

1   in that case.

2           MR. LOESER:  Well, if he did, your Honor, he had a

3   very strange way of describing that, because it was hard to

4   find a compliment in that brief -- brief either.  But --

5   but, nonetheless, the objection, we believe, should be

6   overruled.

7           MS. WEAVER:  Hi, your Honor.  I'll address the

8   Harris Cino objections.  One further point on the VPPA

9   claim, the objection and the total amount of VPPA claim

10  assumes that there could be one coherent VPPA claim across

11  the class period for every single class member.  And I think

12  your Honor's completely right.  We went -- had we proceeded

13  to trial, we were going to conform to proof, and we would

14  have probably had smaller VPPA claims reflecting what one

15  app did for a group of people which also, frankly, would

16  have been difficult to do and manage in a trial.  So, just

17  that point.

18      On the Harris Cino objection regarding whether or not

19  how popular someone is should determine how much they

20  receive in the settlement here, we don't think that's fair,

21  and we don't think friends are a good metric in this case

22  for a couple of reasons.  The first one is just that we

23  didn't have the data.  The -- the Objectors here suggest

24  that the number of friends everybody has today is the same

25  that they might have had throughout the class period.  I

1  don't think that's true in real life, and it wasn't true on

2  Facebook.

3          THE COURT:  Clearly not true for me.  I mean, the

4  longer I'm a judge, the more friends I seem to have.

5          MS. WEAVER:  Good for you.  The second issue --

6          THE COURT:  Don't understand why.

7          MS. WEAVER:  The second issue is that friends also

8  are not a good metric for sharing because it's the activity

9  of the friend that would determine whether the sharing

10 alleged here caused the harm we're looking at and also the

11 particular app, because there were apps which were white

12 listed and ones which were not.

13     So, if you were really going to rely on friends, you'd

14 have to look at how active they were and what apps they

15 downloaded, also data that Facebook simply doesn't have.

16 And when looking, as you know, at a class that's unwieldy,

17 the one metric that -- that Facebook did and repeatedly

18 confirmed to us is that the length of the time on the

19 platform correlates to how much sharing actually occurred.

20 We think that's much more simple.  This is not perfect, as

21 you've noted, but it's rational.  It's coherent.  It's

22 objective.  It's based on evidence.

23     So, we -- we appreciate the facial attractiveness of

24 the idea that the number of friends might have affected

25 sharing, but we don't think it's actually as good as what we

35

1  proposed, and we certainly don't think that offsets a

2  finding that what we are proposing is workable and certainly

3  fair.

4       We don't need to address the Klein objection.  I

5  believe the next one is the All of Us or None regarding the

6  -- the release, your Honor.

7       So, the objection is correct that the settlement

8  agreement in paragraph 46 uses the term "Facebook Users."

9  And the ambiguity that's created here is how Facebook has

10  designed the platform, and only an individual can sign up

11  for a Facebook account.  So, even for an organization, only

12  an individual has an email.  There's no organizational

13  email.  It has to be a natural person.

14       And, so, there's a little bit of ambiguity in the sense

15  that a business can have an agent sign up, which, by the

16  way, I believe we just confirmed with the administrator this

17  morning that is what All of Us or None did.  There is an

18  individual associated who signed up for and submitted a

19  claim in the case, but there is no way that my law firm

20  could submit a claim, and -- and that also came up with

21  regard to the -- the ClaimClam issue as well.  The reason

22  that we had to originally reject the claim submitted by

23  ClaimClam is because an organization cannot submit a claim.

24  It has to be an original individual person.  They corrected

25  that, and that also guarantees, by the way, something we

36

1  were concerned about, which is that individuals receive the

2  moneys, not businesses.

3          THE COURT:  Okay.

4          MS. WEAVER:  That's the answer to that.

5      With respect to Mr. Gallardo, I -- his objection

6  resonates with us as well.  We do think a lot of people were

7  harmed.  I think the difference and perhaps a misperception

8  here that I would like to explain both to Mr. Gallardo and

9  our class, if this is -- has been misunderstood -- the eight

10 class representatives for whom we are seeking service awards

11 are not receiving more money for their claims.  They -- we

12 are asking them to be compensated for the tremendous amount

13 of time and effort they put into this case.  The actual

14 average amount of time they spent was 256 hours.  All of

15 them spent more than 100 hours.  The kinds of things that

16 they had to do or expose themselves to even more inquiry

17 into their personal lives in deposition.  They had to

18 respond to interrogatories identifying each friend they ever

19 met in person.  For some of them it was deeply personal and

20 deeply emotional.  We think that $15,000 is fair.  That is

21 not compensation, and that is not any different than what

22 Mr. Gallardo will receive for his claim.  This is to

23 compensate them for the work, and I would like to say it's

24 not an incentive award.  All of these people had powerful

25 incentive to step forward.  They were very committed to the

37

1  case.  It is a service award, and we do think it's

2  warranted.

3      Yeah.  So, the scope of released parties for Harris

4  Cino point out that I missed one of the objections raised.

5  There were two issues that they raised.  One is the idea

6  that somehow third parties could be swept into the release.

7      I think Facebook in its own case has taken the position

8  that third parties were responsible.  In fact, they invoked

9  an exculpatory defense, and so that clearly -- we are not

10 releasing any third parties.

11     With regard to the subsidiaries like Instagram, you

12 have to look at that in combination with the identical

13 factual predicate language in the release.  Threads, for

14 example, did not exist at the time the conduct occurred that

15 is alleged in the complaint.  Instagram did not engage in

16 the conduct because we are saying Facebook engaged in the

17 conduct.

18     Instagram did not own the APIs and enter into the

19 contracts and share the data with the third parties at

20 issue.  So, there's really no conceivable way that the

21 release could be interpreted in a way that would allow

22 claims against Instagram or Threads for the conduct that we

23 allege because they didn't engage in it.

24          MR. LOESER:  Your Honor, I'm a little reluctant to

25 give it up or to -- to talk about it, but ClaimClam, there's

1  still an issue that we just want to make the Court aware of

2  and kind of think out loud for how to deal with it.

3      They have withdrawn their objection as counsel for

4  ClaimClam noted.  What that means is that we can process

5  those claims, and now we can pay the money directly to the

6  class members.

7      But under the contract that ClaimClam entered with

8  these people, it is taking 15 percent of their recovery.

9  They were going to be able to do that when the money was

10 going through ClaimClam, which we refused to allow.  We are

11 concerned that these folks have contracts with ClaimClam,

12 and ClaimClam may still try to get from these folks 15

13 percent of the recovery.

14     The reason why we're concerned about that is we don't

15 think ClaimClam in this case provided any benefit.  You

16 know, really people were sort of diverted to ClaimClam's

17 portal, gave ClaimClam the same information that they would

18 have just been able to enter into the court-approved portal,

19 and -- and for the privilege of giving the information to

20 someone else instead of the actual approved portal, these

21 people now may be charged 15 percent.

22     It's a matter that -- it's kind of an interesting

23 issue.  It's separate from the settlement approval.  It's --

24 it has nothing to do with the plan of allocation anymore or

25 the fairness of the settlement.  It's just we feel obligated

39

1   as fiduciaries for the class to just bring that to the

2   Court's attention.  It could perhaps be dealt with in a

3   separate order, but it just seems inappropriate to us to

4   make people pay for a service that didn't actually provide

5   any value.

6        THE COURT:  Well, and I -- I -- I imagine, you

7   know, one answer to that could be, Well, that's a -- it's a

8   separate case and if somebody wants to, you know, bring a

9   lawsuit against them for fraud or whatever, they can -- they

10  can do that.  And I guess that -- I think that's probably

11  none of our business.

12       The other thing you seem like you might be alluding to

13  -- and I'm not sure if you are -- is some sort of separate

14  notice to those -- those individuals from class counsel,

15  sort of expressing your view about -- about that.

16       Is that in -- sort of in furtherance of the -- the duty

17  that you have to the class members?

18       MR. LOESER:  Yeah.  I guess I haven't really

19  thought about it that way because, frankly, in the course of

20  interacting with ClaimClam, we've had extensive

21  communications in which we've asked them to provide

22  information to class members expressly noting that they

23  could submit their claim via the official portal.  I don't

24  know if ClaimClam ever did that, but we have now processed

25  those claims.  So, these people will be -- will be getting

40

1   this money.  And, so --

2          THE COURT:  Right.  But I'm -- but I'm -- I

3   thought maybe you were alluding to, you know, in addition to

4   them getting the money, getting a notice, getting some sort

5   of supplemental notice from class counsel.

6          MR. LOESER:  Yeah, and --

7          THE COURT:  You -- you -- ClaimClam is not their

8   lawyers, right?

9          MR. LOESER:  Right.

10         THE COURT:  You're their lawyers.  You're the

11  lawyers for these class members, right?

12         MR. LOESER:  Right.  Right.

13         THE COURT:  I mean, I'm just sort of thinking out

14  loud here.

15         MR. LOESER:  Yeah. I mean, I guess the reason why

16  I'm resisting that a bit is that we -- I don't know that

17  giving them that notice will solve their problem.  Like,

18  they already have a contract with ClaimClam.  It already

19  subjects them to potentially having to pay 15 percent.

20      Now, when we talked to ClaimClam's lawyer about this

21  and raised this concern, one of the things we suggested to

22  him was tell us are you still -- is your client still

23  intending to collect this money from these people.  And --

24  and I think that -- it was unclear to us, but it sounds like

25  perhaps they're not.  If they're not and counsel could

1 simply make that statement clear on the record, we can stop

2 worrying about this issue at all.  It's certainly -- I'm

3 sure it would be difficult to get this money from people

4 once it already goes to these folks.  It's hard to imagine

5 that ClaimClam will be filing a lawsuit over, you know, $50,

6 $60 for these people.  But, you know, really I'm -- it's

7 coming up for a couple of reasons.  One, a concern for these

8 people; two, ClaimClam is now doing something similar in a

9 lot of cases in the Northern District.  So, I'm sure if you

10 walk down the hall, you'd hear from other judges that

11 they're kind of dealing with the same thing.

12       So, and perhaps if we -- if we can unmute ClaimClam's

13 lawyer for a minute and let him say something, if he can

14 simply confirm that ClaimClam isn't going to try and take

15 those 15 percent in these circumstances, I think problem

16 solved.  And if it -- if that's not going to happen, then

17 perhaps it's just something that we put a pin in it and try

18 and deal with it separately when and if ClaimClam tries to

19 collect from these folks.  But it is just something that

20 concerned us.

21           MR. BORDEN:  Well, thank you.  We -- we dispute

22 the underlying premise that ClaimClam has not provided a

23 service.  It provides two services in cases like these.  The

24 first is that it is able to, using AI, identify additional

25 class members beyond those which, you know, did respond to

42

1  the notice.  I think they said that there was a 93 or so
2  percent coverage rate for the notice that went out.  And,
3  you know, seven percent of a $250 million -- I mean 250
4  million person class is, you know, between -- you know, it's
5  about 15 million, 16 million people.  So, they are able to
6  identify class members who otherwise would be waiving their
7  claims and they wouldn't receive anything.  So, that's the
8  first service they have.
9       The second service they have is that they have a stable
10  of customers who've signed up for their services who are
11  able to, you know, make claims in many different class
12  cases.  So, I mean, you know, like my daughter, who has all
13  kinds of social media, she -- she might be a member of
14  several different settlement classes.  She gives them the --
15  the information one time, and then they're able to make
16  claims for her.
17       The second thing that they -- or another thing that
18  they provide in terms of value is they -- they help submit
19  their claims, and there were several instances in this case,
20  I would say, according to my client, it looks like about
21  1500 people who were going to submit claims who, you know,
22  either had some kind of error on their form or they actually
23  weren't eligible because they were outside the country.
24  They weighted those forms out, and they fixed the forms for
25  the people who were trying to submit.

43

1       So, I don't think -- I -- I dispute the premise that

2  they add nothing to a class like this, even where the class

3  members are known.  This is a giant and heterogenous class,

4  and many people are not -- you know, they -- I mean, people

5  were sending their claims forms directly into the court,

6  your Honor.  And that doesn't mean that the notice was

7  defective.  It just means that there's a lot of people in

8  this class, and, you know, they have difficulty, some

9  people, in making claims.  And, so, if they want to hire a

10 service like ClaimClam to do it, they should be allowed to

11 do so.

12      So, that's our position, and that was what I wanted to

13 -- to make clear on the record before, but we -- you know,

14 this is a service that I think will benefit a lot of

15 classes.  They're not trying to foment any kind of

16 objections.  In many cases --

17          THE COURT:  Do you want to answer the question

18 that Mr. Loeser posed?

19          MR. BORDEN:  Sure.  You know, the -- the answer to

20 the question is -- he asked me this question yesterday when

21 we talked, and I have not had the opportunity to contact my

22 client.  I tried.  He's in Europe.

23      But, practically, I don't think that they would have

24 any way.  Like, once the money gets paid out, I don't think

25 they're going to be trying to claim back against class

44

1  members.  They -- they did this because -- and they

2  submitted the claims with the names and the contact

3  information so they could be directly compensated because

4  they care about their clients and want them to receive their

5  money no matter what.

6      So, I -- I feel like we should be on the sort of same

7  side as the -- of the V as Mr. Loeser and Ms. Weaver.  And

8  -- and I think there's very little likelihood that they're

9  going to -- they're not going to go after people for -- you

10 know, if it's a $30 claim and the fee is 15 percent, that's

11 like -- that's a non-viable option.

12          MR. LOESER:  So, just very briefly, your Honor --

13 I'm sorry.  Were you going to say something?

14          THE COURT:  No.  Go ahead.

15          MR. LOESER:  I -- I don't want to take up more of

16 the Court's time on this than -- than is necessary, but it

17 is something that as -- as practitioners in this -- in this

18 area, it does concern us because if you think about how much

19 time and effort goes into crafting the notice and coming up

20 with the claims process, to have third parties introduce

21 themselves into the process, it would be one thing if what

22 they're saying to their clients is that you can go to this

23 court-approved notice and court-approved portal and submit

24 this very same information and you won't be charged anything

25 or you can choose to do it with us, and we'll charge you 15

45

1  percent, that would put us in a different place, and I just

2  -- it just concerns me that given all the time that goes

3  into crafting the communications with class members that you

4  have a for-profit enterprise that's steering people out of

5  the normal process.  So, that -- that's our concern, and --

6              MS. WEAVER:  And just --

7              THE COURT:  Okay.  Well, I mean, if -- oh, I'm

8  sorry, Ms. Weaver.  Go ahead.

9              MS. WEAVER:  I'm sorry.  We're paying a claims

10  administrator.  You know, we submitted -- we went through an

11  RFP process, et cetera.  It may be that ClaimClam really is

12  adding value and reaching out to people using AI.  I don't

13  think there was a need in this case.  Twenty-nine -- roughly

14  29 million people or 27 million people figured out how to

15  file a claim.  But why should the class pay for it twice?

16              THE COURT:  Yeah.  And I think the -- all I can

17  say at this point is if the motion needs to be filed

18  relating to this, then file a motion relating to this, but

19  I'm not sure there's anything more that I can say about it

20  at this stage.

21              MR. LOESER:  Understood, your Honor.

22              THE COURT:  Okay.

23              MR. LOESER:  There's one other -- there was a

24  late-filed untimely objection.  Under the procedure in

25  place, those objections generally don't need to be

46

1  considered, but of the untimely ones, this one raised an

2  issue that we just put before the Court and we did just want

3  to very briefly address because it's --

4          THE COURT:  Okay.

5          MR. LOESER:  -- it's an important issue, and that

6  was the objection from Michelle Leonard, Docket Number 1171.

7      This was an Objector on -- by a person who's not sight

8  impaired, raising concerns about whether the communications

9  enabled sight-impaired people to obtain notice.  That --

10  that is something that we were careful on -- Anjion was

11  careful and has now confirmed that the -- the website

12  created was ADA compliant, did utilize tools and mechanisms

13  to assist sight impaired people, among others.  And, so, we

14  don't believe that's a -- a valid objection but just wanted

15  to make sure the Court knew that -- that it's -- the issues

16  have been dealt with by the administrator in the setup of --

17  of the website.

18      So, that was the only one that raised -- of the

19  untimely objections, that was the one that raised an issue

20  that wasn't covered by prior objections, and we just wanted

21  to let the Court know that.

22          THE COURT:  You want to file maybe a supplemental

23  declaration from the claims administrator responding to

24  that, just given the nature of the objection?  I haven't

25  seen that objection.  I think perhaps because it was filed

47

1  late, I've not seen it, but given the nature of it, I think

2  it might be prudent for you to file a supplemental

3  declaration addressing it.

4         MR. LOESER:  We will do that, your Honor.  We also

5  need to file an amended final order that takes into account

6  the full scope of objections, addresses them, updates the

7  prior order that was, frankly, prepared a long time ago and

8  needs updates.  So, with the Court's permission, we -- if we

9  could do that at a week, at most a week out, and then I

10 think everything would be ready for decision after that.

11        THE COURT:  Okay.

12        MS. WEAVER:  If we're in the line of housekeeping,

13 your Honor, and I --

14        THE COURT:  Yeah.

15        MS. WEAVER:  -- I don't know if you are.

16        THE COURT:  That sounds fine.  So, let me just be

17 clear.  A revised proposed order will be due seven days from

18 today.  And in -- at the same time, you can -- you can file

19 a declaration addressing this objection, this ADA objection

20 that you've just mentioned.  No need to address anything

21 additional to that.

22     Sorry, Ms. Weaver.  Go ahead.  Actually, could I ask

23 one just very much housekeeping question just before I

24 forget?  So, the -- you -- you've indicated in the

25 settlement agreement -- but I just want to make sure we're

48

1  all on the same page -- that the entire action is dismissed

2  with prejudice upon approval of the settlement, and you may

3  remember five years ago or something you divided it up into

4  prioritized claims and non-prioritized claims, prioritized

5  defendants, non-prioritized defendants, and then there were

6  some prioritized claims that I dismissed.  I think it -- I

7  think it was with leave to amend, right.  But it's another

8  point, actually, about the pre-2009, right, is that the

9  claims were dismissed with leave to amend.  But I think what

10 I did is I moved them to the deprioritized claims so as not

11 to get us bogged down in the pleadings, right.  And, so, the

12 -- even those claims haven't been sort of dismissed with

13 prejudice yet, if I recall correctly.

14       But, in any event, I just wanted to make sure that

15 we're talking about all that stuff, prioritized and de-

16 prioritized, the entire action is dismissed with prejudice

17 upon approval of the -- of the settlement, right?

18            MS. WEAVER:  Absolutely, your Honor.  We had

19 noticed that as well.  You have accurately described what we

20 anticipate the entire -- full on judgment in the entire

21 case, and those claims will be released.

22            THE COURT:  Got it.  Okay.

23            MS. WEAVER:  There is one other housekeeping

24 issue, which is opt outs.  In describing to you, I didn't

25 know where we were falling, and if we're winding up here, we

49

1  do need to report to you the number of opt-outs.  Roughly to

2  date, .008 percent of the class has opted out.  The de-

3  duplicated number is roughly 20,231 opt outs.  Roughly 4,000

4  -- 4,083 of that 20,000 also submitted claims, and in that

5  situation, we are reaching out to those 4,000 to determine

6  whether or not they wish to opt out or file a claim.

7       We have been working actively with Anjion.  Obviously,

8  our claims administrator has been processing millions and

9  millions of claims.  They've told us that they will give us

10 a final determination of opt outs which your Honor would

11 want for a final order.  They said no later than October

12 3rd.  We hope that it's sooner, and we will provide it to

13 the Court.

14      So, when we were proposing a set of proposed revised

15 orders, you were saying by next Thursday.  There is one

16 little asterisk on this issue.  We need to provide you with

17 the cleansed number of opt outs once we get that from the

18 claims administrator.

19           THE COURT:  Does it make sense to hold off on the

20 revised proposed order until you get that number?

21           MS. WEAVER:  It probably does, your Honor.  That

22 would be easier for you or we could do a subsequent filing

23 with just that.

24           THE COURT:  That's fine.  Just -- just do it all

25 at the --

50

1          MS. WEAVER:  Okay.

2          THE COURT:  Do it all at the same time.  I know

3  you have plenty of incentive to get this in at the earliest

4  possible date.  So --

5          MS. WEAVER:  We do, and any incentive the Court

6  can provide us is also welcome.  So --

7          THE COURT:  And can you also go back and look at

8  your proposed order and make sure that it fully compiles

9  with my -- I -- relatively recently, that is, like within

10  the last year, I think I've made some tweaks to the stuff in

11  my standing order on post-distribution accounting.  And, so,

12  if you could just go back and take one more look at that and

13  make sure everything is -- in your proposed order that

14  you're submitting is fully compliant with that.

15          MS. WEAVER:  We will do that.  We have that right

16  here, your Honor.  We were looking at it in preparing for

17  the hearing.  So, that was another reason we were proposing

18  submitting additional orders.  Okay.  We will do that.

19          THE COURT:  Okay.  Very good.  Thank a lot.

20          MR. LOESER:  Thank you, your Honor.

21          THE COURT:  Thank you to all the Objectors.  I

22  appreciate your input, and we'll -- we'll issue a ruling as

23  soon as we -- shortly after receiving the remaining

24  materials from the Plaintiffs.

25          MR. LOESER:  And, your Honor, before we sign off,

51

1  I did want to thank the Court, court staff.  This has been

2  an adventure.  We appreciate the Court's hard work, and we

3  have these folks assembled here who have been working on

4  this case now for over five years, and I know Ms. Weaver and

5  I are most appreciative of the hard work that a lot of

6  people put into this case.  So, thank you to the Court.

7  Thank you to our teams, and we're happy to have reached this

8  milestone in this case.

9              THE COURT:  Thank you.

10             ALL:  Thank you, your Honor.

11        (Proceedings adjourned at 1:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

52

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16            Echo Reporting, Inc., Transcriber

17              Saturday, September 9, 2022

18

19

20

21

22

23

24

25